Dan Stormer, Esq. [S.B. #101967]
Brian Olney, Esq. [SB # 298089]
David Washington, Esq. [SB #305996]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Emails: dstormer@hadsellstormer.com
         bolney@hadsellstormer.com
         dwashington@hadsellstormer.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF MICHAEL LEE, deceased, by and through ALICIA JOSLIN as Administrator; MARY PAMELA SANDY, <br><br> Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; RALPH DIAZ; SCOTT KERNAN; DIANA TOCHE; CONNIE GIPSON; KATHLEEN ALLISON; KATHERINE TEBROCK; JARED LOZANO; LORI AUSTIN; KAMAL FREIHA; KAREN MCGEE; LAURA EDMONDS; MELISSA SHEFFIELD; DOUGLAS ANDERSON; AZAR NEWTON; JT WALKER; LATOSSIA KRASCHEL; DEMETRIUS NOCERINO; CHERYL MIMS; PRIYA RAMACHANDRAN; JANET GOREWITZ; ANNIE GUTIERREZ; SHARON PAGE-PRESSLEY; LAWRENCE HARRISON; KIRBY SURPRISE; RICK FLYNN; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL** <br><br> 1. Failure to Provide Mental Health Treatment in Violation of the 8th Amendment <br> 2. Failure to Protect from Harm in Violation of the 8th Amendment <br> 3. Deprivation of Familial Relationship in Violation of the 1st and 14th Amendments <br> 4. Discrimination in Violation of Title II of the Americans with Disabilities Act and the Unruh Civil Rights Act <br> 5. Discrimination in Violation of Section 504 of the Rehabilitation Act <br> 6. Negligent Supervision, Hiring, Training & Retention <br> 7. Wrongful Death <br> 8. Negligence <br> 9. Failure to Furnish/Summon Medical Care |

COMPLAINT FOR DAMAGES

# I.    INTRODUCTION

1.     On January 8, 2019, Michael Lee committed suicide at California Medical Facility (CMF) in Vacaville, California by hanging himself in his cell.

2.     Michael entered the custody of the California Department of Corrections and Rehabilitation (CDCR) on August 30, 2017, with a known history of mental illness and recent suicide attempts.  CDCR staff were aware of his mental health disabilities as well as his history of suicide attempts—including suicide attempts while in CDCR's custody.  While incarcerated, Michael was dependent upon CDCR officials and staff for mental health treatment.

3.     However, throughout the approximately 16 months of his incarceration at CDCR, Michael was denied constitutionally adequate mental health care.  Instead, Michael was transferred among 14 placements, responsibility for his mental health treatment was shuffled among at least 13 primary clinicians—none of whom were psychiatrists—and CDCR officials repeatedly recommended the same treatments they knew to be ineffective when these treatment were even implemented at all.  Throughout his incarceration at CDCR, Michael's mental health condition continued to deteriorate.  Following his final transfer to CMF on November 13, 2018, CDCR officials ignored clear indicia by Michael of elevated suicide risk including wearing ropes around his neck, not attending treatment groups, giving away all his possessions, running in place while naked for hours on end, becoming non-communicative and withdrawn, and breaking off all contact with his mother, with whom Defendants knew Michael had a close relationship.

4.     Despite actual notice and knowledge of Michael's serious mental illness and increased risk factors for suicide, CDCR officials violated CDCR policies and procedures and the standard of care regarding mental health care and suicide prevention.  They did not adequately assess his suicide risk, did not provide treatment planning to address his escalating mental health symptoms, and did not provide him constitutionally adequate mental health care.  Defendants' willful acts and omissions in failing to provide Michael necessary mental health treatment constituted deliberate indifference and directly resulted in his death.

5.     Defendants are CDCR clinicians responsible for Michael's care as well as CDCR supervisors and administrators who were responsible for ensuring adequate provision of mental health

care and protection from harm to prisoners in CDCR, including at CMF specifically. As a result of the Special Master reporting process and federal court orders, the supervisors and administrators have been on notice for years of the specific inadequacies in mental health treatment and suicide prevention that directly led to Michael's death.

## II.    JURISDICTION

6.    This Complaint seeks damages for the violations of the civil rights, privileges, and immunities guaranteed by the First, Eighth, and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, for violations of the Americans with Disabilities Act, Title II, 42 U.S.C. § 12191, *et seq.*, and the § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and for violations of California state law.

7.    This court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

8.    This court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1376, because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

## III.    VENUE

9.    Plaintiffs' claims arose in California in Solano County, San Joaquin County, and Kings County. Venue therefore lies in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(2).

## IV.    PARTIES

10.    Plaintiff ESTATE OF MICHAEL LEE alleges claims by and through the Administrator of the Estate, ALICIA JOSLIN. The Estate alleges claims for violations of Michael's civil rights under the Eighth Amendment and for violations of his rights under state and federal law.

11.    Plaintiff MARY PAMELA SANDY (hereafter "Pamela" or "Pamela Sandy") is Michael Lee's mother. She is suing individually for violations of her civil rights under the First and Fourteenth Amendments and violations of her rights under state law.

12.    Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR) is an agency of the State of California that is responsible for the operation of the California state prison and parole systems, including operation of California Medical Facility (CMF), where Michael Lee died.

13.     Defendant RALPH DIAZ was, from September 1, 2018 and continuing after Michael's death on January 8, 2019, the Acting Secretary for CDCR and is currently the Secretary for CDCR.  As Acting Secretary, Defendant Diaz was the highest-level official in CDCR and was responsible for administering and overseeing the operations of CDCR, including the management, safety and security of all CDCR prisons and the prisoners and staff therein, including CMF.  Defendant Diaz was responsible for supervision, training, discipline, and retention of agents and employees working within CDCR.  He was responsible for promulgation and implementation of policies and procedures in CDCR, including at CMF, and was responsible for the care, custody, and control of all prisoners housed in CMF.  Defendant Diaz was regularly provided with reports concerning the treatment of mentally ill prisoners, improper classification of prisoners in the prisons, prison suicides, and other violations involving the housing, care, mental health care, and treatment of prisoners at CMF.  Defendant Diaz is a named Defendant in the *Coleman* litigation in his official capacity and was regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court.  Defendant Diaz is sued in his individual capacity.  Specifically, Defendant Diaz's failure to ensure the enforcement of policies, rules or directives and/or failure to implement appropriate policies, rules or directives set in motion a series of acts by others which he knew, or reasonably should have known, would cause harm to Michael Lee.  Defendant Diaz's affirmative conduct includes his acquiescence in the violations alleged herein.

14.     Defendant SCOTT KERNAN was, from the date of Michael's transfer into CDCR custody on August 30, 2017, until August 31, 2018, the Secretary for CDCR.  As Secretary, Defendant Kernan was the highest-level official in CDCR and was responsible for administering and overseeing the operations of CDCR, including the management, safety and security of all CDCR prisons and the prisoners and staff therein, including CMF.  Defendant Kernan was responsible for supervision, training, discipline, and retention of agents and employees working within CDCR.  He was responsible for promulgation and implementation of policies and procedures in CDCR, including at CMF, and was responsible for the care, custody, and control of all prisoners housed in CMF.  Defendant Kernan was regularly provided with reports concerning the treatment of mentally ill prisoners, improper classification of prisoners in the prisons, prison suicides, and other violations involving the housing,

care, mental health care, and treatment of prisoners at CMF. Defendant Kernan was a named Defendant in the *Coleman* litigation in his official capacity and was regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court. Defendant Kernan is sued in his individual capacity, including with respect to the 2015 and January 2016 suicide audits. Specifically, Defendant Kernan's failure to ensure the enforcement of policies, rules or directives and/or failure to implement appropriate policies, rules or directives set in motion a series of acts by others which he knew, or reasonably should have known, would cause harm to Michael Lee. Defendant Kernan's affirmative conduct includes his acquiescence in the violations alleged herein. Defendant Kernan's authority and responsibility for ensuring adequate provision of mental health treatment in CDCR, and specifically at CMF, and correcting identified deficiencies is demonstrated through, among other things, his personal response to the audit of the audit of suicides at CDCR facilities from 2014 through 2016 and corresponding recommendations for change issued by the California State Auditor of suicides from 2014 through 2016. *See* Exhibit 1 at 75.

15. Defendant DIANA TOCHE was, at all times relevant herein, the Undersecretary of Health Care Services for CDCR. As Undersecretary, Defendant Toche was and is responsible for supervising the day-to-day administration of all Health Care Services for CDCR adult prison facilities, including CMF, and responsible for overseeing and implementing policies, procedures, and practices related to the provision of mental health care services at these facilities. Defendant Toche was regularly provided with reports concerning the treatment of mentally ill prisoners, improper classification of individuals in the prisons, prison suicides, and other violations involving the mental health care and treatment of prisoners at CMF. Defendant Toche is a named official capacity Defendant in the *Coleman* litigation and is regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court, including with respect to the 2015 and January 2016 suicide audits. Defendant Toche is sued in her individual capacity. Specifically, Toche knowingly failed to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which she knew or reasonably should have known would cause others to inflict a constitutional injury on Michael Lee. Defendant Toche's affirmative conduct includes the acquiescence in the violations alleged herein.

16.     Defendant CONNIE GIPSON was the Acting Director of the Division of Adult Institutions (DAI) for CDCR from September 1, 2018, through May 2019, when she was appointed Director.  As Acting Director of DAI, Defendant Gipson was responsible for supervising the day-to-day administration of the 33 CDCR adult prison facilities, including CMF, and responsible for overseeing and implementing policies, procedures, and practices related to the operations of these facilities. During the relevant time period, Defendant Gipson was regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court, including with respect to the 2015 and January 2016 suicide audits.  Defendant Gipson is sued in her individual capacity. Specifically, Defendant Gipson knowingly failed to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which she knew or reasonably should have known would cause others to inflict a constitutional injury on Michael Lee.  Defendant Gipson's affirmative conduct also includes the acquiescence in the violations alleged herein.

17.     Defendant KATHLEEN ALLISON was the Director of the Division of Adult Institutions (DAI) for CDCR from 2016 until around August 31, 2018.  As Director of DAI, Defendant Allison was responsible for supervising the day-to-day administration of the 33 CDCR adult prison facilities, including CMF, and responsible for overseeing and implementing policies, procedures, and practices related to the operations of these facilities.  During the relevant time period, Defendant Allison was regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court, including with respect to the 2015 and January 2016 suicide audits. Defendant Allison is sued in her individual capacity.  Specifically, Defendant Allison knowingly failed to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which she knew or reasonably should have known would cause others to inflict a constitutional injury on Michael Lee.  Defendant Allison's affirmative conduct also includes the acquiescence in the violations alleged herein.

18.     Defendant KATHERINE TEBROCK was, at all times relevant herein, the Deputy Director of the Statewide Mental Health Program for CDCR.  She was appointed to that position in or around November 2015 and remained in the position until after Mr. Lee's death.  In this role, Defendant Tebrock was responsible for overseeing provision of mental health care in CDCR,

promulgating and implementing policies and procedures, supervision of practices, and taking corrective action when necessary to ensure provision of constitutionally adequate care. Prior to her appointment to her current position, Defendant Tebrock was Chief Deputy General Counsel for CDCR, where her responsibilities included the management and oversight of the health care legal team, including the *Coleman* litigation. Prior to that, Defendant Tebrock was Chief of the CDCR court compliance legal team, where her responsibilities including active participation in and monitoring of the *Coleman* litigation. Defendant Tebrock was aware of the *Coleman* Special Master reports, the orders of the *Coleman* Court, and the 2013 findings of the *Coleman* Court that CDCR continues to fail to provide constitutionally adequate mental health treatment to prisoners. Defendant Tebrock was regularly provided with reports concerning the treatment of mentally ill prisoners, improper classification of individuals in the prisons, prison suicides, and other violations involving the mental health care and treatment of prisoners at CMF. Defendant Tebrock was a named Defendant in her official capacity in the *Coleman* litigation and was regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court, including with respect to the January 2015 and January 2016 suicide audits. Defendant Tebrock knowingly failed to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which she knew or reasonably should have known would cause others to inflict a constitutional injury on Michael Lee. Defendant Tebrock's affirmative conduct includes acquiescence in the violations alleged herein. Defendant Tebrock is sued in her individual capacity. Defendant Tebrock's authority and responsibility for ensuring adequate provision of mental health treatment in CDCR and correcting identified deficiencies is demonstrated through, among other things, the audit of suicides at CMF in 2014 and corresponding recommendations for change issued by the California State Auditor of suicides in 2014 through 2016, which repeatedly cites discussions with the Deputy Director for CDCR's Statewide Mental Health Program and her involvement in oversight of suicide prevention policies, procedures, and practices. *See*, *e.g.*, Exhibit 1 at 55 & 60.

19. Defendant JARED LOZANO was the Acting Warden of CMF from 2018 until October 2019, when he was appointed Warden of CMF. As Acting Warden of CMF, Defendant Lozano was legally responsible for oversight of operations at CMF, implementation of CDCR policy and

procedures, staff training, safety and security of prisoners housed at CMF, and the supervisor of all other individual Defendants employed at CMF.  Defendant Lozano was regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court relating to CMF, including with respect to the January 2015 suicide audit.  Defendant Lozano is sued in his individual capacity.  Defendant Lozano's affirmative conduct includes his knowing failure to ensure the enforcement of policies, rules or directives and/or failure to implement appropriate policies, rules or directives that set in motion a series of acts by others which he knew, or reasonably should have known, would cause others to inflict a constitutional injury on Michael Lee.  Defendant Lozano's affirmative conduct includes his acquiescence in the violations alleged herein.

20.     Defendant LORI AUSTIN is and was, since September 2017, employed as the Health Care Chief Executive Officer ("CEO") for CMF.  In this role, Defendant Austin was the hiring authority for all health care staff at CMF, including medical, dental, and mental health care, and was responsible for the hiring, promotion, training, and supervision of health care staff at CMF.  Defendant Austin is sued in her individual capacity.  Defendant Austin was regularly provided with reports concerning the treatment of mentally ill prisoners, improper classification of individuals in the prisons, prison suicides, and other violations involving the mental health care and treatment of prisoners at CMF.  Defendant Austin is regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court relating to CMF, including with respect to the 2015 suicide audit.  Defendant Austin's affirmative conduct involves her knowing failure to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others which she knew or reasonably should have known would cause others to inflict a constitutional injury on Michael Lee.  Defendant Austin's affirmative conduct includes acquiescence in the violations alleged herein.

21.     Defendant DOE 1 is and was, at all times relevant herein, employed as the Health Care Chief Executive Officer for CHCF.  In this role, Defendant DOE 1 was the hiring authority for all health care staff at CMF, including medical, dental, and mental health care, and was responsible for the hiring, promotion, training, and supervision of health care staff at CMF.  Defendant DOE 1 is sued in their individual capacity.  Defendant DOE 1 was regularly provided with reports concerning the treatment of mentally ill prisoners, improper classification of individuals in the prisons, prison suicides,

and other violations involving the mental health care and treatment of prisoners at CMF. Defendant DOE 1 was regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court relating to CMF, including with respect to the 2015 suicide audit. Defendant DOE 1's affirmative conduct involves here knowing failure to ensure enforcement of policies, rules, or directives that set in motion a series of acts by others which she knew or reasonably should have known would cause others to inflict a constitutional injury on Michael Lee. Defendant DOE 1's affirmative conduct includes acquiescence in the violations alleged herein.

22.     Defendant KAMAL FREIHA was employed as a psychologist at Deuel Vocational Institution ("DVI") while Michael was in custody at DVI. Defendant Freiha conducted Michael's intake assessment. Defendant Freiha failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Freiha is sued in his individual capacity.

23.     Defendant KAREN MCGEE was employed as a Social Worker at San Quentin while Michael was in custody at San Quentin. Defendant McGee was one of at least thirteen individuals who served as Michael's primary clinician. Defendant McGee failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant McGee is sued in her individual capacity.

24.     Defendant LAURA EDMONDS was employed as a Licensed Clinical Social Worker at CSP Corcoran while Michael was in custody at CSP Corcoran. Defendant Edmonds was one of at least thirteen individuals who served as Michael's primary clinician. Defendant Edmonds failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Edmonds is sued in her individual capacity.

25.     Defendant MELISSA SHEFFIELD was employed as a psychologist at CSP Corcoran while Michael was in custody at CSP Corcoran. Defendant Sheffield was one of at least thirteen individuals who served as Michael's primary clinician. Defendant Sheffield failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Sheffield is sued in her individual capacity.

26.     Defendant DOUGLAS ANDERSON was employed as a psychologist at CSP Corcoran while Michael was in custody at CSP Corcoran.  Defendant Anderson was one of at least thirteen individuals who served as Michael's primary clinician.  Defendant Anderson failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure.  Defendant Anderson is sued in his individual capacity.

27.     Defendant AZAR NEWTON was employed as a psychologist at CSP Corcoran while Michael was in custody at CSP Corcoran.  Defendant Newton was one of at least thirteen individuals who served as Michael's primary clinician.  Defendant Newton failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure.  Defendant Newton is sued in his individual capacity.

28.     Defendant JT WALKER was employed as a Social Worker at CSP Corcoran while Michael was in custody at CSP Corcoran.  Defendant Walker was one of at least thirteen individuals who served as Michael's primary clinicians.  Defendant Walker failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure.  Defendant Walker is sued in his individual capacity.

29.     Defendant LATOSSIA KRASCHEL was employed as a Social Worker at CSP Corcoran while Michael was in custody at CSP Corcoran.  Defendant Kraschel was one of at least thirteen individuals who served as Michael's primary clinician.  Defendant Kraschel failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure.  Defendant Kraschel is sued in her individual capacity.

30.     Defendant DEMETRIUS NOCERINO was employed as a psychologist at CHCF while Michael was in custody at CHCF.  Defendant Nocerino was one of at least thirteen individuals who served as Michael's primary clinician.  Defendant Nocerino failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure.  Defendant Nocerino is sued in his individual capacity.

31.     Defendant CHERYL MIMS was employed as a Post-Doc Intern at CHCF while Michael was in custody at CHCF.  Defendant Mims was one of at least thirteen individuals who served as Michael's primary clinician.  Defendant Mims failed to adequately assess Michael's mental health

needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Mims is sued in her individual capacity.

32. Defendant PRIYA RAMACHANDRAN was employed as a Social Worker at CHCF while Michael was in custody at CHCF. Defendant Ramachandran was one of at least thirteen individuals who served as Michael's primary clinician. Defendant Ramachandran failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Ramachandran is sued in her individual capacity.

33. Defendant JANET GOREWITZ was employed as a Psychologist at CHCF while Michael was in custody at CHCF. Defendant Gorewitz was one of at least thirteen individuals who served as Michael's primary clinician. Defendant Gorewitz failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Gorewitz is sued in her individual capacity.

34. Defendant ANNIE GUTIERREZ was employed as a psychologist at MCSP while Michael was in custody at MCSP. Defendant Gutierrez was one of at least thirteen individuals who served as Michael's primary clinician. Defendant Gutierrez failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Gutierrez is sued in her individual capacity.

35. Defendant SHARON PAGE-PRESSLEY was employed as a psychologist at CMF while Michael was in custody at CMF. Defendant Page-Pressley was one Michael's mental health evaluators during his incarceration at CMF. Defendant Page-Pressley failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Page-Pressley is sued in her individual capacity.

36. Defendant LAWRENCE HARRISON was employed as a psychiatrist at CMF while Michael was in custody at CMF. Defendant Harrison was one Michael's mental health evaluators during his incarceration at CMF. Defendant Harrison failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Harrison is sued in his individual capacity.

37.     Defendant KIRBY SURPRISE was employed as a psychologist at CMF while Michael was in custody at CMF. Defendant Surprise was one Michael's mental health evaluators during his incarceration at CMF. Defendant Surprise failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Surprise is sued in his individual capacity.

38.     Defendant RICK FLYNN was employed as a Licensed Clinical Social Worker at CMF while Michael was in custody at CMF. Defendant Flynn was one of at least thirteen individuals who served as Michael's primary clinician during his incarceration at CMF. Defendant Flynn failed to adequately assess Michael's mental health needs and suicide risk and provide him necessary mental health treatment, in violation of CDCR policy and procedure. Defendant Flynn is sued in his individual capacity.

39.     Defendant DOE 2 is an employee of CDCR and the Chief of Mental Health at CMF during the time period relevant to the events, actions, and omissions described herein. Defendant DOE 2 was responsible for chairing the Suicide Prevention and Response Focused Implementation Team at CMF. Through chairing of this team and supervision of provision of mental health care at CMF, Defendant DOE 1 was responsible for reviewing and implementing CDCR policies and procedures related to suicide prevention at CMF, and responsible for ensuring that appropriate corrective actions were taken to address deficiencies in suicide prevention identified by the *Coleman* Special Master and CDCR's internal review process. On information and belief, Defendant DOE 2 failed to ensure that the Suicide Prevention and Response Focused Implementation Team fulfilled its obligations. On information and belief, Defendant DOE 1 also failed to supervise mental health staff at CMF and implement appropriate procedures and training to ensure adequate completion of treatment planning and suicide risk evaluations for patients with serious mental health needs and risk of suicide.

40.     Defendants DOEs 3 through 10 are additional employees of CDCR, including but not limited to correctional officers within CMF, civilian staff, and medical and mental health professionals who were responsible for implementation of CDCR policy and procedures and the safety and security of prisoners including Michael Lee. Plaintiffs allege that each of the Defendants named as a "DOE" was in some manner responsible for the acts and omissions alleged herein. Plaintiffs further allege that

each of Defendants Does 3 through 10 was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of medical, mental health, and jail custody employees and/or agents involved in the conduct alleged herein. At the present time, the identities of DOES 3-10 are unknown and not discoverable to Plaintiffs without access to documents within the sole custody and control of Defendants. Plaintiffs will ask leave of this Court to amend this Complaint for Damages to allege such names and responsibility when that information is ascertained. DOES 3-10 are sued in their individual capacity.

41. At all times relevant herein, Defendants engaged in the acts or omissions alleged herein under color of state law.

## V. EXHAUSTION OF PRE-LAWSUIT PROCEDURES FOR STATE LAW CLAIMS

42. Plaintiff Pamela Sandy timely filed a governmental tort claim with Defendant State of California on July 8, 2019. The Estate of Michael Lee timely filed a tort claim on July 9, 2019, six months after Plaintiffs learned of Michael's death. By correspondence dated December 9, 2019, the State of California rejected these governmental tort claims.[1]

## VI. FACTUAL ALLEGATIONS

**A. Prior to Michael's Death, Defendant CDCR Officials Were Under Federal Court Orders to Remediate Known Deficiencies in Mental Health Treatment**

*1. Coleman Court Findings of Constitutionally Inadequate Mental Health Treatment*

43. In 1990, a group of prisoners with serious mental illness filed a federal class action in the Eastern District of California alleging that inadequate provision of mental health treatment in CDCR violated their rights under the Eighth Amendment to the U.S. Constitution. *Coleman v. Wilson*, E.D. Cal. Case No. S-90-cv-00520 LKK JFM; *see also* Exhibit 1 at 10-11.

44. In 1995, the *Coleman* Court ruled that the State of California, through CDCR, was violating the Eighth Amendment of the U.S. Constitution by failing to provide adequate mental health treatment to prisoners with serious mental illness. *See Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal.

---

[1] The State of California did not assert that any of Plaintiffs' tort claims were untimely.

1995).[2] The *Coleman* Court identified numerous ways in which CDCR failed to provide

constitutionally adequate mental health care, including (1) inadequate screenings for mental illness at

the time of reception and during incarceration; (2) serious and chronic understaffing in the area of

mental health care; (3) no effective method for insuring the competence of mental health staff or

ensuring that inmates have access to competent mental health care; (4) delays in access to care; (5)

"extremely deficient" maintenance of medical records, including (a) incomplete or nonexistent

treatment plans and (b) the failure to take reasonable steps to obtain information necessary to the

provision of adequate medical care, including the failure to obtain medical records from county jails for

inmates on their initial admission to a Department of Correction institution and the failure to transfer

records when inmates move from one Department of Correction institution to another; (6) inadequately

trained staff; and (7) deficiencies in medication management and inadequate involuntary medication

procedures, including the lack of protocols for the use of involuntary medication and the

underutilization of involuntary medication, resulting in harm to inmates who are decompensating as a

result of mental illness. *See id.* at 1296-97, 1305-15; *see also Coleman v. Wilson*, No. CIV S-90-0520

LKK JFM P, 1994 U.S. Dist. LEXIS 20786 (E.D. Cal. 1994). The *Coleman* Court ordered CDCR to

correct these deficiencies and provide adequate mental health care for prisoners with serious mental

illness.

45. In December 1995, the *Coleman* Court appointed a Special Master to monitor the

implementation of required policies and procedures for provision of constitutionally adequate mental

health care. *Coleman v. Brown*, 938 F. Supp. 2d 955, 959 (E.D. Cal. 2013). The Special Master is

ordered to file regular reports that are provided to the Court and the parties to the *Coleman* case,

including CDCR officials, reflecting the findings and recommendations of the Special Master, and his

team of subject matter experts. "The adequacy of suicide prevention" was one of the many areas of

---

[2] The class certified in 1991 consisted of "all inmates with serious mental disorders who are now or who will in the future be confined within the California Department of Corrections (except the San Quentin State Prison, the Northern Reception Center at Vacaville and the California Medical Facility-Main at Vacaville." *Id.* at 1293. The class definition was subsequently amended in July 1999 to include "all inmates with serious mental disorders who are now, or who will in the future, be confined within the California Department of Corrections." *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 898 n.11 (E.D. Cal. 2009).

mental health treatment the Special Master was ordered to review.

46. In 2001, a group of prisoners filed a separate lawsuit alleging constitutionally inadequate medical care at all California state prisons. The State conceded that deficiencies in prison medical care violated prisoners' Eighth Amendment rights and stipulated to a remedial injunction, but failed to comply with that injunction. In 2005, district court found that "the California prison medical care system is broken beyond repair," resulting in an "unconscionable degree of suffering and death," and appointed a Receiver to oversee remedial efforts. In an order issued on October 3, 2005, the *Plata* Court found that CDCR suffered, among other things, from "a lack of continuity of care." *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 U.S. Dist. LEXIS 43796, at *46 (N.D. Cal. Oct. 3, 2005).

47. In 2009, the *Coleman* Court issued an order stating, among other things, that "[I]nsufficient access to higher levels of care has created a system which is overwhelmed by the acuity of its patients at every level of care," and that "EOP units house many patients in need of inpatient care" in particular. *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 940 (E.D. Cal. 2009).

48. In 2013, despite issuing hundreds or more remedial orders, the *Coleman* Court found that CDCR and its officials had not yet adequately addressed the deficiencies found by the Court in 1995. *Coleman v. Brown*, 938 F. Supp. 2d 955, 959 (E.D. Cal. 2013). The Court ruled, based on extensive evidence, that CDCR continues to violate the Eighth Amendment by failing to provide adequate mental health treatment to prisoners. As a result, the *Coleman* case is still active, with regular audits conducted by the Special Master, and orders issued by the *Coleman* Court in response to findings and recommendations in these reports.

49. The *Coleman* Court has consistently made findings and corresponding orders over the years relating to CDCR's ongoing inadequacies in suicide prevention policies and practices that, on information and belief, are reviewed directly by the CDCR statewide chain of command responsible for oversight and implementation of mental health treatment policies, procedures, and practices. This statewide chain of command includes the Secretary of CDCR, the Undersecretary of Health Care Services, the Director of the Division of Adult Institutions, and the Deputy Director of the Statewide Mental Health Program for CDCR (including when serving in an acting capacity), positions held or formerly held by individual Defendants named in this case.

### 2. *Coleman Court Orders that Defendant CDCR Officials Remedy Constitutionally Deficient Care, Including Suicide Prevention*

50.     At the times relevant to the events described herein, there were six CDCR officials primarily responsible for reviewing the *Coleman* Special Master's findings and recommendations and the *Coleman* Court's orders, making necessary changes in CDCR policies, procedures, practices, and trainings; and ensuring that these changes were actually implemented throughout CDCR, including at CMF: (i) Defendant Diaz, the Acting Secretary of CDCR; (ii) Defendant Kernan, the prior Secretary of CDCR; (iii) Defendant Toche, the Undersecretary of Health Care Services for CDCR; (iv) Defendant Gipson, the Acting Director of the Division of Adult Institutions for CDCR; (v) Defendant Allison, the prior Director of the Division of Adult Institutions for CDCR from and (vi) Defendant Tebrock, the Deputy Director of the Statewide Mental Health Program for CDCR.  Defendants Diaz, Kernan, Toche, and Tebrock were named official-capacity Defendants in the Coleman litigation.

51.     At the times relevant to the events described herein, there were three CMF officials responsible for oversight of mental health treatment and suicide prevention at CMF, and ensuring that related policies, procedures, and trainings were implemented, including those addressing deficiencies identified by the *Coleman* Court and Special Master: (i) Defendant Lozano, the Warden at CMF; (ii) Defendant Austin, the Health Care Chief Executive Officer of CMF; and (iii) Defendant DOE 1, the Chief of Mental Health at CMF.

52.     On April 5, 2013, more than five years before Michael's death, the *Coleman* Court held that the suicide prevention practices in CDCR facilities were constitutionally inadequate and issued an order stating:

> In summary, for over a decade a disproportionately high number of inmates have committed suicide in California's prison system. Review of those suicides shows a pattern of identifiable and describable inadequacies in suicide prevention in the CDCR. Defendants have a constitutional obligation to take and adequately implement all reasonable steps to remedy those inadequacies. The evidence shows they have not yet done so. In addition, while defendants represent that they have fully implemented their suicide prevention program, they have not. An ongoing constitutional violation therefore remains.

*Coleman v. Brown*, No. Civ. S-90-520 LKK/JFM (PC), 938 F. Supp. 2d 955, 979 (E.D. Cal. 2013).

53.     The *Coleman* Court further explained in its April 5, 2013, Order that suicide rates in

CDCR remained "nearly 80% higher than the national average for prison populations," and that "more than seventy percent of inmate suicides in California involve significant inadequacies about *which defendants have known for years.*" *Id.* (emphasis added). The constitutional inadequacies the Court ordered CDCR officials to correct in its April 5, 2013 Order included

> (1) failures to refer inmates to higher levels of care when clinically appropriate; (2) failures to conduct indicated mental health evaluations and/or assessments; (3) failure to conduct adequate or timely mental health status examinations; . . . (5) inadequate completion of [Suicide Risk Evaluations]; [and] (6) inadequate emergency responses.

*Id.* at 977. The Court highlighted CDCR custody staff's ongoing failure to implement "[c]lose clinical monitoring of suicidal inmates; proper and timely referral of decompensating inmates to higher levels of care, particularly mental health crisis beds and inpatient care; [and] appropriate clinical management of suicidal inmates pending referral to higher levels of care, including proper assessment of suicidal risk factors." *Id.* The Court also identified CDCR custody staff's ongoing failure to adhere to policies and procedures "regarding conduct of custody welfare checks," and "supervision of inmates who have histories of increased suicide risk." *Id.*

54. Accordingly, by 2013 CDCR officials (1) knew that CDCR policies and procedures regarding the provision of mental health treatment and suicide prevention were not being followed by mental health clinicians; (2) knew that training of mental health clinicians within CDCR was inadequate to ensure compliance with CDCR policies and procedures regarding the provision of mental health treatment and suicide prevention; and (3) knew of significant inadequacies in CDCR's policies and procedures that left prisoners vulnerable to a serious risk of harm by suicide.

55. On July 12, 2013, the *Coleman* Court ordered the establishment of a Suicide Prevention Management Workgroup to address the problems identified in the Court's April 5, 2013 Order. Among other thing, the Court ordered that:

> Defendants shall forthwith, under the supervision of the Special Master, establish a suicide prevention/management work group comprised of CDCR clinical, custody, and administrative staff, Department of State Hospitals (DSH) staff, the Special Master's experts, plaintiffs' counsel and, as appropriate, the *Plata* receiver to work under the guidance of the Special Master to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause.

*Coleman v. Brown*, No. Civ. S-90-520 LKK/JFM (PC) (ECF 4693) (E.D. Cal. July 12, 2013) (cited in

*Coleman v. Brown*, No. CIV S-90-0520 KJM DAD PC, 2015 U.S. Dist. LEXIS 12748, at *20 (E.D. Cal. Jan. 14, 2015)); *see also* Exhibit 1 at 12.

56. On information and belief, Defendants Toche and Tebrock were members of the Suicide Prevention Management Workgroup, and Defendants Diaz, Kernan, Allison, and Gipson received information about its work.

### 3. *2015 Coleman Special Master Audit Identification of Deficiencies in Suicide Prevention in CDR and CMF*

57. On January 14, 2015, nearly four years before Michael's death, the *Coleman* Special Master filed an "Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," attached hereto as Exhibit 2. The Special Master's 2015 Audit was based on a review of conditions related to suicide prevention in all CDCR institutions, including CMF, from November 2013 to July 2014 by Court-appointed national suicide prevention expert Lindsay Hayes, attached hereto as Exhibit 3.

58. The 2015 review identified CMF specifically as housing caseload inmates with histories of self-injurious and suicidal behavior in cells that had not been retrofitted to be suicide-resistant even while retrofitted cells remained empty, falsifying observation sheets by filling in times for observations that never occurred, and inadequate treatment planning. *See* Exhibit 3 at 39, 40.

59. The 2015 review also identified a suicide at CMF involving an inmate with a prior suicide attempt and several suicide risk factors despite denying any suicidal ideation. The clinician wanted to admit the inmate to a Mental Health Crisis Bed ("MHCB") but a conferring psychiatrist disagreed and the inmate was left at the EOP level of care and hung himself in his EOP cell. Exhibit 3 at 42-43. CDCR's own suicide report recommended corrective action on issues including failure to perform required security checks, failure to complete a suicidal risk evaluation, and a failure to document important clinical information. Exhibit 3 at 43. Critically, the review identified an additional deficiency contributing to the suicide arising from the disagreement among CMF's clinical staff whether to admit the inmate to an MHCB and the decision not to do so. Exhibit 3 at 43. The review stated:

[A]*ny disagreement between clinical staff regarding the level of suicide risk should always*

*result in a conservative approach and decision for MHCB admission.* Absent a decision for MHCB admission, if mental health staff still felt the inmate was at risk for suicide, alternative interventions, such as placement on Suicide Watch/Suicide Precaution in alternative housing and/or extended observation, five-day clinical follow-up and custody welfare checks, should be used.

Exhibit 3 at 43 (emphasis added).

60.     The 2015 review found that the suicide prevention practices in most CDCR facilities fell below the requirements set forth in CDCR's Mental Health Program Guide.  Exhibit 3 at 3.  Among the specific problems Mr. Hayes were a failure to review all relevant medical records at intake at Deuel Vocational Institution, Exhibit 3 at 166; incomplete suicide risk evaluations, deficiencies in treatment planning, and evaluators disregarding or ignoring suicide risks during Inter-Disciplinary Treatment Team ("IDTT") meetings at Mule Creek State Prison ("MCSP") and California State Prison, Corcoran ("CSP Corcoran"), Exhibit 3 at 79-80, 150-51; and the rapid removal of inmates with histories of suicidal ideation and suicide attempts from suicide watch at California Health Care Facility ("CHCF"), Exhibit 3 at 164.

61.     In conjunction with the 2015 Audit, the Special Master requested an order from the *Coleman* Court directing implementation of certain recommendations necessary to correct serious deficiencies in the provision of mental health care to suicidal inmates. These recommendations included, *inter alia*:

    a.  Improved training for suicide prevention that specifically covers "identifying inmates for suicide despite their denials of risks" and "identified problem areas and corrective actions from previous CDCR suicides";

    b.  Improved training and mentoring regarding the completion of accurate Suicide Risk Evaluations (SREs) and regular audits of clinicians' SREs to ensure they were being completed thoroughly; and

    c.  The development of a timetable for training all mental health clinicians on treatment planning for the suicidal inmate, both in connection with Suicide Risk Evaluations and as a regular treatment practice.

*See* Exhibit 3 at 5-9.

62.     On February 3, 2015, the *Coleman* Court entered an order adopting all of the Special

Master's recommendations. *Coleman v. Brown*, No. 2:90-cv-0520 KJM DAD P (ECF 5271) (E.D. Cal. Feb. 3, 2015) (attached hereto as Exhibit 4). Pursuant to the Court's February 3, 2015 Order, Defendants Kernan, Toche, and Tebrock were required to take steps to implement the changes set forth in the Special Master's recommendations to address unreasonable risk of harm by suicide at CMF. Upon assuming the positions identified herein, Defendants Diaz, Allison, Gipson, Lozano, and Austin became responsible for implementing the Court's order.

63. Thus, in February 2015, Defendants were well aware that (1) CDCR policies and procedures regarding the provision of adequate mental health care and suicide prevention were not being followed by mental health clinicians at CDCR prisons including CMF; (2) training for mental health clinicians at CDCR prisons including CMF was not adequate to ensure compliance with CDCR policies and procedures regarding the provision of adequate mental health care and suicide prevention; and (3) there were remaining inadequacies in the CDCR policies and procedures themselves that led to inadequate provision of mental health care to prisoners at CDCR prisons including CMF.

### 4. *2016 Coleman Special Master Audit Identification of Deficiencies in Suicide Prevention in CDCR*

64. Suicide prevention deficiencies were also noted in the Special Master's 2016 audit of CDCR mental health practices. The 2016 report noted that "[a]cross institutions, the Special Master's expert found treatment plans and progress notes that did not contain documentation of meaningful clinical intervention being provided to inmates." Exhibit 5 at 107. The report further stated that "[r]eview of treatment plans found numerous cases of inadequacies in treatment plans, with failures to address inmates' behaviors and symptoms indicating the need for change in treatment plans, or to address their refusals of treatment," and "[r]eview of treatment plans found that they had not been appropriately revised to address changes in inmates' mental health conditions, including decompensation, increased symptomology, or changes in clinical presentation." Exhibit 5 at 118 and 120. The report also highlighted the repeated failures by IDTTs to correctly analyze or even consider referrals to higher levels of care. Exhibit 5 at 10, 114-116.

### 5. *2018 Coleman Special Master Audit Identification of Deficiencies in Suicide Prevention at CDCR*

65.     Additional suicide prevention deficiencies were identified in the Special Master's 2018 audit of CDCR suicide prevention practices.[3]  The on-site audit began on May 23, 2017 and concluded on February 15, 2018, and covered 23 selected CDCR prisons including DVI, San Quentin, MCSP, CHCF, CSP Corcoran, and CMF.  The audit recognized "CDCR's continuing challenge of implementing and sustaining adequate suicide prevention practices" and identified many specific deficiencies including inadequate intake assessments and inadequate and non-responsive treatment and safety plans.  The audit noted, among other things, that (1) staff at 86 percent of the audited facilities failed to adequately observe MHCB patients; (2) staff at multiple facilities were observed to be falsifying observation forms; (3) four inmates who committed suicide in restrictive housing units were found in various states of rigor mortis despite records purporting to show the completion of a timely Guard One check, indicating that the checks were not adequately performed; and (4) continuing problems with adequate safety planning for [suicidal ideation] in 20 of 21 or 95 percent of audited facilities" and that interdisciplinary treatment team meetings and treatment plans were "grossly inadequate and often simply repeated Program Guide requirements . . . rather than a specific plan to reduce the inmate's suicide risk."  Exhibit 6 at 4 and 17-19.

66.     The 2018 audit singled out CMF as a prison where several problems were particularly severe.  Specifically, the report identified widespread deficiencies in compliance rates at CDCR facilities for suicide prevention block training of medical and mental health staff and stated that compliance rates were "particularly anemic" at CMF.  Exhibit 6 at 26.  The report also singled out CMF as a prison that failed to perform required Suicide Risk Evaluations (SREs) and Suicide Risk and Self-Harm Evaluations (SRASHEs), and identified CMF as a prison where safety and treatment plans were generic, inadequate, and not made specific or individualized with regard to circumstances of each patient, and even deferred the identification of important details to other clinicians.  Exhibit 6 at 17, 152.

### 6.     *2018 Whistleblower Report by Dr. Michael Golding*

67.     On October 31, 2018, the Court released a scathing whistleblower report by Dr. Michael

---

[3] The report was distributed in draft form to the *Coleman* parties for comments and/or objections on August 27, 2018, and filed on November 5, 2018.  Exhibit 7 at 5.

Golding, a Chief Psychiatrist for CDCR, identifying CDCR's widespread manipulation of the mental health data it had previously reported to the Court—a practice Dr. Golding described as having "cost the CDCR system dearly by preventing adequate care for a large majority of CDCR mental health patients." Exhibit 8 at 12. Dr. Golding identified a wide range of practices evidencing a "significant bias" in the reporting of health care data by CDCR including, among other things, CDCR's practice of inflating the number of appointments between EOP inmates and psychiatrists (for example, reporting that 95% of scheduled appointments with psychiatrists were "seen as scheduled" when the actual percentage was less than 46%), and drastically overreporting compliance figures for medication non-compliant patients (for example, by reporting a 100% compliance rate at CHCF when in fact the compliance was just 3.6%). *See generally* Exhibit 8.

68. Dr. Golding highlighted other systemic deficiencies at CDCR, including:

a. assigning non-medically trained psychologists and social workers, rather than medically trained psychiatrists, as a patient's "primary clinician,"[4] and permitting psychologists and social workers to override psychiatrists' medical judgments and orders—a practice Dr. Golding described as "one of the most radical policy decisions ever" that produced "a steep cost in terms of bad outcomes," Exhibit 8 at ix-x;

b. conducting psychiatric consultations through the prisoner's cell door rather than in a confidential office space, which contributed to CDCR's high rate of suicide, Exhibit 8 at v-vi, 11; and

c. "patient dumping" whereby CDCR staff reduce their workload or legal risk by transferring difficult patients to the care of other staff, resulting in excessive patient transfers. Dr. Golding stressed the need for continuity of care, stating that "A single treatment team should take care of a given patient wherever the patient is in a given institution, and transfers between institutions should be minimized," and described

---

[4] CDCR policies, as codified in the CDCR Program Guide, state that the primary clinician is responsible for performing "the necessary case management functions for all outpatients in their caseloads," including "assessment, treatment planning and treatment, clinical monitoring, and clinical case reviews." Primary clinicians also bear responsibility for "coordinat[ing] with institutional services that are considered helpful in maintaining or improving inmate-patient functioning" and documenting "[s]pecific reasons when the inmate-patient is unable to attend or participate in group therapy."

CDCR's practice of excessive transfers as "disastrous." Exhibit 8 at 121, 124. Dr. Golding stated that suicidal patients in particular should usually remain in a single institution. Exhibit 8 at 123.

**7.** ***Continued Increase in Suicide Rates Demonstrates that CDCR's Failure to Meaningfully Address Suicide Prevention Continues***

69. A relentless increase in the rate of suicides in CDCR facilities demonstrates that CDCR officials have failed to remediate the many known problems causing elevated levels of largely foreseeable and preventable suicides. Since 2014, the suicide rate at CDCR institutions has increased every year. In 2018, the suicide rate reached 26.3 suicides per 100,000 inmates—the highest rate since the CDCR began tracking the figure in 1990. In 2019, the suicide rate increased even further, to 28.7.

**B.** **Defendants Provided Inadequate Mental Health Care to Michael, Resulting in His Death**

**1.** ***Michael's Background***

70. Michael was born in Santa Barbara, California on November 8, 1985. He performed well in school and was an avid athlete, participating on the swim and basketball teams.

71. On or around June 26, 2004, Michael was leaving a party when one of his friends offered to give him a ride. Michael accepted, unaware that his friend was intoxicated. Michael's friend crashed the vehicle and died. Michael survived the crash but spent the next three weeks in a trauma center. While in the trauma center, Michael suffered swelling around his brain and was placed in a drug induced coma. Michael was then sent to Mercy San Juan Medical Center in Carmichael, California where he received further treatment, but the damage was severe. Michael required months of extensive rehabilitation to relearn most basic tasks and abilities.

72. Michael's life was forever changed by the trauma of the car crash. Although he overcame the physical injuries from the crash and held a number of jobs in the years following his accident, he would suffer mental health issues for the rest of his life.

73. Around 2007 or 2008, while working as a landscaper, Michael began hearing voices, started taking drugs, and spent time in and out of jail for minor offenses. Pamela Sandy, Michael's mother, took Michael to get help at the Auburn Medical Clinic, but he only visited several times before refusing further treatment.

74. In 2009, Michael had a significant mental health incident. Michael was placed on involuntary psychiatric hold at Marshall Medical Center in Placerville, California in response to an apparent suicide attempt. Michael had been found by passersby while he was lying in the middle of a road, seemingly with the hope of being hit or runover by a vehicle.

75. In 2016, Michael had another significant mental health incident. Michael was found wandering down a rural road, disoriented, alone, and suffering frostbite.

76. In or around June 2017, Michael had a confrontation with a group of men he believed had stolen from him. An altercation ensued and one of the men was struck in the head and injured.

77. On or around June 20, 2017, Michael left a suicide note at Pamela's home. Pamela called the Placer County Fire Department for assistance, but they informed her that they were unable to help because Michael denied having any suicidal intentions. The Placer County Sheriff's Department arrived at Pamela's house. Pamela gave a report of Michael's suicide attempt and gave the officers Michael's suicide note. Pamela then took Michael to Tahoe Forest Hospital where he was held for observation. Michael was released several hours later.

78. On or around June 30, 2017, Michael turned himself in for his role in the fight that had taken place several weeks earlier. Michael was arraigned, plead guilty, and sentenced within just 48 hours, and was thereafter incarcerated in the El Dorado County Jail.

79. In or around August 2017, Pamela brought Michael's mental health records related to his traumatic brain injury to the El Dorado County Jail. She spoke to the warden, a doctor, and a nurse at El Dorado County Jail about Michael's medical records, his traumatic injury and resulting mental health condition, and prior suicide attempts. Pamela told each of them that Placer County had records relating to Michael's most recent suicide attempt. Pamela implored these officials to make sure that all of this information would be sent with Michael to his next placement. Each official assured Pamela that that the documents would be sent with to whichever facility Michael would be transferred to next. On information and belief, all of this information was provided to CDCR upon Michael's August 30, 2017 transfer to Deuel Vocational Institute (DVI) in Tracy, California and made available to Defendant Kamal Freiha.

80. The trip to deliver Michael's mental health records was the last time Pamela would ever

see her son alive.

**2.** *Defendants Were on Notice that Michael Suffered from Mental Illness and Related Symptoms*

81. On August 30, 2017, Michael was transferred to CDCR custody at Deuel Vocational Institution ("DVI") in Tracy, California.

82. On September 14, 2017, Defendant Kamal Freiha administered an intake assessment of Michael including a mental and medical health evaluation history. Defendant Freiha noted that Michael was suffering from command and persecutory auditory hallucinations, paranoia, depression, anxiety, and a mood disorder. According to CDCR records, Michael stated during the evaluation, "I'm ok I guess, it sucks being here. And I hear voices all day everyday." On information and belief, this assessment did not include the mental health history Pamela had provided to the El Dorado County Jail. The history and severity of Michael's traumatic brain injury, the subsequent onset of his mental health issues, his previous suicide attempt, and his June 2017 suicide note were not included in this assessment even though all of this information, and Michael's recent suicide attempt in particular, would have been relevant to Defendants' determination regarding Michael's initial placement and his mental health treatment plan. Defendant Freiha improperly assigned Michael to the Correctional Clinical Case Management System ("CCCMS") level of care. According to Defendants' policies, CCCMS is the lowest level of care available for mental health in CDCR custody. While in CCCMS, Michael's mental health continued to deteriorate.

83. On September 20, 2017, Michael was involved in an altercation with another inmate. He was cited for a Rule 115 violation for battery on another prisoner.

84. In an October 2, 2017 assessment, Michael stated, "I hear voices in my head telling me to do things ... they told me to punch somebody." Clinical Social Worker Aaron McDonald noted that "He remains stable though symptomatic, and it is highly likely that with medication management, he will achieve a great degree of remission from his symptoms." On information and belief, Defendants did not adjust Michael's mental health placement or medication at this time.

85. On October 3, 2017, Michael was transferred to the Administrative Segregation Unit ("ASU") at San Quentin State Prison. He remained at the CCCMS level of care.

COMPLAINT FOR DAMAGES                    - 24 -

86.     On October 6, 2017, Michael informed Defendant Social Worker Karen McGee that he isolates himself when he senses that he will become symptomatic.  According to CDCR records, Defendant McGee noted that "[h]e remains stable though symptomatic, and it is highly likely that with medication management, he will achieve a great degree of remission from his symptoms."

87.     On October 9, 2017, Michael's interdisciplinary treatment team created a new mental health master treatment plan.  Defendant McGee was listed as Michael's Primary Clinician.  On information and belief, Defendant McGee did not make or coordinate changes to Michael's mental health placement or treatment at this time and Michael was not prescribed medication.

88.     On October 31, 2017, Michael was transferred to the ASU at California State Prison Corcoran ("CSP Corcoran").  He was maintained at the CCCMS level of care.

89.     On November 16, 2017, Defendants diagnosed Michael with Bipolar I Disorder, Mood Disorder, and listed a diagnosis for Adjustment Disorder with Depressed Mood.  On information and belief, Michael's treatment was not adjusted to reflect the new diagnoses.  Following this diagnosis, Michael's mental health continued to decline.

90.     On November 21, 2017, Defendant Licensed Clinical Social Worker ("CSW") Laura Edmonds noted that Michael had "no real [Mental Health] treatment history."

91.     On November 28, 2017, Defendant CSW Edmonds noted that Michael was decompensating and might need to be referred to a higher level of care.  According to CDCR records, Michael was not attending any therapy or going out to the yard.  Additionally, Defendant Edwards noted that Michael appeared depressed, that he had flooded his cell, and that he was observed pacing in his cell.  On information and belief, despite signs that Michael's mental health was rapidly declining, Defendant Edmonds did not make or coordinate any changes to Michael's treatment or mental health placement at this time.

92.     On November 29, 2017, Michael's interdisciplinary treatment team created a new mental health master treatment plan.  Defendant Edmonds was listed as Michael's Primary Clinician, his second at CDCR.  In the new treatment plan, Defendant Edmonds noted that, in addition to the behavior listed on November 28, Michael was sleeping for twelve hours at a time, refusing medication, refusing meals, speaking in bizarre and unintelligible speech and suffering from a psychosis that was

not currently being addressed by medication. Defendant Edmonds suggested that Michael might require a Penal Code § 2602 involuntary medication order because of the severity of his symptoms. On information and belief, Defendant Edmonds never pursued or coordinated attempts to explore an involuntary medication order.

93.     On December 4, 2017, after months of transfers between facilities and signs of worsening mental health, Michael was transferred to the Enhanced Outpatient Program ("EOP") level of care. According to CDCR's mental health policies, EOP is for inmates with "acute onset or significant decompensation of a serious mental disorder" or an "inability to function in general population." Michael remained isolated in an ASU following the transfer. According to CDCR records, this transfer was due to "treatment avoidance and requiring a higher level of care due to demonstrating signs of decompensation that include refusal to participate in treatment, flooding the tier, threatening others, and labile mood."

94.     Despite the transfer to a higher level of care, Michael continued to exhibit mental health issues. CDCR records reflect that on December 20, 2017, a custody officer noted that Michael was not eating or going to yard and had a cut on his nose. On information and belief, Defendants did not look into this injury or take immediate action in response to Michael's strange conduct. On information and belief, had Defendants done so, they would have learned that the injury to Michael's nose was related to Michael's failed attempt to commit suicide by hanging. Instead, and despite signs that Michael was decompensating, Michael's recent suicide attempt remained undocumented, undiscovered, and untreated by CDCR personnel.

95.     On December 26, 2017, Michael's interdisciplinary treatment team created a new mental health master treatment plan. Defendant Melissa Sheffield, a psychologist, is listed as Michael's Primary Clinician, his third. In the treatment plan, Defendant Sheffield states that Michael is exhibiting decompensation evidenced by "refusing to eat meals, refusing medications, and [his] poor functioning in [CCCMS]. [Michael] isolates in cell and sleeps periods of 12 hours, wakes up for short periods and returns back to sleep." Defendant Sheffield states that Michael has been "flooding [his] cell," "saying bizarre unintelligible things," and "[becoming] aggressive when approached at cell front." On information and belief, despite recognizing these symptoms of mental distress, Defendant Sheffield did

pursue or coordinate having Michael sent to a higher level of care or any change to his treatment plan at this time.

96.     In a January 4, 2018, mental health note, Defendant Sheffield noted that "[Michael] feels overwhelmed by 'the voices' who he says make him feel paranoid and suspicious of others. The voices become more pronounced with stress and isolation." Michael was quoted as stating that "I really feel embarrassed. I don't ever like to talk about it but I feel like I need to tell you I hear voices. Like 24 hours a day ... they just won't stop. They are clear voices and they always want me to starve myself or hurt myself. They tell me they will hurt my mom if I don't do it. They tell me she is the only one I have left that loves me." Despite knowledge that Michael was exhibiting symptoms of decompensation and endorsing self-harm, Defendant Sheffield did not adjust or coordinate changes to Michael's treatment plan or level of care at this time.

97.     On January 10, 2018, Defendant Sheffield noted that Michael was having trouble adjusting to the changes in his environment. She noted that, "It seems he experiences increased stress and anxiety [when] there is some variability and unpredictability in his environment." Despite knowledge of Michael's frequent transfers between CDCR facilities, and the acknowledgment that 'variability and unpredictability' were negative mental health triggers for Michael, Defendant Sheffield did not adjust or coordinate changes to Michael's treatment plan or level of care at this time.

98.     CDCR records from January 15, 2018, show that Michael continued to experience paranoia and auditory hallucinations and quote him as stating that "I hear things, they tell me don't eat, don't drink, hurt yourself, I don't want to, I am not suicidal. Everybody is against me, they are talking about me." Psychiatrist Marina Marchak diagnosed Michael with Schizoaffective disorder and prescribed antipsychotic medication to help with the voices.

99.     Michael refused to take his antipsychotics and, on January 27, 2018, requested that he be taken off his prescription entirely.

100.    On February 1, 2018, Defendant Sheffield noted that Michael's mental state was deteriorating. Defendant Sheffield quoted Michael as stating, "I can[']t die, we live forever. I would just strangle myself with a sheet, but what is the point. I live forever." In her assessment, Defendant Sheffield stated, "[Michael] is losing touch with what is real and what is not. He is buying into the

voices, and has reduced his reality testing techniques. He believes the voices are controlling his 'comfort' and best interest. He believes that if he does not do what they say they will hurt him and his family." Despite Michael's repeated endorsement of self-harm, now including suicidal ideation, Defendant Sheffield did not adjust or coordinate changes to Michael's treatment plan or level of care at this time.

101.    One week later, on February 8, 2018, Michael was transferred to the Mental Health Crisis Bed ("MHCB") level of care at the California Health Care Facility ("CHCF") because he posed a danger to self.  Michael expressed suicidal ideation, stating "I want to kill myself, the voices are telling me to kill myself. I want to wrap a sheet around my neck and just die. I want to suffocate myself. They are telling me that I will be better off."  Michael also mentioned that he was very depressed and hopeless, stating that "I just want to escape the pain and suffering."

102.    CDCR records show that Michael told the medical staff at CHCF about his previous suicide attempt in December 2017 and quote him as stating that "I have tried before, in Dec[ember]. I wrapped a sheet around my neck, passed out and my nose was bleeding. I hit my head. I woke up and flopped around on the floor for a while, I didn't tell anyone."  Licensed CSW Tiffany Sparks noted that Michael was at high chronic and acute suicide risk.

103.    On February 9, 2018, Psychologist Kelly Phan diagnosed Michael with Cluster B Personality Disorder, Polysubstance Dependence, Mood Disorder Secondary to Substance Abuse, and Psychosis Secondary to Substance Abuse.

104.    On February 11, 2018, Michael's interdisciplinary team created a new mental health master treatment plan.  Defendant psychologist Demetrius Nocerino is listed as Michael's Primary Clinician, his fourth since transferring to CDCR.  Defendant Nocerino noted that Michael was expressing self-isolating behaviors, poor appetite, and suicidal ideation.  That same day, Dr. Canon discontinued Michael's prescription for his anti-psychotic medication.

105.    In a February 12, 2018, Suicide Risk and Self-Harm Assessment, Defendant Nocerino noted that Michael was at risk of further decompensation without an involuntary medication order. Psychiatrist Nicholas Canon likewise recommended seeking an order for involuntary medication. Defendant Nocerino stated that he supported sending Michael to an Intermediate Care Facility ("ICF").

According to CDCR policy, an ICF placement is appropriate when "the inmate-patient is unable to adequately function within the structure of the CDCR EOP level of care" or "The patient engages in ritualistic or repetitive self-injurious/suicidal behavior that has not responded to treatment in a CDCR facility. Without inpatient mental health treatment, the inmate-patient is likely to develop serious medical complications or present a threat to his life." On information and belief, however, Defendant Nocerino did not pursue sending Michael to inpatient care at this time.

106. CDCR documentation for the period between February 9 to February 13, 2018, shows that Michael refused to eat while in MHCB placement.

107. On February 13, 2018, Michael was discharged from MHCB placement and returned to the EOP level of care. In Michael's discharge summary, Dr. Nocerino wrote that Michael refused to medicate, that this prevented Michael from being transferred to inpatient care, and that a non-emergent involuntary medication order should be considered. None of these steps were taken, however, and Defendants returned Michael to EOP care.

108. Michael continued to express signs of decompensation following his return to EOP care. On February 22, 2018, CDCR personnel found Michael's room in disarray with ripped toilet paper on the floor and materials stuffed into the toilet. CDCR records show that Michael was pacing in his cell and responding to internal stimuli. Defendant Sheffield noted that Michael was suffering from command auditory hallucinations and that staff members were worried about his well-being. Defendant Sheffield noted that Michael was not eating, refusing to interact with staff, and that he was expressing rapid pacing and outbursts directed at staff members. Defendant Sheffield stated that Michael's auditory hallucinations ordered him to not eat, take meds, or talk to staff and that "Mr. Lee may be suffering from CAH [command auditory hallucinations] without the ability to resist or control them."

109. A Post-Doc Intern, Weifu Liao, assessed Michael's chronic risk of suicide as moderate, his acute risk of suicide as high, and diagnosed Michael as gravely disabled. Michael was sent back to MHCB placement. **CDCR records show that Michael told Defendant Sheffield that he would not warn staff of his suicidal ideations or suicide attempts in the future.**

110. On February 23, 2018, Michael's interdisciplinary treatment team created a new mental

health master treatment plan. Defendant Azar Newton is listed as Michael's fifth Primary Clinician at CDCR. Michael's interdisciplinary treatment team states that Michael required inpatient psychiatric care but that they did not recommend him to inpatient treatment because he was not medication compliant, and recommended evaluating Michael for a non-emergency involuntary medication order. According to Defendant Newton, "[Michael] has refused 81% of his structured [therapy] offered. It appears his [therapy] refusal rate appears to be influenced by his medication non-compliance and [Grave] Disability. When medicated he attends [therapy] and his Grave Disability is manageable; consequently, when non-compliant with medication he begins refusing appointments. Treatment team will not [refer] to DSH at this time because team would like to explore possible PC 2602 to help increase stability and compliance." On information and belief, Defendants evaluate Michael for an involuntary medication order or seek one at this time.

111. During the MHCB initial assessment on February 23, 2018, Michael told a psychologist that he had been thinking about suicide with a sheet around his neck for two months.

112. Defendants kept Michael in MHCB care until February 28, 2018. During this time, Michael refused to go to therapy and continued to refuse all medication. Despite Michael's continued resistance to treatment, Defendants made no material change to Michael's treatment plans at this time.

113. On February 28, 2018, Michael's interdisciplinary treatment team created a new mental health master treatment plan. Defendant Cheryl Mims, a post-doc intern, is listed as sixth Michael's Primary Clinician and his second new primary clinician that week. Michael was discharged from MHCB care and transferred to CSP Corcoran EOP. On information and belief, Defendants did not seek a higher level of care or involuntary medication order at that time.

114. Michael's mental health condition continued to deteriorate. Soon after Michael's first two back-to-back transfers to MHCB care in February, Defendants returned him to MHCB care under similar circumstances.

115. On March 7, 2018, a Defendant Sheffield noted that Michael evidenced continued to experience paranoid and persecutory delusions.

116. On March 13, 2018, Michael's interdisciplinary treatment team created a new mental health master treatment plan. Michael's Primary Clinician was changed again, back to Defendant

Sheffield.  Defendant Sheffield noted that "The patient has refused 82% of treatment in EOP within the past five weeks. He reported feeling distrustful of his clinician due to recent referrals to MHCB. He reported refusing his groups because he is uncomfortable in a group setting and was dealing with residual anger toward the program, provider, and prison in general."  Defendant Sheffield also noted that Michael could not be recommended to psychiatric inpatient programs because he was medication non-compliant.  Defendant Sheffield noted that Michael might be eligible for non-emergent involuntary medication.  On information and belief, Defendants did not seek a higher level of care or an involuntary medication orders at this time.

117.    On April 1, 2018, Michael was brought to the triage treatment area because he had stopped eating again for several days.  A licensed clinical social worker evaluated Michael and determined that he showed signs of depression, anxiety, and hopelessness.  Michael was transferred to MHCB care on the same day—his third MHCB stay in less than two months.

118.    On April 4, 2018, Michael's interdisciplinary treatment team created a new mental health master treatment plan.  Defendant Priya Ramachandran, a social worker, is listed as Michael's seventh Primary Clinician.

119.    On April 6, 2018, psychologist Daniel Gaylin called Pamela Sandy to discuss Michael's mental health.  Dr. Gaylin's notes show that Pamela informed Dr. Gaylin of Michael's June 2017 suicide attempt and that she was concerned he would be struggling with suicidal ideation. Pamela asked Dr. Gaylin to tell her son that she loved him and missed him.  On information and belief, Defendants did not include information of Michael's June 2017 suicide attempt in any subsequent mental health treatment plans.

120.    On April 11, 2018, Michael's interdisciplinary treatment team created a new mental health master treatment plan.  Defendant Janet Gorewitz, a psychologist, is listed as Michael's eighth Primary Clinician.  Defendant Gorewitz noted that Michael continued to refuse medication, continued to self-isolate, and appeared to be "internally preoccupied with active process." Notwithstanding all this, and despite noting that Michael had been sent to MCHB care three times in the prior six months, Defendant Gorewitz did not seek an involuntary medication order and recommended that Michael return to EOP care.  On information and belief, this was below the standard of care.

121.     On April 12, 2018, Michael was discharged from MCHB to EOP care—11 days after his admission on April 1.

122.     On information and belief, Michael should have been sent to inpatient due to, among other things, CDCR's inability to meet his treatment needs, his repeated stays at the MHCB level of care, and the duration of his most recent stay.  CDCR policies on inpatient treatment state that "[r]eferrals to a DMH facility may be made by CDCR clinicians for inmate-patients who are so severely disturbed or suicidal that their treatment needs cannot be met in a CDCR treatment program or who may require a comprehensive psychiatric assessment."  CDCR policies further provide that "[i]nmate-patients who have had repeated admissions to a CDCR Mental Health Crisis Bed (MHCB) or have been in an MHCB for longer than ten days shall be considered for such a referral."  On information and belief, Michael was not considered for a referral to inpatient care at this time.

123.     On April 24, 2018, Michael's interdisciplinary treatment team created a new mental health master treatment plan.  Defendant JT Walker, a social worker, was listed as Michael's ninth Primary Clinician overall and his third primary clinician that month.  Defendant Walker noted that Michael was refusing to interact with staff and refusing all medication.  On information and belief, Defendants did not seek a higher level of care or involuntary medication at this time.

124.     On June 13, 2018, Michael was admitted to MHCB care for a fourth time with a determination that he posed a danger to self.  According to CDCR records, Michael told a psychiatrist that "I'm suicidal, but I don't want to talk about it. And I don't need any medications. I've tried them before, and I don't like them."

125.     On June 14, 2018, Michael's interdisciplinary treatment team created a new mental health master treatment plan.  Defendant Douglas Anderson, a psychologist, is listed as Michael's tenth Primary Clinician.  Defendant Anderson noted that Michael remained medication non-compliant, that Michael did not attend 98% of his treatment sessions, and that Michael was pacing around his cell.  Despite these facts, Michael's four recent admissions to the MHCB unit, and Michael's endorsement of suicidal ideation previous day, Defendants did not seek involuntary medication or a higher level of care at this time.

126.     On June 21, 2018, Michael's interdisciplinary treatment team created a new mental

health master treatment plan.  Defendant Douglas Anderson remained listed as Michael's Primary Clinician.  Defendant Anderson noted that "[the interdisciplinary treatment team] tried to verify the veracity of IP's statements (e.g., no longer experiencing AH and he did not have MH issues) in order to effectively assess him for a safety and Tx plan, but IP was consistent in declining to speak with MHCB PC's about his issues and only came out of his cell once for interview."  Defendant Anderson also noted that Michael continued to refuse psych meds and therapy sessions.  Despite Michael's prior warnings that he would not inform staff of his suicidality, Michael's four admissions into MHCB care within four months, and Michael's continued refusal to engage with mental health staff, Michael was discharged back to EOP care.

127.    On information and belief, despite Michael's ongoing refusal of treatment, his refusal to take medication, and his frequent placements in the MHCB level of care for suicidal thoughts and decompensation, Defendants did not seek an involuntary medication order or to admit Michael to inpatient care.  Defendants also failed to make responsive adjustments to Michael's treatment plans at this time.

128.    Michael continued to express symptoms of mental illness and suicidal ideation throughout July and August of 2018.  According to weekly mental health progress notes, Michael continued to suffer from auditory hallucinations and continued to refuse any medications prescribed to him.  During this time, Michael's behavior included refusing to speak to staff, not eating and losing significant weight, lacking personal belongings, pacing in his cell, and at all times refusing to meet mental health staff outside of his cell.

129.    On July 7, 2018, Michael's interdisciplinary treatment team created a new mental health master treatment plan.  Defendant LaTossia Kraschel, a social worker, is listed as Michael's eleventh Primary Clinician. According to Defendant Kraschel:

Although Patient has 4 MHCB admits over the past 6 months, a DSH referral is not indicated b/c IDTT concluded patient is not gravely disabled but shows symptoms of decompensating by isolating, refusing to leave cell and complying with command hallucinations. *It was determined by the team that IP meets criteria for PC 2602.* Documentation shows he was either sporadic or refusing medication at prior MHCB admits as well as previous EOP placements and currently does not want to take medication, stating, "I don't need them." Patient has a history of displaying bizarre behavior while not on medication as per documentation "e.g., he paced a lot in his cell, isolated, did not want to come out and spoke extensively in garbled speech." [The

interdisciplinary treatment team] has decided patient is not being referred to a higher LOC at this time as a 2602 referral is being made.

On information and belief, despite indicating that Michael would not be sent to inpatient care because of a need for involuntary medication, Defendants sought neither an involuntary medication order nor a transfer to inpatient care for Michael at this time.

130. Michael was transferred to Mule Creek State Prison ("MCSP") EOP care on August 24, 2018, after a one-day layover in the ASU EOP unit at California State Prison Sacramento. He remained at MSCP EOP care until November 13, 2018. During his time at MCSP, mental health evaluations showed that Michael expressed aversion to interacting with mental health evaluators, did not attend mental health treatment sessions, and refused to take medication.

131. On September 4, 2018, Michael's interdisciplinary treatment team created a new mental health master treatment plan. Defendant Annie Gutierrez, a psychologist, is listed as Michael's twelfth Primary Clinician. Defendant Gutierrez's report noted Michael's prior MHCB placements as well as his prior suicide attempt while in CDCR custody.

132. On September 7, 2018, Michael was seen by Psychiatrist Robert Johnson. Michael was not evaluated by a psychiatrist again until November 20, 2018, in violation of CDCR policies requiring EOP patients to be evaluated by a psychiatrist at least monthly.

133. Meanwhile, on November 7, 2018, shortly before his transfer from MSCP, Michael told Defendant Gutierrez, "I have been making shoe laces. They keep my shoes on." Despite Michael's previous admission that he attempted a suicide by hanging, Michael's previous comments that he felt compelled to hang himself, and Michael's statement that he would not notify CDCR of any future suicide attempts, and Michael's statement indicating possible intent to self-harm, Defendants did not transfer Michael to a higher level of care at this time, nor did they adjust his treatment plan.

**3.** ***Defendants Provide Inadequate Response to Michael's Symptoms at CMF, Leading to His Suicide***

134. On November 13, 2018, Michael was transferred to EOP housing in California Medical Facility ("CMF") in Vacaville, California.

135. On November 20, 2018, Michael was noted to be behaving in a bizarre manner. CMF staff noted that Michael was running in place without clothing for extended amounts of time.

According to a consult note by Defendant Psychologist Sharon Page-Pressley, custody officers brought this conduct to her attention while she was on another call. Defendant Page-Pressley arrived at the cell an hour after she was informed of Michael's bizarre conduct. Both Defendant Page-Pressley and the custody officer attempted to get Michael's attention, but he was unresponsive. Defendant Page-Pressley then conferred with the on-call psychiatrist and they both agreed that Michael was in need of a higher level of care. Despite this discussion, Defendant Page-Pressley then changed her mind and overrode the diagnosis of the psychiatrist. Ms. Page-Pressley asserted that Michael would not pose a threat to himself or anyone else because "he was probably tired for running for nearly [three] hours."

136.    That same day, Defendant Lawrence Harrison, a psychiatrist, noted that, in addition to the bizarre behavior noted by Ms. Page-Pressley, there was a piece of cloth or string hung in Michael's cell. Although the cloth rope, the incessant pacing, and the refusal to acknowledge or interact with staff mirrored prior incidents immediately preceding Michael's placement in the MHCB level of care for suicidal ideation and decompensation, Defendants kept Michael in his current placement in EOP housing. Defendant Harrison wrote in the "Plan / Disposition" section of his note to "Strongly consider for higher level of care referral, as four MHCB admissions within a short time meet criteria for such a referral." Michael was not referred to a higher level of care, however. This would be the last time Michael was ever evaluated by a psychiatrist.

137.    On November 23, 2018, Defendant Kirby Surprise, a psychologist, noted that a crisis intervention team was called to Michael's cell. Michael was seen that morning with the rope made from his sheets around his neck. In response, custody officers removed the rope and cautioned Michael against destroying prison property. Mr. Surprise noted that Michael had been found in 2017 with a ligature around his neck but did not reference Michael's admission of his 2017 suicide attempt by hanging. In addition to the rope, Defendant Surprise noted that Michael was found naked and unresponsive twice in the preceding 72 hours and that Michael's cell floor was covered in food paper and trash. Though Defendant Surprise was aware of Michael's prior attempt to commit suicide by hanging, and that Michael was exhibiting common signs of decompensation such as excessive pacing, a state of undress or exhibitionism, unresponsiveness to staff, strewing trash about the cell, and self-isolation, Defendant Kirby wrote that Michael was not expressing any suicidal ideation and Defendant

Kirby did not recommend a higher level of care.

138.    That same day, Defendant Flynn, a licensed CSW, wrote a treatment plan prescribing more frequent nigh time cell checks by custody staff and delegating any "follow through" to the EOP treatment team, without any discussion of how Michael's mental health condition would be addressed.

139.    On November 28, 2018, Defendant Flynn conducted a Suicide Risk and Self-Harm Evaluation.  In the assessment, Defendant Flynn noted that other CDCR personnel were alarmed that Michael was expressing strange behavior such as exercising in the nude, giving away his canteen items, refusing meals, and sleeping more than usual.  These actions were red flags and, moreover, aligned with behaviors exhibited by Michael when he was previously diagnosed as decompensating, gravely disabled, and exhibiting suicidal ideation.  Defendant Flynn's Safety / Treatment Plan noted that Michael was not taking any anti-psychotic or anti-depressant medication, refused to participate in treatment programs, and had previously attempted suicide, but provided no meaningful plans for addressing any of these issues, stating only that Flynn would establish rapport and provide Michael with the use of CBT.  The Safety / Treatment Plan stated that Flynn would work with custody as to "ways to engage towards [Michael's] involvement in EOP program" but did not identify any of these "ways."

140.    On November 29, 2018, Michael's interdisciplinary treatment team created a new mental health master treatment plan.  Defendant Flynn is listed as Michael's thirteenth (and final) Primary Clinician.  Defendant Flynn noted that Michael was being "treatment resistant," but stated that, even though other institutions noted that Michael needed a higher level of care, Michael would not be referred to a higher level of care at this time.

141.    On December 6, 2018, Defendant Flynn wrote that Michael would not be referred to a higher level of care because his treatment refusals had occurred in a previous institution—even while stating that Michael was continuing to refuse treatment at CMF—and because Michael denied thoughts of self harm—even though Michael's medical records stated that he had previously told mental health staff that he would not tell them if he intended to commit suicide.  Defendant Flynn further explained that Michael was "calm, cooperative, without behavioral problems," and that he "has maintained adequate hygiene, cell area is clean, walks to chow hall, and occasionally goes to dayroom to watch

TV."

142. Despite clear sings of increasing decompensation and mental distress that CDCR officials had previously cited in diagnosing Michael with decompensation, grave disability, and suicidal ideation, CMF staff actually *reduced* the frequency of their mental health check-ins with Michael. From November 29th until his suicide on January 8, 2019, CDCR recorded just six mental health evaluation contacts with Michael—approximately one per week. During each of these contacts, moreover, Michael refused to leave his cell, gave only short responses, and refused to attend group therapy. Nonetheless, Defendants did not transfer Michael to a higher level of care, nor did they adjust his treatment plan.

143. These were not the only red flags that Defendants ignored. On November 28, 2018, Defendant Flynn told Michael that his mother had called to seek how he was doing and asked Michael to sign a release form permitting CDCR officials to information about his condition with her. Michael did not reply and continued pacing about his cell. On December 12, Defendant Flynn reminded Michael that his mother had called and asked Michael if he would like to contact her, but once again Michael did not reply. On December 19, Defendant Flynn asked Michael if he would contact his mother and sign a release form to let her know how he was doing, and Michael replied "no" without providing any explanation for his refusal. On information and belief, Defendants knew from Michael's medical records and their prior communications with Pamela that Michael had a close relationship with his mother, and Michael's disinterest in speaking with her was an obvious sign that Michael's mental health condition was deteriorating. Pamela had repeatedly spoken with Michael's clinicians, including Defendant Harrison, and told them that Michael's refusal to call her was not like Michael, a red flag demonstrating that he needed help, and that she was extremely concerned for his wellbeing. Despite knowledge of Michael's close relationship with his mother prior to his incarceration, CDCR personnel did not identify Michael's refusal to communicate with his mother as an indicator of his deteriorating mental health.

144. On December 20, 2018, Michael refused to come for his office appointment with Defendant Harrison, who saw Michael at his cell. Defendant Harrison wrote in the "Plan" section of his progress note only the following: "Continue to observe for any basis for involuntary treatment or for

transfer to higher level of care."

145.    Meanwhile, on December 12, December 19, December 26, and January 2, Defendant Flynn cut and pasted the same identical content in the "Plan" section of Michael's progress notes: "Continue current level of care. As part of Treatment Plan, PC will continue to meet on weekly basis to address his resistive pattern, which includes not attending PC session and groups." None of these plans were specific or individualized, and none were changed to reflect the continuing deterioration in Michael's mental health condition. None of the plans identified even a single strategy for addressing Michael's resistive pattern or refusal to attend his sessions and groups.

146.    At Michael's last check-in on January 2nd, he was noted to have no personal belongings in his cell. Defendants did not increase their mental health contacts with Michael at this time.

147.    At 6:41 P.M. on January 8, 2019, Michael was found hanging in his cell from a piece of cloth wrapped around his neck. His wrists were bound behind his back with another piece of cloth. He was pronounced dead at 6:59 P.M. He was just 33 years old.

148.    Pamela learned of her son's death the following day, on January 9.

149.    Pamela has been absolutely devasted by her son's death. She previously lost her mother and brother to suicide. The grief she has experienced and continues to experience from the loss of her son is without limit.

150.    On January 30, 2019—more than three weeks after Michael's death—CDCR recorded Michael as having attended a full session of his group therapy.

151.    Over the course of roughly 16-month incarceration at CDCR, Michael was transferred between 14 different placements at 6 different CDCR facilities, subjected to at least 16 different mental health treatment plans, and assigned to at least 13 different primary clinicians. In some cases, Michael was passed around among multiple primary clinicians even within a single placement.

152.    Michael's extraordinary number of treatment plan hindered his care. Despite Michael's persistent mental distress and deteriorating mental health condition, his treatment plans were generic and contained similar boilerplate content over the course of his incarceration at CDCR. The treatment plans also repeatedly provide the same treatments, such as one-on-one counseling, group therapy sessions, education on the necessity of medication, and compliance with medication despite clear

evidence that Michael was resistant to group therapy and medication. The treatment plans fail to address how the treatments would be implemented in light of Michael's sustained resistance to them. The few recommendations that might have addressed these issues were never pursued. For example, mental health progress notes, psychiatric evaluations, and master treatment plans from November 29, 2017, February 12, 2018, February 13, 2018, February 23, 2018, February 28, 2018, March 13, 2018, April 10, 2018, April 11, 2018, and September 3, 2018 all list a recommendation or intent to seek a Penal Code § 2602 involuntary medication order for Michael, yet, on information and belief, CDCR never followed-up on any of these recommendations and no involuntary medication order was ever sought, let alone obtained.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Deliberate Indifference to Serious Mental Health Needs in**

**Violation of the Eighth Amendment to the Constitution of the United States**

**(42 U.S.C. § 1983)**

**(Plaintiff Estate Against ALL Defendants Except CDCR)**

153.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

154.    Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Doe 1 failed to promulgate, implement, and/or enforce adequate policies, procedures, practices, and training to ensure provision of minimally adequate mental health treatment to prisoners housed within CDCR facilities, including CMF, including policies, procedures, and corrective training expressly identified in *Coleman* filings and/or ordered to be implemented by the *Coleman* Court.

155.    Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Doe 1 failed to promulgate, implement, and/or enforce policies, procedures, and practices to ensure that mental health staff met the standard of care when providing treatment to CDCR prisoners, including at CMF.

156.    Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Doe 2 also failed to adequately supervise the provision of mental health services at their respective

institutions, violating their constitutional obligation to ensure that prisoners entrusted to their care receive necessary treatment and that the *Coleman* orders were being implemented.

157.    Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Doe 2 also failed to properly train and supervise custody staff regarding policies, procedures, and practices necessary for the provision of adequate mental health care, including those policies and procedures that had been ordered by the *Coleman* Court.

158.    Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Doe 1 were on notice for years prior to the death of Michael Lee that their provision of mental health care fell far short of the minimum elements of a constitutional health care system.  These Defendants were specifically on notice that their policies, procedures, and practices resulted in failure to provide necessary mental health care to the prisoners at CMF, and that this failure may result in otherwise preventable death and suffering.

159.    Defendants were on notice specifically through the *Coleman* filings, Special Master Reports, and Court Orders that providing appropriate treatment to address increased suicidality is a critical component of mental health treatment, and CDCR policies reflect this awareness.

160.    Defendants' failure to correct their policies, procedures, and practices despite notice of significant and dangerous problems evidences deliberate indifference to the prisoners in their care. Among other things, Defendants filed to address known problems involving "patient dumping" and a lack of continuity of care, including the excessive transfer of inmates between CDCR institutions and placing an inmate under the care of an excessive number of primary clinicians; failure to refer inmates to higher levels of care when clinically appropriate, particularly to inpatient care; inadequate involuntary medication procedures, including the lack of protocols for the use of involuntary medication and the underutilization of involuntary medication; failure to place inmates at risk of suicide in suicide resistant cells; failure to document important clinical information, including during the initial transfer to CDCR and when transferring inmates between CDCR institutions; failure to take a conservative approach and resolve disagreements between clinical staff regarding the level of suicide risk in favor of a higher level of care or at least in favor of other preventative and precautionary measures; failure to create adequate treatment plans, revise treatment plans to address changes in

inmates' mental health conditions, and implement those plans; failure to identify inmates at risk of suicide despite their denials of those risks; assigning non-medically trained psychologists and social workers, rather than medically trained psychiatrists, as a patient's primary clinician; permitting psychologists and social workers to override psychiatrists' medical judgments and orders; and conducting psychiatric consultations through the prisoner's cell door rather than in a confidential office space.

161. Michael Lee's mental health needs were known to Defendants Freiha, McGee, Edmonds, Sheffield, Nocerino, Newton, Mims, Ramachandran, Gorewitz, Walker, Anderson, Kraschel, Gutierrez, Page-Pressley, Harrison, Surprise, and Flynn during his incarceration in CDCR institutions. Despite this knowledge, and Michael's obvious signs of psychological and emotional distress, Defendants Freiha, McGee, Edmonds, Sheffield, Nocerino, Newton, Mims, Ramachandran, Gorewitz, Walker, Anderson, Kraschel, Gutierrez, Page-Pressley, Harrison, Surprise, and Flynn failed to provide necessary mental health evaluation and treatment to Michael while he was incarcerated in CDCR institutions, in conscious disregard of Michael's mental health needs and CDCR's required policies and procedures.

162. Defendant Freiha failed to include relevant and available medical information in Michael's intake, resulting in an incomplete mental health record. Additionally, Defendant Freiha placed Michael in CCCMS care rather than in a higher level of care appropriate to Michael's mental conditions and recent expressions of suicidal ideation.

163. Defendants McGee, Edmonds, Sheffield, Nocerino, Newton, Mims, Ramachandran, Gorewitz, Walker, Anderson, Kraschel, Gutierrez, and Flynn all failed to take follow-up and remedial actions to ensure the Michael received necessary medical care. This includes a failure to create specific and individualized treatment plans responsive to Michael's deteriorating mental health history, symptoms, and mental health needs, and his persistent refusal to attend group therapy or take medication in particular; failure to seek involuntary medication orders; and failure to seek higher level of care, including inpatient care in particular.

164. Michael Lee's mental health needs were known to Defendants Page-Pressley, Harrison, Surprise, and Flynn during his incarceration at CMF. Despite this knowledge, and Michaels's obvious

signs of psychological and emotional distress, Defendants Page-Pressley, Harrison, Surprise, and Flynn failed to provide necessary mental health evaluation and treatment to Michael while he was incarcerated at CMF. For example, Defendants Page-Pressley, Harrison, Surprise, and Flynn failed to cite Michael's suicidal ideation or move Michael to a higher level of care in response to his mental health incidents in November 2018, in conscious disregard of required policies and procedures. Defendant Harrison failed to take any action in response to Michael's refusal to speak with Pamela despite knowledge that this was an obvious sign of Michael's severe mental distress.

165. On November 20, 2018, Defendant Page-Pressley overruled a mental health determination that Michael needed to be sent to a higher level of care in spite of clear signs of decompensation. Though Michael spent several hours in an unresponsive state running in his cell, Defendant Page-Pressley determined that Michael posed no threat to himself, stating "he was probably tired for running for nearly [three] hours." Defendant Page-Pressley was aware that Michael experienced similar signs of mental health distress during his previous episodes of suicidal ideations, but she determined that he was not at risk of suicide. Defendant Page-Pressley overrode the clinical judgment of a psychiatrist and resolved this disagreement among clinicians in favor of keeping Michael in the EOP level of care and without taking any additional precautionary measures. In so doing, Defendant Page-Pressley knowingly denied Michael necessary mental health care to prevent his suicide.

166. Defendants Harrison, Surprise, and Flynn were all aware that Michael had constructed a cloth rope in his cell, that he had previous documented threats of suicide by hanging, and that he had previously attempted to kill himself by hanging. In spite of this knowledge, Defendants did not seek a higher level of care for Michael, place him on suicide watch, seek involuntary medication, or conduct mental health evaluations and/or visits more than once a week. Defendant Flynn conducted a suicide risk assessment but did not cite Michael as a suicide risk. By ignoring Michael's obvious signs of suicidal ideation and his construction of tools to commit suicide by hanging, Defendants Harrison, Surprise, and Flynn all denied Michael necessary mental health care to prevent his suicide by hanging.

167. Defendants Diaz and Kernan, as Secretaries of CDCR, and Defendant Gipson and Allison, as Directors of DAI, were responsible for ensuring the safety and security of prisoners within

CDCR, including ensuring that they received constitutionally adequate mental health treatment. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CMF were inadequate, Defendants Diaz, Kernan, Gipson, and Allison knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Michael Lee.

168. Defendant Toche, as Undersecretary of Health Care Services for CDCR, and Defendant Tebrock, as Deputy Director of the Statewide Mental Health Program for CDCR, were responsible for the administration of health care services to prisoners with CDCR, including ensuring that they received constitutionally adequate mental health treatment. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CIW were inadequate, Defendants Toche and Tebrock knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Michael Lee.

169. Defendant Lozano, as Warden of CMF, was responsible for the safety and security of prisoners at CMF, including ensuring that they received constitutionally adequate mental health treatment. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CMF were inadequate, Defendant Hughes knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Michael Lee.

170. Defendant Austin, as Health Care CEO at CMF, was responsible for ensuring that medical staff at CMF provided constitutionally adequate mental health treatment to prisoners including Michael Lee. Despite notice that medical staff at CMF were not providing adequate and necessary care consistent with the Constitution and CDCR's own requirements, Defendant Austin knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Michael Lee.

171. Each of Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Doe 1, intentionally, willfully, knowingly, and deliberately failed to take reasonable and sufficient actions to implement the recommendations of the *Coleman* Special Master regarding mental health treatment and suicide prevention at CDCR facilities, placing Michael Lee at undue and substantial risk

of harm by suicide.

172. Defendants' actions and/or omissions as alleged herein, including but not limited to their failure to provide Michael Lee with appropriate psychiatric care and to identify suicide risk, along with the acts and/or omissions of Defendants in failing to train, supervise, and/or promulgate appropriate policies and procedures to identify suicide risk and provide psychiatric treatment, constituted objective and subjective deliberate indifference to Michael Lee's serious psychiatric needs, health, and safety.

173. As a direct and proximate result of Defendants' conduct, Michael Lee experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

174. The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Michael Lee, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### Second Claim for Relief

**Failure to Protect from Harm in Violation of the Eighth Amendment to the Constitution of the United States (42 U.S.C. § 1983)**

**(Plaintiff Estate Against Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, Doe 1, Doe 2, Page-Pressley, Harrison, Surprise, and Flynn)**

175. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

176. Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Doe 2 were on notice that their deficient policies, procedures, and practices alleged herein created substantial risk of serious harm, including self-harm, to a prisoner in Michael Lee's position.

177. Each Defendant could have taken action to prevent unnecessary harm to Michael Lee but knowingly and deliberately refused or failed to do so.

178. Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Doe 2 failed to have minimally necessary policies and procedures concerning the adequate care and housing of Michael Lee. Their deficient policies, procedures, and practices alleged herein created substantial

risk of serious harm, including self-harm, to Michael Lee.

179.     Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Doe 2 failed to promulgate, implement, and/or enforce policies, procedures, and practices to ensure that mental health staff met the standard of care when providing treatment to prisoners in CDCR prisons, including at CMF.

180.     Defendants Diaz and Kernan, as Secretaries of CDCR, and Defendants Gipson and Allison, as Directors of DAI, were responsible for ensuring the safety and security of prisoners within CDCR, including taking reasonable actions to address substantial risk of serious harm.  Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CDCR prisons including CMF were inadequate, Defendants Diaz, Kernan, Gipson, and Allison knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Michael Lee.

181.     Defendant Toche, as Undersecretary of Health Care Services for CDCR, and Defendant Tebrock, as Deputy Director of the Statewide Mental Health Program for CDCR, were responsible for the administration of health care services to prisoners with CDCR, including taking reasonable actions to address substantial risk of serious harm. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CDCR prisons including CMF were inadequate, Defendants Toche and Tebrock knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Michael Lee.

182.     Defendant Lozano, as Warden of CMF, was responsible for the safety and security of prisoners at CMF, including taking reasonable actions to address substantial risk of serious harm. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CMF were inadequate, Defendant Lozano knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Michael Lee.

183.     Defendant Austin, as CEO at CMF, was responsible for ensuring that medical staff at CMF provided constitutionally adequate mental health treatment to prisoners including Michael Lee.

Despite repeated notice that medical staff at CMF were not providing adequate and necessary care consistent with the Constitution and CDCR's own requirements, Defendant Austin knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Michael Lee.

184. By policy, procedure, and practice, Defendants Lozano, Austin, and Doe 2 knowingly and deliberately permitted Michael to be denied constitutionally appropriate care including the identification and response to Michael's known risk of self-harm, including suicide.

185. By policy, procedure, and practice, Defendants Lozano, Austin, and Doe 2 knowingly and deliberately failed to remediate suicide hazards at CMF, including in Michael's cell.

186. Defendants Lozano, Austin, and Doe 2 also failed to adequately supervise the provision of mental health services at CMF, violating their constitutional obligation to ensure that prisoners entrusted to their care receive necessary treatment.

187. Defendants Lozano, Austin, and Doe 2 also failed to properly train and supervise custody staff regarding policies, procedures, and practices necessary for the provision of adequate mental health care.

188. Defendants' failure to correct their policies, procedures, and practices despite notice of significant and dangerous problems evidences deliberate indifference to the prisoners in their care. Defendants failed, among other things, to address the known deficiencies identified in paragraph 160, *supra.*

189. Defendants Page-Pressley, Harrison, Surprise, and Flynn's repeated decisions not to seek a higher level of care for Michael, not to seek an involuntary medication order, and not to conduct adequate mental health checks despite obvious signs of decompensation and suicidal ideation directly placed Michael at substantial risk of serious harm, including suicide. Defendant Flynn's repeated decisions not to create adequate, specific, and individualized care plans addressing Michael's known mental health needs directly placed Michael at substantial risk of serious harm, including suicide, and knowingly failed to protect him from that harm. Defendant Harrison failed to take any action in response to Michael's refusal to speak with Pamela despite knowledge that this was an obvious sign of Michael's severe mental distress.

190.     On November 20, 2018, Defendant Page-Pressley overruled a mental health determination that Michael needed to be sent to a higher level of care in spite of clear signs of decompensation.  Though Michael spent several hours in an unresponsive state running in his cell, Defendant Page-Pressley determined that Michael posed no threat to himself, stating "he was probably tired for running for nearly [three] hours."  Defendant Page-Pressley was aware that Michael experienced similar signs of mental health distress during his previous episodes of suicidal ideations, but she determined that he was not at risk of suicide.  Defendant Page-Pressley overrode the clinical judgment of a psychiatrist and resolved this disagreement among clinicians in favor of keeping Michael in the EOP level of care and without taking any additional precautionary measures.  In so doing, Defendant Page-Pressley knowingly placed Michael at unreasonable and substantial risk of serious harm and knowingly failed to protect him from that harm.

191.     Defendants Harrison, Surprise, and Flynn were all aware that Michael had constructed a cloth rope in his cell, that he had previous documented threats of suicide by hanging, and that he had previously attempted to kill himself by hanging.  In spite of this knowledge, Defendants did not seek a higher level of care for Michael, place him on suicide watch, seek involuntary medication, or conduct mental health evaluations and/or visits more than once a week.  Defendant Flynn conducted a suicide risk assessment but did not cite Michael as a suicide risk.  By ignoring Michael's obvious signs of suicidal ideation and his construction of tools to commit suicide by hanging, Defendants Harrison, Surprise, and Flynn all knowingly placed Michael at unreasonable and substantial risk of serious harm and knowingly failed to protect him from that harm.

192.     Each Defendant could have taken action to prevent unnecessary harm to Michael Lee but knowingly and deliberately refused or failed to do so.

193.     Defendants' actions and/or omissions as alleged herein, including but not limited to their failure to provide Michael Lee with constitutionally appropriate care and to identify and respond to his clear suicide risk, along with the acts and/or omissions of Defendants in failing to train, supervise, and/or promulgate appropriate policies and procedures to provide constitutionally appropriate care and to identify and respond to his clear suicide risk, constituted objective and subjective deliberate indifference to Michael Lee's serious psychiatric needs, health, and safety.

194.     As a direct and proximate result of Defendants' conduct, Michael Lee experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

195.     The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Michael Lee, and were therefore malicious, wanton, and oppressive.  As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Third Claim for Relief

### Deprivation of Substantive Due Process Rights in Violation of First and Fourteenth Amendments to the Constitution of the United States—Loss of Parent/Child Relationship (42 U.S.C. § 1983)

### (Plaintiff Pamela Sandy Against ALL Defendants Except CDCR)

196.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

197.     The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Michael Lee's serious psychiatric needs, health, and safety, violating Michael Lee's constitutional rights, and their failure to train, supervise, and/or take other appropriate measures to prevent the acts and/or omissions that caused his untimely and wrongful death, deprived Plaintiff Pamela Sandy of her liberty interests in the parent-child relationship in violation of her substantive due process rights as defined by the First and Fourteenth Amendments of the Constitution.

198.     As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, Plaintiff Sandy suffered injuries and damages as alleged herein.

199.     The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

/ / /

/ / /

**Fourth Claim for Relief**

**Violation of Americans with Disabilities Act (ADA), Title II, 42 U.S.C. § 12101, *et seq.*,**

**and The Unruh Civil Rights Act, Cal. Civil Code § 51**

**(All Plaintiffs Against Defendant CDCR)**

200.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

201.    Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

202.    In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

203.    Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

204.    Michael Lee was a "qualified individual" with a mental impairment that substantially limited his ability to care for himself and control his mental, medical, or physical health condition as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2).

205.    CDCR and CMF are covered entities for purposes of enforcement of the ADA, 42 U.S.C. § 12131(2).

206.    Under the ADA, CDCR and CMF are mandated to "develop an effective, integrated, comprehensive system for the delivery of all services to persons with mental disabilities and developmental disabilities . . ." and to ensure "that the personal and civil rights" of persons who are receiving services under its aegis are protected.

207.    Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to

be a "serious and pervasive social problems."  42 U.S.C. § 12101(a)(2).

208.    CDCR and CMF are mandated under the ADA not to discriminate against any qualified individual on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a).

209.    Defendant CDCR violated the ADA by the acts and omissions of its employees and agents in:

a.    failing to provide services or reasonably accommodate Michael Lee with access to CDCR programs and services;

b.    failing to properly train and supervise CDCR staff, employees and officers at multiple facilities on how to appropriately treat, monitor, and interact with disabled persons, such as Michael Lee; and

c.    discriminating against Michael Lee on the basis of disability by dismissing his recurring mental health needs and suicidal ideation.

210.    Michael Lee was denied the benefits of the services, programs, and activities of CDCR and CMF which deprived him of mental health and medical health programs and services which would have provided the delivery of treatment, follow-up and supervision.  This denial of programs and services was the result of his disability in that he was discriminated against because of his mental illness, in that he suffered from conditions in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs and to protect himself from self-harm.  Defendant's failure to train their employees, and the denial of mental and medical health care, treatment, follow-up, training, and supervision resulted in the violation of Plaintiff's constitutional rights.

211.    Defendant knew that it was substantially likely that Michael would be harmed but failed to act on that likelihood, and thus acted with deliberate indifference, thereby intentionally discriminating against Michael in violation of Title II of the ADA.

212.    As a direct and proximate result of Defendant's actions, Michael Lee suffered injuries and damages causing great pain and leading to his death, as alleged herein.

213.    As a result of Defendant's violation of the ADA, Defendant has also violated the Unruh

Act. Cal. Civil Code § 51(f).

**<u>Fifth Claim for Relief</u>**

**Violation of the Rehabilitation Act, 29 U.S.C. § 794**

**(All Plaintiffs Against Defendant CDCR)**

214.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

215.     Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits, or be subjected to discrimination under any program or activity receiving federal financial assistance . . . ." 29 U.S.C. § 794.

216.     Michael Lee, at all times relevant herein, was a qualified individual with a disability within the meaning of the Rehabilitation Act because he suffered from a mental illness, which at times caused him to act out, and resulted in substantial limitations in his mental and emotional processes such as thinking, concentrating, and interacting with others. *See* 29 U.S.C. § 705(20)(B).

217.     CDCR "engaged in the business of . . . health care," custody for persons whose "operations" fall within the definition of "program or activity" covered by the Rehabilitation Act, 29 U.S.C. Section 794(b).

218.     At all times relevant to this action, CDCR received federal funding within the meaning of the Rehabilitation Act.

219.     Through their acts and omissions described herein, Defendant CDCR has violated the Rehabilitation Act, including all applicable implementing regulations, by excluding Michael Lee, from participation in, denying him the benefits of, and subjecting him to discrimination in the benefits and services it provides to the general public.

220.     Defendant knew that it was substantially likely that Michael would be harmed but failed to act on that likelihood, and thus acted with deliberate indifference, thereby intentionally discriminating against Michael in violation of Section 504 of the Rehabilitation Act.

221.     As a direct and proximate result of Defendant's actions, Michael Lee suffered injuries and damages causing great pain and leading to his death, as alleged herein.

**Sixth Claim for Relief**

**Negligent Supervision, Training, Hiring, and Retention**

**(Survival Action – California State Law)**

**(Plaintiff Estate Against Defendants Diaz, Kernan, Toche,**

**Gipson, Allison, Tebrock, Lozano, Austin, and Does 1-2)**

222.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

223.    Defendants Diaz, Kernan, Toche, Gipson, Allison, Tebrock, Lozano, Austin, and Does 1-2 had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrained from the conduct and/or omissions alleged herein.

224.    Defendants breached this duty, causing the conduct alleged herein.  Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of California.

225.    As a direct and proximate result of Defendants' failure, Plaintiffs suffered injuries and damages as alleged herein.

226.    The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Seventh Claim for Relief**

**Wrongful Death – California Code Civ. Proc. § 377.60**

**(All Plaintiffs Against ALL Defendants EXCEPT CDCR)**

227.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

228.    Michael Lee's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants.  Defendants' acts and/or omissions thus were also a direct and proximate cause of Plaintiffs' injuries and damages, as alleged herein.

229.    As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or

omissions, Plaintiffs incurred expenses for funeral and burial expenses in an amount to be proved.

230.    As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiff Sandy suffered the loss of the services, society, care, and protection of the decedent, as well as the loss of the present value of his future services to his family.  Plaintiff is further entitled to recover prejudgment interest.

231.    The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Eighth Claim for Relief**

**Negligence**

**(Survival Action – California State Law)**

**(Plaintiff Estate Against ALL Defendants EXCEPT CDCR)**

232.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

233.    Defendants failed to comply with professional standards in the care and supervision of Michael Lee during his incarceration within CDCR facilities.

234.    The failures by Defendants Diaz, Kernan, Toche, Gipson, Allison Tebrock, Lozano, Austin and Does 1 and 2 include but are not limited to failing to ensure the provision of timely and necessary mental health treatment and failing to ensure appropriate assessment and evaluation of suicide risk through the adoption, promulgation, and implementation of adequate policies, procedures, and training.

235.    Defendants Diaz, Kernan, Toche, Gipson, Allison Tebrock, Lozano, Austin and Does 1 and 2 also failed to appropriately supervise, review, and ensure the competence of provision of care and treatment to Michael Lee by medical and custody staff, and failed to enact appropriate standards and procedures that would have prevented such harm to him.

236.    Defendant Freiha failed to include relevant and available medical information into Michael's intake, resulting in an incomplete mental health record.  Additionally, Defendant Freiha

placed Michael in CCCMS care rather than a level of care appropriate to Michael's mental conditions and recent expressions of suicidal ideation.

237.     Defendants McGee, Edmonds, Sheffield, Anderson, Newton, Walker, Kraschel, Nocerino, Mims, Ramachandran, Gorewitz, Gutierrez, Flynn, Page-Pressley, Harrison, Surprise, and Flynn each failed to comply with professional standards in the planning and provision of care to Michael and the supervision thereof.

238.     Together, Defendants acted negligently and improperly, breached their respective duties, and as a direct and proximate result, Plaintiffs suffered injuries and damages as alleged herein.

239.     The negligent conduct of Defendants was committed within the course and scope of their employment.

240.     The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Ninth Claim for Relief

### Failure to Furnish / Summon Medical Care

### (Survival Action – California State Law)

### (Plaintiff Estate Against Does 3-10)

241.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

242.     Custodial Doe Defendants owed Michael Lee a duty of care to provide him immediate medical care.

243.     The conduct of Does 3-10 alleged herein, including but not limited to the facts that Defendants knew or had reason to know that on or before January 8, 2019, Michael Lee needed immediate medical care and was not given such care, violated California state law, including Cal. Govt. Code §§ 844.6 and 845.6.

244.     The alleged conduct of Does 3-10 was committed within the course and scope of their employment.

245.   As a direct and proximate result of Defendants' breach, Michael Lee suffered injuries and damages causing great pain and leading to his death, as alleged herein.

246.   The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.   For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.   For damages related to loss of familial relations as to Plaintiff Pamela Sandy;

3.   Funeral and burial expenses, and incidental expenses not yet fully ascertained;

4.   General damages, including damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering, the loss of the services, society, care and protection of the decedent, as well as the loss of financial support and contributions, loss of the present value of future services and contributions, and loss of economic security;

5.   Prejudgment interest;

6.   For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

7.   For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, 29 U.S.C. § 794a(b), Cal. Civ. Proc. Code § 52(a), and as otherwise authorized by statute or law;

8.   For restitution as the court deems just and proper;

9.   For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

/ / /

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury in this action.


Dated: June 9, 2020

Respectfully Submitted,

HADSELL STORMER RENICK & DAI LLP


By: /s/ Brian Olney

Dan Stormer
Brian Olney
David Washington
Attorneys for Plaintiffs



August 2017



# California Department of Corrections and Rehabilitation

It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides

Report 2016-131



COMMITMENT
INTEGRITY
LEADERSHIP



**CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814



**916.445.0255** | TTY **916.445.0033**

For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**



*Don't want to miss any of our reports? Subscribe to our email list at* **auditor.ca.gov**

*For questions regarding the contents of this report, please contact* Margarita Fernández, Chief of Public Affairs, *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternate format reports available upon request | Permission is granted to reproduce reports



August 17, 2017                                                                                                    2016-131

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California  95814

Dear Governor and Legislative Leaders:

As requested by the Joint Legislative Audit Committee, the California State Auditor presents this audit report concerning the California Department of Corrections and Rehabilitation's (Corrections) policies, procedures, and practices for suicide prevention and reduction, with a particular emphasis on the recently elevated suicide rate at the California Institution for Women. Although female inmates account for about 4 percent of Corrections' total inmate population, they accounted for 11 percent of inmate suicides from 2014 through 2016. This report concludes that Corrections should provide increased oversight and leadership to ensure that prisons follow its policies related to suicide prevention and response.

We identified significant weaknesses in prisons' suicide prevention and response practices at the four prisons we reviewed. Specifically, we found that the prisons failed to complete some required evaluations to assess inmates' risk for suicide and those that the prisons did complete were often inadequate. The inadequacies included leaving sections of the risk evaluations blank, failing to appropriately justify the determinations of risk, failing to develop adequate plans for treatment to reduce the inmates' risk, and relying on inconsistent information about inmates to determine risk. Also, the prisons we reviewed did not properly monitor inmates who were at risk of committing suicide. For example, we found that staff were not staggering behavior checks or conducting checks in the required 15-minute intervals. Finally, we found that some staff members at the prisons we visited had not completed required trainings related to suicide prevention and response. These conditions may have contributed to elevated suicide and attempted suicide rates at California prisons.

Corrections also lacks assurance that prisons are implementing its policies to address serious issues. For many years, a court-appointed special master, working with Corrections to address inmate mental health care, identified many of the same issues we discuss in this report. In 2013 Corrections began developing an audit process to review prisons' compliance with its policies and procedures, including those it issued in response to the special master's reports; however, that process is still in development. In addition, Corrections could provide additional leadership to prisons regarding the communication of best practices related to suicide prevention efforts. Finally, Corrections' policies require it to complete a thorough review of a prison's compliance with policies and procedures following an inmate's suicide, but Corrections does not complete such reviews for suicide attempts. This hinders Corrections' ability to identify problems with a prison's compliance with crucial policies and procedures until after an inmate dies.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
State Auditor

## Selected Abbreviations Used in This Report

| | |
|---|---|
| CCWF | Central California Women's Facility |
| CIW | California Institution for Women |
| Corrections | California Department of Corrections and Rehabilitation |
| health care division | Corrections' Division of Health Care Services |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison, Sacramento |
| VSPW | Valley State Prison for Women |

# Contents

Summary                                                                    1

Introduction                                                               7

**Chapter 1**
Prisons Have Not Followed Corrections' Policies When
Responding to Inmates Who Have Attempted or Are at
Risk of Attempting Suicide                                                17

Recommendations                                                          37

**Chapter 2**
A Number of Factors Have Likely Contributed to High Rates
of Inmate Suicides and Suicide Attempts at CIW                           39

Recommendations                                                          49

**Chapter 3**
To Reduce Inmate Suicides and Attempts, Corrections Must
Strengthen Its Oversight and Demonstrate Greater Leadership              51

Recommendations                                                          63

**Appendix A**
Rates of Inmate Suicides and Suicide Attempts in State Prisons
From 2012 Through 2016                                                   67

**Appendix B**
Scope and Methodology                                                    71

**Response to the Audit**
California Department of Corrections and Rehabilitation                  75

Blank page inserted for reproduction purposes only.

# Summary

## Results in Brief

Despite the fact that the rates of inmate suicide in California's prisons has been higher on average than those of all U.S. state prisons for several years, the California Department of Corrections and Rehabilitation (Corrections) has failed to provide the leadership and oversight necessary to ensure that its prisons follow its policies related to inmate suicide prevention and response. Corrections is responsible for providing mental health services to its inmates who are unable to function within the usual correctional environment because of mental illness. However, from 2005 through 2013, the average suicide rate in Corrections' prisons was 22 per 100,000 inmates—substantially higher than the average rate of 15.66 per 100,000 in U.S. state prisons during the same period. Further, in recent years, the rates of female inmates who committed suicide while in Corrections' prisons have soared: from 2014 through 2016, female inmates made up only about 4 percent of Corrections' total inmate population, yet they accounted for about 11 percent of its inmate suicides. These statistics, combined with the significant deficiencies we identified when we reviewed suicide prevention and response practices at four prisons, raise questions regarding Corrections' leadership on this critical issue.

When we reviewed the California Institution for Women (CIW); California State Prison, Sacramento (SAC); Central California Women's Facility (CCWF); and Richard J. Donovan Correctional Facility (RJD), one area in which we identified significant weaknesses was the four prisons' evaluations of inmates' suicide risk. Specifically, for various reasons, including when inmates attempt suicide, express suicidal thoughts, or engage in self-harm, Corrections' policy requires that prison mental health staff (mental health staff) complete suicide risk evaluations (risk evaluations) to assess an inmate's risk for suicide. These risk evaluations are critical to successful suicide prevention because they help mental health staff identify inmates who are likely to attempt suicide and the treatments needed to prevent them from doing so. Nonetheless, over the past several years, court-appointed mental health experts have repeatedly notified Corrections of problems related to its risk evaluations. Further, when we examined risk evaluations for the 36 of 40 inmates we reviewed who required them, we found that the prisons failed to complete at least one required risk evaluation for 10 of the inmates and completed inadequate risk evaluations for 26 of the inmates. The inadequacies we noted included leaving sections of the risk evaluations blank, failing to appropriately justify the determinations of risk, failing to develop adequate plans for treatment to reduce the inmates' risk, and relying on inconsistent or incomplete information about the inmates to determine risk.

*Audit Highlights . . .*

*Our audit of Corrections' policies and practices for inmate suicide prevention and response highlight the following:*

» *The average suicide rate in Corrections' prisons was substantially higher than the average of U.S. state prisons.*

» *The rates of female inmates who committed suicide while in Corrections' prisons have soared in recent years.*

» *We found significant weaknesses in compliance with suicide prevention and response policies when we reviewed 40 files on inmates who committed or attempted suicide at four prisons.*

• *Prisons failed to complete or completed inadequate risk evaluations for many of those inmates who required them.*

• *Prisons did not complete or created inadequate treatment plans for some inmates—plans did not always specify medication dosage and frequency, treatment methods, provider information, or follow-up upon discharge.*

• *Prisons did not properly monitor inmates who were at risk of committing suicide.*

» *Although Corrections has known about many of the issues related to suicide prevention and response policies and practices that we found for a number of years, it has not fully implemented processes to address the issues that have been raised.*

» *Corrections could take a more proactive leadership role in identifying programs or best practices and reviewing a prison's practices following an inmate's suicide attempt.*

In 2013 Corrections established a risk evaluation training, as well as a mentoring program to assess, every two years, whether mental health staff adequately completed risk evaluations and to provide training as needed. Corrections enhanced the mentoring program in 2016 by requiring prisons to audit mental health staff's risk evaluations twice each year and to have these staff undergo mentoring if they failed the audit; however, the results of our review demonstrate that this program has not resolved the problems. The failure may be due in part to Corrections allowing mental health staff to improperly complete significant sections of the risk evaluations and still pass Corrections' audit. According to Corrections' clinical support chief, Corrections does not expect perfection from its mental health staff. She also stated that despite their training, some mental health staff still do not know how to complete risk evaluations, and that others may rush when completing them because of their heavy workloads. Although Corrections has taken some steps to address these issues, the fact that the problems with the risk evaluations have continued shows that Corrections must increase its oversight.

Similarly, the prisons we reviewed failed to complete required treatment plans for some inmates and created inadequate treatment plans for others. Treatment plans are crucial to suicide prevention: based on the inmates' needs, they set goals for the inmates' treatment and determine the specific treatment methods mental health staff will use. State regulations and Corrections' policy require that prisons complete a plan for initial treatment (initial treatment plan) within 24 hours of an inmate's admission to a mental health crisis bed (crisis bed) and a more comprehensive plan within 72 hours of admission (72-hour treatment plan). Initial treatment plans are important because they prescribe treatment for the first few days of an inmate's crisis-bed stay. Nonetheless, when we reviewed the files of 26 inmates who required them, we found that CIW, CCWF, and RJD did not complete initial treatment plans for some inmates. Further, 25 inmates also required 72-hour treatment plans, but one prison did not complete such plans for two inmates. Finally, all 23 of the remaining 72-hour treatment plans we reviewed failed to meet the requirements outlined in state regulations. The most common problems we identified were that the plans did not specify medication dosage and frequency, treatment methods, the providers responsible for the treatments, or the follow-up treatments for the inmates who were discharged.

The four prisons also did not properly monitor inmates who were at risk of committing suicide. Corrections' policies require prisons to conduct staggered behavior checks at intervals not to exceed every 15 minutes of inmates who are at high risk of self-injury but not in immediate danger. However, when we reviewed records for 25 such inmates, we found that the prisons exceeded 15-minute

intervals for checks on 17 inmates, did not stagger checks for 19 inmates, and appeared to have prefilled or preprinted the forms documenting checks for eight inmates. Corrections said that a new electronic health record system that it is currently implementing systemwide will reduce some of these issues, as will a planned audit process that will include automated monitoring of these checks. Nevertheless, we still found problems with staff not staggering checks or conducting checks that exceeded intervals of 15 minutes at two prisons that implemented the new system, bringing into question whether it will fully resolve the problems we identified.

Taken as a whole, the types of compliance issues we identified at the four prisons we reviewed may have contributed to Corrections' continuing high suicide rates relative to those of prison systems in other states. In addition, a number of specific factors may have contributed to elevated suicide and suicide attempt rates among Corrections' female inmates. As we mention previously, the rate of suicide among female inmates has increased dramatically since 2014. This increase is especially pronounced at CIW, where six of the seven suicides by female inmates from 2014 through 2016 occurred. Officials at Corrections and CIW identified a number of reasons why the suicide rate at CIW may have increased during this period, including domestic violence in interpersonal relationships, drug involvement, and drug trafficking. Officials at CIW further cited a change in prison culture resulting from the conversion of Valley State Prison for Women to a men's institution and the subsequent transfer of high-security-level inmates to CIW.

In addition, we found that some staff members at CIW and the other prisons we visited had not completed required trainings related to suicide prevention and response. Corrections' policies require prison staff to participate in specific trainings on issues such as preventing suicide, assessing inmates' suicide risk, and developing treatment plans. However, when we reviewed records for 20 staff members at CIW, we found that the prison could not provide evidence that the staff members attended all required trainings. For example, the prison could not demonstrate that four of the 20 staff members attended annual required suicide prevention training in 2016. Further, Corrections' officials reported that not all staff members at the other three prisons received required trainings in 2016. Corrections' clinical support chief was unable to explain why these staff members had not participated in trainings as required. Instead, she stated that Corrections relies on the prisons' in-service training units to address clinical training noncompliance issues.

The ongoing nature of many of the problems we identified at the four prisons we reviewed is particularly troubling. A court-appointed special master has overseen many aspects of Corrections' provision

of mental health care since 1995. Since at least 1999, the special master has identified many of the same problems we found in our audit. In January 2015, the special master filed a report that was an audit of suicide prevention practices in each of the 35 prisons, which contained 32 recommendations. Corrections responded to the majority of these recommendations through the adoption of new policies, improvements to its facilities, changes to its trainings, and other actions. However, Corrections has not yet fully ensured prisons' compliance with changes resulting from the recommendations. According to Corrections, it began developing an audit process in 2013 to audit prisons' compliance with policies and procedures, but it has not yet completed that process nearly five years later, explaining that it continues to work on finalizing it with the special master. Absent such monitoring, Corrections lacks assurance that the prisons are addressing the serious problems the special master has identified.

Further, Corrections could take a more proactive leadership role in identifying programs and best practices that may help in preventing inmate suicide. For example, we identified best practices at one of the prisons we visited that we believe could benefit certain inmates at other prisons. Although Corrections recently conducted a suicide prevention summit with the chiefs of mental health and other prison leadership, at which it discussed best practices related to prisons' suicide prevention efforts, its documentation and dissemination of innovative programs and best practices related to suicide prevention has generally been limited. Similarly, Corrections has not conducted thorough reviews of the circumstances surrounding suicide attempts. Pursuant to its policies, the death of an inmate by suicide initiates an intensive review process in which Corrections identifies any problems with the prison's compliance with policies and procedures. It then issues a report containing recommendations to address those problems. However, Corrections requires no such review for suicide attempts. Corrections' clinical support chief explained that Corrections plans to implement a process for each prison to review a selection of its incidents of inmate self-harm; however, we question whether such reviews will be sufficiently impartial and critical. Without a thorough and unbiased review of the factors contributing to inmate suicide attempts, Corrections is hindered in its ability to identify potential problems with a prison's suicide prevention and response practices until after an inmate dies.

**Selected Recommendations**

*Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress toward meeting its goals related to the completion of suicide risk evaluations in a sufficient manner.

- Its progress toward meeting its goals related to the completion of 72-hour treatment plans in a sufficient manner.

- The status of its efforts to ensure that all staff receive training related to suicide prevention and response.

- Its progress in implementing the recommendations made by the special master regarding inmate suicides and attempts. Corrections should also include in its report to the Legislature the results of any audits it conducts as part of its planned audit process to measure the success of changes it implements as a result of these recommendations.

- Its progress in identifying and implementing mental health programs at the prisons that may ameliorate risk factors associated with suicide.

*Corrections*

Corrections should immediately require mental health staff to score 100 percent on risk evaluation audits in order to pass. If a staff member does not pass, Corrections should require the prison to follow its current policies by reviewing additional risk evaluations to determine whether the staff member needs to undergo additional mentoring.

To ensure that prison staff conduct required checks of inmates on suicide precaution in a timely manner, Corrections should implement its automated process to monitor these checks in its electronic health record system by October 2017.

To address the unique circumstances that may increase its female inmates' rates of suicide and suicide attempts, Corrections should continue to explore programs that could address the suicide risk factors for female inmates.

To ensure that all prison staff receive required training related to suicide prevention and response, Corrections should immediately implement a process for identifying prisons where staff are not attending required trainings and for working with the prisons to solve the issues preventing attendance.

To ensure that prisons comply with its policies related to suicide prevention and response, Corrections should continue to develop its audit process and implement it at all prisons by February 2018. The process should include, but not be limited to, audits of the quality of prisons' risk evaluations and treatment plans.

To ensure that all its prisons provide inmates with effective mental health care, Corrections should continue to take a role in coordinating and disseminating best practices related to mental health treatment by conducting a best practices summit at least annually. The summits should focus on all aspects of suicide prevention and response, including programs that seek to improve inmate mental health and treatment of and response to suicide attempts. Corrections should document and disseminate this information among the prisons, assist prisons in implementing the best practices through training and communication when needed, and monitor and report publicly on the successes and challenges of adopted practices.

In an effort to prevent future inmate suicide attempts, Corrections should implement its plan to review attempts with the same level of scrutiny that it uses during its suicide reviews. Corrections should require each prison to identify for review at least one suicide attempt per year that occurred at that prison. To ensure that the reviews include critical and unbiased feedback, Corrections should either conduct these reviews itself or require the prisons to review each other. These reviews should start in September 2017 and follow the same timelines as the suicide reviews, with the timeline beginning once the team identifies a suicide attempt for review.

## Agency Comments

Corrections stated it would address the specific recommendations in a corrective action plan within the timelines outlined in the report. We look forward to Corrections' 60-day response to our recommendations.

# Introduction

## Background

The California Department of Corrections and Rehabilitation (Corrections) is responsible for protecting the public by safely and securely supervising adult and juvenile offenders, providing effective rehabilitation and treatment, and integrating offenders successfully into the community. It operates two adult women's prisons and 33 adult men's prisons across the State.[1] According to a report Corrections issued in 2017, 123,540 male inmates and 5,876 female inmates were incarcerated within its facilities as of December 31, 2016. Figure 1 on the following page shows the locations of Corrections' prisons and highlights the four prisons we selected for review during the course of our audit work.

Corrections is responsible for the provision of mental health care to all of its inmates, including receiving, evaluating, housing, treating, and referring those inmates who are unable to appropriately function within the constraints of the usual correctional environment because of mental illnesses. Its Division of Health Care Services (health care division) provides mental health services through its Mental Health Services Delivery System (mental health system), the mission of which is "to provide inmates with an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of both [the inmates and prisons]." Corrections employs numerous individuals, such as psychiatrists, psychologists, social workers, and nurses, to provide mental health services to inmates (mental health staff). Prison staff may refer inmates to the prison's mental health program, or inmates may submit requests for services to the prison's mental health staff for their approval.

Despite the mental health services that Corrections provides, the rate at which its inmates commit suicide has generally been higher than the rates in most other states. Table 1 on page 9 shows the number of attempted suicides and suicides from 2012 through 2016 at the four prisons we reviewed, and Appendix A presents these data for all the State's prisons. According to a 2016 report by a mental health expert appointed by a U.S. district court, the average suicide rate in Corrections was 22 per 100,000 inmates from 2005 through 2013, significantly higher than the average rate of 15.66 per 100,000 inmates in U.S. state prisons during the same period. Although Corrections' 2014 inmate suicide rate of 16.97 per 100,000 inmates was lower than the 2014 rate of 20 per 100,000 inmates for all U.S. state prisons, Corrections' inmate suicide rates have been higher on average than those of U.S. state prisons since 1999.

---

[1]  Corrections houses women within other facilities, including some medical facilities and a small facility at Folsom State Prison. In addition, Valley State Prison housed women before Corrections converted it to a men's facility in 2013.

**Figure 1**
**Map of Adult Correctional Institutions and the Four Prisons We Visited**



CALIFORNIA'S CORRECTIONAL
AND REHABILITATION INSTITUTIONS

• Adult correctional institution
○— Adult correctional institution we
visited as part of this audit

Pelican Bay State Prison

California Correctional Center
High Desert State Prison

Folsom State Prison
Folsom Women's Facility
**California State Prison, Sacramento**
California
Medical Facility
California State
Prison, Solano
San Quentin
State Prison
California Health
Care Facility
Deuel Vocational Institution

Mule Creek State Prison

Sierra Conservation Center

**Central California Women's Facility**
Valley State Prison

Correctional Training Facility
Salinas Valley State Prison
Pleasant Valley State Prison

Avenal State Prison

Substance Abuse Treatment Facility
and State Prison in Corcoran
California State Prison, Corcoran

North Kern State Prison
Kern Valley State Prison
Wasco State Prison

California Men's Colony
California Correctional Institution
California City Correctional Facility

California State Prison,
Los Angeles County

California Institution for Men
**California Institution for Women**

California Rehabilitation Center
Chuckawalla Valley State Prison
Ironwood State Prison

Calipatria State Prison

Centinela State Prison

**Richard J. Donovan Correctional Facility**

Source: Corrections.

The suicide rate of Corrections' male inmates remained relatively static from 2012 through 2016; however, the suicide rate of its female inmates increased. In 2012 female inmates accounted for about 5 percent of Corrections' inmate population and for 4 percent of its suicides. However, although female inmates made up about 4 percent of Corrections' inmate population from 2014 through 2016, they accounted for about 11 percent of the suicides. Almost all of the suicides during this period occurred at the California Institution for Women (CIW). In fact, concern about CIW's high suicide rate was the impetus for this audit.

**Table 1**
**Suicides and Suicide Attempts at the Four Prisons We Visited, From 2012 Through 2016**

| | WOMEN'S PRISONS | | MEN'S PRISONS | |
| | CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF) | CIW | RICHARD J. DONOVAN CORRECTIONAL FACILITY (RJD) | CALIFORNIA STATE PRISON, SACRAMENTO (SAC) |
|---|---|---|---|---|
| **2012** | | | | |
| Population* | 2,931 | 1,642 | 3,539 | 2,698 |
| Suicides | 0 | 1 | 0 | 1 |
| Attempts | 5 | 13 | 28 | 22 |
| **2013** | | | | |
| Population* | 3,531 | 2,082 | 3,364 | 2,246 |
| Suicides† | 0 | 1 | 3 | 1 |
| Attempts | 8 | 15 | 33 | 32 |
| **2014** | | | | |
| Population* | 3,648 | 2,005 | 3,070 | 2,218 |
| Suicides | 0 | 2 | 1 | 2 |
| Attempts | 6 | 15 | 22 | 11 |
| **2015** | | | | |
| Population* | 3,002 | 1,882 | 3,096 | 2,237 |
| Suicides† | 0 | 2 | 2 | 3 |
| Attempts | 11 | 34 | 51 | 12 |
| **2016** | | | | |
| Population* | 2,865 | 1,863 | 3,094 | 2,327 |
| Suicides† | 1 | 2 | 0 | 3 |
| Attempts | 25 | 24 | 59 | 8 |
| **Totals** | | | | |
| **Population*** | 3,195 | 1,895 | 3,233 | 2,345 |
| **Suicides†** | 1 | 8 | 6 | 10 |
| **Attempts** | 55 | 101 | 193 | 85 |

Sources:  California State Auditor's analysis of Corrections' COMPSTAT metrics from 2012 through 2016, and the average daily population for each prison as reported by Corrections.

\* *Population* is based on Corrections' average daily population. The total represents the average of the five years' populations.

† The numbers we present here reflect our amendments to Corrections' COMPSTAT data. As we discuss in Chapter 3, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. We have therefore adjusted the number of suicides in 2013, 2015, and 2016 to include three suicides that we identified at CIW, RJD, and SAC; however, we caution that these numbers may still not be accurate.

## Court-Ordered Oversight of Corrections' Mental Health Services

As Figure 2 shows, federal courts have monitored Corrections' delivery of mental health services to its inmates for over two decades, as a result of a decision on a lawsuit that began in 1990—*Coleman v. Brown* (*Coleman*).[2] This federal class action lawsuit alleged that Corrections failed to provide constitutionally adequate mental health care to mentally ill inmates. The court identified that Corrections had failed to provide timely access to necessary care, which exacerbated inmates' suffering and illnesses. In addition the court found that Corrections had an inadequate screening system for mental illnesses, deficient medical recordkeeping, improper administration of medication, and insufficient staffing. In December 1995, the court in *Coleman* appointed a special master to oversee and work with Corrections to address the constitutional violations, monitor implementation of court-ordered remedial plans, and submit reports on Corrections' progress in implementing improvements. Over the next decade, the special master submitted 15 reports to the court, which noted that although Corrections had made some progress, it still had not met its constitutional obligation to provide inmates with adequate mental health care during that time. Further, the special master's fifteenth report in January 2006 indicated a reversal in Corrections' progress. Specifically, this report noted systemwide increases in staffing vacancy rates and rates of inmate suicide.

In April 2001, another class action lawsuit, *Plata v. Brown* (*Plata*), alleged constitutional violations in Corrections' delivery of medical care to inmates that resulted in unnecessary pain, injury, and death.[3] These violations included delays in or failure to provide access to medical care, untimely responses to medical emergencies, and the interference of custodial staff with the provision of medical care. After the plaintiffs filed the lawsuit, they and Corrections agreed that Corrections would implement certain policies and procedures to improve its delivery of medical care, which the court entered as an order in 2002. However, in 2005 the federal court determined that Corrections had yet to ensure that its medical system met constitutional standards. As a result, the court appointed a receiver in February 2006 to provide leadership and executive management of Corrections' medical health care delivery system. This receivership is still in place.

---

[2]    When this case was filed, it was called *Coleman v. Wilson*.

[3]    When this case was filed, it was called *Plata v. Davis*.

**Figure 2**
**Timeline of Court-Ordered Oversight of Corrections**



**April 1990**
*Coleman*, a class action lawsuit, is filed, alleging constitutional violations due to lack of adequate mental health care.

1990

1995

**September 1995**
Court rules in favor of plaintiff, stating Corrections' delivery of mental health care violated the Constitution.

**December 1995**
Court ordered a special master to develop a plan to address constitutional violations and monitor Corrections' implementation of the plan.

2001

**April 2001**
*Plata*, a class action lawsuit, is filed, alleging constitutional violations in Corrections' delivery of medical care to its inmates.

**January 2006**
Special master files reports, noting a reversal in Corrections' progress of its remedial efforts.

2006

**February 2006**
Court appoints receiver to provide leadership and executive management of Corrections' medical health care delivery system.

**August 2009**
Court finds that Corrections' prison population reached a high of more than 170,000 inmates in October 2006. Court orders Corrections to reduce its prison population to 137.5 percent of capacity.

2009

2013

**November 2013**
Suicide expert begins his audit on Corrections' prisons.

**January 2015**
Suicide expert files his completed audit on suicide prevention practices at Corrections' prisons, which results in 32 recommendations.

2015

**January 2016**
Suicide expert completes a follow-up audit on prisons' implementation of the recommendations.

2016

**August 2016**
The Joint Legislative Audit Committee approves a request for the State Auditor to conduct an audit of Corrections' suicide prevention policies due to concerns related to the number of suicides at CIW.

SPECIAL MASTER OVERSEES CORRECTIONS' MENTAL HEALTH CARE DELIVERY (*Coleman*)

FEDERAL RECEIVERSHIP OVERSEES CORRECTIONS' MEDICAL CARE DELIVERY (*Plata*)

Sources: Reports from the special master's suicide expert in 2015 and 2016, court documents, and minutes of the California State Legislature's Joint Legislative Audit Committee.

In 2007 the courts in *Coleman* and *Plata* recommended that both cases be assigned to a three-judge panel to address prison overcrowding. In August 2009, the three-judge panel noted that in 2006—the same year that the *Coleman* special master's report noted a reversal in Corrections' delivery of mental health services and the court in *Plata* appointed the receiver—California's prison population reached a historic high of more than 170,000 inmates. This historic high led to unprecedented overcrowding of California's prisons. The three-judge panel found overcrowding to be the primary cause of many of the issues relating to inadequate mental health and medical care in California's prisons. Therefore, the three-judge panel ordered Corrections to develop a plan to reduce its prison population, which at that time was at about 190 percent of capacity, to 137.5 percent of capacity. In 2011 the Legislature passed various laws that realigned the criminal justice system, which reduced overcrowding by allowing for inmates who were not convicted of serious or violent crimes, or felonies requiring registration as a sex offender, to serve their sentences in county jails instead of state prisons.

Although these efforts resulted in the reduction of Corrections' inmate population, a March 2013 *Coleman* special master's report identified continuing inadequacies in Corrections' delivery of mental health services. The special master had repeatedly identified many of these inadequacies in earlier reports, such as Corrections' failure to enforce its own policies regarding the delivery of mental health services and the prisons' failure to provide adequate emergency responses to suicides. In response to the report, the court in *Coleman* ordered Corrections to establish a suicide prevention and management workgroup consisting of members of Corrections' clinical, custody, and administrative staff; experts appointed by the special master; and others. The workgroup engaged a nationally recognized suicide prevention expert (suicide expert) to conduct a review of the suicide prevention practices at each of Corrections' prisons. In January 2015, the suicide expert filed his report, which contained 32 recommendations to Corrections. The suicide expert issued an update to this report in January 2016, in which he evaluated Corrections' progress in implementing the recommendations through a review of 18 prisons. We discuss the suicide expert's report and update in Chapter 3.

**Suicide Prevention and Response**

As we mention earlier, the goal of Corrections' mental health system is to provide appropriate levels of mental health treatment to seriously mentally ill inmates in the least restrictive environment. As presented in Figure 3, Corrections provides escalating levels of mental health care to inmates, up to and including referrals to Department of State Hospitals' facilities if Corrections cannot meet inmates' mental health needs.

**Figure 3**
**Levels of Care in Corrections' Mental Health System**



**4** **Inpatient Care**
Provides care at Department of State Hospitals' facilities for inmates whose conditions cannot be successfully treated in the outpatient setting or in short-term mental health crisis-bed (crisis bed) stays. Corrections provides this level of care for female inmates in the Psychiatric Inpatient Program at CIW.

**3** **Crisis Beds**
Provides care to inmates with marked impairment and dysfunction requiring 24-hour nursing care, inmates who present a danger to others as a consequence of serious mental disorders, and inmates who present a danger to themselves for any reason.

**2** **Enhanced Outpatient Program**
Provides care to inmates with mental disorders who would benefit from the structure of a therapeutic environment that is less restrictive than an inpatient setting and who do not require continuous nursing care. The program is located in a designated living unit at each prison.

**1** **Correctional Clinical Case Management System**
Provides care to inmates whose conditions are relatively stable and whose symptoms are controlled or are in partial remission as a result of treatment.

Sources:  Corrections' 2009 *Mental Health Program Guide* (program guide) and *2014 Annual Accomplishments* report.
Note:  Not all institutions contain all levels of care.

**Terms Related to Inmate Suicide**

**Suicidal ideation:** Thoughts of suicide or death. Such thoughts may be either specific or vague and may include the desire to be dead.

**Suicidal intent:** The intention to deliberately end one's life.

**Self-harm without intent:** An act of purposeful self-harm without suicidal intent.

**Suicide attempt:** An act of purposeful self-harm with the intent to die.

**Suicide:** An act of purposeful self-harm that causes or leads to one's own death.

Sources: Corrections' 2009 program guide and suicide risk evaluation training documents.

A primary component of Corrections' mental health system is crisis intervention, which is treatment for rapid-onset or worsening symptoms of mental illness in inmates. Such symptoms may include thoughts of suicide. Corrections has identified factors that can lead inmates to experience mental health crises while in prison, including the loss of an existing support system outside of prison, the restrictions of incarceration, and fears of being unable to cope with the outside world upon release. Corrections' policy states that staff must refer inmates who are dangers to themselves to crisis beds, an inpatient treatment setting for inmates who have acute symptoms of serious mental disorders or are suffering from significant or life-threatening disabilities. If no crisis beds are available at a prison, staff must place an inmate in a temporary housing location in the prison—known as *alternative housing*—pending admission to a crisis bed. Under these circumstances, policy requires prisons to transfer an inmate to a crisis bed at another prison if the other prison can provide the same level of custody and security.

Corrections' policies outline specific steps prison staff must take when they become aware of inmates' suicidal ideation, suicidal intent, or self-harm, which the text box defines. If prison staff become aware of any of these conditions, Corrections' policy requires that they place inmates under observation until mental health staff can conduct a suicide risk evaluation (risk evaluation). As we discuss in Chapter 1, mental health staff use these evaluations to determine inmates' risk of suicide and to make specific recommendations regarding the level of care required.

Corrections also has a policy that prison staff must follow when staff discover inmates who are attempting suicide. When responding to a suicide attempt in progress, Corrections' policy requires prison staff to sound an alarm to summon additional personnel, respond appropriately when blood is present, neutralize any significant security threats to themselves or others, and initiate life-saving measures consistent with training. When medical personnel arrive, they take over responsibility for the medical treatment and life-saving measures.

Following the admission of inmates to crisis beds as a result of suicide attempts, ideation, or self-harm, prison staff must complete various steps in order to provide treatment. Figure 4 provides a summary of these steps. For example, while inmates are in crisis beds, prison staff must keep them under observation. Depending on whether inmates are in immediate danger, staff must either

maintain continuous visual contact with them or perform checks at staggered intervals not exceeding once every 15 minutes. Further, while inmates are in crisis beds, prison staff must complete treatment plans. According to Corrections' policies, crisis-bed stays are supposed to last for up to 10 days, although inmates may stay longer with the approval of a prison's chief of mental health.

**Figure 4**
**Corrections' Process for Inmates' Admission to and Discharge From Crisis Beds**



Sources:  Corrections' 2009 program guide and related policy memos.

Corrections has taken certain actions to ensure that the prisons comply with its policies and to identify additional ways to prevent inmate deaths due to suicide. For example, Corrections has established its own Suicide Prevention and Response Focused Improvement Team (suicide prevention team) and established suicide prevention teams at each prison. The purpose of these teams is to provide staff with training and guidance with regard to suicide prevention, response, reporting, and review. The suicide prevention teams at each prison are also responsible for monitoring and tracking all self-harm incidents, suicide attempts, and deaths, as well as reviewing the prison's policies to ensure consistency with Corrections' policies. According to Corrections' policies, these teams must be composed of certain prison staff representing multiple disciplines, such as the chief psychologist and chief psychiatrist, and must meet once per month.

In addition, following each suicide, Corrections completes a review of the prison's compliance with policies and procedures, including examining the history of the inmate's mental health care while incarcerated and the prison's emergency response to the suicide. It describes the results of its review in a report (suicide report) that it provides to the prison. When warranted, Corrections makes recommendations to the prison to improve the quality of care and ensure compliance with its policies and procedures.

# Chapter 1

## PRISONS HAVE NOT FOLLOWED CORRECTIONS' POLICIES WHEN RESPONDING TO INMATES WHO HAVE ATTEMPTED OR ARE AT RISK OF ATTEMPTING SUICIDE

The four prisons we reviewed failed to consistently follow Corrections' policies for responding to, treating, and observing inmates who had attempted or were at risk of attempting suicide. For example, we found many instances in which prisons either did not perform or did not adequately complete required risk evaluations, even though mental health staff use these critical documents to determine the treatment inmates should receive. In addition, we identified numerous instances in which prisons did not include necessary information in inmates' treatment plans, potentially affecting the nature and timeliness of the care the inmates received. In fact, Corrections' reviews of inmate suicides and its own audits of the quality of both risk evaluations and treatment plans have found that prisons did not complete these documents to its required standards. Further, the four prisons may have placed inmates at risk of death by insufficiently monitoring them following suicide attempts, and some prisons failed to respond to suicide attempts in accordance with Corrections' policies.

### The Prisons We Reviewed Did Not Properly Evaluate Some Inmates' Suicide Risk

Risk evaluations are critical to successful suicide prevention because they help prisons identify inmates who are likely to attempt suicide and determine the treatments needed to prevent them from doing so. The proper completion of a risk evaluation can therefore be the difference between life or death for an inmate. Corrections' policies require that mental health staff complete risk evaluations under a number of circumstances, including when inmates have initial face-to-face evaluations for suicidal thoughts, threats, attempts, or self-harm, as well as before their discharge from crisis beds. When completing risk evaluations, mental health staff are to examine inmates' mental status and determine the presence or absence of chronic and acute risk factors for suicide. The text box includes examples of such risk factors. They must also review any protective factors that may mitigate inmates' risk of suicide, such as religious beliefs, family support, and participation

---

**Examples of Inmate Suicide Risk Factors**

Chronic risk factors

- History of suicide attempts
- History of emotional, physical, or sexual abuse
- Chronic pain problem
- Long or life sentence
- History of depressive or psychotic disorders
- History of certain mental illnesses
- History of substance abuse

Acute risk factors

- Suicidal thoughts
- Recent trauma
- Recent bad news
- Agitation or anger
- Hopelessness or helplessness
- Increasing interpersonal isolation
- Single cell placement

Sources: Corrections' 2009 program guide and suicide risk evaluation form.

in group activities. Finally, mental health staff must document whether inmates are at high, moderate, or low risk for suicide and make specific recommendations regarding the appropriate level of care. Mental health staff must also address how the treatment plan will be implemented and any required follow-up procedures.

*Despite the critical role risk evaluations serve, all four prisons we reviewed failed to complete at least one required risk evaluation.*

Despite the critical role risk evaluations serve, all four prisons we reviewed failed to complete at least one required risk evaluation. Specifically, for a selection of 40 inmates who attempted or committed suicide from 2014 through 2016, we reviewed the risk evaluations the prisons conducted just before or immediately following the suicide attempt or suicide, and the suicide reports Corrections completed following the suicides. We identified that the prisons should have completed risk evaluations for 36 of these 40 inmates. However, as Table 2 shows, 10 of the 36 inmates were missing at least one required risk evaluation. Although the four prisons offered a number of reasons for the missing risk evaluations, they generally agreed that they had failed to comply with Corrections' policies. For example, the chief of mental health of CCWF stated that risk evaluations are not always necessary for inmates discharged to a higher level of care because the receiving institutions will complete them on admission. However, she acknowledged that Corrections' policies require prisons to complete risk evaluations under these circumstances, and Corrections' clinical support chief affirmed that conducting risk evaluations on discharge to a higher level of care is helpful for continuity of care.

In addition to failing to complete certain risk evaluations, the four prisons completed inadequate risk evaluations for 26 of the 36 inmates we reviewed. Each of these 26 inmates received at least one inadequate risk evaluation, and 13 received more than one. The types of problems we identified varied. For example, mental health staff left blank sections of the risk evaluations for 10 inmates, including sections detailing their consideration of some risk factors and identifying whether the inmates had a desire or plan to die. These blank spaces suggest that the mental health staff may not have considered all relevant information when determining the likelihood of the inmates attempting suicide, which could have caused them to underestimate the inmates' suicide risk level.

Further, for 18 of the 36 inmates, mental health staff did not adequately justify their determinations of the inmates' suicide risk levels. Specifically, either they did not incorporate risk factors when justifying their determinations or they simply listed inmates' risk factors without considering their behaviors or symptoms. In some cases, mental health staff noted the presence of several risk factors and warning signs of imminent suicide risk, yet they still concluded that inmates were at low acute risk, which refers to short-term

fluctuations in inmates' risk of attempting suicide, without adequately documenting the rationale for their determinations. For example, one mental health staff member at SAC indicated that an inmate was at low acute risk for suicide, despite noting that he demonstrated five of the 10 warning signs of imminent suicide risk. The mental health staff member did not include any of these warning signs in the justification of risk, but rather noted that the inmate denied a desire to commit suicide. However, the mental health staff member also indicated that the inmate stated that talking about his suicidal ideation was difficult because he had no intention of ever going to a crisis bed. The inadequate justification for this inmate's risk determination suggests that the mental health staff member may not have considered all risk factors and therefore may have incorrectly estimated the inmate's risk of suicide—a problem that we found repeatedly in the risk evaluations we reviewed.

**Table 2**

**The Four Prisons We Reviewed Completed Inadequate Risk Evaluations**

| PRISON | NUMBER OF INMATES REVIEWED WHO REQUIRED ONE OR MORE RISK EVALUATIONS | NUMBER OF INMATES MISSING AT LEAST ONE REQUIRED RISK EVALUATION | NUMBER OF INMATES WITH ONE OR MORE INADEQUATE RISK EVALUATIONS |
|---|---|---|---|
| CCWF | 9 | 7 | 7 |
| CIW | 8 | 1 | 4 |
| RJD | 9 | 1 | 6 |
| SAC | 10 | 1 | 9 |
| Totals | 36 | 10 | 26 |

| PRISON | SPECIFIC PROBLEMS WITH THE RISK EVALUATIONS* (BY NUMBER OF INMATES) | | | |
|---|---|---|---|---|
| | SECTIONS IN RISK EVALUATION WERE BLANK | JUSTIFICATION OF RISK DETERMINATION WAS INCOMPLETE[†] | TREATMENT PLAN TO REDUCE RISK WAS MISSING OR INCOMPLETE[†] | STAFF USED INCONSISTENT OR INCOMPLETE INFORMATION ABOUT THE INMATE TO DETERMINE SUICIDE RISK |
| CCWF | 5 | 5 | 3 | 2 |
| CIW | 2 | 2 | 2 | 1 |
| RJD | 0 | 4 | 5 | 3 |
| SAC | 3 | 7 | 8 | 4 |
| Totals | 10 | 18 | 18 | 10 |

Sources:  California State Auditor's review and analysis of health records for 10 inmates at each of the four prisons, Corrections' 2009 program guide, and other Corrections' policies.

\* We present the number of inmates who had risk evaluations with the problem listed. Some inmates had multiple inadequate risk evaluations, and some had risk evaluations that had more than one of the problems listed.

[†] We determined whether the justifications and risk reduction plans in the risk evaluations were complete based on whether they contained all required elements named in Corrections' suicide risk evaluation audits and mentoring documents.

The four prisons also failed to develop adequate plans for treatment within the risk evaluations for half of the inmates we reviewed. When completing risk evaluations, mental health staff must document treatments targeting modifiable risk factors, such as feelings of agitation, anger, or hopelessness. These treatments should be as specific as possible, leaving little room for misinterpretation or confusion. However, mental health staff failed to document such specific treatments in the risk evaluations for 18 of the 36 inmates we reviewed. For example, CIW's risk evaluation for an inmate that had just attempted suicide indicated that she demonstrated seven acute risk factors, including depression and agitation or anger. However, the mental health staff member did not prescribe treatment, noting only that the inmate should be observed and should continue her current medication. Prisons are not likely to be able to prevent inmates from attempting suicide without addressing the factors that increase their risk of doing so.

*Prisons are not likely to be able to prevent inmates from attempting suicide without addressing the factors that increase their risk of doing so.*

Further, for 10 of the inmates we reviewed, mental health staff completed risk evaluations based on inconsistent or incomplete information. For example, according to the suicide report Corrections completed following one inmate's suicide at SAC, mental health staff had completed for the inmate three different risk evaluations, which stated that he had certain protective factors in place to reduce his risk of suicide, including family support and good coping skills. However, a review of other documents in the inmate's file showed that he did not have these protective factors. Corrections stated in the suicide report that similarities among the three risk evaluations suggest that mental health staff copied the risk and protective factors from previous evaluations, resulting in an inaccurate picture of the inmate's mental health. Similarly, another one of Corrections' suicide reports stated that the final risk evaluation CIW completed before an inmate's suicide failed to note that she had a history of suicide attempts—a critical determinant of future suicide risk. According to the suicide report, the mental health staff member appeared to accept the inmate's denial of any prior suicide attempts and did not review the suicide attempt history documented in a previous risk evaluation.

Corrections offered some reasons for the prisons' failure to complete adequate risk evaluations. Specifically, its clinical support chief explained that mental health staff have heavy caseloads, which the four prisons we reviewed generally also indicated is a contributing factor. The clinical support chief stated that if prison management has not set clear expectations that suicide risk evaluations should be prioritized, mental health staff may rush to complete risk evaluations. She said prison management should help mental health staff by redirecting their workloads to allow

them to devote the necessary attention to complete adequate risk evaluations. She also stated that, despite existing training, mental health staff are still unsure of how to complete risk evaluations.

Despite its ability to point to reasons for deficiencies in risk evaluations, our review demonstrates that Corrections has not adequately addressed those factors, jeopardizing its ability to prevent inmate suicide attempts. In fact, for years mental health experts on suicide have called on Corrections to address many of the same problems we identified in our review. For example, a 2013 special master's report stated that for half of the suicide cases in 2011, prisons either did not complete risk evaluations or concluded that inmates had a low or "no appreciable" risk of suicide without adequate consideration of risk factors, past history, or medical records. Clinical experts that the special master engaged noted similar problems with risk evaluations each year through 2014, when they concluded that the prisons had either failed to conduct or had inadequately completed risk evaluations in almost 70 percent of the suicide cases that occurred that year. Further, beginning in November 2013 and continuing through July 2014, the suicide expert reviewed each prison's suicide prevention practices and found that mental health staff often did not complete required risk evaluations and that the quality of risk evaluations was frequently problematic. Specifically, the suicide expert's review of hundreds of risk evaluations found that many contained risk factors and protective factors that did not align with the mental health staff's assessments of the inmates' risk levels.

*For years mental health experts on suicide have called on Corrections to address many of the same problems we identified in our review.*

Although Corrections has taken actions in response to these findings, those actions have not resulted in significant change. For example, in 2013 Corrections issued policies requiring mental health staff to attend a seven-hour training and, every two years, undergo a mentoring program that focuses on administering risk evaluations. The mentoring program involves trained mentors observing mental health staff conducting one or more risk evaluations, assessing their skills, and when needed, providing training on the proper techniques for completing risk evaluations. However, as the reports cited demonstrate, neither the training nor the mentoring program ensured that mental health staff adequately completed risk evaluations. The suicide expert noted that mental health staff were required to complete only two risk evaluations under the supervision of a mentor and that they received no additional critiques until they had to undergo the mentoring program two years later. Based on his recommendations, Corrections modified its policy in early 2016 to, among other things, require that prisons audit risk evaluations for each mental health staff member twice each year, and to require that those who failed the audit repeat the mentoring program.

Although we agree that this change was necessary to improve oversight of risk evaluations, room for further improvement in both the policy and its implementation remains. Specifically, Corrections' risk evaluation audits permit a degree of failure. Figure 5 shows the process prisons use when completing the audits to determine whether mental health staff members need additional mentoring. During the audit, program supervisors review seven items—which Table 3 lists—that must be in a risk evaluation. Corrections' policy requires that mental health staff correctly complete six of the seven items to pass the audit.

**Figure 5**

**Corrections' Process for Determining Whether Mental Health Staff Require Additional Mentoring on Completing Risk Evaluations**



Twice each year the prison audits one randomly selected suicide risk evaluation for every staff member who completes risk evaluations.

The audit reviews seven items, and the staff member must adequately complete at least six to pass.

✔ PASS            FAIL ✖

The prison audits a second suicide risk evaluation.

✔ PASS            FAIL ✖

The prison audits a third suicide risk evaluation.

✔ PASS            FAIL ✖

No further action is taken until the next audit cycle.

The prison refers the staff member to repeat the mentoring program.

Sources:  Corrections' health care division's March 15, 2016, memorandum revising its risk evaluation mentoring program and Corrections' instructions for completing the risk evaluation audit.

However, as a result, a mental health staff member could fail to complete an important section in a risk evaluation, such as detailing the inmate's history of suicide attempts or describing the risk reduction plan, and still pass. Corrections' clinical support chief said that Corrections does not require that mental health staff obtain 100 percent because it does not expect perfection and because if too many failed the audit, it would not have enough mentors to complete the necessary mentoring. She also identified all but one item in the audit—the identification of sources of information—as critical. Nevertheless, listing the sources of information is important to ensure that mental health staff are considering all critical sources of information when evaluating an inmate's risk factors. In response to our concerns, Corrections' clinical support chief explained that Corrections could make passing certain items within the audit mandatory. However, because of the importance of each section of the risk evaluation, we believe requiring mental health staff to adequately complete all sections is essential for reducing the risk of inmate suicide.

**Table 3**

**Items of a Risk Evaluation and Corrections' Corresponding Audit Criteria**

| RISK EVALUATION ITEM | RISK EVALUATION AUDIT CRITERIA | |
| --- | --- | --- |
| | AUDIT ITEM | DESCRIPTION |
| Check boxes indicating the presence or absence of chronic and acute suicide risk factors. | 1 | Are all risk factor boxes checked? |
| Check boxes indicating the presence or absence of protective factors that mitigate suicide risk. | 2 | Are all protective factor boxes checked? |
| Check box indicating whether inmate has a history of suicide attempts. | 3 | Is the item complete? |
| Include details of previous suicide attempts. | 4 | If the inmate has a history of suicide attempts, did the staff member detail those attempts? |
| Include the sources of information used to complete the risk evaluation, such as inmate interview, staff interview, or mental health file review. | 5 | Did the staff member document the sources of information used? |
| Describe the justification of risk determination. | 6 | Are both chronic and acute risk levels checked and justified in the narrative, citing the presence or absence of identified risk factors, protective factors, and warning signs? |
| Describe the safety/risk reduction plan. | 7 | Did the staff member incorporate the identified modifiable risk factors, protective factors, and warning signs into a risk reduction plan? |

Sources: Corrections' risk evaluation form and its risk evaluation audit criteria.

Corrections has similarly set the bar too low for the percentage of prisons' risk evaluations that must pass the risk evaluation audit—90 percent—yet it has still struggled to meet its own standards. According to Corrections' mental health administrator for quality management and inpatient facilities (quality administrator), the prisons report to Corrections the percentage of mental health staff members who passed the risk evaluation audit each month. A June 2017 Corrections report shows that from December 1, 2016, through May 31, 2017, prisons reported that 71 percent of risk evaluations systemwide met the audit criteria. Although this is a marked improvement from the prisons' performance in 2014 and 2015—Corrections' reports show that only 38 percent of the risk evaluations audited passed during that two-year period—it is still far below Corrections' established goal of 90 percent. However, even if Corrections achieved its goal, mental health staff would still have adequately completed only nine out of 10 risk evaluations. We believe that this is an unacceptable level of failure, given the potential consequences of deficient risk evaluations.

*Although prisons reported that 71 percent of risk evaluations systemwide met the audit criteria from December 1, 2016, through May 31, 2017, it is still far below Corrections' established goal of 90 percent.*

Corrections also sets its completion standards too low for the percentage of risk evaluations that each prison should complete on time. According to the quality administrator, Corrections uses an automated process to track the percentage of risk evaluations that each prison completes on time and requires prisons that score lower than 85 percent to develop an action plan for improvement. According to Corrections' reports, from December 1, 2016, through May 31, 2017, the prisons collectively achieved a score of 92 percent for being on time. The quality administrator said that it set the goal at 85 percent because that is a standard goal for health care processes. However, given that the timely completion of risk evaluations is critical to ensuring that inmates receive prompt and necessary treatment to reduce their risk of suicide, we believe Corrections should find it unacceptable for more than one in 10 inmates to not receive a risk evaluation on time.

Corrections could improve the quality of its risk evaluations by updating its electronic risk evaluation form. In our review of risk evaluations at RJD, we found that the prison had included prompts to aid the mental health staff member in completing the form. For example, in the section for documenting the treatment to reduce the inmate's risk, the prison included text instructing mental health staff to document treatment interventions for those risk factors that can be treated, which are referred to as *modifiable risk factors*. We found that this risk evaluation met all of the requirements of the risk evaluation audit. Although this was the only risk evaluation that we reviewed at RJD that contained these prompts, according to RJD's chief psychologist, the prison began including these prompts in early 2016 and she believed that they had contributed to an improvement in risk evaluations. Consistent with the chief's

statement, Corrections' risk evaluation audit reports showed
that the percentage of RJD's risk evaluations that passed the
audit increased from 77 percent in January 2016 to 100 percent
in March 2017.  Corrections' clinical support chief agreed that
such prompts would be beneficial, and that Corrections could
incorporate them into the risk evaluation forms in its electronic
health record system.

**Prison Staff Failed to Establish Treatment Plans for Some Inmates, and
the Plans They Established for Others Were Inadequate**

According to the suicide expert, treatment planning is a critical
element of any correctional system's suicide prevention program.
A treatment plan is based on a comprehensive
assessment of an inmate's physical, mental,
emotional, and social needs and must include
the goals of treatment and identify the treatment
methods prison staff will use. State regulations and
Corrections' policies require that the admitting staff
develop a provisional diagnosis and a plan for initial
treatment (initial treatment plan) within 24 hours
of an inmate's admission to a crisis bed. In addition,
state regulations and Corrections' policies require
that an inmate's treatment team—which must
include, at a minimum, a crisis-bed psychiatrist,
a crisis-bed clinician, nursing staff, a correctional
counselor, and the inmate if appropriate—complete
a treatment plan within 72 hours of the inmate's
admission to a crisis bed (72-hour treatment plan).
The text box describes selected information state
regulations require in a 72-hour treatment plan.

> **Selected Requirements for a
> 72-Hour Treatment Plan**
>
> - All mental health diagnoses.
>
> - Prescribed medication, dosage, and frequency
>   of administration.
>
> - Treatment goals with interventions, actions toward
>   improvement, and measurable objectives.
>
> - Treatment methods to be used, including the frequency of
>   the methods and the persons or disciplines responsible for
>   each method.
>
> - Goals for aftercare and a plan for post-discharge follow-up.
>
> Source:  California Code of Regulations, Title 22, Section 79747.

Despite the importance of treatment plans, three of the four prisons
we reviewed did not always comply with state regulations and
Corrections' policy that require prison staff admitting inmates to
crisis beds to develop an initial treatment plan within 24 hours.
Corrections' policies state that this initial treatment plan should
contain a provisional diagnosis and an initial plan for treatment.
Although this is Corrections' only written requirement regarding
initial treatment plans, its clinical support chief explained that she
would expect an initial treatment plan to contain an admitting
diagnosis, reason for admission, a description of symptoms, and
immediate interventions to address those symptoms and target
the reason for admission. However, mental health staff did not
complete such plans for four of the 26 inmates who should have
had them at the four prisons we reviewed. Because Corrections'
policies state that inmates must be discharged from crisis beds
within 10 days, unless otherwise approved for a longer stay, inmates

without initial treatment plans may not have a treatment plan for up to 30 percent of their stays in crisis beds—until the 72-hour treatment plan is complete.

In addition, one of the prisons we reviewed failed to comply with state regulations and Corrections' policies for completing 72-hour treatment plans. As Table 4 shows, we reviewed 25 files for inmates who attempted or committed suicide from 2014 through 2016 who should have had 72-hour treatment plans following their admission to crisis beds at the four prisons. We found that mental health staff completed 23 of these 72-hour treatment plans. However, CCWF's mental health staff did not complete a 72-hour treatment plan for two inmates, but rather completed a separate supplemental section, which does not serve as the 72-hour treatment plan. CCWF's chief of mental health acknowledged that when she assumed her position in mid-2015, mental health staff were not completing all sections of the 72-hour treatment plans. She could not provide an explanation for this deficiency because she was not familiar with the guidance mental health staff had received at that time; however, she stated that after she noticed the practice, she reminded mental health staff that they needed to complete all sections of the 72-hour treatment plans.

**Table 4**

**Problems With 72-Hour Treatment Plans at the Four Prisons We Reviewed**

| | PRISON | | | | |
|---|---|---|---|---|---|
| | **CCWF** | **CIW*** | **RJD** | **SAC** | **TOTAL** |
| **Number of inmates who...** | | | | | |
| ...should have had a 72-hour treatment plan | 9 | 7 | 5 | 4 | 25 |
| ...did not receive a 72-hour treatment plan | 2 | 0 | 0 | 0 | 2 |
| ...received a 72-hour treatment plan | 7 | 7 | 5 | 4 | 23 |
| **Missing or incomplete items on the treatment plans reviewed** | | | | | |
| Mental health diagnoses | 0 | 0 | 0 | 0 | 0 |
| Medication dosage and frequency | 1 | 4 | 4 | 3 | 12 |
| Treatment goals with interventions and measurable objectives | 1 | 0 | 0 | 2 | 3 |
| Treatment methods, including frequency and persons responsible for each method | 7 | 4 | 5 | 4 | 20 |
| Post-discharge follow-up plan | 5 | 5 | 3 | 4 | 17 |

Sources: California State Auditor's analysis of mental health records for selected inmates at each of the four prisons reviewed, Corrections' 2009 program guide, and California Code of Regulations Title 22, Section 79747.

\* Staff at CIW completed one treatment plan more than 72 hours after the inmate was admitted to a crisis bed.

Moreover, none of the 23 completed 72-hour treatment plans we reviewed were adequate based on the elements state regulations require. For example, many of the 72-hour treatment plans were missing either the treatment methods, the frequency at which the treatment methods should be completed, or who was responsible for administering the methods. Without this information, inmates may not receive necessary treatment from the correct providers at appropriate intervals. In addition, many of the 72-hour treatment plans we reviewed had missing or incomplete discharge follow-up plans. It is vital that the treatment teams begin planning for inmates' care following discharge from crisis beds as soon as possible because Corrections' policies state that crisis-bed stays should be 10 days or fewer, although crisis-bed stays may surpass 10 days with the approval of the prison's chief of mental health or a designee.

Further, some 72-hour treatment plans we reviewed had multiple deficiencies. For example, one 72-hour treatment plan at SAC—for an inmate admitted to a crisis bed after a suicide attempt in 2016—lacked specific treatment interventions, the frequency of treatment, and a discharge plan. Additionally, the prison's mental health staff left several other sections of this plan blank, such as a statement of the inmate's mental condition and descriptions of the long-term goals of the inmate and of the inmate's participation in the treatment planning process. When we inquired, prison officials at SAC stated that this treatment plan was not acceptable and that management would address the deficiencies with the mental health staff member.

Corrections has been aware for years that its 72-hour treatment plans were inadequate, because multiple experts have reached this conclusion. For instance, a 1999 special master's monitoring report found that several treatment team meetings failed to develop realistic and meaningful 72-hour treatment plans at one prison. The same report noted that another prison did not hold any treatment team meetings in the crisis-bed unit. Further, a special master's review of inmate suicides that occurred in the second half of 2012 determined that the prisons had provided inadequate 72-hour treatment plans for about 33 percent of the inmates who committed suicide, while a similar special master's review of inmate suicides that occurred in 2014 found that this number had risen to over 65 percent. Finally, the suicide expert found continued problems with the adequacy of treatment planning for patients identified as suicidal at all 18 prisons that he reviewed in his 2016 report on suicide prevention practices.

*Corrections has been aware for years that its 72-hour treatment plans were inadequate, because multiple experts have reached this conclusion.*

To address concerns related to treatment planning, Corrections stated that it implemented an internal audit of the quality of the 72-hour treatment plans beginning in September 2013. Every quarter, each prison must audit a random sample of 15 of its 72-hour treatment plans per institutional program, which includes

crisis beds. In these audits, the reviewers are instructed to examine 15 crucial aspects of the 72-hour treatment plans, including whether the interventions are measurable and specify frequency and duration, as well as whether the goals for the inmates are correlated to problems and interventions. According to Corrections' quality administrator, a plan must meet 13 of the 15 criteria in order for a treatment plan to pass the internal audit. She also stated that if the audits identify a systemic problem in a program or prison, the prison must work with Corrections' staff to create a corrective action plan that the prison must then submit to Corrections.

These audits found varying levels of treatment plan quality from 2014 through 2016 at the four prisons we reviewed. According to Corrections' reports, its overall monthly rate of 72-hour treatment plans that met the audit criteria from 2014 through 2015 fluctuated between 0 percent and 67 percent, with no treatment plans meeting the audit criteria for 14 of these 24 months. According to the quality administrator, none of the audited plans met the criteria during these months because the audits were new and the standards were fairly high. In the second half of 2016, the overall monthly rate of treatment plans that met audit criteria fluctuated from 55 percent to 68 percent. However, in at least one month, all four prisons we reviewed had lower percentages of treatment plans that met the audit criteria than Corrections' overall rate. In fact, in July 2016, only 33 percent of SAC's audited treatment plans met the audit criteria. The quality administrator stated that the prisons have continued to struggle to pass the audits because Corrections had examined only the timeliness of 72-hour treatment plans before 2014. She explained that mental health staff should now be more aware of the standards as the result of several trainings. However, Corrections has had regulations in effect since 1996 that specify what a 72-hour treatment plan should include. Therefore, Corrections' mental health staff should have already been aware of these requirements.

As part of this audit, we were also requested to determine whether CIW allows inmates identified as suicidal to have access to inmate program activities or movements, such as yard time. The chief of mental health at CIW explained that it had always been CIW's policy to allow inmates in crisis beds access to yard time; however, prior to this audit, privileges for inmates would only be documented in treatment plans if access to these privileges was restricted in any way. He further described that any records of yard privileges for inmates in crisis beds would have been maintained by a recreation therapist separate from the treatment plan; however, CIW was unable to provide these records for the six inmates we reviewed. Thus, we were unable to determine whether these inmates had access to privileges like yard time. As a result of our audit, CIW stated that it has verbally instructed staff to improve their

*It had always been CIW's policy to allow inmates in crisis beds access to yard time; however, prior to this audit, privileges for inmates would only be documented in treatment plans if access to these privileges was restricted in any way.*

documentation regarding inmate privileges such as yard time by indicating in treatment plans whether inmates have access to such privileges or by justifying why the inmates do not. Furthermore, in response to the suicide expert's recommendation, Corrections updated its policies in June 2016 to allow inmates in crisis beds to have access to phone and visitation privileges equal to the privileges the inmates would have when not in a crisis bed—privileges which inmates in crisis beds at CIW were previously not allowed to have.

In conducting our audit work, we observed that some inmates faced delays in being placed in a crisis bed. Specifically, in certain cases, inmates must await assignment to crisis beds because only a limited number of these beds are available. Corrections' policies require that inmates awaiting crisis beds be assigned to alternative housing, which is meant to be short-term and can include large holding cells or other housing where complete and constant visibility can be maintained. Inmates must be transferred out of alternative housing within 24 hours and, according to CCWF's chief of mental health, alternative housing should provide a crisis-bed level of care. Thus, we expected that inmates who remain in alternative housing for more than 24 hours would receive the same documentation of care as inmates in crisis beds, including initial and—if necessary—72-hour treatment plans. However, Corrections' clinical support chief for mental health stated that mental health staff complete treatment plans when inmates enter a new level of care and that alternative housing is a temporary placement rather than a level of care. She explained that completing treatment plans for inmates in alternative housing is not practical for various reasons, including that most alternative housing settings lack space to conduct confidential treatment plan meetings and not all members of the treatment team are required to see inmates in alternative housing. She also stated that inmates receive their standard medications while in alternative housing and that psychiatrists can order additional medication as necessary. Although these explanations appear to be reasonable, we remain concerned that Corrections has not always transferred inmates out of alternative housing within 24 hours.

For example, in a 2016 monitoring report, the special master found that 47 percent of CIW's alternative housing stays and 36 percent of RJD's alternative housing stays during the review period exceeded 24 hours. Our findings are similar to those of the special master. Specifically, 10 of 40 inmates we reviewed remained in alternative housing for more than 24 hours. For instance, one inmate was in alternative housing for approximately six days following a suicide attempt before being admitted to a crisis bed. Because she was discharged from the crisis bed about seven days after her admission, nearly half of her time at a crisis-bed level of care was spent in alternative housing. Of even greater concern,

*In conducting our audit work, we observed that some inmates faced delays in being placed in a crisis bed.*

*Two inmates assigned to alternative housing ultimately committed suicide after not being admitted to crisis beds based on the mental health staff's assessments of their mental health.*

two inmates assigned to alternative housing ultimately committed suicide after not being admitted to crisis beds based on the mental health staff's assessments of their mental health. Both of these inmates committed suicide within two weeks of discharge from alternative housing.

In order to address the fact that some inmates spend more than 24 hours in alternative housing while waiting to transfer to a crisis bed, Corrections submitted a budget change proposal for the 2017–18 fiscal year, requesting the construction of 100 new crisis beds. It is Corrections' belief that adding additional crisis beds will help alleviate the issue of inmates spending more than 24 hours in alternative housing, because many of the inmates that spend more than 24 hours in alternative housing do so because no crisis beds are available. The Legislature approved Corrections' request for 100 new crisis beds in its 2017–18 budget. According to the deputy director of the statewide mental health program, the 100 crisis beds should be sufficient; however, sufficiency assumes that the needs of Corrections' inmate population will not change in ways that will require additional crisis beds. Also, Corrections has the ability to monitor alternative housing stays that exceed 24 hours as a part of its audit process, which we discuss in Chapter 3.

### Prison Staff Did Not Sufficiently Monitor At-Risk Inmates or Respond to Suicide Attempts as Corrections' Policies Require

At all four prisons we reviewed, we observed deficiencies in the prisons' efforts to monitor inmates who were at risk of committing suicide. Staff at each of the four prisons failed to appropriately observe inmates within the required time interval, giving inmates greater opportunities to injure themselves with potentially lethal results. Further, we found instances where prison staff prefilled observation logs and did not stagger the timing of checks. In addition, Corrections has determined that prison staff did not always respond appropriately upon discovering that inmates had attempted to commit suicide. Specifically, Corrections' reviews of inmate suicides found that prison staff sometimes failed to bring required life-saving equipment to the scene, did not appropriately relieve pressure on three hanged inmates' airways, and did not always promptly summon medical responders. Although Corrections agreed that these issues are problematic, it has only recently taken steps to address them.

***Prison Staff Did Not Always Monitor Inmates at High Risk of Suicide as Corrections' Policies Require***

Our review found that the four prisons have not always performed timely and appropriate checks of inmates placed on suicide precaution. As the text box shows, Corrections has established specific policies for monitoring inmates at risk of suicide, depending on whether they are in immediate danger of self-harm. Because suicide watch entails continuous, direct visual observation of inmates, we could not confirm through a review of watch logs whether this type of observation occurred. Instead, we focused our review on suicide precaution logs, which indicate when prison staff conducted their staggered behavior checks of inmates. Corrections' policy requires prison staff to stagger their behavior checks of inmates on suicide precaution in intervals not to exceed 15 minutes. According to the chief nursing executive at CCWF, the purpose of staggering behavior checks is to ensure that inmates are not able to anticipate when checks will occur and hurt themselves between checks. Nonetheless, the records for 19 out of 25 inmates we reviewed who were placed on suicide precaution indicated they did not always receive staggered behavior checks. Table 5 on the following page presents the problems we identified with suicide precaution checks at the four prisons we reviewed. When prison staff do not stagger the timing of their behavior checks of inmates on suicide precaution, they increase the risk that inmates will be able to injure themselves, perhaps fatally.

Table 5 on the following page shows that the prisons we reviewed did not always conduct suicide precaution behavior checks in a timely manner and that, for several inmates, prison staff prefilled or preprinted the observation logs. All four prisons exceeded the maximum requirement of 15-minute intervals between checks for some inmates, with several intervals at SAC and CCWF exceeding 20 minutes. In one particularly egregious example, prison staff at CCWF checked on an inmate on suicide precaution 90 times, but exceeded 15 minutes between checks more than 35 times, with one gap lasting longer than one hour. Further, we found that staff appeared to prefill times for checks on observation logs for eight of the 19 inmates on suicide precaution that we reviewed in prisons that used paper logs, rather than electronic logs. For example, we found several instances of logs with preprinted observation times for three inmates on suicide precaution who required staggered

> **Suicide Watch and Suicide Precaution**
>
> When inmates are in crisis beds because of suicide risk and are in immediate danger of self-harm, they are placed on suicide watch, which entails the following:
>
> - They are allowed only a no-tear smock or gown, a safety mattress, and a no-tear blanket. All furniture is removed.
>
> - Staff must provide continuous, direct visual observation as well as nursing checks every 15 minutes.
>
> When inmates are in crisis beds because of a high risk of attempting self-harm but are not in immediate danger, they are placed on suicide precaution, which entails the following:
>
> - If they are at higher risk, they are allowed only a no-tear smock or gown, a safety mattress, and a no-tear blanket. If they are at lower risk, they are allowed certain clothing, reading and writing materials, and toiletries. Mental health staff must use their clinical judgment when allowing inmates access to these items.
>
> - Staff must conduct staggered behavior checks of the inmate in intervals not to exceed 15 minutes.
>
> Source: Corrections' 2009 program guide.

checks. We also identified logs that listed observation times after inmates had been discharged, suggesting the logs were prefilled. This strongly suggests that staff may not have actually conducted visual observation at the times the logs indicate, and may not have conducted the observations at all.

**Table 5**
**Problems With Monitoring of Inmates on Suicide Precaution at the Four Prisons We Reviewed**

| PRISON | NUMBER OF INMATES OUT OF 10 ON SUICIDE PRECAUTION | INMATES ON SUICIDE PRECAUTION WHO DID NOT RECEIVE STAGGERED CHECKS | | INMATES ON SUICIDE PRECAUTION WHO RECEIVED CHECKS WITH INTERVALS GREATER THAN 15 MINUTES | | NUMBER OF INMATES WITH LOGS NOT COMPLETED APPROPRIATELY (I.E. PREFILLED OR PREPRINTED) | TOTAL NUMBER OF SUICIDE PRECAUTION RECORDS REVIEWED THAT HAD AT LEAST ONE OF THE ISSUES IDENTIFIED IN THIS TABLE |
|---|---|---|---|---|---|---|---|
| | | NUMBER | PERCENTAGE | NUMBER | PERCENTAGE | | |
| CCWF* | 7 | 6 | 86% | 6 | 86% | 2* | 7 |
| CIW* | 7 | 6 | 86 | 2 | 29 | 1* | 6 |
| RJD | 5 | 4 | 80 | 4 | 80 | 2 | 5 |
| SAC | 6 | 3 | 50 | 5 | 83 | 3 | 6 |
| Totals | 25 | 19 | 76% | 17 | 68% | 8 | 24 |

Sources:  California State Auditor's review and analysis of health records for 10 inmates at each of the four prisons, Corrections' 2009 program guide, and Corrections' other policies.

\* CCWF and CIW transitioned to an electronic health record system in October 2015, and suicide precaution checks are now recorded electronically in this system. Therefore, we could only test for prefilling/preprinting for four of the seven inmates on suicide precaution at CCWF and six of the seven inmates on suicide precaution at CIW.

Officials at the four prisons agreed that suicide precaution observations have been problematic. The chief of mental health at CCWF stated that checks might have been late or not appropriately staggered in the past because staff did not understand how to implement staggered checks. She also explained that staff shift changes can cause intervals between checks that exceed 15 minutes and that staff are sometimes unable to conduct checks at the required times because they are engaged with other inmates. Prison staff at SAC indicated that the prison used preprinted forms in the past to help nurses stagger their checks but stopped this practice after the suicide expert's 2015 report stated that they were inappropriate. Further, they explained that SAC now conducts spot checks of its suicide precaution logs.

Although prison officials indicated the implementation of Corrections' new electronic health record system should reduce some of the issues we found, we still identified problems in the prisons that have implemented the system. According to Corrections' January 2016 report titled *An Update to the Future of California Corrections*, the electronic health record system allows providers to more efficiently prescribe treatment, maintain or

strengthen continuity of care, work cohesively with other treatment team members, and monitor inmate progress. Both CCWF and CIW implemented the system in October 2015, whereas Corrections' remaining prisons are in various stages of transitioning to the new system, with Corrections estimating that all prisons will have implemented it by October 2017. Prison officials at CCWF and CIW indicated that the shift to the new system has improved compliance with their monitoring of suicidal inmates because providers can order the behavior checks and set when they are due. However, we still found instances in which staff did not stagger behavior checks after CIW and CCWF implemented the system, and the checks continued to occur at predictable intervals. Corrections' chief psychologist of quality management and informatics asserted that he believed it is difficult in practice for mental health staff to mentally track every patient they are monitoring and plan to stagger the behavior checks. The continued problems we observed with staggering behavior checks suggest that Corrections needs to increase training for mental health staff on how to properly stagger such checks.

Additionally, out of the four prisons we reviewed, SAC and RJD did not regularly check on the welfare of inmates in certain housing units as required by Corrections' policies. The policies require that prison staff regularly observe all inmates placed in certain housing units.[4] These checks, known as security welfare checks, should occur at staggered intervals twice an hour, with the intervals not exceeding 35 minutes. However, the security welfare check data show that SAC and RJD did not conduct these checks as required. For example, four of the 10 inmates we reviewed at SAC were in segregated housing units, yet none appeared to have received timely security welfare checks on the days they either committed or attempted to commit suicide. For one of these inmates, SAC could not provide any evidence demonstrating the welfare checks occurred at all. For another inmate, the security welfare check log shows some intervals between checks were longer than an hour on the day the inmate committed suicide. According to a Corrections' suicide report, when staff discovered the inmate's body, more than 50 minutes had elapsed since the last check. As these examples clearly show, when they do not check on inmates as required, prison staff may miss opportunities to prevent inmates from injuring themselves or attempting to commit suicide.

Although Corrections has recently taken steps to ensure that prisons comply with the suicide precaution and security welfare check policies, it is too soon to determine the effectiveness of

*Out of the four prisons we reviewed, SAC and RJD did not regularly check on the welfare of inmates in certain housing units as required by Corrections' policies.*

---

[4]  Inmates may be removed from a prison's general population and placed in segregated housing for various reasons, including that they pose an immediate threat to the safety of others.

these actions. In particular, the suicide expert recommended in his January 2015 report that Corrections enforce its policies regarding behavior checks at staggered intervals not to exceed 15 minutes between checks for inmates on suicide precaution. In response to this recommendation, Corrections issued a memorandum in March 2016 reiterating policies for inmates placed in crisis beds, including the requirements for observing inmates on suicide precaution. Additionally, Corrections' quality administrator explained that it is developing an audit process that it plans to implement statewide for reviewing prisons' compliance with its policies and procedures. Corrections' regional teams will conduct this process, and it will include a review of suicide precaution logs and security welfare check logs. We describe this audit process in more detail in Chapter 3. Further, she indicated that as part of this audit process, Corrections is developing automated monitoring of suicide precaution checks in its electronic health record system to ensure compliance with Corrections' policies. However, since Corrections has not yet finalized its development of the audit process, including the automated monitoring, it is too early to determine its effectiveness.

*We found that mental health staff at CCWF, RJD, and CIW did not always make required daily progress notes for inmates in crisis beds.*

Finally, we found that mental health staff at CCWF, RJD, and CIW did not always make required daily progress notes for inmates in crisis beds. Corrections' policies require mental health staff to assess and monitor on a daily basis the condition of inmates who are in crisis beds. According to the policies, mental health staff must document these daily contacts within 24 hours. However, four inmates we reviewed at CCWF, two inmates at RJD, and two inmates at CIW did not receive daily progress notes for at least one day while in crisis beds. Without these notes, prison staff are hindered in their ability to assess inmates' progress and determine whether they should be either discharged or referred to a higher level of care. For example, an inmate at CCWF spent over 20 days in a crisis bed before she was discharged—more than twice as long as Corrections' policies specify—yet she did not receive progress notes for several of the additional days. Had staff completed the daily progress notes, this inmate might have received the treatment she needed in a timelier manner. The chief of mental health at CCWF could not explain why staff did not make these progress notes. The quality administrator stated that Corrections does not currently monitor prisons' compliance with requirements for daily progress notes for inmates in crisis beds but is open to incorporating such monitoring into its audit process once all prisons have transitioned to the electronic health record system in October 2017.

*Corrections' Suicide Reports Are Not Always Timely and Have Identified
Various Concerns Regarding Prisons' Compliance With Emergency
Response Requirements*

One of the experts engaged by the special master noted that the
suicide review process and the issuance of suicide reports on
each inmate suicide is one of the strengths of Corrections' suicide
prevention program. However, of the 16 suicide reports that we
reviewed, Corrections completed nine later than the 60 days
following a suicide that its policy requires. In two instances,
Corrections took 137 days to complete a report—more than double
the timeline established in its policies. Corrections' clinical support
chief attributed two of the late reports to a shortage of resources
caused by a large number of suicides that occurred over a short
time frame, while she explained that several others were late
due to the complexities of the necessary reviews. However, she
stated that delays in completing a suicide report would not delay
Corrections from informing a prison of an urgent problem that
needed immediate attention; in such cases, while reviewers are still
on-site, they would inform the prison of the issue. Nevertheless,
we believe that it is critical that Corrections complete these reports
as expeditiously as possible because they are a crucial tool for
identifying problems with the prisons' clinical care and compliance
with policies and procedures, including their emergency responses
to suicides.

In fact, several suicide reports we reviewed identified
that prison staff have not always complied with
Corrections' requirements and state regulations for
how to respond to suicide attempts. For instance,
state regulations and Corrections' policy require
that a cut-down kit be immediately accessible in
each housing unit of a prison and that staff use the
kit in cases of attempted hangings. The text box
lists the cut-down kit's required contents—several
of which can be used to provide life-support care or
clear an obstruction to an airway—which
Corrections has identified as being critical to saving
the life of inmates who attempt suicide by hanging.
However, of the 15 suicides by hanging that we
reviewed, Corrections' suicide reports noted
three instances in which responders did not
indicate having or using all or part of a cut-down
kit. For example, one suicide report found that
prison staff immediately responding to the hanging
did not use a resuscitator at the scene of the emergency. Rather, the
report found that prison staff indicated the resuscitator was used
after the inmate had been transported away from the scene of
the emergency.

---

**Contents of a Cut-Down Kit**

A cut-down kit must be kept in a lockable metal box
maintained within each housing unit and must contain
the following:

- An inventory list affixed to the inside of the
  box door.

- One emergency cut-down tool.

- One single patient use resuscitator.

- One CPR mask.

- A minimum of 10 latex gloves.

- A disposable oral airway.

Source:  Corrections' 2009 program guide.

Corrections offered several possible explanations for why prison staff may not have carried or used the entire kit when responding to suicide attempts. According to an associate warden for the Division of Adult Institutions' mental health compliance team (compliance team associate warden), staff who did not bring an entire cut-down kit may have had any missing items elsewhere on their persons or used their required training to perform the necessary life-saving measures. She also noted that the kits' storage locations in some units may have restricted staff's access to them. For example, she explained that some housing units store kits in secured control booths, even though the booth windows may not be large enough for the required metal boxes to pass through. According to the compliance team associate warden, this limitation has resulted in prisons using various bags, buckets, or other storage devices to store cut-down kits—all of which deviate from Corrections' policy that prisons store kits in lockable metal boxes.

Corrections is aware of the problems related to the storage of the cut-down kits and is in the process of taking steps to address them. Specifically, the clinical support chief for mental health indicated that Corrections had formed a workgroup to address keeping the kits in bags rather than boxes so that they could be more easily stored in secured areas. The compliance team associate warden also explained that her team is in the process of developing a memo to update Corrections' policies on when to use cut-down kits and how prison staff should maintain them. According to the compliance team associate warden, the memo will make some significant changes to Corrections' current policies, including requiring that prisons keep all cut-down kit items together in a durable bag and that prison staff bring the kits to suicide attempts by asphyxiation in addition to hangings. It will also emphasize that staff must transport the entire kit to the scene of an emergency. The compliance team associate warden expects that Corrections will finish and implement the memo by August or September 2017. Without such changes to its policies, Corrections risks additional instances of prison staff not having the entire kit at a moment when it could potentially save an inmate's life.

*Without changes to its policies, Corrections risks additional instances of prison staff not having the entire kit at a moment when it could potentially save an inmate's life.*

Corrections' suicide reports also note other issues with prisons' emergency response, and the suicide review process can result in changes to emergency response preparedness. For example, two suicide reports identified issues with the timing of summoning medical responders. Corrections addresses these types of issues by including recommendations in its suicide reports, which the prisons are responsible for implementing. Furthermore, Corrections' policy requires specific staff to follow up with prisons to ensure that they implement the recommendations. To address several issues related to their emergency responses, the prisons involved submitted to Corrections evidence that they had provided additional training

to their staff, which we believe is appropriate. In another example, three suicide reports identified concerns with staff not relieving pressure on an inmate's airway when the inmate was discovered hanging. However, CIW identified that prison staff involved in one of these incidents had most recently received suicide prevention training roughly six months before the suicide, but that the training did not provide specific instruction on relieving tension on the inmate's body by using a stable object for support. We find it concerning that Corrections omitted this critical information from this training, as its mental health policies have specified since 2009 that responding prison staff must relieve pressure on the inmate's airway. In 2016 Corrections updated its suicide prevention training to include instruction to support the inmate's airway. Corrections' clinical support chief stated that the information should have been included in previous versions of the training and that its omission was an oversight. She explained that the information was likely missing from previous versions of the training because when her team revised the training they focused on adding new issues rather than reviewing the training to ensure that all of the necessary information was included. She further explained that she was surprised to find that the information was missing, because the same team that assembled the 2009 program guide with Corrections' policies put together the training.

## Recommendations

### Legislature

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress toward meeting its goals related to the completion of risk evaluations in a sufficient manner.

- Its progress toward meeting its goals related to the completion of 72-hour treatment plans in a sufficient manner.

### Corrections

Corrections should immediately require mental health staff to score 100 percent on risk evaluation audits in order to pass. If a staff member does not pass, Corrections should require the prison to follow its current policies by reviewing additional risk evaluations to determine whether the staff member needs to undergo additional mentoring.

To ensure that it identifies inmates who are at risk of attempting suicide and determines the treatments needed to prevent them from doing so, Corrections should immediately reevaluate and revise its goals for the percentage of risk evaluations that mental health staff must complete on time and for the percentage of risk evaluations that must pass its risk evaluation audits. It should set revised goals that better take into consideration the importance of mental health staff completing adequate risk evaluations in a timely matter. Corrections should require prisons that perform below its revised goals to develop improvement plans.

To improve the quality of its risk evaluations, by December 2017 Corrections should develop and incorporate into its electronic risk evaluation form prompts to aid mental health staff in completing adequate risk evaluations that meet all audit criteria.

To minimize the number of inmates who spend more than 24 hours in alternative housing, Corrections should use the audit process it is developing to monitor the amount of time inmates spend in alternative housing and annually reassess its need for additional crisis beds.

To ensure that prisons document the privileges, such as yard time, that inmates receive while in a crisis bed, Corrections should immediately require prisons to develop and formalize policies to record on their treatment plans the privileges inmates are allowed and receive while in a crisis bed.

To ensure that prison staff conduct required checks of inmates placed on suicide precaution in a timely manner, Corrections should implement its automated process to monitor suicide precaution checks in its electronic health record system by the time it is implemented systemwide in October 2017. Further, Corrections should train staff on how to plan for and conduct staggered suicide precaution checks.

To monitor prisons' compliance with its requirement that inmates in crisis beds receive daily progress notes, Corrections should implement monitoring of these notes electronically into its audit process by the time the electronic health record system is in use systemwide in October 2017. Corrections should require prisons that are out of compliance to develop and implement quality improvement plans, and it should follow up on the prisons' implementation of those plans.

To ensure that prison staff appropriately respond to attempted suicides, Corrections should implement its proposed changes to its emergency response policies regarding cut-down kits by December 2017 and should include in its policies a method for monitoring prisons' compliance.

# Chapter 2

## A NUMBER OF FACTORS HAVE LIKELY CONTRIBUTED TO HIGH RATES OF INMATE SUICIDES AND SUICIDE ATTEMPTS AT CIW

From 2014 through 2016, the rates of inmate suicides and suicide attempts at CIW were significantly higher than the rates at either CCWF or Corrections' men's prisons. Staff at Corrections and CIW provided several reasons for CIW's elevated rates, including inmate drug involvement, domestic violence in interpersonal relationships between female inmates, and the transfer of additional inmates to CIW and CCWF following the conversion of a women's prison to a men's prison. Because suicide is the result of multiple factors, we believe many of these causes could have contributed to CIW's high rates of suicides and suicide attempts. In addition, we identified several factors that many of Corrections' prisons share in common that may influence rates of inmate suicides and suicide attempts. Specifically, Corrections has not established a means of ensuring that all staff receive required trainings related to suicide prevention and response, and as a result, some staff may not have the knowledge necessary to address inmates' mental health needs. Further, Corrections has struggled to fill certain mental health staff vacancies, particularly for psychiatrist positions. Finally, Corrections has not recently updated its staffing model to ensure that the prisons have adequate staff to meet their inmates' mental health needs.

### Corrections Has Identified Possible Causes for the High Suicide Rate at CIW

As the Introduction discusses, the rates of suicides and suicide attempts at women's prisons in California have increased over the last several years. After declining from 2012 through 2013, the rates of both suicides and attempted suicides at women's prisons rose dramatically, from 3.7 attempts and 0.35 suicides per 1,000 inmates in 2014 to 10.3 attempts and 0.63 suicides in 2016.

Further, as Table 6 on the following page shows, the rates of suicides and attempted suicides at women's prisons were significantly higher and less stable than the rates at other prisons in California during this same time period. Although the increase in female inmate suicides is dramatic, Corrections' clinical support chief noted that even one suicide can significantly affect the rate because of the small population of female inmates. However, she acknowledged that there have been more suicides among female inmates than she would have expected and she believes that California's rates are high in comparison to large prison systems in other states.

**Table 6**
**Suicides and Attempted Suicides in Adult Prisons From 2012 Through 2016**

| | | INMATE POPULATION* TOTALS | ATTEMPTED SUICIDES | | SUICIDES | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | TOTALS | PER 1,000 INMATES | TOTALS[†] | PER 1,000 INMATES |
| 2012 | Women's prisons | 6,643 | 30 | 4.5 | 1 | 0.15 |
| | All other prisons[‡] | 119,633 | 322 | 2.7 | 24 | 0.20 |
| | All prisons | 126,276 | 352 | 2.8 | 25 | 0.20 |
| 2013 | Women's prisons | 5,627 | 23 | 4.1 | 1 | 0.18 |
| | All other prisons[‡] | 117,611 | 351 | 3.0 | 25 | 0.21 |
| | All prisons | 123,238 | 374 | 3.0 | 26 | 0.21 |
| 2014 | Women's prisons | 5,646 | 21 | 3.7 | 2 | 0.35 |
| | All other prisons[‡] | 117,006 | 344 | 2.9 | 18 | 0.15 |
| | All prisons | 122,652 | 365 | 3.0 | 20 | 0.16 |
| 2015 | Women's prisons | 4,887 | 45 | 9.2 | 2 | 0.41 |
| | All other prisons[‡] | 109,243 | 346 | 3.2 | 17 | 0.16 |
| | All prisons | 114,130 | 391 | 3.4 | 19 | 0.17 |
| 2016 | Women's prisons | 4,743 | 49 | 10.3 | 3 | 0.63 |
| | All other prisons[‡] | 114,938 | 370 | 3.2 | 23 | 0.20 |
| | All prisons | 119,681 | 419 | 3.5 | 26 | 0.22 |
| 5-YEAR TOTALS | Women's prisons | | 168 | | 9 | |
| | All other prisons[‡] | | 1,733 | | 107 | |
| | All prisons | | 1,901 | | 116 | |

Sources:  California State Auditor's analysis of Corrections' COMPSTAT metrics and additional information on suicides provided by various prisons.

\*  *Inmate population* is the average of the 12 months in each year.

†  The numbers we present here reflect our amendments to Corrections' COMPSTAT data. As we discuss in Chapter 3, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. We have therefore adjusted the number of suicides in 2013, 2015, and 2016 to include three suicides that we identified at CIW, RJD, and SAC that were not included in the COMPSTAT data; however, we caution that these numbers may still be not accurate.

‡  According to a COMPSTAT research program specialist, Corrections expresses its numbers in COMPSTAT by institution and not by gender. Thus, *Women's prisons* includes CCWF and CIW, as well as the former Valley State Prison for Women (VSPW) in 2012, and CCWF and CIW from 2013 through 2016. *All other prisons* comprises nearly all male inmates; however, it does include inmates in other facilities, including some that house both men and women, such as certain medical facilities, and Folsom State Prison, which has a small women's facility.

The clinical support chief offered three primary reasons for why the suicide rate at women's prisons has been high in recent years. First, she explained that unlike male inmates, female inmates tend to build family units within prisons, and Corrections has found that domestic violence can occur within these units. She believes that this domestic violence has contributed to the higher suicide rates at women's prisons. She stated that in order to address this issue, Corrections is planning to develop a curriculum regarding same-sex domestic violence for female inmates who receive mental health services.

The second reason the clinical support chief pointed to was drug involvement. Specifically, she explained that substance abuse affects female inmates differently than male inmates because incarcerated women have high levels of past trauma. That trauma, combined with substance abuse, likely increases the risk of suicide. According to the clinical support chief, drugs or drug trafficking were involved in four of the six most recent suicides in women's prisons. She stated that in order to address this issue, Corrections is hoping to finalize a contract in the near future to establish a co-occurring disorders program at CIW and at other prisons. She explained that this program would be modeled on best practices that combine mental health issues with treatment for substance abuse.

Finally, the third reason she cited was that the realignment of prisons changed the composition of the inmate population in state prisons. In 2011 the Legislature passed various laws that realigned the criminal justice system by allowing inmates who were not convicted of serious or violent felonies, or felonies requiring registration as a sex offender, to serve their sentences in county jails rather than state prisons. She explained that as a consequence of realignment and lower-level offenders being sentenced to county jails, inmates who remain in state prisons generally have more severe behavioral issues and are more likely to have committed violent crimes. She also said that inmates who have committed violent crimes are potentially more likely to commit suicide because they have a history of using violence as a response to various situations, including self-directed violence. As a result, female inmates in the State's prisons may be more likely to make lethal suicide attempts.

These reasons, however, apply to all female inmates and do not necessarily explain the difference in the rates of suicides and attempts between CIW and CCWF, which are both women's prisons. As Table 1 in the Introduction shows, all but one of the suicides occurring from 2014 through 2016 at the two women's prisons we reviewed occurred at CIW. During this same period, there were also more suicide attempts at CIW than at CCWF, despite CIW's smaller inmate population. For example, there were 11 attempted suicides at CCWF in 2015, but 34 attempted suicides at CIW. We asked the clinical support chief why she thought the suicide and suicide attempt rates at CIW were higher than those at CCWF from 2014 through 2016 and she stated that she did not have any easy hypotheses for why the rates were higher at CIW. She additionally described that based on her understanding, the characteristics of the inmates at CIW and CCWF do not seem to differ significantly. Moreover, the Centers for Disease Control and Prevention has identified that suicidal behavior results from a combination of many factors—including genetic, developmental, environmental, psychological, social, and cultural factors—operating through diverse and complex pathways. It is therefore likely that there are many components to the cause for the difference in suicide and suicide attempt rates between CIW and CCWF.

*Substance abuse affects female inmates differently than male inmates because incarcerated women have high levels of past trauma that, when combined with substance abuse, likely increases the risk of suicide.*

Prison officials at CIW, however, did identify one other explanation for why the suicide rate at CIW was elevated from 2014 through 2016: they attributed the increased suicide rate at CIW to the conversion of VSPW to a men's prison and the subsequent transfer of higher-security-level inmates to CIW than the prison was designed to house. Corrections converted VSPW to a men's prison due to the decline in the number of female inmates in state prisons following realignment. According to Corrections' acting associate warden of female offender programs and services, Corrections transferred about 970 inmates to CCWF and 400 inmates to CIW from VSPW from September 2012 through January 2013. Two chief psychologists and a senior psychologist at CIW stated that the transfer of inmates resulted in a number of negative effects, including increases in gang influences, more drugs, higher-security-level inmates, and increased conflict in the housing units. The chief executive officer at CIW explained that CIW was not designed to house high-security-level offenders, and he agreed that the change in prison culture following the conversion of VSPW may have contributed to the increase in suicides and attempted suicides. We attempted to verify whether high-security-level inmates were transferred to CIW; however, Corrections' acting associate warden of female offender programs and services explained that Corrections does not have a historical breakdown of that information.

*Two chief psychologists and a senior psychologist at CIW stated that the transfer of inmates resulted in a number of negative effects, including increases in gang influences, more drugs, higher-security-level inmates, and increased conflict in the housing units.*

Although Corrections acknowledged at the time that the conversion of VSPW to a men's prison might significantly affect CIW and CCWF, it did little to prepare those prisons. According to documentation Corrections provided, beginning in 2011, Corrections developed action plans for the conversion of VSPW and held meetings with certain stakeholders to discuss these plans. However, Corrections was unable to provide evidence of such a meeting occurring at CIW. Further, CIW officials were unable to recall the occurrence of such a meeting. Corrections distributed a memorandum in late August 2012 announcing the conversion of VSPW and the resulting transfer of its female inmates to CIW, CCWF, and certain other special programs beginning the next month. However, the memorandum lacked any details regarding the steps the prisons should take to prepare for the new inmates; instead, it simply stated that the support of the wardens in ensuring their prisons' assistance was appreciated. According to Corrections' acting associate warden of female offender programs and services, the wardens at each prison were responsible for preparing their staff for the conversion and the subsequent increases in their inmate populations. Both an associate warden at CIW and its chief executive officer confirmed that, beyond the standard preparations made for inmate transfers, they could not remember any special preparations or training that CIW provided for its staff.

The inmates who transferred from VSPW were not the majority of those attempting suicide at either CIW or CCWF. This supports CIW officials' perspective that there was a cultural change at the prison subsequent to the transfers. According to CIW, inmates who transferred from VSPW committed 8 percent of the suicides and suicide attempts at CIW from 2014 through 2016. Similarly, CCWF's data show inmates who transferred from VSPW committed 12 percent of the suicide attempts at CCWF during this period. CIW's chief executive officer stated that before the transfer of inmates from VSPW, he would have described CIW as a prison that had relatively few issues with inmates. He explained that he could no longer describe the prison in this way after the transfer because the inmates from VSPW brought with them a culture of substance abuse, illegal drug trading, and violence related to drug trafficking.

**CIW and Other Prisons Have Not Ensured That Their Staff Have Received Required Training on Suicide Prevention and Response**

As we describe in the previous section, Corrections and CIW were able to identify certain factors that are unique to CIW and CCWF and that may have contributed to CIW's high rates of suicides and suicide attempts. However, we identified additional factors that may increase the risk of inmate suicides and attempts at both men's and women's prisons throughout the State. One of these factors is Corrections' failure to ensure that prison staff receive required training related to suicide prevention and response. We believe this lack of training may have contributed to some of the problems we identify in Chapter 1.

Because effective suicide prevention and response at prisons requires a collective effort, staff that routinely interact with inmates should receive training on how to identify and help inmates at risk of suicide as well as on how to respond to suicide attempts. When staff fail to fulfill their duties as Corrections' policies require, it may result in the serious injury or death of inmates whose lives depend on both the quality and promptness of the interventions that staff provide. The Joint Legislative Audit Committee (Audit Committee) asked us to evaluate the adequacy of the mental health and suicide prevention training specifically for CIW staff, and we found that the prison did not ensure that its staff received the required trainings. We also identified similar attendance concerns at the three other prisons we reviewed, and we found that some trainings need improvement in terms of their content and delivery.

Officials at CIW could not demonstrate that some staff had attended required training courses related to inmate suicide. State regulations and Corrections' policies require each prison to ensure that all staff

*Officials at CIW could not demonstrate that some staff had attended required training courses related to inmate suicide.*

**Selected Training That Corrections Requires Related to Suicide Prevention and Response**

**Annual Suicide Prevention:** Provides staff with a basic understanding of suicide prevention and their roles when working in a prison. This training includes elements related to responding to suicide attempts.

**Risk Evaluation Mentoring Program:** Provides one-on-one training and mentoring on the administration of risk evaluations. Mentoring includes feedback on risk assessment, risk formulation, and crisis intervention skills.

**Risk Evaluation for Mental Health Staff:** Focuses on practical methods to improve the accuracy and reliability of risk assessments across staff and settings. This training is designed to complement the risk evaluation mentoring program.

**Safety/Treatment Planning Within Suicide Risk Assessment and Management:** Helps mental health staff know when and how to create adequate treatment/safety plans that contain specific actions mental health staff and inmates will undertake to reduce risk of suicide.

Sources: State regulations, Corrections' policies, 2016 lesson plans, and presentation slides for the listed trainings.

whose assignments routinely involve inmate contact complete various trainings related to suicide prevention and response. The text box lists some of these trainings. In addition, we reviewed a training on working with female offenders, which provides information and skills that support managing female inmates safely and effectively. However, when we reviewed training records for a selection of staff at CIW, we found that prison officials could not demonstrate whether some staff had attended certain trainings. Specifically, the in-service training manager at CIW could not demonstrate that four of the 20 staff members attended a required annual suicide prevention training during 2016. Further, of the 15 mental health staff we reviewed who were required to take the same course at CIW in 2015, the prison's documentation shows that only nine attended.

Moreover, some mental health staff at CIW did not attend a required training on conducting risk evaluations or receive mentoring. Corrections requires staff who will be evaluating whether inmates are at risk of suicide to attend a training on how to complete risk evaluations. We reviewed 10 psychologists, psychiatrists, or social workers who were required to attend this training within 180 days of hire; however, the documents the prison provided demonstrate that only six did so. Further, we found that CIW did not adequately audit risk evaluations for five of the 10 mental health staff we reviewed, and did not provide mentoring for two mental health staff that failed the audit. As Chapter 1 explains, the correct completion of risk evaluations is critical because they help mental health staff identify inmates who are likely to attempt suicide as well as the treatments needed to prevent them from doing so.

CIW provided several reasons for why it was unable to demonstrate that certain staff attended the required trainings. In particular, the in-service training manager explained that some of the staff simply did not attend the training. However, he also stated that before May 2015, CIW did not effectively track its training. Further, he explained that staff in the training units at CIW and other prisons do not always record attendance—which is demonstrated by a sign-in sheet—in Corrections' tracking system. He indicated that as a result, when staff transfer to CIW, CIW must directly contact the prisons at which they previously worked to determine if those prisons can provide the sign-in sheets for trainings. This situation could lead to staff missing required trainings. For example, CIW's in-service training manager stated that one staff member we

reviewed had received the required suicide prevention training at a different prison in 2016, but he could not provide documentation that the staff member had actually received this training.

Some of the problems we found are not unique to CIW: Corrections reported that not all staff at the prisons we reviewed received required trainings in 2016. For example, at SAC, about half of the required staff received training on the principles of safety planning for suicidal inmates. Attendance compliance at RJD, CIW, and CCWF was 72 percent, 83 percent, and 89 percent, respectively, with this training requirement, according to Corrections' reports. Staff attendance rates for the annual suicide prevention training ranged from 68 percent at CIW to 95 percent at CCWF. Staff attendance was similar for the suicide risk evaluation mentoring, with reported attendance rates ranging from 71 percent at SAC to 95 percent at CCWF. Corrections' clinical support chief stated that Corrections has not followed up with the prisons regarding the reasons for the low attendance rates. She explained that although the prisons provide Corrections with some staff attendance rates at trainings, Corrections does not request that they explain or justify those rates. Rather, she stated that Corrections relies on the prisons' in-service training units and chiefs of mental health to address training noncompliance issues. Lastly, although not a training on suicide prevention, a program regarding working with female offenders was offered in 2015 and 2016. CIW and CCWF reported average staff attendance rates of 74 percent and 91 percent, respectively, for this training.

This is not a new problem, nor is it isolated. In his 2016 report regarding selected prisons' suicide prevention practices, the suicide expert also identified concerns with staff attendance at required trainings in 2014. Specifically, he found that attendance for the annual suicide prevention training across 18 prisons varied from 0 percent to 100 percent during the period he reviewed. He reported that 94 percent of custody staff, 69 percent of medical staff, and 63 percent of mental health staff received the annual suicide prevention training in the 18 prisons during 2014. He concluded that the compliance rates for training both medical and mental health staff remained problematic.

*The suicide expert found that attendance for the annual suicide prevention training across 18 prisons varied from 0 percent to 100 percent during 2014.*

In addition, our review found that CIW's trainers themselves have missed required classes. Corrections requires that instructors teaching suicide prevention and risk evaluation trainings participate in specific train-the-trainer courses. Although both of CIW's instructors for the suicide prevention training and the instructor for the risk evaluation training attended the required courses, only one of five of its mentors had received the necessary training. Further, the two suicide prevention trainers taught several trainings before they were qualified to do so per Corrections' requirements. CIW's suicide prevention

team coordinator stated that she received training from Corrections and that she subsequently provided training to all mentors. She explained that she believed the training she provided was sufficient to fulfill the training requirements for mentors. However, the clinical support chief stated that all mental health staff are required to receive Corrections' training before mentoring other staff. She further explained that, at one point, Corrections allowed prisons to train their own mentors, but it discontinued this practice around 2013 after realizing the content was not always adequately communicated.

Unless Corrections ensures that its trainers have the knowledge and tools necessary to provide instruction in an engaging and effective manner, it reduces the effectiveness of its training about suicide prevention practices. In the suicide expert's January 2015 report, he stated that he attended the required one-hour suicide prevention trainings at seven prisons and that many were problematic. For example, the suicide expert noted that at one of the trainings, the instructor simply read the nearly 40 PowerPoint slides at a fairly quick pace, ending the presentation after about 25 minutes. The suicide expert pointed out that another training lasted roughly 40 minutes and that the only interaction between the instructor and the participants occurred when one participant asked about the length of the class. He also observed that one prison had only offered the suicide prevention training via DVD. If Corrections does not ensure that all trainers receive instruction on delivery, it risks its trainers poorly presenting information and failing to create meaningful discussions regarding the training topic, which significantly diminishes the value to those attending the training.

*We found that some of Corrections' suicide prevention trainings were missing required content.*

Additionally, we found that some of Corrections' suicide prevention trainings were missing required content. For example, Corrections' policies require that the annual suicide prevention and response training explain how to handle situations in which inmates with mental health concerns commit violations of prison rules. However, we did not find such content in the suicide prevention training from 2014 through 2016. Corrections offers a training that focuses on situations involving violations of prison rules, but that training is not offered to everyone whom Corrections requires to take the annual suicide prevention training. Corrections must also follow a 2015 court order requiring it to incorporate into its trainings certain topics that the suicide expert's January 2015 report outlines. The suicide expert recommended that Corrections expand the length and content of certain suicide prevention trainings by including various topics, such as dealing effectively with inmates perceived to be manipulative. Although the annual suicide prevention training, risk evaluation training, and a training aimed at helping staff improve the accuracy of diagnoses contained discussion of such perceptions, a webinar on treatment planning in risk evaluations did not. Without required content, Corrections' trainings will lack effectiveness in

preventing suicides and improving responses to attempted suicides. For example, if Corrections' staff assume inmates are expressing suicidal thoughts in order to obtain some benefit—in other words, are being manipulative—the staff may miss important warning signs of impending suicide attempts.

## Staff Vacancies Continue to Challenge Corrections' Ability to Provide Sufficient Mental Health Services to Inmates

For more than 20 years, Corrections has continued to struggle to fill key mental health position vacancies, creating the risk that it may not be able to adequately serve inmates in need of mental health services. In a May 2016 report, the special master recounts that the court in *Coleman* ruled in 1995 that Corrections was significantly and chronically understaffed in the area of mental health care services and did not have sufficient staff to treat the large numbers of mentally ill inmates in its custody. The special master reported that during the intervening 20 years, the proportion of Corrections' inmates requiring mental health care soared from less than 15 percent to 29 percent of the total inmate population, for a total of nearly 37,000 inmates requiring mental health care. In 2002 the court ordered Corrections to maintain a vacancy rate among psychiatrists, psychologists, and social workers of not more than 10 percent.

When we reviewed Corrections' data on three key positions the court identified—psychiatrists, psychologists, and social workers—we found that vacancy rates were highest among psychiatrists. According to our analysis of Corrections' data, its prisons overall had a 31 percent vacancy rate for psychiatrists, 9 percent for psychologists, and 2 percent for social workers as of December 2016. Each of the four prisons we reviewed had vacancy rates below 10 percent for social workers and at or below 10 percent for psychologists. However, CCWF, RJD, and SAC have continued to struggle to fill psychiatrist positions, with vacancy rates of about 32 percent, 31 percent, and 44 percent, respectively. According to a March 2017 report from the National Council for Behavioral Health, there is a national shortage of psychiatrists. Only CIW had vacancy rates below 10 percent for all three classifications. When prisons do not maintain adequate mental health staff, their ability to provide quality mental health care to inmates can suffer. For example, according to the coordinator of SAC's suicide prevention team, a shortage of psychiatrists has a trickle-down effect because if inmates do not receive the proper medication, they may act out more and require additional attention or therapy, exacerbating mental health staff's already heavy workloads.

*When we reviewed Corrections' data on three key positions the court identified—psychiatrists, psychologists, and social workers— we found that vacancy rates were highest among psychiatrists at 31 percent as of December 2016.*

Furthermore, the prisons' total authorized mental health positions may not be enough to fulfill inmates' needs. For example, CIW's chief of mental health stated that even when CIW's mental health positions are almost fully staffed, mental health staff still feel overwhelmed and do not have time to meet with inmates as often as they believe is needed. Similarly, the chief of mental health at CCWF stated that although workloads seem manageable based on Corrections' minimum requirements for mental health care, inmates sometimes require significantly more visits than the minimum required, effectively increasing staff workload. She explained that given the increased workload for suicide prevention, mental health staff may neglect routine but important tasks, such as completing follow-up suicide risk evaluations, to focus on urgent matters, such as responding to imminent suicide threats.

The staffing problems that these prisons noted are likely in part due to the fact that Corrections has not updated its staffing model since 2009. Specifically, the chiefs of mental health at both CIW and CCWF expressed the need for Corrections to revisit the staffing model it uses to determine the number of mental health staff needed per prison. For example, CCWF's chief of mental health indicated that the staffing ratios for women's prisons is 20 percent higher than staffing ratios for men's prisons in the model; however, this adjustment is not enough to compensate for the increased number of mental health crises and referrals that arise with the female inmate population. Corrections' associate director of policy and clinical support (associate director) acknowledged that Corrections has not revised the model since 2009, eight years ago. She explained that when calculating the number of staff needed per prison, the model does not take into account the following factors: gender; facility layout; security level; and number of inmates in each security level, excluding restricted housing. The associate director explained that she believes Corrections needs to revisit the 2009 staffing model to take into account some of these factors as well as Corrections' revised policies, recent court orders, the prisons' implementation of the new electronic health record system, and the prisons' adherence to requirements based on its current filled positions.

## Recommendations

### *Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- The status of its efforts to ensure that all mental health staff receive required training and mentoring related to suicide prevention and response.

- The status of its efforts to fill vacancies in its mental health treatment programs, especially its efforts to hire and retain psychiatrists.

### *Corrections*

To address the unique circumstances that may increase its female inmates' rates of suicide and suicide attempts, Corrections should take the following actions:

- Implement its planned same-sex domestic violence curriculum by December 2017.

- Continue to explore additional programs that could address the suicide risk factors for female inmates.

To ensure that all prison staff receive required training related to suicide prevention and response, Corrections should immediately implement a process for identifying prisons where staff are not attending required trainings and for working with the prisons to solve the issues preventing attendance.

To ensure that trainers and risk evaluation mentors at all prisons are able to train staff effectively, Corrections should immediately begin requiring prisons to report the percentage of their trainers and mentors who have received training on how to conduct training and mentoring. It should work with prisons to ensure that all trainers and mentors receive adequate training.

To maximize the value of its trainings related to suicide prevention and response, Corrections should ensure that starting in January 2018, its trainings include all content that the special master and its own policies require.

To ensure that it has enough staff to provide mental health services to all inmates who require care, Corrections should review and revise its mental health staffing model by August 2018.

# Chapter 3

## TO REDUCE INMATE SUICIDES AND ATTEMPTS, CORRECTIONS MUST STRENGTHEN ITS OVERSIGHT AND DEMONSTRATE GREATER LEADERSHIP

Corrections has struggled for decades to adequately provide mental health services to inmates. As a result, most of its efforts to reduce its inmate suicide rates in recent years have been in response to court-ordered oversight. For example, in response to the suicide expert's 2015 recommendations, it adopted a number of policies, implemented facility improvements, and improved its training. However, its policies are unlikely to have significant impact if it does not ensure that the prisons fully implement and adhere to them—which it has yet to do. Although Corrections stated it is developing an audit process to ensure that prisons comply with policies and procedures, it has known about their noncompliance for years, and it is uncertain as to when it will fully implement this process across all prisons. Similarly, Corrections created teams at each of the prisons to specifically focus on suicide prevention and response; however, it has not ensured that these teams consistently provide leadership on critical issues. In addition, Corrections has not always proactively sought opportunities to demonstrate leadership in regards to documenting and disseminating programs or best practices for preventing inmate suicide.

### Although Corrections Has Developed Policies and Training to Address Past Recommendations, It Has Not Ensured That Prisons Fully Implement These Changes

From November 2013 through July 2014, the suicide expert conducted a comprehensive audit of suicide prevention practices in each of Corrections' prisons. This audit resulted in a January 2015 report containing 32 recommendations. The court in *Coleman* subsequently ordered Corrections to work with the special master to develop strategies to implement these recommendations, and it also ordered the suicide expert to provide an updated report on Corrections' progress. The suicide expert completed this updated report in January 2016, in which he stated that Corrections had begun to implement corrective actions in response to his recommendations. Through the adoption of new policies, improvements to its facilities, changes to its trainings, and other actions, Corrections has now addressed the majority of the recommendations from the suicide expert's January 2015 report. Table 7 on the following page lists selected recommendations from the suicide expert's 2015 report to Corrections and Corrections' responses to those recommendations.

**Table 7**

**Selected Recommendations From the Suicide Expert's 2015 Report**

| RECOMMENDATION | CORRECTIONS' ACTION IN RESPONSE TO RECOMMENDATION | DATE ACTION TAKEN | IS CORRECTIONS ENFORCING/MONITORING COMPLIANCE WITH THIS POLICY? |
|---|---|---|---|
| Corrections should revise its risk evaluation mentoring program to require ongoing mentoring throughout the year and audit mental health staff's risk evaluations on a regularly scheduled basis. | Issued memorandum to all prisons implementing a revised mentoring program and describing regular audits of risk evaluations. | March 2016 | **No.** Corrections tracks aggregate information the prisons report to monitor compliance, but does not follow up with the prisons. |
| Corrections should enforce its policy authorizing only two levels of observation for suicidal inmates: *suicide precaution* and *suicide watch*. | Issued memorandum to all prisons reiterating existing policy that the only two levels of observation are suicide precaution and suicide watch. | March 2016 | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should take action to correct inaccurate documentation on inmate suicide precaution observation forms. | Issued memorandum to all prisons reiterating existing policy regarding documentation on suicide precaution observation forms. | March 2015 | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should enforce its policy of housing only newly admitted inmates in administrative segregation units in retrofitted suicide-resistant cells for their first 72 hours of admission to the prison. | Included reiteration of this policy in its annual suicide prevention training. | July 2015 | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should ensure all crisis beds are suicide resistant. | Developed a schedule to begin retrofitting cells at identified prisons. | November 2015 | Corrections indicated one prison required extensive retrofitting and is still in progress. |
| Corrections should revise its policy so that all inmates discharged from a crisis bed or alternative housing, where they had been housed due to suicidal behavior, are observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred. | Issued revised policy regarding checks of inmates discharged from crisis beds, and is working to finalize a policy regarding alternative housing. | January 2016 | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should take corrective action to address inconsistencies between privileges allowed for patients in crisis beds. | Issued memo reiterating and clarifying policy regarding privileges for inmates in crisis beds. | June 2016 (revised February 2017) | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |

Sources: The suicide expert's 2015 report, Corrections' memoranda, and interviews with Corrections' officials.

Several of the recommendations from the suicide expert's 2015 report directed Corrections to revise, examine, or enforce existing policies. Corrections addressed several of these recommendations by issuing memos to the prisons that either reiterate or revise policies. For example, Corrections' 2009 program guide states that custody staff must conduct hourly checks for the first 24 hours after discharge of inmates at risk of suicide who had been admitted to a crisis bed or alternative housing. However, the suicide expert recommended in his 2015 report that these checks occur at 30-minute intervals. In response to this recommendation, Corrections issued a memorandum in January 2016 requiring checks every 30 minutes for the first 24 hours that inmates are discharged from crisis beds.

Corrections is working to finalize a similar policy for inmates released from alternative housing. Further, Corrections made changes to its suicide prevention training and risk evaluation mentoring program.

However, Corrections has yet to fully ensure prisons' compliance with the new and revised policies resulting from the suicide expert's recommendations. For example, despite these policies, many of the problems we identify in Chapter 1 relate to the completion and quality of both risk evaluations and treatment plans. Further, these same issues have persisted for years: court-ordered reports by the special master dating back to 2002 identified similar concerns. In addition, Corrections has yet to ensure attendance at suicide prevention team meetings, as we describe later in this chapter. Further, as we show in Chapter 1, the monitoring it currently provides does not result in significant positive change at the prisons. Although revising policies and holding trainings are important parts of improving prisons' ability to prevent and respond to suicides, Corrections cannot ensure that prisons actually comply with its policies unless it provides adequate monitoring.

> *Corrections has yet to fully ensure prisons' compliance with the new and revised policies resulting from the suicide expert's recommendations.*

Corrections is still developing an audit process to, among other things, track implementation of several of the suicide expert's recommendations. According to Corrections' quality administrator, Corrections is integrating certain recommendations from the suicide expert's report into an audit process for conducting audits of prisons' compliance with policies and procedures. The portion of the audit process conducted on site at the prisons rates 12 broad areas—including treatment planning processes, suicide prevention and response to suicide, leadership, staffing, and quality management—on a scale ranging from *proficient* to *urgent concerns*. The resulting reports include specific recommendations.

We reviewed the report of a pilot audit that Corrections conducted of a certain prison and found that the audit was thorough and critical in its analysis of identified deficiencies. According to the report, the audit combined performance data, document reviews, patient and staff interviews, health care record reviews, and the regional teams' on-site observations of the prison's day-to-day operations. Our review suggests that the audit process may prove helpful as Corrections begins improving areas in which it has consistently struggled, particularly because it requires monitoring of several of the suicide expert's recommendations. For example, in response to one of the suicide prevention expert's recommendations, Corrections issued a memo to prisons in March 2016 that explicitly states that they can use only suicide watch or precaution levels of observation for suicidal inmates in crisis beds. According to the health care administrator in charge

of quality control, Corrections added instructions on reviewing prisons' use of suicide watch and precaution to the audit process in response to the suicide expert's recommendations.

Nevertheless, the audit process has been in development for some time. According to Corrections' chief psychologist of the health care division, the court in *Coleman* indicated several times that Corrections needs to demonstrate that it has a full quality improvement system in place that includes processes for continually monitoring, enforcing, and improving its policies and procedures. She explained that, to comply with this requirement with the eventual goal of replacing the court's monitoring, Corrections began developing the audit process and expanded the role of its regional teams, who will be following it. Corrections' quality administrator stated that Corrections first began development of the audit process in 2013, that the regional teams have conducted several initial audits of selected prisons, and that they plan to continue developing the process for use systemwide in the future. However, the quality administrator indicated that Corrections has not established a concrete date for implementation of the audit process systemwide. Corrections' quality administrator stated that it is continuing to work collaboratively with the special master to finalize the audit process. Until Corrections fully implements the audit process systemwide, it lacks assurance as to whether its prisons are adhering to the policies it put in place to address several of the suicide expert's recommendations.

*Despite issuing and revising numerous policies, Corrections has not updated its program guide to reflect these changes since 2009.*

Additionally, despite issuing and revising numerous policies, Corrections has not updated its program guide to reflect these changes since 2009, creating the potential for confusion for the prisons that must implement those policies. Corrections' clinical support chief stated that it would have to coordinate any formal revision to the entire program guide with the special master. However, she explained that prisons can access all of Corrections' policy changes at a central location on its intranet. Further, in March 2017 the court in *Coleman* encouraged Corrections to update its program guide through the publication of addenda called "pocket parts." However, the fact that prison and mental health staff must refer both to the program guide and to any relevant update memos and addenda when determining how to implement policies, is inefficient and adds needless confusion to an already complex process.

Updating the program guide would also help Corrections to identify and correct inconsistencies within it. For example, the program guide states that inmates must not stay in crisis beds for more than 10 days without the approval of a high-ranking official. However, one part of the program guide states that approval must come from the chief of mental health or the appropriate designee,

whereas another part states that approval must come from the chief psychiatrist or the appropriate designee. These are different positions at the four prisons we reviewed. Although we did not identify specific concerns related to this discrepancy, it is further indicative of the need for Corrections to review and revise its program guide. When Corrections does not ensure that prisons are implementing policy changes appropriately or does not document its policies in a clear, organized, consistent, and consolidated fashion, it risks creating confusion and inconsistency in the treatment that prisons provide to inmates. According to Corrections' deputy director of the statewide mental health program, Corrections intends to incorporate appropriate portions of the program guide into state regulations, which will help strengthen Corrections' mental health system. She explained that Corrections has been working on memorializing the policies in regulations, but has yet to begin the formal process for promulgating the regulations and does not have a time frame for when it intends to begin this process.

## Corrections Has Not Ensured That Prisons' Suicide Prevention Teams Adequately Fulfill the Purposes for Which They Were Created

Although Corrections established a statewide suicide prevention team as well as suicide prevention teams at each of the prisons, it has not ensured that these teams exercise sufficient leadership to help prevent suicides. To reduce the risk of inmate suicides, Corrections' policies require the suicide prevention teams to provide staff with training and guidance with regard to suicide prevention, response, reporting, and review. Corrections' policies state that the statewide suicide prevention team and teams at each prison must meet at least monthly, and require that individuals in certain positions, as the text box shows, attend each meeting. However, only one of the four prisons we reviewed met Corrections' attendance requirements. Further, the suicide prevention teams often failed to discuss key issues that might enable the prisons to better prevent suicides.

Suicide prevention and response in California's prisons requires attention from multiple clinical disciplines. If required members are absent, they and the staff they supervise risk missing important information, and the suicide prevention team lacks the insight of the missing members. Nonetheless, only CCWF met attendance

> **Required Membership of Suicide Prevention Teams**
>
> Prisons:
> - Suicide prevention team coordinator (chairperson)
> - Chief psychiatrist*
> - Chief psychologist*
> - Supervising registered nurse
> - Senior licensed psychiatric technician or licensed psychiatric technician
> - Correctional health services administrator
> - Department of State Hospitals' coordinator
>
> Statewide:
> - Suicide prevention team coordinator (chairperson)
> - Chief psychiatrist
> - Chief psychologist
> - Nurse consultant
> - Designated facility captain
>
> Source: Corrections' 2009 program guide.
>
> * A senior psychiatrist or senior psychologist attendance meets the quorum requirement in prisons without a chief psychiatrist or chief psychologist position.

requirements for its team in 2016. Although each of the four prisons we visited held monthly suicide prevention team meetings during 2016, the minutes of these team meetings at CIW, SAC, and RJD indicate that they did not meet attendance requirements for 11, 10, and eight monthly meetings, respectively, in 2016. We also found instances in which required suicide prevention team members missed several meetings. For example, at CIW the chief psychiatrist or a designee failed to attend eight of 12 meetings, and at SAC the supervising registered nurse missed six of 12 meetings.

These attendance issues have been brought to Corrections' attention before, and it has pointed to obstacles that make achieving a quorum challenging. For instance, the suicide expert stated in his 2016 report that he found that attendance by some required suicide prevention team members, particularly chief psychiatrists or their designees, was inconsistent at many prisons. Specifically, he explained that eight of the 18 suicide prevention teams he reviewed still fell short of attaining a quorum at their monthly meetings. Corrections' clinical support chief stated that prison staff have many competing demands, making it difficult for teams to coordinate schedules and added that Corrections overlooked the difficulties in assembling key participants in these meetings at the time leadership drafted the program guide. She further explained that some elements regarding suicide prevention team attendance are not clear, such as whether one individual may fill multiple roles and who may send designees. Nevertheless, we found that CCWF was able to meet the attendance requirements every month during 2016. CCWF's chief of mental health explained that its team plans several weeks in advance of a meeting to ensure that all required members can attend, reminds team members about the meeting during the week it is scheduled, and waits until all members are present before starting the meeting.

Further, the suicide expert raised concerns regarding whether the prisons' suicide prevention teams had fully met their responsibilities, some of which are listed in the text box. For instance, one of these responsibilities is ensuring each prison's implementation of and compliance with all of Corrections' policies and procedures relating to suicide prevention and response. However, in his 2016 report, the suicide expert found that the suicide prevention teams had not adequately monitored and evaluated the risk evaluations completed at their respective prisons. Specifically, the suicide expert stated that the prisons' suicide prevention teams were collecting only

---

**Selected Responsibilities of Prisons' Suicide Prevention Teams**

- Ensure implementation of and compliance with all Corrections' policies and procedures relating to suicide prevention and response.

- Implement training related to suicide prevention and response.

- Update local operating procedures to ensure consistency with Corrections' policies regarding suicide prevention and response.

- Review all suicides and suicide attempts in response to which staff performed CPR or other medical procedures, as well as prison staff cell entry and cut-down procedures.

- Monitor and track all suicide gestures, suicide attempts, self-mutilations, and deaths.

Source: Corrections' 2009 program guide.

quantitative but not qualitative monthly data on the completion of risk evaluations. Moreover, in his 2015 report, the suicide expert explained that he found that the prisons engaged in little discussion of overall suicide prevention strategies during their meetings. He commented that most meeting minutes reflected recitations of certain monthly statistics, but included few meaningful discussions about challenging cases or struggles with risk evaluations and treatment planning. In his January 2016 report, he stated that he found few positive changes in suicide prevention team practices at the 18 prisons he reviewed.

We identified similar concerns when we reviewed the minutes for the past three years of suicide prevention teams' meetings at the four prisons we visited. Specifically, the teams often did not discuss key issues, including self-harm incidents and the completion of risk evaluations. CCWF's minutes indicate that the suicide prevention team's reviews of attempted suicides were mostly narrations of events or recitation of statistics rather than analytical discussions focused on lessons learned and prevention. For example, its May 2016 minutes describe that two inmates attempted suicide by swallowing foreign objects, but the minutes do not indicate any actions required or lessons learned as a result of these incidents. In the same minutes, the team reported that the prison's mental health staff had a 29 percent passing rate for risk evaluation audits, but the minutes do not indicate that the team discussed what caused the low passing rate and how they planned to improve staff performance. Similarly, at RJD, discussions about mentoring and training prison staff regarding the completion of risk evaluations largely focused on quantitative data, such as attendance and completion rates. Further, RJD's suicide prevention team minutes do not indicate that discussions extended to the quality of the training or mentoring. Without such discussions, the work of the suicide prevention teams becomes more focused on reporting data rather than ensuring compliance with Corrections' policies and procedures related to suicide prevention and response.

## Corrections Has Not Ensured That It Reports Reliable Data on Inmate Suicide and Suicide Attempts

Corrections collects and reports data related to its operations using an organizational management tool called COMPSTAT. Each month Corrections publishes a statistical report detailing more than 500 data points on its prisons' operations. According to the COMPSTAT operations manager, Corrections' staff conduct a quality control process that entails reviewing the data they receive from prisons each month. She explained that staff look for outliers, unexpected patterns, and system issues. In addition, she stated that Corrections' staff meet with each prison's staff annually to discuss

*We found discrepancies in the data related to COMPSTAT—Corrections' organizational management tool—that bring into question the data's accuracy.*

the data in detail, which includes a joint annual review with the prison's leadership to discuss each line item in the annual report to ensure that the COMPSTAT numbers match the prison's numbers.

Nevertheless, we found discrepancies related to COMPSTAT's data that bring into question the data's accuracy. For example, for each of the four prisons we reviewed, we selected four months of COMPSTAT data from 2014 through 2016 and compared those months to the prisons' incident logs. We found that COMPSTAT reported a greater number of attempted suicides at CIW and suicides at CCWF than were recorded in their incident logs, and that it reported fewer attempts at SAC and RJD than were recorded in their respective logs. Further, when we reviewed suicide prevention team meeting minutes, incident reports, and other records, we found that COMPSTAT did not include suicides that occurred from 2013 through 2016 at three of the prisons we reviewed. Moreover, we were surprised to find that the special master's reports identify significantly more suicides from 2012 through 2015 than are recorded in COMPSTAT. For instance, COMPSTAT shows 18 suicides in 2015, while the suicide expert reported 24—a 33 percent difference.

Corrections' clinical support chief offered a number of explanations for the discrepancies we identified. She stated that the special master's reports used data from Corrections' mental health program on suicides in prisons, which she believes are accurate because it is this program that determines whether a death is a suicide. She explained that the numbers in COMPSTAT may be understated because they are based on prison staff's initial incident reports. She told us that the classification of incidents may not be accurate because an inmate may die from an attempted suicide days or weeks after the attempt occurs. Further, she noted that mental health staff have the opportunity to more thoroughly review the circumstances of incidents, which may cause them to reach different conclusions than the prison staff's initial incident reports reflect. In these instances, the clinical support chief indicated that the mental health program's data will reflect its staff assessment of the incident, but COMPSTAT may not. Specifically, she explained that prison staff are supposed to update this information in COMPSTAT by providing updated incident reports; however, she believes this step may not have always occurred given the understated suicide numbers in COMPSTAT.

The clinical support chief stated that she has previously raised these concerns with the COMPSTAT team, and the team was not resistant to adjusting its processes in order to present more accurate data. Because COMPSTAT represents Corrections' comprehensive source of data it makes readily available to the public on suicides and attempted suicides for each of its prisons, it must take steps

to ensure that the data are accurate. Otherwise, the public may draw incorrect conclusions about the rate of suicides and suicide attempts at a given prison or in the system as a whole.

## Corrections Can Increase Its Documentation and Dissemination to Prisons of Best Practices Related to Suicide Prevention

Although innovative programs and best practices related to inmate suicide prevention exist, Corrections could increase its efforts to document and disseminate this information to the prisons, and to monitor the success of programs or practices that could prove beneficial. For example, during our visit to RJD, we noted that it had implemented a program known as Striving to Achieve Rewards (STAR) that might benefit certain inmates at other prisons as well. RJD implemented STAR in August 2016 for inmates in its enhanced outpatient program, which provides care for mentally disordered inmates in a structured therapeutic environment that is less restrictive than inpatient care. According to a STAR pamphlet, the program's purpose is to improve inmate quality of life by creating a therapeutic community where inmates have many opportunities for positive experiences. STAR provides rewards to inmates for engaging in positive behavior, such as attending mental health groups and treating mental health staff and peers in a respectful manner. Over time, the inmates accumulate points that they can use for different levels of rewards, including participating in drama and book clubs and purchasing items, such as hygiene products, from the STAR store. RJD's chief psychologist stated that preliminary data, while not conclusive, have indicated that incidents of self-harm and rules violations have decreased since STAR began, even though RJD's inmate population has increased.

*RJD implemented a program that rewards positive behavior, such as attending mental health groups and treating staff and peers in a respectful manner. RJD stated that incidents of self-harm and rules violations have decreased since the program began.*

We also noted another program that RJD is in the process of developing that could prove useful for staff working in other prisons. Specifically, according to the program-related materials, workplace stress and job burnout are high among staff working in correctional settings. To better support its staff in managing its high-risk inmate population, RJD began developing a program named Helping Everyone Reach Objectives. The program's documentation indicates that RJD is designing a framework to provide additional resources and support to its multidisciplinary treatment teams who directly deal with inmate-patients. The program aims to ensure that RJD continues to provide high-quality care to its inmate population by providing staff with consultation and coaching, as well as fostering closer collaboration between all prison staff. According to RJD's chief psychologist, the prison had implemented aspects of the program with certain staff as of May 2017. It anticipates an increased rollout by the summer of 2017.

Corrections' clinical support chief agreed that RJD's programs are innovative and explained that implementing them on a systemwide basis might be useful at some prisons, depending on those prisons' missions, infrastructures, and security levels. Nevertheless, Corrections' documentation related to discussion and dissemination of innovative programs and best practices related to suicide prevention is limited. For example, the deputy director of Corrections' statewide mental health program stated that in February 2016, Corrections' mental health program held a summit regarding suicide prevention at its headquarters in Northern California. She explained that prison leadership, including prisons' suicide prevention team coordinators, chiefs of mental health, and selected wardens, attended the summit to discuss challenges with suicide prevention, share best practices, and identify additional initiatives that might help improve the suicide prevention efforts already in place. She noted that Corrections has a number of plans for implementing ideas such as increasing outreach to inmates both inside and outside of mental health care. However, she could not provide documentation of the best practices discussed or of the outcomes of the summit's discussions—she could only provide the agenda and a spreadsheet listing Corrections' suicide prevention team's July 2017 tasks and priorities, which indicated the suicide summit occurred and another one would be scheduled in the near future. She stated that Corrections is tentatively planning to hold another summit in October 2017, and acknowledged that holding these summits at least annually is a good idea. We believe such meetings should occur on an ongoing basis, not only to discuss and document best practices, but also to monitor their effectiveness. This approach would provide Corrections an opportunity to formally disseminate information regarding programs like those at RJD.

Additionally, Corrections' clinical support chief stated that it holds quarterly meetings at headquarters between the prisons' chiefs of mental health where informal discussion on best practices may occur. She further explained that the regional teams hold monthly calls for all prisons within their respective regions, which also allows for the sharing of ideas and best practices. However, because these discussions are not documented, the clinical support chief could not provide evidence of any best practices discussed. Because it has not documented the discussion of best practices during these meetings and calls, Corrections has likely missed opportunities to formally identify and disseminate innovative program ideas systemwide, as well as to evaluate the effectiveness of these practices.

### Corrections Could Do More to Assess Ways to Reduce Suicide Attempts

Corrections' policies require that it review each
suicide to determine whether staff complied with
its policies and procedures, such as the prison's
emergency response to the suicide, completion of
suicide risk evaluations, and follow-up treatment
after the inmate's discharge from a crisis bed
prior to the suicide. The text box lists the specific
information Corrections reviews. Corrections'
policies require it to submit a report to the prison
within 60 days of the inmate's death that includes
recommended actions to address any problems it
identified during its review and due dates for the
prison to complete those actions. Prisons then
have 90 days to submit documentation proving
they have implemented the recommendations.
According to Corrections' clinical support chief,
Corrections established these timelines to ensure
that it promptly identifies problems and that
prisons take quick action to correct them.

The resulting reports are comprehensive enough
to provide Corrections and its prisons with
information critical to improving suicide prevention and response.
Nonetheless, Corrections does not conduct similarly detailed
reviews of the circumstances surrounding suicide attempts. As a
result, it may not identify problems with clinical care or prisons'
compliance with policies until those problems have contributed
to an inmate's death. Although Corrections' policies require
prisons to monitor and track suicide attempts, we do not believe
Corrections requires sufficient detail in these reviews. Specifically,
as of March 2017, its policies require that prisons' suicide
prevention teams review the appropriateness of treatment plans
for these inmates and the daily follow-up checks that mental health
staff must complete for five days following the inmates' discharges
from crisis beds. However, Corrections does not require prisons
to review other important circumstances surrounding suicide
attempts, such as the actions of staff responding to the incidents
and the adequacy of the risk evaluations that mental health staff
completed before the attempts.

One of the four prisons we reviewed has implemented policies
requiring in-depth documented reviews of selected self-harm
incidents, including suicide attempts, at its facility. Specifically, SAC
implemented a policy requiring its suicide prevention coordinator
and supervisors involved with crisis triage and inpatient care to
identify self-harm incidents that might require detailed review,
such as incidents where the inmates suffered serious bodily injury.

---

**Information Included in Corrections' Investigation of an Inmate Suicide**

- Emergency response to the incident.

- Medical autopsy and toxicology findings.

- Inmate's background.

- Inmate's ability to function in an institutional setting.

- Inmate's mental health history.

- Inmate's suicide attempt history.

- Mental health care the inmate received while incarcerated.

- Inmate's medical history.

- Significant events preceding the suicide.

Source:  California State Auditor's analysis of Corrections' suicide report template.

SAC prison officials explained that the suicide prevention team assigns mental health staff to conduct a review of the identified incident. According to a prison official at SAC, since 2008 the prison has completed roughly 450 of these self-harm reviews, but has performed a decreasing number because of increasing workloads and time constraints. We reviewed three of these reviews that the prison completed in 2016 and found that they generally included a thorough review of the inmates' mental health history, mental health status, and suicide risk. However, the reviews did not contain an examination of the adequacy of the inmates' previous risk evaluations or treatment plans, and were not as detailed or pointed in their criticism as Corrections' suicide review process.

Corrections plans to require prisons to complete more detailed reviews of suicide attempts. According to Corrections' clinical support chief, Corrections will require prisons to conduct detailed reviews of a selection of self-harm incidents where the inmate intended to die and there was serious bodily injury beginning in July 2017. She said that the prisons will need to review all of the same items that are included in the suicide reviews, except those that are not applicable, such as autopsy and toxicology reports, or those that would be inappropriate due to the need to protect inmate privacy, such as cellmate or peer interviews. However, even if Corrections requires prisons to be more detailed in their examination of self-harm incidents, prison staff are less likely to be as critical of their own processes as an external reviewer from Corrections might be. Corrections' clinical support chief stated that requiring Corrections to conduct such reviews at each prison could be resource intensive, but that pairing each prison with another, similar prison and having them review each other could help to ensure that the reviews are impartial. Absent an unbiased, thorough review of the factors contributing to inmate suicide attempts, Corrections may not identify potential problems with prisons' suicide prevention and response practices until after inmates have already died.

## Recommendations

### Legislature

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress in implementing the recommendations made by the special master's experts, the court-appointed suicide expert, and its own reviewers regarding inmate suicides and attempts. Corrections should include in its report to the Legislature the results of any audits it conducts as part of its planned audit process to measure the success of changes it implements as a result of these recommendations.

- Its progress in identifying and implementing mental health programs that may ameliorate risk factors associated with suicides at the prisons.

### Corrections

To ensure that prisons comply with its policies related to suicide prevention and response, Corrections should continue to develop its audit process and implement it at all prisons by February 2018. The process should include, but not be limited to, audits of the quality of prisons' risk evaluations and treatment plans.

To ensure that prisons can easily access Corrections' current policies related to mental health, Corrections should ensure that its program guide is current and complete as it works to incorporate the program guide into regulations. Corrections should immediately begin working with federal court monitors to draft regulations.

To ensure that suicide prevention teams meet quorum requirements, Corrections should, starting January 2018, work with prisons that consistently fail to achieve a quorum to resolve issues that may be preventing the teams from having all required members present at meetings.

To eliminate confusion regarding suicide prevention team meeting attendance, Corrections should immediately update its program guide to clarify who is required to attend suicide prevention team meetings, which attendees may send designees, and the extent to which staff may fill multiple roles when meeting quorum requirements.

To ensure that suicide prevention teams exercise leadership at prisons, Corrections should immediately require them to use available information about critical factors—such as the number and nature of inmate self-harm incidents and the quality and compliance with the policy of risk evaluations and treatment plans—to identify systemic issues related to suicide prevention. Corrections should require the suicide prevention teams to assess lessons they can learn, create plans to resolve current issues, and prevent foreseeable problems in the future.

To provide the public and relevant stakeholders with accurate information on suicides and suicide attempts in its prisons, Corrections should immediately require prison staff to work with mental health staff to reconcile any discrepancies on suicides and suicide attempts before submitting numbers to the COMPSTAT unit.

To ensure that all its prisons provide inmates with effective mental health care, Corrections should continue to take a role in coordinating and disseminating best practices related to mental health treatment by conducting a best practices summit at least annually. The summits should focus on all aspects of suicide prevention and response, including programs that seek to improve inmate mental health and treatment of and response to suicide attempts. Corrections should document and disseminate this information among the prisons, assist prisons in implementing the best practices through training and communication when needed, and monitor and report publicly on the successes and challenges of adopted practices.

In an effort to prevent future inmate suicide attempts, Corrections should implement its plan to review attempts with the same level of scrutiny that it uses during its suicide reviews. Corrections should require each prison's suicide prevention team to identify for review at least one suicide attempt per year that occurred at its prison. To ensure that the reviews include critical and unbiased feedback, Corrections should either conduct these reviews itself or require the prisons to review each other. These reviews should start in September 2017 and follow the same timelines as the suicide reviews, with the timeline beginning once the team identifies a suicide attempt for review.

We conducted this audit under the authority vested in the California State Auditor by Section 8543 et seq. of the California Government Code and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives specified in the Scope and Methodology section of the report. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
State Auditor

Date:            August 17, 2017

Staff:           Laura G. Kearney, Audit Principal
                 John Lewis, MPA
                 Fahad Ali, CFE
                 Amanda Millen, MBA
                 Alejandro Raygoza, MPA
                 Kelly Reed, MSCJ

Legal Counsel:   Heather Kendrick, Sr. Staff Counsel

For questions regarding the contents of this report, please contact
Margarita Fernández, Chief of Public Affairs, at 916.445.0255.

Blank page inserted for reproduction purposes only.

# Appendix A

## RATES OF INMATE SUICIDES AND SUICIDE ATTEMPTS IN STATE PRISONS FROM 2012 THROUGH 2016

The Joint Legislative Audit Committee (Audit Committee) requested that we compare the rates of suicides and attempted suicides for male and female inmates in all state prisons from 2014 through 2016. In order to calculate these rates, we used data from Corrections' COMPSTAT system because it is the most comprehensive source of publicly reported data for the entire correctional system. Based on our analysis of COMPSTAT data, Table A beginning on the following page presents the rates and number of inmate suicides and suicide attempts at each state prison from 2012 through 2016. As we discuss in Chapter 3, the data from COMPSTAT on inmate suicides and attempted suicides are unreliable; however, they are also the most comprehensive, as well as being the data Corrections makes available to the public. Therefore, we present the data here but recommend in Chapter 3 that Corrections take steps to ensure its accuracy in the future.

## Table A
## Suicides and Suicide Attempts in Each California Prison From 2012 Through 2016

| PRISON | 2012 | | | | | 2013 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | POPULATION | ATTEMPTED SUICIDES TOTAL | PER 1,000 | SUICIDES TOTAL | PER 1,000 | POPULATION | ATTEMPTED SUICIDES TOTAL | PER 1,000 | SUICIDES TOTAL | PER 1,000 |
| Avenal State Prison | 5,020 | 5 | 1.00 | 1 | 0.20 | 4,497 | 3 | 0.67 | 0 | 0.00 |
| California City Correctional Facility | — | — | — | — | — | — | — | — | — | — |
| California Correctional Center | 4,657 | 2 | 0.43 | 0 | 0.00 | 4,903 | 2 | 0.41 | 0 | 0.00 |
| California Correctional Institution | 4,643 | 5 | 1.08 | 1 | 0.22 | 4,572 | 5 | 1.09 | 1 | 0.22 |
| California Health Care Facility | — | — | — | — | — | — | — | — | — | — |
| California Institution for Men | 5,002 | 10 | 2.00 | 0 | 0.00 | 4,747 | 7 | 1.47 | 0 | 0.00 |
| California Institution for Women | 1,636 | 13 | 7.95 | 1 | 0.61 | 2,095 | 15 | 7.16 | 0 | 0.00 |
| California Medical Facility | 2,363 | 17 | 7.19 | 1 | 0.42 | 2,250 | 28 | 12.45 | 2 | 0.89 |
| California Men's Colony | 5,368 | 21 | 3.91 | 0 | 0.00 | 4,983 | 29 | 5.82 | 0 | 0.00 |
| California Rehabilitation Center | 3,694 | 1 | 0.27 | 0 | 0.00 | 3,434 | 1 | 0.29 | 0 | 0.00 |
| California State Prison, Corcoran | 4,626 | 20 | 4.32 | 1 | 0.22 | 4,410 | 16 | 3.63 | 1 | 0.23 |
| California State Prison, Los Angeles County | 3,848 | 13 | 3.38 | 0 | 0.00 | 3,723 | 7 | 1.88 | 1 | 0.27 |
| California State Prison, Sacramento | 2,693 | 22 | 8.17 | 1 | 0.37 | 2,233 | 32 | 14.33 | 1 | 0.45 |
| California State Prison, Solano | 4,313 | 4 | 0.93 | 1 | 0.23 | 4,007 | 2 | 0.50 | 0 | 0.00 |
| California Substance Abuse Treatment Facility and State Prison | 5,683 | 15 | 2.64 | 0 | 0.00 | 5,603 | 11 | 1.96 | 0 | 0.00 |
| California Training Facility, Soledad | 5,759 | 4 | 0.69 | 0 | 0.00 | 5,279 | 3 | 0.57 | 2 | 0.38 |
| Calipatria State Prison | 3,814 | 0 | 0.00 | 0 | 0.00 | 3,621 | 12 | 3.31 | 0 | 0.00 |
| Centinela State Prison | 3,659 | 2 | 0.55 | 1 | 0.27 | 3,025 | 1 | 0.33 | 0 | 0.00 |
| Central California Women's Facility | 2,934 | 5 | 1.70 | 0 | 0.00 | 3,532 | 8 | 2.27 | 0 | 0.00 |
| Chuckawalla Valley State Prison | 2,712 | 0 | 0.00 | 0 | 0.00 | 2,594 | 0 | 0.00 | 0 | 0.00 |
| Deuel Vocational Institution | 2,504 | 12 | 4.79 | 2 | 0.80 | 2,515 | 6 | 2.39 | 0 | 0.00 |
| Folsom State Prison | 2,840 | 2 | 0.70 | 3 | 1.06 | 3,017 | 4 | 1.33 | 3 | 0.99 |
| High Desert State Prison | 3,695 | 8 | 2.17 | 0 | 0.00 | 3,359 | 2 | 0.60 | 1 | 0.30 |
| Ironwood State Prison | 3,503 | 3 | 0.86 | 0 | 0.00 | 3,273 | 3 | 0.92 | 0 | 0.00 |
| Kern Valley State Prison | 4,108 | 10 | 2.43 | 0 | 0.00 | 3,728 | 20 | 5.36 | 1 | 0.27 |
| Mule Creek State Prison | 3,027 | 15 | 4.96 | 1 | 0.33 | 2,822 | 13 | 4.61 | 1 | 0.35 |
| North Kern State Prison | 4,680 | 8 | 1.71 | 0 | 0.00 | 4,761 | 14 | 2.94 | 1 | 0.21 |
| Pelican Bay State Prison | 3,091 | 11 | 3.56 | 0 | 0.00 | 2,785 | 17 | 6.10 | 0 | 0.00 |
| Pleasant Valley State Prison | 3,737 | 8 | 2.14 | 2 | 0.54 | 3,412 | 5 | 1.47 | 1 | 0.29 |
| Richard J. Donovan Correctional Facility | 3,537 | 28 | 7.92 | 0 | 0.00 | 3,355 | 33 | 9.84 | 3 | 0.89 |
| Sierra Conservation Center | 4,555 | 1 | 0.22 | 1 | 0.22 | 4,856 | 4 | 0.82 | 0 | 0.00 |
| San Quentin State Prison | 3,853 | 13 | 3.37 | 3 | 0.78 | 4,206 | 14 | 3.33 | 3 | 0.71 |
| Salinas Valley State Prison | 3,607 | 37 | 10.26 | 4 | 1.11 | 3,503 | 27 | 7.71 | 2 | 0.57 |
| Valley State Prison | 2,074 | 12 | 5.79 | 0 | 0.00 | 3,004 | 3 | 1.00 | 0 | 0.00 |
| Wasco State Prison | 5,043 | 25 | 4.96 | 1 | 0.20 | 5,134 | 27 | 5.26 | 1 | 0.19 |
| **Totals\*** | 126,276 | 352 | 2.79 | 25 | 0.20 | 123,238 | 374 | 3.03 | 25 | 0.20 |

Source: California State Auditor's analysis of Corrections' COMPSTAT metrics.

Notes: As we note in Chapter 3 on page 58, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. The numbers in this table are not adjusted; we present them as they appear in COMPSTAT.

Italicized rows represent the four prisons reviewed in this audit.

\* Because we calculated populations based on a 12-month average, annual population amounts may differ from the total prison populations due to rounding.

| | 2014 | | | | | 2015 | | | | | 2016 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | |
| POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 |
| 4,028 | 4 | 0.99 | 0 | 0.00 | 3,369 | 3 | 0.89 | 0 | 0.00 | 3,274 | 2 | 0.61 | 0 | 0.00 |
| 1,825 | 0 | 0.00 | 0 | 0.00 | — | — | — | — | — | 1,933 | 0 | 0.00 | 0 | 0.00 |
| 4,909 | 0 | 0.00 | 1 | 0.20 | 4,138 | 1 | 0.24 | 0 | 0.00 | 3,991 | 0 | 0.00 | 1 | 0.25 |
| 4,404 | 3 | 0.68 | 2 | 0.45 | 3,949 | 11 | 2.79 | 1 | 0.25 | 3,435 | 17 | 4.95 | 2 | 0.58 |
| 1,626 | 17 | 10.45 | 0 | 0.00 | — | — | — | — | — | 2,342 | 26 | 11.10 | 1 | 0.43 |
| 4,636 | 13 | 2.80 | 1 | 0.22 | 3,859 | 7 | 1.81 | 1 | 0.26 | 3,669 | 6 | 1.64 | 0 | 0.00 |
| *1,994* | *15* | *7.52* | *2* | *1.00* | *1,887* | *34* | *18.02* | *2* | *1.06* | *1,882* | *24* | *12.75* | *2* | *1.06* |
| 2,082 | 16 | 7.69 | 1 | 0.48 | 2,342 | 15 | 6.41 | 1 | 0.43 | 2,563 | 8 | 3.12 | 0 | 0.00 |
| 4,368 | 18 | 4.12 | 0 | 0.00 | 3,910 | 15 | 3.84 | 2 | 0.51 | 4,101 | 12 | 2.93 | 3 | 0.73 |
| 2,826 | 0 | 0.00 | 0 | 0.00 | 4,946 | 7 | 1.42 | 0 | 0.00 | 3,006 | 2 | 0.67 | 0 | 0.00 |
| 4,335 | 17 | 3.92 | 0 | 0.00 | 4,280 | 20 | 4.67 | 1 | 0.23 | 3,640 | 33 | 9.07 | 0 | 0.00 |
| 3,587 | 22 | 6.13 | 0 | 0.00 | 3,520 | 11 | 3.13 | 0 | 0.00 | 3,479 | 19 | 5.46 | 2 | 0.57 |
| *2,212* | *11* | *4.97* | *2* | *0.90* | *2,240* | *12* | *5.36* | *3* | *1.34* | *2,339* | *8* | *3.42* | *2* | *0.86* |
| 4,005 | 8 | 2.00 | 1 | 0.25 | 3,858 | 5 | 1.30 | 0 | 0.00 | 3,983 | 2 | 0.50 | 0 | 0.00 |
| 5,435 | 16 | 2.94 | 1 | 0.18 | 5,489 | 19 | 3.46 | 0 | 0.00 | 5,296 | 32 | 6.04 | 0 | 0.00 |
| 4,963 | 5 | 1.01 | 0 | 0.00 | 2,539 | 1 | 0.39 | 0 | 0.00 | 5,184 | 5 | 0.96 | 0 | 0.00 |
| 3,863 | 5 | 1.29 | 0 | 0.00 | 3,792 | 2 | 0.53 | 0 | 0.00 | 3,819 | 0 | 0.00 | 0 | 0.00 |
| 2,862 | 0 | 0.00 | 0 | 0.00 | 3,287 | 4 | 1.22 | 0 | 0.00 | 3,614 | 4 | 1.11 | 0 | 0.00 |
| *3,652* | *6* | *1.64* | *0* | *0.00* | *3,000* | *11* | *3.67* | *0* | *0.00* | *2,861* | *25* | *8.74* | *1* | *0.35* |
| 2,315 | 1 | 0.43 | 0 | 0.00 | 2,150 | 0 | 0.00 | 0 | 0.00 | 2,425 | 0 | 0.00 | 0 | 0.00 |
| 2,561 | 14 | 5.47 | 0 | 0.00 | 2,361 | 10 | 4.24 | 3 | 1.27 | 2,340 | 14 | 5.98 | 0 | 0.00 |
| 3,100 | 2 | 0.65 | 0 | 0.00 | 2,913 | 0 | 0.00 | 1 | 0.34 | 2,979 | 1 | 0.34 | 1 | 0.34 |
| 3,421 | 9 | 2.63 | 1 | 0.29 | 3,416 | 1 | 0.29 | 0 | 0.00 | 3,702 | 2 | 0.54 | 0 | 0.00 |
| 3,018 | 5 | 1.66 | 0 | 0.00 | 3,392 | 1 | 0.29 | 0 | 0.00 | 3,265 | 1 | 0.31 | 0 | 0.00 |
| 3,804 | 30 | 7.89 | 1 | 0.26 | 3,759 | 26 | 6.92 | 0 | 0.00 | 3,910 | 16 | 4.09 | 3 | 0.77 |
| 2,908 | 17 | 5.85 | 2 | 0.69 | 2,869 | 22 | 7.67 | 0 | 0.00 | 3,266 | 18 | 5.51 | 0 | 0.00 |
| 4,591 | 18 | 3.92 | 0 | 0.00 | 4,243 | 11 | 2.59 | 0 | 0.00 | 4,381 | 5 | 1.14 | 1 | 0.23 |
| 2,777 | 4 | 1.44 | 1 | 0.36 | 2,647 | 11 | 4.16 | 0 | 0.00 | 2,247 | 15 | 6.67 | 1 | 0.44 |
| 3,113 | 7 | 2.25 | 0 | 0.00 | 2,868 | 2 | 0.70 | 0 | 0.00 | 3,206 | 1 | 0.31 | 1 | 0.31 |
| *3,076* | *22* | *7.15* | *1* | *0.33* | *3,114* | *51* | *16.38* | *1* | *0.32* | *3,112* | *59* | *18.96* | *0* | *0.00* |
| 4,628 | 2 | 0.43 | 0 | 0.00 | 4,377 | 3 | 0.69 | 0 | 0.00 | 4,329 | 3 | 0.69 | 0 | 0.00 |
| 3,920 | 12 | 3.06 | 2 | 0.51 | 3,720 | 14 | 3.76 | 2 | 0.54 | 3,953 | 10 | 2.53 | 0 | 0.00 |
| 3,415 | 19 | 5.56 | 1 | 0.29 | 3,663 | 23 | 6.28 | 0 | 0.00 | 3,718 | 17 | 4.57 | 4 | 1.08 |
| 3,243 | 7 | 2.16 | 0 | 0.00 | 3,339 | 11 | 3.29 | 0 | 0.00 | 3,455 | 6 | 1.74 | 0 | 0.00 |
| 5,154 | 20 | 3.88 | 0 | 0.00 | 4,897 | 27 | 5.51 | 0 | 0.00 | 4,983 | 26 | 5.22 | 0 | 0.00 |
| 122,652 | 365 | 2.98 | 20 | 0.16 | 114,130 | 391 | 3.43 | 18 | 0.16 | 119,681 | 419 | 3.50 | 25 | 0.21 |

Blank page inserted for reproduction purposes only.

# Appendix B

## SCOPE AND METHODOLOGY

The Audit Committee directed the California State Auditor to perform an audit of Corrections' policies, procedures, and practices related to suicide prevention and reduction. We were directed to review the suicide and attempted suicide rates for male and female inmates in all state prisons; Corrections' policies and procedures for inmate suicide prevention and response, as well as their implementation; and CIW's implementation of Corrections' policies. We were also asked to determine areas in which Corrections could improve its mental health services, causes for CIW's high suicide rates, and the adequacy of mental health and suicide prevention training for CIW staff. Table B lists the objectives that the Audit Committee approved and summarizes the methods we used to address those objectives.

**Table B**
**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | We reviewed relevant state laws and regulations. |
| 2 | Evaluate Corrections' policies and procedures for inmate suicide prevention and response, including those related to instances when an inmate exhibits suicidal behavior. Determine whether such policies and procedures are implemented consistently throughout California's state prisons. | • We judgmentally selected three prisons to review in addition to CIW based on an analysis of the number of suicides and suicide attempts from 2014 through 2016 and of the prisons' missions: CCWF, RJD, and SAC.<br>• We obtained Corrections' policies and procedures for inmate suicide prevention and response. Further, we reviewed local operating procedures at each of the four prisons.<br>• We reviewed the *Coleman* special master monitoring reports, Corrections' suicide reports, and the suicide expert's audits to identify recommendations made to CIW, Corrections, and the other three prisons. We determined if the appropriate policies and procedures reflected those recommendations. We also interviewed relevant Corrections' staff for perspective on the implementation of these recommendations.<br>• We judgmentally selected 10 inmate suicides and suicide attempts from 2014 through 2016 from each of the four prisons. We reviewed the records for the 40 inmates' suicides and suicide attempts to determine if the prisons adhered to their local operating procedures and Corrections' policies and procedures on suicide prevention and response. We interviewed relevant staff at Corrections and at the prisons to obtain perspective on issues we found pertaining to these records. |
| 3 | For the most recent three-year period, compare the suicide and attempted suicide rates for male and female inmates in all state prisons. | • To better identify trends, we reviewed the five-year period from 2012 through 2016.<br>• We gathered Corrections' statistics on inmate suicides and suicide attempts from 2012 through 2016 for all California state prisons from Corrections' organizational management tool called COMPSTAT.<br>• We analyzed the COMPSTAT data to present the inmate suicide and suicide attempt rates by prison in Appendix A.<br>• We obtained perspective from Corrections' officials on any trends or inaccuracies that we observed and the methods Corrections used to gather and track these data.<br>• For Table 1 on page 9 and Table 6 on page 40, we adjusted the COMPSTAT data we present on suicides for the four prisons we reviewed based on documentation of suicides not recorded in COMPSTAT. In Table 1, we also adjusted the prison populations for the four prisons we reviewed based on average daily populations Corrections provided. In Appendix A, we did not adjust the COMPSTAT data as they are the data Corrections makes available to the public. |

*continued on next page . . .*

| AUDIT OBJECTIVE | METHOD |
|---|---|
| 4 Identify areas where Corrections can improve its mental health services, particularly with respect to the safety and care for inmates needing mental health treatment. | · Using the results of the testing of policies and recommendations in Objective 2, we determined areas in which Corrections could improve its practices. We gathered perspective on these areas of improvement from relevant Corrections' staff. |
| | · We reviewed the monthly meeting minutes for the statewide suicide prevention team and the suicide prevention teams at each of the four prisons for 2016 to determine the meeting attendees and the topics staff addressed. |
| | · We interviewed Corrections' officials and reviewed available documentation to identify the methods used to discuss, document, and disseminate best practices to the prisons related to suicide prevention and response. |
| | · We obtained Corrections' reports on position vacancy rates as of December 2016 for social workers, psychiatrists, and psychologists at the four prisons we reviewed and for Corrections as a whole. |
| | · We interviewed key staff at the four prisons and Corrections' headquarters to gather perspective on staff vacancies. |
| 5 In reviewing the CIW do the following: | The procedures we performed in Objective 2 also addressed this objective. |
| a. Evaluate whether CIW appropriately implemented Corrections' suicide prevention policies. | |
| b. Identify and analyze CIW's policies and procedures in the event of a suicide, including any ensuing investigation and communication with the deceased inmate's family during and after such investigation. | · The procedures we performed in Objective 2 also addressed this objective. |
| | · We reviewed Corrections' procedures for communicating with a deceased inmate's family following a death. |
| | · We reviewed records for six inmates who committed suicide from 2014 through 2016 and determined that CIW complied with Corrections' policies for communicating with a deceased inmate's family following a suicide. |
| c. To the extent possible, identify the causes or factors contributing to the higher rates of suicide and suicide attempts at CIW, including any systemic problems or failures. | · We interviewed key Corrections' headquarters staff and CIW staff to gather their perspectives on the causes for the higher rates of suicide and suicide attempts at CIW from 2014 through 2016. |
| | · We evaluated data from CIW and CCWF regarding the suicide attempts by inmates who transferred from VSPW. |
| | · We reviewed Corrections' available documentation of the plan to convert VSPW to a men's prison. |
| | · We interviewed officials at CIW and Corrections to determine if the conversion process accounted for the effect the transfer of inmates from VSPW would have on CIW. |
| d. Identify and analyze CIW's policies and practices in the event that an inmate displays suicidal behavior. Evaluate CIW's ability to appropriately house and treat inmates identified as suicidal and determine whether CIW allows access to inmate program activities or movements such as yard time. | · The procedures we performed in Objective 2 for the 40 inmates' suicides and suicide attempts also addressed this objective. |
| | · We reviewed CIW's policies and documentation for six inmates regarding access to yard time. |
| e. Evaluate the adequacy of the mental health and suicide prevention training for CIW staff. | · From a list containing all employees at CIW, we randomly selected 20 CIW staff members and determined the percentage who received annual suicide prevention training in 2014, 2015, and 2016. |
| | · From a list containing all mental health staff at CIW, we randomly selected 10 psychiatrists, psychologists, and social workers and determined how many received training on how to complete suicide risk evaluations and other trainings required for mental health staff. |
| | · We reviewed several suicide prevention trainings that Corrections' staff received to determine if the trainings contained the content Corrections' policies require and any additional content the suicide expert had recommended. |
| | · We obtained self-reported data on selected required trainings from CCWF, CIW, RJD, and SAC and identified instances of low compliance. |
| 6 Review and assess any other issues that are significant to the audit. | · We interviewed selected advocacy groups to identify their key concerns related to our audit scope. |
| | · We addressed concerns related to delays in emergency response and monitoring inmates in Objective 2. |
| | · We also addressed concerns related to identifying and disseminating best practices in Objective 4. |

Sources: California State Auditor's analysis of the Audit Committee's audit request number 2016-131, planning documents, and analysis of information and documentation identified in the table column titled *Method*.

**Assessment of Data Reliability**

In performing this audit, we obtained data from Corrections' COMPSTAT organizational management tool. The U.S. Government Accountability Office, whose standards we are statutorily required to follow, requires us to assess the sufficiency and appropriateness of computer-processed information that we use to support findings, conclusions, or recommendations. Corrections' COMPSTAT tool provides monthly data to stakeholders and the public on a variety of measures at each of Corrections' prisons and other institutions. We used COMPSTAT data to report on the number of suicides and attempted suicides throughout California's adult prisons. We performed data-set verification procedures and found no errors. Further, as reported in Chapter 3, we assessed the accuracy and completeness of COMPSTAT data by comparing the data on suicides and attempted suicides for selected months to incident logs from the four prisons we visited and identified several errors. We also compared the number of suicides reported in COMPSTAT to those in reports from the special master's suicide experts and found they did not agree. Finally, during the course of our audit work, we identified one suicide each at three of the four prisons we visited that was not included in COMPSTAT. As a result, we determined that COMPSTAT data are not sufficiently reliable for the purposes of this audit. Nevertheless, we present these data in the report because COMPSTAT is Corrections' comprehensive source of data available on suicides and attempted suicides for each of its prisons, and it contains data Corrections makes publicly available. We discuss our findings in more detail in Chapter 3 and make a recommendation for improving the data on page 64.

We also obtained summary data from Corrections on the rates at which its employees attend various trainings. We tested selected employees at CIW and determined they did not all attend required trainings. We requested self-reported summary data from Corrections for each of the four prisons we visited to determine whether there was evidence at each prison to corroborate our findings at CIW. Because the data corroborated our findings, we determined it would be too resource-intensive to further test the accuracy and completeness of the prisons' self-reported data. Instead, we clearly attribute the data in the report to Corrections.

Blank page inserted for reproduction purposes only.

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION          EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF THE SECRETARY**

P.O. Box 942883
Sacramento, CA 94283-0001

July 31, 2017

Ms. Elaine M. Howle, State Auditor
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

Dear Ms. Howle:

The California Department of Corrections and Rehabilitation (CDCR) submits this letter in response to the California State Auditor's (CSA) audit titled "California Department of Corrections and Rehabilitation: It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides."

CDCR takes its responsibility to prevent inmate deaths by suicide very seriously and reviews each case carefully to allow it to continue to refine the suicide prevention program. Delivery of mental health services to CDCR inmates has improved overall, and CDCR continues to create a culture of focused improvement, oversight, and accountability in the area of suicide prevention both with staff and inmates. CDCR is committed to continuously evaluating and improving the performance and quality of the entire Mental Health Services Delivery System, including suicide prevention and response practices.

CDCR has made a great deal of progress implementing policies, training, and support for suicide prevention practices statewide, and acknowledges there is further progress to make. CDCR has completed or has in progress 58 initiatives, only 29 of which were recommendations from external suicide experts. For example, CDCR is nearing completion of a contract to provide substance abuse treatment specifically designed for individuals with mental health issues at the California Institution for Women (CIW) and other institutions; is developing a contract to address domestic violence for inmates in the mental health system in CDCR's women's institutions; has implemented the use of new suicide assessment tools and treatment protocols that reflect best practices in the field of suicidology; and provides increased mental health outreach to all inmates at CIW (including those who are not in the mental health system) by offering access to brief, solution-focused counseling.

CSA's report on CDCR's suicide prevention policies highlights areas where CDCR has already improved its practices, and where improvements continue to be made. CDCR will consider the recommendations made by the auditors to continue to improve upon its ongoing suicide prevention mission.

CDCR would like to thank CSA for their work on this report and will address the specific recommendations in a corrective action plan within the timelines outlined in the report. If you have further questions, please contact me at (916) 323-6001.

Sincerely,

SCOTT KERNAN
Secretary

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.
     **Plaintiffs,**

    **vs.**                    **No. CIV S-90-0520 KJM DAD PC**

EDMUND G. BROWN, JR., et al.
     **Defendants**

**SPECIAL MASTER'S REPORT ON**
**HIS EXPERT'S AUDIT OF SUICIDE PREVENTION PRACTICES**
**IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF**
**CORRECTIONS AND REHABILITATION**

Attached is the *Coleman* Special Master's Expert's Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation (CDCR).  It is submitted as part of the Special Master's continuing review of the Defendants' compliance with court-ordered remediation in this matter.  This report is the product of on-site examination and critique by the Special Master's expert, Lindsay M. Hayes, M.S., of suicide prevention practices and individual suicide case files in all 34 CDCR institutions, from November 12, 2013 to July 24, 2014.  Unlike the earlier reports by other Special Master's experts on suicide prevention, Mr. Hayes' report and recommendations are based on not only his reviews of inmate suicide case files, but also from his findings that were gathered during his on-site institutional inspections.  The earlier reports were drawn from in-depth psychiatric reviews and analyses of treatment and case files on CDCR inmates who committed suicide.

The Special Master directed Mr. Hayes to conduct this review to assist a *Coleman* court-ordered workgroup, the Suicide Prevention Management Workgroup, in its task of addressing and resolving the problem of elevated suicide rates among CDCR inmates. (ECF 4693)  Suicide prevention has been a long-running theme in the *Coleman* remedial effort.  This Court noted the need for a program to identify, treat, and supervise inmates at risk for suicide from as far back as its remedial order in this case.  (ECF 612), *Coleman v. Wilson*, 912 F.Supp. 1282, 1298 n.10 (E.D. Cal. 1995 (citing *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558, 1577 (D.Idaho 1984)), and has entered several orders on suicide prevention practices over the ensuing years.  On April 5, 2013, in its order denying the Defendants' motion to terminate federal court oversight, the *Coleman* Court stated:

> In summary, for over a decade a disproportionately high number of inmates have committed suicide in California's prison system.  Review of those suicides shows a pattern of identifiable and describable inadequacies in suicide prevention in the CDCR.  Defendants have a constitutional obligation to take and adequately implement all reasonable steps to remedy these inadequacies.  The evidence shows they have not done so. In addition, while defendants represent that they have fully implemented their suicide prevention program, they have not.  An ongoing constitutional violation therefore remains.

(ECF 4539)

Following the filing of the Special Master's Expert's Report on Suicides Completed in CDCR from January 1, 2012 – June 30, 2012 (ECF 4376), on July 12, 2013, the *Coleman* court ordered the establishment of a Suicide Prevention Management Workgroup to address and resolve this problem.  Among other things, the Court ordered that:

> Defendants shall forthwith, under the supervision of the Special Master, establish a suicide prevention/management work group comprised of

2

> CDCR clinical, custody, and administrative staff, Department of State
> Hospitals (DSH) staff, the Special Master's experts, plaintiffs' counsel
> and, as appropriate, the *Plata* receiver to work under the guidance of the
> Special Master to timely review suicide prevention measures, suicide
> deaths, and deaths deemed to be of undetermined cause.

(ECF 4693)

The Workgroup was promptly assembled and met three times (July 31, August
21, and October 17, 2013). Its members concluded that the Workgroup required an
expert assessment of current suicide prevention practices in all 34 CDCR prisons in
order to effectively accomplish its purpose.  Consequently, at the Special Master's
request, Mr. Hayes was appointed by the *Coleman* court to Special Master's staff as an
expert (ECF 4857), and was directed by me to conduct his audit of inmate suicide
prevention practices in all CDCR prisons and prepare the attached report.

Mr. Hayes is Project Director for the National Center on Institutions and
Alternatives and a nationally recognized expert in the field of suicide prevention in
correctional settings.  He serves as a suicide prevention consultant to the U.S.
Department of Justice Civil Rights Division with regard to investigations of confinement
conditions in adult and juvenile correctional facilities throughout the nation.  He has
assisted other U.S. federal courts with oversight of suicide prevention practices in adult
and juvenile correctional systems and evaluated adult and juvenile inmate suicide
prevention practices in a variety of state and local jurisdictions.  Mr. Hayes has
conducted five national studies of suicides in jails, prisons, and juvenile justice facilities,
has written over 60 publications in the area of suicide prevention in the correctional
setting, and is a frequent lecturer on suicide prevention at professional conferences and
seminars. He is a recipient of the National Commission on Correctional Health Care's

3

Award of Excellence for outstanding contributions in the field of suicide prevention in correctional facilities.

Mr. Hayes' report was distributed in draft form to the *Coleman* parties on November 20, 2014, after which they were given 30 days to submit comments and/or objections to the draft report.  Both parties responded timely.

In their response to the draft report, Plaintiffs requested additional recommendations beyond those offered by Mr. Hayes.  These requested recommendations were in the areas of staff training, initial health care screenings, suicide risk evaluations, 30-minute welfare checks, use of suicide-resistant cells for newly admitted inmates in administrative segregation, perceptions of suicidal inmates as manipulative, psych tech practices, use of psychiatric observation and crisis evaluation for suicidal inmates, use of alternative housing cells and outpatient housing units for suicidal inmates, and institutional Suicide Prevention and Response Focused Improvement Teams, among other things.  While these requests for additional recommendations reflect thoughtful understanding and analysis of various aspects of the problem of inmate suicides in CDCR prisons, they are not being offered or recommended for the Court's consideration at this time.

Defendants' response offered commentary on nearly all of Mr. Hayes' recommendations, generally indicating willingness to work with the Special Master on resolving the identified problem(s) underlying Mr. Hayes' recommendations, and in some cases indicating that remedial measures were already being developed and/or implemented.  Defendants' particularized responses to Mr. Hayes' recommendations are referenced within his report where each of the recommendations appears.

The Special Master agrees with the recommendations offered by Mr. Hayes in his attached report.  Requests for orders directing implementation of recommendations within reports by the Special Master's experts "should come, if at all, from the special master."  (ECF 3731)  Accordingly, the Special Master requests that the Court order Defendants to adopt the following recommendations and to work with the Special Master in the Suicide Prevention Management Workgroup, and otherwise as may be necessary, on the development of strategies and the implementation of the changes and practices described in the recommendations within in the areas designated below, as follows:

I.      **Suicide Prevention Training**

- Expand the length and content of the pre-service "Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e. including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices.

- Expand the length and content of the annual "Crisis Intervention and Suicide Prevention" training workshop to  include the topics described above;

- Ensure that all custody and health care staff receive both pre-service and annual suicide prevention training, and

- Ensure that all pre-service and annual suicide prevention training is conducted by qualified mental health personnel.

II.     **Initial Health Screening and Receiving and Release Unit Environment**

- The Initial Health Screening form (CDCR Form 7277) should be revised to omit compound questions and include separate direct questions, such as "Have you ever attempted to commit suicide?" and "Are you currently thinking of hurting yourself?";

- Intake screening should be conducted only in the nurse's office within a reception and receiving (R&R) unit;

- The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process; and

- Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality

III.  **Suicide Risk Evaluations (SREs)**

- CDCR should revise its SRE Mentoring Program to
  - eliminate its "graduation" component after completion of two adequate assessments,
  - conduct ongoing mentoring throughout the year, and
  - audit clinicians' SREs on a regularly scheduled basis.

- Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis.

IV.  **30-Minute Welfare Checks in Administrative Segregation, Security Housing Units (SHUs), and Condemned Units**

- Continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at Pelican Bay State Prison and at the California Health Care Facility (Phase 3, per the directive)

V.  **Use of Suicide-Resistant Cells for Newly Admitted Inmates in Administrative Segregation Units**

- CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72 hours of their housing in the unit) and inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status).

- CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours.

- Any inmate discharged from suicide observation status and arriving in administrative segregation from either a Mental Health Crisis Bed or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan.

6

- Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled.  They should be placed in suicide-resistant, retrofitted cells.

- Based on current data indicating that risk of suicide in administrative segregation extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates.

## VI.    Treatment Planning for Suicidal Inmates

- CDCR should adopt the recommendations made in connection with SREs, set forth above, which will also improve treatment planning contained in the SREs section above; and

- CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment," described above.

## VII.   Perception of Suicidal Inmates as Manipulative

- The perception that all inmates who threaten suicide are manipulative persists among the treatment teams as a misguided mindset that should be repeatedly addressed at different levels including pre-service and annual suicide prevention trainings, the SRE Training and Mentoring Program, and the newly created SRE treatment planning webinar.

## VIII.  Psych Tech Practices

- CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs.

## IX.    Use of "Psychiatric Observation" and "Crisis Evaluation" Statuses for Suicidal Inmates

- CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch.

- CDCR, under the guidance of the Special Master, should examine the use of "psychiatric observation" status or other similarly-named practices for use in MHCBs and alternative housing cells for non-suicidal inmates and clarify when it may be used, via a directive or policy and procedure.

X.    **Use of "Alternative Housing Cells" and Outpatient Housing Units (OHUs) for Suicidal Inmates**

- The CDCR "Alternative Housing Cell Prioritization" memorandum dated December 12, 2012 should be revised to require that all cells utilized for alternative housing must be suicide-resistant.

- Until all alternative housing cells are suicide-resistant, any inmate housed in an alternative housing cell that is not suicide-resistant should be observed on a continuous basis until transferred to an MHCB.

- Any inmate housed in an alternative housing cell that is suicide-resistant should be observed at staggered intervals not to exceed every 15 minutes (Suicide Precaution), or be on continuous observation (Suicide Watch), depending on the level of the inmate's suicide risk.

- Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed.

XI.    **Outpatient Housing Unit/Mental Health Crisis Bed Discharge and Efficacy of Five-Day Clinical Follow-Up and 60-Minute Custody Welfare Checks**

- CDCR, under the guidance of the Special Master, should completely revise the current Five-Day Follow-up/60-Minute Welfare Check protocol.  At a minimum:

    - The "Interdisciplinary Progress Note – 5-Day Follow-Up" form that contains five days of notes on a single page should be replaced by a form similar to the "Interdisciplinary Progress Note" utilized at the California Training Facility (CTF) that allows clinicians to use a separate sheet for each day of follow-up.

    - All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred.

    - The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-case basis by the mental health clinician

and clinically justified in the inmate's treatment plan.  No other frequency of observation should be authorized.

- All inmates discharged from an MHCB or alternative housing and immediately re-housed in an administrative segregation unit should only be placed in a suicide-resistant, retrofitted cell for a period to be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan.

- Five-day follow-up assessments and 30-minute checks by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing suicidal ideation and/or engaging in self-injurious behavior.

## XII.   Local Suicide Prevention and Response Focused Improvement Teams

- CDCR, under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.

## XIII.   Corrective Actions to Address Additional Miscellaneous Issues

- CDCR, under the guidance of the Special Master within the Suicide Prevention Management Workgroup, should examine and consider taking corrective actions to address the problems identified in the attached Report in the following areas:

  - Forms for Documentation of Observation

  - Non-Suicide-Resistant Mental Health Crisis Beds

  - Privileges for Inmates in Mental Health Crisis Beds

  - Informal Recommendations Within CDCR Suicide Reports

  - Frosted Exterior Cell Windows and Sensory Deprivation

  - High Refusal Rates for New Admit Screens in Administrative Segregation

The Special Master further requests that the Court order him to provide an update report to the Court on the state of Defendants' implementation of suicide prevention policies and practices in CDCR prisons, with said report to be within the Special Master's

regular compliance report following the conclusion of the upcoming Twenty-Sixth

Monitoring Round, or to be submitted to the Court as soon as practicable thereafter.



Respectfully submitted,


/s/

_____
Matthew A. Lopes, Jr., Esq.
Special Master


January 14, 2015

# An Audit of Suicide Prevention Practices
# in the Prisons of the California Department of
# Corrections and Rehabilitation

Lindsay M. Hayes, M.S.
January 14, 2014

## Introduction

Over the past several years, the *Coleman* Court has addressed the continuing problem of inmate suicides in the prisons of the California Department of Corrections and Rehabilitation (CDCR).  On April 5, 2013, the Court stated that "for over a decade a disproportionately high number of inmates have committed suicide in California's prison system.  Review of those suicides shows a pattern of identifiable and describable inadequacies in suicide prevention in the CDCR.  Defendants have a constitutional obligation to take and adequately implement all reasonable steps to remedy these inadequacies.  The evidence shows they have not done so.  In addition, while defendants represent that they have fully implemented their suicide prevention program, they have not.  An ongoing constitutional violation therefore remains."  (ECF 4539)

On July 12, 2013, the *Coleman* court ordered the establishment of a Suicide Prevention Management Workgroup to address and resolve this problem.  Among other things, the Court ordered that:

> Defendants shall forthwith, under the supervision of the Special Master, establish
> a suicide prevention/management work group comprised of CDCR clinical,
> custody, and administrative staff, Department of State Hospitals (DSH) staff, the
> Special Master's experts, plaintiffs' counsel and, as appropriate, the *Plata*
> receiver to work under the guidance of the Special Master to timely review
> suicide prevention measures, suicide deaths, and deaths deemed to be of
> undetermined cause.

(ECF 4693)  The Workgroup was organized and met on three occasions, July 31, August 21, and October 17, 2013.  Its members decided and agreed that an expert assessment of current suicide prevention practices in all 34 CDCR prisons was needed for the workgroup to carry out its charge.  As a result of this decision by the work group, and at the request of the *Coleman* Special Master, this reviewer was engaged to conduct an audit of inmate suicide prevention practices within the 34 CDCR prisons.

The audits began on November 12, 2013 and continued through July 24, 2014.  They entailed an on-site assessment of each prison's suicide prevention practices, and included reviews of suicide prevention local operating procedures (LOPs), selected health care records of inmates currently or recently on suicide precautions/suicide watch status (referred to collectively as "suicide observation" in some portions of this report), hundreds of electronic unit health records (eUHRs) of inmates who had been referred to the mental health program for assessment of suicide risk, minutes of meetings of the institutional Suicide Prevention and Response Focused Improvement Teams (SPRFITs), and all inmate suicides which occurred from 2012 to

1

the times of this reviewer's site visits by examination of eUHRs, CDCR Suicide Reports, and, where applicable, any Quality Improvement Plans (QIP)[1]. The audit also included observation of psychiatric technician (psych tech) rounds in administrative segregation units, the intake screening process conducted by nursing staff in the institutional reception centers (RC) and receiving and release units, Inter-Disciplinary Treatment Team (IDTT) meetings, and custody rounds in administrative segregation units and Security Housing Units (SHUs). This reviewer also interviewed numerous custody and health care staff.

The order and dates of this reviewer's on-site assessments were as follows:

1. California State Prison, Los Angeles County (CSP/LAC): November 12-13, 2013
2. California Correctional Institution (CCI): November 14-15, 2013
3. California State Prison, Sacramento (CSP/Sac): November 20-21, 2013
4. Folsom State Prison (FSP): December 3-4, 2013
5. California Institution for Men (CIM): December 5-6, 2013
6. Centinela State Prison (Cen): December 17, 2013
7. Calipatria State Prison (Cal): December 18, 2013
8. Richard J. Donovan Correctional Facility (RJD): December 19-20, 2013
9. California Medical Facility (CMF): January 7-8, 2014
10. California State Prison, Solano (CSP/Solano): January 9-10, 2014
11. San Quentin State Prison (SQ): January 21-22, 2014
12. California Men's Colony (CMC): February 4-5, 2014
13. Salinas Valley State Prison (SVSP): February 6-7, 2014
14. California State Prison, Corcoran (CSP/Cor): February 18-19, 2014
15. California Substance Abuse Treatment Facility (CSATF): February 20-21, 2014
16. Ironwood State Prison (ISP): March 4-5, 2014
17. Chuckawalla Valley State Prison (CVSP): March 5-6, 2014
18. Wasco State Prison (WSP): March 25-26, 2014
19. North Kern State Prison (NKSP): March 27-28, 2014
20. Central California Women's Facility (CCWF): April 8-9, 2014
21. Valley State Prison (VSP): April 10-11, 2014
22. Kern Valley State Prison (KVSP): April 22-23, 2014
23. Correctional Training Facility (CTF): April 24-25, 2014
24. Pleasant Valley State Prison (PVSP): May 6-7, 2014
25. Avenal State Prison (ASP): May 8-9, 2014
26. California Institution for Women (CIW): May 20-21, 2014
27. California Rehabilitation Center (CRC): May 22-23, 2014
28. Sierra Conservation Center (SCC): June 10-11, 2014
29. Mule Creek State Prison (MCSP): June 12-13, 2014
30. California Health Care Facility (CHCF): June 24-25, 2014
31. Deuel Vocational Institution (DVI): June 26-27, 2014

---

[1] For purposes of this report, all reviews of eUHRs and Suicide Reports do not include critiques of clinical judgment. Rather, these reviews are based upon critiques of implementation and use of suicide prevention practices set by the *Coleman Program Guide* (2009 revision) and generally applicable standards of care. Suicides by CDCR inmate-patients while in inpatient mental health programs run by the California Department of State Hospitals (DSH) were not included in this audit.

32. California Correctional Center (CCC): July 8-9, 2014
33. High Desert State Prison (HDSP): July 10-11, 2014
34. Pelican Bay State Prison (PBSP): July 23-24, 2014

In addition, this reviewer observed a full-day Mental Health Services Delivery System (MHSDS) training workshop at the CDCR Basic Correctional Officer Academy in Galt, California, on November 22, 2013. The workshop included a section on "Crisis Intervention and Suicide Prevention." Block suicide prevention training workshops were also observed at seven prisons: CIW, CMC, KVSP, PVSP, CSATF, VSP, and WSP.

## SUMMARY OF FINDINGS AND EMERGING TRENDS

It is the opinion and conclusion of this reviewer that the applicable provisions of the *Coleman Program Guide* on suicide prevention and response provide reasonable and comprehensive guidelines for the identification and management of suicidal inmates. However, the most significant finding from this audit was that suicide prevention practices in the prisons often did not mirror *Program Guide* requirements. While CDCR has made important advances with its suicide prevention practices, it has not yet fully implemented a thorough, standardized program for the identification, treatment, and supervision of inmates at risk for suicide. As shown in Table 1, from 2010 through 2013, the *number* of inmate suicides in CDCR prisons annually has remained nearly unchanged. Across the same period the *rate* of inmate suicides per 100,000 in CDCR prisons has remained substantially higher than the inmate suicide rate of 16 suicide deaths per 100,000 inmates in other correctional systems throughout the United States.[2] Although the total number of inmate suicides and the corresponding suicide rate in any prison system should not be the sole barometer by which adequacy of its suicide prevention practices should be measured, they can be important tools in making that assessment.

## TABLE 1

### AVERAGE DAILY INMATE POPULATION, SUICIDES, AND SUICIDE RATE IN CDCR PRISONS, 1999 THROUGH DECEMBER 2014[3]

| Year | ADP | Suicides | Suicide Rate |
|------|-----|----------|--------------|
| 1999 | 159,866 | 25 | 15.6 |
| 2000 | 160,855 | 15 | 9.3 |
| 2001 | 155,365 | 30 | 19.3 |
| 2002 | 158,099 | 22 | 13.9 |
| 2003 | 155,722 | 36 | 23.1 |
| 2004 | 163,346 | 26 | 15.9 |
| 2005 | 164,179 | 43 | 26.2 |
| 2006 | 171,340 | 43 | 25.1 |
| 2007 | 172,535 | 34 | 19.7 |
| 2008 | 165,700 | 37 | 22.3 |

---

[2]*See, e.g.* Noonan, M.E. (2014), *Mortality in Local Jails and State Prisons, 2000-2012 - Statistical Tables*, Washington DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.
[3]Data does not include suicides of CDCR inmates which occurred in contracted, out-of-state facilities.

| 2009 | 159,084 | 25 | 15.7 |
| 2010 | 165,747 | 35 | 21.1 |
| 2011 | 161,818 | 34 | 21.0 |
| 2012 | 134,901 | 33 | 24.4 |
| 2013 | 132,827 | 31 | 23.3 |
| 2014 | 126,619 | 23[4] | 18.2 |

The best methodology for determining whether CDCR has fully implemented its suicide prevention program is to (1) assess suicide prevention practices within each CDCR prison, and (2) review each inmate suicide in relation to practices in the prison and determine its degree of preventability. The critical measurement tool that was utilized was the *Coleman* Program Guide. Specific standards on suicide prevention training, levels of suicide observation, suicide risk evaluation (SRE), management of suicidal inmates, emergency medical response, responsibilities of the SPRFITs, and the mortality review process are found in *Program Guide* Chapter 10, "Suicide Prevention and Response." Other *Program Guide* chapters, including "Reception Center Mental Health Assessment" (Chapter 2), "Mental Health Crisis Bed" (Chapter 5), and "Administrative Segregation" (Chapter 7), provided guidance in other suicide prevention-related areas.

CDCR has made significant progress in suicide prevention with its creation of important tools including the Suicide Risk Evaluation (SRE) form, the requirement that psych techs conduct daily rounds in administrative segregation units to help identify potentially suicidal behaviors, the establishment of SPRFITs to monitor suicide prevention practices, and comprehensive reviews of each inmate suicide. However, there continued to be significant problems with implementation of these practices.

The inmate suicide review process and the issuance of a Suicide Report on each inmate suicide continued to be one of the strengths of the CDCR suicide prevention program. However, a significant number of the corrective actions, developed as "quality improvement plans" within CDCR's suicide review and reporting process, were seemingly repeated over and over again, from one suicide to another, from year to year. A prime example of this was the frequent appearance of corrective actions requiring mental health clinicians to be trained or retrained on the administration of SREs and the associated mentoring program. Other prominent examples were the frequent appearance of corrective actions requiring correctional officers (CO) to be retrained on the requirement to conduct 30-minute rounds in administrative segregation units, and requiring nursing staff to be retrained on appropriate emergency medical response to suicides.

Perhaps the most surprising finding from this audit was how strikingly obvious many of the deficiencies in suicide prevention practices were. Yet, they had not been identified in any CDCR quality assurance/quality improvement activities, including the SPRFIT process. For example:

---

[4]As of December 26, 2014.

- Initially, psych techs responsible for daily administrative segregation unit rounds were observed at many prisons to be conducting them without timely completing "Psych Tech Daily Rounds" forms, or were completing forms not authorized by CDCR.

- COs in various prisons were observed not conducting timely 30-minute rounds in administrative segregation units, or not documenting their completed rounds in housing logs.

- Medical staff responsible for conducting observation of inmates in several Mental Health Crisis Bed (MHCB) units were observed to be not conducting rounds at required intervals and then falsifying documentation on observation sheets.

- In many prisons operating MHCB units or Outpatient Housing Units (OHUs), unauthorized observation forms and an unauthorized level of observation referred to as "psychiatric observation" were being utilized, regardless of their nonexistence or the lack of even any mention in the *Program Guide*.

- Staff in various prisons were observed to be not only conducting intake screening without sufficient privacy, but failing to ask all of the required questions, *including whether the inmate was currently suicidal*.

While these deficiencies were not found at all 34 prisons, to varying degrees they were found in most of the prisons. Had a viable suicide prevention quality assurance/quality improvement process been in place, most, if not all, of these deficiencies should have been readily identified and corrected.

The following are 12 areas in which this reviewer found CDCR prisons to be consistently deficient. Sustained correction of the problems in these areas could dramatically improve CDCR's suicide prevention practices and have the greatest impact on reducing the number of inmate suicides in its prisons.

1) <u>**Suicide Prevention Training**</u>

    A.    <u>**Pre-Service Training**</u>

On November 22, 2013, this reviewer observed a full-day pre-service training workshop in a classroom at the CDCR Basic Correctional Officer Academy in Galt, California. The venue was very good, with comfortable seating and excellent audio-visual equipment. The training instructor was a Ph.D. clinical psychologist. The approximately 40 cadet officers were attentive and interactive throughout the full-day workshop.

The workshop was based on the 110-page *Mental Health Services Delivery System Instructor Guide* that was last revised in May 2013. The workshop included an Introduction and sections on (1) The MHSDS, (2) Recognizing Mental Disorders, (3) Crisis Intervention and Suicide Prevention, (4) Conclusion: MHSDS, and (5) Heat-Related Pathologies.

Review of the *Instructor Guide* found that it had very good content, including crisis intervention, emergency mental health referrals stressors and internal/external factors regarding suicide, interaction with the suicidal inmate, levels of suicide observation, and responding to a suicide attempt (SA) in progress.  However, what the *Instructor Guide* did not include, and what could have been very helpful in basic instruction on suicide prevention, were sections on (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) ineffectiveness of "contracting for safety"; (4) updated research on CDCR suicides, (5) identified problem areas and corrective actions from previous CDCR Suicide Reports, and (6) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices.

Overall, the workshop was problematic.  The first few hours of it were quite good, with the instructor presenting an unscripted introduction to the signs and symptoms of mental illness and promoting interaction among the cadets by inviting them to discuss any personal insights on the topic.  However, the remainder of the workshop, including presentation of the "Crisis Intervention and Suicide Prevention" section, was deficient for several reasons.  First, the instructor appeared very unfamiliar with using the PowerPoint slides that accompanied sections of the *Instructor Guide*.  Second, the instructor's presentation did not follow the order of the PowerPoint slides, causing confusion and distraction as the cadets and other observers attempted to find the corresponding sections in the *Student Handbook*.

Presentation of the "Crisis Intervention and Suicide Prevention" section was especially problematic.  This section was scheduled to take 2.5 hours, but the instructor spent only about an hour on it.  The presentation began out of order with a discussion of emergency response to a SA, followed by a haphazard presentation of other information.  For example, the instructor read a list of suicide protective factors without explaining what the terms meant or their effect on the SRE process.  Much of the information was presented either inadequately or not at all.  For example, an extremely important PowerPoint slide (No. 58) in the *Instructor Guide* entitled "IS PATH WARM" (i.e., <u>i</u>solation, <u>s</u>ubstances, <u>p</u>urposeless, <u>a</u>nxiety, <u>t</u>rapped, <u>h</u>opelessness, <u>w</u>ithdrawn, <u>a</u>gitation/anger, <u>r</u>ecklessness, <u>m</u>ood) was not covered.

## B.   <u>Annual Training</u>

With regard to annual suicide prevention instruction, the *Program Guide* requires that "All CDCR health care and custodial employees at the local institutions shall attend updated training on suicide prevention and response at least once annually.  Suicide Prevention and Response Training shall be part of the new employee orientation provided by mental health staff in collaboration with the in-service training (IST) unit at each local institution.  New COs shall receive this training at the Basic Correctional Officer Academy."  *Program Guide*, Chapter 10, p.12-10-6, 12-10-7.

This reviewer had been informed by CDCR officials from the Statewide Mental Health Program that the annual suicide prevention workshop would be expanded to two hours of instruction for 2014.  However, review of IST training schedules at several audited prisons found that only one-hour instruction was offered during 2014.  This reviewer examined both the one-hour IST lesson plan entitled "Suicide Prevention" (approved February 2011), and the one-hour

lesson plan entitled "Suicide Prevention" for Health Care New Employee Orientation. Both contained basically the same instruction. Although the content of the 38 PowerPoint slides was very good, the material was somewhat outdated.

The current annual suicide prevention training program in CDCR is inadequate. At a minimum, the annual training should be expanded to include the same topics that were offered in the pre-service training described above, including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative, (2) identifying inmates at risk for suicide despite their denials of risk, (3) ineffectiveness of "contracting for safety"; (4) updated research on CDCR suicides, (5) identified problem areas and corrective actions from previous CDCR Suicide Reports, and (6) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices.

This reviewer observed presentations of the one-hour IST Suicide Prevention Training workshops at seven CDCR prisons. Many were problematic. For example, at CSATF on February 20, 2014, the instructor (a mental health clinician) simply read the 38 PowerPoint slides at a fairly quick pace, ending the presentation after about 25 minutes. The workshop was extended only another 15 minutes because this reviewer and other invited observers attempted to engage the audience in further discussion about inmate suicides. A similar training workshop at WSP on March 25, 2014 lasted only approximately 40 minutes. The training was not interactive except for one participant asking "How long is this class?" Until recently, the suicide prevention workshop at VSP had been offered only via DVD, and the presentation by an instructor on April 10, 2014 was fraught with audio-visual problems. A suicide prevention workshop conducted at PVSP on May 6, 2014 was completed in a mere 35 minutes.

The greatest deficiency in annual suicide prevention training was ***the complete lack of enforcement of any requirement for annual training of non-custody staff, which includes medical, nursing, and mental health staff.*** In addition, CDCR's "Recommended Training for Institutional New Employee Orientation" ***did not include any requirement for suicide prevention training for new employees, making CDCR's Office of Training and Professional Development training mandate noncompliant with the suicide prevention training requirements in the Program Guide***.[5] "All CDCR health care and custodial employees at the local institutions shall attend updated training on suicide prevention and response at least once annually." *Program Guide*, Chapter 10, Part C., p. 12-10-6.

Not surprisingly, this inconsistency between CDCR's Office of Training and Professional Development and the *Program Guide* has led to inconsistent suicide prevention training practices across the prisons. A few had high levels of compliance for both custody and health care personnel, but the vast majority had very low or zero levels of compliance for health care personnel. While a few prisons, such as FSP, offered non-custody personnel suicide prevention handouts and quizzes from a facility training bulletin, this practice does not suffice as sound suicide prevention training. Suicide prevention training is best provided in a live, interactive

---

[5]Conversely, for *custody* staff, CDCR's Office of Training and Professional Development mandated annual one-hour instruction on suicide prevention within the annual 40-hour Off-Post Training Schedule for 2013 (January 1, 2013 through December 31, 2013).

environment among correctional, mental health, and medical personnel, as suicide prevention is really about collaboration across these groups.  Simply having staff read printed or electronic material by themselves has very limited instructional value.

In addition to correctional staff, nursing personnel and psych techs should be the backbone of CDCR's suicide prevention program because these staff are well positioned to identify potentially suicidal behavior.  Observations of the intake screening process by nursing staff and the daily administrative segregation unit rounds by psych techs indicated a dire need for high quality annual suicide prevention training for these staff.

This reviewer's discussions with mental health clinicians likewise indicated a great need for their training as well, as illustrated by the following examples of this reviewer's interactions with clinical staff.  One clinician told this reviewer that it was his/her clinical judgment that an inmate would be at only moderate acute risk for suicide if his/her stated means of committing commit suicide were limited, for example, to use of a handgun, as compared to hanging with a bed sheet.  In another example, a psychiatrist stated in conversation with this reviewer that he/she had been recently surprised by national research indicating that over 90 percent of inmate suicides were committed by hanging.  This psychiatrist had mistakenly assumed that the vast majority of inmate suicides were by drug overdose, and was apparently completely unaware of overwhelming data on CDCR inmate suicides indicating that hanging was by far the most common means by which these inmates had committed suicide.

At other prisons, "contracting for safety" was regularly utilized by medical staff with inmates who were referred to Triage and Treatment Areas (TTAs) for assessments after hours.  There are several problems associated with "contracting for safety."  First, there are no CDCR policies authorizing its use.  In fact, the practice is not even addressed in any national correctional standards.  Second, most correctional systems do not utilize "safety contracts" because they have been found to be ineffective in the management of suicidal individuals.  While there may be some positive therapeutic aspects to safety contracts, most clinicians agree that once a patient becomes suicidal, his or her written or verbal assurances are no longer effective to counteract suicidal impulses.  *See* K. Garvey, J. Penn, A. Campbell, C. Esposito, and A. Spirito, *Contracting for Safety With Patients:  Clinical Practice and Forensic Implication*, JOURNAL OF THE AMERICAN ACADEMY OF PSYCHIATRY AND LAW, 37:363-370 (2009).

In a discussion with a nurse conducting intake screenings, this reviewer asked why she had not asked the newly admitted inmate if he/she were currently feeling suicidal after the nurse had asked the inmate if he/she had a history of suicidal behavior.  The response from the nurse was "If the inmate did not report any history of suicidal behavior, they could not have current ideation."  This response indicated inadequate training.

***Recommendations****:* [6]

- ***Expand the length and content of the*** <u>***pre-service***</u> ***"Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e. including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent Coleman and/or SPRFIT audits of suicide prevention practices.***

- ***Expand the length and content of the*** <u>***annual***</u>  ***"Crisis Intervention and Suicide Prevention" training workshop to  include the topics described above;***[7]

- ***Ensure that*** <u>***all***</u> ***custody and health care staff receive both pre-service and annual suicide prevention training;***[8] ***and***

- ***Ensure that all pre-service and annual suicide prevention training is conducted by qualified mental health personnel.***[9]

### 2)   Initial Health Screening and Receiving and Release Unit Environment

This reviewer audited two areas of intake screening: 1) the adequacy of the intake screening form and the completeness of nursing staff's conduct of the intake process, and 2) the adequacy of privacy and confidentiality during the process.

The Initial Health Screening form (CDCR Form 7277) utilized by nursing staff on inmates newly admitted into CDCR's RCs and all other prisons contained several questions pertaining to the identification of suicide risk and mental illness.  Before 2014, the form was last revised in July 2013.  It contained the following mental health/suicide risk questions:

- Does the inmate have a mental health problem?
- Has inmate received bad news?
- Has the inmate ever been treated for mental illness?

---

[6] As stated in the Special Master's report which accompanies this report ("Special Master's Report on His Expert's Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation"), the *Coleman* parties timely submitted their responses to the draft version of this report, which was distributed to them on November 20, 2104.  Within Defendants' submission were specific responses to this reviewer's recommendations in this report.  Defendants' responses are referenced individually where each of these recommendations appears in this report.

[7] Defendants reported that they agree to work with the Special Master within the context of the Suicide Prevention Management Workgroup, that they are revising and updating both the Pre-Services and Basic Cadet Officer Academy training materials to incorporate the first and second recommendations above, and that they will provide the training materials to the Special Master for his review and comment before they are finalized.

[8] Defendants reported among other things that they are developing a tracking system and audit programs for all suicide prevention trainings to ensure employee compliance with training requirements.

[9] Defendants reported that all such training will be conducted by a psychiatrist, psychologist, or social worker, who will be required to undergo "training for trainers" that is being developed, and that the training materials will be provided to the Special Master for review and comment before they are finalized.

- Has the inmate been hearing voices or seeing things that are not there?
- Has the inmate had any thoughts of hurting himself/herself or others in the past year?
- Is inmate thinking of committing suicide now or ever attempted suicide?
- Does the inmate appear disoriented as to time, place, or person?
- Does the inmate appear to have difficulty understanding the questions, or in making appropriate responses to them?

In May 2014, the Form was revised slightly by CDCR headquarters, as follows:

- Do you have a mental health problem?
- Have you recently received bad news?
- Have you ever been treated for mental illness?
- Have you been hearing voices or seeing things that are not there?
- Does the I/M report feeling down or depressed more than half the time in the last two weeks?
- Are you thinking of committing suicide now, or have you ever attempted suicide?
- Does the inmate appear disoriented to time, place, or person?
- Does the inmate appear to have difficulty understanding the questions, or in making appropriate responses to them?
- In the past year, has the I/M had thoughts that they would be better off dead or of hurting themselves?

During this reviewer's on-site audits at the CHCF on June 24, 2014 and at PBSP on July 23, 2014, a *second* version of the revised Form was found to be in use.  It had been last revised by CDCR headquarters in May 2014, as follows:

- Does the inmate have a mental health illness?
- Has inmate recently received bad news?
- Has the inmate ever been treated for a mental illness?
- Has the inmate been hearing voices or seeing things that are not there?
- Does inmate report feeling down or depressed more than half the time in the past two weeks?
- In the past year, has the inmate had thoughts that they would be better off dead or of hurting themselves?
- Has the inmate ever made a suicide attempt?
- Does the inmate appear to have difficulty understanding the questions, or in making appropriate responses to them?
- Does the inmate appear disoriented to time, place, or person?

*Notably, this second May 2014 version of the Initial Health Screening form (CDCR 7277)* *does **not** contain any inquiry regarding whether the inmate is currently at risk for suicide.*

As stated above, CDCR Form 7277, Initial Health Screening Form, has recently undergone several revisions and various versions of the Form remain in circulation in the CDCR system.  In the earlier of the two May 2014 versions, one of the most important questions -- "Have you ever attempted to commit suicide, or are you currently thinking of hurting yourself?" -- was flawed because it was presented as a compound question.  During this reviewer's observations of the intake process at several prisons, nurses often asked inmates *only* whether they had previously attempted suicide, *but not whether they were currently suicidal.* Clearly this compound question should be divided into two separate questions.  Additionally, as stated above, the second of the May 2014 versions of the Form is seriously flawed because it does not inquire about current risk of suicide.

With regard to privacy and confidentiality considerations, the booking and processing area of any correctional facility is usually chaotic and noisy.  Staff there may feel pressured to process a high number of inmates in a short period of time.  Under these circumstances, two key components of identifying suicidal behavior – time and privacy – are scarce.  Staff's ability to carefully assess inmates' potential for suicide by asking the inmate a series of questions, interpreting inmates' responses (including gauging the truthfulness of their denials of suicide risk), and observing their behavior is greatly compromised in this impersonal environment, which actually lends itself to the opposite of what is being sought.  As a result, clearly suicidal behaviors of many inmates and the presence of suicide risk-inducing stressors and conditions can be lost on intake staff.

Privacy in the intake process was often compromised in the Reception and Receiving (R&R) units audited by this reviewer.[10]  An array of different practices made for lack of privacy and confidentiality.  These ranged from an open door to the nurse's office, officers stationed inside the office or at the door, conducting of intake screening outside the nurse's office in an open area close to officers and other inmates, and multiple intake screenings occurring simultaneously as inmates sat in close proximity to each other.  At PBSP, as there was *no* nurse's office within the R & R unit, intake nurses were forced to stand in a large holding cell to which inmates brought one-by-one, with an officer on each side of the inmate holding his arms.  At DVI, two intake nurses were in a large office within the R&R unit, but were simultaneously conducting separate intake screenings, with two inmates sitting in close proximity to each other, and several other inmates waiting to be screened and sitting within 15 feet of the nurse's station.  At MCSP, intake screenings were conducted in an open area of the officers' station with an officer straddling the inmate; the nurse's office in the R&R unit was *not* used.

## *Recommendations*:

- ***The Initial Health Screening form (CDCR Form 7277) should be revised to omit compound questions and include separate direct questions, such as "Have you ever attempted to commit suicide?" and "Are you currently thinking of hurting yourself?";***[11]

---

[10]The prisons where privacy did <u>not</u> appear to be a problem were ASP, CEN, CCC, CCWF, CIM, CIW, CRC, CTF, PVSP, CSP/Solano, SQ, and VSP.

[11] Defendants reported that they agree to address this recommendation by working with the Special Master in the Suicide Prevention Management Workgroup, that they are revising the initial health screening form to omit

- ***Intake screening should be conducted only in the nurse's office within an R&R unit;***

- ***The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process; and***

- ***Nurse and officer safety should remain the top priority during the intake screening process.  If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality.***[12]

### 3)    Suicide Risk Evaluations

The *Program Guide* requires that a SRE be completed by a trained mental health clinician at various times during an inmate's CDCR confinement.  These times include but are not limited to:

- Any time the medical or mental health screening of a new arrival at an institution indicates a current or significant history within the past year of suicide risk factors, ideation, threats, or attempts.  *Program Guide*, Chapter 10, Part D., 12-10-9.

- Any time that it is reported an inmate is currently experiencing suicidal ideation (SI), threats, and/or engaging in a gesture or attempt.  *Program Guid*e, Chapter 10, Part D., 12-10-8.

- Before placement in an OHU or MHCB based on the inmate's suicidal ideation, threats, or attempt.  *Program Guide*, Chapter 10, Part D., 12-10-8.

- Following release from an OHU or MHCB if the placement had been based on suicidal behavior, and thereafter a minimum of every 90 days for one year. *Program Guide*, Chapter 10, Part D., 12-10-9.

This reviewer found that almost all emergency mental health referrals for reported suicidal ideation (SI) and/or self-injurious behavior drew a response from mental health (if on site) or from medical staff almost immediately.  However, there were numerous examples of emergency referrals for SI and/or self-injurious behavior in which SREs were <u>not</u> completed. This problem was most acute at CCWF, where approximately 56 percent of all emergency

---

compound questions and include the recommended questions, and that they will share the revised form with the Special Master for review and comment before the next Suicide Prevention Management Workgroup meeting.  They also reported that current forms were redistributed to the field and that, within the nursing leadership of the California Correctional Health Care Services, a teleconference among all Chief Nurse Executives was conducted to ensure that current forms were being used during the intake process.

[12] Defendants reported that they agree to work with the Special Master to address and resolve the second through fourth recommendations above.

mental health referrals for SI did not result in completion of an SRE. Other prisons that were problematic in this respect were CCC (40 percent), CHCF (37 percent), MCSP (32 percent), and CIW (24 percent).

CDCR developed an SRE Mentoring Program to improve the quality of SREs and decrease the number and rate of inmate suicides. An integral part of the Mentoring Program was the requirement that all mental health clinicians complete a seven-hour SRE training workshop. This reviewer found high completion rates for SRE training. On November 20, 2013, this reviewer attended a portion of an SRE training session at SAC and reviewed the 78-slide PowerPoint presentation entitled "Suicide Risk Assessment for CDCR Clinicians." The slides included a review of chronic and acute risk factors, protective factors, basic elements of a thorough risk assessment (data collection, suicide inquiry, judgment of risk and rationale, treatment planning, and documentation), and review of scientific journal articles/research on the assessment process, manipulative and malingering behaviors, etc. The PowerPoint presentation and the observed portion of the training workshop were excellent. However, a weakness in the Mentoring Program was that the clinician/mentee was required to complete only two SREs under the supervision of a mentor before being credentialed for two full years, with no formalized subsequent `critique by a mentor or supervisor.

Based on review of hundreds of SREs during this audit, this reviewer found that the quality of the SREs was often problematic. Many reviewed SREs contained chronic and acute risk factors and protective factors that were inconsistent with assessments of chronic and acute risk levels. Deficiencies in SREs had been reported in numerous CDCR Suicide Reports, resulting in QIPs to return the clinician to the same mentoring program that he or she had previously completed. This problem was most acute at SVSP, where at least seven of the ten suicides that occurred between 2012 and 2014 involved deficient SREs. As one CDCR reviewer noted: "During this review, as in others at other facilities, there is poor inter-relator reliability of the SRE and the reluctance of clinicians to classify an inmate a moderate or high risk even when the data clearly show numerous chronic risk factors. In this inmate's case[13], the multiple chronic factors were correctly identified but because he denied a history of SI or attempts the clinician rated him low. More training appears to be needed." It should not take the tragedy of an inmate suicide and the resulting Suicide Report to prompt remedial training of clinicians on how to conduct a competent SRE.

This reviewer also found that the institutional SPRFITs were not adequately monitoring and evaluating the SREs completed at their prisons. Reviewed SPRFIT minutes often included only quantitative but not qualitative monthly data on completion of SREs. For example, a recent audit by an institutional SPRFIT coordinator indicated 100-percent compliance with the treatment planning section of the SRE during the audit. However, in this reviewer's discussion of the "MHCB-SRE Audit" with the SPRFIT coordinator, it became apparent that the audit measured only whether the treatment planning section of the SRE was completed, and not whether the treatment plan contained a specific strategy to reduce SI/self-injurious behavior and/or whether subsequent progress notes addressed the appropriate problem area in the inmate's treatment plan.

---

[13]SVSP 6.

*__Recommendation__:*

- ***CDCR should revise its SRE Mentoring Program to***
  - ***eliminate its "graduation" component after completion of two adequate assessments,***
  - ***conduct ongoing mentoring throughout the year, and***
  - ***audit clinicians' SREs on a regularly scheduled basis.***

- ***Each facility's SPRFIT should audit the __quality__ of completed SREs on a monthly basis.*** [14]

### 4)  30-Minute Welfare Checks in Administrative Segregation, SHUs, and Condemned Units

Pursuant to previous CDCR directives, correctional staff had been required to complete 30-minute welfare checks of inmates in administrative segregation since 2006 and in Security Housing Units since 2013. In 2014, CDCR implemented the Guard One system to verify 30-minute welfare checks of all inmates in administrative segregation during the first 21 days of their stays. [15]  Per memorandum dated May 9, 2014 from the CDCR Director of the Division of Adult Institutions (DAI), use of the Guard One system was amended again to require welfare checks of all inmates in administrative segregation, SHUs, and Condemned Units at staggered intervals not to exceed 35 minutes via the Guard One system for the entire lengths of their stays. This expansion was the result of finding continuing deficiencies in the use of the Guard One system, described below.  This expansion was a significant and commendable policy change.

Overall, this reviewer found high compliance rates for Guard One documentation during the on-site audits, with most prisons exceeding a rate of 90 percent.  However, before the May 9, 2014 memorandum was issued, this reviewer found very low compliance levels for 30-minute welfare checks of inmates housed in administrative segregation units for more than 21 days, and for inmates in SHUs, for whom the Guard One system was not used, regardless of their lengths of stay.  For example, despite CDCR directives that required 30-minute welfare checks in administrative segregation units since 2006 and in SHUs since 2013, this reviewer examined housing unit logs that indicated large gaps between welfare checks, finding intervals as long 60 and to 120 minutes between checks.  There were even examples of falsification of the documentation.  Many administrative and supervisory custody staff were either unaware of

---

[14] Defendants reported that SRE mentoring is being reviewed for adequacy, sustainability, frequency, and duration. They also reported that an SRE audit tool is being developed, that the audit will begin in January 2015, and that they will work on its implementation with the Special Master in the context of the Suicide Prevention Management Workgroup.

[15] The Guard One system involves a hand-held "pipe," a metal disc that is attached to each cell door, and a software program.  The officer conducting housing unit rounds is required to touch the end of the pipe to the disc on the cell door.  The pipe will then emit a sound and the time of the contact with be recorded on the pipe.  The data from the pipe is then downloaded into the software program on a desktop computer in the housing unit by a supervisor, and is reviewed daily to ensure compliance.  Although the Guard One offers dramatic improvement over previous practices, the technology can validate that correctional staff are conducting rounds at the required intervals, but it cannot assure that staff are actually observing the interior of each cell to verify the inmate's well-being.

previous directives or were not enforcing compliance. Many COs were aware of the requirement for 30-minute checks but were simply not complying and/or were failing to document the checks as required. Although compliance levels for the 30-minute checks improved somewhat over the course of this reviewer's site visits, documentation problems continued despite the advance notice that prisons began receiving that this reviewer would be examining their housing unit logs.

### *Recommendation*:

- ***Continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at PBSP and at the CHCF (Phase 3, per the directive).***[16] [17]

### 5)   Use of Suicide-Resistant Cells for Newly Admitted Inmates in Administrative Segregation Units

Pursuant to CDCR policy, for the first 72 hours of all newly-arrived inmates' stays in administrative segregation, they must be assigned cells that have been retrofitted to be suicide-resistant, i.e. having no features conducive to the commission of a suicide. The 72-hour timeframe is based on earlier CDCR data indicating that risk of suicide is elevated during the initial 72 hours of placement. After the initial 72 hours, inmates are then to be reassigned to other cells in administrative segregation.

This reviewer observed several problems with regard to the housing of newly admitted inmates in the administrative segregation units:

- Not all newly admitted inmates (i.e., those in the first 72 hours of their stays in the unit) were housed in suicide-resistant cells.
- Not all of the suicide-resistant cells housed newly admitted inmates.
- Several newly admitted inmates were double-celled in non-suicide-resistant cells.

There appeared to be multiple reasons for these practices. These included the fact there were insufficient retrofitted cells to accommodate all newly arrived inmates. Also, custody staff were not consistently rotating inmates out of these retrofitted cells after the 72-hour period to allow for assignment of these cells to newly arrived inmates.[18]  As shown in Table 2 below, nine inmates committed suicide within 72 hours of their transfers into an administrative segregation

---

[16]The May 9, 2014 directive set forth the following schedule for implementation: "Phase 1 will begin on May 19, 2014, with all ASUs that have the Guard One system currently installed; Phase 2 will begin on June 16, 2014, consisting of KVSP's ASU overflow, all PSU, SHUs (excluding PBSP's Facilities C & D), and Condemned Housing Units; and Phase 3 will consist of PBSP's Facilities C & D along with the CHCF-Stockton. Phase 3's activation date has yet to be determined and will be announced in a subsequent directive."
[17]Defendants reported among other things that, to address concerns regarding documentation and accuracy, each unit supervisor will print and review the Round Tracker Report at the end of each shift to ensure that all required safety/welfare checks were completed, and that any discrepancies will be appropriately addressed with staff.
[18]According to the most recent available data from CDCR, there were 406 retrofitted new intake cells throughout the prison system as of March 29, 2007.

units between 2012 and 2014, **and in eight of the nine cases, the inmates were <u>not</u> placed in suicide-resistant, retrofitted cells as required.**

<u>**TABLE 2**</u>
**Length of Stay in Administrative Segregation Before Suicide**
**2012 – October 18, 2014**

| <u>Inmate</u> | <u>Date of Suicide</u> | <u>Length of Stay</u> | <u>Placed in Retrofitted Cell</u> |
|---|---|---|---|
| SVSP 5 | 3/20/12 | 27 days | |
| WSP 1 | 5/12/12 | 38 days | |
| FSP 8 | 5/30/12 | 14 days | |
| MCSP 1 | 6/7/12 | 65 days | |
| RJD 5 | 6/23/12 | 12 hrs. | no |
| ASP 1 | 6/28/12 | 1 day | no |
| SAC 4 | 7/25/12 | 3 days | no |
| SCC 1 | 7/28/12 | 1 day | no |
| CMF 3 | 8/17/12 | 39 days | |
| SVSP7 | 9/7/12 | 74 days | |
| SVSP 8 | 10/25/12 | 5 days | |
| SVSP 11 | 1/24/13 | 7 days | |
| FSP 10 | 3/8/13 | 10 hrs. | no |
| LAC 5 | 4/15/13 | 81 days | |
| COR 10 | 4/29/13 | 1 day | no |
| FSP 11 | 5/27/13 | 9 days | |
| CTF 1 | 6/16/13 | 51 days | |
| MCSP 2 | 8/19/13 | 71 days | |
| SQ 9 | 9/24/13 | 86 days | |
| PVSP 1 | 10/15/13 | 88 days | |
| WSP 2 | 12/27/13 | 21 days | |
| CCI 1 | 2/24/14 | 90 days | |
| PBSP 7 | 2/24/14 | 41 days | |
| HDSP 7 | 2/27/14 | 249 days | |
| SVSP 13 | 3/18/14 | 57 days | |
| MCSP 3 | 5/19/14 | 74 days | |
| SQ 12 | 5/22/14 | 49 days | |
| CSATF 5 | 7/6/14 | 13 days | |
| KVSP 6 | 7/9/14 | 22 hrs. | no |
| CIW 8 | 7/30/14 | 15 days | |
| CSATF 6 | 9/6/14 | 69 days | |
| CCC 5 | 9/7/14 | 2 days | no |
| CCI 8 | 9/14/14 | Unknown | |
| SVSP 14 | 10/18/14 | 1 day | yes[19] |

---

[19]Although the assigned cell had been retrofitted, the inmate asphyxiated himself with a plastic bag.

**Average length of stay in administrative segregation before suicide:  42 days**

In addition, it appears that more than housing of only newly arrived inmates in these retrofitted cells may need to be done.  Current data now indicates that the risk of suicide is extending beyond the initial 72 hours of inmates' stays.  This reviewer examined the 34 inmate suicides that occurred in administrative segregation units from 2012 to October 18, 2014. Among these suicide deaths, the average length of stay in administrative segregation was ***42 days, with a range of ten hours to 249 days***.  See Table 2.

An emergent problem that requires immediate corrective action is the CDCR policy and practice of not requiring a newly admitted inmate into administrative segregation to be housed in a retrofitted cell if he or she can be double-celled with another compatible inmate.  Such double-celling is in a non-retrofitted cell. The apparent underlying theory -- that assigning a newly arrived inmate with a compatible cellmate provides more protection from suicide than assigning the inmate to a single suicide-resistant, retrofitted cell -- is flawed for several reasons.  Among them is the simple fact that the cellmate may be out of the cell, recently transferred, or sleeping during a SA. Double-celling should not be considered a protective factor and, in fact, CDCR's own data indicates that numerous CDCR suicides during 2012-2014 took place in double-celled administrative segregation cells, general population (GP), and Sensitive Needs Yard (SNY) housing.

Finally, this reviewer examined several cases in which the inmate was placed on suicide observation in a OHU or MHCB, stabilized, and then returned to the same environment (usually an administrative segregation unit) where he or she was housed before the OHU or MHCB placement. In all of these cases, the inmate was re-housed in an unsafe, non-retrofitted cell. Although CDCR initiated a policy several years ago to provide five-day clinical follow-up by mental health staff and welfare checks by correctional staff at 60-minute intervals as a means to further ensure inmates' stability following MHCB discharge[20], it did not extend this policy to require housing in retrofitted cells for inmates returning to their housing units from OHU or MHCB stays.

***Recommendations:***

- ***CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house  newly admitted inmates (i.e.,  those within their first 72 hours of their housing in the unit) and inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status).***[21]

---

[20]The efficacy of these clinical and custodial follow-up procedures is discussed in detail in Part 11 of this report, pp. 27-29.

[21] Defendants reported among other things that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation, including a reassessment of the number of appropriate intake cells.

- ***CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours.***[22]

- ***Any inmate discharged from suicide observation status and arriving in administrative segregation from either an MHCB or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan;***[23]

- ***Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled.  They should be placed in suicide-resistant, retrofitted cells.***[24]

- ***Based on current data indicating that risk of suicide in administrative segregation extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates.***[25]

### 6)    <u>Treatment Planning for Suicidal Inmates</u>

The standard of care requires an individualized treatment plan, including provision of follow-up services, for each inmate placed on suicide observation status.  The treatment plan should be developed by qualified mental health staff in conjunction with the inmate and medical and correctional staff.  It should describe the signs, symptoms, and circumstances under which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and specific actions the inmate and staff will take if SI reoccurs.

The *Program Guide* briefly addresses treatment planning for inmates at risk of suicide within the section of Chapter 10, "Suicide Prevention and Response," part D., "Clinical Care Services," that covers the SRE.  It states "Treatment recommendations should be as specific as possible, leaving as little room as possible for misinterpretation or confusion. A brief rationale for each recommendation shall be provided. They shall also address how the treatment plan will be implemented and any required follow-up procedures."  *Program Guide*, Chapter 10, p. 12-10-11.  The "Suicide Risk Assessment for CDCR Clinicians" PowerPoint presentation observed by this reviewer on November 20, 2013, described above, offered some additional instruction on development of treatment plans for suicidal inmates. For example, one of the slides stated the

---

[22] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation.

[23] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation.

[24] Defendants' response to this recommendation was essentially that, although double-celling has been previously identified as having a preventive effect on suicides, the Suicide Prevention Management Workgroup should examine relevant data on this practice to better understand its effect on suicide risk.

[25] Defendants reported that they are evaluating the appropriate duration for an inmate's placement in an intake cell, that other clinical measures that can contribute to inmate safety in administrative segregation are being discussed or piloted, and that they agree to continue to address this issue with the Special Master in the Suicide Prevention Management Workgroup.

following: "(1) How to decrease acute risk and warning signs; (2) How to increase protective factors; (3) Does current treatment plan need to be changed (if MHSDS); (4) Be concrete/behavioral;[26] (5) Need for psychiatric intervention - medication consult; (6) Plan should include crisis management (3 days ) and short-term (1-2 weeks); and (7) what resources are available to the patient (internal and external)?"

This reviewer examined hundreds of mental health treatment plans (MHTP) and treatment plan sections of discharging SREs to determine whether mental health clinicians had developed reasonable treatment plans for reducing inmates' SI, suicidal behaviors, and/or self-injurious behaviors, and whether there was concordance between the treatment plans and subsequent progress notes. In an overwhelming number of cases, most of the SRE treatment plan sections simply provided narrative that repeated *Program Guide* requirements (e.g., "discharge from MHCB, provide 5-day follow-up by Primary Clinician (PC), provide daily rounds by the PT, and medication management"), rather than a specific plan to reduce the inmate's suicide risk. Reviewed MHTPs were also problematic. In some, the "problem" area of SI was properly identified and a specific "intervention" was outlined, but there was no evidence in subsequent progress notes that the plan was being effectuated. In other reviewed records, the treatment plans were not even revised to include SI *despite the fact the inmate had been placed in the MHCB for SI.*

Treatment planning practices at DVI perhaps best exemplified this problem. The quality of treatment planning ranging from one extreme to the other. In one reviewed case, a clinician developed a very thoughtful and individualized treatment plan:

"The I/P will be admitted to OHU for psychiatric observation. OHU team to monitor I/P for safety concerns. Treatment plan to include following goals: 1) Reduce daily on-going Sx ideation to 2x/week, I/P making vague statements, need to clarify overall baseline; 2) Reduce anxiety from daily to 2x/week or below by Cognitive Behavioral Therapy (CBT), anxiety management skills, i.e., relaxation, breathing exercises, thought analysis to contain worries; 3) Reduce depression from daily to 2x/week or below by supportive counseling, challenging maladaptive thoughts by CCM; and 4) Psychiatric medication evaluation to alleviate acute distress and stabilize sleep."

But at the other extreme, another clinician who regularly completed SREs at the prison had developed and inserted the following template into each treatment plan section of the SRE form:

___Place in OHU to monitor for signs and symptoms and safety
___Released to custody with a 5-day F/U
___Hold in OHU for Parole Agent pick-up
___Needs further evaluation

---

[26]During the SRE training attended by this writer at CSP/Sac on November 20, 2013, the instructor stressed that the treatment plan components should be concrete in that they "should be measurable, e.g., the specifically recommended intervention 'will decrease suicide ideation by 50 % by next week,' rather than simply 'decrease agitation or increase coping skills.'"

___Transfer to MHCB with first bed availability
___Refer to PC and psychiatrist for appointment within one week
___Review LOC/IDTT

This template, which simply recited *Program Guide* requirements, reflects a lack of understanding and/or indifference to effective treatment planning for inmates presenting with SI.

As a result of this reviewer's initial suicide prevention audits, CDCR created a 60-slide PowerPoint webinar-based training presentation entitled "Safety/Treatment Planning for Suicide Risk Assessment" in June 2014. Webinars were conducted on four occasions (on July 8, July 10, July 14, and July 16) and attended by approximately half of all CDCR mental health clinicians. Review of the PowerPoint slides indicated that training was intended to enable clinicians to create reasonable, short-term, and specific strategies to reduce inmates' suicidal thoughts, avoiding the tendency of clinicians to simply repeat *Program Guide* requirements. It is premature to opine on the effectiveness of this training for creating better treatment plans within SREs and for improving concordance between treatment planning strategies and subsequent progress notes. It also remains unclear whether all of the remaining mental health clinicians will receive this new training.

In conclusion, treatment planning to include continuity of care for suicidal inmates is a critical element of any correctional system's suicide prevention program. It remains a work in progress for CDCR.

***Recommendations***:

- ***CDCR should adopt the recommendations made in connection with SREs, set forth above, which will also improve treatment planning contained in the SREs section above; and***

- ***CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment," described above.***[27]

### 7)      Perception of Suicidal Inmates as Manipulative

Inmates perceived as manipulative pose a great challenge to correctional and health care professionals. It is not unusual for inmates to call attention to themselves by threatening suicide or even feigning an attempt in order to avoid a court appearance, avoid a disciplinary sanction, bolster an insanity defense, gain cell relocation, receive preferential treatment by staff, or draw compassion from an unsympathetic spouse or other family member. As this reviewer has noted

---

[27] In response to both recommendations above, Defendants reported that they developed a training program to improve the quality of treatment plans, that half of staff have received the training, that the rest will receive it during spring 2015, and that new clinical staff will receive it as well. They also reported that training on treatment planning is currently included in the SRE training, which is required every two years.

in numerous examined eUHRs, some CDCR inmates simply use manipulation as a survival technique.

The prevailing approach to this problem should be that any inmate who would go to the extreme of threatening suicide or even engaging in self-injurious behavior requires special attention. Too often correctional and health care professionals conclude that the inmate is simply attempting to manipulate his or her environment and, therefore, such behavior should be ignored and not reinforced through intervention. And also too often, a feigned SA goes further than anticipated and results in death. The research warns against assuming that inmates who appear to be manipulative are not also suicidal. These behaviors are not mutually exclusive.[28] Although there are no easy solutions to the management of inmates who threaten suicide or engage in self-injurious behavior for a perceived secondary gain, the critical issue is not how staff label the behavior, but how they react to it. The reaction must include a multidisciplinary treatment plan.

This reviewer found that there was a misguided mindset among a small but formidable faction of mental health clinicians at each prison who perceived *all* self-injurious behavior as manipulative and that inmates feigned SI for secondary gain. This mindset was often expressed during IDTT meetings. For example, in July 2014 this reviewer attended an IDTT meeting at PBSP.  A particularly challenging inmate was being discussed.  When this reviewer asked for the inmate's current diagnosis, the rapid-fire response from one unidentified team member was "manipulation." At the same prison, as recently as February 2014, an inmate had committed suicide.  Clinical staff had perceived this inmate's chronically bizarre behavior to have been related to "hiding out in the MHSDS for secondary gains."  This reviewer found other examples at CIW, where some inmates perceived as manipulative by clinical staff were placed in a MHCB on Suicide Precaution status, with observation at 30-minute intervals, clothed only in a safety smock, and prohibited from having mattresses.

Nevertheless, even assuming a clinician correctly concludes that the inmate feigned SI in order to achieve a secondary gain (for example, a cell relocation due to safety concerns), the inmate's treatment plan should nevertheless address the issue.  Examples of appropriate response might include working with custody staff on inmate safety issues, teaching the inmate alternative ways to advocate for himself or herself, etc.

Many Correctional Treatment Centers (CTCs) contained so-called "safety cells"[29] in which inmates were temporarily housed while in immediate crisis as a result of mental illness and/or suicidal behavior.  Physician orders for use of these cells were typically limited to four-hour blocks.  Due to the intended temporary use of these cells, the safety cells did not contain beds and the seclusion rooms did not contain sink/toilets. Despite these intended limited uses of these cells, this reviewer was informed of at least two prisons – HDSP and VSP  – which had been placing inmates believed to be feigning SI for secondary gain ***into safety cells for up to five days, without immediately notifying the Health Care Placement Oversight Program (HCPOP)***.

---

[28]See G. Dear, D. Thomson, A. Hills, "Self-Harm in Prison: Manipulators Can Also Be Suicide Attempters," *Criminal Justice and Behavior*, 27: 160-175 (2000); J. Haycock, "Listening to 'Attention Seekers:' The Clinical Management of People Threatening Suicide," *Jail Suicide Update* 4 (4): 8-11 (1992).
[29]These cells are used for seclusion and mental health observation and can also be utilized for constant observation of an inmate under suspicion of secreting contraband.

These inmates would later be returned to their housing units without the knowledge of HCPOP. Until June 2014, and in preparation for this reviewer's on-site assessment, all inmates at HDSP who were referred to a MHCB were initially housed in the CTC safety cells to "weed out suspected manipulative behavior." At VSP, these uses of safety cells were detected several months earlier by CDCR's quality improvement process.  These practices at both of these prisons were identified and corrected before this reviewer's assessments, but this reviewer observed in other prisons that alternative housing was used initially for inmates thought to be manipulative, *even though MHCBs were readily available within the prison.*

In November 2013, this reviewer conversed with a mental health clinician who had been conducting annual suicide prevention block training to custody staff for many years.  This clinician volunteered that most inmates placed in their prisons' OHUs were not suicidal, but rather were manipulative and simply desired "a change of scenery." According to the clinician, these inmates then quickly learn that placement on suicide observation status means removal of all clothing and underwear, issuance of a safety smock, and sleeping on the bare floor – not what they expected  -- and they were quickly returned to their housing units. It was obviously problematic that the clinician chosen to instruct most of the annual suicide prevention workshops at the prison would believe that most inmates threatening suicide were manipulative.

Further, also problematic was the practice by CCWF custody personnel of placing inmates perceived to be feigning SI on a "modified property issue" status in administrative segregation with little, if any, collaboration with mental health clinicians.

Finally, many CDCR Suicide Reports have included criticisms that decisions made by the treatment teams have been flawed because of their perception of the inmate as exhibiting manipulative behavior. Most of these Suicide Reports did not include formal recommendations for corrective action because the problem of perceived manipulative behavior driving clinical decisions was not an isolated problem.  Rather, it was described as an issue of "complexity within correctional institutions statewide" that would be addressed by via teleconference from central office.[30]  This problem remains pervasive across CDCR prisons and requires more than a webinar to be rectified.

*Recommendation*:

- *The perception that all inmates who threaten suicide are manipulative persists among the treatment teams as a misguided mindset that should be repeatedly addressed at different levels including pre-service and annual suicide prevention trainings, the SRE Training and Mentoring Program, and the newly created SRE treatment planning webinar.*[31]

---

[30] See, e.g., the case review for the inmate designated as Inmate CIW5 in the Appendix.
[31] Defendants reported that inmate manipulative behavior is covered within the seven-hour training on SREs, and that in spring 2014 they presented a webinar on management of manipulative inmates.  They also reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation.

8)   **Psych Tech Practices**

According to the *Program Guide*, psych techs are required to "conduct rounds seven days per week in all administrative segregation units to attend to the mental health needs of all inmates. The psych tech shall make initial contact with each inmate placed in the administrative segregation unit within 24 hours of placement." *Program Guide*, Chapter 7, "Administrative Segregation," Part F., p. 12-7-5. Psych techs are also required to conduct weekly rounds of mental health caseload inmates in SHUs, and bi-weekly rounds for non-mental health caseload inmates in SHUs. *Program Guide*, Chapter 8, "Security Housing Unit," Part F, subpart 6, p. 12-8-7. Psych techs are required to document their observations of each mental health caseload inmate on a daily basis on the Psych Tech Daily Rounds form.

This reviewer observed daily psych tech rounds in the administrative segregation units in most of the audited prisons. In almost all cases, the psych techs appeared to be hard-working and conscientious employees. Most also appeared to have good rapport with the majority of the inmates, and a basic knowledge of the mental health caseload inmates they were seeing.

However, this reviewer also found several systemic problems with psych tech practices in the administrative segregation units, and to some extent in the SHUs:

- Psych techs rarely received the annual suicide prevention training required by the *Program Guide*. *Program Guide*, Chapter 10, "Suicide Prevention and Response," Part C, p. 12-10-6, 7.

- It did not appear during this reviewer's initial prison tours that psych techs were spending any more time determining the mental health status of mental health caseload inmates than non-caseload inmates while conducting their daily rounds in administrative segregation units. The "Psych Tech Daily Rounds" form requires the psych tech to note the inmate's mental health concerns, prescribed medications, medication side effects, suicidal/homicidal ideation, appetite, sleep, orientation, mood, affect, behavior, grooming/hygiene, cell condition, medication compliance per the medication administration record (MAR), participation in program, and signs of decompensation. While a few psych techs spent sufficient time with mental health caseload inmates to accurately observe their mental health status, most rounds could be more accurately described as "drive-by" encounters lasting a few moments.

- Although a few psych techs completed the "Psych Tech Daily Rounds" form immediately following each inmate encounter, more commonly they completed the forms after the rounds were finished. This practice raises concern about the accuracy of the completed forms, given the difficulty with recalling the details of each inmate's mental health status by the time rounds were ended. In one administrative segregation unit, there were 54 Enhanced Outpatient Program (EOP) and 33 Correctional Clinical Case Management System (3CMS) inmates. It was not surprising that there were significant inconsistencies between these inmates' records and the corresponding entries by the psych techs on the daily rounds forms. This inconsistency was also seen in reviewed inmate suicide cases

23

(e.g., <u>SQ 9</u>, suicide on September 24, 2013; <u>SVSP 13</u>, suicide on March 18, 2014, and <u>PBSP 7</u>, suicide on February 24, 2014).

- In a few toured facilities, unauthorized "Psych Tech Daily Rounds" forms were being used.

It should be noted that this reviewer found that psych tech practices improved dramatically over the nearly nine-month course of the CDCR prison tours. The "drive-by" contacts and untimely completions of Psych Tech Daily Rounds forms found during the earlier tours were greatly diminished by the time of the later tours. It appeared that this improvement in psych tech rounds in the administrative segregation units may have been the result of advance notice being given to the prisons that this reviewer would be observing such rounds, as opposed to any increased auditing by supervising nursing staff. Although psych tech practices during administrative segregation unit rounds were said to be periodically audited by supervisory nursing staff, such oversight appeared to be lacking.

CDCR's commitment to posting psych techs in locked housing units, particularly in the administrative segregation units, was an excellent initiative. When psych techs are utilized correctly, that is, when they are properly trained and instructed to spend sufficient time with each inmate (particularly those on the mental health caseload) and to accurately document their observations, psych techs' input from their rounds can be a critically important tool in CDCR's suicide prevention effort. For now, the sustainability of adequate psych tech practices in administrative segregation and SHU rounds is unproven and requires continued monitoring.

***<u>Recommendation</u>:***

- ***CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs.*** [32]

### 9) <u>Use of "Psychiatric Observation" and "Crisis Evaluation" Statuses for Suicidal Inmates</u>

This reviewer found that many CDCR prisons were using a practice known as "psychiatric observation" status to manage suicidal inmates in either their MHCBs or alternative housing cells. Presumably this practice is used by mental health clinicians to avoid the more stringent requirements of Suicide Precaution/Suicide Watch.

---

[32]Defendants reported that the correct form for documenting psych tech rounds was re-distributed to all CDCR chief nurse executives, and that existing training on psych tech clinical rounds will be updated to address the deficiencies identified in this report. They also reported that the current tool for conduct of quarterly audits of psych tech rounds will be reviewed for needed improvements, and that each prison will ensure that the results of its audits will be provided to the institutional quality management committee and mental health quality management subcommittee.

At CCI, for example, "psychiatric observation" status was used frequently in the prison's Outpatient Housing Unit (OHU), while Suicide Precaution/Suicide Watch was used infrequently, with the last Suicide Precaution used in late October 2013 and that last Suicide Watch used in September 2013. When this reviewer asked CCI mental health staff for the written policy on "psychiatric observation," he was given a copy of Chapter 5 of the *Program Guide*, "Mental Health Crisis Bed." On page 12-5-32, "Mental Health Conditions Appropriate for Placement into an OHU," the following sentence was circled: "Inmates who engage in behaviors that might be indicative of a mental disorder that interferes with daily living and requires further observation and evaluation." It is clear that this policy directive was not intended to create a separate "psychiatric observation" status, distinct from Suicide Watch or Suicide Precaution, making "psychiatric observation" an unauthorized practice. Another practice found by this reviewer in July 2014 at PBSP was "behavioral checks" at 60-minute intervals for most inmate-patients *admitted* into the MHCB for SI.

At CEN, although both Suicide Precaution and Suicide Watch were frequently used in the CTC for inmates identified as suicidal, "psychiatric observation" status was also being used there. Although first seen at CEN, similar practices were seen at many of the other prisons. Mental health leadership at CEN developed a local policy, found in their CTC Policy and Procedure Manual, that outlined procedures for using psychiatric observation status. The stated "purpose" of psychiatric observation status was: "(1) To prevent suicide and/or injury to self, other inmate(s) patient(s), and/or staff; (2) To assess the inmate-patient's mental health condition and treatment needs; and (3) To provide interim treatment measures pending transfer to a MHCB." Clinical judgment dictated whether or not inmates on psychiatric observation status had allowable items (including beds) and clothing in their rooms. Although not stated in the policy, inmates on psychiatric observation status were normally observed at 30-minute intervals, well below the standard of care for observation of suicidal inmates. Many prisons were also using psychiatric observation status as a step-down from Suicide Precaution or Suicide Watch, a reasonable concept but, again, it was not authorized by the *Program Guide*.

Without opining on the efficacy of psychiatric observation status as a step-down from Suicide Precaution and/or as an observation level for non-suicidal inmates in mental health crisis, there are additional concerns with use of psychiatric observation for suicidal inmates. At CCI, there was no documentation of this type of observation. It resulted in inmates being stripped naked, clothed in safety garments, and being placed in cells without bedding. Rather, if the clinician assesses the inmate as suicidal and determines that items and possessions should be restricted from the inmate's room or cell, what *should* occur is placement of the inmate on either Suicide Precaution or Suicide Watch status. A suicidal inmate should never be observed at 30-minute -- and certainly not at 60-minute -- intervals, regardless of acuity level. Another problem with psychiatric observation status is that because it is not sanctioned by the MHSDS or the *Program Guide*, it escapes any continuous quality improvement review.

"Crisis evaluation" status was found in use at some of the prisons which have OHUs. A CDCR mental health quality management official told this reviewer that "crisis evaluation" status was developed as a way to distinguish the mental health patients from medical patients in the OHU, as a data entry label, and was not intended to replace "suicide precaution" or "suicide

watch." However, this reviewer found otherwise. For example, the applicable LOP at CTF, dated August 29, 2013, defined "crisis evaluation" as follows:

> "If the clinician cannot determine, with reasonable certainty, that the inmate-patient is at high or medium risk for suicide, and more time is needed to evaluate the inmate-patient's condition, the clinician shall place the inmate-patient in an OHU with orders for Crisis Evaluation. The clinician will then specify the method, frequency, and materials/items the patient may have in order to keep him safe. This will not trigger an immediate/automatic referral to MHCB and allows for clinicians to further evaluate the level of care and treatment needs of the patient. The inmate-patient must be discharged from the OHU within 48 hours."

At CTF, an inmate who was expressing SI and threatened to cut himself on March 1, 2014, was seen by a clinician. The following physician's order was placed in his record: "Admit to OHU for 'crisis evaluation' until further notice." Most concerning was the fact that the inmate was discharged from the OHU two days later without an SRE, five-day clinical follow-up, or treatment plan. In another case involving a suicidal inmate at CTF, clinicians were using an unauthorized CDCR observation form that contained separate options for Suicide Watch, Suicide Precaution, psychiatric observation, and *crisis evaluation*.

This reviewer also observed a wide spectrum of observation practices for inmates in MHCBs who were not on suicide precaution or suicide watch status. These observation levels ranged from none to 30-minute, 60-minute, and 120-minute intervals, all in stark contrast to the *Program Guide* objective "To observe, monitor, and provide continuous nursing assistance to inmate-patients whose condition requires 24 hours or more to achieve stabilization." *Program Guide*, Chapter 5, "Mental Health Crisis Bed, p. 12-5-2. According to CDCR mental health officials, a work group has been established to review the use of psychiatric observation and possibly develop policies and procedures that may make its use appropriate. To date, the Special Master and his experts have not received any documentation of this workgroup activity.

***Recommendation***:

- ***CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch.***

- ***CDCR, under the guidance of the Special Master, should examine the use of "psychiatric observation" status or other similarly-named practices for use in MHCBs and alternative housing cells for non-suicidal inmates and clarify when it may be used, via a directive or policy and procedure.*** [33]

---

[33] With regard to the first of the two recommendations above, defendants reported that a workgroup has been established to assess the minimum frequency of rounding in MHCB units and to consider implementation of a new "step down" status for inmates previously on suicide precaution, with clearly identified frequency of rounding. They further reported that once the frequency has been determined, training will be issued to the institutions. With

### 10)   Use of "Alternative Housing Cells" and OHUs for Suicidal Inmates

CDCR directives do not address the frequency of observation, nor any requirement of suicide-resistant cells, for inmates placed in alternative housing cells while awaiting placements into MHCBs.  *See*  Memorandum, "Alternative Housing Cell Prioritization," December 12, 2012. In a recent discussion with CDCR officials, it was indicated to this reviewer that there were "expectations" that inmates be placed in suicide-resistant cells and observed continuously until transferred to an MHCB.

This reviewer's observations indicated that these expectations were not being met. At NKSP, for example, unit A-4 was observed being used for administrative segregation overflow housing, RC inmates, and as alternative housing for inmates  awaiting MHCB placement. While touring the unit, this reviewer found several problems, including that all ten alternative housing cells were not suicide-resistant, and staff were conducting rounds at only 30-minute intervals for suicidal inmates. Similar problems were found at other prisons.  Holding cells in CTCs designated as alternative housing were not always suicide-resistant, and nursing rounds were not meeting the minimum standard of staggered 15-minute intervals.

There were other problems as well in a significant number of prisons.  Most OHUs contained cells designated to house suicidal inmates that were not suicide-resistant.  CTF, for example, had cells with bars, wall ventilation grates, non-suicide-resistant handicapped railing, window brackets, television stands, etc.  CRC also had dangerous OHU cells, although all inmates identified as suicidal were placed on continuous observation until transferred to an MHCB.  At SCC, the three cells in the ten-bed OHU that were used for suicidal inmates contained cell bars on the doors (with Lexan paneling on the *outside*), sinks with dangerous faucet lips, and tables and stools with dangerous brackets. Despite these conditions, inmates on suicide observation status were to be observed at 15-minute and 30-minute intervals. Conditions were acutely problematic at MCSP, where six cells in the administrative segregation building (Building 13) were designated as "Mental Health Outpatient Housing Unit" (MHOHU) cells. Except for the sink/toilet combo, all fixtures including beds had been removed from these cells. The environment more closely resembled seclusion cells than an MHOHU, making it difficult to envision a suicidal inmate feeling safe in a therapeutic environment.  At DVI, damaged floor tiles in several of the ten rooms could easily have been used for self-harm by inmates.

Other prisons, such as VSP for example, had rooms which they used to house patients with both medical and mental health needs ("swing beds") and placed suicidal inmates there. These rooms contained numerous suicide hazards, including hospital beds, window brackets, wall/ceiling ventilation grates with large holes, exposed pipe chases, etc.  In most, but not all, of these prisons, continuous observation was required for these suicidal inmates.  At CCC, for example, two OHU cells were designated as "swing beds" to house suicidal inmates, where inmates were placed on continuous observation until transfer to an outside MHCB, usually at HDSP.

---

regard to the second of the two recommendations, they indicated that the same workgroup will collaborate with CCHCS nursing to clarify procedures and policies for observation of inmates housed in MHCB units.

Although the *Program Guide* and various CDCR directives emphasize that inmates housed in OHUs on suicide observation status should be transferred within 24 hours, it was not unusual for inmates to remain in the OHUs for up to 72 hours or longer. During this time, they did not have beds and were forced to sleep on the floor with only a mattress. In most OHUs that used "swing beds," the rationale for removing hospital beds was that they were not suicide-resistant. While the hospital beds were indeed hazardous for suicidal inmates, the practice of withholding a bed from an inmate is not an acceptable alternative and does not reflect the standard of care for correctional facilities.  Inmates placed on suicide observation must be housed in a cell or room that is suicide-resistant, with a bed that is suicide-resistant. Pursuant to a CDCR directive dated October 29, 2013, entitled "State-Issued Clothing and Bedding for Mental Health Inmate-Patients in the Mental Health Crisis Bed and Out-Patient Housing Unit," inmates placed in either an MHCB or OHU for suicidal observation must be housed in a room that contains "*a bed (cement bed with mattress on top acceptable).*" Although this reviewer observed that most, if not, all of the MHCBs contained suicide-resistant beds, few, if any, of the OHUs contained any kind of bed.  Forcing an inmate to sleep on a mattress on the floor can only exacerbate the suffering of those who are suicidal and/or mentally ill.

*Recommendation*:

- ***The CDCR "Alternative Housing Cell Prioritization" memorandum dated December 12, 2012 should be revised to require that all cells utilized for alternative housing must be suicide-resistant.***[34]

- ***Until all alternative housing cells are suicide-resistant, any inmate housed in an alternative housing cell that is not suicide-resistant should be observed on a continuous basis until transferred to an MHCB.***[35]

- ***Any inmate housed in an alternative housing cell that is suicide-resistant should be observed at staggered intervals not to exceed every 15 minutes (Suicide Precaution), or be on continuous observation (Suicide Watch), depending on the level of the inmate's suicide risk.***[36]

- ***Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed.***[37]

---

[34] Defendants reported that they are discussing retrofitting alternative cells to insure that they are suicide-resistant and considering a review of the settings used for alternative housing.  They agreed to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation.

[35] Defendants reported that CDCR policy already requires that inmates placed into alternative housing or OHUs are to be observed continuously, (*per 10/13 Memorandum, revised 7/14, Inmate Medical Services Policies and Procedures: Vol. 12: Mental Health Services, Ch. 5, Provision of Care, Pol. 12.05.301, Housing of Inmate-Patients Pending MHCB Transfer*).  They agreed to discuss implementation of this policy with the Special Master in the Suicide Prevention Management Workgroup.

[36] Defendants reported that the *Program Guide*, Chapter 5, p. 12-5-42, already requires Suicide Watch or Suicide Precaution for suicidal inmates placed in OHUs, and that observation practices in alternative housing and OHUs will be monitored by CDCR regional mental health staff.

[37] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to review this recommendation and the settings used for alternative housing.

**11)** **OHU/MHCB Discharge and Efficacy of Five-Day Clinical Follow-Up and 60-Minute Custody Welfare Checks**

According to the *Program Guide*, following discharge from an MHCB, the inmate shall receive five-day follow-up assessments by mental health clinicians, and welfare checks by custody personnel at 60-minute intervals for at least the first 24 hours. After the initial 24-hour period, "a mental health clinician shall then discuss the inmate-patient's behavior with the custody staff and evaluate the inmate-patient to determine if the custody checks should be continued or discontinued. If the custody checks are continued, the mental health clinician shall determine whether the checks are to be every hour, every two hours, or every four hours for the next 24-48 hours." If, after a second evaluation, mental health clinical staff believe that additional hourly checks are required, the inmate shall be readmitted to the MHCB for further stabilization. *Program Guide*, Chapter 5, "Mental Health Crisis Bed," p. 12-5-29. As reflected in SPRFIT meeting minutes at almost all of the prisons, historically there have been varying degrees of compliance with five-day follow-ups and hourly custody welfare checks of recently released inmates from suicide watch or suicide precaution status.

The efficacy of this *Program Guide* requirement is questionable. In fact, the form used to document these follow-up assessments ("Interdisciplinary Progress Note – 5-day Follow-Up," CDCR MH 7230B), forced clinicians to write five days of progress notes in five small boxes on a single page. Even if the clinician were operating with an adequate treatment plan, there was no room on the current form to document such work. As a reasonable alternative, mental health clinicians at CTF were observed using a different form, "Interdisciplinary Progress Note," CDCR 7230-MH," that was Subjective Objective Assessment and Plan (SOAP)-formatted, with each of the five days of follow-up documented on a separate form. The extra space was sufficient to document the inmate's mental status and the status of his or her treatment plan.

In addition, placement of an inmate in a non-suicide-resistant cell and requiring observation at 60-minute intervals for the first 24 hours (or at two-hour and four-hour increments on subsequent days) certainly does not suffice as a protective measure against suicide so soon after discharge from an OHU/MHCB. Subsequent observation of these inmates "every two hours, or every four hours for the next 24-48 hours" certainly has no protective value. This schedule appears to be designed for the convenience of custody staff rather than for the protection of an inmate who might have a recurrence of SI. In fact, CDCR appears to be advancing contradictory approaches by implementing the Guard One system, which mandates 30-minute rounds in its special housing units, while it continues to require rounds at one-hour, two-hour, and four-hour intervals for inmates recently discharged from an OHU or MHCB. Finally, in at least one prison, SVSP, toured by this reviewer, mental health clinicians apparently believed that five-day follow-up assessments and 60-minute checks for 24-hours by custody staff were an acceptable *alternative* to MHCB admission.

As shown below in Table 3, during the past three years, ten suicides occurred within 30 days or less after the inmate's discharge from the OHU/MHCB. Among these suicide deaths, the average period between discharge and suicide was 11 days. Six of the ten suicides occurred in administrative segregation units, and none of these six inmates were housed in suicide-

resistant cells at the times of their deaths.  This data is clearly important for purposes of treatment planning and follow-up services, and may also have implications for the adequacy of the SREs completed upon the discharges, and the clinical judgments exercised therein.

### TABLE 3
### Length of Time Between MHCB Discharge and Suicide, Within 30 Days
### 2012 through November, 2014

| Inmate | Date of Suicide | Location | Length of Time from Discharge |
| --- | --- | --- | --- |
| SVSP5 | 3/10/12 | Admin. Seg. | 5 days |
| DVI4 | 5/12/12 | RC | 11 days |
| FSP8 | 5/30/12 | Admin. Seg. | 14 days |
| CIW5 | 7/6/12 | SCU[38] | 1 day |
| SCC4 | 7/28/12 | Admin. Seg. | 1 day |
| SVSP11 | 1/24/13 | Admin. Seg. | 6 days |
| SAC6 | 5/28/14 | PSU | 21 days |
| SATF5 | 7/6/14 | Admin. Seg. | 13 days |
| CIW8 | 7/30/14 | Admin. Seg. | 15 days |
| CIM3 | 8/11/14 | RC | 19 days |

**Average:  11 days**

***Recommendation:***

- ***CDCR, under the guidance of the  Special Master, should completely revise the current Five-Day Follow-up/60-Minute Welfare Check protocol. At a minimum:***

  - ***The "Interdisciplinary Progress Note – 5-Day Follow-Up" form that contains five days of notes on a single page should be replaced by a form similar to the "Interdisciplinary Progress Note" utilized at CTF that allows clinicians to use a separate sheet for each day of follow-up.[39]***

  - ***All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred.[40]***

  - ***The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-***

---

[38] Supportive Care Unit

[39] Defendants reported that the five-day follow-up form is currently being revised to address this concern, and will be sent to the Special Master before it is implemented. They also reported that the electronic health record will reflect this change when it is implemented.

[40] Defendants' response to this recommendation was that it requires further discussion in the Suicide Prevention Management Workgroup.  They indicated that they are not aware of any another state penal system which implements 30-minute observations for these inmates and that they focus on preparation and treatment planning for inmates being discharged from placement in an MHCB or alternative housing for suicidal behavior.

*case basis by the mental health clinician and clinically justified in the inmate's treatment plan.  No other frequency of observation should be authorized.*[41]

- *All inmates discharged from an MHCB or alternative housing and immediately re-housed in an administrative segregation unit should only be placed in a suicide-resistant, retrofitted cell for a period to be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan.*[42]

- *Five-day follow-up assessments and 30-minute checks by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing suicidal ideation and/or engaging in self-injurious behavior.*[43]

### 12)   Local SPRFITs

The *Program Guide*, Chapter 10, "Suicide Prevention and Response," sets the various responsibilities for the local SPRFITs.  Following review of all CDCR suicides from the 2012 through September 2014, it appeared that the deficiencies cited in each case and the parties responsible for the corrective actions fell within the jurisdiction of the local SPRFIT.

One of the inherent responsibilities of the SPRFIT system should be systematic progress toward a decrease in the number and rate of inmate suicides at each prison.  This has not occurred consistently throughout CDCR. For example, each local SPRFIT is required to meet at least monthly and carry out various responsibilities including ensuring compliance with all CDCR suicide prevention policies and procedures, five-day clinical follow-ups, treatment plans, etc. However, during local SPRFIT meetings attended by this reviewer and/or in meeting minutes examined by this reviewer, there was little discussion of overall suicide prevention strategies.  The SPRFIT meetings were mostly recitations of monthly statistics regarding compliance rates for five-day follow-ups and use of the Guard One system. There were few meaningful discussions about challenging inmates such as those on the "high risk" list, struggles with SREs and treatment planning, etc.  Any discussions of SREs in monthly local SPRFIT meetings minutes were quantitative rather than qualitative.

Although SPRFIT meetings were scheduled for 60 minutes, most of the local meetings attended by this reviewer were much briefer. Review of minutes of local SPRFIT meetings in some prisons indicated that several of the required team members such as the Chief of Mental Health (CMH), Chief Psychiatrist, Chief Psychologist, etc. were often absent from at least three consecutive monthly meetings, most notably at CSATF from November 2013 through January 2014, at DVI from April through June 2014, and at PVSP from November 2013 through April 2014.

---

[41] Defendants' response to this recommendation was that it also requires further discussion in the Suicide Prevention Management Workgroup.

[42] Defendants offered no response to this recommendation.

[43] Defendants reported that they will clarify appropriate use of five-day clinical follow-up so that it is not used indiscriminately or inappropriately.

Most importantly, many of the deficiencies identified by this reviewer in each prison were easily observable. They should not have been identified for the first time by a *Coleman* expert and/or monitor, but rather by the local SPRFIT. Although the local SPRFIT concept is a valuable tool in CDCR's suicide prevention program, its process appears to have lost its way and needs to be rebooted.

***Recommendation***:

- ***CDCR, under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.***[44]

### 13)   Other Miscellaneous Issues

### A)   Forms for Documentation of Observation

The MHCBs, OHUs, and other alternative housing cells in many CDCR toured facilities were using observation forms containing pre-printed 15-minute intervals. This practice is contrary to *Program Guide* requirements for observation at staggered 15-minute intervals. Only the "Suicide Watch/Suicide Precaution Record" (CDCR 7365, revise July 2009) should be utilized. CSATF was noted to be using a form last revised in October 1990. In addition, this reviewer observed several poor practices regarding documentation of observation at many of the toured prisons. These included forms with time intervals that were not up-to-date, forms that were being updated as this reviewer was touring the unit, and observation sheets that were not being kept on each room door but rather at the Nurse's Station, thus allowing for the possibility that these sheets were being completed without rounds having been performed. This reviewer's observation of falsification of observation sheets was found in at least six CDCR facilities, CCI, CIM, CMF, DVI, LAC, and SAC, and resulted in notification to nursing supervisors in each site.[45]

### B)   Non-Suicide-Resistant MHCBs

Although most MHCBs were suicide-resistant, several were not. They contained handicap railing with a several-inch open gap between the railing and wall, and square-

---

[44] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation. They also reported that CDCR's statewide mental health program will work with the SPRFIT coordinator at each prison to enhance the effectiveness of the SPRFIT, focusing on quality of clinical assessments and interventions, quality of rounding, and institution-specific issues. Defendants also indicated that the items raised in this report may be monitored by the SPRFIT and integrated into CDCR's Continuous Quality Improvement Tool (CQIT).

[45] Defendants reported that they agree to work with the Special Master in the Suicide Prevention Management Workgroup to address and resolve this recommendation, that the correct form and requirements for documentation of psych tech rounds were discussed with nursing leadership, and that the correct form has been distributed to all chief nurse executives. They also reported that an audit tool is being developed to assist the prisons with monitoring of suicide precaution documentation.

shaped stainless steel sinks protruding from the wall that were conducive to SAs by hanging. Handicap railing should be replaced with solid stainless steel railing that does not contain gaps.  Triangle-shaped stainless steel shelving should be attached to each side of existing square-shaped stainless steel sinks so that any ligatures will slide off the sink.[46]

## C)   Privileges for Inmates in MHCBs

Inmates housed in the CTC for medical purposes were not prohibited from recreation, visits, or telephone calls. However, there were questionable practices in the CTCs regarding privileges afforded to MHCB inmates.  For example, although recreation was permitted based upon clinical judgment for an inmate on MHCB status, visits and telephone calls were prohibited. Most recreation was time spent with the recreation therapist outside inmate-patient's room, and rarely, if ever, included yard time. Many clinicians appeared indifferent to the issue or dismissed it as a "custody" issue. Although the *Program Guide* indicates that recreation is permitted, the allowance of visits, telephone calls, or yard for an MHCB inmate is not addressed.

While generally an inmate's stay in an MHCB is relatively brief and temporary loss of such privileges may not be onerous, CDCR's own data indicates that MHCB lengths of stay are increasing and are no longer relatively brief.  One could also argue that MHCB inmates are in crisis and very unstable, and allowing them a family visit and/or telephone call may exacerbate their suicidal symptoms. The stronger counter-argument is that these inmates will eventually be discharged from the MHCB, and there is both a safety and therapeutic value to gauging the inmate's response to a visit, telephone call, or potential bad news while the inmate is being closely monitored by the Interdisciplinary Treatment Team (IDTT) within the MHCB, on a case-by-case basis as clinically indicated.[47]

## D)   Informal Recommendations Within CDCR Suicide Reports

Many CDCR Suicide Reports of 2012 – 2014 inmate suicides included "deficiencies" and/or "concerns" listed by the CDCR reviewer that did *not* result in a recommendation for corrective action through a QIP.  It appeared the CDCR reviewer was simply identifying a problem and informally relaying it back to the facility for resolution.  The problem with that is, without a QIP, the deficiency was not subject to any formal corrective oversight from CDCR headquarters.[48]

---

[46] Defendants reported that replacement of non-suicide resistant beds in MHCBs is a priority, and that they will work with the Special Master in the Suicide Prevention Management Workgroup to address this problem.

[47] Defendants reported that they are willing to discuss the provision of telephone and visiting privileges to inmates in CTCs in the Suicide Prevention Management Workgroup.  However, they also stated that because stays in MHCBs are intended to be brief (i.e. no longer than ten days), the privileges identified in this recommendation may not be practicable, particularly in cases in which visitation or telephone calls are not clinically indicated.

[48] Defendants reported that this issue has been corrected via a memorandum dated 11/21/14, and that any concerns in a suicide report that arose out of operations within the jurisdiction of CCHCS will be handled through the *Plata* receiver's nursing and medical death review committee process.

### E)   Frosted Exterior Cell Windows and Sensory Deprivation

Many toured administrative segregation units had exterior cell windows that were frosted to prevent natural sunlight from entering the cell. Although some custody officials suggested that the windows were frosted to reduce heat from the sunlight during the hot weather months, many inmates complained of sensory deprivation from the lack of natural sunlight.  They were also free to cover their exterior windows with paper if heat became excessive.[49]

### F)   High Refusal Rates for New Admit Screens in Administrative Segregation

Many facilities reported high rates of refusal of mental health screenings for newly admitted administrative segregation inmates.  At ISP, the refusal rate was 86 percent in February 2014. Although the mental health screenings should ideally be administered to inmates once they are physically housed in the administrative segregation unit, some facilities reported much lower refusal rates when the screens were administered by a mental health clinician in the TTA before the inmate was re-housed in administrative segregation.[50]

***Recommendation****:*

- ***CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues.***

## CONCLUSION: NEXT STEPS

Following debriefing sessions at the end of each prison tour, this reviewer was frequently assured by the CMH that the identified deficiencies would be corrected as soon as possible. Despite such assurances, it would be impossible to verify that such corrective actions have been taken without re-inspection. For example, during the tour of CSP/Solano in January 2014, this reviewer found that mental health clinicians were frequently ordering observation at 30-minute intervals for inmates admitted into alternative housing or  MHCBs and on Suicide Precaution status. This practice was a clear violation of the CDCR *Program Guide*, and the CMH indicated that the deficiency would be corrected. However, during a review of an inmate's eUHR in July 2014, this reviewer examined a June 27, 2014 SRE when the inmate was at CSP/Solano.  This SRE was completed over five months after this reviewer's on-site assessment there. The inmate had been admitted into the MHCB the day before the SRE for "increased instability, disheveled, and danger to self." According to the SRE, he was assessed as being a "moderate" acute risk for suicide and placed on Suicide Precaution status with observation at 30-minute intervals. This

---

[49] Defendants reported that frosted windows are used to reduce excessive heat entering the prison housing units, but they agreed to continue discussing this matter with the Special Master in the Suicide Prevention Management Workgroup.

[50] Defendants reported they already screen all inmates before placement into administrative segregation units, but they stated that they are examining screening options and are willing to discuss this proposal in the Suicide Prevention Management Workgroup, which they said may also want to consider additional screenings before placement of inmates into administrative segregation.

practice violated *Program Guide* requirements back in January 2014 and continues to violate it today.

In addition, the CDCR mental health and custody officials who accompanied this reviewer on many of his prison tours gave informal assurances that many of the identified deficiencies had been acknowledged and that corrective actions were planned. There was also some discussion of revising the Continuous Quality Improvement Tool (CQIT) to ensure that it had a more robust focus on suicide prevention. Some of these corrective actions have already been seen. Examples are the recent webinar on SRE treatment planning, and the expansion of the Guard One system to require 30-minute welfare checks beyond the inmates' initial 21 days in the administrative segregation units and the use of the technology in all SHUs, and Condemned Units. However, there has been silence on the other promised initiatives, perhaps because CDCR has been awaiting the findings and recommendations in this report.

In conclusion, it is hoped that the next step in this process is for CDCR to review this report's findings, embrace its recommendations, and develop a comprehensive corrective action plan under the guidance of the Special Master. The appropriate context would appear to be the Suicide Prevention/Management Workgroup that was ordered by the *Coleman* Court on July 12, 2013, "comprised of CDCR clinical, custody, and administrative staff, DSH staff, Special Master's experts, plaintiffs' counsel and, as appropriate, the Plata Receiver."[51] These workgroups should convene on a regular basis, preferably monthly, until the work is completed.

Finally, re-inspection of select prisons which continue to struggle with their suicide prevention programs would promote both the provision of technical assistance and a measurement of the sustainability of CDCR's corrective actions.

---

[51] Defendants reported that CDCR has collected responses and comments from each individual institution discussed in this report and that they believe those comments should be addressed within the Suicide Prevention Management Workgroup. They also reported that they agree that the Suicide Prevention Management Workgroup should work with the Special Master to develop a comprehensive corrective action plan to address the outstanding issues identified in this report.

# APPENDIX

| | Prison | Page |
|---|---|---|
| 1) | California State Prison, Los Angeles County | 1 |
| 2) | California Correctional Institution | 4 |
| 3) | California State Prison, Sacramento | 12 |
| 4) | Folsom State Prison | 19 |
| 5) | California Institute for Men | 24 |
| 6) | Centinela State Prison | 27 |
| 7) | Calipatria State Prison | 30 |
| 8) | Richard J. Donovan Correctional Facility | 32 |
| 9) | California Medical Facility | 39 |
| 10) | California State Prison, Solano | 45 |
| 11) | San Quentin State Prison | 49 |
| 12) | California Medical Center | 63 |
| 13) | Salinas Valley State Prison | 65 |
| 14) | California State Prison, Corcoran | 79 |
| 15) | Substance Abuse Treatment Facility | 85 |
| 16) | Ironwood State Prison | 89 |
| 17) | Chuckwalla Valley State Prison | 91 |
| 18) | Wasco State Prison | 92 |
| 19) | North Kern State Prison | 97 |
| 20) | Central California Women's Facility | 103 |
| 21) | Valley State Prison | 107 |
| 22) | Kern Valley State Prison | 111 |
| 23) | Correctional Training Facility | 117 |
| 24) | Pleasant Valley State Prison | 122 |
| 25) | Avenal State Prison | 127 |
| 26) | California Institution for Women | 132 |
| 27) | California Rehabilitation Center | 145 |
| 28) | Sierra Conservation Center | 147 |
| 29) | Mule Creek State Prison | 151 |
| 30) | California Health Care Facility | 165 |
| 31) | Deuel Vocational Institution | 168 |
| 32) | California Correctional Center | 174 |
| 33) | High Desert State Prison | 176 |
| 34) | Pelican Bay State Prison | 180 |

**1)**   **California State Prison - Los Angeles County (LAC)**

**Inspection**: November 12-13, 2013

LAC housed approximately 4,500 inmates, most of whom were at Level IV security classification.  It had a 16-bed Correctional Treatment Center (CTC) and three administrative segregation units.  Approximately 37 percent of inmates were on the mental health caseload, which included 1,316 3CMS and 371 Enhanced Outpatient Program (EOP) inmates.  CTC holding cells were designated as alternative housing beds and were used for inmates identified as suicidal and awaiting placement in a Mental Health Crisis Bed (MHCB).  Other alternative housing cells were located in the administrative segregation units.

**Screening/Assessment**: There were no new admissions during this reviewer's site visit.  Psych techs rounds in administrative segregation were not observed.

**Housing**: Fourteen of the 16 CTC beds were designated as MHCBs.  There was also a safety cell and a mental health observation cell.  All MHCB rooms did not contain any obvious features which could be used for a suicide attempt (SA) by hanging.  Two holding cells were also located in the CTC and were said to be used infrequently for temporary alternative housing for suicidal inmates, who were required to be on continuous observation.  These holding cells were suicide-resistant.  The prison also used other alternative housing cells for inmates on suicide precaution/suicide watch.  These cells were located in Facility D, Building 1 (cells 101-105) and one of the administrative segregation units (A-4, cells 119-126).

Occasionally, suicidal inmates were also housed in R & R Unit cells.  The alternative housing cells located in D-1 (cells 101-105) were not suicide-resistant.  They all contained stools, gaps between the desktop and wall, and mesh screening that contained holes with a diameter greater than the industry standard of 3/16 inch.  Ironically, Lexan paneling that seemingly had been installed to block access to the holes was incorrectly installed on the outside (and not from inside), thereby allowing the inmate easy access to the mesh screening for use as an anchoring device in a SA.

In addition, although the three administrative segregation units had a total of 21 retrofitted suicide-resistant cells for inmates on new intake status, this reviewer also observed that newly arrived inmates were being placed in any available cell within the three units.  Each of these cells was not retrofitted.

**Observation**: This reviewer examined the forms being used to document required observation of suicidal inmates housed in the CTC by either nursing staff or psych techs.  One concern was that staff were using a form that contained pre-printed 15-minute intervals.  Another, more important concern was staff had not documented any observation of an inmate on suicide precautions for over one hour, from 9:30 a.m. to 10:30 a.m.

Further, during the tour of the administrative segregation unit housing 3CMS inmates (Unit A-5), correctional staff were aware of the California Department of Corrections and Rehabilitation (CDCR) requirement to conduct staggered 30-minute rounds of new inmates housed in the unit

1

for their first 21 days using the Guard One electronic scanning system, but not of the requirement to observe all inmates there at 30-minute intervals.  Instead, officers were documenting checks at 60-minute intervals.  Subsequent review of the Guard One data for November 11, 2013 in the Unit A-5 found only a few violations during the 24-hour period, with an overall compliance rate of 97 percent.

**Management/Treatment Planning**: This reviewer examined various Electronic Unit Health Records (eUHRs) of inmates on suicide observation status and of inmates referred to mental health on an urgent and/or emergent basis.  Although these charts indicated that inmates were consistently seen by clinical staff on a daily basis while on suicide observation status, and that inmates referred to mental health were generally seen timely, there were several problems.  For example, in one reviewed chart (LAC 1), the inmate cut his left arm on October 29, 2013 in an act of self-injurious and/or suicidal behavior.  He informed the triage nurse "that he cut himself because of family stressors and that he felt suicidal at the time, but not feeling suicidal now" (a few minutes later).  The inmate was placed on Suicide Watch status.  The treatment plan section of a Suicide Risk Evaluation (SRE) completed the following day (October 30) simply stated "continue SW, awaiting admission to MHCB when bed is available."  The inmate had a long history of self-mutilation and multiple SAs during 2012, yet the mental health treatment plan (MHTP) form completed the following day (November 1) and signed by various team members failed to address the problem of suicidal and/or self-injurious behaviors.

In another case (LAC 2), an EOP inmate became agitated on October 27, 2013 and began hitting the wall of the cell, stating "I am feeling suicidal."  He complained of problems with his family and custody staff.  He was pacing in his cell and appeared agitated to the responding nurse.  The inmate was placed on Suicide Watch.  An SRE was completed approximately 12 hours later, on the following day (October 28).  It was inadequate.  The clinician noted that the inmate denied any suicidal ideation (SI) and did not report SI (within the past three months) as an acute risk factor on the form, and stated that the "patient is a poor historian."  This reviewer's examination of the Mental Health Tracking System (MHTS) found that the inmate had been placed in an MHCB on ten different occasions from July 9, 2007 through September 22, 2013 for a period of 336 days, including a recent 18-day stay from September 22 through October 10, 2013.  Almost all of the inmate's MHCB placements were for suicidal behavior.  The clinician noted that the inmate was "not in acute distress" and that his "suicide risk is minimal."  The treatment plan section of the SRE did not address treatment planning.  It simply stated: "Discharge suicide watch, released to custody, start 5-day step down, canceled MHCB."  A review of the inmate's chart found that the five-day follow-up never occurred.

In contrast, in case LAC 3, the treatment plan section of an SRE completed on October 10, 2013 repeated policy requirements and stated: "IP is being discharged as EOP LOC, 5-day step down to be initiated when IP returns to D Yard EOP program; IP to be seen on a weekly basis for 1:1 Case Manager (CM) contacts; IP should be encouraged to participate in groups and activities with Recreational Therapist (RT); IP may benefit from learning to manage difficult mood states and circumstances without resorting to maladaptive patterns (claiming he is suicidal)."

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambulatory Bag (Ambu bag), and cut-down tool.

**Training**: According to training records, approximately 97 percent of custody staff was currently certified in Cardiopulmonary Resuscitation (CPR).  Nursing staff reported 100 percent compliance with CPR training.  In addition, approximately 90 percent of both custody and non-custody staff were currently compliant with annual suicide prevention block training.  Non-custody personnel (including medical, nursing, and mental health staff) had <u>not</u> received annual suicide prevention block training.  Finally, almost all of the required mental health clinicians had received the seven-hour SRE training as of November 5, 2013, with most receiving it in March 2013 and completing the mentoring program.

**Recent Suicides**: LAC had two inmate suicides during 2012-2014.  In the **first** case (<u>LAC 4</u>), during the early morning of December 8, 2012, the inmate was found hanging by a sheet from the upper bunk of his general population (GP) cell.  His body was in *rigor mortis*.  He had entered CDCR in September 2011 to serve a life sentence for murder.  He was transferred to LAC in April 2012.  He had no history of mental illness or suicidal behavior, and was not on the mental health caseload.  He did not have any recent RVRs nor was he recently housed in administrative segregation.  A possible precipitating factor listed by the CDCR reviewer in the Suicide Report was a perceived inability to serve his life sentence.  No recommendations were offered in the Suicide Report.

In the **second** case (<u>LAC 5</u>), during the morning of April 15, 2013 the inmate was found hanging by a sheet from the upper bunk of his administrative segregation unit cell.  He had entered CDCR in November 2008 to serve a sentence of voluntary manslaughter of his ex-girlfriend.  He began receiving mental health care in 2008 and was diagnosed with Schizoaffective Disorder in April 2009, after previous diagnoses of Adjustment Disorder and Major Depressive Disorder.  In October 2012, the inmate was placed in a MHCB for SI.  In January 2013, after requesting protective custody due to fear for his personal safety, he was housed in the administrative segregation unit while awaiting possible transfer to a Sensitive Needs Yard (SNY) in another prison.  At the time of his death, he was at the 3CMS level of care (LOC) and was being considered for EOP based upon increasing paranoia, auditory hallucinations (AH), and noncompliance with psychotropic medication.  On March 15, 2013, the psychiatrist changed his medication.  On both April 4 and April 9, at the inmate's request the primary clinician (PC) agreed to postpone his elevation to EOP.  Possible precipitating factors listed by the CDCR reviewer in the Suicide Report were his inability to serve a long sentence and his fear for his personal safety.

The Suicide Report noted three issues with this suicide; (1) The inmate's primary clinician twice postponed his transfer to a higher level of care in the weeks immediately preceding his death, despite noting the inmate's decompensation.  The clinician did not sufficiently document the rationale for the delays, did not consult with other psychologists, and did not appear to have offered increased clinical services in lieu of the transfer.  (2) On two separate occasions, discrepancies in mental health documentation were found.  (3) The inmate had been refusing psychotropic medications from November 2012 through February 2013, yet there was no documentation of a nursing referral to psychiatry for medication noncompliance.

There were several issues not addressed in the Suicide Report.  For example, the Report did not contain discussion of other possible precipitating factors, including the inmate's increasing paranoia, AH, and noncompliance with psychotropic medication.  In addition, in the months leading up to his suicide, the inmate was seen by a clinician on both February 7, 2013, with a progress note stating that the inmate reported that "I wish I was dead," and on February 15, 2013, with an SRE stating "I want to die".  Despite this information and worsening mental health status, the clinician determined the inmate continued to be at "low" acute risk for suicide.  In addition, the February 7 encounter should have resulted in completion of an SRE.  Further, despite being housed in the administrative segregation unit at the time of his death and required to be seen daily by a psych tech, the last "Cell Check-Psych Tech. Rounds" sheet in the chart was dated March 28, 2013.  Review of all of these sheets since January 2013 found that the psych tech consistently documented that the inmate exhibited no signs of mental illness, reported normal sleep and eating, demonstrated alert behavior and appropriate mood, exhibited fair personal hygiene and cell cleanliness, and was stable overall.  These observations were in stark contrast to the PC's observations of increasing paranoia, AH, noncompliance with his psychotropic medication, and need for elevation to the EOP level of care.

## 2)   **California Correctional Institution (CCI)**

**Inspection**: November 14-15, 2013

CCI housed approximately 4,700 inmates, most of whom were at Level IV security classification.  CCI had a 16-bed Outpatient Housing Unit (OHU), eight SHUs; and three administrative segregation units for caseload and non-caseload inmates.  In addition, alternative housing beds (in Unit 4B) were available but were said to be rarely used for inmates identified as suicidal and awaiting placement in an MHCB.  Approximately 24 percent of CCI inmates were on the caseload, including 1,125 3CMS and six EOP inmates.

**Screening/Assessment**: This reviewer observed one new admission during the intake screening process.  The nurse asked all the required questions on the Initial Health Screening form, CDCR 7277.  However, due to the inmate's Secured House Unit (SHU) status, privacy and confidentiality were compromised because the inmate was housed in a therapeutic module and two correctional officers (CO) were standing between the inmate and nurse during the entire screening process.

In addition, this reviewer observed required daily psych tech rounds in the administrative segregation units on November 15.  Only a few inmates who were new intakes into the unit were required to have the 31-item Mental Health Screening form completed.  The psych tech confided to this writer that it was her practice that if the inmate answered "no" to the first 12 questions on the screening form, the remaining 19 questions were not asked.  Although the administrative segregation unit rounds conducted by this psych tech were thorough, the practice of not asking all the required questions on the screening form was problematic.  The screening was also performed cell-side with little effort to persuade the inmate to be escorted outside his cell to a private setting.

**Housing**: CCI had a 16-bed OHU, with eight cells designated to house inmates with mental illness and/or requiring suicide observation.  The cells were mostly suicide-resistant.  Conduit piping was on the wall and ceiling, although it was adequately covered with security caulking.  In addition, electrical outlets in several cells were "hot," although correctional staff informed this reviewer that maintenance staff had been asked to place a metal plate over the outlet whenever an inmate was on suicide observation status.  This stated practice seemed unlikely, given the methods that were said to be employed each time an inmate was placed on an observation status.  Most importantly, this writer found that inmates on Suicide Precaution/Suicide Watch, or a local CCI practice of placing inmates on "psychiatric observation" status (see below), were not provided with suicide-resistant beds in the cells.  In fact, because CCI did not have any suicide-resistant beds, inmates housed in the OHU on any observation status were forced to sleep on a mattress placed the floor because metal-framed bunks had been removed from each cell.  The lack of suicide-resistant beds in the OHU was problematic.  Two alternative housing cells (in Unit 4B) located in close proximity to the OHU were said to be used infrequently for overflow for Suicide Precaution/Suicide Watch.  These cells were found to be suicide-resistant.

In addition, although the three administrative segregation units had a total of 17 retrofitted cells for inmates on new intake status, this writer also observed that newly arrived administrative segregation inmates were being placed in any available cell within the three units, each of which were not suicide-resistant.

**Observation**: This reviewer determined that Suicide Precaution/Suicide Watch was infrequently used at CCI.  Suicide Precaution was last used a few weeks earlier in late October 2013, and Suicide Watch was last utilized over a month earlier, on September 14, 2013.  Instead, mental health staff frequently utilized "psychiatric observation" status.  When this writer asked for a written policy on psychiatric observation, a page from the MHCB chapter of the *Program Guide* was provided and the following was circled: "Inmates who engage in behaviors that might be indicative of a mental disorder that interferes with daily living and requires further observation and evaluation."

This writer also observed that observation sheets were not completed for two inmates on psychiatric observation status on November 14, although all OHU inmates were said to be observed at 15-minute intervals.  When this reviewer asked why these inmates were on psychiatric observation status, the response was that one inmate had a "mood disorder" and the other inmate had been exhibiting "bizarre behavior."  Despite the fact they were not on Suicide Precaution/Suicide Watch, both inmates were clothed in *paper* shirt/shorts and housed in cells without beds.  When asked why these inmates were clothed in paper garments and without beds if they were not suicidal, neither health care or custody staff could provide an explanation.  The eUHRs of both inmates were subsequently reviewed.  In the first case (CCI 1), the inmate was at the 3CMS level of care with a diagnosis of Major Depressive Disorder, was admitted to the OHU on November 13 for "SIs, and was placed on psychiatric observation," not Suicide Precaution.  In the second case (CCI 2), the inmate was admitted to the OHU for "aberrant bizarre behavior" that was neither identified nor explained in his record.  An SRE subsequently completed on November 14 resulted in the inmate's discharge from the OHU later that day.

The use of "psychiatric observation" status at CCI was problematic for many reasons. It was not authorized in the *Program Guide* for inmates who require Suicide Precaution/Suicide Watch; it did not result in documented observation; it resulted in inmates being stripped naked and placed in paper garments; it resulted in inmates being placed into cells without beds; and it may have been used to avoid the requirements of Suicide Precaution/Suicide Watch. Most importantly, it appeared that neither of the two cases discussed above were reported to HCPOP as required for anticipated MHCB transfer.

On November 15, this reviewer spent over two hours in the administrative segregation units observing required daily rounds by the psych tech. During that time, COs did <u>not</u> conduct any 30-minute cell checks of non-intake cells, although subsequent review of the unit log indicated that the checks were purportedly performed during this time frame. Such falsification of records is problematic. Administrative segregation unit logs for other reviewed days listed only hourly counts as welfare checks, or simply read: "30 minute checks done." Subsequent review of Guard One data, which is required to verify the observation of new intake inmates in administrative segregation units for the first 21 days of their stays, found a 99-percent compliance rate during the 24-hour period of November 12, 2013.

In addition, this reviewer's examinations of several SHUs found that required 30-minute rounds were performed inconsistently. For example, in SHU Bldg. 3, no observation checks were recorded in the unit log for the two prior shifts; in SHU Bldg. 6, the unit log read: "welfare checks every 1/2 hour from 14:30-21:30," which reflects an inadequate practice for documenting 30-minute checks; in SHU Bldg. 7, observation checks were recorded in the unit log at 30-minute intervals except for the 60-minute period preceding this reviewer's arrival; and in SHU Bldg. 8, 30-minute rounds were not being done consistently.

Finally, it should be noted that there were only six psych techs employed at the facility to provide daily rounds of the three administrative segregation units, as well as weekly rounds of eight SHU units and three SNY units. CCI previously had 11 psych tech positions for these responsibilities.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation status and of inmates referred to mental health on an urgent and/or emergent basis. Although the reviewed charts indicated that inmates were consistently seen daily by clinical staff while on suicide observation status, and that inmates referred to mental health were generally seen timely, several problems were found. For example, in a reviewed record for an inmate (<u>CCI 3</u>), although all required forms were completed, the quality of the documentation was problematic. An SRE completed on October 31, 2013 contained a sufficient treatment plan that included the following: "continue to reinforce adaptive coping skills with IP per treatment plan dated 8/26/2013, to eliminate over-reporting exaggeration of symptoms including using suicidal language for secondary gain." However, no documentation was found in either the Interdisciplinary Progress Notes: 5-Day Follow-Up CDCR Form 7230B or Interdisciplinary Progress Notes: General CDCR Form 7230A to indicate any such treatment planning was occurring. In addition, although the inmate was on Suicide Precaution in the OHU from October 25 through October 27, the psych tech conducting daily rounds in the administrative segregation unit completed a Psych Tech Daily Rounds Form indicating that the same inmate had been

6

observed in administrative segregation unit *during the same time period*.  Such falsification of records is problematic.

In another case (CCI 4), the inmate cut his forearm with a razor in a "suicidal gesture" that required eight stitches on October 4, 2013.  He was escorted to the OHU and placed on Suicide Precaution.  A subsequent SRE documented that the inmate was expressing SI and reporting a desire to die, but "no plan yet."  He had several other risk factors, including being at the 3CMS level of care, current anxiety and depression, a diagnosis of Major Depressive Disorder, a poor social support system, and a prior history of SAs.  His mental status was poor, and included poor sleep, appetite, and hygiene.  Although the clinician ultimately maintained the inmate on Suicide Precaution, the inmate was assessed as being a "low" acute risk for suicide.  On the following day, October 5, another clinician assessed the inmate and determined that he was no longer a suicide risk and would be discharged from Suicide Precaution.  No SRE was completed to justify the assessment and release from the OHU.  On the following day, October 6, an SRE was completed that justified the discharge from Suicide Precaution.  The next day, October 7, the inmate was returned to the OHU on Suicide Precaution after again verbalizing SI.  According to the progress note and SRE, the inmate had "a flat affect, recent cutting episode, paranoid ideation, social isolation, poor coping skills, and substantial acute risk."  On October 8, another clinician completed an SRE that noted "acute risk seems low as inmate denies any current SI, intent, attempt, or plans."  The inmate was continued on Suicide Precaution and referred to an MHCB.  However, a progress note authored by the same clinician for the same date and time stated that "SRE was completed.  Inmate didn't fit the criteria for OHU admission.  He was released to custody as CCCMS LOC."  Despite this contradictory progress note, the inmate was maintained on Suicide Precaution.  On October 10, the inmate was transferred to an MHCB at California Men's Colony (CMC).  A MHTP completed on October 15 did not address SI.  On October 18, the inmate was returned to CCI and the SRE and Five-Day Follow-Up Forms were completed, but neither gave any indication of treatment planning for SI.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, approximately 97 percent of custody staff was currently certified in CPR.  Records regarding non-custody compliance with CPR training were requested, but were not provided.  In addition, approximately 90 percent of both custody and non-custody staff were initially reported to be currently compliant with annual suicide prevention training, although it was later determined that non-custody staff had not completed the block training.  Further, 86 percent of required mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

Finally, current CCI practice was for mental health personnel to provide instruction for the one-hour annual suicide prevention workshop.  In this reviewer's brief discussion with the clinician designated to provide most of the annual suicide prevention training, the clinician said that most inmates placed in the OHU were not suicidal, but were simply manipulative and desired a change of scenery.  According to the clinician, these inmates quickly learn that placement on suicide observation status was not what they expected and were quickly returned to their housing units.

It was problematic that the clinician designated to instruct most of the annual suicide prevention workshops would espouse this belief.

**Recent Suicides**: CCI experienced five inmate suicides during 2012-2014.  In the **first** case (CCI 5), the inmate was found hanging by a sheet from the ventilation grate of his SHU cell during the evening of March 18, 2012.  The inmate had entered CDCR in November 2004 to serve a 59-year sentence for attempted murder and had been transferred to CCI in July 2007.  He was not on the caseload and did not have a history of mental illness or suicidal behavior.  The inmate had been housed in the SHU since May 2008 and was scheduled for release from the unit in August 2012.  Although possible precipitating factors for the suicide were not specifically identified by the CDCR reviewer in the Suicide Report, the inmate left a suicide note in which he expressed having experienced symptoms of depressed mood and remorse over his crime and decisions made during his life.  The CDCR suicide reviewer did not offer an opinion on the impact, if any, of the inmate's five-year SHU confinement on his decision to commit suicide.  According to the CDCR reviewer, this 31-year-old inmate also had little hope of eventual parole.  The Suicide Report contained three bases for recommendations for corrective actions via a Quality Improvement Plan (QIP): "(1) Incident reports indicated that chest compressions were not initiated as part of the CPR response until the inmate arrived at the Facility B's medical clinic; (2) Facility B medical staffing was inadequate to handle emergency medical response for that facility.  Assistance by staff from Facilities A and C was needed, causing a delay in medical assistance during this emergency.  (It should be noted that CCI responded to this finding by stating that the Facility B nurse arrived at the cell within five minutes); and (3) Daily SHU records for the inmate from July 2011 through March 18, 2012 indicated approximately 14 occasions when he was offered exercise time.  This is significantly less yard time than is mandated for SHU inmates."

It was noteworthy that in this reviewer's discussion of this suicide with CCI mental health staff, they did not appear to be particularly familiar or interested in the case, apparently because the inmate was not on the caseload.  One clinician commented, "We haven't had a caseload suicide since 2011."

In the **second** case (CCI 6), the inmate was found asphyxiated by a sheet in his SHU cell during the afternoon of December 16, 2013.  He had tied a sheet around his neck and then used a magazine as a tourniquet to tighten the ligature.  When found, the inmate's body was in *rigor mortis*.  The inmate had entered CDCR in February 1995 to serve a 15-year to life sentence for second-degree murder of his girlfriend.  He was transferred to CCI in May 2013.  The inmate served a prior CDCR term for manslaughter.  He had an extensive disciplinary history, with 15 RVRs from nine different CDCR facilities from 1995 through 2013, including violence against other inmates.  Due to safety concerns, he was designated as SNY.  At the time of his death, the inmate was serving a second SHU term for assaulting an inmate.

Although the inmate denied any history of suicidal behavior, and an SRE completed in a 2013 assessed his chronic risk for suicide to be "moderate" and acute risk to be "low," he reported a previous history of mental illness and had been placed in 3CMS in September 2002.  His most recent diagnoses were Mood Disorder Not Otherwise Specified (NOS) and Anti-Social Personality Disorder.  He also reported a family history of mental illness, including suicides of

both his father and grandfather, and a difficult childhood, including physical abuse by his father. He confided to his PC in January 2013 that his father did not commit suicide, but that he had accidentally shot his father during an argument when he was 11-years-old. He reported increased depression and requested an increase in psychotropic medication. The inmate also reported in April 2012 that he wanted to commit "one more murder" so that he could receive the death penalty because he did not want to live out his life in prison. In October 2013, he also requested assistance from his correctional counselor with obtaining information about organ donation.

Despite these behaviors, the inmate always denied any thoughts of suicide to his PC, although he did endorse problems with sleeping that included nightmares of his father and flashbacks to his turbulent childhood. Because this inmate had refused all out-of-cell mental health appointments, he was being seen only cell-side by his PC. He had not had any interaction with his psychiatrist since August 2013. The psychiatrist's note dated November 19, 2013 indicated that medications were being reduced in a "benign manner to elicit cooperation with medication monitoring." A psychiatrist added that "cell front visits are not satisfactory for assessment." In a note dated December 5, 2013, the psychiatrist noted that the inmate's motivation for treatment was "minimal" and that "due to continued non-compliance with mental health program and medication, monitoring will continue to reduce and discharge meds." The inmate had refused psychotropic medication nine times during the ten days before his death.

According to records, the inmate had limited family contact and had not received any visitors for over seven years. However, on the morning of his suicide on December 16, 2013, the inmate's sister apparently called CCI in response to a "goodbye" letter she had recently received from the inmate. In the letter, he said that he "expected to die from HIV." However, medical records did not contain any information to support this, and historically the inmate reported few serious medical problems. It appeared that the sister talked to a correctional counselor who attempted to transfer the call to the mental health clinician, but the call did not go through. The inmate committed suicide later that day, which also was the anniversary of his girlfriend's death.

Possible precipitating factors for the suicide were not specifically identified by the CDCR reviewer in the Suicide Report. Although the inmate did not specifically verbalize SI in the weeks prior to his death, there was deterioration in his mood. He complained to his PC of poor sleep and nightmares, symptoms of post-traumatic stress, and became increasingly more irritable, refusing medications and out-of-cell mental health appointments.

The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) On December 16, 2013, the inmate's sister contacted his correctional counselor. According to the counselor's documentation, during the telephone conversation, counselor revealed to inmate's sister that he was in the mental health program. Inmate participation in the Mental Health Services Delivery System (MHSDS) is considered confidential medical information and cannot be divulged without a release of information from the inmate for the recipient; and (2) the documentation by the CCI psychiatrist notes no face-to-face visits with inmate after August 18, 2013. The 2009 *Program Guide* requires that a 3CMS inmate's psychiatric medication be re-evaluated at least once every 90 days....Inmate was ducated several times during November 2013, but (psychiatrist) did not visit the inmate at cell front. Inmate's

medications were decreased and the psychiatrist noted that he would continue to taper the medication."

The Suicide Report did not refer to two other deficiencies that should have precipitated corrective action. First, although the CDCR reviewer was critical of the correctional counselor's disclosure of confidential information to the inmate's sister regarding his caseload status during their December 16 telephone conversation, there was no further discussion or recommended inquiry into the failure of the correctional counselor to establish contact with a mental health clinician as a result of the sister's emergency call. The telephone conversation should have been treated as an emergency mental health referral. Second, inmates housed in SHU were required to be observed by correctional staff at 30-minute intervals. Given that the inmate was found in a state of *rigor mortis*, it appeared that correctional staff had failed to conduct 30-minute welfare checks as required during the hours preceding his death.

In the **third** case (CCI 7), the inmate was found hanging by a sheet from a ventilation grate of his administrative segregation cell during the late evening of February 24, 2014. CPR was delayed for over 11 minutes because the inmate had jammed the cell door with a towel and first responding correctional staff had difficulty entering the cell. Officers carried him down the stairs of the housing unit without initiating life-saving measures. The inmate had entered CDCR in April 2004 to serve a 27-year to life sentence for rape, sodomy by force, and assault with a deadly weapon against a former acquaintance. He was transferred to CCI on November 27, 2013 and was immediately placed in the administrative segregation unit due to safety concerns.

Upon entering CDCR, the inmate denied any prior history of mental illness or suicidal behavior. His reporting of family history of mental illness was inconsistent with his reports to mental health staff during clinical contacts. He had an extensive history of substance abuse. During his CDCR term, the inmate had received 12 RVRs, most of which involved fighting with other inmates. The most recent RVR resulted in a SHU term in November 2012. While housed in the SHU, the inmate was attacked with a razor by his cellmate. The incident resulted in his cellmate being charged with assault with a deadly weapon and a trial in which the inmate was waiting to testify at the time of his death.

The inmate was placed on the mental health caseload following a SA by hanging in his administrative segregation cell on October 28, 2005. He was placed in a MHCB for approximately ten days, with diagnoses of Adjustment Disorder, Polysubstance Abuse by History, and Anti-Social Personality Disorder. Precipitating factors for the SA were cited as an alleged recent battery on an officer that resulted in a Rule Report Violation (RVR), the recent death of his grandmother, and estrangement from his family in Mexico. The inmate also self-reported two other incidents of suicidal behavior outside of CDCR -- a drug overdose at age 18 and intent to shoot himself at age 22. Following discharge from the MHCB, the inmate was maintained at the 3CMS level of care. The inmate also had been designated SNY due to the nature of his commitment offense.

The inmate was generally compliant with mental health treatment, participating in Interdisciplinary Treatment Team (IDTT) meetings and taking psychotropic medication, although he rarely agreed to confidential sessions. He often complained about increased

depression and sleeping problems. He reported good family support through telephone calls and letters. According to his PC, the inmate never voiced any SI or victimization concerns during their weekly cell-side interactions. He did, however, appear to be waiting impatiently to testify in the court proceedings. It had been expected that he would be at CCI for only approximately one week, but trial dates kept being postponed.

The weekly psych tech rounds were unremarkable. According to administrative segregation staff, the inmate kept to himself, rarely went out to yard, and never disclosed his commitment offense due to fear of assault. His most recent SRE was completed in December 2013, indicating chronic risk for suicide as "moderate" and acute risk as "low."

Although the CDCR reviewer did not find any obvious or known precipitating factors for the suicide, the inmate left a suicide note that was addressed to an inmate in a nearby cell. In the note, the inmate apologized for disrespecting this inmate and asked him not to harm his family. In another letter, the inmate was apparently feeling threatened by gang members and feared they might harm his family. It was unclear if this fear was due to the nature of his commitment offense, or because he would be testifying against his former cellmate, or was a combination of these and other issues.

During the course of the review, the CDCR reviewer found numerous deficiencies of varying levels of importance with the inmate's care. For example, nursing documentation of the emergency response on February 24, 2014 was sparse. Regarding nursing response, the Automatic External Defibrillator (AED) was not applied at the scene, and nursing staff waited until the inmate was transported to the Triage and Treatment Area (TTA). Nursing staff were initially delayed in responding to the emergency because they were not stationed at the TTA during the first watch shift. With regard to mental health care, the SRE completed on December 3, 2013 did not include a mental status evaluation. There was no direct clinician-to-clinician contact between Salinas Valley State Prison (SVSP) and CCI clinical staff when the inmate arrived at CCI in November 2013. The inmate's IDTT meeting was scheduled several days late. The inmate never met with his psychiatrist during his nearly three-month stay in administrative segregation at CCI. With regard to custody concerns, correctional staff did not initiate CPR at the scene of the emergency. It was initiated by medical staff outside the housing unit. An administrative segregation placement notice should have been issued to the inmate within 48 hours of his November 27, 2013 admission to the unit, but it was not issued until January 14, 2014.

The Suicide Report contained two bases for recommendations for corrective action through a QIP: (1) first responding personnel, including custody staff, were required to immediately initiate CPR at the scene of the emergency; and (2) the AED was required to be brought to the scene, and immediately utilized at the scene, of the emergency.

In the **fourth** case (CCI 8), the inmate was found to have ingested multiple prescription pills in his administrative segregation cell during the late evening of September 14, 2014. He entered CDCR on October 4, 2012 to serve an unknown sentence for conspiracy to kidnap. He was transferred to CCI on December 5, 2012 and was placed at the 3CMS level of care for anxiety

11

and depression.  At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website, including the Suicide Report, had not been examined by this reviewer.

In the **fifth** case (CCI 9), the inmate was found hanging by a coaxial cable and t-shirt from the bunk in his cell during the morning of November 30, 2014.  He entered CDCR on November 10, 2009 to serve a life sentence for first degree murder.  He was transferred to CCI on March 9, 2012 and was placed at the 3CMS level of care for anxiety and depression.  At the time of this writing, the inmate's eUHR and other documents posted on the CDCR secure website had not been examined by this reviewer.  To date, the Suicide Report had not yet been completed.


3)      **California State Prison - Sacramento (CSP/Sac)**

**Inspection**: November 20-21, 2013

CSP/Sac housed approximately 2,217 inmates, most of whom were at Level IV security classification.  It had two CTCs with a total of 20 MHCBs, a 20-bed unlicensed MHCBU, five PSUs, a 20-bed OHU; a SHU; and three administrative segregation units for caseload and non-caseload inmates.  In addition, this writer was informed that "alternative housing" beds were available throughout the complex, but rarely utilized for inmates identified as suicidal and awaiting MHCB placement because SAC had 40 MHCBs. (As seen below, however, this writer found that "alternative housing" beds in OHU were indeed being utilized temporarily for suicide precaution/suicide watch.)  The 1,299 caseload inmates comprised approximately 59 percent of the total prison population.

**Screening/Assessment**: This reviewer observed several new admissions during the intake screening process on November 21, 2013.  The two nurses assigned to the Receiving and Release (R & R) Unit were not normally assigned to the post and appeared confused as to whether newly arrived inmates who were presented as "lay-overs" and probably would be transferred the next day were required to go through the Initial Health Screening CDCR Form 7277 process.  These lay-overs would later be housed in an administrative segregation unit.  It also appeared that the nurses were utilizing a CDCR Form 7277 form that differed slightly from forms this reviewer had observed at other prisons.  Both nurses were observed to be conducting the screening process as if it were their first time.  They both failed to ask all the required questions of at least two inmates.  But for a CO's presence in the doorway, the Nurse's Office provided sufficient privacy and confidentiality.

This reviewer observed daily psych tech rounds in the administrative segregation units on November 21.  Psych tech rounds of the stand-alone administrative segregation unit and the B-4 administrative segregation unit, which housed over 160 inmates of whom approximately half were 3CMS, took less than one hour.  Three inmates identified as new intakes into the stand-alone administrative segregation unit required the 31-item Mental Health Screening.  One refused the interview.  Because the second inmate was leaving for an out-of-state placement the following day, he was not offered any screening.  The third inmate initially consented to the interview but refused to leave the cell when he was approached by an officer to be escorted to an office.  No attempt was made by the psych tech to conduct the screening cell-side.  Review of

these inmates' eUHRs indicated that two of them were at the 3CMS level of care at their sending facilities and, therefore, not required to have the mental health screening.

As observed by this reviewer, daily psych tech rounds were brief, with little effort to engage each inmate or initiate even a brief conversation.  Although only weekly rounds were required for SHU inmates, this reviewer was informed that psych techs conducted daily rounds in the B-3 because it was less confusing to schedule.  However, this reviewer observed that the psych tech's rounds of the 90-bed SHU housing approximately 17 3CMS inmates took less than five minutes.

**Housing**: CSP/Sac had two CTCs.  CTC-1 had 16 beds and CTC-2 had 12 beds, of which 20 were designated as MHCBs.  The rooms and the beds within them were suicide-resistant.  All cells in the 20-bed MHCBU were designated as providing unlicensed MHCB level of care.  Each cell was suicide-resistant, and had safe beds, ventilation grates, and light fixtures.  The environment in this unit was sterile.  Cells appeared dirty and dark and offered limited visibility of their interiors.  It was nearly impossible to see into the cell of an inmate who had been downgraded from Suicide Watch to Suicide Precaution earlier that morning because he had rubbed soap on his entire cell door window.  The observation sheet for this inmate's cell indicated that a CNA had documented that the inmate had done this 90 minutes earlier, but there was no attempt to clean it until this reviewer's inquiry resulted in removal of the inmate from the cell and the window being cleaned.

This reviewer was informed earlier in the day that "alternative housing" beds were available in the OHU but rarely used for inmates identified as suicidal and awaiting MHCB placement because there were sufficient MHCBs.  This reviewer's examination of the OHU housing logs for the preceding week indicated that four inmates had been placed on both Suicide Watch and Suicide Precaution status pending transfer to an MHCB.  The designated cells in the OHU were not suicide-resistant, and had dangerous ventilation grates and gaps between bunk railings and walls that could be used for suicides by hanging.

There were no clinician's offices in either the MHCBU or OHU in which assessments could be conducted privately.  Assessments were conducted either cell-side in the OHU, and either cell-side or in therapeutic modules in the MHCBU.  The MHCBU modules were located in a high traffic area of the dayroom area that offered very limited privacy and confidentiality.

This reviewer found that several of the 12 designated new intake cells in the administrative segregation units were not suicide-resistant.  In Unit A-5, the administrative segregation unit for EOP inmates, there were gaps between the bunks and walls, and between the desks and walls, that could be used for suicides by hanging.

**Observation**: This reviewer found different observation forms being used for documentation of required observation of suicidal inmates in each of the two CTCs.  In CTC-1 the form had pre-printed time intervals and blank spaces for Q-15 checks.  In CTC-2, the form appropriately contained blank spaces to be filled in.  The MCHBU also used a form with pre-printed time intervals.  In CTC-2, at 9:42 a.m. on November 20, 2013, examination of an observation sheet for an inmate on Suicide Precaution indicated that the assigned CNA had already pre-filled in

13

checks for 9:54 a.m., 10:00 a.m., 10:14 a.m., 10:38 a.m., and 10:51 a.m.  In CTC-2, reviewed observation sheets were filled out correctly.

This reviewer toured several administrative segregation units and examined unit logs that were required to document 30-minute cell checks of non-intake cells.  Various problems were found. For example, in administrative segregation unit B-4, documentation of 30-minute checks had stopped at 5:30 a.m. that morning, November 20.  In the stand-alone administrative segregation unit, the log book indicated that the 3:00 p.m. check had been done, but the current time was only 2:50 p.m.  Later review of Guard One data on checks during new intake inmates' initial 21 days in administrative segregation identified numerous documentation irregularities in B-4 Unit during the 24-hour period of November 20, 2013.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation status and inmates referred to mental health on an urgent and/or emergent basis.  Although the reviewed charts indicated that inmates were consistently seen daily by clinical staff while on suicide observation status, and inmates referred to mental health were generally seen timely, several problems were found.

For example, this reviewer observed an inmate (Sac 1) being downgraded from Suicide Watch to Suicide Precaution in the MHCBU on November 20, 2013.  The documentation supporting the downgrading was an initial psychiatric evaluation by the unit psychiatrist done mid-morning that same day.  The three-page evaluation was very thorough.  It indicated that the inmate had a current diagnosis of Bi-Polar Disorder and a history of self-injurious behavior.  He had been a patient in the state hospital most recently from July through October 2013.  He was admitted to the MHCBU the previous day for cutting himself on the forearm.  The document indicated that the inmate had refused to be assessed.  When asked whether the inmate had in fact refused, the psychiatrist answered "Yes, he refused to talk to me today," and based the evaluation solely upon a chart review.  When asked how the inmate could be downgraded from Suicide Watch to Suicide Precaution without an actual face-to-face assessment, the psychiatrist indicated that it was his clinical judgment that the inmate was no longer at high acute risk for suicide and had not engaged in any self-injurious behavior since his arrival in the MHCBU during the previous day. This reviewer then asked whether an SRE had been completed since the inmate's admission to the MHCBU.  The psychiatrist replied "no," but said that one would probably be completed later in the day by the inmate's PC.  Soon thereafter, this reviewer determined that an SRE had been completed by the inmate's PC at 8:15 a.m. that same day, shortly before the psychiatric evaluation.  The SRE indicated that the inmate was cooperative with that assessment and reported with regard to his self-injurious behavior," 'I was just stressed out....being in prison.' He stated that some of the stress is related to the additional prison time he is facing.  He said he is 'sick of prison' and has difficulty coping... He denies SI, but stated he has thoughts of harming himself to relieve stress.'" The SRE indicated that the inmate continued to be at "high acute risk" for suicide and recommended continued Suicide Watch status. This case was problematic because the clinician downgraded the inmate from Suicide Watch to Suicide Precaution without either a face-to-face assessment or review of an SRE completed a short time earlier indicating a continued high acute risk for suicide.

14

In another reviewed chart (Sac 2), although all required forms were completed, the quality of the documentation was problematic. The inmate had been in an MHCB from October 25 to November 4, 2013 for self-injurious behavior. The discharge SRE contained the following treatment plan: "Discharge from MHCB with 5-day follow-up, continue to provide motivational interviewing to learn and use effective coping skills to manage acuity of MH symptoms in program activities less acute than in MHCB." The plan appeared adequate, yet there was no documentation found in either the Interdisciplinary Progress Notes 5-Day Follow-Up CDCR Form 7230B or Interdisciplinary Progress Notes General CDCR Form 7230A to indicate any such treatment planning was occurring. On November 12, another clinician wrote a treatment plan entry on an Interdisciplinary Progress Note that read, "Present case at IDTT, develop a treatment relationship with I/P and set goals of 60 days w/o a crisis bed visit or an RVR. Group attendance at 85% and 100% participation in clinical contacts.  I/P will contract with clinician to have her alerted when the voices start telling him to hurt himself." This treatment plan was not consistent with the previous plan of November 4, and there was no indication that it was being followed as of November 21, 2013.

This reviewer observed the IDTT process in CTC-2 and the MHCBU. The sessions were very different from each other.  During the CTC-2 process, inmates were fully participating members of the team and advocated for themselves. The team chair withheld discussion of any inmate until he was present, unless there was a security issue. The process worked quite well. However, although there was discussion of various inmates' self-injurious behaviors, there was limited concordance between discussions and treatment planning.

In the IDTT process in the MHCBU, inmates were discussed openly before their arrivals.  One session became quite confusing to the participants. The inmate (Sac 3) arrived in a safety smock and appeared to be on either Suicide Watch or Suicide Precaution. The unit psychiatrist summarized the case, stated that the inmate was not suicidal, and looked to the inmate for confirmation.  The inmate nodded his agreement that he was not suicidal. When another team member asked the inmate if he had ever attempted suicide, he replied, "Yes, approximately six months ago by hanging." There was no attempt to verify this reported history of a SA or of any other information during the meeting, and the inquiring clinician suggested that the inmate be kept on Suicide Precaution. A brief discussion followed.  A few minutes later, the same clinician recommended that the inmate be taken off Suicide Precaution. When the CMH, who was observing the process, noted this apparent conflict, the original clinician corrected herself and suggested that the inmate remain on Suicide Precaution.

This reviewer was told on November 21, 2013 that a Suicide Prevention Response Team (SPRFIT) workgroup would be established to work in improving documentation of clinical judgments used to place inmates on, and remove them from, suicide observation status.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, approximately 100 percent of custody staff and 95 percent of nursing staff were currently certified in CPR.  Approximately 95 percent of custody staff had received annual suicide prevention training, but nearly none of health care staff had

received it.  As of November 20, 2013, 97 percent of mental health clinicians had received the seven-hour SRE training and completed the SRE mentoring program.

**Recent Suicides**: There were four inmate suicides at CSP/Sac in 2012-2014. All four occurred in the PSU.  In the **first** case (SAC 4), the inmate strangulated himself with an ace bandage in his PSU cell during the early morning of July 25, 2012. He had entered CDCR in December 1990 to serve a 31-year to life sentence for murder. He had been at CSP/Sac since May 2011, and had been at the 3CMS level of care since April 2009, following a MHCB placement for self-injurious behavior. His most recent admission to an MHCB was in March 2012 for self-injurious behavior. The inmate had multiple diagnoses over the years that included Psychotic Disorder, Schizophrenia, and Bi-Polar Disorder. He had accrued numerous disciplinary charges over the years, resulting in more than 13 years added to his sentence. On July 21, 2012, the inmate was involved in a fight with his cellmate and was subsequently placed in an administrative segregation unit overflow cell in the PSU. He was noted to be "disorganized and not making sense." Two days later, on July 23, custody staff noted that the inmate was "acting weird." He was seen by a clinician who described the inmate as "pacing in his cell, appeared agitated and refused to speak with the psychologist." There was no indication that a higher level of care was considered at that time. The inmate was found dead in his cell less than 24 hours later, in a state of *rigor mortis*. It took the emergency response team more than 14 minutes to enter the cell.

The Suicide Report from the CDCR reviewer contained two bases for recommendations for corrective action through a QIP: (1) The clinical psychologist who assessed the inmate on July 23, 2012 did not consult the eUHR before contact with the inmate and did not sufficiently document whether or not an MHCB admission was warranted based upon the inmate's presenting behavior; and (2) custody staff did not follow the proper protocol in responding to an unresponsive inmate, resulting in a 14-minute delay in entering the cell. Custody staff were disciplined as a result of the delayed emergency response.

The Suicide Report did <u>not</u> cite at least three other deficiencies that should have precipitated corrective action: (1) The psych tech progress note dated July 23, 2012 indicated that the inmate exhibited a normal mental status, in stark contrast to both custody's and the mental health clinician's observations that the inmate was acting weird and pacing the cell; (2) The inmate was not placed in a retrofitted suicide-resistant cell when he was placed in an administrative segregation overflow cell in the PSU on July 21, although such placement was unrelated to his suicide by self-strangulation; and (3) Because the inmate was found in a state of *rigor mortis*, it appeared that the required observations at 30-minute intervals were not performed on July 24.

In the **second** case (Sac 5), the inmate committed suicide on February 16, 2013 by overdosing on approximately 108 pills. The inmate had been assigned to a PSU cell and was at the EOP level of care. During the afternoon of February 16, he had told custody staff that he was suicidal and was transported to the TTA to be assessed. However, before the assessment, he became unresponsive.  CPR was initiated, but he was subsequently pronounced dead. The inmate had entered CDCR in March 2001 to serve a term for arson. In 2005, he set fire to his cell at California Medical Facility (CMF), was again charged with arson, and was found not guilty by reason of insanity and sent to the state hospital. He had an extensive history of self-injurious behavior that included a near-fatal SA by setting himself on fire in February 2011.  He was

16

transferred to CSP/Sac in December 2012. The inmate had been seen last by his PC on February 13, 2013, three days before his death. He denied any SI and requested that, based upon his EOP progress, he be considered for 3CMS level of care. The CDCR reviewer's investigation found that the inmate was unhappy being kept at EOP level of care and may have ingested the medication in an attempt to gain transfer from the prison, although this would have likely resulted in his placement in a state hospital and eventual return to the EOP level of care. The reviewer also noted that the inmate had previously stated to a psychiatrist "that he could not tolerate social isolation as it reminded him of the severe neglect and abuse endured as a child....and the psychiatrist reasoned that the inmate did not want to be in the PSU or SHU due to the bad memories the isolation triggered."

The Suicide Report contained one basis for recommendation for corrective action through a QIP: (1) "Incorrect tubes were used in the blood draw and the laboratory was not able to test medication levels in the inmate."

The autopsy report concluded that the inmate committed suicide by ingesting an excessive amount of propranolol.  The Suicide Report failed to address the question of how the inmate could possess excessive amounts of such medication, nor did it recommend any corrective actions to prevent similar incidents in the future.

In the **third** case (Sac 6), the inmate was found hanging by a sheet from a ventilation grate of his PSU cell during the late evening of May 28, 2014. Life-saving measures including initiation of CPR and transport to a local hospital were commenced, but the inmate was pronounced dead three days later on May 31, 2014. The inmate had entered CDCR in July 1992 to serve a 38-year to life sentence for several counts of second-degree robbery and battery. He received additional time for subsequent convictions of sexual battery on a county jail inmate in 1990, and an assault on a CDCR inmate resulting in death in 1994. He had an extensive history of violence against both CDCR staff and inmates, and had received approximately 30 RVRs.  He had most recently been housed at Pelican Bay State Prison (PBSP) until his transfer to the PSU at CSP/Sac in February 2013. His most recent RVR occurred on May 16, 2014 for sexual misconduct. He also had a significant history of gang involvement.

The inmate had an extensive history of mental illness. He received inpatient psychiatric as early as 11 years of age. During his CDCR confinement, he was hospitalized several times between 1995 and 2012 for both grave disability and incompetence to stand trial. Records indicated that he had experienced "psychosis during incarceration that had manifested into poor activities of daily living, illogical thinking, disorganized grooming and bizarre behavior, poor cell sanitation, and allowing excrement to accumulate around his toilet." He was last admitted into Department of State Hospitals (DSH) in April 2012. At the time of his death, the inmate was at the EOP level of care and most recently was diagnosed with Schizophrenia, Polysubstance Dependence, and Anti-Social Personality Disorder. He had periodically been on *Keyhea* orders since 1991.

The inmate's history of suicidal behavior was not well documented within the eUHR.  He confided to a psychiatrist in November 2012 that he attempted suicide a few times during the late 1980s and early 1990s, once at age 18 with a steak knife "but it was too dull," and then again a few years later at age 22 by trying to break his own neck. Several recent SREs noted "non-lethal

suicide" attempts on six occasions, including scratching his wrist in 1993 which resulted in MHCB placement at Mule Creek State Prison (MCSP).

On April 20, 2014, the inmate expressed SI and was placed on suicide observation status in the OHU at CSP/Sac, first on Suicide Watch, and then on Suicide Precaution a few hours later. He was assessed by a clinician the following morning on April 21, and denied any SI, stating that "I just needed a change of view.... I've been in that section for eight months, and everyone who was there has left. I wanted a different cell." An SRE was completed and the inmate was discharged back to the PSU. The treatment plan section of the SRE addressed development of an alternative strategy to cope with confinement and not misusing the MHCB process. Required five-day follow-up assessments were completed by a clinician, but they did indicate concordance with the above plan.

The following week, on April 28, the inmate again reported SI, severe depression, and visual hallucinations (VH) of "dead people." He was placed in an MHCB where he remained until May 7, 2014. On April 30, the inmate received an RVR for battery on an officer, an incident that allegedly occurred before his MHCB admission. On May 7, an MHCB clinician completed an SRE that assessed both his chronic and acute suicide risks as "low." The examiner was apparently unaware of the recent RVR because the appropriate box for recent disciplinary infraction on the SRE was marked "no." Given the inmate's extensive history of mental illness, history of violence, long sentence, history of sexual assault, and history of suicidal behavior, an assessment of low chronic risk for suicide was inconsistent with this inmate's record. The treatment plan contained in the discharge SRE stated the following: "(1) Staff on treatment unit will continue to monitor and treat IP per program protocol; (2) Medication assessment and management if deemed appropriate by psychiatry staff; (3) Psychosocial intervention could include: a) aiding IP in developing therapeutic alliance in order to facilitate better tx participation, b) aiding IP in identifying sources of distress and creating repertoire of useful coping mechanisms; and (4) Reality therapy to assist I/P and better managing psychotic symptoms." Required five-day follow-up assessments were completed by a clinician, but again they did not show any concordance with the above plan.

On the morning of his suicide, May 28, the inmate again threatened suicide to a CO and was referred to mental health staff for assessment. A clinician later assessed the inmate and determined that he was not at risk for suicide. An SRE was not completed.

The CDCR reviewer in this case did not offer any possible precipitating factors for this suicide, and no suicide note was found. This reviewer found several deficiencies in mental health services, including inaccuracies in SREs completed on April 21, April 29, and May 7, 2014. Most importantly, an SRE was not completed after the inmate threatened suicide on the morning of May 28. There were also concerns related to the emergency medical response by both medical and correctional staff. The Suicide Report contained three bases for recommendations for corrective action through a QIP: "(1) According to policy, when correctional staff responds to an inmate in need of life-saving measures, they must immediately initiate CPR. Custody staff did not initiate CPR in accordance with policy; (2) According to the Emergency Medical Response System, the AED is to be brought to the emergency scene and utilized immediately. During the inmate's emergency response, the AED was not applied until arrival at the TTA; and (3) Per the

Mental Health Program Guide, a SRE should be completed on an inmate reporting SI. The evaluation did not occur."

In the **fourth** case (Sac 7), the inmate was found hanging by a sheet from the light fixture of his PSU cell during the afternoon of July 7, 2014. He entered CDCR in December 1997 to serve a 40-year to life sentence for second-degree murder. He was transferred to CSP/Sac on June 20, 2014. The inmate was placed on the caseload in December 2002, and was designated for the EOP level of care on March 27, 2014.  His most recent diagnosis was Mood Disorder NOS. At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report, had not been reviewed by this writer.

## 4)    Folsom State Prison (FSP)

**Inspection**: December 3-4, 2013

Folsom State Prison (FSP) housed approximately 3,000 male inmates, most of whom were at Level II security classification.  In addition, almost two-thirds of the inmates were serving life sentences. Approximately 25 percent of FSP inmates were on the caseload, including 757 3CMS and eight EOP inmates.  The prison did not have a CTC, MHCB, or OHU. There were nine alternative housing cells located in the administrative segregation unit to temporarily house suicidal inmates before their transfers to an MHCB.

**Screening/Assessment**: There were no new admissions for this reviewer to observe during this visit.  Daily psych tech rounds in the administrative segregation unit were observed on December 2. The rounds were generally unremarkable. The psych tech completed the required form for all 3CMS inmates, but told this reviewer that psych techs converse only with inmates in administrative segregation for disciplinary reasons and do not converse with other non-caseload inmates in the unit who are there, for example, on orientation status.  This writer was informed that orientation status inmates were not eligible for yard, were locked down in their cells 24 hours a day, and were allowed out only for scheduled appointments. The average length of stay for orientation status inmates in administrative segregation was approximately 14 days.

**Housing**: Reviewed records indicated that most inmates requiring an MHCB were transferred from FSP within 24 hours. The alternative housing cells in the administrative segregation unit, B-Side, cells 1-9, were suicide-resistant.  These cells were also used for new intakes in administrative segregation.  Ten cells, cells 10-19, on the B-Side were also used for new intakes but were not suicide-resistant, as they contained large mesh ventilation grates, bunk railings, and shelving that were conducive to SAs by hanging. During 2012-2013, FSP had three inmate suicides in the administrative segregation unit in which either light fixture conduit piping or shelving was used as an anchoring device in these hangings.

**Observation**: There were no inmates on suicide observation status in alternative housing cells during the two-day audit period. The administrative segregation unit logs that were used to document 30-minute checks of non-intake cells were documented appropriately.  Review of Guard One data for checks of new intakes in administrative segregation during their first 21 days indicated only one missed check during the 24-hour period of December 2, 2013.

19

**Management/Treatment Planning**: This writer reviewed eUHRs of inmates on suicide observation status and inmates referred to mental health on an urgent and/or emergent basis. The charts indicated that clinical staff consistently saw inmates daily while on suicide observation status, and inmates referred to mental health generally seen on a timely basis. However, several problems were found. For example, in one reviewed case (FSP 1), a 3CMS inmate was placed on Suicide Watch on September 9, 2013 after cutting his left arm with a razor. According to the Interdisciplinary Progress Note, "I/P reports he wanted to kill himself because he cannot take being in prison. I/P reports past SA by cutting his wrists in 2009 and he had to be treated at the emergency room. I/P reports if left alone he will try to kill himself by finding a way to cut his wrist and arms." The inmate was placed on Suicide Watch pending MHCB placement in another prison. However, on the following day, September 10, the same clinician assessed the inmate cell-side and wrote in another Interdisciplinary Progress Note that "I/P was stabilized and removed from 1:1 suicide watch. I/P reports he is no longer feeling like harming himself and he no longer wants to die." The clinician apparently consulted with two other clinicians, the MHCB placement order was rescinded, and the Suicide Watch was discontinued. A MHTP completed two days later, on September 11, did not address the suicidal or self-injurious behavior, nor the September 9 SA. A progress note completed by the clinician a few weeks later, on September 27, stated "F/U every 90 days or by IP request."

There were numerous concerns associated with this case. No SRE was used to place this inmate on Suicide Watch status on September 9, nor to remove him from Suicide Watch status less than 24 hours later on September 10. There was no clinical justification in the September 10 Interdisciplinary Progress Note to remove the inmate from Suicide Watch status nor was there consideration of a downgrade to Suicide Precaution. The clinician conducted a cell-side assessment of the inmate on September 10, with no explanation of why it was not conducted in private. There was no treatment planning to address the problem of suicidal or self-injurious behavior or continuity of care.

In another case (FSP 2), the inmate was transferred from Wasco State Prison (WSP) to FSP on September 4, 2013. During the initial health screening by nursing staff, he self-reported as 3CMS and taking psychotropic medication. Although apparently referred to mental health from screening, he was not seen by mental health until two months later on November 4, when he was seen by a clinician as result of a self-referral. His psychotropic medication, however, had been continued.

In another case (FSP 3), medical staff responded to a medical emergency in the administrative segregation unit on November 13, 2013. Upon arrival, the inmate complained of chest pain and anxiety. He was stabilized and placed on the urgent mental health referral list. Review of the record on December 3 did not find documentation of any assessment by mental health staff. This reviewer requested an investigation by the CMH, and later received word that a clinician had assessed the inmate nine days later on November 22, but had not yet written an Interdisciplinary Progress Note.

In another case (FSP 4), on November 4, 2013, mental health received an emergency referral from custody regarding notification by the inmate's family that the inmate might be suicidal.

Upon assessment, the inmate denied any SI and indicated he was upset following a weekend visit by his girlfriend. In addition, he reported the second anniversary of his mother's death was approaching and that it was a sad time for him. No SRE was completed.

In another case (FSP 5), a clinician saw an inmate on November 8, 2013 for a one-week follow-up. The inmate appeared tearful, anxious, and stressed following "recent news that his wife wants to leave him." He also reported having financial concerns and difficulty sleeping. He denied any SI. Sleep hygiene and relaxation training were discussed. The clinician noted "consider 3CMS placement if I/P continues distress; currently I/P is ambivalent about volunteering for treatment." Several days later, on November 12, the inmate was seen by a psychiatrist after referral by the PC. The inmate reported AH which "usually just say his name but have told him to kill self. He believes they are from his mind playing tricks and he will not do what they say." The inmate reported feeling irritable and having difficulties with both sleep and appetite. He denied any suicidal intention, but "states he thought about suicide." The inmate was diagnosed with Bi-Polar Disorder and psychotropic medication was initiated. He was recommended for 3CMS level of care. He was seen the same day by another clinician and reported similar symptoms. No SRE was completed by either clinician.

It appeared to this reviewer that there was reluctance and/or hesitation to complete SREs on inmates presenting with possible SI, even if ideation was denied. It also appeared inmates were placed on suicide observation status infrequently.  The last placement on Suicide Watch status was on November 13, two weeks before the audit.  Few incidents of self-injurious behavior, and none for November 2013, were reported.  After this reviewer's record examination, corrective action by the CMH was taken immediately in several cases.

In contrast to the numerous problems detected during the chart review, there was strong continuity of care provided in another reviewed case (FSP 6). The inmate, housed in the administrative segregation unit, had conditionally threatened to commit suicide if he were found guilty and sentenced to serve additional time. He appeared in court on September 5, 2013. On his return later that day, he appeared to be in a "hypomanic state, saying hello to everybody loudly and telling everybody to accept his last BYE BYE." Although denying any SI, he was placed on Suicide Watch as a precaution. He was assessed the following day. An SRE indicated a moderate acute risk for suicide. He remained on Suicide Watch pending MHCB placement in another prison. He was seen daily by mental health and was subsequently transferred to a MHCB at Kern Valley State Prison (KVSP). He remained in the MHCB until September 12 when he was returned to FSP.  Five-day follow-up assessments were conducted as scheduled.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro- shield, Ambu bag, and cut-down tool.

**Training**: According to training records, approximately 98 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  Approximately 99 percent of custody staff received annual suicide prevention training. One hundred percent of mental health clinicians received the seven-hour SRE training in March 2013 and completed the mentoring program.

There were several issues with annual suicide prevention training at FSP. For example, non-custody staff, including medical, nursing, and mental health, did <u>not</u> receive the required one-hour classroom instruction in suicide prevention.  They were simply offered handouts and quizzes from an FSP training bulletin. During the 2012-2013 training calendar, only 20 minutes was devoted to classroom instruction for suicide prevention for custody staff because the In-Service Training (IST) coordinator decided to include two other subject areas within the one-hour time block. For 2013-2014, the calendar was corrected and the original one-hour block was devoted to suicide prevention. Given that FSP had five inmate suicides during 2012-2013, it was disconcerting that FSP did not devote more time and resources to suicide prevention training.

**Recent Suicides**: FSP had five inmate suicides in 2012-2014. In the **<u>first</u>** case (<u>FSP 7</u>), on May 21, 2012, the inmate was found hanging by a sheet from the light fixture conduit of his GP cell. He also sustained massive bleeding due to cutting with two razor blades. He had entered CDCR in 1999 to serve a 32-year to life sentence for murder and had been at FSP since December 2009. He did not have a history of mental illness and had not been on the caseload.  His sister committed suicide in March 2010. The inmate had several medical problems including chronic shoulder pain. According to the CDCR Suicide Report, there were no obvious precipitating factors leading to the inmate's suicide. A suicide note found in the inmate's cell referred to his chronic shoulder pain and expressed frustration that medical staff was not providing sufficient pain medication. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "Review whether the pain management provided this inmate was adequate, and if necessary, generate their own Quality Improvement Plan."

In the **<u>second</u>** case (<u>FSP 8</u>), this 3CMS inmate was found hanging by a sheet from the light fixture conduit of his administrative segregation unit cell on May 30, 2012. He had entered CDCR in 2005 to serve an 11-year sentence for assault.  In 2009, he was assessed an additional eight years to serve for assault on an inmate. At the time of his death, he was scheduled for trial on June 8, 2012 for attempted murder of an inmate, and facing a "third strike" conviction. He had been housed in the administrative segregation unit since November 2010. The inmate had various diagnoses over the years, including Anxiety Disorder, Bi-Polar Disorder, and Depressive Disorder, and had a family history of suicide. He also had several medical problems, including acute neck pain for which he was prescribed methadone. On May 15, 2012, the inmate threatened suicide after being informed that he was being temporarily transferred from the administrative segregation unit at CSP/Sac to the administrative segregation unit at FSP due to overcrowding. He was placed on Suicide Precaution in a MHCB at CSP/Sac. The following day, May 16, the inmate was discharged from the MHCB with a recommendation for placement in an administrative segregation unit at CSP/Sac. Instead, he was transferred to the administrative segregation unit at FSP. On May 30, the day of his suicide, the inmate was seen by his primary care physician (PCP) who discontinued his methadone because of suspected misuse.

The CDCR reviewer found two possible precipitating factors in the inmate's suicide. One was his upcoming trial on an attempted murder charge and possible life sentence if convicted.  The other was the abrupt discontinuation of his methadone medication. The reviewer also found several problems, including inconsistent SREs completed on May 15 and May 16, the lack of collaboration between mental health and custody staff regarding a mental health recommendation to retain the inmate in the administrative segregation unit at CSP/Sac, the

unawareness by the PCP who discontinued the inmate's methadone on the day of the suicide that he had recently been on Suicide Precaution, and custody staff's failure to observe the inmate at 30-minute intervals. There were two bases for recommendations and corrective actions through a QIP: (1) "The inmate's bridging order for opiate medication was allowed to expire without interviewing the inmate and was discontinued; and (2) Tier COs signed for all the completed welfare checks, although from 0700 to 2100, the ASU S&E COs actually completed the welfare checks."

In the **third** case (FSP 9), the inmate was found hanging by a wire and sheet from a wall bracket of his GP cell on November 13, 2012. His body was found in *rigor mortis*. The inmate had entered CDCR in September 1989 to serve an 18-year to life sentence for murder, and had been at FSP since June 2012. He was placed at the 3CMS level of care in May 2011.  He was diagnosed with Mood Disorder and received psychotropic medications until he asked that they be discontinued in September 2012. A few months later, on November 7, 2012, a week before his death, the inmate met with his PC. He was described as frustrated and complaining of ongoing pain in his back and shoulder. He also requested an appointment with the psychiatrist to restart his psychotropic medication. No obvious precipitating factors for the suicide were found by the CDCR reviewer.  A few delays in mental health evaluation and treatment planning were noted, but they were deemed unrelated to the suicide and therefore did not result in any formal recommendations. In addition, although his body was found in rigor mortis, his GP housing unit was not subject to either 30-minute or 60-minute rounds.

In the **fourth** case (FSP 10), the inmate was found hanging by a sheet from the shelf of his administrative segregation unit cell on March 8, 2013. He had entered CDCR in May 2012 to serve a five-year sentence for assault, and had been at FSP since June 2012. The inmate did not have a history of mental illness or being on the caseload. He did, however, have various recent medical problems, including swelling of his face and limbs. The autopsy found a large tumor on his liver that had been unknown to both the inmate and medical staff.

The inmate had been transferred to the administrative segregation unit during the early morning of March 8 for protective custody. Contrary to policy, he was <u>not</u> placed in a retrofitted new intake cell. He committed suicide several hours later. Although the CDCR reviewer did not find any obvious precipitating factors for the suicide, the inmate appeared to be concerned about his recent medical problems. His last letter contained numerous bizarrely written passages that may have indicated undiagnosed mental illness. It remained unclear why the inmate requested protective custody on the day of his death.

The Suicide Report contained five bases for recommendations for corrective action through a QIP: "(1) Documentation of the emergency response indicated that life-saving measures were not begun on the tier, but while the inmate was being transported to the TTA….; (2) Correctional staff failed to properly perform CPR, as only chest compressions were done and the Ambu-bag or personal mouth barriers were not used; (3) When re-housed in ASU, the inmate was not placed in a retrofitted intake cell, and was not housed with another inmate….; (4) Documentation of the required 30-minute welfare checks in ASU indicated that the checks exceeded 30-minutes several times on March 8, 2013 in violation of DAI policy….; and (5) Several recommendations

were identified pertaining to ways FSP could improve their emergency response and staff documentation of the response."

In the **fifth** case (FSP 11), the inmate was found hanging by a sheet from the shelf of his administrative segregation unit cell on May 27, 2013. He entered CDCR in March 2010 to serve a nine-year sentence for burglary and other offenses and was house at FSP. He had served five years of the sentence and had approximately 11 months remaining before parole. Although the inmate did not have a history of mental illness and was not on the caseload, he self-reported hallucinations to a nurse shortly after entering the administrative segregation unit on May 18, 2013. He was seen by a clinician on May 20 and reported vague AH for a two- to three-year period of time. The inmate denied any SI and "was considering entering 3CMS level of care." The clinician's diagnostic impression was "Rule-Out Amphetamine-Induced Psychotic Disorder," with a plan for follow-up, although no follow-up date was in the progress note. Although the CDCR reviewer did not find any obvious precipitating factors for the suicide, he or she referred to the inmate's recent letters to his wife indicating stress over a pending transfer to a new prison, uncertainty about his future as a gang dropout, anxiety about release in 2014, and AH threatening to hurt him as possible precipitants. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "Despite the availability of clinical mental health staff on call during weekends, nursing staff did not appropriately process the 'urgent' referral written on May 18, 2013 as they failed to alert mental health staff of the referral." The inmate was seen by a clinician two days later on May 20.  The Suicide Report did not offer a recommendation and QIP for the clinician's May 20, 2013 progress note that lacked a date for follow-up with the inmate. This reviewer raised this issue with the CMH during the on-site assessment and the administrator agreed that a corrective action was warranted.

## 5)   **California Institution for Men (CIM)**

**Inspection**: December 5-6, 2013

The CIM housed approximately 4,800 inmates, including inmates with Level I, II, and III security classifications. CIM had two CTCs containing a total of 34 MHCBs; two administrative segregation units for caseload and non-caseload inmates; and a Reception Center (RC) with capacity for approximately 600 inmates. Approximately 34 percent of CIM inmates were on the caseload, with 1,597 3CMS and 48 EOP inmates.

**Screening/Assessment**: Several new admissions were observed undergoing the medical intake and mental health screening processes on December 5.  The Initial Health Screening process using CDCR Form 7277 was conducted by two nurses assigned to the R & R Unit. Each was observed to be appropriately conducting the screening process in a private cubicle. The 31-item mental health screening form was completed in private offices of two clinical psychologists. This process worked quite well, with staff having full access to the MHTS to verify the inmate's history of mental health/suicidal behavior.

Daily psych tech rounds in both administrative segregation units were observed on December 5. In the Palm Unit, the psych tech spent an adequate amount of time conducting rounds, but

stopped to converse with only caseload inmates.  In the Cypress Unit, the psych tech attempted to converse with all inmates in the unit.

**Housing**: Both CTCs, Units 1 and 4, did <u>not</u> have suicide-resistant cells.  Unit 1 had rooms with small gaps between the walls and window frames, faucet handles, and large-hole ventilation grates in the ceilings that could be used for suicides by hanging. Unit 4 also had rooms with small gaps between the walls and window frames, faucet handles, exposed toilet chase piping, and large-hole ventilation grates in the ceiling that could be used for suicides by hanging.  Both CTCs contained suicide-resistant beds.

Each administrative segregation unit contained eight retrofitted new intake cells.  There were several conditions that were problematic with regard to housing of newly admitted inmates.  Not all newly admitted inmates were housed in retrofitted cells during their first 72 hours in segregation.  Not all of the retrofitted cells housed newly admitted inmates.  Several newly admitted inmates were double-celled in non-retrofitted cells.

Because of lack of space, several inmates on RC orientation status were housed in one of the administrative segregation units.  They were not locked down and were permitted yard privileges.

**Observation**: On December 5, 2013, there was one inmate on Suicide Watch and five inmates on Suicide Precaution in the CTCs.  When the observation forms for the inmates on Suicide Precaution were requested, it took the CNAs an inordinate amount of time to locate them, indicating that documentation was not being recorded at 15-minute staggered intervals. One CNA was observed "catching-up" by recording at least four notations on one observation sheet as this reviewer was attempting to review it. Other forms contained recordings of exact 15-minute intervals. Because it appeared that this inauthentic documentation on the observation sheets was being done by multiple CNAs, this reviewer discussed this problem with the nursing supervisor.

There was <u>no</u> documentation in either administrative segregation unit of the required 30-minute cell checks, except occasionally by a third shift crew who documented the checks correctly. However, review of Guard One data to verify observation of new intake inmates in the administrative segregation units for their first 21 days indicated no violations in either unit during the 24-hour period of December 3, 2013.

**Management/Treatment Planning**: This writer reviewed various eUHRs of inmates on suicide observation status and inmates referred to mental health on an urgent and/or emergent basis. The charts indicated that inmates were consistently seen daily by clinical staff while on suicide observation and that inmates referred to mental health were generally seen timely basis. However, several problems were found. In one reviewed case (<u>CIM 1</u>), the inmate had an extensive history of mental illness and self-injurious/suicidal behavior. He had most recently engaged in self-injurious behavior on October 3, 2013 when he cut his wrist and arm at the county jail and required emergency care. He entered CDCR through CIM on October 18, 2013, and was placed in a MHCB for assessment on November 18. A MHTP completed on November 20 included the problem of "SI," with the appropriate objective of "reduce/eliminate SI" and the

reasonable interventions of "daily clinical, therapeutic contact using CBT/DBT to facilitate cognitive restructuring and increase problem solving skills." The inmate remained in the CTC until December 2.  His discharge SRE included the following treatment plan: (1) EOP LOC, (2) Med per MD, (3) Weekly follow-up by assigned clinician, and (4) Crisis intervention as needed. This treatment planning from the SRE was inadequate for the objective of reducing and/or eliminating SI in an inmate with an extensive history of self-injurious behaviors. In fact, the inmate was returned to the MHCB two days later on December 4 for SI with a specific plan to commit suicide.

Review of a recent SPRFIT audit indicated 100 percent compliance with the treatment planning section of the SRE. Discussion of the audit with the SPRFIT coordinator indicated that the audit measured only whether the treatment planning section of the SRE was completed, and <u>not</u> whether the treatment plan contained any specific strategy to reduce SI and/or whether subsequent progress notes addressed the appropriate problem area within the inmate's treatment plan.

Review of 20 sample records of inmates referred to mental health on an urgent or emergent basis for SI during 2013 found that 18 (or 90 percent) appropriately included completion of an SRE.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut down tool.  One CO had considerable difficulty opening the emergency response kit in the Palm administrative segregation unit.

**Training**: According to training records, 100 percent of custody staff and nursing staff were currently certified in CPR.  One hundred percent of custody staff received annual suicide prevention training, but medical and mental health staff had not received annual suicide prevention block training. One hundred percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: CIM had two inmate suicides during 2012-2014. In the **<u>first</u>** case (<u>CIM 2</u>), the inmate was found unresponsive in his GP SNY cell on October 27, 2012. The death was originally classified by CDCR as an accidental overdose, but the medical examiner determined on June 6, 2013 that the death was a suicide by amitriptyline poisoning. The inmate entered CDCR in 1997 to serve a 13-year to life sentence for first-degree murder, use of a firearm, great bodily injury, and possession of controlled substances. Before this inmate's confinement in CDCR, he was a practicing psychiatrist in California and had been consistently employed until his commitment offense, which involved a violent dispute with his neighbor. He remained incident-free throughout his confinement, and never incurred any RVRs.

Upon entering CDCR, the inmate experienced sleep disturbance, decreased energy levels, lethargy, and other symptoms related to depression. He also admitted to being a substance abuser. He was eventually placed on the caseload in 2004 at the 3CMS level of care. By September 2008, his behavior was stabilized and he was discharged from the caseload.  He also had several medical problems, including degenerative joint disease, chronic kidney disease, Hepatitis C, and gout. He had been receiving amitriptyline as a keep-on-person pain medication.

On October 12, 2012 the inmate appeared at his initial Board of Parole Hearing (BPH) and was denied parole. The BPH committee encouraged the inmate to "stay discipline free, earn positive chronos, and get self-help groups, and seek therapy." He completed all of the BPH recommendations for treatment, including Anger Management, Creative Options, and Narcotics Anonymous. Fifteen days later, on October 27, the inmate committed suicide.

Although the inmate did not leave a suicide note, the CDCR suicide reviewer offered the inmate's recent parole denial as the possible precipitating factor to the suicide, suggesting that after he had already served 15 years of his sentence, and the denial of parole "most likely had a significant negative affect and he may have felt that no matter what he did, he could not secure parole." The Suicide Report did not contain any recommendations.

In the **second** case (<u>CIM 3</u>), the inmate was found hanging in his RC cell during the afternoon of August 11, 2014. He was placed at CIM on July 3, 2014, expressed SI the following day, and was transferred to an MHCB and placed on Suicide Precaution. He was discharged from the MHCB on July 23 and returned to the RC at the EOP level of care with a diagnosis of Schizophrenia. At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report, had not been examined by this reviewer.

## 6)      *California State Prison – Centinela (CEN)*

**Inspection**: December 17, 2013

CEN housed approximately 2,782 inmates, most of whom were at Level III security classification. It had a 15-bed CTC that was licensed only for medical inmates and was not used as an MHCB. The CTC had four alternative housing cells it used for inmates identified as suicidal and awaiting placement in an MHCB. There were two administrative segregation units for caseload and non-caseload. Less than one percent of inmates were on the caseload, including 38 3CMS and 1 EOP.

**Screening/Assessment**: Intakes for several new admissions were observed. Two nurses asked all required questions on the Initial Health Screening CDCR Form 7277. Each nurse was assigned an office with sufficient privacy. Confidentiality was maintained by custody staff stationed outside the closed glass door.

Daily psych tech rounds in the administrative segregation units were observed on December 17. A psych tech was assigned to each administrative segregation unit and conducted rounds twice per day. Observed rounds were conducted appropriately.

**Housing**: Although the alternative housing cells were suicide-resistant, they were <u>not</u> equipped with suicide-resistant beds, which was problematic. Inmates on any suicide observation level slept on mattresses on the floor.

Administrative segregation unit A-5 housed several 3CMS inmates. It had eight retrofitted new intake cells. Administrative segregation unit A-6 had 11 retrofitted cells. Although there were newly-arrived inmates in A-5, all of the new intake cells in A-5 were empty. All of the

retrofitted cells in A-6 cells were filled with inmates beyond their initial 72 hours. As a result, newly arrived inmates in both units were housed in non-retrofitted cells.

**Observation**: Although both Suicide Precaution and Suicide Watch were used frequently in the CTC for suicidal inmates, psychiatric observation was also being used.  There is no CDCR system-wide policy or procedure relative to psychiatric observation, nor is it ever appropriate to use it in lieu of Suicide Precaution or Suicide Watch.  Like some other CDCR prisons, Centinela developed a local policy, contained in its CTC Policy and Procedure Manual, that set forth the purpose of psychiatric observation: "(1) To prevent suicide and/or injury to self, other inmate(s) patient(s), and/or staff; (2) To assess the inmate-patient's mental health condition and treatment needs; and (3) To provide interim treatment measures pending transfer to an MHCB." Clinical judgment dictated whether or not inmates on psychiatric observation status had allowable items, including beds and clothing in their cells. Although it was not stated in the policy, inmates on psychiatric observation status were normally observed at 30-minute intervals, well outside the standard of care for observation of suicidal inmates.

Without opining on the efficacy of utilizing psychiatric observation status as a step-down from suicide precautions and/or as an observation level for inmates in mental health crisis but not suicidal, there were several problems with the use of psychiatric observation for suicidal inmates. First, if the clinician assessed the inmate as suicidal and determined that items and possessions should be restricted, the inmate should be placed on either Suicide Precaution or Suicide Watch status. Second, a suicidal inmate should never be observed at 30-minute intervals, regardless of his or her level of acuity. Third, because use of psychiatric observation status is not sanctioned by CDCR nor referenced in the *Program Guide*, it does not appear to be included in any continuous quality improvement review.

The administrative segregation units' log books were examined for correct documentation by custody officers of 30-minute checks of non-intake cells. Documentation in the A-6 log was slightly late, but both logbooks were generally accurate.  Review of Guard One data to verify the observation of newly arrived inmates in A-5 for their first 21 days indicated only one missed check during the 24-hour period of December 16, 2013.

**Management/Treatment Planning**: eUHRs of inmates on suicide observation status or referred to mental health staff on an urgent and/or emergent basis were reviewed.  These records indicated that inmates were consistently seen daily by clinical staff while on suicide observation status and were seen timely after referral to mental health.  However, several problems were found.  For example, in one reviewed chart (CEN 1), on October 14, 2013 the inmate was referred to mental health staff by nursing and reported that "I'm losing my mind. I can't think straight." He was described in the clinician's progress note as "alert, verbal, fully oriented. Mood and affect depressed. Tearful at times. Recently arrived at CEN after lengthy stay in Contra Costa County Jail. Passive SI without plan or intent." An SRE was completed and the inmate was assessed as moderate acute risk for suicide. The inmate was not placed on Suicide Precaution. The follow-up visit scheduled by the clinician was not until one week later.  Three days later on October 17, the inmate was placed on Suicide Precaution by another clinician after displaying almost the same behavior that was seen on October 14.

28

In another reviewed case (CEN 2), an emergency referral was sent to mental health staff on November 18, 2013 after the inmate's mother called the facility expressing concern that he might be suicidal. When interviewed by the clinician, the inmate stated "No, I'm not suicidal. What I told my mother is that I would go on suicide watch before I let them send me to Jamestown." The inmate had several risk factors, including being at the 3CMS level of care with a Depressive Disorder, and refusing psychotropic medication, resulting in a worsening mood. In addition, his fiancée had recently lost her job and called off their wedding for financial reasons. The inmate had been recently informed he would soon be transferred to Sierra Conservation Center (SCC) which was further away from his fiancée. He reported sleep and appetite difficulties, and that "Everything looks gray at the moment." He was referred to the psychiatrist and scheduled for follow-up with the clinician in one week. He was not placed on Suicide Precaution nor was an SRE completed. Two days later on November 20, the inmate was seen by a psychiatrist and displayed much of the same behavior as he did two days earlier, and he again denied SI. The clinician noted that the "inmate had been seen by three different clinicians since November 16 based on both self-referral and mother calling in reporting concerns about the inmate that he might be suicidal....and that he had expressed SI." He was not placed on Suicide Precaution nor was an SRE completed.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were certified in CPR.  Ninety-nine percent of custody staff were compliant with annual suicide prevention training, but neither medical nor mental health staff had completed the annual block training. One hundred percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: CEN had one inmate suicide during 2012-2014. In that case (CEN 3), the inmate was found by his cell mate hanging by a sheet from the shelf and desk of his GP cell during the morning of January 1, 2012. The inmate had entered CDCR in August 1996 to serve a 19-year to life sentence for murder and had been housed in Cen since April 2009. He was not on the caseload and did not have a history of mental illness or suicidal behavior. Although possible precipitating factors for the suicide were not specifically identified by the CDCR reviewer in the Suicide Report, the inmate was described as isolative and withdrawn, had not had any family contact since 2007, and was facing deportation upon his eventual parole. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "Documentation of the emergency medical response....contained multiple inconsistencies in the recording of the various actions taken."

**7)**     **Calipatria State Prison - Calipatria (CAL)**

**Inspection**: December 18, 2013

CAL housed approximately 3,850 inmates, most of whom were at Level IV security classification. It had an 18-bed OHU with alternative housing cells that were used for inmates identified as suicidal and awaiting placement in an MHCB. There were two administrative segregation units for caseload and non-caseload inmates. Less than one percent of CAL inmates were on the caseload, with 17 3CMS and two EOPs.

**Screening/Assessment**: There were no new admissions during the audit.

Daily rounds by two psych techs in the two administrative segregation units were observed on December 18. A psych tech was assigned to each unit and conducted rounds twice per day. Administrative Segregation Unit A-5 housed caseload inmates. There were four 3CMS inmates in the unit on December 18. The psych tech was observed to be <u>not</u> spending any additional time with these caseload inmates and did not complete a Psych Tech Daily Rounds Form on any of them during the rounds. In the stand-alone unit, the psych tech conducted rounds appropriately.

**Housing**: Although no inmates were on a suicide observation status during the December 18 audit, review of the unit log indicated that most inmates on suicide observation were placed in two designated cells. Although all of the OHU rooms were suicide-resistant, they were <u>not</u> equipped with suicide-resistant beds. Inmates on any suicide observation level had to sleep on a mattress on the floor, which is problematic.

Administrative segregation unit A-5 had eight retrofitted new-intake cells and unit A-6 had ten. Most new intakes were housed in A-5. All of the retrofitted cells were occupied by inmates housed in the unit longer than 72 hours, while numerous newly admitted inmates in the unit were housed in non-retrofitted cells. For example, one inmate who had arrived the day before was at the 3CMS level of care, and was housed in a cell with mesh screening on the interior door containing large holes, shelves, a gap between the bunk and wall, and desk/stool bracket, all of which were conducive to suicide by hanging. Cells in the unit had fewer protrusions, with most furnishings made of cement.

**Observation**: Although both Suicide Precaution and Suicide Watch were used in the OHU for suicidal inmates, psychiatric observation was also occasionally used in the unit. This practice was not sanctioned by CDCR nor referenced in the *Program Guide*. Mental health officials at CAL developed a local operating procedure (LOP) which explained "psychiatric observation": "When an inmate is experiencing psychotic symptoms such as hallucinations and delusions that may have harm contents (both toward self and others), he will be placed on Psychiatric Observation." Clinical judgment dictated whether or not inmates on psychiatric observation were allowed property including beds and clothing in their rooms. Psychiatric observation procedure required observation at 15-minute intervals.

Log books for each of the two administrative segregation units were reviewed for documentation of 30-minute cell checks of non-intake cells by COs. The logbooks for both administrative

segregation units bore no documentation of these checks.  Supervisory and line correctional staff were unaware of the CDCR policy requiring these checks.  Review of Guard One data to verify observations of new-intake inmates during their first 21 days found over 49 violations during the 24-hour period of December 16, 2013.

**Management/Treatment Planning**: Review of  eUHRs of all inmates referred to mental health staff on an urgent and/or emergent basis during the 30-day period before the audit indicated that all 14 inmates were seen timely.  Due to time constraints, records of inmates on suicide observation status were not reviewed.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 96 percent of custody staff and 100 percent of nursing staff were certified in CPR.  With regard to annual suicide prevention training, 96 percent of custody staff received the training during 2013, but only 51 percent of medical and mental health personnel received the training. After the audit, the Chief Nurse Executive provided documentation indicating that 86 percent of nursing staff had received suicide prevention training during 2013.  Most of the workshops were conducted  from December 17 through December 31, 2013, after this reviewer's on-site audit.  One hundred percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: CAL had one inmate suicide during 2012-2014. In that case (Cal1), the inmate was found during the morning of October 24, 2012 hanging by a sheet from the top bunk of his GP cell. His body was in *rigor mortis*. The inmate had entered CDCR in May 1999 to serve a 12-year to life sentence without parole for murder, and had been housed at CAL since September 2010. He was not on the caseload and did not have a history of mental illness or suicidal behavior. Although possible precipitating factors for the suicide were not specifically identified by the CDCR reviewer in the Suicide Report, the inmate had little family contact for several years.  It was speculated that his death might have been related to gang affiliation. The reviewer found several deficiencies in the emergency response and offered three bases for recommendations for corrective action through a QIP: "(1) CDCR cell standards policy requires that inmates maintain an unobstructed view of the interior of their cells at all times to facilitate security and checks by custodial staff. During the night-time hours of October 23, a sheet of obscured secured the inmate's bunk so that correctional staff could not complete their duties to identify a 'living, breathing' inmate in the cell; (2) Confusion regarding the initiation of CPR in the context of apparent rigor mortis occurred during the emergency response procedures for the inmate; and (3) CDCR custodial practices require prompt sounding of alarms when an inmate is unresponsive due to a suspected medical emergency....an excessive amount of time elapsed before the alarm was initiated and the cell door opened."  An additional problem in the emergency medical response was that vital signs were attempted while the ligature was still tightly wrapped around the decedent's neck.

31

**8)**     **Richard J. Donovan Correctional Facility (RJD)**

**Inspection**: December 19-20, 2013

RJD housed approximately 3,270 inmates, most of whom were at Level III security classification.  RJD had a 28-bed CTC, with 14 rooms designated as MHCBs, and two administrative segregation units for caseload and non-caseload inmates. There alternative housing beds in one of the administrative segregation units, a mainline EOP unit, and an SNY unit. Inmates temporarily placed in these cells were observed on continuous Suicide Watch while awaiting an MHCB.  Approximately 59 percent or 1,935 inmates in the prison were on the caseload.

**Screening/Assessment**: An intake screening for one new arrival  was observed on December 20. The Initial Health Screening CDCR Form 7277 process was conducted by a nurse assigned to the R & R Unit. The Nurse's Office provided only partial privacy, as the door remained open with an officer stationed in the doorway. This was unnecessary because the inmate being processed was elderly, frail, and physically disabled. Observation by this reviewer was stopped when a nursing supervisor lingered in the area and the nurse conducting the assessment became uncomfortable.

Daily psych tech rounds in administrative segregation unit were observed on December 20. The psych tech had been working in the unit for several years and had good rapport with the inmates. Psych Tech Daily Rounds Forms were completed for all inmates in the unit. It was this psych tech's practice to defer completing the forms until rounds were finished.  This is a questionable practice because it is unrealistic for the psych tech to remember the mental status of each of the approximately 150 inmates in the unit after rounds have been finished.  The psych tech did not spend any additional time conversing with the approximately 54 EOP inmates and 33 3CMS inmates in the unit during rounds.

**Housing**: All 14 MHCBs in the CTC were suicide-resistant and furnished with suicide-resistant beds. Administrative segregation unit B-6 contained 12 retrofitted new-intake cells. There were problems with the housing of newly-admitted inmates into the administrative segregation units: (1) not all newly-admitted inmates were housed in retrofitted cells; and (2) not all of the retrofitted cells housed newly admitted inmates. The same problems were found in administrative segregation unit B-7, which had 12 new-intake cells. This practice was particularly concerning because an EOP inmate committed suicide on June 23, 2012 within several hours of entering unit B-6 and being placed in a non-retrofitted cell.

**Observation**: Observation sheets for inmates on suicide observation were attached to the door of each MHCB cell.  This was a good practice that helped facilitate observation at required intervals. All forms appeared to have been documented correctly by CNAs, although the forms being used had 15-minute time intervals pre-printed on them.

This reviewer found that COs in both administrative segregation units were not conducting 30-minute rounds of inmates in non-intake cells, and instead were using "ASU *Hourly* Welfare Track Sheets." It was reported that COs used the Guard One system only to record 30-minute

checks of inmates who had pink intake sheets on their cell doors.  In unit B-6, this reviewer found at least six inmates on new-intake status who were housed in non-retrofitted cells and were not receiving 30-minute checks via the Guard One system because the pink intake sheets were not placed on their doors. In two of these cases, the inmates were on the caseload, with one just returned from DSH and the other just returned from an MHCB placement.

Review of Guard One data to verify observation of newly admitted inmates in administrative segregation for their first 21 days found over 188 violations in B-6 during the 24-hour period of December 18, 2013.

**Management/Treatment Planning**: Review of eUHRs of inmates on suicide observation status or referred to mental health on an urgent and/or emergent basis indicated that inmates were consistency seen daily while on suicide observation and were seen timely by mental health after referral. However, several problems were found. In most of the reviewed cases, concordance between the treatment plan and subsequent progress notes was not found.  In one case (RJD 1), the portion of the MHTP dated December 6, 2013, while the inmate was in a MHCB, listed the problem area of "SI" and appropriately contained "interventions" for teaching dialectical behavioral therapy (DBT) distress tolerance skills, assisting the inmate with developing a safety plan for managing SI, developing goals and reasons for living, and clarifying safety concerns, among other things. A clinician's subsequent progress note dated December 11, 2013, when the inmate had returned to the administrative segregation unit, was generally concordant with the earlier treatment plan. It stated: "Tx plan while in ASU will focus on utilizing cognitive behavioral therapy (CBT) and relaxation techniques and learning coping skills to increase ability to self-regulate mood, decrease impulsivity, and manage reported sxs of depression and reported AH in conjunction with medication management."

In another reviewed case (RJD 2), the inmate was admitted to an MHCB on November 15, 2013, after being observed with a ligature around his neck and suicide note in the cell. The treatment plan dated a week later, on November 23, did <u>not</u> identify "SI" as a problem area.  The treatment plan section of the MHCB discharge SRE, dated November 23, stated simply: "Discharge from MHCB to EOP level of care for 5-day follow-up protocol.  I/P may benefit from DBT skills training. Encourage the inmate to allow himself to feel the emotions that accompany his loss of his mother. Assist IP with medical follow-up care upon arrival to HU." A review of subsequent progress notes during November and December 2013 did not find any DBT therapy groups offered to the inmate.

Another reviewed case (RJD 3) showed inconsistency between descriptions of the inmate's behavior in documentation by the primary clinical staff and documentation by the psych tech on the Psych Tech Daily Rounds Forms. The inmate had written a Health Services Request Form on November 15, 2013 stating that he was refusing to eat his meals in protest of his administrative segregation status. Two other request forms, dated November 14 and November 18, spoke of his self-reported worsening of mental health symptoms, including AH. According to the progress notes by the PC on November 18, the inmate had become very isolative, refusing to come out of his cell or participate in any programming. The inmate was also refusing his psychotropic medication and some of his meals, and his cell window was almost completely covered.  He reported sleeping only three hours per night. He had been placed on the high-risk list upon return

33

from an MHCB placement in September 2013. The clinician also noted that the inmate continued to be irritated regarding his administrative segregation placement and the circumstances relating to it, but demonstrated insight into how his problems could worsen by his isolating himself from others.  However, the psych tech' s Daily Rounds Forms for November 4 through November 17 indicated that the inmate expressed no mental health concerns, had a fair appetite and fair sleeping pattern, pleasant mood, participated in programming, and showed no signs of decompensation.

Apart from the problems discussed above, mental health staff at RJD had begun to develop a fairly good quality improvement process for suicide prevention. A designated clinical psychologist had been tasked with responsibility for several aspects of an audit, including the SRE mentoring program, preparation of executive summaries of individual sentinel events, audit of the high-risk list, creation of a "tier walk report" (a shorter version of the executive summary audit), and audit of Interdisciplinary Progress Notes. To date, this quality improvement process has not included auditing of treatment planning for suicidal inmates or measurement of concordance between treatment planning and subsequent progress notes.

The IDTT process worked well during three observed case presentations. During the team meeting, it was reported to this reviewer that although recreation may be permitted for an inmate on MHCB status based on clinical judgment, visits and telephone calls were prohibited by custody practice. Conversely, inmates housed in the CTC for medical reasons were not denied recreation, visits, or telephone calls. Review of the *Program Guide* indicated that recreation was permitted, but visits and telephone calls for a MHCB inmate were not addressed.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: Training records indicated that 100 percent of custody staff and nursing staff were certified in CPR.  One hundred percent of custody staff were compliant with annual suicide prevention training. Medical and mental health staff did <u>not</u> receive annual suicide prevention training. One hundred percent of mental health clinicians received the seven-hour SRE training and completed the mentoring program.

This reviewer asked a mental health clinician who conducted the annual suicide prevention training for custody staff if he/she was able to present all of the PowerPoint slides in the CDCR lesson plan.  The clinician responded that not all of the slides were presented because of personal preference to allow time for dialogue with participants and review pertinent local issues, including recent RJD suicides. This valuable approach indicated that the current the one-hour time allotment for annual suicide prevention training is insufficient.

**Recent Suicides**: RJD had six inmate suicides during 2012-2014. In the **<u>first</u>** case (<u>RJD 4</u>), the inmate was found hanging by a sheet from the top bunk of his SNY cell during the early morning of June 11, 2012. His cellmate was asleep. Because medical responders were unable to establish an oral airway due to the decedent's clenched teeth, he was probably in at least partial *rigor mortis*.  The inmate had entered CDCR in June 2004 at the age of 18 to serve a 40-year to life sentence for second-degree murder.  He had been housed at RJD since August 2011 and had

been on the caseload since July 2010 and at the EOP level of care since April 2012. He had multiple MHCB admissions, the last of which occurred in July 2011. He had a self-reported history of multiple SAs and a family history of suicide. In violation of a policy requiring an SRE every 90 days for one year following discharge from an MHCB, no SRE had been completed since July 2011, shortly after this inmate's last MHCB placement.

The inmate also had various prior administrative segregation and SHU terms, the last in November 2011. In April 2012, his level of care was increased to EOP due to his deteriorating mental health, including poor mental status, AH, SI, poor hygiene, and inconsistent medication compliance. There was disagreement among his IDTT, principally with the psychiatrist, as to whether or not the inmate had a serious mental illness. He had been diagnosed with a Psychotic Disorder, but the psychiatrist believed he had Anti-Social Personality Disorder. The inmate's psychotropic medication was discontinued on May 3, 2012, allegedly at the inmate's request, but there was no documentation as to why it was discontinued. During this time, there was a one-month gap in weekly PC contacts. Psychotropic medication was re-started a month later, on June 1, 2012, after the inmate complained of increasing AH and depressed mood. He denied any SI. An order to restart his psychotropic medications was given, but when "the inmate stated he would not take medication daily, the psychiatrist negotiated with him to take the medication every third day. The inmate missed multiple individual and group therapy appointments and refused yard during the month before his suicide. He also had various somatic complaints and appeared obsessed about possible HIV infection, although test results were all negative.

Although possible precipitating factors for the suicide were not identified by the CDCR reviewer, the Suicide Report noted that the inmate had recently lost family support and that his mental health had deteriorated significantly during the preceding several months. The Suicide Report contained four bases for recommendations for corrective actions through a QIP: "1) Despite the inmate's history of SI and attempts and his frequent crisis bed admissions prior to arriving at RJD, no SREs were completed by clinicians at the RJD; (2) The inmate demonstrated on-going reluctance to comply with his medication routine. Psychiatrist attempted to encourage his compliance by prescribing psychotropic medications on an as needed basis and based on the inmate's request; (3) Documentation describing the inmate's psychological concerns appeared inconsistent with his presentation and suggested the need for a more in-depth review of his history along with more detailed interviewing of his current symptoms; and (4) A one-month gap in weekly PC contacts occurred in May 2012, when the inmate was a participant in the EOP level of care, which requires weekly clinical contact."

In the **second** case (RJD 5), the inmate was found hanging by a sheet from the top bunk of his administrative segregation cell during the evening of June 23, 2012. He had been single-celled in a double cell. The inmate had been involved in a fight earlier in the day and was subsequently placed in administrative segregation unit B-6.  He should have been placed in a retrofitted cell, but he was not.  He committed suicide by tying a sheet through the gap between the wall and the bunk, then around the support that holds the bunk to the wall, and then around his neck.  The inmate had entered CDCR in October 2003 to serve a 12-year sentence for burglary. He served his entire sentence at RJD before his death.

This inmate had a long history of mental illness, SAs, and self-injurious behavior. He was placed at the EOP level of care a month after his October 2003 admission. He was initially diagnosed with Schizoaffective Disorder, and later with Bi-Polar Disorder. He was on the high-risk list for chronic SI. Although he expressed SI in December 2010 and engaged in self-injurious behavior in February 2011, his last SRE was on November 15, 2010. He last saw the psychiatrist on June 11, 2012 after becoming noncompliant with his psychotropic medication because of perceived weight gain. His medication was adjusted. He last saw his PC on June 15 and again on June 22, the day before his suicide. The inmate denied any current SI.

According to the CDCR reviewer, the inmate's last treatment plan, dated June 21, 2012, "was vague and did not include all current symptoms, specifics of past treatment and treatment response, or significant psychiatric events such as SAs and episodes of self-harm." It was noted that the inmate was estranged from his family due to his sexual orientation and was becoming increasingly anxious regarding a potential parole in March 2013. The reviewer noted that "the inmate worried almost constantly about things over which he had no control....As his parole date drew nearer he focused on what might go wrong and feared he would fail again in the community. As he already had two strikes, he feared another conviction would lead to a life sentence."

The Suicide Report contained five bases for recommendations for corrective action through a QIP: "(1) Several omissions and inconsistencies in the 30-minute Welfare Check Tracking Sheet were noted during the review period; (2) This review noted difficulties in the mental health treatment of the inmate as outlined in the progress notes, the treatment plan, and treatment goals; (3) An SRE was not completed following an event in which the inmate cut himself deeply, requiring sutures; (4) On February 21, 2011, the inmate initiated a fight in the morning food line and received an RVR. No referral was made for a mental health evaluation for possible mitigation of the RVR; and (5) After the fight on February 21, the inmate cut himself and disclosed his behavior to a psychiatrist on March 3, 2011. An SRE was not completed, the treatment plan was not updated for self-harm as a problem area until June 2011, and documentation did not indicate that IDTT team members were informed of the self-harm incident." The Suicide Report did <u>not</u> include that the inmate was placed in a non-retrofitted cell on June 23, 2012, shortly before his suicide.

In the **<u>third</u>** case (<u>RJD 6</u>), the inmate was found hanging in the Prison Industries Authority (PIA) Shoe Factory by a supervisor during the afternoon of August 8, 2013. The inmate had entered CDCR in March 2010 to serve a 20-year sentence for sexual abuse of children.  He had been at RJD since August 2012. He did not have a history of mental illness or suicidal behavior, and was not on the caseload. He had little contact with his family, and had few disciplinary infractions. The CDCR reviewer did not find any precipitating factors. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "Neither the PIA employee who found the inmate nor his supervisor used their personal alarms to alert others of the emergency. As a result, there was a delay in the emergency response time."

In the **<u>fourth</u>** case (<u>RJD 7</u>), the inmate was found hanging by a sheet from the top bunk of his SNY cell during the afternoon of September 18, 2013. He had been single-celled in a double cell after his cell mate was transferred to a different prison several days earlier. The inmate had

entered CDCR in August 2006 to serve a sentence of life without parole for first-degree murder. He was transferred to RJD in March 2013, when he informed the intake nurse that he was "living on the edge". Shortly after his arrival, he was placed in the SNY after an allegation of an in-cell sexual assault. The inmate had a vague history of mental illness.  He had not been on the caseload since October 2010. He self-reported three prior SAs and a family history of suicide. The inmate had little contact with his family and had few disciplinary infractions. He had several medical problems, and sporadically used a wheelchair due to a degenerative bone disease. He frequently complained about pain management; he was tapered off morphine in 2010 and prescribed over-the-counter pain medication and anti-inflammatory medication. He continued to file appeals regarding medication until the time of his suicide.

The CDCR reviewer noted several possible precipitating factors, including a sentence of life without parole, recent loss of his cell mate to a prison transfer, lack of family support, dissatisfaction with pain management, and apparent upset with a CO on the morning of his suicide who had allegedly taken his special diet identification card. The Suicide Report contained four bases for recommendations for corrective action through a QIP: "(1) The inmate was tapered off his morphine pain medication by CDCR physicians, and offered over-the-counter pain medication in its place. Despite documentation that indicated the inmate felt his pain level was poorly managed on the new regime, medical did not make any changes to his medications; (2) Upon arrival at RJD on March 21, 2013, the inmate screened positive for previous mental health and suicidal behavior and was not referred to mental health; (3) On the day of his death, the inmate 'may have had his special diet card taken and put on the bottom of the stack, and him being sent back to the food line. As a result, the inmate allegedly left the chow hall without being able to eat;' and (4) At the time of the review, there were no instructions posted on the door of the mental health building for how inmates can request emergent or urgent mental health services."

In the **fifth** case (RJD 8), the inmate was found hanging by a sheet from a ventilation grate of his SNY cell during the morning of November 26, 2013. The inmate had entered CDCR in July 2009 to serve a 29-year sentence for attempted murder and robbery. He had two previous CDCR commitments. The inmate was transferred to RJD on July 22, 2013.  He had an extensive history of mental illness in CDCR, including five in-patient hospitalizations from 1994 to 2009, during his two prior CDCR commitments. Following these commitments, he was designated as a Mentally Disordered Offender and was hospitalized further. Upon his last commitment to CDCR in July 2009, he was initially diagnosed with Schizoaffective Disorder by History and placed at the 3CMS level of care. In September 2011, following a series of fights with other inmates and poor programming, disorientation, pressured speech, derailed answers, flat affect, and obsessive complaints of being wrongly classified as Hispanic, he was elevated to the EOP level of care. He often refused his psychotropic medication and was on a *Keyhea* order. The inmate had little contact with his family, and had not received any visitors nor made any telephone calls since 2010. He had four RVRs for fighting, all in close proximity to each other during an eight-month period in 2011. A fifth and final RVR was issued in June 2012, involving indecent exposure front of a female staff member.

During 2012, the inmate's mental health continued to deteriorate, and he was placed on the High-Risk List at RJD, to which he had transferred on May 25, 2012.  He was in intermediate

inpatient care at the Salinas Valley Psychiatric Program from September 2012 through July 2013. Upon his return to RJD on July 22, 2013, his diagnosis was Psychosis NOS, Rule-Out Substance Induced Psychosis, Schizophrenia by History, Poly-Substance Dependence, and Personality Disorder NOS.

On October 25, 2013, his SNY housing unit was placed on lockdown following two staff assaults. All therapeutic groups were canceled and the inmate's PC saw him weekly at cell front. During that time, the clinician's progress notes generally indicated that he was stable, his thought processes were clear and organized, and he appeared to be coping well with lockdown conditions. On November 19, 2013, however, the inmate told the clinician that he was experiencing stomachaches which he attributed to swallowing pages from a Bible ten years earlier. He also submitted health care requests that complained of cramping, constipation, and pain. He was scheduled for an IDTT meeting the following day, November 20, but did not attend.  Despite his non-attendance, a progress note from the meeting included responses to a mental status examination (MSE).  The CDCR reviewer in this case questioned how an MSE could have been completed without the inmate being present at the IDTT meeting. The PC last saw the inmate on November 25,when he appeared relieved that the lockdown had ended, but was still fixated on his stomachaches being attributable to eating pages from the Bible or possibly to his psychotropic medication. He also reported sleep and appetite problems.

The CDCR reviewer did not offer any specific precipitating factors for the suicide, but noted that a number of chronic risk factors, including his long prison sentence, poor impulse control, and history of psychotic symptoms, coupled with the month-long lockdown in his housing unit, resulted in deteriorating mental health and possible delusions, elevating his risk for suicide.

The Suicide Report listed numerous deficiencies and six bases for recommendations for corrective action through a QIP: "(1) Documentation received from Investigative Services Unit (ISU) contained in the preliminary incident package was incomplete and contained discrepancies, contradictions, and omissions; (2) The inmate's property was not available for inspection to this reviewer as a result of a mix-up with his property in the ISU; (3) Both the psychiatrist and psychologist appeared to have re-dated notes written previously without modifying or adding information to make them current; (4) The inmate did not attend the IDTT of November 20, but there appeared to be a MSE completed on this date. The time and date of the MSE completion was not clearly documented on the CDCR Form 7388; (5) Two different inmates said that the inmate communicated to custody officers that he was suicidal before he died; and (6) Documentation reviewed as part of this evaluation suggested that mental health ducats during late October 2013 through early December 2013 lockdown were disproportionately completed compared to medical and dental. During the lockdown, there were numerous cell-front and/or dayroom mental health contacts but very few face-to-face, confidential contacts. The lack of confidential, face-to-face contacts provided is problematic." A subsequent investigation determined that there was no evidence to support the allegation that the inmate self-reported that he was suicidal shortly before committing suicide.

In the **sixth** case (RJD 9), the inmate was found hanging by a sheet from the upper locker of his GP sheet during the evening of August 19, 2014. The inmate entered CDCR in September 2010 to serve a sentence of unknown duration length for robbery. He was transferred to RJD on

38

February 25, 2011. The inmate was placed on the caseload at the EOP level of care.  His most recent diagnosis was Schizophrenia and Mood Disorder NOS. At the time of this report, the eUHR, the Suicide Report, and other documents from the CDCR secure website had not been examined by this reviewer.

**9)      California Medical Facility (CMF)**

**Inspection**: January 7-8, 2014

CMF housed 2,063 inmates, most of whom were at Level III security classification. CMF had two 23-bed MHCB wings.  Temporary alternative housing of inmates who required an MHCB was available in observation cells within the MHCBs. There were three administrative segregation units for caseload and non-caseload inmates. Approximately 40 percent of CMF inmates were on the caseload, with 430 3CMS and 400 EOPs.  In addition, DSH ran a 199-bed acute care program and a 208-bed intermediate care facility (ICF).

**Screening/Assessment**: Intake screening of one new admission was observed on January 7.  The Initial Health Screening CDCR Form 7277 process was conducted by a nurse assigned to the R & R Unit. The nurse asked all of the required intake screening questions.  The Nurse's Office provided sufficient privacy and confidentiality, but an officer was stationed inside the room rather than in the hallway, compromising the privacy and confidentiality of the assessment. Replacement of the solid door with one containing a large window could accommodate both safety for staff and auditory privacy for the inmate.

Daily psych tech rounds on all three administrative segregation units were observed on January 8. Rounds in units I-3 and M-3, which housed caseload inmates, were quite thorough.  The psych tech documented the form for each inmate as the psych tech conducted the rounds, which this reviewer had seen only rarely before this site inspection.  Rounds in the Willis Unit, which housed GP inmates, were more cursory and best described as "drive-by" rounds.

It was reported that mental health clinicians tried to complete the 31-Item Mental Health Screening Questionnaire for non-caseload new intakes to administrative segregation in the TTA. However, a recent SPRFIT audit found that in December 2013, in 50 percent of cases, the screening forms were not completed for new intakes.

**Housing**: All rooms in the two MHCBS were suicide-resistant and furnished with suicide-resistant beds.  The three administrative segregation units contained a total of 11 retrofitted new intake cells. However, housing of newly-admitted inmates in administrative segregation was problematic in several respects.  Not all newly admitted inmates were housed in retrofitted cells during their first 72 hours, while some retrofitted cells housed inmates who were not new admittees.  Although several newly-admitted caseload inmates in administrative segregation had histories of self-injurious and suicidal behavior and were housed in non-retrofitted cells, three of the seven retrofitted cells in Unit I-3 were empty.

39

**Observation**: There were several problems with observation of patients in the MHCBs. First, although it was reported that all patients were observed at 15-minute intervals, review of observation sheets indicated that there were gaps because the assigned CNA on the unit had left for a lunch break and no other staff were conducting rounds in her place. More concerning was the fact that after nursing staff were eventually located to resume the 15-minute rounds, this reviewer observed staff falsifying the observation sheets by filling in times for the observations that had been missed. It was obvious which patients were on Suicide Watch because there was a staff conducting constant observation from outside the room door.  However, it was impossible to determine which patients were on Suicide Precaution without reviewing each chart. The census board located on the wall of the Nurse's Station did not distinguish patients on Suicide Precaution/Suicide Watch from other patients on the units. The Chief of Mental Health (CMH) at CMF accompanied this reviewer on his inspection of the MHCBs and immediately initiated corrective action based on these findings.

In the Willis Unit, Guard One data was reviewed for custody checks on administrative segregation new intakes during their initial 21 days.  The compliance rate was 95 percent during the 24-hour period of January 6, 2014.  Review of documentation for 30-minute rounds of non-new intake inmates in administrative segregation indicated that officers were noting the checks in *each* inmate's individual custody file. The impracticality of this practice, which would require an officer to enter a notation in each of the 20 inmates' files twice per hour during an entire eight-hour shift, made this practice suspect.  It should be noted that the Willis Unit, for GP administrative segregation inmates, housed only 41 inmates in this 125-bed unit on January 7.

**Management/Treatment Planning**: This writer reviewed eUHRs of various inmates on suicide observation status or referred to mental health on an urgent and/or emergent basis. The reviewed records indicated that inmates were consistently seen daily by clinical staff while on a suicide observation status, and that inmates referred to mental health generally seen timely.  Review of charts of inmates recently discharged from suicide observation status  indicated a mix of adequate and inadequate treatment planning. For example, in one case (CMF 1), the inmate was admitted to an MHCB on November 2, 2013 after expressing SI. An undated MHTP correctly listed the problem of SI, but listed the treatment goal as simply "maintain safety."  When the inmate was released from the MHCB ten days later, on November 12, 2013, the treatment plan section of the SRE stated "Discharge to EOP with 5-day follow-up, provide group and individual treatment to promote adjustment to recent incarceration, reality orientation, and management of AH, medication management." There was no indication in subsequent progress notes that such individual and group treatment was being provided.

Conversely, in another case (CMF 2), the inmate was re-admitted into the MHCB on November 1, 2013 for the fourth time since September 2013 for SI. He was a gang dropout with safety concerns and  well known to the clinical team for threatening suicide to avoid being housed in administrative segregation. The inmate's treatment plan, developed on November 6, documented the problem as "the inmate-patient was not suicidal, but in order to get away from ASU, he uses SI to get admitted."  The treatment goal was "the inmate-patient's coping resources are limited and it is crucial to learn some coping skills through counseling to be able to adapt to his environment." The treatment plan also noted that "he makes progress while in MHCB, but has not been able to maintain progress when he returns to Ad Seg. His clinician was notified of his

40

return and need for support." The discharge SRE on November 6 adequately contained a treatment plan consistent with the treatment plan that stated: "Discharge to EOP with 5-day follow-up; provide support/encouragement/ frequent contacts to promote ability to deal with frustrations of waiting for endorsement to another institution; individual and group treatment to promote increase in tolerance for frustration, better coping skills, and rational thinking." Review of five-day follow-up progress notes indicated that the inmate was receiving individual counseling for his perceived manipulative behavior (e.g., "Discussions regarding the use of the 'S' word and going to a MHCB would not help him to reduce his level of care and would hold up any endorsement/ transfer, which he seemed to understand at that moment."

Although a recent SPRFIT review found that 100 percent of inmates released from an MHCB during December 2013 had an accompanying discharge SRE, the review did not address whether the SREs contained a viable treatment plan.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, approximately 81 percent of custody staff and 100 percent of nursing staff were certified in CPR. Approximately 94 percent of custody staff were compliant with annual suicide prevention training, although they were being instructed by IST instructors and not by mental health clinicians. Ninety-five percent of mental health clinicians received the seven-hour SRE training and completed the mentoring program. Until a workshop was initiated in December 2013, health care staff had not been receiving the required annual suicide prevention block training.

**Recent Suicides**: CMF had four inmate suicides during 2012-2014. In the **first** case (CMF 3), the inmate was found hanging by a sheet from two ventilation grates of his Unit M-3 administrative segregation cell during the evening of August 17, 2012. He had several prior CDCR confinements. In 2009, he was paroled to Atascadero State Hospital but, following an assault on a program psychiatrist in July 2011, was returned to CDCR to serve a new 14-year sentence for assault. The inmate had several MHCB admissions in early 2012, resulting in elevation to the EOP level of care and transfer to Unit M-3 ASU at CMF in July 2012. He was considered highly assaultive and received many RVRs resulting in both SHU and administrative segregation terms throughout his multiple CDCR confinements.

This inmate had a long history of mental illness, with four SAs by hanging and self-injurious behaviors including cutting and setting his cell on fire. His most recent MHCB admission was in April 2012. He was diagnosed with Schizoaffective Disorder and had been recently noted as stable on psychotropic medication. The inmate was seen weekly by his PC. Although initially described as feeling stressed by his current administrative segregation placement and upset about some missing property in early July 3, 2012, he was seen on the day of his suicide, August 17, and described as "having a good mood, his thought process was organized and goal directed, and he seemed future oriented." The CDCR  reviewer in this case did not identify any specific factors precipitating the suicide.  However, the reviewer did note that the inmate was housed in the same administrative segregation cell for the entire month of his confinement and had not been housed in either of the two new intake cells. The CDCR reviewer also noted that, although the inmate

was not required to receive Guard One 30-minute welfare checks because he was beyond his initial 21 days in administrative segregation, other inmates on new intake status were designated for those checks but there was no documentation that the required checks occurred during the shift in which the inmate was found hanging. The Suicide Report contained one (1) recommendation for corrective action regarding the lack of documented welfare checks.

In the **second** case (CMF 4), the inmate was found hanging by an extension cord from a support beam of his EOP GP cell during the early morning of August 14, 2013. Although he was housed in a double cell, no other inmate was assigned to the cell. The inmate entered the CDCR in July 1999 to serve a seven-year to life sentence for attempted first-degree murder of his sister. He had a long history of mental illness and was most recently diagnosed with Bipolar Disorder. He had been placed at the 3CMS level of care upon his admission. He was transferred to CMF in July 2007 and elevated to the EOP level of care. This inmate also had several medical problems, including obesity, chronic back pain, and prior surgeries to repair a ruptured Achilles tendon and to reconstruct his knee. He often used a wheelchair due to chronic pain and struggles with incontinence.

The inmate also had a history of being physically abused by other inmates and was regularly assigned a single cell. In July 2012, he was scheduled to move from his single EOP cell to a 3CMS dormitory. He became overwhelmed by this reclassification decision and attempted suicide by overdosing on Tylenol, muscle relaxants, and sleeping pills. He was admitted to an MHCB. The clinician noted upon discharge in August 2012 that "any future plans to change his housing should be planned with his clinician, as it represents a high risk situation of SIB." He was returned to single-cell status in an EOP housing unit.

Several events occurred in early and mid-2013 that might have contributed to this inmate's eventual suicide in August. He was notified in February 2013 that one of his sons had died. On August 24, 2013, he attended a parole hearing and received an unexpected five-year deferral, which resulted in mild SI. Due to his chronic medical problems, the inmate informed a nurse on June 5, 2013 that he "elects to be Do Not Resuscitate (DNR) and request that no heroic interventions be attempted." On July 16, 2013, he wrote a 23-page letter to the *Coleman* Compliance Unit expressing overall frustration with confinement and SI. In the letter, he stated he had 400 pills that he could use to kill himself and he was experiencing AH. The letter also indicated that he gave the pills to his PC. A progress note from the clinician dated July 18 stated that "IP continues to deal with various stressors. He is anxious and worries excessively about others' opinions of him. His depressive symptoms appear to have moderated somewhat. Thoughts of self-harm are still present but he denies any specific plans." An SRE completed on July 19, 2013 noted that "IP acknowledged that he had been having suicidal thoughts and plans but stated he had written a letter almost 2 weeks ago when he was very depressed and frustrated." The clinician noted his chronic suicide risk as "moderate," and his acute suicide risk as "low to moderate."

On July 25, 2013, the inmate met with his IDTT who decided to transfer him to a different EOP unit with a different psychiatric team. He expressed reservations about moving to the new unit. In a subsequent progress note dated August 9, his PC stated that the inmate "is less depressed that he was several weeks ago. He does not report any SI or plans.... He continues to express

42

anxiety about potential problems he could face on a different unit." Two days later on August 11, 2013, the inmate was seen by another clinician in response to a suicide letter that correctional staff had found in his cell. The inmate denied any SI, but endorsed several suicide risk factors. The clinician wanted to admit the inmate to an MHCB, but a conferring psychiatrist disagreed and the MHCB admission was not initiated nor was an SRE completed. Instead, the clinician decided to place the inmate on "24-hour custody watch with a 5-day follow-up." The following day, August 12, the clinician again saw the inmate. He stated, "I tried to be in a better mood tomorrow. I know I get upset by the past. Not sure what I will do (on August 14, the day of transfer). I might refuse to move." The clinician rescinded the five-day extended observation because it was thought to be contrary to LOP at CMF. The inmate committed suicide two days later.

The Suicide Report contained four bases for recommendations for corrective action through a QIP: (1) Despite a post order requiring security checks to be conducted at 30-minute intervals, checks were not recorded for at least two hours prior to discovery of the decedent; (2) An SRE was not completed as required following the mental health clinician's interview with the inmate on August 11, 2013; (3) Important clinical documentation was missing from the eUHR, including documentation of consultations between the mental health clinician and psychiatrist on August 12 regarding possible placement in an MHCB and the decision to rescind the five-day follow-up and custody welfare checks; and (4) CTC by-laws at CMF should be revised to allow admitting privileges to clinical psychologists in order to avoid clinical disagreements with psychiatrists regarding admitting decisions.

The Suicide Report, however, omitted several deficiencies that contributed to this suicide. When the inmate was seen by a clinician on August 11 and August 12, an SRE was not completed despite strong indications of suicide risk. In addition, any disagreement between clinical staff regarding the level of suicide risk should always result in a conservative approach and decision for MHCB admission. Absent a decision for MHCB admission, if mental health staff still felt the inmate was at risk for suicide, alternative interventions, such as placement on Suicide Watch/Suicide Precaution in alternative housing and/or extended observation, five-day clinical follow-up and custody welfare checks, should be used. As discussed in this report, although the efficacy of five-day clinical follow-up and 60-minute welfare checks as currently practiced were questionable, these strategies were available but were not fully used in this case.

During the CMF audit, this reviewer discussed this suicide with mental health officials at the prison and from CDCR mental health administration. They discussed various corrective actions taken as a result of this suicide, but said that various CTC licensing requirements created an impediment to allowing psychologists to have admitting privileges, and that "admitting privileges to the CTC for psychologists has been highly contentious within the medical community at California Training Facility (CTF) and system-wide." To date, *no* solution has been found to correct the problem.

As a result of the deficiencies in this suicide case, the Chief Psychiatrist and Acting Chief Executive Officer (CEO) at CMF conducted a two-hour suicide prevention training workshop for over 150 mental health and custody staff in September 2013. The workshop, conducted before completion of the Suicide Report, included a presentation of 50 PowerPoint slides that utilized

43

this inmate's suicide as a teaching tool for appropriate documentation of clinical decisions, required completion of SREs when suicide risk is indicated, appropriate use of an MHCB, and other tools to manage suicide risk.

In the **third** case (CMF 5), the inmate was found hanging by a sheet from a ventilation grate of his GP cell during the early morning of September 21, 2013. He entered CDCR in April 2004 to serve a 16-year to life sentence for second-degree murder. The inmate had initially been placed at the 3CMS level of care during his first few years of confinement, based on a self-reported history of mental illness and suicidal behavior while confined pretrial in a county jail and while he was in the community. His initial diagnosis by a CDCR clinician was "Major Depressive Disorder, Mild, with considerations given to Substance-Induced Mood Disorder and Alcohol Dependence in Institutional Remission." In August 2006, the inmate was removed from the caseload based on remission of symptoms of mental illness and being free of psychotropic medication for more than one year. He had no history of gang involvement or RVRs.

On August 23, 2013, the inmate was referred to mental health.  He reported AH and difficulty sleeping, and requested resumption of his psychotropic medication. He was placed at the 3CMS level of care and referred to a psychiatrist.  On September 9, 2013, he was seen by another clinician who completed a mental health evaluation. The inmate again stated that he was hearing voices telling him "he would be better off dead than in prison, and telling him to kill himself. The inmate believed the voices were coming from his desk, the TV and books in the library. He experienced tactile disturbances consisting of someone touching his legs at night. He expressed paranoid beliefs about the sexual orientation of his work supervisor. He was having nightmares, sleeping three hours a night, and experiencing diminished appetite." According to the evaluation, "the inmate stated that he did not want to reach the point where he hurt himself or anyone else." According to an SRE completed on September 9, the inmate was assessed at a "moderate" chronic risk and at acute risk for suicide. The clinician conferred with a supervisor and psychiatrist before deciding that "Placement in MHCB was considered, but the IP stated he had no suicidal intent or plan and was seeking help (although he has many statistical risk factors, and has AH with command for self-harm)." The inmate was elevated to the EOP level of care and placed in a double cell in another housing unit. He was also seen by a psychiatrist and restarted on psychotropic medication, while denying any SI.

On several occasions, the inmate reported to custody and mental health staff that he was being sexually harassed by several transgender inmates in the housing unit and/or an incident of attempted rape.  He reported to the IDTT on September 19, 2013 that he was inappropriately touched in the shower by other inmates. He also recanted any AH and commands to kill himself and stated that he had been placed at the EOP level of care by mistake,  claiming there was a miscommunication between himself and the Spanish interpreter regarding his symptoms. He requested a return to work on the mainline. However, he did not deny the attempted rape. According to the IDTT, because the inmate did not display any signs of acute psychosis nor appear to be crisis, they decided to return him to the 3CMS level of care. His diagnosis was changed to Paranoid Schizophrenia with a rule-out for Post-Traumatic Stress Disorder (PTSD). The following day, September 20, the inmate was transferred to another housing unit, where the alleged attempted rape had occurred, and placed in a single cell. He committed suicide the following day.

44

The CDCR reviewer in this case found that the inmate had been notified of his mother's death on September 17, but did not disclose this information to any mental health staff.  The Suicide Report contained three bases for recommendations for corrective action through a QIP: (1) Despite reporting on several occasions that he had been sexually assaulted, custody, mental health, and nursing staff all failed to properly initiate the PREA (Prison Rape Elimination Act) protocol; (2) The referral to the psychiatrist written on August 23 was not processed correctly and the inmate was not seen by the psychiatrist until 17 days later on September 9; and (3) The psychiatrist's order for psychotropic medication written on September 9 failed to reach the pharmacy and the medication had to be re-ordered by another psychiatrist one week later, on September 16. In addition to the failure to report the inmate being a victim of sexual assault, the inmate was re-assigned shortly before his death to the same housing unit in which the sexual assault occurred.

In the **fourth** case, the inmate (CMF 6) was found hanging in the bathroom area of his dormitory cell in the ICF during the early afternoon of July 7, 2014. He entered CDCR in December 1997 to serve a life sentence for attempted murder of his wife. He was transferred to CMF in January 2014. He had an extensive history of mental illness, with the most recent diagnosis of Major Depressive Disorder, Severe, Recurrent, and Personality Disorder NOS. He also had a history of attempted suicide by hanging in 2005 and 2013. Because the ICF is a DSH program and was not included in this assessment, this death was not reviewed for this report.

## 10)    California State Prison - Solano (CSP/Solano)

**Inspection**: January 9-10, 2014

CSP/Solano housed 4,121 inmates with Level II and III security classifications. CSP/Solano had a 15-bed CTC, with nine rooms designated as MHCBs. An administrative segregation unit contained six retrofitted cells that could be used for alternative housing of inmates requiring an MHCB.  Approximately 36 percent of CSP/Solano inmates were on the caseload, with 1,455 3CMS and 16 EOPs.

**Screening/Assessment**: Intakes screenings of several new admissions was observed on January 9.  The Initial Health Screening CDCR Form 7277 process was conducted by a nurse assigned to the Reception and Receiving (R&R) Unit. The Nurse's Office provided sufficient privacy and confidentiality, with custody staff stationed in the corridor.  The nurse conducted the intake screening process thoroughly.

Daily psych tech rounds in the administrative segregation unit were observed on January 10. There were approximately 53 3CMS inmates in the unit at the time.  The psych tech interacted adequately with most inmates who were awake during rounds, but there were no efforts to interact and/or at inspect cell conditions of inmates who were sleeping, including those on the caseload.  As at most of the other prisons, the psych tech did not complete the Psych Tech Daily Rounds Forms on caseload inmates until the rounds were completed.  This practice was unreliable because it was  unreasonable to expect psych techs to remember the mental status of each of the 53 caseload inmates in the unit after rounds were finished.

**Housing**: All of the MHCBs were suicide-resistant and furnished with suicide-resistant beds. The two administrative segregation units, Buildings 9 and 10, contained a total of ten retrofitted new intake cells. There were problems with the housing of newly admitted inmates in the administrative segregation units. Not all newly admitted inmates were housed in retrofitted cells during their initial 72 hours, and not all of the retrofitted cells housed newly admitted inmates. On January 10, two of the six intake cells in Building 10 were empty while at least eight new intakes were housed in non-retrofitted cells.

**Observation**: Although there were no inmates on Suicide Precaution/Suicide Watch during the site visit, there were several problems with observation of patients in the CTC. The nursing supervisor reported that all patients in the MHCB were on a Q-60 minute level of observation and that these rounds were not documented. Although not specifically prohibited within the *Program Guide*, observation at Q-60 minute intervals for patients in a crisis unit exceeded the standard of care.

Although CSP/Solano's local suicide prevention policy was revised in October 2013, it was outdated and inconsistent with the *Program Guide* and current CDCR policies. For example, the LOP stated that "no furniture shall be allowed in the room unless approved by the MHCB psychiatrist or psychologist or on weekends and holidays by the on-call psychiatrist. The inmate shall be initially issued a safety mattress on the floor..." This LOP was incorrect. All patients assigned to a MHCB were required to be housed in a room that had a suicide-resistant bed and a non-tear mattress. The LOP also incorrectly stated that "a psychiatrist or psychologist, in consultation with IDTT members, shall write an order to discontinue Suicide Precaution when the inmate-patient is no longer in imminent danger of self-harm. The inmate-patient shall then be moved to routine checks by nursing staff every 15 minutes and then, if clinically indicated, to every 30 or 60 minutes." This portion of the LOP was incorrect as well. The *Program Guide* requires that inmates on Suicide Precaution are required to be observed at 15-minute intervals, not *moved to* that level of observation. The *Program Guide* does not call for observation of MHCB patients at Q-30 or Q-60 minute intervals, although it does not prohibit them.

It was reported that use of alternative housing cells for inmates referred to an MHCB was infrequent and was last done in September 2013. However, review of the "Alternate/Temporary Housing Log" for that period, and discussion with the CMH, indicated that mental health staff were frequently using "psychiatric observation" status at Q-30 minute intervals for inmates placed in these alternative housing cells. As discussed above with regard to other CDCR prisons, it is inappropriate to use psychiatric observation status at Q-30 minute intervals pending MHCB admission when Suicide Precaution or Suicide Watch is indicated. Staff at CSP/Solano were frequently using Q-30 observation for inmates admitted to an MHCB and on Suicide Precaution, in violation of the *Program Guide*.

Guard One data on correctional staff checks on inmates during their initial 21 days in administrative segregation was reviewed. The compliance rate was 89 percent during the 24-hour period of January 6, 2014. Review of the administrative segregation unit log indicated that 30-minute rounds of inmates in non-intake cells were being documented.

**Management/Treatment Planning**: eUHRs of inmates on suicide observation status and inmates referred to mental health on an urgent and/or emergent basis were reviewed.  Inmates were consistently seen daily by clinical staff while on suicide observation status, and inmates referred to mental health were generally seen timely.  However, several problems were found. For example, in the first case (SOL 1), the inmate was admitted into the CTC on December 24, 2013 after expressing SI. A treatment plan was developed two days later, on December 26.  It correctly listed the problem of SI, but the stated treatment goal was simply "stabilize symptoms." When the inmate was discharged from the MHCB on January 1, 2014, the treatment plan section of the SRE stated that the inmate would be returned "to Adseg. with a 5-day follow-up by PC and hourly checks by custody. Inmate will see psychiatrist within one week of return to AdSeg.... Inmate encouraged to pursue transfer with custody, inmate would like to transfer to CMF to be with brother who is now there."  This narrative did not amount to an adequate treatment plan. When the inmate was readmitted to the CTC on January 7, 2014 for SI, he was initially placed on Q-30 minute observation which was downgraded the following day to Q-60 minute observation. Treatment planning remained inadequate.

In another case (SOL 2), the inmate was admitted into the CTC on December 31, 2013 for SI. The SRE indicated "high acute risk." However, he was placed on Q-30 observation and on the following day, January 1, 2014, the clinician ordered: "Continue CTC MHCB observation for suicide precautions and Q-30 minute for psychiatric observation." The inmate's treatment plan, dated January 2, 2014, listed a  treatment goal to "stabilize symptoms," which was inadequate. The patient was subsequently discharged from the CTC on January 8, but without a discharge SRE.  In another case (SOL 3), an inmate with an extensive and recent history of self-injurious behavior and multiple MHCB admissions was seen by a CTC psychiatrist on December 9. Although he had a depressed mood and continued to endorse SI ("I can't tell you the plans"), the clinician downgraded this inmate to Q-30 minute psychiatric observation status.

In another reviewed case (SOL 4), there was inconsistency between descriptions of the inmate's behavior in documentation by the primary clinical staff and documentation by the psych tech on the Psych Tech Daily Rounds Forms. The inmate was seen by his PC on December 3, 2013, appearing anxious about his Institutional Classification Committee (ICC) meeting the following day. He had been refusing his psychotropic medication during the preceding two weeks because he was waking up in the middle of the night in a panic. He expressed guilt and remorse for past mistakes and poor choices made and the harm caused to his family. He had a depressed affect and was observed to be tearful throughout the assessment, and was referred to the psychiatrist for medication evaluation. The inmate was seen by the psychiatrist a short time later that same day and was described as "highly labile, cries easily, cooperative, sad mood." However, according to the psych tech's documentation on the daily rounds forms for December 3, the inmate expressed no mental health concerns, had a good appetite and good sleeping pattern, pleasant mood, affect within normal limits, participated in programming, had not been prescribed any psychotropic medication, and showed no signs of decomposition.

This reviewer observed an IDTT meeting in the CTC. The patient (SOL 5) was readmitted to the CTC on January 7, 2014 for SI. For reasons that were unclear, he was currently on Q-60 minute observation.  This 3CMS patient had previously been in the CTC from December 24, 2013 through January 2, 2014. During the required five-day clinical follow-ups in the administrative

47

segregation unit, it was determined that he had been refusing his psychotropic medication and expressing SI. He had been placed in the administrative segregation unit for non-disciplinary, safety reasons. During the IDTT meeting, the inmate appeared concerned about the location of his property and possible increase in classification points due to an alleged verbal threat to a CO. There was little, if any, discussion about treatment planning or reference to strategies to reduce the patient's SI during the meeting. The escorting CO volunteered to ask about the inmate's property, which made the inmate appeared relieved and appreciative of this offer.

**Intervention**: All reviewed housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were certified in CPR. Ninety-four percent of custody staff had completed the annual suicide prevention block training. Although it was reported that many medical and mental health staff received suicide prevention training, it was not completed during the annual block training. Ninety-five percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: SOL had two inmate suicides during 2012-2014. In the **first** case (SOL 6), the inmate was found hanging by a sheet from the bunk of his GP cell during the early morning of July 13, 2012. His body was described by medical responders as "pale, unresponsive, slightly stiff". He had entered the CDCR in January 1991 to serve a 16-year to life sentence for second-degree murder of his mother. He had served 21 years of the sentence, was housed at CSP/Solano since July 2004, and had very few disciplinary problems. He had numerous chronic medical conditions including chronic back pain, Hepatitis C, and hearing impairment. He was never on the mental health caseload. Before his involvement in an altercation with another inmate on May 14, 2012, this inmate had not received an RVR since May 1999. The May 14, 2012 incident did not result in an administrative segregation placement, but he was re-housed in another GP unit. Although allegedly upset by the housing change, this incident occurred two months before his suicide. No other identified precipitating events were found by the CDCR reviewer. The inmate was viewed by staff and other inmates as a loner who kept to himself and followed a very rigid schedule. No recommendations for corrective action were generated as part of the CDCR Suicide Report.

In the **second** case (SOL 7), the inmate was found hanging in his GP cell during the afternoon of September 2, 2014. He entered CDCR in October 2007 to serve a 25-year to life sentence for second-degree murder. He was transferred to CSP/Solano on June 14, 2011. The inmate was placed on the caseload at the 3CMS level of care in December 2013. His most recent diagnoses were Post-Traumatic Stress Disorder and Polysubstance Dependence. At the time of this writing, the eUHR and other documents posted on the CDCR secure website, including the Suicide Report, had not been examined by this reviewer.

48

**11)**   <u>**San Quentin State Prison (SQ)**</u>

**Inspection**: January 21-22, 2014

SQ housed approximately 4,036 inmates at Level II, RC, and Condemned Unit security classifications. SQ had a variety of housing units, including a 38-bed CTC with 17 rooms designated as MHCBs; ten Specialized Care Beds for condemned inmates in the Central Health Services Building; three housing units held approximately 685 condemned inmates (the Condemned Unit, the Adjustment Center, and North Segregation); a five-tier administrative segregation unit; and a RC.  An OHU contained several retrofitted cells that could be used for alternative housing of inmates awaiting a MHCB, but were said to be used rarely. Approximately 28 percent of SQ inmates were on the caseload, including 1,072 3CMS and 67 EOPs.

**Screening/Assessment**: The intake and mental health screening processes of several new admissions were observed on January 21.  The Initial Health Screening CDCR Form 7277 process was conducted adequately in private by a nurse assigned to the R & R Unit.  The initial 31-item mental health screening form was completed in the private office of a clinical psychologist. This process worked well, with the clinician having full access to the MHTS to verify the inmate's history of mental health/suicidal behavior.

This reviewer observed daily psych tech rounds conducted by two psych techs assigned to the administrative segregation unit on January 22.  It was found that the two psych techs employed different practices. A psych tech observed on Tiers 1 and 2 only stopped and interacted with caseload inmates, while the psych tech on Tiers 3 through 5 was observed stopping and attempting to interact with all inmates regardless of their caseload status. As found at almost all of the other prisons, the psych techs did not complete the Psych Tech Daily Rounds Forms on caseload inmates until after the rounds were finished.  This practice raised questions as to the reliability of the documentation, given the apparent difficult the psych techs would reasonably be expected to have with remembering the mental health status of each of the approximately 78 caseload inmates housed in the unit.

In addition, this writer had the opportunity to observe completion of the 31-item mental health screening form that was administered to non-caseload inmates upon admission into the administrative segregation unit. The screening included completion of two forms: the original 31-item mental health screening form, as well a 14-item abbreviated form that was being pilot-tested. The process was problematic because the screening occurred in a very cramped officer station on the second tier, with an officer stationed at the door, thereby negatively impacting privacy and confidentiality.

This reviewer observed a psych tech conduct daily rounds on the Condemned Unit for inmates classified as "Class B," meaning they were serving a disciplinary sanction for an RVR, and were on the mental health caseload.  Psych tech rounds for all other condemned inmates, including the approximately 185 caseload inmates, were conducted only twice per month.

**Housing**: All 17 MHCB cells were suicide-resistant and furnished with suicide-resistant beds. The administrative segregation unit contained approximately eight new intake cells that had been retrofitted. However, there were problems with housing of newly admitted inmates in the administrative segregation unit.  Not all newly admitted inmates were housed in retrofitted cells during their initial 72 hours, and not all of the retrofitted cells housed newly admitted inmates. This reviewer observed at least five newly arrived inmates who were housed in non-retrofitted cells, and at least one of them was on the caseload.

**Observation**: All patients in the MHCB were required to be observed a Q-15 minute level of observation, unless they were on Suicide Watch status and received constant observation. The Observation Record form, used for documentation of observation of patients on Suicide Precaution, contained pre-printed 15-minute time intervals.  This was inconsistent with the *Program Guide* requirement for observation at *staggered* intervals that did not exceed 15 minutes.

With regard to custody checks of inmates in the administrative segregation unit, this reviewer examined the Guard One data, which is used to verify checks on newly admitted inmates in administrative segregation during their initial 21 days.  The data indicated a compliance rate of only 62 percent during the 24-hour period of January 21, 2014.  Review of the administrative segregation unit log found that 30-minute rounds of inmates in non-intake cells were not always being documented timely.

Correctional staff were required to conduct rounds at only 60-minute intervals in the three housing units holding condemned inmates.  These rounds were <u>not</u> recorded in any logbook.

**Management/Treatment Planning**: eUHRs of inmates on suicide observation and inmates referred to mental health on an urgent and/or emergent basis were reviewed. Although the reviewed charts indicated that clinical staff consistently saw inmates daily while on suicide observation status, and inmates referred to mental health seen timely, several problems were found.  For example, in the first case (<u>SQ 1</u>), the inmate had most recently been admitted to an MHCB on November 10, 2013 for SI and self-injurious behavior by cutting. An SRE documented an extensive history of suicidal and self-injurious behaviors, including head-banging, lacerations on his arms, and hanging. The patient was stabilized in the CTC and discharged four days later on November 14. He was assessed as a "high chronic risk" and a "moderate acute risk" for suicide. Follow-up assessments occurred as required. Several weeks later, during the evening of January 14, 2014, the inmate received distressing family news and again engaged in self-injurious behavior by head-banging. He was transferred to an MHCB and assessed by a clinician the following day, January 15. However, according to the SRE, the inmate did not have a history of SAs, did not have either current SI or ideation within past three months -- despite the fact that he had engaged in self-injurious behavior less than 24 hours earlier. The clinician completing the SRE consulted with other members of the IDTT and concluded that the inmate was a "moderate chronic risk"  and a "low acute risk" for suicide. This risk assessment, and recording of this patient's historical information regarding prior risk, were inconsistent with the November 2013 assessments. On January 15, 2014, the IDTT discharged the inmate from the MHCB to GP housing with five-day clinical follow-up and the following

50

treatment plan: "IP agrees to once again access safety plan with PC if new SIB urges arise." No "safety plan" could be found in the eUHR.

In another case (SQ 2), the inmate was admitted to an MHCB at some time before December 5, 2013. His initial treatment plan, dated December 5, listed the problem of "suicidal thoughts" and the goal of "eliminate suicidal thoughts." The inmate was stabilized in the CTC and discharged a week later on December 12, 2013. The discharge SRE contained the following treatment plan: "discharge to EOP LOC, 5-day follow-up, transfer back to home institution Avenal State Prison (ASP), and out-patient team notified." Notably, almost the exact same treatment plan by the same clinician was found for the MHCB discharge of another inmate (SQ 3) on the same day, December 12. On both December 16 and December 17, 2013, the inmate (SQ 2) received follow-up visits by an out-patient clinician. The two progress notes contained *exactly the same narrative* except for the different dates recorded on the forms. Because these two progress notes were identical, it was unclear whether the inmate was seen by this clinician on either or both of these dates.

In another reviewed case (SQ 4), the inmate, who was in the Condemned Unit, threatened suicide on December 16, 2013, following an argument with nursing staff. He appeared enraged, paranoid, and despondent. He had an extensive history of mental illness and suicidal behavior, and had recently been admitted to the CTC in November 2013. A clinician completed an SRE on December 16, assessed the inmate as being "high chronic risk" and "high acute risk" for suicide, and the inmate was admitted into an MHCB. A treatment plan completed two days later, on December 18, listed the problem of "suicidal thoughts" and the goal to "resolve suicidal thoughts." The inmate was stabilized in the CTC and discharged the following week, on December 23, 2013. The discharge SRE contained the following treatment plan: "(1) IP will be discharged from CTC to EOP LOC and will be moved to East Block (EB), (2) medication monitoring with adjustments as needed, (3) weekly 1x1 session with PC and follow-up in five days, (4) attendance of groups and recreation therapy, (5) to maintain stability, and (6) continuous focus on suicide prevention."

Treatment planning, in treatment plans themselves and in the treatment plan sections of discharge SREs, were problematic in nearly all of the reviewed charts reviewed, and clearly in all three cases discussed above. Of interest, an SRE audit conducted internally at SQ in December 2013 found that treatment plan "goals and objectives were identified" in 67 percent of audited MHCB cases, and treatment plan "interventions were identified" in 100 percent of audited MHCB cases. These audit findings are a stark contrast to this reviewer's findings and raise questions regarding the efficacy of the quality improvement process at SQ.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were certified in CPR. Ninety-seven percent of custody staff and none of the medical and mental health staff received annual suicide prevention training during 2013. Eighty-nine percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

51

**Recent Suicides**: SQ had eight inmate suicides, including four on the Condemned Unit, during 2012-2014.  In the **first** case (SQ 5), the inmate was found hanging by a shoelace from the top bunk of his GP cell during the early afternoon of April 25, 2012. His body was in *rigor mortis*. He had last been seen alive during breakfast approximately eight hours earlier. The inmate had entered CDCR in April 2004 to serve a 16-year to life sentence for second-degree murder of his ex-girlfriend.  Although he previously attempted suicide following the murder in January 2002, and had been on suicide observation status at the county jail, the inmate did not have a history of mental illness and was not on the caseload. He had no prior criminal record.  He had served approximately eight years of the sentence and had been housed at SQ since August 2010.  He had very few disciplinary problems. The inmate had frequent visits by both friends and family members, including a visit three days before his death on April 22. He did not have any significant medical problems. The CDCR reviewer did not find any precipitating factors leading to this suicide.  Other than the lack of required welfare checks in GP housing that allowed the inmate's suicide to go unnoticed for a significant amount of time, no bases for recommendations were offered.

In the **second** case (SQ 6), the inmate was found hanging by an electrical cord from the bookshelf of his Condemned Unit cell during the late afternoon of May 27, 2012. He entered CDCR in 1999 to serve a 60-year to life sentence for multiple counts of child sexual assault. In June 2004, the inmate was sentenced to death for the 1979 murder of a young boy and was transferred to SQ. He had multiple prior convictions for child sexual assault.  He was on various protective custody statuses over his eight years in the Condemned Unit, due to the nature of the offenses.  These included administrative segregation, SNY, Medically Restricted Yard due to various medical problems, and Small Management Yard (SMY).  Although the inmate had not self-reported any previous history of mental illness, he was placed at the 3CMS LOC in 2004 upon his arrival at the Condemned Unit, following a mental health evaluation. During his confinement in the Condemned Unit, the inmate had "a waxing and waning of depressed feelings" regarding the legal appeals of his conviction and his future. He often complained about harassment by inmates and COs due to the nature of his offenses. He was prescribed psychotropic medication at various times during his confinement to reduce depression and anxiety. His diagnoses varied among Major Depressive Disorder, Dysthymia, and Depressive Disorder. At 68 years of age, the inmate was having increasing medical problems, including chronic knee, back, and shoulder pain, diabetes, and chronic obstructive pulmonary disease. He used a wheelchair when moving long distances.

The inmate consistently denied SI during his incarceration. When asked by a clinician in late 2008 "what kept him going," he responded, "All I know is I don't want to die." He was consistently assessed as both low chronic and acute risk for suicide in multiple SREs completed during his confinement. These included one conducted two days before his death in which he "denies any current SI, plan or intent. Is future oriented, compliant with mental health treatment."

Although the CDCR reviewer did not find any precipitating factors leading to this suicide, it was noteworthy that the inmate was experiencing significant and more frequent harassment from inmates following the airing of an episode on a television program known as "Cold Case Files"

in November 2011 that highlighted a series of this inmate's previous offenses. The CDCR reviewer theorized that because the inmate attempted suicide during one of the most staff-intensive periods of the day, at approximately 4:00 p.m., this suicide may have been an attempt to gain cell relocation rather than an attempt to end his life. The Suicide Report did not contain any recommendations.

It is noteworthy that although the CDCR reviewer theorized that the inmate attempted suicide to coincide with one of the most staff-intensive periods of the day, the CDCR review did <u>not</u> verify when the inmate was last seen alive. As discussed above, correctional staff were required to only conduct rounds at 60-minute intervals in the three units housing condemned inmates, and these rounds were not recorded in any logbook.

In the **third** case (SQ 7), the inmate was found hanging by a sheet from the bars of his Condemned Unit cell during the early morning of August 26, 2012. He entered CDCR in December 2005 on a death sentence for two murders.  He was housed at SQ during his entire confinement. The inmate did not have a history of mental illness or suicidal behavior, and was not on the caseload.  He was seen by mental health clinicians periodically throughout his confinement, most recently in May 2012.  He always denied SI or any mental health problems. He did not have any RVRs during his confinement. This inmate had a number of chronic medical conditions, the most important of which was a degenerative joint disease and orthopedic problems with his ankles, knees, and shoulders for which he was prescribed Morphine and Fentanyl patches. In July 2012, his PCP discontinued his prescription for Fentanyl after a nurse observed that he was not wearing his patch, and a patch was found elsewhere in the housing unit. On July 17, the inmate met with the PCP who explained that the Fentanyl prescription "had been stopped due to a violation of the pain medication contract," and that his Morphine prescription "will be eventually discontinued after a long taper," but that his case would be discussed with the SQ Narcotic Management Committee. The inmate became upset, refused to speak with medical staff on several occasions, and filed an appeal of the medication discontinuation. According to the CDCR reviewer, "it was evident from the review conducted for this report that the cessation of analgesic medications played the prominent role in the inmate's suicide....Although there were some aspects of the discontinuance that could have been handled differently, such as the provision of non-opiate analgesics during the morphine taper, it appeared to have been done appropriately and with reasoned discussion among health care staff." No recommendations were contained within the Suicide Report.

In the **fourth** case (SQ 8), the inmate was found hanging by a sheet from the bars of his Condemned Unit cell during the evening of April 14, 2013. He entered CDCR in March 2005 on a death sentence for five murders. He was housed at SQ for most of his confinement. Although the inmate did not have a prior history of suicidal behavior, he did express SI during the sentencing phase of his trial, stating "I just want to be done with this, I want to die." He had frequent family visits and very few RVRs during his confinement.

From 2005 through late 2009, the inmate was at the 3CMS LOC due to intermittent grandiose and paranoid delusional beliefs and intermittent auditory and VHs. His diagnoses varied among Delusional Disorder, Schizophrenia, and Personality Disorder NOS. His medical records also indicated a fixation with somatic medical issues. In late 2009, he began to refuse psychotropic

medication, became socially withdrawn, and refused to eat. His LOC was elevated to EOP in October 2009.

On January 21, 2010, the inmate pushed two ballpoint pens into both eye sockets, resulting in traumatic brain injury and permanent blindness. Following return from the hospital, he was placed in an MHCB and told the psychiatrist that he blinded himself to relieve pain from other parts of his body. He was diagnosed with Chronic Paranoid Schizophrenia with Somatic Delusions, and subsequently agreed to restart psychotropic medication. In February and March 2010, the inmate was in a rehabilitative facility for speech and physical therapy, and then subsequently transferred to CSP/Cor. In April 2010, he was admitted to an MHCB for psychotic delusions and grave disability. He returned to SQ in December 2010.

During 2011 and 2012, the inmate's medication compliance was inconsistent.  He  continued to voice somatic complaints about hip and joint pain that were not verified by supplemental testing. On August 4, 2012, the inmate was taken to the hospital following a methadone overdose, returned to the prison, and placed in an MHCB. The inmate later stated that the overdose was not a SA but rather an attempt to relieve foot pain. The following month, on September 25, 2012, he overdosed on morphine and heroin, was hospitalized, and returned to the prison and again placed in an MHCB. Although initially stating that the overdose was a SA, the inmate later retracted the statement and insisted it was an attempt to bring attention to his medical needs. His treatment team considered a higher level of inpatient treatment, but ultimately decided to keep him in EOP on the Condemned Unit and housed next to his brother on the assumption that it would be less stressful. In addition to weekly visits with his PC and monthly contacts with the psychiatrist, the inmate was identified as a "high risk" inmate and seen daily by a psych tech at cell front.

Over the next several months, the inmate was compliant with his medication but was reluctant to attend mental health groups because he did not believe he had a mental illness. His last SRE was completed on February 1, 2013, with an assessment of both "low" chronic risk and acute risk for suicide. Given this inmate's history of serious self-injurious behavior and two drug overdoses, and his placement on a high-risk list, an assessment of "low" chronic risk suicide was dubious. On April 5, 2013, the inmate told his PC, "I don't really see the point in coming to therapy" and requested a change in frequency of their sessions from weekly to every two weeks. On April 8, he asked his psychiatrist to reduce his psychotropic medication. He last saw a mental health clinician on April 13, 2013, the day before his suicide, and appeared "relaxed and comfortable."

Although the CDCR reviewer praised mental health staff for attempting to build "a fragile therapeutic alliance despite his resistance and lack of insight into his condition," the CDCR reviewer noted that "clinicians did not accurately appreciate the lethal potential he presented" by his self-injurious and suicidal behavior, and that "over the last seven months of his life, the clinicians caring for the inmate consistently rated his chronic suicide risk as low or moderate, given these chronic risk factors. Conversations with his clinicians suggested to this reviewer that they put more weight on his denials of suicidality, rather than on his overt behavior." The Suicide Report did not contain any recommendations.

In the **fifth** case (SQ 9), the inmate was found hanging by a sheet from the top bunk of his administrative segregation unit cell during the early afternoon of September 24, 2013. He re-

entered CDCR in May 2013 as a parole violator with a new conviction, for assault with a deadly weapon, which potentially was a third strike, but he was able to plead guilty to a lesser charge to avoid a life sentence and instead received a six-year sentence. The inmate had several prior CDCR confinements. He had previously been at the 3CMS LOC due to self-reported AH and depression. He was previously diagnosed with Schizoaffective Disorder. His most recent CDCR confinement ended when he was released on parole in August 2011.

Upon arrival at the SQ RC in May 2013, the inmate denied any mental health problems and expressed unwillingness to participate in mental health services. On July 1, 2013, while still in the RC, he was accused of drugging and raping his cell mate resulting in his administrative segregation placement. The inmate was seen by a mental health clinician and complained of AH and depression.  He vehemently denied the rape accusation. He was again diagnosed with Schizoaffective Disorder with Cluster B Traits.  He agreed to re-start psychotropic medication and was placed at the 3CMS LOC. Almost immediately, he became noncompliant with his psychotropic medication and generally resistant to mental health treatment.  He frequently refused appointments with his PC or he appeared but invariably asked to be removed from the caseload. Both a treatment plan and an SRE were completed during an IDTT meeting on July 26, 2013.  The treatment plan listed the problem of "mood stability."  The SRE estimated his suicide risk to be both "low" for chronic and acute risk.  It should be noted, however, that the SRE was generally inadequate. There were no inquiries regarding the lethality and date of two previous SAs.  Acute risk factors such as "change in housing," "single cell placement," "recent disciplinary" were all marked "no," even though the inmate had recently been placed in a single cell in the administrative segregation unit following the rape allegation.

During a session with his PC on August 13, 2013, the inmate appeared very upset and was crying during the session, complaining "I've not heard from a family...my fiancé has not written in a month...I feel very depressed, restless, and not eating...I have racing thoughts...I am feeling really bad...I think he might come in and talk about it...I have a back-up plan if he leaves me...I wrote to him all the time for two years when he was in prison...it really hurts me...I haven't learnt to deal with my mental illness but I feel really stressed out right now...."  The inmate continued to refuse to start any psychotropic medication, but agreed to attend the next scheduled appointment with his PC. During a session with his  clinician the following week, on August 20, the progress note stated that the inmate's "mood had improved  from last week," but that "I saw him (the alleged rape victim) sign some papers....I am stressing out what they are….He has placed me in hell, there is homo bashing in there...I can't sleep, they don't give you Trazodone or Benadryl in here, I have racing thoughts...they run rampant...I am reaching out to my family, my mom and sister...I have had no contact for a year...I got a letter from him (fiancé)...he said he was working and moved, but I am now not sure if he is right for me, he put hate in my heart..." The progress note also stated that the clinician would request a medication evaluation.

On August 26, the inmate met with a psychiatrist and again refused psychotropic medication, commenting that he thought sessions with his PC were helpful, and "he gets a lot of benefit from writing things out." On the following day, August 27, the inmate again met with his PC and stated that "he saw the doctor yesterday and refused medication... He said he would see me in three weeks but I think I will be moving on... I hope to get to committee and go back...if not another month it's not going to kill me... I sent my partner a poem for his birthday... I am back

talking to my neighbor we talked it out, I don't want to leave on a bad note, I did that with someone in the county and I still feel bad about it...this is it for me (last spell in prison)... I don't let any man bruise me, this guy just came up to me and hit me, I stabbed him in the park with children around, I had scissors... I don't wear bruises well..." The clinician noted that the inmate's mood was stable.

On September 3, 2003, the inmate met with his PC and appeared very upset at the clinician, stating "... It hurt me all week, you said you would not give me any paper and yet you do XXX for XXX... I just use it to write my racing thoughts... I thought we had an understanding ...you know I am sensitive...I wish to refuse all mental health ducats." The clinician noted that the inmate "expressed benefits from interacting with PC but today expressed the opposite. Pt presentation vacillates from enjoying/accepting services to refusing services and feeling slighted. Pt has poor insight and fair judgment." The inmate was seen briefly at cell front by another clinician the following week, September 12, and was observed as "minimally cooperative, dysphoric mood." The following week, September 17, the inmate met briefly with his PC and stated "I refuse, you know why...I will always refuse...I am okay..." The progress note stated that the inmate "remains stable but is refusing to have office contact with PC. Pt changes his mind easily about interaction."

On the morning of September 24, 2013, the inmate again met with his PC and reported, "I can't think straight anymore, I think I need to go back on my meds...It's like I am going along this road and it forks but I still want to keep going straight...I start a book and can't do it...I went to ICC last week, they are going to hold me for 60 days but I didn't do nothing...I'm tired of being back there...I am taking the Depakote (for seizure disorder), but I think I need to go back on my Geodon." According to the progress note, the inmate's mood was "tearful and emotional." He reported an increase in anxiety and "eluded (*sic*) to thinking about whether to leap or live but has no plan to harm himself or others and able to contract with PC re plan to see MD and discuss other medication....Pt brought up incident from 16 years ago that he feels remorseful for." The progress note also stated that clinician would again request a medication evaluation. The inmate returned to his cell and committed suicide a few hours later.

As described by the CDCR reviewer, the inmate had been experiencing multiple stressors during the last few months of his life that in all likelihood were the precipitants to his suicide. These included placement in the administrative segregation unit pending an investigation of allegedly raping his cellmate, being angry at medical staff after they rescinded his Continuous Positive Airway Pressure (CPAP) machine, describing the administrative segregation unit as "hell" and that there was "homo bashing" directed at him. In addition, he appeared to become increasingly upset regarding the perceived lack of family support and his disintegrating relationship with his fiancé. His overall frustration and anxiety was increasing, and coincided with a recent ICC decision to extend his administrative segregation placement for another 60 days. The Suicide Report contained three bases for recommendations for corrective action through a QIP: (1) the PC failed to complete an SRE on September 24, 2013 after inmate verbalized SI; (2) the inmate was never formally or properly evaluated (i.e., utilizing a mental health evaluation) prior to being placed in 3CMS; and (3) the PC noted that they met with the inmate on July 1, 2013 to initiate a 3CMS LOC but there was no verification that the meeting ever occurred.

56

It should be noted that there were several other concerns and/or deficiencies noted in this case that were not addressed in the Suicide Report. One was the inadequate and incomplete SRE dated July 26, 2013, discussed above.  Although the CDCR reviewer noted that the inmate was very upset with his PC in late August 2013 for allegedly withholding writing paper, which he had found to be therapeutic, there was no inquiry and/or explanation in the Suicide Report as to whether such writing paper was, in fact, withheld and, if so, why it was withheld.  Review of the weekly Psych Tech Daily Rounds forms during August and September 2013 indicated that the inmate's presentation was consistently stable, with a pleasant mood, affect, cooperative behavior, and few complaints about appetite and sleep. This documentation was in stark contrast to the inmate's increasingly poor mental status, as consistently documented in his PC's progress notes during the same time period, which raised serious questions regarding the veracity of the information on the Psych Tech Daily Rounds forms. This issue was not addressed in the Suicide Report.

In the **sixth** case (SQ 10), the inmate was found hanging by a sheet from the bars of his Condemned Unit cell during the late evening of October 4, 2013. He entered CDCR in January 1999 after being sentenced to death for the murders of two sheriff's deputies.  He had been housed at SQ for his entire confinement. During his almost 15 years in the Condemned Unit, the inmate had only one disciplinary incident. The inmate was placed on the caseload in response to a self-referral for depression in February 2003. He reported becoming increasingly depressed, with periodic crying spells and poor sleep habits. Psychotropic medication was started and he was placed at the 3CMS LOC with a diagnosis of Bipolar Disorder. During the ensuing years, the inmate's mood and irritable behavior was managed with varying medications. He reported occasional SI, but identified his children and mother as protective factors against suicide. The records, however, also reflected that his elderly mother had been in declining health and was moved into assisted living sometime during 2012.  The inmate continued to speak with her frequently by telephone.  He became estranged from his daughter and was in contact with his son only infrequently. The inmate experienced several medical problems, the most acute of which was a painful condition known as geniculate neuralgia, a condition of the facial nerve which causes severe intermittent pain localized in the inner ear. His symptoms were treated with a variety of medications.

At the 3CMS LOC, the inmate was seen by his PC every 90 days. During a session on July 5, 2013, the clinician noted that the inmate had a history of mood instability, paranoia, and depression. The inmate reported that "I'm having problems on the yard. It's complicated, but I'm getting a lot of attitude from them. I don't want to go out anymore. I'm thinking of going to Yard 7." Although the inmate did not present as depressed, the clinician noted that the inmate "did admit to having depressing thoughts at times and stated he does have transient SI with no plan or intent 'about once a month.' Stated he would never harm himself because he cares about his mother and his children.  Talked about relationships with children and he recently spoke to his son, though his daughter has not spoken to him in years....His SI is concerning, however, the protective factors are strong ones." The inmate was referred to "stress management group therapy list for next rotation" and would be seen again by the PC within 90 days. There was no indication in the chart that the inmate was ever assigned to, or participated in, stress management therapy prior to his death.

On September 5, 2013, the inmate met with his psychiatrist.  He was described as increasingly irritable with "crankiness" over the past several weeks. His psychotropic medication was increased and he was scheduled to be seen again in 60 to 90 days. The inmate was seen again by his PC on September 17, 2013 and was observed to be exhibiting both paranoia and irritability. He stated "I don't have anything to say. I don't want to talk to you. I don't like your agenda. I'm not going to talk about that. I don't want to talk to you ever again. I don't like you mental health people." Although denying any SI, the inmate continued to be irritable and somewhat hostile. His case was discussed later that day with the treatment team, including the psychiatrist, who "plans to see patient."  The team decided "to maintain PC at this time as his desire to speak with clinician may be attributable to increase in paranoia, which is what it looks like .... Follow by psychiatry per plan this morning." This was the last contact with a mental health provider prior to his death on October 4, 2013.

The CDCR reviewer did not offer any precipitating factors for the inmate suicide, nor did the Suicide Report contain any recommendations/corrective actions for this case. There were, however, several areas of concern that should have been addressed in the Suicide Report. First, the two most recent encounters with the inmate's PC, on July 5 and September 17, 2013 were characterized by the inmate's increased irritability and increased paranoia. Although the dosages of his medications were increased when seen by the psychiatrist on September 5, there was no discussion in the record regarding a possible elevation in LOC and/or frequency of contact by clinical staff. Second, although the PC stated on September 17 that the case was discussed with the psychiatrist, who "plans to see the patient," there was no record that the inmate was seen by the psychiatrist prior to his death three weeks later on October 4. Third, although the PC stated in the July 2013 progress note that the inmate would be referred to stress management therapy, there was no indication that the inmate was referred and/or participated in such therapy. Fourth, although the inmate consistently denied any SI throughout his confinement during administration of SREs, he self-reported in July 2013 that he experienced SI "about once a month." Although the clinician noted that the SI was "concerning," it was offset by the strong protective factors of his children and his mother. However, these protective factors may not have been as strong as they appeared. For example, although the record reflected a strong relationship with his elderly mother, he appeared to be estranged from both children. Regardless, the inmate had not had an SRE completed since March 2013 and, given his self-reporting of monthly SI and his increasing irritability and paranoia, the CDCR reviewer failed to raise the issue of whether completion of at least one additional SRE was appropriate. It was unclear why these multiple issues were not raised during the CDCR review.

In the **seventh** case (SQ 11), the inmate was observed jumping from the fourth tier railing of his GP housing unit during the early morning of January 21, 2014.  He sustained severe injuries, including a traumatic brain injury.  He was pronounced dead in the hospital the following day, January 22. The inmate entered CDCR in December 1985 to serve a 40-year to life sentence for the murders of his girlfriend and her six-year-old son. He had been at SQ since June 26, 2013. He arrived with his cellmate from RJD and, although they had requested to be housed together, they were assigned to different housing units and remained friends.

Although the inmate did not report any history of mental illness in the community, he began to receive mental health services for depression shortly after entering CDCR in 1985. His

depressive symptoms increased to a point where he was transferred to ASH in February 1987 where he remained for almost five years, returning to CDCR in 1992. While at ASH, he received treatment for "depression, SI, rageful thinking, homicidal fantasies involving his mother and women who looked like his mother, and substance abuse." He returned to CDCR with a diagnosis of Major Depressive Disorder.

According to reports, the inmate programmed well over the course of more than 20 years following his return from ASH, holding down a job and avoiding disciplinary problems. Although he had reported several prior SAs in the community, and was noted to have requested the death penalty for the instant offense in 1985, records did not indicate any instances of suicidal behavior during his CDCR confinement.  At the time of his death, the inmate was at the 3CMS LOC.  The records also indicated episodic periods of depression accompanied by SI and "vague homicidal ideation (HI)." His behavior began to de-escalate upon his transfer to SQ in June 2013 and the denial by custody officials of his request to be housed with his cellmate from RJD.  On July 1, 2013, he requested discontinuance of the psychotropic medication and removal from 3CMS. A few months later, in September 2013, he was briefly placed in administrative segregation because of refusing to move from a lower bunk to an upper bunk. This signified his first RVR in almost 30 years of incarceration. He began to regularly complain to his PC about conditions at SQ, including ability to share a cell with his previous cellmate, sanitary conditions, noise, and boredom in his job. He began to request a prison transfer.

On October 2, 2013, his PC received notification that the inmate had told his former RJD cellmate that he was considering committing suicide by jumping off the housing tier. The inmate was seen by his PC the following day and reported being "very depressed.... Did think about jumping, but briefly and no longer feels that way." He again complained about the conditions at SQ and the "difficulty getting into programs." The inmate also told the clinician that if he were not transferred, he "might get desperate." He was seen again by his PC on October 11, and then the following week, on October 16, by a psychiatrist who noted "vague references to thoughts of self-harm and being tired of life." He told the psychiatrist, "I despise this place." A diagnosis of Bipolar Disorder with Depression was reconfirmed. During a session with his PC on October 25, the inmate admitted to experiencing "periods of thinking he might be better off dead" and continued to feel "sad." During his IDTT meeting on October 31, the inmate was observed to be "close to tears" and admitted to "feelings of hopelessness." The inmate was preparing for his upcoming parole hearing in March 2014, and hoped to at least be transferred to another CDCR prison. As part of the IDTT meeting, the PC completed an SRE which indicated both "moderate" chronic and acute risk for suicide. The "moderate" acute risk for suicide was based on positive responses for recent SI, current depression, hopelessness/helplessness, and recent change in housing. The inmate reported only a few protective factors.  The mental status portion of the document simply stated "depressive feeling discouraged being in SQ  - once transfer and obsessing regarding it." The treatment plan section of the SRE simply stated, "CCCMS, PC contact."

Although the PC had noted on the October 25 progress note that the inmate would be seen the following month, he was not seen again until December 20, 2013. It was noteworthy that the chart contained a CDCR Form7362 Health Care Services Request from the inmate, dated November 28, 2013, and signed by the PC as having seen the inmate on December 20, 2013.

The form was stamped as received by medical records on December 23, 2013, three days after that appointment took place. There was no indication as to when the PC received this request. During the December 20 session with the inmate, the PC noted that the "IM is coping better with SQ, and appeared to be in a better mood. Seems this is because he sees that the possibility of transfer to another prison as possible, and says he can be patient with it for a few months. Has a board meeting in March and knows he cannot ask for transfer until after that, will make the request after the date." Although the clinician noted that the inmate's "affect was sad, and significantly depressed over being in SQ, and having to deal with many stressors, but depression over this has improved.... No SI, intent, or plans." A follow-up session was scheduled for two months later, but the inmate committed suicide the following month.

The CDCR reviewer found numerous deficiencies in the case, including: (1) there was sparse documentation and no written referral generated by the clinician who received information that the inmate was contemplating jumping off the tier on October 2, 2013; (2) although the PC received notification that the inmate was very depressed and contemplated jumping off the tier on October 2, 2013, the inmate was not immediately placed on any suicide observation status nor seen by the clinician until the following day; (3) an SRE was not completed as required on October 3 as a result of the referral that the inmate was suicidal; (4) the PC noted in a progress note dated October 25, 2013 that the inmate would be seen again in one month, but was not seen for almost two months following that session; (5) the SRE completed on October 31, 2013 was problematic, including an inadequate plan to reduce risk by stating simply "CCCMS, PC contact"; (6) the medical chart was unclear as to when medical/mental health staff received the inmate's Health Care Services Request Form dated November 29, 2013 stating "I need to see doctor. I need some help. Please schedule me."  The PC saw the inmate on December 20, well outside the timeline for mental health referrals; and (7) given the inmate's mental status at the IDTT meeting on October 31, 2013, which included appearing "very depressed," "close to tears," "looks downward," and has "poor" insight and judgment, coupled with a diagnosis of Bipolar Disorder, Most Recent Episode Depressed, Moderate," there was no mention in the record of consideration of a higher LOC or details on how the depressive symptoms were going to be treated.

Despite all of the above identified deficiencies in mental health services provided in this case, the corrective action contained in the Suicide Report was focused on only one recommendation: to provide SRE mentor training to the inmate's PC.

In the **eighth** case (SQ 12), the inmate was found hanging by a sheet from the bars of his administrative segregation unit cell during the early morning of May 22, 2014. He entered CDCR on February 27, 2014 to serve a nine-year sentence for attempted murder. He had been at SQ for  his entire confinement, and was transferred to the administrative segregation unit on April 4 due to safety concerns, following a fight with another inmate of different ethnicity. A transfer to SNY was pending. Although the inmate reported a history of substance abuse, he did not have a history of mental illness in the community. However, during a competency evaluation related to the instant offense, he was briefly found incompetent to stand trial based on possible cognitive problems. He was also believed to be "feigning psychiatric and memory impairment.....and might exhibit malingering behaviors in the future." There was brief reference in the inmate's county jail records that he had a "history of SI," but no indication of a timeframe.

The inmate reported family support and denied any gang involvement during his brief CDCR confinement.

Following his placement in the administrative segregation unit on April 2, the inmate was referred to mental health, based upon a positive mental health screening.  He was seen by a psychiatrist on April 10. The psychiatric note indicated that although the inmate was self-reporting AH, there did not appear to be any evidence of such. Nonetheless, the psychiatrist's provisional diagnosis was Psychotic Disorder NOS. Several days later on April 15, the inmate was seen by another clinician who completed a Mental Health Evaluation based upon a referral for possible "thought disorder" and "suicidality." Although the inmate was thought to be possibly malingering, it was recommended that he be placed on the caseload at the 3CMS LOC. This clinician's diagnosis was Adjustment Disorder, depressed type. An SRE was  completed and showed both "low" moderate and acute risk for suicide. The SRE treatment plan goal was to provide "weekly individual treatment to address stressors and determine whether malingering or if reports of psychotic sx are genuine."

The inmate was seen by his PC on April 21, April 23, May 5, and May 12, 2014. Although the PC told the CDCR reviewer that the inmate was seen on May 19, there was no documentation of this alleged session found in the eUHR. In the April 21 progress note, the clinician stated that the inmate "Inconsistently reports intermittent SI, ideas of reference and AH while also denying that he has these experiences any longer." On April 23, the inmate attended his IDTT meeting and was given a diagnosis of Psychotic Disorder NOS, R/O Malingering. The May 5 progress note indicated that he denied any SI and "reports some paranoid about the well-being of his family. Reports intermittent SI." The last progress note, dated May 12, indicated that the inmate denied any current SI and "continues to present inconsistently sometimes stating intermittent SI, delusions of his mother having sex with inmates, his family being under threat if he doesn't kill himself, having spirits in his body and no brain in his head. IP's statements do not match affect which is often playful and smiling.....IP may be malingering for secondary benefits of seeking meds. IP gave verbal contract for safety...."

The CDCR reviewer did not offer any specific precipitating factors for this suicide, noting that the inmate did not leave a suicide note.  The CDCR reviewer theorized that the death "was most likely influenced by an underlying depressive, paranoid, possibly psychotic process resulting in an impulsive act on his life."

The reviewer raised two concerns regarding mental health services: (1) Documentation in the record frequently mentioned the inmate's "intermittent suicidality" and "intermittent SI," without further detail.  "Documentation of SI should provide more depth, including details of any difficulty elucidating information from the inmate about reported ideation;" and (2) The PC's purported last session with the inmate on May 19 was not available for review in the eUHR, and the "missing progress note calls into question the timely filing of healthcare information into the eUHR."

It remained unclear why the CDCR reviewer's above concerns did not result in formal recommendations for corrective action in the Suicide Report, including the fact that the alleged May 19 progress note that was thought to be "untimely" filed was still not accounted for as of

July 3, 2014, the issuance date of the Suicide Report. It would have been reasonable to offer a recommendation calling for further inquiry regarding whether in fact there ever was a progress note for that date. Further, the Suicide Report did <u>not</u> address the clinician's assessment of the inmate's acute risk for suicide as "low" on the SRE dated April 15, 2014.  This assessment was questionable, given the "intermittent SI," single cell placement, safety concerns (which were incorrectly listed as "none" on the form) which prompted the administrative segregation placement, current/recent psychotic symptoms, and increasing interpersonal isolation. In addition, it fell short of the standard of care for the clinician to engage in a "verbal contract for safety" with the inmate during their session on May 12, 2014.

In sum, it  is noteworthy that four of the eight suicides that occurred at SQ from 2012 to 2014 were in the Condemned Unit. According to mental health staff, despite its uniqueness, the Condemned Unit is run much like any other mainline housing unit.  Given the high incidence of suicides in the Condemned Unit, it was problematic that psych tech rounds occurred only twice per month and that correctional staff were only required to conduct rounds at 60-minute intervals that were not recorded in any logbook. The issue of custody rounds was addressed in May 2014 with issuance of a DAI memorandum requiring Guard One rounds in the Condemned Unit. Beginning on June 16, 2014, observation at 30-minute intervals was required in the Condemned Units.  It was also noteworthy that there were <u>no</u> recommendations offered within any of the CDCR reviews of the four suicides by condemned inmates.

## 12)    <u>California Men's Colony (CMC)</u>

**Inspection**: February 4-5, 2014

CMC housed 4,771 inmates, most of whom were at Level III security classification. A new 50-bed MHCB unit was opened in August 2013.  An administrative segregation unit housed caseload and non-caseload inmates. The administrative segregation unit also contained 16 retrofitted cells that were used to house newly admitted inmates during their first 72 hours in the unit.  These could be used for temporary alternative housing of inmates requiring an MHCB. Twenty-nine percent of CMC inmates were on the caseload, with 740 3CMS and 659 EOPs.

**Screening/Assessment**: The intake screening process on a new admission was observed on February 4.  The Initial Health Screening CDCR Form 7277 process was conducted by a nurse assigned to the R & R Unit. The Nurse's Office provided sufficient privacy and confidentiality, but a CO was stationed inside the room, and the door, which had a large glass window, remained open. Despite the compromised privacy and confidentiality, the nurse asked all of the required intake screening questions.

Daily psych tech rounds by two psych techs assigned to the administrative segregation unit were observed on February 4 and 5. The two psych techs employed differing practices.  One of the psych techs, who had started work at the prison in November 2013, carried the Psych Tech Daily Rounds Forms with her and completed them for caseload inmates as the rounds were conducted. The other psych tech, who had been at the prison for several years, completed the Psych Tech Daily Rounds Forms on EOP inmates after the rounds were completed.  This psych tech suggested to this reviewer that it would be distracting to the inmate if time were taken to fill out

each form while at the cell, which would interrupt continuous eye contact during the psych tech-inmate interaction. As found in almost all of the other prisons, this psych tech's practice of deferring completion of the Psych Tech Daily Rounds Forms on caseload inmates until after rounds were completed raised questions concerning the reliability of the documentation, as it would be unreasonable to expect the psych tech to remember the mental status of each of the approximately 65 EOP inmates housed in the unit after rounds had concluded.

**Housing**: All of the MHCB cells were suicide-resistant and furnished with suicide-resistant beds. Unlike the other facilities  examined by this reviewer, there were no newly admitted inmates within their initial 72 hours in administrative segregation who were housed in non-retrofitted cells. In fact, all of the new intake cells were empty and the census of the administrative segregation unit was low during this period.

**Observation**: Although the CMC's LOP on suicide prevention  contained an "observation status" requiring supervision at 30-minute intervals for non-suicidal patients, in practice all inmates designated for an MHCB were required to be observed at Q-15 minutes unless they were on Suicide Watch and received constant observation. The prison's "Suicide Watch/Suicide Precaution Record" contained 15-minute pre-printed time intervals, which is inconsistent with *Program Guide* requirement for observation at *staggered* intervals not to exceed 15 minutes. After discussion with the CMH, the  observation form was replaced.

Guard One data on custody 30-minute checks on inmates during their first 21 days in administrative segregation was reviewed.  The compliance rate was 97 percent during the 24-hour period of February 3, 2014. Review of administrative segregation unit logs indicated that 30-minute rounds of inmates in non-intake cells were documented as required.

**Management/Treatment Planning**: eUHRs of inmates on suicide observation status and of inmates referred to mental health on an urgent and/or emergent basis were reviewed. Inmates on suicide observation status were consistently seen daily by clinical staff while on suicide observation status.  Inmates referred to mental health were consistently seen on a timely basis. However, there were some problems, primarily with treatment planning.

In the first case (CMC 1), a 3CMS inmate housed in the administrative segregation unit was seen cell-front on a weekly basis by his PC during December 2013 and January 2014.  Progress notes indicated that he consistently complained of a poor appetite and poor sleeping.  He was showing increasing agitation, indifferent hygiene, racing thoughts, labile mood, and refused to take his psychotropic medication. During this same period, the weekly Psych Tech Daily Rounds forms completed by psych techs indicated that this inmate's presentation was consistently stable, with a pleasant mood, affect, and cooperative behavior. These forms did not contain any complaints about appetite and sleep, nor noncompliance with medication. This content is in stark contrast to the consistent documentation of this inmate's behavior in his PC's progress notes, raising serious questions about the reliability and veracity of the information entered on the Psych Tech Daily Rounds forms.

In another case (CMC 2), the inmate was admitted to an MHCB several times during December 2013 for SI. He had an extensive history of self-injurious and suicidal behavior, including

hanging and cutting, and a recent DSH placement ten months earlier. The inmate was assessed as being at "high" chronic risk for suicide. On December 10, 2013, an MHCB discharge SRE was completed.  The entirety of the treatment plan was: "DC to EOP LOC: 1."

In another reviewed case (CMC 3), the inmate was placed in an MHCB on December 19, 2013, after "cutting his wrist out of anger and frustration" while housed in the administrative segregation unit.  He had a history of depression and prior MHCB placements for SI. The inmate's treatment plan identified the problems of "SI and depression," with the goal being to "eliminate SI, decrease frustration and depression." The inmate remained in an MHCB until December 31, 2013, when the discharge SRE listed the following treatment plan: "D/C CTC, Return to ASU, 5-Day FU, and no psych. Rx." Review of the inmate's five-day follow-up forms suggested no effort at treatment planning to reduce his SI.

It should be noted that a quarterly audit of SREs conducted by a CMC health program specialist in January 2014 corroborated this reviewer's assessment of treatment planning, finding low levels of compliance with plans that consistently addressed strategies to reduce suicidal behavior.

**Intervention**: Housing units examined by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were certified in CPR.  Consistent with *Program Guide* requirements, custody, medical, and mental health staff received annual suicide prevention training, with compliance rates over 90 percent for 2013. Ninety percent of mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: Although CMC had eight inmate suicides during 2010 and 2011, it had no suicides since December 2011.  The SPRFIT was active in its suicide prevention role.  It developed several local strategies to reduce the incidence of inmate suicide. It established a walk-in clinic in the GP yards as a way to establish better communication between the inmate population and mental health staff, and offered inmates an opportunity to express concerns and need for assistance. In addition, placards listing warning signs of suicidal behavior and mental health contact information were posted in family and attorney visiting rooms.  A 13-minute DVD on suicide prevention was developed entirely by an inmate advisory group in July 2011.  It educated the larger inmate population on the warning signs and risk factors for suicide and encouraged inmates to seek assistance whenever they and/or a peer they observed were struggling with depression and suicidal thoughts.

Compared to the other prisons examined by this reviewer, CMC overall had a more than adequate suicide prevention program.

**13)**    **Salinas Valley State Prison (SVSP)**

**Inspection**: February 6-7, 2014

SVSP housed 3,361 inmates, including  226 patients in the SVPP program run by DSH.   The majority of SVSP inmates were at Level IV classification.  SVSP had a 22-bed CTC, with ten designated MHCBs and four alternative housing cells in the CTC to temporarily house suicidal inmates prior to transfer to an MHCB.  There were four administrative segregation units for caseload and non-caseload inmates.  Thirty-four percent of SVSP inmates were on the mental health caseload.  There were 1,142 3CMS and 354 EOP inmates.

**Screening/Assessment**:  Intake screening at SVSP was not observed because there were no new admissions during the site visit.  However, daily psych tech rounds in administrative segregation unit D-2 were observed on February 7.  The rounds were unremarkable and the psych tech completed the Psych Tech Daily Rounds Form for all caseload inmates.  The psych tech reported that she had been instructed to complete the Forms at cell-front that week and had been reluctantly complying with the directive.  Under the previous practice, Forms were completed following round completion.

**Housing**:  All CTC rooms were clean, suicide-resistant, and furnished with suicide-resistant beds.  However, the four alternative housing cells were <u>not</u> suicide-resistant and contained protrusions, including handicapped railings and privacy barriers that obscured observation of the toilet, that were conducive to a SA by hanging.

The four administrative segregation units had a total of 20 new intake cells that had been retrofitted to be suicide-resistant; the only exception was administrative segregation unit Z-9, where the holes in the wall ventilation grates were too large.  However, there were several problematic issues concerning the housing of newly admitted inmates in administrative segregation.  Specifically, not all inmates within their first 72 hours of administrative segregation housing were in retrofitted cells, while not all retrofitted cells housed newly admitted inmates. In fact, at least nine inmates housed in administrative segregation for 72 hours or less were assigned to unsafe cells; among them was at least one caseload inmate.

**Observation**:  Four inmates were on Suicide Precaution in CTC alternative housing cells on February 6, the day before the site visit, receiving checks at 15-minute intervals.  Because these inmates were housed in unsafe cells, continuous observation was required.  MHCB inmates were on a staggered Q-15 minute level of observation, unless they were on Suicide Watch and received continuous observation.  The Observation Record Form used to document observation of inmates on Suicide Precaution contained pre-printed 15-minute time intervals that were contrary to the *Program Guide* requirement of observation at staggered intervals not exceeding 15 minutes.  It was also reported that budget concerns had resulted in mental health clinicians <u>not</u> authorizing the use of Suicide Watch in the CTC until March 2013, when the CDCR regional director for mental health discovered the violation and instituted corrective action.

Several IDTT meetings in the CTC were observed on February 6, 2014; one was particularly troublesome.  The inmate (<u>SVSP 1</u>) was admitted to the MHCB on January 27 after expressing

SI and was placed on Suicide Precaution.  During the February 6 IDTT meeting, he was upset, angry, frustrated, and tearful.  There appeared to be several ongoing stressors in his life, including an upcoming murder trial and a potential "third strike."  His PC explained that his frustration tolerance was low, while the inmate reported "that he did not think he could trust himself to be safe."  During the prior few days, he had refused out-of-cell contacts and staff reported that he appeared severely depressed, frequently tearful, and continued to endorse feelings of hopelessness.  The IDTT meeting recommended a DSH referral with continued observation on Suicide Precaution.  At the end of the IDTT meeting, however, the CDCR regional mental health administrator and the CDCR chief of clinical support, both of whom had attended the IDTT meeting, spoke briefly with the PC and convinced her to upgrade the inmate's status to Suicide Watch.  Due to  concern with the inmate's safety, the reviewer returned to the MCHB on the morning of February 7 to check on the inmate's observation status.  The inmate was neither on Suicide Watch nor Suicide Precaution.  Corrective action was subsequently initiated.

Review of unit logs for all four administrative segregation units as to documentation of 30-minute welfare checks of non-intake cells revealed that welfare checks were <u>not</u> being performed nor documented.  Review of Guard One data to verify observation of new intake inmates housed in administrative segregation for 21 days or less indicated 97 percent compliance for January 6, 2014.

**Management/Treatment Planning**:  eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis revealed that clinical staff consistently saw inmates daily while on suicide observation, and inmates referred to mental health were generally seen timely.  However, other matters were problematic.

The eUHR examination revealed several charts where the only document used to provide clinical justification for MHCB discharge was the Mental Health Crisis Bed Discharge Summary Form.  Because this Form lacked a treatment plan section and SREs were <u>not</u> completed at discharge, these inmates did not have a treatment plan at discharge.

There were also concerns as to the quality of SREs completed as a result of emergency mental health referrals for SI.  The charts of 14 inmates who had recently received emergency mental health referrals for SI were reviewed.  All of these inmates were initially placed on Suicide Precaution in alternative housing, including the four on February 6 as indicated above, and were referred to a mental health clinician for assessment.  SREs were completed for 12 of the 14 inmates.  In one (<u>SVSP 2</u>) of the two cases where an SRE was not completed, the clinician's progress note reported that the caseload inmate was having difficulties with his cellmate and expressed SI.  The clinician noted that the "patient was tearful throughout session and stated that he will 'get suicidal' if he is not moved to ad. seg."  The clinician conferred with the correctional sergeant and the plan was that the "patient will be transferred to ad. seg. in an effort to ensure safety.  Patient will continue to receive mental health services."  In essence, the inmate was removed from Suicide Precaution in an alternative housing cell and  relocated to administrative segregation and placed on 24-hour observation; this consisted of 60-minute rounds by custody staff.

Only four of the 12 cases where SREs were completed resulted in MHCB admission.  The remaining eight inmates were discharged from Suicide Precaution and returned to their original housing units from alternative housing, often with a plan for five-day follow-up mental health assessments and 24-hour, 60-minute custody checks; SVSP clinicians apparently believed these were an acceptable alternative to MHCB admission.  Several of these inmates continued to express SI, albeit some conditionally based on their attempt to drive their housing placement.

Mental health staff completing SREs also set high thresholds for placing inmates on suicide observation.  In one case (SVSP 3), the inmate was placed on Suicide Precaution in a CTC alternative housing cell during the evening of February 5, 2014 after expressing SI in administrative segregation.  This EOP inmate, who had a *Keyhea* order and a prior history of self-injurious behavior, was seen early the next morning on February 6.  Despite several acute risk factors, including SI, he was assessed at "low" acute suicide risk because he was informed that he "was being considered for a referral to DSH."  The inmate was discharged from Suicide Precaution, with a plan "to be returned to yard housing to his EOP clinician on the yard for follow-up with 5-day mental health follow-ups and 24-hour custody checks."  However, he was returned to administrative segregation, which was the housing unit from which he came before arriving at CTC alternative housing.  The reviewer's visit to administrative segregation on February 7 to examine documentation ordering the 24-hour custody checks revealed that custody never received the order and the inmate had <u>not</u> been observed as expected by mental health.

In another case (SVSP 4), the inmate was in an MHCB from December 14 through 16, 2013.  He was at the EOP LOC and was previously admitted to the CTC in August 2013 for the suicidal gesture of cutting his right wrist with a razor, which required suturing.  His updated MHTP was completed following MHCB discharge on December 19, 2013, but it did not include any reference to, or plan for, addressing self-injurious and/or suicidal behavior.

Other concerns with SREs and treatment planning documentation by SVSP clinicians will be discussed in the "Recent Suicides" section.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records did not indicate the percentage of custody staff that had CPR certification, but approximately 100 percent of nursing staff were certified.  Ninety-seven percent of custody staff was compliant with annual suicide prevention training.  Contrary to preferred practices, psych techs, and not qualified mental health clinicians, presented most training workshops.  Medical and mental health staff did not receive annual suicide prevention training during 2013.  The percentage of mental health clinicians who received the seven-hour SRE training in March 2013 and completed the mentoring program was unknown.  As SVSP had ten inmate suicides during 2012-2014, the lack of annual suicide prevention training for non-custody staff was problematic.

**Recent Suicides**:  SVSP had ten inmate suicides from 2012-2014.  In the **<u>first</u>** case (SVSP 5), the inmate was found hanging by a sheet from a ventilation grate of his administrative segregation cell on March 20, 2012.  He had entered CDCR in April 2005 to serve a nine-year

parole violation term for residential burglary.  In January 2009, he received an additional three-year term for drug possession.  He was transferred to SVSP in May 2010.  He had been at the 3CMS LOC since 2002 and had at least five previous MHCB and OHU admissions for SI and self-injurious behaviors.  He also had multiple RVRs during the past four years; the most recent involved a February 22, 2012 assault on another inmate and led to his administrative segregation placement.

On March 14, six days before his suicide, the inmate allegedly attempted to hang himself, but was stopped by his cellmate and subsequently referred to a clinician.  An SRE was completed; the inmate continued to express SI with a plan to hang himself.  He was referred for MHCB admission.  Upon arrival at the MHCB, clinicians assessed him.  He reported no longer feeling suicidal and described the SA as "stupid."  He also stated that "I felt better before I got here." Although clinicians were aware that he had allegedly attempted suicide, they neither consulted with the referring clinician nor reviewed the initial SRE.  The clinician completing the SRE  had not identified <u>any</u> acute risk factors and had assessed the inmate as a "low" acute suicide risk. On March 15, less than 24 hours after the MHCB admission, the inmate was discharged.  Five-day follow-up was completed and he did not voice further SI.  However, on the fourth and fifth days of follow-up, he was agitated and stressed that his wife had missed her scheduled visit; he reported increased sadness, crying, and anxiety.  Despite these behaviors, no further mental health intervention was provided.  The inmate committed suicide on March 20.

The CDCR reviewer provided an insightful clinical critique of the case and stated in the Suicide Report that:

> This case demonstrates the importance of obtaining first-hand information about an individual referred for a mental health evaluation for admission to the CTC. For example, information from an officer would identify the inmate-patient as being suicidal would have been helpful.  In addition, had the CTC clinicians been aware of the PC's findings and specifically the inmate-patient statements, they would have had valuable information to complete their assessment.  The inmate-patient informed the PC he wanted to die and was upset that the cellmate intervened in his plan to kill himself.  The inmate- patient presented differently at the CTC.  The clinicians could have questioned him about his sudden change if they had access to the earlier information.  His statements about wanting to die could have influenced the CTC clinicians to admit him.  In addition, suicide is often a process with a beginning and an end.  His suicidal behavior on March 14, 2012 suggested that he had been thinking about taking his life and the fact that he was stopped did not necessarily mean that his problems have been resolved and that he no longer wished to die.  This makes it important to discuss the origins of the suicidal behavior and to use the 5-day follow-up sessions to closely examine the crisis and work towards a resolution of the stress causing the suicidal thoughts.

The Suicide Report contained one basis for recommendation for corrective action through a QIP: (1) all mental health clinicians involved in the inmate's case enter the Proctor-Mentor Program to improve the quality of SREs completed by mental health clinicians.

In the **second** case (SVSP 6), the inmate was found hanging by a sheet from the upper bunk of his GP cell on August 12, 2012. He had entered CDCR in May 2011 to serve a 30-year-to-life sentence for his girlfriend's murder. Upon admission, he reported anxiety, insomnia, and depression, and was placed at the 3CMS LOC with a diagnosis of Bipolar Disorder. The diagnosis was changed to Adjustment Disorder upon arrival at SVSP in October 2011. Two months later, on December 7, 2011, he was placed on Suicide Precaution for 24 hours after expressing SI. In May 2012, he was removed from the caseload after refusing mental health services and psychotropic medication for six months as a result of peer pressure.

The CDCR reviewer identified several chronic risk factors and possible precipitating factors to the inmate's suicide. Among them were his grandmother's death in July 2012 and his father's recent cancer diagnosis. His suicidal behavior history included SI prior to his CDCR confinement, a non-verified SA upon CDCR admission in May 2011, and his brief placement on Suicide Precaution in December 2011 after expressing SI. The inmate also told his probation officer in 2011 that "I wish I could get the death penalty but only if they could do it (execute him) in six months to a year;" he remained remorseful for killing his girlfriend. The reviewer noted that:

> during this review, as in others at other facilities, is the poor inter-relator reliability of the SRE and the reluctance of clinicians to classify an inmate a moderate or high risk even when the data clearly show numerous chronic risk factors. In this inmate's case, the multiple chronic factors were correctly identified but because he denied a history of SI or attempts the clinician rated him low. More training appears to be needed.

The Suicide Report contained one basis for recommendation for corrective action through a QIP: (1) development of a Proctor-Mentor Program at SVSP to improve the quality of SREs completed by mental health clinicians.

In the **third** case (SVSP 7), the inmate was found hanging by a sheet from the upper bunk of his administrative segregation cell on September 17, 2012. He had re-entered CDCR for the fifth time in March 2004 to serve a 21-year term for assault with serious injury. He was transferred to SVSP in July 2009. He had been at the 3CMS LOC since 2005 due to stress and long-term imprisonment. He had various medical problems, including arthroscopic knee surgery and Hepatitis C. On July 6, 2012, he was involved in a fight with another inmate and placed in administrative segregation due to enemy concerns. Four days later, he was seen by a mental health clinician after CDCR received a letter from the Prison Law Office alleging that he had been the victim of a gang rape on July 3. Upon being assessed, the inmate reported being raped and expressed SI. He was tearful, hopeless, helpless, sad, anxious, and fearful. He was referred to the CTC and placed on Suicide Precaution in an alternative housing cell pending MHCB admission. He was also seen by a psychiatrist, who changed his medication.

On July 11, the following day, another psychiatrist saw the inmate and completed an SRE which stated that he was at "low" acute risk for suicide because he denied any SI, intent, or plan. He was discharged from Suicide Precaution and cleared to return to administrative segregation with

a five-day mental health follow-up.  In addition to these follow-up assessments, the PC saw him on a regular basis.  Progress notes indicated treatment related to sexual assault issues and coping strategies for dealing with stress, depression, and anger.  The inmate was compliant with his psychotropic medication.  He was seen by his PC on August 23 and was "still discouraged by lack of response to allegations of assault. Stated that his mood has been depressed and that he has been oversleeping."

The inmate was seen again on August 27 and September 13, but denied any acute mental health problems, including SI.  He received arthroscopic knee surgery on August 29; the sutures were removed on September 11.  He also periodically complained that the pain medication was not completely effective.  He filed complaints against a SVSP physician for discontinuing his surgeon's pain medication order and against SVSP custody officials concerning their investigation of his alleged sexual assault.

The CDCR reviewer offered several precipitating factors to the suicide based on personal letters found in the inmate's cell following his death.  These factors included increased depression due to his alleged sexual assault, fear of continued retaliation following administrative segregation release, and frustration with continued pain following knee surgery and inadequate medication dosages to manage the pain.  The Suicide Report contained four bases for recommendations for corrective action through a QIP:  (1) the adequacy of the investigation and apparent violation of PREA protocol concerning the inmate's sexual assault allegation; (2) custody staff's mishandling of the PLO letter; (3) discontinuation of a mood stabilizing psychotropic medication on July 10 without written clinical justification; and (4) review of the inmate's prescribed pain medication protocol.

Although not related to the proximate cause of his death, there was another concern that the CDCR reviewer did <u>not</u> identify.  This concern was with the adequacy of the SRE that the psychiatrist completed on July 11, 2012.  This SRE assessed the inmate at "low" acute risk of suicide, because he denied SI, despite the abundance of other acute risk factors.

In the **fourth** case (SVSP 8), the inmate was found hanging by a sheet from the ventilation grate of his administrative segregation cell on October 25, 2012.  He had entered CDCR in September 1984 to serve a 17-year-to-life sentence for a gang-related, second-degree murder.  He was not a caseload inmate.  His medical history included Hepatitis C and chronic pain from both a degenerative disc in his back and a gunshot wound.  He had a significant history of gang involvement within CDCR, but left gang activity in 2001 and was reclassified to a SNY.  His last RVR was in 2003.

On October 20, 2012, the inmate reported a safety concern and was re-housed in administrative segregation.  The following day, he allegedly took too much methamphetamine and was sent to the emergency room for treatment.  When he returned to the institution on October 22, he was sent to the CTC pending a mental health evaluation.  An SRE was subsequently completed; the inmate denied SI and indicated that the methamphetamine overdose was not related to suicidal behavior.  The clinician assessed him at both "low" chronic and acute suicide risk.  The inmate was returned to administrative segregation.  During the next few days, he displayed bizarre behavior, his cell was in disarray, and he was heard saying "I feel like crap," complaining of

nausea and vomiting.  He also began to refuse medication to treat his Hepatitis C and other medical treatment.  On October 23, he suggested to a psych tech that "I want help but don't trust anyone."  Mental health continued to see him daily, including the morning of his death on October 25.  Although the inmate continued to deny SI, staff was concerned about his behavior.

The CDCR reviewer offered one possible precipitating factor to the suicide; the likelihood that the inmate would receive an RVR for his methamphetamine overdose that would jeopardize his possibility of paroling in July 2013.  The CDCR reviewer also opined that the inmate likely "developed an acute, drug-induced psychotic disorder (from his methamphetamine overdose) that was not diagnosed by SVSP clinicians."  The Suicide Report contained four bases for recommendations for corrective action through a QIP:  (1) the clinician who conducted the SRE on October 22 did not gather correctional and medical information; as such, there was a lack of awareness of the inmate's administrative segregation housing for safety concerns and the likelihood that he would be denied parole due to his methamphetamine use.  The clinician also did not communicate with available staff, resulting in the failure to identify all risk factors; (2) the administrative segregation clinician failed to identify an acute drug-induced psychotic disorder in the inmate upon his return to the unit; (3) there was no documentation from medical providers regarding an inquiry as to how much methamphetamine the inmate ingested and/or swallowed; and (4) the psych tech conducting administrative segregation  rounds on October 23 did not initiate a mental health referral when the inmate stated "I want help but don't trust anyone."

In the **fifth** case (SVSP 9), the inmate was found to have asphyxiated himself with a shoelace in his GP cell on November 20, 2012.  He had entered CDCR in October 1994 to serve a four-year term for assaulting peace officers, namely, a CYA teacher and medical technician.  While in prison, he committed four more felonies that added more than 15 years to his sentence.  He had been scheduled for parole on December 11, 2012 and, as an undocumented alien, anticipated deportation to Mexico following CDCR release.  However, on October 27, 2012, he was informed that he had been certified as a Mentally Disordered Offender and would be paroled directly to ASH.  The inmate had over 27 RVRs, many of which were for assault, resulting in single-cell housing.  His most recent assault occurred on October 11, 2012, leading to another RVR and a revised parole date of December 11, 2012.

The inmate was transferred to SVSP in January 2009 and was at  EOP LOC.  He had multiple DSH and MHCB admissions.  His most recent diagnosis was Schizoaffective Disorder and he had a *Keyhea* order since 2004.  According to the CDCR reviewer, the inmate's:

> psychiatric symptoms were described as visual and AH, rambling or tangential speech, poor impulse control (hitting, kicking, and spitting at staff), poor hygiene and grooming, anger, agitation, smearing feces, confusion,
> refusal to eat, and lack of insight into his mental illness.  He frequently asserted that his psychiatric medications were causing his AH.  Some clinicians doubted that he suffered from a mental illness because after his assaults, the inmate usually claimed that the voices told him to hit someone.  His lack of remorse for the assaults was also a factor in their skepticism.  Furthermore, he was uncooperative

with some competency and insanity assessments in that he did not appear to give his best effort and clinician suspected him of malingering.

The inmate did not appear to be completely compliant with his psychotropic medication in the weeks prior to his death; laboratory results showed sub-therapeutic levels on October 25, 2012. It was believed that he was cheeking and/or vomiting the medications.

The inmate had several recent, but brief, placements on Suicide Precaution for SI on June 11, October 14, and October 23, 2012. The placements did not last for more than 24 hours and did not include MHCB admissions. The CDCR reviewer noted that "SREs pertaining to this inmate's risk of suicide were variable in diligence of completion."

The reviewer offered several possible precipitating factors to the suicide, including anxiety related to his upcoming parole and ASH transfer rather than deportation to Mexico. Although the inmate claimed to be looking forward to his return to Mexico, he had neither visits nor telephone calls during his SVSP confinement and there were no funds in his trust account. It was not known whether he had any existing family members living in Mexico. The Suicide Report contained two bases for recommendations for corrective action through a QIP: (1) it took approximately 17 minutes for medical personnel to arrive at the scene because staff reductions delayed opening of a security gate; and (2) the officers failed to notice the shoelace ligature around the inmate's neck during approximately ten minutes of CPR. The CDCR reviewer did <u>not</u> recommend a QIP to improve SREs, but indicated initiation of an SRE mentoring program at SVSP in the near future.

In the **sixth** case, the inmate (<u>SVSP 10</u>) was found hanging by a sheet from the ventilation grate of his cell at the DSH Salinas Valley Psychiatric Program (SVPP) during the morning of November 29, 2012. He had entered CDCR in February 2006 to serve a 32-year-to-life sentence for second-degree murder of his mother's companion. He was transferred to DSH's SVPP on November 2, 2012. He had an extensive history of mental illness, with the most recent diagnosis of Major Depressive Disorder, Severe, with Psychotic Features, or Schizoaffective Disorder, Depressed Type. He also had an extensive history of self-injurious and suicidal behaviors. Because DSH administered the SVPP program and it was not subject to this reviewer's on-site suicide prevention assessment, the death was not examined for this report.

In the **seventh** case (<u>SVSP 11</u>), the inmate was found hanging by a sheet from the bunk of his administrative segregation cell on January 24, 2013. He had entered CDCR in August 1996 to serve a 28-year-to-life sentence for first-degree murder; he began his sentence in the CYA in December 1995 and was transferred to CDCR when he was 20 years old. He was placed at the 3CMS LOC from 2002 to 2003 and was then discharged from the mental health caseload until 2009, when he was again placed at the 3CMS LOC. As his mental health continued to deteriorate, he was placed at the EOP LOC in September 2010. He received in-patient DSH care at ASH and SVPP for two years and was transferred to SVSP on January 16, 2013. He committed suicide eight days later. His most recent diagnosis was Major Depressive Disorder and Anti-Social Personality Disorder.

During his 16 years of confinement, the inmate accumulated 17 RVRs; most were non-assaultive and involved possession of contraband or willful delay of a peace officer. His last RVR was in March 2011. He had several administrative segregation placements for either rules violations or safety concerns. His last administrative segregation placement occurred upon transfer to SVSP on January 16, 2013 "pending classification review." The following week, on January 24, the day of his death, the ICC saw him and approved his release from administrative segregation to SNY housing pending transfer to another facility. He was also approved for double-cell housing with another EOP inmate.

The inmate had a significant history of SI and self-injurious behavior. However, there were few serious SAs except for one by hanging in 1999, that records did not verify. During his SVPP hospitalization in January 2012, a clinician noted that "he states that he thinks about suicide 1-2 times each week and feels that he is 'very likely' to attempt suicide again in the future... At intake, patient stated that he thought about suicide 'all the time.' He has an extensive history of self-injury; however, previous SREs have not categorized these as SAs." Documented self-injurious behavior occurred in 1997 for scratching his arm with a razor, 2000 and through 2010 for multiple incidents of cutting, and 2011 for cutting, while at SVPP.

When transferred to SVSP on January 16, 2013, an intake nurse saw the inmate, who reported hearing voices "all the time telling him to hurt self and is worthless." He denied feeling suicidal, but stated feeling anxious. He was placed on Suicide Precaution in the CTC's alternative housing unit (AHU) and was seen by a psychiatrist the following day. An SRE was completed, the inmate denied SI, and the clinician noted that "chronic risk moderate due to history of multiple SAs and history of severe mental illness, but doing very well on meds, currently euthymic, not psychotic, so acute risk is low." He was cleared for EOP housing with a five-day mental health follow-up and 60-minute welfare checks for 24 hours.

The inmate was seen daily during the next five days by mental health and was reported to be "stable." He did not participate in group activity during this time period with the exception of a group conducted a few hours prior to his death. He also saw a psychiatrist for an initial psychiatric evaluation approximately three hours before his death on January 24 and denied SI. However, he admitted to AH "mostly derogatory and tell him to hurt himself. States he tries to read to keep the voices away. AH, but not as intense... alert, cooperative...good eye contact, speech is not pressured, mood is mildly anxious; affect intense, stable....relatively stable on current meds and doses." There was also a question whether he received all of his prescribed psychotropic medication because the eUHR did not contain the medication administration record (MAR). A few hours later at approximately 4:00 p.m., the PC saw the inmate, although no interaction was documented. At that time, he expressed concern about being housed in a SNY that lacked adequate EOP services. Supportive counseling was provided, but the inmate was found hanging in his cell approximately 90 minutes later.

The CDCR reviewer offered a few possible precipitating factors to the suicide, including the fact that the inmate:

> did have a number of chronically high suicide risk factors (life sentence, history
> of violence, substance dependence, depression, and paranoia) and it is unclear if

he received medication while at SVSP.  These factors, combined with previous attempts and historically impulsive behavior, making the possibility that he became overwhelmed by the stress of his impending move and, in an increased depressed and paranoid state, impulsively took action to end his life.  However, several factors suggest that his actions did not reflect that he intended to die, but only intended to interrupt is scheduled housing move to Facility A/SNY.

The Suicide Report contained two bases for recommendations for corrective action through a QIP:  (1) the MAR from January 17-24, 2003 was missing from the records; although medications were noted as having been ordered by the pharmacy, "it is unknown whether the inmate received prescribed medications during this crucial time."  A subsequent review of the autopsy report by this reviewer also indicated that several medications were not listed in the toxicology results; and (2) all items in the inmate's cell not deemed to be evidence by correctional staff were not retained; CDCR reviewers were thus unable to examine these items.

Although <u>not</u> raised by the CDCR reviewer, several other matters were problematic.  Among them, the psychiatrist who completed the SRE on January 17, 2013, resulting in the inmate's release from Suicide Precaution, only interviewed the inmate and did not speak with other staff or review the eUHR or Central File (C-file).  Given that the inmate had been consistently assessed as a "high" chronic risk for suicide during the past three years, an assessment of "moderate" chronic risk was questionable.  The clinician also only found two acute risk factors, namely, administrative segregation housing and single-cell placement, and seemingly ignored the acute risk factor of "safety concerns," which the inmate had consistently endorsed during the past several years.  Psych techs were conducting daily administrative segregation rounds using a rounds form that was not authorized by CDCR and did not allow for collection of adequate mental health status information.  There also was no inquiry as to why, contrary to CDCR policy, the inmate was housed in the same unsafe, non-retrofitted intake cell during his entire eight days of administrative segregation confinement.

In the **<u>eighth</u>** case (SVSP12), the inmate severely slashed both sides of his throat with a razor in his SNY cell on July 31, 2013.  The incident was witnessed by his cellmate and responding COs.  Despite life-saving measures, he lost a tremendous amount of blood and was subsequently pronounced dead.

The inmate had re-entered CDCR in July 2012 to serve a 17-year sentence for assault; he had seven prior CDCR confinements.  He had been transferred to SVSP on July 22, 2013, nine days prior to his death.  He had a few prior RVRs, was classified as double-cell eligible, and required SNY housing.  He was placed on the mental health caseload in November 2012 following MHCB admission for SI, AH, and refusing psychotropic medication.  Upon MHCB discharge, he was placed at the 3CMS LOC.  His most recent diagnosis was Schizoaffective Disorder.  In May 2013, he expressed safety concerns to staff and was placed in administrative segregation at California Substance Abuse Treatment Facility (CSATF) until July 22, 2013, when he was transferred to SVSP and placed in the SNY.  He consistently denied SI.

With the exception of MHCB admission in November 2012, the inmate had no recent significant history of suicidal behavior other than an incident of self-injurious behavior, by superficially

cutting his wrist, approximately seven years earlier. During a psychiatric assessment at CSATF on May 28, 2013, he complained of AH, lack of sleep, and poor appetite, but refused psychotropic medication. An SRE completed on June 6, 2013 assessed him as a "moderate" chronic and acute suicide risk. When he arrived at SVSP in July 2013, a clinician assessed him for purposes of treatment planning. A resulting SRE completed on July 26, five days before his death, indicated a "low" chronic and acute risk of suicide.

On July 31, 2013, the day of his death, the inmate's proposed list of visitors, including several family members who had last visited him in 2008, was disapproved. It was unclear why these visitors were disapproved and whether the inmate was aware of this decision prior to his death.

The CDCR reviewer did not offer any possible precipitating factors to the suicide. However, it was noted that the inmate's cellmate had observed him destroying personal paperwork, including pictures and letters to/from family members, in the days prior to his suicide. The cellmate believed that the inmate was becoming increasingly fearful, confused, and perhaps paranoid. The Suicide Report did <u>not</u> contain any recommendations.

Although <u>not</u> raised in the Suicide Report, the CDCR review did not sufficiently address two issues. <u>First</u>, the reviewer did not seek a definitive explanation from SVSP officials as to why the inmate's proposed list of visitors was disapproved; this was possibly a significant decision since it occurred on July 31, the date of the inmate's death. <u>Second</u>, two SREs completed approximately six weeks apart on June 6 and July 26 listed very different chronic and acute risk factors; the June 6 SRE listed ten chronic and seven acute risk factors, while the July 26 SRE listed only five chronic and one acute risk factor. Although any relationship to the proximate cause of the suicide was arguably unclear, such disparity should have been seen as problematic to the CDCR reviewer.

In the **<u>ninth</u>** case (<u>SVSP 13</u>), the inmate was found hanging by a sheet from the light fixture of his administrative segregation cell during the late evening of March 18, 2014. Life-saving measures, including CPR, were initiated and he was transported to a local hospital, where he was pronounced dead three days later on March 21, 2014. He had entered CDCR in May 2010 to serve a 14-year sentence for second-degree attempted murder, use of a deadly weapon, and infliction of grave bodily injury. He was placed at the 3CMS LOC following RC screening based on current symptomology and a history of mental health treatment in the community, including AH and an initial diagnosis of Schizophrenia. He was transferred to SVSP in December 2012.

The inmate's mental illness resulted in a very difficult transition to CDCR. He had six RVRs for fighting and assaults on correctional staff, four of which occurred during a two-month period in September and October 2010 while confined at PBSP. He had three MHCB admissions during that time for SI, aggression, and agitated behavior. He was eventually referred to DSH and received treatment at an ICF from February 2011 through February 2012. Upon return to CDCR, he was maintained at the EOP LOC with a diagnosis of Schizophrenia, Paranoid Type. The inmate did not acknowledge his mental illness and inconsistently took his psychotropic medication, resulting in a *Keyhea* order. Due to his mental illness, he continued to be assaultive and was confined to administrative segregation on several occasions. His mental illness also

resulted in other inmates trying to take advantage of him by pressuring him for sex and/or taking his possessions and canteen items.  He often threatened suicide as a means of dealing with these safety concerns.

The inmate's history of self-injurious and suicidal behavior was extensive and included incidents in 2005, 2006, 2008, 2010, and 2012 for wrist cutting and choking.  He experienced SI on numerous occasions, resulting in multiple MHCB placements.  His most recent SRE was completed on January 23, 2014; the administrative segregation clinician assessed him as a "moderate" chronic suicide risk and "low" acute suicide risk.

In November 2013, the inmate reported SI and was placed in an MHCB.  At that time, he complained of not having regular contact with his family and of being taken advantage of by his cellmate, who had stolen several of his possessions.  On January 21, 2004, he approached this former cellmate in the SVSP dining hall and punched him in the back of the head.  The inmate was transferred to administrative segregation and, at the time of his death, was awaiting transfer due to safety concerns.

Inmates interviewed following the suicide indicated that, although his family continued to place funds in his account, they had little contact with the inmate and he rarely received visits or letter correspondence.  They also consistently reported that he frequently talked about committing suicide and appeared to become more depressed and hopeless during the last few months of his life.

These inmate accounts were consistent with the inmate's recent interactions with mental health staff.  During his last MHCB stay for SI in November 2013, the inmate told his PC that "I haven't heard from my family I think they are mad at me."  He also stated that "I think my cellie is trying to make me mad."  On February 21, 2014, he was seen by an administrative segregation clinician after being placed in a holding cell due to custody's concern that he "was a danger to himself."  The inmate denied SI, but reported that he was "very depressed."  An SRE was <u>not</u> completed.  During this time, he became focused on real and imagined physical ailments; he complained about a hole in his ribs that nursing staff indicated was psychosomatic in nature.  The CDCR reviewer also indicated that the inmate was anxiously obsessing about his body.

On March 6, 2014, the psychiatrist saw the inmate, who reported feeling more depressed.  The following day, he stated to the administrative segregation clinician that he felt "stressed and angry" and of not sleeping for the previous two nights.  The last session with the administrative segregation clinician occurred on March 13; the inmate again reported feeling "a little depressed," but refused a confidential session.  Group progress notes from this time period reported his refusal to participate in group treatment.  A psych tech who the CDCR reviewer interviewed stated that the inmate had "left two groups early during the final weeks of his life and then stopped coming to group altogether."

The CDCR reviewer did not offer any specific precipitating factors for the suicide, but theorized that during the last few weeks of the inmate's life, he exhibited increasing anxiety and depression.  As stated in the Suicide Report, "his increasing feelings of helplessness, on-going

victimization, impulsivity, and possible feelings of rejection from his family may have contributed and experiencing overwhelming hopelessness" that resulted in his suicide.

The Suicide Report did <u>not</u> contain any recommendations for corrective action. However, the CDCR reviewer raised several concerns. Among them, nursing staff saw the inmate on February 22, 2014 regarding a medical complaint that was deemed "a somatic delusion" and led to a mental health referral. However, there was no evidence in the eUHR that the referral was forwarded to mental health. An SRE that a telepsychiatrist completed on November 21, 2013 was also incorrectly completed and neither contained information regarding previous SAs nor addressed a mental status evaluation. There was also no documentation of clinician-to-clinician contact between the administrative segregation and EOP clinicians within five days of the inmate's January 21, 2014 administrative segregation placement.

The CDCR reviewer reported that "the above concerns have been communicated at the institutional level." It was unclear, however, why such concerns were not formalized as bases for recommendations for corrective action through a QIP. There also were several other problem areas that were <u>not</u> identified in the Suicide Report. First, the inmate's most recent SRE on January 23, 2014, which was conducted two days after his administrative segregation placement, did not completely reflect his suicide risk factors. The risk factors for current recent depressive episode, hopelessness/helplessness, increasingly interpersonal isolation, safety concerns, and single-cell placement were all marked "no," but should have been marked "yes" based on his behavior. Protective factors of family support were noted on the SRE, but the inmate had informed his PC and other inmates during this time that his family had abandoned him. This inconsistency might reflect a lack of communication between administrative segregation and EOP clinicians, although these clinicians subsequently insisted that such communication took place.

Second, these risk and protective factors could have been correctly identified on February 21 had the mental health clinician completed an SRE following a custody staff referral that the inmate was "a danger to himself." Third, during the last few weeks of the inmate's life, the administrative segregation clinician and fellow inmates consistently reported that he was becoming increasingly more depressed, anxious, and isolated, resulting in his refusal to participate in group treatment. A psych tech reported that he "left two groups early during the final weeks of his life and then stopped coming to group altogether." However, review of the weekly Psych Tech Daily Rounds Forms suggested quite the opposite; they indicated that the inmate had no mental health concerns, did not complain about appetite for sleep, exhibited a mental status within normal limits, and participated in programming. This perspective called into question the veracity of the Psych Tech Daily Rounds Forms.

In the **tenth** case (SVSP 14), the inmate was found to have asphyxiated himself with a plastic bag in his ASU cell during the late afternoon of October 18, 2014. The inmate re-entered the CDCR system on May 10, 2013 to serve a 30-year-to-life sentence for robbery. He was transferred back to SVSP from CHCF two days earlier on October 16, 2014. The inmate was placed in the MHSDS at EOP LOC for Paranoid Schizophrenia and Anti-Social Personality Disorder. At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report, had not been examined by this reviewer.

*Summary*:  This reviewer found that SVSP was a problematic facility.  In addition to the very high number of suicides during the past few years, SVSP exhibited numerous poor practices concerning suicide prevention.  Among them, it appeared that mental health clinicians completing SREs in response to emergency mental health referrals set high thresholds for placing inmates on suicide observation.  Many inmate suicides during the 2012-2014 time period also involved incomplete or otherwise inadequate SREs.

## 14)      California State Prison/Corcoran (CSP/Cor)

**Inspection**: February 18-19, 2014

CSP/Cor housed 4,365 inmates, the majority of which were at Level IV classification.  The institution had a 96-bed Acute Care Hospital (ACH), with 24 designated MHCBs.  There were four alternative housing cells in Unit D of the ACH to temporarily house suicidal inmates prior to MHCB transfer.  There were three administrative segregation units for caseload and non-caseload inmates.  Two SHU facilities housed almost 50 percent of the total inmate population.  Thirty-six percent of CSP/Cor inmates were caseload inmates; there were 1,290 3CMS and 274 EOP inmates.

**Screening/Assessment**:  As there were no new admissions during the two-day site visit, the intake screening process at CSP/Cor was not observed.  However, psych tech rounds in SHU 4B1 were observed on February 19; these rounds were performed daily in administrative segregation, but weekly in the SHU.  With the exception of the psych tech using an unauthorized CDCR form, the rounds were unremarkable and the form was completed at cell-front for all caseload inmates.  Psych techs were subsequently provided with the correct Psych Tech Daily Rounds Form.

**Housing**:  All 24 MHCBs in the ACH were clean, suicide-resistant, and furnished with suicide-resistant beds.  The alternative housing cells in Unit D of the ACH were suicide-resistant, but lacked beds and inmates slept on a mattress on the floor.  IDTT meeting space in the ACH was problematic; one IDTT treatment team meeting was conducted in a converted cell, while another was held in the ACH's "tub room."  IDTT meeting spaces were so small that this reviewer and the CMH had to stand in the doorway to the outside exercise yard in order to observe one of the IDTT meetings.  These rooms were also used as staff offices.  It was reported that many senior clinicians choose not to work in the ACH due to these working conditions.

ASU 1, the stand-alone administrative segregation unit, contained five new intake cells that had been retrofitted to be suicide-resistant.  As detailed below, an inmate committed suicide in April 2013 in ASU 1 by hanging himself from a ventilation grate in a non-retrofitted intake cell.  Contrary to policy, this inmate was placed in this unsafe cell the day before his suicide.  Administrative segregation unit 3A03, which also served as an EOP Hub, had six suicide-resistant, new intake cells.  Administrative segregation unit 3A04, which mostly housed 3CMS inmates, had three non-suicide resistant new intake cells that contained protrusions such as shelves, large gauge ventilation grates, and gaps between the wall and desk and between the wall and bunks, which made them conducive to a hanging SA.

**Observation**:  All inmates assigned to an MHCB had Q-15 minute observation, unless on Suicide Watch and receiving constant observation.  The Observation Record Forms that documented observation of the 23 inmates on Suicide Precaution on February 18 were up-to-date and accurate.  No inmates were in alternative housing cells during the site visit, although a few of the cells had been used the previous week.

Several IDTT meetings held in the ACH on February 18 and 19 were observed.  The IDTT meetings conducted on February 18 were problematic, with the psychologist always only referring to inmates by their last name.  In one case, the inmate (COR 1) was admitted to an MHCB a few days earlier on February 14 and was on Suicide Precaution.  An SRE completed the previous day was incomplete, while the assessment conducted during the IDTT meeting was comprised of a clinician asking the inmate "you're not suicidal, right?"  In another case, the inmate (COR 2) also had been admitted to an MHCB on February 14 and was on Suicide Precaution.  The IDTT meeting's purpose was to assess his suicide risk with a preliminary plan for discharge.  Although the treatment team ultimately decided to allow him to receive his clothing, there was never any discussion about his suicide risk.  The IDTT meetings conducted the following day, on February 19, were much better; the treatment team adequately reviewed each case and assessed the risk of inmates on Suicide Precaution.

Review of unit logs for all three administrative segregation units as to documentation of 30-minute welfare checks of non-intake cells revealed adequate documentation.  Review of Guard One data for inmates housed in administrative segregation for 21 days or less indicated 95 percent compliance for February 18, 2014 for both ASU1 and 3A03.

**Management/Treatment Planning**:  eUHRs of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis were examined.  Although the review indicated that clinicians consistently saw inmates on suicide observation daily, and inmates referred to mental health were generally seen timely, other matters were problematic.

Several eUHRs in which inmates were discharged from either alternative housing or an MHCB without completion of an SRE were reviewed.  Because SREs contained a treatment plan section, if the clinician discharged an inmate from Suicide Precaution without an SRE, the inmate would not have a treatment plan at discharge.  For example, one inmate (COR 3) who expressed SI was placed on Suicide Precaution in alternative housing in the late evening of January 22, 2014.  He was seen by a clinician the following morning and only a Release Orders from Alternate/Temporary Housing Form was completed; it merely stated "Patient to talk to Building Sergeant about lost property issue, referred to psychiatry for medication change."  Neither an SRE nor progress note was completed.  This same inmate was previously admitted to an MHCB on December 3, 2013 and was discharged the following day by way of a Mental Health Crisis Bed Discharge Summary Form rather than an SRE.  No treatment plan was also written on that occasion.

In another case, the inmate (COR 4) expressed SI during the evening of January 16, 2014 to a TTA nurse and was placed on Suicide Precaution in alternative housing.  The following morning he was seen by a clinician who completed an Interdisciplinary Progress Note-PC Crisis

Evaluation Form that was sub-titled "Psychologist/Psychiatrist Admission Checklist at ER" and simply stated "I'm doing fine.  I don't feel like hurting myself or anyone else anymore.  No longer endorses SI, HI, AH, VH.  Awoke from sleep and came to the door to speak to PC.  Calm and respectful."  The inmate was discharged from Suicide Precaution with a Release Order from Alternate/Temporary Housing Form.  An SRE was not completed.

In another case, the inmate (COR 5) was admitted to an MHCB on January 16, 2014 for SI.  An SRE was not completed and the inmate was discharged the following day with an incomplete MHTP that listed SI and interventions of "psycho-pharmaceutical assessment, daily clinical contact, and welfare check," but did not indicate goals or target dates for completion.  A Mental Health Crisis Bed Discharge Summary Form was also completed, but no discharging SRE. There was thus no treatment planning beyond the required five-day follow-up note.

There were also concerns regarding the quality of SREs completed due to emergency mental health referrals for SI.  In one case, the 3CMS inmate (COR 6) ingested a razor blade and was transported to the emergency room on January 1, 2014.  Upon returning to CSP/Cor several days later on January 6, he was placed in alternative housing pending a mental health assessment.  A clinician saw him several hours later and completed an SRE that indicated a "low" acute risk for suicide; the estimate of chronic risk was not stated.  The inmate denied SI and reported that he swallowed the razor blade by "accident."  The SRE's treatment plan section simply stated "(r)elease from AHU, 5-day follow-up initiated.  If decompensation is observed, he should be referred to ER/TTA for further break evaluation/treatment."  In another case, the same clinician used the same poor treatment planning narrative for an EOP inmate (COR 7) by writing the following in the SRE's treatment plan section:  "Stable at the present time.  Release from the alternative housing program.  Begin 5-day follow-up upon release from AHU.  If decompensation is observed, refer back to the ER/TTA for further evaluation/treatment."

In other cases, although discharging SREs were completed, the SRE treatment plan section simply stated "refer to treatment plan of this date."  When the medical chart was reviewed for a treatment plan, the only document completed was the Interdisciplinary Treatment Team-Level of Care Decision Form that lacked a treatment plan, and simply noted the LOC (see, for example, COR 8).  There were thus numerous problems with CSP/Cor clinicians' SREs and treatment planning documentation when discharging inmates from alternative housing and MHCBs.

**Intervention**:  All reviewed housing units contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records indicated that 99 percent of custody and 97 percent of nursing staff had CPR certification.  Ninety-nine percent of custody staff was also compliant with annual suicide prevention training, as was 77 percent of mental health staff and six percent of medical staff.  Ninety-eight percent of mental health clinicians received the seven-hour SRE training, and 92 percent completed the SRE mentoring program.

**Recent Suicides**:  CSP/Cor had three inmate suicides from 2012-2014.  In the **first** case (COR 9), the inmate strangulated himself with a sheet and shoelace in his SHU cell during the afternoon of August 28, 2012.  The inmate entered CDCR in June 2000, at age 17, to serve a

nine-year term for burglary and robbery.  In February 2002, he received a 25-year to life
sentence for assault on a CO.  He was transferred to CSP/Cor in June 2003 and spent most of his
confinement in the SHU.  He had 16 RVRs, the last of which occurred in November 2011.  He
had good family support, especially from his girlfriend, until April 2012, when she was arrested
for mailing drugs to her brother at another CDCR facility.

The inmate had been at the 3CMS LOC from 2006 through 2008, and from 2009 until his death.
His most recent diagnosis was Depressive Disorder.  He was known to be struggling with the
reality of his life sentence and often refused mental health services.

On August 21, 2012, the inmate was brought to the TTA following an alleged drug overdose.  He
later reported he had staged the incident because he wanted protective custody and removal from
the SHU due to fear for his life from gang and drug activities.  He refused further medical
treatment and was temporarily rehoused in administrative segregation.  The following day, the
Institutional Gang Investigators (IGI) unit interviewed him; he had been providing information
about Mexican Mafia operations inside and outside of the prison since 2011.  He was
subsequently rehoused in another SHU building pending further investigation.

On August 27, 2012, the day before his death, the inmate's PC attempted to interview him in
preparation for his IDTT meeting scheduled for the following morning, but the inmate refused
the interview.  The clinician wrote an SRE that was identical to one completed the previous year
on November 8, 2011; the clinician apparently used the template from the first SRE due to the
inmate's refusal to be interviewed.  The inmate's alleged drug overdose was not mentioned in the
SRE.  Review of the inmate's medical chart did not indicate any known history of suicidal
behavior.

On the morning of August 28, 2012, IGI unit members visited the inmate and informed him that
officers from the Los Angeles County Sheriff Department's gang unit would be at CSP/Cor later
that day to interview him.  In exchange, his property was returned to him and he was told that he
would be permitted to telephone his girlfriend.  Several hours later, however, the inmate refused
to leave his cell to call his girlfriend, meet with the Los Angeles County Sheriff's Department, or
attend his IDTT meeting.  IGI staff reported that he appeared very fearful and paranoid and
suggested to the SHU lieutenant and COs that they monitor him.  He was found dead several
hours later in a state of *rigor mortis*.

The CDCR reviewer theorized that the main precipitating factor to the inmate's suicide was his
perception that he would be assaulted and/or killed by the Mexican Mafia for cooperating with
the IGI unit.  Three bases for recommendations for corrective action through a QIP were
identified in the Suicide Report:  (1) there was a lack of communication between medical and
mental health staff regarding the alleged drug overdose on August 21, 2012; as a result, the
inmate's PC was unaware of the alleged overdose and the extent of the inmate's fear for
retaliation of informant activities; (2) although IGI staff alerted housing unit staff about the
inmate's unusual behavior on August 28 and requested that he be more closely monitored, he
was left unobserved for over two hours prior to being found dead; and (3) the inmate's fear of
retaliation from gang members following his decision to become an informant could have been a

suicide risk factor that should have been addressed by CDCR headquarters in their statewide suicide prevention efforts.

In the **second** case (COR 10), the inmate was found hanging by a sheet from the ventilation grate of his administrative segregation cell on April 29, 2013.  He had entered CDCR in February 2010 to serve an 82-year to life sentence for first-degree murder and attempted murder.  He was transferred to CSP/Cor in March 2012.  He had good family support and frequent telephone contact and visits.  He had two RVRs during his approximate two-year confinement and was given SNY status based on his fear of retaliation from gang members.

Despite the inmate having an extensive mental health history that the C-file documented, he was never placed on the mental health caseload; his C-file was never reviewed and he consistently denied any current or previous mental health history.  Subsequent C-file review by the CDCR reviewer revealed that the inmate had been treated for AH and paranoia in the community, had received psychotropic medication for Paranoid Schizophrenia and Bipolar Disorder while incarcerated in the Orange County Jail, and had several previous admissions to Western Medical Center for forensic evaluations.  The reviewer found that, although a CD containing the inmate's mental health history from the community was contained on the C-file, medical and/or mental health staff never reviewed the information; the Orange County Jail Transfer Form that arrived with the inmate did not document any mental health history.

On April 28, 2013, the inmate, who had been experiencing significant difficulty sleeping during the previous week and was upset by the perceived loud noises from a certain inmate in a nearby cell, manufactured a shank and stabbed this inmate as he returned from yard.  He was placed in administrative segregation pending investigation, but the assigned cell was not a suicide-resistant new intake cell.  His former cellmate subsequently told the CDCR reviewer that the inmate had become increasingly more paranoid during the week and believed the entire housing unit was talking about him.  He had told his cellmate that "he was afraid he was going crazy" and "don't want to live if I'm crazy."

On April 29, the following morning, a psych tech saw the inmate at approximately 7:45 a.m.  The inmate did not make eye contact and refused to come out of the cell.  The psych tech noted that the inmate appeared extremely anxious, paced the cell, and rubbed his hands against his forehead.  He then began to self-report an extensive psychiatric history, current paranoid thoughts, grandiose beliefs, and auditory and VHs.  He denied current SI, but told the psych tech that he had been unable to sleep for over one week.  The psych tech completed an Emergency Mental Health Referral at approximately 9:00 a.m.  In addition, and unrelated to the psych tech referral, a housing sergeant completed an Urgent Mental Health Referral at approximately 9:00 a.m. based on information received the previous day that the inmate had been unable to sleep and it "was making him feel crazy."  A short time later at approximately 9:38 a.m., the CO discovered that the inmate had committed suicide.

The Suicide Report contained four bases for recommendations for corrective action through a QIP:  (1) although the inmate was appropriately identified as needing an emergency mental health referral on April 29, 2013, there was a two-hour delay by the psych tech in providing mental health with this information.  Contrary to *Program Guide* requirements, the inmate was

82

not "under continuous staff observation until evaluated by a licensed mental health clinician;" (2) rather than administering the 31-item mental health screen to the inmate, the psych tech allowed the inmate to complete the screening form himself; (3) it did not appear that responding medical staff retrieved an emergency response bag as there was no mention of an AED being applied; and (4) supporting information related to the inmate's prior mental health treatment at the Orange County Jail was not appropriately transferred to CDCR. The inmate's mental health history was thus unknown to medical and mental health personnel.

Although not contained in the Suicide Report, two other matters were problematic. First, upon entry to administrative segregation on April 28, 2013, the inmate was placed in an unsafe, non-intake cell rather than in a suicide-resistant, new intake cell as per CDCR policy. Second, although the CDCR reviewer criticized the Orange County Jail for not forwarding a discharge summary with the inmate that noted his extensive mental health history, the reviewer located and reviewed the inmate's mental health history from a CD that the Orange County Jail forwarded and was contained in C-file. It was unclear why CDCR did not recommend a QIP based on this finding.

In the **third** case (COR 11), the inmate was found hanging by a sheet from the door holes of his SHU cell on July 22, 2013. He had entered CDCR in May 1999 at 18 years of age to serve a 15-year to life sentence for attempted murder. In 2004, he was sentenced to an additional 18-year to life sentence for the attempted murder of another inmate. In 2007, he allegedly murdered his cellmate; a trial on that case was scheduled to begin on August 9, 2013. The inmate had been transferred to CSP/Cor in July 2007. He was placed in the SHU in 2010 when he was validated as a member of the Mexican Mafia and due to multiple serious RVRs. He was briefly at the 3CMS LOC between June and September 1999 for an Adjustment Disorder with Depressed Mood. Other than routine screenings, he had no further interactions with mental health and consistently denied both SI and a history of suicidal behavior. He did not have any serious medical conditions. Beginning on July 8, 2013, he participated in a mass hunger strike and continued to refuse all meals until July 21, 2013. He began accepting food the following day, on July 22, which was the day of his death.

Although the CDCR reviewer offered several scenarios as possible precipitating factors to his death, no definitive precipitant could be confirmed. The Suicide Report contained one basis for recommendation for corrective action through a QIP: (1) contrary to CDCR policy for SHU inmates, this inmate had not been consistently offered ten hours of weekly yard.

Although not raised in the Suicide Report, the case revealed two additional problems. First, contrary to CDCR policy dated May 28, 2013 requiring observation of SHU inmates at 30-minute intervals, the inmate had not been observed for over one hour prior to being found hanging on July 22, 2013. Medical records indicated he had "lividity on his back." Second, emergency response records indicated the 911 emergency call was not initiated until 9:19 p.m., which was over 13 minutes from the notification of the SA and an excessive amount of time.

**15)**     **California Substance Abuse Treatment Facility (CSATF)**

**Inspection**: February 20-21, 2014

CSATF housed 5,522 inmates in a mixture of mostly Level II, III, and IV security classifications. CSATF had a CTC with 20 designated MHCBs. There were four alternative housing cells, two holding cells and two mental health observation cells, in the CTC to temporarily house suicidal inmates prior to MHCB transfer. There were two administrative segregation units for caseload and non-caseload inmates. Thirty-seven percent of CSATF's inmates were caseload inmates; there were 1,682 3CMS and 354 EOP inmates.

**Screening/Assessment**: The intake screening process of several new admissions was observed on February 21. A nurse assigned to the R & R Unit conducted the Initial Health Screening. The screening was conducted in the open doorway of the Nurse's Office, as other inmates sat behind the inmate being screened; privacy and confidentiality were thus compromised. A CO also stood directly behind any screened inmate with a Level IV security classification. The nurse was observed asking all required questions on the Initial Health Screening Form.

The reviewer observed required psych tech rounds in both administrative segregation units. The rounds were unremarkable and the Psych Tech Daily Rounds Form was completed at cell-front for all caseload inmates. A psych tech was observed administering the 31-item mental health screen to a newly admitted administrative segregation inmate. The screening was completed in the privacy of a small office on the unit, with an officer stationed outside of the room.

**Housing**: All MHCB rooms were clean, suicide-resistant, and furnished with suicide-resistant beds. However, the two mental health observation cells did not have suicide-resistant beds; inmates slept on a mattress on the floor. Inmates in the mental health observation cells were under constant observation because the cells were not suicide-resistant.

The administrative segregation unit housing caseload inmates, E-1, contained five new intake cells that were retrofitted to be suicide-resistant. The stand-alone administrative segregation unit similarly contained five new intake cells. However, several inmates who had been housed in the unit for less than 72 hours were housed in unsafe, non-retrofitted intake cells in both units. In E-1, cells housing new intake inmates contained protrusions including shelves, large gauge ventilation grates, and gaps between the wall and desk and between the wall and bunks conducive to a hanging SA. In the stand-alone unit, cells housing new intake inmates contained ventilation grates that had not been retrofitted.

**Observation:** Although Suicide Precaution and Suicide Watch were frequently used in MHCBs for inmates identified as suicidal, psychiatric observation was also observed in the unit during the site visit. Although not sanctioned by CDCR and not referenced in the *Program Guide*, CSATF mental health officials previously developed a local policy within their CTC Policy and Procedure Manual that outlined procedures for using psychiatric observation. This policy indicated that the purpose of psychiatric observation was: "(1) To prevent suicide and/or injury to self, other inmate(s)patient(s), and/or staff; and (2) To assess the inmate-patient's mental health condition and treatment status." In fact, however, psychiatric observation was often used

as a step-down from Suicide Precaution, with inmates observed at 60-minute intervals.  MHCB clinicians also frequently used psychiatric observation at 30-minute intervals for inmates assessed as suicidal.  Such a practice was contrary to *Program Guide* requirements.

As to documenting observation of inmates on suicide observation, CTC nursing staff did <u>not</u> use the CDCR-approved Suicide Watch/Suicide Precaution Record CDCR 7365 (revised July 2009) Form.  Instead, they used an outdated Patient Observation Record Form that had been last revised in October 1990 and allowed for Suicide Precaution at 30-minute intervals.

Observed IDTT meetings of two CTC inmates on February 20 were problematic.  In the first case, the inmate (<u>CSATF 1</u>) had been admitted to the MHCB approximately one week earlier for SI.  Although several Physician's Orders were written during the week, the last clinical progress note was dated five days earlier, on February 15.  Although the inmate continued to endorse SI, Suicide Precaution were reduced from 15-minute to 30-minute intervals.  During the February 20 IDTT meeting, the inmate continued to endorse SI; he stated that although he had no plan yet, he "wouldn't want it to be painful, if it's painless, it would be a possibility."  He rated the severity of his SI to be "7 out of 10."  Although the treatment team engaged in a thoughtful conversation as to his level of suicide risk, there was no discussion regarding his observation level.

In the second case, the inmate (<u>CSATF 2</u>) had voiced SI and was admitted to the CTC's mental health observation room, without a suicide-resistant bed, after-hours on February 18, 2014.  Because the observation room was considered alternative housing, he was initially placed on constant observation.  The following day, the inmate continued to report SI without a plan.  He remained in the observation room, but was downgraded to Suicide Precaution with observation at 15-minute intervals.  During the February 20 IDTT meeting, this reviewer asked why the inmate had been assigned to a specific MHCB cell, yet remained in the mental health observation room with only a mattress on the floor?  The PC appeared unaware of the inmate's housing status.  Another clinician indicated concern with his level of suicidal behavior, but not enough to warrant constant observation.  However, such elevated concern was not documented in progress notes.  Subsequent review of the inmate's observation form revealed that nursing staff had not observed him for over one hour prior to his IDTT meeting.

Review of administrative segregation unit logs for documentation of 30-minute welfare checks of non-intake cells revealed their proper documentation for the stand-alone unit.  However, 30-minute welfare checks were not consistently performed in administrative segregation unit E-1, which housed caseload inmates.  Review of Guard One data for inmates housed in administrative segregation for 21 days or less indicated 97 percent compliance for a selected 24-hour period for each administrative segregation unit.

**Management/Treatment Planning**:  eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated that clinical staff consistently saw inmates daily when on suicide observation and that inmates who were referred to mental health were generally seen timely.  However, other matters were problematic.

Among them, several reviewed eUHRs revealed inmates being discharged from the MHCB without an adequate treatment plan.  For example, one inmate (<u>CSATF 3</u>) expressed SI and

engaged in superficial wrist cutting with a razor.  He was placed on Suicide Precaution in alternative housing during the late evening of January 15, 2014.  He had been "intermittently included in the MHSDS for recurring depression with reports of hopelessness, feelings of sadness, isolation, at times SI, vegetative symptoms, and decreased energy.  He has in the past attributed his depression due to his vision loss and other medical problems."  His most recent diagnosis was Major Depressive Disorder.  Although a clinician decreased his observation from 15 to 30-minute intervals on January 16, he remained in the mental health observation cell for two additional days without a suicide-resistant bed.  On January 21, he was released from alternative housing following completion of an SRE in which the clinician documented the following treatment plan, in its entirety: "Discharge CCCMS with 5-day follow-up."

In another case, the inmate (CSATF 4) expressed SI in the EOP yard on December 14, 2013 following bullying problems with his cellmate.  He was brought to the TTA, where a clinician completed an SRE with a finding of "moderate" chronic and acute suicide risk.  He was placed in alternative housing in the mental health observation room with observation at 15-minute intervals.  Two days later, on December 16, he was moved to a MHCB.  A MHTP was completed on December 19 with "anxiety" as the identified problem and "decrease anxiety" as the treatment goal.  An SRE was also completed on December 19 and the inmate was discharged from Suicide Precaution and the MHCB, with the following treatment plan, in its entirety: "Discharge to EOP, five day follow-up to yard."

There were numerous problems with SRE and treatment planning documentation by CSATF clinicians when discharging inmates from alternative housing and MHCBs.

**Intervention**:  Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records revealed that 97 percent of custody and 100 percent of nursing staff had CPR certification.  Ninety-seven percent of custody staff was compliant with annual suicide prevention training, but only 22 percent of medical and mental health staff received this training.  Eighty-one percent of mental health clinicians received the seven-hour SRE training and 92 percent completed the mentoring program.

**Recent Suicides**:  CSATF had two inmate suicides from 2012-2014.  In the **first** case (CSATF 5), the inmate was found hanging by a sheet from the light fixture of his administrative segregation cell during the afternoon of July 6, 2014.  He had entered CDCR in March 2010 to serve a 15-year to life sentence for second-degree murder.  He was transferred to CSATF in April 2014 and transferred to the caseload inmate administrative segregation unit, E-1, on April 25.  At that point, he was at the 3CMS LOC.  The inmate had ten RVRs during his confinement, the most recent of which occurred in October 2013.  He had few medical complaints.

Both custody and mental health records revealed that the inmate was fearful of assault by other inmates due to an incident at Calipatria State Prison, where he allegedly had consensual sex with another inmate.  He had repeatedly requested SHU placement for protection.  On May 27, 2014, he expressed SI, with a plan to cut his wrists, and was admitted to a MHCB for further evaluation.  An SRE was completed and indicated "high" chronic and acute suicide risk.  He

self-reported a prior SA by cutting his wrist approximately 11 years earlier at age 17.  Clinical notes reported that:

> the inmate-patient has become increasingly depressed and he genuinely believes his life is in danger if sent back to the yard.  He was unable to program on D & E Yards at SATF.  He is isolative, hopeless and helpless, is single cell and has a definite plan in mind to kill himself.  He does believe suicide to be his only option at this point since he 'can't stay in ASU for years.'  He has the plan to cut his wrist, but is seeking help.

The inmate was initially diagnosed with Adjustment Disorder with Anxiety and placed on Suicide Precaution with observation at 15-minute intervals.  He remained in the MHCB for several weeks and was subsequently placed on psychiatric observation at 60-minute intervals.

On June 23, a MHTP was completed and indicated problem areas of "depression" and "anxiety," with the goal to "decrease anxiety/depressive symptoms with positive CBT."  The treatment plan stated that the:

> I/P is being discharged at the EOP LOC and will have weekly PC contacts, monthly psychiatry contacts, and 10 or more groups per week.  Continue to work on alleviating anxiety symptoms as well as paranoia, rumination, and obsessions related to safety concerns 'having a hit put on me' by way of reality therapy and CBT.  I/P placed on 5-day follow-up.  Educated I/P on his medications and encouraged to continue with his compliance.

An SRE was completed and assessed his chronic suicide risk as "high" and his acute suicide risk as "moderate."  The clinician noted that he "continues to struggle with hopelessness and helplessness.  Anxiety and depressive symptoms have improved.  Continues to have safety concerns but is less paranoid."  The IDTT meeting also recommended the inmate to the ICF LOC at DSH.  He was accepted on July 1.

On June 24, the inmate was discharged from the MHCB and rehoused in administrative segregation unit E-1 while awaiting a DSH bed.  He continued to express safety concerns and told a clinician that he "feels as though a DSH placement will jeopardize his life."  Five-day follow-up progress notes reflected an inmate with unresolved safety concerns and increased anxiety and paranoia, noting his "overall level of functioning remains unimproved."  The notes did not indicate any concordance with his MHTP or the plan contained within the discharging SRE dated June 23.  Psych Tech Daily Rounds Forms from June 30 through July 6, the morning of the suicide, were unremarkable.  The inmate was apparently informed of his DSH acceptance during an ICC meeting on July 3.  He committed suicide three days later.

The CDCR reviewer did not offer any specific precipitating factors to the death, but noted the inmate's persistent and increasing anxiety and paranoia leading to the DSH referral.  Several letters that the inmate wrote but had not mailed reflected isolation and loneliness concerning his perceived lack of recent contact from his fiancée and fear of assault.  The CDCR reviewer listed numerous deficiencies in the mental health services provided to the inmate, including inadequate

treatment plans that did not address safety concerns, poor communication between mental health and custody staff regarding these safety concerns, inadequate SREs, and at least four duplicative and boilerplate progress notes written in June 2014.  Despite these deficiencies, the Suicide Report contained only one basis for recommendation for corrective action through a QIP:  (1) additional clinical training regarding both the quality and accuracy of five-day follow-up progress notes.

In the **second** case (CSATF6), the inmate was found hanging by a sheet from the light fixture in his administrative segregation cell during the early morning of September 6, 2014.  He had entered CDCR in 1998 to serve an unknown sentence.  He was at the 3CMS LOC at the time of his death.  His most recent diagnosis was Adjustment Disorder.  He had been housed in administrative segregation since June 10, 2014 for an alleged battery on another inmate and was facing a long SHU term.  At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report, which had not been completed, had not been examined by this reviewer.

## 16)    **Ironwood State Prison (ISP)**

**Inspection**:  March 4-5, 2014

ISP housed 3,077 inmates, the majority of which were Level III classification.  The institution had a 14-bed OHU for inmates with medical or mental health issues, with three rooms designated as alternative housing cells for suicidal inmates.  There was one administrative segregation unit for caseload and non-caseload inmates.  ISP housed 12 caseload inmates, including one inmate at the EOP LOC.

**Screening/Assessment**:  The intake screening process of several new admissions was observed on March 4.  A nurse assigned to the R & R Unit conducted the Initial Health Screening, which was performed in the Nurse's Office with the door open.  Nonetheless, privacy and confidentiality were not technically compromised because officers and other inmates were not in the area.  Observation revealed that the nurse did not ask all of the Initial Health Screening Form's mental health and suicide risk questions.  Among those not asked were questions regarding current suicide risk, prior SAs, and the receipt of bad news.

Observation of psych tech rounds in administrative segregation indicated little distinction between the psych tech's interaction with caseload and non-caseload inmates.  The psych tech did not complete the Psych Tech Daily Rounds Form for the five caseload inmates during rounds.  Observation of the psych tech administering the 31-item mental health screen to a newly admitted administrative segregation inmate indicated completion of the process in the privacy of a small office with an officer stationed outside of the room.  The psych tech confided that it was unusual for inmates to participate in the mental health screening process.  Recent SPRFIT meeting minutes revealed an 86 percent refusal rate.

**Housing**:  The three rooms designated as alternative housing cells contained wall ventilation grates with large holes that had not been retrofitted, but were otherwise suicide-resistant.  The rooms lacked beds and inmates slept on a mattress on the floor.

Administrative segregation unit A-5 contained five new intake cells that had been retrofitted to be suicide-resistant.  Observation indicated that all inmates who were housed in administrative segregation for 72 hours or less were in a new intake cell.

**Observation**:  The OHU utilized Suicide Precaution and Suicide Watch for inmates identified as suicidal and awaiting MHCB transfer.  However, psychiatric observation was also used in the OHU, even though this practice was neither sanctioned by CDCR nor referenced in the *Program Guide*.  Inmates on psychiatric observation were observed at 15-minute intervals.  OHU nursing staff relied on an older version of the CDCR-approved Suicide Watch/Suicide Precaution Record CDCR 7365 Form that contained pre-printed 15-minute time intervals, and did not allow for staggered observation.

Administrative segregation unit logs that contained documentation of 30-minute welfare checks for non-intake cells were up-to-date.  Review of Guard One data indicated 100 percent compliance for administrative segregation inmates housed in the unit for 21 days or less during the reviewed 24-hour period.

**Management/Treatment Planning:**  eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated that inmates were consistently seen by clinical staff daily when on suicide observation.  Inmates referred to mental health were seen timely.  However, treatment planning was problematic.  For example, on December 5, 2013, mental health received an emergency referral from custody for an inmate (ISP 1) who expressed SI with a plan to hang himself.  The inmate was also concerned about being assaulted by other inmates.  He was placed in the OHU on psychiatric observation at 15-minute intervals.  When seen the following day by mental health, he denied SI and only complained of "poor sleep in past few days."  An SRE was completed and the chronic and acute suicide risk were assessed as "low."  The inmate was discharged from the OHU and returned to administrative segregation.  The SRE treatment plan merely stated:  "(1) Release to custody (back to unit), (2) Initiate 5-day follow-up protocol."

**Intervention**:  Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Records indicated that 98 percent of custody and 96 percent of nursing staff had CPR certification.  Ninety-three percent of custody, but only one percent of medical and mental health staff, were compliant with annual suicide prevention training.  One hundred percent of required mental health clinicians received the seven-hour SRE training and completed the mentoring program.  Observation of the one-hour suicide prevention block training on March 4, 2014 indicated that a very proficient clinical psychologist conducted the training and covered the required material.

**Recent Suicides**:  There were no suicides at ISP from 2012-2014.

**17)**     <u>**Chuckawalla Valley State Prison (CVSP)**</u>

**Inspection**: March 5-6, 2014

CVSP housed 2,294 inmates, the majority of whom were at Level II classification. The institution had one administrative segregation unit. Its OHU had been closed since October 2013, with no plans to reopen it. CVSP housed 12 caseload inmates, including one at the EOP LOC.

**Screening/Assessment**: Because there were no new admissions to CVSP during the site visit, intake screening could not be observed. An intake nurse reported that inmates who received intake screening typically stood in the open doorway of the Nurse's Office, with a custody officer standing directly behind them. Privacy and confidentiality were thus compromised.

Psych tech rounds in administrative segregation were observed on March 6, 2014. As no caseload inmates were housed in the unit at the time, completion of Psych Tech Daily Rounds Forms was not required. The psych tech reported that the Forms were completed at cell-front following interaction with each caseload inmate. Observed psych tech rounds were conducted in accordance with policy.

**Housing**: Inmates requiring alternative housing for suicidal behavior were immediately transported to the ISP OHU pending MHCB transfer.

CVSP's administrative segregation unit contained nine new intake cells that had been retrofitted to be suicide-resistant. All inmates housed in administrative segregation for 72 hours or less were in a new intake cell, but several inmates reported having been housed in non-intake cells for the entirety of their initial 21 days in administrative segregation.

**Observation**: Suicide observation (Suicide Watch and Suicide Precaution) did not operate at CVSP as all suicidal inmates were immediately transported to the ISP OHU pending MHCB transfer.

Administrative segregation unit logs that contained documentation of 30-minute welfare checks for non-intake cells were not always up-to-date. Review of Guard One data indicated 100 percent compliance for administrative segregation inmates housed in the unit for 21 days or less during the reviewed 24-hour period.

**Management/Treatment Planning**: eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated that inmates were consistently seen by clinical staff timely, but that treatment planning was problematic. Because CVSP and ISP shared mental health clinicians and this issue was addressed in the ISP review, it will not be repeated here.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records reported that 95 percent of custody and 100 percent of nursing staff had CPR certification.  Ninety-nine percent of custody was compliant with annual suicide prevention training, but only five percent of medical and mental health staff were compliant. Seventy-five percent of mental health clinicians received the seven-hour SRE training and 67 percent completed the mentoring program.

**Recent Suicides**:  There were no suicides at CVSP from 2012-2014.


**18)**   **Wasco State Prison (WSP)**

**Inspection**: March 25-26, 2014

WSP housed 5,144 inmates, with the vast majority on RC status.  WSP had an 18-bed CTC with six designated MHCBs; and an administrative segregation unit located in building D-6. Approximately 20 percent of WSP inmates were on the mental health caseload, with 1,033 3CMS and 105 EOP inmates.  In addition, alternative housing beds located in the administrative segregation unit were used for inmates identified as suicidal and awaiting placement in a MHCB.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake and mental health screening processes.  The Initial Health Screening (CDCR Form 7277) process was conducted by a nurse assigned to the RC.  All questions on the form were asked appropriately.  There was semi-privacy afforded during the process, with the door to the Nurse's Office left open, but no other inmates in the area and officers attending to other responsibilities. The initial 31-item mental health screening form was completed in the private offices of three clinical psychologists.  This process normally occurred on the fifth day of the RC process unless an emergent or urgent mental health referral was generated, with staff having full access to the Strategic Offender Management System (SOMS).  Most of the RC clinical staff indicated that both SOMS and the MHTS would not be accessed unless the inmate self-reported a prior CDCR confinement.  Such a practice was troubling given the fact that WSP had an inmate suicide in April 2013 in which mental health clinicians were unaware of the inmate's history of mental illness during a prior CDCR confinement because the inmate denied any such history upon intake.

This reviewer observed daily rounds by two psych techs in the administrative segregation unit. One psych tech was regularly assigned to the unit and observed to accurately conduct their rounds.  The other psych tech, a registry employee, was observed to be only briefly interacting with inmates and did not appear to differentiate between caseload inmates and non-caseload inmates. In addition, although a private area was available for confidential mental health screening of newly-arrived administrative segregation inmates, the registry psych tech was observed asking an inmate "Do you want a confidential setting or can we just do the screening right here?"  This reviewer then observed completion of the cell-front mental health screening with the cellmate casually observing the process.

**Housing**:  WSP had an 18-bed CTC, with six rooms designated as MHCBs.  The rooms contained no obvious protrusions which could be utilized in a SA by hanging.  The institution

also used alternative housing cells in the administrative segregation unit for inmates identified as suicidal and awaiting MHCB placement.  Because any available administrative segregation cell could be used, including cells that were not suicide-resistant, inmates were required to be on continuous observation until transferred.  Several mental health clinicians stated that alternative housing was frequently used at WSP because only six MHCBs were available.  According to available data, 82 percent of inmates were transferred to a MHCB within 24 hours.

The administrative segregation unit contained 12 retrofitted cells for inmates on new intake status.  During the site visit, two newly-admitted inmates were observed housed in non-retrofitted cells despite the fact that there were four empty new intake cells.  Each of the non-retrofitted cells was very dangerous.

**Observation**:  Although both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal, this reviewer observed that psychiatric observation was regularly used in the unit.  Review of the CTC Census Reports for January and February 2014 found that psychiatric observation was used much more frequently than either Suicide Precaution or Suicide Watch.  On March 25, 2014, for example, five inmates were on psychiatric observation and one inmate was under Suicide Precaution in the six MHCBs.  Mental health officials at WSP previously developed a local procedure within their LOP for Suicide Prevention and Response that contained a brief explanation of psychiatric observation:  "Whenever a patient exhibits unusual behavior or becomes dangerous to self or others....To prevent suicide and/or injury to self, others, and staff."  Inmates were issued regular prison uniforms and required observation at 15-minute intervals.  In practice, however, inmates on psychiatric observation were more likely to be observed at 30-minute intervals.  The practice of 30-minute observation for suicidal inmates was problematic.

This reviewer examined the observation forms used to document observation of suicidal inmates housed in MHCBs and found that all of the forms were up-to-date, but the observations were not documented on a staggered basis.

Finally, during the initial tour of the administrative segregation unit, the unit log used to document 30-minute welfare checks of non-new intake inmates appeared to be up-to-date.  However, upon this reviewer's return to the administrative segregation unit unannounced the following day, the unit log had not been updated for approximately two hours.  Subsequent review of the Guard One data for the administrative segregation unit found only a few violations during the 24-hour period, with overall compliance at 96 percent for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found.  For example, in one case (WSP 1), the inmate had an extensive history of mental illness and reported AH that resulted in an altercation with his cellmate on December 30, 2013.  He was admitted to a MHCB on Suicide Precaution based upon both a "moderate" chronic and acute risk for suicide.  He remained hospitalized for

approximately two weeks and was discharged from the MHCB on January 15, 2014 with the following treatment plan:

> DC from CTC-MHCB at the EOP LOC 24-hour custody checks to commence 5-day follow-ups by clinician to assure symptom stabilization; 10-day psychiatry to maintain or adjust med doses. Safety plan extensively discussed and rehearsed with I/P which includes education about how to receive emergency psychiatric care for re-emerging symptoms and/or suicide/homicide urges, and how to think through problems that arise and choose alternate solutions other than threats. I/P also educated about his mental illness and expected emotional experiences along with the importance of treatment compliance and reaching out to MH staff.  I/P informed about his rights to receive or refuse treatment; and the risk and benefits of receiving or declining treatment.  Other areas of focus is on intensive anger management through integrated overlearning of new behaviors; observance of consequences of threats toward staff; and learning alternate behaviors.

This thoughtful treatment plan was offset by five-day follow-up progress notes that did <u>not</u> contain any concordance with the above plan, as well as the following treatment plan contained in a SRE dated the fifth follow-up day of January 21, 2014:  "IP will be offered EOP LOC with weekly PC encounter, daily groups, monthly IDTT (with initial IDTT to be held next week), at least for face-to-face Licensed Psychiatric Technician (LPT) contacts per week.  He agrees to notify staff if his symptoms worsen or if he does not feel safe."  This treatment plan bore no resemblance to the January 15 plan.

Finally, this reviewer examined a sample of charts of inmates referred to mental health staff on an urgent or emergent basis during January and February 2014.  Of 22 reviewed charts, 19 or 86 percent appropriately included completion of a SRE for inmates who presented with SI.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambulatory Bag (ambu bag), and cut-down tool.

**Training**:  According to training records, 94 percent of custody staff was certified in CPR. Nursing staff reported 100 percent compliance with CPR training.  In addition, 93 percent of custody staff and 73 percent of nursing staff were compliant with annual suicide prevention block training.  The nursing staff had been trained by a nurse educator at the institution.  Mental health staff had not received annual suicide prevention block training.  Finally, 93 percent of required mental health clinicians had received the seven-hour SRE training, with only 73 percent having completed the mentoring program.

This reviewer observed the annual suicide prevention block training on March 25, 2014.  The scheduled 60-minute workshop lasted approximately 40 minutes and was not interactive other than a participant inquiring "How long is this class?"

**Recent Suicides**: WSP had two inmate suicides during 2012 – 2014.  In the first case (<u>WSP 2</u>), the inmate was found hanging from the ceiling light fixture of his administrative segregation cell by a sheet during the afternoon of May 12, 2012.  The inmate re-entered CDCR on February 15,

2012 to serve a four-year sentence for grand theft auto and a parole violation.  He remained in the RC at WSP until his death.  The inmate's intake medical screening and mental health screening were negative for both mental health and suicidal behavior histories.

On April 5, 2012, the inmate cut his wrists in his cell and, while officers were escorting him for treatment, he became combative and inadvertently injured an officer who hit his head on a guard rail and broke his right hand when falling to the floor.  The inmate was referred to a mental health clinician who completed a SRE that identified the following chronic risk factors: history of major depressive disorder, psychotic disorder, substance abuse, violence, poor impulse control, perceived loss of social support, and SAs (hanging and cutting in 2008).  The identified acute risk factors included: SI, current depressive episode, current psychotic symptoms, current anxiety, agitation, disturbance of mood, and recent negative staff interactions.

The inmate reported that he cut himself because he was "stressed out" and angry, and "I told the cop last night that I needed to talk to the doctor and he would not let me.... I urinated on myself because it stressed me out."  He also stated he heard voices that told him "I have to give oral copulation to fight back."  The psychologist described the inmate as "very agitated and hypomanic with slightly pressured speech."  The clinician rated him as both a "moderate" chronic and acute risk for suicide.  The inmate was referred to a psychiatrist for further evaluation, and recommended for 3CMS LOC.  The inmate was not placed on Suicide Precaution.  The inmate was seen by a psychiatrist shortly thereafter for "anxiety and auditory hallucinations."  The psychiatrist noted that the inmate "cut left wrist superficially today" and had a history of self-injurious behavior.  The inmate told the psychiatrist that "I am not suicidal. I needed to get away from my cellmate."  His mood was described as "anxious, paranoid" and he was given a diagnosis of Psychotic Disorder NOS and Anxiety Disorder.  Psychotropic medication was prescribed.  The inmate was transferred to the administrative segregation unit based upon the alleged assault on an officer.

Four days later on April 9, 2012, the inmate was assessed by another psychologist who apparently was unaware of the assessments conducted on April 5, 2012.  The inmate reported similar symptoms and this clinician offered a diagnosis of Depressive Disorder NOS and Amphetamine Dependence.  An SRE was also completed and the clinician determined that the inmate was both a "low" chronic and acute risk for suicide.  The clinician also wrote that custody staff and a psych tech reported that the inmate was manipulative and "using alleged symptoms to go to hospital."

On April 11, 2012, the inmate was seen again by a psychiatrist after fighting with his cellmate.  He presented as "depressed and anxious and worried about how his pending assault case could result in additional charges."  He reported experiencing AH since 2006, and repeated his history of suicidal behavior, as well as disclosing that his mother had previously committed suicide.  The psychiatrist gave a diagnosis of Depressive Disorder NOS, and revised the psychotropic medication.  The inmate also attended an IDTT that day and a progress note stated that he was "fearful, cautious, agitated, sad, moody, angry."  The inmate reported having a good appetite, but difficulty with sleep.  He was experiencing command AH telling him to harm himself and "pee on people."  The IDTT diagnosed him with Schizoaffective Disorder Depressive Type, and he was officially placed on 3CMS LOC.

In subsequent interactions with the administrative segregation clinician on a weekly basis from April 13, 2012 through May 9, 2012, the inmate presented as anxious and preoccupied with the possibility of getting additional prison time for his alleged assault on an officer.  There were unconfirmed reports that the inmate perceived he was likely to receive an additional five-year prison term.  He also reported sleeping problems and concerns about losing his single cell status. He asked the clinician about using his mental illness as a defense, asked about the insanity defense, and requested assistance in forming a defense.  In contrast, the Psych Tech Daily Rounds forms suggested that the inmate had no complaints and was otherwise stable during this period.

The CDCR reviewer in this case was critical of the clinical treatment provided, stating, "A review of clinical documentation did not show evidence that clinicians probed for details about this self-harm history, current symptoms, and violent behaviors toward self and others thus clinicians did not have important information to make and justify clinical decisions, implement interventions, and develop treatment plans to address his serious mental illness and deteriorating condition, and the origins of the suicidal behaviors."  The Suicide Report contained three bases for recommendations for corrective action through a QIP: (1) Apparent lack of follow-up questions during clinical interviews; (2) Lack of mental health evaluation based upon ICC recommendation of April 12, 2012; and (3) the UHR did not contain an administrative segregation unit Pre-Placement Chrono form.  A fourth recommendation to retrofit the light fixture in the inmate's administrative segregation unit cell was rescinded because the cell had not been designated to be suicide-resistant.

Finally, there were several issues that were <u>not</u> addressed in the Suicide Report, including a discussion as to why an inmate who engaged in self-injurious behavior, reported current SI, and was assessed as a moderate acute risk for suicide on April 5, 2012 was not placed on Suicide Precaution in a MHCB.  In addition, there was no discussion regarding how completion of two SREs a few days apart on April 5, 2012 and April 9, 2012 by two different clinicians resulted in assessment of "moderate" and "low" chronic risk for suicide, or why the clinician that assessed the inmate on April 9, 2012 was unaware of their colleagues' assessments on April 5, 2012 and April 6, 2012.  Finally, there was no discussion regarding the inconsistency of reporting the inmate's behavior in weekly progress notes by the administrative segregation clinician and the Psych Tech Daily Rounds forms by the psych tech.

In the **second** case (<u>WSP 3</u>), the inmate was found hanging from the upper bunk of his GP cell by a sheet during the early morning of April 18, 2013.  The inmate re-entered CDCR on February 20, 2013 to serve a two-year sentence for possession of a controlled dangerous substance.  He remained in the RC at WSP until his death, and was eligible for parole in December 2013.  The inmate had two previous CDCR terms, and had been placed on the mental health caseload in 2011 due to paranoid and delusional behavior that resulted in three brief admissions to a MHCB.  The inmate had never fully participated in treatment due to fear of gang reprisals.  However, upon arrival at WSP in February 2013, the inmate denied any history of mental illness and suicidal behavior, and was never seen by a mental health clinician after completion of the mental health screening on February 28, 2013.

Although the inmate had a history of mental illness during a prior CDCR confinement, he did not demonstrate any obvious signs of SI during his current incarceration.  The CDCR reviewer did not identify any possible precipitating factors to the suicide, but the Suicide Report contained two bases for recommendations for corrective action through a QIP:  (1) Some of the inmate's personal effects were sent to his family prior to inspection by the CDCR reviewer; and (2) The inmate had been previously paroled in December 2011 at 3CMS LOC.  Upon re-admission in February 2013, a new CDCR number was issued and medical and mental health personnel failed to review either the SOMS or MHTS.  On July 1, 2013, the SPRFIT coordinator at WSP reported to Division of Correctional Health Care Services (DCHCS) headquarters that "mental health clinicians will be trained to use the SOMS computer program to (1) locate the inmate's previous CDCR numbers, and (2) locate their LOC history."

### 19)    __North Kern State Prison (NKSP)__

__Inspection__: March 27-28, 2014

NKSP housed 4,716 inmates, with the vast majority on RC status.  NKSP had a 16-bed CTC with ten designated MHCBs, and an administrative segregation unit housed in building D-6.  Approximately 20 percent of NKSP inmates were on the mental health caseload, with 822 3CMS and 102 EOP inmates.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in housing unit A-4, which was also utilized for administrative segregation and RC overflow.

__Screening/Assessment:__  This reviewer observed several new admissions during the medical intake and mental health screening processes.  The Initial Health Screening (CDCR Form 7277) process was conducted by two nurses assigned to the RC.  Privacy and confidentiality were compromised because each nurse was conducting the screening adjacent to each other, separated only by a small partition with the two inmates in close proximity to each other.  One nurse consistently failed to ask inmates if they were currently suicidal, instead only inquiring as to whether they had a history of SAs.  There was, however, an excellent practice of stationing a psychiatrist in the RC to expedite mental health evaluations and assessment of medication needs.

This reviewer observed the administration of the 31-item mental health screening form completed by clinical psychologists.  This process normally occurred on the third day of the RC process, unless an emergent or urgent mental health referral was generated, with staff having full access to SOMS.  However, most of the RC clinical staff indicated that both SOMS and the MHTS would not be accessed unless they felt it necessary.  Privacy and confidentiality were compromised because the two psychologists assigned to the process were sitting in close proximity to each other in one narrow room, separated by a small partition.  In addition, a third staff member was working at a third desk. When situated at either end of the room, this reviewer could clearly hear the screening questions by each clinician, responses from both inmates, as well as telephone conversation of the third staff member.  It should be noted that the diagnostic building was configured similarly to other CDCR facilities inspected by this reviewer.  At NKSP, three small offices in the Diagnostic Building were assigned to three health care specialists who did not conduct inmate interviews in their respective offices, whereas in other

prisons, these same three offices were assigned to three clinical psychologists and designated for mental health screening and other diagnostic testing.

This reviewer observed daily rounds by a psych tech in the administrative segregation unit. The psych tech was observed to accurately conduct and document their rounds. However, it appeared that the psych tech was spending an inordinate amount of time with each inmate to impress the reviewer, thus observation of the process was stopped.

**Housing**: NKSP had a 16-bed CTC, with ten rooms designated as MHCBs. The rooms contained no obvious protrusions which could be used in a SA by hanging. The institution also used alternative housing beds in A-4 Unit for inmates identified as suicidal and awaiting MHCB placement. The conditions in this unit were very problematic. Cells 101 through 110 were designated for alternative housing. Upon inspection, this reviewer found that these cells contained metal screens with perforated holes on cell fronts that could easily be used as an anchoring device in a SA by hanging. In addition, not all of these designated cells contained retrofitted ventilation grates. Most problematic was the fact that inmates housed in these cells awaiting MHCB placement were often <u>only</u> observed at 30-minute intervals.

Finally, the administrative segregation unit contained nine retrofitted cells for inmates on new intake status. During the inspection, this reviewer observed several newly-admitted inmates housed in non-retrofitted cells. In fact, one inmate had returned from a MHCB on March 27, 2014 and was housed alone on the second floor of the unit in a non-retrofitted cell. Each of the non-retrofitted cells in D-6 was very dangerous. It should also be noted that an inmate committed suicide in December 2013 by hanging himself from an exposed sprinkler head pipe in an administrative segregation cell. Although the cell (No. 131) had not been designated as a new intake cell and, therefore, was not retrofitted, the protective cone to the sprinkler head had still not been replaced as of March 27, 2014. Several other cells in building D-6 also had exposed sprinkler head pipes.

**Observation**: Although both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal, this reviewer observed that psychiatric observation was regularly used in the unit. Mental health officials at NKSP previously developed a local procedure within their LOP for Suicide Prevention and Response that required observation of inmates on psychiatric observation at 60-minute intervals. In addition, although the LOP also stated that inmates on Suicide Precaution were required to be observed at 30-minute intervals, this reviewer observed that, in practice, inmates were being observed at 15-minute intervals for Suicide Precaution and 30-minute intervals for psychiatric observation. This reviewer examined the observation forms used to document observation of suicidal inmates housed in MHCBs and found that all of the forms were up-to-date, but the observations were not documented on a staggered basis.

Finally, during the tour of the administrative segregation unit on March 27, 2014, the unit log used to document 30-minute welfare checks of non-new intake inmates was found to be up-to-date. Subsequent review of the Guard One data for the administrative segregation unit found only a few violations during a 24-hour period, with overall compliance at 98 percent for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found.  For example, in one case (NKSP 1), the inmate had been placed on Suicide Precaution in a MHCB on March 22, 2014 with observation at 15-minute intervals.  At some point, the inmate was downgraded to psychiatric observation with observation at 30-minute intervals, although a Physician's Order was not found in the eUHR.  He was seen by a psychiatrist on a daily basis and, despite verbalizing that "I am still suicidal" on March 25, 2014 and "expressing intermittent feelings of self-harm" on March 26, 2014, the psychiatric note stated "continue CTC care at the level of psychiatric observation."  On March 28, 2014, this reviewer observed an assessment by two clinicians who were not regularly assigned to the CTC, during which the inmate stated that he "was thinking of killing himself yesterday, but not today, was very anxious about not getting his meds, wanted to bang his head against the wall, but got tired and fell asleep."  Following the assessment, when this reviewer asked the clinicians what level of observation the inmate was on, they responded that he was on Suicide Precaution with observation at 15-minute intervals.  This reviewer examined the chart and the CTC Daily Census for March 28, 2014 and confirmed that the inmate was still on psychiatric observation with observation at 30-minute intervals.

Cases NKSP 2 and NKSP 3 symbolized the inadequacy of treatment plans found in SREs used to justify discharge from a MHCB.  The discharging SREs in both cases are presented in their entirety as follows: "(1) Discharge to CCCMS LOC, (2) Initiate *Coleman* follow-ups, (3) 7-day psychiatry follow-up, and (4) 7-day CM follow-up."  In another case (NKSP 4), the treatment plan section of the SRE dated January 28, 2014 stated: "Present at IDTT - 1/29/14, continue mental health services with case management at the CCCMS LOC, medication compliance or referral to psychiatry for follow-up, individual therapy, reduce inappropriate aggressive behavior and increase boundaries, increase coping mechanisms and impulse control, and decreased SI and grave disability (reports) to manage conflict."  There was no documentation found in either the five-day follow-up progress notes or any subsequent progress notes from the PC to indicate concordance with the above treatment plan.

Finally, this reviewer examined a sample of charts of inmates referred to mental health staff on an urgent or emergent basis during February 2014.  The review found that SREs were completed for inmates who presented with SI in 100 percent of the cases.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 95 percent of custody staff was certified in CPR.  Nursing staff reported 100 percent compliance with CPR training.  In addition, 96 percent of custody staff and 94 percent of nursing and mental health staff were compliant with annual suicide prevention block training.  Finally, 93 percent of required mental health clinicians had received the seven-hour SRE training, with only 77 percent having completed the mentoring program.

**Recent Suicides**:  NKSP had one inmate suicide during 2012 – 2014.  In that case (NKSP 5), the inmate was found hanging from the exposed sprinkler head pipe of his administrative segregation unit cell by a sheet during the early morning of December 27, 2013.  The inmate entered CDCR in April 2011 to serve a 15-year sentence for robbery, assault, and false imprisonment.  According to available records, the inmate did not have a history of mental illness in the community, however, both parents were reported to have histories of depression and an uncle had previously committed suicide.  Upon entry into CDCR, inmate did not report any concerns regarding mental health or suicidal behavior.  He enjoyed strong support from his family.

While housed at CEN September 7, 2013, the inmate complained to a nurse of feeling depressed due to concerns regarding a sick family member and possible out-of-state transfer.  He was referred to a mental health clinician who determined that he did not meet criteria for the mental health caseload.  On September 12, 2013 the inmate was informed that he was declared eligible for out-of-state transfer.  During subsequent interactions with mental health staff, the inmate began to report an increasing number of serious symptoms of mental illness, including depression and anxiety and AH.  Clinicians believed that he was reporting the symptoms in an attempt to meet the criteria for caseload inclusion, thereby avoiding out-of-state transfer.  On September 17, 2012, an SRE was completed and the inmate reported that he "had passive SI during the criminal proceedings against him and during times of 'severe hardship,' such as adjusting to school, peers, authority figures.  He has thought about jumping off a bridge or a building.  Most recent SI occurred three months ago.  Patient asserts that he does not really want to die."  His affect was described as "looks superficial, with moist and tearful eyes."  The clinician determined that the inmate was not a "reliable informant," and although he endorsed many acute risk factors for suicide, he was assessed as a "low" acute risk because the endorsements were "unreliable."

On September 26, 2013, the inmate filed a medical appeal regarding his ineligibility for the mental health caseload.  A few weeks later on October 8, 2013, his appeal was granted.  He was diagnosed with an Adjustment Disorder with Depressed Mood and prescribed psychotropic medication to address continuing complaints of anxiety and poor sleep.  A diagnosis of Anti-Social Personality Disorder was added.  He was entered into 3CMS LOC.  When informed that would be transferred from because the institution did not offer mental health services, he inquired as to what prisons were close to his family in the San Diego area and appeared to make a conditional suicide threat during a session with his clinician on October 21, 2013:  "If they take me away from my family I will feel more entitled to carry out the thoughts." As a result, a MHTP completed the following day referenced "passive SI."  The inmate was not transferred to the San Diego area, but to NKSP on December 6, 2013, and housed in the administrative segregation unit due to the vague self-reported safety concerns.

While in administrative segregation, the inmate was seen on a weekly basis by mental health clinicians and during daily psych tech rounds.  During the first few days of administrative segregation confinement, the records indicated that he did not voice any complaints, showed no signs of decompensation and denied any SI.  However, when interviewed on December 9, 2013 by a correctional lieutenant regarding the veracity of his safety concerns, the inmate became

frustrated and stated "I want to go home and be with my family.  I'm done."  A mental health referral was generated and he was seen the following day by a psychologist.  An SRE was completed and the clinician assessed the inmate as being both a "low" chronic and acute risk for suicide.  The clinician, however, failed to document several acute risk factors, including current SI, current recent depressive episode, current/recent anxiety or panic symptoms, recent change in housing (i.e., administrative segregation), and single cell placement.  The SRE form also had very little, if any, second page narrative.  Several days later on December 16, 2013, the inmate was seen by a psychiatrist following complaints of side effects and sleeping problems caused by his medication.  The psychotropic medication was adjusted.  In contrast to this clinical perception of the inmate's declining mental health, Psych Tech Daily Rounds forms completed by psych tech staff from December 9, 2013 through December 22, 2013 indicated that the inmate did not voice any mental health concerns, did not report any side effects from medication, did not experience any appetite or sleep problems, and his mental status was observed to be within normal limits.

On December 23, 2013 the inmate was seen again by the psychiatrist and complained about his medication and feeling "anxious and stressed out."  The following day, the inmate was initially seen by a psych tech after officers observed him yelling and kicking his cell door during the previous night.  He told the psych tech that people were plotting to harm his family.  An urgent mental health referral was written and he was seen later that morning by a psychologist who noted that the inmate reported persistent fear and concern about the safety of his parents and himself, and wanted to make a telephone call to his parents to warn them of the danger.  He told the psychologist that "They put a hit out on me....They know where I live, my parents' names, and what kind of car they have."  The inmate was also seen by a psychiatrist who offered him different medication, but the inmate refused.  He appeared calmer the next two days, but refused to speak to the psychiatrist on December 26, 2013 simply stating "I refuse, just leave me alone." He committed suicide the following day.

Although the CDCR reviewer did not offer any specific precipitating factors to the suicide, it was noted that the inmate had "acknowledged to past clinicians that he felt guilty and remorseful about the impact his arrest and conviction have had on his family.  Maybe that those feelings, separation from family support during the holidays, and his frustration that his plans to stay close to his family had not succeeded led to his resolve to end his life."  The Suicide Report contained five bases for recommendations for corrective action through a QIP:

> (1) There were concerns regarding the accuracy of testimony and documentation from the officer who discovered the inmate hanging at 6:19 a.m. and stated he was performing Guard One checks at the time.  Review of Guard One logs failed to indicate any checks being performed at 6:19 a.m., rather they were performed at both 6:09 a.m. and 6:38 a.m.  The officer also wrote on the Inmate Segregation Record that he found the inmate hanging out approximately 6:25 a.m.; (2) The requirement for observation at 30-minute intervals was violated because emergency medical response documents indicated the inmate was found in the state of rigor mortis with "both arms raised and stiff" and had a "clenched jaw," indications that the inmate had been dead for several hours.  However, correctional staff documented in the Inmate Segregation Record that the inmate

had been observed at regular 30-minute intervals and was "exercising /miscellaneous cell activity" at 6:09 a.m.; (3) There was conflicting documentation pertaining to emergency medical response and whether the AED and Ambu bag were utilized; (4) An SRE dated December 10, 2013 failed to document the presence of a number of acute risk factors; and (5) There was no documentation of the pre-placement administrative segregation unit screening form in the eUHR.

Finally, there were several issues that were <u>not</u> addressed in the Suicide Report.  First, similar to the incomplete SRE completed by an NKSP clinician on December 10, 2013, there was an incomplete SRE completed by a CEN clinician on September 17, 2013.  On both occasions, these two clinicians separately assessed the inmate as being at "low" acute risk for suicide despite numerous acute risk factors.  The SRE dated September 17, 2013 included the following acute risk factors: SI, current/recent depressive episode, current/recent psychotic symptoms, current/recent anxiety or panic symptoms, current/recent substance abuse/intoxication, hopelessness/helplessness, increasing interpersonal isolation, recent bad news, single cell placement, recent negative staff interactions, and recent disciplinary.  Despite these 11 acute risk factors, the CEN clinician assessed the inmate as being at "low" acute risk for suicide.  In addition, and related to the miscalculation of acute risk factors, there were at least two other occasions, on October 21, 2013 and October 22, 2013, when SI was indicated, but did not result in completion of an SRE.  Although the CDCR reviewer indicated that mental health clinicians might have wrongly perceived the inmate to be manipulative, e.g., noting that the "although inmate may have exaggerated some symptoms to gain admission into MHSDS, he seemed to suffer from symptoms of anxiety and depression," the reviewer did not go far enough in suggesting that such a perception by both CEN and NKSP clinicians resulted in dismissal of the inmate's acute risk factors for suicide, and should have resulted in additional training.  Finally, there was no discussion regarding the inconsistency of reporting the inmate's declining mental health as noted in weekly progress notes by the administrative segregation unit clinician and psychiatrist with weekly Psych Tech Daily Rounds forms completed by psych tech staff that reported a mental health status within normal limits.


**20)    Central California Women's Facility (CCWF)**

**Inspection**: April 8-9, 2014

CCWF housed 3,658 inmates with an array of security classifications, Levels I through IV and RC status.  CCWF had a 39-bed Skilled Nursing Facility (SNF) with 12 designated MHCBs in eight rooms, and an administrative segregation unit that also contained a 20-cell condemned unit. Approximately 36 percent of CCWF inmates were on the mental health caseload, with 1,273 3CMS and 58 EOP inmates.  In addition, alternative housing cells for inmates identified as suicidal and awaiting placement in a MHCB were located in either TTA holding cells or safety/observation rooms in the SNF.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake and mental health screening processes on April 8, 2014 and April 9, 2014.  The Initial

Health Screening (CDCR Form 7277) process was conducted by two nurses assigned to the RC. Good privacy and confidentiality were maintained because only one inmate was screened at a time and the door to the Nurse's Office remained closed. However, the nurse who conducted the vast majority of the screenings consistently failed to ask inmates if they were currently suicidal, instead only inquiring as to whether they had a history of SAs. Following this reviewer's observation of the process, the nurse was asked why they had not inquired whether the inmates were currently feeling suicidal after asking them about a history of suicidal behavior. The nurse responded by saying "If the inmate did not report any history of suicidal behavior, they could not have current ideation."

In addition, this reviewer observed the administration of the 31-item mental health screening form completed by clinical psychologists. This process occurred within the first seven days of the RC process unless an emergent or urgent mental health referral was generated, with staff having full access to SOMS. However, most of the RC clinical staff informed this reviewer that both SOMS and the MHTS would not be accessed unless they felt it necessary. Good privacy and confidentiality were maintained because clinicians had private offices and doors remained closed during the process.

This reviewer observed daily rounds by a psych tech in the administrative segregation unit. The psych tech was observed to accurately conduct and document their rounds, however, unlike the SQ condemned unit, psych tech rounds were not conducted in the CCWF condemned unit.

**Housing**: CCWF had a 39-bed SNF, with 12 designated MHCBs in eight rooms. The rooms did not contain any obvious protrusions which could be utilized in a SA by hanging. In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in either TTA holding cells or safety/observation rooms in the SNF. Inmates were required to be under continuous observation while housed in these cells.

In addition, the administrative segregation unit contained four retrofitted suicide-resistant cells for inmates on new intake status. During the site inspection, although this reviewer observed only one newly admitted inmate housed in a non-retrofitted cell, correctional staff stated that new intake inmates were frequently placed in non-retrofitted cells when the four designated cells were occupied.

Finally, CCWF custody officials utilized "Modified Property Control Status" (MPCS) for selected problematic inmates housed in administrative segregation. According to institution policy (Special Placements, Policy No. 62050), "MPCS is to manage inmates who continued to pose a serious threat to the physical safety of staff, other inmates or themselves, after placement on PCS (property control status)." Inmates on this status were required to be observed at 60-minute intervals and issued only a "safety gown, blanket and mattress, toilet paper (issued on an as-needed basis), sanitary napkins (issued on an as-needed basis), one bra (exchanged on an as-needed basis), and one panty (exchange daily)." Inmates were also issued a paper tray, one spoon, and a Styrofoam cup for each meal. Although inmates on MPCS were required to be referred to mental health staff within 24 hours and seen by a clinician on a daily basis, custody staff were solely responsible for an inmate's placement on, and discharge from, MPCS.

This reviewer observed the problematic use of MPCS during a tour of the administrative segregation unit on April 8, 2014.  While observing psych tech rounds, this reviewer was surprised to see an inmate (CCWF 1) clothed only in a safety smock.  Subsequent review of her eUHR found the following:  The inmate presented as a significant management problem to both custody and mental health staff.  She had been housed in the administrative segregation unit since November 2013 for refusal to accept a cellmate in GP.  She was 3CMS LOC with a diagnosis of Polysubstance Dependence, Adjustment Disorder with Anxiety, and Narcissistic Personality Disorder.  The inmate frequently threatened suicide when she perceived her needs were not being met, but was rarely placed on suicide observation.  For example, on March 12, 2014, she threatened suicide and was escorted to the TTA for assessment, but not admitted to a MHCB.  The following week on March 20, 2014 the inmate again threatened suicide, was escorted to the TTA for assessment, but again returned to the administrative segregation unit shortly thereafter.  The following day, the inmate threatened suicide on two separate occasions and was escorted to the TTA for assessment.  She was returned to administrative segregation each time without being admitted to a MHCB.  During this two-day time period, the inmate repeatedly told staff that "I will kill myself if I don't get to go to a crisis bed," and "I will kill myself if I don't get to go to EOP and get the help I need." The administrative segregation clinician offered to meet with the inmate more regularly and offered her treatment materials from the EOP program and to schedule an IDTT hearing to review her LOC, but she refused to cooperate, stating "I just can't go on. I can't cope with everything."  Progress notes indicated that the inmate was not admitted to a MHCB because her "SI is not credible" and there was an "absence of positive symptoms for depression, lack of adequate description of thoughts/intention regarding suicide...and the fact that she refused to share any information about her reasons for being suicidal."

The inmate, however, was admitted to a MHCB during the later evening of March 21, 2014 after she placed a ligature (sheet) around her neck in a suicidal gesture.  She remained in the MHCB for approximately a week and was discharged back to administrative segregation on March 27, 2014.  The discharging treatment plan recommended that the inmate be placed in a "behavioral management cell, commence 5-day follow-up, take to ASU IDTT to address inmate-patient's request to be made EOP.  Assess overall functioning, encourage inmate-patient to cope with her current status and returned to the comprehensive parole planning she was engaging in prior to insisting she be made EOP and paroling at that LOC."  On April 2, 2014 the inmate attended an IDTT and the team declined to place her in EOP LOC; determining that she "appears to be engaging in behavior that is for secondary gain, as opposed to being the result of the severe and persistent mental disorder."  Several hours later, the inmate again threatened suicide, was escorted to the TTA for assessment and, although a clinician completed an SRE that found her to be at "moderate" acute risk for suicide, she was returned to the administrative segregation unit shortly thereafter without a MHCB admission.

The following day, April 3, 2014, a correctional lieutenant wrote a "general chrono" that stated the following:

> On Thursday, April 3, 2014, while housed in ASU, the inmate was removed from
> her cell due to her notifying staff of having SIs.  Recently, inmate has had
> multiple incidents similar to this nature; specifically, on March 20, 2014, March

21, 2014, April 1, 2014, and again on April 3, 2014, the inmate has expressed an intent to harm herself.  She also displayed behavior that is unusual, bizarre and/or uncharacteristic, making reference on multiple occasions that she "sees dragons" and that she is "living in another world."  Per consultation with mental health, due to inmate's continued SIs, coupled with her bizarre behavior, hallucinations, and disrespect towards others, she will be placed on MPCS as a control message in an attempt to prevent her from harming herself or others.  Inmate will be seen by the ICC within 10 days of placement.

There were several concerns with using MPCS in this case.  First, if staff (whether custody or health care) were concerned that the inmate was at potential risk for suicide, the inmate should have been admitted to a MHCB, or alternative housing until a MHCB was available.  Second, if MPCS was a behavioral management plan, it was not being utilized collaboratively in this case.  In fact, the inmate's most recent MHTP, dated April 3, 2014, did not even contain reference to her MPCS.  Pursuant to CCWF policy, MPCS is a custody initiative, and mental health clinicians have no input into its duration for an inmate.  An example of lack of collaboration between custody and mental health with MPCS was a brief passage contained within the December 2013 SPRFIT minutes that simply stated: "Custody in Ad-Seg has been stripping out cells and restricting property for patients claiming they are suicidal."  Third, a safety smock is a garment designed exclusively for the prevention of suicide by hanging. Pursuant to the *Program Guide*, a safety garment should only be authorized by the mental health clinician following the comprehensive assessment of suicide risk.  Custody staff should be prohibited from authorizing use of safety smocks.  Fourth, although this inmate was clothed in a safety smock and allegedly on MPCS because of a concern for suicide and/or other self-injurious behavior, she was only required to be observed at 60-minute intervals (although all administrative segregation inmates were required to be observed every 30 minutes) and not housed in a retrofitted, suicide-resistant administrative segregation cell.  Such measures did not demonstrate a concern for suicide.  Fifth, although the MPCS policy stated that "inmates will be placed on MPCS as a control measure only.  MPCS will not be utilized for punitive reasons," the policy could easily be interpreted by inmates and other observers as a punitive response to perceived manipulative behavior.

**Observation**:  Both Suicide Precaution and Suicide Watch were used in the SNF for inmates identified as being suicidal.  Unlike many other toured institutions, this reviewer did not observe the use of psychiatric observation at CCWF, and all inmates in a MHCB were required to be observed at 15-minute intervals.  This was a good practice.  In addition, this reviewer examined the observation forms used to document observation of suicidal inmates and found that all of the forms were up-to-date and observations documented on a staggered basis.

Finally, the administrative segregation unit log used to document 30-minute welfare checks of non-new intake inmates was observed to be up-to-date.  Subsequent review of the Guard One data for the administrative segregation unit found very few violations during a 24-hour period, with overall compliance at 99 percent for new intake inmates.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a

daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found.  For example, in one case (CCWF 2), the inmate was admitted to a MHCB on March 6, 2014 for SI and discharged approximately a week later on March 12, 2014 with the following treatment plan:

> Discharge to EOP on hourly checks and 5-day follow-up. Sergeant and CO notified.  Inmate-patient will be housed in the room with other Developmentally Disabled Person (DDP) inmates for support and to minimize opportunities for her to be picked up.  Recommend continued work with PC on grief issues and behavioral management of depression.  Recommend inmate-patient be referred to EOP "Grief" and Loss" group and "Substance Abuse" group.  She should also be encouraged to participate in every Rec Therapy group in which she is invited.  Wellness and Yoga would be helpful as the endorphins of physical activity will improve her mood and overall energy.  Due to borderline intellectual functioning, it will be difficult for inmate-patient to stay informed of medications and note the medication regime that works best for her.  In addition, inmate-patient tends to be suggestible, may readily endorse symptoms that she does not have….best to keep in mind before making changes to her medication regime.

Despite this thoughtfully worded treatment plan, there was no documentation found in either the five-day follow-up progress notes or any subsequent progress notes from the PC to indicate concordance with the above plan.

This reviewer examined a sample of charts of inmates referred to mental health staff on an emergent basis during a three-week period in March 2014.  The review found that SREs were completed for inmates who presented with SI in only eight of 18, or 44 percent of the cases.  One case (CCWF 3) was symbolic of most cases reviewed.  The inmate expressed SI to custody staff during the late evening of March 2, 2014 and was transported to the TTA for assessment.  She informed the nurse that she had a plan to hang herself and stated she had attempted suicide earlier in the evening and also was cutting herself.  The on-call psychiatrist was notified and decided not to admit the inmate to a MHCB because she recanted her ideation and "contracted for safety" with the nurse.  The required SRE was not completed.  The following day, March 3, 2014, the inmate was returned to the TTA and informed the nurse that "I feel suicidal, my daughter is sick, and I feel suicidal, I also feel homicidal, I can't honestly don't feel safe going back there, I am hearing voices to do things." The on-call psychiatrist was notified and again a decision was made not to admit the inmate to a MHCB, and she was returned to her housing unit.  The required SRE was not completed.

Finally, several other miscellaneous issues arose during the eUHR review.  For example, this reviewer examined several cases in which both nursing and mental health staff used "contracting for safety" in the assessment of suicide risk.  In fact, in one particular case (CCWF 4) the safety contract was actually written into the nurse's progress note on March 15, 2014 as follows:  "I, CCWF 4 agree not to harm myself or others and contacting medical, mental health, or custody staff.  I'm not hearing voices or seen things that are not there."  In other cases (e.g., CCWF 5) inmates were discharged from MHCBs without a discharging SRE, thus without treatment plans.  In addition, both medical and mental health staff complained that it took between one and four

105

weeks for documents to be scanned into the eUHR, an issue that would impact the ability for continuous quality improvement.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 100 percent of custody and 93 percent of nursing staff were certified in CPR.  In addition, 97 percent of custody staff was compliant with annual suicide prevention block training.  Neither medical nor mental health staff had completed the annual suicide prevention block training, although informational material was said to have been given to nursing staff.  Finally, 100 percent of required mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: CCWF did not have any inmate suicides during 2012-2014.

## 21)    Valley State Prison (VSP)

**Inspection**: April 10-11, 2014

VSP housed 3,216 inmates, with the vast majority being Level II SNY status. VSP had a 23-bed OHU that utilized "swing beds" for inmates identified as suicidal and awaiting placement in a MHCB.  In addition, until recently, three dry holding cells in the OHU were also being used for alternative housing of suicidal inmates.  On April 11, 2014, following this reviewer's suggestion, alternative housing was relocated into the administrative segregation unit. Approximately 42 percent of VSP inmates were on the mental health caseload, with 1,163 3CMS and 192 EOP inmates.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on both April 10, 2014 and April 11, 2014.  The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit.  Privacy and confidentiality were adequate, with the door to the nurse's office partially closed during the screening process.  On April 10, 2014 the nurse consistently failed to ask inmates if they were currently suicidal, instead only inquiring as to whether they had a history of SAs.  On April 11, 2014 however, the same nurse apparently had received corrective action from the previous day and consistently asked each newly admitted inmate about current SI.

This reviewer observed daily rounds by a psych tech in the administrative segregation unit on April 10, 2014.  The psych tech was observed to accurately conduct and document their rounds.

**Housing**:  VSP had a 23-bed OHU that utilized "swing beds" for inmates identified as suicidal and awaiting placement in a MHCB.  All of the rooms contained obvious protrusions which could be utilized in a SA by hanging, including furniture, handicap railing, exposed pipes etc. Most problematic, however, was the fact that suicidal inmates were not observed on a continuous, 1:1 basis in the OHU, which was required when housed in rooms that were not suicide-resistant.  In addition, three dry holding cells in the OHU were, until recently, also being

used for alternative housing of suicidal inmates.  This reviewer was informed that these cells, without sinks and toilets, were holding inmates up to five days without the knowledge of Health Care Placement Oversight Program (HCPOP).  Previous VSP mental health officials (i.e. CEO and CMH) had initiated the practice in an attempt to decrease manipulative behavior.  Those officials were recently replaced and suicidal inmates were no longer housed in the dry cells up to five days, but could be housed for up to 48 hours.  On April 11, 2014, alternative housing was relocated into the administrative segregation unit.

Finally, the administrative segregation unit contained two retrofitted cells for inmates on new intake status.  In fact, most of the administrative segregation cells had concrete construction and there were not any gaps between the wall and furnishings.

**Observation**:  Although both Suicide Precaution and Suicide Watch (on rare occasions) was used in the OHU for inmates identified as being suicidal, this reviewer observed that psychiatric observation was regularly used in the unit and most inmates were said to be observed at 15-minute intervals.  However, as noted above, because none of the OHU rooms were suicide resistant, all suicidal inmates should be observed on a continuous, 1:1 basis.  Because no inmates were on suicide observation during this reviewer's two-day assessment, observation forms used to document observation could not be examined.

Upon examination of the administrative segregation unit log used to document 30-minute welfare checks of non-new intake inmates this reviewer found that welfare checks conducted during the First Watch (10:00 p.m. to 6:00 a.m.) were not properly documented, with notations simply stating "30-minute rounds done" at the end of the shift.  Subsequent review of the Guard One data for the administrative segregation unit found very few violations during a 24-hour period, with overall compliance at 99 percent for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found.  For example, in one case (VSP 1), the inmate had been placed on Suicide Precaution in the OHU during the evening of March 9, 2014 after informing a nurse that "I have thoughts of hurting myself."  He was seen the following morning, by a mental health clinician who completed an SRE indicating the inmate had "expressed SI after receiving some bad news that he will be transferred again, causing him to lose family visits and completing his education again.  He currently denies any thoughts of SI with no specific plan, intent, or means, however, continues to feel hopeless and powerless with constant change."  He was assessed as being at "low" acute risk for suicide and downgraded to psychiatric observation, a level of observation that was not authorized in the *Program Guide*.

In addition, while on Suicide Precaution and psychiatric observation, nursing staff were documenting the observation at 60-minute intervals.  On March 11, 2014, the inmate was released from the OHU with the following treatment plan:  "I/P was seen on 3/10/14 and completed 7386 and 7388 assessment to continue mental health treatment.  IDTT held today to change LOC to C3MS.  He will be discharged from the OHU and released to yard with 5-days.

He will follow with assigned PC and be referred for Stress Management." Review of the eUHR found that five-day follow-ups were completed from March 12, 2014 through March 16, 2014 without any accompanying progress notes and no indication of any treatment planning (including stress management). As of April 11, 2014, the inmate had not been seen by any mental health staff, including his PC, since the last day of the five-day follow-up approximately three weeks earlier on March 16, 2014.

In another case (VSP 2), the inmate reported AH telling him "to hurt myself," with a plan to cut himself with a razor. He was on 3CMS LOC and appeared paranoid. He was placed on Suicide Watch and housed in alternative housing because there were no OHU beds available. The inmate was seen by the IDTT the following morning, elevated to EOP LOC, discharged from Suicide Watch, and returned to his housing unit. An SRE was not completed, therefore, a treatment plan was not completed. Review of the eUHR found that, although five-day follow-ups were completed from March 18, 2014 through March 23, 2014 and a separate progress note completed on March 21, 2014 there was no other documentation that the inmate was being treated as of April 11, 2014.

As noted above, the CEO and CMH were replaced in March 2014 and the current CMH identified several problem areas in the delivery of mental health services. The following areas were in the midst of corrective action: Pre-administrative segregation unit screening, administrative segregation unit cell front contacts, OHU policy and procedures, SRE audit and training (to include review of ten SREs per month), annual suicide prevention training, urgent mental health referrals, 90-day follow-up SREs, and five-day follow-ups.

Finally, this reviewer examined a sample of charts of inmates referred to mental health staff on an emergent basis for SI during March 2014.[1] Of these emergency mental health referrals, 18 were found in the MHTS, and an additional 16 were found in the TTA Log. The review found that SREs were completed in 94 percent, or 32 of 34 of the cases.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**: According to training records, 94 percent of custody and 97 percent of nursing staff were in compliance with CPR training. In addition, 95 percent of custody staff was compliant with annual suicide prevention block training. Medical and mental health staff had not received annual suicide prevention training. Finally, 98 percent of required mental health clinicians had received the seven-hour SRE training, and 86 percent had completed the mentoring program.

This reviewer observed the annual suicide prevention block training on April 10, 2014. Until recently, the suicide prevention workshop at VSP had only been offered via a DVD. The observed presentation on April 10, 2014 was fraught with audio-visual problems and periodic

---

[1] It should be noted that, beginning with this facility review, this writer also began to review the TTA Log at each facility because it was discovered that the MHTS was not an accurate repository for all emergency mental health referrals. In fact, emergency referrals found in the TTA Log were not always found in the MHTS, and emergency referrals found in the MHTS were not always found in the TTA Log. In some of the subsequently reviewed facilities, the total number of emergency referrals found in the TTA Log greatly exceeded those found in the MHTS.

interruptions from VSP medical officials accompanying this reviewer on the tour, which distracted both the instructor and participants.

**Recent Suicides**:  VSP had one inmate suicide during 2012 – 2014.  In that case (VSP 3), the inmate was found hanging from the shower head of a SNY shower room by an electrical cord during the afternoon of October 1, 2013.  The inmate entered CDCR in September 1996 to serve an 85-year to life sentence for assault on a peace officer, disregard for safety, and vehicle theft.  According to available records, the inmate did not have a significant history of mental illness in the community, although he was treated for Attention Deficit-Hyperactivity Disorder (ADHD) as a child.  While in CDCR, although not on the caseload at the time of his death, the inmate received mental health services at the 3CMS LOC from 2000 through 2002 for anxiety, depression, and insomnia.  He did not have any history of suicidal or self-injurious behavior.  The inmate accrued seven RVRs during his 17-year confinement, the last of which occurred shortly after his transfer to VSP in November 2012.

Due to a history of gunshot wounds to his abdomen and pelvic area in 1992 and 1995, resulting in multiple abdominal surgeries, the inmate suffered from severe chronic pain throughout his incarceration.  He frequently requested further surgery for the removal of bullet fragments, but medical experts believed the risk of surgery was too dangerous.  The inmate had been treated for many years with anti-inflammatory medication to manage his pain, and was approved to receive morphine in December 2012.

The CDCR reviewer believed that two issues might have been precipitating factors for the inmate's suicide.  First, according to inmate's mother (who was interviewed by the reviewer following the suicide), "He was preparing us when he said there was nothing more they could do for him.  He had hopelessness.  He asked to be sent home to die, but he was rejected.  He was suffering so much.  And with all that morphine he couldn't think straight."  Second, the inmate was informed on September 18, 2013 (two weeks before his death) that his 24-year-old daughter had committed suicide by hanging.  Although he had only met the daughter once 20 years earlier, according to his mother, "he was devastated ....That put them in a tailspin.  She (his ex-girlfriend and daughter's mother) dropped a bomb.  He was so so mad.  He called every day after that, venting.  That type of news and being so sick.  He had to vent."  In addition, three suicide notes that were found in the inmate's cell spoke of frustration for chronic pain he suffered, separation from his family, and problems with a cellmate.

Although the Suicide Report did not recommend any corrective action in this case, the subsequent DCHCS Combined Death Review Summary found a few issues, including nursing staff using an Epi-Pen during CPR without authorization, and "the lack of a 'code leader' to accept leadership responsibility caused the Emergency Medical Response to be disorganized."  The CDCR reviewer did not believe either issue to be a contributing factor to the inmate's death.

In addition, there were a few other issues that were not addressed in the Suicide Report.  For example, the Suicide Report stated that "According to available records, the inmate had *received* a telephone call on September 18, 2013 notifying him that someone had died."  It was unclear from the wording of this statement how an inmate could have "received a telephone call" from outside the prison without VSP staff knowing about it, nor any inquiry or discussion as to

whether or not any VSP staff were aware that the inmate's daughter had died prior to his death. If VSP staff were aware of the death, a mental health referral should have been generated. In addition, CDCR reviews of other inmate suicides that involved the issue of chronic pain management invariably contained a recommendation and corrective action for collaboration between medical and mental health staff in best treating the inmate. It was unclear why such a recommendation was not offered in this case.

## 22)   **Kern Valley State Prison (KVSP)**

**Inspection**: April 22-23, 2014

KVSP housed 3,795 inmates, with the vast majority being Level IV classification. KVSP had a 20-bed CTC with 12 designated MHCBs, and four administrative segregation units (B-1, B-2, ASU 1, and ASU 2). Approximately 33 percent of KVSP inmates were on the mental health caseload, with 1,145 3CMS and 122 EOP inmates. In addition, alternative housing beds for inmates identified as suicidal and awaiting MHCB placement were located in both the administrative segregation units and selected SNY housing units.

**Screening/Assessment**: This reviewer observed several new admissions during the medical intake screening process on April 22, 2014. The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit. Privacy and confidentiality were compromised because the nurse conducted the screening with a door to the Nurse's Office open and the inmate straddling a chair positioned in the hallway facing into the Office. The hallway was very noisy, with officers yelling instructions to other inmates. The nurse was observed to be asking all the required intake screening questions.

This reviewer observed daily rounds by psych techs in a few of the administrative segregation units on April 22 and 23, 2014. The psych techs were observed to accurately conduct and document their rounds.

**Housing**: KVSP had a 20-bed CTC with 12 designated MHCBs. The rooms did not contain any obvious protrusions which could be utilized in a SA by hanging. In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in both the administrative segregation units and selected SNY housing units. Because many of these cells had not been retrofitted, inmates housed there were required to be observed on a continuous basis.

Finally, three of the administrative segregation units (B-1, ASU 1, and ASU 2) contained 20 retrofitted cells for inmates on new intake status. During the site inspection, however, this reviewer toured B-1 and observed all ten new intake cells full, and an additional ten inmates on new intake status housed in non-retrofitted cells. In addition, although B-2 Unit did not have any designated new intake cells, there were several newly-admitted inmates housed in non-retrofitted cells. Of note, a recent suicide in July 2014 involved a newly admitted inmate placed into a non-retrofitted cell in B-2 Unit in violation of CDCR policy. Each of the non-retrofitted cells in both

110

B-1 and B-2 Units were very dangerous, and contained gaps between the wall and bed, desk/stool, and shelf.

**Observation**:  Although both Suicide Precaution and Suicide Watch was used in the CTC for inmates identified as being suicidal, this reviewer observed that psychiatric observation was regularly used in the unit.  In fact, there were eight inmates on psychiatric observation and three on Suicide Precaution during this reviewer's inspection of the CTC on April 22, 2014.   It appeared that the practice and/or pattern was for clinicians to place an inmate on Suicide Precaution for 24 to 48 hours and then downgrade them to psychiatric observation.  Psychiatric observation was regularly used at KVSP, with inmates observed at 60-minute intervals.  Review of selected eUHRs did not find adequately documented clinical judgment for step-down decisions.  Further, up until a few days before this reviewer's assessment, KVSP nursing staff was using an old CDCR observation form that contained pre-printed time intervals, therefore, staggered observation was not occurring.  The correct observation form was being used beginning April 19, 2014.

Finally, during the tours of three administrative segregation units on April 22 and 23, 2014, this reviewer examined the unit logs used to document 30-minute welfare checks of non-new intake inmates.  The reviews found that no welfare checks were documented during the Second Watch (6:00 a.m. to 2:00 p.m.) for several days in both March and April 2014 in all three units.  In one administrative segregation unit (B-1), welfare checks were not performed during several 16-hour periods spanning the First and Second Watch.  In administrative segregation unit 2, the monitoring team entered the Unit at approximately 8:10 a.m. on April 23, 2014.  The Unit Log was reviewed and indicated that a 30-minute welfare check had last been completed at 5:35 a.m.  The team exited the Unit and returned approximately 40 minutes later.  At that time, the Unit Log was re-checked and it indicated that all of the missing welfare checks from 5:35 a.m. forward had been brought up-to-date and documented on a staggered basis.  Such falsification of a document was problematic.  However, subsequent review of the Guard One data for all four administrative segregation units found high compliance rates during a 24-hour period (B-1: 92 percent, B-2: 98 percent, Administrative Segregation Unit 1: 96 percent, and Administrative Segregation Unit 2: 98 percent) for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found.  For example, in one case (KVSP 1), the inmate was returned from a two-day hospitalization during the evening of March 15, 2014 following treatment for an intentional overdose of methadone.  He was on 3CMS LOC and had a diagnosis of Schizoaffective Disorder.  The inmate was placed on Suicide Watch in alternative housing on a SNY.  The following morning, March 16, 2014, the inmate was seen by a psychiatrist and discharged from Suicide Watch and returned to the SNY with a "3-day mental health f/u."  An SRE was not completed.  Review of the eUHR did not find any follow-up progress notes by mental health staff.  A week later on March 24, 2014, an initial SRE was completed the PC.  The clinician assessed the inmate as having a "moderate" chronic risk for suicide based upon an extensive history of SAs and self-injurious behaviors that included an

111

overdose from heroin in 2010, cutting his neck and attempting to hang himself two months later, an overdose from alcohol and pills and 2011, and placing a razor blade in his mouth and having another inmate hit them in the face.  He had three prior MHCB admissions.  The March 24, 2014 SRE contained the following treatment plan: "(1) I/P will attend all MH appointments and take psychotropic medication as directed, (2) The I/P shall refrain from engaging in self-harming behaviors, and (3) should I/P have thoughts, plan, or intent to harm himself, he will first notify any staff person prior to taking any action against himself."

The eUHR review also found that clinicians were using the same treatment plan boiler-plate narrative for many inmates released from a MHCB.  For example the discharging SREs of three different inmates (KVSP 2, KVSP 3, and KVSP 4), written by three different clinicians on March 5, 2014, March 24, 2014, and April 1, 2014, contained the same exact treatment plan: "Release to custody for housing assignment, Mental Health to monitor with 5-day Follow-Up, Custody to monitor with a 3-day Follow-Up, Psychiatry to monitor psych meds Rx once inmate-patient reaches assigned housing, Mental Health Primary Clinician to update 7388 Treatment Plan regarding recent MHCB admission, Recommend Group Therapy participation for enhanced coping skills and problem-solving techniques."

Finally, this reviewer examined emergency mental health referrals for SI during March and April 2014.  Of these referrals, eight were found in the MHTS for March 2014, and an additional 59 were found in the TTA Log for March and April 2014.  A review of selected eUHR charts found that SREs were completed in 83 percent, or 15 of 18 of the cases.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 99 percent of custody and 90 percent of nursing staff were in compliance with CPR training.  In addition, 98 percent of custody and 16 percent of nursing staff were compliant with annual suicide prevention block training.  Mental health staff had not received annual suicide prevention training.  Finally, 80 percent of required mental health clinicians had received the seven-hour SRE training, and 34 percent had completed the mentoring program.

This reviewer observed the annual suicide prevention block training on April 22, 2014.  The one-hour workshop was provided by a clinical psychologist who provided a very good overview of the materials and invited/received participation from trainees.

**Recent Suicides**:  KVSP had two inmate suicides during 2012 – 2014.  In the **first** case (KVSP 5), the inmate was found hanging from the light fixture of his SNY cell by a sheet during the afternoon of October 1, 2013.  The inmate entered CDCR on his 20th birthday in September 2009 to serve a six-year sentence for armed robbery and causing great bodily injury.  The inmate accrued four RVRs during his confinement, the last of which occurred in November 2012.  He associated with a prison gang that was noted for its involvement in trafficking drugs   In June 2010, the inmate dropped out of a gang and was endorsed to a SNY.  He was transferred to KVSP in August 2010 and had an estimated parole release date in February 2014.

112

According to available records, the inmate did not have a history of mental illness in the community, although there was significant substance abuse within the family, and his sister was previously diagnosed with Bipolar Disorder and had attempted suicide.  While in CDCR, the inmate first complained about "severe depression and constant inability to sleep" in December 2010 following his transfer to KVSP.  He was eventually placed in 3CMS  with an initial diagnosis of Adjustment Disorder with Depressed Mood.  Although he was initially assessed as being at "moderate" chronic risk for suicide (and "low" acute risk) on an SRE, the inmate did not self-report a history of suicidal or self-injurious behavior, nor express any SI.  An initial IDTT was held in February 2011, however, a MHTP was never developed.  Subsequent progress notes indicated that the inmate was not receptive to mental health treatment, often refused mental health contacts and any psychotropic medication.  According to the records, although the inmate often refused services, he was seen on a quarterly basis and "wanted to stay in 3CMS because he liked to have his clinician stop by to check on him, even though he didn't always want to talk.  He never attended his annual IDTTs, although he was encouraged to do so."  His last IDTT was held on February 5, 2013, and he refused to attend the meeting.  The inmate was seen cell front by his PC and appeared stable, although his diagnosis was changed to Major Depressive Disorder, Recurrent, Unspecified.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, and he had been projected for release on parole in February 2014.  Both inmates and staff who were interviewed by the CDCR reviewer expressed shock regarding the inmate's suicide.  His cellmate said that the inmate received financial support from his aunt, had completed several college courses, had future plans, and a parole date in less than a year.  However, in his  suicide note, the inmate wrote that he had contemplated suicide for a long time and had even made several SAs.  He also admitted to an extensive use of methamphetamine in prison, had become addicted, and deeply in debt.  He also reported violent tendencies that had not yet acted upon, suggesting that "simply put, I have a major screw loose.  I know is just a matter of time before I act on these urges.  It's better that I go now before I do."  Although the CDCR reviewer found a few problems in the documentation of the inmate's mental health treatment in late 2010 and early 2011 (e.g., a Health Care Request form that was not followed up on until four weeks later, and a MHTP that was not completed as required in February 2011), those areas were not contributory to his death because he was seen on multiple occasions by mental health clinicians during the past two years.  The Suicide Report did not recommend any corrective action in this case.

In the **second** case (KVSP 6), the inmate was found hanging from the top bunk of his administrative segregation unit cell by a sheet during the morning of July 9, 2014.  The inmate entered CDCR in January 1994 at age 18 to serve a 22-year to life sentence for murder and robbery that was committed when he was 16 years of age.  He was transferred to KVSP on January 31, 2014.  The inmate was seen by the BPHs in 2011 and received a five-year set off until 2016.  He had 34 RVRs during his 20-year confinement, the most recent of which occurred the day before his suicide and involved battery on his cellmate. The inmate was reported to be estranged from most of his family, but received frequent visits from his girlfriend, the most recent of which occurred four days before his death.  He was being medically treated for Hepatitis C, Hyperthyroidism, Psoriasis, and chronic lower back pain.

According to records, the inmate had a history of mental illness in the community that included both ADHD and substance abuse.  There was also a significant family history of mental illness, including the suicide of his grandmother and a reported history of depression of his mother and sisters.  During his CDCR confinement, the inmate first reported symptoms of depression in November 1995 and was placed in 3CMS.  Through the years, he was elevated to EOP due increased depression and anxiety and housed in a PSU. The inmate self-reported a history of suicidal behavior during his CDCR confinement that included a SA by hanging and cutting his arms.  Both incidents reportedly occurred in 2002 while the inmate was housed in a SHU at COR, and resulted in MHCB admissions.  According to the inmate, "I was serving an indeterminate SHU term and I was overwhelmed."  His last SRE was completed in 2010, but did not include the lethality of suicide risk.

Most recently, the inmate was receiving 3CMS LOC, although he was historically a marginal participant, often refusing psychotropic medication, meeting one-on-one with his PC, and missing IDTT meetings.  According to records, he preferred cell-front visits from his clinician. His most recent MHTP dated March 2014 indicated diagnoses of Adjustment Disorder with Mixed Anxiety and Depression and Panic Disorder Without Agoraphobia.  The inmate last met with his PC on May 22, 2014.  His mental status was reported to be within normal limits.  The clinician wrote the following treatment plan in the progress note: "I/P will be monitored for an increase in mental health systems and suicidality. PC will utilize motivational interviewing, DBT, and CBT to assist I/P with learning and implementing positive coping skills, reframing is thinking, and identifying and correcting cognitive distortions.  PC will follow-up with IP in 30 days/PRN to monitor sxs, monitor appropriateness of LOC, and safety concerns."  Despite the intention of seeing the inmate again in 30 days, there was no documentation found in the eUHR that the PC saw the inmate again.

During the last several months of his life, the inmate was seen on a regular basis by a psychiatrist for non-compliance with psychotropic medication.  The eUHR also indicated that the inmate began to submit health care requests with regularity beginning in May 2014 that included complaints of numbness in the shoulder, shortness of breath, chest pain, weight gain and thyroid issues which he believed were caused by his psychotropic medication.  He was last assessed by a psychiatrist on June 26, 2014 and diagnosed with Generalized Anxiety Disorder.  He had previously been seen by a psychiatrist a few weeks earlier on June 6, 2014 for the same concern, and was diagnosed with Mood Disorder NOS.  On both occasions, the inmate denied any SI and his mental status appeared to be within normal limits.

On July 7, 2014, the inmate was observed to be "sluggish when walking, staggering, with slurred speech."  He was seen by a nurse, but refused to be escorted to the TTA for further evaluation. During the afternoon of the following day, however, the inmate was escorted from a SNY to the TTA after exhibiting combative and bizarre behavior.  He appeared to be experiencing a drug overdose and was transferred to a local hospital for treatment.  At the hospital, the inmate admitted that he "smoked meth with marijuana."  He was returned to KVSP several hours later with a diagnosis of Methamphetamine Intoxication and re-housed in an administrative segregation unit (B-2) following an altercation with his cellmate.

The inmate was found hanging at approximately 10:38 a.m. on July 9, 2014.  Although Guard One data indicated that the inmate's cell had been checked eight minutes earlier at 10:30 a.m., the veracity of this check by correctional staff was questionable given a subsequent emergency medical response notation that life-saving measures were terminated "due to lividity."

The CDCR reviewer in this case did not offer any specific precipitating factors for the suicide, and a suicide note was not found.  The reviewer, however, noted the inmate's "chronic SI and had reoccurring thoughts of ending his life due to the perceived futility of his future."   The reviewer estimated his chronic risk for suicide as "high."  The reviewer also noted several deficiencies in mental health and medical care, including lack of a mental health evaluation upon KVSP admission in January 2014, prolonged delay in the initial IDTT until March 2014, inconsistent MHTPs, the most recent SRE had been completed in 2010 and did not include lethality of risk, and failure of a prompt mental health referral by medical staff following observation of "bizarre" behavior following suspected drug overdose on July 8, 2014.  Despite the multiple deficiencies found, the Suicide Report only contained one basis for recommendation for corrective action through a QIP:  "Contrary to CDCR policy, the inmate was not placed in a retrofitted new intake cell upon admission to the ASU on July 8, 2014."

Finally, there were two additional issues not contained within the Suicide Report.  First, despite the fact that the inmate's PC scheduled a 30-day follow-up, there was no indication in the eUHR that the inmate was seen by the clinician after May 22, 2014.  Second, although Guard One data indicated that the inmate's cell had been checked eight minutes earlier at 10:30 a.m., the veracity of this check by correctional staff was questionable given a subsequent emergency medical response notation that life-saving measures were terminated "due to lividity."

## 23)   **Correctional Training Facility (CTF)**

**Inspection**:  April 24-25, 2014

CTF housed 4,869 inmates, with the vast majority being Level II classification. CTF had a 21-bed OHU/Infirmary with four designated rooms to temporarily house suicidal inmates awaiting MHCB placement and an administrative segregation unit located in O-Wing.  Approximately 23 percent of CTF inmates were on the caseload, with 1,100 3CMS and two EOP inmates.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in OHU overflow cells that were said to be rarely used for that purpose.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on April 24, 2014.  The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit.  Privacy and confidentiality were somewhat compromised because the door to the Nurse's Office was left open, but no officers or other inmates were observed in the area.  The nurse was observed to be asking all the required intake screening questions.

This reviewer observed daily rounds by a psych tech in the administrative segregation unit on April 24, 2014.  The psych tech was observed to accurately conduct and document their rounds.

**Housing**:  CTF had a 21-bed OHU/Infirmary with four designated rooms to temporarily house suicidal inmates awaiting MHCB placement.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in OHU overflow cells that were said to be rarely used for that purpose.  All of the rooms designated to house suicidal inmates were found to be extremely dangerous, with ventilation grates that had not been retrofitted, cell bars, and in at least one room, a handicap railing that could easily be used in a SA by hanging.  At the time of the site visit, there were not any pending work orders to retrofit any of these designated OHU rooms.  Whereas most institutions required continuous observation of suicidal inmates placed in designated alternative housing cells that were deemed unsafe, CTF did not have such a policy and suicidal inmates could be placed on any level of suicide observation.

Finally, the administrative segregation unit contained 12 retrofitted cells for inmates on new intake status.  During the inspection, this reviewer did not observe any new intake inmates in non-retrofitted cells.

**Observation**:  Although both Suicide Precaution and Suicide Watch was referenced in CTF's LOP on suicide prevention, the LOP also referenced the term "crisis evaluation."  According to the directive, signed August 29, 2013:

> If the clinician cannot determine, with reasonable certainty, that the inmate-patient is at high or medium risk for suicide, and more time is needed to evaluate the inmate-patient's condition, the clinician shall place the inmate-patient in an OHU with orders for Crisis Evaluation. The clinician will then specify the method, frequency, and materials/items the patient may have in order to keep him safe.  This will not trigger an immediate/automatic referral to MHCB and allows for clinicians to further evaluate the LOC and treatment needs of the patient.  The inmate-patient must be discharged from the OHU within 48 hours.

Although a Quality Management official with the DCHCS Mental Health Program informed this reviewer that the "crisis evaluation designation was developed as a way for us to distinguish the mental health inmate-patients in the OHU from those in the unit for medical reasons. The crisis evaluation status was developed as a data entry label and was not intended to replace 'Suicide Precautions' or 'Suicide Watch' criteria or designation," this reviewer found otherwise at CTF. A review of various eUHRs and an un-authorized CDCR observation form, indicated that Suicide Watch, Suicide Precaution, psychiatric observation, *and* crisis evaluation were used at CTF for suicidal inmates housed in the OHU.  More problematic was the fact that the levels of observation for such suicidal inmates ranged from continuous observation to 60-minute intervals. In one case (CTF 1), for example, the inmate reported command AH to commit suicide and was placed on observation at 15-minute intervals in the OHU on February 16, 2014.  The following morning, February 17, 2014, he was assessed by a clinician who completed a SRE that indicated both a "moderate" acute and chronic risk for suicide, but decreased the level of observation to 30-minute intervals.  Several hours later, the clinician further downgraded the level of observation to 60-minute intervals.  The following day, February 18, 2014, another clinician initiated a MHCB referral based upon continued AH.  All of these varying levels of observation occurred in an unsafe OHU room.

116

Finally, during the tour of the administrative segregation unit on April 24, 2014, this reviewer examined the logs used to document 30-minute welfare checks of non-new intake inmates on each of the three tiers. The reviews of several 24-hour periods in April 2014 found that welfare checks were not always correctly documented on each shift on each tier, with most chronic problems occurring on the third tier during the First Watch (10:00 p.m. to 6:00 a.m.). However, subsequent review of the Guard One data for the administrative segregation unit found fewer violations during a 24-hour period, with overall compliance at 94 percent for new intake inmates.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis. Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found, particularly in the area of adequate treatment planning. For example, in one case (CTF 2), the inmate was placed in the OHU for SI on April 18, 2014. Upon his discharge three days later on April 21, 2014 the treatment plan contained within the SRE stated the following in its entirety: "IM to be discharged from the OHU as safety concerns will be addressed by custody and mental health. IM has been given psychotropic medication for anxiety. IM to be placed at 3C LOC with follow-up for anxiety and hopelessness."

In another case (CTF 3), the inmate was admitted into the OHU on crisis evaluation status for threatening to cut himself. He was placed on Suicide Watch. The following morning, March 2, 2014, the level of observation was downgraded to 15-minute intervals. Several hours later during the afternoon, the same clinician discharged the inmate from the OHU. With the exception of Physician's Orders, the eUHR in this case did not contain an admission SRE, a progress note to clinically justify the downgrading of observation, a discharge SRE, or a treatment plan.

This reviewer examined emergency mental health referrals for SI from January 2014 through March 2014. Of these referrals, 21 were found in the MHTS and an additional 13 were found in the TTA Logs. A review of eUHRs found that SREs were completed in 80 percent or 27 of 34 of the cases. In one emergency referral (CTF 4), the inmate approached an officer on a SNY on January 27, 2014 and stated "he was having suicidal thoughts." An emergency mental health referral was generated and the inmate was seen shortly thereafter by a mental health clinician. According to progress note, the inmate reported that he "was feeling intimidated and threatened sexually by his cellie. Patient reported that he felt 'my back was against the wall' and suicide was the only way out. Patient stated that if his housing situation is resolved then he will no longer feel suicidal." Although the clinician collaborated with a SNY lieutenant to find an AHU for the inmate, an SRE was not completed despite the fact that the inmate was on the "high risk list" for previous suicidal behavior.

Finally, it should be noted that mental health clinicians at CTF were observed using a different form to document five-day follow-up progress notes following an inmate's discharge from an OHU or MCHB. The form, entitled "Interdisciplinary Progress Note," CDCR 7230-MH, was SOAP-formatted and each of the five days of follow-up were documented on a *separate* daily

form.  The extra room on the form allowed for sufficient space to document the inmate's mental health status and status of their treatment plan.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 97 percent of custody and 100 percent of nursing staff were in compliance with CPR training.  In addition, 96 percent of custody staff was compliant with annual suicide prevention block training. Medical and mental health staff had not received annual suicide prevention training.  Finally, all of the required mental health clinicians had both received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**:  CTF had two inmate suicides during 2012 – 2014.  In the **<u>first</u>** case (<u>CTF 5</u>), the inmate was found hanging from the ventilation grate of his administrative segregation cell by a sheet during the evening of June 16, 2013.  The inmate entered CDCR in August 2002 to serve a 16-year sentence for continuous sexual abuse of a child (his 18-year-old daughter).  The inmate accrued four RVRs during his confinement, the last of which occurred in July 2008.  He was transferred to CTF in June 2010 and was eligible for parole in December 2015.  Due to the nature of his crime, the inmate was assigned to a SNY his entire incarceration.

According to available records, the inmate did not have a history of mental illness in the community, although he grew up in a chaotic family lifestyle.  His family also had a history of suicide, which included a step-brother (who allegedly sexually abused him on one occasion), a grandfather, and two uncles.  In 1978, the inmate was hit by truck while riding a motorcycle and received a sizable insurance settlement.  Following the accident, he began to abuse drugs.  During his CDCR confinement, he remained in contact with a two brothers and a cousin, but was estranged from his wife, who filed for divorce following his arrest and two children.  The inmate had various medical problems related to his 1978 motorcycle accident, including hypertension, hypothyroidism, and multiple sequelae.  He was treated with various medications and, according to the CDCR reviewer, it did not appear that his medical problems were the proximate cause of his eventual suicide.

The inmate was placed in 3CMS  shortly after his initial CDCR confinement in August 2002.  He presented with "complaints of AH, flat affect, loss of appetite, and anhedonia, and guilt."  He was initially diagnosed with Major Depression with Psychotic Features and treated with psychotropic medication.  He carried a diagnosis of Schizoaffective Disorder from 2003 through 2008, and then Mood Disorder NOS, from 2008 through April 2013.  Other than attempting suicide by cutting his wrist in the county jail in 2002, the inmate did not have a significant history of suicidal and/or self-injurious behavior, and was assessed as both a "low" acute and chronic risk for suicide on the two occasions that SREs were completed (in April 2012 and March 2013).  In April 2012, the inmate informed his psychiatrist that he wanted to discontinue all medications and be discharged from 3CMS. Although the medications were discontinued, he was retained in 3CMS  until April 9, 2013 when he was discharged at his annual IDTT meeting.

A few weeks later on April 25, 2013, the inmate reported enemy concerns to an officer on a SNY and was transferred to administrative segregation.  Although hesitant to re-enroll in 3CMS

because he believed it might adversely affect his post-prison release plans, the inmate agreed to speak with mental health staff on a weekly basis while in the administrative segregation unit. During the last contact with the PC on June 13, 2013, the inmate reported sleeping problems and feeling stressed and anxious. The clinician initiated a referral to the psychiatrist, but the inmate was apparently not seen prior to his suicide.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, noting that, other than the enemy concerns from a specific inmate that he reported to custody staff on April 25, 2013, his behavior appeared consistent over the past few months of his life. There was, however, some evidence of increased anxiety during these last few months, exemplified by a mental health referral from custody staff on May 22, 2013 in which the officer believed the inmate was showing signs of hallucinations and paranoia regarding threats from another inmate. In fact, during an interview with the CDCR reviewer following the death, the inmate's brother suggested that he was becoming increasingly paranoid and fearful that his offense was going to be announced to other inmates by the inmate he viewed as an enemy. His brother also stated that the inmate spoke about the isolation of the administrative segregation unit, complaining about "no job, books, people, nothing but sitting and thinking."

The Suicide Report contained four bases for recommendations for corrective action through a QIP. All of these issues related to officer and nursing responsibilities on the day of the inmate's suicide on June 16, 2013: (1) neither of the two officers who found the inmate hanging, nor a third officer, activated their personal alarms or institutional radios to alert others custody personnel of the emergency; (2) documentation of the emergency response indicated that life-saving measures were not begun on the tier, but rather five minutes later when the inmate arrived at the TTA; (3) two nurses working in the administrative segregation unit did not immediately join in the emergency response; and (4) in violation of CDCR policy, security rounds were not conducted at 30-minute intervals, rather they occurred at 60-minute intervals.

In the **second** case (CTF 6), the inmate was found dead from exsanguination in his SNY cell during the early morning of July 4, 2013. The inmate entered CDCR for the second time in December 1999 to serve a 25-year to life sentence for the first-degree murder of his girlfriend. He received an additional enhancement of six years for a prior felony conviction and use of a weapon. He was transferred to CTF in March 2005. He enjoyed good family support, and had weekly telephone conversations with his mother. The inmate had an "exemplary" work record during confinement, and was placed on SNY status in 2009 after providing information about a riot to custody officials. The inmate accrued only two RVRs during his almost 14-year confinement, the most recent of which occurred two days before his death. On July 2, 2013 the inmate was charged with "overfamiliarity with staff" after writing "I love you" on his cell window, a message that was intended for a female CO working in the unit.

According to available records, the inmate did not have a history of mental illness in the community, although he and his family suffered from substance abuse. He was placed in 3CMS shortly after his initial CDCR confinement in 1999 and diagnosed with Major Depressive Disorder with Psychotic Features. He was discharged from the MHSDS a few years later in January 2002. According to the CDCR reviewer, the inmate "had no further contact with mental health for the remainder of incarceration, functioned well, and appeared emotionally stable."

119

The inmate had a history of two SAs, both of which occurred in 1998 prior to his CDCR confinement and involved driving his truck over a cliff following his girlfriend's murder and cutting his throat in the county jail.  He did not have any major medical problems during his CDCR confinement.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, noting that he had spoken with his mother on the telephone a few days before his death and did not appear to be depressed nor give any indication of his impending suicide.  In his suicide letter, however, the inmate expressed feelings of loneliness and isolation and profound remorse for his girlfriend's death.  In addition, the reviewer found that the inmate's recent RVR, occurring two days before his death and more than ten years removed from his only other rules violation, was puzzling.  The reviewer theorized that, because he had cellmate, the inmate intentionally incurred the RVR so as to be single-celled in the administrative segregation unit or another housing unit in order to better ensure his SA was not discovered.  In addition to the suicide note, various poems were found in the inmate's cell, including one addressed to a childhood friend who had also committed suicide by exsanguination.

The Suicide Report contained four bases for recommendations for corrective action through a QIP.  All of these issues related to officer and nursing responsibilities on the day of the inmate's suicide on July 4, 2013 and were very similar to those found in the previous CTF suicide (CTF 5): (1) the CO who found the inmate did not activate his personal alarm to alert others of the emergency; (2) contrary to basic first aid principles, correctional staff failed to immediately apply pressure to the wound in the inmate's neck; (3) there was a significant delay in the arrival of TTA nurses to the housing unit; and (4) deficiencies and inconsistencies were noted in the incident package and TTA log regarding documentation of the timeline of the emergency response.


## 24)   **Pleasant Valley State Prison (PVSP)**

**Inspection**: May 6-7, 2014

 PVSP housed 3,063 inmates, with the vast majority being Level III classification.  PVSP had a 16-bed CTC with six rooms designated as MHCBs and two administrative segregation units.  Approximately 43 percent of PVSP inmates were on the caseload, with 1,316 3CMS and three EOP inmates.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in TTA holding cells and CTC overflow rooms.

**Screening/Assessment**:  This reviewer only observed one new admission during the medical intake screening process on May 6, 2014.  The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit.  Privacy and confidentiality were adequately provided because the door to the Nurse's Office was closed.  The nurse was observed to be asking all of the required intake screening questions.

This reviewer observed daily rounds by psych techs in the two administrative segregation units on May 6 and 7, 2014.  The psych techs were observed to accurately conduct and document their rounds.

**Housing**:  PVSP had a 16-bed CTC with six rooms designated as MHCBs.  The rooms did not contain any obvious protrusions which could be used in a SA by hanging.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in TTA holding cells and CTC overflow rooms.  Inmates placed in alternative housing cells were required to be observed on a continuous basis.

Finally, one administrative segregation unit (D-4) designated to house caseload inmates contained three retrofitted cells for inmates on new intake status, whereas the stand-alone administrative segregation unit had six retrofitted new intake cells.  During the inspection of D-4 Unit, although this reviewer did not observe any newly admitted inmates housed in non-retrofitted cells, correctional staff stated that new intake inmates were frequently placed in non-retrofitted cells when the three designated cells were occupied.  It should also be noted that this reviewer could not assess whether all new intake inmates in the stand-alone administrative segregation unit were housed in retrofitted cells because of a recent practice of no longer placing "new intake" placards with entry dates on the cell doors.

**Observation**:  Although both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal, this reviewer also observed that psychiatric observation was regularly used in the unit.  On May 7, 2014, there were five inmates in MHCBs, with three on psychiatric observation and two on Suicide Precaution.  Two of the inmates on psychiatric observation had been admitted into the CTC the previous day.  In addition to this observation status not being referenced in the *Program Guide*, it was problematic that some inmates assessed as being suicidal were being observed at 30-minute intervals.  This reviewer examined the observation forms used to document observation of suicidal inmates housed in the MHCBs and found that all of the forms were up-to-date, with observations documented on a staggered basis.

Finally, during the tour of both administrative segregation units, this reviewer examined the logs used to document 30-minute welfare checks of non-new intake inmates.  The reviews found that there were at least 11 days during April 2014 in which 30-minute welfare checks were not consistently performed during the First and Third Watches in D-4 Unit, and at least six days during April 2014 in which 30-minute welfare checks were not consistently performed during the First and Third Watches in the stand-alone administrative segregation unit.  However, subsequent review of the Guard One data for both administrative segregation units showed no violations during a 24-hour period, with compliance at 100 percent for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found, particularly in the area of adequate treatment planning.  For example, in two cases (PVSP 1 and PVSP 2), both inmates had exactly

the same treatment plan contained within their respective SREs to justify discharge from the MHCB.  The plans, written by two different clinicians, stated the following:

> d/c to CCCMS LOC on OP-41 status and 5-day MHCB f/u, DC meds written x 30 days, consult PC for continuity of care, PC contact q 90 days or prn for mental status updates, MHCB f/u q 90 days x 1 year to monitor stability, psychiatry contact prn for medication mgnt, IDTT q 365 days or prn to update treatment plan as necessary."

Another clinician typically wrote the following treatment plan narrative in the SRE justifying discharge from the MHCB:  "Discharge on OP-41 F/U" (see, e.g., <u>PVSP 3</u>).  In yet another case (<u>PVSP 4</u>), both the clinician's admission SRE of March 4, 2014 and the discharging SRE of March 6, 2014 were exactly the same, with the discharging SRE containing the following treatment plan: "d/c to CCCMS LOC on OP-41 status and 5-day MHCB f/u, consult PC, PC contact q 90 days, psychiatry contact prn, IDTT q 365 days."

This reviewer examined emergency mental health referrals for SI from January 2014 through April 2014.  Of these referrals, ten were found in the MHTS and an additional 14 were found in the TTA Logs.  A review of eUHRs found that SREs were completed in 92 percent, or 22 of 24 of the cases.

Finally, it should be noted that review of minutes from SPRFIT meetings held at PVSP for the six-month period of November 2013 through April 2014 found that several prominent members of the Committee, including the CMH, Chief Psychiatrist, and Chief Nurse Executive, were missing from most, if not all, of the monthly meetings.  Such a lack of leadership attendance was troubling.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 99 percent of custody and 100 percent of nursing staff were in compliance with CPR training.  In addition, 98 percent of custody and 79 percent of medical and mental health staff was compliant with annual suicide prevention block training.  Finally, 93 percent of the required mental health clinicians had both received the seven-hour SRE training and completed the mentoring program.

This reviewer observed the annual suicide prevention block training on May 6, 2014.  Although the instructor appeared very proficient, the material was presented in rapid fashion, there was little interaction with participants, and the workshop lasted only 35 minutes followed by a ten-minute post-test.

**Recent Suicides**:  PVSP had three inmate suicides during 2012 – 2014.  In the **<u>first</u>** case (<u>PVSP 5</u>), the inmate was found hanging from the upper bunk of his SNY cell by a shoelace during the afternoon of May 15, 2012.  His body was found in the early stages of *rigor mortis*.  The inmate entered CDCR in May 1999 to serve a 34-year to life sentence for two counts of second-degree murder (vehicular homicide), evading a peace officer, and hit-and-run.  The inmate accrued

seven RVRs during his confinement, the last of which occurred in April 2011.  He was affiliated with a gang until 2003 and was assigned to a SNY.  The inmate was transferred to PVSP in September 2011.  He enjoyed good family support, with weekly visits from his wife.

According to available records, the inmate did not have a history of mental illness in the community, but had a history of substance abuse.  He also did not report any history of suicidal and/or self-injurious behavior, and denied any SI during his CDCR confinement. The inmate had various chronic medical conditions, including asthma, migraine headaches, and left elbow pain. According to the CDCR reviewer, these medical problems did not appear to be contributing factors to his suicide.

On January 3, 2012, the inmate submitted a request to be seen by mental health staff because of decreased sleep, increased fatigue, and excessive worrying about "a lot of things."  He was diagnosed with Generalized Anxiety Disorder and referred to the IDTT for a follow-up assessment within 30 days.  However, the follow-up assessment never occurred and he submitted another health care request on April 21, 2012 and was seen by the same clinician more than a week later on April 30, 2012.  His symptoms were similar to that which was reported in January, and he denied any SI.  The clinician wrote a diagnosis of "no diagnosis" and again requested that he be seen by the IDTT within 30 days.  Two weeks later on the morning of May 15, 2012 a CO responded to an altercation between the inmate and his cellmate.  He was seen shortly thereafter by mental health clinician, but was generally uncooperative.  The clinician also incorrectly noted in a progress note that the inmate was a participant in 3CMS.  The inmate committed suicide several hours later that day.  Following the inmate's suicide, however, the clinician who had assessed the inmate in January and April 2012 informed the CDCR reviewer that she had considered referring him to 3CMS, but that his level of distress was both "non-acute in non-emergent," and he had been reluctant to enter the MHSDS because he did not want to take psychotropic medication.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, although noting that he appeared to seek assistance of mental health staff during the past few months in managing his increasing anxiety regarding his mother's declining health and other unknown concerns.  He did not leave a suicide note.  According to his cellmate, the inmate had stopped leaving his cell for meals and yard time during the past week, and had begun to see "mice, faces, and people in the cell" that were not there.  There were rumors that the inmate had been taking illegal drugs.  According to the CDCR reviewer, "given his self-reported symptoms of anxiety, it is possible that he chose to self-medicate his stress and worry."

The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) On January 12, 2012, the inmate was evaluated by a clinician who intended to schedule him for a follow-up by the IDTT within 30 days.  A referral for that follow-up did not occur.  On April 21, 2012, after a second evaluation, the clinician evaluated the inmate's level of distress as non-acute and non-emergent.  Although progress notes indicated plans for IDTT follow-up, no referral was made; and (2) Progress notes documenting the incidents listed above suggest a lack of familiarity with this inmate's history.  Diagnoses were not consistent from one evaluation to the next and available documentation did not indicate the development of a treatment plan, other than referral to IDTT."

123

In the **second** case (PVSP 6), the inmate was found dead from exsanguination in his SNY cell during the afternoon of May 16, 2012.  His body was found in the state of *rigor mortis*.  This suicide occurred one day after the death of the inmate detailed above (PVSP 5) in another SNY housing unit, and the deaths appeared to be unrelated and coincidental.  The inmate had entered CDCR in December 2011 to serve a 22-year sentence for two counts of sexual molestation of his girlfriend's daughter.  In addition, there were allegations that he was being investigated for similar offenses against his twin sons.  The inmate did not have any RVRs during his confinement, and was assigned to a SNY based upon the nature of his crime.  He was transferred to PVSP on April 3, 2012, less than six weeks prior to his death.  It did not appear that the inmate had any family support in the form of visits, telephone calls, or letter correspondence during his brief six-month confinement.

According to available records, the inmate's social history was unclear, but he reportedly had a history of substance abuse.  According to his ex-wife, he experienced a depressive episode in 2001 which resulted in a SA (cutting his right wrist) and psychiatric hospitalization. Upon entry into CDCR in December 2011, the inmate self-reported this prior SA and psychiatric hospitalization from ten years earlier, but denied any current SI or other mental health concerns.  Based upon the screening, the clinician decided not to refer the inmate for a further mental health evaluation.  The inmate's medical history was unremarkable.

Although the CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, the review found he had received a letter from his brother on May 12, 2012 indicating that his twin sons had recently made accusations that he had sexually abused them and that he might be facing additional criminal charges.  In a suicide note found in his cell, the inmate apologized to his family, but vehemently denied sexually abusing any of his children.  He also stated in the letter that "I can't continue with this, it's too hard for me."

The Suicide Report contained one basis for recommendation for corrective action through a QIP: "The inmate was not referred for a further mental health evaluation despite positive responses on the RC 31-item mental health screening questionnaire indicating a previous SA, psychiatric hospitalization, and being prescribed psychotropic medication.  The SPRFIT of DCHCS should discuss ways to improve the accuracy and utility of this standardized mental health screening, to include making recommendations for changing the scoring rules for the questionnaire."

In the **third** case (PVSP 7), the inmate was found hanging by a sheet from the ventilation grate of his administrative segregation unit cell during the morning of October 15, 2013.  His body was found in *rigor mortis*.  The inmate entered CDCR in May 2001 to serve a 21-year sentence for voluntary manslaughter of his girlfriend, assault with a deadly weapon, and burglary.  He was transferred to PVSP in October 2012.  The inmate accrued three RVRs during his confinement, the last of which occurred in July 2013 and involved battery on another inmate resulting in his placement in administrative segregation.  He enjoyed good family support, including regular visits from his father.

According to available records, the inmate did not have a history of mental illness in the community, but had a history of substance abuse.  In addition, he apparently tried to commit

suicide by cutting his arms immediately after the death of his girlfriend in 1999.  Upon entry into CDCR, the inmate was on the caseload until July 2008.  He was initially placed in 3CMS  until December 2007 and carried a diagnosis of Major Depressive Disorder, Recurrent.  For a two-month period of December 2007 through January 2008, he was elevated to EOP with a diagnosis of Schizoaffective Disorder, followed by a return to 3CMS with a diagnosis of Major Depressive Disorder, Recurrent.  While on the caseload, the inmate had a history of refusing his psychotropic medication.

On July 21, 2013, inmate was referred to mental health staff after refusing to participate in the mental health screening upon admission to administrative segregation.  However, he was not seen by mental health staff until over a month later on September 27, 2013, a few weeks prior to his death.  The clinician's progress note stated that the inmate "reported being slightly depressed due to medical problems."  'I have neck and back pain.'"  He denied any mental health issues and the clinician did not feel that he met MHSDS criteria.

The inmate suffered from chronic back and neck pain sustained from a fall in 2008.  He was treated with morphine (then methadone) and other pain medication and physical therapy.  His complaints about pain seemed to intensify during 2013, and he was seen by medical staff more than 15 times for what he described on calendars in his cell as "insufferable pain" from April 2013 until a week before his death on October 15, 2013.  In fact, on the calendars examined by the CDCR reviewer following his suicide, the inmate had documented his pain level on a daily basis and noted his level of depression beginning in late September and continuing through several days prior to his death.  Apparently, psych tech staff conducting daily rounds of the administrative segregation unit did not notice these calendar entries or observe the inmate's level of distress.

The CDCR reviewer did not offer any specific precipitating factors for the inmate's suicide, a curious non-finding given the fact that he had increasingly complained about the "insufferable pain" in his back that was documented on calendars in his cell.  The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) Nursing staff appropriately referred the inmate to the mental health department after he refused to participate in the 31-item screen on July 21, 2013.  However, mental health staff did not evaluate the inmate for his refusal until September 27, 2013; and (2) Two concerns related to custodial procedures were identified in this review.  These warranted a referral to the Warden of PVSP to determine the need for investigation."

The two concerns were that, after the inmate was found hanging in his cell, the administrative segregation sergeant ordered the cell door immediately closed and the area treated as a crime scene, thereby prohibiting medical staff from initiating life-saving measures.  In addition, the inmate's body was found in rigor mortis and the coroner's investigator estimated that he had been dead for approximately four to eight hours.  The CDCR policy for 30-minute welfare checks in the administrative segregation unit had been repeatedly violated in this case.  Of note, a review of Guard One in both administrative segregation units by PVSP officials found significant problems with 30-minute welfare checks during a six-month period of June 2013 through November 2013.  As previously stated, continuing problems with 30-minute welfare checks in the administrative segregation unit were found during this reviewer's May 2014 tour.

**25)   Avenal State Prison (ASP)**

**Inspection**: May 8-9, 2014

 ASP housed 3,949 inmates at Level II security classification.  ASP had a ten-bed OHU with six designated rooms to temporarily house suicidal inmates awaiting MHCB placement.  There was also an administrative segregation unit.  Approximately 35 percent of ASP inmates were on the caseload, with 1,399 3CMS and two EOP inmates.  In addition, alternative housing beds for inmates identified as suicidal and awaiting placement in a MHCB were located in OHU overflow cells that were said to be rarely used for that purpose.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on May 8, 2014.  The Initial Health Screening (CDCR 7277) process was conducted by a nurse assigned to the R & R Unit.  Privacy and confidentiality were adequately provided because the door to the Nurse's Office was closed.  Although the nurse was observed to be asking all the required intake screening questions relating to suicide risk, several medical and mental health questions were missed.

This reviewer observed daily rounds by two psych techs assigned to the administrative segregation unit on May 9, 2014.  The psych techs were observed to accurately conduct and document their rounds.

**Housing**:  ASP had a ten-bed OHU with six designated rooms to temporarily house suicidal inmates awaiting MHCB placement.  In addition, there were OHU overflow cells that were said to be rarely used for that purpose.  All of the rooms designated to house suicidal inmates were found to be extremely dangerous, with the ceiling ventilation grates that had not been retrofitted, a smoke detector cage in one cell, and handicap railings in three cells that could easily be used in a SA by hanging.  In addition, all rooms had live electrical outlets. There were not any pending work orders to retrofit any of these designated OHU rooms.  None of the rooms had suicide-resistant beds, and metal beds were removed when inmates were on either Suicide Watch or Suicide Precaution.  As detailed below, ASP also used psychiatric observation for some suicidal inmates, with observation at 30-minute intervals.  The unsafe metal bunks were <u>not</u> removed from cells housing suicidal inmates on psychiatric observation.

In addition, the administrative segregation unit had eight retrofitted cells for inmates on new intake status, and this reviewer observed that all newly-arrived administrative segregation inmates were housed in these retrofitted cells.  In fact, because the administrative segregation unit was approximately 50 percent under capacity at the time, there were a sufficient number of retrofitted cells to house inmates who had been placed in the unit for less than 21 days.

**Observation**:  Although both Suicide Precaution and Suicide Watch were used in the OHU for inmates identified as being suicidal and awaiting placement in a MHCB, this reviewer was informed that psychiatric observation was regularly used in the unit.  This reviewer examined several cases in which inmates were admitted into the OHU for SI and placed on crisis evaluation status with observation at either 30-minute or 60-minute intervals.  For example, in one case (<u>ASP 1</u>), the inmate voiced SI during the late evening of April 21, 2014 and was

admitted to the OHU for crisis evaluation with observation at 30-minute intervals.  A SRE was not completed, nor were any observation forms found in the eUHR.  The inmate was released from suicide observation the following day, but, according to the discharging SRE, remained in the OHU pending transfer to an institution with EOP LOC.  In a similar case (ASP 2), the inmate voiced SI during the late evening of April 30, 2014 and was admitted into the OHU for "crisis intervention" with observation at 30-minute intervals.  A SRE was not completed until the afternoon of the following day, May 1, 2014, when he was discharged from the OHU.

In another case (ASP 3), an administrative segregation inmate voiced SI to a psych tech on the morning of January 19, 2014 and was assessed shortly thereafter by a psychiatrist.  The psychiatrist wrote the following in the SRE:  "Given severity of acute stressor, I/P endorsing significant depression, maintaining SI without a plan, endorsing extreme helplessness/hopelessness, high impulsivity and unpredictability in future actions, he cannot be sent back to the ASU today and benefits from OHU admission for crisis intervention and for safety reasons.  He has a history of depression."  The inmate was then admitted into the OHU with observation at 60-minute intervals.

In summary, clinical orders for observation of suicidal inmates at either 30-minute or 60-minute intervals was problematic, particularly in a physical environment like the OHU that did not have any suicide-resistant cells.  Such practices were not referenced in the *Program Guide*.

Finally, during the tour of the administrative segregation unit on May 9, 2014, a review of the logs used to document 30-minute welfare checks of non-new intake inmates found that welfare checks were correctly documented as required.  Subsequent review of the Guard One data for the administrative segregation unit found very few violations during a 24-hour period, with overall compliance at 99 percent for new intake inmates.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several problems found related to treatment planning.  For example, in one of the cases (ASP 3) that involved an inmate admitted to the OHU for SI, but on observation at only 60-minute intervals, the subsequent treatment plan found in the discharging SRE dated February 5, 2014 was quite thorough.  It stated:

> Crisis assessment treatment for immediate mental health care will be provided as needed. Will continue to monitor any SIs or changes in behavior as appropriate. Motivational interviewing to be provided in concert with Prchaska and DiClemente's Stages of Change model in regards to his drug use, motivation to remain sober, and criminal thinking.  I/P to identify three negative consequences of using.  Short-term care - I/P to be seen weekly and PRN for individual therapy and monthly and PRN for medication management.  I/P to attend groups as appropriate.  I/P to be seen daily by LPT to review and monitor symptoms; report to be presented to PC.  Long-term-care - I/P to remain compliant with medication. I/P to continue individual therapy, including addressing depression and anxiety

127

through supportive psychotherapy, CBT and psycho-education.  Therapy will also address the increasing of protective factors such as familiar support, exercise, plans for the future and self-efficacy.  Address any anger management issues in individual therapy and group therapy.

This detailed and thoughtful treatment plan was offset by the fact that review of five-day follow-up notes and subsequent progress notes did not show any concordance with the above plan.

In several other cases, inmates were discharged from the OHU without a SRE and, therefore, without a treatment plan.  For example, an inmate (ASP 4) was admitted into the OHU on January 30, 2014 for SI and discharged four days later on February 3, 2014.  An SRE was not completed.

Finally, this reviewer examined emergency mental health referrals for SI from January 2014 through March 2014.  Of these referrals, six were found in the MHTS and an additional 24 were found in the TTA Logs.  Subsequent review of 20 eUHRs found that SREs were completed in 80 percent or 16 of 20 of the cases.  One of the cases (ASP 5) of an emergency referral not resulting in completion of an SRE was particularly troubling.  The inmate had been referred to mental health on an emergency basis from custody on April 2, 2014 because of observation of a depressed mood.  The clinician described the inmate's presentation as follows:

> His birthday just passed, he caught his wife with another man on the day after his birthday.  He lost both his parents within the year apart, he lost his dog, brother committed suicide a year and a half ago.  One child in Washington and two other children.  He was assaulted in his dorm a week ago.  Feels mad, extremely depressed, irritable, 'I feel loss and spaced out.'  Antisocial and paranoid. Experiencing anxiety.  I/P states he attempted suicide by his mother's grave.  I/P experienced a lot of loss.  He states he recently got a letter from his current wife who is 50 years old, telling him she is going to 'party' and do all that she wants since she is not with I/P anymore.  I/P reports he feels depressed as well because he recently received a letter from social services informing him his children are currently in foster care.  PC encouraged I/P to get in contact with social worker to obtain more information on what is going on.  Before ending interview, PC asked I/P if he was experiencing any SI or AH and he denied.

The inmate "contracted for safety." A SRE was not completed.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 95 percent of custody staff was certified in CPR. Nursing staff reported 89 percent compliance with CPR training.  In addition, 95 percent of custody and 83 percent of medical and mental health staff were compliant with annual suicide prevention block training.  Finally, 89 percent of the required mental health clinicians had received the seven-hour SRE training and 96 percent had completed the mentoring program.

**Recent Suicides**:  ASP had one inmate suicide during 2012 – 2014.  In that case (<u>ASP 6</u>), the inmate was found unresponsive by self-strangulation with a t-shirt around his neck in the lower bunk of his administrative segregation cell during the early morning of June 28, 2012.  His body was in the state of *rigor mortis*.  The inmate re-entered CDCR in August 2007 to serve an eight-year sentence for arson of his family's home.  He was transferred to ASP in September 2009.  The inmate had three RVRs during his CDCR confinement, the last of which occurred in October 2011.  It did not appear that the inmate had any strong family support, although he was in periodic contact with his grandmother.

According to available records, the inmate did not have a history of mental illness in the community, although he and other family members suffered from substance abuse.  Upon entry into CDCR in August 2007, he told the intake screening nurse that he was "possibly suicidal" and had been on suicide precautions in the county jail.  He also reported a SA by drug overdose a few months earlier in May 2007.  He was referred to mental health staff for further evaluation and assessed as being at low risk for suicide.  A few months later in September 2007, inmate again attempted suicide by drug overdose.  He was placed on Suicide Precaution in the administrative segregation unit, which had been used for MHCB overflow at the time, diagnosed with Bipolar Disorder, and placed in 3CMS.  The inmate was discharged from Suicide Precaution a few days later.  Of note, when assessed by a psychiatrist during this time, the inmate denied any current SI, "but said he would not tell me if he was experiencing.  Said suicide would be very helpful in solving our problems."  Subsequent SREs from 2008 through 2011 consistently assessed him as being at both "low" chronic and acute risk for suicide.  Records also indicated that he was only sporadically compliant with psychotropic medication, and his medications were discontinued in June 2011.  He appeared generally ambivalent about his mental health treatment.

During the inmate's last IDTT on October 12, 2011, the PC at the time completed a SRE based solely on his self-report.  The SRE erroneously reflected that the inmate had never made a SA, had no family history of suicide despite the inmate previously reporting that an uncle had committed suicide prior to his birth, and had no history of violence or poor impulse control despite the arson of his family home.  The inmate's last contact with mental health staff occurred on May 10, 2012 when he again requested to be removed from 3CMS,  having been off psychotropic medication for almost a year.  The progress note indicated that the inmate did not like to talk about himself or his feelings.  The CDCR reviewer noted that "given that the inmate's past four quarterly PC sessions had been with four different psychologists, his reluctance to speak was perhaps understandable."  The inmate remained in  3CMS.  He did not have any significant medical problems.

On June 27, 2012, the day before his death, the inmate approached an officer in the yard and stated that, although not gang-affiliated, he had been carrying drugs for a gang, had taken more than his allowance and was in severe debt, and believed his life was in danger.  He requested protection and was transferred to the administrative segregation unit.  Upon arrival, he was not placed in any of the eight retrofitted new intake cells, apparently because they were all full.  Instead, he was single-celled at the far end of the unit on the second tier.

The CDCR reviewer did not offer any plausible precipitating factors for the suicide and the inmate did not leave a suicide note. The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) On October 12, 2011, the inmate's PC completed a SRE based only on the inmate's self-report. His history of SAs, family history of suicide, and poor impulse control were not documented. This error was repeated on the MHTS, a primary source of information for future clinicians and PTs. According to the CMH at ASP, several concerns exist regarding this clinician's clinical practice; and (2) The inmate was not placed into an intake cell upon entry into the ASU. Intake cells were full at that time."

Finally, it should be noted that several of the conclusions contained in the Suicide Report were troubling. The CDCR reviewer appeared particularly concerned about the inaccurate SRE of October 12, 2011, completed nine months prior to the inmate's death, noting that "the primary issue of concern raised by this review was insufficient documentation on the SRE." Other important issues, occurring on the day of the suicide, appeared less significant to the reviewer. For example, it was curious that the reviewer opined that the fact "the inmate was in rigor does not imply that his death occurred hours before, due to the variability in the onset of rigor," as well opining that the "emergency response was rapid and appropriate." Although medical experts cannot always ascertain the exact time of death after an individual is found in rigor mortis, the medical literature is quite consistent in reporting that rigor mortis begins immediately after death and becomes visible after two to three hours. And while it would certainly have been appropriate to opine that CPR should not have been initiated if the inmate was in rigor mortis, to suggest that the "emergency response was rapid and appropriate" was simply incorrect given the fact that an officer discovered the inmate unresponsive at 6:45 a.m. on June 28, 2012 and medical staff were not able to initially assess the inmate and begin CPR until almost 11 minutes later at 6:56 a.m. Finally, although the Suicide Report contained a recommendation and QIP regarding the fact that the inmate was not put in a new intake cell as required by CDCR policy, the reviewer seemed to downplay this violation by stating "given that self-harm was not apparent to staff viewing him through the cell window, cell location may not have been a significant factor in the suicide." Prior CDCR reviews of inmate suicides have <u>not</u> contained attempts at justifying or downplaying violations of policy and it was curious that it occurred several times in this case.

### 26)   <u>California Institution for Women (CIW)</u>

**Inspection**: May 20-21, 2014

CIW housed 2,092 inmates across three classification levels, Level I, II, and III. CIW had an 18-bed CTC with ten designated MHCBs, an OHU, Support Care Unit (for EOP inmates), SHU, PSU, and administrative segregation unit. Approximately 43 percent of CIW inmates were on the caseload, with 801 3CMS and 89 EOP inmates. In addition, alternative housing beds located in the OHU were used for inmates identified as suicidal and awaiting placement in a MHCB. In addition, CIW administered a 45-bed Psychiatric In-Patient Program (PIP) for inmates in CDCR custody.

**Screening/Assessment**:  This reviewer did not observe any new admissions during the medical intake screening process on May 20-21, but returned to the institution on May 22 to observe the process.  Two nurses were observed conducting intake screening in two separate rooms.  Privacy and confidentiality were adequately provided.  Each nurse was observed to be asking all the required intake screening questions.

In addition, this reviewer observed daily rounds by three psych techs assigned to the administrative segregation unit and PSU on May 20-21. All of the psych techs were observed to accurately conduct and document their rounds.

**Housing**:  CIW had an 18-bed CTC, with ten rooms designated as MHCBs.  Generally, the rooms did not contain any obvious protrusions which could be used in a SA by hanging.  The only potentially dangerous fixture in the MHCBs and all of the CTC rooms, was a stainless steel sink that had sharp edges that could be used as an anchoring device in a SA by hanging.  In other CTCs assessed by this reviewer, two stainless steel triangles were attached to the wall and both sides of the sink to eliminate the sharp edges.  The institution also used four "swing" medical beds in the CTC as alternative housing cells for inmates identified as suicidal and awaiting MHCB placement.  These rooms also contained the same potentially dangerous sinks as detailed above and a handicap railing that was not suicide-resistant.  In addition, the medical beds were removed from the rooms and inmates had to sleep on the floor.  The OHU could also be used for alternative housing, but was said not to have been used for that purpose to date.

This reviewer observed that most inmates on Suicide Precaution were <u>not</u> issued mattresses.  Subsequent review of several eUHRs of these inmates did not find any clinical justification for the removal of mattresses.  Such practices were contrary to the *Program Guide*, and very problematic.

Finally, the administrative segregation unit contained eight retrofitted cells for inmates on new intake status.  During the site inspection, this reviewer observed that all eight cells were occupied by inmates on new intake status.  This reviewer was informed, however, that the number of new intake inmates exceeded the number of new intake cells a few times per month and when that occurred, inmates were placed in non-retrofitted cells that contained multiple hazards.

**Observation**:  Although both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal, this reviewer observed that other observation levels were regularly used in the unit.  For example, in addition to inmates on Suicide Precaution being observed at 15-minute intervals, contrary to the *Program Guide*, inmates on Suicide Precaution were also being observed at 30-minute intervals.  In addition, psychiatric observation was regularly used in the CTC, with the inmates observed at 15-minute, 30-minute, and 60-minute intervals.  Although such practices were not referenced in the *Program Guide*, mental health officials at CIW previously developed an LOP for Suicide Prevention and Response that authorized their use.

The practice of 30-minute observation for suicidal inmates was problematic.  For example, this reviewer examined the eUHRs of two inmates (<u>CIW 1</u> and <u>CIW 2</u>) that were both admitted to the MHCB in close proximity to each other during the evening of May 19, 2014, after expressing SI.

Both were receiving 3CMS LOC.  Both inmates were placed on Suicide Precaution with observation at 30-minute intervals, clothed only in a safety smock, and prohibited from having mattresses.  This reviewer attended the IDTT of one of the inmates (CIW 2) the following day, May 20, 2014.  During the meeting, it was learned that the two inmates were sexual partners and the team believed they had threatened suicide for the secondary gain of being housed near each other in the CTC.  Regardless of the clinicians' belief that these inmates were manipulative, their placement on 30-minute observation for SI and withholding their mattresses, was well below the standard of care and in violation of the *Program Guide*.

This reviewer examined the observation forms used to document observation of suicidal inmates housed in the MHCBs and found that all of the forms were up-to-date, but the observations were not documented on a staggered basis.  In addition, contrary to practices found at other CTCs where observation forms were placed outside each MHCB, certified nursing assistants (CNAs) at CIW kept the forms in individual folders on a desk at the end the corridor.  This reviewer observed two CNAs sitting at the desk and documenting in each inmate folder.  Placement of these observation forms on a desk at the end of the corridor, and not on MHCB doors, created the possibility that observation would not be consistently performed as required.

Finally, during the tours of the administrative segregation unit, SHU and PSU on May 20 and 21 2014, this reviewer examined the unit log used to document 30-minute welfare checks prior to full implementation of the Guard One system.  In reviewing unit logs for April and May 2014, we found that correctional staff had been conducting welfare checks at 60-minute intervals.  It appeared that CIW officials, specifically the supervising lieutenant over these three housing units, were unaware of numerous CDCR directives (the most recent of which was issued on May 28, 2013) requiring 30-minute welfare checks of all inmates housed in the administrative segregation unit, SHU and PSU.

In addition, pursuant to a recent CDCR directive that expanded the use of Guard One to *all* administrative segregation inmates (both pre-and post-21 days),[2]  review of the Guard One data for the administrative segregation unit found overall compliance during the 24-hour period of May 20, 2014 to be only 73 percent.  This low compliance rate could be attributed to the fact that May 20 was only the second day that correctional staff were required to utilize the Guard One system throughout the entire administrative segregation unit.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found related to treatment planning.  For example, in one case (CIW 3), the inmate was admitted to a MHCB on April 3, 2014 for SI.  She had a significant history of suicidal behavior, including at least four SAs.  Upon discharge from the MHCB four days later on April 7, 2014, the SRE contained the following treatment plan: "I/P will be discharged from the MHCB on 4/7/14 on a 5-day step down.  She will follow-up

---

[2] As previously detailed in this report, the May 9, 2014 directive expanded the requirement for welfare checks at staggered intervals that did not exceed 35 minutes to all inmates housed in ASUs, SHUs, PSUs, and the Condemned Units. The directive applied to ASUs beginning May 19, 2014.

with the treatment team in CCCMS about developing healthy relationship skills and coping techniques for frustration/impulsivity."  In a similar case (CIW 4), the CTC clinician wrote the following treatment plan in the discharging SRE:  "I/P will be discharged to CCCMS/Yard on 5-day step down."

In addition, this reviewer observed three IDTT meetings in the CTC on May 20, 2014.  Overall, the IDTT performed well and was well represented with two psychologists, a psychiatrist, a recreation therapist (who was particularly engaged with all three inmates), a nurse, and a correctional counselor.  It appeared that at least two of the inmates were viewed by the treatment team as being manipulative, and decisions in all three cases were made to change the conditions of Suicide Precaution without the benefit of risk assessments.  The team did not offer any reasonable response to this reviewer's inquiry as to why five of nine CTC inmates that day were not provided mattresses.

This reviewer examined emergency mental health referrals for SI from January 2014 through May 2014.  Of these referrals, eight were found in the MHTS (from January 2014 thru April 2014) and an additional 17 were found in the TTA Logs (from April and May 2014).  A review of eUHRs found that SREs were completed in only 76 percent or 19 of 25 of the cases.  This relatively low level of SRE completion might be attributed to clinicians' belief that SREs were unnecessary if the inmate was manipulative.  For example, in one case (CIW 3), the inmate submitted a Health Care Services Request Form that was received by mental health staff on January 21, 2014 that stated:  "I keep having flashbacks….I want to die, I feel like hurting myself, I think I am overmedicated, I can't handle this prison program, I have sex with every girl I meet, and need to go back to the EOP program." The inmate was seen by a clinician shortly thereafter and denied any SI.  The clinician found that she "has secondary gains to her behaviors."  The clinician placed the inmate on five-day follow-up services, but did not complete an SRE.  In a similar case (CIW 1), the inmate expressed SI to a psych tech during rounds and was referred to a psychologist for further assessment.  The clinician's subsequent progress note stated the following:  "I/P claiming she is feeling suicidal 'send me to suicide watch, I'm going to hang myself if you send me back to my cell.'  When asked if she has something to hang herself with, she stated, 'I'll find something.'  Angry and upset being told in ICC that she will be transferred to CCWF.  Informed I/P that being sent to the MHCB will not deter her from being transferred up north.  I/P indicated that she understands this, and was not the reason why she is claiming SI." Although the clinician believed that "IP's claim of SI is most likely not valid" and an SRE was not completed, the inmate was recommended for further assessment by the psychiatrist in the TTA.  A short time later, the inmate was seen by the psychiatrist and continued to express SI.  The psychiatrist decided not to admit the inmate to a MHCB, rather she was returned to her housing unit on a five-day follow-up and an SRE was not completed.

Finally, it should be noted that review of monthly SPRFIT Committee minutes held at CIW from February through April 2014 found that the Chief Psychiatrist (or other psychiatrist) did not attend any of the meetings.  The lack of psychiatric leadership attendance was troubling.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 92 percent of custody staff was certified in CPR.  Nursing staff reported 100 percent compliance with CPR training.  In addition, 100 percent of custody staff was compliant with annual suicide prevention block training.  Medical and mental health staff had not received annual suicide prevention block training.  Finally, 94 percent of required mental health clinicians had received the seven-hour SRE training, with 96 percent having completed the mentoring program.

This reviewer observed the annual suicide prevention block training on May 20, 2014.  The instructor appeared proficient, the material was presented adequately, and there was some interaction with participants.  The instructor later informed this reviewer that it was very challenging to present all of the required PowerPoint slides and encourage participation within the 60-minute allotted timeframe for the workshop.

**Recent Suicides**:  CIW had four inmate suicides during 2012 – 2014.  In the **<u>first</u>** case (<u>CIW 5</u>), the inmate was found hanging from the bed and locker of her Support Care Unit cell by a mesh laundry bag during the evening of July 6, 2012.  The inmate entered CDCR in April 1996 to serve a 30-year to life sentence for the murder of her husband.  She was transferred to and from CIW on several occasions, and last transferred to the institution in January 2010.  The inmate only had one RVR during her confinement, and the incident, smoking in her cell, occurred in 1998.  She appeared to have good family support and frequent visits from a religious community group.

The inmate had a significant history of mental illness, both in the community and during CDCR confinement.  She was placed at EOP LOC soon after her CDCR arrival.  She was hospitalized twice at Patton State Hospital (PSH), the first time for 11 months from September 1999 through August 2000 following a serious SA by hanging, and the second time for more than five years from December 2004 through January 2010 following a SA of cutting her wrists.  The inmate had multiple diagnoses during her hospitalization, including Major Depressive Disorder, PTSD, Borderline Personality Disorder and Schizoaffective Disorder.  At the time of her death in July 2012, her diagnosis was Mood Disorder NOS and a provisional diagnosis of Psychotic Disorder NOS.  The inmate was on both 3CMS and EOP  during her CDCR confinement, and was most recently elevated to EOP in January 2012.  She was reportedly compliant with her psychotropic medication throughout most of her confinement.  According to the CDCR reviewer, the inmate had a number of chronic medical conditions that were not contributory to her subsequent death.

The inmate had a social history that was once termed "colorful," and included four marriages and employment as a prostitute in a legal brothel in Nevada.  The CDCR reviewer in this case believed that a more accurate descriptor of her life was "tumultuous" because of her multiple psychiatric hospitalizations and SAs.  In addition, the inmate self-reported a mental health history that began at age 12 due to physical and emotional abuse by her mother, and death of her brother by drowning.  She also reported sexual abuse by her step-father.  In addition to her own prior SAs, the inmate reported that her sister had also attempted suicide.

As indicated above, the inmate had a significant history of suicidal and self-injurious behaviors, both in the community and during CDCR and PSH confinement.  The incidents in the community included SAs by laceration, overdose, and hanging.  The SA by drug overdose

occurred following her fourth husband's murder in August 1994.  As stated above, she attempted suicide in CDCR by hanging in 1999 and again by cutting her wrists in 2004.  During her stay at PSH, she again attempted suicide by hanging in October 2009. Following her return from PSH, the inmate again attempted to hang herself with a belt from her bathrobe in April 2012.  Although she had a total of 14 MHCB admissions in the period between her return from PSH in January 2010 and her death, she was not referred back to DSH.  During this time period, when not in a MHCB, the inmate was housed in CIW's Support Care Unit.

There were various reasons for the inmate's multiple MHCB admissions during 2010 and 2012, including wrist lacerations after her father died in March 2011, AH of SI, other self-injurious behavior (e.g., cutting her ankles), panic attacks, and severe depression when told that her sister had spent all of their inheritance following their parents' deaths.  She also complained of having a microchip implanted in her head that she believed had been put there by an ex-husband so that he could spy on her and control her thoughts.

In May 2012, clinicians began to observe that the inmate's behavior was deteriorating, with increased depression, more frequent complaints about the microchip in her head, more anxiety and paranoia, and sleeping problems.  Her psychotropic medication was adjusted in an attempt to decrease her symptoms.  On May 19, 2012, she was escorted to the TTA following complaints about panic attacks and SI.  She was not admitted to a MHCB, but returned to the SCU with a five-day follow-up.  Several days later on May 24, 2012 the inmate attended an IDTT and the progress note from the session noted her "obsessions, ruminating, anxiety, sadness, constricted affect, and some paranoid ideation."  She continued to complain about increased panic attacks during clinical sessions on May 29, 2012 and June 1, 2012.  A week later on June 9, 2012, the inmate was taken to the TTA after expressing SI when reportedly informed that her sister had spent all of her inheritance.  She was admitted to a MHCB feeling "overwhelmed" with a plan to hang herself.  She was discharged from the MHCB two days later on June 11, 2012 with a five-day follow-up.  Her PC began twice-weekly contacts with the inmate on June 16, 2012 and she again reported receiving a disturbing letter from her sister, expressed SI, and "placed on 5-day follow-ups with custody rounds on the SCU."  On June 28, 2012 she told her PC that she was "really worried about my money..... I feel that my sister has spent the money."

By early July 2012, the inmate's anxiety and agitation continued to increase.  She became obsessed with the state of her inheritance and told her PC on July 2, 2012 that she had been writing several letters every day to her sister.  Three days later on July 5, 2012, she expressed feelings of hopelessness and SI, increased anxiety and poor sleep, binge eating, and "too many conflicts on the unit."  Regarding her inheritance, the inmate told the clinician that "Even if I had my inheritance, I just don't feel good.  I want to die.  Death seems better."  She was admitted to a MHCB.  The inmate was seen by a CTC clinician the next day and stated "I feel better today.  I just needed time to think."  The clinician wrote that "I/P reported that she had slept better last night and realized that she needed to accept things in her environment that she had no control of.  I/P was encouraged to use her coping skills when encountering stressors.  I/P was glad to know that she would be returning to her unit.  I/P stated, I want to be with my friends and get their support."  An SRE was completed, and the inmate denied any current SI.  Although endorsing AH, she insisted "they don't bother me."  She was assessed as "high" chronic risk and "low" acute risk for suicide.  The inmate was discharged back to the SCU and the treatment plan

135

section of the SRE stated the following in its entirety: "I/P will be discharged on a 5-day step-down. This writer will communicate with PC regarding status and transfer." Welfare checks at 60-minute intervals were also recommended. The inmate committed suicide several hours later.

The CDCR reviewer in this case was critical of the clinical treatment provided, particularly the lack of referral to a higher LOC following 14 MHCB admissions between 2010 and 2012 and the impact that perceived manipulative behavior had on the decision by multiple IDTTs not to refer. The reviewer's comments were insightful and pointed:

> It appeared to this evaluator that staff at CIW was split into two camps - those that believed that the inmate was crippled by severe personality pathology that included some psychotic features (implanted chip, AH), and others who focused instead on her blatant manipulations (pressuring other inmates to clean her cell or rub her back) and label her symptom complaints as malingering. Staff splits like those seen in this case can have a deleterious effect on clinical care. For this I/P, the team that believed that she did not have an Axis I mental disorder moved quickly to a discussion of reduction of LOC, while those who that believed that she did suffer serious psychotic symptoms increased her antipsychotic medications to the maximum dose, without significant clinical improvement. The staff of the MHCB appeared to downplay her reported psychotic symptoms and seem to have attributed her behaviors solely to her Axis II personality disorder pathology.

Although the CDCR reviewer detailed several specific deficiencies in clinical care, the Suicide Report contained only two bases for recommendations for corrective action through a QIP: "(1) Providing inmates with double-cell status is a known protective factor in preventing suicide in correctional settings. The inmate was single-celled upon discharge from the MHCB unit on July 6, 2012. It is likely that she would not have died by suicide if assigned the cellmate; and (2) The period immediately following an in-patient hospitalization is a period of high suicide risk. The timing of discharges is an important component of the MHCB unit decision-making. The inmate was discharged on a Friday afternoon. The records suggest that she was discharged without adequate consideration of the consequences of a Friday PM discharge."

Finally, although the Suicide Report was otherwise very comprehensive, several other issues regarding the case and the above recommendations were worth noting. First, the treatment plan contained within the discharge SRE written on the morning of the inmate's death simply stated "I/P will be discharged on a 5-day step-down. This writer will communicate with PC regarding status and transfer" was particularly unhelpful. The CDCR reviewer noted that treatment planning was inadequate in this case, suggesting that several "forms seem identical - as if they were cut-and-pasted. Overall this reviewer does not believe the shortcomings contributed significantly to the inmate's demise, therefore, this issue is not the basis of a formal recommendation." Given the fact that treatment planning should be the critical tool in the continuity of care following an inmate's discharge from a MHCB, it was troubling that the reviewer did not believe that the lack of treatment planning contributed significantly to this inmate's death, particularly when the reviewer was critical of clinical care.

Second, the fact that clinical judgment becoming clouded by perceived manipulative behavior was a systemic problem within CDCR should not prevent a recommendation for corrective action in a specific inmate suicide case. There are many systemic issues identified in other CDCR Suicide Reports (e.g., failure to conduct 30-minute welfare checks, delay in initiation of life-saving measures, inadequate treatment planning, etc.) that still result in specific recommendations and QIPs. Third, although the vast majority of CDCR suicides occur in single cells, there are many suicides that occur with inmates on double cell-status, including two of the four suicides at CIW during 2012 – 2014, and double-celling is not always the strong protective factor that one might hope it to be. As such, the reviewer's statement that "it is likely that she would not have died by suicide if assigned the cellmate" was dubious at best.

In the **second** case (CIW 6), the inmate was found hanging from the shower head in her GP housing area by a sheet during the morning of November 14, 2013, and pronounced dead at the hospital two days later on November 16, 2013. The inmate re-entered CDCR on January 24, 2012 to serve a four-year sentence for burglary and possession of a controlled dangerous substance. She was transferred to CIW on April 18, 2012. The inmate had 14 RVRs during her confinement, the most recent of which occurred in August 2013 for refusal to submit to a urine sample and disobeying orders. She appeared to have good family support. According to the CDCR reviewer, the inmate had a few chronic medical conditions that were not contributory to her subsequent death.

According to the review of records in this case, the inmate did not have a significant history of mental illness in the community, but had a significant history of substance abuse that began when she was 13-years-old. She had several prior arrests as a juvenile, and three prior CDCR confinements, all of which were related to her substance abuse. At age 15, she was reportedly hospitalized for SI, and attempted suicide by drug overdose the following year for which she was not hospitalized. During this time, her older brother committed suicide by hanging.

Prior to the inmate's first CDCR confinement in 2004, she was diagnosed with Bipolar Disorder at the county jail and prescribed psychotropic medication. Upon entering CDCR a short time later, she was placed in 3CMS with a diagnosis of Adjustment Disorder and Amphetamine Dependence. She was discharged from the caseload less than a year later.

Upon her most recent CDCR admission in January 2012, the inmate received a mental health evaluation that determined she did not meet criteria for inclusion on the caseload. A year later on February 13, 2013, the inmate was admitted to the emergency room after being found unresponsive in a housing unit from an alleged drug overdose. She was returned to CIW four days later on February 19, 2013 and denied the overdose was a SA, stating the incident was the result of "spiritual warfare in my head" that she was trying to stop. She was diagnosed with Anxiety Disorder NOS, Cannabis Dependence, and Amphetamine Dependence. The inmate was placed on five-day follow-up and placed in 3CMS. As part of her enrollment in 3CMS, her PC completed an SRE on February 26, 2013 that stated the following: "IP reports that she put rope around her neck two weeks ago but then stopped herself, then on February 13, 2013, OD on methamphetamine, though she denies it was a S/A." The inmate denied any current SI and was assessed as being at "low" chronic risk and "moderate" acute risk for suicide. The treatment plan included "3CMS LOC, IDTT, and continue current psychotropic medication." The medication,

137

however, was discontinued at her request in March 2013, and then restarted again in June 2013. On August 5, 2013, the inmate was assessed by a psychiatrist due to medication non-compliance. She also reported symptoms of "panic attacks, waking up at night and not sleeping." Her medication was increased for better efficacy.

On September 10, 2013, the inmate was seen by mental health staff as a result of an emergency referral regarding the alleged death of her son. She informed the clinician that her mother had informed her of the death during a telephone conversation the previous night. She told the clinician that "she had lost the two closest people in her life the last six months," in reference to the death of her father in May 2013. (A subsequent investigation by the CDCR reviewer in this case determined that the inmate's son had not died.) She denied any SI. The inmate was seen twice more in October for medication non-compliance, and the medication was discontinued on October 23, 2013.

Other than theorizing that the inmate may have been harassed by other inmates to repay a significant drug debt, the CDCR reviewer did not identify any possible precipitating factors to the suicide. The inmate did not leave a suicide note. The Suicide Report contained two bases for recommendations for corrective action through a QIP: "(1) The inmate was placed in the MHSDS at the CCCMS LOC per a placement chrono dated February 26, 2013. However, per the clinical documentation, the initial IDTT and corresponding treatment plan were not completed until March 26, 2013....A treatment plan must be completed by the PC within 14 working days; (2) At the two IDTTs held for the inmate on March 26, 2013 and June 14, 2013, there were no psychiatrists present. The absence of psychiatrists is a policy violation according to the 2009 *Program Guide*."

In the **third** case (CIW 7), the inmate was found hanging from the cell door in her GP cell by a sheet during the morning of February 24, 2014. The inmate re-entered CDCR on October 18, 2011 to serve an 11-year sentence for burglary and theft. She was transferred to CIW on October 18, 2012. The inmate had three RVRs during her three-year confinement, one of which involved conspiracy to introduce controlled substances for distribution, for which she received an additional 32-month sentence in November 2013. She appeared to have good family support, demonstrated by visits from family and friends. According to the CDCR reviewer, the inmate had several chronic medical conditions that were not contributory to her subsequent death.

According to the review of records in this case, the inmate did not have a significant history of mental illness in the community, but she had a history of substance abuse. Upon entry into CDCR in October 2001, she denied any current or prior mental health concerns and, therefore, was not entered into the MHSDS. In December 2012, the inmate was seen by a clinician as the result of an emergency referral after she reported being depressed because of her uncle's death. She also self-reported anxiety and being sexually molested by a cousin during her adolescence. The inmate also reported two prior SAs by drug overdose (in 2002 and 2005) that resulted in hospitalizations. A SRE completed on December 21, 2012 found her at "moderate" chronic risk and "low" acute risk for suicide. She placed in 3CMS with diagnoses of Anxiety Disorder, Major Depressive Disorder, Poly-Substance Dependence, Personality Disorder and PTSD.

During the early part of 2013, the inmate was seen by her PC on a regular schedule and continued to complain about nervousness, anxiety, poor concentration, and impaired memory. From May 31, 2013 through December 19, 2013, she was housed in the administrative segregation unit because of the aforementioned conspiracy to bring drugs into the institution. A SRE completed on June 4, 2013 by the PC determined that the inmate was at both "low" chronic and acute risk for suicide. It was noted by the CDCR reviewer in this case that the PC either ignored or did not review the inmate's prior SRE which documented the two prior SAs and subsequent hospitalizations. Another SRE, completed by the PC a month later on July 2, 2013, also failed to document the inmate's prior SA history. Also in June 2013, the inmate began to take psychotropic medication, and her diagnosis was revised to Anxiety Disorder, Polysubstance Dependence, and Personality Disorder.

The inmate's last contact with a mental health clinician before her February 24, 2014 suicide occurred three weeks earlier on February 3, 2014 as the result of a routine contact. She appeared both anxious and irritable, and displayed some paranoia. Supportive counseling was provided.

Other than theorizing that the inmate may have been upset regarding the dissolution of a sexual relationship with another inmate the week before and recently receiving an additional 32-month sentence in November 2013, the CDCR reviewer did not identify any possible precipitating factors to the suicide. The Suicide Report did not contain any recommendations for corrective action, although the reviewer noted a concern that the PC had not conducted thorough reviews of the eUHR to document the inmate's previous SAs on the SREs. The reviewer "recommended that CIW conduct an inquiry regarding the necessity of reviewing previous SRE collateral information in the most recent SREs and determine if additional training or action is necessary." This reviewer's examination of the CDCR secure site did not contain any documentation that this informal recommendation was acted upon by CIW, and it was unclear why this recommendation was not formally presented in the Suicide Report with the required QIP.

Finally, one additional issue that was not found in the Suicide Report concerned the emergency response to the suicide on February 24, 2014. According to the records, COs responding to the emergency initially allowed another inmate to assist with CPR, and it appeared that correctional staff had to return to the Unit staff office on two separate occasions to retrieve both the cut-down tool and Ambu bag. The Suicide Report did not include a discussion as to the necessity for allowing an inmate to conduct CPR in the presence of other correctional staff, nor why it was necessary for correctional staff to take separate trips back to the Unit office when the rescue tool and Ambu bag should be contained in the same emergency response bag. The impact of this delay, if any, to the overall emergency response was not explored in the Suicide Report.

In the **fourth** case (CIW 8), the inmate was found hanging from the bookshelf of the SHU section of her administrative segregation cell by a sheet during the afternoon of July 30, 2014. The inmate re-entered CDCR on May 18, 2011 to serve a five-year sentence for discharge of a firearm and a parole violation. She was 19-years-old. The inmate had been previously committed to the California Youth Authority (CYA) at age 15 in 2006 for possession of a controlled dangerous substance and robbery. She was transferred from CYA to CDCR in July 2009, then paroled from CDCR in November 2010. Less than six months later, she was re-committed to CDCR. The inmate remained at CIW for most of her confinement, only leaving the institution

for brief hospitalizations related to seizures.  The inmate accumulated over 26 RVRs during her three-year confinement, including being out of bounds, possession of a controlled substance, disobeying a direct order, contraband, kissing another inmate, alteration of clothing, refusing assigned housing, and attempted escape.  She spent the majority of her confinement in either administrative segregation or SHU during the last two years of her life, and told a clinician that "I just stopped caring" after her aunt's death in March 2013.  It was a potentially stressful event because her aunt's residence was a primary ingredient of her parole plan.  Her estimated parole release date was extended from September 2013 to October 2015 as a result of her multiple RVRs.

The inmate had several serious medical problems, included a history of pancreatitis and migraines.  Following an assault by another inmate in December 2013, she developed seizures and was treated by medical providers on a regular basis.  Her most recent seizure occurred on July 25, 2014, a few days before death.

Although the inmate was not viewed as a reliable historian, and did not report a significant history of mental illness in the community, she reported a history of substance abuse beginning at age 12 when she joined a gang.  She also reported being sexually molested as a teenager and that that her mother suffered from depression.  Upon re-entry into CDCR in May 2011, the inmate screened negative for any mental health problems and was not referred to the MHSDS.  However, in early February 2012, she submitted a mental health referral reporting a depressed mood, low energy, poor sleep, and racing thoughts.  She was seen by a clinician and reported being depressed because her family had recently cut off all contact with her.  The inmate was found to meet the criteria for 3CMS LOC.  Her initial diagnosis was Depressive Disorder NOS, and she was prescribed psychotropic medication.  She continued to program within GP and was seen by her PC on a regular basis.

The inmate had an extensive history of suicide and self-injurious behavior in both the community and during CDCR confinement.  She reported an attempted suicide by hanging at age 15 and cutting herself.  The inmate stated that she cut himself to relieve pain, and had at least five incidents of self-injurious behavior by cutting during her CDCR confinement.  In addition, her close friend committed suicide in November 2013.

The inmate also had multiple admissions to a MHCB, beginning on May 12, 2013 when she allegedly threatened suicide when her needs were not being met.  She told a clinician that "I am not suicidal, I just wanted to talk to the psychologist."  The inmate was discharged from the MHCB two days later on May 14, 2013 with the following treatment plan in her SRE:  "Place on 5-day step down, will be seen by the IDTT in ASU, psych techs to follow-up daily, medications to be monitored by psychiatry."  The inmate was again placed in a MHCB for SI and anxiety from September 28 through September 30, 2013.  Upon discharge on September 30, 2013, the treatment plan on the SRE simply stated:  "I/P to be discharged from MHCB to CCCMS/SHU on a 5-day step down."  Her diagnosis was changed to Depressive Disorder NOS, Amphetamine Dependence, and Anti-Social Personality Disorder.

During this time, the inmate was serving a six-month SHU term for multiple RVRs from May 12 through October 24, 2013.  Following her release, she was readmitted into the administrative

segregation unit a few weeks later on November 12, 2013 for refusing assigned housing in GP and disobeying orders resulting in the use of force. She continued to be seen by a mental health clinician on a weekly basis. The inmate was released back into GP on December 11, 2013, but was assaulted by another inmate, hospitalized, and returned to CIW the following day and placed back into administrative segregation for safety concerns. On January 17, 2014, she told the clinician that she began experiencing SI two days earlier due to depressed feelings of hopelessness related to termination of a relationship. She also expressed anxiousness regarding seizures that had started as a result of the recent assault. The inmate continued to be seen on a weekly basis by the administrative segregation unit clinician for the next several months and was provided supportive counseling.

During the late evening of June 27, 2014, the inmate was admitted to a MHCB following an assault on staff in the administrative segregation unit. The incident began when she was observed to be having a seizure or drug-induced seizure in her cell. When COs began to enter the cell, she began to resist by flailing her arms and spitting. She was escorted to the CTC and placed on Suicide Watch under continuous observation. She continued her disruptive behavior and both the mattress and safety blanket were removed from her room. The next day, she refused to submit to urinalysis. The inmate was downgraded to psychiatric observation at 30-minute checks and issued a safety mattress and blanket on June 30, 2014. She was discharged from the MHCB on July 1, 2014 with the following treatment plan in her SRE:

> While in MHCB, I/P was seen daily by the MHCB treatment team and she had her medication evaluated by the MHCB psychiatrist. I/P had initial IDTT on 6/30/14. Treatment focused on: Reinforcing the verbalized acceptance of responsibility for connection between impulsive behavior and negative consequences. I/P was educated about the use of 'stop, think, listen and plan' in day-to-day living and to identify the positive consequences of using this technique. I/P will be discharged from the MHCB on 7/1/14 to CCCMS/SPHU on a 5-day step down. She will follow up with her team treatment team in CCCMS. Future treatment recommendations include: Assisting I/P and identifying rewards that would be effective in reinforcing suppression of impulsive behavior, and teaching I/P cognitive methods (thought stoppage, thought substitution, reframing, etc.) in gaining and improving control over impulsive actions.

Several days later on July 4, 2014, the inmate was found hanging in her administrative segregation cell by a sheet. She had also swallowed a razor blade. She was sent out to the hospital for treatment and returned to CIW a week later on July 11, 2014 and was immediately placed in a MHCB on Suicide Watch. She informed a clinician that her SA was an impulsive act due to many factors, including her birthday a day earlier (July 3), the birthday of her brother who was fatally shot six years earlier, the possibility of picking up additional charges based upon the alleged staff assault, and possibility of a prolonged SHU placement or transfer to CCWF where she had enemies. The inmate was seen by CTC clinicians on a daily basis until her MHCB discharge on July 16, 2014. She was assessed as being at "high" chronic risk and "low" acute risk for suicide. The treatment plan in the discharging SRE was consistent with the above plan from July 1 and stated the following:

> While in MHCB, I/P was seen daily by the MHCB treatment team and she had her medication evaluated by the MHCB psychiatrist. I/P had initial IDTT on 7/11/14. Treatment focused on: Reinforcing the verbalized acceptance of responsibility for connection between impulsive behavior and negative consequences. I/P was educated about coping skills for recent stressors in her environment and anger and depression. Specifically, she was educated about coping skills for symptoms related to trauma. Discussed coping skills for both anger and anxiety related to assault that occurred in December 2013. I/P will be discharged from the MHCB on 7/16/14 on a 5-day step down to EOP/SPHU. This is a higher LOC. Future treatment recommendations include processing I/P's angry feelings or anger outbursts that have recently occurred and reviewing alternative behaviors. I/P should also be encouraged to explore the negative self talk that is associated with past trauma and the predictions of unsuccessful coping or catastrophizing.

The inmate was released back into the administrative segregation unit and provided with five-day follow-ups. There was <u>no</u> indication from the eUHR of any concordance with the thoughtful treatment plans noted above on July 1, 2014 and July 16, 2014 and five-day follow-ups or any subsequent progress notes.

On July 28, she was seen by a psychiatrist after an argument with one of the administrative segregation officers. She appeared to be both frustrated and angry, but denied any SI. According to the psychiatric note, the inmate "was moderately agitated and punched the window a couple of times but was able to follow direction." Two days later on the morning of her suicide (July 30, 2014), the inmate appeared at her IDTT meeting. She complained of depressive symptoms of crying, hopelessness, irritability, and oversleeping. She had been refusing most of services and appeared angry that her LOC had been increased to EOP. Her diagnoses were revised to Major Depressive Disorder, Amphetamine Dependence, and Anti-Social Personality Disorder. Of note, the MHTP developed at the July 30, 2014 IDTT bore <u>no</u> resemblance to the treatment plans found in the July 1 and July 16 SREs. Following the meeting, the inmate was escorted back to her cell and immediately covered up the cell window. After being told by custody staff that she was going to be cell-extracted and sent to the CTC due to safety concerns, she removed the covering from her window and denied any SI to her PC. The inmate was found hanging a few hours later, and it took correctional staff over eight minutes to enter the cell and initiate life-saving measures.

The CDCR reviewer speculated that there were several recent stressors in the inmate's life that were possible precipitating factors to her suicide, noting that "life began a downward spiral following the severe head injury she suffered on December 12, 2013 when she was assaulted by other inmates." These stressors included continued fear of assault from other inmates, her cellmate had recently moved out because of the continuing seizures from the head injury and she felt rejected, her girlfriend had recently been transferred to another prison, and she had been admonished by her brother for being a lesbian. The reviewer also noted that the 23-year-old had poor coping and problem-solving skills to handle these stressors. A suicide note was found in her cell that read, in part, that "I am tired of suffering and hurting everyone….I just can't go on

anymore, forgive me." The Suicide Report included three bases for recommendations for corrective action through a QIP: (1) Despite the fact that the inmate was assessed to be at both "high" chronic and acute risk for suicide on June 28, 2014, made a serious SA on July 4, and acquired five RVRs from June 27 through July 11, 2014, "there was no clear documentation or rationale as to why a Psychiatric Inpatient Program (PIP) referral was not generated. This was particularly troublesome in terms of the team's notation that the inmate needed a higher structured LOC in a hospital setting;" and (2) and (3) "The presence of organized drug trafficking and use within the institutional environment poses a suicide risk to inmates" and needs to be addressed systemically by DCHCS and DAI.

Finally, two additional issues were <u>not</u> found in the Suicide Report. First, there was no concordance with the treatment plans dated July 1 and July 16 and the five-day follow-ups or any subsequent progress notes. Second, when the inmate was found hanging in her administrative segregation unit cell on July 30, 2014, it took correctional staff over eight minutes to enter the cell and initiate life-saving measures.

*<u>Summary</u>: This reviewer found that CIW was a problematic institution that exhibited numerous poor practices in the area of suicide prevention, including conducting 60-minute rounds in administrative segregation, SHU, and Psychiatrist Services Unit (PSU); observing some suicidal inmates at 30-minute intervals; withholding mattresses without clinical justification from some suicidal inmates; not always completing SREs on inmates expressing SI; and inadequate treatment planning.*

## 27) <u>California Rehabilitation Center (CRC)</u>

**Inspection**: May 22-23, 2014

CRC housed 2,892 inmates, with the vast majority at Level II classification status. CRC had a ten-bed OHU in six rooms for both medical and mental health needs. The institution did <u>not</u> have an administrative segregation unit. Approximately 40 percent of CRC inmates were on the caseload, with all 1,143 in 3CMS LOC.

**Screening/Assessment**: This reviewer observed several new admissions during the medical intake screening process on May 23, 2014. The nurse was observed conducting intake screening in a Nurse's Office that was separated from the custody portion of the R&R Unit. Privacy and confidentiality were adequately provided. The nurse was observed to be asking all the required intake screening questions in rapid-fire fashion and appeared uninterested. Limited vital signs were taken (i.e., only blood pressure). Each screening took between one and two minutes.

**Housing**: CRC had a ten-bed OHU in six rooms for both medical and mental health needs. All of the rooms contained obvious protrusions which could be used in a SA by hanging. All inmates housed in the OHU awaiting transfer to a MHCB were observed on a 1:1, continuous basis.

**Observation**:  Although both Suicide Precaution and Suicide Watch could theoretically be used in the OHU for inmates identified as being suicidal, due to the fact that none of the rooms were suicide-resistant, all inmates were required to be observed on a 1:1, continuous basis.  Between January 1, 2014 and April 30, 2014, CRC had seven inmates admitted into the OHU for SI.  All of the inmates were discharged within 24 hours and either returned to their CRC housing unit or transferred to a MHCB at either CMC or CIM.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found related to treatment planning and failure to always complete and SRE for inmates presenting with SI.  For example, in one case (CRC 1), the inmate was admitted to the OHU on March 17, 2014 for SI.  He had scratched himself on the wrist a few days earlier and reported paranoid thoughts of other inmates trying to hurt him.  He was discharged from the OHU the following day and the SRE contained the following treatment plan:  "Inmate is at EOP LOC.  He is seen at least weekly for CCM.  Plan to update and monitor status, including emotional and paranoia."  In another case (CRC 2), the inmate was admitted into the OHU on March 21, 2014 after informing staff that he would kill himself if he was transferred. He was discharged from the OHU the same day and the SRE contained the following treatment plan:  "Return to dorm on 5-day follow-up, notify PC that inmate is on psychotropic medication and will be assessed for CCCMS LOC, educated the importance of taking the psychotropic medication daily, notify someone if he feels like he needs extra help."  In a third case (CRC 3), the inmate was admitted into the OHU on April 19, 2014 after expressing SI.  He was discharged from the OHU the following day with the following treatment plan:  "Encourage patient to work with his psychologist on coping skills, five-day follow-up."

Finally, this reviewer examined emergency mental health referrals for SI from January through May 2014.  Of these referrals, one was found in the MHTS and an additional 11 were found in the TTA Logs.  A review of eUHRs found that SREs were completed in only 66 percent, or eight of 12, of the cases.  For example, in one case (CRC 4), the inmate expressed SI to a medical provider and was appropriately referred to a mental health clinician.  The inmate informed the psychologist that he was receiving treatment for Hepatitis C and the medication was reportedly making him "feeling down" with "tranquil ideation of hurting himself."  He denied a specific plan for suicide or history of suicidal behavior.  The psychologist did not complete an SRE and recommended that the inmate be returned to his dorm.  In another case (CRC 5), an inmate told a nurse during a five-day follow-up on the morning of March 30, 2014 that "I do think about hurting myself, but I don't want to hurt myself."  The nurse contacted the on-call clinician who simply recommended that the inmate be returned to his dorm.  An SRE was not completed.

**Intervention**: This reviewer did not tour any of the CRC housing units.

**Training**:  According to training records, 100 percent of custody staff was certified in CPR.  Nursing staff reported 100 percent compliance with CPR training. Medical and mental health staff had not received annual suicide prevention block training.  Finally, all of the required mental

health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**:  CRC did not experience any inmate suicides during 2012 – 2014.


**28)     Sierra Conservation Center (SCC)**

**Inspection**:  June 10-11, 2014

 SCC housed 2,652 inmates across three classification levels, Level I, II, and III.  An additional 2,010 Level I inmates were dispersed among 19 conservation camps.  SCC had a ten-bed OHU for inmates with medical and mental health needs, and an administrative segregation unit.  Approximately 24 percent of SCC inmates were on the caseload, with all 625 at the 3CMS LOC.  In addition, alternative housing beds were designated in the administrative segregation unit, but said to not have been used in several years.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on June 11, 2014.  The screening process was conducted in the Nurse's Office of the R & R Unit, but privacy and confidentiality were compromised because the door to the office remained open and the next inmate to be screened was sitting in close proximity outside in the hallway.  The nurse was observed to be asking all the required intake screening questions.

In addition, this reviewer observed daily administrative segregation unit rounds by a psych tech on June 11, 2014.  The rounds were problematic because the psych tech was only interacting with 3CMS inmates and not conversing with non-caseload inmates in the administrative segregation unit.  In a subsequent discussion with the psych tech's supervisor, this reviewer was informed that the psych tech and supervisor were "unaware of a policy" that required psych techs to conduct rounds of all inmates.  The supervisor assumed that, because CDCR policy only required documentation on caseload inmates, psych techs were not required to interact with non-caseload inmates.

**Housing**:  SCC had a ten-bed OHU used for inmates with both medical and mental health needs.  Although each of the rooms had tall ceilings and unsafe ventilation grates that were not easily assessable, some of the rooms contained obvious protrusions which could be used in a SA by hanging.  For example, three of the rooms primarily used for suicide observation (Nos. 6, 7, and 8) had Lexan paneling on the outside of the cell bars, thereby allowing inmates easy access to the cell bars in a SA by hanging.  In addition, some rooms had faucet lips that could be used as an anchoring device and a table top which should either be removed or retrofitted with two stainless steel triangles attached to the wall and either side of the table top to eliminate the sharp edges from being an anchoring device.  In addition, similar to most OHUs toured by this reviewer, the OHU at SCC did not have any suicide-resistant beds and inmates slept on the floor.  Further, alternative housing beds were designated in the administrative segregation unit, but said to not have been used in several years.

Finally, the administrative segregation unit contained 12 retrofitted cells for inmates on new intake status. During the inspection, this reviewer observed the cells were either empty or occupied by inmates on new intake status. This reviewer did not observe any new intake inmates in non-retrofitted cells.

**Observation**: Although both Suicide Precaution and Suicide Watch were used in the OHU for inmates identified as being suicidal, this reviewer also observed that psychiatric observation was used in the unit. Although most inmates assessed as being suicidal were on either Suicide Precaution or Suicide Watch, this reviewer did find that psychiatric observation at 30-minute intervals was used for a handful of inmates assessed as being suicidal. For example, in one case (SCC 1), the EOP inmate was admitted into the OHU on June 1, 2014 after being observed to be "anxious, pacing back and forth in cell, exhibited anger, delusional ideation." He was referred to mental health staff, and the completed SRE found that he was both a "moderate" chronic and acute risk for suicide. Although he expressly denied any SIs, he "made statements that were self-critical" and had "multiple warning signs and mood volatility." He was placed on psychiatric observation at 30-minute intervals. Such practices were not referenced in the *Program Guide*.

Nursing staff was <u>not</u> using the current CDCR observation form (CDCR 7365), rather they were using an antiquated form and not providing documentation at staggered intervals.

Finally, during the tour of the administrative segregation unit, this reviewer examined unit logs used to document 30-minute welfare checks prior to full implementation of the Guard One system in mid-May 2014. The review of unit logs for March and April 2014 found only 79 percent compliance with 30-minute welfare checks. Subsequent review of Guard One data for the entire administrative segregation unit for selected 24-hour periods in late May 2014 found overall compliance at 95 percent.

**Management/Treatment Planning**: This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis. Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found related to incomplete SREs and treatment planning. For example, in one case (SCC 2), the SRE written on April 22, 2014 was incomplete because the second page of the assessment form was not completed (other than checkmarks noted on the Estimate of Risk). In another case (SCC 3) the inmate was admitted to the OHU on February 9, 2014 for SI. He was discharged from Suicide Precaution two days later on February 11, 2014 with the following treatment plan in his SRE: "Place in 3CMS, D/C from OHU, 5-day follow-up, one day-in."

This reviewer examined emergency mental health referrals for SI from January through May 2014. Of these referrals, three were found in the MHTS and an additional 36 were found in the TTA Logs. A review of 23 eUHRs found that SREs were completed in 96 percent, or 22 of 23 of the cases.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

146

**Training**:  According to training records, 100 percent of both custody and nursing staff were certified in CPR.  In addition, 90 percent of custody staff had completed annual suicide prevention block training; whereas 63 percent of medical staff and 68 percent of mental health staff had completed the same annual training.  Finally, 100 percent of required mental health clinicians had received the seven-hour SRE training, with 94 percent having completed the mentoring program.

**Recent Suicides**:  SCC had one inmate suicide during 2012 – 2014.  In that case (SCC 4), the inmate was found hanging from the light fixture in his administrative segregation unit cell by a sheet during the early morning of July 28, 2012.  The inmate had entered CDCR in April 2007 to serve a ten-year sentence for assault and terroristic threats.  He was transferred to SCC on July 16, 2012.  The inmate had five RVRs during his confinement, the last of which occurred on June 2, 2012 and involved destruction of the property for a broken light fixture in the administrative segregation unit at CSP-Solano.  He appeared to have good family support and was not thought to be gang-affiliated.

Upon entry into CDCR in April 2007, the inmate reported receiving mental health services in the community, including three hospitalizations for depression between 1985 in 2004 and treatment for substance abuse.  Although viewed as an unreliable historian, he was placed into the MHSDS at the 3CMS LOC.  His initial diagnosis was Adjustment Disorder with Depressed Mood, Rule Outs (R/O) for Major Depressive Disorder with Psychotic Features and Anxiety Disorder NOS.  The diagnosis was changed to Depressive Disorder NOS.  He was maintained on psychotropic medication, but was not always compliant.  The inmate denied either a history of suicidal or self-injurious behavior.  He did, however, report several medical problems, including occasional seizures, dizziness, and blackouts from previous head injuries. He was also treated for hypertension.  The inmate also complained about chronic knee and back pain and arthritis in his hands.  He had been prescribed several pain medications, but they were changed the week before his suicide.

In February 2012, the inmate was placed in the administrative segregation unit at CSP-Solano after being assaulted by another inmate in GP.  He remained in that institution's administrative segregation unit until transfer to SCC on July 16, 2012.  He was initially housed in the administrative segregation unit, but transferred to GP on July 20, 2012. Three days later on July 23, an emergency mental health referral was issued by custody staff based upon observations of paranoia and fear of assault in GP.  A subsequent SRE completed the same day by a clinician found that although the inmate denied any SI or history, he appeared "unpredictable due to voices and no sleep in four days, and being in a new prison....Very paranoid....Possible hopelessness due to yard."  He was assessed as being both at "moderate" chronic and acute risk for suicide, and placed on Suicide Precaution with observation at 15-minute intervals.  The inmate was discharged from Suicide Precaution the following day, on July 24, 2012, but remained in the OHU.  The next day, July 25, he was seen by a clinician who assessed and revised his diagnosis to Major Depressive Disorder with Psychotic Features, Poly-Substance Dependence, and Anti-Social Personality Disorder.  Soon thereafter, an OHU nurse observed the inmate to be pacing the floor and tearing his sheet into strips.  She documented the observation and informed a CO, but neither of them alerted mental health staff.

147

A discharging SRE completed the following day on July 26 was problematic.  There was no narrative or mental status exam listed on the second page, the chronic risk for suicide column was left blank, acute risk for suicide was assessed as being "low," and justification for the risk level stated the following:  "Able to recognize where his paranoia came from  - said he was coming off other meds when he arrived here, feels okay, going back to yard now."  The treatment plan section of the SRE simply stated:  "CM, 5-day follow-up, psy., 1-day lay-in."  There was no discussion regarding his previous hopelessness and paranoia regarding returning to the GP yard.  The inmate was discharged back to GP the next day, July 27, 2012.

After being in the GP yard for less than 24 hours, the inmate was again assaulted by another inmate on July 27, 2012.  He was again re-housed in the administrative segregation unit, but placed on the second floor and not in a new intake cell as required.  He was seen briefly by a mental health clinician for the first day of his five-day follow-up and was described as being "hostile, irritable, and marginally cooperative," apparently angry over the change in his pain medication.  He committed suicide several hours later.

The inmate did not leave a suicide note and, although the CDCR reviewer did not offer any specific precipitating factors for the suicide, speculated that, given his history of substance abuse, his difficulties in the GP yard might have been related to "on-going efforts to obtain substances, and possibly due to drug debts."  The Suicide Report contained three bases for recommendations for corrective action through a QIP:

> (1) Serious failures to follow CDCR policy and procedures occurred prior to and during the discovery of the suicide, including, but not limited to the following - no 30-minute welfare checks documented during first watch, gap in 30-minute checks...., officer did not activate alarm or radio for help, do not communicate emergency to control officer, the officer entered ASU cell alone and cut down the inmate without assistance, an ASU intake cell was not used for newly arrived inmate who was on a 5-day suicide follow-up, a nurse stationed in the OHU saw the inmate tearing his sheet into strips.  She did not tell mental health staff, but she did tell an officer who did not act on this information, CO in the OHU did not pass on the nurse's report of the inmate tearing sheets to mental health staff; (2) In response to the OHU nurse's failure to refer the inmate to mental health staff after he was observed tearing sheets, training was provided to all nursing staff regarding mental health referrals and appropriate documentation practices; and (3) When inmate was placed in OHU on July 23, 2012, he was put on suicide precautions.  He was not referred to an MHCB, as required by current policy for all inmates placed on either suicide watch or suicide precautions.

Finally, there were a few issues that were not addressed in the Suicide Report.  First, although the CDCR reviewer suggested that certain factors may have precipitated the inmate's suicide, such as "his status as an untreated addict who struggled unsuccessfully to cope with emotional distress, his experience of perceived physical pain, his conflict with other inmates resulting in injury and contributing to a state of fear and anxiety," such known triggers to suicide risk were not incorporated into the inmate's treatment plan that was completed within the problematic SRE

dated July 26, 2012.  That treatment plan, which simply stated "CM, 5-day follow-up, psy., 1-day lay-in," was grossly inadequate.  Second, the inmate had been charged with destruction of the property for a broken light fixture in the administrative segregation unit at CSP-Solano on June 2, 2012.  In light of the fact that his suicide involved a hanging from a light fixture in his administrative segregation unit cell at SCC, the Suicide Report was missing a discussion and/or investigation regarding whether the earlier incident at CSP-Solano was a possible failed SA by hanging.

**29)   Mule Creek State Prison (MCSP)**

**Inspection**: June 12-13, 2014

 MCSP housed 2,950 inmates across three classification levels, Levels I, III, and IV, although most were Level III.  MCSP had a ten-bed CTC, with eight rooms designated as MHCBs; a MHOHU; and two administrative segregation units located in Buildings 12 and 13.  Approximately 60 percent of MCSP inmates were on the caseload, with 1,172 in the 3CMS and 609 in the EOP LOC.  In addition, alternative housing cells were designated in the MHOHU and were used on a daily basis.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process on June 13, 2014.  The screening process was problematic for several reasons.  First, the screening was not conducted in the Nurse's Office, rather it was staged in the large open area of the R & R Unit, with an officer standing alongside each inmate being screened.  As such, there was no privacy and confidentiality for the process.  Second, the nurse conducting the screening consistently failed to ask inmates if they were *currently* suicidal.  Third, the nurse did not take vital signs on any of the inmates being screened.

In addition, this reviewer observed daily administrative segregation unit rounds by two psych techs on June 12, 2014.  The psych techs were observed to accurately conduct and document their rounds.

**Housing**:  MCSP had a ten-bed CTC, with eight rooms designated as MHCBs.  The rooms did not contain any obvious protrusions which could be used in a SA by hanging.  In addition, alternative housing cells were designated in the MHOHU, a six-cell section of the overflow administrative segregation unit in Building 13.  The unit was mislabeled as a MHOHU as it was neither a mental health unit nor an OHU.  With the exception of the sink/toilet combo, all other fixtures had been removed from each of the six cells.  Despite an LOP signed by the MCSP Warden and CEO in December 2013 stating "a cement bed with mattress on top is acceptable" for housing in the MHOHU, all cement beds had been removed from each MHOHU cell.  The reason for this action was unclear because, similar to new intake administrative segregation cells, simply retrofitting the original beds by closing the gap between the bed and the wall would have made these cells suicide-resistant.  As such, all inmates housed in these MHOHU cells had to sleep on the floor.  These cells, used on a daily basis, were more sterile than an administrative segregation unit cell and more closely resembled seclusion cells.  In fact, 49 inmates were housed in these cells on suicide observation during the month of May 2014, and most inmates

admitted to a MHCB at MCSP were initially housed in MHOHU cells.  In conclusion, *the physical environment of the MHOHU was very problematic, and it was difficult to imagine why a suicidal inmate would continue to endorse SI when subjected to such an anti-therapeutic atmosphere.*

Finally, the administrative segregation unit in Building 12 contained three retrofitted cells for inmates on new intake status. During the site inspection, this reviewer found that there were at least seven newly admitted inmates (i.e., those housed in the unit for the first 72 hours) that were housed in unsafe, non-retrofitted cells.

**Observation**:  Both Suicide Precaution and Suicide Watch were used in the CTC for inmates identified as being suicidal.  However, although the use of psychiatric observation was no longer used in the CTC, there were two inmates in MHCBs on June 12, 2014 that were not under any enhanced level of observation.

CTC nursing staff was using an older version of the CDCR observation form that contained pre-printed 15-minute time intervals, thus not allowing for documentation at staggered intervals.  In addition, staff in the MHOHU was using an antiquated CDCR observation form that also contained pre-printed 15-minute time intervals.

Finally, during the tour of the administrative segregation unit in Building 12, it was observed that the Guard One system had been used to document 30-minute welfare checks of both Buildings 12 and 13 (and not simply those inmates on 21-day orientation status) since September 2013.  This was a good practice.  Subsequent review of Guard One data for both administrative segregation units for selected 24-hour periods found overall compliance at 93 percent.

**Management/Treatment Planning**:  This reviewer examined various eUHRs of inmates on suicide observation and of inmates referred to mental health staff on an urgent and/or emergent basis.  Although the charts indicated that inmates were consistently seen by clinical staff on a daily basis when on suicide observation, and inmates referred to mental health generally seen on a timely basis, there were several other problems found related to incomplete SREs and treatment planning.

In one particularly problematic case (<u>MCSP 1</u>), the inmate was placed in the MHOHU on January 16, 2014 after making superficial lacerations to his left forearm.  A few hours later, he was moved to a MHCB after banging his head on the wall of his MHOHU cell.  The inmate had an extensive recent history of suicidal and self-injurious behavior, including a SA by hanging.  He previously stated that he had been "cutting all my life, it relieves stress and evil spirits."  The inmate remained in a MHCB for two weeks and was discharged on January 31, 2014, and returned to the administrative segregation unit with the following treatment plan:  "I/P was seen by the IDTT on 1/31/14 for discharge planning.  I/P was in agreement with plan to discharge from MHCB to assigned housing on a 5-8 day follow-up."  During the late evening of the following day, February 1, 2014, the inmate was referred back to the TTA by custody staff after again engaging in superficial, self-injurious behavior.  He reported feeling anxious, "a bunch of drama from people," and told the nurse that he was "picking at an old scar to relieve stress."  The on-call clinician was notified and ordered that the inmate be returned to the administrative

segregation unit. An SRE was not completed. Three days later on February 4, the inmate yelled out to a clinician in the administrative segregation unit that "I'm suicidal, I ain't got my yard, my property. I haven't had a phone call." When the clinician asked him if he was suicidal because he had not gotten what he wanted, the inmate stated "Besides that, I'm just not feeling right." An SRE was completed and the inmate was assessed as being a "moderate" chronic risk and "low" acute risk for suicide. He denied any SI but felt "hopeless, helpless, angry, and agitated. I/P has difficulty managing his frustration level and is very open about his willingness to self-harm to get what he wants." The inmate was not referred to a MHCB, rather, he was returned to his administrative segregation unit cell and "custody to do 15-minute checks and LPTs to continue with daily checks. PC will continue with weekly contact."

Fifteen-minute checks in the administrative segregation unit was not authorized in the *Program Guide*, and any inmate requiring 15-minute checks should be on Suicide Precaution in a MHCB. The above case was not an aberration. The same clinician ordered "safety checks every 15 minutes" for another inmate (MCSP 2) in administrative segregation unit on May 21, 2014.

Treatment planning for inmates expressing SI was also problematic. In one case (MCSP 3), the inmate was brought to the TTA during the late evening of May 31, 2014 after superficially cutting his left wrist with a razor and expressing SI. He was then escorted to the MHOHU and placed on Suicide Watch. The inmate had an extensive history of suicidal and self-injurious behavior and multiple MHCB and DSH admissions. He was seen by a clinician the following morning, June 1, and an SRE was completed that indicated both a "moderate" chronic and acute risk for suicide. Although the SRE was unclear as to whether or not the inmate at "moderate" acute risk for suicide would remain on Suicide Watch, i.e., the treatment plan stated the following the following: "Short-term goals - Patient needs evaluation for EOP LOC; Long-term goals - evaluate for MHCB, DSH referral, or LOP LOC," a Physician's Order dated June 1, 2014 specified the inmate's discharge from the MHOHU on a five-day follow-up back to GP. In another case (MCSP 4), the inmate was initially housed in the MHOHU for SI on May 5, 2014 and moved to a MHCB the following day. He remained in the CTC for approximately ten days and discharged on May 15, 2014 with the following treatment plan in the SRE: "I/P is being sent back to the B-Yard. With his clinician there, he will be urged to improve his problem-solving and social skills through clinical intervention and psycho-education."

This reviewer observed several IDTT meetings for inmates in a MHCB on June 12, 2014. The meetings were problematic. In one case (MCSP 5), the inmate was dressed in a smock and, because there was no discussion from the IDTT and no indication on the CTC Census Sheet, it was unclear whether or not he was on suicide observation. Subsequent review of the eUHR found a "continuation order" for Suicide Precaution. In another case (MCSP 6), there was no discussion by the IDTT regarding the inmate's status on Suicide Precaution until he was exiting the meeting and inquired about getting his clothes back.

Finally, this reviewer examined emergency mental health referrals for SI from January through May 2014. Of these referrals, 45 were found in the MHTS, but an additional 145 were found in the TTA Logs. A review of 40 eUHRs found that SREs were completed in only 68 percent, or 27 of 40 of the cases. In two cases (MCSP 7 and MCSP 8), SREs were not completed despite the fact that both inmates stated they were suicidal and nursing staff completed Administrative

Segregation Pre-Placement Chrono forms (CDCR 128-MH7) that required completion of SREs following expressions of SI.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**Training**:  According to training records, 96 percent of custody and 99 percent of nursing staff were certified in CPR.  In addition, 99 percent of custody staff was compliant with annual suicide prevention block training.  Neither medical nor mental health staff had completed the annual suicide prevention block training.  Finally, 100 percent of required mental health clinicians had received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**:  MCSP had five inmate suicides during 2012 – 2014.  In the **first** case (<u>MCSP 9</u>), the inmate was found hanging from the bookshelf of his administrative segregation unit cell by a sheet during the afternoon of June 7, 2012.  The inmate re-entered CDCR in June 2009 to serve a seven-year sentence for possession of a controlled dangerous substance.  He was transferred to MCSP on February 8, 2010.  The inmate had 12 RVRs during his confinement, the last of which occurred on April 4, 2012 and involved battery on another inmate that resulted in his placement in the administrative segregation unit.  It did not appear that he had any family support, and was not thought to be gang-affiliated.  The inmate had a few medical problems, including seizures that, according to the CDCR reviewer, appeared adequately managed.

Upon re-entry into CDCR in June 2009, the inmate did not report any previous history of mental illness, but had an extensive history of substance abuse.  He did, however, have a history of mental health treatment during previous CDCR confinements, beginning in 2004 when he was placed on the caseload at EOP LOC following a serious assault by another inmate.  In 2006, the inmate tried to commit suicide by hanging and was placed in a MHCB. When he returned for his third CDCR commitment in June 2009, he was again placed on the caseload at 3CMS LOC.  He was diagnosed with Major Depressive Disorder, Mild, Recurrent, and prescribed psychotropic medication.  The inmate became non-compliant with the medication and it was discontinued.  He was placed in a MHCB in both December 2009 and January 2010 for another SA by hanging and superficial self-injurious behavior.  SREs completed during this time consistently documented a "low" chronic risk for suicide.  When transferred again to a MHCB in February 2010, he was elevated to EOP.  Following several months of stability, the inmate was downgraded to 3CMS in June 2010. His diagnosis was changed to Mood Disorder NOS, Poly-Substance Dependence, Personality Disorder NOS (R/O Anti-Social Personality Disorder).

During both 2011 and early 2012, the inmate was treated for depression, irritability, and anger control.  He also accrued several RVRs for fighting.  On April 4, 2012, he received an RVR for battery on an inmate and was placed in the administrative segregation unit.  Mental health records during this time reflected that mental health clinicians believed him to be an unreliable historian (once disclosing that his mother had committed suicide when he was 3-years-old, then reporting that she had died from a heroin overdose), who often exaggerated his symptoms to get his needs met.  The inmate was often described as "grandiose, narcissistic, and shallow."  Although placed back on psychotropic medication a few months earlier, he continued only to take them on an intermittent basis.  A few weeks later on April 20, 2012, the inmate was seen by

his PC in the administrative segregation unit and reported that his mood had been "up and down" for the past few weeks. He also complained of a lack of appetite and difficulty sleeping. According to the progress note, "he discussed intermittent SI saying that he would not spend the rest of his life in prison. He referred to it as 'checking out' and said he would not be 'checking out' anytime soon. He denied current SI, plan, or intent. He disclosed that he has been to Department of Mental Health (DMH) in the past and stated that if he becomes suicidal and has to be hospitalized in the future he wants to go straight to DMH and skip the OHU." Given the fact that the inmate had an estimated release date a year later in September 2013, and there was no information in the Suicide Report to indicate he was facing additional time because of the recent RVR, his statement that he "would not spend the rest of his life in prison" was curious.

On the morning of June 7, 2012, the inmate attended his ICC meeting and was informed that because of continuing enemy concerns in GP, he would be transferred to another CDCR institution when he was released from the administrative segregation unit. The inmate apparently believed that the enemy concerns could be resolved, and became angry at the Committee's decision. According to the CDCR reviewer, the inmate was overheard to say on his way back to his cell that "I'll show them." He committed suicide several hours later.

The CDCR reviewer did not offer any specific precipitating factors for the suicide, and a suicide note was not found. However, the reviewer did speculate that, given his perceived history of malingering and manipulative behavior, the timing of the suicide in late afternoon when both mail and food trays were being distributed might have indicated that he had attempted suicide by hanging with the intention of being rescued. The Suicide Report contained one basis for recommendation for corrective action through a QIP: "SREs completed at MCSP were inadequate in that they did not reflect the inmate's documented mental health history and seemed to be based largely on self-report." The reviewer noted that, despite the inmate's multiple prior SAs by hanging and other self-injurious behaviors, several SREs completed in 2010 and 2011 continued to assess his chronic risk for suicide as "low."

In the **second** case (MCSP 10), the inmate was found hanging from the bunk in his administrative segregation unit cell by a sheet during the afternoon of August 19, 2013. The inmate had entered CDCR in October 1993 to serve a 31-year to life sentence for first-degree murder of a neighbor. He was transferred to MCSP on July 11, 2013. The inmate had only two RVRs during his 20-year confinement, the last of which occurred in 2002. It did not appear that the inmate had significant family support, although he maintained delusions of family visits if he was transferred closer to home. The inmate was receiving treatment for several medical problems, including hypertension, diabetes, glaucoma, and hyperlipidemia. He became very concerned about these ailments and unexplained recent weight loss which medical providers believed were primarily related to his increased anxiety.

Prior to his CDCR confinement, the inmate had not received any mental health services in the community. However, it appeared that he had an untreated history of mental illness because upon entering CDCR, the inmate reported AH beginning almost ten years earlier in 1984, and had been diagnosed with Schizophrenia, Paranoid Type, while confined in the county jail on the instant offense. He was hospitalized at ASH for one year (1990 – 1991) during the pretrial stages of his case. His initial CDCR diagnosis was Psychotic Disorder NOS, that was changed to

153

Schizophrenia, Paranoid Type, Chronic.  He was prescribed psychotropic medication.  During the ensuing years, he continued to suffer from AH and paranoia that other inmates were talking about him.  He vacillated between various levels of mental health care, including both 3CMS and EOP between 1996 and 2013.  Although the inmate had been compliant with his psychotropic medication for more than 20 years, he began to refuse medication in late 2012.

The inmate was housed in administrative segregation on several occasions due to unconfirmed safety concerns (based upon his paranoia), including most recently on June 10, 2013 when he was housed at FSP.  Due to increasing symptoms of mania and paranoia, his LOC was increased to EOP, and his diagnosis was changed to Mood Disorder NOS.  He was transferred to MCSP a month later on July 11, 2013.

Upon arrival to MCSP, the inmate was housed in the administrative segregation unit awaiting housing in an EOP yard.  According to records, the inmate had previously asked the ICC at FSP for SNY placement due to safety concerns.  It was determined that his safety concerns were delusional and his request for SNY placement was denied.  He remained single-celled in administrative segregation because he could not be housed with any SNY inmates.  On July 12, 2013, the inmate wrote a disjointed health services request to see mental health staff immediately regarding alleged rumors that "people are spreading."  The request was apparently received by the inmate's PC five days later on July 17, but there was no indication in the eUHR that the request was responded to in the form of a progress note.  The following week on July 23, 2013, the inmate was seen by the clinician and his diagnosis was again changed to Schizoaffective Disorder, Bipolar Type.  The IDTT reviewed his case for a possible DSH referral, but determined that a higher LOC was not indicated at the time.  On July 30, 2013, the inmate submitted another disjointed health services request to mental health stating "I tried to tell you long before this got to such a critical mass. .... Now it is seriously out of control.....God bless us all."  Although this request was also reviewed and signed by the PC, there was no progress note found in the eUHR indicating any intervention with the inmate.

The inmate, however, continued to be seen on a weekly basis, and on August 2, 2013 his diagnosis was changed again to Major Depressive Disorder, Severe with Mood Congruent with Psychotic Features, R/O Schizophrenia, Paranoid Type v. Schizoaffective Disorder.  Progress notes from both his PC and psychiatrist indicated that the inmate felt he had superpowers and that other inmates and staff were out to harm him.  Although he was an active participant in administrative segregation EOP group therapy, he continued to refuse psychotropic medication.  The inmate's clinical team considered involuntary medications on several occasions, but ultimately decided that he did not meet criteria.  According to the CDCR reviewer, "although he presented with significant mental health issues, he appeared oriented, took adequate care of his activities of daily living, and was able to advocate for himself.  He denied he had a mental illness and refused all suggestions of psychotropic medications."

On the morning of his suicide, August 19, 2013, the psych tech reported during morning administrative segregation unit rounds that the inmate was delusional, claiming another inmate in a nearby cell had killed his family and raped his sister.  He became very agitated and was observed to be screaming and yelling.  He refused to converse with either the psych tech or

administrative segregation unit sergeant.  A mental health referral was <u>not</u> generated.  The inmate committed suicide a few hours later.

The CDCR reviewer did not offer any specific precipitating factors for the suicide, and a suicide note was not found.  However, several deficiencies were found and the Suicide Report contained three bases for recommendations for corrective action through a QIP:  "(1) On the morning of his death, both custody and nursing staff reported noting that the inmate was acting in an unusual manner and demonstrating increased symptoms of agitation and psychosis; however, staff from either discipline did not submit a referral for mental health evaluation....; (2) Despite FSP participating in the 7-hour Suicide Prevention training and recently receiving 2-hour training on appropriate SRE completion in the SRE mentoring program, the PC submitted a SRE dated May 13, 2013 which contained incorrect data and was incomplete; and (3) The inmate submitted two self-referrals requesting mental health assistance - CDCR Form 7362 and CDCR Form 22.  Both of these forms were logged as received and processed; however, clinical documentation from these two referrals could not be located in the eUHR at the time of the review.  Additionally, it is unknown if the ASU-EOP PC appropriately referred the inmate to be seen for the CDCR Form 22 referral...."

With regard to this third deficiency, the CDCR reviewer referenced a dubious late eUHR entry by noting in the Suicide Report that "Immediately prior to the suicide case review teleconference, held on October 3, 2013, a copy of the note, dated July 17, 2013, was sent to this reviewer.  However, the exact date of when this note was completed is unknown and it is unknown what caused the delay of this note getting into the eUHR."

In the **third** case (MCSP 11), the inmate was found unresponsive in his CTC cell during the early morning of September 7, 2013.  He was later pronounced dead and a subsequent autopsy determined the death to be a suicide by asphyxia due to "food and fecal material placed in tracheostomy stoma by decedent."  The inmate had re-entered CDCR on August 30, 2013 to serve a seven-year sentence for robbery.  He was transferred from NKSP to MCSP on September 4, 2013.  The inmate had two RVRs during his brief confinement, an assault on an officer shortly after his arrival at NKSP on August 30 and resisting an officer on September 6, 2013.

The inmate had a chaotic childhood and adolescence filled with behavioral problems, substance-abuse, and mental illness.  He became gang-affiliated at an early age, and his behavior resulted in numerous placements, including camps, foster homes, juvenile halls, and psychiatric hospitalizations.  As an adult, he was treated on the caseload during prior CDCR confinements, at both 3CMS and EOP levels of care.  In addition, he was placed in a MHCB on several occasions, as well as one placement in the Vacaville Psychiatric Program (VPP).  The inmate's primary diagnoses ranged from Anti-Social Personality Disorder and Poly-Substance Abuse Dependence to Bipolar Disorder to Schizoaffective Disorder.  He had a long history of medication non-compliance during prior CDCR confinements and had been involuntarily medicated per *Keyhea* proceedings in 2001.  The inmate was eventually paroled in June 2008.

Prior to his most recent and last CDCR commitment, the inmate was housed pre-trial in the Los Angeles County Jail system.  Jail records listed several medical, mental health, and substance abuse problems, including a tracheostomy in 2006 as a result of a bullet wound in his neck that

also paralyzed his vocal cords, multiple stab wounds, Hepatitis C, seizures, substance abuse, Schizoaffective Disorder, Bi-Polar Disorder, Anti-Social Personality Disorder, SI, and self-injurious behavior (self-inflicted abdomen wound).

Although the inmate's most recent CDCR confinement spanned just eight days, almost all of these days were noteworthy up until, and including, the day of his death.  Upon arrival at NKSP on August 30, 2013, he got into an altercation with an officer and was placed in administrative segregation.  The inmate also was argumentative with nursing staff who wanted to assist in clearing out his tracheostomy tube.  He refused any medical attention.  The initial medical screening indicated a history of mental illness and he was referred to mental health staff for further assessment.  The inmate was placed at 3CMS LOC and prescribed psychotropic medication.  Two days later during the evening of September 2, 2013, the inmate reported to a nurse in administrative segregation that he was suicidal and had a plan to cut himself.  He also complained of depression.  The nurse received an order from the on-call psychiatrist for Suicide Watch and the inmate was placed in an alternative housing cell in the A-4 Unit with a safety smock, safety blanket, and mattress, pending transfer to a MHCB.  A nursing note also suggested that the "Patient contracted for safety, 'I will stay safe and not hurt myself.'"  Documentation of observation on the Suicide Watch log was found to be incomplete for several hours that evening.

The following morning, September 3, (his birthday), the inmate was assessed by a mental health clinician who determined that he "was having difficulty with coping with his depression.  His physical issues also are affecting both his attitude and behaviors."  He continued to report SI.  The clinician completed an SRE which found that he was depressed, had a decreasing appetite ("can't swallow"), sad affect ("upset/pissed off"), and poor coping skills.  The SRE indicated that the inmate was at both "high" chronic and acute risk for suicide, noting that "I/M is experiencing hopelessness/helplessness, won't contract for safety, impulsive, per custody I/M's single cell status. Hx of cutting on his arms and needs stabilization with medication through MHCB."  In addition, an undated handwritten note from the inmate was scanned into the eUHR on September 3 that stated "I need 2 speak 2 a psychiatrist.  I am not doing 2 good.  I'll go downstairs if I got to.  My head is not clear right now.  I'm in pain.  I am Suicidal."  The nursing note indicated that he allowed medical staff to clear his tracheostomy tube.  Documentation of observation on the Suicide Watch log was found to be incomplete for almost the entire shift from 12:00 a.m. to 6:00 a.m.

On the morning of September 4, 2013, the inmate was seen again by the mental health clinician and he described his mood as "bad."  His affect appeared "depressed and sad," and the clinician believed his condition was "deteriorating."  The inmate continued to endorse SI and "would not contract for safety."  He remained on Suicide Watch in the AHU (A-4) of NKSP.

According to some records, during the evening of September 4, 2013, the inmate was transferred from the AHU at NKSP where he was on Suicide Watch to the CTC at MCSP. The nurse called the on-call psychiatrist for orders and the Physician Order's reflected that the on-call psychiatrist diagnosed the inmate with Depressive Disorder NOS, and admitted him to a MHCB on Suicide Precaution with only a safety smock (i.e., without a safety blanket or mattress).  It was unclear from the records why the on-call psychiatrist downgraded the inmate from Suicide Watch to Suicide Precaution on September 4 without a face-to-face assessment, nor if the clinician was

even aware that the inmate had been on Suicide Watch at NKSP.  Of note, other eUHR and CDCR records suggested that the inmate was transferred to MCSP at 3:25 a.m. on September 5, 2013 with admission to the CTC at approximately 10:00 a.m.

In any event, the inmate was seen by both a nurse practitioner and a psychiatrist the following day, September 5, at MCSP.  According to the Medical History and Physical Examination form completed by the nurse practitioner, the inmate's chief complaint was "Verbalization that he wanted to commit suicide.  Also, he is complaining of pain on his right lower leg and pain in his right lower rib area.  He had an altercation with an officer or several officers or something prior to coming to our CTC.  The history of that is not clear."  According to the progress note completed by the psychiatrist that day, the inmate denied any SI, stating "I am not suicidal."  He also stated "I am being followed....I get agitated," and the psychiatrist wrote that he "endorses paranoia, stated COs at the sending institution 'strangled and choked him,' he is 'feeling anxious of being followed.'"  The progress note also indicated that the psychiatrist reviewed the records from the Los Angeles County Jail system and quoted the NKSP clinician's assessment of the inmate's behavior.  The psychiatrist found that the inmate was cooperative, but appeared paranoid, and "his insight and judgment were poor."  He was given a diagnosis of Psychotic Disorder NOS, Mood Disorder NOS, Poly-Substance Dependence, Adjustment Disorder with Disturbance of Emotions and Conduct, and R/O Anti-Social Personality Disorder traits.  Nursing notes for September 5 indicated that the inmate was labile, agitated, and disorganized.  He was, however, able to clear his tracheostomy tube without the assistance of nursing staff.  He also refused his evening medication, stating "I don't believe those are my meds."

On the morning of September 6, 2013, the inmate appeared uncooperative with nursing staff, refusing his morning medication and vital signs.  Nursing notes reflected his paranoid, delusional thoughts.  He also began to engage in attention-seeking behavior, such as demanding then refusing his medication and removing and reinserting his tracheotomy tube.  He refused to attend his IDTT.  According to the MHTP completed for the IDTT, a psychologist assessed the inmate and noted that "Today he appeared much worse, anxious, agitated, restless, frantic, refusing to cuff up in order to be removed from his cell for morning rounds, taking of his weight and other vital signs, etc.  Has also been refusing his meds and refusing to eat, communicating his belief that his food and medication are poisoned.  *Keyhea* watch was initiated this date."  The MHTP listed problem areas of SI, psychotic symptoms, confusion, and diagnostic clarification.

At approximately 4:00 p.m. on September 6, 2013, a nurse received a Physician's Order from a psychiatrist to initiate a "*Keyhea* Watch" (that was previously referenced in the MHTP) which required monitoring of the inmate's daily food intake, performance of activities of daily living, showers, and body weight.  As noted by the CDCR reviewer in the Suicide Report, "the order for the 'PC 2602 Watch' is neither a recognized CDCR order, nor a MCSP specific local policy, and did not have a prescribed protocol associated with it.  It did not appear that nursing staff made an effort to clarify the unspecific order."  The psychiatrist also wrote a Physician's Order that discontinued the inmate's Suicide Precaution and placed him on "Violence Precautions," noting that the inmate was paranoid regarding both officers and health care staff.  The term "Violence Precautions" was not contained within the *Program Guide*.  Despite the ambiguity of the Physician's Order, it appeared that nursing staff continued to observe the inmate on a 15-minute

157

basis.  There was no documentation in the eUHR that the psychiatrist had a face-to-face assessment with the inmate prior to the discontinuation of Suicide Precaution.

During the next several hours of September 6, nursing staff observed the inmate to be standing near the cell door, periodically knocking or beating on it, and talking incessantly.  The nurse described his behavior as both agitated and frustrated.  The inmate accepted his dinner tray, but refused to eat, claiming his food was poisoned.  He also refused to shower.  At approximately 8:30 p.m., he initially requested his medication and a snack, and the food port on his cell door was opened.  However, he then refused to "cuff-up" and grabbed the food port which prevented its closure.  Following several warnings to let go of the food port, the inmate was pepper-sprayed by COs.  He refused another request to cuff-up so that he could be decontaminated outside of the cell.  The inmate was then observed to be using sink water to decontaminate himself.  However, his behavior quickly escalated again when he removed the tracheostomy tube and was coughing up blood after putting his finger down the stoma.  He was then seen to be putting food (spaghetti) into the stoma.  He began flooding his cell and was smearing blood on his chest.  At approximately 10:10 p.m., the nurse notified two providers, the medical officer of the day (MOD) and the on-call psychiatrist.  The MOD ordered the nurse to clean the tracheostomy tube and stoma, monitor the inmate for respiratory distress, and send him to the hospital if his condition deteriorated.  At approximately 10:35 p.m., the on-call psychiatrist ordered that the inmate be removed from the cell and given involuntary psychotropic medication.

According to the records, the nurse then approached a CO and repeated the Physician's Orders.  The CO refused to open the door, citing security concerns.  The nurse then approached the sergeant on duty, explained the Physician's Orders for involuntary medication and cleaning and reinsertion of the tracheostomy tube, but the sergeant, and the watch commander, both refused to remove the inmate from the cell.  In the meantime, the inmate continued to pace the cell, placing his fingers in the stoma to make it bleed, and stuffing food and fecal matter into the stoma.  In addition, the administrative officer-of-the-day was also consulted and also refused to open the cell door.  At approximately 11:25 p.m., the nurse notified the MOD that correctional staff would not open the door, the inmate was pacing in his cell, and appeared to have trouble breathing.  The MOD responded by suggesting "If the inmate is walking around how can he be in distress?" and told the nurse "Please don't call me if it is not important."  According to nursing notes, the nurse then apologized to the MOD.

Approximately 30 minutes later at midnight, the nurse observed the inmate smearing feces and blood on the walls and cell door, and vacillating between calm and agitation.  For the next few hours, he continued to be observed at 15-minute intervals and seen to be alternating between pacing the floor, standing by the cell door, and briefly sleeping on the floor.  He had not reinserted his tracheostomy tube and food particles were seen in his stoma.  The inmate's behavior seemed to have deescalated, and there was no indication of volatile behavior reflected in the nursing notes during this time.  At 4:48 a.m. on September 7, 2013, the nurse observed the inmate to be standing at his cell door window.  During morning medication rounds approximately 19 minutes later at 5:07 a.m., the nurse discovered him unresponsive and not breathing on the floor of the cell.  A medical emergency was called and it took approximately eight minutes for custody staff to gather and enter the cell.  Life-saving measures, including

CPR, were initiated two minutes later, but other problems arose as medical staff could not locate an AED nor a new tracheostomy tube.  The inmate was pronounced dead at 5:40 a.m.

The CDCR reviewer did not offer any specific precipitating factors for the suicide and, in fact, speculated that the inmate did not intend to commit suicide.  The reviewer suggested that the inmate "had a pattern of claiming to be suicidal when it appeared to be of benefit to him or when he was unable to cope with a particular situation."  The reviewer acknowledged that "the convergence of events and decisions led to what this reviewer believes may have been a preventable death in custody."  However, numerous deficiencies were found by the CDCR reviewer in this case.  Of note, two versions of the Suicide Report were issued: the first version some time following the Suicide Case Review Focused Improvement team meeting on October 31, 2013 that contained eight recommendations for corrective action; and a second version issued on January 7, 2014 that contained seven recommendations, with an identified deficiency regarding pepper-spraying the inmate and subsequent documentation problems by custody staff having been deleted.

The original eight bases for recommendations for corrective action through a QIP were as follows:

> "(1) Critical documentation from NKSP dated September 3, 2013, including a copy of the inmate's note expressing SI was not scanned into the eUHR until seven days later on September 10, 2013.  As a result, the inmate's treatment team at MCSP lacked vital information; (2) Despite an emergency treatment center with a history of treating patients with tracheostomies, tracheostomy tubes could not be located in either the TTA or the CTC when they were needed as part of life-saving efforts for the inmate.  As a result, nursing inserted an ineffective trumpet into his trachea which was not able to penetrate the blockage; (3) Despite the absence of documented clear risk, custody staff failed to comply with medication treatment orders given by healthcare staff.  Although nursing staff tried multiple different custodial staff members, custody refused to comply and, as a result, the inmate did not receive the proper medical treatment that had been ordered for him; (4) Form 114-D, the Inmate Segregation Record, appeared to have been inaccurately completed as important interactions with the inmate, including the actions that resulted in the discharge of chemical agents and his refusal to come out for medical care had not been documented.  According to policy, all interactions with the inmate should have been documented; (5) Errors in documentation on the inmate's mental health treatment plan were noted, including in accurately listing what medications the inmate was prescribed.  Additionally, treatment interventions identified were not measurable or observable and as a result, would not assist in determining if progress had been made.  The treatment plan also noted that the psychologist disagreed with the referring clinician's SRA of high chronic and acute risk, however, another SRE could not be located in the eUHR; (6) It appears from evidence reviewed for this case review that his psychiatrist may have made deviations from policy and/or poor documentation in treatment the inmate received, including the discontinuation of suicide precautions on September 6.  She also failed to order

159

medical restraints or continuous observation, despite the inmate repeatedly pulling out his tracheotomy tube and wrote an order for a non-CDCR sanctioned policy ("violence precautions"); (7) Similarly, it appears that the MOD may have made deviations from policy and/or poor documentation in the treatment the inmate received, including the failure to follow-up when nursing staff called to update her on her patient's condition and replied, 'If he is walking around how can he be in distress?  Please don't call me if it is not important.'  The statement is not only unprofessional behavior towards her co-worker, but also may represent poor clinical care.  She also failed to order medical restraints or continuous observation, despite the inmate repeatedly pulling out his tracheostomy tube; (8) A number of concerns related to staff's adherence to policies and procedures were identified in this review.  As a result, the OIA has initiated investigations on specific staff members."

Despite listing numerous deficiencies and recommendations for corrective action, there were several other deficiencies that were not identified and/or adequately discussed the Suicide Report.  First, although there was no evidence to suggest that it influenced clinical judgment, both nursing and mental health staff at NKSP used "contracting for safety" with the inmate, a practice that was below the standard of care and not authorized within the *Program Guide.*  Second, nursing staff at both NKSP and MCSP used un-authorized observation forms that contained pre-printed time intervals and did not allow documentation of observation that staggered 15-minute intervals.  In addition, there were significant gaps in the observation logs while the inmate was on Suicide Watch at NKSP.  Further, at the time he was found unresponsive during the early morning of September 7, 2013, he had not been observed for approximately 19 minutes (beyond the 15-minute requirement).  Third, the inmate was on Suicide Watch when he was transferred from NKSP to MCSP during the evening of September 4, 2013 and the on-call psychiatrist changed his level of observation to Suicide Precaution.  It was unclear from the records why the on-call psychiatrist downgraded the inmate from Suicide Watch to Suicide Precaution without a face-to-face assessment, nor if the clinician was even aware that he was on Suicide Watch at NKSP.  Fourth, the MCSP psychologist completing the MHTP for the inmate in conjunction with his IDTT on September 6, noted on the document that the referring clinician from NKSP had rated the inmate at both "high" chronic and acute risk for suicide "with scant justification on how such a determination was reached."  The MCSP clinician believed that "the presence of several positive protective factors would serve to mitigate risk more toward the moderate to moderately severe level."  However, some of these alleged protective factors (e.g. "future orientation/plans for the future," "insight into problems," "active and motivated in psych treatment," "sense of optimism self-efficacy") were dubious at best and not reflected in the inmate's eUHR.  In addition, this MCSP psychologist never completed another SRE to validate their clinical judgment.

In the **fourth** case (MCSP 12), the inmate was found hanging from the bunk of his administrative segregation cell by a sheet during the evening of May 19, 2014.  Life-saving measures were initiated and he was pronounced dead at a local hospital the following day, May 20, 2014.  The inmate had entered CDCR in March 1998 to serve a 24-year to life sentence for second-degree murder, false imprisonment, terroristic threats, and possession of a firearm by an ex-felon.  He was transferred to MCSP on May 25, 2000.  The inmate had 11 RVRs during his

15-year confinement, the last of which occurred on March 6, 2014 and involved assault (with his cane) on an officer.  It appeared that the inmate had adequate family support, with a visit from his sister a month before his death.  The inmate was receiving treatment for several medical problems, including hypertension, chronic body pain, seizures, and end-stage liver disease with "decompensated" cirrhosis secondary to Hepatitis C.  In early May 2014, he requested to complete an advanced directive for health care, and completed the form that listed his cellmate as his primary agent.

According to available records, the inmate had previously reported a history of both emotional and physical abuse as child.  In addition, he struggled with both substance abuse and mental illness from "an early age," and was reportedly hospitalized at Napa State Hospital from 1983 to 1985 and subsequently at another hospital for SI and self-injurious behavior.  Upon admission to CDCR, he was placed on the caseload and alternated between EOP and 3CMS throughout most of his confinement.

The inmate had a history of several serious SAs by hanging during his CDCR confinement.  For example, on July 30, 2004, correctional staff found him hanging in his cell "turning blue with a sheet around his neck."  He was admitted to a MHCB.  On November 2, 2007, he attempted suicide by hanging from a lower rail of the housing unit's second tier by a sheet.  On July 17, 2011, the inmate attempted to commit suicide by hanging in his administrative segregation unit cell.  He was discovered unresponsive and transported to a local hospital where he stayed for several days, then was committed to VPP for SI and on-going depression until October 2012.  His diagnosis was Major Depressive Disorder, Recurrent, Severe, Without Psychotic Features, Polysubstance Dependence, in Full Remission, Anti-Social Personality Disorder, and Other Personality Traits. During his stay at the VPP, he was twice provided acute care for SI.  He was viewed as manipulative by the VPP clinical staff.

Upon his return to CDCR and MCSP, he was maintained at EOP  and carried multiple diagnoses over the years.  Between September 2013 and March 2014, his diagnoses were consistently listed as Depressive Disorder NOS, Poly-Substance Dependence, and Personality Disorder NOS.  The diagnosis of Anti-Social Personality Disorder with Borderline Traits was added on March 12, 2014.

During the evening of March 5, 2014, the inmate was placed in the MHOHU on crisis evaluation with observation at 15-minute intervals after expressing SI and frustration in dealing with custody staff in his housing unit.  He was seen by a clinician the following morning, March 6, and admitted using the "suicide card" in order to get medication for sleep ("I told the building officer that I was suicidal in order to be seen by my psychiatrist, but he put me on the bus and brought me here.  I've no intention of hurting myself").  An SRE completed that morning assessed the inmate at "moderate" chronic risk and "low" acute risk for suicide. Although the plan was to "place at MHOHU under psychiatric precaution" and evaluate on a daily basis, the inmate was released back to his housing unit shortly thereafter on the morning of March 6.  Several hours later, however, he was returned to the MHOHU after a confrontation with an officer on the yard regarding his lost property and charged with assault (with his cane). The reason for the admission on crisis evaluation status was unclear from the eUHR.  The following day, March 7, 2014, he was seen by the same clinician and, although denying any SI, "presently

he reports some on-going dysthymic mood over family and medical issues, however, he denies any sustained, acute mood symptoms as of late." Another SRE was completed and the clinician concluded that the inmate was at "moderate" chronic risk and "low" acute risk for suicide. The inmate was discharged from the MHOHU and transferred to administrative segregation. He continued to be seen by his clinician at the EOP LOC.

It should be noted, however, that several chronic and acute risk factors were inaccurately documented on the March 6 and March 7 SREs, and in particular, the March 7 assessment. For example, despite the inmate's extensive history of at least three serious SAs by hanging in CDCR custody (in 2004, 2007, and 2011), the clinician apparently either discounted this information or was unaware of such history based upon what was written in the SRE section for history of SAs: "Father reportedly killed himself at age 38. By OD and hanging with most recent in 2012." In addition, despite the fact the inmate was diagnosed with end-stage liver disease, had a dysthymic mood, and had just been charged with assault on an officer regarding his lost property, the clinician checked "no" on the following acute risk factors: "current/recent depressive episode," "recent serious medical diagnosis," "hopelessness/helplessness," "recent negative staff interactions," and "recent disciplinary ('115')."

On May 14, 2014, the inmate was seen for a routine contact by his clinician and stated "'I'm better than some days and worse than others. I had to go to the CTC because I had an allergic reaction to a new med. It made me break out in hives. I still have some of it, it's (the hives) not all gone yet.' The inmate stated the Doctor changed his medication and gave him pills for the itching and a shot for inflammation. The inmate stated he just completed a DNR because he says he doesn't think his body is going to make it much longer. He says he stopped taking pain pills because they don't help and he feels like the doctors treat him like a drug addict. Encouraged the inmate to take care of himself as best he can and he might live longer than he thinks. He said his enzyme levels are too high and he just doesn't feel well." Two days later on May 16, the inmate had his RVR hearing and was found guilty of the assault (with his cane). On May 18, 2014 he reportedly had a seizure, but refused any medical treatment. The inmate committed suicide the following day.

The CDCR reviewer did not offer any specific precipitating factors for the suicide, but noted his terminal illness, recent RVR disposition, and continuing fixation regarding his lost property as risk factors for suicide. According to the CDCR reviewer's interview with his cellmate, the inmate was "depressed and suicidal the whole time I knew him....for years....I was very surprised he did it when I was in the cell." The reviewer raised two concerns regarding mental health services received by the inmate, one concerning a Mental Health Evaluation form that could not be found in the eUHR, and a concern regarding the inadequacy of several SREs completed during 2013 and 2014. Two emergency medical response concerns were also noted, one involving a question as to whether a C-Collar was brought to the scene of the emergency, and the other regarding the untimely response of the ambulance and excessive time it took for medical staff to transport the decedent from his cell to the TTA. Finally, there were minor custody concerns regarding reporting documentation. According to the CDCR reviewer, "All identified concerns have been communicated at the institutional level." It was unclear why some of these deficiencies, particularly the inadequate SREs, did not result in formal recommendations for corrective action through a QIP.

162

In the **fifth** case (MCSP13), the inmate was found hanging by a sheet from a ventilation grate of his SNY cell during the late morning of November 2, 2014. The inmate entered the CDCR system on June 9, 1998 to serve an unknown sentence. He was placed in the MHSDS at EOP LOC for Major Depressive Disorder. At the time of this report, the eUHR and other documents from the CDCR secure website, including the Suicide Report (which had not been completed), had not been examined by this writer.

*Summary:  While acknowledging that new mental health leadership, including a new CMH and MHCB/OHU supervisor, was recently installed a few months prior to the on-site assessment, this reviewer found that the MCSP was a problematic institution that exhibited numerous poor practices in the area of suicide prevention, including, but not limited to, an intake nurse who conducted screening in the large open area of the R & R Unit and failed to ask inmates if they were currently suicidal, an anti-therapeutic MHOHU that was neither a mental health unit nor an OHU, an inadequate number of retrofitted new intake administrative segregation cells, a high percentage of inmates expressing SI that did not receive SREs, and inadequate treatment planning.*

## 30)   California Health Care Facility (CHCF)

**Inspection**:  June 24-25, 2014

CHCF housed 1,488 inmates across multiple classification levels; all were assigned to the CHCF for mental health and/or medical needs.  CHCF had 98 MHCBs in three units on Facility A, acute and intermediate programs operated by DSH on Facility B, an OHU on Facility C, a CTC on Facility D, and a yet-to-be-activated multiple use Level II program for EOP and 3CMS inmates and an administrative segregation unit on Facility E.  Excluding the MHCBs and DSH programs, approximately 25 percent of the remaining CHCF inmates were caseload inmates; there were 332 3CMS and 46 EOP inmates.

**Screening/Assessment**:  On June 24, several new admissions were observed during the medical intake screening process in the Patient Management Unit, which CDCR institutions referred to as the R & R Unit.  Screenings were conducted in the Nurse's Office.  However, privacy and confidentiality were compromised because correctional staff stood in the doorway during intake, even though there was a large viewing window between the Nurse's Office and the Officer's Station.  Observation also indicated that the nurse did not ask all of the intake screening questions, including whether the inmate was *currently* suicidal.  Examination of the Initial Health Screening CDCR 7277 Form that CHCF used revealed that it was defective; the critical question regarding whether the inmate was currently suicidal had been *deleted*.  DCHCS officials reported that this question had been inadvertently deleted and sent out from headquarters in May 2014.

**Housing**:  Only 58 of the CHCF's total 98 MHCBs in housing units 301A, 301B, and 302B were occupied during the site visit.  All were suicide-resistant and did not have any obvious protrusions which could be used in a hanging SA.  The units also contained safety and observation rooms, but otherwise lacked alternative housing.

163

Although Facility E's administrative segregation unit had not been activated by the time of the site visit, with one exception, all of the cells had been constructed to be as suicide-resistant as possible. The only exception was the horizontal brackets that connected desk stools to the walls. These brackets could potentially be used as an anchoring device in a hanging SA. Guard One equipment had been installed in the administrative segregation unit.

**Observation**: All MHCB inmates were on either Suicide Precaution or Suicide Watch. No other observation statuses were authorized, and <u>all</u> inmates were observed at a minimum of 15-minute intervals. Examination of the observation form that the CHCF used revealed that it allowed for documentation at staggered intervals. All forms indicated up-to-date documentation. These were all very good practices.

**Management/Treatment Planning**: eUHR review of inmates on suicide observation and of those referred to mental health on an emergent basis indicated that clinical staff consistently saw suicide observation inmates daily, while inmates referred to mental health were generally seen timely. However, treatment planning was problematic, while SREs were not always completed for inmates who expressed SI. In one reviewed case (CHCF 1), the inmate was admitted to a MHCB on March 28, 2014 after sustaining a serious self-inflicted laceration that severed a nerve on his left wrist in the OHU. He remained on the unit for four days. The discharging SRE contained the following treatment plan: "(1) D/C suicide watch, restore full issue, (2) initiate 5-day F/U, (3) retain in CCCMS, (4) housing per custody, (5) Rx. meds per MD orders, 6 F/U with assigned PC asap, (5) continue to monitor and observe prn/asap, (6) medical tx. services as prior, (7) reassess in IDTT 4/8/." In another case (CHCF 2), the inmate was discharged from a MHCB on May 29, 2014 with the following treatment plan contained within the SRE: "Discharge to EOP LOC, Discharged with 5-day follow-up."

Several IDTT meetings in all three MHCB units were observed on June 24 and 25, 2014. Several were problematic. In one case (CHCF3), the inmate was placed in the MHCB on June 16, 2014. The June 24 IDTT meeting lacked a case presentation, the psychiatrist in attendance was not interactive and did not appear to know the inmate very well, and there was no discussion regarding the inmate's SI and/or treatment planning. In another case (CHCF 4), eUHR review revealed the inmate's admission for SI on May 14, 2014 to an MHCB at CHCF from Deuel Vocational Institution (DVI). His history included several SAs, including a handgun incident in 2011 and cutting himself three times in August 2013. He remained at the CHCF until June 6, when he returned to DVI. He again expressed SI and was transferred to a MHCB at CMC. The CMC IDTT meeting initiated a DSH-APP referral and he was subsequently accepted into that in-patient program.

The inmate arrived at the CHCF on the evening of June 23 and was placed in the MHCB on Suicide Watch and with a safety smock. During the June 24 IDTT meeting, there was initial confusion why he was in the MHCB and little discussion regarding his SI. Despite the inadequate discussion, the lead psychologist told the inmate that "we'll try to get your blues back by the end of the day." A subsequent progress note documented that the inmate was downgraded from Suicide Watch to Suicide Precaution. Following the IDTT meeting, it was learned that he had a court hearing on the following day. However, there was no discussion during the IDTT

meeting about how the inmate felt about this upcoming hearing in relation to his SI.  There also was no discussion as to whether it was premature to step the inmate down from Suicide Watch prior to the court hearing.

Only one correctional counselor was assigned to all three MHCB units and IDTT meetings were scheduled around her availability.  This correctional counselor was extremely competent and had excellent rapport with all inmates during their respective IDTT meetings.  In fact, the correctional counselor was observed to be leading the discussion in those IDTT meetings where clinical leadership was otherwise lacking.  Notably, IDTT meetings held in Unit 301B on June 25 were much better and had good case presentations by lead psychologists and more interactive team member participation.  The CMH attended several IDTT meetings on June 24 and acknowledged that much work needed to be done to strengthen the IDTT process.

Emergency mental health referrals for SI during May and June 2014 were examined.  Of these referrals, the MHTS identified seven and an additional six were located in the SEMS Logs, which CDCR institutions referred to as TTA logs.  Review of eight eUHRs revealed that SREs were completed in only five of eight or 63 percent of cases.  In one case (CHCF 5), the clinician's May 23, 2014 progress note stated that the inmate was seen "due to an emergent episode the previous day requiring sedation."  Although unclear from the progress note, the observation form indicated that he was on Suicide Watch in an isolation room in the MHCB unit.  An SRE was not completed and the clinician's progress note was unclear as to any recommendation for further observation.  However, documentation on the observation form ended at 10:30 a.m. on May 22, presumably because the inmate was discharged from observation status.

Another case (CHCF 6) was more problematic.  On May 4, 2014, an officer observed an inmate housed in the Facility D CTC place a bed sheet around his neck and begin to choke himself.  He was placed on Suicide Watch by the on-call psychiatrist at approximately 7:35 a.m.  A psychologist subsequently saw him at approximately 9:30 a.m.  Contrary to what the officer observed, the inmate told the clinician that he was cold and "I was trying to take off the chill."  The progress note indicated that he denied SI and his suicide risk was "low."  The Physician's Order was changed to Suicide Precaution.  Several hours later at 12:30 p.m., the Physician's Order was changed again to the following: "Clarification for the order Suicide Precaution.  Suicide Precaution Q-30 minutes x 24hrs."  A few hours later at 4:40 p.m., the Physician's Order was changed for the final time when the inmate was discharged from Suicide Precaution.  An SRE was not completed to authorize Suicide Watch, an SRE was not completed to discontinue Suicide Precaution, and a treatment plan was not completed.  Within a span of nine hours, this inmate's observation level went from Suicide Watch to Suicide Precaution at 15-minute intervals to Suicide Precaution at unauthorized 30-minute intervals to discontinuation of observation.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records indicated that 92 percent of custody, but only 76 percent of nursing staff, had CPR certification.  One hundred percent of custody staff and 97 percent of medical and mental health staff were compliant with annual suicide prevention block training.  Ninety-seven

percent of mental health clinicians received the seven-hour SRE training and 50 percent completed the mentoring program.

**Recent Suicides**:  There were no inmate suicides at CHCF during 2012-2014.

## 31)   Deuel Vocational Institution (DVI)

**Inspection**: June 26-27, 2014

DVI housed 2,707 inmates; the vast majority were on RC status.  The institution had a 28-bed OHU with ten rooms and four seclusion cells, two of which were padded, that were designated to house inmates awaiting MHCB placement, two administrative segregation units located in K and L Wings, and a RC.  Twenty-one percent of DVI inmates were on the mental health caseload; there were 542 3CMS and 29 EOP inmates.  Cells in the K and L Wing administrative segregation units were designated for overflow alternative housing.

**Screening/Assessment:**  Several new admissions during the medical intake and mental health screening processes were observed on June 26-27, 2014.  Two nurses assigned to the RC conducted the Initial Health Screening.  Both nurses appropriately asked all screening questions.  However, no privacy or confidentiality were afforded during this process as multiple intake screenings occurred simultaneously in a large open area with the various nurses and inmates only separated by a small partition.  Several inmates were also seated in a line within this large open area in close proximity to the nursing stations.  The Nurse's Office appeared to  be solely occupied by a nursing supervisor and not utilized for intake screening.

Two clinical psychologists performed the initial 31-item mental health screen.  These screens normally occurred within 24 to 72 hours of an inmate's admission to the RC, unless an emergent or urgent mental health referral was generated.  One of the clinicians performed the screening in the privacy of their office; the other clinician conducted it in a semi-private housing unit dining hall during off hours when no other inmates were present.  Both clinicians reported that SOMS, eUHR, and MHTS were <u>not</u> accessed unless the inmate self-reported a prior CDCR confinement.

Daily rounds by two psych techs in the K and L Wing administrative segregation units were observed.  Both psych techs appropriately interacted with caseload and non-caseload inmates.  However, neither psych tech completed the Psych Tech Daily Rounds Forms for the 67 caseload inmates until after completion of the rounds.

**Housing**:  Most of the ten OHU rooms were suicide-resistant and did not have any obvious protrusions which could be used in a hanging SA; an exception was those rooms that had warped and/or broken floor tile panels that could be used for self-injury and faucet handles that could be used as anchoring devices in a hanging attempt.  Beds were removed from OHU rooms for Suicide Watch and Suicide Precaution, resulting in suicidal inmates having to sleep on the floor. Cells in the K and L Wing administrative segregation units were designated for overflow alternative housing, but were not used in this capacity since the CHCF's opening in July 2013. Because most of these administrative segregation units' cells were not suicide-resistant, inmates required one-on-one continuous observation.

166

The K Wing administrative segregation unit contained 24 retrofitted suicide-resistant cells for new intake inmates.  Sections of the L Wing administrative segregation unit were designated for administrative segregation overflow, OHU overflow, and the Special Program Unit, which was reserved for RC inmates who were likely to be approved for SNY housing.  Although some L Wing cells had been retrofitted to be suicide-resistant, most were unsafe. During the site visit, four newly admitted inmates were observed being housed on the second floor of the L Wing in extremely dangerous, antiquated cells that contained metal bunk brackets, ladders, shelving, open window panes/grates, and towel racks.  The wall ventilation grates had been retrofitted to be suicide-resistant.

The reviewer observed the very problematic case (DVI 1) of an inmate released from the OHU who was subsequently housed in an unsafe cell in K Wing.  When touring the OHU on June 26, the reviewer observed two clinicians conducting this inmate's SRE.  The inmate arrived at DVI on June 24 and was referred by an intake nurse to mental health based on positive responses for a mental health history and recent suicidal behavior.  A mental health clinician assessed him on the same day and reported a significant history of suicidal and self-injurious behavior, including cutting and stabbing himself with a pencil two weeks prior in the county jail.  The inmate told the clinician that engaging in self-injury "helps me cope with my anger."  Although he denied SI on June 24, he told the clinician that he "quickly decompensates."  An SRE assessed him as being at "moderate" chronic and acute suicide risk.  The inmate was placed in the OHU on Suicide Precaution.  During his assessment with the two OHU clinicians on June 26, he again denied SI and was subsequently discharged from Suicide Precaution and rehoused in administrative segregation.  On June 27, the following day, while the reviewer was observing psych tech rounds on K Wing, the same inmate was observed in a special management cell at the far end of the tier.  The cell was neither retrofitted nor designated as a new intake cell.

**Observation**:  Although both Suicide Precaution and Suicide Watch were regularly used in the OHU for inmates identified as suicidal, a recently drafted LOP at DVI (dated June 2014) indicated that psychiatric observation and "enhanced suicide precautions" were available to clinical staff.  The LOP stated "at times, inmate-patients admitted to the infirmary for mental health reasons will fit into a category between Suicide Precaution and Suicide Watch.  These inmate-patients are categorized as Enhanced Suicide Precaution and must be placed in cells B-233 through B-236 or L-138 through L-149."  Inmates on enhanced suicide precautions were required to be observed at staggered 10-minute intervals.  Although placing a suicidal inmate on observation at intermittent intervals that did not exceed 10 minutes was clearly within the standard of care, such a practice, along with psychiatric observations, was not sanctioned by CDCR and not referenced in the *Program Guide*.

During an OHU tour on June 27, nursing staff's falsification of observation forms was observed. The reviewer entered the unit at 10:39 a.m. and found five inmates on Suicide Precaution. Review of each of their observation forms revealed that times had been post-dated to 10:47 a.m. and 10:59 a.m.  A nursing supervisor was notified of the falsification.

Review of Guard One data for the K and L Wing administrative segregation units found numerous violations in four reviewed housing floors during multiple 24-hour periods; overall

compliance was only 71 percent.  Inmates housed in the Special Program Unit on the second floor of the L Wing administrative segregation unit (overflow), which housed inmates needing SNY classification, did not receive routine observation from custody staff.  As this unit was used for inmates needing protective custody, the lack of welfare checks was problematic.

**Management/Treatment Planning**:  eUHR review of inmates on suicide observation and of those referred to mental health on an emergent basis indicated that clinical staff consistently saw inmates on suicide observation daily, while inmates referred to mental health were generally seen timely.  However, other areas, including treatment planning, were problematic; DVI treatment planning went from one extreme to another.  In one reviewed case (<u>DVI 2</u>), although the clinician incorrectly placed an inmate on psychiatric observation, a very thoughtful and individualized treatment plan was developed:

> The I/P will be admitted to OHU for psychiatric observation.  OHU team to monitor I/P for safety concerns.  Treatment plan to include following goals:  1) Reduce daily on-going Sx ideation to 2x/week, I/P making vague statements, need to clarify overall baseline; 2) Reduce anxiety from daily to 2x/week or below by CBT, anxiety management skills, i.e., relaxation, breathing exercises, thought analysis to contain worries; 3) Reduce depression from daily to 2x/week or below by supportive counseling, challenging maladaptive thoughts by CCM;, and 4) Psychiatric medication evaluation to alleviate acute distress and stabilize sleep.

At the other extreme (<u>DVI 3</u>), another clinician who regularly completed SREs developed the following template that was inserted in each treatment plan section of the SRE form:

> ___Place in OHU to monitor for signs and symptoms and safety
> ___Released to custody with a 5-day F/U
> ___Hold in OHU for Parole Agent pick-up
> ___Needs further evaluation
> ___Transfer to MHCB with first bed availability
> ___Refer to PC and psychiatrist for appointment within one week
> ___Review LOC/IDTT

The above template, which simply recited *Program Guide* requirements, epitomized the lack of understanding and/or  indifference to treatment planning for inmates presenting with SI.  This clinician chose to develop a user-friendly, institutionalized alternative instead of developing a reasonable and measurable strategy to reduce suicidal behavior.

Emergency mental health referrals for SI from January through June 2014 were observed.  Of these referrals, ten were found in the MHTS and 151 were found in the TTA Logs.  Review of 15 eUHRs revealed that SREs were completed in 13 of 15 or 87 percent of cases.

Review of monthly DVI SPRFIT Committee minutes from April through June 2014 revealed that the CMH, Chief Psychologist, and Chief Psychiatrist or other psychiatrist were all absent from all three meetings, which was problematic.

**Intervention**:  Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records indicated that 98 percent of custody and 100 percent of nursing staff had CPR certification.  Eighty-nine percent of custody staff was compliant with annual suicide prevention block training, but neither medical nor mental health staff received this training.  Ninety percent of mental health clinicians received the seven-hour SRE training and 89 percent completed the mentoring program.

**Recent Suicides**:  DVI experienced two inmate suicides during 2012-2014.  In the **first** case (DVI 4), the inmate was found hanging by a sheet from the ventilation grate of his Special Program Unit cell during the morning of May 12, 2012.  He had entered CDCR a few weeks earlier on April 25, 2012 to serve a 49-years to life sentence for multiple counts of child sexual abuse.  He remained on RC status until his death.  He had not reported any significant medical problems.

Although experiencing substance abuse as a teenager, the inmate did not report a history of mental illness in the community.  He briefly received treatment for pedophilia as a teenager while continually denying that such a lifestyle was problematic.  Upon arrival at DVI, he informed the intake nurse during the medical screening process that he was depressed and "suicide was the only option;" he had reportedly begged the judge for the death penalty during his sentencing hearing.  He also told the nurse that he was scared to be in prison.  He was immediately placed on Suicide Precaution in the OHU, and was provisionally diagnosed with Depressive Disorder NOS, and placed in the MHSDS at the 3CMS LOC.

Two days later on April 27, he was transferred to an MHCB at SQ.  One progress note reported he "appears fairly naïve with poor judgment in his cavalier verbalizations of suicide by 'Japanese sword' or displaying absolute bravery if other inmates are going to attack him, akin to characters in a fantasy video game. Appears out of touch with reality when speaking about the possibility of having a normal sexual relationship with a child."  His diagnosis was changed to Adjustment Disorder with Depressed Mood and R/O Major Depressive Disorder.  On April 30, he was assessed as being at "moderate" chronic and "low" acute risk for suicide.  He was discharged from the MHCB with the following treatment plan contained within the SRE:  "I/P has been DC'ed from the CTC at the CCCMS LOC with a 5-day F/U. To return to DVI."

Upon his return to DVI on May 1, he was housed in administrative segregation unit for protective custody due to the nature of his charges.  All but one of the required five-day follow-up notes were completed.  On May 8, he met with his PC prior to his IDTT meeting.  He appeared stable to the clinician and denied any SI, stating "I'm still depressed and have ups and downs but I'm doing good with my cellie."  The clinician's plan was to "continue to track symptoms.... continue to encourage participation."  Two days later on May 10, the ICC transferred the inmate from administrative segregation to the Special Program Unit, then housed on E Wing, which was designated for inmates likely to be classified for SNY housing.  DVI policy indicated that inmates housed in the unit were not routinely supervised by custody staff.  Two days later on May 12, he committed suicide.  The eUHR indicated that nursing staff had difficulty maintaining CPR because they were "unable to open mouth, jaw clenched down."

169

In a subsequent interview with the CDCR reviewer, a cellmate who was briefly housed with the inmate in administrative segregation stated that the decedent had spoken about his plans to commit suicide "from day one" and had also contemplated suicide since being held in the county jail.  He also told his cellmate that "he didn't want to be in a rubber room," referring to the MHCB and OHU.

As to the precipitating factors for the suicide, the CDCR reviewer wrote in the Suicide Report that "from the moment of his arrest, everything that happened to the inmate led directly to his suicide.  As he clearly stated, documented in many clinical notes, he did not want to live in prison.  Do not want to die, but felt it was his only option." The Suicide Report contained two bases for recommendations for corrective action through a QIP:  "(1) This review revealed at least a 10-minute discrepancy between the time the inmate was discovered hanging.....and the time the alarm was given as documented by responding medical staff and by the unit logbook; (2) The last day of the 5-day post MHCB discharge follow-up was not completed by the primary clinician."

It was unclear why, given the CDCR reviewer's suggestion that the inmate would have been at increased risk for suicide throughout his CDCR confinement, there was no discussion in the Suicide Report concerning the absence of treatment planning to address this continuing problem. Also, given that the inmate was housed in the Special Program Unit due to protective custody concerns and was found hanging after not being observed by custody staff for an unknown period of time -- his body was in partial *rigor mortis* -- the Suicide Report lacked a discussion regarding the efficacy of mandating welfare checks on the unit.

In the **second** case (DVI 5), the inmate was found hanging by a sheet and extension cord from the upper ladder of his GP cell during the afternoon of July 25, 2012.  His body was found in the state of full *rigor mortis*.  The inmate had re-entered CDCR on July 27, 2011 to serve a 24-month sentence for burglary and possession of a controlled dangerous substance.  He was transferred to DVI on November 10, 2011.  Although he had an estimated release date of December 2012, he had recently been informed of a pending investigation of another alleged burglary and might be facing the potential of at least 15 additional years in prison.  The inmate had two RVRs during his confinement, the most recent of which, for tobacco possession, occurred the day before his suicide.  He appeared to have good family support, with frequent telephone calls with his parents.

Although the inmate had a significant history of substance abuse, he did not report any mental illness in the community or during prior CDCR confinements.  Upon admission to CDCR on July 27, 2011, he denied any current SI, prior history of suicidal behavior, or need for mental health services.  Upon arrival at DVI in November 2011, he reported a history of depression, but denied the need for mental health services.  As to medical problems, he reported both Hepatitis C and knee joint pain.  He refused any treatment for the hepatitis and pain medication was prescribed for his knees.

As to possible precipitating factors for the suicide, the CDCR reviewer listened to several recent telephone conversations between the inmate and his parents and examined his suicide note.  The

materials reflected the inmate's struggle with feelings of guilt and remorse as to his substance abuse, pain he had caused his parents, and the likelihood of facing additional criminal charges. The Suicide Report contained three bases for recommendations for corrective action through a QIP:

> 1) Security checks were not completed on July 25, 2012, on either second or third watch prior to the time of the discovery of the inmate. This lapse in Post Order protocol stemmed from a permanent reduction in correctional staff instituted on that date. Performance of required security checks would have alerted staff in a timelier manner regarding this attempt, although it is highly unlikely that it would have changed the outcome; 2) Basic life support and advanced cardiac life support protocols were instituted for the inmate although the condition of his body indicated he had died a relatively long time prior to discovery. As a result of interviews with emergency responders, it appeared that staff could benefit from more explicit guidelines and training about if and when emergency medical efforts can be skipped or ended under the circumstances of the clear presence of rigor mortis....; and 3) As a result of the discussion by case review participants on September 7, 2012, of the problem stated in QIP #2, it was determined that the policy pertaining to the emergency response measures, and specifically to the question of the cessation of those measures, requires further discussion by Headquarters staff in order to clarify policy parameters.

*Summary:  This reviewer found that DVI was a problematic institution that exhibited numerous poor practices concerning suicide prevention.  These poor practices included, but were not limited to, intake nurses who conducted multiple screenings at the same time in a large open area, OHU nursing staff's falsification of observation forms, new intake inmates housed in non-retrofitted administrative segregation units, inmates housed in unsafe OHU rooms, low compliance rates for Guard One checks, SRE forms with pre-printed treatment plan templates, and a lack of mental health leadership attendance at recent monthly SPRFIT meetings.*

## 32)   **California Correctional Center (CCC)**

**Inspection**: July 8-9, 2014

CCC housed 2,960 inmates at Level I, II, and III classifications.  Approximately 2,000 additional Level I inmates were dispersed among 18 conservation camps.  The institution had a 13-bed OHU for inmates with medical or mental health needs, with two alternative housing rooms for inmates awaiting MHCB transfer, and an administrative segregation unit.  There was only one caseload inmate, at the 3CMS LOC, at the institution during the site visit.

**Screening/Assessment**:  Several new admissions during the medical intake screening process were observed on July 9, 2014.  Two nurses conducted the screening process in small offices of the R & R Unit.  With one exception, privacy and confidentiality were adequate as each nurse conducted the screenings in separate offices; the only exception was an office technician who was weighing inmates in preparation for intake screenings and was stationed outside of the open doorways between each small office.  Moving the weight scale to the opposite wall of the area

would better ensure privacy and confidentiality during the intake screening process. Each nurse was observed to be asking all the required intake screening questions.

Observation of a psych tech conducting daily rounds in administrative segregation on July 8 revealed the psych tech adequately conversing with all inmates, but only one caseload inmate was housed on the unit.

**Housing**: The OHU rooms, including the alternative housing rooms, were not suicide-resistant and had obvious protrusions which could be used in a hanging SA. Because the rooms were unsafe, any suicidal inmate awaiting MHCB transfer was required to be on one-to-one continuous observation. Most inmates were expedited to a MHCB at High Desert State Prison (HDSP), which was adjacent to CCC.

The administrative segregation unit contained nine retrofitted suicide-resistant cells for new intake inmates. During the site visit, several problematic conditions regarding the housing of newly admitted inmates in administrative segregation were found. Specifically, not all inmates who were housed in administrative segregation for their first 72 hours were housed in retrofitted cells, while not all of the retrofitted cells housed newly admitted inmates. For example, on July 8, 2014, the eight inmates housed in new intake cells had all been housed in administrative segregation for more than 72 hours; the ninth cell was unoccupied. Moreover, all eight new intake inmates who were admitted to administrative segregation on July 8 were placed in unsafe cells, although two of these inmates were double-bunked.

**Observation**: OHU practices were problematic. Although Suicide Precaution and Suicide Watch were routinely used in the MHCB and OHU throughout CDCR for suicidal inmates, inmates were observed being routinely admitted to the CCC OHU *without* any level of observation ordered. The reviewer thus could <u>not</u> locate any observation forms for inmates admitted to the OHU. In one case (CCC 1), the inmate was admitted to the OHU on February 15, 2014 for abdominal pain, anxiety, depression, and paranoia. However, his level of observation was not specified and he was referred to mental health for further assessment. He remained in the OHU for four days until February 18, when he was discharged back to his housing unit. A mental health clinician did not assess him until February 24. In another case (CCC 2), the inmate was admitted to the OHU on February 22, 2014 for a crisis evaluation after learning that his sister had been shot by a gang member and his girlfriend had been raped. His level of observation was not specified and no observation forms were found in the chart. An SRE was not completed and five-day follow-up was not initiated following his discharge from the OHU on February 24.

Review of unit logs for March and April 2014 that documented 30-minute welfare checks prior to Guard One's full implementation in mid-May 2014 indicated 99 percent compliance for 30-minute rounds. Review of Guard One data for the entire administrative segregation unit for selected 24-hour periods in June 2014 revealed overall compliance at 98 percent.

**Management/Treatment Planning**: eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated problems as to levels of observation for inmates admitted to the OHU for crisis evaluations. Because most

inmates identified as suicidal were only temporarily placed in the OHU while awaiting MHCB placement at HDSP, treatment planning was not typically developed by CCC clinicians and, therefore, not reviewed during this site visit.

Urgent and emergency mental health referrals from January through early July 2014 were examined.  Twenty-nine of these referrals were found in the MHTS and an additional 21 were located in the TTA Log.  Of 15 reviewed cases that required SREs because the emergency referral indicated SI, only nine of 15 or 60 percent had completed SREs.  In one case, (CCC 3), the inmate was escorted to the TTA on April 22, 2014 after expressing SI.  He subsequently informed a mental health clinician that "I want to kill myself.  Cut my wrist....I hear voices telling me to kill myself."  The inmate subsequently recanted his SI and was not placed on suicide observation status.  A progress note dated April 22 indicated that a SRE had been completed, but, as of July 9, 2014, no SRE was found in the eUHR.  In another case (CCC 4), custody staff wrote an emergency mental health referral on May 19, 2014 indicating that the inmate had expressed SI and was exhibiting bizarre behavior.  A mental health clinician saw the inmate on the same day, but a subsequent progress note indicated that he then denied SI.  An SRE was not completed.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records indicated that 97 percent of custody and 100 percent of nursing staff had CPR certification.  Ninety-four percent of custody staff completed annual suicide prevention block training, while only 22 percent of medical personnel, who were mostly new employees, had recently completed the training.  No mental health staff had completed the annual suicide prevention training.  All mental health clinicians received the seven-hour SRE training and had completed the mentoring program.

**Recent Suicides**:  There was one inmate suicide at CCC during 2012-2014.  In that case (CCC 5), the inmate was found hanging by a sheet from the top bunk of his administrative segregation cell during the morning of September 7, 2014.  He had entered CDCR on February 4, 2013 and was transferred to CCC on May 28, 2013, where he was subsequently designated to a conservation camp.  He had a prior history of Anxiety and Adjustment Disorders, but was not a caseload inmate at the time of his death.  He escaped from the camp on September 2, 2014, but was apprehended two days later.  He was returned to CCC and rehoused in administrative segregation.  The inmate was the sole occupant of a cell that was not designated for new intake, and therefore, was not suicide-resistant.  As the time of this report, the eUHR and other documents from the CDCR secure website, including  the Suicide Report (which had not been completed), had not been examined by this reviewer.

## 33)   **High Desert State Prison (HDSP)**

**Inspection**: July 10-11, 2014

HDSP housed 3,309 inmates, of which the vast majority were at Level IV classification.  The institution had a ten-bed CTC, with all rooms available as MHCBs, and three administrative

segregation units in buildings D-7, D-8, and the Z-Unit. Approximately 30 percent of HDSP inmates were on the mental health caseload, with 960 3CMS and 21 EOP inmates. Two safety cells in the CTC, namely, a seclusion and an observation cell, were designated as alternative housing cells for inmates awaiting MHCB transfer.

**Screening/Assessment**: The reviewer did not observe new admissions during the medical intake screening process on July 10-11, 2014. Observation of daily psych tech rounds in Building D-7 and in the Z-Unit on July 10 and 11 indicated two psych techs who were accurately conducting and documenting their rounds.

**Housing**: With two exceptions, all of the beds in HDSP's CTC were suicide-resistant. The two exceptions were that some MHCBs had handicap railing that was not suicide-resistant, as the railing had gaps between the rail and wall as opposed to being a solid railing, while stainless steel sinks had sharp edges that protruded from the wall and could be used as an anchoring device in a hanging attempt. These sinks could be retrofitted by adding stainless steel triangle extensions to each side of the sinks. Until recently, mental health clinicians had initially placed most inmates in safety cells to "weed out suspected manipulative behavior" prior to consideration for MHCB placement. The CMH corrected this problematic practice in June 2014 during preparation for this site visit.

HDSP's three administrative segregation units had a total of 15 retrofitted, suicide-resistant cells for new intake inmates; Building D-7, which was used for caseload inmates, had eight cells, Building D-8, which was used for overflow, had five cells, and the Z-Unit had two cells. Buildings D-7 and D-8 had undergone renovation immediately prior to the site visit; administrative segregation inmates had been transferred back and forth between the two units during the past several months. During the site visit, almost all of the eight new intake cells in Building D-7 were full and there were at least nine inmates who were housed in the unit for 72 hours or less housed in unsafe, non-retrofitted cells. Building D-7's eight new intake cells also were not completely suicide-resistant; each cell contained desk stools that were held in place with vertical brackets attached to the wall that could be used as an anchoring device in a suicide hanging attempt.

**Observation**: The HDSP CTC used Suicide Precaution and Suicide Watch for suicidal inmates. However, all other inmates in the MHCB who were not on suicide observation were observed by nursing staff at two-hour intervals, which was problematic. Also, until June 2014, CTC nursing staff used an older version of the CDCR observation form that contained pre-printed 15-minute time intervals, thus not allowing for documentation at staggered intervals. Observation forms were <u>not</u> located outside of the MHCBs, but were on a clipboard in the Nurse's Station; this increased the possibility of inmates not being consistently observed.

During the tour of the three administrative segregation units, unit logs for D-7 and D-8 that were used to document 30-minute welfare checks prior to full implementation of the Guard One system in mid-May 2014 were reviewed. Log review for March and April 2014 revealed 97 percent compliance for 30-minute welfare checks. Review of Guard One data for all three administrative segregation units for selected 24-hour periods in June 2014 indicated overall compliance at approximately 90 percent. However, contrary to CDCR policy, correctional staff

had <u>not</u> been conducting 30-minute rounds in the Z-Unit until shortly after an inmate suicide in that unit on February 27, 2014.

**Management/Treatment Planning**:  eUHR review of inmates on suicide observation and of those referred to mental health on an urgent and/or emergent basis indicated that clinical staff consistently saw inmates daily when on suicide observation, and that inmates who were referred to mental health were generally seen timely.  However, problems were found related to incomplete SREs and treatment planning.  In one case (<u>HDSP 1</u>), the inmate was placed in the MHCB on April 14, 2014 and discharged by a psychiatrist at the 3CMS LOC several days later without an SRE, and thus without a treatment plan.  In another case (<u>HDSP 2</u>), the inmate was discharged from the MHCB on May 19, 2014 without an SRE and, although five-day follow-up was provided, there was no treatment plan.  In a third case (<u>HDSP 3</u>), the inmate was discharged from the MHCB on May 14, 2014 and the SRE's treatment plan section stated the following: "Discharge from MHCB to EOP LOC; future treatment recommendation - medication compliance for continuing mood/psychosis stability, development of coping skills and distraction techniques with frequent reality testing.  These to be achieved through individual group therapy as well as medication management."  Review of subsequent five-day follow-up and weekly progress notes from the inmate's PC did not indicate concordance with the above treatment plan.

Several IDTT meetings for MHCB inmates held on July 10, 2014 were observed.  IDTT meetings were well-represented, with two psychologists, a psychiatrist by way of remote access, two nurses, a RT, and a correctional counselor in attendance.  However, only the psychologists and psychiatrist were fully engaged during these IDTT meetings; other treatment team members were silent.  The IDTT meetings were also somewhat problematic due to limited suicide risk inquiry.  In one case (<u>HDSP 4</u>), the inmate had been placed on Suicide Watch in a MHCB the previous evening due to SI.  Although there was little discussion during the IDTT meeting as to his SI, the treatment team reduced his level of observation to Suicide Precaution.  It was unclear whether an SRE had been completed.  In another case (<u>HDSP 5</u>), the inmate was in the MHCB for approximately one week and the treatment team discharged him to the EOP LOC without a suicide risk inquiry.

Emergency mental health referrals for SI from January through July 2014 were examined.  Eighteen of these referrals were found in the MHTS and an additional 16 were found in the TTA Logs.  Review of the 34 eUHRs indicated that SREs were completed in 33 of 34 or 97 percent of cases.

**Intervention**:  Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**:  Training records indicated that 96 percent of custody and 99 percent of nursing staff had CPR certification.  Ninety-nine percent of custody staff was compliant with annual suicide prevention block training, but neither medical nor mental health staff completed this training.  Ninety-four percent of mental health clinicians received the seven-hour SRE training and 100 percent completed the mentoring program.

**Recent Suicides**:  HDSP had two inmate suicides during 2012-2014.  In the **<u>first</u>** case (<u>HDSP 6</u>),

the inmate asphyxiated himself with two cable/extension cords around his neck and a piece of cloth in his mouth during the very early morning of May 6, 2013.  He had entered CDCR in April 2008 to serve a 34-year sentence for robbery and assault with a deadly weapon.  He was transferred to HDSP in October 2008.  He had three RVRs during his confinement, the last of which occurred in February 2013 and involved gang activity during an organized inmate group workout in administrative segregation.  It did not appear that he had any recent family support; the last family visit occurred in June 2009.  The inmate had no significant medical problems.

Upon entry into CDCR in April 2008, the inmate did not report any community mental health treatment, but was referred to the mental health caseload for evaluation after presenting with depressive symptoms and reporting AH.  He was subsequently placed at the 3CMS LOC with a diagnosis of Schizoaffective Disorder and was prescribed psychotropic medication.  He denied any current or previous history of SI.  All SREs completed for him during 2008 and 2009 indicated a "low" chronic and acute suicide risk.  He was discharged from the mental health caseload in April 2009 at his own request following a period of stability.  The CDCR reviewer indicated that his request for removal from mental health services may have been related to his gang affiliation.  The inmate also staged a brief one-week hunger strike in June 2012 in protest of an RVR.

The CDCR reviewer did not offer any specific precipitating factors for the suicide and a suicide note was not found.  However, the reviewer speculated that letters and poems found in his cell reflected themes of anguish and regret about a life he would never experience, including a wife and children, because of his long incarceration.  The Suicide Report contained three bases for recommendations for corrective action through a QIP; all were related to deficiencies in the emergency medical response to the inmate's suicide on May 6, 2013:

> (1) Twenty-four minutes elapsed between when the inmate was discovered unresponsive in his cell and when first responders first entered the cell; (2) Emergency response documentation noted the first use of the AED in the TTA at 0330.  (Policy requires that responding health care staff transport an AED to the incident scene); (3) According to the Form 837 Incident Report, the emergency response vehicle took 15 minutes to move from Facility D, Building 3 to the TTA.

It should also be noted that most of the 24-minute delay in entering the cell was due to officers changing into personal protective equipment (PPE) due to observation of blood coming from the victim's mouth.

In the **second** case (HDSP 7), the inmate was found hanging by a t-shirt from the ventilation grate of his administrative segregation cell during the early morning of February 27, 2014.  He had entered CDCR in March 2013 to serve a five-year sentence for burglary and receipt of stolen property.  He was transferred to HDSP in June 2013.  He had one RVR during his confinement for battery on an officer on August 13, 2013, resulting in his placement in administrative segregation.  He appeared to have had significant family support.  He received routine medical treatment for psoriasis and back pain; the CDCR reviewer did not believe that either condition was a contributing factor to the suicide.

Prior to CDCR confinement, although the inmate received treatment for ADHD as a teenager, he did not report any other mental health problems other than substance abuse.  Following CDCR admission in March 2013, he denied any current mental health concerns and any SI or history of suicidal behavior.  Two months later in May 2013, a psychiatrist accidentally saw him following submission of a health care request that was suspiciously written in different handwriting and contained a different first name than that of the inmate. The inmate denied any mental health concerns or mental illness history, but reported prior substance abuse.  He again denied any current or prior history of SI and his mental status appeared within normal limits.  However, the psychiatrist diagnosed the inmate with Mood Disorder NOS and Amphetamine Dependence, and recommended that he be seen by his PC in the GP.  However, the inmate was never enrolled in the mental health caseload.  He thus did not have a PC and was not seen again.

The CDCR reviewer did not offer any specific precipitating factors for the suicide.  A suicide note and several unfinished letters found in his cell appeared disjointed and suggested rumination and a possible untreated mental illness.  Other possible precipitating factors were the inmate's initial placement in administrative segregation for safety concerns, while the subsequent alleged battery on an officer had resulted in a referral to the local district attorney for prosecution, and a sanctioned SHU term.  The court ordered an inmate psychological evaluation during a court hearing on January 30, 2014.

The Suicide Report contained three bases for recommendations for corrective action through a QIP:

> (1) According to the July 2013 memorandum, security check should be documented.  At HDSP, the ASU security checks were conducted but not logged as required.  This is a  policy violation; (2) PPE kits were utilized because of reported visible bodily fluids.  After review of emergency procedures, medical appeared to be waiting at the cell door for custody to put on their PPEs which appeared to influence timely cell entry and commencement of CPR; and (3) According to the Emergency Room Medical Response System policy, the AED is to be brought to the emergency scene and utilized immediately.  During the inmate's emergency response, the AED was not applied until arrival at the TTA.

The failure to promptly enter the cell and respond to the scene with an AED were found in both HDSP suicide cases.  These deficiencies had not been corrected following the inmate suicide the previous year (HDSP 6).

This reviewer would note two additional concerns in the case.  First, the CDCR reviewer indicated a "significant concern" that the inmate was diagnosed with a Mood Disorder in May 2013 and referred to a PC that never existed because he was not on the mental health caseload.  However, it was unclear why the CDCR reviewer did not develop a formal corrective action or recommend further inquiry as to whether the inmate *should* have been enrolled on the mental health caseload.  Second, the CDCR reviewer was not correct in stating that "ASU security checks were conducted but not logged as required."  During inspection of the Z-Unit at HDSP on

177

July 11, 2014, correctional staff admitted that they had <u>not</u> been conducting 30-minute rounds in the Z-Unit, but rounds were only initiated after the inmate suicide on February 27, 2014.

## 34)   **Pelican Bay State Prison (PBSP)**

**Inspection**: July 23-24, 2014

PBSP housed 2,824 inmates, with the vast majority at Level IV classification.  The institution had a 14-bed CTC, with ten rooms designated as MHCBs.  Administrative segregation units were located in Buildings A-1, A-2 and the Z-Unit, the PSU was in B-2, and there were 22 SHUs in Buildings C and D.  PBSP was unique in that 42 percent of the inmate population was housed in a SHU.  Nine percent of PBSP inmates were caseload inmates; there were 171 inmates at the 3CMS  and 78 at  EOP.  Two CTC safety cells, namely a seclusion and an observation cell, were designated as alternative housing cells for inmates awaiting MHCB transfer.

**Screening/Assessment**:  Several new admissions observed during the medical intake screening process on July 23, 2014 were problematic.  Two nurses conducted intake screening in two separate large holding cells in the R & R Unit; a room that was routinely utilized as a Nurse's Office in similarly configured R & R Units at other CDCR facilities housed a large piece of photo identification equipment.  Inmates accompanied by two officers were brought into a holding cell.  Each officer held one of the inmate's arms as the screening was conducted.  Privacy and confidentiality thus were obviously compromised.  It was further reported that when the large holding cells were not available due to the high volume of incoming inmates, the screening process was conducted outside of these holding cells in a similarly non-confidential environment.  Observation of both nurses revealed that they were <u>not</u> asking the inmate whether he was *currently* suicidal.  Similar to previous findings at the CHCF, examination of the Initial Health Screening CDCR 7277 Form used at PBSP revealed that it was defective because the critical question of whether the inmate was currently suicidal had been deleted.  DCHCS officials previously reported that the question had been inadvertently deleted and sent out from headquarters in May 2014.

Observation of daily psych tech rounds in administrative segregation Building A-1 indicated adequate rounding.

SHU rounds conducted by a psychologist on July 24 were observed.  These rounds were scheduled to be conducted on a weekly basis; one clinician was assigned to approximately 1,200 inmates assigned to PBSP's 22 SHUs.  The psychologist conducted rounds in approximately four SHU units per day.  Caseload inmates were not housed in the SHUs, therefore, observed rounds were brief, with limited inmate interaction.  The clinician indicated that developing rapport with SHU inmates was challenging and that most preferred not to interact with mental health staff.  When asked whether the distribution of Sudoku puzzles or other CDCR-approved word games, which were commonly found in other lockdown units within CDCR facilities, might be helpful in initiating conversations with inmates, the psychologist was resistant; he stated his belief that the puzzles were not therapeutic, while their distribution was not his responsibility.

**Housing**:  All CTC cells were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging SA.

The three administrative segregation units contained a total of nine cells identified by CDCR as retrofitted for new intake inmates.  Building A-1, which was used for caseload inmates, had two cells, Building A-2, which was also used for caseload inmates but was not housing new intake inmates, also had two cells, and the Z-Unit had five cells.  Although Building A-1 only had two retrofitted cells (117-118), the unit's correctional staff reported that up to 20 (113-122 and 213-222 in Sections B and C) were used for new intake inmates.  However, the two retrofitted cells in Building A-1 had large gauge grate windows that were on the inside of the cell door, with Lexan panels on the outside, but otherwise were suicide-resistant.  Several other cells in sections B and C that were used for new intake inmates had various hazards, including gaps between the wall and bunk and between the wall and desk, and stools with horizontal brackets that were attached to the wall.  Several new intake inmates were housed in these unsafe cells, including an inmate who had recently returned from a DSH program at the CHCF on July 21, 2014.

**Observation**:  Although Suicide Precaution and Suicide Watch were the only CDCR-authorized levels of observation for suicidal inmates, the CTC also regularly used psychiatric observation and/or behavior checks.  Although CDCR had not sanctioned this practice and it was not referenced in the *Program Guide*, PBSP mental health officials previously developed an LOP for Suicide Prevention and Response that contained a brief explanation of psychiatric observation: "Whenever an inmate-patient exhibits unusual behavior or becomes dangerous to self or others....To prevent suicide and/or injury to self, others, and staff."

In fact, it appeared that behavior checks often were the *only* level of observation that PBSP used.  Of eight inmates in the MHCB on July 23, 2014, all were on behavior checks.  All of the inmates in an MHCB were considered at "moderate" or "high" risk for suicide, but were only required to be observed at 60-minute intervals.  Despite this low level of observation, most inmates were deprived of their clothing and issued a safety smock, safety mattress, and safety blanket.  In one case (PBSP 1), the inmate was escorted to the CTC on March 15, 2014 after correctional staff observed him placing a ligature around his neck.  Upon assessment by both a psychologist and psychiatrist, he admitted to being suicidal and stated "I've had enough.  Death has always been a thought.  I'd rather suicide than face certain things.  I can't deal with close relationships.....I tried to kill myself earlier today."  He told the clinicians that his cellmate had returned earlier than anticipated and "got custody involved."  Although not a caseload inmate, he self-reported a prior history of SAs.  He was diagnosed with Mood Disorder NOS, with a diagnosis rationale that "patient has a long history of viewing self as someone who should never have been born and has a history of four SAs with regret none resulted in a completed suicide."  An SRE was completed and found the inmate to be at "high" acute risk and "moderate" chronic risk for suicide.  *The inmate was admitted to an MHCB with observation at 60-minute intervals*.

In another case, an inmate (PBSP 2) was admitted to an MHCB on June 21, 2014 with observation at 60-minute intervals after an SRE found him to be at "moderate" acute risk for suicide due to "SI with a vague plan."  On July 18, 2014, an inmate (PBSP 3) was admitted to an MHCB after an SRE found him to be at "high" acute risk for suicide due to SI and "recent psychotic and depressive symptoms, recent losses, hopelessness, single cell placement, potential

reported safety issue, and early into current prison term." He was placed on 60-minute behavior checks. All of the above cases involved different PBSP clinicians.

Unit logs from A-1, A-2, and the Z-Unit were reviewed regarding documentation of 30-minute welfare checks prior to full implementation of the Guard One system in mid-May 2014. Review of unit logs for February, March, and April 2014 found 98 percent compliance with 30-minute checks. Review of Guard One data for all three administrative segregation units for selected 24-hour periods in June 2014 found overall compliance at 95 percent. Review of Guard One data for the PSU during selected 24-hour periods in June 2014 found overall compliance at 99 percent.

The institution's 22 SHUs had yet to be required to activate the Guard One system at the time of this site visit. PBSP officials reported that the 30-minute welfare check requirement in the SHUs had been suspended in June 2013 due to the "unique physical design" of the units having a "negative impact on staff and inmates at PBSP."[3] As such, welfare checks within the SHUs were typically conducted at 60-minute intervals.

**Management/Treatment Planning**: eUHR review of inmates on suicide observation and of inmates referred to mental health on an urgent and/or emergent basis indicated that inmates were consistently seen by clinical staff daily when on suicide observation and that inmates referred to mental health were generally seen timely. However, there were other problems related to incomplete SREs and treatment planning. In one case (PBSP 4), the inmate was placed in an MHCB during the evening of January 20, 2014 for SI and required observation at 15-minute intervals. On the next day, January 21, a psychologist completed an SRE that found him to be at "low" acute risk and "moderate" chronic suicide risk. However, the SRE was completed *without* an inmate interview and was based on eUHR review and discussion with other staff. Despite the inmate not being interviewed, the clinician lowered his observation level from Suicide Precaution at 15-minute intervals to 60-minute behavior checks. The clinician stated that a decision on the issuance of clothing would be deferred, stating "no increase in issue, as we are unable to assess patient's status in order to increase his issue, at this time."

Treatment planning was problematic in other cases. In one case (PBSP 5), the inmate was discharged from an MHCB on June 25, 2014 with the following treatment plan contained within the SRE: "I/P is being discharged back to custody and his sending institution at the CCCMS LOC for symptom and medication management. Five-day follow post discharge. Follow-up with psychiatry and psychology within seven days for on-going medication management and stabilization." In a previously referenced case (PBSP 2), the inmate was admitted to the MHCB for SI on June 21, 2014, and then discharged on June 30, with the following treatment plan contained within the SRE: "Discharge to custody at CCCMS LOC, pending transportation to return to DVI, with 5-day follow-up, safety check log, psychiatry and CM lines in 7 days." Other than reciting *Program Guide* requirements, these treatment plans did not contain specific strategies to reduce SI.

---

[3]In addition to the "unique physical design," other reasons listed for the suspension of 30-minute welfare checks in the SHUs were staff shortages, increased staff injuries, and an alleged increase in inmate complaints.

The reviewer observed IDTT meetings in the PSU and CTC. The IDTT meetings of two inmates housed in the CTC were observed on July 24, 2014. The IDTT meetings were well-represented, with a psychiatrist, DSH coordinator, RT, correctional counselor, and several psychologists and nurses in attendance. There was very good interaction between the inmate and the treatment team during each meeting and good discussion between treatment team members as to strategies for these inmates' stabilization. At the conclusion of the IDTT meetings, this reviewer asked team members why, contrary to *Program Guide* requirements, most suicidal inmates were admitted to the MHCB with observation at 60-minute intervals? The IDTT treatment team had no explanation as to why this practice occurred.

The reviewer examined emergency mental health referrals for SI from January through July 2014. Of these referrals, 36 were found in the MHTS and an additional 12 were found in the TTA Logs. eUHR review found that 18 of 22 or 82 percent had completed SREs. One case (PBSP 6) symbolized the problem of not consistently completing SREs as required. On February 24, 2014, a psych tech initiated an emergency mental health referral of the inmate after he was observed engaging in self-injurious behavior by cutting his forearms with his fingernails. He was escorted to the EOP clinic and seen by a nurse. He stated that "I feel better now," and told the nurse that "when he feels stress he cuts himself to feel better but denies ever being suicidal." The nurse contacted the on-call clinician who "advised to go back to housing and submit emergency referral for tomorrow morning." An SRE was not completed. The inmate was seen by another clinician on February 25, the following morning, and an SRE was still not completed. A few weeks later on March 12, 2014, the inmate was again observed engaging in the same self-injurious behavior as he did on February 24. However, this time he was admitted to the MHCB. On March 13, the following day, an SRE was completed and indicated that the inmate had multiple prior SAs by both hanging and cutting from 2004 through 2013. He admitted that "cutting could be a way to get attention" and to relieve stress in dealing with an upcoming parole hearing, scheduled for next month, and probable deportation back to Mexico. This critical information could have been gathered earlier, and appropriate treatment provided, if an SRE had been previously completed on February 24.

**Intervention**: Toured housing units all contained an emergency response bag that included a micro shield, Ambu-bag, and cut-down tool.

**Training**: Training records indicated that 96 percent of custody and 100 percent of nursing staff had CPR certification. Ninety-six percent of custody staff was compliant with annual suicide prevention block training, but neither medical nor mental health staff completed this training. Eighty-nine percent of mental health clinicians received the seven-hour SRE training and completed the mentoring program.

**Recent Suicides**: PBSP had one inmate suicide during 2012-2014. In that case (PBSP 7), the inmate was found hanging by a sheet from the bunk of his administrative segregation cell during the afternoon of February 24, 2014. His body was in the state of *rigor mortis*. The inmate had entered CDCR in January 2007 to serve a 15-year sentence for assault with a firearm and firing into an inhabited vehicle. He was transferred to PBSP on January 14, 2014 and was housed in administrative segregation because of two pending disciplinary reports for obstructing a peace officer. He had 20 RVRs during his confinement, mostly for assaultive behavior; the last was in

181

November 2013 for fighting.  The inmate had recently renounced his gang affiliation and had received notification on February 12, 2014 that he was approved for transfer to an appropriate SNY.  He had adequate family support, with visits and letter correspondence.  He did not have any significant medical problems.

Upon entry into CDCR in January 2007, the inmate did not report any mental health concerns or prior treatment in the community.  However, he and other family members reportedly had substance abuse problems.  He denied SI and a history of suicidal behavior.  He had intermittent contact with mental health clinicians throughout his CDCR confinement.  For example, following his self-report of depression while confined in administrative segregation in February 2008, he was diagnosed with Adjustment Disorder, Mixed, and Anti-Social Personality Disorder, but was not admitted to the mental health caseload.  Several months later in September 2008, a psychiatrist saw him for an evaluation of psychotropic medication needs due to increased stress, but he was not prescribed any medication nor received further assessments.  On December 5, 2013, while housed in administrative segregation at HDSP, he threatened suicide and was admitted to an MHCB at the institution.  He was discharged from the MHCB on December 16, 2013 and returned to administrative segregation at HDSP.  An SRE determined that he was at both "low" chronic and acute risk for suicide.  He was again diagnosed with Adjustment Disorder with Mixed Disturbance, but was not enrolled in the mental health caseload.  Three days later on December 19, 2013, an emergency mental health referral was initiated after he reported vague AH and SI.  The responding clinician completed an SRE that found the "I/P has a documented history of attempting to gain access to certain desired changes in his environment by using conditional language of suicidal verbal behavior.  When P/C explained directly and clearly that the two options were for the I/P to be sent back to housing or be admitted to CTC, I/P recanted his suicidal language and stated he just wanted a shower."  The inmate was then returned to administrative segregation.

On January 9, 2014, custody staff generated an urgent mental health referral after a member of the inmate's family called HDSP and expressed concern about his mental health.  He was subsequently seen by a clinician.  The inmate appeared stable and denied mental health problems.  When the inmate arrived at PBSP the following week on January 14, 2014, he informed the intake nurse that he had experienced SI before his transport from HDSP and further reported "auditory hallucinations but that they do not tell him to hurt himself or others." Although he denied SI, an urgent mental health referral was initiated and the inmate was seen by a clinician the following morning, on January 15.  He told the clinician that "I have safety concerns. I'm afraid for my life. I need protective custody right now. I don't want mental health."  The inmate denied any current SI.  Two days later on January 17, he was again referred to mental health by custody staff, who noted that he was "incapable of caring for himself, confused, disoriented, hostile, assaultive, poor tension, needs med review, exhibits bizarre behavior, unpredictable, hears things."  Custody described him as "yelling and throwing himself at the cell door."  However, when seen by a clinician, he denied SI or mental health concerns. He was diagnosed with Personality Disorder NOS.

A psych tech saw him during daily rounds two days later on January 19, which was incorrectly listed as January 21 in the Suicide Report.  At that time, his behavior was observed as bizarre, his mood as manic, his insight and judgment as poor, and his thought processes and content as

jumbled.  He was referred to, and seen by, a mental health clinician on January 22.  He appeared "uncooperative, guarded, evasive," his mental status was found to be within normal limits, and the clinician did not believe he met the inmate caseload criteria.

On February 5, 2014, custody staff initiated another mental health referral that stated "Third referral from custody since 01-15-2014, he appears paranoid and inappropriate affect."  The following day, February 6, a mental health referral was initiated by a psych tech who stated, "Possible delusional thought process and has thrown himself into the cell door and punching walls....Needs psychotropic medication review, exhibits bizarre behavior, hears things/sees things/imagine things."  The inmate was subsequently seen by a clinician who noted that "he did appear to be responding to internal stimuli and appeared to be talking to himself.  He was advised that he will be admitted to CCCMS for a monitoring period due to four mental health referrals and recent MHCB admission."  The inmate was seen at his initial IDTT meeting on February 12, 2014 and given diagnoses of Adjustment Disorder, with Disturbance of Mood and Conduct, and Personality Disorder NOS, with Narcissistic, Anti-Social, Borderline and Histrionic Traits.

On February 18, 2014, a clinician saw the inmate, who denied having mental health problems.  The inmate was uncooperative.  The clinician submitted a psychiatric referral for medication review due to "possible delusional thought process and has thrown himself into the cell door and punching walls."  He was seen by a psychiatrist that same day, who noted the inmate "with no prior mental health services, suddenly now hearing radio waves, throwing himself against the cell walls, intense religious delusion .... 'safety concerns' hiding out in the MHSDS for secondary gains."  He was not seen again by mental health staff and committed suicide one week later.

The CDCR reviewer did not offer any specific precipitating factors for the suicide and a suicide note was not found.  Although the Suicide Report contained only one basis for recommendation for corrective action, the reviewer raised several concerns, including observation that the inmate "routinely and throughout his incarceration refused out-of-cell contact with mental health and custody staff.  He signed refusals only when required.  Inmate appears to have systematically desensitized staff to his lack of cooperation, by often refusing to even acknowledge the presence of custody and mental health staff when they came to the cell."  The reviewer noted that the SRE completed on February 6, 2014 incorrectly rated the inmate as both a "low" chronic and acute risk for suicide and incorrectly listed several protective factors that were not substantiated.  Based on the inmate's chronically bizarre behavior, the reviewer asked mental health officials to "Please address methods of intervention with patients that may be refusing services and frequently coming to the attention of staff for disruptive and strange behaviors."  It was unclear whether the reviewer was addressing these concerns to HDSP or PBSP officials, or both.  The reviewer also expressed concern that the inmate had not been initially placed at the 3CMS LOC following his MHCB discharge at HDSP on December 13, 2013.  The only recommendation contained within the Suicide Report was a broad plea to all CDCR facilities:  "Appropriate intervention and identification, assessment, and treatment of complex mental disorders has been a concern noted in a number of suicide cases, and is highlighted in the current review.  This suggests a need for further training for clinical staff in the institutions."

This reviewer notes that this case presents several other concerns.  First, although this reviewer was informed during both the HDSP and PBSP site visits that this case presented several deficiencies, and that subsequent corrective actions had been completed, it was unclear why the Suicide Report did not include formal recommendations for corrective action based on the CDCR reviewer's multiple concerns. Second, although at least two psych techs initiated mental health referrals based on the inmate's bizarre behavior, review of weekly Psych Tech Daily Rounds Forms for the three-week period prior to the inmate's suicide suggested that he was consistently displaying behavior within normal limits.  Such a description was inconsistent with the concerning behavior noted by custody, mental health, and other psych techs.  Finally, the CDCR reviewer failed to address the fact that, due to the inmate's body being found in a state of rigor mortis, administrative segregation correctional staff had failed to observe him at 30-minute intervals.

## ACRONYMS and ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Manager System |
| ACH: | Acute Care Hospital |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| AED: | Automatic External Defibrillator |
| AH: | Auditory Hallucinations |
| AHU: | Alternative Housing Unit |
| Ambu bag: | Ambulatory Bag Used for CPR |
| APP: | Acute Psychiatric Program at Vacaville |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| BPH: | Board of Parole Hearings |
| C-file: | Central File |
| CAL: | Calipatria State Prison |
| CAP: | Corrective Action Plan |
| CBT: | Cognitive Behavioral Therapy |
| CCC: | California Correctional Center |
| CCI: | California Correctional Institution |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEN: | Centinela State Prison |
| CEO: | Chief Executive Officer |
| CHCF: | California Health Care Facility |

| | |
|---|---|
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |
| CM: | Case Manager |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMH: | Chief of Mental Health |
| CNA: | Certified Nursing Assistant |
| CO: | Correctional Officer |
| CPAP: | Continuous Positive Airway Pressure |
| CPR: | Cardiopulmonary Resuscitation |
| CQIT: | Continuous Quality Improvement Tool |
| CRC: | California Rehabilitation Center |
| CSATF : | California Substance Abuse Treatment Facility |
| CSP: | California State Prison |
| CSP/Cor: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| CTF: | California Training Facility/Soledad |
| CVSP: | Chuckawalla Valley State Prison |
| CYA: | California Youth Authority |
| DAI: | Division of Adult Institutions |

| | |
|---|---|
| DBT: | Dialectical Behavioral Therapy |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmentally Disabled Person |
| DMH: | Department of Mental Health |
| DNR: | Do Not Resuscitate |
| DSH: | Department of State Hospitals |
| DVI: | Deuel Vocational Institution |
| EB: | East Block |
| EOP: | Enhanced Outpatient Program |
| eUHR: | Electronic Unit Health Record |
| FSP: | Folsom State Prison |
| GP: | General Population |
| HCPOP: | Health Care Placement Oversight Program |
| HDSP: | High Desert State Prison |
| HI: | Homicidal Ideation |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| IDTT: | Interdisciplinary Treatment Team |
| IGI: | Institutional Gang Investigators |
| I/P: | Inmate/Patient |
| ISP: | Ironwood State Prison |
| IST: | In-Service Training *or* Incompetent to Stand Trial |
| ISU: | Investigative Services Unit |

KVSP:            Kern Valley State Prison

LOC:             Level of Care

LOP:             Local Operating Procedure

LPT:             Licensed Psychiatric Technician

MAR:             Medication Administration Record

MCPS:            Modified Property Control Status

MCSP:            Mule Creek State Prison

MHCB:            Mental Health Crisis Bed

MHCBU:           Mental Health Crisis Bed Unit

MHOHU:           Mental Health Outpatient Housing Unit

MHSDS:           Mental Health Services Delivery System

MHTP:            Mental Health Treatment Plan

MHTS:            Mental Health Tracking System

MOD:             Medical Officer of the Day

MSE:             Mental Status Examination

NKSP:            North Kern State Prison

NOS:             Not Otherwise Specified

OHU:             Outpatient Housing Unit

OIA:             Office of Internal Affairs

OP:              Operating Procedure

PBSP:            Pelican Bay State Prison

PC:              Primary Clinician

PCP:             Primary Care Physician

| | |
|---|---|
| PIA: | Prison Industry Authority |
| PIP: | Psychiatric Inpatient Program |
| PPE: | Personal Protective Equipment |
| PREA: | Prison Rape Elimination Act |
| PRN: | As Needed |
| PSH: | Patton State Hospital |
| PSU: | Psychiatrist Services Unit |
| PT: | Psychiatric Technician or Psych Tech |
| PTSD: | Post-Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| R&R: | Reception and Receiving |
| RC: | Reception Center |
| RJD: | Richard J. Donovan Correctional Facility |
| R/O: | Rule Out |
| RT: | Recreational Therapist |
| RVR: | Rule Violation Report |
| SA: | Suicide Attempt |
| SCC: | Sierra Conservation Center |
| SHU: | Secured Housing Unit |
| SI: | Suicidal Ideation |
| SMY: | Small Management Yard |
| SNF: | Skilled Nursing Facility |

SNY:               Sensitive Needs Yard

SOMS:              Strategic Offender Management System

SOAP:              Subjective Objective Assessment and Plan

SPRFIT:            Suicide Prevention and Response Focused Improvement Team

SQ:                San Quentin State Prison

SRA:               Suicide Risk Assessment

SRE:               Suicide Risk Evaluation

SVPP:              Salinas Valley Psychiatric Program

SVSP:              Salinas Valley State Prison

TTA:               Triage and Treatment Area

VH:                Visual Hallucinations

VSP:               Valley State Prison

VPP:               Vacaville Psychiatric Program

WSP:               Wasco State Prison

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DAD P |
| Plaintiffs, | |
| v. | **ORDER** |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

Between November 12, 2013 and July 24, 2014, the Special Master's expert, Lindsay M. Hayes, M.S., conducted a comprehensive audit of suicide prevention practices in each of the thirty-four prisons operated by the California Department of Corrections and Rehabilitation (CDCR). On January 14, 2015, the Special Master filed a report on Mr. Hayes' audit, ECF No. 5258, together with Mr. Hayes' report on that audit, ECF No. 5259.

Mr. Hayes' audit followed agreement by the Suicide Prevention Management Workgroup that "an expert assessment of current suicide prevention practices in all 34 CDCR prisons was needed for the workgroup to carry out its charge." ECF No. 5259 at 1.[1] The audit is based on on-site assessments of suicide prevention practices at each of CDCR's thirty-four prisons and included review of suicide prevention local operating procedures, health care records

---

[1] The Suicide Prevention Management Workgroup was established by court order filed July 12, 2013, ECF No. 4693.

1

1   of inmates on suicide watch, records of inmates referred to the mental health program for

2   assessment of suicide risk, minutes from meetings of institutional Suicide Prevention and

3   Response Focused Improvement Teams (SPRFITs), and all inmate suicides between 2012 to the

4   time of individual institutional visits by the auditor.  ECF No. 5259 at 1-2.

5           Mr. Hayes' report includes numerous findings made during the audit and contains

6   a comprehensive set of recommendations.  It was distributed in draft to the parties in November

7   2014 and the parties were given thirty days to submit comments and/or objections to the draft

8   report to the Special Master.  ECF No. 5258 at 4.  Plaintiffs submitted to the Special Master a

9   request for additional recommendations in several areas.  ECF No. 5258 at 4.  Beyond his

10  summary of plaintiffs' request, the Special Master has chosen not to include plaintiffs'

11  recommendations for consideration by the court at this time.  ECF No. 5258 at 4.[2]  Defendants'

12  "particularized responses" to the recommendations made by Mr. Hayes have been incorporated

13  into the final expert report filed on January 14, 2015.  *See* ECF No. 5258 at 4.

14          The Special Master reports that he agrees with Mr. Hayes' recommendations and

15  he recommends that defendants be ordered to adopt those recommendations and work with him in

16  the Suicide Prevention Management Workgroup, "and otherwise as may be necessary, on the

17  development of strategies and the implementation of the changes and practices described in the

18  recommendations. . . ."  ECF No. 5258 at 5.  The Special Master also requests an order requiring

19  him to provide an update to the court on defendants' implementation of suicide prevention

20  policies and practices, either in his Twenty-Sixth Round Monitoring Report or as soon thereafter

21  as practicable.  Neither party has filed objections to the Special Master's report or the order he

22  requests.  In addition, neither party has filed objections to the final expert report filed with the

23  Special Master's report.  It appears from review of the expert's report that defendants have agreed

24  to work on, or are already working on, the great majority of the expert's recommendations, either

25  in the context of the Suicide Prevention Management Workgroup or otherwise with the Special

26

---

27  [2] The court previously has noted that requests for court orders based on recommendations made
    by the Special Master's suicide prevention experts should be made, if at all, by the Special
28  Master.  Order filed November 23, 2009 at 13-14, ECF No. 3731.

1    Master.  Where there is apparent hesitation by defendants about a particular recommendation they

2    have represented a willingness to discuss the issue further in the Suicide Prevention Management

3    Workgroup.  *See, e.g.*, ECF No. 5259 at 30-31 nn. 40-41.

4               After review of both reports, and good cause appearing, IT IS HEREBY

5    ORDERED that:

6               1.  Defendants shall adopt the recommendations contained in the Special Master's

7    Report on his Expert's Audit, ECF No. 5258, and shall work with the Special Master in the

8    Suicide Prevention Management Workgroup and otherwise as may be necessary on the

9    development of strategies and the implementation of the changes and practices contained in those

10   recommendations; and

11              2.  The Special Master shall provide an update to the court on defendants' progress

12   in implementing suicide prevention policies and practices either in his Twenty-Sixth Round

13   Monitoring Report or in a companion report to be filed therewith.

14   DATED:  February 3, 2015.

15

16   _____

17   UNITED STATES DISTRICT JUDGE

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
     Plaintiffs

v.                        No. CIV S-90-0520 KJM KJN P

EDMUND G. BROWN, JR., et al.,
     Defendants

**TWENTY-SIXTH ROUND MONITORING REPORT OF THE
SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH
PROVISIONALLY APPROVED PLANS,
POLICIES, AND PROTOCOLS**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & WEST LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
(401) 824-5100
Fax: (401) 824-5123
May 6, 2016

## ACRONYMS and ABBREVIATIONS

3CMS:               Correctional Clinical Case Management System

Ambu bag:           Ambulatory Bag Used for CPR

ASH:                Atascadero State Hospital

ASP:                Avenal State Prison

C-file:             Case File

C&PR:               Classification and Parole Representative

Calipatria:         Calipatria State Prison

CAP:                Corrective Action Plan

CAPIC:              California Psychology Internship Council

CC I:               Correctional Counselor I

CC II:              Correctional Counselor II

CCAT:               Correctional Clinical Assessment Team

CCC:                California Correctional Center

CCI:                California Correctional Institution

CCWF:               Central California Women's Facility

CDCR:               California Department of Corrections and Rehabilitation

Centinela:          Centinela State Prison

CHCF:               California Health Care Facility

CIM:                    California Institution for Men

CIW:                    California Institution for Women

CMC:                    California Men's Colony

CMF:                    California Medical Facility

CO:                     Correctional Officer

CPR:                    Cardiopulmonary Resuscitation

CQI:                    Continuous Quality Improvement

CQIT:                   Continuous Quality Improvement Tool

CRC:                    California Rehabilitation Center

CSATF:                  California Substance Abuse Treatment Facility

CSP/Corcoran:           California State Prison/Corcoran

CSP/LAC:                California State Prison/Los Angeles County

CSP/Sac:                California State Prison/Sacramento

CSP/Solano:             California State Prison/Solano

CTC:                    Correctional Treatment Center

CTF:                    Correctional Training Facility

CVSP:                   Chuckawalla Valley State Prison

DCHCS:                  Division of Correctional Health Care Services

DSH:                    Department of State Hospitals

DOT:                    Direct Observation Therapy

DVI:                    Deuel Vocational Institution

EOP:                    Enhanced Outpatient Program

ERRC:                   Emergency Response Review Committee

eUHR:                   Electronic Unit Health Record

FIT:                    Focused Improvement Team

Folsom:                 Folsom State Prison

FTE:                    Full-time Equivalent

GACH:                   General Acute Care Hospital

HDSP:                   High Desert State Prison

HPS I:                  Health Program Specialist I

HS:                     *Hora Somni*/Hour of Sleep

ICC:                    Institutional Classification Committee

ICF:                    Intermediate Care Facility

IDTT:                   Interdisciplinary Treatment Team

ISP:                    Ironwood State Prison

KVSP:                   Kern Valley State Prison

LOP:                    Local Operating Procedure

LTRH:                   Long Term Restricted Housing

MAPIP:                  Medication Administration Process Improvement Project

MAR:                    Medication Administration Record

MCSP:                   Mule Creek State Prison

MHCB:                   Mental Health Crisis Bed

MHOHU:                  Mental Health Outpatient Housing Unit

MHSDS:                  Mental Health Services Delivery System

MHTS.net:               Mental Health Tracking System

MERD:                   Minimum Eligible Release Date

MPIMS:                  Madrid Patient Information Management System

NKSP:                   North Kern State Prison

OHU:                    Outpatient Housing Unit

PBSP:                   Pelican Bay State Prison

PC:                     Primary Clinician

PSH:                    Patton State Hospital

PSU:                    Psychiatric Services Unit

PVSP:                   Pleasant Valley State Prison

QIP:                    Quality Improvement Plan

QIT:                    Quality Improvement Team

RJD:                    Richard J. Donovan Correctional Facility

RVR:                    Rule Violation Report

SCC:                    Sierra Conservation Center

| | |
|---|---|
| SHU: | Security Housing Unit |
| SNY: | Sensitive Needs Yard |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |
| SRE: | Suicide Risk Evaluation |
| SSI: | Supplemental Security Income |
| STRH: | Short Term Restricted Housing |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| TCMP: | Transitional Case Management Program |
| TTA: | Triage and Treatment Area |
| VSP: | Valley State Prison |
| VPP: | Vacaville Psychiatric Program at CMF |
| WSP: | Wasco State Prison |

# TABLE OF CONTENTS

**ACRONYMS and ABBREVIATIONS**     i

**THE COLEMAN SPECIAL MASTER'S TWENTY-SIXTH ROUND MONITORING REPORT**     1

**Introduction**     1

**Overview**     6

**SUMMARY OF THE SPECIAL MASTER'S FINDINGS**     12

I.     Mental Health Staffing in CDCR Prisons     12

II.     Quality Management     27

III.     Medication Management     33

IV.     Rules Violation Reports     41

V.     Custody/Mental Health Relations     50

VI.     Program Access     57

VII.     Construction of Mental Health Treatment Space and Beds for Inmates at Various Levels of Care     65

VIII.     Access to Higher Levels of Care     73

    A.     Overview of the Special Master's Findings During the Twenty-Sixth Round     73

    B.     The Role of Access to Higher Levels of Care in Coleman Remediation     74

    C.     Historical Context of the Access-to-Care Problem in CDCR Prisons     75

    D.     The Special Master's Findings on Access to Higher Levels of Care during the Twenty-Sixth Round     79

IX.     Administrative Segregation EOP     86

X.     CDCR's Continuous Quality Improvement Process: Implications for the Quality of Care Delivered in CDCR's Mental Health Program     94

    A.     The Evolution from Quality Management to Quality Improvement     94

    B.     The Special Master's Findings on the Quality of Care

Delivered During the Twenty-Sixth Monitoring Period
Substantiate the Need for a Sound and Durable Quality
Improvement Process in CDCR's Mental Health Program       103

1.   Issues with Use of the Interdisciplinary Treatment
     Team Process                                          104

2.   Treatment Planning Concerns                           107

     a.   Documentation Issues                             107

     b.   Inadequacies of Treatment Plans                  108

     c.   Lack of Needed Modifications and Updating
          of Treatment Plans to Respond to Inmates'
          Current Mental Health Issues                     110

     d.   Failures to Implement Designated Treatment
          Interventions                                    111

     e.   Care Was Not Sufficiently Individualized to
          Address Inmates' Clinical Needs                  111

**CONCLUSION AND RECOMMENDATIONS**                         118

**APPENDIX A - INSTITUTIONAL SUMMARIES**                   133

California State Prison/ Sacramento (CSP/Sac)              133

Folsom State Prison (Folsom)                               150

California Health Care Facility (CHCF)                     159

Pelican Bay State Prison (PBSP)                            175

High Desert State Prison (HDSP)                            189

California Correctional Center (CCC)                       201

Mule Creek State Prison (MCSP)                             205

Sierra Conservation Center (SCC)                           225

California Medical Facility (CMF)                          231

California State Prison/Solano (CSP/Solano)               247

San Quentin State Prison (SQ)                              259

Deuel Vocational Institution (DVI)                         279

California State Prison/Corcoran (CSP/Corcoran)           293

California Substance Abuse Treatment Facility (CSATF)     312

Pleasant Valley State Prison (PVSP)     325

Avenal State Prison (ASP)     339

Salinas Valley State Prison (SVSP)     350

Correctional Training Facility (CTF)     366

California Men's Colony (CMC)     374

Wasco State Prison (WSP)     389

Kern Valley State Prison (KVSP)     401

North Kern State Prison (NKSP)     414

California State Prison, Los Angeles County (CSP/LAC)     432

California Correctional Institution (CCI)     443

California Institution for Men (CIM)     454

California Rehabilitation Center (CRC)     469

Richard J. Donovan Correctional Facility (RJD)     475

Ironwood State Prison (ISP)     498

Calipatria State Prison (CSP)     503

Centinela State Prison (Centinela)     508

Chuckawalla Valley State Prison (CVSP)     513

California Institution for Women (CIW)     518

Central California Women's Facility (CCWF)     532

Valley State Prison (VSP)     544

**APPENDIX B – CLINICAL CASE REVIEWS**     556

California State Prison, Sacramento (CSP/Sac)     557

Folsom State Prison (Folsom)     561

California Health Care Facility     566

Pelican Bay State Prison (PBSP)     573

High Desert State Prison (HDSP)     585

California Correctional Center (CCC)     595

Mule Creek State Prison (MCSP)                                        601

California Medical Facility (CMF)                                     608

California State Prison, Solano (CSP/Solano)                          623

San Quentin State Prison (SQ)                                         629

Deuel Vocational Institution (DVI)                                    642

California State Prison, Corcoran (CSP/Corcoran)                      649

California Substance Abuse Treatment Facility (CSATF)                 666

Pleasant Valley State Prison (PVSP)                                   670

Avenal State Prison (ASP)                                             688

Salinas Valley State Prison (SVSP)                                    702

Correctional Training Facility (CTF)                                  708

California Men's Colony (CMC)                                         713

Wasco State Prison (WSP)                                              717

Kern Valley State Prison (KVSP)                                       732

North Kern State Prison (NKSP)                                        739

California State Prison, Los Angeles County (CSP/LAC)                 749

California Correctional Institution (CCI)                             753

California Institution for Men (CIM)                                  759

California Rehabilitation Center (CRC)                                767

Richard J. Donovan Correctional Facility (RJD)                       771

California Institution for Women (CIW)                                781

Central California Women's Facility (CCWF)                            798

Valley State Prison (VSP)                                             803

**APPENDIX C - IDEAS FOR CONSIDERATION FOR TWENTY-
SEVENTH ROUND MONITORING**                                           807

ix

# THE *COLEMAN* SPECIAL MASTER'S
# TWENTY-SIXTH ROUND MONITORING REPORT

## Introduction

This report covers the Special Master's Twenty-Sixth Monitoring Round review of the defendants' compliance with the plans, policies, and protocols that were provisionally approved by this Court in mid-1997, subsequently revised and re-approved by this Court on March 3, 2006 (Order, ECF 1773), and currently known as the Revised *Coleman* Program Guide (Program Guide). The Special Master's monitor's and expert's[1] institutional site visits for the Twenty-Sixth Monitoring Round began on February 3, 2015 and ended on July 23, 2015. Institutional mental health staff and administrators of the California Department of Corrections and Rehabilitation (CDCR) continued their ongoing full cooperation with the Special Master's monitoring staff at the institutional site visits.

The monitor conducted full on-site visits at all 34 CDCR adult institutions,[2] as it had been approximately two and a half years since the monitor's last on-site prison tour for the preceding monitoring period had ended in late August 2012. Between that time and the Twenty-Sixth

---

[1]Although the collected data and findings discussed in this Report are the product of members of different monitoring teams, the various monitors are referred to collectively as "the monitor." Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."

[2]Avenal State Prison (ASP), California Correctional Center (CCC), California Correctional Institution (CCI), California Health Care Facility (CHCF), California Institution for Men (CIM), California Institution for Women (CIW), California Medical Facility (CMF), California Men's Colony (CMC), California Rehabilitation Center (CRC), California State Prison/Corcoran (CSP/Corcoran), California State Prison/Los Angeles County (CSP/LAC), California State Prison/Sacramento (CSP/Sac), California State Prison/Solano (CSP/Solano), California Substance Abuse Treatment Program (CSATF), Calipatria State Prison (Calipatria), Centinela State Prison (Centinela), Central California Women's Facility (CCWF), Chuckawalla Valley State Prison (CVSP), Correctional Training Facility (CTF), Deuel Vocational Institution (DVI), Folsom State Prison (Folsom), High Desert State Prison (HDSP), Ironwood State Prison (ISP), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), North Kern State Prison (NKSP), Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP), Richard J. Donovan Correctional Facility (RJD), Salinas Valley State Prison (SVSP), San Quentin State Prison (SQ), Sierra Conservation Center (SCC), Wasco State Prison (WSP), and Valley State Prison (VSP).

Monitoring Round, there was a proliferation of orders and projects that were changing the CDCR prison mental health landscape.

A very important project has been, and continues to be, CDCR's development of its continuous quality improvement process (CQI), including its self-auditing tool known at the Continuous Quality Improvement Tool (CQIT).  This process has very significant positive implications for the future of mental health care delivery within CDCR's prisons.  Thus far, developments in this area appear to indicate that CQI and CQIT are potentially a durable remedy for *Coleman* remediation, with the attendant the hope that they set the course and lead to the conclusion of the *Coleman* case.  A detailed discussion of the background and utility of CQI and CQIT is set forth below in Part X of this report.

Other significant activities which occurred since the preceding monitoring period included:

- Litigation and denial of the defendants' motion to terminate *Coleman* federal court oversight;

- Litigation and orders on plaintiffs' post-termination motions for relief in the areas of inpatient treatment, segregated housing, Enhanced Outpatient Program (EOP) administrative segregation hubs, use of force, and inmate disciplinary measures;

- Revision of use-of-force policies and procedures;

- Changes in the use of Guard One in the PBSP SHU;

- Development of plans and policies for changes affecting mental health inmates housed in administrative segregation units;

- Completion and activation of the SQ PIP and the CIW PIP and monitoring thereof;

- Monitoring and reporting by the Special Master on delivery of care to *Coleman* class members in DSH and CDCR inpatient programs;

- CDCR examination and certification of EOP administrative segregation hubs;

2

- Development of CDCR's new mental health staffing plan;

- Monitoring and reporting by the Special Master on implementation of agreed-to changes to Rule Violation Report (RVR) policies and procedures; and

- Settlement of the *Hecker*[3] litigation and transition of surviving *Hecker* issues[4] into *Coleman* monitoring.

Also, since the time when defendants' motion to terminate *Coleman* federal court oversight was denied on April 5, 2013, CDCR's mental health caseload population has surged while its total in-custody population has fallen.  As of April 19, 2013[5], CDCR's mental health caseload population was 32,525 and as of April 3, 2013[6], CDCR's total in-custody population was 132,533, making the mental health caseload population comprise 24.5 percent of the total population.  As of December, 2015[7], CDCR's average total mental health caseload population had risen to approximately 36,800 and as of February 24, 2016[8], CDCR's total in-custody population declined to 127,303, making the mental health caseload population comprise 28.9 percent of the total population.  Stated otherwise, during the same timeframe, CDCR's mental health caseload population rose by approximately 4,275 while its total inmate population fell by

---

[3]*Hecker v. CDCR*, No. 2:05-CV-02441 (E.D. Cal.)
[4]Now referred to as "Program Access" issues.

[5] Closest date to April 5, 2013 for which CDCR's total mental health caseload population was reported; source: CDCR Secure Website, posting covering April 2013.
[6] Closest date to April 5, 2013 for which CDCR's total in-custody population was reported; source: CDCR Public Website, Population Reports.
[7] As of this writing, most recent date for which CDCR's current mental health caseload population has been reported; source: "An Update to the Future of California Corrections, January 2016," p. 12.
[8] As of this writing, the most recent date for which CDCR total in-custody population has been reported; source: CDCR Public Website, Population Reports.

approximately 5,230.  This divergence of populations suggests that a study of the reasons behind it, and whether it is likely to continue, may be in order.

The core monitoring focus areas covered in the Twenty-Sixth Round were institutional mental health staffing levels, quality management, medication management, and transfers to higher levels of care.  Unlike in the past, the monitor did not examine suicide prevention practices at the institutions during this round, as the Special Master's expert Lindsay Hayes was simultaneously conducting a follow-up audit of suicide prevention policies, practices, and procedures, plus individual non-clinical suicide case reviews, in 18 selected CDCR prisons.   His report on the results of his re-audit, and the Special Master's accompanying report, were filed on January 20, 2016 (ECF 5396, 5395)

The monitor also continued to examine the provision of mental health services in the institutions' reception centers, administrative segregation units, administrative segregation EOP hubs, Mental Health Crisis Beds (MHCB), mainline EOPs, and Correctional Clinical Case Management System (3CMS) programs, and reviewed the institutions' use of alternative housing for mental health inmates, referrals of inmates for mental health assessments and treatment, use of force on mental health caseload inmates, staff training on the Rules Violation Reports process, institutional compliance with heat plans, as well as inmate access to mental health appointments, relationships/collaboration between custody and mental health staffs, among other items affecting the delivery of mental health care to inmates.

Since the preceding monitoring period, the Special Master successfully guided the parties in the *Hecker* litigation to a settlement.[9]  By stipulation, the few surviving issues in *Hecker* were merged into *Coleman* monitoring and were reviewed within the Twenty-Sixth Monitoring Round for the first time as part of regular compliance monitoring.  The monitor's findings on these issues are discussed below under the heading of "Program Access."

The format of this report has been modified in order to provide a more streamlined and readable statement of the Special Master's findings.  In previous reports, summaries of the monitor's findings by focus area were attached as Appendix A.  In this report, they are incorporated into the body of the report. They now also include relevant background information to assist the reader's understanding of the subject matter, plus the Special Master's commentary on the monitor's findings and its significance to the overall *Coleman* remedial effort at present. The summaries of the focus areas appear below, as Parts I through X, in the same order in which they are discussed within the individual summaries of the Special Master's findings at each institution.  Appendix A is now comprised of institution-by-institution summaries of the monitor's findings during the Twenty-Sixth Round. The Special Master's expert's clinical reviews of individual inmate cases now appear in Appendix B.  Lastly, some ideas with regard to areas to be monitored in the upcoming Twenty-Seventh Round are presented in Appendix C for consideration and future discussion.

_____

[9] Members of the *Hecker* plaintiff class were recipients of mental health services in CDCR prisons and were, by definition, also members of the *Coleman* plaintiff class.  Their *Hecker* claims arose from denial of access for mental health caseload inmates to certain educational, training, and job programs that were available to other, non-disabled CDCR inmates.

**Overview**

In the Twenty-Sixth Round, the monitor found that, since the preceding monitoring period, institutional performance had improved in some areas, remained generally static in other areas, and had regressed in yet others. One area of concern that emerged from the monitor's findings was mental health staffing. [*See* Part I, below]. Chronic understaffing of CDCR mental health positions had not improved, while CDCR's implementation of its most recent mental health staffing plan, which was filed over a year ago on February 2, 2015 (ECF 5269) seems to have stagnated, leaving CDCR somewhat adrift with mental health staffing.

Vacancies in the key mental health clinical disciplines of psychiatry and psychology remained problematic and were nearly unchanged from rates in 1998, when psychiatrists' and psychologists' vacancy rates were 35 percent and 14.8 percent, respectively. In 2015, vacancy rates in these disciplines were 32 percent and 15 percent respectively. The work necessary to resolving the mental health staffing problem needs to be completed quickly and meaningfully, for without adequate staff, even the best of plans for mental health care are at risk of remaining merely an abstraction. Because of the delay in defendants' implementation of their staffing plan, covering it in this report would have been premature. Accordingly, the Special Master recommends that he be directed to report on it in a free-standing report at a later time. *See* Conclusion and Recommendations, below.

The core structure of CDCR's quality management process remained generally in place and functional during the monitoring period, corroborating the Special Master's findings during the preceding monitoring period that it has in fact taken root [*See* Part II, below], and that further development and implementation of CDCR's continuous quality improvement process is indicated. [*See* Part X, below]. In the meantime, because the monitor found that psychiatrists,

6

psychologists, and social workers at some institutions were not all receiving peer review, the Special Master encourages CDCR to take all necessary steps to complete and implement its new peer review process and ensure that all institutional mental health staff in these disciplines receive peer review.

Part III below covers the Special Master's findings in the area of medication management, which continued to indicate that CDCR's improved levels of compliance in this area had continued overall.  It is anticipated that Medication Administration Process Improvement Project (MAPIP) will continue to assist institutional performance in this area.

Part IV below provides an update on developments in the area of the new RVR policies and procedures since the Special Master's January 30, 2015 report on the RVR process.  As the staff training on the revised policies and procedures did not take place until quite late in the Twenty-Sixth Monitoring Round, implementation of the new RVR policies and procedures will be monitored in the upcoming Twenty-Seventh Round, by which time they should have had the opportunity to become established within the prisons.

Twenty-Sixth Round Monitoring found that long-ingrained cultural conflicts between custody and mental health operations still persisted, despite past efforts to address and end this problem.  [*See* Part V, below].  This is a disappointing and very troubling finding.  The problem must be rectified before it interferes with the viability of the mental health program any further.  CDCR should give serious consideration to extending its custody/mental health collaboration training program throughout all of its institutions.  The Special Master will be looking closely at this area during the Twenty-Seventh Round.

7

The few lingering issues on inmates' access to educational and work assignments that survived settlement of the *Hecker*[10] litigation were incorporated into regular *Coleman* monitoring for the first time in the Twenty-Sixth Round.  [See Part VI, below].  They, along with some new elements of Program Access that are under development, will again be examined in the Twenty-Seventh Round.

After a long history of extended delays, all of the court-ordered construction projects have been completed.  [*See* Part VII, below].  This is an important accomplishment.  However, the CDCR HCFIP and infill projects remain incomplete as of this time.  In 2012, funding was authorized for the HCFIP and three Level II dorm infill projects at existing institutions.  The HCFIP projects which will impact mental health treatment consist of renovations and construction of primary care clinics, mental health clinics, screening rooms, and examination rooms at eleven institutions.  The HCFIP projects are now projected for completion during the summer of 2017.  The infill projects, which will add Level II dorms at MCSP and RJD and increase the number of beds for the Level II EOP population, are slated for completion in May 2016.  A detailed discussion of these projects and their history can be found in Part VII, below.

Finding a solution to the problem of inmate suicides in CDCR prisons has continued to be a matter of concern and a focus of the Special Master's efforts.  On January 18, 2013, when the Twenty-Fifth Round Monitoring Report was filed, 33 CDCR inmate suicides had occurred during the immediately preceding calendar year 2012.  The rate of suicides at that time was

---

[10] *Hecker v. Schwarzenegger*, 2:05-CV-02441 (E.D. Cal.)

24.46 per 100,000, as compared to the rate of 16 per 100,000 across U.S. state prisons at that time, and a CDCR inmate was dying by suicide every 11.06 days, on average.

As initially referenced in his Twenty-Fifth Monitoring Round Report, the Special Master proceeded to organize a suicide-prevention work group, known as the Suicide Prevention Management Workgroup (SPMW), to address this long-standing problem.  The Workgroup reviewed and reached consensus on nearly all of the many suicide prevention strategies it studied and considered during the past year. Details of this work and results thus far are covered in Mr. Hayes' report, "An Audit of Suicide Prevention Practices in the Prisons of the CDCR," filed January 14, 2015, ECF 5259, and his more recent follow-up report, "A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the CDCR," filed January 13, 2016, ECF 5396.

In addition, the Special Master's expert has been attending and offering guidance to CDCR's death review committee in its reviews of inmate suicide cases.  The intent and plan is to promote CDCR's advancement of its own suicide prevention and review, thereby helping CDCR move closer to assuming the role of self-monitoring and correcting of its issues in suicide prevention, i.e. adopting a quality improvement model for its suicide prevention program.  This is one aspect of the larger, multi-dimensional transition from the quality management model to the quality improvement model in CDCR.  In the meantime, the Special Master's psychiatric expert continues to provide his annual CDCR suicide reviews, the most recent of which was filed on January 15, 2016, "Report on Suicides Completed in the CDCR January 1, 2013 - December 31, 2013," ECF 5399.   Release of the psychiatric expert's annual review of suicides in 2014 is expected in the near future.

On the subject of inmates' access to higher levels of care, the Special Master reported in his Twenty-Fifth Monitoring Round Report overall progress with the institutions' use of the

sustainable process for identifying and referring inmates in need of inpatient care.  In the same report, the Special Master also reported that, to the extent the process identified need for MHCBs that was above projections in defendants' Spring 2012 long-range mental health bed plan ("the Blueprint"), defendants were ordered to ensure that the bed plan provided for an adequate number of beds to meet that need.  The Fall 2012 Population Projections, dated November 2012, appeared to indicate that the number of planned MHCBs would be sufficient.

While the two foregoing statements appeared to bode well for access to inpatient care and MHCBs, the Twenty-Sixth Round of monitoring found concerns surrounding Interdisciplinary Treatment Teams' (IDTT) use of CDCR Form 7388B and its associated process for identification and referral of inmates to higher levels of care. Issues found by the Special Master's expert in this important area are discussed below from the standpoints of institutional practices and individual inmate cases in Parts VIII and X, respectively.  Monitoring in the Twenty-Sixth Round also found a downturn in the availability of MHCBs, in contrast to findings during the preceding round which were encouraging, with indications that the numbers of available MHCBs were increasing and the long-persistent shortage of MHCBs was beginning to ease.  During the Twenty-Sixth Round, it appeared that growing wait lists for inpatient care beds was causing a surge in the number of inmates awaiting transfer to inpatient beds as they remained in their MHCBs pending transfer.  The monitor's findings in this regard are discussed in Part VIII, below.

Concerns surrounding the mental health care and treatment of *Coleman* plaintiff class inmates in CDCR segregated housing units have a long history.  In his Twenty-Fifth Round Monitoring Report, the Special Master discussed long-standing concerns with the excessively long stays for EOP inmates in administrative segregation hubs, citing data indicating that as of

10

September 7, 2012, 87 EOP inmates in administrative segregation had been housed there longer than 90 days.[11]  As of April 5, 2013, when the defendants' motion to terminate federal court oversight in this matter was denied, there were 498 EOP inmates in CDCR's administrative segregation hubs.  By February 5, 2016, that number grew to 699, or by nearly 30 percent in less than three years.  The bottom line is that more and more inmates at the EOP level of care are housed in administrative segregation, requiring necessary care and treatment in a setting that has historically been seriously problematic for inmates at that level of care.  Part XIV below discusses the background and status of the various new plans, policies, and procedures that emanated from a comprehensive order entered on April 10, 2014, ECF 5131, and that will hopefully finally resolve the persistent issues in administrative segregation faced by many mental health caseload inmates who are housed there.

Part X below is a discussion of the background, development, and status of CDCR's continuous quality improvement process, which is poised to advance further along toward implementation of the Department's self-monitoring tool known as the Continuous Quality Improvement Tool (CQIT) in CDCR prisons.  Part X also discusses the Special Master's findings and issues surrounding the *quality* of mental health care being provided to individual inmates, particularly in the areas of institutional IDTTs, their development of treatment plans for the mentally ill inmates whose cases come before them, and their use of the sustainable process for identifying and referring inmates in need of higher levels of care.  The Special Master's expert found notable underperformance in the realm of IDTT activities during the Twenty-Sixth Round,

---

[11] Source: CDCR Secure Website, posted November 1, 2012.

as discussed in detail in Part X below.  It is hoped that the monitor's findings and the discussion in Part X will assist CDCR's focus on future use of its promising CQI process generally and its further development and refinement of its CQIT, to improve the institutions' performance in the area of IDTT functions and wherever else improvements to the care are needed.

<u>Summary of the Special Master's Findings</u>

I.     <u>Mental Health Staffing in CDCR Prisons</u>

    A.     <u>History of Mental Health Staffing in *Coleman*</u>

The history of CDCR's struggle to implement a viable staffing plan for the provision of adequate mental health treatment has been long and tortured, and the problem remains unresolved.  In its remedial order of September 1995, the *Coleman* Court ruled, "[t]he overwhelming weight of evidence before this court demonstrates that the California Department of Corrections is significantly and chronically understaffed in the area of mental health care services.  The department does not have sufficient staff to treat large numbers of mentally ill inmates in its custody." *Coleman v. Wilson*, 912 F. Supp. 1282, 1307 (E.D. Cal. 1995).  At that time, the proportion of CDCR inmates suffering from a serious mental disorder constituted approximately 11 to 15 percent of the overall CDCR prison population, according to defendants' expert, Dr. Joel Dvoskin.  *Id.* at 1301.  During the intervening 20 years, today the proportion of CDCR inmates requiring mental health care has soared to approximately 29 percent of the total inmate population[12], for a mental health population of 36,800 inmates.

---

[12] An Update to the Future of California Corrections, January 2016, p. 12.

12

The findings and recommendations of the Magistrate Judge, which were later adopted by the court in its 1995 remedial order, included the following which relate specifically to staffing:

6. Within (90) days of the order of the district court, defendants shall develop and implement a formula for mental health care staffing ratios at all institutions within the class. Said formula shall be developed in consultation with an expert to be designated by the court after consultation with the Special Master, with defendants to pay the cost of the expert.

7. Within (90) days of the order of the district court, defendants shall develop and implement a recruitment program, including but not limited to provision of adequate compensation, for the recruitment of mental health staff at every institution in the class. Said program shall be developed in consultation with an expert to be designated by the court after consultation with the Special Master, with defendants to pay the cost of the expert.

8. Within (90) days of the order of the district court, defendants shall fill those positions presently authorized for the provision of mental health care services. Within (180) days of the order of the district court, defendants shall fill those positions determined to be necessary under the formula developed in paragraph 7, *supra*,

Findings and Recommendations, filed June 6, 1994, ECF 547, p. 80.

The Special Master began his assessment of defendants' staffing ratios in early 1996. His first report on the adequacy of defendants' staffing *ratios* was filed on November 17, 1998, following a hiatus precipitated by Prison Litigation Reform Act-related litigation at that time, and the development of the initial Program Guide. ECF 993. Since 1998, the Special Master has drafted 17 reports that directly or indirectly addressed staffing deficiencies in the mental health program within CDCR.[13] In addition, staffing vacancies have been addressed in all 25 of the Special Master's preceding monitoring reports.

---

[13] Special Master's Recommendations for Staffing Ratios, (filed 11/20/1998, ECF No.994); Supplementary Recommendations of the Special Master on Staffing Ratios and Administrative Segregation, (filed 5/19/1999, ECF No.1033); Special Master's Report on Staffing Vacancies, (filed 5/19/1999, ECF No.1032); Special Master's Recommendations on Defendants' Request for Extension of Time to Staff Administrative Segregation and Expedite Transfers, (filed 2/7/2000, ECF No.1131); Special Master's Recommendation on the Development of a Retention Plan for Psychiatrists, (filed 4/24/2000, ECF No.1149); Special Master's Report and Recommendations on

The Special Master's first report specifically addressing staffing *vacancies* was submitted on May 19, 1999. ECF 1032.  A statement by the Special Master at that time still pertains today – "The focus of the defendants' contracting effort is overwhelmingly on psychiatrists." *Id*. at 4.

In 2002, defendants were ordered to maintain a vacancy rate among psychiatrists and case managers[14] of not more than ten percent, including contracted services.  ECF 1383, p. 4. Contemporaneously, the parties began to negotiate the content of an updated set of standards for mental health care which would eventually be codified into the 2006 *Coleman* Revised Program Guide.  It was during that period that CDCR commenced a field study to determine the levels of staffing necessary to implement the new Program Guide revisions.  The California Department of Finance approved only a small portion of the staffing allocations recommended by CDCR. After repeated failures to fund the full complement of the recommended staffing allocations, the court ordered CDCR to prepare and present to a special session in August 2006 of the California Legislature a proposal for no less than 738.65 permanent positions. However, the Legislature

---

Psychiatrist and Psychiatric Social Worker Vacancies, (filed 12/19/2000, ECF No.1227); Special Master's Report on Defendants' Compliance with Staffing Enhancements for Administrative Segregation, (filed 9/25/2001, ECF No. 1206); Special Master's First Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 9/26/2001, ECF No.1304); Special Master's Report on the Defendants' Compliance with October 26, 2001 and December 20, 2001 Court Orders, (filed 2/21/2002, ECF No.1350); Special Master's Second Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 2/26/2002, ECF No.1351); Special Master's Third Quarterly Report on Defendants' Efforts to Reduce Staffing Vacancies, (filed 7/9/2002, ECF No.1392); Special Master's Report on Defendants' Schedule of Differential Pay for Mental Health Clinicians in Specific California Department of Corrections Institutions, (filed 5/6/2005, ECF No.1661); Special Master's Report on the Impact of Defendants' Increases in Differential Pay for Mental Health Clinicians in California State Prison, Corcoran, (filed 2/15/2006, ECF No.1762); Special Master's Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to Implement the Revised Program Guide, (filed 6/2/2006, ECF No.1851); Special Master's Supplemental Report on the Status and Sufficiency of the Departments' Budget Requests for Staffing to Implement the Revised Program Guide, (filed 7/28/2006, ECF No.1921); Special Master's Report on Plaintiffs' Response to the Sixteenth Report on Compliance Seeking Salary Enhancements for Department of Mental Health Clinicians, (filed 1/30/2007, ECF No.2121); Special Master's Response to Court's May 17, 2007 Request for Information, (filed 5/31/2007, ECF No.2253).

[14] "Case managers" refers collectively to psychologists and social workers.

14

made appropriations for only a number of positions sufficient to implement the revised Program Guide, which was far less than CDCR's proposal, and requested that CDCR conduct a workload study to determine the necessary level of staffing.

In January 2007, CDCR engaged outside consultants to conduct a statewide mental health staffing workload study. The study was conducted over the course of six months and was presented to CDCR in June 2007.  However, it wasn't until April 2008 that a request was submitted to the Legislature for the 404 positions recommended by the workload study.  At the time of the request, CDCR was already plagued with an abundance of vacant positions, but the Legislature refused to fund additional allocations until all vacant positions had already been filled.

After reviewing the work load study in July of 2008, the Special Master determined that its concept and model were appropriate, but the data used to calculate the number of allocations was faulty.[15]  Given the deficiencies reported by the Special Master and the resistance from the Legislature, the work load study lost its momentum and was abandoned.

Subsequently, in 2009, the defendants were ordered to "continue to take all steps necessary to resolve all outstanding staffing allocation issues," including the development of yet another staffing plan.  ECF 3613, p. 2.  In response to the court order, the Special Master provided guidance and assistance to CDCR in its development of a workable staffing plan. Members of the Special Master's staff met with representatives of CDCR and its DAI, Department of Finance, the Receiver's Office, and the Department of the Attorney General over

---

[15] Letter dated July 12, 2008 from the Special Master to Robin Dezember, Chief Deputy Secretary, Division of Correctional Health Care Services and Lisa A. Tillman, Esq., Deputy Attorney General.

the course of eight months to develop and refine a comprehensive staffing plan.  Defendants

submitted their 2009 Staffing Plan to the court on September 3, 2009. ECF 3693.  The plan was

subsequently endorsed by the Special Master.[16]

In the April 5, 2013 order denying defendants' motion to terminate Coleman federal court

oversight, ECF 4539, the court noted at page 57 that the vacancy rates among psychiatrists, staff

psychologists, and social workers significantly exceeded the ten-percent maximum for those

positions that was ordered by the Court on June 12, 2002. ECF 1383.[17]  The court found that

"[d]efendants have not met their initial burden of showing that seriously mentally ill inmates in

the CDCR no longer face substantial risk of serious harm due to significant shortages in mental

health staffing.  Chronic understaffing continues to hamper the delivery of constitutionally

adequate medical care and is a central part of ongoing constitutional violation in this action."

ECF 4539, p. 62.

On March 18, 2014, in an order relating to activation of mental health units at the

California Health Care Facility, the Court ordered defendants to review whether the current

salary schedule for prison psychiatrists was competitive within California and nationally.  ECF

5116, p. 12.  In response, defendants reported that their prison psychiatrist salaries were within

the range of comparable private and public sector psychiatrists' salaries in California and

nationally, and that they had the authority to offer newly-hired psychiatrists salaries in excess of

the minimum starting salary in the State pay scale range.  ECF 5123, p. 3.

---

[16] Letter dated March 4, 2010 from Matthew A. Lopes. Jr. to Debbie Vorous, Esq., Deputy Attorney General and
Michael Bien, Esq., Plaintiffs' Counsel.
[17] In the June 12, 2002 order, the Court identified psychiatrists and case managers.  Case managers (now known as
primary clinicians) were psychologists and social workers.

16

On June 18, 2014, the court *again* ordered the defendants to revise their existing mental health staffing plan to resolve the ongoing problem of mental health staffing shortages and to come into compliance with the requirements of the court's June 13, 2002 order limiting mental health staff vacancy rates to ten percent.  ECF 5171, p. 4.  The court ordered defendants to "assume primary responsibility for this task, with the Special Master providing guidance and expertise where necessary, to ensure its timely completion, and to ensure that plaintiffs are provided notice and an opportunity for input as appropriate." *Id.* at 3.

On February 2, 2015, defendants filed their "Report on Review of Mental Health Staffing."  ECF 5269.  In this latest plan, defendants reported that they maintained a staffing vacancy rate of less than ten percent, with use of contract staff, for psychologists and social workers.  *Id.* at 6.  However, defendants conceded that even with the use of contract staff, the vacancy rate among psychiatry positions was nearly 20 percent.  *Id.* at 6.  They attributed the difficulty with psychiatry staffing in part to a national shortage of psychiatrists.

To remedy their staffing deficits among both psychiatrists and psychologists, defendants proposed a four-pronged approach:

1. Creation of a psychiatric medical assistant classification to support psychiatrists by taking on clerical tasks currently performed by the psychiatry staff.

2. Expansion of its psychologist internship program and reactivating a fellowship program for psychiatrists.

3. Offer differential pay for civil service psychiatrists and increase contract rates for contract psychiatrists to work in hard to recruit institutions.

4. Continue CDCR's recently expanded telepsychiatry program.

*Id.* at 6-10.

17

The Special Master's expert provided comments and input regarding the telepsychiatry program during its development, and in December 2015 visited the location of the telepsychiatry offices and the institutions to observe the effectiveness of the program.  Observed use of the telepsychiatry process by IDTTs was found satisfactory as a viable option in the absence of live psychiatrists at the institutions.

On May 15, 2015, the court ordered defendants to proceed with the proposals in their report but to seek the approval of the Special Master and leave of court before making any changes in their existing mental health staffing ratios. ECF 5307, p. 6.  The court noted that "inadequate mental health staffing levels have plagued the remedial phase of this litigation since its inception and after almost twenty years of effort this problem must be finally and fully remedied." *Id.* at 5.  On November 12, 2015, at the request of the Special Master, the Court ordered him to include in his Twenty-Sixth Round Monitoring Report a report and recommendations on staffing, as required by the order of May 2015.  ECF 5377.

On February 1, 2016, defendants submitted their "CDCR Status Update to Report on Court-Ordered Staffing Review" ("status update") to the Special Master.  They indicated that additional staffing positions for psychiatrists, psychologists, and social workers had been allocated.[18]  Defendants did not provide the actual numbers of clinicians who were hired since they proposed their current staffing plan on February 2, 2015.

It stands to reason that unless current allocated positions are filled with full-time employees, the addition of yet more unfilled positions will be an exercise in futility.  This

_____

[18] An incidental effect of adding these unfilled new positions to the existing unfilled positions was an increase in the vacancy rate.

concept should not be unfamiliar to defendants as it was first brought to their attention in 1999 when the Special Master reported that "[c]orrective efforts presently underway should increase by nearly 25 percent the defendants' current allocation of authorized psychiatrists. All of these additional psychiatrist positions, of course, will initially be vacant and equally subject to the difficulties impeding the filling of positions already allocated." *Id* at 11.

Another prong in defendants' staffing plan provided differential pay for civil service psychiatrists and increased contract rates for contract psychiatrists in hard to recruit locations. However, obtaining additional money is subject to legislative approval and has proved to be a barrier in the past.  Seeking pay increases to hire and retain clinicians is not a new strategy and dates back more than fifteen years ago.  As the former Special Master indicated in his report on psychiatric and social worker vacancies, "[p]olitical and bureaucratic complications slowed the allocation of the pay increase . . ." ECF 1227, p.1.  The 2015-2016 budget has come and gone and now defendants must wait until the 2016-2017 budget to determine if additional funds will be appropriated by the legislature to fund new pay increases.  It is uncertain whether defendants have a contingency plan if this request for additional funds is denied by the legislature or if they plan on waiting yet another year to re-submit their proposal.  Defendants did report increased registry hours for psychiatrists at most institutions due the increase of registry pay rates.

Although CDCR continued to hire registry medical assistants as reported in the status update, they still had not received approval to hire full-time medical assistants.  Until such time as medical assistants can be hired as full time employees, psychiatrists will remain burdened with paperwork, scheduling and other non-clinical tasks.  This impacts the amount of time they are able to perform the work for which they were hired – treating patients.  Failure to remove

these non-clinical tasks from the daily workload of psychiatrists will continue to have a chilling effect on the hiring and retention of psychiatrists within CDCR.

Since the submission of defendants' report in November 2015, there has been no change in the number of psychologist interns or psychiatry fellows employed by CDCR. This represented another prong of defendants' plan which did not appear to be yielding any positive results.

CDCR employs 37 full-time telepsychiatrists and they are looking to expand this number.[19]  Telepsychiatry was first conceived almost two decades ago as a proposed remedy to alleviate the psychiatry staffing shortage.  It is primarily an option for treatment of inmates at the 3CMS level of care, and a less desirable option for inmates at higher levels of care.  In 1999, the Special Master reported that in reference to telepsychiatry, the "defendants have developed the capability of putting together both medical and mental health patients with physicians and psychiatrists, whether specialists or generalists, in remote locations." *Id* at 11.  In 2015, the Special Master's experts *again* determined that telepsychiatry was a viable method for the delivery of mental health services.  The experts' opinions regarding telepsychiatry have not changed since 1999 when the Special Master reported that his "psychiatric experts have viewed the defendants' telemedicine system and believe it has potentially positive uses within the department's overall plans for the delivery of medical and mental health care." *Id* at 11.  For some inexplicable reason, time stood still for another 17 years on this issue.

---

[19] It should be noted that this expansion requires the construction of additional space which is expected to take another ten to 12 months, but only *after* a new lease has been signed.

While defendants' latest court-ordered staffing plan was submitted over a year ago, they have demonstrated no sense of the required urgency for a meaningful implementation of the plan.  As a result, there has been little to no change in mental health staffing throughout CDCR.  In fact, it could be said that defendants' report was actually submitted almost twenty years ago with little to no action taken on those proposed remedies.  CDCR should immediately begin executing the plan by whatever means necessary to remedy this longstanding barrier to compliance, and if salaries need to be increased, then it should be done forthwith.  These chronic staffing problems cannot be resolved by the mere formulation of new plans; full implementation is required.  Multiple plans submitted over the course of 17 years have proven to be ineffective.

Although vacant mental health clinical positions increase and decrease from year to year, unacceptable vacancy rates remain constant. The remedial phase is now over twenty years old and the same problems surrounding clinical vacancies continue to exist and are themselves now over twenty years old.

### B.    Mental Health Vacancy Rates Overall and by Discipline During the Twenty-Sixth Round

As of October 30, 2015, the total number of all established mental health positions for chief, senior, and staff psychiatrists; chief, senior, and staff psychologists; social workers; psych techs; and recreational therapists was 3,029.12.[20]  Of these established positions, 2,379.5 were filled by full-time employees.  The collective vacancy rate among all of these positions was 21 percent, unchanged from the twenty-fifth monitoring period.  The use of contractors reduced the

---

[20] Source: (excluding for psych techs): CDCR Secure Website for Monthly Reports, posted December 2015, covering the period of November 2015.  Because staffing data for psych techs was not included in the monthly posting, the data reported herein on psych tech staffing was obtained from the individual institutional reports for the Twenty-Sixth Monitoring Period.

functional vacancy rate among all mental health positions to 17 percent, which was a slight

decrease in the functional vacancy rate of 18.3 percent reported in the twenty-fifth monitoring

period.   The overall vacancy rate in mental health staffing decreased slightly during the twenty-

sixth monitoring period.

Chief Psychiatrists

The vacancy rate among the 19 allocated chief psychiatrist positions decreased from 33

percent to 16 percent since the preceding monitoring period and approached a level not seen

since the twenty-third monitoring report.  Contract coverage was not used for any of the vacant

positions.  CHCF, CIW and PBSP operated without chief psychiatrists.

Senior Psychiatrists

The vacancy rate for senior psychiatry decreased from 50 percent to twenty-six percent

since the twenty fifth round monitoring report and was slightly less than the twenty-nine percent

vacancy rate reported in the twenty-third monitoring report.  Of the sixteen institutions with

allocated positions, eleven filled all of them.  CHCF filled one of the two positions and SQ filled

two of the three positions.  Three other institutions – CCI, CIW and CSP/Sac had 100 percent

vacancy rates.  No contractors were used to fill any vacancies.

Staff Psychiatrists

Vacancies for staff psychiatrists remained problematic for CDCR with 181.25 of the

322.3 allocated positions filled resulting in a vacancy rate of 44 percent.  The use of 36.5

contractors reduced the functional vacancy rate to 32 percent.

The eight institutions which had staff psychiatry vacancy rates of ten percent or less were

CCC, Calipatria, Centinela and CVSP, each with one allocated position, CIM with 11 allocated

positions, DVI with two allocated positions, Folsom with three allocated positions and NKSP

22

with ten allocated positions.  Contractors reduced the functional vacancy rate to ten percent or less for one additional institution, CMC.  Fourteen institutions – CHCF, CIW, CMF, CMC, CRC, CSP/Solano, CCWF, CTF, MCSP, PBSP, PVSP, RJD, SQ and SCC – had vacancy rates ranging from 11 percent to 50 percent.  Six institutions, CSP/Corcoran, CSP/LAC, CSP/Sac, SVSP, VSP and WSP had vacancy rates ranging from 62 percent to 79 percent.  ASP, CCI, CSATF, HDSP, ISP and KVSP did not fill any of their line psychiatry allocations with full-time psychiatrists.

#### Chief Psychologists

The number of allocated chief psychologist positions more than doubled from the preceding monitoring period from 28 to 61 positions.  Only CCC and Calipatria did not have any allocated positions for a chief psychologist.  The overall vacancy rate increased by more than five-fold from seven percent to 36 percent.  No contractual coverage was used.

Of the remaining thirty-two institutions, eleven had zero vacancies – CHCF, CIW, CSP/Sac, CSATF, Centinela, ISP, MCSP, NKSP, PBSP, SVSP and SCC.  Eighteen institutions had a 50 percent vacancy rate – ASP, CCI, CIM, CMF, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Solano, CCWF, CTF, DVI, Folsom, HDSP, KVSP, RJD, VSP and WSP.  SQ filled two of its three positions but CVSP and PVSP had 100 percent vacancy rates with one and two allocated positions respectively.

#### Senior Psychologists

The vacancy rates among senior psychologists decreased markedly, from 39 percent to 12 percent, since the preceding monitoring period with 185 of the 209 allocated positions filled by full-time psychologists.  No contractors were used to cover any vacancies.  Centinela and ISP had no allocated positions.

Fifteen institutions – ASP, CCC, CCI, CHCF, CMC, CSP/LAC, Calipatria, CTF, DVI, HDSP, PBSP, RJD, SCC, VSP and WSP – had no vacancies.  CIW, CSP/Sac, KVSP and MCSP had vacancy rates of ten percent or less.  CVSP and Folsom had 100 percent vacancy rates with one and three allocated positions respectively.  The remaining institutions had vacancy rates ranging from 11 percent to 36 percent.

<u>Staff Psychologists</u>

Vacancy rates in staff psychologists decreased slightly since the twenty-fifth monitoring period from 21 percent to 19 percent.  Of the 799 total allocated positions, 647.25 were filled with full-time psychologists and the use of contractors reduced the functional vacancy rate to 15 percent.

CCC, CIM, CSP/Solano, Calipatria, Centinela, and CVSP filled all of their staff psychology positions and another ten institutions – CIW, CMF, CMC, CCWF, CTF, DVI, PVSP, RJD, SQ and VSP had vacancy rates of ten percent or less.  There were nine institutions with vacancy rates ranging from eleven percent to 25 percent – CCI, CHCF, CRC, CSP/Sac, Folsom, ISP, MCSP, PBSP and SVSP.  The remaining institutions – ASP, CSP/Corcoran, CSP/LAC, CSATF, HDSP, KVSP, NKSP, SCC and WSP - had vacancy rates ranging from 26 percent to 44 percent.

<u>Intern Psychologists</u>

There were 27 intern psychologist positions allocated for six institutions.  With 19 positions filled, the overall vacancy rate was 30 percent.  CIM and SQ both filled all four of their positions and CSP/Sac filled each of its allocated two positions.  Seven of the eight positions were filled at RJD as were two of the three positions at VSP.  Of the four allocated positions at CMC, none were filled.

24

Social Workers

The overall vacancy rate among social workers decreased from 24 percent to ten percent since the preceding monitoring period with 395 of the 440 allocated positions filled by full-time employees.  Contractors further reduced the vacancy rate to six percent.

Nine of the institutions had filled all of the allocated positions – CCC, CMF, CSP/LAC, Calipatria, Centinela, KVSP, MCSP, PBSP and VSP.  Another ten institutions had vacancy rates of less than ten percent – CHCF, CIM, CIW, CMC, CSP/Corcoran, HDSP, NKSP, PVSP, RJD and SQ.  With the exception of ASP, which had a vacancy rate of 67 percent, the remaining institutions had vacancy rates ranging from 13 percent to 40 percent.

Psych Techs

Vacancies among all psych techs rose to 21 percent compared to the vacancy rate of 6.5 percent in the twenty-fifth monitoring period.  The use of contractors reduced the functional vacancy rate to 17 percent.  Of the 888.82 allocated positions, 709.5 were filled with an additional 31.88 positions covered by contractors.

Vacancy rates were ten percent or less at eight institutions – CIM, CIW, CMC, CSP/Corcoran, CSATF, CTF, Folsom and MCSP.  Eleven institutions – CHCF, CMF, CSP/LAC, CSP/Sac, DVI, NKSP, RJD, SVSP, SCC, VSP and WSP - had vacancy rates ranging from 11 percent to 25 percent.  Another eight institutions had vacancy rates ranging from 31 percent to 55 percent – CCI, Centinela, CCWF, HDSP, KVSP, PBSP, PVSP and SQ.  The institutions with the highest vacancy rates were the desert institutions – CCC, CVSP and ISP – with vacancy rates of 62 percent, 81 percent and 62 percent respectively.

Recreation Therapists

25

The overall vacancy rate among recreational therapists was 30 percent.  Contractors were used to cover 13.43 positions which reduced the functional vacancy rate to 22 percent.  Of the 243.5 allocated positions, 175.5 were filled with full-time employees.

Seven institutions – CCI, CIW, CCWF, DVI, HDSP, PBSP and VSP – filled all of their recreational therapist positions with full-time employees.  Among the remaining institutions with allocated positions, two – CHCF and MCSP – had vacancy rates of ten percent or less.  At seven institutions – CIM, CMF, CMC, CSP/Sac, RJD, SVSP and SQ – vacancy rates ranged from eleven percent to 30 percent. Vacancy rates at another six institutions – CSP/Corcoran, CSP/LAC, CSATF, KVSP, NKSP and WSP – ranged from 31 percent to 85 percent. CSP/Solano was the only institution that did not fill any of its allocated positions.

<u>Office Techs</u>

Of the 406 allocated office technician positions, 351 were filled for a vacancy rate of 14 percent.  No contractors were employed for any vacant positions.

ASP, CCI, CIM, Calipatria, Centinela, CTF, DVI, NKSP, PVSP and SCC filled all of their positions with full-time employees.  Of the remaining institutions, CHCF, CMC, CCWF, MCSP, SVSP and VSP had vacancy rates of ten percent or less and six institutions – CIW, CSP/LAC, CSATF, Folsom, HDSP and PBSP had vacancy rates ranging from eleven percent to 20 percent.  The remaining eleven institutions had vacancy rates ranging from 21 percent to 40 percent.

The following indicates comparisons between staffing vacancies that existed in 1998 and staffing vacancies during the Twenty-Sixth Round Monitoring period – 17 years later.

26

| Position | Vacancy Rate 1998* | Vacancy Rate 2015* |
|---|---|---|
| Psychiatrists | 35% | 32% |
| Psychologists | 14.8% | 15% |
| Social Workers | 26% | 10% |
| Recreational Therapists | 12.5% | 30% |
| Psych Techs | 15% | 21% |
| Clerical | 11.4% | 14% |

*Does not include contract staff.

Staffing allocations are merely numbers on paper and meaningless unless those positions can be filled with actual clinicians. A plan without the ability to implement it is simply a plan and nothing more. Vacancies in clinical staffing result in the lack of appropriate treatment for mental health inmates and until those clinical vacancies are filled, treatment for inmates suffering from serious mental illness will remain inadequate.

## II.   **Quality Management**:

From the time *Coleman* remedial efforts began, the development and implementation of an effectual quality assurance system has been documented as a necessary element of the remedial plan. In the June 6, 1994 Report and Recommendations issued in this matter, the Magistrate Judge recommended that defendants develop and implement a system of quality assurance and peer review of mental health care services. Report and Recommendations, ECF 547, p. 80. The recommendation was adopted by the Court in *Coleman v. Wilson,* 912 F. Supp. 1282, 1323-1324 (E.D. Cal. 1995). In August 1998, defendants were again ordered to implement a quality assurance process for the delivery of mental health care services. Order, ECF 964, p. 1.

27

In June 2002, defendants were ordered to develop a plan to speed the implementation of the quality assurance process within all CDCR institutions.  Order, ECF 1384, p. 2.

The efforts around quality management/quality assurance have continued throughout the *Coleman* remedial process.  In its August 30, 2012 Order adopting the Special Master's Twenty-Fourth Round Monitoring Report in full, the *Coleman* Court emphasized "…in particular its complete concurrence with the Special Master's finding that '[a]n important goal of the remedial phase of this case is, …, for CDCR itself to assume the mantle of ultimate responsibility for diagnosing of its own problems, i.e. conduct its own 'qualitative analysis,' and create a quality improvement process that it can use to achieve and maintain compliance, and move on to eventual removal from federal court oversight."  Order, ECF 4232, p. 4.

In his Twenty-Fifth Round Monitoring Report, the Special Master followed up on this finding, reporting that work was underway on the development of the new quality improvement process.  During the Twenty-Sixth Monitoring Round, work on the new quality improvement process continued.  As a result, the Special Master's findings and conclusions on quality management discussed in this portion of the report were based on institutional performance under the existing quality management framework.

The core structure of the quality management process remained in place statewide. However, quality management efforts and compliance levels varied across institutions. Generally, the appropriate committees continued to meet regularly, maintain minutes and address pertinent mental health program matters.  In addition, a number of institutions chartered QITs or Focused Improvement Teams (FIT) to address problem areas.

However, at several institutions attendance at mental health subcommittee meetings remained problematic.  This has been an ongoing concern as reported in the Twenty-Fourth and

28

Twenty-Fifth Monitoring Rounds.  As stated in the Special Master's Twenty-Fourth Round

Monitoring Report, "attendance and participation by required members at the various committee

meetings is crucial to their effectiveness."  Without participation by appropriately authorized

personnel, the committee meeting process is reduced to a mere formality that does not serve the

objectives of a functioning quality management program.  Interviews with line staff at a number

of institutions revealed a lack of knowledge of and participation in quality management

activities.  For instance, at NKSP and PVSP, few staff were even aware of the existence of the

mental health subcommittee and almost none had participated in a Quality Improvement Team

(QIT).  At PVSP, clinical staff acknowledged the need for additional feedback in order to

improve the quality of clinical practices.  This finding is particularly concerning as the success of

any quality management and/or quality improvement efforts depends on the involvement of the

line staff who are responsible for carrying out the day-to-day operations.  Staff must first be

aware of where performance improvements are needed, in order to improve performance.  The

collective effort of everyone involved in the operation of a program is critical to improvement

and ultimately to the success of the program.  That includes ensuring that line staff are aware of

quality management/quality improvement efforts and are active participants in the process in

whichever role their job classification should dictate.

    During the Twenty-Sixth Monitoring Round, quality management activities at ASP, CCI,

CIW, CMF, CSP/Corcoran, CSP/Sac, RJD and SQ were effective, well-functioning, useful to

staff, and integrated into overall operations.  Institutions showing improvements since the

preceding monitoring period included CCWF, where the quality management program was

modeled to more closely align with the statewide quality management process.  CIM and CMC

also demonstrated some improvement.

At CCC, HDSP, ISP, PVSP and WSP, there were ongoing problems with achieving a quorum at mental health subcommittee meetings.  At CIW, NKSP and PVSP, line staff was not always aware or informed of quality management activities taking place at their institutions.  In addition, at WSP it was unclear whether the mental health subcommittee was functioning as intended or even able to address the operational issues at the institution.

During the reporting period, local governing bodies were reported to be active and meeting regularly at 12 institutions – CHCF, CMC, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, CCWF, HDSP, MCSP, PBSP, RJD and SQ.  Most institutions held their meetings on a quarterly basis, the local governing bodies at CHCF, CSP/Corcoran and HDSP met more frequently.  Attendance was reported to generally have been good, except at HDSP, where a quorum was met at just two of six meetings held during the review period.

Quality management committee meetings were scheduled monthly at ASP, CCC, CCI, CHCF, CIM, CIW, CMF, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano CSATF, Centinela, CCWF, DVI, Folsom, HDSP, KVSP, MCSP, NKSP, PVSP, RJD, SCC, SVSP, SQ, VSP and WSP.  Most of these institutions held six meetings during the review period, with the exception of CSATF and VSP which each held five meetings.  The quality management committee at Calipatria met twice during the review period.  CTF's quality management committee met 20 times.  The quality management committees at CVSP and ISP were combined and met twice per week, and at PBSP the committee met weekly.

A quorum was generally reported at quality management committee meetings statewide, with a few exceptions.  At CIW, the format used for the meeting minutes made it difficult to determine who the required members of the committee were.  At HDSP, a quorum was met at five of six meetings held during the review period.  MCSP lacked psychiatry attendance during a

portion of the review period, which was subsequently remedied upon the hiring of a chief psychiatrist.

Generally, monthly mental health subcommittee meetings were scheduled at ASP, CCC, CCI, CIM, CIW, CMF, CRC, CSP/Solano, Calipatria, Centinela, CCWF, CVSP, Folsom, HDSP, ISP, KVSP, NKSP, PBSP, PVSP, RJD, SVSP, SCC, VSP and WSP.  However, scheduled meetings did not always occur.  At PVSP, only three of five scheduled meetings took place.  The mental health subcommittee at DVI met one to two times per month.  Meetings were held twice per month at, CHCF, CMC, CSP/Corcoran and CSATF.  Weekly mental health subcommittee meetings were held at CSP/LAC and San Quentin.  At MCSP, mental health subcommittee meetings were held twice weekly.  CSP/Sac held 16 mental health subcommittee meetings during the review period and CTF held ten.

Although critical to the efficacy of the process, mental health subcommittee meeting attendance varied across institutions.  A quorum was regularly reported at mental health subcommittee meetings held at: CCI, CHCF, CIM, CMC, CSP/Corcoran, CSP/LAC, CSP/Solano, CSATF, Calipatria, Centinela, CCWF, CTF, Folsom, KVSP, MCSP, NKSP, RJD, SVSP, SQ, SCC, and VSP.  Institutions that failed to achieve a quorum at up to two scheduled mental health subcommittee meetings included CIW, CMF, DVI and PBSP.  Some institutions failed to attain a quorum at 50 percent or more of scheduled mental health subcommittee meetings.  CCC and ISP achieved a quorum at three of six meetings.  At CVSP, a quorum was achieved at only two of six scheduled meetings.  HDSP achieved a quorum at just one of five mental health subcommittee meetings held during the review period.  At PVSP and at WSP a quorum was not achieved at any of the mental health subcommittee meetings, and at ASP, CRC and CSP/Sac, the minutes did not indicate whether a quorum was achieved.

31

During the review period, QITs were chartered and active at: CCI, CHCF, CIM, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CSATF, Calipatria, CCWF, CTF, DVI, Folsom, ISP, KVSP, MCSP, NKSP, PBSP, RJD, SQ, SCC, and VSP.  FITs were chartered and active at ASP and SVSP.  There were no active QITs at CCC, CRC, Centinela, CVSP, HDSP, PVSP or WSP during the review period.

During the Twenty-Sixth Monitoring Round, CCHCS headquarters was in the process of implementing a standardized peer review process to be used at all 34 CDCR institutions.  In December 2014 a memorandum was issued to chiefs of mental health statewide announcing that training would begin on the peer review scoring process in January 2015.  As a result, peer review activities varied greatly across institutions, as a number of institutions were in the process of transitioning to the new peer review format.

During the review period, some form of peer review took place at 18 institutions.  Peer review was performed for all disciplines at CCI, CIM, CMC, CSP/Sac, CSP/Solano, Centinela, CVSP, DVI, Folsom, HDSP, ISP, MCSP, PBSP, SQ and WSP.  At ASP psychiatrists did not participate in peer review for most of the review period due to staffing shortages.  CIW conducted peer review for psychiatrists and psychologists, but not social workers.  At CMF no documentation of active psychology peer review was provided.  There was no psychiatry peer review at CSATF.  At SCC the primary clinician (PC) peer review process was on hold pending implementation of the new statewide peer review program.

There was no peer review at CCC, CRC, CSP/Corcoran, CSP/LAC, Calipatria, CCWF, CTF, NKSP, RJD, SVSP or VSP during the review period.  CHCF provided a peer review Local Operating Procedure (LOP) dated February 2015.  However no other documentation was provided to indicate whether peer review was in place at CHCF, KVSP or PVSP.  CRC reported

32

a planned implementation of the statewide peer review process in August 2015.  At CSP/LAC, peer review was suspended during the latter half of 2014 and a pilot program was started in December 2014.  At RJD, staff had been trained on the peer review process but it had not yet been implemented.

Peer review is an integral part of the quality management/quality assurance process and a key element in the effort to ensure quality of care for class members.  As reported above, during the Twenty-Sixth Monitoring Round, defendants were in the process of implementing a standardized peer review process for system-wide use at all institutions, resulting in sporadic peer review activities across the state.  Upon implementation of the new peer review process, and going forward, it is vital to the *Coleman* remedial effort that all disciplines, psychiatrists, psychologists and social workers, receive peer review.  The Special Master will monitor implementation of the new standardized peer review process during the twenty-seventh monitoring round.

The Special Master's findings regarding quality improvement statewide, demonstrate that the new quality improvement process remains a necessary element for CDCR to achieve and maintain compliance, and reach the ultimate goal of removal from federal court oversight.  As exhibited above, although the quality management framework of several years remained in place, a number of institutions continued to struggle in certain areas, some of which remained unchanged from previous monitoring rounds.

III.   **Medication Management:**

The CDCR has had a long history of problems with medication management.  As far back as this Court's decision in *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D. Cal. 1995), it was noted that there were "multiple problems with use and management of medication, and

inappropriate use of involuntary medications." *Id*. at 1297. The *Coleman* Court elaborated that whether defendants' mental health care delivery system deprived seriously mentally ill inmates access to adequate mental health care focused on the presence or absence of six factors, including administration of psychotropic medication with appropriate supervision and periodic evaluation. *Id.* at 1298, citing *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558, 1577 (D.Idaho 1984). The Court in *Coleman* further noted that defendants' then current medication management practices were unconstitutional as "defendants' supervision of the use of medication is completely inadequate; prescriptions are not timely refilled, there is no adequate system to prevent hoarding of medication, there is no adequate system to ensure continuity of medication, inmates on psychotropic medication are not adequately monitored, and it appears that some very useful medications are not available because there is not enough staff to do necessary post-medication monitoring." *Id.* at 1309.

The *Coleman* Court further noted that some CDCR institutions lacked protocols for involuntary medication use and that involuntary medication was underutilized, resulting in the de facto denial of procedural safeguards to mentally ill inmates. The Court noted this despite evidence that "suggests that in certain instances involuntary medication may be necessary medical treatment for gravely mentally ill inmates." *Id.* at 1312.

Throughout the history of this case, there were many instances when this Court and the Special Master reported the continuing problems with medication management in the provision of treatment to mental health caseload inmates. Ongoing CDCR violations identified by this Court in its July 23, 2007 order resulted in the recommendation that a Three-Judge Court be convened to consider a prisoner release order. Order, ECF 2320. Evidence of prison conditions through August 2008 that was presented to the Three-Judge Court revealed serious continuing

34

constitutional violations in the delivery of mental health care to CDCR inmates, including

inadequate medication management.  Three-Judge Court Order, ECF 3641.

It should also be noted that the *Plata* and *Coleman* Courts recognized the importance of

these cases not assuming redundant or conflicting paths toward resolution of their interrelated

problems.  On January 25, 2007, the *Coleman*, *Plata*, and *Perez* Courts ordered the Special

Master, the Receiver, and the court representatives to "hold monthly meetings for the purpose of

working collaboratively on issues related to coordination of the remedies in each of the . . .

actions."  Order, ECF 2119.  The coordination process has been ongoing since that time.

Relatedly, the significance of an audit tool to a well-functioning medication management

system for both medical and mental health care in the prison system also became apparent.  As

such, the coordinated efforts of the *Plata* receiver's medical staff, the *Coleman* Special Master's

psychiatric experts, and CDCR staff led to the development of a medication management audit

tool through the MAPIP; the *Perez* court representatives were not involved in MAPIP's initial

development.  This audit tool was designed to apply to all medication administration

management, including mental health.  It was initially piloted at CIM, CSP/Corcoran, and

CCWF, and was then rolled out at the various CDCR institutions.  The implementation process

for MAPIP was very variable across institutions, due to differences among "learning curves" and

available expertise.   As of the Twenty-Sixth Monitoring Round, the medication management

audit tool had been implemented at all CDCR institutions except CHCF.

MAPIP should continue to significantly improve CDCR's ability to disseminate and

administer medications, greatly enhance its ability to self-monitor for potential system failures in

medication administration, and encourage early and efficient interventions to restore system

capabilities.  MAPIP's implementation to audit medication management throughout CDCR

35

institutions should make information on medication management readily available in an organized format. The MAPIP audit tool should also continue to advance CDCR's capacity to assume responsibility for self-monitoring of medication management, eventually mitigating the need for outside monitoring in this area.

<u>Medication Continuity for Newly-Arriving Inmates</u>

CSP/Solano, NKSP, and WSP reported compliance with the provision of medications to newly-arriving inmates. Calipatria was compliant and NKSP indicated compliance for five of six months following transfers from community hospitals or DSH inpatient care. ASP reported compliance for the last three months of the review period and for five of six months following discharges from other institution's MHCBs or community hospitals. CTF narrowly missed compliance. DVI medication continuity varied.

Eight institutions - CIM, CSP/Corcoran, CSP/Sac, CVSP, HDSP, KVSP, RJD, and SCC - were noncompliant with medication continuity for new arrivals. Fourteen institutions - CIM, CIW, CMF, CMC, CSP/Corcoran, CSP/Sac, CSATF, CTF, HDSP, KVSP, MCSP, PBSP, RJD, and VSP - reported noncompliance following discharges from community or state hospitals and/or DSH inpatient programs.

<u>Medication Continuity Following Intra-Institutional Transfers</u>

CMC and SQ reported overall compliance following intra-institutional moves, but CMC was noncompliant following moves from administrative segregation and the MHCB. PVSP was compliant except for two months when MHCB discharges were noncompliant. MCSP reported compliance except following MHCB transfers. NKSP was compliant following intra-institutional transfers, but excluding administrative segregation moves. WSP indicated compliance for medication continuity following reception center transfers, but otherwise

36

was noncompliant following intra-institutional transfers.  CSATF inmates stated that prescribed medications typically followed them upon transfer.

Calipatria reported improvement during the review period.  CTF narrowly missed compliance.  CSP/Solano reported both monthly compliance and noncompliance after intra-institutional transfers.

Seventeen institutions - ASP, CCI, CIM, CIW, CRC, CSP/Corcoran, CSP/Sac, Centinela, CCWF, Folsom, HDSP, KVSP, RJD, SVSP, SCC, VSP, and WSP - reported noncompliance for medication continuity following intra-institutional transfers.  However, ASP was compliant following moves into administrative segregation and RJD reported compliance after MHCB discharges.  DVI medication continuity varied.

<u>Medication Administration and Orders</u>

CTF and HDSP reported compliance with medication administration.  CRC indicated compliance except for psychiatric chronic care medications.  RJD was compliant with psychiatrist-prescribed medications.  Calipatria, HDSP, and PVSP reported compliance for chronic care medications.  SCC reported inmate medication compliance.

Five institutions - Calipatria, CVSP, HDSP, PVSP, and SQ - reported compliance with new medication orders; Centinela narrowly missed compliance.  DVI audits revealed that new psychotropic medications were appropriately ordered and administered.  At CCI, new prescription orders and renewals following MHCB and Outpatient Housing Unit (OHU) discharges were compliant.  SQ reported compliance with medication renewals.  MCSP had a process for timely medication renewals.

KVSP and WSP reported noncompliance for medication administration.  Nine institutions - CSP/Corcoran, CSATF, CCWF, HDSP, MCSP, PBSP, PVSP, SQ, and WSP -

indicated noncompliance with psychiatry-prescribed medications.  CSP/Corcoran, CSATF, MCSP, PBSP, RJD, and SVSP reported noncompliance for administration of psychiatry chronic care medications.  CSP/Corcoran and RJD noted noncompliance for newly-ordered psychiatric medications.   KVSP reported noncompliance for new medication orders by outpatient providers.

Response to Inmate Medication Noncompliance

CVSP, CTF, and HDSP indicated compliance with the timeliness of mental health follow-up in cases of inmate medication noncompliance.  CMC reported compliance for four of six months.  PVSP was compliant following urgent medication referrals due to inmate noncompliance.  CRC indicated compliance except for urgent referrals following inmate no-shows and/or refusals of certain medications.  DVI audits indicated compliance for some months for Electronic Unit Health Record (eUHR) documentation reflecting psychiatry contacts with inmates for medication noncompliance.

Centinela reported noncompliance.  CIW, CMF, CSP/Corcoran, ISP, SVSP, and SQ indicated noncompliance for responses following certain inmate medication refusals and no-shows.  DVI indicated noncompliance for psychiatry notification of inmate medication noncompliance.  KVSP reported noncompliance for documentation of seven-day provider follow-up after medication noncompliance, while Medication Administration Record (MAR) documentation indicated nonadherence for medication noncompliance referrals.  RJD reported noncompliance for urgent medication referrals following inmate refusals and no-shows.

Pill Lines

Pill line lengths and wait times were appropriate at CIM, CMC, DVI, HDSP, and SQ. EOP inmates at CCWF received medications from a shaded clinic and a cooling mist was provided during heat alerts.

38

Some CTF pill line waits lasted up to one hour. Pill line waits at PBSP and VSP resulted in some inmates arriving late to groups; VSP staff and inmates also reported excessive pill line waits in the SNY EOP program. At CCI, protection from inclement weather for outdoor pill lines was problematic. Many discarded pills were found near D Yard's pill window at CSP/LAC. Pill lines at CVSP were not audited.

Informed Consent

CCI, CMC, MCSP, and SQ reported compliance for obtaining signed medication informed consent forms from inmates who were prescribed psychotropic medications.

Laboratory Testing

Fourteen institutions - CCI, CMF, CMC, CRC, CSP/Corcoran, CSP/Solano, Calipatria, Centinela, CVSP, ISP, RJD, SQ, SCC, and VSP - reported compliance for laboratory testing of blood levels of inmates prescribed psychotropic medications. MCSP also indicated compliance, but there were methodological issues with the institution's audits. ASP, CIW, and CSP/Sac reported compliance for most laboratory testing measures.

CSATF and PBSP reported noncompliance. HDSP did not provide data.

Direct Observation Therapy (DOT) Medication Administration

CMC reported appropriate implementation of DOT medication administration. The CCI pharmacy maintained a centralized list of non-MHCB inmates with DOT orders. MCSP kept a centralized list of inmates with DOT orders.

HDSP provided all psychiatric medications by DOT. SQ provided all inmates in restricted housing with psychotropic medications by DOT, but staff reported difficulty observing inmates swallowing the medications.

39

CSP/LAC and KVSP were noncompliant with DOT medication administration. Centinela reported noncompliance for DOT administration of chronic care medications.

Keyhea Process

The administration of involuntary medications typically operated effectively at CIM, CIW, CMC, CSP/Corcoran, CSP/Sac, PVSP, RJD, SVSP, and VSP. Involuntary medication orders were rare at CCI. MCSP reported that force was rarely used during involuntary medication administration.

CCWF, HDSP, NKSP, and SQ reported noncompliance for involuntary medication administration. No inmates at CVSP, ISP, or SCC were prescribed involuntary medications.

*Hora Somni*/Hour of Sleep (HS) Medications

CMC, CCWF, and MCSP reported compliance for HS medication administration no earlier than 8:00 p.m. HDSP staff reported conflicting times ranging from 7:00 p.m. to 9:45 p.m. for the evening medication pass, but most HDSP inmates indicated receiving HS medications after 8:00 p.m. SVSP C Yard staff reported that HS medications were distributed at the 5:00 p.m. medication pass. SQ reported noncompliance with HS-administered medications.

Parole Medications

Parole medications were appropriately provided at ASP, CCI, CIM, CIW, CMC, CSP/Corcoran, Calipatria, HDSP, MCSP, and SQ. DVI audits revealed that all paroling inmates signed for their medications upon release, but did not indicate the number who received psychotropic medications. RJD reported noncompliance for medication continuity for paroling inmates.

IV.   __Rules Violation Reports__

There is a long history of policies, procedures, and staff training requirements concerning mental health input into the inmate disciplinary process within CDCR prisons that dates back to the *Coleman* remedial order.  In *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D.Cal. 1995), the Court found "substantial evidence in the record of seriously mentally ill inmates being treated with punitive measure by the custody staff to control the inmates' behavior without regard to the cause of the behavior, the efficacy of such measures, or the impact of those measures on the inmates' mental illnesses."  *Id*. at 1320.  The Court identified the cause of this problem to be inadequate training of CDCR staff on recognition of the signs and symptoms of serious mental illness among inmates who acted out.  *Id.*

The CDCR subsequently took steps to address this problem and to establish a mental health assessment process for disciplinary proceedings for mentally ill inmates.  In August 1998, CDCR modified its existing RVR process by requiring a mental health review of all RVRs issued to CDCR inmates on the mental health caseload.  It also required referral for a mental health review of any inmate who received an RVR and exhibited "bizarre behavior."

Thereafter, in 2003, CDCR further modified its RVR policies by mandating that all mental health caseload inmates who were designated for either the MHCB or EOP levels of care and who had been issued RVRs receive mental health assessments.  Moreover, all 3CMS level of care inmates, and non-mental health caseload inmates who exhibited "bizarre, unusual, or uncharacteristic behavior" and who received RVRs, were required to have mental health assessments as part of the RVR process.  As for staff training, on July 1, 2003, CDCR implemented further changes when it directed that all clinical staff who conducted RVR mental

health assessments and all custody staff who performed RVR hearings were required to take a mandatory four-hour course prior to taking part in the RVR process, with exemptions allowed.

Meanwhile, the Special Master continued monitoring the use of mental health assessments in the inmate disciplinary process. In his Seventeenth Round Monitoring Report, Part B, filed on April 2, 2007, ECF 2180, it was reported that use of mental health assessments in the RVR process for 3CMS inmates was inadequate. In fact, the Special Master concluded that the actual purpose of evaluating mentally ill inmates charged with disciplinary infractions was being overlooked. In response, the Special Master recommended that "defendants be ordered to develop a plan to identify and develop the changes necessary to broaden the impact of the mental health assessment process on 3CMS inmates, to test those changes, and then to implement them system wide." ECF 2180, p. 108-109. The Court adopted the Special Master's recommendations on August 2, 2007, and ordered defendants to develop a plan within 60 days.

Defendants' submission of a revised plan to the Special Master did not occur until May 1, 2008. Its representations included completion of a pilot of the new plan by August 5, 2008, and development of an implementation plan by November 1, 2008. However, it was not until May 10, 2011 that defendants actually distributed a new memorandum directing completion of mental health assessments for 3CMS inmates charged with the most serious disciplinary infractions. This memorandum instructed staff to refer all 3CMS inmates who received a Division A, B, or C RVR for mental health assessments. Mental health assessments of 3CMS inmates who received RVRs for Division D, E, or F violations would still be governed by the "bizarre, unusual, or uncharacteristic behavior" standard.

In June 2011, following numerous requests by the Special Master, defendants finally produced a report on their pilot. Unfortunately, the report revealed that major elements of it had

42

neither been piloted nor implemented.  Several ensuing meetings between the *Coleman* parties and the Special Master during the fall of 2011 resulted in the parties' agreement, with the Special Master's approval, on a newly-revised policy for mental health assessments for 3CMS inmates charged with RVRs.  On September 21, 2011, the *Coleman* parties and the Special Master concurred on expansion of the policies outlined in the May 10, 2011 memorandum to 3CMS inmates who received an RVR that might result in a SHU term, requiring their referral for a mental health assessment.

On October 26, 2011, defendants distributed their associated staff training memorandum, which reiterated that the four-hour mandated training was a prerequisite for clinical and custody staff involvement in the RVR process.  The memorandum directed as follows:

1. The updated September 2011 version of the RVR training curriculum shall be used to train involved staff.

2. All hearing officers, Senior Hearing Officers, Captains, Chief Disciplinary Officers, and appeals coordinators shall receive four hours of training related to appropriate documentation of mental health input into the RVR process.

3. All clinical staff responsible for review of RVRs and preparation of mental health assessments (CDCR Form 115 – MH) shall receive four hours of training related to providing mental health input in the RVR process.

4. The above requirement is to be provided on an ongoing basis prior to staff's involvement in the RVR process.

5. The training is to be collaboratively between custody and mental health.

6. All new staff hired into the applicable classifications were to be trained prior to their involvement in the RVR process.

Defendants directed that training of all staff was to be completed by January 30, 2012.

On November 3, 2011, defendants issued a memorandum as to changes to the form that was used to request a mental health assessment.  Among the memorandum's policies and

procedures were that all custody and clinical staff participating in the inmate disciplinary process would receive on-site training concerning RVR assessment requirements.  This training was to be completed by December 30, 2011.

On December 1, 2011, in his Twenty-Third Round Monitoring Report, the Special Master reviewed defendants' response to the August 2, 2007 order.  He noted the significant time lapse before defendants began to respond to this order, and that little had been achieved.  In fact, the Special Master reported that defendants appeared to "have lost sight of the original identified problem and the goal of the pilot to resolve that problem."  The Special Master also indicated concern, that given the "limited character of what defendants now propose as their plan, appropriate use of the mental health assessments in the disciplinary process for 3CMS inmates may well end up being even more limited than it was before the plan was ordered."  The Special Master pointed out that nearly *four years* had passed with "very little progress," indicating that defendants had violated the 60-day time limit in the August 2, 2007 court order "literally by years." ECF 4124.

On May 29, 2013, plaintiffs moved for enforcement of Court orders and affirmative relief related to the use of force and disciplinary process against *Coleman* class members to remedy alleged constitutional violations. ECF 4638.  As to the disciplinary process, plaintiffs argued that evidence before the Court demonstrated defendants' pattern of imposing unconstitutional, unduly harsh discipline on inmates for behavior arising from or related to their mental illness.   Plaintiffs further maintained that defendants' disciplinary process did not provide sufficient accommodation or consideration of mental illness.  Plaintiffs' filing requested targeted remedial orders to redress defendants continued excessive use of force against *Coleman* class members

and to ensure that mentally ill inmates were not further victimized by cruel and inappropriate disciplinary policies and procedures.  ECF 4638.

Thereafter, on April 10, 2014, this Court entered an order in response to plaintiffs' May 29, 2013 motion. ECF 5131.  In this order, the Court reviewed the history of constitutional violations in the defendants' use of disciplinary measures against mentally ill inmates, among other matters.  The Court then directed the Special Master to review defendants' implementation of the 2011 agreed-to plan for mental health input into the RVR process and report within six months whether defendants had adequately implemented the RVR policies and procedures agreed to in 2011.

Pursuant to the April 10, 2014 order and under the Special Master's direction, members of the Special Master's team subsequently conducted an on-site review of the RVR process at all 34 CDCR institutions.  The site visits were conducted from June 2014 through December 2014 and covered the review period of January 2014 through March 2014.

On October 20, 2014, more than three months prior to filing his RVR Report, the Special Master briefed the defendants by teleconference on the preliminary findings of his RVR review, and offered them the opportunity to submit comments.  The Defendants subsequently submitted a written report to the Special Master on January 9, 2015.  In this report, defendants indicated they had started to initiate efforts to address the Special Master's preliminary findings. Defendants reported that their early efforts included the following:

1.  Revision of the form for requesting a mental health assessment to be used in the RVR process and related training of clinicians on the purpose of the form.

2.  Development of a clinician's guide to drafting these mental health assessments and a companion guidebook on RVRs for hearing officers.

45

3.  Development of a program for institutional tracking of mental health assessments and corresponding RVRs.

4.  Conduct of regular meetings between institutional mental health and custody management regarding RVR hearings that have required mental health assessments.

5.  The provision of both separate and joint training to clinicians and custody staff on the new mental health assessment forms and policies.

6.  Further refinement of CDCR's quality improvement tool, CQIT, to be used in substantive review of input on the mental health assessment forms, RVR dispositions, and of how senior hearing officers mitigated penalties based on information in the mental health assessments.

On January 30, 2015, the Special Master filed his report on CDCR's implementation of policies and procedures on rules violation reports ("RVR Report"). ECF 5266. A central requirement of both the October 26, 2011 and November 3, 2011 memoranda was that all clinical and custody staff who participated in the RVR process receive designated training using a specific curriculum. The October 26, 2011 memorandum required the four-hour training as a prerequisite for clinical and custody staff involvement in the RVR process. The November 3, 2011 memorandum required custody and clinical staff who participated in the inmate disciplinary process to receive on-site training on the mental health assessment requirements listed in the memorandum, and further, that the revised training be used for ongoing training.

To ascertain whether an institution satisfied the memoranda's training mandates, members of the Special Master's team conducting on-site review of the RVR process obtained a copy of all current staff assigned to positions involved in the RVR process at each institution. This list was then compared to the IST reports which documented staff members' attendance at the required training sessions. The monitor also used data from the IST Fox Pro tracking system to help ensure training information accuracy and completeness.

46

Overall, the RVR Report found that CDCR institutions had not implemented and sustained the RVR policies and procedures that had been agreed to in 2011.  In fact, not one institution was able to establish adherence to applicable policies and practices in a consistent and thorough manner.  Even more problematic was the fact that seven and one half years had elapsed since CDCR had been ordered on August 2, 2007 to address this problem.  ECF 2345. Nonetheless, the same deficiencies that the Special Master reported in his Seventeenth Round Monitoring Report, Part B, namely, errors, inconsistencies, inadequate documentation, and mental health input not being considered in RVR deliberations and dispositions, were again found to be pervasive throughout CDCR institutions.

In addition, no institution was able to provide documentation that indicated whether all clinical and custody staff assigned to the RVR process at their institution had received the mandated training.  Training also was not consistently conducted in a collaborative format, i.e., with custody and clinical staff being trained together, nor was it occurring on an ongoing basis.

The Special Master's RVR Report concluded that there were extensive flaws in the execution of the RVR process agreed to in 2011.  The Special Master opined that a breakdown in the training elements of the process appeared to be the root of the problem.  This resulted in CDCR staff's lack of an understanding of the process and awareness of its purpose, which was to rectify problems with defendants' use of inmate disciplinary measures.  As this Court stated nearly 20 years ago, these problems were based on its finding that seriously mental ill inmates "who act out are typically treated with punitive measures without regard to their mental status." *Coleman*, 912 F.Supp. at 1230.  The problem appeared to be compounded by the fact that 33 of the 34 CDCR institutions were found to have no quality control or improvement mechanism to detect and address lapses in staff training.

47

The Special Master's RVR Report also reviewed the various initiatives that defendants had begun to undertake following the October 20, 2014 teleconference, when the Special Master reported his preliminary findings.  The Special Master's RVR Report indicated that defendants' initiatives revealed "a general awareness, understanding, and willingness on the part of defendants to respond to the problems with the RVR process, for which defendants should be commended and encouraged."  ECF 5266.

The Special Master's RVR Report requested that the Court enter an order directing the following:

1.  CDCR shall immediately end the practice of using inmate workers in any aspect of the RVR process.

2.  CDCR shall devise an RVR quality improvement process for incorporation into its Quality Improvement Tool (CQIT) and conduct regular quality improvement reviews of the RVR process, including but not limited to the staff training aspects of the RVR process, in all of its institutions.

3.  Within 243 days, CDCR shall implement, under the guidance of the Special Master, its program of RVR mandatory initial and ongoing training/re-training of all clinical and custody staff who participated in the RVR process.

4.  Following the 243-day period for implementation of the staff training/retraining program, the Special Master shall conduct a review of staff training/re-training on the RVR process in all CDCR institutions, and shall report to the Court on his findings no later than 90 days after the completion of his review.

Subsequent to the filing of the Special Master's RVR Report, the parties met-and-conferred with the Special Master's team to discuss the RVR Report's recommendations and the RVR process.  These meetings took place on February 19, February 27, March 12, March 17, March 23, April 1, and April 2, 2015.  Prior to and during the course of these meetings, it became apparent that additional time was needed to prepare and file the parties' respective responses to the RVR Report.  On February 5, 2015, the Court entered a stipulation between the

48

parties, in agreement with the Special Master, extending the time for the parties to file responses

to the RVR Report by 30 days until March 3, 2015.  ECF 5273.  On March 2, 2015, the Court

entered another stipulation between the parties, with the Special Master's agreement, extending

the time for the parties to file responses to the RVR Report by another thirty days until April 3,

2015. ECF 5285.

During these meetings, the parties, in coordination with the Special Master, made several

modifications to CDCR's RVR policies and procedures.  Specifically, the parties agreed to revise

the 2011 RVR policies, procedures, and staff training that were the subject of the Special

Master's RVR Report.  This resulted in the revision of Title 15, Sections 3310(d), 3315(h), 3317,

3317.1, and 3317.2, Departmental Operating Manual Section 52080.5.8, and the Mental Health

Assessment Form (115-H).  CDCR further agreed to implement a Memorandum entitled

"Implementation of Rules Violation Report Exclusions and Documentation of Rules Violations

in an Alternate Manner Based on Clinical Input for all Inmate Participants in the Mental Health

Services Delivery System."

On May 4, 2015, this Court entered a Stipulated Response and Order on the Special

Master's Report on CDCR's Implementation of Policies and Procedures on Rules Violations

Reports, ECF 5305, which resulted from the parties' stipulation and the Special Master's

concurrence.  Consistent with recommendation 1 of the RVR Report, it was agreed that CDCR

would eliminate the use of inmate workers in the RVR process entirely by upgrading SOMS.

Per recommendation 2, CDCR agreed to revise the CQIT to include a quality improvement

process for RVRs and to conduct regular RVR reviews.  In alignment with recommendation 3,

CDCR agreed to work with the Special Master to develop and implement mandatory training on

the revised RVR policies and procedures for clinical and custody staff who were involved in the

RVR process.  CDCR agreed to implement these policies and procedures, and necessary training, within the 243-day timeframe that the Special Master's RVR Report recommended.  Consistent with recommendation 4, it was agreed that the Special Master would review and report on CDCR's training on the revised policies and procedures.

CDCR headquarters subsequently developed and then implemented at the institutions the mandatory training on the revised policies and procedures for clinical and custody staff who were involved in the RVR process.  These trainings were conducted for selected staff at seven training sites during May and June of 2015.  The trained staff subsequently returned to their institutions to train other required staff.  All classifications required to be trained were to be trained by July 7, 2015.

As this RVR training occurred during or after the respective twenty-sixth round institutional monitoring site visits, it was premature to evaluate it or report on the percentage of required staff who were trained.  The Special Master anticipates that this RVR training will have taken root by the Twenty-Seventh Round monitoring tour, at which time it will be evaluated.

**V.      Custody/Mental Health Relations**

Issues pertaining to the relationship between custody staff and the delivery of mental health care in the California prisons have been present in the *Coleman* case since its inception. In the June 6, 1994 Report and Recommendations issued in this matter, the Magistrate Judge found that custody staff were inadequately trained in the signs and symptoms of mental illness. Report and Recommendations, filed June 6, 1994, ECF 547, p. 61.  The Magistrate Judge recommended that defendants implement a training program to train correctional officers, among other staff, in the recognition and identification of the signs of mental illness.  *Id*. at 79.  The

recommendation was adopted by the Court in *Coleman v. Wilson*. *Coleman v. Wilson*, 912 F.

Supp. 1282, 1323 (E.D. Cal. 1995)

These issues have evolved over time. The topic has been an underlying issue throughout

the remedial process and has surfaced a number of times during the course of the Special

Master's tenure. In his Twentieth Round Monitoring Report, the Special Master reported on

custody practices at SVSP that were creating obstacles to the provision of mental health care.

"Line officers and custodial supervisors assigned to 3CMS and EOP buildings reportedly taunted

inmates about mental disabilities, enforced rules arbitrarily, restricted utilization of space set

aside for mental health programs in an explicable manner, and failed to properly manage the

priority ducat system. This dysfunction created tension and animosity between custody and

mental health staffs and discouraged inmate participation in treatment, thereby thwarting access

to mental health programs." Special Master's Twentieth Round Monitoring Report, ECF 3029,

p. 188. In response, the *Coleman* Court issued an Order directing defendants to develop a plan

to address the dysfunction found at SVSP. Order, filed October 6, 2008, ECF 3072.

In a subsequent Order issued June 17, 2009, the Court disapproved the SVSP plan

submitted by defendants and ordered them to develop a plan under the guidance of the Special

Master. Order, filed June 17, 2009, ECF 3613. As a result, defendants, in collaboration with the

Special Master, developed a custody and mental health collaboration training plan. A copy of

the plan was submitted to the Special Master on October 16, 2009. Defendants' Notice to Court

of Submission of Plan to Special Master, ECF 3709. An amended plan was submitted to the

Special Master on October 26, 2009, which identified programs at seven institutions,

CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, RJD, SVSP, and SQ for conduct of the training.

51

In his Twenty-Third Round Monitoring Report, the Special Master provided the Court with an update on the collaboration training process.  Training had been completed in the designated programs at the selected institutions and defendants planned to expand the training institution-wide at the same facilities over a two-year period.  Twenty-Third Round Monitoring Report, ECF 4124, p. 31.   The Special Master's findings in the Twenty-Fourth Monitoring Round included inmate complaints about demeaning behavior on the part of SVSP custody officers, which echoed findings from the Twentieth Round Monitoring Report.  This officer behavior was reportedly a factor in dissuading class members from attending out-of-cell activities.  Twenty-Fourth Round Monitoring Report, ECF 4205, p. 129.

The Special Master provided a second update on collaboration training in his Twenty-Fifth Round Monitoring Report.  Defendants' outcome evaluation on the training completed in the programs at the seven selected institutions revealed that there had been no significant changes in use-of-force incidents, individual cell-side visits, or treatment cancellations by custody.  The evaluation also found that 60 to 90 days after the training there had been no indication of sustained improvement in staff attitudes.  Defendants reported that staff had requested increased opportunities for the joint training and indicated their desire to expand the collaboration training to all CDCR institutions.  The Special Master requested that defendants provide him with an update on the training program, including whether it was expanded to all institutions.  Twenty-Fifth Round Monitoring Report, ECF 4298, p. 48, 49.  Defendants did not provide a status update in their objections and comments filed in response to the Twenty-Fifth Round Monitoring Report.  Amended Defendants' Objections and Motion to Strike or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master, ECF 4347.

52

Despite all of the previous work committed to addressing the issue of custody/mental health relations, and by extension custody interference in the delivery of mental health care, this problem has remained pervasive across several institutions statewide.  Monitoring in the Twenty-Sixth Round revealed varying levels of the effect of poor custody/mental health relations on the delivery of mental health care, as reported below.  In view of the alarming findings in the OIG's recent investigation of the culture at HDSP[21], it is imperative to once again stress the importance of addressing these issues as they relate to the care of *Coleman* class members.  It should be noted that there were sometimes contradictory reports by staff and inmates as to the status of custody/mental health relations and their effect on mental health care.

During the Twenty-Sixth Monitoring Round, reports by both staff and inmates indicated that one of the most reported problems with custody/mental health relations was disrespectful treatment or harassment of *Coleman* class members.  Inmates complained about poor treatment from custody officers due to their mental illness at: CIM, CSP/Corcoran, CTF, HDSP, KVSP, MCSP, PBSP, PVSP, RJD, SVSP, SQ and VSP.  Certain of these reports were particularly concerning as discussed below.

Correlating with the OIG's finding of a culture of indifference towards inmates at HDSP, interviewed 3CMS inmates reported that custody staff routinely did not respond to inmate requests for immediate mental health treatment.  Further, inmates reported knowing of other

---

[21] http://www.oig.ca.gov/media/reports/Reports/Reviews/2015_Special_Review_-_High_Desert_State_Prison.pdf
The Office of the Inspector General released its 2015 Special Review of High Desert State Prison in December 2015.  The investigation revealed allegations of a perpetuated culture of indifference towards inmates, a broken appeals system, difficulty for vulnerable inmates to program safely, and acquiescence of custody staff in gang politics, in addition to other practices which could potentially affect *Coleman* class members.  (Summary of Findings, p. ii.)

inmates who engaged in self-injurious behavior as a result of these delayed responses to requests for mental health treatment.

At KVSP, there were pervasive and consistent reports of custody officer harassment, intimidation and insensitivity by SNY EOP inmates.  Interviewed EOP inmates expressed a belief that custody staff unduly influenced mental health staff to remove inmates from the EOP program, and reported being told by custody and clinical staff that they were too high-functioning to remain in the program.

At MCSP, interviewed EOP inmates reported that custody staff remarked negatively on inmates' psychotropic medications, race and/or sexual orientation as well as other custody staff who treated class members more appropriately.  In addition, although mental health staff reported good relationships with custody staff, inmates reported a perception that some clinicians were afraid of custody officers and would not talk to them on behalf of their inmate-patients. Inmates also reported housing moves that were perceived as intentional efforts to house certain inmates with incompatible cellmates.

PVSP class members expressed concerns about a recent increase in harassing behavior by certain custody staff.  An incident witnessed by the monitor during the site visit seemed to give credence to the claims.  A custody officer interrupted the 3CMS inmate interviews, opening the door and abruptly demanding to know whether "everyone was properly tucked in."  Upon receiving no response, the officer said, "Shame on me if I find one."  The incident was brought to the attention of the warden and addressed at the time of the site visit.

*Coleman* class members in the EOP program at VSP reported intimidation, threats and retaliation by some unit officers.  Those reports were confirmed by staff.  Groups were reported to begin late due to officers not permitting inmates to timely leave their housing units.  Half of

interviewed 3CMS inmates reported disrespectful comments by some custody officers related to inmates' medication and/or level of care, and most of the inmates stated the importance of avoiding certain officers who engaged in racially-based verbal abuse.

A number of institutions reported good working relationships between custody and mental health staff, including, ASP, CHCF, CMC, Calipatria, CTF, Folsom, HDSP, MCSP, NKSP, PVSP and RJD.  However, at some of those institutions, staff reports of good relations with custody staff conflicted with inmate reports of poor treatment and/or custody interference with the delivery of mental health care services.  Those institutions included, CTF, HDSP, MCSP, PVSP and RJD.  Inmate reports at HDSP, MCSP and PVSP were previously discussed above.  At CTF, inmates complained about disrespectful treatment from custody officers, but reported that there was no interference with their access to mental health care.  At RJD, there were consistent inmate reports across programs of custody officer harassment and interference with mental health services.

At yet other institutions, staff provided mixed reports regarding custody/mental health relations.  At CSP/Corcoran, although relations with custody staff were described as fair, some staff reported their belief that custody staff used the MHCB and alternative housing for housing problematic inmates who did not have mental health concerns.  At CSATF, while some mental health staff reported good working relationships with custody staff, others reported abrasive attitudes by officers in the EOP overflow unit.  WSP mental health staff reported both good and troubled interactions with custody staff.

One of the more disturbing findings was that the cultural issues at SVSP previously reported on in both the Twentieth Round and Twenty-Fourth Round Monitoring Reports were still present and affecting the delivery of mental health care to *Coleman* class members during

55

the Twenty-Sixth Monitoring Round.  During the February 2015 site visit to SVSP, the monitor's

findings were so concerning as to necessitate a second visit, which was completed in June 2015.

In the MHCB unit, there was a pattern of increasing numbers of inmates coming in from

administrative segregation and not wanting to return there.  The inference from staff was that

these inmates were attempting to avoid disrespectful and harassing conduct by custody staff in

the unit.  In a meeting convened specifically to discuss the February 2015 findings, institution

leadership reported that specific measures had been taken to address the custody-related

concerns, including removal of staff from a specific yard and the initiation of OIG investigations.

A good working relationship between custody and mental health staff is fundamental to

the delivery of mental health care to *Coleman* class members in the California prisons.  As stated

in the Special Master's Twenty-Fifth Round Monitoring Report, "Any breakdown in the

custody-mental health relations, and any actions on the part of custody which could have a

chilling effect on a mentally ill inmate's willingness to be escorted to a clinical appointment,

must be eliminated."  Twenty-Fifth Round Monitoring Report, ECF 4298. p. 49.

Many efforts underway are anticipated to have a positive effect on the role of custody

staff in the delivery of mental health services to class members, potentially improving delivery of

mental health care system-wide.  As directed by the *Coleman* Court in its April 10, 2014 Order,

filed April 10, 2014, ECF 5131, defendants have recently implemented a number of new

initiatives, most of which have yet to be fully monitored, which the Special Master anticipates

will have an impact on institution culture and custody/mental health relations.  Those initiatives

include policies surrounding non-disciplinary segregation, short and long-term restricted

housing, unclothed body searches and treatment refusals, 120-day pre-Minimum Eligible Release

Date (MERD) case reviews, long-term MHSDS segregation case-by case reviews, use of force,

56

RVRs, management cell status moratorium, case conferences for DSH discharges returning to a SHU, as well as the EOP ASU Hub monthly certification process.  During the Twenty-Seventh Round monitoring, the Special Master will monitor the implementation of these policies and any culture changes resulting therefrom.

As reported above, CDCR completed the custody/mental health collaboration training in seven of its 35 institutions.

## VI.    __Program Access__

*Hecker v. CDCR, Schwarzenegger et al.* (2:05-CV-02441) was filed on December 1, 2005.  Plaintiffs alleged that defendants were engaging in policies and practices in violation of the Americans with Disabilities Act (ADA) and the Rehabilitation Act.  Pursuant to local rules, plaintiffs identified the *Coleman* case as a related case which the Court had already de-certified as to claims originally pleaded under the Rehabilitation Act.  The practices and policies at issue involved the exclusion of class members from participating in employment positions, substance abuse programming and vocational and educational programs.  Others included failing to provide reasonable accommodations to inmates on heat sensitive medications so that they may access programming, excluding qualified class members from conservation and fire camp programs, assigning class members to higher-security housing based upon their need for psychiatric services, failing to give service credits to class members who experience disability-based delays at reception centers, failing to give class members at the EOP level of care classification score deductions for "average or above average performance" in vocational and educational programs, adding four points to the classification scores of incoming class members without lawful basis, and other discriminatory treatment.

On November 17, 2006, defendants moved to dismiss *Hecker* on the ground of preclusion by *Coleman v. Brown*. ECF 38. The motion was heard on February 8, 2007, but not decided. Instead, on February 27, 2007, the Magistrate Judge recommended that the matter be stayed and referred to the *Coleman* Special Master. ECF 65. The *Coleman* Court adopted the recommendation on March 15, 2007 and referred the matter to the Special Master for a report and recommendation as to whether the claims raised in *Hecker* could be resolved within the remedial phase of the *Coleman* case. ECF 71. The Special Master's report was filed June 12, 2007. ECF 72. He found that merger or consolidation of the two cases were not feasible solutions due to the parties' differences.

Plaintiffs filed a motion to lift the stay on December 14, 2007. (ECF 78) Briefing on the motion was completed January 16, 2008, but no ruling on the motion was made. On September 19, 2012, plaintiffs filed a renewed motion to lift the stay; defendants filed an opposition on October 11, 2012. ECF 94, 97. On October 18, 2012, the Court issued an Order denying plaintiffs' motion without prejudice to its renewal, as appropriate, not later than March 1, 2013. ECF 102. The Court directed the parties to meet and confer under the guidance of the Special Master to: 1) identify which, if any, issues raised in the second amended complaint were resolved through the *Coleman* remedial process; 2) identify which, if any, issues raised in the second amended complaint remained in dispute; and 3) as to any issues identified as remaining in dispute, identify which were or could be resolved in the *Coleman* remedial process, and which could not and the reasons why not.

The parties began the meet and confer process in November 2012, holding two sessions prior to defendants' move to terminate federal court oversight in the *Coleman* case. The parties agreed to defer any additional meet and confer sessions pending the disposition of the motion to

58

terminate.  On March 1, 2013, pursuant to the deadlines established by the October 19, 2012

order, plaintiffs renewed their motion to lift the stay.  ECF 103.  Defendants opposed the motion.

ECF 106.  On April 5, 2013, the *Coleman* Court denied the motion to terminate federal court

oversight.  ECF 4539.  On April 11, 2013, the Magistrate Judge ordered the parties to resume the

meet-and-confer process and complete it by August 16, 2013.  ECF 107.

 At the next meet and confer session, held on April 30, 2013, it was agreed that defendants

would produce data from eight designated prisons to verify their assertions about availability of

programs to class members.  The data would be produced jointly by CDCR headquarters and the

eight prisons and would include data points for institutional heat plans, inmate jobs, vocational

and educational programming, access to general population programming for EOP inmates and

substance abuse programs.  The data would be collected for analysis during the Special Master's

pre-scheduled tours of the eight institutions.  The Special Master's site visits began May 22,

2013 and concluded on June 27, 2013.  They were attended by plaintiffs as well as

representatives of CDCR.  Upon completion of the site visits, the Special Master prepared

informal reports on the collected data, which showed wide variability of services to caseload

inmates across the different prisons.  The data was presented to plaintiffs at an all-parties

meeting.

 A second round of site visits to examine program access data at the same eight prisons

was conducted and concluded in mid-December 2013.  Two in-person meetings were held in

January and February 2014; the second set of data as well as an updated set of policies related to

*Hecker* issues were presented to plaintiffs.  Plaintiffs submitted comments on the updated

policies.  The parties had informal discussions regarding how to develop a framework to resolve

the remaining issues and were in the process of reviewing each other's proposals for settlement.

By the time of the next meeting, a teleconference on May 13, 2014, the issues had been narrowed significantly and the parties continued to review each other's settlement proposals to incorporate the remaining *Hecker* issues into the *Coleman* case and have them monitored as part of the *Coleman* remedial process.  The parties met again on May 29, 2014, but were unable to reach a resolution of all of the remaining issues, thus requested an extension of several weeks' time in which to complete settlement negotiations.

With the assistance of the Special Master, the parties were able to reach a settlement agreement averting further litigation – resolving some of the issues related to policies and practices that may have excluded some class members from participating in programs and may have discriminated against other class members.  A Joint Motion for Preliminary Approval of Settlement Agreement was filed on August 5, 2014.  ECF 124.  On March 2, 2015, an Order for Final Approval of Settlement Agreement was issued by the Court.  ECF 148.  The remaining issues, as stipulated by the parties, were incorporated into the *Coleman* remedial process, and the parties directed to continue negotiations facilitated by the Special Master for their resolution.

As directed, the parties continued to meet with the Special Master, convening four times between May 2015 and September 2015.  Now that negotiations have reached the point where the issues are just about defined, the parties, with the concurrence of the Special Master, have merged discussion of the remaining *Hecker* issues into Coleman all-parties' meetings and into ongoing regular *Coleman* monitoring.  At this time, a number of elements are under development which will come into more focus during the upcoming Twenty-Seventh Monitoring Round.

Full-Time Job Assignments

There were significant differences in the percentage of inmates with full-time job assignments among institutions, and between caseload and non-mental health caseload inmates.

60

Non-mental health caseload inmates were more likely to have full-time job assignments, while 3CMS inmates were more likely than EOP inmates to have such positions.

As to full-time employment assignments for EOP inmates, CMC and SVSP reported that from 30 to 45 percent of inmates held such positions; at CSP/Corcoran and CSP/Sac, the percentage was between 20 and 29 percent.  Five institutions -- CSATF, CCWF, KVSP, PBSP, and VSP – indicated that from 10 to 19 percent of EOP inmates were fully employed.  At seven institutions – CHCF, CIW, CMF, CSP/LAC, MCSP, RJD, and SQ -- less than ten percent of EOP inmates had full-time job assignments.

A higher percentage of 3CMS inmates typically held full-time job assignments.  ASP, CRC, and NKSP reported that between 50 and 65 percent of 3CMS inmates held such positions.  Eight institutions -- CMF, CMC, CSP/Sac, CSP/Solano, CTF, PVSP, RJD, and SCC – indicated that between 40 and 49 percent of 3CMS inmates held full-time positions.  Ten other institutions – CCI, CSP/Corcoran, CSATF, CCWF, Folsom, HDSP, ISP, SVSP, SQ, and VSP -- reported that between 30 and 39 percent of 3CMS inmates had full-time jobs.  Data from seven other institutions – CHCF, CIM, CIW, CSP/LAC, KVSP, MCSP, and PBSP – revealed that between 20 and 29 percent of 3CMS inmates had full-time employment positions.

As for non-mental health inmates, six institutions – CCI, CMF, CSATF, CTF, PVSP, and SVSP -- reported that between 60 and 75 percent of non-mental health inmates had full-time job assignments.  At ASP, CRC, CVSP, and Folsom, from 50 to 59 percent of non-mental health caseload inmates were fully employed.  Nine other institutions -- CHCF, CIM, CIW, CSP/LAC, Centinela, CCWF, HDSP, ISP, and PBSP -- reported that between 40 and 49 percent of non-mental health inmates had full-time job assignments.

Milestone Credits

61

CDCR grants qualified inmates a reduction in their incarceration time when the inmate actively participates in and completes components of in-prison rehabilitation programs, such as academic or vocational training or substance abuse programming. As the inmate progresses through the program, certain components or "milestones" are completed. Varying amounts of "credits" are awarded to the inmate upon completion of specific milestones.

There were significant differences in the percentage of inmates who earned milestone credits. As a general matter, eligible EOP inmates were less likely to earn milestone credits than eligible 3CMS inmates.

Three institutions --- CCI, CMC, and VSP -- reported that between 20 and 31 percent of eligible EOP inmates actually earned milestone credits. At CSATF, between 10 and 15 percent of eligible EOP inmates received milestone credits. Fourteen other institutions -- CHCF, CIM, CIW, CMF, CSP/Corcoran, CCWF, KVSP, MCSP, NKSP, PBSP, RJD, SVSP, SQ, and WSP -- reported that ten percent or less of eligible EOP inmates earned milestone credits. CSP/LAC did not provide pertinent data.

As for 3CMS inmates, VSP reported that approximately 50 percent of eligible 3CMS inmates received milestone credits. Ten institutions – ASP, CIW, CMC, CRC, CSATF, CCWF, CVSP, Folsom, HDSP, and PVSP -- reported that between 20 and 30 percent of eligible 3CMS inmates earned milestone credits. Six other institutions – CCC, CIM, CMF, CTF, ISP, and MCSP -- reported that between 10 and 19 percent of eligible 3CMS inmates earned these credits. Nine other institutions -- CHCF, CSP/Corcoran, KVSP, NKSP, PBSP, RJD, SVSP, SQ, and WSP – reported than ten percent or less of eligible 3CMS inmates actually earned milestone credits. CSP/LAC and CSP/Solano did not provide relevant data.

62

As for non-mental health inmates, eight institutions – ASP, CIW, CMC, CRC, CVSP, ISP, PVSP, and VSP -- reported that between 30 and 45 percent of eligible non-mental health caseload inmates received milestone credits.  Five other institutions – CCC, CSATF, Folsom, MCSP, and SCC – indicated that between 20 and 29 percent of eligible non-mental health inmates earned them.  At eight other institutions – CCI, CIM, CSP/Corcoran, Centinela, CCWF, CTF, HDSP, and RJD – from ten to 19 percent of eligible non-mental health caseload inmates earned milestone credits.  Eight more institutions -- CHCF, CMF, KVSP, NKSP, PBSP, SVSP, SQ, and WSP – reported that ten percent or less of eligible non-mental health caseload inmates earned milestone credits.  CSP/LAC and CSP/Solano did not provide relevant data.

Out-of-Level Housing

There were vast differences as to the percentage of inmates who were housed out-of-level at the respective institutions.  As for EOP inmates, CMF and CMC reported that between 70 and 75 percent of inmates were housed out-of-level, while MCSP and RJD indicated that between 35 and 39 percent of EOP inmates were housed out-of-level.  Five institutions -- CHCF, CSP/LAC, CSATF, SVSP and VSP -- reported that from ten to 25 percent of EOP inmates were housed out-of-level.  At CSP/Corcoran, CSP/Sac, and Folsom, less than ten percent of EOP inmates were housed out-of-level.

As for 3CMS inmates, CMF and CMC reported that from 35 to 40 percent of 3CMS inmates were housed out-of-level.  Seven institutions – CSP/Solano, ISP, MCSP, PVSP, RJD, SVSP, and SCC -- reported that between 15 and 26 percent of 3CMS inmates were housed out-of-level.  Nine institutions—CHCF, CIM, CSP/Corcoran, CSP/LAC, CSATF, DVI, HDSP, NKSP, and WSP – indicated that from ten to 14 percent of 3CMS inmates were so housed.  At

63

ten institutions – ASP, CCC, CRC, CSP/Sac, CTF, Folsom, KVSP, PBSP, SQ, and VSP, less than ten percent of 3CMS inmates were housed out-of-level.

As for non-mental health inmates, CSP/LAC and HDSP reported that between 11 and 20 percent of inmates were housed out-of-level.  Four institutions -- ASP, CTF, Folsom, and PBSP – indicated that less than ten percent of non-mental health inmates were housed out-of-level.

CIW and CCWF reported that inmates at custody levels I to IV were housed together.

ADA Reasonable Accommodation and Grievance Procedures

Seven institutions -- ASP, CIW, CMF, CMC, CRC, CSATF, and Folsom -- confirmed implementation of the ADA reasonable accommodation and grievance procedures.  CHCF, MCSP, SQ, and SCC reported conducting training.

Six institutions -- CCC, CSP/LAC, CCWF, HDSP, PVSP, and VSP -- had yet to implement the revised ADA reasonable accommodation and grievance procedures.  NKSP indicated it was a pilot program.  PBSP reported that it was not on the roll-out schedule; CTF indicated that this procedure was inapplicable to it, and did not provide data.

CIM and CSP/Solano reported no revisions to the ADA reasonable accommodation and grievance procedures.  CCI, CSP/Corcoran, KVSP, and SVSP did not provide information as to the procedures.

Periodic Classification Score Reductions for EOP inmates

Review of CDCR 840s from 13 institutions -- CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/Sac, CSATF, Folsom, HDSP, MCSP, RJD, SVSP, and VSP – indicated that EOP inmates were granted the same semi-annual classification score reductions as non-EOP inmates for successful programming.  A PBSP correctional counselor reported the same.  CCWF indicated

that CDCR 840 documentation was completed annually and entered into ERMS and SOMS, but sample documentation was not reviewed.

CSP/LAC and KVSP did not provide information regarding periodic classification score reductions.  Seven institutions -- ASP, CCC, CCI, CSP/Solano, CTF, NKSP, and PVSP -- reported not having an EOP program or typically not housing EOP inmates; SQ was not an EOP-designated institution.

## VII.   Construction of Mental Health Treatment Space and Beds for Inmates at Various Levels of Care

2015 saw the completion of the last remaining construction project in a process that began ten years earlier, with numerous court-ordered construction projects that dated back to 2006 and that since 2009 have been tracked and reported by CDCR in monthly activation schedules submitted to the Special Master.  While this is a milestone deserving of acknowledgment, it is not the end of the task -- construction of various Health Care Facilities Improvement Projects (HCFIPs) and the infill construction projects outlined in CDCR's Blueprint[22], described below, remains ongoing but is incomplete at the present time.

The significance of mental health bed construction comes into focus when it is viewed in the larger context of *Coleman* remediation generally over time.  As noted by this Court in denying defendants' motion to terminate *Coleman* federal court oversight in April 2013, the Court stated that "[s]hortages in treatment space and access to beds at each level of mental health care have plagued the entire remedial phase of this action." ECF 4539, p. 53.

---

[22] CDCR's April 2012 bed plan, "The Future of California Corrections:  A Blueprint to Save Billions of Dollars, End Federal Oversight, and Improve the Prison System."

Defendants filed their first Statewide Mental Health Bed Plan on April 17, 2006, ECF

1786, in response to a court order dated March 3, 2006.  ECF 1772.  Between August 2005 and

June 2006, CDCR submitted four mental health bed plans to the court:

- August 2005 - Intermediate Care Facility Bed Plan
- April 2006 - Statewide Mental Health Bed Plan
- June 2006 - Interim Intermediate Care Facility and Mental Health Crisis Bed Plan
- June 2006 - Statewide Mental Health Bed Plan, April 2006 - June 2006 Amendment

Over the next three years, bed plans were changed and modified and a Receiver was

appointed to oversee the provision of medical care in the CDCR.[23]  In his efforts to bring the

medical care provided to CDCR inmates up to constitutional standards, the Receiver formulated

his own bed plan which incorporated the construction of additional mental health beds.  This

added to the confusion and uncertainty as to what bed plan the *Coleman* defendants were

utilizing.

In early 2009, the court was concerned about what bed plan defendants were following

and ordered defendants to file and serve a statement setting forth their present bed plan. ECF

3515.  Defendants sought an extension of time to file their statement and requested 90 days to

prepare an updated bed plan.  The court's frustration with defendants' response echoed

throughout the order which issued shortly thereafter.  ECF 3540.  In its written order the Court

stated:

> To say the least, the court is deeply disappointed and distressed
> with the State's response. This court has been engaged in the
> process of attempting to bring the State in conformance with the
> Constitution of the United States for roughly fourteen years. To
> say now that the State has no current viable plan, is uncertain as

---

[23] *Plata v. Brown*, No. c-01-1351 TEH (N.D.Cal.) ECF 473.

> to when it can be developed in light of changing circumstances,
> and needs at least ninety (90) days to develop such a plan, seems
> to demonstrate an unacceptable lack of commitment to its
> constitutional duty, much less to the orders of this court.

*Id* at 1-2.

Clearly concerned about whether defendants would abide by its order to produce a viable

bed plan, the Court also ordered responsible persons to disclose their identities and activities. To

that end, the Court ordered defendants to produce a progress report within ten days requiring the

following information:

> The report shall specify the names of each person who is responsible
> for development of the plan, and exactly what they have been doing
> from the date of receipt of this order. The response shall also include
> the address of each such person, as well as their title.

*Id* at 2.

The Court's intent was anything but ambiguous.  Following a hearing on March 24, 2009,

the Court ordered defendants to file detailed activation schedules for the completion of all court-

ordered construction projects including the CMC 50-bed MHCB project as well as the SVSP 64-

bed Intermediate Care Facility (ICF) project.  ECF 3556.  The Court continued its resolve to hold

individuals accountable for any inaction and required that each construction project list the

names and addresses of all persons responsible for the approval and/or execution of each stage of

every project along with every step necessary for each project, with timelines for completion of

each stage of each project.

Defendants filed the first activation schedules on May 26, 2009, listing a total of thirteen

construction projects with the last project scheduled for completion on May 10, 2013. ECF

67

3591.[24]  Of the thirteen projects listed on the activation schedules, three were court-ordered in 2006, nine were court-ordered in 2007, and one was court-ordered in 2008.  The Court approved the schedules on June 18, 2009. ECF 3613.  These activation schedules were subsequently expanded over time to include additional projects proposed by defendants in their long-term bed plan to address the insufficient number of mental health beds that existed system wide.  Other projects were modified as population needs shifted.

On September 24, 2009, defendants filed yet another long-range bed plan which included those projects in the original activation schedules, some which had been modified, as well as additional projects.  The Court approved the majority of the long-range bed plan but did not approve one of the projects, sought additional information on two new projects, converted two existing projects into one single project and ordered defendants to fully activate all of the projects by the end of 2013.[25] ECF 3761 at 4-5.  In its order, the Court also recognized that a reduction in the prison population might have an effect on defendants' existing bed plan and therefore agreed to consider revisions to the plan if warranted by such a reduction. *Id* at 3.

Over the next two years, the drastic reduction in the prison population due to realignment caused the defendants to reevaluate their long-term bed plan and once again go back to the drawing board.  In April of 2012, CDCR filed a plan entitled "The Future of California

---

[24] SVSP 64-Bed ICF High Custody, ECF 1772 (3/3/06); CSP/LAC EOP Treatment Space, ECF 1998 (10/20/06); CMC 50 MHCB, ECF 1998 (10/20/06); Small Management Yards, ECF 2255 (6/1/07); CMF Treatment Space for EOP ASU, ECF  2461 (10/18/07); CMF 64-Bed ICF High Custody, ECF  2154 (3/1/07); CSP/Sac EOP Treatment and Office Space, ECF 2461 (10/18/07); SVSP 72-Bed EOP ASU, ECF  2461 (10/18/07); SVSP EOP Treatment Space, ECF  2461 (10/18/07); CIW 45-Bed ICF, ECF  2154 (3/1/07); CIW 20-Bed PSU, ECF 2178 (3/28/07); SVSP Treatment Space for Inpatient Care D-5, D-6, ECF 2461 (10/18/07).  The activation schedule for the renovation of 124 cells at CMF in Q1, Q2, Q3, S1 and S2 did not list any court orders.

[25] The Stark EOP project was not approved; additional information was requested for the Consolidated Care Center and the DeWitt-Nelson conversion project; the SVSP 72-bed EOP ASU and the SVSP 96-bed EOP GP projects were converted into one project renamed as the SVSP 300 EOP GP treatment and office space A-Quad project.

Corrections: A Blueprint to Save Billions of Dollars, End Federal Oversight, and Improve the Prison System" (the Blueprint).   The intent of the plan left no doubt that CDCR was looking to end the class action litigation.

> This plan builds upon the changes brought by realignment, and delineates for the first time, a clear and comprehensive plan for the department to save billions of dollars by achieving its targeted budget reductions, satisfying the Supreme Court's ruling, and getting the department out from under the burden of expensive federal court oversight.

Blueprint, Introduction 1.

With the inmate population in decline in the spring of 2012, defendants began discussions with plaintiffs and the Special Master about a revised long-range mental health bed plan. Defendants' original long-range mental health bed plan had already been expanded and included twenty-one construction and conversion projects designed to address the insufficient number of mental health beds and treatment space for the *Coleman* class members.

After discussions with the Special Master and plaintiffs, defendants filed yet another revised long-range mental health bed plan on June 12, 2012 and based their updated bed need on the spring *2012* population projections which were used to determine mental health bed needs projected out to 2013.[26]   Defendants' revised bed plan relied on the population reductions achieved by realignment and the facility improvement projects incorporated into the Blueprint. The court approved the revised bed plan on June 15, 2012 but ordered defendants to continue to work with the Special Master to ensure that a sufficient number of EOP ASU beds were planned.

---

[26] The 2009 long-range mental health plan was based on spring *2009* population projections to determine the mental health bed needs projected out to 2013

ECF 4199.  Some construction projects were eliminated altogether[27] and other projects were modified to account for the population reduction.  The completion date of the last project in the revised bed plan, the Dewitt Nelson conversion project, (now designated as Facility E at CHCF) was then extended to May 31, 2014.

The Court continued to express its frustration in the prolonged construction process in its denial of defendants' motion to terminate in April 2013 when it stated, "[c]reation of that plan for a constitutionally adequate number of beds has taken years," and "[u]ntil all necessary projects are complete, the state's prison system is operating with a constitutionally inadequate amount of treatment space and a constitutionally inadequate number of beds necessary for adequate care." ECF 4539, p. 53.

As is the case with most construction projects, unexpected delays and circumstances extended the completion dates for a small number of the projects.  However, defendants were diligent in their efforts to remedy those delays and minimize their impact.  The last project from the activation schedules was completed on October 9, 2015.[28]  Although some of the projects were not completed on-time in accordance with the timetables established by the activation schedules, defendants are nevertheless to be commended for their efforts in completing the construction projects, some of which were court-ordered nearly a decade ago.

The Blueprint also provided the impetus behind the enactment of Senate Bill 1022 in 2012 which authorized the Health Care Facility Improvement Program (HCFIP).  The HCFIP projects that impact the treatment of mental health inmates consist of renovations and new

---

[27] Funding for the Estrella and Stark juvenile facility conversion projects was denied by the Joint Legislative Budget Committee.  Both projects were eliminated in the June 12, 2102 revised long-range bed plan.
[28] Treatment and office space for EOP GP inmates at CCWF.

construction at eleven institutions.  At three institutions – CMC, MCSP and RJD – the projects will provide new ASU primary care clinics and ASU EOP mental health clinics.  At CIW, the GP primary care clinic will be reconfigured and expanded.  At seven other institutions – CIM, CMC, CSP/Solano, CCWF, DVI, NKSP and WSP – new construction and renovations are scheduled for the reception centers which include the creation of confidential screening and exam rooms at certain facilities.  The projected completion dates for these HCFIP projects range from February of 2016 to the completion of the last project in the summer of 2017.

Realignment also underscored the shortage of housing for Level II inmates due to the reclassification from higher custody levels to lower custody levels, an issue that was also addressed by SB 1022 and the Blueprint.  The enacted legislation authorized the construction of three new Level II dormitory prisons (Infill Projects) at existing facilities that would add 2,376 beds.  Two of these new dormitory facilities – MCSP and RJD - will each house 264 Level II EOP inmates and contain treatment and office space.  Both facilities will also have separate buildings adjacent to the housing units to accommodate additional treatment space and offices. It is expected that these new facilities will help reduce the lack of Level II beds for EOP inmates.

On February 3, 2016, defendants notified the Special Master that EOP inmates would be transferring to the new Level II facility at MCSP beginning February 22, 2016, more than three months ahead of schedule.  The projected completion date for the facility at RJD is currently scheduled for May 2016.

Upon request of the Special Master, defendants agreed to provide monthly updates, in the form of activation schedules, to report on the progress of each HCFIP and Infill Project.[29]

In January 2016, CDCR released "An Update to the Future of California Corrections" ("New Blueprint") which served as an update to the original "Blueprint."  Although the New Blueprint reported that CDCR continued to monitor and make adjustments to the housing needs of the mental health population, it also revealed that the mental health population in 2012-2013 was approximately 33,660 and grew to approximately 36,800 by December 2015 constituting roughly 29 percent of the entire prison population.  New Blueprint, p. 12-13.

Although the planned addition of beds may alleviate some persistent bed shortages, defendants must be mindful of the increasing mental health population.  The "Mental Health Bed Needs Study" dated January 8, 2016, forecasts an overall increase in the bed need for male inmates to be in excess of 700 beds in 2016, with the greatest increase in bed need at the APP, GP-EOP and EOP ASU programs.[30]

While defendant's efforts in the completion of construction projects to date is admirable compared to the situation that existed in 2009, their work is not complete.  Despite the overall reduction in the prison population, the mental health population continues to rise.  Defendants have made countless yard changes to account for the shifting needs of the mental health population and the HCFIP and Infill projects are expected to come online in 2017.  Although there is no clear explanation why the mental health population continues to increase, these

---

[29] The first activation schedule covered the reporting period which ended on November 30, 2015. The schedules include information relative to the anticipated start date of each project versus the actual start date, the anticipated completion date versus actual completion date, and a comment section which details the type and percentage of work completed as well as any problems or delays with each project.

[30] The Department of State Hospitals should also be mindful of the increasing bed needs within its facilities and programs.

inmates still require adequate housing and treatment space.   "Until all necessary projects are complete, the state's prison system is operating with a constitutionally inadequate amount of treatment space and a constitutionally inadequate number of beds necessary for adequate care. That is an ongoing constitutional violation that must be remedied." ECF 4539 at 53.

## VIII.   Access to Higher Levels of Care:

### A.   Overview of the Special Master's Findings During the Twenty-Sixth Round

Unlike in many other areas of mental health care delivery, CDCR institutions were struggling to provide *Coleman* class members with timely access to higher levels of care during the review period.  Across prisons, there were issues with implementation of the process for identifying and referring inmates in need of higher levels of care (Form 7388B process) and with compliance with applicable timeframes for transferring inmates from CDCR prisons into beds within appropriate inpatient mental health programs.[31]  As these transfers became backlogged, availability of MHCBs declined as inmates awaiting transfer to inpatient programs remained in MHCBs.  In turn, this resulted in longer waits for inmates experiencing mental health crises to access MHCBs and, in some instances, placements in less desirable mental health beds while awaiting crisis level care.  If issues with access to inpatient care remain unresolved, and inpatient beds at Atascadero State Hospital (ASH) that are designated for *Coleman* class members are not utilized, it may become necessary to re-visit the possibility of re-opening closed inpatient beds at other facilities to ease any backlog.

---

[31]Availability of beds and the policies and practices surrounding provision of care within the inpatient mental health programs beds will be covered in a separate upcoming report by the Special Master.

The details of the Special Master's findings during the Twenty-Sixth Round on delays in access to care are presented in Part III below.

### B.   The Role of Access to Higher Levels of Care in *Coleman* Remediation

The *Coleman* Court addressed the importance of timely access to care, among other things, in its order of April 5, 2013, denying the defendants' motion under the Prison Litigation Reform Act, 18 U.S.C. § 3626(b) to terminate *Coleman* Court oversight.  ECF 4539.  In a 68-page order, the Court expounded in detail on why it denied the defendants' motion, including a discussion of how continuing issues with inmates' access to higher levels of care had historically caused a failure of compliance with the Eighth Amendment to the United States Constitution ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.")  U.S. Const. Amend. VIII. The Eighth Amendment violation found in *Coleman* was defendants' "`severe and unlawful mistreatment' of prisoners with `serious mental disorders,' through `grossly inadequate provision of . . . mental health care.'"  Order, ECF 4539, p. 23, quoting *Brown v. Plata*, 131 S.Ct. 1910, 1922 & 1923 (2011).  With specific regard to access to higher levels of care, the court stated that "Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive necessary higher levels of mental health care, including inpatient care only available from DMH,[32]" is one of the six critically important goals that are necessary to remedy the Eight Amendment violation.  Order, ECF 4539, p 24, *citing* Order Adopting Special Master's Twenty-Fourth Round Monitoring Report, filed August 30, 2012, ECF 4232, p.5, n.3.  Concomitantly, evidence of "an absence of timely access to appropriate levels of care at every point in the system" is evidence of an ongoing

---

[32] Now Department of State Hospitals (DSH).

constitutional violation.  *See* Order, ECF 4539, p. 46, *quoting Brown*, 131 S.Ct. at 1931 [*quoting*

report filed by Special Master in July 2009 (Twenty-First Round Monitoring Report, ECF 3638,

filed July 31, 2009)].   "The relevant requirement (to assessing defendants' constitutional

compliance) is defendants' constitutional obligation to provide `a system of ready access to

adequate (mental health) care.'"   Order, ECF 4539, p. 47, *quoting Hoptowit v. Ray*, 682 F.2d

1237, 1253 (9th Cir. 1982).  The CDCR defendants' remedial plan -- the Revised Program Guide

-- contains "the time frames which CDCR must meet for the transfer of MHSDS inpatient-

patients between levels of care, whether within the same institution or to another institution" . . .

(and) [t]he timeframes in the Revised Program Guide represent defendants' considered

assessment of what is sufficiently `ready access' to each level of care." Order, ECF 4232, p. 47-

48.

### C.  Historical Context of the Access-to-Care Problem in CDCR Prisons

Issues surrounding access to care are all too familiar in the history of *Coleman*

remediation.  Periods of difficulty with access were followed by the emergence of encouraging

trends, only to be followed by reversions to past conditions.  Inmates remained unidentified for

appropriate care, and even once identified, waited for periods far in excess of established

timeframes before actual placement into appropriate programs, as illustrated by the following

historical summary.

Overcoming the obstacles to providing seriously mentally ill CDCR inmates with access

to higher levels of care has been one of the fundament goals of the *Coleman* remedial effort since

its inception.  *See Coleman v. Wilson*, 912 F.Supp. 1282, 1309 (E.D. Cal. 1995). An important

aspect of solving the problem was identifying those inmates in need of inpatient care, while

developing an effective process in order to make identification a regular, ongoing aspect of the

CDCR mental health program.  To that end, the Special Master recommended several focused projects that were ordered by the *Coleman* Court.

A study known as the Unidentified Needs Assessment (UNA) was ordered by the Court on October 5, 2004. ECF 1607. It resulted in identification of 400 inmates who needed inpatient care, as well as a plan to manage the DSH wait list with provision of level-of-care services to inmates on the wait list and active participation by DSH management and staff, standardization of admission and discharge criteria, oversight of resource utilization, conversion of additional beds for inpatient use, and exploration of new treatment programs and designations to facilitate care of these newly-identified patients.  The UNA study and plan were followed by revised plans in 2006, 2007, and 2008.

Despite these efforts, the inpatient care wait list grew.  In early 2009, the *Coleman* Court ordered an evidentiary hearing and compliance with all existing *Coleman* bed plan orders by designated deadlines, plus the development of concrete proposals for meeting all remaining short-term, intermediate, and long-range bed needs of the *Coleman* plaintiff class.  Order, March 31, 2009, ECF 3556.   The result was a joint CDCR/DSH assessment of unmet need and expedited referral of any identified inmates via the project known as the Mental Health Assessment and Referral Project (MHARP).   CDCR stated in its March 10, 2010 report on MHARP to the Special Master that, as a result of MHARP, 987 cases were either recommended for referral to DSH inpatient care by the MHARP assessment teams or were directly referred by the institutions.  By June 16, 2009, MHARP had identified 561 inmates at 12 selected CDCR prisons for referral to inpatient care.  The *Coleman* Court then approved the continuation and expansion of MHARP to all other non-desert CDCR institutions, Order, June 18, 2009, ECF 3613, which went forward during the balance of 2009.

While MHARP was a worthwhile endeavor, it was not by itself the solution. By early 2010, the wait list for inpatient care had grown to 574 men awaiting intermediate level care and 64 men requiring acute level care. Following a status conference on March 31, 2010, the *Coleman* Court directed defendants to work under the guidance of the Special Master "to develop a plan to reduce or eliminate the waitlists for inpatient care and, in the interim, to better serve the treatment needs of the *Coleman* class members placed on such lists." Order, ECF 3831. Defendants submitted their plan on November 24, 2010. ECF 3962. Per order of April 27, 2011, ECF 4004, in June 2011, the Special Master submitted his report. He recommended that defendants' plan be approved and, among other things, that they be ordered to conduct a further assessment of unmet need modeled after MHARP at the original 12 institutions for men and at two of the women's institutions. He also recommended that the *Coleman* Court hold an evidentiary hearing for defendants to show cause why the 50 beds at Coalinga State Hospital (CSH) designated for *Coleman* class members, and any other vacant beds in that hospital, could not be filled with high-custody CDCR inmates.

On July 22, 2011, the *Coleman* Court ordered an evidentiary hearing on the adequacy of Defendants' new assessment process, which differed from MHARP. ECF 4045. Defendants requested that in lieu of an evidentiary hearing, they be granted a 90-day period in which to work with the Special Master on a supplemental plan to reduce the wait list, which they would then submit to the Special Master for his evaluation. If he did not agree with the defendants' supplemental plan, then the evidentiary hearing may go forward. Defendants' request was granted. Order, August 15, 2011, ECF 4069. They were ordered to work with the Special Master over the ensuing 90 days to develop a supplemental plan to reduce or eliminate the wait list, better serve the treatment needs of inmates on the wait list, and implement any step approved

77

by the Special Master that would make hospital beds immediately available to inmates on the wait list. They were also ordered to work with the Special Master so that an assessment process that met his approval would have been completed by December 9, 2011.  By mid-December 2011, defendants completed the assessment and significantly reduced the inpatient wait list. With the parties' agreement and the Special Master's approval, the *Coleman* Court continued the evidentiary hearing to July 13, 2012.  Order, December 12, 2011, ECF 4131.

On December 13, 2011, defendants submitted their plan for a sustainable self-monitoring process ("the sustainable process") to ensure that inmates in need of inpatient care are timely identified, referred, and transferred to such care.  *See* Defendants Report on Assessment Process and Plan Re: Sustainable Self-Monitoring, filed December 13, 2011, ECF 4132.  On December 15, 2011, the parties reached an agreement on a process for reporting, meeting, and conferring every 45 days for the next six months on the status of the wait list.  Within ten days after each such meeting,  defendants were required to file a status report on the wait list, review of the referral process, and any other issues or developments related to access to inpatient care. Stipulation and Order, ECF 4134.

Beginning in January 2012, the Special Master worked closely with defendants to develop and complete quarterly reviews of the institutions' compliance with the sustainable process.  By the end of June 2012, it was apparent that defendants had substantially implemented the objectives of the sustainable self-monitoring process -- timely identification, referral, and transfer of inmates needing DSH inpatient care -- and to internally monitor and improve the process.  The Special Master and the parties agreed to continue meeting through the rest of 2012, and to have the sustainable process monitored within regular Special Master monitoring activities.  On July 12, 2012, CDCR began accepting inmates into L-Wing at CMF which was

78

converted to house 110 Salinas Valley Psychiatric Program (SVPP) high-custody intermediate

care inmates in as many temporary unlicensed intermediate care beds, with three additional

rooms for observation and restraint.    This allowed CDCR to place high-custody inmates on the

SVPP wait list into inpatient beds.  For the following two years, identification, referral, and

transfers of inmates in need of inpatient care improved significantly overall.  It began to appear

that the problem of long wait times for inmates needing inpatient mental health care was nearing

resolution.  *See* Twenty-Fifth Round Monitoring Report, p. 32-33, 72-83, ECF 4298.

It has now been nearly 12 years since the UNA study was ordered, setting the beginning

of the above-described series of projects on identifying and referring inmates in need of inpatient

care.  While remarkable gains were made with respect to reducing wait lists and improving

timeliness of transfers to inpatient care, they unfortunately have turned out to be short-lived.

Detailed below are the Special Master's expert's findings during the Twenty-Sixth Round, which

indicate that the gains accomplished in 2012 lapsed, and that seriously mentally ill inmates were

again waiting for access to inpatient beds and MHCBs for long periods, out of compliance with

the transfer timeframes embodied in the Program Guide.

### D.    The Special Master's Findings on Access to Higher Levels of Care during the Twenty-Sixth Round

#### 1.    Interdisciplinary Treatment Teams and Use of the Form 7388B Process

IDTTs at only two prisons, CMF and CSP/Sac, were found to be using Form 7388B[33]

appropriately.  At these institutions, non-referrals of inmates indicated that patient assessments

---

[33] Form 7388B evolved from the sustainable process described above.  It refers to the current official CDCR form and associated process by which IDTTs are to identify inmates in need of consideration for referral to higher levels of care. It documents whether the IDTT appropriately undertook the process for assessing whether an inmate meets

and documentation thereof were adequate overall. CMF reviewed its Form 7388Bs for problems

on a monthly basis.

The Special Master's expert found problems with documentation on Form 7388B and

with the conduct of the associated patient assessment process at ASP, CHCF, CIW, DVI, PVSP,

and SQ.  Form documentation was noncompliant at ASP, DVI, PVSP, and CHCF, although

training at CHCF led to improved documentation.  At PVSP, when inmates were identified as

"positive" but not referred, justifications and treatment plan modifications were not documented.

Instead, the entry "initial IDTT" was often noted as the rationale for non-referral, and basic

Program Guide requirements were noted in lieu of appropriate treatment plan modifications.

IDTTs at CIW, CTF, DVI, HDSP, KVSP, NKSP, PVSP, in the MHCB at CHCF, and to a

lesser extent at SQ and in the 3CMS program at CMF, did not use or discuss 7388Bs within the

IDTT process.  Only the PC at PVSP used the form.  The IDTT in the MHCB at KVSP appeared

to leave the decision whether to discuss elevation of the inmate to a higher level of care to the

discretion of the PC, which deviated from CDCR policy on correct use of Form 7388B.

IDTTs' use and discussion of Form 7388B at WSP, CCWF, and NKSP varied, with some

teams having meaningful discussion about the indicators for consideration for higher levels of

care, some having only cursory discussions, and some having none at all.  IDTTs in all programs

at PBSP did not consistently incorporate the Form 7388B process into their team process. At SQ,

it was clear that the PC had completed the form before the IDTT meeting, and that decisions on

whether the inmate met criteria for referral were not being made by the IDTT.  DVI's use of the

---

criteria for consideration for referral to a higher level of care, and if he/she is *not* referred, the rationale and steps
being taken to provide him/her with adequate treatment in the inmate's current setting.

form was overly concrete, with excessive reliance on the objective criteria on the form.  Record reviews at DVI found that Form 7388B was also not consistently completed and when it was, it often was not done correctly. Clinicians on some IDTTs at CTF appeared to be unaware of the use of the CDCR Form 7388B and its related process, and at ASP, IDTTs appeared to be unclear on how to properly use the Form.  During an IDTT meeting at CMC, a clinician erroneously stated that the Form 7388B process did not apply.

The Special Master's expert's review of eight cases at PVSP found that criteria for consideration for referral were overlooked even though readily available information indicated that these criteria were satisfied.  All eight of these patients had had three or more MHCB placements within the preceding six months.   Rationales for non-referrals at CIW were inadequate.  At SQ, only four percent of considered cases were actually referred, with the most frequent rationale for non-referral being that the inmate was receiving enhanced care at the EOP level.

IDTTs at CIW documented rationales for non-referrals and treatment plan modifications that were inadequate.   IDTTs at PBSP did not consistently modify treatment plans for inmates who were not referred to a higher level of care. At SQ, review of records indicated that treatment plans did not consistently meet inmates' needs.  Justifications for non-referrals were not always supported by specific, articulated treatment enhancements nor by clinical documentation in inmates' records.  Instead, there were "cut and paste" entries in 7388Bs, even when previously acceptable rationales were no longer relevant or adequate. IDTTs failed to offer appropriate alternative interventions that specifically targeted the criteria which trigger consideration of inmates for referral.  As inmates' problematic behaviors continued, treatment plans were not being revised to address them.

81

2. **Transfers to Inpatient Care**

a. **Adequacy of Referral/Non-Referral Logs**

Referral logs were documented appropriately and were up to date at CHCF, CMC, and CSP/Corcoran. Other institutions did not fare as well, with inadequate or inaccessible rationales logged at CSP/Solano, CCWF, DVI, HDSP, KVSP, and MCSP.

b. **Transfers to Acute Inpatient Care**

CIW and CSP/Solano were both found fully compliant and CSP/Sac was found 95 percent compliant with timely patient transfers to acute care within ten days of referral.

Sixteen institutions - CIM, CMC, CMF, CSP/Corcoran, CSP/LAC, CSATF, CCWF, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SVSP, and VSP - were noncompliant with the ten-day timeframe. The average compliance rate among these 16 noncompliant institutions was 52 percent, with outliers CSP/LAC and HDSP at 33 percent, and PVSP at 87 percent.

c. **Transfers to Intermediate Inpatient Care**

ASP, CIW, and PVSP all achieved full compliance with transfer of inmates to intermediate inpatient care within 30 days of referral. RJD was also complaint, at the rate of 93 percent.

Another 16 institutions were noncompliant with the 30-day timeframe for intermediate care transfers. They were CHCF, CIM, CMF, CMC, CSP/Corcoran, CSATF, CSP/LAC, CSP/Sac, CCWF, KVSP, MCSP, NKSP, PBSP, SVSP, SCC and VSP. These institutions' average rate of compliance was 53 percent, with outliers CSP/LAC at 12 percent and SVSP at 78 percent.

82

**d.      Transfers Following Inpatient Bed Assignment**

Transfers to inpatient beds within three days of bed assignment were compliant overall at CHCF, CMC, PVSP, and RJD.  Transfers to acute care within three days of inpatient bed assignment were compliant at HDSP.  Transfers to intermediate care within three days of bed assignment were compliant at CMF, SVSP, and VSP.

Transfers to intermediate inpatient beds within three days were noncompliant overall at CSP/Corcoran, MSCP, and NKSP.  Transfers within three days to acute care were noncompliant at CMF and VSP, and transfers to intermediate care within three days were noncompliant at PBSP.

**3.      MHCBs**

**a.      Transfers to MHCBs and Bed Availability**

Transfers to MHCBs within 24 hours of referral were compliant at CCC, CIM, CMF, and PVSP.  MCSP improved its compliance rate to 90 percent over the course of the review period.

However, another 23 institutions were found noncompliant with the 24-hour timeframe. These institutions were ASP, CCI, CHCF, CIM, CIW, CMC, CRC, CSP/Corcoran, CSATF, CSP/Sac, Calipatria, Centinela, CCWF, CTF, Folsom, ISP, PVSP, RJD, SCC, CSP/Solano, SQ, SVSP, and VSP.   The average compliance rate among these noncompliant institutions was 51 percent, with outliers Centinela at zero percent and CCWF at 87 percent.

Notably, noncompliance was attributed to lack of MHCB availability at nine of the noncompliant institutions - CCI, CHCF, CIM, CIW, CMC, CSP/Solano, CTF, ISP, and RJD, as well as at MCSP.

### b.   MHCB Lengths of Stay

CIW was compliant with limiting inmates' stays in MHCBs to no more than ten days. Another five institutions were found noncompliant with the ten-day limitation.   These were CHCF, CMF, CSP/Corcoran, CSP/Sac, and SVSP.  The average compliance rate among the noncompliant institutions was 64 percent, with a range of 64 percent to 80 percent.

### 4.   Outpatient Housing Unit Lengths of Stay

Five institutions - CCC, CSP/Corcoran, CSP/Sac, DVI, and SCC were complaint with limiting inmates' stays in OHUs to no more than 72 hours during the review period.[34]

Another five institutions - ASP, CCI, Calipatria, MCSP, and VSP - were noncompliant with the 72-hour timeframe, with an average compliance rate of 80 percent and outliers ASP at 74 percent and VSP at 85 percent.

### 5.   Alternative Housing Lengths of Stay

Four institutions - CCC, CCWF, CVSP, and SQ - were found compliant with the 24-hour time limitation on stays in alternative housing.   Another seven institutions - CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Solano, RJD, and VSP - were found noncompliant with this timeframe, with an average compliance rate of 63 percent with outliers CIW and CSP/LAC both at 53 percent and CMC at 88 percent.

---

[34] During the time of the review period, inmate stays in OHUs were limited to 72 hours.  More recently, OHUs have been designated as alternative housing and must operate under the same 24-hour timeframe for inmate stays as other alternative housing locations.

### 6.    Transfers to Psychiatric Services Units (PSU)

Nine institutions were found compliant with the 60-day timeframe after endorsement for transfer to a PSU.  These institutions were CCC, CIM, CMF, CMC, CSP/Corcoran, CSATF, MCSP, RJD, and SCC.  Only CHCF and SVSP were found noncompliant, with compliance rates of 66 percent and 86 percent, respectively.

### 7.    Transfers to EOP Administrative Segregation Hubs

Seventeen institutions were found compliant with the 30-day timeframe for transfer to an EOP hub after placement in an administrative segregation unit or after referral to the EOP level of care.  These institutions were ASP, CIM, CIW, CMF, CRC, CSP/LAC, CSP/Solano, CSATF, CVSP, DVI, Folsom, HDSP, NKSP, PVSP, RJD, SCC, and VSP.

Five institutions - CCC, CCI, CSP/Corcoran, ISP, and PBSP - were noncompliant with the 30-day timeframe.  The average compliance rate at the noncompliant institutions was 50 percent, with outliers ISP at zero percent and CSP/Corcoran at 79 percent.  At these two institutions, noncompliance was attributed to lack of beds.

### 8.    Transfers to EOPs

Nine institutions - CRC, CSP/LAC, Calipatria, CCWF, CVSP, CTF, Folsom, ISP and KVSP- were found compliant with the EOP transfer timeframes of 21 days following an inappropriate transfer, 60 days following referral to the EOP level of care, or 30 days after referral to the EOP level of care if clinically indicated.

Another nine institutions - ASP, CCC, CCI, CIM, CSP/Solano, HDSP, NKSP, SQ and SCC, - were found noncompliant with the transfer timeframes.  These nine noncompliant

institutions' compliance rates averaged 67 percent, with outliers HDSP at 23 percent and NKSP at 89 percent.

## IX.    <u>Administrative Segregation EOP</u>

Before the filing of defendants' motion to terminate *Coleman* federal court oversight in this matter, the *Coleman* parties and the Special Master were meeting to discuss and address various concerns surrounding the care, treatment, and discipline of *Coleman* class members housed in CDCR's administrative segregation units.  There were long-standing concerns with some elements of the provision of treatment for EOP inmates in administrative segregation, as well as the fact that some EOP inmates' stays in administrative segregation hubs remained excessively long.  As far back as 2007, the *Coleman* Court had been aware of such issues and ordered defendants to address them.  *See* Order filed March 9, 2007, ECF 2158.[35]

The Special Master initiated the meetings in October 2012 to work on resolving persistent issues in the administrative segregation units, including the elevated proportion of inmates in administrative segregation who are mentally ill, reduction of risks of decompensation and/or suicide, alternatives to use of administrative segregation placements for non-disciplinary reasons, access to treatment/mitigation of harshness of conditions in the administrative segregation units, suicide prevention, and reduction of lengths of stay in administrative segregation.  The expectation was that the meetings "would provide a forum for working through

---

[35] ¶ 3: "Defendants shall work with the Special Master's experts to review the provision of EOPs in administrative segregation units. The review process shall conduct an audit of the EOP administrative segregation population and examine more effective ways for reducing the lengths of stay of EOP inmates in administrative segregation; alternative methods for the delivery of mental health treatment, including the use of a different mix of clinical and para-clinical professionals; the use of different housing and/or service models for particular categories of EOP administrative segregation inmates; and any other strategy or approach likely to better serve the treatment needs of EOP administrative segregation inmates. The study shall result in a brief report prepared within ninety days from the date of this order, which shall be shared with parties, counsel and the court."

and resolving the range of issues which continue within the administrative segregation units of CDCR, and that any progress would be covered in subsequent Special Master's reports."   The meetings continued into December 2012, but upon the defendants' filing of their motion to terminate on January 7, 2013, ECF 4275, these discussions were suspended.

The *Coleman* Court denied the motion to terminate on April 5, 2013. ECF 4539.  Shortly thereafter, the *Coleman* plaintiffs sought relief on a number of issues in areas that figured prominently in the evidence and the Court's findings in connection with its denial of the motion to terminate.  Two significant areas in which plaintiffs moved for additional orders were the housing and treatment of mentally ill inmates in CDCR's segregated housing units, ECF 4580, filed May 9, 2013, and the use of force and disciplinary measures against members of the *Coleman* plaintiff class.  ECF 4638, filed May 29, 2013.

On April 10, 2014, following extensive evidentiary hearings, the Court granted plaintiffs' motions in part, ordering a multi-pronged set of initiatives to address the concerns raised in plaintiffs' motions.  ECF 5131.  With regard to the plaintiffs' request for relief in the areas of use of force and disciplinary measures against *Coleman* class members, the Court ordered the following:

- Defendants shall work under the guidance of the Special Master to revise their use of force policies and procedures as required within the following 60 days.

- The Special Master shall report to the court within six months on whether defendants have adequately implemented the RVR policies and procedures agreed to in 2011.

- Defendants shall work with the Special Master on a timeline for completion of their review of the use of management status so that this practice can be reviewed by the Special Master as part of his review of the implementation of defendants' RVR policies and procedures.

With regard to plaintiffs' request for relief in the area of segregated housing of *Coleman* class members, the Court ordered the following:

- Within 30 days, defendants shall file a plan to limit or eliminate altogether placement of class members removed from the general population for non-disciplinary reasons in administrative segregation units that house inmates removed from the general population for disciplinary reasons.  Defendants shall be prepared to fully implement the plan within 30 days thereafter.  Defendants shall commence forthwith to reduce the number of *Coleman* class members housed for non-disciplinary reasons in any administrative segregation unit that houses disciplinary segregation inmates. Commencing 60 days from the date of (the April 10, 2014 order, ECF 5131), defendants will be prohibited from placing any class members removed from the general population for non-disciplinary reasons for more than 72 hours in administrative segregation units that house inmates removed from the general population for disciplinary reasons.

- Defendants shall work under the guidance of the Special Master to develop a protocol for administrative segregation decisions, including, as appropriate, a plan for alternative housing that will preclude placement of any *Coleman* class member in existing administrative segregation units when clinical information demonstrates substantial risk of exacerbation of mental illness, decompensation, or suicide from such placement.

- Defendants shall forthwith provide to the court and the Special Master monthly reports on whether each EOP administrative segregation hub meets Program Guide requirements for an EOP administrative segregation level of care.  Commencing 60 days from the date of (the April 10, 2014 order, ECF 5131), defendants shall  not admit any *Coleman* class member at the EOP level of care to any EOP administrative segregation hub that has failed to meet or exceed Program Guide requirements for a period of more than two consecutive months. Commencing 60 days from the date of (the April 10, 2014 order, ECF 5131), defendants shall not place any class member at the EOP level of care in any administrative segregation unit during any period in which there are an insufficient number of EOP administrative segregation hub beds available unless failure to remove the inmate from the general population presents an imminent threat to life or safety.

- Within 60 days from the date of (the April 10, 2014 order, ECF 5131), defendants shall file a revised policy concerning strip searches in EOP administrative segregation unit hubs.

- Defendants are prohibited from housing any class member at any SHU in California unless that class member's treating clinician certified that (1) the behavior leading to the SHU assignment was not the product of mental illness and the inmate's mental illness did not preclude the inmate from conforming his or her conduct to the relevant institutional requirements; (2) the inmate's mental illness can be safely and adequately managed in the SHU to which the inmate will be assigned for the entire length of the SHU term; and (3) the inmate does not face a substantial risk of exacerbation of his or her mental illness or

88

decompensation as a result of confinement in a SHU.  In addition, defendants are
prohibited from returning any seriously mentally ill inmate to any SHU unit if said
inmate has at any time following placement in a SHU required a higher level of mental
health care.

The Special Master and expert members of his staff then began working with the parties

to develop the plans and attendant policies and procedures to meet the directives of the April 10,

2014 order.  Under the guidance of the Special Master, and with input from plaintiffs, defendants

completed several plans with related policies and procedures, to address the identified issues

surrounding use of disciplinary measures against class members, placement of class members in

segregated housing, and provision of appropriate care to EOP inmates in administrative

segregation.

On August 1, 2014 and August 29, 2014, defendants submitted their report and related

plans and policies to the Court for review.  On August 11, 2014 and August 29, 2014, the

*Coleman* Court ordered CDCR to implement its proposed plans, policies and procedures, under

the guidance of the Special Master and to be monitored by him in accordance with his

monitoring and reporting duties in the *Coleman* action.  Order filed August 11, 2014, ECF 5196;

Order filed August 29, 2014, ECF 5212.

Thus far, CDCR has completed the necessary plans, policies, and procedures required by

the Order of April 10, 2014.  The following is a summary of the current status of CDCR's

implementation of them, and a brief description of the Special Master's upcoming monitoring of

them.

In July 2014, CDCR began measuring compliance by its EOP hubs with Program Guide

treatment requirements through its new "Administrative Segregation Hub Certification" process.

Each of the hubs was toured for at least two consecutive months by designated CDCR regional

staff along with the monitor.  At the conclusion of the inaugural administrative segregation hub certification process, all CDCR hubs except CCWF's were toured and were given initial certification, and CCWF's hub was subsequently certified.

Once a hub has achieved initial certification, it is required to conduct specific monthly audits of Program Guide requirements monthly, and based on the results it shall self-certify its compliance.  The findings are then reviewed by the deputy director of the CDCR Statewide Mental Health Program, who confirms or denies compliance as applicable.  The deputy director then submits a monthly report to the Special Master, with a copy to plaintiffs, documenting those hubs which met Program Guide requirements for the preceding month and those that did not. Institutions unable to be certified for two consecutive months are decommissioned as EOP hubs and are closed to intake of any EOP administrative segregation inmates.  In order to begin receiving new intakes, the hub must subsequently certify for two consecutive months that it has been compliant with Program Guide requirements.

In connection with its commitment to ameliorate the harsh conditions in administrative segregation for EOP inmates, on August 1, 2014, CDCR filed a plan to ban and place a moratorium on the use of management cell status for EOP inmates.  In September 2015, CDCR banned the use of management cell status pending revision of the controlling provision within the California Code of Regulations.  As of this writing, the ban has been made permanent and is still in place.

For 3CMS inmates in segregated housing, CDCR developed Short Term Restricted Housing (STRH) and Long Term Restricted Housing (LTRH).  Following meetings with the Special Master and plaintiff's counsel, the Court approved defendants' STRH and LTRH plans and policies on August 11, 2014.  The objective of both STRH and LTRH is to reduce risks of

inmate decompensation among 3CMS inmates in segregated housing, while maintaining institutional safety and security.

The STRH offers enhanced treatment and additional out-of-cell activities to 3CMS inmates before moves to general population or transfers to LTRH.  Inmates in STRH will be offered quarterly psychiatry contacts, 90 minutes of weekly group therapy, weekly out-of-cell contacts with PCs, daily psych tech rounds, and 20 hours of out-of-cell activities, exercise, and recreation, which is double the time offered in administrative segregation units and is in addition to shower and mental health treatment time spent out-of-cell. Reception center and women STRH inmates will also receive in-cell therapeutic activities.   Each STRH inmate will receive one electrical appliance, or a radio if physical plant restrictions do not accommodate an appliance.  STRHs for men were established in the stand-alone administrative segregation units at CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, HDSP, KVSP, PBSP, PVSP, and SVSP, and for RC inmates at CIM, DVI, NKSP, SQ, and WSP.   STRHs for women were established at CIW and CCWF.

The LTRH offers enhanced treatment and additional out-of-cell activities to 3CMS inmates serving SHU terms.  These inmates will be offered 15 hours of weekly out-of-cell exercise and recreational activity, which is 50 percent more than the time offered in administrative segregation units and is in addition to shower and treatment time spent out-of-cell.  LTRH inmates will also receive quarterly psychiatry contacts, 90 minutes of weekly group therapy, in-cell therapeutic activities, weekly-out of-cell clinical contacts with PCs, and daily psych tech rounds.  LTRH inmates will be allowed pen fillers, paper, a calendar, a radio, fiction and non-fiction books,  games, puzzles, crosswords, current event material, and personal

property including notebooks and photographs. LTRHs were located at CIW, CSP/Corcoran, and PBSP.

CDCR also revised its policies regarding mentally ill inmates placed in administrative segregation for non-disciplinary reasons (non-disciplinary segregation or NDS, i.e. safety concerns not related to misconduct), requiring movement of such inmates to appropriate non-segregated housing within 72 hours of the Institutional Classification Committee's (ICC) designation of the inmate as having NDS status. The policy revision also allowed NDS inmates enhanced property and privileges as compared to other inmates in segregated housing.

The memoranda implementing the NDS policies were issued on August 14, 2014 and September 2, 2014. Custody training was completed by September 16, 2014, followed by implementation of the new policy. Training of mental health staff was completed on October 3, 2014, and an "NDS hub" for placement of NDS inmates outside of administrative segregation units was opened at CSP/Sac on October 15, 2014.

In response to the order requiring revision of the policy concerning unclothed body searches in EOP hubs, ECF 5131, CDCR revised its DOM Section 52050.161.6 to apply a new standard requiring all unclothed body searches to be conducted in-cell, unless the physical plant of the institution permitted these searches to be conducted in another area where the process would not be visible to others uninvolved in it.

On February 5, 2015, CDCR issued a Treatment Refusal Memo regarding inmates who refused to leave their cells for treatment. Training related to this policy had begun on December 8, 2014 and was concluded on February 25, 2015. In monitoring the treatment refusal policy during site visits, the monitor will obtain a "high refuser report" and request accompanying CDCR Form 128-Bs to examine whether mental health and custody staff had consulted within

92

seven days of identification of a high refuser and documented the consultation. They are also required to consider alternate custody arrangements where unclothed searches are identified as the cause of treatment refusal.

To address the issue of long lengths of stay in administrative segregation affecting *Coleman* class members, CDCR issued a memorandum on September 15, 2014 requiring ICCs to review reasons for continuance or non-continuance of segregated housing of all mental health caseload inmates held in such units. In order to accomplish this, CDCR instructed institutions to complete within 90 days reviews of all qualified mental health inmates held in administrative segregation. This was to be completed after staff had received training, which concluded on October 17, 2014. For mental health inmates held in PSUs and SHUs, the institutions had 180 days following the training to complete the reviews. Institutions began their reviews after October 17, 2014.

Another component of CDCR's plan regarding long lengths of stay in administrative segregation was implementation of a requirement that 120 days before an inmate reaches his or her MERD, the ICC is to review the case factors and make a recommendation related to transfer to a non-segregation bed. The implementing memorandum was issued on September 12, 2014; training was completed on October 13, 2014; and the policy was implemented following completion of the training.

It bears emphasizing that the importance of all of the initiatives described above has not diminished since the time that they were ordered. If anything, they have become more important, as the number of affected inmates has risen significantly since the time plaintiffs sought this relief. As of April 5, 2013, when the motion to terminate was denied, the census of EOP inmates in administrative segregation hubs was 498. As of February 5, 2016, that number

93

has risen to 699, for an increase by nearly 30 percent in less than three years, as *Coleman*

plaintiff class members are no longer being placed into CDCR Security Housing Units (SHU)

unless the stringent conditions of the exception to that directive, noted above, are all satisfied.[36]

Defendants have expressed interest in addressing this growth in the EOP population in

administrative segregation.  The Special Master hopes and anticipates that in the coming months,

he will meet and work with the *Coleman* parties to address ways to reverse this growth in the

EOP population in segregated housing.

## X.     CDCR's Continuous Quality Improvement Process: Implications for the Quality of Care Delivered in CDCR's Mental Health Program

### A.     The Evolution from Quality Management to Quality Improvement

Since the earliest stages of *Coleman* remediation, development and implementation of an

effective and enduring quality assurance program has been identified as the threshold to CDCR's

eventual assumption of responsibility for self-monitoring and effective management of its

delivery of mental health care to members of the *Coleman* plaintiff class.   As the Special Master

stated in his report dated July 17, 1998:

> A strong quality assurance system is the best, and perhaps the only, long-term
> method for continuing evaluation and enhancement of the quality of mental health
> series delivered by the defendants to seriously mentally disordered prisoners in
> the California Department of Corrections.  If effectively implemented and
> thoroughly institutionalized in the defendants' mental health delivery system, its
> impact will inure to the benefit of the plaintiff class long after the court has ceased
> to monitor this case.  Quality assurance is the critical key to an enduring remedy.

Special Master's Recommended Schedule for Implementation of Defendants' Quality

Assurance Plans, p. 3, filed July 20, 1998, ECF 958.

---

[36] Source: Information provided by CDCR to the Special Master, February 5, 2016.

94

Early in the remedial effort, CDCR instituted a quality management process for the institutions that generally consisted of a local governing body at each institution, subcommittees for quality management and mental health, quality improvement teams (QITs) to address identified issues, and clinician peer review at the institutions which have mental health missions. The Special Master monitored and reported in his regular compliance reports on defendants' integration of the institutions' quality management practices into their regular operations. Over time, it was becoming clear that this fundamental quality management structure was taking root and maturing in a number of the institutions.

By the conclusion of the Special Master's Twenty-Fourth Monitoring Round in early 2012, it had become apparent that some CDCR institutions had generally established and were maintaining the basic quality management framework that had been conceived early in the remedial process. However, while the quality management structure in place at that time was useful, it still did not enable CDCR to diagnose and resolve problems with the quality of care it delivers. This was related, in part, to the lack of a central office-driven quality improvement process. CDCR's quality management process had been generally focused on quantification of deficiencies in performance by looking at the presence or absence of various elements -- for example, what percentage of designated forms were completed, or how many inmates received a mental health screening within timeframes, or whether interdisciplinary treatment team meetings were conducted according to established scheduling requirements, to name a few. Even when some quality improvement processes were implemented, they were done at the institutional level, and did not include important remedies that could only be initiated or developed at the central office level to address issues that were system-wide. Quality *improvement*, on the other hand, focuses not merely on measuring performance indicators but also on identifying problems and

95

crafting resolutions with system-wide application, and thus on improving the care that is delivered throughout CDCR prisons.  As noted by the *Coleman* Court in its remedial order, it is not merely access to care, but access to *adequate* care that is constitutionally required.  *Coleman v. Wilson*, 912 F.Supp. 1282, 1308 (E.D. Cal. 1995).[37]

Thus, after successive monitoring and reporting cycles, quality assurance emerged in 2012 as a major theme and direction of *Coleman* federal court oversight.  On August 30, 2012, the *Coleman* Court adopted the Special Master's recommendation in his Twenty-Fourth Round Monitoring Report that defendants be ordered to review and assess their existing quality management process, and to develop a central office-based quality *improvement* process.  Order, August 30, 2012, ECF 4232.  The Special Master's recommendation, and the court's order adopting it, were based on the Special Master's finding that "over the past several monitoring periods . . .  CDCR institutions have generally succeeded with establishing and maintaining the foundation of the quality management framework that was conceived early in the remedial process.  The initial goals of establishing the basic infrastructure of quality management appear[ed] to have been realized.  Across institutions, local governing bodies, quality management committees, and mental health subcommittees [were] in place and [were] generally meeting regularly and drawing good attendance.  QITs [were] being chartered and used appropriately.  Peer review [was] generally taking place."  Special Master's Twenty-Fourth Round Monitoring Report, filed July 2, 2012, ECF 4205, p. 63.

Adopting the Special Master's recommendation, the Court stated:

---

[37]To be clear, the Special Master is not offering any legal opinion or conclusion insofar as what is constitutionally required, as that determination lies within the sole jurisdiction of the Court.

[T]he court wants to emphasize in particular its complete concurrence with the Special Master's finding that '[a]n important goal of the remedial phase of this case is . . . for CDCR itself to assume the mantle of ultimate responsibility for diagnosing its own problems, i.e. conduct its own `qualitative analysis,' and create a quality improvement process that it can use to achieve and maintain compliance, *and move on to removal from federal court oversight.*

Order, filed August 30, 2012, ECF 4232, p. 4-5, emphasis in original, *quoting* Special Master's

Twenty-Fourth Round Monitoring Report, p. 65.  The Court ordered as follows:

Defendants shall review and assess their existing quality assurance process, and  . . . develop an improved quality improvement process by which they can address issues with the quality of the care that is delivered, as described in the Special Master's Twenty-Fourth Round Monitoring Report.  The quality improvement process shall be developed from the standpoint of it being the beginning of a transition by CDCR into self-monitoring by its own DCHCS.  It shall include, but not be limited to, the development of a process for improved document production for institutional paper reviews, so that the provided information is clear, consistent, responsive to the Special Master's document request, and useful for the assessment of institutional levels of compliance.  The defendants' review and assessment of their existing quality assurance process, and the development of an improved quality improvement process, shall be carried out under the guidance of the Special Master and his staff, with participation and input of the *Coleman* plaintiffs, during the six-month period following the entry of this order.

Order, ECF 4232, p. 5-6.

This order had profound implications for the direction of *Coleman* federal court

oversight, signaling that the focus was shifting towards the long-term goal of the quality

management effort -- eventual transition away from court-supervised external monitoring to

assumption by defendants of the responsibility for self-monitoring.  It set the stage for

development of a more matured and self-sustaining quality management process than what had

been in place.  Although CDCR had some success with its institutional quality management

program, there remained a need for a higher-level, system-wide means to gauge and improve the

levels of quality in the mental health care that was being delivered in the prisons.  Even when

existing processes were consistent with a quality improvement process, they often lacked the

97

capacity to implement needed changes because the required remedy involved system-wide issues that could only be effectively addressed at the centralized health care central office level.

The centralized quality improvement process would require the development of an audit tool with relevant indicators and measurements to capture institutional levels of compliance with *Coleman* Program Guide and other applicable standards in the delivery of mental health care in CDCR prisons.  It would create the methodology for gathering and assessing such information, and using it to implement improvements where and as indicated by CQIT audits conducted by central office.  By using the tool to integrate a quality improvement process into the management of mental health service delivery, CDCR should be, as a result, better positioned to improve mental health services and achieve better mental health treatment results and outcomes.

Work was underway in late 2012 on development of a quality improvement tool for CDCR to self-monitor its special populations, quality of care, safety and cultural considerations, access to care, and utilization and management.  Defendants agreed to create a quality improvement process by which CDCR can identify issues and improve its performance levels in the delivery of mental health care.  The self-auditing tool that was developed is now known as the Continuous Quality Improvement Tool ("CQIT" or "the tool").  Members of the Special Master's staff worked with assigned CDCR officials to work on the development of a quality improvement tool, helping identify performance indicators and compliance metrics.  The tool was intended to not only yield detailed reports on institutional compliance levels, but also to help shape remediation in areas of institutional weakness.

By early January 2013, CQIT key indicators had been identified, and a prototype of the audit tool had been developed.  Plaintiffs' counsel and representatives of the Special Master's staff attended a webinar on the development of the tool on February 8, 2013.  However, due to

98

the pendency at that time of defendants' motion to terminate *Coleman* Court oversight,

participation by the Special Master's staff and plaintiffs' counsel in the CQIT project was

suspended until the motion was denied by order entered April 5, 2013, ECF 4539, in which the

Court implicitly noted the CQIT project as a remaining task in the remediation effort:

> The Special Master has also observed, correctly, that "[t]he ultimate goal of
> *Coleman* monitoring is to eventually render itself obsolete as more and more
> institutions obtain adequate compliance levels and are prepared to assume self-
> monitoring responsibilities . . .  The hope is that as more and more institutional
> mental health programs progress toward adequately higher levels of functioning,
> they too will be shifted to a self-monitoring and reporting status. If their progress
> proves to be stable and maintainable, the Special Master's oversight will no longer
> be needed, and monitoring and review of institutional performance will eventually
> be turned back over to CDCR.

*Id*. at 31, n.33.

Accordingly, two months after the original six-month timeframe for completion of the

CQIT project had already expired, the *Coleman* Court granted a limited extension of time to July

1, 2013, for the initial form of the tool to be completed.  Orders, filed April 23, 2013, ECF 4561,

4562.  The fledgling CQIT tool was piloted at eight institutions over six consecutive weeks[38],

from May 22, 2013 to June 26, 2013.  Members of the Special Master's staff and *Coleman*

plaintiffs' counsel attended the conduct of the pilot.

On August 2, 2013, the Special Master filed his report on the results of the pilot.  Special

Master's Report on Defendants' Quality Improvement Process.  ECF 5730.  Therein, the Special

Master noted the *Coleman* Court's statement in its remedial order that CDCR develop a program

to ensure the delivery of *adequate* mental health care to remedy the constitutional deficiencies in

---

[38]California Institution for Men (CIM), CSP/Los Angeles County (CSP/LAC), California Men's Colony (CMC),
CSP/Sac, Salinas Valley State Prison (SVSP), Central California Women's Facility (CCWF), California Substance
Abuse Treatment Facility (CSATF), and the California Correctional Institution (CCI).

the delivery of mental health care in the California state prisons at that time.  *Id.* at 2, *citing*

*Coleman v. Wilson*, 912, F.Supp. 1282, 1308 (E.D. Cal. 1995), *citing Grubbs v. Bradley*, 821

F.Supp. 496, 500 (M.D. Tenn. 1993).  He emphasized that "[q]uality *improvement . . .* focuses

not merely on measuring performance indicators but also on identifying problems and crafting

resolutions with system-wide application, and thus on improving the care that is delivered

throughout CDCR prisons."  *Id.* at 3 (emphasis in original).

    With specific regard to the summer 2013 pilot, the Special Master reported that the CQIT

tool appeared to be fundamentally sound and "off to a good start," and that more work remained

to be done to address some issues which were revealed in the course of the pilot.  It was clear

from the pilot that CQIT's capacity to accommodate and utilize information on the *quality* of

mental health care needed expansion in order for the tool to fulfill its purpose of helping CDCR

improve the care being delivered.  Areas identified by the pilot as needing more work included

(1) having the CDCR examiners become familiar with Mental Health Tracking System

(MHTS.net) information before beginning their on-site assessments, (2) having a psychiatrist on

every on-site audit team, (3) increasing CDCR's pre-site visit communication with the

institutions about the assessment process, (4) increasing training of the examiners on use of the

CQIT tool, effective strategies for conducting group surveys of inmates, coordination between

custody and mental health on conduct of the CQIT audits, and conduct of effective exit

conferences at the institutions, (5) ensuring that MHTS.net data - which makes up a significant

part of the information gathered by the CQIT tool- is complete and up-to-date, (6) ensuring that

groups of inmates to be surveyed are assembled efficiently, seated comfortably, and are

sufficiently large in number to provide a meaningful sampling, and (7) observing activities, e.g.

IDTT meetings, being conducted as closely to how they are normally and usually run as possible.

In addition, the tool needed to cover additional parameters including mental health staffing at the institutions, as well as various custody-related matters including heat measures and condition/use of therapeutic modules.  The Special Master recommended that CQIT audit results be published in both system-wide and individual institutional reports, in both dashboard and narrative report-type formats, at regular intervals.

In its order following the Special Master's August 2, 2013 report, the Court noted the need for continuation of work on CQIT until it is completed so that it may accomplish its purpose:

> Rather than set another deadline, the court will reiterate that defendants' development and implementation of an improved quality improvement process is fundamental to ending federal court oversight in this action.  It is grounded in this court's obligation to end its supervision of defendants' delivery of mental health care to members of the plaintiff class when defendants have implemented a *durable* remedy for the Eight Amendment violations in the delivery of that care. A key component of a durable remedy is the development and implementation of an adequate quality improvement process by which defendants will self-monitor, and as necessary, self-correct inadequacies in the delivery of mental health care to the thousands of seriously mentally ill inmates incarcerated in California's prisons.  Defendants are required to work under the guidance of the Special Master, with input from plaintiffs' counsel, on this task until it is completed.

Order, filed February 27, 2014, ECF 5092.

On September 11, 2013 CDCR provided a revised "Continuous Quality Improvement on Site Audit Guidebook" to the Special Master for review by his expert.  The guidebook addressed (1) scheduling a site visit, (2) preparing for the site visit, (3) arrival at the site, (4) substantive mental health audit questions and instructions, (5) substantive custody audit questions and instructions, and (6) post visit instructions.  On September 20, 2013, CDCR conducted a mental health CQI training session related to the Guidebook and attended by the Special Master's expert and plaintiffs' counsel.

During November and December 2013, the Special Master's expert and CDCR staff met and consulted on the CQI process to address further development and refinement of the CQIT. On January 23, 2014, CDCR provided a presentation to plaintiffs' counsel on the CQIT indicators and the chart audit questions in the tool, to which plaintiffs provided feedback.

From February 26, 2014 through February 28, 2014, the Special Master's expert resumed meeting with CDCR staff on further development of the tool, specifically with regard to custodial areas, reviewing draft reports including custodial findings at all of the CQIT-piloted institutions. In addition, the complete CQIT electronic dashboard including its "drill down" capabilities were demonstrated.

In July and August 2014, the Special Master's expert accompanied CDCR mental staff on test runs of the tool at DVI, CSP/Solano, SVSP, CIW, CSP/LAC, CSP/Sac, CMC, CSP/Corcoran, and RJD. CDCR also produced for the Special Master's review August 6, 2014 and September 26, 2014 revisions of the Guidebook, covering the newly modified and added areas described above. Feedback from the Special Master's expert was then provided to defendants.

Subsequently, the *Coleman* parties and the Special Master agreed that CDCR would use the CQIT measures pertaining to administrative segregation in its audits of CDCR's administrative segregation EOP hubs for certification.[39] These audits were conducted during September and October 2014, with the Special Master's expert and plaintiffs' counsel observing the process.

---

[39] The administrative segregation EOP hub certification process is described in Part XIV, below.

Defendants provided a further-revised version of the Guidebook dated July 1, 2015.  On July 21, 2015, plaintiffs' counsel submitted their comments on the report-writing outline that was attached to the revised Guidebook.  Two days later, the issues raised by plaintiffs' counsel were addressed during a meeting with the Special Master's expert, who provided further input.

During July, August, and September 2015, the Special Master's expert, defendants, and plaintiffs' counsel continued their consultation and work on the further revision, development, and refinement of the CQI process and tool.  Plaintiffs were provided ample opportunities during the period to comment and propose revisions, which were appropriately considered by CDCR.

On September 30, 2015, at an all parties' meeting, the CQI process was addressed.  The parties and the Special Master agreed that defendants may proceed with a trial implementation of CQIT in the institutions, with the Special Master and plaintiffs' counsel present to observe during the Special Master's monitoring visits.  The parties and the Special Master also agreed that the CQI indicators will be revised over time as issues and findings may evolve.

On December 9, 2015, CDCR provided an updated CQI presentation to the Special Master for his review and comments.  Another meeting was held two days later, on December 11, 2015, at which time plaintiffs offered their recommendations for changes to CQIT that were subsequently adopted and incorporated into the tool.  CDCR will conduct a trial implementation of the tool at ten selected institutions during the upcoming Twenty-Seventh Monitoring Round, as described in greater detail below.

**B.**     **The Special Master's Findings on the Quality of Care Delivered During the Twenty-Sixth Monitoring Period Substantiate the Need for a Sound and Durable Quality Improvement Process in CDCR's Mental Health Program**

Consistent with previous rounds, in the Twenty-Sixth round, the Special Master's expert conducted a comprehensive assessment of offered mental health services, including crisis

interventions and consideration of referrals to higher levels of care.  The expert observed IDTT meetings and reviewed inmates' treatment plans, examining treatment of individual inmates to assess its adequacy for these inmates and whether inmates' treatment plans were updated as necessary.  The expert examined the treatment services offered by the different clinical disciplines represented on the IDTTs, as well as the appropriateness of custody staff involvement in the IDTT process.  The Form 7388B process that is utilized when the inmate's condition deteriorates, or the inmate is not effectively participating in his or her treatment program, or he or she is no longer benefiting from treatment services available at the inmate's current level of care were also observed and assessed.

Overall, the Twenty-Sixth Round Monitoring found widespread improvement with timeliness of IDTT meetings and psychiatric and PC contacts since the preceding monitoring period.   However, across institutions and inmates, the Special Master's expert found significant ongoing problems with regard to IDTT meetings, inmates' treatment plans, treatment(s) being provided to individual inmates, and referrals to higher levels of care.  As trial implementation of CQIT rolls out, it will be the Special Master's objective to work with the parties to determine and adjust, as necessary, the capacity of CQIT to help CDCR examine and resolve the issues, assess the quality and adequacy of care being delivered, report on it, and develop and implement resolutions to any identified shortcomings or problems. The following discussion of the Special Master's expert's findings indicates areas in which consistent issues were found and which should be addressed from a quality improvement standpoint as an effective function of the CQI process.

### 1.      Issues with Use of the Interdisciplinary Treatment Team Process

In a number of observed IDTT meetings across institutions, meaningful team discussion covering inmates' levels of care, treatment plans, and/or measurable treatment goals were

lacking. In some observed meetings, articulated problems and treatment goals were often vague, overly broad, not measurable and/or not responsive to inmates' diagnoses or mental health issues.

At observed IDTT meetings at CIM and PVSP, there was no interdisciplinary discussion about the inmate before his arrival or during his presence at the meeting.  IDTTs in CHCF's MHCB had minimal discussion regarding treatment plans, which may have been a reflection of the limited treatment options available to the MHCB inmates due to their essentially locked-down status in those units.  Some IDTTs at NKSP discussed inmate behaviors and/or symptoms but did not address them in treatment plans. In the MHCB at CIW, treatment plans were not consistently discussed in the treatment team meetings.  In meetings at CTF and Folsom, there was a lack of discussion concerning inmates' level of care.  At CSATF, clinical presentations did not include specific and operational treatment plans.  During observed IDTTs in the MHCB at SVSP, while overviews of the inmates' presenting problems were provided during the team meeting, there was no discussion about treatment goals or plans or what must occur for the patient to be discharged from the MHCB.  In meetings in the EOP SNY and EOP mainline programs at RJD, treatment plans were presented and discussed by all the PCs, but only one of them presented goals that were measurable.

Treatment plans developed for 3CMS inmates at CIW were overly broad, not properly individualized or operationalized, and were missing appropriate clinical interventions.  The clinician in an observed IDTT for [CRC Inmate B] did not present measurable treatment goals during the IDTT meeting.  For some inmates in the SHU at CSP/Corcoran and CTF, treatment goals in several treatment team meetings were not clearly defined and stated in measurable terms.  IDTTs at Folsom did not offer measurable treatment goals and strategies in all cases.

105

Case presentations at HDSP were sparse, typically lacking inmates' diagnoses and medications. Treatment planning in the 3CMS program at CSP/Solano was not sufficiently focused on specific goals or interventions, although the team was clearly attempting to incorporate recently-received headquarters training concerning IDTTs and treatment planning. At NKSP, there was appropriate discussion about the inmate's symptoms between treatment team members, but treatment goals had essentially been determined before the meeting, with no further discussion about it regardless of the inmate's presence. In the MHCB at PVSP, records indicated several inmates diagnosed with Adjustment Disorder being held beyond ten days without operationalized treatment plans.

Level-of-care decisions were discussed among team members, but not directly with the inmates at CMC. All PCs at observed IDTTs at PBSP did not review treatment plans with inmate-patients. In several IDTT meetings at CSP/Corcoran, clinical discussions were not directly addressed to the inmate in the team meetings. In the PSU at PBSP, interactions between team members and inmates were not consistently therapeutic in tone. In several IDTT meetings observed at PVSP, proposed interventions were not actual therapeutic ones directed to individual inmates. In IDTT meetings observed in the 3CMS program at PBSP, clinicians did not address inmates' apparent increased anxiety regarding their treatment plans. At an IDTT meeting at CHCF for a non-English speaking inmate with significant dementia and a long history of schizophrenia, the patient's resulting communication problems were not addressed by the team. At CSP/Solano, there was not even minimal discussion in treatment planning about how to better engage administrative segregation inmates who refused to attend IDTTs.

Review of records and observation of meetings revealed that required disciplines were not consistently attending IDTT meetings. CHCF, CCWF, and ASP were noncompliant with the

presence of the psychiatrist in their 3CMS programs.  At PBSP SHU IDTT meetings, the psychiatrist was typically absent.  At multiple IDTT meetings at CSP/Corcoran, only the PC attended.  In 3CMS administrative segregation at CMF, the SHU at CSP/Sac, and at MCSP, required disciplines were typically absent.

In a number of institutions, IDTT meetings were conducted in inappropriate and/or distracting environments.  At the CCC SHU, there were numerous distractions, with team members having side conversations, or shuffling and passing documents while patients were speaking; mobile phones rang more than once.  Meeting space at HDSP was inadequate, requiring staff to stand or sit on tables.  At CSP/LAC, the meeting room lacked a door.  Some housing areas at RJD had IDTT meetings conducted in a partitioned area on the housing unit floor that was typically used by custody and lacking in privacy.  During the STRH IDTT meetings at CSATF, the room provided sufficient privacy but custody staff interrupted meetings on two occasions to retrieve possessions.  The administrative segregation IDTT meeting at KVSP was conducted in a non-private room.  Considerable ambient noise hindered staff-inmate interaction at an observed IDTT meeting at CSP/Solano.   Patient privacy was affected by a custody officer entering the area to retrieve food items.

### 2. <u>Treatment Planning Concerns</u>

#### a. <u>Documentation Issues</u>

Across institutions, the Special Master's expert found treatment plans and progress notes that did not contain documentation of meaningful clinical intervention being provided to inmates. For example, neither the treatment plan nor the progress notes for [PVSP Inmate G] reflected that he was receiving any meaningful clinical interventions.   Other reviewed records contained unresolved contradictions and discrepancies in clinical documentation, for example, in

the clinical documentation in the eUHR for [RJD Inmate I] which was contradictory. In the case of [CIW Inmate C], records indicated that her treatment team found that she remained highly psychotic and unstable.  However, a second psychiatrist who was not on the treatment team documented completely contradictory information the following day, indicating that the inmate had been under the influence of drugs rather than psychotic. [CCWF Inmate D]'s record contained discrepancies in documentation regarding the status of her referral to the CIW PIP and the delay in her acceptance there.  Information in the record for [CIW Inmate D] indicated 100-percent compliance with medications, while other documentation and the inmate's MAR indicated the contrary.  For [SQ Inmate F], the adequacy of his care could not even be determined because of the paucity of documented information that might have justified his level of care at the time of the site visit or indicated whether his treatment plan was appropriately individualized.

### b.     Inadequacies of Treatment Plans

Multiple record reviews disclosed treatment plans that did not adequately address the inmates' mental health issues.  Review of treatment plans found numerous cases of inadequacies in treatment plans, with failures to address inmates' behaviors and symptoms indicating the need for change in treatment plans, or to address their refusals of treatment.

For example, for [PVSP Inmate E], while his Form 7388B indicated adequate clinical justification for not referring the inmate to a higher level of care, his treatment plan did not include treatment modifications to address the mental health issues that caused him to be considered for a referral.  Instead, it merely restated standard MHCB treatment or referenced a pending PC2602.   [CIW Inmate C] treatment plans did not appropriately target the inmate's serious symptoms and functional impairment.  [ASP Inmate J]'s treatment plan did not address

108

his specific symptoms and behaviors that had resulted in his initial referral to the OHU or his elevation to a higher level of care.  The treatment plan for [MCSP Inmate G] did not address his treatment refusal.

Record reviews found treatment plans that were too vague, lacking operationalization and specific, measurable treatment targets or goals.  [CIW Inmate D]'s treatment plan was overly broad and vague, making it unclear what the treatment team proposed to do to try to improve the inmate's symptom presentation and functional level.  Treatment plan interventions documented in the record of [NKSP Inmate A] were too vague to address targets that were overly broad.  The treatment plan in the eUHR of [PVSP Inmate E] was also overly vague and did not include treatment interventions beyond forced medication.  [PVSP Inmate D]'s MHCB treatment plan had no operationalized treatment targets or goals and listed only Program Guide standards as interventions.  The treatment plan of [NKSP Inmate A] was not properly individualized and operationalized, notwithstanding the extensive detail included in the narrative summary of his chart.  On [DVI Inmate D]'s return from an MHCB, his treatment plan was not adequately individualized, without interventions designed sufficiently to treat his serious mental illness.  [ASP Inmate G]'s treatment plan was poorly constructed and inadequate for either EOP or 3CMS inmates because it was vague, did not target the primary treatment issue, and did not include specific effective interventions.

[PVSP Inmate D]'s treatment plan in the MHCB had no operationalized treatment targets or goals and listed only Program Guide standards as interventions, and did not address the inmate's reason for returning to the MHCB.  In the case of [PVSP Inmate A], his treatment plan remained inadequate after his admission to the MHCB following a very serious suicide attempt.  Treatment planning for [CIW Inmate I]'s was inadequate, with chronic fragmented placement of

109

her in the MHCB. [SVSP Inmate D]'s PC notes appeared to be using templates as opposed to an individualized conceptualization and documentation of this inmate's specific treatment needs. While [CCC Inmate D]'s clinical presentation and attention to self-care deteriorated in October 2014, there was no documentation in the record that his treatment team had any clear plan to re-assess his level of functioning.

**c.**    **Lack of Needed Modifications and Updating of Treatment Plans to Respond to Inmates' Current Mental Health Issues**

Review of treatment plans found that they had not been appropriately revised to address changes in inmates' mental health conditions, including decompensation, increased symptomology, or changes in clinical presentation.  Updated or modified treatment plans that were clinically indicated or required by the Program Guide were not found in multiple records that were reviewed.

The eUHR of [CIW Inmate L] showed that the most recent treatment plan lacked modifications to address her ongoing rule-violating behaviors, nor did it address her request to be treated for severe mood swings.  Even as [PVSP Inmate A] showed early signs of decompensation, the clinical staff did not appear to recognize it as such, and consequently did not modify the treatment plan and clinical interventions appropriately.  There was no modification of [CIM Inmate A]'s treatment plan to target his high risk of violence. When [PVSP Inmate A] reported increased symptoms while still in the 3CMS program, his treatment plan was not modified in response.  [RJD Inmate I]'s medical problems that caused him severe pain were not addressed as part of his mental health treatment plan.  It was not readily apparent that treatment providers modified [KVSP Inmate A]'s treatment plan to attempt to improve the inmate's participation in his mental health programming.  It appeared that the treatment team did

110

not recognize multiple signs of possible decompensation of [DVI Inmate F], and did not modify

his treatment plan appropriately.  At the time of the site visit, there was no formal updated

treatment plan for [CMF Inmate H] in his eUHR, as required by the Program Guide.

[NKSP Inmate E] needed a more comprehensive operationalized treatment plan

developed that adequately addressed his serious symptoms.  In the case of [CMC Inmate A],

although he was decompensating as his symptoms increased, his treatment plan was not modified

to address his decompensation.

### d.      Failures to Implement Designated Treatment Interventions

Even when treatment interventions were identified in treatment plans, they were not

always implemented.  Review of records for [CIW Inmate C] revealed that specific alternative

interventions were not implemented to address those areas that had identified the inmate for

consideration for referral to a higher level of care.  For [MCSP Inmate C], the cognitive

behavioral therapy included in his treatment plan as an intervention was not provided.  [PVSP

Inmate B] presented staff with several reasons underlying his self-injurious behavior that should

have been targets of treatment during his initial MHCB admission, but they were not addressed.

His treatment plan simply restated Program Guide standards. [KVSP Inmate E]'s treatment plan

provided information that was incongruous with the inmate's mental status (i.e. the inmate was

non-responsive, yet the treatment modifications included cognitive behavioral interventions).

### e.      Care Was Not Sufficiently Individualized to Address Inmates' Clinical Needs

### i.    Diagnoses in Inmates' Records Lacked Adequate Clinical Supporting Documentation

111

In several cases reviewed by the Special Master's expert, clinical documentation supporting the diagnoses of record was not found or was inadequate, and/or diagnostic conflicts and discrepancies remained unresolved according to the reviewed records.

The record of [PVSP Inmate G] contained inadequate clinical documentation to support his diagnosis of record.  [CMF Inmate L]'s historic diagnosis of major depressive disorder in partial remission was removed from his medical record absent an adequate clinical rationale. The diagnostic rule-out of a substance-induced persistent psychosis in the case of [SVSP Inmate C] was unclear, given documentation of psychosis in the three-month period preceding admission to the MHCB.  This did not comport with DSM diagnostic criteria nor did it contain any rationale indicating that the inmate disclosed recent drug use or tested positive for the presence of drugs.

There were cases in which inmates apparently required diagnostic evaluations, but no documentation that they had been completed was found in the record.  The diagnostic picture of [KVSP Inmate A] was not clear from a record review, and it appeared that this inmate may have benefitted from a referral to a DSH hospital for diagnostic clarification, but that did not occur. Similarly, it appeared likely that [KVSP Inmate A] would have benefitted from a referral to DSH for diagnostic clarification.  Although there may have been a high degree of secondary gain related to [PVSP Inmate B]'s behavior, his presentation of serious and complex symptoms required a comprehensive diagnostic evaluation, which was not conducted.  The IDTT for [DVI Inmate E] should have revised his treatment plan and prioritized a diagnostic clarification.  For [DVI Inmate E], the treatment team failed to revise his treatment plan prioritizing diagnostic clarification.  [NKSP Inmate E] was diagnosed with Hypochondriasis, but staff documentation of symptoms consistent with a psychotic disorder as a primary diagnosis indicated a need for

112

diagnostic clarification, which was not done. The presenting clinician in an observed IDTT for [CRC Inmate B] did not discuss his level of care. There was no updated mental health evaluation or suicide risk assessment located in the eUHR of [PVSP Inmate H] at the time of the review. There was also no mental health evaluation or suicide risk assessment found in the medical record of [PVSP Inmate G]. [PVSP Inmate A] was not properly evaluated while in the MHCB and did not receive an accurate Suicide Risk Evaluation (SRE) upon discharge; he had not received an SRE at admission either. The quality of the initial SRE of [CIM Inmate C] was poor and his discharge SRE was not individualized.

### ii. Records Reflected Unresolved Conflicts and Inconsistencies in Diagnoses

At the time of the site visit, there were inmates in the PVSP MHCB who had clear histories of specified serious mental illnesses, but who were instead diagnosed with Adjustment Disorder and prescribed antipsychotic medications and mood stabilizers. Review of the eUHRs for [NKSP Inmate H] and [NKSP Inmate J] found marked unresolved discrepancies between their PCs' and psychiatrists' diagnoses. [ASP Inmate B] received differing diagnoses that were documented in the record but never reconciled. In the cases of [CSP/Corcoran Inmate A] and [NKSP Inmate I], diagnoses and diagnostic considerations between psychiatry and psychology were not coordinated or resolved. In the record for [NKSP Inmate H], the rationale for the Rule-Out of Psychotic Disorder NOS after the completion of the Mental Health Evaluation, as well as later reference in the eUHR to this inmate's psychotic thoughts, were unclear. [ASP Inmate A]'s symptoms of Post-Traumatic Stress Disorder (PTSD) were noted by some clinicians, but not followed through by later clinicians, and this inmates' trauma problems were not addressed.

### iii.   Records Did Not Reflect that Inmates Were Receiving Care Aligned with their Mental Health Needs

There were several reviewed medical records documenting inmates who were not receiving clinical services consistent with their mental health needs. A review of [PVSP Inmate G]'s medical records demonstrated that he was not receiving clinical services consistent with Program Guide requirements. EOP inmate [CCWF Inmate A] presented with severe psychotic symptoms, but her record lacked documentation that the psychiatrist was working on treating this patient with needed antipsychotic medications or that the inmate was being educated to help her understand the need for treatment.  [SQ Inmate E] required treatment for suicidality and limited coping skills, but based on available documentation, he was not provided the required treatment. The care provided to [CIW Inmate I] was lacking in meaningful continuity across housing placements, transitional care recommendations from the PSU to the Special Care Unit (SCU), and provision of transitional care while the inmate was in the SCU.

### 3.   Issues With IDTTs' Use of Form 7388B in Consideration of Referrals of Inmates to Higher Levels of Care

As illustrated in the cases discussed below, institutional IDTTs did not consistently utilize CDCR Form 7388B correctly, and in other instances it did not consider referral at all even when it should have.[40]  Across institutions, there were cases in which documentation in inmates' UHRs reflected inappropriate use of Form 7388B in consideration of referral of the inmate to higher levels of care, and in some cases, no consideration of referral of inmates who should have been considered.

---

[40] This section, like sections A and B above, is focused on quality of care in referrals to higher levels of care from the vantage point of individual inmate cases.  For a related discussion of use of Form 7388B from the vantage point of the IDTTs' workings, see also Part VIII, "Access to Higher Levels of Care," above.

114

Cases illustrating these concerns include [DVI Inmate E], whose treatment team did not complete Form 7388B during each team meeting, as required.  The IDTT did not refer [CIW Inmate L], who had had three RVRs in six months.  Her IDTT's rationale for non-referral reflected a misunderstanding of this indicator for triggering consideration for referral, and deviated from sustainable process requirements.  In the case of [CMC Inmate A], the PC's statement that discussion of referral of the inmate to a higher level of care was irrelevant due to this inmate's new-arrival status was contrary to the correct process for using Form 7388B.  In the case of [KVSP Inmate A], CDCR Form 7388B was used to justify lowering the patient's level of care from EOP based on the fact that he was not "gravely disabled," even though grave disability is not a criterion for placement at the EOP level of care.

[PVSP Inmate D] was not properly considered for referral because the MHCB treatment team failed to take into account his multiple crisis bed placements within the prior six months. The CDCR Form 7388B process for [SQ Inmate E] was not properly completed, with no objective assessment of his need for a higher level of care.  Documentation on the Form 7388B of the IDTT's decision to not refer [CHCF Inmate E] to inpatient care was clinically insufficient. Transfer to a higher level of care for [CSP/Solano Inmate D] should have been considered more promptly due to his significant distress and symptoms.

It appeared that while [CIW Inmate D] should have been referred to an MHCB, particularly in light of her risk of suicide, she was instead placed on an apparent *ad hoc* "five-day follow-up" without any preceding discharge from an MHCB or inpatient care.  Similarly, in the case of [ASP Inmate E] who decompensated, it appeared that a "five-day follow up" was substituted for MHCB admission and/or consideration for transfer to a higher level of care.

The IDTT for [PVSP Inmate B] documented inappropriate rationales for non-referral on the Form 7388B and did not modify his treatment plan to address the factors which had triggered consideration of him for referral.  Likewise, documentation in the medical records of [CIW Inmate C] did not adequately justify her non-referral, and her treatment plan did not specify alternative interventions implemented to address the reasons why she was notconsidered for referral.

In the case of [CIW Inmate D], no justification for her non-referral to the EOP level of care was entered on Form 7388B.  For [KVSP Inmate B], the IDTT did not meaningfully consider referral and used clinically inadequate "boilerplate" language on the Form 7388B. [NKSP Inmate E] should have been referred to intermediate care, but was not.  It was unclear from documentation why an earlier referral of [CIW Inmate A] to the CIW PIP had been rescinded, even though it appeared to have been clinically indicated.  For [CCWF Inmate A], an unstable EOP inmate, documentation indicated neither ongoing assessments for referral to a higher level of care nor more aggressive efforts to treat her at the EOP level of care.

### C.    Next Steps for CDCR's Quality Improvement Process

Given CDCR's demonstration of willingness and capability thus far with developing its quality improvement tool, the time has come for the next step in the progression toward CDCR's eventual assumption of responsibility for self-monitoring its mental health program and correcting any identified deficiencies or problems.   This will mark the beginning of CDCR's implementation of CQIT as an early step in the transition away from court-supervised monitoring of mental health care of inmates within CDCR's prisons.  The Special Master's expert's findings during the Twenty-Sixth Round Monitoring on the quality of mental health care of *Coleman* class members, summarized above, can help define the course for further

development and refinement of CQIT so that it can begin to confront and resolve these current issues with *quality* of care and others that may appear over time.

At this stage, the next logical inquiry is how, as a practical matter, CQIT can be applied to help CDCR achieve its intended goal with its CQI process: (1) to continually assess whether provided services provided consistently achieve their desired outcomes in the mental health program, (2) to develop and implement any desired changes, and (3) to refine the capacity of CQIT to identify future opportunities for improvement and implement those improvements as needed.  The result will be an effective long-term strategy by which the quality of mental health care in CDCR prisons will flourish and adverse outcomes can be averted.

On December 11, 2015, the Special Master and the parties agreed to a trial implementation of CQIT in the Special Master's upcoming Twenty-Seventh Monitoring Round. The trial implementation will be piloted at one institution early in the monitoring round, on which CDCR will complete a draft report that it will share with the Special Master and plaintiffs' counsel.  Subsequently, trial implementation of CQIT will take place at another nine institutions later in the monitoring round.  The total ten institutions for the trial implementation are SVSP, Centinela, Calipatria, HDSP, CCC, RJD, NKSP, ISP, CVSP, and CSP/LAC, with the Special Master and plaintiffs' counsel observing the early pilot and the later trial implementation at the remaining nine institutions in a process that is expected to be interactive.[41]  This will be done within the context of the Special Master's monitoring of defendants' implementation of the various plans, policies, and procedures which were developed in the areas of mental health care and treatment in administrative segregation units, use of force, and the inmate disciplinary

---

[41]The CQIT process will not be utilized in monitoring of the DSH inpatient programs.

process on mental health caseload inmates[42], per Order filed April 10, 2014, ECF 5131, as well as the sustainable process for identification and referral of inmates in need of higher levels of care. As CDCR moves ahead with its trial implementation of CQIT[43], and subsequently assumes increasingly greater self-monitoring responsibilities, the Special Master will continue to provide his guidance to CDCR to help ensure the progress and success of CQIT's potential toward becoming a durable remedy in *Coleman* remediation, with the hope that it leads to the eventual conclusion of *Coleman* federal court oversight.

## CONCLUSION AND RECOMMENDATIONS

After numerous past staffing plans that have faltered, defendants' current staffing plan needs to be implemented and their staffing problems need to be resolved, for it has some profound implications.  The problem pervades the remedial effort, standing in the way of full realization of the benefits of the many improvements in mental health care that have been made in *Coleman*.  There is also another aspect to the problem: without staffing sufficient to accommodate the treatment needs of an expanding mental health population, one of the seven key components to ending Court oversight in this matter will not be completed.  (*See* below)

---

[42] For a more detailed background and description of these items, *see* Part XIV, above.

[43] The Electronic Health Record System (eHRS) that was developed by the *Plata* receiver for CDCR's inmate health records, including mental health records, was previously planned to "go live" from January through July 2016 on a rolling schedule.   On January 25, 2016, CDCR notified the Special Master that the "go live" roll-out had been delayed due primarily to  issues with the pharmacy aspect of the eHRS, and that he would be kept advised of a new roll-out schedule when the technical issues were resolved.  This suspension of the roll-out may affect whether the trial implementation of CQIT can be carried out as described and/or on the timeframe projected above.

The Special Master believes that the mental health staffing problem calls for a targeted, fast-track approach in the form of monthly meet-and-confer sessions with defendants. These sessions should include, but not be limited to (1) updates to the Special Master on defendants' implementation of their staffing plan; (2) discussion and consideration of across-the-board salary increases, particularly for psychiatrists; and (3) discussion and consideration of clustering of higher-acuity mentally ill inmates within those institutions where historically it has been shown that mental health staff, particularly psychiatrists, can be more readily attracted and retained.

While staffing remains problematic, there is real reason to be encouraged, as defendants' CQI program appears to be on course for continued progress. So far, the CQIT element of the overall CQI program is a notable achievement, both technologically and managerially from a mental health clinical standpoint. It shows great promise for continued evolution into the durable remedy via which CDCR can achieve compliance in *Coleman* remediation and, if utilized correctly, allow CDCR to eventually emerge from *Coleman* Court oversight. As CDCR moves its CQI process forward, the Special Master urges CDCR to keep in mind the findings and issues identified in this report. It is hoped and intended that these findings will help CDCR sharpen the focus of its CQI effort and its CQIT to better identify and analyze the remaining issues, craft the necessary remedies, and achieve lasting solutions to concerns identified above that continue to surround the delivery of mental health care to CDCR inmates. In addition, during the Twenty-Sixth Monitoring Round, CDCR reported that it was working on a new peer review process for implementation system-wide. This is also an encouraging development, as peer review is an important quality improvement tool in improving the quality of care delivered by the clinical disciplines.

The upcoming Twenty-Seventh Monitoring Round will mark another step toward CDCR's realization of its goals in CQI.  It will mark the first time when, in addition to the Special Master's direct monitoring of mental health care delivery, CDCR will begin to participate in monitoring activities with its trial implementation of CQIT.  The *Coleman* parties and the Special Master have agreed to this trial implementation at ten designated institutions, with the first of the ten serving as a pilot of the trial implementation.  CDCR will then prepare a draft comprehensive report on the pilot, to be shared with the Special Master and plaintiffs' counsel, who will have 30 days to submit any comments or objections, after which defendants shall file with the Court their finalized report on the pilot.  The parties' agreement was conditioned upon and made with the further understanding and agreement that CDCR's trial implementation does not in any way substitute for, or relieve defendants' of, any duties to comply with all orders, stipulations, agreements, plans, policies, or procedures, or any of their other obligations within *Coleman* remediation, nor does it substitute for, or relieve the Special Master of, any of his duties, including but not limited to monitoring and reporting on CDCR's compliance with its duties and obligations within *Coleman* remediation.

In closing, defendants are asked to consider how they would be best advised to direct their efforts and proceed from here on.  The Special Master's message to defendants in this regard is the same as it has been since the beginning, and that is to focus on the goal of reaching compliance.  This message appeared to have been lost in recent times during the frenzy of an attempt to litigate this matter to an abrupt ending.  In the end, that strategy only wasted time and resources that could have been invested in compliance, and set back the eventual conclusion of *Coleman* remediation and court oversight by years.  The concluding words of the Special Master in his Twenty-Fifth Round Monitoring report remain as apt today as they were three years ago

when that report was issued:  "At this time, any attempt at a more abrupt conclusion to federal

court oversight would be, in the opinion of the Special Master, not only premature but a needless

distraction from the important work that is being done in the quality improvement project."

Special Master's Twenty-Fifth Round Monitoring Report, ECF 4298, p. 51.

　　　　Lost time cannot be reclaimed, but the best course for the remainder of CDCR's path to

the end should be one directed to compliance as its destination.  This will not be a vague and

uncertain course yet to be invented.  The *Coleman* Court has already articulated the goals which

must be met in the remedial phase of *Coleman*, stating that "[m]eeting each of [the following]

goals is critically important":

> (1)　　Re-evaluation and updating of CDCR suicide prevention policies and practices;
>
> (2)　　Ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to receive the higher levels of mental health care that they need and that are only available from DSH;
>
> (3)　　Review of, and compliance with, all elements of their Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days;
>
> (4)　　Completion of the construction of mental health treatment space and beds for inmates at varying levels of care;
>
> (5)　　Full implementation of defendants' new mental health staffing plan;
>
> (6)　　Training of staff for greater collaboration between custody and mental health; and
>
> (7)　　Refinement and implementation of MHTS.net to its fullest extent and benefit.

Order adopting the Special Master's Twenty-Fourth Round Monitoring Report, filed August 30,

2012, ECF 4232; *see also* Special Master's Twenty-Third Round Monitoring Report, filed

December 1, 2011, ECF 4124; Special Master's Twenty-Second Round Monitoring Report, filed

March 9, 2011, ECF 3990.

While CDCR previously conducted custody/mental health collaboration training at seven of its institutions, the monitor found issues at a number of institution with mental health/custody relations.  This was a concerning finding, particularly at this stage of *Coleman* remediation.  As noted above, training to overcome the cultural issues between the custody and mental health staffs of the prisons needs to be completed as one of the seven goals of *Coleman* that havwe been adopted and pronounced by the Court.

In addition, as discussed above in Part XIV, the *Coleman* Court has set the parameters of what defendants must accomplish to address identified concerns surrounding specifically the use of force and inmate disciplinary measures against mentally ill inmates, and housing and treatment of mentally ill inmates in CDCR's segregated housing units.  In this vein, the Court ordered the *Coleman* defendants to:

- Revise and implement their use of force policies and procedures as required.

- Work with the Special Master on a timeline for completion of their review of the use of management status so that he may review this practice within his review of implementation of the revised RVR policies and procedures.

- Devise and implement a plan to limit or eliminate non-disciplinary placement of inmates into administrative segregation units that house inmates placed there for disciplinary reasons, and as of June 9, 2014 refrain from all non-disciplinary placements there for longer than 72 hours.

- Develop a protocol for administrative segregation decisions, including a plan for alternative housing that will preclude placement of any *Coleman* class member in existing administrative segregation units when clinical information demonstrates substantial risk of exacerbation of mental illness, decompensation, or suicide from such placement.

- Report monthly to the Court and the Special Master on whether each EOP administrative segregation hub meets EOP administrative segregation Program Guide requirements, and as of June 9, 2014, refrain from admitting any *Coleman* class EOP inmate to a hub that failed to meet Program Guide requirements for over two consecutive months or in any administrative segregation unit while there are insufficient EOP administrative

122

segregation hub beds available, unless failure to remove the inmate from general population presents an imminent threat to life or safety.

- As of June 9, 2014, shall file a revised policy on inmate strip searches in EOP administrative segregation hubs.

- Refrain from housing any Coleman class member in any SHU in California unless the class member's treating clinician certifies that (1) the behavior leading to the SHU assignment was not the product of mental illness and the inmate's mental illness did not preclude the inmate from conforming his or her conduct to the relevant institutional requirements; (2) the inmate's mental illness can be safely and adequately managed in the SHU to which the inmate will be assigned for the entire length of the SHU term; and (3) the inmate does not face a substantial risk of exacerbation of his or her mental illness or decompensation as a result of confinement in a SHU.  In addition, defendants are prohibited from returning any seriously mentally ill inmate to any SHU unit if said inmate has at any time following placement in a SHU required a higher level of mental health care.

Order, filed April 10, 2014, ECF 5131.  As noted above, defendants have completed the referenced plans, policies, and procedures required by this order, but they must be fully implemented and maintained for the intent of the Court's order to be fulfilled.

While more work remains to be done, defendants should take well-deserved encouragement from the progress they have made toward compliance.  Overall, while some areas of noncompliance persist, their severity is to a much lesser degree than previously.  Defendants have the capability to address the remaining issues, finish the tasks, and reach the goals.  Their qualified and resourceful staff have demonstrated the expertise necessary to make this happen, but again, the key to success is to keep the focus on compliance.

Undoubtedly, everyone who has touched this effort wants lasting, real solutions to the problems that have been targeted by *Coleman*. There is too much at stake in the welfare of the approximately 36,800 CDCR inmates currently on the mental health caseload for any shortcuts to the end of *Coleman* remediation.  It would make no sense to divert resources away from the real work to be done, costing precious time and potentially deferring the resolution that everyone

123

-- the *Coleman* parties, the Special Master, and most of all the members of the *Coleman* plaintiff class -- want to see happen.  It is time for the full benefit of all of the hard work that has been done, and that will continue to be done, to lead to fruition.

On March 1, 2016, the Special Master provided the *Coleman* parties with a draft version of this report.  In accordance with regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the draft report.  Plaintiffs' counsel submitted a written response requesting that the Special Master include in this report three additional recommendations for court orders.  The Special Master then held a teleconference with the parties on April 27, 2016 to discuss the plaintiffs' requests.

For reasons discussed more specifically below, the Special Master does not recommend the entry of any of the additional orders sought by plaintiffs.  Defendants are presently engaged in a number of projects designed to advance them toward compliance.  These projects are being carried out on a variety of fronts, including continuous quality improvement, suicide prevention, and access to inpatient care, among others.  Some are court-ordered, while others are the product of multidisciplinary workgroup efforts, but all are aimed at accelerating the attainment of compliance.   It is important that any additional projects be carefully drawn so that defendants can remain on pace toward successful completion of the ongoing projects.

The first of plaintiffs' three requested court orders was:

1. **Defendants shall commission and facilitate a study of the population trends that show significant *increases* in the mental health caseload population as compared to *decreases* in the overall in-custody CDCR population. The study shall assess the reasons behind these divergent trends and identify strategies to address them.  Such study shall be provided to the Special Maser and the parties, and shall be completed within 120 days of the court's order.  (Emphases in original).**

In support of this recommendation, plaintiffs correctly state that the draft Twenty-Sixth Round Report cites the divergence of the mental health and non-mental health censuses, and that this divergence "suggests that a study of the reasons behind it, and whether it is likely to continue, may be in order."  During the Special Master's teleconference, plaintiffs noted that understanding the reasons behind the divergence is important to effective policy-making and to managing the implications of the divergence for responding to future demand for mental health beds.  They succinctly framed the issue in their written response: "Defendants' population reduction measures have not led to a meaningful reduction of the CDCR mental health caseload population."  Plaintiffs also raised important, thought-provoking questions -- whether *Coleman* class members experience unintended *de facto* disadvantages and/or discrimination as a result of policies and practices pertaining to criminal charges, security levels, segregated housing, credits, parole, and community diversion.  The Special Master already monitors and covers program access, i.e. inmates' opportunities to obtain job and education credits, in his regular compliance reports.  The other questions raised by plaintiffs are beyond the purview of the Special Master's charge.  While these concerns should not be minimized, and in fact a population study may be indicated, there is no compelling reason why the *Coleman* court should order defendants to commission and facilitate a population study.

The reduction in CDCR's overall inmate population came about through the three-judge court's order in the litigation to resolve claims due to overcrowding of CDCR prisons, *Coleman v. Brown*, No. CIV S-90-0520 KJM KJN P (E.D. Cal.)/*Plata v. Brown*, No. C01-1352 TEH (N.D. Cal.).  Presumably, the divergence between the mental health caseload census and the overall in-custody census was never an intended or projected result of the three-judge court's population reduction order.   Nonetheless, the CDCR prison population problem was brought

125

before that tribunal, which is the proper forum for continued enforcement of the population

reduction order and for any derivative inmate population issues.  Although the three-judge court

was comprised in part by the *Coleman* court, that court is not by itself a substitute or an alternate

forum to which inmate population issues should be transferred.  If plaintiffs wish to pursue their

recommendation that CDCR be ordered to commission and facilitate a population study, the

proper forum for a grant of such relief would be the three-judge court.

The second of plaintiffs' three requested court orders was:

**2.** **Defendants shall work immediately with the Special Master, his experts, and plaintiffs to develop and implement effective policies and procedures that will address the following issues regarding EOP prisoners housed in administrative segregation units:**

**a)** **The large number of EOP prisoners in administrative segregation and their excessive lengths of stay in segregated housing units, which contrasts with the decrease in the overall CDCR segregation population.**

**b)** **The current and projected unmet bed need for EOP prisoners requiring segregated housing, including the operation of EOP administrative segregation hubs above court-ordered and otherwise established capacities.**

**c)** **Compliance with court-ordered staffing ratios and related requirements in the EOP administrative segregation hubs, including the need to integrate a staffing ratio component into the EOP administrative segregation hub certification process.**

This recommendation reflects legitimate concerns with the rising population of EOP

inmates in administrative segregation and its effect on these inmates' care, treatment, and lengths

of stay in segregation. An aspect of the concern is the disproportionately high rate at which EOP

inmates are represented in administrative segregation, where the rate of suicides by *Coleman*

class members has been consistently elevated for years.

126

There is a long history in *Coleman* of issues surrounding the placement and treatment of mentally ill inmates in administrative segregation.  These issues have not gone unaddressed; they have been targeted repeatedly in a variety of orders including the following:

| Order 10/26/01, ECF 1309 | Establishing primary clinician staffing ratio of 1:9 in EOP administrative segregation hubs. |
|---|---|
| Order 6/13/02, ECF 1383 | Establishing maximum ten-percent vacancy rates for psychiatrists and case managers. |
| Order 3/9/07, ECF 2158 | Directing Special Master to review/consider more effective means of care delivery to EOP inmates in administrative segregation, including reduced lengths of stay, re-mix of clinical and para-clinical staffing, and use of different housing and/or service models. |
| Order 6/1/07, ECF 2255 | Directing defendants to consider including in their plan (1) required ICC reviews every 45 days for inmates awaiting disposition of DA referrals and all mental health caseload inmates in administrative segregation over 90 days, and (2) transfers of inmates pending processing of DA referrals. |
| Order 4/10/14, ECF 5131 | Ordering defendants to, among other things, develop a plan and related procedures requiring (1) monthly certification of administrative segregation EOP hubs that meet EOP Program Guide requirements; (2) a ban on admission of *Coleman* class members (a) to any hub which has failed to meet Program Guide requirements for more than two consecutive months, (b) to any hub which exceeds its population cap, and (c) to any SHU; (3) conduct of case-by-case reviews of all *Coleman* class members in administrative segregation longer than 150 days[44]; (4) limitation or exclusion from administrative segregation any *Coleman* class members designated for administrative segregation for non- |

---

[44] These case-by-case reviews are intended to promote shorter stays, returns to non-segregated housing, and thus lower census in administrative segregation units.

| | disciplinary reasons if the unit also houses GP inmates for disciplinary reasons, and (5) revision of strip search policy in the hubs. |
|---|---|
| Orders 4/11/14, 4/29/14 ECF 5196, 5212 | Ordering implementation of defendants' plans, policies, and procedures developed in response to April 10, 2014 order. |

During the April 27 teleconference, defendants indicated that they have a number of initiatives that they believe will be responsive to administrative segregation EOP issues and that they wish to share with plaintiffs. An appropriate context for this to be done is already in place. In the fall of 2015, the *Coleman* parties were meeting to discuss EOP administrative segregation issues, among other things. In December 2015, the parties asked the Special Master to participate in their meetings, which he agreed to do but could not begin immediately. At that time, the DSH waitlist issues which emerged during the summer of 2015, plus the Special Master's report-writing duties, had resulted in a flurry of activities in which the Special Master's resources were heavily absorbed. These included the Special Master's experts' case-by-case reviews of *Coleman* class members for placement in their least restrictive inpatient housing settings, observation and critique of training of trainers and then staff training on the new MOU policies, simultaneous with preparation of eight reports including this one, three expert reports on suicides and suicide-prevention practices in CDCR prisons, and a full-scale compliance report on all seven mental health inpatient programs for CDCR inmates.

The Special Master is deeply committed to supporting the parties' willingness to meet on the issues identified by plaintiffs. Because the importance and timeliness of these issues call for

focused attention, the Special Master will convene a work group, to be comprised of plaintiffs, defendants, and members of his own staff, dedicated to addressing administrative segregation EOP issues.  In addition, the Special Master will be simultaneously examining the administrative segregation EOPs within the ongoing Twenty-Seventh Round of Monitoring and will cover his findings in his upcoming compliance report on the Twenty-Seventh Round.

Plaintiffs' request at this time for additional court orders directed at the administrative segregation EOP is not necessary.  Their concerns are already addressed by existing court orders. What plaintiffs request amounts to an order directing defendants to comply with these existing court orders -- "Plaintiffs request that the Special Master recommend that defendants be ordered to comply with court orders and to end EOP ASU overcrowding forthwith."  No such order is necessary.  The *Coleman* court need not re-announce its already-issued directives concerning the administrative segregation EOP.  The existing orders were all entered to compel compliance by those to whom they were directed.  To the extent that defendants have not been complied with these orders, they remain in full force and effect and their requirements must be satisfied.

Of note, however, is the overly-high population at the EOP administrative segregation hub at RJD.   It has a court-ordered capacity of 63 (*See* Order, entered July 27, 2004, ECF 1598), but it has held 78 to 110 inmates from August through December 2015.[45]   This significant upward departure from the population cap is not only concerning, it is also a clear deviation from defendants' own plan, the implementation of which was ordered by the Court on August 11, 2014 and August 29, 2014 (ECF 5196, 5212).  Defendants must comply with and resolve the over-

---

[45] Source: CDCR Monthly Population Data, secure FTP website.

population of the RJD EOP administrative segregation hub forthwith, or they will have to seek

and obtain relief from the population cap order.

The third of plaintiffs' three requested court orders was:

3.    **Defendants shall work with the Special Master and plaintiffs to develop and implement a corrective action plan to address deficiencies at California State Prison/Sacramento (CSP/Sac), with specific focus on the PSU program.  Such a plan would address Program Guide compliance failures, staffing requirements, measures to transition segregated class members to less restrictive settings, and segregation lengths of stay.**

During the Special Master's April 27 teleconference, defendants reported that they were

working on a number of new initiatives at CSP/Sac, including a step-down program for their

PSU.  Plaintiffs have indicated their agreement and support for what they have heard thus far

from defendants on this.  Thus, an exchange of views and ideas and the beginning of meaningful

response to plaintiffs' concerns with CSP/Sac are underway.

The initiation of a corrective action plan for CSP/Sac, as plaintiffs have requested, would

be a step backwards and is unnecessary in any event.  In the early, formative period of *Coleman*

remediation, the corrective action plan model was employed on an institution-by-institution basis

to help define and focus efforts to resolve identified problems in those institutions.  That was

before current problem-identifying and problem-solving strategies had been developed, when the

corrective action plan model for trouble-shooting had utility.

Today, the corrective action plan model has outlived its usefulness.   Since 2012, CDCR

has been developing its CQI process and its associated tool, the CQIT.  As noted in the Special

Master's Twenty-Sixth Round Monitoring Report, CQI has come a long way and continues to

show clear promise as part of CDCR's growing capacity to find and fix its issues in mental health

care delivery.  It is about to undergo trial runs at ten institutions in the ongoing Twenty-Seventh

130

Monitoring Round.  This is the time for CQI to move ahead, not for the revival of a now-outmoded model such as an institution-specific corrective action plan to be revived.

CSP/Sac continues to be monitored regularly by the Special Master.  It will undergo its usual full-scale review in the ongoing Twenty-Seventh Monitoring Round, and will be covered in the Special Master's compliance report to follow.  There does not appear to be any emergent situation in progress at CSP/Sac that calls for further court intervention at this time.  It should be kept in mind that CSP/Sac in particular has a very complex mental health mission whose growth has been explosive.  Past reports by the Special Master have generally found over time that CSP/Sac has been performing reasonably well.   The institution bears a significant burden in fulfilling its mission; one might say this is the result of its successes in mental health, as it has taken on increasingly greater responsibilities.  In the meantime, the appropriate forum for addressing any issues with CSP/Sac would be the Special Master's quarterly policy meetings with the *Coleman* parties.

In view of all of the foregoing, the Special Master recommends:

- That, due to the urgency of the long-standing mental health staffing issues, the Court order the defendants to provide the Special Master with monthly updates on their implementation of their staffing plan so it may be tracked and monitored by the Special Master the Special Master, and that the Court further order the defendants and the Special Master to meet and confer monthly to discuss and consider strategies and initiatives, including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained, all to resolve the problem of mental health staffing in CDCR prisons in a thorough and lasting way;

- That the Court order the Special Master to issue a stand-alone report on the status of mental health staffing and implementation of the defendants' staffing plan, said report to be issued within 120 days of entry of the Court's order;

- That the Court enter an order directing CDCR to complete its new peer review process and implement it so that the mental health clinical disciplines of psychiatry, psychology,

and social work at all 34 CDCR institutions undergo peer review under the new process on a regular basis;

- That the Court enter an order directing defendants and the Special Master to meet and confer to discuss, consider, and develop strategies and initiatives to improve collaboration between custody and mental health.  Strategies may include additional or modified trainings, enhanced communication, and leadership development.  The goal of any training or change in methods of communication across disciplines should be developed with an eye toward long-term and sustainable culture change.

- That the Court enter an order adopting the above-described plan and agreement for CDCR to conduct its trial implementation of CQIT at ten CDCR institutions, in the manner described above, during the Special Master's upcoming Twenty-Seventh Monitoring Round.


Respectfully Submitted,


_____/s/_____
Matthew A. Lopes, Jr., Esq.
Special Master


May 6, 2016


132

# APPENDIX A

## INSTITUTIONAL SUMMARIES

### California State Prison/ Sacramento (CSP/Sac)
February 3, 2015 – February 5, 2015

Census:

As of February 9, 2015, the total inmate population at CSP/Sac was 2,159 inmates, for a decrease by 534 inmates or 20 percent since the time of the preceding monitoring visit. The number of mental health caseload inmates dropped from 1,537 to 1,356, for a 12-percent decline.

There were 42 inmates in crisis beds at CSP/Sac on February 9, 2015. The Enhanced Outpatient Program (EOP) mainline census rose by 28 inmates from 374 to 402. The Psychiatric Services Unit (PSU) census rose by 85 inmates for a total of 309 inmates, due to a large extent to transfers of PSU inmates from Pelican Bay State Prison (PBSP). The Securrity Housing Unit (SHU) housed 73 inmates, including 35 inmates who were at the Correctional Clinical Case Management System (3CMS) level of care. The mainline 3CMS population fell precipitously by 44 percent, from 717 to 405 inmates.

There were 231 inmates in administrative segregation, down from 291 at the time of the preceding monitoring visit. Forty-four inmates were housed in an overflow unit. The administrative segregation EOP hub housed 112 inmates.

CSP/Sac reported several mission changes since the preceding monitoring round. It activated a non-disciplinary segregation (NDS) unit on October 2014, a third mainline EOP unit with 66-bed capacity in December 2014, and a short-term restricted housing unit (STRH) in the stand-alone administrative segregation unit in January 2015. At the time of the visit, no inmates had been admitted to the NDS unit.

Staffing:

CSP/Sac had a total of 302.77 mental health positions, including psych techs and clerical staff. This was an increase by 70.37 positions since the preceding monitoring period. Use of contract staff reduced the 22-percent vacancy rate to a functional vacancy rate of 15 percent.

The chief psychiatrist and both chief psychologist positions remained filled. The senior psychiatrist position remained vacant. Twelve of the 17.4 senior psychologist supervisor positions were filled, for a 31-percent vacancy rate. One of the 1.5 supervising social work positions was filled. All four senior psych tech positions were filled.

The number of staff psychiatrist positions increased from 20.5 to 22 positions since the preceding monitoring period. With 17 filled and one covered by contract staff, there was a functional vacancy rate of 18 percent.

Staff psychologist positions increased from 50 to 62 since the preceding monitoring period. Fifty of the 62 psychologist positons were filled. Contract staff covered 6.25 of the 12 vacancies, for a functional vacancy rate of ten percent.

Twenty-five of the 30 social worker positions were filled. Use of contractors reduced the functional vacancy rate to three percent.

Of the 108.87 established psychiatric technician positions, 85.6 were filled leaving a vacancy rate of 21 percent. Use of 14.88 contractors reduced the functional vacancy rate to 14 percent.

The number of recreation therapist positions increased from 13.54 to 27.5 since the preceding monitoring period. Twenty of the 27.5 positions were filled. The 27-percent vacancy rate was reduced to a functional vacancy rate of 16 percent with use of contractors.

Eighteen of the 25.5 clerical positions were filled, for a vacancy rate of 29 percent.

134

CSP/Sac reported that a proposal to implement telepsychiatry was submitted in December 2014 but no decision had been made by the time of the site visit.

During the review period, CSP/Sac began utilizing a California Psychology Internship Council (CAPIC)-approved pre-doctoral internship and practicum programs for third-year psychology doctoral students. At the time of the visit, two pre-doctoral psychology interns and two third-year psychology practicum students were working at the institution.

Quality Management:

The quality management process at CSP/Sac continued to function well, consistent with Program Guide requirements. The local governing body had the same composition and met quarterly during the review period.

The quality management committee met monthly, with membership and attendance compliant. Useful minutes were maintained.

The mental health subcommittee was chaired by the chief of mental health or designee and remained active during the review period. A review of minutes for 16 meetings indicated that the subcommittee covered audit results, suicide prevention, IEX guidelines, the key indicator report, and various custody matters. The minutes did not indicate whether a quorum was achieved. There were active QITs on the Mental Health Tracking System (MHTS.net), group therapy, job satisfaction, treatment plans, Form 7388B evaluations, assessment of primary clinician (PC) workloads, and strategies relevant to use of force. No formal corrective actions plans had been developed to address deficiencies discovered within the administrative segregation EOP hub certification process.

In March 2014, the institution implemented a new statewide peer review policy that required inter-institutional documentation reviews. CSP/Sac was paired with California Men's

135

Colony (CMC) for semi-annual review of each other's clinical documentation. The process was halted until January 2015, when it was implemented on a smaller scale.

Medication Management:

CSP/Sac maintained its robust medication management audit system. It transitioned to the medication administration process improvement project (MAPIP) format since the preceding monitoring period. The psychiatry report included quarterly compliance rates for prescribed psychiatric medications and laboratory testing of blood levels for inmates on psychotropic medications. The monthly nursing report included compliance rates for medication continuity during transfers, patient compliance with prescribed medications, and appropriate medication preparation and administration. Corrective action plans (CAPs) were established to address medication refusals, retraining of nursing staff on the administration process and documentation, missed medications, and administration-related errors.

Institutional audits found that 78 percent of newly-arriving inmates received their medications timely. Medication continuity following intra-institutional moves was only 67-percent compliant. Following discharges from the Mental Health Crisis Bed (MHCB), medication continuity was 67-percent compliant. After patients' returns from an inpatient program or community hospital, it was 72-percent compliant. Audits indicated a compliance rate of 67 percent following transfers to locked units. The compliance rate for administration of involuntary medications exceeded 90 percent.

CSP/Sac conducted audits regarding laboratory testing of inmates' blood levels for anti-psychotics, Depakote, lithium, Clozapine, antidepressants, Lamactil, and Carbamazepine. Testing was compliant for five of these medications, and CAPs were formed to address noncompliance with the remaining two, Lamactil and Carbamazepine.

136

Transfers:

The intermediate care and acute care referral logs provided by the institution contained the requisite data with few inconsistencies.  The monitor's expert's review of sample treatment plans generated during Interdisciplinary Treatment Team (IDTT) meetings indicated that form 7388B was being utilized appropriately.

During the review period, of the 1,454 inmates who met one or more criteria for consideration for referral to inpatient care during the review period, eight percent were referred. CSP/Sac referred 43 inmates to acute care, with 83 percent of these referrals completed within timeframes and posted on SharePoint.  Three acute care referrals were rescinded.  Of the 40 completed referrals, 38 or 95 percent did not transfer within timeframes.

CSP/Sac referred 74 inmates to intermediate care, with 82 percent of these completed within timeframes, as compared to 74 percent during the preceding monitoring period.  Seven intermediate care referrals were rescinded, two had pending Vitek hearings, and one was on the wait list.  Of the 64 completed referrals, 21 percent did not transfer within timeframes.

During the review period, there were no rejections from either acute or intermediate care. Out of the 37 Vitek hearings, only one inmate prevailed.  One referral did not transfer within 72 hours of bed assignment.

At the time of the site visit, 15 inmates were accepted and awaiting transfer to inpatient programs.  The five awaiting transfer to acute care had wait times ranging from zero days to 13 days.  The ten awaiting transfer to intermediate care had wait times ranging from five days to 43 days.

Staff reported timely uploading of Department of State Hospitals (DSH) discharge summaries that were easy to access and that provided useful information on continuity of care for inmates returning to California Department of Corrections and Rehabilitation (CDCR).

CSP/Sac continued to operate two licensed MHCB units and one unlicensed MHCB unit known as the MHCBU.  There were a total of 45 MHCBs at CSP/Sac, including 25 licensed MHCBs and 20 unlicensed MHCBs.  In Correctional Treatment Center 1 (CTC-1), there were 13 designated mental health beds, two restraint and seclusion rooms, and two medical beds. Correctional Treatment Center 2 (CTC-2) had 12 designated mental health beds.  The MHCBU, in Facility B, had 20 unlicensed crisis beds.

Institutional data indicated a total of 609 admissions to MHCBs, with 347 admissions to CTC-1 and CTC-2 and 262 admissions to the MHCBU.  In the CTC MHCBs, the average stay lasted 11.6 days, with a range of 0.5 days to 69.5 days.  There were 155 admissions, or 45 percent, with stays lasting longer than ten days during the review period.  In the MHCBU, the average stay lasted 12.49 days, with a range of 1.5 to 53.5 days.  There were 123 admissions, or 47 percent, with stays lasting longer than ten days during the review period.

Approximately 75 percent of referrals to the crisis bed did not result in admissions. Supervisory staff attributed many of these non-admissions to referrals made after normal work hours, but this issue had not been submitted for any quality management process.

During the review period, CSP/Sac transferred 18 inmates to MHCBs at other institutions.  Transfers of six inmates exceeded the 24-hour timeframe, with transfer times ranging from two days to 13 days.

When MHCBs were unavailable, inmates were placed into available medical Outpatient Housing Unit (OHU) beds or alternative housing.  Headquarters data indicated 456 placements in

138

alternative housing, with 94 percent of inmates transferred out within 24 hours.  Of the 27, or six percent, not transferred within 24 hours, stays lasted from approximately two hours to 25 days.

Pursuant to policy implemented in January 2105, alternative housing was located in the following locations, by order of preference: CTC licensed medical beds, OHU swing beds, OHU overflow beds, two ZZ cells in A-Facility, two ZZ cells in B-Facility, two ZZ cells in C-Facility, two contraband cells in B-Facility, and two contraband cells in C-Facility.  Contraband cells were utilized when all of the above cells were filled, as these cells did not have a toilet and sink.  If all of these areas were filled, regular cells on housing blocks were utilized with property and standard issue removed from them.  CTC holding cells were used as the last resort, with lengths of stay never to exceed four hours.

The monitor reviewed holding cell logs for the period of November 2014 through January 2015.  Of the 205 inmates placed in holding cells in Facility-A, only four had stays in excess of four hours.  None of the 25 inmates placed in holding cells in Facility-B had stays in excess of four hours.  However, it was noted that reviewed logs were not complete and information on 15-minute checks was not entered timely.

Other Issues:

Reception Center:

Observed new intake screenings were not conducted in confidential settings.  The inmate was seated in a hallway outside of the nurse's office, with a custody officer standing next to him.  The nurse used the current version of the intake screening form and asked all of the questions on the form.

139

<u>Administrative Segregation EOP</u>:

Administrative segregation intake screenings were 91-percent compliant.  Institutional data indicated 90-percent compliance for both initial psychiatry and initial PC contacts.  Ongoing psychiatry contacts were 82-percent compliant, which was attributed at least in part to large caseloads.  Compliance rates for initial PC contacts and contacts for treatment refusals were 88 percent and 67 percent, respectively.  Daily psych tech rounds were 91-percent compliant.

The two psychiatrists had caseloads of 46 and 48, respectively.  The six PCs had caseloads ranging from 12 to 14, and two newly-assigned PCs had caseloads of seven and nine, respectively.  One PC in the process of advancing to a supervisory position had a caseload of eight.

Provided information indicated compliance with timely initial and follow-up IDTT meetings.  Composition of IDTTs was also reportedly compliant.

On average, EOP inmates were offered 13.21 hours of structured therapeutic activities, attended 5.67 hours, and refused 7.54 hours.  An average of .40 hours of therapy was cancelled per week.  Staff attributed low attendance to housing of inmates in the administrative segregation overflow in PSU-2, increased MHCB admissions, and inmate refusals.  Modified treatment hours were not tracked during the review period.

The institution reported a total of 514 non-confidential out-of-cell contacts during the reporting period.  Data produced by the institution on cell-front contacts for MHCB, EOP, and 3CMS inmates in administrative segregation indicated that 3,805 were due to refusals, 2,282 to staff decisions, 253 to modified programming, 47 to lack of escorts, and 3,622 to unspecified reasons.

During July 2015, the average stay for the 241 EOP inmates in administrative segregation was 105 days. Eighty-five or 35 percent had stays in excess of 90 days. During December 2015, 96 inmates were in administrative segregation. For the 16 whose stays exceeded 90 days, the average stay lasted 140 days. On a monthly basis, CSP/Sac conducted 30-day custody reviews for all EOP inmates who had been housed in administrative segregation over 90 days. A report was generated for each monthly meeting.

3CMS STRH:

The STRH opened in January of 2015, too recently for an assessment of the adequacy of its programming. Restart chairs were being used in the unit and at least one inmate reported access to a television in his cell. Air vents in the cells were suicide-resistant. The yard and space used for out-of-cell structured therapeutic activities were adequate in size.

MHCB:

CSP/Sac reported compliance with timely initial and follow-up IDTT meetings, clinical contacts, and Suicide Risk Evaluation (SRE) requirements. However, data in MHTS.net on clinical contacts and SREs was inconsistent and incorrect. CTC-1 and CTC-2 had 13 and 12 beds, respectively, and shared responsibility for providing care. The two psychiatrists in CTC-1 and CTC-2 each had a caseload of seven. There were 12 PCs in CTC-1 and CTC-2.

In both CTC-1 and CTC-2, clinical contacts were reported to occur in confidential settings. The two units shared a recreation therapist who canvassed eligible inmates for participation, which was reportedly about 50 percent.

CTC-1 and CTC-2 also shared a yard which they used on alternate days from Tuesday through Friday, and on additional days if the recreational therapist was available. Only one inmate was allowed on the yard at any time. Sessions lasted from 30 to 45 minutes. Staff was

141

unable to estimate the weekly number of hours that each inmate was actually offered or received, but refusals were noted by custody staff.  There was no official yard log.  Inmates' movement and participation were noted in the healthcare chart at the end of each day.  Inmates in the MHCB did not have routine access to telephones or visitation privileges, although exceptions could be requested by mental health staff if clinically indicated.

During the review period, there were 54 inmates with three or more admissions to a crisis bed.  Thirty-three of these inmates were referred to the Positive Behavioral Support Team (PBST) for interdisciplinary discussion and enhanced treatment planning and management. However, no studies were conducted to compare outcomes between inmates referred to the PBST and those not referred.

The institution reported that staff ratios in the 20-bed MHCBU were the same as in the licensed crisis bed units.  The MHCBU had two assigned psychiatrists and seven PCs.

The monitor's expert attended six IDTT meetings in the MHCBU during the site visit. All appropriate disciplines attended and provided input, but the focus of the meetings was more on the inmates' current conditions rather than treatment planning.  Confidential treatment space was lacking, and clinical contacts occurred either cell-side or in treatment modules located in high traffic areas in the MHCBU.  Although inmates were offered daily out-of-cell contacts in a "confessional" setting, a very small percentage actually came out of their cells.  Staff noted that all inmates in the MHCBU were cuffed when escorted out of their cells, in contrast to inmates in the CTCs.  The MHCBU utilized part of a SHU yard, and it was reported that inmates with longer stays were more likely to go to yard.

Significant physical plant problems persisted in the MHCBU.  The cells appeared dirty and dark, with limited visibility into cell interiors.  CSP/Sac continued to exclude from the

MHCBU those inmates who needed wheelchair access, were on restraints or seclusion, or were undergoing Clozaril initiation.

A review of the restraint and seclusion log indicated 18 uses of restraints, with durations ranging from 1.45 hours to 48.5 hours.  Although compliance with pertinent policies and procedures was not audited, nursing staff used a checklist to facilitate compliance.  The monitor's expert reviewed records of seven inmates placed in restraints and found that the restraint policy was being implemented appropriately.

Alternative Housing:

Inmates placed in CTC medical beds or OHU cells were reportedly placed on one-to-one direct visual observation until an SRE was completed and an order was written permitting suicide precautions for CTC medical beds or OHU cells with furniture.  Inmates placed in alternative housing pending crisis bed admission were reportedly placed on constant direct visual observation.

At the time of the site visit, there were five inmates in the OHU or alternative housing on suicide observation status.  The monitor observed inmates in the ZZ cells to be on continuous observation, but an inmate in a non-suicide resistant OHU cell on suicide precaution status was observed at only 15-minute intervals.  Contrary to a statement in Suicide Prevention and Response Focused Improvement Team (SPRFIT) meeting minutes that all designated OHU cells had been retrofitted, these cells continued to have dangerous gaps that could be used as ligature anchors.

CSP/Sac reported that inmates in alternative housing were evaluated daily by a psychologist or social worker, and that inmates in the medical CTC beds may also have been evaluated by a psychiatrist.  It had maintained its long-standing Crisis Triage Team consisting of

143

two clinical psychologists and a master's-level social worker who managed the services provided to inmates in alternative housing.  Confidential treatment space was lacking in the OHU, and clinical contacts occurred cell-side.

SHU:

Institutional audits of the SHU indicated that initial psychiatry contacts were noncompliant, but follow-up psychiatry contacts were compliant.  Both initial and follow-up PC contacts were compliant.

Initial and follow-up IDTT meetings were noncompliant.  Audits indicated a compliance rate of only 49 percent for the presence of all required attendees at IDTT meetings.  It was reported that compliance levels in the SHU were adversely affected by SHU staff being redirected to other duties.

PSU:

At the time of the site visit, CSP/Sac had three PSUs.  All new arrivals in the PSU were initially placed in Step 1 of the five-step Behavioral Incentive Program (BIP) for evaluation.  During the reporting period, a total of 1,460 Step actions were taken in the PSU.  Of those, 793 or 54 percent maintained the inmate at his current Step level, 426 or 29 percent increased the inmate's Step level by one or more steps, and 241 or 17 percent decreased the inmate Step level by one or more levels.  The primary reason for inmates being retained at their current levels or having their levels increased was listed as "participation."  A decrease in a Step level was usually attributed to the inmate's receiving a Rule Violation Report (RVR).  The average stay in the PSU lasted 86.63 days, with a range of three days to 229 days.

CSP/Sac was compliant with timely initial and follow-up IDTT meetings in the PSU, but the rate of attendance by all required disciplines was only 79 percent.  Initial psychiatry contacts

144

were 86-percent compliant, and initial PC contacts were 76-percent compliant.  Routine psychiatry contacts were 82-percent compliant, and routine PC contacts were 93-percent compliant.

Institutional data indicated a total of 129 non-confidential out-of-cell psychiatry contacts and 1,545 non-confidential out-of-cell PC contacts during the reporting period.  The institution reported that out of a total of 620 cell-front psychiatry contacts, 390 were due to refusals, 48 to staff decisions, 36 to modified programming, two to no escort, and 144 were unspecified.  Of the reported 3,153 PC cell-front contacts, 867 were due to refusals, 429 to staff decisions, 148 to modified programming, 35 to lack of escort, and 1,674 were unspecified.

Fifty-seven percent of PSU inmates were offered ten hours of group therapy per week.  Institutional data indicated that on average inmates in the PSU were scheduled for 9.84 hours of weekly structured therapeutic activities, offered 9.93 hours, received 5.67 hours, and refused 3.66 or 39 percent of offered hours, with .51 hours of therapy cancelled per week.

The newest PSU unit, PSU-3, opened in October 2013 and was also used as an administrative segregation overflow unit housing 50 inmates.  This reportedly led to problems with clinical contacts, continuity of care, group attendance, increased RVRs, high refusal rates, and higher crisis bed admissions.  PC ratios ranged from 1:14 to 1:16 during much of 2014.  As of February 2015, eleven of the 125 inmates in PSU-3 were on modified programming.

EOP:

CSP/Sac had three EOP mainline programs, identified as A-EOP, B-EOP, and EOP-B2.5.  A-EOP and B-EOP had the capacity to treat 200 inmates.  EOP-B2.5, which was activated in December 2014, had the capacity to treat 66 inmates.

The three psychiatrists had caseloads ranging from 94 to 100.  Psychiatry vacancies in other programs caused EOP psychiatrists to be redirected to cover them, detracting from their time in the EOP.  Eleven PCs had caseloads of 24 to 30.  Two part-time PCs had caseloads of 14 and 22, respectively, and three other PCs had caseloads of ten to 13.  PC vacancies resulted in larger caseloads and core groups being conducted by psych techs.  There were four recreational therapists.  A growing number of newly-hired staff was unlicensed.

The institution was compliant with initial clinical assessments.  MHTS.net indicated 85-percent compliance for timely initial psychiatric contacts and 79-percent compliance for ongoing psychiatric contacts.  Audits of PC contacts indicated compliance and occurrence in a confidential setting.  Data indicated that no inmates were placed on modified treatment programs.

Facility audits indicated compliance rates for initial and quarterly IDTT meetings of 90 percent and 99 percent, respectively.  Attendance by required disciplines was 89-percent compliant.  At four IDTT meetings observed by the monitor's expert, all appropriate staff and three of the four inmates were present.  Discussion was multidisciplinary and treatment plans were discussed specifically with each inmate.  Staff had access to SOMS and the Electronic Unit Health Record (eUHR) during the meetings.

Based on MHTS.net data, EOP mainline inmates were offered an average of 13 hours of structured therapeutic activities per week.  Approximately one quarter of the inmates who attended structured recreational yard participated in the offered activities, as shown by both MHTS.net data and confirmed by inmate reports.  Recreational therapists reported a lack of adequate access to materials such as current movies, magazines and writing instruments for the inmates.

146

As compared to inmates on A-Yard, many inmates on B-Yard had been transferred from administrative segregation or discharged from the PSU, and consequently had a higher rate of gang-related issues or predatory behavior.  Some of these inmates on B-Yard no longer needed EOP level of care but were required to remain at that level of care for a minimum of 90 days pursuant to Program Guide requirements.

3CMS:

Compliance with initial psychiatric contacts occurred 89 percent of the time.  According to institutional audits, initial PC contacts were only 41-percent compliant.  Routine psychiatric contacts were timely 86 percent of the time.  MHTS.net information indicated compliance with routine PC contacts.

Initial IDTT meetings were only 70-percent compliant, but follow-up IDTT meetings were compliant.  Audits indicated 65-percent compliance for attendance by all required disciplines at IDTT meetings.  Supervisory staff attributed this to the need for increased clinical staffing.

Referrals:

CSP/Sac processed 1,706 referrals during the review period.  Data indicated that 97 percent of emergent referrals drew a response within the same day.  However, only 45 percent of urgent referrals were seen within 24 hours, and only 81 percent of routine referrals were followed up timely.

Heat Plan:

Records were reviewed for the period of May 2014 through October 2014.  The institution was compliant with sending monthly reports to headquarters, but data indicated multiple instances of missed temperature readings in various units.  The institution reported that

147

weekly lists of heat-risk inmates were generated by pharmacy and distributed to the units. Affected inmates were issued heat cards indicating they were prescribed heat-sensitive medications.

RVRs:

In 2014, CSP/Sac implemented a new operational procedure on the use of mental health assessments.  Documentation provided by the institution reported that some staff received training before the issuance of the new operating procedure, and some after it, leaving it unclear how many staff were actually trained on the new procedure.

Pre-Release Planning:

Audits indicated a compliance rate of 94 percent for providing paroling inmates with a 30-day supply of their medications.

Program Access:

Institutional data indicated that of the 624 available full-time jobs, 383 or 57 percent were filled by non-Mental Health Services Delivery System (MHSDS) inmates, 160 or 26 percent were filled by 3CMS inmates, and 110 or 18 percent were filled by EOP inmates.

Of the 240 part-time academic program assignments, 132 or 55 percent were held by non-MHSDS inmates, 87 or 36 percent were held by 3CMS inmates, and 21 or nine percent were held by EOP inmates.

For the 545 voluntary academic assignments, 256 or 47 percent were filled by non-MHSDS inmates, 120 or 22 percent were filled by 3CMS inmates, and 169 or 31 percent were filled by EOP inmates.

Of the 91 full-time and part-time vocational education positions available, 37 or 41 percent were filled by non-MHSDS inmates, 29 or 32 percent were filled by 3CMS inmates, and 25 or 27 percent were filled by EOP inmates.

The institution had implemented new policies and procedures for evaluating EOP inmates for program assignments and milestone credits, but at the time of the site visit only three EOP clinicians had received training.  The institution had begun collecting data documenting milestone credits within the two week period preceding the site visit, which did not yield enough information to determine the efficacy of the new policies and procedures.

For out-of-level housing of caseload inmates, institutional data indicated that three Level I EOP inmates were placed in Level IV housing, and two Level II EOP and two Level II 3CMS inmates were placed in Level IV housing.

A review of samples of CDC 840 forms and 128-Cs documented the semi-annual reductions in classification scores for completion of programming.  Two reviewed cases documented reference to reduced classification score reductions on the 128-C (ICC committee notes) but one did not.  The monitor was provided with only the Form 840 reclassification score sheet for a fourth case and was unable to determine if the updated score sheet was referenced in the ICC.

Document Production Issues:

MHTS.net continued to be a useful management information tool but at times it was limited by inaccurate data entry.  Staff also expressed concern about the amount of time that data entry detracted from time spent on their work duties.

Although the institution reportedly provided three sources of data relative to alternative housing, only one spreadsheet from headquarters was found in the materials for alternative

149

housing.  The other two spreadsheets were locally generated and covered alternative housing

placements and alternative housing pre-placement and post placement programming.  The

institution was able to identify discrepancies between the headquarters-generated data and the

locally-generated data.

**Folsom State Prison (Folsom)**
May 20, 2015 - May 22, 2015

Census:

As of May 18, 2015, Folsom housed 2,962 inmates, for a two-percent increase since the

preceding monitoring period. There were 2,459 male inmates and 503 female inmates in the

Folsom Women's Facility (FWF), which opened in January 2013.  Folsom did allocate mental

health staff separately between its male and female populations.

There were seven male and two female EOP inmates, and 622 male and 141 female

3CMS inmates.

There were 48 inmates, including two EOP inmates pending transfers to EOP hubs and

six 3CMS inmates, in administrative segregation.

Staffing:

 One chief psychologist position was filled and the other was kept open per headquarters'

directive for cost-saving reasons.

The senior psychiatrist position and all three psychiatrist positions were filled.

One senior psychologist supervisor and both senior psychologist specialist positions were

vacant.  Six of seven psychologist positions were filled, for a 14-percent vacancy rate.

Three of five social work positions were filled, for a vacancy rate of 40 percent.  One

social worker was unlicensed.

150

The psych tech supervisor position was filled.  Five of 5.3 psych tech positions were filled, for a six-percent vacancy rate.

The Health Program Specialist I (HPS I) position was filled, but the CHSA position was vacant.  Three of five office technician positions were filled.

Quality Management:

The quality management committee met monthly, always attained a quorum, and maintained minutes.  It addressed mental health issues including access to care, staffing, training on use of force, and MHCB referrals.

The mental health subcommittee met monthly, always achieved a quorum, and kept detailed minutes.  It discussed compliance with clinical contacts, staffing, peer review, QITs, audits, and trainings.

QITs addressed SREs, administrative segregation pre-placement screens, MAPIP, timely submission of mental health documents to medical records, documentation of five-day clinical follow-ups, and MHCB referrals.  Availability of Case Files (C-files) during IDTT meetings, five-day clinical follow-ups, effective communication, MAPIP, and eUHR/MHTS.net concordance among other things were audited.

Peer review was conducted by Folsom mental health staff for psychiatry, psychology, and social work.   From October 22, 2014 to April 22, 2015, mental health staff from Centinela State Prison (Centinela) conducted peer review of three Folsom psychiatrists, four psychologists, and one social worker.

Medication Management:

Other than documentation of medication continuity following intra-institutional transfers, medication management was generally compliant, according to psychiatry and nursing audits.

151

Transfers:

During the review period, there were no referrals, pending transfers, or completed transfers of inmates to DSH inpatient programs.  No inmates were returned to Folsom following discharges from inpatient programs.

During the review period, ten male and seven female inmates transferred to MHCBs at other institutions.  Eight of ten male inmates transferred within 24 hours of MHCB referral.  The two untimely transfers occurred after 52 hours.  Nine of ten men had a bed assignment within 24 hours of MHCB referral.  Six of seven female inmates transferred to an MHCB within 24 hours of referral; the one overdue transfer also occurred after 52 hours.  Six of seven female inmates had a bed assignment within 24 hours of MHCB referral.

Twenty-three of 25 or 92 percent of alternative housing placements were within timeframes.

No inmates were transferred to a PSU.

Eighteen of 19 or 95 percent of EOP inmates timely transferred to EOP programs; the one overdue transfer took 63 days.  During the site visit, Folsom's nine mainline EOP inmates had stays averaging 14 days; none exceeded 30 days.

Two EOP inmates housed in administrative segregation timely transferred to EOP hubs.

Folsom was unable to report 3CMS administrative segregation lengths of stays during the review period, but reported that no 3CMS inmates were housed in administrative segregation for more than 150 days.  As such, no case by case reviews were conducted.  Staff reported that male inmate transfers from CSP/Sac's administrative segregation unit to Folsom's segregated unit had not occurred during the review period.

During the site visit, two EOP inmates housed in administrative segregation had stays of 13 and 19 days.  Six administrative segregation 3CMS inmates' stays averaged 41 days and ranged from 17 to 71 days.

Folsom was unable to report the number of male NDS mental health caseload inmates during the review period.  None of the four NDS inmates housed in administrative segregation during the site visit were mental health caseload inmates.

Other Issues:

MHSDS Inmates in Administrative Segregation:

During the site visit, the PC-to-inmate ratio in administrative segregation was 1:8.  A .5 psychiatrist position was also assigned to the unit.

Folsom reported 100-percent compliance with timely initial and follow-up psychiatry contacts and timely initial and follow-up PC contacts.  Folsom also reported a compliance rate of 100 percent for initial and follow-up IDTT meetings.  There was 86-percent compliance for required staff attending IDTT meetings; required staff not in attendance were the psychiatrist and psych tech.

Due to inmate refusals, three of 86 or three percent of psychiatry contacts were cell front.  Forty-nine of 450 or 11 percent of PC contacts were cell front.

Group treatment was not offered in administrative segregation during the review period.

Review of 114As indicated that inmates received a minimum of ten hours of weekly yard and three weekly showers.  An interviewed EOP administrative segregation inmate did not express any concerns with provided mental health treatment.

<u>3CMS</u>:

Six PCs assigned to the male 3CMS program had caseloads that averaged 104 inmates. Two psychiatrists were also assigned to this program.

Due to the general population yard's aggressive gang politics, 3CMS inmates who arrived from other institutions and were endorsed to Folsom's minimum security facility (MSF) were initially housed in administrative segregation.  After the Institutional Classification Committee (ICC) saw them, they were transferred to the MSF, without initially being housed in the general population.  Staff indicated that this procedure reduced gang issues and violence at Folsom.

Folsom reported 99-percent compliance for initial 3CMS inmate psychiatry contacts and a compliance rate of 100-percent for follow-up psychiatry contacts.  For PC contacts, there was 99-percent compliance for initial contacts and 100-percent compliance for follow-up contacts. Folsom was 98 percent compliant with conducting initial IDTT meetings and 100-percent compliant with routine IDTT meetings.  Required staff attended IDTT meetings 95 percent of the time; correctional counselors consistently attended IDTT meetings.

Observed male inmate IDTT meetings revealed attendance by required staff.  Although treatment plans were presented at all meetings, measurable goals, strategies, and levels of care were not always discussed.  Treatment team clinicians also did not ask inmates whether they understood the IDTT process or their treatment plans.  Some treatment plans were also reviewed and signed during the one-on-one pre-IDTT meeting, instead of during the IDTT meeting in the presence of the treatment team.

All required staff and inmates attended observed FWF IDTT meetings.  At these meetings, mental health staff discussed inmates' mental health and related issues, but did not

154

consistently discuss goals, measurable outcomes, or inmates' levels of care.  Clinicians did not

offer groups to inmates during IDTT meetings, but provided a 3CMS program pamphlet that

indicated offered groups.

Folsom offered clinician-led process groups for 3CMS inmates, but the group wait list

identified some inmates who had been waiting for groups since 2013.  Staff reported that groups

were reviewed for clinical appropriateness prior to inmate group assignment or placement on the

wait list.

An observed group for male inmates effectively engaged inmates and was clinically

relevant.  Interviewed group members reported that the mental health program had improved

inmate behaviors and that groups were beneficial, and requested more groups.  However,

interviewed group members also stated that changes in clinicians were problematic and that

custody staff was often disrespectful.

FWF began accepting female 3CMS inmates in June 2014.  Approximately 15 female

3CMS inmates were interviewed concerning the mental health program.  Many indicated

frustration with FWF's clinical services and reported that custody, and not mental health, ran

FWF's mental health program.  They also expressed concern with mental health caseload

inmates' ineligibility to earn half-time credits to reduce prison sentences.  In fact, more than half

of interviewed female inmates stated an intention to leave the 3CMS program in order to earn

such credits.  They also reported other inmates who had stopped prescribed medications in an

attempt to satisfy early release eligibility criteria; some of these inmates wound up in the MHCB

following medication termination.  Many interviewed 3CMS female inmates were unaware of

the availability of groups.

Referrals:

Folsom reported 99-percent compliance for timely response to mental health referrals. There was 100-percent compliance for response to 28 emergent referrals, 98-percent compliance for response to 198 urgent referrals, and 99-percent compliance for response to 994 routine referrals.

Space:

Mental health staff reported insufficient treatment space at FWF, which also was neither confidential nor private. FWF group treatment took place in a non-confidential, multi-purpose room that lacked privacy.

Mental Health/Custody Relations:

Mental health staff typically reported having a good relationship with custody.

Heat Plan:

There were five stage I heat alerts during the review period, but no stage II or III heat alerts. The institution completed heat logs and forwarded them to headquarters. Observed units had appropriate digital thermometers that were located on the tier in locked boxes and enabled a clear viewing of readings.

RVRs:

Documentation indicated that 13 clinicians attended training on mental health input in the inmate disciplinary process on February 19, 2015.

Use of Force:

As of May 20, 2015, Folsom reported that 92 percent of custody staff and 100 percent of mental health staff had completed the controlled use of force training. The immediate use of force training had been implemented through block training.

156

<u>Access to Care</u>:

Staff reported good access to care and did not indicate any access to care problems. During the review period, Folsom issued 9,798 ducats and add-on appointments for mental health services, of which 9,196 or 94 percent were completed.  As to the 602 non-completed ducats, five or less than one percent were due to inmate refusal, 37 or six percent were not completed due to custody reasons, and 560 or 93 percent were not completed due to non-custodial reasons.

<u>Program Access</u>:

Although Folsom did not have an EOP program, all mental health clinicians attended the EOP functional evaluation training in November 2014.

a.   <u>Job and Program Assignments</u>:

On May 21, 2015, two EOP inmates had part-time, unpaid academic positions.

Of the 3CMS inmate population, 271 had full-time jobs, of which 197 were paid and 74 were non-paying.  An additional 100 3CMS inmates had full-time, unpaid vocational education positions and 28 had part-time, unpaid vocational education positions.  One 3CMS inmate had a full-time, unpaid academic position, and 162 had part-time, unpaid academic positions.

As to non-mental health caseload inmates, 1,121 had full-time employment positions, of which 808 were paid and 313 were non-paying.  An additional 321 non-mental health caseload inmates had part-time, unpaid academic positions, 164 had full-time, unpaid vocational educational assignments, 63 had part-time, unpaid vocational education positions, and five participated in full-time, paid substance abuse treatment programs.

Five EOP inmates were eligible for work training assignments but were unassigned, as were 100 3CMS and 217 non-mental health caseload inmates.

157

b.  Milestone Credits:

On March 31, 2015, two of four EOP inmates were eligible to earn milestone credits, with one or 50 percent earning them.  Three hundred one of 793 3CMS inmates were eligible to earn milestone credits, with 86 or 29 percent earning them.  Of 2,143 non-mental health caseload inmates, 705 were eligible to earn milestone credits, with 181 or 26 percent earning them.

c.  Out-of-Level Housing:

There were 24 3CMS and 86 non-mental health caseload custody Level I inmates housed in Level II housing.  There were 89 non-mental health caseload custody Level II inmates housed in Level I housing.  There were also 17 3CMS and 31 non-mental health custody Level III inmates housed in Level II housing.

d.  ADA Reasonable Accommodation and Grievance Procedures:

Folsom implemented the revised ADA reasonable accommodation and grievance procedures during the week of February 23, 2015.

e.  Periodic Classification Score Reductions:  EOP Inmates:

EOP inmates were granted classification score reductions for successful programming.

*Coleman* Postings.

All observed housing units contained *Coleman* postings.

158

## California Health Care Facility (CHCF)
July 21, 2015 - July 23, 2015

Census:

As of July 18, 2015, the total inmate census at the CHCF was 1,554, of which 841 or 54 percent were on the mental health caseload.

There were 88 patients in the 98-bed MHCB.

The total EOP census was 351, including 258 in mainline.  There were 402 inmates at the 3CMS level of care, including 73 in mainline and 12 in the prison work crew.

The OHU housed 21 EOP and 158 3CMS inmates at the time of the site visit.

There were 19 EOP inmates and 159 3CMS inmates in the CTC.

The 50-bed administrative segregation unit was an EOP hub.  At the time of the site visit, 43 EOP inmates were housed there.

Staffing:

Positions for the chief psychiatrist and the two chief psychologists were filled.  One of the chief psychologists served as the chief of mental health.

The two senior psychiatrist supervisor positions were filled, and according to staff, a third such position had been approved as a "long-term blanket hire" to be paid from funding for a vacant psychiatry position.  Fifteen of 22 psychiatry positions were filled, for a 32-percent staff psychiatrist vacancy rate.  Funding allocated to two of the psychiatry vacancies was used for a psychiatrist on call and medical officer of the day positions.

The five senior psychologist supervisor positions were filled.  CHCF was also authorized to fill an additional senior psychologist supervisor position.  Three of the five senior psychologist specialist positions were filled.  Of the 39 psychologist positions, 35 were filled, but two were

out on long-term medical leave, creating a 15-percent vacancy rate.   According to the institution, 12 were unlicensed but were appropriately supervised.

The supervising psychiatric social worker and the 11 social work positions were all filled. A contract social worker covered for a social worker who was on long-term sick leave.  Four social workers were unlicensed.

Twenty of the 21 recreation therapist positions were filled, for a five-percent vacancy rate.

In the MHCB, positions for the RN shift leader and 24 RNs were all filled. Twenty of the 24 psych tech positions were filled, as were 14 of the 16 CNA positions, for vacancy rates of 17 percent and 12 percent, respectively.

In administrative segregation and EOP mainline, the 13 RN positions, ten LVN positions, and 27 of the 28 psych tech positions were filled.

The sole CHSA II and the two HPS positions were filled.  The 2.7 AGPA positions were increased to three positions and were filled. One of the 1.8 OSS II positions was filled, for a 45-percent vacancy rate.

Twenty-one of the 22 OT positions were filled, for a 4.6-percent vacancy rate. Registry staff covered for an OT who was out on long-term sick leave.

Use of telepsychiatry in the MHCB, CTC/OHU, administrative segregation, and the EOP mainline had been replaced as a result of aggressive hiring of psychiatrists.  Telepsychiatry was used during the review period for individual clinical contacts and IDTT meetings for EOP mainline inmates only.

Quality Management:

The local governing body met monthly and achieved a quorum at each meeting. Meetings were chaired by the institution's CEO and were attended by the chief of mental health, the warden, and the executive director of DSH.  Minutes indicated that the group was involved with approving various mental health-related policies.

The quality management committee met monthly during the review period.  Meeting minutes were maintained.   The committee was chaired by the CEO.  The chief of mental health and the warden attended meetings.  Minutes documented discussions that covered standing committee reports including the mental health program subcommittee reports, among other things.

The mental health quality management subcommittee was chaired by the chief of mental health.  It met twice per month, achieved a quorum, and was very active.  Minutes indicated that it covered custody issues, reports from the QITs, suicide prevention, and compliance-related issues, among other mental health-related topics.

CHCF resolved two QITs, on pending appointments and trends in MHCB referrals, during the review period.  At the time of the site visit, QITs on the SPRFIT, administrative segregation, and effective communication compliance and accountability were active.  The administrative segregation QIT met monthly and covered EOP hub certification-related issues.

A peer review Local Operating Procedure (LOP) dated February 2015 and outlining the peer review process was provided.  No other documentation was provided to indicate that peer review was in place.

Medication Management:

At the time of the site visit, MAPIP was not implemented at the CHCF. No start date was provided. Staff reported that psychiatry and nursing were awaiting MAPIP training by headquarters.

Transfers:

At the time of the site visit, the CHCF had had its SPRFIT coordinator for five months. Referral/non-referral logs were generally complete, except for some cases in which missing data would have affected calculation of transfer timelines. No referrals to DSH programs were rejected. Staff attributed this to on-site consultation with supervisory staff before referrals were submitted. In addition, the DSH coordinator attended IDTT meetings in which DSH referrals were considered and discussed. The Correctional Clinical Assessment Team (CCAT) process was sometimes used before referrals were submitted.

Staff reported that documentation on Form 7388B required improvement. Pre-visit audit results indicated that 60 to 86 percent, or an average of 73 percent, of completed Form 7388Bs were documented appropriately. Training during June 2015 led to improved documentation, according to staff reports.

There were 220 referrals to acute care, of which 13 were rescinded. Ninety-five percent, or 208, of the referral packages were accepted timely by headquarters. Seventy-seven percent, or 170, of the referral packages were submitted timely to DSH. Information on when DSH received the referrals was unavailable. Time spans from the IDTTs' making of the referrals to the patient transfers to DSH ranged from 11 to 74.5 days. The average time from when the CHCF sent the referral to DSH to the time when patients transferred was 13.6 days. Delays in transfers to DSH were attributed to the statewide waitlist and staff unfamiliarity with required transfer timeframes. All of the acute care transfers were completed within 72 hours of bed assignment.

162

Of the 152 intermediate care transfers, eight were rescinded.  Ninety-five percent of the referral packages were timely accepted by headquarters.  Available data for 120 transfers indicated that 90 or 75 percent of transfers to intermediate care complied with the 30-day timeframe.  The delays were attributed to the statewide waitlist and staff unfamiliarity with required transfer timeframes.  All of the intermediate care transfers were completed within 72 hours of bed assignments.

Inmates prevailed at only two of the 78 Vitek hearings during the review period.  At the time of the site visit, two inmates were awaiting transfer to DSH.

According to the DSH non-referral log, 1,029 inmates were considered but not referred to DSH during the review period.  Documentation of reasons was consistent with headquarters' specifications.

DSH discharge summaries were posted timely on SharePoint.  For inmates discharged back to the CHCF, discharge packets were forwarded to the supervising psychiatrist and psychologist to assign the case.  PCs were encouraged to contact DSH for clinician-to-clinician discussions, but this did not occur routinely.  Lack of these communications was attributed to DSH clinicians being difficult to reach and/or not returning phone calls from CHCF staff.

Provided data indicated that there were 1,240 referrals to the MCHB at the CHCF during the review period, and that 1,096 or 88 percent of these resulted in MHCB admissions.   Fifty-five inmates had two or more MHCB admissions during the review period.  Sixty or five percent of the MHCB admissions were from the CHCF.  If no MHCB was available at the CHCF, an order was written for alternative housing, where the inmate was monitored one-to-one. The average MHCB stay lasted 12.4 days, with a range of 11 days to an outlier of 170.4 days, and a second-longest stay of 86.7 days.  Thirty-six percent of stays lasted longer than ten days.  Staff

attributed the long stays to a perceived belief by psychiatry that inmates undergoing medication changes required monitoring. Staff training on levels of monitoring outside of the MHCB was planned.  Clinical discharges and removals from the MHCB were not tracked for timeliness.

There were only four transfers to outside MHCBs during the review period.  Three took longer than 24 hours.  The average transfer time was 29.38 hours, with a range of 5.87 hours to 47.10 hours.  Reasons for the late transfers included lack of MHCB availability and potential need for Clozapine pending transfer to California Medical Facility (CMF).

Pre-site visit data indicated that there were 86 admissions to alternative housing during the review period.  It showed that in 80 percent of cases, inmates were transferred to an MHCB within 24 hours.  Late transfers exceeded 24 hours by a range of .1 hour to .9 hours, or an average of .3 hours.  At the time of the site visit, inmates placed in alternative housing but not transferred to the MHCB were not being routinely tracked.

During the review period, there were three PSU referrals, two of which resulted in timely transfers. The third was held up by a DSH admission.

Other Issues:

    Administrative Segregation EOP:

During the review period, 86 percent of initial screenings were completed within EOP inmates' first five days in administrative segregation.

Data indicated that 96 percent of initial psychiatry contacts and 98 percent of follow-up contacts were timely. The psychiatrist in the hub had a caseload of 37.

Ninety-seven percent of initial PC contacts were timely and preceded inmates' initial ICC meetings.  Follow-up contacts were timely 98 percent of the time.  Of the five assigned PCs, three had caseloads of eight each, one had seven, and the remaining one had 12.

The compliance rate for timeliness of initial IDTT meetings was 97 percent, and for follow-up meetings it was 98 percent.   Required disciplines attended 97 percent of meetings. Staff reported that inmates who refused over half of offered treatment were evaluated during daily "huddles."  An IDTT meeting would be provided to the inmate if deemed appropriate, and thereafter the inmate would be seen at least weekly, as indicated.

The ICC process was observed during the site visit.   The meeting began on time and was chaired by the warden's designee. Appropriate custody staff, the senior psychologist supervisor, and three PCs attended.   Inmates were given an opportunity to agree or disagree with the committee's findings.   Their mental health histories were discussed.  The mental health clinicians had a significant role in discussing and determining potential risks to inmates' mental health.  Before the inmates were returned to their housing, the clinicians asked each of them if they needed to see a clinician that day and made sure that they understood how to contact mental health if necessary.  The committee chair and custody staff explained the custodial process and the ICC appeal process clearly and allowed inmates to ask questions.

During the review period, EOP inmates were offered an average of 15.3 hours of structured therapeutic activities per week, attended an average of 8.68 hours, and refused an average of 6.64 hours per week.  An average of .89 hours per week were canceled.

Yard time was offered in two-hour increments from 7:00 a.m. to 3:00 p.m., five days per week.  Every two hours, a group of inmates clustered by cell numbers were offered two hours of yard, except on Wednesdays when ICC meetings took place and on one other day during the week.

As of July 22, 2015, 11 inmates had stays longer than 90 days in administrative segregation.  Staff reported that inmates whose stays exceeded 90 days were reviewed every

Monday at a warden's meeting with the inmates' PCs and other mental health staff.  On Tuesdays, the unit lieutenant and senior psychologist supervisor met, discussed, and implemented plans for all inmates whose stays exceeded 60 days. It was reported that the senior psychologist presented the results of the reviews at ICC meetings.  On July 22, 2015, all four inmates whose stays exceeded 150 days were referred to the CSR and were awaiting transfer.

On July 22, 2015, 14 inmates were on NDS status.  One of them was on expedited status but his transfer was delayed due to lack of available Sensitive Needs Yard (SNY) EOP beds. Staff reported that backlogs at Mule Creek State Prison (MCSP) and RJD accounted for extended stays in administrative segregation at the CHCF.

MHCB:

The CHCF had three MHCB units, A1A, A1B, and A2B. Each unit had 30 beds with two respiratory isolation rooms for inmates who were clinically discharged and awaiting transport. Each unit also had two rooms that were not used because they lacked flush toilets.  Fifteen to 18 of the rooms in each unit were ADA-compliant.

Each unit had an assigned clinical team consisting of three psychiatrists, six clinicians, and one recreation therapist. One unit had a psychiatric nurse practitioner. There were also "floating" positions for a psychologist, a social worker, and a recreation therapist. Two psychiatrist positions for weekend coverage were vacant at the time of the site visit.  The seven psychiatrists in the MHCB had caseloads of ten to 15, and the 19 PCs had caseloads of five to seven.  RNs, CNAs, and psych techs were also assigned to the units. There were a total of four Correctional Counselor Is (CC I) allocated to the three units.

Staff reported that newly-admitted inmates received a history and physical within 24 hours, an updated or new mental health assessment (Form 7386), an SRE if admitted for

166

suicidality, and an initial IDTT meeting within 72 hours, with a completed Form 7388B.  Review of provided pre-site information indicated that inmates were being seen daily by the psychiatrist or psychologist, and at least twice per week by the psychiatrist, as reflected in a compliance rate of 94 percent in MHTS.net. These contacts reportedly occurred out-of-cell in a designated interview room.  All inmates in the MHCB were placed on suicide precautions throughout their stays.

Initial and follow-up IDTT meetings were timely in 96 percent of cases, based on MHTS.net data.  All required disciplines attended, and updated treatment plans and Form 7388Bs were completed during the meetings.  Review of a limited sample of charts found good documentation in eUHRs of inmates' courses of treatment in the MHCB.

Seven IDTTs across the three units were observed during the site visit.  All inmates were assigned a staff assistant during the meetings to assist with explaining the process to the inmates. In all cases, the staff assistant was a correctional officer (CO). It was unclear how or why this practice was established.  The psychiatrist asked the inmate about his diagnosis and medications, nursing staff asked about medical issues, the PC provided a summary of the inmate's treatment, and the recreation therapist commented on activities provided to the inmate.  The inmates generally appeared most interested in opportunities for out-of-cell activity.  Discussion of treatment plans was limited, perhaps due to the limited treatment options available in the MHCB. Form 7388Bs were completed by the PCs but were generally not discussed.  Discussions about cuff status varied, and when it was discussed, custody staff were reluctant to recommend uncuffed status, even for Level II and III inmates, as it appeared that MHCB placement was considered a *per se* high-risk factor.  Easing of restrictions was delayed.  On July 21, 2015, no

inmates in the MHCB units were on uncuffed status.   Decisions concerning discharges back to sending institutions or referrals to higher levels of care did not overcome avoidable delays.

Inmates were reported to have individual access to the unit recreational area for about two to three hours per week.  A recreation therapist provided activities, usually in-cell, on an individual basis.  Dayroom was not available to MHCB patients, and yard access was less than what medical patients in the CTC received.  Staff reported patient instability, non-classification of inmates from reception centers, and lack of any process for identifying which inmates could co-recreate safely as reasons why MHCB patients were not allowed to access the dayroom or recreate together.  The result was that patients had less out-of-cell time than inmates in administrative segregation and were functionally secluded. The warden agreed to begin a process for assessing patients who were in the MHCB beyond ten days for individual suitability for yard and dayroom with patients.

Review of six sample discharge summaries found that they were legible and clinically meaningful. Staff reported that property, bedding, cuffing, and movement restrictions were reviewed timely and relaxed when appropriate.

Seclusion and Restraint:

During the review period, there was one placement in seclusion.  It lasted less than one hour.  There were four placements in restraints, involving three inmates, with all lasting less than four hours.  Staff identified some problems with adherence to applicable policies and procedures.

Alternative Housing:

Cells in the medical CTC were used as alternative housing for inmates awaiting MHCB placement.  Treatment services were similar to those in the MHCB.  Staff reported that two PCs had caseloads of five to seven patients.  They conducted emergency assessments as needed.  It

was reported that inmates were always placed on one-to-one observation, but information from nursing staff indicated that it was not uncommon for inmates to be placed on 15-minute watch instead.

Inmates in alternative housing were frequently provided with only mattresses, which was similar to conditions for MHCB inmates whose medical needs caused them to be placed in medical CTC overflow cells

At the time of the site visit, staff reported that all 3CMS inmates eligible for Long Term Restricted Housing (LTRH) or STRH were designated for transfer to appropriate hubs.

EOP:

The mainline EOP was located in the E Facility.  It had 375 beds and was at 71 percent of capacity at the time of the site visit.

Initial PC contacts were 93-percent compliant for timeliness, and 94-percent compliant for follow-up contacts. There was one psychiatrist for the program.  Telepsychiatry was provided for 134 inmates.  Six PCs had caseloads of 21 to 26, and another seven PCs had caseloads of 13 to 19.

Timeliness of initial IDTT meetings was 84-percent compliant.  For follow-up meetings it was 99-percent compliant.  Audits indicated that required disciplines attended IDTT meetings in 96 percent of cases.

Group and individual therapy was conducted in the mental health building located on the yard.  It had adequate space for individual and group treatment.  An average of 14.34 hours of group treatment per week were scheduled, 13.82 hours were offered, 8.61 hours were attended, 5.21 hours were refused, and .52 hours were cancelled. An observed group on anxiety was facilitated by a social worker and had ten participants.  It was well run, with active participation

169

by most members.  There was wide diversity of group offerings, which were continuing to expand as the population grew.  For EOP inmates on modified programming, audits indicated that they were scheduled for an average of 7.25 hours per week, offered 6.42 hours, attended 2.55 hours, refused 3.87 hours, and that no hours were cancelled.

Structured recreational yard groups were offered at 8:00 a.m. and 9:00 a.m. Monday through Friday, 10:00 a.m. Monday through Thursday, and at noon on Monday. During Stage 1 heat alerts, all yard groups were re-directed to group rooms in the mental health clinic for indoor recreational activities offered by recreation therapists.  At the time of the site visit, no recreation yard groups were offered to EOP inmates housed in medical units.

EOP inmates also had access to high school equivalency education, college courses, a computer laboratory, and an extensive library. There were waitlists for some of these programs.

Interviewed EOP inmates indicated that generally they were pleased with the mental health services they received at the CHCF.  They reported being seen every other week by their PCs for individual therapy in private settings, and on alternating weeks in group settings.  They were offered at least ten hours of group therapy per week, although some concern was expressed regarding the diversity of group offerings.  They reported that they were offered yard access on the small yard adjacent to the EOP unit daily until 2:30 p.m. and only had access to the large yard for approximately four hours on Saturdays and Sundays. They were concerned that their access to the large yard was markedly less than that which was afforded the general population inmates.  Additionall, they were concerned that the small yard was closed at 2:30 p.m. rather than the reported 4:00 p.m. closing time.  This observation was verified by the Special Master's expert, and this issue was discussed with the facility supervisory staff.  Inmates also voiced concern about some officers who called EOP inmates inappropriate names and at times taunted

170

and/or aggravated them.  These issues were discussed in detail with the CEO and the warden, who both indicated that they would be addressed.

EOP inmates who had significant medical issues were housed in medical units, which had assigned psychologists, social workers, psychiatrists, and recreation therapists.  During May and June 2015, these inmates were seen monthly by their psychiatrists in private settings in 100 percent of cases, and were seen at least weekly by their PCs in approximately 98 percent of cases.

Initial IDTT meetings were completed within 14 calendar days of inmates' placements.  They were preceded by an intake evaluation completed by the psychiatrist.  Follow-up IDTT meetings were conducted at least quarterly in 100 percent of cases.   They were attended by all required disciplines, with eUHRs and ERMS readily accessible.

Some of the inmates with medical issues received ducats to attend groups, but many were confined to bed, resulting in clinicians conducting treatment at bedside and therapeutic activities on the unit or in the room.  Fifteen therapeutic groups were offered.   Eighty-eight percent of inmates attended ten or more hours of group treatment per week during June 2015.  However, because of some inmates' significant medical issues, it was not uncommon for them to be offered modified programming.

Based on information from staff and MHTS.net data, the EOP program in the medical units appeared to function well.  Inmates with dementia were referred to either the EOP for modified programming and/or to the *Clarke* program, as the CHCF did not have an established dementia program.  Approximately 25 inmates were reported to have diagnoses of dementia.

3CMS:

Rates of completion of intake assessments for 3CMS inmates were 29 percent and 41 percent for May and June, 2015, respectively.  A CAP was implemented at the time of the site visit.

Approximately 99 percent of 3CMS inmates prescribed psychotropic medications were seen at least quarterly by a psychiatrist.  The psychiatrist assigned to the mainline 3CMS had a caseload of 81 patients, and two other psychiatrists assigned to the OHU and the CTC had caseloads of 121 and 144, respectively, with the larger caseload including some EOP inmates.

Approximately 99 percent of all 3CMS inmates were seen at least quarterly, and often more frequently, by their PCs.  Psychiatry and PC contacts took place in private settings, although no data was provided on what percentage, if any, were not conducted in private settings.  The three assigned PCs had caseloads ranging from 109 to 111.

Compliance rates for conduct of initial IDTT meetings within 14 working days of inmates' arrivals in May and June, 2015 were 92 percent and 79 percent, respectively.  It was reported that intake evaluations were routinely conducted by a psychiatrist before initial IDTT meetings.   One-hundred percent of inmates received follow-up IDTT meetings at least annually. The meetings were attended by all required disciplines, with ready access to eUHRs and ERMS.

Over 60 percent of 3CMS inmates were enrolled in weekly group therapies. Some groups had waitlists.

3CMS Inmates in Administrative Segregation:

Generally, 3CMS inmates were not housed in administrative segregation at CHCF, which had an EOP administrative segregation hub.  Three 3CMS inmates were housed temporarily in the hub during the review period.

172

Documented PC contacts indicated that initial contacts were timely, and that follow-up contacts were nearly compliant for timeliness.

Presented data indicated that initial and follow-up IDTT meetings were conducted timely, but the rate of attendance by required disciplines was 67 percent for the review period.

Referrals:

Reported compliance rates for timeliness of response to mental health referrals were 100 percent for emergent referrals, 94 percent for urgent referrals, and 90 percent for routine referrals.

Mental Health/Custody Relations:

The CHCF staff did not report problems with custody-mental health relations.

Heat Plan:

Data provided in advance of the site visit indicated one Stage 1 heat alert at the CHCF, during May 2015.  During the site visit, Stage 1 of the heat plan was activated.  There were no reported Stage II or Stage III heat alerts.

Pharmacy generated a daily list of heat-risk inmates that was accessible to staff.

The heat policy had not been revised to take into account the shaded areas and use of misters in the outdoor recreational areas.

RVRs:

Staff reported that all 325 staff assistants and hearing officers had been trained on the new RVR policies.  As of March 1, 2015, 68 mental health staff had been trained.

<u>Use of Force</u>:

Institutional data indicated that 99 percent of the 725 line custody staff and 97 percent of supervisory custody staff had been trained on the new use-of-force policies. Ninety percent of mental health clinical staff and 88 percent of mental health supervisory staff had been trained on the new use-of-force policies.

<u>Program Access</u>:

a.      <u>Job and Program Assignments</u>:

According to data gathered on June 15, 2015, paying full-time jobs were held by nine EOP inmates, 84 3CMS inmates, and 334 non-MHSDS inmates.  Four 3CMS inmates and 22 non-MHSDS inmates held full-time jobs that were non-paying.

Paying part-time jobs were held by 30 EOP inmates, 14 3CMS inmates, and 24 non-MHSDS inmates. Non-paying part-time jobs were held by 19 EOP inmates, two 3CMS inmates, and six non-MHSDS inmates.   Non-paying vocational education assignments were held by 14 EOP inmates, 11 3CMS inmates, and 21 non-MHSDS inmates. Non-paying part-time academic assignments were held by six EOP inmates, 32 3CMS inmates, and 66 non-MHSDS inmates. Volunteer assignments were held by 2 EOP inmates, 17 3CMS inmates, and 58 non-MHSDS inmates. There were 120 EOP inmates, 44 3CMS inmates and 40 non-MHSDS inmates who were eligible for full time assignments who did not have them.

b.      <u>Milestone Credits</u>:

CHCF reported that as of May 31, 2015, 331 or 17 percent of its total inmate population of 1,978 inmates were eligible to earn milestone credits.  Of those eligible, 42 or 13 percent were EOP inmates, 38 or 11 percent were 3CMS inmates, and 251 or 76 percent were non-MHSDS inmates.   Among eligible inmates, 2.38 percent of eligible EOP inmates actually earned them;

5.26 percent of eligible 3CMS inmates actually earned them, and 7.97 percent of eligible non-MHSDS inmates actually earned them.

        c.        <u>Out-of-Level Housing</u>:

CHCF is classified as a Level II facility.  Provided data for June 16, 2015 indicated that 17 EOP Level I inmates and seven 3CMS Level I inmates, 16 EOP Level III inmates and two 3CMS Level III inmates, and two EOP Level IV inmates and one 3CMS Level IV inmate were housed at the CHCF.

        d.        <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

 Institutional information indicated that training on ADA reasonable accommodation and grievance procedures was completed on February 9, 2015.

        e.        <u>Periodic Classification Score Reductions: EOP Inmates</u>:

Review of six of the eight completed CDC 840s confirmed that EOP inmates were granted the same semi-annual classification score reductions as non-EOP inmates for successful programming.

        *Coleman* <u>Postings</u>:

*Coleman* postings were observed in the housing units.

**Pelican Bay State Prison (PBSP)**
April 7, 2015 – April 9, 2015

<u>Census</u>:

As of April 6, 2015, PBSP's total inmate population was 2,629, which was down by 16 percent since the preceding monitoring period.

Eight inmates were in the MHCB.  There were 78 mainline EOP inmates and 125 mainline 3CMS inmates.

175

The administrative segregation population of 167 included one EOP inmate pending transfer to an EOP hub and 38 3CMS inmates.  Fourteen inmates, including one 3CMS inmate, in administrative segregation were on NDS status at the time of the site visit.

The SHU population of 1,141 included four 3CMS inmates.  The PSU population fell to 14 from 120 during the preceding monitoring period.

Staffing:

The chief psychiatrist position remained vacant. The two positions for chief psychologist were filled.

Only one of four psychiatrist positions was filled, for a 75-percent vacancy rate. Use of .6 contractors reduced the functional vacancy rate in psychiatry to 60 percent.

The senior psychologist supervisor position and the two senior psychologist specialist positions were filled.  Of 12 staff psychologist positions, 11.5 were filled and the remaining half-vacancy was covered by a contractor.  All four social work positions were filled, as were all four recreational therapist positions, although one recreation therapist was on long-term medical leave.

All five mental health clerical positions were filled but one was not covered due to a long-term medical leave.  The HPS I position was filled.  The CHSA II position was kept open per a cost-saving directive from headquarters.  The OSS II position, though eliminated, was filled as a "blanket" position.

Two of three senior psych tech positions and 24 of the 40.7 psych tech positions were filled. Many of these vacant psych tech positions were newly established. With use of one

contract psych tech, the functional vacancy rate was reduced to 39 percent.  Twenty-two of 24.1 LVN positions were filled, for a nine-percent vacancy rate.

PBSP made significant use of telepsychiatry during the review period.

Quality Management:

The local governing body met in October 2014 and addressed numerous items including revised policies and procedures.

Over 25 committees reported to the quality management committee.   It typically met weekly during the review period.  It always reported a quorum, maintained extensive meeting minutes, and addressed issues taken to the committee.

The mental health subcommittee met six times during the review period and reported a quorum for four meetings.  It maintained detailed minutes and addressed such issues as key indicators, QITs, peer review, MHTS.net performance reports, health care access quality reports, alternative housing placements, DSH referrals, and audits.

There were three open QITs during the review period.  One worked on developing a system to improve coordination of telepsychiatry and PC contacts.  Another worked on improving mental health-custody collaboration in the penalty mitigation aspect of the RVR process.  The third QIT addressed coordination among mental health, nursing, and custody to improve treatment hours for EOP inmates.

The institution audited MHTS.net/eUHR concordance, delivery of *Hora Somni*/Hour of Sleep (HS) medications after 8:00 p.m., inmates' receipt of parole medications, referrals to higher levels of care, explanation of medications and obtaining of consent forms from inmates in the MHCB, involuntary administration of injectable medications, and medication continuity following patient transfers.

177

Peer review was convened monthly during the review period.  Psychology and social work peer review were conducted jointly during the first four months, and separately during the last two months of the review period.  Psychology peer review focused on treatment planning, case presentations, and chart reviews.  Social work peer review addressed diagnoses and documentation of Axis I disorders in charts.   With only one staff psychiatrist position filled, no psychiatry peer review was conducted.

Medication Management:

MAPIP audits found noncompliance in the areas of laboratory testing of blood levels of inmates taking psychotropic medications, medication continuity following transfers from community hospitals, inmates' noncompliance with psychiatrist-prescribed medications, and administration of psychiatric chronic care medications.  These findings were consistent with dashboard results and staff reports.

Long pill lines with wait times longer than 20 minutes led to inmates arriving late to group therapy.

Transfers:

Twenty-six of the 27 acute care referral packages were completed timely.  In 13 cases, transfers were within the ten-day transfer time limit.  All but one of the 26 transfers took place within 72 hours of a bed assignment.  At the time of the site visit, five inmates were awaiting transfer to acute care.  Four were within the ten-day time limit, and one had been waiting for 19 days.

During the review period, there were 11 referrals to intermediate inpatient care, two of which were initiated at locations other than PBSP.  Ten referrals were completed timely and two

were rescinded.  Three of the nine transfers were within the 30-day time limit, and eight were within 72 hours of a bed assignment.

During the review period, four inmates returned to PBSP from acute care, and 17 returned from intermediate care. The DSH coordinator received email communications on discharges and downloaded from SharePoint discharge summaries that were typically legible, comprehensive, and useful.

There were 133 admissions to the PBSP MHCB among 113 different inmates.  Five inmates transferred to MHCBs at other institutions.  Four of these had a bed assignment within 24 hours of referral.  Three left PBSP within 24 hours of referral and the other two left within 48 hours.

Data indicated that from September 4, 2014 to February 26, 2015, 23 of 26 or 88 percent of transfers of EOP inmates in administrative segregation to EOP hubs were timely.  The three untimely transfers were late by an average of eight days.  Eight of the nine or 89 percent of the caseload inmates in the stand-alone unit were transferred timely, and one was transferred late by 2.9 days.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Administrative segregation at PBSP was not an EOP hub.

Provided data indicated that 51 3CMS inmates were placed in administrative segregation during the review period.  By March 17, 2015, 26 or 51 percent had been removed from administrative segregation and transferred to other CDCR prisons, and one had paroled.  At the time of the site visit, 38 3CMS inmates were in administrative segregation.  The ICC had approved six of them for transfer to other institutions, including four to SHUs and two for safety

179

reasons. Eight were pending resolution of disciplinary charges and ten were pending SHU audits.

Of the remaining four, one was nearing conclusion of an investigation and one was held during

court proceedings.  The remaining two had not yet appeared before the ICC. At the time of the

site visit, eight had been in administrative segregation over 150 days.

For 3CMS inmates in administrative segregation, data indicated that during the review

period, all 23 initial psychiatry contacts were timely.  Of the 625 measures of follow-up

psychiatry contacts, 605 or 97 percent were read as timely.  Institutional data indicated that from

August 31, 2014 to March 1, 2015, 13 psychiatry contacts were at cell front, although provided

documentation indicated that approximately half of them were cell-front.  Twelve of these were

due to inmate refusals and one was the result of the psychiatrist's decision.

From September 1, 2014 to February 28, 2015, 68 of 69 or 99 percent of initial PC

contacts were timely.  Of the 1,284 measures of follow-up contacts, 16 were indicated as late, for

a compliance rate of 99 percent. Data also indicated that 41 percent of follow-up PC contacts

were at cell front during the review period.  Fifty-three percent of these were due to inmate

refusals, and 35 percent were due to staff decision.

Psych tech rounds were audited by the senior psych tech on a monthly basis.  Audits

found 100-percent compliance for presence of signatures and initialing, but entries under "reason

for visit" were lacking.

Initial and follow-up IDTT meetings were both 97-percent compliant for timeliness.  A

full complement of required staff was present at 91 percent of meetings.  Psychiatry was absent

from every meeting which had fewer than all required staff.

From December 29, 2014 to March 31, 2015, documentation indicated that for 3CMS inmates in administrative segregation, weekly averages for group therapy were 2.55 hours scheduled, 2.44 hours offered, .15 hours cancelled, .5 hours refused, and 1.91 hours received.

Provided documentation indicated that average weekly offerings of yard ranged from seven to 11.22 hours in September 2014, 9.25 to 13.54 hours in October 2014, 11.66 to 15.50 hours in November, 10.58 to 14.12 hours in December 2014, 8.71 to 16.9 hours in January 2015, and 11.85 to 18.06 hours in February 2015.

Case-by-case reviews were done for seven 3CMS inmates in administrative segregation. Lengths of stay for six of these inmates ranged from 178 to 281 days.

MHCB:

During the review period, patient stays in the MHCB averaged 11.2 days in length. Forty-seven or 35 percent of stays exceeded ten days.  At the time of the site visit, there were eight inmates in the ten-bed MHCB.  Of the four who had been there longer than ten days, three were awaiting transfer to acute care and had been in the MHCB for an average of 19 days.

The MHCB was supervised by the chief of mental health.  It was staffed by one full-time psychiatrist, three full-time psychologists, a half-time senior psychologist supervisor, and a half-time psychologist.

Initial IDTT meetings were timely in 80 percent of cases, and follow-up IDTT meetings were timely in 96 percent of cases.  Quality of reviewed treatment plants was varied, although they did improve over the course of the review period.  Form 7388Bs did not always indicate appropriate justification of decisions to not refer the inmates to higher levels of care, and were sometimes not incorporated into the IDTT process.  IDTTs also did not consistently include appropriate treatment modifications for inmates who were not referred to higher levels of care.

181

Observed IDTT meetings were held in a crowded room. Placement of inmates into a holding cell hindered communication between the inmates and the psychiatrist. Not all PCs reviewed the treatment plans with the inmates.

Alternative Housing:

Provided data indicated the housing of 52 inmates in alternative housing during the review period. Of these, 36 or 69 percent had alternative housing placements that lasted 24 hours or less. The 16 alternative housing stays that lasted longer than 24 hours exceeded it by an average of 0.82 days, and the longest alternative housing stay exceeded 24 hours by an additional 2.83 days. For the months of September, October, and November 2014, the institution produced data indicating that 29 of 32 or 91 percent of alternative housing placements resulted in admissions to the MHCB.

SHU:

Mental health clinicians screened all inmates before placement in the SHU. During the review period, 212 evaluations were completed. Screenings consisted of review of the eUHR to determine whether a reliable 31-item screen or completion of Form 7386 had been done and whether the record reflected a SHU-disqualifying diagnosis. Typically, any clinically disqualified inmates were seen by the ICC and endorsed to an appropriate SHU. If a reliable screening had not already been done, one was completed. After screening, inmates were seen by the ICC.

Initial and follow-up clinical contacts were compliant for timeliness. Sixty percent of them took place in non-private settings.

Rates of timeliness of initial and follow-up IDTT meetings were 57-percent and 98-percent, respectively, though there was no data regarding the number that occurred before the ICC. The psychiatrist and psych tech, both required attendees, were typically absent.

No treatment groups beyond those offered in the PSU were provided.

An assigned PC conducted rounds every other week. Observed rounds were brief, with little to no interaction with inmates. It was unclear how the clinician could identify inmates' mental health needs unless told of them by the inmates.

PSU:

The PSU at PBSP provided mental health services at the EOP level of care. It was supervised by a senior psychologist supervisor and was staffed by a .75 contract psychiatrist, a full-time and a half-time psychologist, two psych techs, and a recreation therapist. Treatment space was adequate.

Rates of timeliness of initial and follow-up psychiatry contacts were 85-percent and 75-percent compliant, respectively.

Initial and ongoing PC contacts were timely in 95 percent and 94 percent of cases, respectively. Staff reported that treatment space was adequate.

Initial and follow-up IDTT meetings were timely in 94 percent and 96 percent of cases, respectively. Attendance by required disciplines at IDTT meetings was 96-percent compliant. No information was provided with regard to whether initial IDTT meetings preceded ICC meetings.

At an ICC meeting, all required staff and mental health supervisors were in attendance. Mental health clinicians' input was appropriate and thorough and was utilized by the chairperson in determining the inmates' housing.

Apart from the four inmates on modified treatment plans, on average 13.2 hours of treatment including group therapy and 10.2 hours of structured therapeutic activity were offered per week.  When including inmates on modified treatment plans, the weekly average offerings were 6.4 hours of treatment per week and 2.5 hours of structured therapeutic activity.  Three of the four inmates on modified treatment plans were referred to intermediate inpatient care, and one was admitted to an MHCB and subsequently to acute inpatient care.  Because of the low census in the PSU, groups were very small and were sometimes consolidated.  This led to participants being uncomfortable with disclosure of information to non-regular group members and unfamiliar with group material.

EOP:

At the time of the site visit, 78 EOP inmates, including ten on modified treatment programs, were housed on B-Yard in Building 3.  Two of the ten on modified treatment programs were in the MHCB.  Most of the psychiatric care was provided by telepsychiatry. There were 4.5 PCs, whose caseloads ranged from ten to 16, and two recreation therapists.

From September 1, 2014 to March 28, 2015, timeliness of initial and follow-up psychiatry contacts was 88-percent and 85-percent compliant, respectively.  Approximately 83 percent of psychiatry contacts were by telepsychiatry in private settings, and approximately 17 percent of psychiatry contacts took place in private settings.  There were four contacts at cell front due to staff decision or inmate refusal.

184

From September 1, 2014 to March 28, 2015, all initial PC contacts were timely, and 99-percent of follow-up PC contacts were timely.  From August 31, 2014 to March 1, 2015, 68 percent of PC contacts were in private settings, and 32 percent were at cell front or in other non-private settings.  Reasons for cell-front contacts included staff decision, inmate refusals, and inmates being on modified programs.

Initial IDTT meetings were timely in 86 percent of cases, as were 96 percent of follow-up IDTT meetings.  Attendance by required staff was 99-percent compliant.

 During the review period, an average of 11.3 hours of weekly group treatment was offered and an average of 8.8 hours was attended.  For inmates on modified programs, on average 6.6 weekly group hours were scheduled, 6.3 hours were offered, 2.8 hours were attended, 3.5 hours were refused, and 0.35 hours were canceled.

EOP inmates were offered an option of two groups that ran Monday through Friday.  They consisted of a clinician-led process group and/or a leisure group led by a recreational therapist.  A psych tech was assigned to provide health-related groups.  An observed clinician-led process group was clinically relevant and engaged all participants.

Interviewed inmates in the cognitive processing group reported that they knew their clinicians, knew how to access services, and benefitted from the mental health program. They confirmed good relationships with clinicians but indicated that some custody officers spoke negatively about inmates taking prescribed medications. They complained that only one hour of daily yard was offered.  Staff reported that offers of yard hours were not formally tracked, but estimated that inmates received 1.5 hours per week. Some group times conflicted with scheduled yard.

185

For EOP inmates housed in administrative segregation, average weekly group treatment hours were 4.47 hours scheduled, .25 hours cancelled, 4.22 hours received, and 1.94 hours refused.

3CMS:

The 3CMS program at PBSP had a telepsychiatrist who was shared with administrative segregation and had a caseload of 90.  The full-time social worker had a caseload of 100. The second social worker was shared with other mental health programs and had a caseload of 27.

All initial psychiatry contacts and 98 percent of follow-up psychiatry contacts were timely.  All five cell-front psychiatry appointments were due to inmate refusals.

Ninety-six percent of initial PC contacts and 99.8 percent of follow-up PC contacts were timely.  Of the 128 cell-front PC contacts, 62.5 percent were due to inmate refusals, 28 percent were due to staff decision, one percent were due to escort unavailability, and 8.5 percent were due to unspecified reasons.  According to staff, treatment space was adequate.

Ninety-two percent of initial IDTT meetings and all follow-up IDTT meetings were conducted timely.  Required clinical staff attended 92 percent of meetings, with psychiatry having the highest absentee rate, due to psychiatry staffing vacancies.

Three observed IDTT meetings were attended by the senior psychologist, PC, correctional counselor, and the psychiatrist via telepsychiatry, as well as the inmates.  The meetings were clinically-driven. Clinicians presented short-term and long-term goals and discussed inmates' levels of care.  Two of the three inmates disagreed with the PC's treatment plans and explained why.  In both cases, clinicians re-focused the meetings but did not address these inmates' apparent anxieties about their treatment plans.

186

Staff and inmates reported that groups for 3CMS inmates had not been offered since August 2014 because clinical staff were needed for EOP services.  No date for resumption of groups was provided.

Some interviewed 3CMS inmates reported seeing their clinicians quarterly, but only half reported finding 3CMS services beneficial.  They indicated that group treatment would be helpful.

Referrals:

The institution reported an overall compliance rate of 93 percent for timely response to mental health referrals.  For emergent referrals, timeliness of response was 100-percent compliant.  Urgent referrals drew a timely response in 93 percent of cases, and routine referrals drew a timely response in 94 percent of cases.  Response to referrals for medication referrals was timely in 87 percent of cases.

Heat Plan:

PBSP did not report any Stage I, II, or III heat alerts during the review period.  A list of inmates who were prescribed heat-risk medications was prepared weekly.

Access to Care:

Of the total 16,156 mental health ducats and add-on appointments reported for the review period, 68 percent were completed.  Among the non-completed ducats, 64 percent were due to inmate refusal, two percent were due to custody reasons, and 34 percent were due to otherwise unspecified non-custodial reasons.

Program Access:

a.      Job and Program Assignments:

Nine EOP inmates had full-time jobs.  Among 3CMS inmates, 29 had full-time jobs, one was a participant in part-time vocational education, and two were voluntary participants in academic programs.  Another 63 3CMS inmates were eligible for work training assignments, but were unassigned.

Among the non-mental health population, 488 inmates had full-time jobs, two had part-time jobs, 52 participated in part-time vocational education, and six were voluntary participants in academic programs.  Another 380 non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

b.      Milestone Credits:

Fifteen of 93 EOP inmates were eligible for milestone credits, but none earned them. Eighteen of 168 3CMS inmates were eligible for milestone credits, and one earned them. Among the 2,372 non-mental health caseload inmates, 310 were eligible for milestone credits, and 19 earned them.

c.      Out-of-Level Housing:

Three 3CMS Level III inmates were in Level IV housing.  One non-mental health caseload Level I inmate was in Level IV housing.  There were 26 non-mental health caseload Level II inmates in Level I housing, and two non-mental health caseload Level II inmates in Level IV housing.  Thirty-six non-mental health caseload Level III inmates were in Level IV housing.

d.      ADA Reasonable Accommodation and Grievance Procedures:

PBSP was not on the roll-out schedule for the revised ADA accommodation and grievance procedure, which includes appeals regarding accommodations for psychiatric disabilities.

e.      <u>Periodic Classification Score Reductions:  EOP Inmates</u>:

An interviewed correctional counselor reported that EOP inmates typically were reviewed and received class score reductions similar to non-EOP inmates for successful programming, although not necessarily semi-annually.

<u>*Coleman* Postings</u>:

*Coleman* postings in English and Spanish were observed in all reviewed housing units.

**<u>High Desert State Prison (HDSP)</u>**
May 12, 2015 – May 14, 2015

<u>Census</u>:

On May 12, 2015, HDSP housed 3,303 inmates, for a ten-percent decline from the census of 3,762 that was reported for the preceding monitoring period.  There were 871 inmates on the mental health caseload, which had grown by ten percent since the prior monitoring period and comprised 26 percent of the total inmate population.

The MHCB unit housed ten inmates.

There were five mainline EOP and 842 mainline 3CMS inmates; the 3CMS population represented a 27-percent population increase.  The administrative segregation population of 182 included one EOP inmate who was at HDSP for court proceedings and 13 3CMS inmates.  The administrative segregation 3CMS population had decreased by 81 percent since the previous monitoring round.

<u>Staffing</u>:

Positions for one of two chief psychologists were filled.

Both psychiatrist positions were vacant.

189

All three senior psychologist positions were filled.  Of 12 psychologist positions, eight were filled, for a 33-percent vacancy rate.  Two psychologists were unlicensed.

Positions for the supervising social worker, eight social workers, and one recreational therapist were filled.  Six social workers were unlicensed.

The senior psych tech position was filled.  Nine of 14 psych tech positions were filled, for a 36-percent vacancy rate.

The HPS I position was filled, but the CHSA II position was vacant.  Four of seven mental health clerical positions were filled, for a 43-percent vacancy rate; one of the vacant positions was a salary savings that permitted the hiring of an OSS II in the blanket.

Four full-time and two part-time telepsychiatrists served HDSP.  There was an average of 509 monthly individual and IDTT meeting telepsychiatry appointments.

Quality Management:

The local governing body met monthly between September 2014 and February 2015.  Maintained meeting minutes only indicated a quorum for two months.  Issues that the local governing board addressed included suicide prevention and alternative housing.

The quality management committee met monthly, kept meeting minutes, and reported a quorum for five of six months.  Numerous subcommittees, including mental health, routinely reported to the quality management committee.

The mental health subcommittee met five times during the review period; minutes indicated a quorum for only one meeting.  The mental health subcommittee addressed many mental health-related issues, including peer review, updating LOP, access to care, dashboard review, audits, and CAPs for mental health matters.

190

HDSP implemented several CAPs and conducted monthly performance reports.  Among other issues, they addressed PC documentation, MHCB/DSH inmate discharges that were not readmitted within 30 days, SREs, five-day follow-up discharges, administrative segregation EOP inmate transfers to EOP hubs, and mental health referrals.  An audit on agreement between eUHR records and MHTS.net information indicated 99-percent compliance from September 2014 to February 2015.  No QITs were chartered.

The institution conducted internal peer review for one psychologist and one social worker.  As peer review was in its infancy, HDSP reported that trends or patterns had yet to emerge.

Medication Management:

The institution did not provide MAPIP data for laboratory testing of inmates who were prescribed mental health medications and there were no other audits of prescribed psychiatric medications.

At 72-percent compliance, nursing transfer measures largely reported noncompliance. There was 98-percent compliance for medication continuity following parole, but no other nursing transfer measures exceeded 90 percent.  Medication continuity after MHCB discharge was 86-percent compliant, and medication continuity after discharge from a community hospital or DSH inpatient program was 83-percent compliant.

Other nursing transfer measures reported much lower compliance rates.  There was 54-percent compliance for medication continuity upon inter-institutional transfer at R&R, 66-percent compliance for continuity of nurse administered/Direct Observation Therapy (DOT) medication with intra-institutional transfers, and 44-percent compliance for medication continuity after transfer to a locked unit.

191

Medication compliance measures averaged 86 percent.  There was 92-percent compliance for timely provider visits after refusal or no show.  There was 85-percent compliance with psychiatry-prescribed medications, 81-percent compliance for involuntary medications, and a compliance rate of 86 percent for medical-prescribed medications.

Medication administration measures averaged 90 percent.  There was 99-percent compliance for psychiatric-prescribed chronic care medications, medical-prescribed chronic care medications, and new psychiatric medications.  New medical-prescribed medications averaged 93 percent compliance.  Compliance with chronic care TB medications was noncompliant at 58 percent.

All psychiatric medications were provided DOT.

During the site visit, 308 inmates were prescribed HS medications.  Staff reported conflicting times for the evening medication pass that ranged from 7:00 p.m. to 9:45 p.m.  Most inmates indicated receiving HS medications after 8:00 p.m. and reported pill lines that lasted from 20 to 25 minutes.

Mental health staff were unable to report the percentage of inmates who received psychiatric medication following parole.  The pharmacist estimated that more than 95 percent of inmates received parole medication.

Transfers:

Seven inmates were referred to acute inpatient care.  All referral packets were completed timely.  One was rescinded.  One Vitek hearing did not find in favor of the inmate.  DSH accepted the remaining six acute care referrals, of which two transferred timely.  The four untimely transfers all took place after between 14 and 17 days.  All six transfers were within 72 hours of a bed assignment.  During the site visit, there were no inmates pending DSH transfer.

192

Review of the non-referral log indicated inadequate non-referral rationales.  The non-referral rationale for more than 90 percent of entries was that the inmate's current level of care was clinically indicated.  The reason for non-referral in the remaining cases was the inmate's assessment in the MHCB.  Non-referral log notations were also uninformative as to the clinical rationale why the current level of care was clinically appropriate or concerning MHCB assessment results.

There were 161 MHCB placements, involving 144 inmates.

No inmates housed at HDSP were transferred to a PSU.

Eleven of 12 or 92 percent of EOP transfers to hubs were timely.

Three of 13 or 23 percent of inmates that HDSP identified for EOP level of care timely transferred to mainline EOP programs.  The ten untimely transfers averaged 35 days overdue, with a range of one to 130 days; the inmate who transferred after 130 days had a medical hold.  Lack of EOP beds was the reason for delays.

During the site visit, one of five of HDSP's mainline EOP inmates had a medical hold.  Three of the four remaining inmates were pending transfer to an EOP program for less than 60 days; the fourth inmate was pending transfer for 69 days.

HDSP was unable to report administrative segregation length of stays during the review period.  On April 20, 2014, two EOP and 13 3CMS inmates were housed in administrative segregation.  The two EOP inmates had stays of 34 and 31 days.  The 13 3CMS inmates' stays averaged 66 days and ranged from ten to 230 days.  All three mental health caseload inmates housed in the stand-alone administrative segregation unit were transferred within 24 hours of mental health designation.

Other Issues:

193

<u>MHSDS Inmates in Administrative Segregation</u>:

For administrative segregation 3CMS inmates, HDSP reported 91-percent compliance for initial psychiatry contacts and 96-percent compliance for follow-up contacts.  For PC contacts, there was 90-percent compliance for initial contacts and a compliance rate of 95 percent for follow-up contacts.

Initial IDTT meetings for 3CMS inmates were 92-percent compliant; follow-up meetings were 100-percent compliant.  Data indicated that required staff attended 100 percent of meetings.

Beginning March 2, 2015, HDSP had begun transferring segregated 3CMS inmates to the newly-created STRH, resulting in a significant decrease in the institution's administrative segregation 3CMS population.  Inmates were selected for STRH transfer based on their administrative segregation length of stay; inmates with the longest stays were transferred first.  However, clinicians reported that they were not provided with detailed information about the STRH's functioning or available programming, limiting their ability to adequately prepare inmates for the move.

Observed IDTT meetings revealed attendance by all necessary staff and access to required information.  The meetings were well-run and demonstrated all disciplines' active participation, including telepsychiatry.  However, IDTT meeting space was inadequate; staff had to stand or sit on tables.

Groups for 3CMS inmates had decreased with the declining administrative segregation MHSDS population.  An observed psych tech-led anger management group was adequately conducted.  However, the group treatment space was inadequate; groups took place in a line of holding cells that limited interaction among participants, and lacked auditory and visual privacy.

Interviewed group members reported mental health staff's general accessibility.  They also indicated that psych tech rounds regularly occurred and that mental health staff took adequate time to talk to them and follow-up on their concerns.  They also generally reported good treatment by custody.  However, some expressed a perception of mental health staff's reluctance to provide the intense treatment that they believed they required.

All six inmates who were housed in administrative segregation for 150 days or more on September 22, 2014 had their case by case review and were subsequently released from the unit.

MHCB:

HDSP's CTC had ten designated mental health beds, which were often filled to capacity.  Room 11, which was also used for seclusion and restraint, was the primary overflow cell.  In contrast to the previous site visit, when HDSP provided more than 70 percent of MHCB referrals, during the review period 90 percent of the institution's MHCB referrals originated from facilities other than HDSP.  HDSP mental health staff nonetheless reported good MHCB access as well as good communication with sending institutions regarding clinician-to-clinician contacts and transmittal of relevant documentation.

From October 6, 2014 through April 5, 2015, stays for the 161 MHCB placements averaged seven days.  Thirty or 19 percent of MHCB stays exceeded ten days, with a range of 11 to 37 days.

HDSP reported compliance for initial psychiatry contacts, but only 66-percent compliance for follow-up contacts.  For PC contacts, there was 83-percent compliance for initial contacts and 90-percent compliance for follow-up contacts.  There was only 73-percent compliance for initial IDTT meetings, but a compliance rate of 98 percent for follow-up IDTT meetings.

195

Observed IDTT meetings indicated the presence of required disciplines, active telepsychiatry participation, and good staff rapport with inmates.  Necessary information was available.  Decisions concerning issue and privileges were discussed with inmates and were made with adequate consideration of inmates' individual risk factors.  However, case presentations were sparse and typically did not address inmates' diagnoses, medications, and positive factors for higher level of care consideration, while staff interactions with inmates were often limited.

Inmates arrived to IDTT meetings handcuffed, but the cuffs were removed following inmate placement in the therapeutic module.  Inmates, including those in a suicide smock, sat on the bare metal seat in the therapeutic module and it was not cleaned afterwards.

Seclusion and Restraint:

Overall, seclusion and restraint were appropriately used.  There were 23 instances of seclusion, involving 15 inmates; one inmate required seclusion four times, two required seclusion three times, and one required seclusion twice.  One instance of restraint lasted less than 24 hours.

Alternative Housing:

All 44 alternative housing placements were within timeframes.

3CMS:

For 3CMS inmates, there was 95-percent compliance for initial psychiatry contacts and 94-percent compliance for follow-up contacts.  Only 76 percent of initial PC contacts were timely, but 95 percent of follow-up contacts were timely.  Mental health leadership reported that PCs were typically directed to meet with inmates at least monthly and to increase contacts as

196

clinically indicated.  Inmates reported meeting with their PCs anywhere from twice weekly to quarterly and expressed being able to increase these contacts as needed.

Eighty-four percent of initial IDTT meetings were timely, as were 99-percent of follow-up meetings.  Required staff attended IDTT meetings 95 percent of the time.  Of 29 IDTT meetings that all required staff did not attend, the correctional counselor was not in attendance 100 percent of the time, and the psychiatrist missed 23 of 29 or 79 percent of meetings.

3CMS inmates reported telling custody when they needed an immediate appointment with mental health staff, but indicated that custody routinely did not respond quickly to such requests.  Inmates further reported knowing of other inmates who engaged in self-injurious behavior as a result of custody's delayed responses to inmates' requests to meet with mental health staff.  Some inmates reported that their property was damaged when they requested immediate mental health assistance.

Two observed IDTT meetings were conducted in private offices with adequate light and computer access; all required staff attended.  Psychiatry input was minimal during one of the meetings, but was more extensive during the other.  The IDTT meetings demonstrated minimal inmate input as to current level of functioning and treatment goals.  Inmates were asked to sign treatment plans without having reviewed them, which was problematic.

During the site visit, HDSP did not provide groups for 3CMS inmates, although inmates had expressed interest in such groups.

Observed private offices that mental health staff used for 3CMS inmate treatment on B Yard indicated adequate light, space, and computers.  However, staff routinely reported insufficient office space, which compromised confidentiality and interfered with mental health services, requiring collaboration, flexibility, and communication among staff.

197

Mental health staff reported that HDSP's telepsychiatrists had provided a stabilizing influence in the provision of mental health services.  Staff also expressed satisfaction with the availability of telepsychiatry and its treatment team participation.  At the time of the site visit, two telepsychiatrists had visited HDSP.

Referrals:

HDSP reported 92-percent compliance for timely response to 1,123 mental health referrals.  There was 100-percent compliance for response to 64 emergent referrals, 89-percent compliance for response to 46 urgent referrals, and 91-percent compliance for response to 1,013 routine referrals.

Mental Health/Custody Relations:

Mental health staff reported generally good relations with custody staff.

Heat Plan:

There were no stage I, II, or III heat alerts during the review period.  Review of the administrative segregation heat log revealed the recording of temperatures every three hours. HDSP reported inmates who were prescribed heat-sensitive medications on a weekly basis.

Use of Force:

HDSP reported that 100 percent of mental health staff and 58 percent of custody staff had been trained in the new use of force policy.

Access to Care:

HDSP issued a total of 8,999 ducats and add-on appointments for mental health services, of which 7,095 or 79 percent were completed.  As to the non-completed ducats, 1,057 or 56

percent were due to inmate refusal, four or zero percent were not completed due to custody reasons, and 843 or 44 percent were not completed due to non-custodial reasons.

Program Access:

a.  Job and Program Assignments:

As HDSP did not have an EOP program, there were no EOP inmates with work training assignments.  Of 3CMS inmates, 284 had full-time jobs, of which 183 were paying and 101 were non-paying positions.  Of eight inmates with part-time employment positions, six were paying and two were non-paying.  There were 87 3CMS inmates with part-time, non-paying academic positions.  There were 22 3CMS inmates with full-time, unpaid, vocational education positions, and 26 3CMS inmates with part-time, unpaid, vocational educational positions.

Of non-mental health caseload inmates, 900 had full-time employment assignments, of which 602 were paying and 298 were non-paying positions.  Another 18 non-mental health inmates had part-time jobs, of which 11 were paying and seven were non-paying.  There were 178 non-mental health caseload inmates with part-time, unpaid, academic positions.  Eight non-mental health inmates were enrolled in full-time vocational educational programs, and 28 were enrolled in part-time vocational education programs, all of which were non-paying.  One EOP, 346 3CMS, and 883 non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

b.  Milestone Credits:

On March 31, 2015, zero of five EOP inmates were eligible to earn milestone credits.  Of 891 3CMS inmates, 142 were eligible to earn milestone credits, of which 34 or 24 percent earned them.  Of 2,484 non-mental health caseload inmates, 538 were eligible to earn milestone credits, with 91 or 17 percent earning them.

c.  <u>Out-of-Level Housing</u>:

One 3CMS custody Level I inmate was housed in Level IV housing and ten non-mental health caseload custody Level I inmates were housed in Level III housing.  There were 37 3CMS custody Level II inmates housed in Level III housing and one 3CMS custody Level II inmate housed in Level IV housing.  There were 66 non-mental health caseload custody Level II inmates housed in Level I housing, 109 non-mental health caseload custody Level II inmates housed in Level III housing, and four non-mental health caseload custody Level II inmates housed in Level IV housing.

There were 50 3CMS custody Level III inmates housed in Level IV housing and 120 non-mental health caseload custody Level III inmates housed in Level IV housing.  There were also three non-mental health caseload custody Level IV inmates housed in Level III housing.

d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

HDSP had yet to implement the revised ADA reasonable accommodation and grievance procedures.

e.  <u>Periodic Classification Score Reductions for EOP inmates</u>:

EOP inmates were granted the same semi-annual classification score reductions as non-EOP inmates for successful programming.

<u>*Coleman* Postings:</u>

There were *Coleman* postings in administrative segregation unit D-8 in both English and Spanish.

<u>**California Correctional Center (CCC)**</u>
May 15, 2015

<u>Census</u>:

As of May 15, 2015, the total inmate population of CCC was 4,135, a six-percent decline since the preceding monitoring period.  CCC did not physically house 1,712 of these inmates, who were located at a conservation camp.

At the time of the site visit, no mental health caseload inmates were at CCC.  There were 178 inmates in administrative segregation.

<u>Staffing</u>:

The senior psychiatrist position was vacant.  Positions for the senior psychologist, four staff psychologists, and the clinical social worker were filled.

Two of 5.2 psych tech positions were filled.  Use of one contract psych tech reduced the functional vacancy rate to 42 percent.

The HPS I position was filled.  Two of three mental health clerical positions were vacant, leaving a 67-percent vacancy rate.

There were 14 psychiatry telemedicine contacts during the review period.

<u>Quality Management</u>:

The quality management committee met monthly from September 2014 through February 2015, maintained minutes, and always achieved a quorum.  Various subcommittees including the mental health subcommittee routinely reported to the quality management committee.

During the review period, the mental health subcommittee held six meetings and achieved a quorum at three.  Minutes were maintained.  The subcommittee addressed training of

medical and nursing staff on suicide prevention, inmate safety, and access to care and other custody-related matters.

CCC implemented CAPs on timeliness of IDTT meetings and PC contacts.  Monthly audits from September 2014 through February 2015 on eUHR/MHTS.net concordance found 100-percent compliance.  No QITs were chartered.

There was no peer review at CCC during the review period.

Medication Management:

At the time of the site visit, no inmates were taking prescribed psychotropic medications. Staff reported that when inmates were prescribed these medications, they were monitored by a psych tech pending transfers to mental health programs at other prisons.

Transfers:

No inmates were referred or transferred to intermediate or acute inpatient care during the review period.  At the time of the site visit, no transfers to inpatient care were pending.

All six transfers to MHCBs at other institutions were done within 24 hours of referral.

All three OHU placements and both alternative housing stays complied with timeframes. One OHU placement and both alternative housing stays resulted in transfers to outside MHCBs.

Transfers of all eight inmates identified at the 3CMS level of care to 3CMS programs at other institutions were completed within timeframes.

Other Issues:

MHSDS Inmates in Administrative Segregation:

CCC reported 100-percent compliance for timeliness of initial and follow-up PC contacts, and initial and follow-up IDTT meetings for 3CMS inmates in administrative segregation.

Discussions with a psych tech and supervisory and line clinical staff indicated inconsistencies in their understanding of some mental health policies and procedures. While all agreed that any incoming inmate exhibiting signs of distress or acute mental illness would receive a mental health referral, there were discrepancies in their understanding of the role of inmates' histories of mental illness in deciding whether to refer inmates to mental health staff for assessment. There was also vagueness surrounding policy and procedure on mental health staff seeing non-mental health caseload inmates.

Alternative Housing:

The OHU at CCC had 14 beds for both medical and mental health inmates. Two psychologists were assigned full-time to the OHU and alternative housing. Two OHU cells, which were also used as contraband cells, were not retrofitted for suicide-resistance. Inmates in the OHU pending MHCB transfers were under direct observation by psych techs.

Eleven additional cells were designated as alternative housing and were used for OHU overflow.

3CMS:

CCC reported 100-percent compliance for timely initial and follow-up IDTT meetings for mainline 3CMS inmates.

Referrals:

The institution reported 100-percent compliance for response to the two emergent referrals, 95-percent compliance for the 22 urgent referrals, and 98-percent compliance for the 185 routine referrals.

Heat Plan:

CCC did not report any stage I, II, or III heat alerts during the review period.

203

RVRs:

The institution reported that CCC mental health clinical staff attended training on the new RVR process on September 4, 2014.

Use of Force:

CCC reported that 100 percent of mental health staff were trained on the new use-of-force policies.  As of April 10, 2015, only 39 percent of custody staff had received this training.

Access to Care:

There were 226 mental health ducats and add-on appointments from September 2014 through February 2015.  Eight percent there were not completed, due to reasons other than inmate refusals or custody reasons.

Program Access:

a.      Job and Program Assignments:

One thousand thirteen non-mental health caseload inmates had full-time employment positions and two had part-time positions.

Ninety non-mental health caseload inmates had full-time academic positions, 381 had part-time academic positions, 214 had full-time vocational education positions, and 70 participated in part-time substance abuse treatment programs.

One hundred four non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

b.      Milestone Credits:

As of March 31, 2015, no mental health caseload inmates were eligible to earn milestone credits.  Of 4,188 non-mental health caseload inmates, 2,694 or 64 percent of inmates were eligible to earn milestone credits, and 26 percent actually earned them.

204

c.      <u>Out-of-Level Housing</u>:

No mental health caseload inmates were in out-of-level housing at CCC.

d.      <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CCC had not yet implemented the revised ADA reasonable accommodation and

grievance procedures.

e.      <u>Periodic Classification Score Reductions - EOP Inmates</u>:

CCC did not house EOP inmates.

**<u>Mule Creek State Prison (MCSP)</u>**
March 23, 2015 – March 25, 2015

<u>Census</u>:

As of March 20, 2015, MCSP housed a total of 2,841 inmates, for a decline by seven

percent since the preceding monitoring period.  The mental health caseload population was 1,705

or 60 percent of the total population.  There were 517 inmates in the mainline EOP and 1,062

inmates in the mainline 3CMS.  The MHCB and the Mental Health Outpatient Housing Unit

(MHOHU) each held five inmates.

There were 148 inmates in administrative segregation.  Nineteen inmates were on NDS

status.  The administrative segregation EOP hub held 64 EOP inmates.  Three EOP inmates were

pending transfer to another hub and one was pending transfer to a PSU.  There were 50 3CMS

inmates in administrative segregation.

<u>Staffing</u>:

On March 20, 2015, the chief psychiatrist position and two chief psychologist positions

were filled.

Of the institution's 12.5 psychiatrist positions, 6.5 were filled, for a vacancy rate of 48 percent. Use of 3.4 Full-time Equivalent (FTE) registry psychiatrists reduced the functional vacancy rate in psychiatry to 21 percent.

Nine of the 11 senior psychologist positions were filled, for an 18-percent functional vacancy rate. MCSP filled 31 of its 40.5 staff psychologist positions, with a resulting vacancy rate of 23 percent that was reduced marginally to a functional vacancy rate of 22 percent with use of a .7 FTE registry psychologist.

The supervising social work position was filled. Seventeen of the 20.5 social work positions were filled. The 17-percent vacancy rate in social work was reduced to a functional vacancy rate of six percent with use of 2.2 FTE registry social workers.

Both senior psych tech positions were filled. Of the 33.6 psych tech positions, 31 were filled, for an eight-percent vacancy rate.

Twelve of the 19 recreation therapist positions were filled, leaving a vacancy rate of 37 percent.

With five of the six administrative support positions filled, the vacancy rate was 17 percent. There were 20 mental health clerical positions of which 15 were filled, leaving a vacancy rate of 25 percent.

Quality Management:

Mental health leadership described the quality improvement process at MCSP as very helpful and continuing to improve. Information on changes in quality improvement functions was disseminated to line staff via meetings and by email.

Review of minutes of a local governing body meeting in October 2014 indicated that required members attended. Activities included updates from the medical executive committee,

206

discussions of policies and procedures, a performance improvement work plan, licensing reports, and construction reports.

Minutes of monthly QMC meetings during the review period indicated attendance by all required disciplines except psychiatry, which later improved upon the hiring of a chief psychiatrist. The committee took up healthcare improvement projects, a healthcare disaster plan, in-fill projects, updates from the institution's CEO, information on policies and procedures, issues surrounding access to care, a performance improvement work plan, review of the dashboard, and reports from the mental health director, nursing director, and chief pharmacist. Minutes of the mental health subcommittee meetings were reviewed. The committee met twice per week with generally good attendance except by psychiatry, which was affected by a staffing vacancy issue. Agendas were broad in scope, including reports on the RVR process, the MHCB, health information management, program-by-program access to care, EOP treatment hours, QITs, DSH, suicide prevention, reports from nursing, and such matters within mental health programs as staffing and performance improvement projects, including the sustainable process for inmate access to higher levels of care. Audits using the mental health dashboard were conducted regularly. Results were used as a management tool, and corrective actions were developed and implemented as needed.

Active QITs during the review period addressed five-day clinical follow-up, timeliness of mental health referrals, in-fill planning, testing of concordance between eUHR s and MHTS.net, and EOP treatment hours. The last two QITs were resolved during the review period. There were active FITs on suicide prevention and the administrative segregation EOP, among others. Documentation of these activities was good.

All psychologists and social workers who had been at the institution for at least six months underwent peer review during 2014.  The process involved both qualitative and quantitative reviews of charts.  The applicable LOP at that time was followed.  Psychiatrists working in the MHCB during the review period underwent peer review, but a new process for psychiatry peer review was being developed at health care services at headquarters.

Medication Management:

Provided results from MAPIP audits generally indicated compliance with continuity of medications following intra-institutional moves.  However, other compliance scores indicated that there were issues with continuity of medications following MHCB transfers and discharges from DSH or community hospitals, inmates' compliance with psychiatrist-prescribed medications, and administration of medications outdoors and in chronic-care situations.  Data was not available on timeliness of new orders, timeliness of renewals after discharges from the MHCB or OHU, or continuity following moves into or out of administrative segregation. It was observed that the methodology employed at MCSP deviated from MAPIP protocol. Samplings were taken quarterly rather than monthly.  It was unclear whether the list of inmates receiving psychotropic medications covered the entire review period.  Data on all nursing measures and two psychiatry measures was missing for the final quarter of 2014.  Some pharmacy results were also absent for December 2014.  It also appeared that the disciplines involved in the MAPIP process did not meet to review the entire MAPIP results.

Staff reported that a process was in place to ensure that medications were renewed in a timely manner.

Medication orders were written for no longer than 90 days, and bridge orders for no longer than 30 days.  Inmates on bridge orders were given appointments with the psychiatrist within 14 days.

Written informed consents were being obtained consistent with Program Guide requirements, according to MAPIP results.

MAPIP results generally indicated adherence to protocols for laboratory testing of blood levels for inmates receiving psychotropic medications, although there were some methodological issues with these audits.

Twenty-two inmates were receiving medications via DOT. A centralized list of these inmates was kept, but the process for verifying staff's consultation of the list or MARs was overly informal and vague.

At the time of the site visit, 45 inmates were receiving involuntary medications per 2602 designation.  Nine were initiated at other institutions, three were initiated at MCSP, and 20 were renewed during the review period.  Staff reported that force was used rarely, if ever, in administration of involuntary medications.

It was reported that HS medications were administered at 8:00 p.m.

Parole medications were being provided to inmates consistently with Program Guide requirements.

Transfers:

At the time of the site visit, MCSP had a full-time DSH coordinator and an acting DSH co-coordinator.  Communication between MCSP and DSH about current or returning patients was generally good.  MCSP was given adequate notice of returning inmates and legible and

209

useful discharge summaries. The DSH coordinator attributed any backlog on the DSH waitlist to lack of DSH beds and not to CDCR practices.

The referrals logs contained most of the required information.   In the non-referral logs, there were some entries of "not in best interest of patient."  Headquarters staff had already instructed staff to not use this language, and review of an updated log indicated that it had stopped.

During the review period, MCSP referred 29 inmates to acute inpatient care, all at Vacaville Psychiatric Program at CMF (VPP).  All referral packets except one were completed timely.  Two referrals were rescinded and none were rejected.  Of the 27 patient transfers, six or 22 percent did not transfer within the ten-day time limit, transferring in 11 to 15 days.  Five or 19 percent of patient transfers did not occur within the 72-hour time limit following bed assignment.

MCSP referred 38 inmates to intermediate inpatient care during the review period.  Six referrals were rescinded, one was on medical hold, and none were rejected.  Of the 31 inmates who transferred, seven or 23 percent were transferred later than the 30-day time limitation, waiting from 31 days to 58 days to transfer.  Five or 16 percent were moved later than 72 hours after bed assignment.

At the time of the site visit, one inmate referred to acute care and two referred to intermediate care were awaiting transfer, all still within Program Guide transfer time limits.

There were 146 inmate transfers to outside MHCBs during the review period.  The average time from request to transfer was 32 hours, and the range was 4.77 hours to 105.4 hours.  Ninety-two or 63 percent of transfers were beyond 24-hour time limitation on transfer to an MHCB.  However, transfer times improved significantly over the course of the review period, from a compliance rate of five percent in August 2014 to a compliance rate of 90 percent in

January 2015.   For 76 or 83 percent of the 92 late transfers, reasons for the untimely transfers were listed as "no MHCB available," "lack of MHCB," or "bed availability."   Another reported reason was completion of medical clearances.   Staff also reported that earlier in the review period, it was erroneously believed that transfer time was calculated from when HCPOP assigned a bed number, rather than from the time of IDTT referral.   This misunderstanding was cleared up by a headquarters memorandum dated December 23, 2014.   Staff reported that the clinical director and the MHCB clinical supervisor established a work group to expedite medical clearances, and that the chief of mental health and the associate warden for health care were working on streamlining the transfer process.

During the review period, 24 inmates were transferred to a PSU.   Only one transfer exceeded the 60-day time limitation.

There were 363 placements in the MHOHU during the review period.   Of these, 179 did not result in admissions to an MHCB, and 23 percent exceeded the 72-hour timeframe for transfer out of the MHOHU, with the average overly-long stay .2 days overdue and the longest stay lasting five days.   Among the 184 MHOHU placements which resulted in transfers to MHCBs, 21 percent exceeded the 24-hour transfer time limit, with the average overly-long stay exceeding the time limit by .2 days and the longest stay lasting 3.8 days.

Other Issues:

Administrative Segregation EOP:

At the time of the site visit, inmates' stays in MCSP's administrative segregation hub ranged from one to 184 days, with an average stay of 48.2 days

Mental health pre-screens were not completed in 20 percent of cases.   Staff reported that this was due to psych tech training issues, which were subsequently corrected.

Only 11 percent of initial mental health assessments were completed before inmates'
initial IDTT meetings.  Institutional staff reported that they had been unaware that these
assessments should precede the meeting, and that the practice had recently been corrected.

One hundred percent of inmates were seen monthly by a psychiatrist.  Seventy-one
percent of these contacts were cell-front.

The eight PCs assigned to the hub had caseloads of five to ten patients.  PC contacts
occurred within Program Guide timeframes in 94 percent of cases during the review period.
Forty-seven percent of these contacts were cell front.  Treatment space was inadequate, but this
was expected to be remediated by an in-fill project.

Inmates were given follow-up IDTT meetings quarterly, and inmates on modified
programming received IDTT meetings monthly.  Required disciplines attended 98 percent of
IDTT meetings, although the August 2014 rate for full attendance was reported to have been 15
percent due to psych tech staffing issues.  Access to the eUHR, SOMS, and ERMS was available
during the meetings.  At five IDTT meetings observed during the site visit, all required
disciplines attended, and two of the five inmates attended.  There was good interdisciplinary
discussion among team members.

Staff reported that during the review period, 100 percent of initial IDTT meetings
occurred before initial ICC meetings.

Inmates were offered an average of 14.28 hours per week of structured therapeutic
activity, and received an average of 7.76 hours.  It was reported that mental health staff received
training on new procedures to deal with treatment refusals, and that custody staff would be
receiving the training in the near future.  Groups were conducted in the dayroom in the housing

unit, Building 12, with use of therapeutic modules.  Three sets of modules were placed in a semi-circle, but one set was significantly lacking in auditory privacy.

Institutional data indicated that 96 inmates, or an average of 16 per month, had been on modified programming during the preceding six months.  These inmates' treatment plans called for more frequent IDTT meetings and treatment planning directed at increasing participation in out-of-cell structured therapeutic activity.  Five inmates on modified programming moved into full EOP programming during the review period.

Yard was scheduled on a rotation of every other day, including for the walk-alone yards.  Staff reported that inmates had access to a minimum of 12 hours of yard or walk-alone time per week.  Rates of yard offerings to eligible inmates were reported as 92 percent for August 2014, 39 percent for September 2014 due to power outages, 96 percent for November 2014, 100 percent for December 2014, and 83 percent for January 2015.

Rates of offers of showers to inmates were reported as 97 percent for August 2014, 76 percent for September 2014, 97 percent for December 2014, and 98 percent for January 2015.  Electrical entertainment devices were available to inmates in the administrative segregation unit.

MHCB:

Eight of the ten beds in the CTC were used for mental health purposes and were suicide-resistant.  The CTC was filled at the time of the site visit.  Clinical space for individual contacts was limited but space used by the IDTT was adequate.

There were 86 admissions to the MHCB during the review period. The average stay lasted 17.8 days, with a range of less than one day to 76 days.  Fifteen inmates had three or more admissions, including one with seven, one with six, one with five, one with four, and eight with three.

213

The institution reported that 92 percent of initial SREs and 89 percent of follow-up SREs were completed timely.

One psychiatrist was assigned to the MHCB. For the period September 1, 2014 to March 9, 2015, the institution reported that 95 percent of initial psychiatry contacts were timely. Among the reported 214 follow-up psychiatry contacts during the same period, 206 or 96 percent were timely.

From September 1, 2014 to March 9, 2015, 77 or 95 percent of the 81 initial PC contacts were timely.  All 221 follow-up PC contacts during that period were timely.

Documentation indicated that IDTT meetings were conducted timely, with all required disciplines present.  At observed meetings, clinicians had good rapport with their patients and were familiar with their capabilities.  However, multiple inmates were brought in wearing only suicide smocks and were asked to straddle the chair, creating uncomfortable and unsanitary conditions for no apparent justifiable reason.

Seclusion and Restraint:

The restraint log indicated that seven inmates had 12 uses of restraints, lasting from 50 minutes to four days.  No documented reasons for these uses were provided at the time of the site visit.

Alternative Housing:

The institution had a designated MHOHU consisting of six modified cells, numbered 110 to 115 located in Building C 13, an administrative segregation unit.  Each cell had a call light. These cells were unsuitable for use as a MHOHU, and institutional staff were advised of same. Staff reported that the MHOHU utilized treatment modules for confidential contacts, and treatment modules or clinicians' offices, as available, for all other contacts.

214

There were also five cells, numbered 107 to 109, 116, and 117, also in administrative segregation, designated as MHOHU overflow.  Custody reported that the cells on either side of these cells were offline so that mental health inmates would not be housed adjacent to administrative segregation inmates.  In addition, there were two alternative housing cells in the Triage and Treatment Area (TTA), four in Receiving and Releasing, and up to two contraband watch cells, if needed.  Staff reported that only the MHOHU and MHOHU overflow cells in administrative segregation were used during the review period.

From August 1, 2014 to February 15, 2015, there were 363 reported MHOHU placements.  Of these, 184 or 51 percent resulted in referrals to MHCBs.  One hundred forty-five or 79 percent of these transfers to MHCBs were timely.  There were 41 placements in alternative housing outside the MHOHU, with 93 percent of them resulting in timely discharges or transfers.

EOP:

EOP inmates at MCSP were housed in Building 5 on A-yard and in Buildings 6 and 7 on B-yard.

Three psychiatrists assigned to the EOP had caseloads of 104, 117, and 132 patients, respectively.  Another two psychiatrists who amounted to less than two FTEs had caseloads of 66 and 88 patients, respectively.  Ninety-four percent of the 2,338 initial psychiatry contacts during the review period were completed timely.  Follow-up psychiatry contacts were noncompliant, with only 79 percent of the 31,171 contacts conducted timely.  Of the 3,494 total psychiatry contacts during the review period, 508 or 17 percent were conducted via telepsychiatry.

Apart from the telepsychiatry contacts, there were 2,909 psychiatry contacts, 2,812 or 97 percent of which were conducted in private settings and 97 or three percent of which were

215

conducted in non-private settings.  Among the 97 psychiatry contacts in non-private settings, 41

or 42 percent were out of cell.  Of the remaining 56 or 58 percent of psychiatry contacts which

were cell front, 28 or 50 percent were due to inmate refusals, 23 or 41 percent were due to staff

decisions;  three or five percent were due to "unspecified" reasons, and two or four percent were

due to lack of custody escort.

There were 22 PCs assigned to the mainline EOP.  Nineteen had caseloads ranging from

21 to 27 patients, and three PCs who also had other responsibilities in the mental health program

had caseloads of 12, 15, and 19, respectively.  MCSP reported that 89 percent of the 1,273 initial

PC contacts from August 1, 2014 to February 15, 2015 were completed timely, as were 91

percent of follow-up PC contacts during the same period.

Of the 6,634 PC contacts in non-private settings, 3,780 or 57 percent were cell front and

2,854 or 43 percent were in non-private out-of-cell settings. Of the 3,780 cell-front contacts,

1,903 or 50 percent were the result of staff decision, 1,304 or 34 percent were for unspecified

reasons, 337 or nine percent were because of inmate refusals, 233 or six percent were due to

inmates being on modified programming, and three or less than one percent were due to lack of

custody escort.

Five IDTT meetings were observed during the site visit.  Required staff attended,

although the psychiatrists were not the patients' own psychiatrists.  Telepsychiatrists did not

attend remotely because the necessary equipment had not yet arrived at the institution.  It was

observed that mental health staff did not address or advocate possible treatment interventions

with medical and/or custody staff as part of treatment planning.  For example, one psychiatrist

erroneously told a patient that he could not receive HS medication because of  "a custody

regulation."  This was brought to the attention of mental health and custody supervisory staff

216

who indicated that they would remediate the misunderstanding.  In response to another inmate's complaint of inadequate medical care for his chronic back pain, the meeting facilitator suggested the sleep/pain group to address this inmate's complaint.

During the review period, an average of 14.4 treatment hours per week were scheduled, and an average of two hours were cancelled each week.  Inmates were offered an average of 12.4 weekly treatment hours, attended an average of 7.28 hours, and refused an average of 5.12 hours.  For inmates on modified programming, an average of 12.68 hours per week were scheduled and an average of 11.07 hours were offered.  These inmates attended an average of 4.47 hours and refused an average of 6.6 hours each week.

Interviewed EOP inmates indicated that there were scheduling conflicts among groups, yard, and vocational programs, and that inmates were not credited for group attendance if they arrived more than 15 minutes late.  Inmates also reported that they did not always attend groups because they did not know the time, did not want to deal with custody, and sometimes did not feel like talking about problems.  They requested fewer leisure groups, more clinical groups including peer groups for inmates serving life sentences, a group on current events, and more visual aids to clarify the purpose of groups.  Inmates also requested sensitivity training for custody staff, particularly on first and third watches.  Inmates also reported a perception that some clinicians were afraid of custody officers and would not talk to them on behalf of their patients.  They also expressed concern about multiple clinician changes and believed that some new clinicians were unaware of patients' earlier treatment plans and goals.

3CMS:

Eighty-two percent of intake assessments of 3CMS inmates were completed within ten working days.

217

Caseloads for the three psychiatrists assigned to the 3CMS program ranged from 342 to 379. Ninety-four percent of initial psychiatry contacts were completed within the Program Guide timeframes. Eighty-seven percent of 3CMS inmates taking psychotropic medication were seen at least quarterly by a psychiatrist.

The ten PCs assigned to the 3CMS mainline program had caseloads that ranged from 85 to 116. Two additional PCs who also had other responsibilities had caseloads of five and 53, respectively.

Eighty-nine percent of 3CMS inmates were seen at least quarterly by their PCs. Staff reported that PC and psychiatry contacts took place in private settings except on A-yard, which used cubicles with privacy walls. Space for individual clinical contacts was inadequate on A-Yard.

Ninety-six percent of initial IDTT meetings were held within 14 work days of inmates' arrivals. Ninety-six percent of follow-up IDTT meetings took place at least annually. Documentation indicated that 42 percent of IDTT meetings were attended by the psychiatrist, PC, and correctional counselor. This was attributable in large part to psychiatry staffing vacancies. Custody records but not eUHRs were accessible by computer.

Staff reported that several therapeutic groups were being offered on A-Yard and a group was planned to start on B-Yard, but groups were not being offered on C-Yard. Limited staffing and treatment space were cited as reasons, particularly on B-Yard and C-Yard.

Inmates on C-Yard were interviewed. They expressed reservations about participating in group treatment because of confidentiality concerns. Several inmates had significant complaints regarding how COs were treating them. They described lack of connection between mental health services and custody staff, especially in the RVR context. Their perceptions of the mental

218

health program varied widely.  Those inmates receiving psychotropic medications reported no problems with medication continuity and that they saw the same psychiatrist in a private setting approximately every 90 days.  They also reported seeing their PCs with similar frequency, and some reported greater frequency.  The mental health sick call process appeared to be working adequately.

SNY inmates on A-Yard were also interviewed.  Several reported problems with medication continuity.  Two reported not being seen by their PCs within the preceding 90 days.  All complained about limited access to group therapy and lack of private settings for their clinical contacts, which took place within cubicles in a large room.  Review of heath care records for four inmates on A-Yard indicated PC contacts with varying clinicians, failures to implement treatment plans, late follow-ups by psychiatry on initiations of new medications, and frequent absences by psychiatry at inmates' follow-up IDTT meetings.

3CMS Inmates in Administrative Segregation:

The two PCs assigned to the 3CMS administrative segregation program had caseloads of 24 and 25, respectively.  Psychiatry and PC contacts were consistent with Program Guide requirements.

Initial IDTT meetings were timely in over 95 percent of cases.  However, treatment space in the unit was inadequate but was expected to be improved by an infill project in the near future.  3CMS inmates in administrative segregation were not offered group therapy due to staffing and space limitations.

At the time of the site visit, inmates' stays in administrative segregation averaged 96.3 days and ranged from one to 507 days.  Staff indicated that many of the long stays were due to custody-related issues such as investigations, extensions, endorsements, and RVRs.

As of March 2, 2015, MCSP has not been directed to transfer any 3CMS inmates in administrative segregation to the STRH or LTRH.

Referrals:

Timeliness of response to the 161 urgent mental health referrals was 94-percent compliant.  Overdue responses were late by 5.2 hours on average.  There were 393 emergent mental health referrals, which drew timely responses in 99 percent of cases.  Late responses were only six minutes overdue on average.  Response to the 2,403 routine mental health referrals was timely in 86 percent of cases, with overdue responses late by 3.6 workdays on average.

Mental Health/Custody Relations:

Staff reported good relationships between custody staff and mental health staff. However, interviewed EOP inmates reported that custody staff was disrespectful and that they remarked negatively on inmates' psychotropic medications, race, and/or sexual orientation. Inmates also reported that some custody officers commented negatively on other officers who treated inmates more appropriately.  Two specific officers on third watch were cited as problematic and were known to institutional and regional staff.  Inmates also expressed concern about cell moves that were perceived as intentional efforts to house certain inmates with incompatible cellmates.

Heat Plan:

The institution's heat plan required that temperature readings be taken every year from May 1 to October 31.  Staff reported that the heat plan was updated with added detail in April 2014 and again in December 2014.

During the site visit, 3CMS units A-1, A-2, and A-5, EOP units B-6 and B7, the MHCB, administrative segregation, and the OHU were reviewed for compliance with the heat plan.  Each

unit had thermometers in the upper officer tower, and all but one unit had thermometers on the walls between the tiers on each side of the housing unit.  Temperature readings in the housing units ranged from 68 to 74 degrees.  Heat plan postings appeared in several areas of the toured units.  It was observed that the large yard inside each facility and the smaller yards for the administrative segregation and MHCB units were uncovered and provided no cooling mist.  Heat plan coordination staff reported that every Monday morning they generated a heat medication list from Maxor and distributed it to every housing unit and facility in the prison.  Staff also reported that they provided heat card passes to affected patients.

Temperatures were not being recorded at the time of the visit because it took place outside of the heat period.  Interviewed custody and nursing staff in each housing unit were able to explain the required process including their roles in monitoring inmates' intake of water and ice and notifying nursing staff when necessary.  Custody staff reported they used the heat list for checking tiers.  Staff reported that at the end of the month, the facility captain reviewed the heat plan logs before they were submitted to the heat plan coordinator.

Eight reviewed daily activity reports contained documentation of activation and deactivation of the heat plan.  The monthly summary reports for August, September, and October 2014 were completed and submitted to the statewide heat plan coordinator.

Access to Care:

MCSP provided its monthly health care access reports for August 2014 through January 2015.  According to those reports, in August 2014, of the 3,867 mental health ducats, 3,044 or 79 percent were completed.  Of the 823 non-completed ducats, 218 or 26.4 percent were due to inmate refusals, 604 or 73.3 percent due to non-custody reasons, and no more than one or less than one percent was due to custody reasons.

221

In September 2014, of the total of 3,836 mental health ducats, 2,786 or 73 percent were completed.  Of the 1,050 non-completed ducats, 185 or 17.6 percent were due to inmate refusals, 860 or 81.9 percent were due to non-custody reasons, and five or less than one percent were due to custody reasons.

In October 2014, of the total 4,446 mental health ducats, 3,462 or 78 percent were completed.  Of the 984 non-completed ducats, 254 or 26 percent were due to inmate refusals, 666 or 68 percent were due to non-custody reasons, and 64 ducats or five percent were due to custody reasons.

In November 2014, of the total 3,552 mental health ducats, 2,742 or 77 percent were completed.  Of the 810 non-completed ducats, 174 or 21.6 percent were due to inmate refusals, 630 or 77.7 percent were due to non-custody reasons, and six or less than one percent were due to custody reasons.

The reports provided for December 2014 and January 2015 were not analyzed because of data errors.

<u>Construction</u>:

Through an in-fill project, an extension of the original MCSP prison is expected to be built.  It will be surrounded by a separate perimeter lethal fence but will be accessible only through the existing entrance to the prison.  The new facility will have its own R&R and medical clinic but no CTC.  The new D-Yard and E-Yard will be approximately a quarter mile from the main prison and will house 264 Level II inmates in each of three housing units that will be on each of the two yards.  Each unit will be made up of four wings that will hold 66 inmates in each wing.  D-Yard will house only mental health inmates and will have one unit, Building 18, dedicated specifically for 264 EOP inmates.  All three housing units on D yard will be air-

222

conditioned.  3CMS inmates will be housed on both D-Yard and E-Yard and will be interspersed within the other five units.

Program Access:

a. Jobs and Program Assignments:

Provided data indicated that there were 1,505 available full-time jobs, of which 1,193 or 79 percent were filled by non-MHSDS inmates, 311 or 20 percent were filled by 3CMS inmates, and one or .06 percent was filled by an EOP inmate.  There were 435 available part-time jobs, of which 307 or 68 percent were filled by non-MHSDS inmates, 128 or 32 percent were filled by 3CMS inmates, and none were filled by EOP inmates.

The institution reported 61 full-time academic assignments, of which 43 or 70 percent were held by non-MHSDS inmates, 18 or 30 percent were held by 3CMS inmates, and none were held by EOP inmates.  Of the 771 part-time academic program assignments, 540 or 70 percent were held by non-MHSDS inmates, 231 or 30 percent were held by 3CMS inmates, and none were held by EOP inmates.

There were 256 vocational education assignments, of which 191 or 75 percent were filled by non-MHSDS inmates and 65 or 25 percent were filled by 3CMS inmates.  Of the 68 part-time vocational education assignments, 48 or 61 percent were filled by non-MHSDS inmates and 20 or 29 percent were filled by 3CMS inmates.   No full-time or part-time vocational education assignments were filled by EOP inmates.

There were 812 substance abuse treatment assignments, of which 531 or 95 percent were filled by non-MHSDS inmates and 281 or 35 percent were held by 3CMS inmates.  There were no eligible EOP inmates.

Staff reported that 42 mental health clinical staff attended a PowerPoint training session on IDTT review of EOP inmates' suitability for program assignments and functional evaluation. Participants included psychiatrists, psychologists, social workers, and rehabilitation therapists.

       b.      <u>Milestone Credits</u>:

MCSP reported that a total of 431 inmates were eligible for milestone credits.  Of those eligible, 217 or 50 percent were non-mental health caseload inmates, 111 or 26 percent were 3CMS inmates, and 103 or 24 percent were EOP inmates.  Of those inmates eligible for milestone credits, 20.74 percent of non-mental health caseload inmates earned credits, 12.61 percent of 3CMS inmates earned milestone credits and 8.74 percent of EOP inmates earned milestone credits.

       c.      <u>Out-of-Level Housing</u>:

Institutional data indicated that three Level I 3CMS inmates and eight Level I EOP inmates were in Level III housing.  Two hundred twenty-one Level II 3CMS inmates and 136 Level II EOP inmates were in Level III housing.  One Level II 3CMS inmate and two Level II EOP inmates were in Level IV housing.  There were six 3CMS Level III inmates and seven Level III EOP inmates in Level IV housing.  There were 29 3CMS Level IV inmates and 30 Level IV EOP inmates in Level III housing.

       d.      <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

Staff submitted documentation of training for the reasonable accommodation request process, which was completed by January 26, 2015.  MCSP trained 201 custody staff, according to the training records provided for review.

       e.      <u>Periodic Classification Score Reductions: EOP Inmates</u>:

Documentation indicated that 29 EOP inmates were granted semi-annual classification score reductions for successful programming.

### Sierra Conservation Center (SCC)
February 27, 2015

Census:

As of February 24, 2015, SCC housed 4,364 inmates, for a two-percent increase since the preceding monitoring period.  The total mental health population was 637, which was 27-percent higher than during the preceding monitoring period.

The administrative segregation unit census was 106, which included 28 3CMS inmates. There were 609 3CMS inmates in mainline.

Staffing:

The senior psychiatrist position was filled.  One of the two chief psychologist positions was filled but the other was kept open per a cost-saving directive from headquarters. The senior psychologist supervisor position and one of the two senior psychologist specialist positions were filled.

Two of the three staff psychiatrist positions were filled, resulting in a 33-percent vacancy rate.

 The six staff psychologist positions were filled.  Of the five social worker positions, three were filled, resulting in a 40-percent vacancy rate.

Three of the 3.5 psych tech positions were filled, for a 15-percent vacancy rate.  The recreation therapist position was filled.

Three of the five clerical positions were filled, resulting in a 40-percent vacancy rate.

Quality Management:

SCC did not have a CTC.  The local governing body met only as needed and did not meet during the review period.

During the review period, the quality management committee met monthly, always attained a quorum, and kept detailed minutes.  Agenda items included mental health staffing vacancies and training sessions.

The mental health subcommittee met monthly, with a quorum present at all meetings. Minutes were kept.  Agendas contained appropriate mental health-related items.

During the review period, SCC had two ongoing QITs that were chartered in 2013, but no new QITs. One of the ongoing QITs addressed entry of data on administrative segregation pre-screens and 31-item screens into MHTS.net.  The other ongoing QIT addressed delays in processing of inmate medication non-compliance chronos and ensuring that inmates were seen by psychiatry within seven days.

An internal psychiatry peer review committee was continuing to meet.  The PC peer review process was temporarily on hold.  Staff reported that implementation of the new statewide peer review program for psychologists and social workers was scheduled for March or April 2015.

Medication Management:

Generally, inmates' medication compliance was at or above the 90-percent rate. However, compliance rates for continuity of medications were only 58 percent following inter-institutional transfers, and 77 percent following intra-institutional transfers.  Staff attributed these rates to inmate medication refusals, and reported that the Pharmacy and Therapeutic committee had formed a QIT to address this concern.

226

According to MAPIP scores, compliance rates for laboratory testing of blood levels of inmates prescribed psychiatric medications were 90 percent or higher.

There were no inmates on involuntary medication orders during the review period.

Transfers:

There were no transfers to acute or intermediate inpatient levels of care during the review period.

Of the 26 inmates transferred to an MHCB, only ten or 38 percent were transferred timely.  Lack of bed availability was cited as the reason for the delays.

According to the data provided, there were 45 OHU admissions during the review period. Four or nine percent of these placements resulted in stays lasting longer than 72 hours. Transfers from all 16 alternative housing placements other than the OHU were timely.

The sole transfer to a PSU during the review period was timely.

During the review period, transfers of the three EOP inmates in administrative segregation to EOP administrative segregation hubs at other institutions were timely.  No EOP inmates were in administrative segregation at the time of the site visit.

Five inmates were transferred to mainline EOP programs during the review period.  One transfer was late by 36 days.  At the time of the site visit, there were no mainline EOP inmates pending transfer.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Compliance rates for psychiatry contacts and initial PC contacts were 100 percent. Follow-up PC contacts were 96-percent compliant.

The institution reported that 100 percent of initial IDTT meetings in administrative segregation were timely, and 95 percent of follow-up meetings were timely.  Attendance by required disciplines at IDTT meetings was 79-percent compliant, as there were some absences by the psychiatrist, the CC I, or the psych tech.

Daily psych tech rounds were being conducted.

The institution reported that 15 inmates in administrative segregation for non-disciplinary reasons were identified as eligible to receive property and privileges, but the institution did not report on whether they actually received it.  Determinations of eligibility for property and privileges were made by the ICC.

Twenty inmates were identified as meeting criteria for accelerated transfers out of administrative segregation.  All but one, who was on a medical hold, were transferred within 72 hours.


Alternative Housing:

SCC had a ten-bed OHU.  Psychiatry contacts were conducted weekly.  All OHU clinical contacts were reported as taking place in private settings. At the time of the site visit, there were no mental health patients housed in the OHU. There were two alternative housing cells in the administrative segregation unit that were used for OHU overflow.

No inmates were in alternative housing at the time of the site visit.

3CMS:

Initial and follow-up psychiatry contacts were 100-percent compliant and were conducted in private settings.  Psychiatry caseloads ranged from 112 to 120.

Initial PC contacts were 86-percent compliant and follow-up contacts were 100-percent compliant.  PCs' caseloads ranged from 58 to 79.

Compliance rates for initial and follow-up IDTT meetings were 79 percent and 100 percent, respectively.

Referrals:

Response to all 16 emergent referrals during the review period was timely.  There were 27 urgent referrals, 93 percent of which drew timely responses.  Responses to the 1,112 routine referrals were also 93-percent compliant.

Heat Plan:

SCC was compliant with the heat plan during the review period.  Monthly heat plan reports and temperature logs were provided for review.  During the heat period, which was July through October 2014, there were 80 Stage I heat plan activations, 202 Stage II heat plan activations, and 35 Stage III heat plan activations.  Inmates were given access to ice and extra showers during Stage II and III heat alerts.  Nursing rounds were conducted during Stage III heat alerts.  The pharmacy updated the list of inmates on heat sensitive mediations Monday through Friday and posted it to SharePoint.

Use of Force:

SCC reported that at the time of the site visit, 100 percent of both custody and mental health staff had received training on the new use-of-force policy.

Program Access:

a.      Job and Program Assignments:

Institutional data indicated that 1,016 or 78 percent of available full-time jobs were filled by non-MHSDS inmates, and 288 or 22 percent were filled by 3CMS inmates.  There were no part-time jobs at SCC.

For part-time academic program assignments, 337 or 82 percent were held by non-MHSDS inmates, one was held by an EOP inmate, and 75 or 18 percent were held by 3CMS inmates.  There were no voluntary academic program assignments at SCC.

Non-MHSDS inmates held 186 or 77 percent of full-time vocational education assignments, and 57 or 23 percent were held by 3CMS inmates.

For part-time substance abuse treatment program assignments, 12 or 63 percent were held by non-MHSDS inmates and seven or 37 percent were held by 3CMS inmates.

b.      Milestone Credits:

Institutional information indicated that during the review period, 25.64 percent of non-MHSDS inmates and 23.35 percent of eligible EOP inmates earned milestone credits.

Although SCC did not have an EOP program, all PCs and two of the three psychiatrists were trained on functional evaluation of EOP inmates for program assignments.

c.      Out-of-Level Housing:

With regard to out-of-level housing of caseload inmates, institutional data indicated that on February 12, 2015, there were 14 Level I 3CMS inmates in Level II housing and one in Level III housing.  There were 88 Level II 3CMS inmates in Level III housing.  There were six Level III 3CMS inmates in Level II housing and 23 Level IV 3CMS inmates in Level III housing.  No EOP inmates were housed out of level.

d.      ADA Reasonable Accommodation and Grievance Procedures:

SCC reported that training for the new reasonable accommodation process was held on February 23, 2015.

*Coleman* Postings:

*Coleman* postings in both English and Spanish languages were found in all buildings toured by the monitor, including the SNY yards and the administrative segregation unit.  All postings were placed in areas commonly accessible to *Coleman* class members.

**California Medical Facility (CMF)**
April 14, 2015 - April 16, 2015

Census:

As of April 14, 2015, CMF had a total census of 1,810, including 1,005 inmates on the mental health caseload.

Eighty-eight inmates, including 55 EOP and eight 3CMS inmates, were in administrative segregation.  There were two EOP inmates pending transfer to a PSU, one of whom transferred on the first day of the site visit.  Forty-nine inmates were in the institution's MHCB known as the Mental Health Crisis Bed Facility (MHCBF).

The mainline EOP census was 417, and the mainline 3CMS census was 476.

Staffing:

The chief psychiatrist and senior psychiatrist positions were filled.  One of the two chief psychologist positions was kept open, per a headquarters' cost-saving directive.  The 4.5 senior psychologist supervisor positions were filled.

Eleven of the 15.5 staff psychiatrist positions were filled, for a 29-percent vacancy rate.  Use of 1.5 FTE psychiatry contractors reduced the functional vacancy rate to 19 percent.

231

Of the 4.5 senior psychologist specialist positions, 3.5 were filled, resulting in a 22-percent vacancy rate.  The 36 staff psychologist positions were filled.

The supervising social worker position was filled.  Although the number of social work positions was reduced to 15.5 in January 2015, CMF still had 19.5 social workers on staff at the time of the site, with an expected decline to 15.5 over time through attrition.

Of the 18.5 recreation therapist positions, 16.5 were filled and the remaining two were covered by FTE contractors.

The senior psych tech positions was filled. Fifty-three of the 62 psych tech positions were filled, resulting in a 15-percent vacancy rate.

Of the 23 clerical positions, 19.5 were filled, leaving a 15-percent vacancy rate.  One of the two CHSA II positions was filled.

Quality Management:

CMF had an active and effective quality management system.  During the review period, the quality management committee met monthly and maintained minutes.  Meetings were chaired by the CEO and attended by the chief of mental health and other staff. Minutes reflected discussions covering departmental committee reports and any compliance issues that were indicated by the headquarters dashboard.

The mental health subcommittee met monthly except in November 2014. It achieved a quorum at all meetings but one.  Meetings were chaired by the chief of mental health.  Minutes reflected comprehensive discussions on various aspects of the mental health program including compliance levels.   During the review period, the institution conducted monthly audits of MHTS/eUHR concordance.  Audit results were discussed during mental health subcommittee meetings.

232

CMF had several QITs, FITs, and workgroups running during the review period.  These included a QIT on reduction of self-harm, and FITs on suicide prevention and administrative segregation.  There were also program improvement work plans on group therapy attendance in the EOP, the RVR process, and MHCB re-admissions.  All of these were active during the review period and reported to the mental health subcommittee.

CMF appeared to have an active peer review process in place for psychiatry and social work.  Although local policies and procedures indicated that psychology peer review was also required, no documentation regarding active psychology peer review was provided.

Medication Management:

Medication management at CMF was monitored through its outpatient medication management committee.  It was comprised of mental health, nursing, medical, and custody staff, met weekly, and discussed MAPIP measures.

Medication continuity following transfers from community hospitals and DSH inpatient programs was noncompliant.  Staff identified the EOP housing units as areas where this problem appeared.  Psychiatry, nursing, and custody reported working with the outpatient medication management committee to address this issue and associated documentation issues.

Urgent medication referrals for refusals and no-shows were noncompliant.

Laboratory testing of blood levels for inmates prescribed psychotropic medications was compliant.

During the review period, 23 inmate outpatients and 18 inpatients were prescribed Clozaril.  Monthly nursing audits focused on the ordering and laboratory testing associated with use of Clozaril and found compliance rates of 90 percent or higher.

Transfers:

233

Institutional data indicated that there were 54 referrals to acute inpatient care during the review period.  Of these, 49 or 91 percent resulted in transfer and two or nine percent were rescinded. Of the total 47 transfers, 31 or 63 percent were completed within timeframes, and 84 percent of these transfers took place within 72 hours of bed assignment.

There were 120 referrals to intermediate inpatient care during the review period.  Of these, 105 or 87.5 percent resulted in transfers and 15 or 13 percent were rescinded.  Fifty-six or 33 percent of the transfers were completed within timeframes.  In 90 percent of these transfers, patient movements were completed within 72 hours of bed assignment.

No referrals to acute or intermediate inpatient care were rejected by DSH.  Inmates prevailed on their Vitek challenges to placement into inpatient care in four out of the 17 Vitek challenges.

Form 7388Bs, which are used in the process of identifying inmates in need of referral to higher levels of care, were reviewed monthly by one clinician to identify any problems.  Issues generally included untimely medical clearances and late clinical referrals.

Examination of non-referrals to DSH generally found that assessments had been done appropriately and that decisions to not refer were supported in the record. Documentation associated with DSH referrals was adequate overall.  The DSH coordinator reported that clinical reviews of the DSH referrals were monitored daily.

Staff reported that the DSH coordinator, clinicians, and DSH staff had good collaborative working relationships, although clinician-to-clinician contacts before and after DSH placements generally did not occur. CMF relied instead on DSH discharge documentation.

234

There were 443 admissions to CMF's MHCBF during the reporting period. Of these, 144 or 33 percent lasted longer than ten days, with an average stay lasting 13.1 days.  Five MHCB transfers were to outside MHCBs, but only one of these was timely.

All 13 referrals to a PSU resulted in timely transfers.

Presented documentation indicated that all administrative segregation EOP inmates were transferred to an EOP administrative segregation hub timely.

Other Issues:

Administrative Segregation EOP:

CMF had an administrative segregation EOP hub.  The units for inmates on the mental health caseload were in I-3 and M-3.  Treatment was provided primarily in O-3 within the O-Facility treatment unit, which was new and offered appropriate space.   There were three group rooms, each of which held eight treatment modules, as well as one IDTT meeting room. One large conference room was used for ICC and morning meetings between clinical and custody staff.  There were also three non-contact interview rooms, and one interview room on each housing unit.  No mental health caseload inmates were housed in the Willis administrative segregation unit.  It was only partially occupied with inmates occupying a portion of the first of the three floors.

From October 1, 2015 through March 31, 2015, 317 administrative segregation pre-screens were completed. Of these, 312 or 95 percent were reported as compliant.

Institutional data reported that 31-item screens were administered to 55 inmates from September 7, 2014 through March 8, 2015.  Thirty-eight of the 55 inmates were GP inmates. The remaining 17 were inmates who had been removed from the mental health caseload for more

than six months.  Compliance rates were 90 percent for the GP inmate screenings and 65 percent for the former caseload inmate screenings.

According to institutional reporting, during the review period 107 comprehensive mental health clinical assessments were completed before the inmates' initial IDTT meetings.  One hundred two or 95 percent of these were timely.  Other data indicated that PCs completed 161 evaluations of inmates within five calendar days of their placements in administrative segregation during the review period.  Provided information showed that 135 or 84 percent of these were completed timely.

CMF documented all 87 initial psychiatry contacts and all 1,254 follow-up psychiatry contacts during the review period as completed timely.  Interviewed inmates reported consistency with psychiatry contacts and no difficulties with receiving their psychiatric medications.  The assigned psychiatrist had a caseload of 63.

Documentation on PC contacts indicated 155 initial contacts, of which 92 percent were completed timely.  It also indicated that 1,317 follow-up contacts were completed, with 99 percent of them done timely.  Interviewed inmates reported that they received weekly contacts with their PCs.  Caseloads for the six PCs ranged from seven to nine.

Institutional data indicated 59 cell-front contacts with inmates in modified programs in administrative segregation.  CMF reported that 849 or approximately one-third of all 2,703 psychiatry and PC contacts for inmates not on modified programming were cell-front contacts. Of all 849 cell-front contacts, 566 or 67 percent were due to inmates' refusals, 206 or 24 percent were due to staff decisions, 12 or one percent were due to the lack of escorts, and 65 or eight percent were unspecified.  A total of four psychiatry contacts were cell-front.  Institutional data

236

also reported that 87 or approximately three percent of the total 2,703 contacts for inmates not on modified programming took place out-of-cell in non-private settings during the review period.

Audits of IDTT meetings indicated that they were in over 90 percent of cases, with necessary disciplines in attendance 88 percent of the time.  At an observed IDTT meeting, necessary team members including a psychiatrist, PCs, a correctional counselor, and a psych tech, plus a medical assistant assigned to help the psychiatrist were all present.  Computers were available and used by team members.  Interdisciplinary discussion and patient involvement were good. Treatment planning and goals were discussed and referrals to higher levels of care were considered.

Staff reported that a significant rise in the hub census during the review period affected the institution's capacity to offer structured therapeutic activities, but that it had levelled off before the site visit.  The institution reported that during the review period, it offered a weekly average of 10.94 hours of structured therapeutic activity to patients not on modified programming. On average, patients attended 8.71 hours and refused 2.23 hours per week. Weekly averages for inmates on modified programs were 3.23 hours offered, 2.43 hours attended, and .79 hours refused.

Psych tech rounds in M-3 were also observed. The psych tech was familiar with the inmates on the unit.

Institutional audit reports and proof-of-practice documentation indicated that inmates were receiving ten or more hours of yard time and three showers per week.

The range of monthly average lengths of stay in administrative segregation from September 2014 through January 2015 was 74.2 days to 87 days.  During the same period, the number of EOP inmates whose stays exceeded 90 days ranged from 16 to 20.   On the first day

237

of the site visit, the hub held 56 EOP inmates, including seven whose stays exceeded 150 days. There were also 13 3CMS inmates held in the hub.

As of April 14, 2015, 12 EOP inmates were on NDS.  One was in acute inpatient care at the time of the site visit.   Documentation confirmed that NDS inmates were receiving approved property and privileges at the time of the site visit.

MHCB:

CMF had a 50-bed stand-alone facility for crisis care, known as the Mental Health Crisis Bed Facility or MHCBF. Data indicated that 375 inmates were housed in the MHCBF from September 7, 2014 through March 8, 2015, with an average stay lasting 12.8 days.  Sixty six inmates had three or more MHCBF admissions during the review period.

Of the total 695 initial SREs conducted, 676 or 97 percent were timely.  All 23 follow-up SREs were timely.

All 392 initial psychiatry contacts were timely, as were 97 percent of the 1,160 follow-up psychiatry contacts.  Psychiatrists had caseloads of 12.

Of the total 414 initial PC contacts, 409 or 99 percent were timely.  Ninety-seven percent of the 1,151 follow-up PC contacts were timely. PCs had eight inmates on their caseloads.

There were 406 initial IDTT meetings, of which 379 or 93 percent were conducted timely.  Ninety-eight percent of the 1,060 follow-up IDTT meetings were timely.  At observed IDTT meetings on April 15, 2015 in Units A and B, required staff were in attendance.  All inmates were kept cuffed until they were inside the treatment module. All clinicians were well prepared, knowledgeable about inmates' histories and treatment goals, engaged in discussions, and receptive to inmates' expressions of concerns and needs. Input from nursing and the CC was relevant and did not require prompting.

238

Color-coded magnets were used on the census board in Units A and B to alert staff to inmates on suicide watch. The alerts indicated suicide watch, suicide precaution, and 15-minute checks on inmates not on suicide precaution.  Suicide watch and precaution forms were posted on the inmates' cell doors in all areas.  None were pre-printed or pre-filled out.

Alternative Housing:

Staff reported that the OHU at CMF was used for medical purposes only.  Alternative housing cells were in the MHCBF on Units A and B.  There were four suicide-resistant wet cells, two of which were used for inmates awaiting MHCB placement. Once these four cells were filled, other wet holding cells that were not suicide-resistant on Units A and B unit were used. They were very small, and according to staff, stays in them were limited to 24 hours.  At the time of the site visit, these cells were not in use. They were clean and placed so as to afford visibility into these cells.

Of the 160 stays in alternative housing during the review period, 126 or 79 percent were compliant with timeframes.  Overly-long stays exceeded timeframes by one minute to five days, plus one outlier at ten days.

CMF reported that it had not received authorization from headquarters to transfer inmates to either the LTRH or the STRH.  At the time of the site visit, the institution held several inmates who potentially met criteria for such placements.

EOP:

The EOP housing units were located on M-1, M-2, N-1, N-2, N-3, L-1, and L-2. Programming on the N-1 and L-1 housing units was for Level III inmates, with a program capacity of 447.  It was designed specifically for very low-functioning seriously mentally ill and developmentally delayed patients.

239

With some exceptions, treatment was provided in O-1 and O-2 within the new O-Unit, which provided excellent treatment and office space. On each of the two floors, there were eight group rooms, IDTT meeting rooms, a general interview room, and 19 individual clinicians' offices that were used for private clinical contacts. Each housing unit also had a clinical interview room.

Initial psychiatry contacts were timely in 96 percent of cases. Follow-up psychiatry contacts were timely in 90 percent of cases. Three psychiatrists had caseloads ranging from 110 to 112, and another psychiatrist had a caseload of 60.

The institution reported that 100 percent of initial PC contacts were timely, as were 95 percent of follow-up contacts. Audits indicated that at least 90 percent of psychiatry and PC contacts took place in private settings. Fifteen of the 18 PCs had caseloads ranging from 18 to 29, and the remaining three PCs had caseloads of three, eight, and 12, respectively.

Initial IDTT meetings were 85-percent compliant for timeliness, and follow-up IDTT meetings were timely in 100 percent of cases. Institutional audits found that 88 percent of meetings were attended by required members.

A wide variety of therapeutic groups were offered. On average, inmates were scheduled for 14.37 hours of group per week, offered an average of 12.76 hours, attended an average of 7.69 hours, and refused 5.07 hours. Cancellations accounted for 1.61 hours per week on average. Approximately 91 percent of inmates were scheduled for ten hours per week, 81 percent of inmates were offered at least ten hours, 25 percent attended ten hours, and nine percent refused groups.

Two EOP groups on the O-Unit were observed. One was a long-standing process group that was facilitated by a psychologist and covered various topics. It had 14 participants, in space

240

that was adequate.  Participants were actively involved in group discussion.  Many of them expressed appreciation for the treatment in the EOP, and reported that it had benefitted them greatly.  The second group was for inmates whose primary language was Spanish. It was facilitated by a recreation therapist. Participants in this group likewise expressed appreciation for the quality of groups, in particular because they were facilitated by clinicians and recreation therapists in Spanish.

Audits indicated that 57 percent of EOP inmates on modified programming were offered at least five hours of group treatment per week.  On average, these inmates were scheduled for 7.25 hours per week, offered 6.42 hours, attended 2.55 hours, and refused 3.87 hours.  An average of .83 hours were cancelled.

The heat plan was activated at CMF during September 2014. The institution made some accommodations for patients on heat-sensitive medications.  It tried to maximize these inmates' enrollment in morning yard activities and scheduled them for more than the minimum of ten weekly hours of structured therapeutic activities to compensate for any cancellations.

3CMS:

Treatment for CMS inmates was provided in R-2, U-Wing, and in three medical areas.

Initial psychiatry contacts were 77-percent compliant for timeliness. Follow-up contacts were timely 93 percent of the time.  No psychiatric contacts were cell-front or in non-private settings.  Patients who refused psychiatric contacts were re-scheduled for private office contacts. The psychiatrists also served alternative housing and hospice programs.  Three psychiatrists had caseloads of 60, 183 and 249, respectively.

Audits found initial PC contacts 87-percent compliant and follow-up PC contacts 98-percent compliant for timeliness. During the review period, there were seven cell-front PC

contacts due to inmate refusals and 15 out-of-cell contacts in non-private settings. Three psychologist-PCs had caseloads ranging from 105 to 118. Two of the three social worker-PCs each had caseloads of 46, and the third had a caseload of 74.

Provided data indicated that initial IDTT meetings were nearly 85-percent compliant, and follow-up meetings were 100-percent compliant. However, required staff attended 66 percent of meetings. A correctional counselor was present in 112 or 35 percent of the total 319 meetings during the review period.

At an observed IDTT meeting in the G-1 medical area, the inmate's initial treatment plan was discussed. The program supervisor, psychiatrist, PC, and correctional counselor attended and contributed to the discussion. Treatment goals were developed by the PC and communicated to the patient in understandable terms, and the patient's agreement was elicited. Treatment objectives were reasonable and measurable. The team discussed the patient's level of care among themselves but not directly with the patient. At six other observed IDTT meetings, all required disciplines attended. They provided background information on the patient, reviewed his progress, and communicated directly with the patient about his level of care and responded to his questions. However, the team did not utilize the Form 7388B in considering any level-of-care changes, and thus there was no systematic team review of patients' levels of care.

During the review period, there were seven regularly scheduled clinician-facilitated therapeutic groups for 200 3CMS inmates. On average, these inmates received 2.35 hours to 3.65 hours of group per month. An art therapy group in U-Wing was observed during the site visit. It was used to mitigate its five participants' depressive symptoms. Participants were actively involved and responded readily to the facilitator's promptings. Review of these participants' treatment plans found that 90 percent of them included group interventions to

242

address symptoms associated with diagnoses of mood or depressive disorders. Interviewed participants reported that the group provided them relief from stress. All reported satisfaction with their psychiatrists and PCs and knew how to reach them if necessary.  They also reported that they understood the purpose of the IDTT, knew their mental health diagnoses, and could recite the names of their medications, but none were familiar with their treatment plans.

The monitor's expert also observed a pain management group facilitated by a psychologist.  Patients were assigned to this group by their PCs or their physicians.  Three of the five scheduled inmates were present.  The group used handouts, homework, didactic material, and guided group discussion on the nature of pain and effective strategies for coping with it. This group appeared to have educational rather than therapeutic value to the participants.

3CMS Inmates in Administrative Segregation:

According to institutional data for the review period, all six initial psychiatry contacts and all 162 follow-up contacts for 3CMS inmates during the review period were timely.

Institutional data covering the same period also indicated that all 27 initial PC contacts and all 296 follow-up contacts were timely.

Similarly, the data indicated that all 19 initial IDTT meetings and all 245 follow-up meetings were timely.  Provided data indicated that attendance by required disciplines was 88-percent compliant.  However, staff reported full compliance with attendance.  Review of sample treatment plans suggested that errors with data entry led to the data under-reporting attendance, as the sampled treatment plans bore signatures of all required disciplines.

Referrals:

243

CMF reported a total of 455 mental health referrals. Compliance rates for timeliness of response were 100 percent for the 43 emergent referrals, 96 percent for the 95 urgent referrals, and 94 percent for the 317 routine referrals.

Heat Plan:

CMF was in compliance with the heat plan during the reporting period.  During the two-month heat season of September and October 2014, there were 21 Stage I heat alerts and no Stage II or III heat alerts.  There were no heat-related incidents during the review period.

During the heat season, the pharmacy prepared a list of all inmates taking heat-sensitive medications. It was distributed to the litigation coordinator, facility lieutenants, facility captains, mental health staff, and others via a weekly email and posting on SharePoint.  In all housing units toured by the monitor, including administrative segregation, officers had access to portable thermometers which were used to take temperatures in the units and inside cells.

RVRs:

CMF provided training attendance lists demonstrating that custody and mental health staff had completed mandatory RVR training as of April 2015.

Access to Care:

Staff reported that health care access unit staff were available and assisted with transporting inmates to appointments. A review of CMF's monthly Health Care Access Quality Reports from September 2014 through February 2015 indicated that two percent of issued mental health ducats and add-on appointments were not completed due to custody reasons.

Program Access:

a.      Job and Program Assignments:

244

Institutional data indicated that 580 or 73.14 percent of available full-time jobs were filled by non-MHSDS inmates, 19 or 2.4 percent were filled by EOP inmates, and 194 or 24.46 percent were filled by 3CMS inmates.

Among available part-time jobs, 23 or 54.76 percent were filled by non-MHSDS inmates, 15 or 35.71 percent were filled by EOP inmates, and four or 9.52 percent were filled by 3CMS inmates.

For part-time academic program assignments, 144 or 68.25 percent were held by non-MHSDS inmates, 13 or 6.16 percent were held by EOP inmates, and 54 or 25.59 percent were held by 3CMS inmates.  There were no voluntary academic program assignments at CMF.

For full-time vocational education assignments, 27 or 64.29 percent were held by non-MHSDS inmates, two or 4.76 percent were held by EOP inmates, and 13 or 30.95 percent were held by 3CMS inmates.

For part-time vocational education assignments, 54 or 72 percent were held by non-MHSDS inmates, five or 6.67 percent were held by EOP inmates, and 16 or 21.33 percent were held by 3CMS inmates.

b.     <u>Milestone Credits</u>:

CMF did not participate in the functional assessment training offered in 2014, but it reported that it had a process in place to assess EOP inmates for job and academic assignments. The institution also established a workgroup and held weekly meetings with custody staff to address any concerns.

Information provided by the institution via health care services at headquarters indicated that during the review period, 6.96 percent of non-MHSDS inmates, 2.68 percent of eligible EOP inmates, and 12.5 percent of eligible 3CMS inmates earned milestone credits.

c.     <u>Out-of-Level Housing</u>:

With regard to out-of-level housing of caseload inmates, institutional data indicated that as of March 27, 2015, there were four Level I 3CMS inmates housed in Level II housing.  There were four Level I 3CMS inmates and 24 Level I EOP inmates housed in Level III housing.  There were 159 Level II 3CMS and 238 Level II EOP inmates housed in Level III housing.  Two Level III 3CMS inmates were housed in Level II housing.  There were 15 Level IV 3CMS inmates and 34 Level IV EOP inmates housed in Level III housing.

d.     <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CMF confirmed through provided training materials and examples of completed forms that it had implemented revised ADA accommodation and grievance procedures.

e.     <u>Periodic Classification Score Reductions: EOP Inmates</u>:

At the time of the site visit, staff reported that EOP inmates were being granted the same semi-annual classification score reductions as non-EOP inmates. CMF provided for review a sample of completed reclassification score sheets documenting the institution's implementation of the semi-annual classification score reductions for EOP inmates.

<u>*Coleman* Postings</u>:

The January 2015 revised *Coleman* postings, in both English and Spanish languages, were found in all of the housing units toured by the monitor, including administrative segregation and the buildings housing mainline caseload inmates.  All postings were placed in common areas accessible to class members.

**California State Prison/Solano (CSP/Solano)**
March 17, 2015 – March 19, 2015

Census:

On March 17, 2015, CSP/Solano's census was 3,851, including 1,420 inmates or 37 percent of the total inmate population who were in the MHSDS. Since the preceding monitoring period, the institution's overall census had fallen by nine percent, and the MHSDS census had increased by 21 percent.

The MHCB held nine patients. Five EOP inmates were awaiting transfers to an EOP program. There were 1,353 inmates in the 3CMS mainline. Administrative segregation held 49 MHSDS inmates, including three EOP inmates pending transfer to a hub.

Staffing:

CSP/Solano's chief psychiatrist and chief psychologist positions were both filled.

There were no senior psychiatrist positions. Five or 83 percent of the six staff psychiatrist positions were filled, for a functional vacancy rate of 17 percent.

The 3.5 senior psychologist supervisor positions and the 14 staff psychologist positions were all filled. One psychologist was not licensed.

The supervising clinical social worker position was filled as were nine of the 13 staff social worker positions, for a vacancy rate of 31 percent. With coverage of an additional 2.5 positions, the functional vacancy rate was reduced to 11.5 percent. Two social workers were unlicensed. PCs' caseloads ranged 54 to 121 across all programs.

The senior psych tech position and all three psych tech positions were filled. One of the two established recreation therapist positions was filled.

The OSS II position was vacant, and the HPS position was filled.

247

Quality Management:

Minutes of the local governing body's December 3, 2014 meeting were provided.  A quorum was present and approved various health-related policies.

During the review period, the QMC met monthly with a quorum in attendance at every meeting.  The QMC addressed mental health issues related to MAPIP, pharmacy, and medical records during the review period, and reviewed reports from other committees including the mental health subcommittee.

Minutes of mental health subcommittee meetings during the review period were provided.  They indicated that the committee met monthly with a quorum present and undertook corrective measures to address issues as appropriate.  Activity was driven according to performance indicators on all aspects of the MHSDS program, including MHTS.net/eUHR concordance, QITs, monthly custody data, alternative housing utilization, SPRFIT matters, and involuntary medications.  Issues were forwarded to the QMC for its consideration as appropriate.

At the time of the site visit, the institution's only ongoing QIT was working on reducing cancellations of appointments.  The QIT was multi-disciplinary and progressing appropriately, according to staff.

CSP/Solano was paired with California Correctional Institution (CCI) for peer review in which CSP/Solano's and CCI's clinicians were assigned to review each other.  During the review period, the peer review committee met once and reviewed one psychiatrist, two psychologists, and one social worker on staff at CSP/Solano.  Feedback had been received and communicated to these staff members via memoranda from the peer review coordinator.  Staff reported that the process was too recently implemented for any detectable trends to have emerged.

Medication Management:

248

Continuity of medications following inter-institutional transfers was 100-percent compliant.  Following intra-institutional transfers except for administrative segregation, SHU and PSU transfers, compliance rates for continuity of non-DOT medication ranged from 71.43 percent in July 2014 to 100 percent in October, November, and December 2014.

The institution had implemented MAPIP audits since the time of the preceding monitoring period.  Results of quarterly audits were reviewed with the chief psychiatrist at the time of the site visit.  They showed that prescribing and monitoring of atypical antipsychotic medications was found 93.75-percent compliant in the September 2014 quarterly audit, and 100-percent compliant in the December 2014 quarterly audit.  For prescriptions for Depakote, carbamazepine, Lamictal, and antidepressant medications, the institution reported that it was found 100-percent compliant in both the September and December 2014 quarterly audits.  The institution did not prescribe clozapine.

Transfers:

The institution's referral log for the review period indicated that seven inmates were referred to acute inpatient care.  All were accepted and transferred timely.

The referral log indicated four referrals to intermediate inpatient care.  Three were accepted and transferred timely, but no data was provided regarding the fourth case.

At the time of the site visit, six CSP/Solano patients were in DSH inpatient programs and none were awaiting transfer to a DSH bed.

The institution reviewed its non-referral log for patients who met one or more criteria for consideration for referral to a higher level of care at a DSH facility but were not referred.  All but one of these inmates were in the MHCB at the time they met the criteria.  At the time of the site visit, four such inmates were in the MHCB.  While internal audits found the rationales for non-

249

referral to be adequate in all cases, most of these rationales consisted of only a statement that the inmate's existing level of care was "clinically indicated," and that MHCB staff were adjusting these patients' medications to move them toward stabilization, or that staff planned to continue consideration for DSH placement.

CSP/Solano transferred ten patients to outside MHCBs during the review period. Three were transferred timely. The late transfers were overdue by a range of five hours to three days, or an average of 33 hours overdue. Staff reported that the predominant reason for these delays was unavailability of MHCBs.

During the review period, there 31 total placements in alternative housing pending placement in an MHCB. Stays ranged from .08 days to 5.5 days. Sixteen or 52 percent of stays in alternative housing exceeded timeframes.

CSP/Solano reported that no patients were eligible for transfer to a PSU during the review period.

During the review period, 20 inmates met criteria for transfer to an EOP hub and all transferred within timeframes. Of the three EOP inmates in administrative segregation, one was a transfer from another prison for out-to-court proceedings, and the other two were pending transfer to an EOP hub.

During the review period, 42 inmates were identified as needing EOP mainline housing. Of those, 37 or 88 percent were transferred timely. Transfers of the remaining five inmates were late by a range of two days to 32 days.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Administrative segregation inmates were housed in Unit 10, with Unit 9 utilized for occasional overflow.  Information produced before the monitor's visit indicated only one use of overflow housing during the review period.  Treatment space in administrative segregation remained insufficient.  Three therapeutic modules located on the south side of the building's floor allowed for limited private contacts.  Leadership acknowledged this issue and reported that additional therapeutic modules were on order.

At the time of the site visit, there were a total of 124 inmates in administrative segregation, including 49 3CMS inmates and three EOP inmates.  The institution reported that the average length of stay in administrative segregation was 41.05 days for non-MHSDS inmates, 27.83 days for EOP inmates, and 36.89 days for 3CMS inmates.  It also reported that as of February 19, 2015, two MHSDS inmates had been in administrative segregation longer than 150 days, and that both were engaged in active court cases at that time.

Pre-screenings were conducted timely for 90 percent of the 146 3CMS inmates and for two of the three EOP inmates placed in administrative segregation during the review period.  In comparison, 95 percent of the pre-screenings for the general population inmates placed in administrative segregation were timely.  The late pre-screenings were attributed to difficulties the night shift nursing staff was having with providing screen results to mental health staff.

For the 31-item screens, 91 percent of the total 154 screens were completed within timeframes.

Psychiatry contacts were reported as 100-percent compliant for both the total 162 initial contacts and the total 556 follow-up contacts.  The institution's success with staffing its full-time psychiatry positions was cited as the reason.

251

According to provided data, 93 percent of the 86 initial PC contacts were timely, as were 98 percent of the 975 follow-up contacts.

A total of 196 cell-front contacts were reported.  Forty-one percent were attributed to staff decision, 34 percent to inmate refusals of a private setting, 14 percent to modified programming, eight percent to "unspecified," and two percent to lack of available escort.  One staff member conducted 96 percent of all of the "staff decision" cell-front contacts, which affected 30 different inmates receiving these non-private contacts.  Many of these contacts occurred on the same day, and in nine cases the inmate was seen four or more times on the same day.  No clear reason was provided.

Initial IDTT meetings occurred within timeframes in 97 percent of cases.  Untimely meetings were late by a range of three days to 38 days.  Ninety-nine percent of follow-up IDTT meetings were conducted within timeframes.  The late meetings were overdue by a range of six days to 34 days.  Required disciplines other than PCs attended 86 percent of IDTT meetings.

Observed IDTT meetings during the site visit were attended by a full complement of staff, with access to necessary information.  Case presentations by PCs ranged from lacking in focus and completeness to being well-conducted.  Staff interaction was generally good.  The space used for IDTT meetings, as well as for ICC meetings, was within a general area shared with custody.  It consisted of a conference table in a space that was separated from the general area by partitions.  Ambient noise interfered significantly with interactions among inmates and the team.  In one instance, a custody officer entered the area to retrieve food items, which compromised the confidentiality of the discussion.  Staff reported that noise and interruptions were usually worse than what was observed.  At meetings which the inmate refused to attend,

there was minimal to no discussion about ways to better engage the inmate in his own treatment planning.

Due to lack of space for therapeutic groups, none were conducted for MHSDS inmates in administrative segregation.  Reviewed documents indicated that MHSDS inmates in administrative segregation were being offered only 3.5 hours of yard twice per week, or a total of only seven hours per week.  Review of the 114-As for a sample of six MHSDS inmates indicated that most offers of yard were accepted.  Inmates were allowed to request return to their cells before the yard sessions ended.

All approvals of inmates for NDS status were logged by the captain or the ICC.  Log entries included the inmate's name, CDCR number, level of care, and dates of placements in administrative segregation, administrative review, and issuance of property, but not dates of transfers out of administrative segregation.  The institution also did not produce a list of all inmates on NDS during the review period or their transfer dates.

MHCB:

The nine-bed MHCB at CSP/Solano was staffed with one full-time and two part-time psychiatrists, and two full-time and one part-time PCs.  Rotating teams of a psychiatrist and psychologists provided 20 hours of coverage on the weekends.

During the review period, there were 95 admissions, approximately two-thirds of which were transfers from other prisons.  The average daily census was 7.9, and the average length of stay was 15.8 days.  All nine beds were filled at the time of the site visit.  It was reported that earlier plans to reduce the number of beds to five had been abandoned because of increased demand for crisis beds.

253

Both initial and follow-up psychiatry contacts were reported to have been 100-percent compliant.  Initial PC contacts were 93-percent compliant, and follow-up contacts were 100-percent compliant.

Initial IDTT meetings were 94-percent compliant, and follow-up IDTT meetings were 100-percent compliant.  Based on observed IDTT meetings, post-meeting discussions with the team and the responsible regional psychologist, and on reviews of patient charts and presented data, it appeared that the IDTT in the MHCB needed to explore ways to expedite its assessments of inmates' needs for treatment and transfers to higher levels of care.  This observation was echoed by institutional leadership, who indicated that remedial measures in this regard were being undertaken.

SREs were conducted timely in 99 percent of cases.  The two SREs that did not comply with timeframes were .5 days and .6 days overdue, respectively.

Once approved by the IDTT, a recreation therapist worked with inmates while in their cells and on the yard during second watch.

Seclusion and Restraint:

Use of therapeutic restraints did not appear to be excessive, with only two instances logged as used during the review period.

Alternative Housing:

The institution used cells numbered 123 through 128 in the administrative segregation unit as alternative housing.  These cells were also used for new intakes in administrative segregation.  They were located in front of the control booth, which made for ease of continuous direct observation, as required.

3CMS:

Since the preceding monitoring visit, most of the growth in the mental health population at CSP/Solano was in the 3CMS program.  At the time of the site visit, there were 1,353 mainline 3CMS inmates, plus five EOP mainline inmates awaiting transfer.

Ninety-eight percent of both initial and follow-up psychiatry contacts during the review period were reported as compliant.  However, psychiatry had difficulty with responding to referrals for medication noncompliance.  With improved psychiatry staffing, efforts were being made to improve response times.

Initial PC contacts were 74-percent compliant, and follow-up PC contacts were reported as 95-percent compliant.  Some 3CMS inmates were seen more frequently than every 90 days for follow-up contacts.

Data indicated that 92 percent of psychiatry and PC contacts were conducted in a private setting.

Initial IDTT meetings were 79-percent compliant with timeframes, with late meetings averaging four days overdue.  Follow-up IDTT meetings were 99-percent compliant with timeframes.  Required staff attended in 98 percent of cases.  At observed IDTT meetings in D-yard, all required participants were present and necessary information was accessible.  Discussions were good and included useful input from the correctional counselor.  Team members demonstrated good rapport with the inmates and had an excellent working knowledge of each case.  Although the team was clearly attempting to implement recent training from headquarters, treatment planning was not sufficiently focused on specific goals or interventions.

Groups were offered in the 3CMS program, but both staff and inmates reported long wait times for group treatment.  Staff were not regularly able to place inmates into groups in

255

accordance with their clinical needs.  A group dealing with depression was observed at the time of the site visit.  The group was well-conducted, but there were problems with assembling all participants, the latest of whom arrived a half-hour late.  The participants were interviewed after the session concluded.  They reported general satisfaction with mental health services, including responsiveness and accessibility of staff and continuity of medications.  However, they also expressed some areas of concern which were primarily difficulties with ducats, long wait times for placement in therapeutic groups, and lack of knowledge of their treatment goals.  These concerns were corroborated by discussions with staff and leadership, as well as by observation of a 3CMS group.

Referrals:

There were a total of 1,543 mental health referrals during the review period.  Response to all 13 emergent referrals was compliant.  Of the 51 urgent referrals, 98 percent were handled timely, and of the 1,479 routine referrals, 96 percent were handled timely.

Heat Plan:

Six housing units were reviewed for compliance with the institutional heat plan. CSP/Solano had instituted a local policy requiring housing of all heat-risk inmates in one of six identified housing units, which were Units 2, 8, 10 (administrative segregation), 16, 19, and 24. Additionally, heat-risk inmates were given a heat-risk identification card which was used to expedite their movement into the housing unit once a Stage I heat alert was announced.

All six housing units were compliant with the heat plan.  Staff knew the policy, temperatures were being taken consistently, and lists of heat-risk inmates were readily available to staff on a weekly basis during the heat plan period of May through October every year.

<u>Access to Care</u>:

Institutional monthly health care access reports for August 2014 through January 2015 were provided to the monitor.  The reports indicated that in August 2014, a total of 1,647 ducats were issued for mental health appointments, of which 1,471 or 89 percent were completed.  Of the 176 non-completed ducats, 22 or 12 percent were due to inmate refusals and 154 or 88 percent were due to non-custody reasons.  No non-completed ducats were attributed to custody reasons.

A total of 1,719 ducats were issued for mental health appointments in September 2014.  Of these, 1,516 ducats or 88 percent were completed.  Of the 203 non-completed ducats, 22 or 11 percent were due to inmate refusals, and the remaining 181 or 89 percent were due to non-custody reasons.  None of the non-completed ducats were attributed to custody reasons.

The data for October 2014 indicated that 1,892 ducats were issued for mental health appointments, and that 1,593 or 84 percent of these were completed.  There were 299 non-completed ducats, of which 38 or 13 percent were due to inmate refusals, and 261 or 87 percent were due to non-custody reasons.  No failures to complete any appointments were attributed to custody reasons.

Of the total of 1,290 ducats issued for mental health appointments during November 2014, 1,111 or 86 percent were completed.  Of the 179 non-completed ducats, 11 or six percent were due to inmate refusals, and 167 or 93 percent were due to non-custody reasons.  One ducat was reported as non-completed for custody reasons.

In December 2014, the institution issued 1,551 ducats for mental health appointments, of which 1,211 or 78 percent were completed.  Of the 341 non-completed ducats, 21 or six percent

257

were due to inmate refusals, 278 or 81 percent were due to non-custody reasons, and 42 or 13 percent were due to custody reasons.

In January 2015, there were 1,522 ducats issued for mental health appointments, of which 1,299 or 85 percent were completed.  Of the 223 non-completed ducats, 33 or 15 percent were due to inmate refusals, 177 or 79 percent were due to non-custody reasons, and 13 or six percent were due to custody reasons.

Program Access:

a.     Job and Program Assignments:

Although CSP/Solano did not have an EOP program, in January 2015 its staff received the mandatory training on evaluation of EOP inmates for program assignments.  A report on job assignments dated February 12, 2015 indicated that three EOP inmates were assigned full-time jobs, two EOP inmates had part-time academic assignments, 554 3CMS inmates had full-time jobs, and 299 3CMS inmates had part-time jobs.

b.     Milestone Credits:

The institution did not provide information on milestone credits.

c.     Out-of-Level Housing:

On February 24, 2015, 33 3CMS Level I inmates were housed in Level II housing and four Level I 3CMS inmates were in Level III housing.  There were 104 Level II 3CMS in Level III housing, four Level III 3CMS inmates in Level II housing, and 63 Level IV 3CMS inmates in Level III housing.

d.     ADA Reasonable Accommodation and Grievance Procedures:

CSP/Solano did not provide information on its ADA Reasonable Accommodation and Grievance Procedures other than reporting that no revisions had been made to its policies and procedures.

   e.      Periodic Classification Score Reductions:  EOP Inmates

CSP/Solano did not have an EOP program.

*Coleman* Postings:

Six housing units and the CTC were checked for the presence of *Coleman* postings. Postings were found in five of the six housing units, but three of them and the one in the CTC were the outdated 2010 version.  CDCR was providing the current 2015 version of the posting in an 8.5 by 11-inch size, which was difficult to read.

**San Quentin State Prison (SQ)**
May 4, 2015 – May 6, 2015

Census:

On May 4, 2015, San Quentin's total inmate population was 3,899.  The mental health caseload population was 1,117 inmates, an increase of 25 percent since the 25th monitoring round.  There were two inmates at the MHCB level of care.  The EOP mainline had a population of 28 inmates.  There were three EOP inmates in administrative segregation.  The 3CMS population totaled 793 inmates, with 62 inmates at the 3CMS level of care housed in administrative segregation.  There were 1,165 inmates in the reception center, including 11 EOP and 277 3CMS inmates.

Staffing:

One of two chief psychologist positons was filled, and served as chief of mental health. At the time of the site visit, San Quentin had an acting chief of mental health as the permanent

259

chief was out on extended leave.  The second chief psychologist position was left vacant as a cost saving measure.

The two chief psychiatrist positions were filled.  The senior psychiatrist position was vacant.  The 12 staff psychiatrist positions were all filled.

Two of the eight senior psychologist specialist positions were vacant for a 25-percent vacancy rate.  All four of the senior psychologist positions were filled.  Of 36 staff psychologist positions, 32.5 were filled for a vacancy rate of ten percent.

Of the two supervising social worker positions, one was filled leaving a 50-percent vacancy rate.   Sixteen of 19 social worker positions were filled leaving a 16-percent vacancy rate.

All seven senior psych tech positions were filled.  Of the 54.5 psych tech positions, 36.6 were filled, leaving a 33-percent vacancy rate.   There were eight recreation therapist positions; six were filled for a 25-percent vacancy rate.

There was no reported use of contractors at San Quentin.

Quality Management:

The quality improvement process at San Quentin remained a thoughtful and useful process.  The local governing body met monthly, and meeting minutes were reviewed.  Agenda items focused on credentialing issues and policies and procedures.  The required attendees were generally present.

The quality management committee met monthly.  Minutes were provided for review. Attendance was good; the agenda regularly covered multiple issues including:  health care appeals and correspondence; primary care and chronic care; emergency response review committee (ERRC); clinic updates; mental health, dental and pharmacy and therapeutic

260

subcommittees; CTC/OHU; reception center and discharge care; death reviews; and the health care access team among others.  Actions taken by the quality management committee included various San Quentin performance improvement work plan initiatives such as addressing polypharmacy, EKG protocol, scheduling and access to care.

The mental health subcommittee met on a weekly basis and had a good attendance rate. Its standing agenda items addressed mental health nursing issues, five-day follow-ups, health record issues, RVR/indecent exposure issues and transfer issues. The subcommittee also deliberated relevant follow-up issues such as PIP updates, and various mental health quality management reports.

Audits performed at San Quentin during the review period included, concordance between MHTS.net and the UHR and the medication administration process improvement plan. The institution also audited components of the healthcare dashboard process and treatment planning.

QITs and FITs were chartered and/or continued during the review period regarding condemned EOP and administrative segregation structured treatment received, in addition to SPRFIT, effective communications, and enhanced IDTT presentations.  The specialized care for the condemned program (SCCP)/Intermediate Care Facility (ICF)/PIP integration QIT was completed during December 9, 2014.  The goal of the QIT was to provide a psychiatric inpatient program to provide acute and intermediate care to the condemned population at San Quentin, including integrating the inmates currently housed in the SCCP.  Policies and procedures were developed in the months preceding the activation which directed the manner in which services were provided on this licensed unit.

At the time of the site visit, San Quentin was in the process of implementing the new statewide peer review policy and coordinating with their paired institution, California Institution for Men (CIM), to begin the new process during the current quarter.  Staff psychologists and social workers completed the two-hour statewide peer review training, which was provided during March 2015.

During the review period, San Quentin mental health staff completed peer reviews according to the LOP.  Peer review committees were in place for psychologists, social workers and for psychiatrists.  The psychologist and social worker peer review committees consisted of three members per committee, who reviewed two to three of their peers at a time.  The psychiatry peer review committee consisted of two members, who each reviewed one peer at a time.  All staff were reviewed on an annual basis.

Peer review committee members received relevant training regarding the process and feedback was presented to those reviewed in written format.  During the review period, twelve psychologists, seven social workers and three psychiatrists were reviewed by their peers, which required a total of five peer review committee meetings.  The peer review process was generally reviewed favorably by the clinicians.

Medication Management:

San Quentin used the medication administration process improvement program (MAPIP) in an effective manner.  Compliance scores of at least 90 percent during the review period, with very few exceptions, were obtained in the following domains:  continuity of medications under the following circumstances:  intra-institutional moves, transfers to administrative segregation, renewals, and new medication orders; informed consent; pill lines; obtaining laboratory tests via

CDCR protocols for psychotropic medications including atypicals, Clozaril, antidepressants and other mental health medications; and parole medications.

A polypharmacy report was generated at the institutional level, which included both medical and psychiatric medications.  Less than two percent of all prescribed antipsychotic medications involved polypharmacy.

The maximum length of medication orders for psychotropic medications was 90 days. The maximum length of bridge orders was 14 days.  Inmates receiving bridge orders were scheduled for a psychiatric examination prior to expiration of the bridge order.

Approximately ten percent of psychotropic medications were non-formulary.

Analysis of MAPIP findings identified non-compliance with psychotropic medications, excluding PC 2602 ordered medications, which appeared related to timeliness of follow-up psychiatry appointments.  There was also non-compliance with PC 2602 ordered medications, which appeared to be related to nursing staff not realizing they were PC 2602 ordered medications, and HS administered medications, which reportedly had been corrected during April 2015.

All inmates in restricted housing units received psychotropic medications on a DOT basis although the physical plant presented notable limitations concerning the DOT process. Specifically, staff advised that it was frequently difficult to adequately observe the inmates swallowing the medication since the cells were not opened during the medication administration process.

At the time of the site visit, 16 inmates were receiving psychotropic medications on an involuntary basis via the PC 2602 process.  One PC 2602 process was initiated during the review

263

period and 15 PC 2602 requests were renewed and upheld.  No PC 2602 processes were discontinued during the review period.

At the time of the site visit, staff reported that 44 inmates were receiving psychotropic medications that were being administered on an HS basis.

Transfers:

A significant portion of the referrals to inpatient care on the DSH referral log were from the 2014 unmet need assessment project of the condemned inmate population and inmates identified in anticipation of that assessment.  There were a total of 37 inmates on the referral log. Two of those inmates had been identified for referral to inpatient care, refused to consent and prevailed on the *Vitek* hearing.  Of the remaining 35 inmates, four were not identified as part of the unmet needs assessment project or in anticipation of the assessment project of condemned inmates.

The remaining 31 inmates on the referral log were referred to inpatient care as part of the activation process of the SQ PIP, and had been identified as part of the unmet needs assessment project for the condemned or in anticipation of the assessment.  Their referral and transfer timelines were all adjusted due to the time it took to activate the SQ PIP, consequently, calculating timelines for referrals and transfers for these inmates would provide no meaningful information.

The remaining four referrals occurred as any referral would and fit the parameters of what was typically reviewed for referrals to higher levels of care during a review period.  All of the four referrals that were not connected to the assessment project were for intermediate care; three occurred in the month of November 2014 and one in the month of February 2015.  Three were for condemned inmates, while the fourth (February) was for an inmate housed elsewhere at

San Quentin.  All were completed and timely submitted and the response by DSH or SQ PIP was also timely.  Inmates were subsequently transferred to outside crisis beds within 72 hours of bed assignment, 50 percent of the time.  The two inmates who were not transferred timely were transferred to SQ PIP.

Observation of IDTTs during the site visit suggested that not all treatment teams had fully incorporated the CDCR form 7388B into the treatment team process.  Some teams were highly skilled and had incorporated the criteria on the 7388B flawlessly into the team process while others addressed criteria only partially, were stilted or did not review the criteria at all.  It was clear in some teams that the PC had completed the responses to the 7388B prior to the IDTT and that the decisions regarding whether the inmate met any of those items was not essentially a team decision.

The most frequent rationale for a lack of referral was that the current level of care was appropriate and that the inmate was receiving enhanced care at the EOP level of care. However, when reviewing multiple medical records, treatment plans did not consistently meet the needs of the inmates and did not always elucidate the "enhanced" treatment that staff reported as being provided as the justification for the non-referral.

The DSH coordinator noted an anomaly in the non-referral audit form in that there was no "drop down" option for inmates in the condemned program.  The DSH coordinator elected to enter "administrative segregation" for those inmates and noted that in some of the audit forms, it was not noted each month.  It appeared it would be an operationally useful option for "condemned" to be added to the drop-down menu for a more accurate analysis of audit findings of condemned referrals and non-referrals.

It was observed that justifications for non-referral were not consistently specific in nature and supported by the clinical documentation in the medical record.  In some cases it was stated in the 7388B month after month that an inmate who had been refusing treatment groups for months had committed to attending "some" groups or even "three" treatment groups or yard groups as a rationale to not refer the inmate to a higher level of care.  It was noted that while that may be an acceptable rationale for one month when it might represent a change in the clinical presentation for that inmate, when the inmate failed to follow through despite staff repeatedly providing "support" and "encouragement," there might be a need for other clinical intervention and clinical rationale in subsequent months.

In some instances the team had "cut and pasted" in the CDCR form 7388B, even when a prior acceptable rationale was no longer relevant or adequate.  Multiple individual audits did not note this despite medical record confirmation.

In addition, these treatment teams did not offer appropriate alternative interventions that specifically targeted the positive criteria that caused the inmate to be identified for consideration for referral.  It was observed that in these non-referred cases, that as the same problematic behavior continued, the treatment plan was not revised to address them specifically.

Behavioral interventions were rarely utilized when indicated, resulting in no progress over time for multiple inmates or unnecessarily slow progress for others.  It should be noted that a January 21, 2015, San Quentin quality management performance report also noted poor compliance with documentation of reasons for refusal and interventions to increase attendance on treatment plans for high refusing inmates.

Based on staff interviews and discussion, there appeared to be some residual concerns among non-SQ PIP staff regarding the quality of treatment that inmates would actually receive

266

from DSH, which may have translated into a reluctance to refer inmates to DSH.  That same January 21, 2015 performance report did note that staff were going to receive additional treatment plan training.  It was unclear from the performance report how detailed that training would be and if it would address all problems related to inpatient care.

San Quentin transferred a total of 82 inmates to an outside MHCB during the review period; 44 or 54 percent were transferred within the 24-hour requirement.

There were 376 3CMS transfers from the reception center during the review period.  Of those, 201 or 53 percent were over the 90-day Program Guide transfer requirements.  There were 77 EOP inmates transferred from the reception center during the review period, of which 36 or 47 percent exceeded the 60-day transfer requirement.   At the time of the site visit, there were eight EOP inmates housed in the reception center over 60 days.

Staff reported that there were numerous reasons why inmates were not moving within the established timeframes, particularly 3CMS inmates.  The reasons for delay included medical holds, awaiting the completion of the disciplinary process, and specific beds not being available, e.g. SNY.

During the review period there were 67 inmates housed in alternative housing, of which 60 or 90 percent were transferred within 24 hours, and seven or ten percent were housed in the central health care building for a period over 24 hours.

Other Issues:

Reception Center:

San Quentin continued to operate a reception center with services provided by mental health staff referred to as the "RC Team."  This team of mental health clinicians included psychologists, social workers, psychiatrists and a recreation therapist.  They were responsible for

267

completing initial assessments, comprehensive evaluations and providing ongoing treatment services to 3CMS and EOP inmates until those inmates were moved to their permanent housing locations.

Treatment groups were provided to reception center "enhanced" 3CMS and EOP inmates that included anger management, stress management, substance abuse, process group and recreational therapy. Groups were scheduled daily. The monthly average census of EOP inmates averaged 17 to 30 inmates during the review period. Enhanced 3CMS inmates were designated as such by their treatment teams and eligible for multiple treatment groups and increased PC contacts as determined by the treatment team. 3CMS inmates not designated as "enhanced" received the standard reception center 3CMS services.

There was no data provided on initial mental health screening or evaluations completed or the timeliness of such.

Based on the data provided, initial psychiatric contacts in the reception center EOP program were 98-percent compliant. Routine contacts were completed timely 99.8 percent of the time. Initial PC contacts were compliant for timeliness at 91 percent. San Quentin completed routine EOP contacts in a timely manner 96 percent of the time.

For 3CMS inmates in the reception center, initial PC contacts occurred timely 99.8 percent of the time, and routine contacts were timely completed 99.7 percent of the time. Initial and routine psychiatric 3CMS contacts were reportedly compliant at 100 percent.

The institution did not provide data related to the use of non-confidential space in the reception center.

Group treatment data for the average number of hours offered and attended was not provided for reception center EOP inmates. While specific data was not provided, a quality

268

management performance report indicated that San Quentin consistently was unable to "meet or exceed" performance benchmarks for providing EOP structured treatment opportunities.  That performance report specifically cited the reception center population and challenges in treating the reception center population as factors in not meeting the EOP target hours for out-of-cell structured treatment.

MHSDS Inmates in Administrative Segregation:

San Quentin provided some treatment groups to EOP administrative segregation inmates awaiting transfer to an EOP Hub facility.  During the review period the number of EOP administrative segregation inmates at any given time ranged from four to 11.  The administrative segregation mental health treatment team consisted of psychiatrists, psychologists, social workers, and a recreation therapist to treat 3CMS and EOP inmates.

The EOP treatment group schedule indicated that there were ten different treatment groups and four therapeutic yards offered at the time of the site visit.  Topic areas included substance abuse, stress management and emotional regulation.  Recreation therapy made up 50 percent of the treatment group schedule.  The schedule made use of every day of the week but Saturday.  Data reflecting EOP offered and attended hours was not provided.

Compliance with administration of the 31-item screening checklist in administrative segregation was 82 percent for the period of September 29, 2014 through March 29, 2015.  There was no information on timely IDTTs prior to ICC.  Initial IDTT meetings were held timely when not considering the date of the ICC 98 percent of the time.

Routine IDTTs occurred timely 99.7 percent of the time.  While IDTT attendance was reported, staff had not completed appropriate paperwork for each IDTT.  For those IDTTs where staff reported on attendance, all required participants attended 94 percent of the time; however,

269

this represented 14 percent of total IDTTs held in administrative segregation during the review period based on the other data provided.  The high compliance rate for team attendance for those IDTTs where data was reported was noted.

Initial PC contacts were compliant at 96 percent and routine contacts were timely 98 percent of the time.  Analysis of the data showed that 46 percent of contacts occurred cell-front. The primary reason for these cell-front contacts was documented as "staff decision."  It should be noted that significant PC contacts occurring cell-front is likely to compromise inmates' access to actual treatment.  This was reflected in the medical record reviews, as many of the reviewed progress notes for administrative segregation indicated that individual contacts frequently appeared superficial, more in line of brief "check-ins" rather than actual therapeutic contacts linked to specific interventions and goals on the treatment plan.

Based on the data presented, psychiatry achieved 100-percent compliance with timely initial and routine appointments.

For psychiatrists, 12 percent of individual contacts were conducted in non-confidential areas, five of which were listed as cell-front due to staff decision.  The majority of those non-confidential contacts were for routine psychiatric appointments, and it was unclear why they had not been ducated to the designated treatment area in the health services building.

Interviewed inmates requested increased treatment availability and time out of their cells. Inmates also expressed concerns regarding distribution of crank radios and what they perceived as inequitable distribution and a failure to comply with policy.  There were also concerns with some custody staff and correctional counselors being disrespectful to inmates and not interacting well with those with a mental illness.  Many of these concerns were supported by staff.  Multiple

270

inmates requested that custody staff who work in the unit receive enhanced training in working with the mentally ill.

During the review period, the average length of stay for 3CMS inmates was 72 days, and for EOP inmates the average was 21 days. There were no EOP inmates held in administrative segregation over 90 days.

During the site visit, there were five inmates designated NDS and each had been authorized to receive authorized property.

MHCB:

San Quentin did not have any formally designated beds for MHCB purposes, although vacant SQ PIP beds could be used for such purposes for condemned inmates. Program Guide requirements were being met for MHCB care provided at San Quentin. During the review period, 14 inmates were admitted to the SQ PIP beds for MHCB purposes. Five of these inmates had lengths of stay longer than ten days with reasonable rationales provided for such length of stay that ranged from 18-42 days. Four of the five inmates were eventually admitted to the SQ PIP. The MHCB census during the review period ranged from zero to two inmates.

New admissions were given a history and physical within 24 hours, an updated or new mental health assessment, an SRE upon admission and discharge, and an initial IDTT review within 72 hours.

Inmates were reportedly seen daily by a psychiatrist, psychologist or social worker and at least twice a week by a psychiatrist. All individual contacts occurred in a private setting unless the inmate refused to leave their cell.

Following the initial IDTT meeting, IDTT reviews were conducted at least weekly with updated treatment plans and access to higher level of care checklists.  All required staff attended the IDTT meetings.

Suicide watch and precaution practices were compliant with Program Guide requirements.  Property, bedding, and movement restrictions were reviewed timely and relaxed as clinically appropriate.

Reviewed logs documented that MHCB inmates were offered daily outdoor recreational time of 60 to 90 minutes per day as well as one out-of-cell group therapy per day.

Discharge summaries were found in the eUHR.  Three records were randomly selected for review.  Timely psychiatric admission notes were found in four eUHRs randomly selected for review.

Seclusion and Restraint:

One inmate was placed in seclusion during the review period, which lasted for a duration of four hours.  No inmates were placed in restraints for mental health purposes during the review period.

Alternative Housing:

San Quentin provided alternative housing in 22 cells in the central health care building. Inmates in alternative housing were constantly observed by nursing staff and daily mental health clinical contacts occurred, which were offered in a private setting. When inmates were discharged from MHOHU/OHU back to their housing unit, appropriate clinical follow-up occurred.

EOP:

272

According to the data provided, the majority of EOP inmates at the institution were housed within the condemned program.  A list of activities for condemned EOP inmates was provided and included treatment groups such as dialectical behavior therapy, substance abuse, cognitive restructuring and anger management.  There was also an EOP therapeutic yard that condemned inmates could attend.  There were fewer therapeutic activities available to inmates housed in the Adjustment Center than those housed in East Block due in part to physical plant and space limitations.

Based on the schedule, there were seven one-hour treatment groups scheduled for EOP inmates housed in the Adjustment Center, while there were a total of 16 two-hour treatment groups scheduled for EOP inmates housed elsewhere.  The room used for group treatment in the Adjustment Center was not a confidential space.  This created challenges for facilitators in the Adjustment Center and could negatively impact inmate attendance.

The average number of structured out-of-cell treatment offered per EOP inmate was 13.4 hours, while the average number of structured treatment attended per week was 5.8 hours, excluding those on modified program.  For just those inmates on modified program, the average number of structured treatment hours offered per week was 8.8 hours while the average number of hours attended per week was 2.4 hours.

The high refusal rates, 43 percent for those not on modified program and 27 percent for those on modified program were concerning to the institution and had been the subject of a QIT and quality management corrective action item as well.  A quality management performance report noted that a number of the highest refusers in the condemned EOP program were transferred to the SQ PIP during the review period, leading to expectations that the refusal rate would drop somewhat.

273

It was observed that behavioral interventions as part of treatment planning appeared generally to be underutilized, and was a subject of quality management performance report discussions.  Chart reviews indicated that many of the inmates who regularly refused much of their treatment plan appeared to be candidates for behavioral interventions and behavioral plans.  This was often not considered as part of the treatment plan.  Behavioral interventions would also address the Axis II/personality disorder issues that staff attributed some of the high treatment refusal to as well.

Initial treatment team meetings were 91-percent compliant.  Routine EOP IDTTs were completed 99.7 percent of the time.  Required staff was present at 93 percent of IDTTs.

Staff reported data errors regarding initial psychiatric contact data.  Routine psychiatric contacts were completed timely 98 percent of the time.  Initial PC contacts were 100-percent compliant, while routine contacts were compliant 97 percent of the time.

The percentage of appointments that occurred in a non-confidential setting could not be computed because the report provided included aggregated data from several different programs.

IDTTs in the condemned unit were observed for 3CMS and EOP inmates and continued to be well-facilitated.  Team members maintained a therapeutic interaction with the inmate throughout the meeting.  All members participated in a meaningful way that demonstrated a sophisticated and cohesive team.  The criteria from the CDCR form 7388B was more fully incorporated into the team process and had clearly been incorporated into the conceptualization of each case.  The SQ PIP was seen as a valuable resource and considered regularly for each inmate.

The inmate was truly a partner in his treatment as demonstrated through plan development.  Medical record review indicated that documentation of these treatment plans had

274

improved in the months closest to the site visit.  There was clearly significant treatment

conceptualization and intervention development occurring at the IDTT, but that was not always

captured in the treatment plan itself, particularly in the earlier months of the review period.

Documentation of the tremendous efforts of the condemned treatment team for both EOP and

3CMS inmates was very important and stressed to the team during the observation of IDTT.

   3CMS:

   The mainline 3CMS program was generally consistent with Program Guide requirements.

The 3CMS mainline team provided services for approximately 640 3CMS inmates in the non-

condemned mainline program.  Occasionally, a mainline 3CMS inmate was recommended for

EOP, and in those cases, the inmate was provided increased services and a transfer to a mainline

EOP facility was expedited.

   Ninety-four percent of initial IDTT meetings were held within 14 working days of

referral/arrival, and annual IDTTs were reported to be completed timely 100 percent of the time.

The institution was compliant with required attendance at 94 percent of IDTT meetings.  Access

to the eUHR and C-File occurred via computers within the meeting room.

   In general, an intake evaluation was completed by a psychiatrist prior to the IDTT.

   Data showed that 95 percent of initial PC contacts were timely completed and routine PC

contacts were timely 99 percent of the time. Psychiatrists also met with 99 percent of 3CMS

inmates receiving psychotropic medications on a quarterly basis.

   PCs' and psychiatrists' interviews occurred in confidential settings.

   Mainline 3CMS inmates were offered groups, which included:  stress reduction and pain

management; PTSD veterans; lifers; developing self-compassion; improving relationships;

substance abuse and anger management.  In general, each group had about ten members.  At the

time of the site visit, there were about 121 inmates who had been referred for group therapy by their PCs and were on a waitlist dating back to October 2014.  Of those on the waitlist, 70 had previously attended groups.  Inmates who had not yet attended a group were given priority for future groups.

A significant portion, approximately 50 percent, of the 3CMS caseload was seen more frequently than every 90 days for clinical reasons.

During the site visit, seven randomly selected mainline 3CMS inmates were interviewed in a group setting.  Medication continuity problems were not present based on information obtained from these inmates.  These inmates confirmed that their mental health appointments were occurring in a confidential setting.  The inmates reported that the frequency of their meetings were consistent with the Program Guide requirements.  In general, they reported reasonable continuity of care was present relevant to seeing the same psychiatrist and PC.

Several inmates complained about delayed responses to mental health sick call requests. They also indicated that the pill call lines generally took about 30 minutes for a given individual to receive his medication.  Three of these inmates had participated in a group therapy, which generally was reported to have been helpful.  Several other inmates were on a waitlist for group treatment.  The health care records of six of these inmates were reviewed, confirming the information obtained during the group interview.

<u>Referrals</u>:

The institution had four emergent mental health referrals during the review period, of which all were seen timely.  There were 40 urgent referrals, of which 36 or 85 percent were timely.  The data showed that there were 1,292 routine referrals during the review period, of which 96 percent were seen timely.

276

Space:

There were ongoing space challenges in the reception center due to insufficient space to provide groups.  Additionally, staff reported that the use of holding cells in the central health care building for alternative housing disrupted the flow of inmates to clinicians at times when the cells being used were also adjacent to the waiting areas for inmates coming into the area for appointments.

Heat Plan:

Temperature logs were being completed on the units and forwarded according to policy. The institution provided a newly revised Heat Related Pathologies Plan dated May 4, 2015 for review.  San Quentin maintained digital thermometers in the units and conducted temperature readings on various areas of the highest tier in the unit every three hours.

RVRs:

San Quentin did not provide information regarding the number of mental health staff and custody officers trained on the revised RVR policies.

Access to Care:

The Associate Warden of Health Care was assigned to review access to care reports and work with medical and mental health leadership to resolve any issues identified as deficiencies. At the time of the site visit, there was an effort to resolve deficiencies in the areas of transfer reporting guidelines for inmates being transferred to MHCB and access to clinical staff in the ducating process.

Program Access:

    a.      Job and Program Assignments:

Data for April 1, 2015 indicated that one EOP inmate, 257 3CMS inmates and 718 non-MHSDS inmates had full-time job and program assignments at San Quentin.

Full-time job assignments included 242 3CMS inmates and 676 non-MHSDS inmates, of which 204 3CMS inmates and 619 non-MHSDS inmates were paid.  No EOP inmate had a full-time job assignment.

All five non-MHSDS inmates assigned full-time to the academic program were paid.  No EOP or 3CMS inmates held full-time academic program assignments.  There were 109 3CMS inmates and 171 non-MHSDS inmates with part-time, unpaid academic assignments.

The full-time vocational educational program included 15 3CMS inmates and 37 non-MHSDS inmates.  Inmates assigned to the vocational education program were not paid.

Three inmates at the 3CMS level of care held voluntary job assignments.  One EOP inmate, 141 3CMS inmates and 308 non-MHSDS inmates provided voluntary services at San Quentin that were not specifically described.

Five non-MHSDS inmates were in a substance abuse program.

b.      Milestone Credits:

For the period October 1, 2014 - March 31, 2015, San Quentin reported that 233 inmates in its 3CMS program were eligible for milestone credits, of which 9.44 percent actually earned the credit.  Of the four eligible EOP inmates, none earned milestone credits.  There were 745 eligible non-MHSDS inmates during the period, of which 2.42 percent earned milestone credits.

c.      Out-of-Level Housing:

On April 10, 2015, a total of 26 3CMS Level I inmates, 12 Level III 3CMS inmates and one Level IV 3CMS inmate were housed in Level II housing.

d.      ADA Reasonable Accommodation and Grievance Procedures:

278

San Quentin provided documentation of training of staff related to the ADA Reasonable Accommodation and Grievance Procedures.

> e.      Periodic Classification Score Reductions: EOP Inmates:

San Quentin was not an EOP-designated institution.

*Coleman* Postings:

Placement of *Coleman* postings was not reviewed during the site visit.

**Deuel Vocational Institution (DVI)**
February 3, 2015 – February 5, 2015

Census:

On February 2, 2015, DVI housed 2,365 inmates, for a decline by five percent since the monitor's preceding site visit on August 7-9, 2012.  The mental health caseload population of 512 was an increase by three percent since the preceding visit.  There were 18 inmates in the OHU, one EOP inmate in mainline, and 131 3CMS inmates in mainline.  Of the 145 inmates in administrative segregation, three were EOP inmates pending transfer to a hub institution, and 34 were at the 3CMS level of care.

In the reception center, the total census of 1,467 inmates was an increase by 23 percent.  The reception center mental health caseload census of 14 EOP inmates and 319 3CMS inmates was an increase by 29 percent.

Staffing:

Of the 49 established mental health positions at DVI, 43 were filled, for an overall vacancy rate of 12 percent in mental health.  Use of contractors reduced the mental health functional vacancy rate to three percent.

Of the two chief psychologist positions, one was filled and functioned as the chief of mental health, while the other position was frozen for budgetary reasons.  The senior psychiatrist position, the senior psychologist supervisor position, and the two senior psychologist specialist positions were all filled.

Both staff psychiatrist positions were filled, and a contractor provided an additional 1.25 FTE staff psychiatrist coverage.  Fifteen of the 16 established staff psychologist positions were filled, but two psychologists were out on long-term sick leave.  With contract coverage of 1.38 positions, the functional vacancy for staff psychologists was ten percent.

Of the seven established social worker positions, six were filled, for a functional vacancy rate of 14 percent.

The senior psych tech position was filled.  Six of the eight psych tech positions were filled, and contractors covered the two vacancies.

The recreation therapist position was filled.  The seven clerical positions, including six office techs and one health program specialist, were filled, although one OT was on long-term sick leave.  The CHSA II position was frozen.

During July and August 2014, DVI also had 20 hours per week of telepsychiatry.

Quality Management:

The quality management committee met monthly during the six-month review period.  It was chaired by the CEO for health care or his designee.  Required members attended and minutes were maintained.  Agenda items included LOP revisions, QIT formation, CQIT audit results, and custody and program area updates.

The mental health subcommittee met once or twice per month during the review period. Minutes of ten meetings indicated a quorum at nine of the meetings, with improved attendance

by custody since the preceding review period.  Agenda items included QIT formation, SRE training, performance report results, peer review plan, mental health staffing, and ongoing audits and reports by nursing, custody, and the SPRFIT coordinator.  Because IST was no longer tracking health care on-the-job training, an audit of the tracking of monthly training was conducted in December 2014, resulting in recommendations of best practices for these trackings.

The sole active QIT during the review period was to improve compliance with transfer timelines for 3CMS and EOP inmates housed in the reception center, as the compliance rate was only 38 percent.  The QIT found that transfer delays were caused primarily by bed unavailability and that new chronos were being requested every 90 days, regardless of whether the inmate changed level of care.  The QIT recommended that mental health provide weekly listings of the dates of all EOP and 3CMS inmates' levels of care and that custody staffing for the reception center be increased.

The institution was in the process of statewide standardization of peer review.  The committees were selected and awaiting training and the implementation plan from headquarters. Wasco State Prison (WSP) conducted a peer review of 13 PCs reviewed and five psychiatrists at DVI on August 15, 2014.  It focused on clinicians' documentation in patient progress notes and eUHRs and found that most documentation met or exceeded clinical standards.

Medication Management:

Audits indicated that new psychotropic medications were ordered, noted on the MARs, and administered in accordance with policy guidelines and timeframes.  Continuity of medications appeared to vary across the review period, but the extent to which psychotropic medications were affected was unknown because the audits did not distinguish between medical and psychotropic medications.

281

The compliance rate for notification of psychiatrists of inmate medication noncompliance was low at 25 percent.  Documentation in eUHRs of psychiatric contacts with inmates specifically for medication non-compliance was 90-percent compliant in August and 100-percent compliant in September and October, but it fell to 55 percent in November 2014, according to institutional audits.  No data was available for December.

Medication administration audits throughout the monitoring period indicated that pill lines did not exceed two hours and that no individual inmate's wait time exceeded 30 minutes.

MAPIP audits in August indicated that all released inmates signed for their medications at their times of release, but it did not indicate how many of these were psychotropic medications.

Transfers:

There were no referrals by DVI to acute or intermediate level inpatient programs during the review period.  Six inmates were identified as meeting criteria for consideration for referral to inpatient care.  Two had been identified due to multiple RVRs.  However, the DSH non-referral log indicated that two were identified for participating in less than 50 percent of their treatment and four were identified for three or more crisis admissions, making it unclear whether it was six or eight inmates who had been identified for consideration.  The non-referral log indicated the reasons for non-referral of these inmates as "current LOC is clinically indicated." The comment boxes in the non-referral log could not be expanded for full viewing, obscuring the reader's view of any rationales for the non-referrals in five of the six cases.  In the sixth case, it appeared that the rationale for non-referral may have been in whole or part that the inmate, who was EOP and housed in administrative segregation, was due to parole.  Non-referral to inpatient

282

care due to imminence of an inmate's release date is a violation of a *Coleman* court order.  (ECF no. 2927, entered August 7, 2008)

Record reviews indicated that Form 7388Bs were not always completed or were completed incorrectly.  At observed IDTT meetings, CDCR Form 7388B was not discussed within the treatment team process.  An inmate who appeared to be appropriate for referral was not considered.  The team's use of the form appeared to be overly concrete, with over-reliance on the objective criteria on the form.

There were 274 OHU admissions (including some repeat admissions) of which four or one percent lasted longer than 72 hours.  One hundred fifty three or 56 percent of the OHU admissions resulted in MHCB admissions, of which two-thirds were untimely.  Unavailability of beds was cited as the primary reason for late admissions.

No mainline EOP inmates transferred during the reporting period.  At the time of the visit, one had been awaiting transfer since November 19, 2014.  DVI staff was unable to provide an explanation for the delay.

Of the 51 inmates referred to EOP administrative segregation hubs during the reporting period, 44 or 90 percent were transferred timely.  Three were awaiting transfer at the time of the site visit.

There were 79 mainline EOP inmates transferred from the reception center during the reporting period, including 17 or 22 percent which were late.  At the time of the site visit, 14 EOP inmates in the reception center were awaiting transfer.

Of the 696 3CMS inmates transferred from the reception center during the reporting period, 362 or 52 percent were transferred late.  At the time of the site visit, 319 were awaiting transfer.

283

Other Issues:

Reception Center:

The DVI reception center was comprised of two divisions, the reception center and the special processing unit (SPU), which was comparable to a mainline SNY.  Because of this division, plus the fact that inmates were released for their ducats several hours before their appointments, they waited for their appointments for long periods of time outdoors in a small yard until their appointments began.  This led to some appointments not being kept. No clear explanation was provided as to why these inmates were moved and caused to wait so long before their appointments.

Psychiatric initial evaluations and contacts were 100-percent compliant.  Initial screenings met timeframes 99 percent of the time.  Clinicians reported that most inmate interviews were conducted in a confidential setting, but no summarized confirming data was provided.  Clinicians went to see inmates in the housing units, many of which had confidential space, in cases of appointment "no shows."  Other, non-confidential spaces that were used included the dayroom and chow hall.

The reception center EOP had four psychiatrists (three of whom were contractors) and two clinicians.  Initial evaluations of EOP inmates were completed timely 95 percent of the time, and inmates were seen by their PCs timely 96 percent of the time.  Compliance rates for timeliness of initial and follow-up IDTT meetings for EOP inmates were 97 percent and 100 percent, respectively.  However, psychiatry attendance was problematic.

EOP inmates in both the RC EOP and the RC EOP special processing unit were scheduled for daily therapeutic groups.  No data was provided on group hours offered and received in the reception center during the review period.  Record review indicated that use of

284

pre-printed forms was the predominant means of documenting inmates' progress in groups.  SPU inmates reported that they were often forced to choose between simultaneously occurring group and yard time.

For 3CMS inmates in reception center, initial mental health evaluations were 89-percent compliant, and ongoing PC contacts were 99-percent compliant.

MHSDS Inmates in Administrative Segregation:

Based on cell availability, recent intakes were placed throughout K-Wing, L-1, and L-2. K-Wing was preferred because the mental health office was there and had a holding cell in a confidential setting.  Part of K-wing was closed for maintenance at the time of the site visit. However, custody officers could not provide a list or other documentation identifying inmates on the mental health caseload, nor could they indicate where to obtain this information.

MHTS.net data indicated that DVI was 88-percent compliant with administrative segregation pre-screening.  The 31-item screen was completed timely 87 percent of the time.  No data on frequency of completion in a confidential setting was provided.  Initial mental health evaluations were completed timely 84 percent of the time, and initial psychiatric contacts occurred timely 100 percent of the time.  Initial IDTT meetings were only 54-percent compliant.

Ongoing psychiatric contacts were 100-percent compliant, but ongoing PC contacts were 85-percent complaint.  Cell-front contact data was not summarized and was indecipherable. Quarterly follow-up IDTT meetings met Program Guide requirements 95 percent of the time

Although DVI was not an administrative segregation EOP hub, it was providing some group treatment for EOP inmates in administrative segregation.  They were offered an average of 4.03 hours per week and received an average of 2.22 hours per week.   Group therapy was scheduled within L-1, which had six therapeutic modules, one of which was ADA-accessible.

285

Custody staff reported that yard time ran from 7:30 a.m. to 12:30 p.m. daily.  Inmates could not return to their cells early, except in emergencies.  Eleven caseload inmates' 114-D files were reviewed for documentation of yard offerings of at least ten hours per week for the month of December 2014.  This indicated that a minimum of ten hours per week was offered only 68 percent of the time, and that inmates refused yard 87 percent of the time.

At an observed morning mental health-custody meeting, appropriate staff was present and discussion covered a new arrival and existing inmates.  Staff indicated that a mental health supervisor conducted an audit of these meetings, but it was merely a paper notation indicating "ok" or "not ok" for each day of the month.

Non-Disciplinary Segregation:

No inmates were designated as on non-disciplinary segregation (NDS) status at the time of the site visit.  However, during an observed ICC observation meeting, a non-mental health caseload inmate was placed on NDS status.  This was not noted within the inmate's 114-D file. When the unit staff sergeant was asked how this information was communicated to unit staff, the sergeant said that he advised them of same.  However, this was an informal process with no documented procedure.

Alternative Housing:

At the time of the site visit, the OHU housed four inmates, three of whom were on suicide precaution status and one was on suicide watch.  There were six psychiatric OHU beds in unit B2.  DVI also had two padded cells that were used for "temporary housing/cool-down" and could not be used for more than four hours.  Four cells previously used for mental health patients had been decommissioned because of their recessed structure.  Two of those were used as alternative "cool down" rooms that were approved for brief placements.  There were also four

286

suicide watch cells in L-Wing, which staff reported had been retrofitted and which appeared to

be suicide-resistant.  Visibility into these was only partial.  DVI staff reported that they had

requested the same suicide-resistant beds installed statewide in MHCBs but had been denied.

Consequently, inmates were made to sleep on mattresses placed in the middle of the cell floors,

some of which were cold and uncomfortable.

When OHU and L-Wing beds were filled, inmates in need of OHU placement would be

placed in designated K-Wing administrative segregation cells.  Staff reported that overflow cells

in L-Wing, but not the administrative segregation cells, were used at times during the review

period.  Use of these cells was driven by the statewide wait list for MHCBs, according to staff

reports.  During the review period, two inmates were housed in the overflow cells in L-Wing,

one for 37.25 hours and one for 20.35 hours.

The OHU had an assigned psychiatrist seven days per week.  OHU documentation

indicated that a psychologist was present for referrals and releases.  There were also back-up

clinicians in case of staff absences.  There were some staffing changes during the review period

to address problems including repeated failure to track instances of inmate self-harm.  One office

was used as clinical office space and for treatment team and inmate interviews, severely limiting

treatment opportunities.

OHU clinicians indicated that they contacted HCPOP as soon as it was determined that

an inmate required an MHCB for stabilization, or by the second day of an OHU placement,

whichever came first.  Inmates returned from an MHCB were seen by OHU staff for an SRE and

possible admission back to the OHU.  Three of the four OHU admissions during the site visit

were "admit from MHCB."

Inmates could be admitted to and discharged from the OHU by a psychiatrist, psychologist, licensed nurse practitioner or physician's assistant, according to DVI LOP 191. Psychologists admitting inmates must refer them to a psychiatrist for a medication evaluation and to a physician for physical examination.  It was unclear whether appropriate nurse practitioners and physician's assistants had received appropriate SRE training that would equip them to admit and discharge inmates from the OHU.  It was also unclear whether RNs who were completing evaluations after hours had received appropriate training.  While the LOP referenced that a verbal order to admit was required, this might defer the safe placement of an inmate until he could be evaluated by a psychiatrist or psychologist.  During the site visit, an inmate referred for possible OHU admission was observed left alone waiting for at least 70 minutes with no staff directly monitoring him.  The custody officer stationed at a desk nearby was covering various competing responsibilities which did not allow him to observe the waiting inmate.

According to MHTS.net data, OHU clinicians were compliant with daily clinical contacts and completion of initial, ongoing, and discharge SREs at rates of 93, 98, and 100 percent, respectively.  Data indicated that initial PC contacts were 84-percent compliant.  Review of a small sample of OHU medical records was consistent with the MHTS.net data, although it did suggest that initial contacts were compliant.  No audit data was available for history/physicals, psychiatric contacts/evaluations, or discharge plans.

Treatment in the OHU consisted of primarily the OHU placement itself as a temporary "time-out," medication management, and brief individual contacts with mental health staff there. Staff utilized this time as an assessment opportunity to determine if the inmate required inpatient treatment at a higher level of care.  Each morning staff met in a "morning huddle" to discuss cases, administrative issues and review plans for the day.

288

3CMS:

DVI had a Level II mainline 3CMS program with two clinicians who had caseloads of about 1:70.  The telepsychiatrist position for the program was lost during the review period.

Initial mental health evaluations were only 63-percent compliant.

Initial and follow-up psychiatric contacts were 100-percent and 99-percent complaint, respectively.  For reasons that were unclear, DVI was noncompliant with initial and ongoing PC contacts in the mainline 3CMS program, at 69 percent and 83 percent, respectively.

Initial IDTT meetings were only 22-percent compliant but annual follow-up IDTT meetings were 100-percent compliant.  Limited reported data on IDTT meeting attendance indicated compliance rates of 89 percent for October, 85 percent for November 2014, but only 47 or 60 percent for December, which was attributed in part to the extended absence of a psychiatrist.

There was no data provided regarding 3CMS treatment groups.  The only group data provided was for administrative segregation and reception center groups.

Referrals:

DVI reported 2,764 mental health referrals.  The 71 emergent referrals drew timely responses in 92 percent of cases.  For the 74 urgent referrals, the rate of timely response was 95 percent, and for the 1,799 routine referrals, it was 97 percent.

Space:

Mental health leadership indicated long-standing problems with adequacy of treatment and office space.  They reported assurance by CDCR headquarters that pending construction will improve the situation.

<u>Mental Health/Custody Relations</u>:

Staff reported that their data did not always correspond with the Access to Care reports completed by custody staff.  Some staff reported that certain custody staff marked the inmates as having appeared for ducats based on escort from the cell, rather than on whether he actually attended his appointment.  Conversely, mental health clinicians would record the appointment as a "no show" if the inmate had returned to his cell before the appointment began, creating inconsistency between mental health's and custody's reports.  Some staff reported that they worked with their custody counterparts to agree on the entry so that Access to Care reports would be consistent and accurate.  The efficacy of this approach varied from area to area, being most successful in administrative segregation and least successful in reception center.  Mental health staff indicated that they had reported this up their supervisory chain.

<u>Heat Plan</u>:

There were no heat-related incidents reported during the reporting period.

During the heat season, indoor and outdoor temperatures were logged and forwarded to the litigation coordinator and a monthly heat report was sent to headquarters.  Housing units received weekly lists of all inmates taking heat-sensitive medications.  Those inmates were given access to cooling measures including fans, ice and extra showers during Stage II and III heat alerts.

Nursing performed rounds in housing units where temperatures reached 95 degrees. There were 21 heat days recorded in July, 12 in August, seven in September, and none in October.  The litigation coordinator reported reviewing inmate housing lists weekly to determine if inmates on heat medications were housed appropriately.  It was also the litigation

290

coordinator's practice to prepare a weekly discrepancy report, listing any failures to follow the heat plan.

Temperature reading sensors were observed in housing units C, D, E, F, G, East Hall, West Hall, J, K, and L wings.  The readings were being taken in each housing unit, but the locations of the sensors were problematic in several units.  In units D, E, F, G, J, and East Hall, the sensors were located on the third floor, hanging from the bars of the officer's station.  In West Hall, the sensor was on the second floor, but it was located within the officer's station and within three feet of an open window.  In K-wing, the sensor was located within the officer's station on the second floor.  C-Wing had the sensor on the second floor hanging from the officer station bars.

RVRs:

The institution did not provide records of RVR training of custody and mental health staff.

Use of Force:

DVI used the current, headquarters-approved lesson plan for use-of-force staff training. Provided documentation showed that three of the 30 mental health clinical staff for whom training was required were out on long-term sick leave.  Of the remaining 27, 25 received the training for a compliance rate of 93 percent.  Of the 90 custody managers and supervisors who required training, 76 attended, for a compliance rate of 84 percent.  Of the 405 COs, 378 attended, for a compliance rate of 93 percent.

Program Access:

a.    Job and Program Assignments:

Because DVI did not have an EOP program, there were no work training assignments assigned to EOP inmates.  Data provided by headquarters showed that 84 percent of the full-time available jobs were filled by non-caseload inmates and 16 percent were filled by 3CMS inmates. 56 percent of the part-time available jobs were filled by non-caseload inmates and 44 percent were filled by 3CMS inmates.

For the part-time academic program assignments, 86 percent were held by non-caseload inmates and 14 percent were held by 3CMS inmates.  For the voluntary academic assignments, 91 percent were filled by non-caseload inmates and nine percent were filled by 3CMS inmates. Eighty-one percent of the full-time vocational educational assignments were filled by non-caseload inmates and 19 percent were filled by 3CMS inmates.  Eighty-two percent of the part-time vocational educational assignments were filled by non-caseload inmates and 18 percent were filled by 3CMS inmates.

b.      Milestone Credits:

The institution had implemented new policies and procedures on the evaluation of EOP inmates for program assignments and milestone credits.  Training was completed on October 27 and 28, 2014.  Because DVI is a 3CMS mainline institution, there were no inmates who met the criteria for functional evaluation.

c.      Out-of-Level Housing:

For out-of-level housing of caseload inmates, institutional data indicated that one Level III EOP inmate was placed in Level II housing, six Level I 3CMS inmates were placed in Level II housing, eight Level III 3CMS inmates were placed in Level II housing, and two Level IV 3CMS inmates were placed in Level II housing.

*Coleman* Postings:

292

*Coleman* postings were not found in all of the toured units.  Postings that were found were not the updated version and were sometimes blocked from view by items placed in front of them.  In the K-Wing administrative segregation unit, the 2002 version was located on a wall behind officers' hanging coats, and in D-Unit, the 2002 version was found on a bulletin board accessible to class members.  No postings were found in the L-1 and L-2 units or the mainline C-Unit.

**California State Prison/Corcoran (CSP/Corcoran)**
February 17, 2015 – February 20, 2015

<u>Census</u>:

At the time of the site visit, CSP/Corcoran housed a total of 4,059 inmates, for a decline by 685 or 14 percent since the preceding monitoring period.  There were 1,651 inmates on the mental health caseload, which had grown by eight percent since the preceding monitoring period and comprised 40 percent of the total inmate population.

The MHCB unit housed 26 inmates.  One MHCB inmate was in non-disciplinary segregation.

There were 90 EOP inmates in the administrative segregation hub.  The mainline EOP population of 228 had grown by 55 percent since the preceding monitoring period.  Twenty-three EOP inmates were housed in 3CMS housing units.  Fourteen were in non-disciplinary segregation, and four with SHU terms were pending transfer to a PSU.

There were 852 3CMS inmates in mainline, 359 in the SHU, 70 in administrative segregation, 55 in non-disciplinary segregation, and 22 in Long-Term Restricted Housing.  This represented a decline by 58 percent in administrative segregation and an increase by 47 percent in mainline.

293

Staffing:

Excluding nursing and psych techs, only 68 of 106.9 established mental health positions were filled, for a 36-percent vacancy rate.  Use of 12.66 contractors reduced the functional vacancy rate to 25 percent.

Positions for the chief psychiatrist, two chief psychologists, five senior psychologist supervisors, and three senior psychologist specialists were filled.

Of the 11 staff psychiatrist positions, only 2.5 were filled, for a 77-percent staff psychiatrist vacancy rate.  The institution reported that its staff psychiatrists had caseloads of 65, 122, and 222 inmates, respectively.  Use of 5.36 contractors reduced the functional vacancy rate to 29 percent.  Caseloads were not provided for registry psychiatrists.  Mental health staff reported that the shortage in psychiatry coverage caused the institution to re-direct psychiatrists to programs according to need.

Eighteen of 32 staff psychologist positions were filled, for a 44-percent vacancy rate. Use of 3.49 contractors reduced the functional vacancy rate to 33 percent.  Six of the staff psychologists were unlicensed.

The supervising social worker position and 14 of 19.4 clinical social worker positions were filled, for a 28-percent vacancy rate.  The functional vacancy rate was reduced to eight percent with use of 3.81 contractors.

The vacancy rate for recreation therapists was 64 percent, with seven of the 11 positions vacant.

Three of four senior psych tech positions were filled, as were 60 of 61.95 psych tech positions, for a three-percent vacancy rate.  However, eight psych techs were on extended sick leaves.

294

Thirteen and a half of the 16.5 mental health clerical positions were filled, for an 18-percent vacancy rate.  The three HPS positions and one OSS II position were filled, but the CHSA II position was vacant.

CSP/Corcoran reported telepsychiatry data in terms of actual appointments, as opposed to the number of telepsychiatry hours.  During the latter five months of the six-month review period, there were 977 individual and IDTT meeting telepsychiatry appointments.

Quality Management:

Staff interviews and document review indicated that CSP/Corcoran maintained a robust quality management function.

During the review period, the local governing body met four times, always attained a quorum, and addressed approval of mental health-related LOPs, among other things.

The quality management committee met each month of the review period and always reported a quorum.  Detailed minutes for five of the six meetings indicated that the committee took up an extensive agenda of numerous mental health-related issues including staff vacancies, telepsychiatry, the populations of the various mental health programs, alternative housing stays, program compliance for PC contacts, IDTT meetings, and mental health-related LOPs and CAPS.  The CAPS addressed performance indicators for timely mental health referrals and PC contacts, discharge follow-ups, alternative housing stays, offered EOP treatment hours, and administrative segregation prescreens, among other things.  Meeting minutes indicated progress on these CAP items and sustainable process reviews.

The mental health subcommittee met twice each month during all six months of the reporting period and always achieved a quorum.  It addressed MAPIP issues including medication continuity audits and programming for the institution's various inmate populations.

295

It also reviewed 7388B audits and DSH referrals, staffing, out-of-cell contacts, PC and IDTT meeting compliance rates, IEX referrals, treatment hours, MHCB admissions and stays, restraint/seclusion, suicide watch, PC 2602 statistics, and QITs, among other things.

Four active QITs at CSP/Corcoran during the review period addressed the EOP hub Treatment Improvement Plan (TIP), MHTS.net/eUHR concordance, mental health document scanning, and five-day clinical follow-up procedures, respectively.  The QIT on the TIP led to meetings among mental health, nursing, and custody staff on improving the EOP hub treatment program.  It also addressed ensuring that nursing pre-screens were completed and entered in the tracking system and adding additional groups when group sessions were canceled due to fog.  A QIT on MHTS/eUHR concordance checked both of these information management systems for consistency.  QITs also examined timeliness of submission and scanning of mental health documentation, and compliance with post-MHCB discharge five-day clinical follow-ups.

During the review period, there was no peer review for psychiatrists, psychologists, or social workers.  The institution began a peer review process in connection with an upcoming accreditation site visit by the American Correctional Association.  It had Salinas Valley State Prison (SVSP) psychiatrists, psychologists, and social workers review files of their professional counterparts at CSP/Corcoran.

Medication Management:

Medication continuity for newly-arriving inmates at the institution was 61-percent compliant, and following intra-institutional moves it was 47.9-percent compliant.  Other medication continuity compliance rates were 55 percent after MHCB discharges, 72.5 percent after transfers to locked units, and 64.6 percent after discharged from a community hospital.

Inmate medication compliance rates included 43.6 percent for psychiatrist-prescribed medications, 99.4 percent for involuntary medications, and 49.6 percent following timely provider visits after refusals or no-shows.  Compliance rates for medication administration were 37.38 percent for psychiatrically-prescribed chronic care medications, and 78 percent for compliance with new psychiatric medications.  Staff attributed these low compliance rates to high treatment refusal rates and documentation gaps on MARs.  This was corroborated by review of the refusal tracking logs and MARs.

Laboratory testing of inmates' blood levels for psychotropic medications was 91.2-percent compliant.

The institution was 98-percent compliant with providing parole medications to inmates being released from the prison.

Transfers:

The inpatient care referral log was up-to-date and contained required information for the most part.  There were 500 cases in which IDTTs considered but did not refer inmates to higher levels of care.

There were 25 referrals to DSH acute care, all of which were completed timely and accepted, and one was rescinded by the institution.  Eleven were transferred timely, and 13 transferred within 72 hours of a bed assignment.  At the time of the site visit, two inmates had been awaiting transfer to acute care for eight days.

CSP/Corcoran initiated seven DSH intermediate care referrals for which all packets were completed timely.  Three transferred timely, and five transfers occurred within 72 hours of a bed assignment.  At the time of the site visit, one inmate had been awaiting transfer to intermediate care for 65 days.

297

Thirty-nine inmates returned from inpatient care during the review period.  The DSH coordinator reported receiving email notification of DSH discharges.  DSH discharge summaries were posted to SharePoint and were reported to be legible and useful.

Of 174 inmates transferred to an outside MHCB during the review period, 101 or 58 percent had a bed assignment within 24 hours of referral.  Forty-two or 24 percent were transported within 24 hours of referral.

There were 25 MHCBs in the institution's CTC.  During the review period, 267 inmates were admitted, with an average stay lasting 9.8 days, and a range of zero to 114 days.  One hundred seventeen or 44 percent of stays exceeded ten days.  Twenty-one inmates at CSP/Corcoran had re-admissions, with a range of three to 12 admissions during the review period.  Nineteen of these 21 inmates had stays in two or more MHCBs at other institutions' MHCBs.

Alternative housing consisted of 20 rooms in various areas.  Data showed that 55 percent of 323 alternative housing stays at CSP/Corcoran during the review period did not exceed 24 hours.  On average, alternative housing stays exceeded timeframes by 1.1 days.  Eighteen stays exceeded timeframes by three to ten days, and four stays exceeded timeframes by 25 to 58 days.  Staff attributed these delays to untimely completions of history/physicals, timing of custody's transfers to outside MHCBs, and unavailability of MHCBs through HCPOP.

Of the 94 EOP inmates transferred to an administrative segregation EOP hub, 74 or 79 percent transferred within 30 days.  Among a sample of five inmates, reasons for delays were overpopulation and closure of the CSP/Corcoran hub to new intakes, safety and security concerns, an MHCB admission, and an inmate's refusal to move from his current housing.

All 38 EOP inmates endorsed to a PSU transferred within 60 days of PSU endorsement.

298

Other Issues:

    Administrative Segregation EOP:

    The administrative segregation EOP hub was located in the 3A yard, a Level IV facility. Program capacity remained at 99 inmates, but it ran approximately 30 percent over capacity and at times reached a high of 140 inmates.  Staff reported that the hub was closed to new intakes on December 3, 2014 due to overcapacity.  At the time of the site visit, there were 90 inmates in the hub, including 58 whose stays had exceeded 90 days.  The institution reported that it did not conduct ICC reviews every 30 days for these inmates, as they were reviewed every two weeks in a regularly-scheduled unit meeting.  Lengths of stay ranged from 90 to 512 days.  Seven inmates were endorsed for transfer at the time of the site visit.

    Initial psychiatric contacts were 92-percent compliant.  Eighty-seven percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 30 days.

    Initial and weekly PC contacts were 89 and 97 percent compliant, respectively. The PC-to-inmate ratio ranged from one-to-12 to one-to-14 during the review period, and was one-to-eight at the time of the site visit.  Ninety-one percent of initial evaluations were completed by PCs within five days of inmates' placement in the hub.  Comprehensive clinical assessments before initial IDTT meetings were only 36 percent complaint.

    Observed psych tech rounds were well-conducted.  Discussion with the psych tech indicated that appropriate decisions were made concerning which inmates required referral to mental health staff for follow up.

    Review of minutes for three months of ICC meetings indicated that they were attended by the warden, associate warden, captains, ISU sergeant, Classification and Parole Representative (C&PR), and Correctional Counselor IIs (CC II).  Inmates' case factors and housing were

299

reviewed.  Except for some handwritten notes indicating action for a few inmates, there were no other indications of any formalized actions.  Delays in transfer were largely due to pending RVRs (usually for battery and threats) and pending court dates.

Seventy-seven percent of initial IDTT meetings were completed within fourteen calendar days.  Follow-up IDTT meetings took place at least every 90 days 94 percent of the time.  The institution reported an 85-percent compliance rate for appropriate inter-disciplinary attendance at IDTT meetings.  All disciplines who attended had 100 percent compliance with attendance, but psychiatry was present for only one of the 50 IDTT meetings reviewed.

At observed IDTT meetings, required staff were present and necessary documentation was available.  Interaction among the team was good.  PCs' presentations were adequate.  Inmates were considered for higher levels of care as indicated.  Treatment goals were discussed, but needed greater alignment with clinical assessments and improved measurability.  EOP inmates with IEX issues could not be transferred to an appropriate treatment program because of a requirement that their RVRs must first be resolved.

Inmates were offered an average of 12.4 hours of structured therapeutic activities per week, with an attendance rate of 44 percent for receiving ten hours per week.  Apart from inmates on modified treatment plans, on average 20 inmates refused more than half of offered treatment per week.  Institutional data indicated that 90 percent of these inmates were offered at least ten hours of structured therapeutic activities per week, but none attended at least ten hours.

A portion of an observed group on coping skills started on time and had therapeutic modules that were adequately clean and appropriately arranged.  The facilitator had a good rapport with the participants, although additional efforts to facilitate interaction among group members may have been helpful.  In a subsequent group interview of the participants, they

reported that groups were useful, but also that group schedules conflicted with recreational opportunities, that choosing recreation over group would be documented as a group refusal, and that groups were interrupted for medication passes.

Staff reported that inmates were offered a minimum of 3.5 hours of yard every other weekday. Yard on Sunday was available for make-up if any inmate had not received ten hours during the week. This was generally corroborated by documentation, although there were cancellations due to fog and/or vaccinations.

The LOP on unclothed body searches and associated training were not finalized by the time of the site visit. No interviewed inmates indicated that unclothed body searches would discourage their group attendance. Staff were trained on dealing with inmates who refused over half of their treatment but expressed frustration with having to investigate reasons for refusals which were already known.

MHCB:

CSP/Corcoran's General Acute Care Hospital (GACH) was converted to a CTC on December 1, 2014. It had 25 MHCBs and one seclusion and restraint chair.

Initial SREs were completed timely 74 percent of the time. Initial psychiatric and clinical contacts were 44-percent and 64-percent compliant, respectively. Follow-up SREs were completed timely 64 percent of the time. Follow up psychiatric and clinical contacts were 65-percent and 88-percent complaint, respectively. These low compliance rates were attributed to staff shortages.

Initial IDTT meetings were 86-percent compliant, while follow-up IDTT meetings were only 37-percent compliant. At observed IDTT meetings, all disciplines attended and all inmates were uncuffed once placed into the treatment module. Discussions were clinically-driven and

covered treatment plans, goals, and triggers.  The facilitating clinician engaged the inmate, who was allowed and encouraged to ask questions.  Two of the three inmates had concerns with custody officers.  The psychiatrist reported on inmates' medications but did not ask the inmate about side effects or other related concerns.

MHCB inmates did not receive yard time.

Five-day clinical follow-ups post-MHCB discharge were 82-percent compliant.

Seclusion and Restraint:

Staff reported five instances of inmate restraint during the review period, with duration of restraints ranging from four to 23 hours.  No reasons for the restraints were documented in the log.

Alternative Housing:

CSP/Corcoran used 20 rooms in multiple areas as alternative housing for MHCB patients. Some were in CTC Unit D, which had an area for confidential contacts and was designated as the priority alternative placement.  Other areas used were the SHU visiting area, the TTA, and the administrative segregation unit treatment building.  At the time of the site visit, two of the 20 rooms were occupied.

Staff reported that daily clinical rounds were conducted in alternative housing, with particular attention to inmates not transferred within 24 hours.  It was reported that 55 percent of the 323 stays in alternative housing exceeded 24 hours, by an average extra 1.1 days.  Four stays exceeded timeframes by 25 to 58 days, and 18 exceeded timeframes by three to ten days.  Staff attributed this to untimely completion of history and physicals, timing of transfers to outside MHCBs, and unavailability of MHCBs through HCPOP.

Mental health staff described mental health-custody relations as fair.  Some staff believed that custody used MHCB and alternative housing for placements of problematic inmates who did not have mental health problems.

 Cleanliness of the alternative housing area was problematic.  PIA took over cleaning responsibility in September 2014.  It was reported that cleaning had improved from a completion rate of 65 percent to 75 percent.

<u>3CMS SHU</u>:

At the time of the site visit, there were 40 inmates in the SHU.  The average length of stay was 47 days, with a range of one to 143 days.  Including preceding stays in administrative segregation, the average total stay was 154 days.

Initial psychiatry contacts were 100-percent complaint, while 97 percent of initial PC contacts were timely.  Follow-up psychiatry contacts were 98 percent complaint, and 86 percent of weekly follow-up PC contacts were timely.

Eighty-four percent of initial IDTT meetings were completed timely, and 97 percent of follow-up IDTT meetings were timely.  The overall rate of attendance by all required IDTT members was only 61 percent.  From a sample of 380 IDTT meetings, attendance rates by discipline were 71 percent for psychiatry, 76 percent for senior psychologists, 82 percent for PCs, 62 percent for psych techs, and 75 percent for correctional counselors.

Ninety-three percent of psychiatric cell-front visits were attributed to inmate refusals.  Seventy-five percent of cell-front PC contacts were attributed to inmate refusals and 20 percent were attributed to staff decision.

Treatment of 3CMS inmates in the SHU was reported to have been adversely affected by reductions in staffing allocations and scheduling of escort officers.  Leadership reported only

sporadic conduct of groups during the review period.  Some staff who had been conducting groups were reassigned to serve the EOP population.  Groups were not being offered at the time of the site visit.

Long Term Restricted Housing:

The LTRH program began on January 19, 2015, and 3CMS inmates in the SHU were in the process of being moved there at the time of the site visit.

The LTRH was intended to implement a novel approach to treatment of the 3CMS SHU population.  Comprehensive planning for the introduction of this complex unit lacked sufficient inter-disciplinary involvement, although by the time of the site visit, there were indications that it was improving.  Leadership indicated that affected inmates received only minimal preparation for their moves, and that mental health staff had only tangential involvement in the order of the moves. Program leadership indicated that treatment space was adequate, although concerns arose about confidential space.  The physical plant was adequate for group treatment and was sufficiently clean.

At the time of site visit, it was reported that 69 inmates were in the program.  Fifteen PCs were allocated to the LTRH units.  Care was provided by several clinicians reassigned from other programs, and interviews were being scheduled.

Provided documentation indicated that provision of in-cell therapeutic activities was determined by the IDTT on an ongoing basis.  Arriving inmates received a program booklet, a work/activity book, and a radio if they did not already have an appliance.  It was reported that word games and puzzles were provided during regular rounds.

At the time of the site visit, a few inmates had already had IDTT meetings.  These meetings were not held soon after their arrivals at the LTRH, but according to their IDTT

304

schedule while in the SHU.  At observed IDTT meetings, all required staff were present, although not all of them were regularly assigned to the inmate, and required documents were available.  Levels of staff interaction varied and the discussion was generally adequate.  The psychiatrist was led into the discussion only minimally, even regarding medication management issues and meeting with the inmate.  Treatment goals required greater definition and expression in measurable terms.  Factors to consider for potential referral to higher levels of care were not routinely presented or assessed.

Attendance rates for one-to-one contacts averaged 37 percent.  Inmate interviews confirmed that they were offered out-of-cell time and access to showers.  Tracking sheets covering February 2, 2015 to February 22, 2015 indicated only one instance in which an inmate either did not receive, or was offered and refused, two hours of out-of-cell activity.

All inmates on the unit were assigned to groups.  Provided data indicated that group attendance rates during the initial four weeks of the program ranged from 39 percent to 67 percent in week three.  Leadership noted that some recreational activities conflicted with scheduled treatment.  At the time of the site visit, inmates were placed into groups based on group availability, without consideration of clinical indications.  Groups operating at that time included stress management, anger management, coping skills, and IEX.  An observed group on anger management was well-run and drew excellent participation by group members.

The day room had a television and several atoms chairs.  Tracking sheets indicated that inmates were generally offered four hours a week of dayroom activities broken into two-hour segments on two consecutive days.  Some inmates indicated apprehension about going to the dayroom, and tracking data indicated only a 14.5-percent acceptance rate among the only 18 inmates who accepted offers of dayroom.

305

<u>EOP SNY:</u>

The EOP SNY yard was housed on yard 3B in unit 3B01.  It was full to its capacity of 150, plus another 18 inmates in overflow in building 3B02.  There were seven PCs assigned to the 228 inmates, for a clinician-to-patient ratio of one-to-33.  Treatment activities were conducted in two group rooms and six individual session rooms.

Ninety-one percent of initial psychiatrist contacts and 74 percent of initial PC mental health assessments were completed timely.

Ninety-two percent of follow-up psychiatrist contacts and 79 percent of follow-up PC contacts were timely.

At three observed IDTT meetings, appropriate clinical staff, the CC I, and the EOP vocational instructor attended and participated.  A Spanish language interpreter was present as needed.  Discussion appeared disorganized and not addressed to the inmate.  One of the three treatment plans contained the potentially unattainable goal of "inmate will never have suicide ideation," while other treatments plans/goals were read by the clinician but not discussed with the inmate.

At their initial IDTT meetings, inmates were given a list of groups to attend but without discussion of their purpose.  The psychiatrist had not seen one patient because of his orientation status, and made no attempt to see him during the week of the meeting.  The psychiatrist also did not discuss medication side effects with the patients.

Average weekly treatment hours were 19.11 scheduled, 10.11 offered, 7.15 attended, nine cancelled, and 2.96 refused.  Average weekly modified treatment hours were 9.79 scheduled, 5.51 offered, 4.10 attended, 4.28 cancelled, and 1.41 refused.

306

Groups were conducted five days per week by recreation therapists or psych techs. Average group attendance ranged from six to 20.  There were no core groups or process groups.

Group interviews of eight inmates indicated that all knew and had contacts with their psychiatrists and PCs.  Two reported being told of their treatment plans by their PC before the IDTT meeting, two reported being told about their treatment plans during the meeting, and four reported being told about it after the meetings.  Five said they were not involved in their treatment plans and four inmates said their placement in groups was random.

3CMS:

There were 852 3CMS inmates in mainline.  The 5.5 PCs had caseloads ranging from 100 to 175, and a clinician-to-patient ratio of one-to-16.

Group treatment for 3CMS inmates remained unavailable.  Leadership attributed this to inadequate staffing, which hindered their ability to meet Program Guide requirements.  Further, the presence of approximately 20 EOP inmates on Yard 3C caused mental health staff to have to focus their attention on providing the more frequent clinical contacts required for EOP inmates.

High inmate turnover on Yard 3B led to many intake assessments being done. Leadership also reported increased self-referrals attributed to the inability of staff to provide the intensity of care required by some inmates, which in turn led to difficulties meeting Program Guide requirements, including timely response to referrals and timely completion of both initial and follow-up IDTT meetings.

Administrative Segregation 3CMS:

The administrative segregation 3CMS program was housed in Yard 3A.  It had a census of 70 and five PCs, for a clinician-to-patient ration of one-to-14.  Adequacy of confidential space for clinical contacts was reported to be an ongoing problem.

307

Staff reported 100 percent of initial psychiatry contacts were timely, and 90 percent of initial PC contacts were timely.  One hundred percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 90 days.  Ninety-six percent of inmates received at least weekly contacts with their PCs.

During the review period, 83 percent of initial IDTT meetings were timely.  Follow-up meetings took place at least every 90 days 100 percent of the time.  However, none of the 171 reviewed IDTT meetings had a full complement of required disciplines.  Psychiatry was present at only .06 percent of meetings, and the PC attended only 31percent of meetings.  Psych techs attended 79 percent of IDTT meetings during the review period.  During observed IDTT meetings, factors for possible transfers to higher levels of care were generally considered.  At an observed IDTT meeting, required staff were present and necessary documents were available.  There was good interaction among attendees, although the psychiatrist attended via telepsychiatry and was not regularly introduced to the inmate

Staff reported that inmates were offered yard every other day for a minimum of 3.5 hours each day, five days per week, with Sunday yard as a make-up day for any inmate who had not received ten hours that week.

Referrals:

Of the 229 emergent referrals during the review period, 97 percent drew a timely response.  For urgent referrals, the timely response rate was 85 percent.  Seventy percent of the routine referrals received a timely response.

It was reported that most routine referrals were made for medication-related issues, and that the institution's understaffing in psychiatry contributed to the 67-percent compliance rate for timeliness of response.

Mental Health/Custody Relations:

Mental health staff described relations with custody as fair.  Some staff believed that custody used MHCB and alternative housing for housing of problematic inmates who did not have mental health concerns.

Heat Plan:

No heat plan issues during the review period were reported.  Heat logs were completed and forwarded to headquarters.  Units with multiple thermometers reported the highest temperatures rather than averages.  Staff noted that cell temperatures were not checked routinely, but only if there were specific complaints.

Use of Force:

As of December 12, 2014, 98 percent of custody staff received training on the new use of force policy and procedure.  No documentation on training of mental health staff was provided.

Access to Care:

There were staff reports of lack of access to inmates, including some indicating difficulties with meeting inmates before 11:00 a.m.  Clinicians also reported insufficiency of access-to-care officers which resulted in inability to see mental health caseload inmates for sufficiently long durations, or having to see them at cell front.  Reportedly, in the EOP administrative segregation hub, the 10.5 assigned escort teams were often diverted to other health care-related duties.

Monthly Health Care Access Quality Reports for August through December 2014 indicated that only three percent of issued mental health ducats and add-on appointments were

not completed due to custody factors, and that 12 percent were not completed due to non-custodial reasons other than inmate refusals.

Program Access:

a.       Job and Program Assignments:

As of January 22, 2015, 46 EOP inmates had full-time employment positions.  The institution was unable to report whether they were paid positions or the number of PIA positions. It was reported that funding was insufficient to offer all pay for all positions, but inmates who excelled at non-paying jobs were given the opportunity to advance to paying positions.  Four EOP inmates had full-time non-paying vocational education positions and 45 EOP inmates participated in part-time academic programming.  An additional 57 EOP inmates were eligible for work training assignments but were unassigned.

A total of 317 3CMS inmates had full-time employment positions, but likewise the institution could not report which positions were paying and/or the number of PIA positions. Another 198 3CMS inmates were enrolled in part-time academic positions, while 29 3CMS inmates participated in part-time substance abuse treatment programming and 23 3CMS inmates were enrolled in full-time vocational education programs. An additional 178 3CMS inmates were eligible for work training assignments but were unassigned.

Among non-mental health caseload inmates, 1,161 had full-time employment positions, 531 had part-time academic positions, 62 participated in part-time substance abuse treatment programs, and 72 participated in full-time vocational education programs.  One hundred seventy eight were eligible for work training assignments but were unassigned.

b.       Milestone Credits:

310

During the review period, 64 of 331 EOP inmates were eligible to earn milestone credits. Only 3.13 percent earned the credit. Two hundred thirteen of the 1,293 3CMS inmates were eligible, but only 5.63 percent earned milestone credits. For non-mental health caseload inmates, 523 of the 2,518 were eligible, but only 12.24 percent earned the credit.

  c. <u>Out-of-Level Housing</u>:

As of January 20, 2015, no Level I MHSDS inmates were housed as CSP/Corcoran. There were 51 Level II 3CMS and two Level II EOP inmates housed in Level III housing, and one Level II 3CMS inmate was housed in Level IV housing. There were 20 Level III 3CMS inmates and four Level III EOP inmates housed in Level IV housing, and 36 Level IV 3CMS inmates and ten Level IV EOP inmates housed in Level IV housing.

  d. <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CSP/Corcoran did not provide information regarding its ADA Reasonable Accommodation and Grievance Procedures. The institution reported that it had been informed by CDCR headquarters that this information was compiled for only a limited number of institutions which did not include CSP/Corcoran.

  e. <u>Periodic Classification Score Reductions – EOP Inmates</u>:

Review of a sample of completed CDCR 840s confirmed that EOP inmates were granted classification score reductions for successful programming, although some of the CDCR 840s were conducted only annually.

**California Substance Abuse Treatment Facility (CSATF)**
April 27, 2015 – April 29, 2015

Census:

On April 24, 2015, CSATF housed 5,542 inmates, for less than a one-percent increase from the census reported during the prior site visit in July 2012.  There were 2,295 inmates on the mental health caseload, which had grown by 26 percent since the previous site visit and comprised 41 percent of the total inmate population.

The MHCB unit housed 19 inmates.

There were 352 mainline EOP and 1,846 mainline 3CMS inmates.  The administrative segregation population of 224 included three EOP inmates pending hub transfer and 75 3CMS inmates in STRH.

Staffing:

Positions for the chief psychiatrist and two chief psychologists were filled.

All eight staff psychiatrist positions were vacant, leaving a 100-percent vacancy rate.  Contractors covered 2.75 psychiatry positions, reducing the functional vacancy rate to 66-percent.

Four senior psychologist supervisor positions were filled.  Three of four senior psychologist specialist positions were filled, for a 25-percent vacancy rate.  Of 34 staff psychologist positions, 26 were filled, leaving a 24-percent vacancy rate.

The supervising social worker position was filled.  Seventeen of 19 social work positions were filled, for an 11-percent vacancy rate.

312

Positions for three senior psych techs were filled.  Thirty-four of 36.3 psych tech positions were filled, for a six-percent vacancy rate.  Three contractors reduced the psych tech functional vacancy rate of zero.

Only four of 13 recreational therapist positions were filled, for a 69-percent vacancy rate.

One AGPA and three HPS I positions were filled, but the CHSA II position was vacant. Sixteen of 19 clerical positions were filled, leaving a 16-percent vacancy rate.

There were 4,409 individual and IDTT meeting telepsychiatry appointments, for a monthly average of 735 appointments.  Staff reported that turnover in telepsychiatry had resulted in a lack of consistency.

Quality Management:

The local governing body met twice.  Minutes were provided for only one meeting and did not reflect whether there was a quorum.  Mental health-related issues that the local governing body addressed included staffing, the CQIT, EOP inmate treatment, and clinical contacts.

The quality management committee met five times, maintained meeting minutes, and always reported a quorum; one meeting was cancelled.  Addressed issues included the EOP program, cocci, and information technology.  Numerous subcommittees, including mental health, reported monthly to the quality management committee.

The mental health subcommittee met twice monthly, kept meeting minutes, and always achieved a quorum.  It addressed a wide range of matters, including DSH referrals, medication management, parole and involuntary medication orders, staffing, access to care, RVRs, QITS, the MHCB, the EOP and 3CMS programs, suicide prevention, and quality management. Discussed quality management issues included effective communication, MHTS.net/eUHR concurrence, and timeliness of IDTT meetings and SRE follow-ups.

313

There were three active QITS during the review period.  A QIT on timely completion of mental health pre-screens was terminated after compliance rates increased to above 85 percent. Following staff re-training, a QIT on critical contact compliance rates was also closed.  A QIT on improvement in five-day follow-up compliance rates chartered during the reporting period remained active.

CSATF's internal peer review team met in February 2015 and reviewed two psychologists and two social workers.  Of the four clinicians, one was found to exceed standards, two met them, and minor concerns were expressed as to the fourth.  There was no psychiatry peer review. CSATF did not participate in external peer review during the reporting period.

Medication Management:

CSATF staff used MAPIP and the quality management committee to perform medication management audits.  MAPIP audited psychiatry measures that evaluated laboratory blood work and tasks that were performed prior to ordering antipsychotic medications, nursing compliance, and medication administration.

Psychiatry was noncompliant with ordering clinically-indicated laboratory tests of blood levels for inmates on antipsychotic medications.  However, all but three of twenty nursing measures exceeded 90 percent.  The three noncompliant measures were for medication continuity following transfers from community hospitals, medication compliance with psychiatry-prescribed medications, and administration of psychiatric chronic care medication. High inmate refusal rates were the reasons for noncompliance.  Staff further reported that the CEO, CNE, and chief psychiatrist had met and discussed plans to reduce inmate refusals and improve medication management.

Inmates typically reported that prescribed medications followed them upon transfer.

314

Transfers:

There were 19 referrals to acute inpatient care and 24 referrals to intermediate inpatient care.  CSATF rescinded one acute and four intermediate care referrals.  DSH did not reject any referrals.  None of the 30 Vitek hearings found in favor of the inmate.

Of the 18 acute care referrals who transferred, nine or 50 percent were timely.  Of the 20 intermediate care referrals who transferred, 11 or 55 percent were timely.  During the site visit, one inmate awaited acute care transfer; none awaited transfer to intermediate care.

The DSH coordinator monitored inmate returns from DSH to CSATF.  Staff reported that clinician-to-clinician contacts occurred when DSH was untimely in sending discharge reports, or there was a question about inmate behavior or the discharge diagnosis.

There were 182 admissions to CSATF's MHCB.  There were also 111 transfers of CSATF inmates to MHCBs at other institutions, of which 51 or 46 percent were timely.

One inmate timely transferred to a PSU.

One hundred six of 108 inmates referred to administrative segregation EOP hubs transferred timely.

CSATF reported housing 43 EOP and 193 3CMS inmates in administrative segregation during the review period.  EOP inmate lengths of stay averaged 16 days and ranged from four to 53 days; 3CMS inmate stays averaged 56 days and ranged from one to 215 days.

 The institution was unable to report the number of NDS mental health caseload inmates during the review period.  At the time of the site visit, there were 17 NDS inmates in the STRH.

Other Issues:

MHSDS Inmates in Administrative Segregation:

315

For administrative segregation EOP inmates, there was 97-percent compliance for psychiatry contacts, 91-percent compliance for PC contacts, 89-percent compliance for IDTT meetings, and a compliance rate of 47 percent for required staff attending IDTT meetings.

For administrative segregation 3CMS inmates from September 1, 2014 to March 19, 2015, CSATF reported only 71-percent compliance for initial psychiatry contacts, but 90-percent compliance for follow-up contacts.  For the same period, for PC contacts there was 89-percent compliance for initial contacts and 98-percent compliance for follow-up contacts.  Fifty-eight percent of PC contacts were cell front, while 92 percent of out-of-cell PC contacts were confidential.

There was 65-percent compliance for initial IDTT meetings and 98-percent compliance for follow-up meetings.  CSATF reported 30-percent compliance for required staff's attendance at IDTT meetings.

Four of ten mental health caseload inmates in administrative segregation with stays exceeding 150 days on September 22, 2014 were released following their case by case review.

CSATF began transferring inmates to STRH, which was located in the former stand-alone administrative segregation unit, during the week of April 20, 2015.  STRH officially opened and commenced programing on April 27, 2015.

One psychiatrist assigned to both the STRH and 3CMS programs had 62 mental health caseload inmates.  Four STRH PCs had caseloads that ranged from nine to 21 inmates, and one had a caseload of three inmates.  Six additional custody officers were assigned to the unit as escorts.  Promoting continuity of care, clinicians and escort officers assigned to STRH had transferred together with inmates from administrative segregation.

The STRH program was housed in a building that contained two sides.  Each side had two wheelchair accessible cells, a group room with seven ATOM chairs, and four rooms with therapeutic modules for confidential individual contacts.  Although the space was sufficient for the STRH's population of 75 3CMS inmates at the time of the site visit, the chief of mental health noted it would be inadequate when the unit was at capacity.

Inmates expressed mixed reactions to the STRH program.  None indicated preparation for the move to the unit other than receiving a booklet about the program.  Inmates complained about the unit's sensory deprivation; there was no direct sunlight into their cells, while many found the physical plant isolating in comparison to the previous segregation unit.  However, some inmates saw the STRH's potential for increased out-of-cell activities and clinical programing.  Inmates' views of custody officers ranged from decent to disrespectful.

Observed STRH IDTT meetings revealed required staff to be in attendance and adequate staff interaction and access to information.  The IDTT meeting room provided sufficient confidentiality, although on two occasions custody staff interrupted observed meetings.

At the time of the visit, staff was in the early stages of implementing group programming; there were groups on anger management and coping skills.  The chief of mental health stated that when the unit's population increased, group frequency and content would also increase.  An observed anger management group was adequately conducted.

Interviewed group participants expressed varying reactions to the ATOM chairs.  Some appreciated the increased opportunities for interaction that the chairs provided, in comparison with the therapeutic modules; others reported feeling less protected from fellow inmates.

The STRH had 20 stand-alone recreational yards that could accommodate up to 40 inmates.  The yards each had a table with two chairs, so that inmates could eat, and a chin-up

317

bar.  Inmates reported being offered sufficient yard.  Staff indicated that all inmates were scheduled for 21 hours of weekly yard with the goal of providing a minimum of 18 weekly hours.  However, inmates expressed concern about the yard's unsanitary conditions, which observation confirmed.  Custody leadership indicated that the ability to maintain clean yards was hampered by water use restrictions, but agreed to explore ways to ameliorate this problem.

MHCB:

CSATF had a 40-bed CTC, of which 20 beds were MHCBs.  Two of the beds were observation rooms which were not used as crisis beds, but housed inmates who needed additional observation.  The MHCB contained two padded cells.  The remaining beds were designated for medical inmates.  MHCB beds were suicide resistant.

The MHCB psychiatrist had a maximum caseload of 25 inmates, which included inmates in alternative housing.  MHCB PCs were each assigned four to five inmates.

During the site visit, all 40 MHCB beds were occupied.  One hundred fifteen of 182 or 63 percent of admissions to CSATF's MHCB during the review period exceeded ten days.  Stays averaged 18 days.

Observed MHCB IDTT meetings were held in rooms that doubled as clinical office space.  Inmates were placed in therapeutic modules during IDTT meetings and were handcuffed based on clinical or other appropriate reasons.  IDTT meetings began on time and were attended by appropriate disciplines, including an impressive lead clinician, while only clinically relevant information was discussed in the inmate's presence.  IDTT meetings discussed treatment plans, measurable goals, and the decision to maintain, increase, or decrease the level of care, among other matters.

318

A written order from the treating psychiatrist permitted MHCB inmates to participate in yard. Staff reported that such orders were consistently written and that custody complied with them. Individual recreational therapy was also provided to MHCB inmates.

It was reported during the site visit that there had recently been an increase in MHCB admissions due to the transfer of 3CMS inmates to STRH. Staff reported several caseload inmates who had had difficulty adjusting to the unit's lack of stimuli and sensory deprivation.

Seclusion and Restraint:

There were four incidents of restraint during the review period. Audits identified deficits and CAPs were implemented.

Alternative housing:

Four holding cells in the TTA were used for alternative housing. When they were occupied, alternative housing was first provided in a three-bed ward in the TTA and thereafter, in cells in buildings C-3, D-3, or F-1. Staff reported that use of such external alternative housing cells located outside of the CTC or TTA occurred once during the review period. Two alternative housing PCs were assigned five and nine inmates, respectively.

EOP:

CSATF's EOP program was housed in building G. Building G-1 housed most EOP inmates and G-3 was used for overflow housing. Staff and inmates reported staffing shortages and a lack of groups, among other issues with the overflow unit. Staff also noted that inmates discharged from DSH were sometimes transferred to the EOP overflow unit and ended up in the MHCB due to the overflow unit's lack of services.

Psychiatrists in the EOP program had caseloads that averaged 76 and ranged from 52 to 98 inmates.  Eleven PCs had caseloads between 24 and 28 inmates.  Two other EOP inmate PCs had caseloads of nine and 11 inmates.

From September 1, 2014 through March 19, 2015, only 52 percent of EOP inmate initial psychiatry contacts were timely, while there was 73-percent compliance for follow-up contacts.  All psychiatry contacts were confidential; 74 percent were through telepsychiatry.

For EOP inmate PC contacts, there was 97-percent compliance for initial contacts and 90-percent compliance for follow-up contacts.  Ninety-six percent of PC contacts were confidential.  There was 80-percent compliance for initial IDTT meetings and 99-percent compliance for follow-up meetings.  Required staff attended IDTT meetings 72 percent of the time between September 1, 2014 and March 26, 2015.

Between September 22, 2014 and March 22, 2015, weekly treatment hours for EOP inmates who were clinically appropriate for full programming averaged 14.7 hours scheduled, 10.7 hours offered, 8.3 hours attended, four hours cancelled, and 2.5 hours refused by the inmate.  During this same period, weekly treatment hours for EOP inmates who were not clinically appropriate for full programming averaged 1.9 hours scheduled, 1.6 hours offered, 1.4 hours attended, 0.3 hours cancelled, and 0.2 hours refused.

An observed process group was clinically relevant and well-attended, with good inmate participation.  Interviewed EOP inmates expressed satisfaction with the mental health program, psychiatrists and PCs.  Voiced concerns included lack of yard and laundry not being processed weekly.

3CMS:

Four psychiatrists assigned to the 3CMS program had caseloads that averaged 223 and ranged from 179 to 279 inmates.  Eight 3CMS inmate PCs had caseloads ranging from 159 to 187 inmates; two others had caseloads of 114 and 116 inmates, and two others had 60 and 74 inmates each.

From September 1, 2014 to March 19, 2015, CSATF reported a compliance rate for 3CMS inmates of 87 percent for initial psychiatry contacts and 95 percent for follow-up contacts; 100 percent were confidential.  For PC contacts, there was 68-percent compliance for initial contacts and 94-percent compliance for follow-up contacts.  Ninety-two percent of PC contacts were confidential.

During this same period, initial IDTT meetings were timely 72 percent of the time and follow-up meetings were timely 99 percent of the time.  There was 73-percent compliance for required staff's attendance at IDTT meetings.

Observed IDTT meetings revealed staff in attendance to include the telepsychiatrist, a medical assistant, mental health clinicians, the 3CMS supervisor, and the correctional counselor. Four of six observed meetings were presented without specific and operational treatment plans. The supervisor, and not the PC, presented treatment goals to inmates, who were not asked whether they understood the process.

Groups were provided for some 3CMS inmates.

Referrals:

CSATF reported 98-percent compliance for timely response to 58 emergent referrals, 96-percent compliance for response to 113 urgent referrals, but only 83-percent compliance for response to 2,233 routine referrals.

Mental Health/Custody Relations:

CSATF mental health leadership reported a good working relationship with custody leadership; mental health staff also generally reported a good relationship with custody staff. However, some mental health staff on G-3, which was the EOP overflow unit, reported abrasive attitudes by some of the unit's officers.

Heat Plan:

There were 33 days during the review period when outside temperatures exceeded 90 degrees, indicating a stage I heat alert.  There were no stage II or stage III heat alerts.

During stage I heat alerts, CSATF accommodated inmates prescribed heat-sensitive medications with dayroom activities and night yard.  The STRH contained a list of inmates who were prescribed heat-sensitive medications.

RVRs:

CSATF reported that RVR training was provided separately to mental health and custody staff and that custody had recently received training on the mental health RVR process.

Use of Force:

One hundred percent of on-the-job clinical staff received training on the new use of force policy.  Overall, 79 percent of custody staff received this training; it was received by 84 percent of lieutenants, 79 percent of sergeants, 79 percent of officers, 83 percent of CCIIs, and 88 percent of CCIs.

Access to Care:

CSATF issued 18,053 ducats and add-on appointments for mental health services, of which 14,209 or 79 percent were completed.  As to the non-completed ducats, 531 or 14 percent

were not completed due to inmate refusal, 64 or two percent were not completed due to custody reasons, and 3,249 or 84 percent were not completed due to non-custodial reasons.

Program Access:

CSATF reported that all mental health staff had received training on the functional evaluation process for EOP inmates.

a.   Job and Program Assignments:

Institutional data indicated that 34 or one percent of available full-time jobs were filled by EOP inmates, 612 or 24 percent were filled by 3CMS inmates, and 1,937 or 75 percent were filled by non-mental health caseload inmates.  There were no part-time job assignments.

For part-time academic assignments, 66 or five percent were held by EOP inmates, 361 or 28 percent were held by 3CMS inmates, and 880 or 67 percent were held by non-mental health caseload inmates.  There were no voluntary academic program assignments.

For full-time vocational education assignments, one or 0.25 percent were held by an EOP inmate, 100 or 25 percent were held by 3CMS inmates, and 294 or 74 percent were held by non-mental health inmates.  For part-time vocational education assignments, 20 or 21 percent were held by EOP inmates, 20 or 21 percent were held by 3CMS inmates, and 54 or 58 percent were held by non-mental health caseload inmates.  There were no voluntary vocational education assignments.

For re-entry substance abuse treatment program assignments, 37 or six percent were held by EOP inmates, 152 or 26 percent were held by 3CMS inmates, and 395 or 68 percent were held by non-mental health caseload inmates.

There were 128 EOP, 321 3CMS, and 484 non-mental health caseload inmates who were eligible for work training assignments, but were unassigned.

b.   <u>Milestone Credits</u>:

CSATF added guidelines regarding milestone credit implementation to the LOP for EOP inmates.  On February 28, 2015, 145 of 358 EOP inmates were eligible for milestone credits, of which 19 inmates or 13 percent earned them.  Of 3CMS inmates, 371 of 1,847 were eligible to earn milestone credits, with 110 3CMS inmates or 30 percent earning them.  Six hundred thirty-two of 3,242 non-mental health caseload inmates were eligible to earn milestone credits; 170 inmates or 27 percent earned them.

c.   <u>Out-of-Level Housing</u>:

On March 16, 2015, there were 48 EOP, 28 3CMS, and 77 non-mental health caseload custody Level I inmates who were housed in Level II housing, and one non-mental health caseload custody Level I inmate in Level III housing.  There were seven EOP, 64 3CMS, and 93 non-mental health caseload custody Level II inmates who were housed in Level III housing, and one 3CMS and three non-mental health caseload custody Level II inmates in Level IV housing.

There were ten EOP, 27 3CMS, and 62 non-mental health caseload custody Level III inmates in Level II housing, and 32 3CMS and 85 non-mental health caseload custody Level III inmates in Level IV housing.  There was one EOP and two non-mental health caseload custody Level IV inmates housed in Level II housing, and two EOP, 54 3CMS, and 25 non-mental health caseload custody Level IV inmates in Level III housing.

d.   <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CSATF reported implementation in July 2014 of an ADA reasonable accommodation panel for accommodations and grievances.  A facility captain and staff services manager provided training for staff.

e.   <u>Periodic Classification Score Reduction for EOP Inmates</u>:

324

EOP inmates were granted the same semi-annual classification score reductions as non-EOP inmates, which document review confirmed.

*Coleman* Postings

The January 2015 *Coleman* posters in both English and Spanish were located in all toured buildings, including the STRH.  All posters were located in areas accessible to class members.

**Pleasant Valley State Prison (PVSP)**
April 21, 2105 - April 23, 2015

Census:

As of April 20, 2015, the total inmate population at PVSP was 2,996, a decline by 771 inmates or 20 percent since the preceding monitoring period.  The mental health caseload population of 1,293 inmates was down by 412 or 24 percent since the preceding monitoring period. It made up 43 percent of the total population.

Four patients were in the MHCB unit.

Among the total 115 inmates in the administrative segregation unit were one EOP inmate and 42 3CMS inmates.  All four inmates on NDS status were at the 3CMS level of care.

The mainline EOP population declined from eight to four since the preceding monitoring period.  The mainline 3CMS population of 1,242 had fallen by six percent since the preceding monitoring period.

Staffing:

PVSP and Avenal State Prison (ASP) shared the chief of mental health position, which was filled.  The chief psychiatrist position was filled.  The two chief psychologist positions were vacant.

325

Three of 5.5 psychiatry positions were filled, for a 45-percent vacancy rate. According to mental health staff, this shortage resulted in redirection of psychiatrists to programs where they were needed most.

The two senior psychologist supervisor positions, and one of the two senior psychologist specialist positions were filled. Ten of the 13.5 psychologist positions were filled, for a 26-percent vacancy rate. Use of .34 contractors reduced the functional vacancy rate to 23 percent.

The supervising social worker position and seven of the nine social worker positions were filled, for a 22-percent vacancy rate. Use of .98 contractors reduced the functional vacancy rate to 11 percent. One of the social workers was on long-term leave.

At the time of the site visit, the recreation therapist position was vacant, but a hire was pending.

PVSP had no supervising psych techs at the time of the site visit. Six of the 13.3 psych tech positions were filled, for a vacancy rate of 55 percent.

Seven of the ten mental health clerical positions were filled, as were the two HPS positions and one OSS II positions. The CHSA II position was vacant.


Quality Management:

The quality management committee was chaired by the CEO and met six times, with a quorum present at each meeting during the review period. Minutes were well maintained and reflected meaningful discussions, problem-solving, and reviews of subcommittee reports.

The mental health subcommittee reported to the quality management committee. It's only chartered QIT was on referrals. It did not charter any new QITs during the review period. Many staff reported unawareness that the mental health subcommittee even existed and had not served

on a QIT. Clinical staff acknowledged the need for additional feedback to improve the quality of clinical work and practices.  Three of the mental health subcommittee's five scheduled meetings went forward during the review period.  Minutes indicated that at the October 2014 meeting, only half of required members plus two designees were present, and the designees were not prepared for the meeting.  Minutes also indicated that, unlike at other institutions, attendance by the chief of mental health was optional and that the subcommittee was chaired by the HPS I rather than by a mental health supervisor.  For the November 2014 meeting, there were no minutes, attendance sheet, or attachments.  Upon review of the agenda for that meeting, staff recounted that it involved numerous "old business" items that continued to be tabled.  Minutes for the January 2015 meeting indicated that issues with attendance continued. The QIT on referrals was mentioned in the minutes but was tabled until the March 2015 meeting.

No documentation was provided indicating that peer review was in place during the review period.

Medication Management:

Use of MAPIP was generally effective at PVSP.  Continuity of medications was generally compliant, except for two months when compliance rates for continuity following discharges from the MHCB fell to 72.7 percent and 77.7 percent, respectively.

Rates of inmates' compliance with their medications averaged 62.9 percent for medications prescribed by psychiatry and mid-level practitioners during the review period. Compliance rates for both urgent medication referrals due to inmates' noncompliance and for inmates' compliance with involuntary medication orders were consistently above 90 percent.

Administration of both ongoing chronic-care medications and new prescriptions was consistently 100-percent compliant.

327

Psychiatry measures remained the greatest challenge in medication management, making it difficult to assess prescribing practices.  No audit results for psychiatry measures were provided for December 2014, reportedly due to psychiatry staffing vacancies including for the chief psychiatrist position at that time.  The only audit of psychiatry measures that was actually completed was for March 2014.

Pharmacy measures were consistently 100-percent compliant, with solid reporting on medication errors, availability of medications in clinics, maintenance of the emergency cart, and after-hours medication supplies.

Transfers:

PVSP had a part-time DSH coordinator whose other responsibilities included assisting the institutional CEO with quality management tasks and coordinating the local SPRFIT.

During the review period, PVSP referred and transferred eight patients to acute inpatient care.  One of these referrals was later transferred to intermediate care.  All of the inmates referred to DSH inpatient care signed consents to treatment.  One of the transfers to acute care was late, but all were within 72 hours of a bed assignment.  The subsequent transfer to intermediate care was timely and was made within 72 hours of a bed assignment.

The single APP referral met all timelines in the DSH referral process.

Review of the DSH coordinator's audits of Form 7388Bs revealed some issues with the process of identifying inmates for referral to inpatient care.  In November 2014, there were eight cases in which IDTTs failed to identify criteria for consideration of referral to inpatient care, even though the relevant information was readily available.  All eight patients had had three or more MHCB placements within the preceding six months.  Also, the Form 7388B was not a regular part of IDTT meeting activity. It was usually used by only the PC rather than by the team

328

as a whole. Even when inmates were identified as meeting criteria and the Form 7388B was marked as "positive," appropriate justifications for non-referrals and treatment plan modifications were not documented. Instead, "initial treatment team" was often noted as the rationale for non-referral, regardless of available information. Basic Program Guide requirements were noted in lieu of appropriate treatment modifications. Grounds for the DSH coordinator's findings of appropriateness of treatment plan modifications were not always apparent. Staff indicated that the DSH coordinator had not received any related training or orientation.

During the review period, 72 inmates were admitted to the six-bed MHCB at PVSP. Sixty-eight or 94 percent of these placements were completed within 24 hours of referral. Of the four inmates transferred to outside MHCBs, three had bed assignments and were transferred within 24 hours of referral.

No EOP inmates were transferred to PSUs during the review period.

All six transfers to EOP administrative segregation hubs were completed within 30 days.

Eight inmates who were designated as 3CMS during the review period were transferred timely out of the stand-alone administrative segregation unit to administrative segregation hubs. Transfer times ranged from 52 minutes to six hours. Staff reported that these inmates were not moved to 3CMS STRH or LTRH at other locations, as those programs were being filled from within at those locations. PVSP was slated to have an STRH in the future, pending renovations to increase treatment space.

Other Issues:

  MHSDS Inmates in Administrative Segregation:

329

Audit documentation indicated a compliance rate of 96 percent for daily custody/mental health meetings in all administrative segregation units.

For 3CMS inmates in administrative segregation during the review period, timeliness of initial psychiatry contacts was 77-percent compliant.  Follow-up contacts were 92-percent compliant.  Two psychiatry contacts were cell-front.

Timeliness of initial PC contacts was 94-percent compliant.  Follow-up contacts were 99-percent compliant.  Thirty-six percent of all PC contacts took place in private interview rooms. The four assigned PCs had caseloads of 11 inmates, on average.

Initial IDTT meetings were timely in 87 percent of cases, while follow-up meetings were conducted timely in 99 percent of cases.  Attendance by required disciplines was 96-percent compliant.

Yard-D housed both administrative segregation and general population inmates. In the mental health clinic on Yard-D, Building 3, IDTT meetings for three 3CMS inmates were observed during the site visit.   The PC led the meeting in the absence of the psychiatrist and communicated directly with the inmates about their medications and side effects, and facilitated referrals to psychiatry when requested by the inmate.   There were no team discussions about the inmates before or after the meetings.  Form 7388Bs were not discussed, although record review indicated that they were completed routinely.

At an observed ICC meeting in administrative segregation, mental health input consisted of the inmate being asked how his mood was, whether he had any mental health concerns, and whether he knew how to access mental health staff.  The mental health clinician did not advise the ICC of the inmate's mental health status, level of care, or other mental health-related information.

330

Group treatment was unavailable to 3CMS inmates in administrative segregation.

Staff reported that mental health caseload inmates in administrative segregation were scheduled for ten hours of yard per week.  Yard was scheduled based on cell assignments and was offered seven days per week in order to provide ten hours.  Review of yard offerings for six randomly selected inmates in the 114-A log for February 2015 found that ten hours were offered 50 percent of the time. The durations of each yard offering and whether the inmate refused or accepted yard were recorded in the log.

At the time of the site visit, four inmates in administrative segregation were on NDS status.  Institutional documentation confirmed that NDS inmates on the mental health caseload were referred for expedited transfer and that inmates received approved property and privileges.

Institutional data indicated that as of the time of the site visit, six inmates in administrative segregation had been there over 150 days.  Two endorsed for transfer to Kern Valley State Prison (KVSP), two had been referred to the CSR for endorsement to transfer, one was referred to the CSR for a CSP/Corcoran SHU audit and transfer, and one was pending an RVR hearing on an attempted murder.

MHCB:

There were 72 admissions to the six-bed MHCB at PVSP during the review period.  The average daily census was 3.9.  The average length of stay was 10.2 days, with a range of one to 42 days.

Compliance rates for timeliness of initial and follow-up psychiatric contacts were only 24 percent and 35 percent, respectively.

Initial and follow-up PC contacts were 92-percent and 99-percent compliant, respectively.

331

Initial IDTT meetings were 84-percent compliant.  Attendance by psychiatry and sometimes by the CC I was insufficient.  Follow-up IDTT meetings were 91-percent compliant.

During observed IDTT meetings, team members interacted appropriately but did not elicit input from custody staff.  The CC I did not use the computer to provide relevant information and did not otherwise contribute to the process.  Treatment planning needed improvement.  Articulated problems and treatment goals were often vague, overly broad, and not responsive to patients' diagnoses and mental health issues.  Interventions were sometimes merely reiterations of Program Guide minimum standards rather than therapeutic interventions geared to individual patients.  Isolation and medication were the apparent primary treatment modalities.

Mental health supervisors reported that compliance with MHCB policy was hindered by repeated changes in staffing, which resulted in ongoing need for staff training, particularly in the areas of conducting mental health assessments and record reviews.  Review of MHCB documentation indicated problems with diagnoses in the MHCB. Inmates were diagnosed with adjustment disorders, but were prescribed antipsychotic medications and mood stabilizers, or were held in the MHCB longer than ten days without operationalized treatment plans to address their diagnoses.  Some inmates were diagnosed with adjustment disorders despite clear and specific diagnostic histories of serious mental illness.  It was unclear whether MHCB clinical staff were reviewing patients' earlier medical records.

Some patients' stays in the MHCB exceeded ten days based on clinical needs such as recent initiation of forced medication orders, or because of referrals to higher levels of care.  In other cases, inmates with diagnoses of adjustment disorder were kept for 20 days and inmates asking for cell changes were kept for 22 days. In cases of personality disorders, staff were more likely to allow inmates to remain in the MHCB until they asked to leave.   Record review

332

indicated that numerous inmates were not seen by any clinician on one or more days during their stays. It was unclear whether this was due to lack of seven-day coverage and/or lack of backup coverage in the MHCB.

In the MHCB, all patients were cuffed, regardless of their status. IDTTs did not discuss inmates' cuff status.  Custody staff indicated that all inmates remained cuffed throughout their stays.  Patients were not allowed outdoor yard for recreation therapy or other outside activities. When patients were discharged back to their housing units, on the first day of their five-day follow-ups they were required to be confined to quarters instead of having normal programming.

Seclusion and Restraint:

The institution reported that three inmates were placed into restraints, for an average duration of 5.8 hours. One of these inmates was placed in restraints twice during the review period.

Alternative Housing:

Six rooms in the CTC were used for alternative housing.  If needed, four large wet holding cells in the CTC, two examination rooms in the TTA, and one medical holding cell on each facility were also used as alternative housing.   According to staff, inmates in alternative housing remained on one-to-one watch by an LVN or psych tech for the durations of their stays.

There were 30 alternative housing placements, all within the CTC, during the review period. Ninety-three percent satisfied timeframes.  Two or seven percent of placements exceeded timeframes, by .62 days and 1.62 days, respectively.  Staff attributed this to lack of MHCB availability.

3CMS:

PVSP housed both mainline and SNY 3CMS inmates.

333

Initial psychiatry contacts were 96-percent compliant, and follow-up contacts were 98-percent compliant. All of these contacts took place in private settings, according to institutional data.

Eleven PCs were assigned to the 1,242 mainline 3CMS inmates, for a staff-to-patient ratio of one-to-113.  Institutional data indicated that 78 percent of initial PC contacts were timely, and that late ones were overdue by one to 87 days.  Follow-up contacts were timely in 98 percent of cases. Nearly all took place in private settings.  Of the total eight cell-front contacts during the review period, four were due to patient refusals, one was due to modified programming, and three were for unspecified reasons.

Provided data indicated that 91 percent of IDTT meetings were attended by required disciplines.  Absences were predominantly by psychiatrists, due at least in part to staffing vacancies.  A CAP addressed IDTT attendance issues during the review period.  Provided audit results indicated that only 57 percent of initial IDTT meetings were timely, with overdue meetings late by a range of one to 84 days. Follow-up IDTT meetings were timely in 99 percent of cases.

Eight groups were made available to both mainline and SNY 3CMS inmates as well as to non-mental health caseload inmates. Topics were relevant to participants regardless of their mental health designations. During the review period, 137 inmates received approximately 5.3 hours of group treatment per month. At the time of the site visit, of the 174 inmates on the group wait list, 75 percent were 3CMS inmates.

During the site visit, a portion of group session on victim awareness was observed.  It was a two-hour support group that addressed victim empathy. The group consisted of 13 inmates and had been ongoing for 11 months.  It was apparent that group norms involving extensive self-

disclosure, non-judgmental acceptance, and confidentiality had become well-established over the life of the group.

A written expression group was also observed during the site visit. It was facilitated by a mental health clinician who directed participants to journal various personal topics including family love.  Participants read their writings aloud, after which other participants shared their reactions. It was apparent that they had learned how to provide appropriate feedback and that there was a high level of group support among all members.

Interviewed 3CMS inmates indicated overall satisfaction with clinical services.  They were knowledgeable about the purpose of IDTT meetings, knew the names of their PCs, and knew how to contact the clinician or psychiatrist for an unscheduled contact if needed. They were satisfied with referral response times, indicating they were generally prompt. Nearly all expressed a desire for more available groups.

During the inmate interviews, a custody officer opened the door and abruptly demanded to know whether "everyone was properly tucked in." When no one responded, the officer said, "Shame on me if I find one."  Several inmates expressed concerns about what they described as a recent increase in perceived harassing behavior by a few custody staff. The incident was brought to the attention of the warden and was being addressed at the time of the site visit.

Referrals:

Institutional data indicated that the 15 emergent referrals to mental health all received a timely response.  The 14 urgent referrals drew timely responses in 86 percent of cases, as did 89 percent of the 1,039 routine referrals.  Seventy-four percent of the 206 referrals for medication refusals received timely responses.

MHTS.net:

335

Staff reported that MHTS.net was used to track inmate arrivals, level-of-care changes, psychiatry and PC contacts, initial and follow up IDTT meetings, mental health and SREs, psych tech rounds, five-day follow-ups, and response to mental health referrals, among other things. Staff reported that MHTS.net was accessible through various work stations.   They were familiar with other information sources including SOMS, ERMS, PHIP, and UHRs.  MHTS.net had the capability to track suicide risk information, and staff reported that they knew how to pull lists of inmates at high risk through the "red alert" feature.  MHTS.net reports could be pulled on demand, and were posted every Monday in the office of the chief of mental health for clinicians to consult.  The DSH referral log was also available electronically.

Mental Health/Custody Relations:

Interviewed mental health and custody line staff reported good working relationships. Examples of collaboration between them were observed during the site visit.  However, health care custody supervisors reported not receiving timely communications from mental health supervisory staff.

Heat Plan:

No heat plan issues were indicated during the review period.  Heat logs were completed and forwarded to headquarters each month, as required. Thermometers were placed directly across from the control booth on the second tier, and also inside the control booth but reading temperatures outside of the booth.  The list of heat-risk inmates was included on the daily movement sheet and was available to all housing unit staff via the local server.

Use of Force:

336

As of February 28, 2015, 762 of 780 or 97.9 percent of custody staff had received training on the new use of force policy and procedure.  Twenty-three of 25 or 92 percent of mental health staff had received training.

Access to Care:

Custody staff reported that mental health staff did not use the statewide-approved daily ducat tracking sheet, which increased the time custody staff spent on locating inmates' work assignments, TABE scores, and ethnicities.  The ducat-tracking system, which was part of SOMS, was designed to prevent issuance of overlapping ducats for the same inmate, or ducats for inmates who had left the institution.  Custody staff reported that mental health staff's failure to use the approved system resulted in issuance of multiple overlapping ducats for the same inmates and for those who had left PVSP, which affected inmates' access to care.

Program Access:

a.    Job and Program Assignments:

As of March 3, 2015, 556 3CMS inmates had full-time employment positions.  The institution was unable to report which of these positions were paid positions.  Another 173 3CMS inmates were enrolled in part-time academic positions.  Fourteen 3CMS inmates participated in part-time substance abuse treatment programming, and 61 3CMS inmates were enrolled in full-time vocational education programs.

Among non-mental health caseload inmates, 1,212 had full-time employment positions, 422 had part-time academic positions, 120 participated in part-time substance abuse treatment programs, and 156 participated in full-time vocational education programs.

b.    Milestone Credits:

337

Provided data indicated that from September 1, 2014 through February 28, 2015, one or 25 percent of EOP inmates, 274 or 20 percent of 3CMS inmates, and 640 or 34.7 percent of non-mental health caseload inmates who were eligible to earn milestone credits actually earned them.

   c.     <u>Out-of-Level Housing</u>:

On March 16, 2015, four Level I MHSDS inmates were housed in Level III housing. There were 225 Level II 3CMS inmates housed in Level III housing, and 57 Level IV 3CMS inmates and one Level IV EOP inmate housed in Level III housing.

   d.     <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

PVSP reported that the revised ADA Reasonable Accommodation and Grievance Procedure had not been implemented at the institution, and that an implementation date had not been determined as of the time of the site visit.

   e.     <u>Periodic Classification Score Reductions: EOP Inmates</u>:

PVSP did not had an EOP mainline program.


<u>*Coleman* Postings</u>:

Six of the nine reviewed housing units at PVSP had *Coleman* postings.  One housing unit did not have any *Coleman* postings, and two others had only Spanish language versions of the postings.

**Avenal State Prison (ASP)**
July 21, 2015 - July 23, 2015

Census:

As of July 22, 2015, the total inmate census at ASP was 2,599, which was 48 percent lower than it was during the preceding monitoring period.  The mental health caseload population of 922 was 21 percent less than it was during the preceding monitoring period, and constituted 35 percent of the total inmate population.

There were two mainline EOP inmates, 915 mainline 3CMS inmates, and five 3CMS inmates in the OHU for medical reasons.

Staffing:

The senior psychiatrist position was vacant and was covered by a contractor.  Positions for the chief psychologist and the two senior psychologist supervisors were filled.  The supervising social worker position was vacant.

All five psychiatry positions were vacant. Contractors covered four of these positions, for a functional vacancy rate of 20 percent.

The two senior psychologist specialist positions were filled.  Four of 11 staff psychologist positions were vacant but were all covered by registry staff.

Contractors covered all three vacancies among the eight social work positions.  The recreation therapist position was filled.

All nine mental health clerical positions and the OSS II and HPS I positions were all filled.

Quality Management:

Quality management at ASP was mature, well-established, and integrated into overall operations.

The quality management committee met six times during the review period. Minutes were provided for five of the six meetings and reflected good attendance.  Substantive discussions and reviews of reports were supported by use of multimedia.

The mental health subcommittee met monthly during the review period. No new QITs were chartered.  There were three active FITs, two of which concerned IDTTs and referrals to mental health. Review of minutes indicated that the mental health subcommittee actively used the performance dashboard, standardized reports, data from statewide database systems, and on-demand reports indicating compliance levels.  The minutes did not indicate whether a quorum was achieved at meetings.

Psychologists and social workers underwent peer review at ASP.   Because of psychiatry staffing shortages, psychiatrists did not participate in peer review for most of the review period. Peer review consisted of presentation of a case review by the clinician, followed by feedback from five peers.  Minutes did not indicate whether the feedback was guided by any objective criteria.  In May 2015, ASP implemented the statewide peer review process.

Medication Management:

For a signification portion of the review period, medication continuity following intra-institutional moves was noncompliant except following moves into administrative segregation.

During the final three months of the review period, the institution was compliant with medication continuity following inter-institutional transfers. The institution was compliant for medication continuity for five of the six months of the review period following discharges from MHCBs or community hospitals.

340

The institution reported that due to psychiatry staffing shortages, MAPIP's psychiatry measures were difficult to calculate.  These audits were conducted by nursing staff under psychiatry's guidance until psychiatry staffing improved.  For December 2014 through February 2015, compliance rates were 66 percent for atypical antipsychotics, 97 percent for Lithium, 99 percent for Lamictal, and 100 percent for measures addressing Depakote, carbamazepine, and antidepressants.  No inmates were prescribed Clozaril during that period. There was no improvement plan as a result of these audits.  For the period of March through May 2015, audits indicated compliance rates were 99 percent for atypical antipsychotics and Lithium, 100 percent for carbamazepine, 92 percent for Depakote, 80 percent for Lamictal, and 89 percent for antidepressants.

ASP was compliant with providing a one-month supply of medications to paroling inmates.

Transfers:

ASP referred two inmates to intermediate care.  Neither required Vitek hearings.  Both referral packets were submitted timely to utilization management, but completion of the referral packets did not meet timeframes.  For one of the two inmates, once his referral packet was completed and submitted, all other timeframes, including transfer timelines, were met, and he was transferred to Atascadero State Hospital (ASH). The second inmate was admitted to an MHCB during the referral period and was transferred to an EOP program before ultimately being transfered to DSH.  His transfer to DSH did not comply with timeframes.

No inmates were pending DSH transfer at the time of the site visit, and none had been discharged back to ASP during the review period.

Two inmates had positive indicators on the Form 7388B and were both appropriately not referred to DSH.

Record reviews indicated that staff were not utilizing Form 7388B correctly. Staff documentation on the Form regarding inmates who did not meet any referral criteria was confusing as to whether applicable criteria were inadvertently not marked.  Documentation that was on the Form appeared in incorrect places.  For example, treatment modifications for a noncompliant inmate were documented on the first page of the Form instead of on the second page where they belonged.

Forty-nine inmates were referred and transferred to MHCBs at outside institutions. Thirty-six or 73 percent of these MHCB transfers occurred within 24 hours of referral.  Late transfers averaged .8 days overdue.  All but one transfer to an MHCB were done within 24 hours of bed assignment.

Fifty-one of 69 or 74 percent of mental health OHU stays met timeframes.  The 18 overly-long stays were overdue by an average of five days.

There were 21 alternative housing placements.  No information was provided with regard to applicable timeframes.

No inmates transferred to a PSU.

All three administrative segregation EOP inmates transferred timely to EOP administrative segregation hubs.

Fifteen of 22 or 68 percent of EOP inmates were transferred timely to EOP programs. The seven late transfers were overdue by an average of 52 days, with a range of nine to 116 days. Delays were attributed to lack of EOP beds.

Other Issues:

342

MHSDS in Administrative Segregation:

For 3CMS inmates in administrative segregation, initial and follow-up psychiatry contacts were 100-percent compliant for timeliness.  One contact was cell-front, due to inmate refusal.  No psychiatry contacts took place in non-private out-of-cell areas.

The institution reported 100-percent compliance for timeliness of initial PC contacts and 97-percent compliance for follow-up contacts for 3CMS inmates.  There were 195 cell-front PC contacts, and three contacts in non-private out-of-cell areas.

Initial and follow-up IDTT meetings were timely 100 percent of the time.  However, attendance by required disciplines was only 24-percent compliant, due largely to absence by psychiatry.

No mental health caseload inmates were housed in the stand-alone unit during the review period.

During the review period, ASP housed 17 mental health caseload inmates on NDS status, all of whom were designated for expedited transfer. Fourteen of the 17 transferred within 72 hours of NDS designation.  Two of the remaining three were transferred after six days, and the third was transferred after 13 days.  Two of these delays were due to lack of bed availability, and the third was due to a holiday weekend.   The institution had a process for identifying NDS inmates to provide them with property/privileges and expedited transfers. The facility captain reviewed all administrative segregation placements for NDS designation. The ICC then reviewed and confirmed the designations, and the inmate was then provided expedited transfer.   Privileges were provided to NDS-designated inmates pending their transfers.

One of three mental health caseload inmates housed in administrative segregation for 150 days or more as of September 22, 2014 was released from the unit after his case review.  The other two were transferred to another institution.

Alternative Housing:

There were no mental health caseload inmates in the OHU at the time of the site visit.

Each day in the OHU and the TTA, either the senior supervising psychiatrist or assigned psychiatrist was available to provide medication evaluations and/or clinical consultations.  Beginning at 5:00 p.m. seven days per week, an on-call psychiatrist provided emergency coverage in the TTA.  A clinical psychologist also covered the TTA and OHU from 7:00 a.m. until 4:00 p.m. on the weekend days.

One psychologist covered the TTA and the OHU and was responsible for day-to-day clinical management of inmates in crisis in those areas.  This clinician also provided clinical consultation to less experienced PCs for inmates who were difficult to manage.  A private office for the clinician in the OHU contained a treatment module.  The clinician reported that all inmates were seen in the module, regardless of their custody levels.

The recreation therapist visited the OHU as requested by the OHU clinician.  Most recreation therapy activity occurred in cell, with some in the small outdoor concrete yard or in the small television/library room.

Typically, inmates were placed in the OHU for suicidality. SREs following OHU admissions or discharges were not always completed as required.   Inmates were placed on 30-minute checks/observation instead of on required suicide precaution/suicide watch statuses. It was reported that approximately two weeks before the site visit, all OHU inmates were placed on suicide watch.  At least one of the beds designated as a "swing bed" in the

OHU was not suicide-resistant. Cameras in the OHU rooms worked but were not monitored, due to lack of sufficient staff, according to custody staff.

On occasion, the OHU housed inmates whose level of care was raised to EOP but who otherwise could not program on the general population yard.  These inmates were moved to the OHU's long-term care wing, received their property, and participated in yard.  During the site visit, no EOP inmates in the OHU were awaiting transfer. It was unclear how often ASP initiated an expedited transfer for an EOP inmate.  In one reviewed case, the inmate was housed in the OHU pending transfer but it was not expedited despite clear indications to justify it.

There were several mental health caseload inmates receiving medical care in the OHU. All had property.  One was observed on the yard.

<u>3CMS</u>:

ASP reported 100-percent compliance for both initial and follow-up psychiatry contacts for 3CMS inmates.  Seven psychiatry contacts were cell-front.

The two PCs in the general population 3CMS program had caseloads of 59 and 73 inmates, respectively. In the SNY 3CMS program, the 13 PCs had caseloads ranging from 44 to 95 inmates. The institution did not report on the timeliness of initial or routine PC contacts. Forty-five PC contacts were cell-front.

The institution reported a compliance rate of 92 percent for initial IDTT meetings. Overdue IDTT meetings ranged from one to 23 days late.  Follow-up IDTT meetings were 100-percent compliant.  The compliance rate for attendance by required disciplines was 64 percent, due largely to the absence of psychiatry.  The institution reported that recent psychiatry hires had improved IDTT attendance rates.  Correctional counselors attended 97 percent of IDTT meetings.

345

At observed IDTT meetings on B-Yard, required disciplines were present but the psychiatrist was a supervising psychiatrist and not the treating psychiatrist. The meeting space was good. All required documentation was available and accessed by staff when indicated. The team engaged well with each other in thoughtful discussion. Team members also interacted well with the inmates and included them appropriately in treatment planning and goal-setting.

At observed IDTT meetings on C-Yard, the psychiatrist again was a supervising psychiatrist and not the treating psychiatrist. Treatment team members had access to eUHRs and SOMS and consulted them as indicated. The meeting space was also good. Discussion among staff was thorough, and inmates were given ample opportunity to participate and ask questions. However, the meetings required greater focus, structure, and time management. Some inmates needed to have the purpose of the meeting explained to them more clearly. Although treatment goals were measurable, in some follow-up meetings there was minimal discussion of the inmate's progress toward them during the preceding year. While some treatment goals were appropriate, they could not be attained with PC contacts as planned every 60 to 90 days. Treatment goals either should have been modified, or more frequent contacts should have been planned.

A variety of process and didactic groups were available for 3CMS inmates. ASP reported that 54 3CMS inmates were on a wait list for group therapy and 30 of them had been waiting for over six months. On C-Yard, an observed clinician-run group on addictions was well facilitated. Inmates sat around a table in private, air-conditioned space. Rapport between the leader and the group, and among the participants was good. Addressed areas, including the role of trauma and loss in substance abuse, were appropriate. The group was generally well-facilitated, with a few missed opportunities to promote greater interaction among participants.

346

An observed group led by a recreation therapist was well-structured and well-facilitated. The recreation therapist had initially spent an extensive amount of time developing and preparing for the group, which was a model of what should be expected from a recreation therapy group.

Referrals:

The institution reported 100-percent compliance for timely response to the 42 emergent referrals during the review period. Response to the 73 urgent referrals was 95-percent compliant. The 1,488 routine referrals drew timely responses in 98 percent of cases. The compliance rate for timely response to the 289 referrals for inmate medication noncompliance was 92 percent.

MHTS.net:

Mental health staff reported that any problems with MHTS.net were typically due to data entry errors. They indicated that they generally found MHTS.net more reliable than the dashboard.

Mental Health/Custody Relations:

Mental health staff reported that relations with custody staff were typically very good.

Heat Plan:

There were no Stage II or III heat alerts during the review period. There were eight Stage I heat alerts during May 2015.

RVRs:

ASP reported that 30 of 34 or 88 percent of required mental health staff attended the mandatory training for the revised RVR mental health assessment process. The four staff who did not attend worked only on weekends.

The institution reported that 100 percent of custody staff attended the revised RVR training.

347

<u>Use of Force</u>:

ASP reported that 22 of 24 or 92 percent of mental health clinicians received the mandatory mental health use of force training.

One hundred percent of custody staff received the training.

<u>Program Access</u>:

a.    <u>Job and Program Assignments</u>:

No EOP inmates had work training assignments.  One EOP, 94 3CMS, and 119 non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

Among 3CMS inmates, 558 had full-time jobs, of which 471 were paying and 87 were non-paying positions.  Among non-mental health caseload inmates, 949 had full-time employment assignments, of which 813 were paying and 136 were non-paying.  There were seven 3CMS inmates with part-time, non-paying employment positions.

Twenty-three 3CMS inmates had full-time, non-paying academic positions.  There were 54 non-mental health caseload inmates with full-time, non-paying academic positions.

There were 124 3CMS inmates who had part-time, non-paying academic positions. There were 241 non-mental health caseload inmates with part-time, non-paying academic positions.

One 3CMS inmate was in a full-time, paying substance abuse treatment program.  Ten non-mental health caseload inmates were in full-time, paying substance abuse treatment programs.  There were also two non-mental health caseload inmates who had part-time, paying substance abuse treatment positions.

There were 63 3CMS inmates with full-time, non-paying, vocational education positions. There were 108 non-mental health caseload inmates enrolled in full-time, non-paying vocational educational programs.

There were 15 3CMS inmates with part-time, non-paying, vocational educational positions.   There were 32 non-mental health caseload inmates enrolled in part-time, non-paying vocational education programs.

b.   Milestone Credits:

As of May 31, 2015, neither of the two EOP inmates at ASP were eligible to earn milestone credits.  Of the 1,046 3CMS inmates, 281 were eligible to earn milestone credits and 74 or 26 percent actually earned them.  Of 1,773 non-mental health caseload inmates, 452 were eligible to earn milestone credits, and 163 or 36 percent actually earned them.

c.   Out-of-Level Housing:

There were 28 3CMS and 69 non-mental health caseload Level I inmates housed in Level II housing.  There were three non-mental health caseload custody Level II inmates housed in Level I housing.  There were 24 3CMS and 22 non-mental health caseload Level III inmates housed in Level II housing.  There were seven 3CMS and four non-mental health caseload Level IV inmates housed in Level II housing.

d.   ADA Reasonable Accommodation and Grievance Procedures:

ASP implemented the ADA reasonable accommodation and grievance procedures effective May 15, 2015.

e.   Periodic Classification Score Reductions for EOP inmates:

ASP did not have an EOP.

349

*Coleman* Postings:

*Coleman* postings were prominently displayed in both English and Spanish languages in six observed housing units on C-Yard and D-Yard.

**Salinas Valley State Prison (SVSP)**
February 17, 2015 – February 20, 2015
June 12, 2015

Census:

On February 17, 2015, SVSP housed a total of 3,552 inmates, for an increase by 363 inmates or 11 percent since the preceding monitoring period.  There were 322 inmates in administrative segregation.

The MHSDS population was 1,654, or 47 percent of the total population.  It increased by 294 inmates or 22 percent since the preceding monitoring period.

The mainline EOP census of 463 was 51-percent higher than during the preceding monitoring period.  Of these, 49 EOP inmates were in administrative segregation.

There were 1,038 mainline 3CMS inmates, which was an increase by eight percent since the preceding monitoring period.  One hundred one of these 3CMS inmates were in administrative segregation.

Staffing:

Of the 155.5 established mental health positions, 116.5 were filled, for an overall vacancy rate of 25 percent.  Use of contract coverage reduced the functional vacancy rate to 21.7 percent.  Positions for the chief psychiatrist, three chief psychologists, and the supervising social worker were all filled.

Of the seven staff psychiatrist positions, only 2.5 were filled, for a vacancy rate of 64 percent. Use of 1.75 FTE contract psychiatrists reduced the functional vacancy rate to 39 percent.

Four of the five senior psychologist/supervisor positions were filled, as were three of the 4.5 senior psychologist/specialist positions. Of the 35 staff psychologist positions, 27 were filled. Use of 3.5 FTE contract psychologists reduced the functional vacancy rate to seven percent. Eight of the psychologist positions were filled by unlicensed staff.

Fifteen of the 17.5 social worker positions were filled, for a vacancy rate of 14 percent. Nine social worker positions were filled by unlicensed staff.

The two senior psych tech positions were filled. Of the 42.5 psych tech positions, 33 were filled, for a vacancy rate of 22 percent.

Nine of the 14 recreation therapist positions were filled, for a vacancy rate of 36 percent. One of these positions was filled by unlicensed staff.

Among the 17 office tech positions, 11 were filled, leaving a vacancy rate of 35 percent. Positions for all three health program specialists, the sole office support supervisor II, and the sole AGPA were all filled, but the correctional health program administrator II position was vacant.

Quality Management:

The institution reported that it was in the process of developing its own quality management support unit. No information was provided regarding the local governing body.

During the review period, the quality management committee met monthly, achieved a quorum, and maintained minutes for all meetings. These meetings were chaired by the CEO and attended by the chief of mental health. Minutes documented discussions that covered areas of

351

concern to mental health including staffing, suicide prevention, program compliance reports, EOP administrative segregation hub certification, and the effect of lockdowns on mental health programming.

Provided minutes for meetings of the mental health subcommittee indicated that it met monthly during the review period.  The meetings were chaired by the chief of mental health and achieved a quorum.  Minutes reflected discussions on various mental health program areas including program compliance and issues related to the EOP administrative segregation hub certification.

The institution had a Focused Improvement Team (FIT) on administrative segregation which met approximately every two weeks.  Minutes indicated that its focus was on parameters related to certification of the administrative segregation unit.

Formal peer review did not occur during the review period.

Medication Management:

The overall compliance rate for medication continuity was 48 percent.  Continuity of nurse-administered and DOT medications following intra-institutional transfers was 58-percent compliant for the month of November 2014.  Following moves out of an MHCB, the rate of continuity was only 32 percent.

Counseling for inmates who were noncompliant with their medications was provided in only 57 percent of cases.  Involuntary medications were 90-percent compliant, according to institutional audit results.  Audits of administration of chronic care medications prescribed by a psychiatrist indicated a 26-percent compliance rate.

Overall, psychiatric diagnostic monitoring was 72-percent compliant.  Initial psychiatric evaluations were delayed by approximately one month.  Psychiatric evaluation and follow-up

352

were particularly untimely on D-yard, which was in the process of being converted to an SNY. The psychiatric nurse practitioner on D-yard reportedly had a caseload of approximately 150 inmates, which will increase as the conversion is completed.

Staff on C-Yard reported that HS medications were being distributed at the 5:00 p.m. medication pass.

Transfers:

The current DSH coordinator, appointed in January 2015, reported continuing data issues that needed to be resolved. This was evident from missing and incorrect data on the DSH referral logs examined during the site visit.

During the review period, 36 inmates were referred to acute inpatient care. Nine or 25 percent of referral packets were not completed within Program Guide timeframes. One paroled before bed assignment. Seventeen or 49 percent of the remaining 35 inmates transferred outside of Program Guide timeframes, with wait times ranging from 11 to 83 days. No inmates prevailed on any of the eight Vitek hearings. Thirteen of the transfers were beyond 72 hours of a bed assignment. At the time of the site visit, two inmates who had been accepted to a DSH acute care program were awaiting transfer, with wait times of four days and 34 days, respectively.

During the reporting period, 125 inmates were referred to intermediate care. Sixty or 48 percent of referrals were not completed within Program Guide timeframes. By the time of the site visit, two were rescinded, one paroled, one was awaiting bed assignment, and one was pending transfer. Of the remaining 120 inmates who transferred to DSH, 27 or 22 percent were outside of Program Guide timeframes, with wait times ranging from 32 to 62 days, and one outlier at 133 days. No inmates prevailed at any of the 27 Vitek hearings. Only two inmates did not transfer to a DSH facility within 72 hours of a bed assignment. At the time of the site visit,

353

there were seven inmates accepted to a DSH intermediate care program and awaiting transfer, with wait times ranging from four to 64 days.

Institutional data indicated that 14 inmates transferred to a PSU during the review period. Twelve or 86 percent transferred within Program Guide timeframes.

According to provided data, there were 174 admissions among 155 inmates to the MHCB at SVSP from July 14, 2014 to January 11, 2015.  Lengths of stay ranged from 1.5 to 46.5 days, including 34 or 20 percent of stays that lasted longer than ten days.  There were also 75 transfers to outside MHCBs during the review period.  Twelve or 16 percent of these transferred within timeframes.  Most cases of delays were attributed to lack of MHCB availability.

SVSP did not have a MHOHU/OHU.

No data on inmate transfers to EOP hubs during the review period was provided.  Census data provided on site indicated that 27 inmates were in the EOP hub and 22 were awaiting transfer to an EOP hub at the time of the site visit.

Other Issues:

MHSDS Inmates in Administrative Segregation:

At the time of the site visit, the SVSP EOP administrative segregation hub was not certified.  All nine transfers to hubs during the review period were within timeframes.

In the SVSP hub, the compliance rate for the comprehensive mental health clinical assessment before the initial IDTT meeting was only 13 percent.  Initial IDTT meetings were timely 86 percent of the time, while follow-up IDTT meetings were timely 94 percent of the time.  All required disciplines were routinely present at the meetings.

Initial PC contacts were 91-percent compliant, follow-up PC contacts were 95-percent compliant, and contacts following treatment refusals were 49-percent compliant.  The institution

354

reported a total of 3,211 cell-front PC contacts.  Among the proffered reasons for conducting these contacts at cell front were inmate refusal (1,589), staff decision (1,037), modified programming (199), and lack of escort (71).

At an observed IDTT meeting in the hub, all required disciplines were present. Treatment planning was good, with identified goals and patient involvement.  Possible need for a higher level of care was also discussed.

The institution reported that 11.91 hours per week of group treatment were scheduled.  Of these, 10.6 hours were offered, 7.18 hours were attended, 3.42 hours were refused, and 1.32 hours were cancelled.  Sixty-six percent of inmates were offered at least ten hours of group per week, and 28 percent attended at least ten hours per week.

For 3CMS inmates, both psychiatry and PC contacts were over 90-percent compliant. However, interviewed patients indicated that approximately half of their PC contacts were cell-front and lacked privacy.  Psychiatric contacts were also timely, with a compliance rate of greater than 90 percent.  Audits of IDTT meetings for 3CMS inmates found that they were timely and attended by required participants.

NDS inmates were being identified correctly, according to documentation and interviews of the C&PR and other staff.  Unit sergeants tracked these inmates on a local server, making the inmates' names, CDCR numbers, dates of NDS designation, placement in administrative segregation, and issuance of property available to all unit custody supervisors.  Data provided on site indicated that at the time of the site visit, 27 inmates had NDS designation for determination of privileges and property.  Five had been designated as NDS for accelerated transfers.  One transferred to DVI, two were granted bus seats and were pending transfer, one was placed in the MHCB before CSR review, and one was pending CSR review.

355

Provided data on mental health caseload inmates in the stand-alone unit indicated that three caseload inmates were housed there during the review period, and that two of them were moved out within timeframes.  However, no information on their levels of care was provided. Interviewed staff indicated that no caseload members were in the stand-alone unit at the time of the site visit.

MHCB:

There were ten operational MHCBs at the institution.  MHCB staff consisted of one full-time and one half-time psychiatrist, six psychologists, one part-time social worker, and one part-time recreation therapist.

During the reporting period there were 155 admissions to the MHCB, with an average length of stay of 7.9 days and a range of 0.6 to 46.5 days.  Thirty-six or 23 percent of inmates, had stays in excess of ten days.

The compliance rate for initial SREs was 88 percent, and for follow-up SREs it was 78 percent.  Compliance rates for initial and follow-up psychiatry contacts were 84 percent and 88 percent, respectively.  Both initial and follow-up PC contacts were conducted timely, but contacts for treatment refusals were only 49-percent compliant.

Initial and follow-up IDTT meetings were timely.  The Special Master's expert observed three IDTT meetings.  All required disciplines and the inmates attended these meetings, which were held in a room with adequate space with computer access.  Overviews of the inmates' presenting problems were given during the meetings, but they lacked discussions of pertinent clinical issues such as post-head injury auditory hallucinations, treatment planning and goals, and what needed to occur for the inmates to be discharged from the MHCB.  One inmate was escorted in cuffs but his cuff status was never discussed during the meeting.

356

At the time of the site visit, there was no yard access due to lack of shade and staff shortages.  Recreation therapy was provided three nights per week and included letter writing, games, and one-to-one contacts.  Staff reported that a dayroom was also available for television viewing.

Staff reported that for the preceding six months, HCPOP was not being notified when inmates were placed in alternative housing after hours.  Instead, psychologists called HCPOP the morning after these placements and sometimes waited for several hours before receiving a reply from HCPOP.  This led to inmates remaining in alternative housing and delays in their treatment.

Seclusion and Restraint:

There were no reported uses of restraints during the reporting period.

Alternative Housing:

There was conflicting data regarding the number of inmates who were placed in alternative housing during the review period.  Documentation provided pre-site visit indicated that 112 inmates were placed in alternative housing and that 75 percent transferred within timeframes.  Documentation provided by the institution at the time of the visit indicated that 257 inmates were placed in alternative housing during the review period and that only 112 or 44 percent transferred to MHCBs.  Staff attributed this low transfer rate to their perception that inmates claimed suicidality to achieve a change of housing or cellmate and then recanted their claims the following day.  It was also reported that some inmates sought placements in alternative housing as a means to obtain psychiatric medications they were not receiving on the yard.

The alternative housing LOP, "Alternative Housing Policy and Procedure Draft 1.5," indicated that alternative housing was comprised of CTC holding cells with and without toilets,

357

and BPH holding cells with and without toilets on the yards.  The institutional Mental Health

LOP No. 400 indicated different locations, but it appeared that staff were adhering to the draft

policy.

The four large holding cells in the CTC were clean and in direct line of sight of the

nursing station.  They held 16, 15, nine, and eight inmates, respectively.  During business hours,

these cells are also used for inmates awaiting medical appointments, which created a noisy

environment in the unit.  The BPH cells in Complex 1were dimly lighted and dirty.  Each had the

capacity for one inmate.  The BPH cells in Complex 2 were slightly cleaner.

EOP:

On the A-yard EOP, psychiatric contacts were timely 88 percent of the time.  The

institution reported that 91 percent of initial PC contacts were timely, as were 98 percent of

follow-up contacts.  The institution reported that 77 percent of clinical EOP contacts occurred in

private settings.  Initial and follow-up IDTT meetings were compliant with timeframes and

attendance by required participants in 90 percent of cases.

Audits of group treatment hours indicated that 86 percent of inmates were scheduled for

ten hours of group per week, 71 percent were offered at least ten hours per week, 33 percent

attended ten hours, four percent refused group therapy, and two percent cancelled.

The Special Master's expert observed two EOP therapeutic groups run by the

participants' own PC on the A-Yard Level III treatment facility.  Group sizes ranged from five to

six inmates.  The groups were well-run, with good participation.  Facilitators made efforts to

engage patients in group discussions.  It was noted that inmates from the A-4 housing unit

arrived late by as much as 30 to 45 minutes to the 8:45 a.m. group therapy sessions, and that this

was a chronic problem.  Delivery of medications by one nurse to both the A-4 and A-5 buildings

358

appeared to be the cause.  Tracking of these group sessions was of concern, as these inmates were not receiving the full scheduled hours.

At the time of the site visit, the EOP D-Yard conversion of the Level IV EOP to an SNY Level IV EOP was 90-percent completed.  These SNY EOP inmates were housed in D-3 and D-4.  There were deeply significant concerns with the delivery of mental health care on the D-Yard.  Clinicians there reported frustration with their inability to provide Program Guide-required care under prevailing conditions.  Technically, their caseloads numbered 30 patients, but staff absences and departures made for much larger *de facto* caseloads.  This led to the mental health supervisor providing direct care rather than attending to supervisory duties.

Other than a yard group led by a recreation therapist, there was no group therapy occurring on D-Yard.  Groups were decreased so that general population EOP inmates and SNY EOP inmates had groups on alternating days, which resulted in inmates being scheduled for half of the groups that they should have received.  Facilitators reported that few if any inmates had received group therapy for the preceding several weeks.  This paucity of groups was exacerbated by a lack of consistency of facilitators for the few groups that there were.  Re-directing of psych techs to other duties led to other psych techs covering groups without preparation, planning, or knowledge of group topics.  Group facilitators indicated that no curricula or supplies were available and that they tried to improvise.  Group sessions were sometimes counted as completed even when inmates appeared briefly to indicate they would not stay for the entire session due to other activities.

Inmates were kept on orientation status for prolonged periods of time, lasting several weeks or months.  These inmates were confined to their cells with no yard or groups.  Clinical staff reported that staffing deficiencies related to clinicians' sick absences led to significant

359

delays with initial and follow-up clinical contacts for these inmates.  While inmates received

psychiatric services by telepsychiatry with a nurse practitioner, it was reported that the first

available appointment for psychiatric evaluation was delayed by four weeks.  Interviewed

inmates also reported medication lapses.

The Special Master's expert interviewed several inmates on the yard and in their cells on

D-4.  Many of these inmates expressed frustration, agitation, fearfulness, and confusion due to

completed and proposed changes on the yard and the lack of mental health services being

provided.  Several of these inmates required medication evaluation, clinical assessment, and/or

emergency evaluation.  Interviewed inmates indicated that because they were frequently released

late from their housing units they lost time for groups, yard, and individual treatment sessions.

They also reported that they frequently received ducats for groups that had no facilitators, or for

groups on days when no groups were scheduled, or during early morning hours before they were

released from their housing units.  No interviewed inmates reported being offered ten hours per

week.  No groups were provided for those who spoke only Spanish.  Compounding all of these

problems were fear and safety issues following the stabbing of any SNY inmate by a general

population inmate.

By the time of the June 2015 re-visit, the SNY conversion had been completed and all

group rooms were in use.  However, interviewed inmates reported concerns with group

cancellations, ducating, and a lack of group therapy for Spanish-speaking inmates.  Mental health

leadership reported that previous data entry errors which had resulted in ducting errors had been

addressed and corrected.  They also reported that groups had been cancelled because of modified

programming due to a riot on the yard that affected group availability for EOP inmates, as well

as re-direction of psych techs who had been facilitating groups.  Insofar as the lack of Spanish-

360

language groups, it was reported that mental health leadership was investigating the possibility of congregating those inmates to maximize the potential for Spanish-language groups.

It was reported that approximately two-thirds of mental health staff on D-Yard had left between the times of the February and June 2015 site visits, reportedly as a result of difficulties following a staff assault.  It was reported that the change in staff had helped stabilize the unit and improve morale.  The compliance rate for EOP group offerings improved from 43 percent during the February 2015 visit to 78 percent by early June 2015.

3CMS:

At the time of the January 2015 visit, the 3CMS program was staffed with eight PCs. Their caseloads ranged from 70 to 138 and averaged 113 inmates.

Data indicated that clinical intake assessments for 3CMS inmates were being completed within ten days of arrival, as required.  Initial and follow-up psychiatry contacts were 95-percent and 96-percent compliant, respectively.

PC contacts were 100-percent compliant.  Staff on C-Yard reported that most of these contacts, as well as group and telepsychiatry contacts, were conducted in private settings.  Pre-site visit data indicated refusal rates of 4.5 percent for July 2014 and 12 percent for December 2014.  Institutional data varied somewhat, indicating refusal rates of 12 percent from July to September 2014 and 13 percent for September to December 2014.

The institution reported only four cell-front contacts for psychiatry during the review period.  Data indicated 575 cell-front PC contacts during the review period, which were attributed to staff decisions (195), inmate refusals (167), and modified programming (65), among other things.

361

Initial IDTT meetings were held within 14 days of arrival in 95 percent of cases.  Annual follow-up IDTT meetings were 100-percent compliant, with all required disciplines in attendance 99 percent of the time.  IDTT meetings on B-yard were observed during the site visit.  Four inmates were scheduled but three cases were heard in absentia due to inmates' illnesses.  All required disciplines attended and staff appeared knowledgeable of the inmates' psycho-social histories and treatment needs.

3CMS groups were provided only on C-yard and were held at 10:00 a.m. and 1:00 p.m. on Monday, Tuesday, Thursday, and Friday.  Topics included coping skills, anger management, advanced victim awareness, lifer group, and critical thinking.  Groups were cancelled or inmates were unable to attend due to modified programming from June 20, 2014 to July 29, 2014, and from December 4, 2014 to January 9, 2015.  During lockdowns or modified programming, priority ducats were issued for appointments but groups were cancelled.

Referrals:

During the review period, 92 percent of the 49 emergent referrals received a response within four hours.  Ninety-five percent of the 102 urgent referrals and 94 percent of the routine referrals drew responses within timeframes.

Mental Health/Custody Relations:

At the time of the February 2015 site visit, there were cultural issues among custody, medical, and mental health staff that had a negative effect on staff interactions with inmates and the delivery of mental health care.  Staff reported a pattern in the MHCB of increasing numbers of inmates coming in from administrative segregation and not wanting to return there.  While there was no direct confirmation by inmates, staff inferred that these inmates were attempting to avoid disrespectful and harassing conduct by custody staff in administrative segregation.

362

At the time of the June 2015 re-visit to follow-up on custody/mental health relations among other things at SVSP, the institution's warden reported that meetings were taking place among supervisory staff for custody, medical, mental health, and dental to address the custody-related concerns. Measures taken included personnel changes including removal of high-level custody staff from D-Yard, initiation of OIG investigations.

Heat Plan:

The monitor reviewed the institution's heat plan LOP, monthly compliance reports to CDCR headquarters, and weekly lists of inmates prescribed heat risk medications. The institutional LOP was current and compliant with CDCR's annual heat plan memorandum. Monthly reports were submitted to headquarters timely and reflected no Stage II or Stage III heat alerts during the reporting period. All inspected units had thermometers located on the second tier.

Use of Force:

Mental health supervisory staff was 75-percent compliant and mental health line staff was 78-percent compliant with receiving mandatory training on use of force. Custody supervisory staff was 89-percent compliant with receiving their four-hour mandatory training, and custody line staff was 92-percent compliant with receiving their one-hour training.

Access to Care:

Review of SVSP's monthly Health Care Access Quality Reports for July through December 2014 indicated that five percent of issued mental health ducats and add-on appointments were not completed due to custody factors, and that 12 percent were not completed for non-custodial reasons other than inmate refusals.

Program Access:

a.       Jobs and Program Assignments:

The institution reported that it had implemented new policies and procedures regarding evaluation of EOP inmates' functionality for program assignments and milestone credits. Provided data indicated that 61 percent of mental health staff had completed the training by December 2014.

Data provided by CDCR indicated that 1,234 or 69 percent of the full-time available jobs were filled by non-MHSDS inmates, 3CMS inmates filled 409 or 23 percent of such jobs, and EOP inmates filled 137 or eight percent of them.

For the part-time academic program assignments, 305 or 67 percent were held by non-MHSDS inmates, 133 or 29 percent were held by 3CMS inmates, and 16 or four percent were held by EOP inmates.

Non-MHSDS inmates held 198 or 71 percent of the voluntary academic assignments. 3CMS inmates held 65 or 23 percent of them, and EOP inmates held 14 or five percent of them.

Fifty-two or 60 percent of the part-time vocational educational assignments were filled by non-MHSDS inmates.  There were 27 or 32 percent of these assignments filled by 3CMS inmates, and seven or eight percent filled by EOP inmates.

There were 1,050 eligible unassigned inmates.  This included 512 or 49 percent who were non-MHSDS inmates, 360 or 34 percent who were 3CMS inmates, and 168 or 16 percent who were EOP inmates.  Of the eligible unassigned EOP inmates, 165 or 98 percent were assigned to work group A-1, which was comprised of inmates diagnosed as totally disabled and therefore incapable of performing an assignment.  The remaining two percent were assigned to work group A-2, which was comprised of involuntary unassigned inmates who are defined as willing but

364

unable to perform in an assignment.  These inmates were placed on a wait list pending

availability of an assignment.  Of the eligible unassigned 3CMS inmates, 102 or 28 percent were

assigned to work group A-1 and 258 or 72 percent were assigned to work group A-2.  Thirteen

percent of the non-MHSDS eligible but unassigned inmates were assigned to work group A-1

and 87 percent were assigned to work group A-2.

      b.     <u>Milestone Credits</u>:

Data indicated that from August 1, 2014 to January 31, 2015, 1.96 percent of eligible

EOP inmates, 2.27 percent of eligible 3CMS inmates, and 8.18 percent of non-MHSDS inmates

earned milestone credits.

      c.     <u>Out-of-Level Housing</u>:

SVSP had a number of caseload inmates in out-of-level housing.  In the Level III

housing, there were eight Level I EOP inmates, 66 Level II EOP inmates, 15 Level IV EOP

inmates, one Level I 3CMS inmate, 15 Level II 3CMS inmates and 171 Level IV 3CMS inmates.

In the Level IV housing, there was one Level I EOP inmate, five Level II EOP inmates, ten

Level III EOP inmates, two Level I 3CMS inmates, three Level II 3CMS inmates, and 27 Level

III 3CMS inmates.

      d.     <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

No data on ADA reasonable accommodation and grievance procedures was provided.

Review of the proof-of-practice documents indicated that EOP inmates were granted

classification score reductions for successful programming, although some of the CDCR 840s

were conducted annually.

      <u>*Coleman* Postings</u>:

Inspection of eight housing units for the presence of *Coleman* postings found a posting dated June 2010 in four housing units.  In one of these units, the plaintiffs' counsel's address information was torn from the posting.  One unit had a current Spanish language posting.  The three units had no *Coleman* postings at all.

### Correctional Training Facility (CTF)
April 30, 2015 – May 1, 2015

Census:

As of April 27, 2015, CTF housed 4,875 inmates, for a decline by 13 percent since the preceding monitoring period.  There were 1,432 inmates on the mental health caseload.

One mainline EOP inmate was pending transfer.  There were 1,378 mainline 3CMS inmates in the institution.

The administrative segregation population of 132 included one EOP inmate who was pending transfer to an administrative segregation EOP hub and 40 3CMS inmates.  Twelve 3CMS inmates were in the OHU.

Staffing:

The chief psychologist position was filled.

The senior psychiatrist and three of the four staff psychiatrist positions were filled.

Positions for the two supervising senior psychologists, two senior psychologist specialists, and 11 psychologists were all filled.

A contractor filled the vacant supervising social worker position.  Eight of ten social worker positions were filled, for a 20-percent vacancy rate.

The senior psych tech and five psych tech positions were all filled.

The HPS I position was filled.  Six of eight clerical positions were filled, for a 25-percent vacancy rate.

366

Quality Management:

The quality management committee met 20 times during the review period.  It maintained detailed minutes and always achieved a quorum.  It received reports on mental health matters such as staffing, access to care, SREs, MHCB referrals, QITs, and SPRFIT issues. During the review period, the mental health subcommittee held ten meetings, kept minutes, and always achieved a quorum.  It addressed staffing, audits, administrative segregation pre-placement screens, OHU admissions, custody procedures for inmates on one-to-one observation, psych tech responsibilities, DSH referrals, training on controlled use-of-force, inmate appointment arrival times, inmate safety, MHCB referrals, and training on case-by-case reviews. QITs addressed psych tech duties, access to mental health care, and timely mental health information scanning.

Peer review was not conducted during the review period.

Medication Management:

CTF implemented MAPIP in December 2014.  Staff reported that MAPIP measures of noncompliance were reported to the quality management committee and mental health subcommittee, and were tracked on the dashboard.

The overall compliance rate for continuity of medications was 86 percent.  Continuity of NA/DOT medications following both inter-institutional and intra-institutional moves was 89 percent.  For inmates discharged back to CTF from DSH inpatient programs for a community hospital, continuity of medications was 83-percent compliant.  Following transfers to locked units, continuity of medications was 66-percent compliant.  Staff attributed these medication continuity compliance rates to lack of coordination among custody, nursing, and pharmacy staffs.

Compliance rates exceeded 90 percent for both medication administration and response to cases of inmate medication noncompliance.

Waits in pill lines lasted 45 to 60 minutes on the North Facility.  Staff attributed the long waits to changes in psych tech duties and the loss of nursing staff.

Transfers:

There were no referrals or transfers to DSH inpatient programs during the review period.

Twelve of 18 or 67 percent of transfers to outside MHCBs were timely.  The predominant reason for the late transfers was lack of MHCB availability

No inmates transferred to a PSU.

Six of seven or 86 percent of EOP inmates in administrative segregation transferred timely to EOP hubs.

Ten inmates identified for the EOP level of care all transferred timely to mainline EOP programs.

Other Issues:

MHSDS Inmates in Administrative Segregation:

The senior psychiatrist's caseload was 13, while the psychologist's and social worker's caseloads were 38 and 11, respectively.

CTF reported 100-percent compliance for timeliness of initial and follow-up psychiatry contacts for 3CMS inmates from October 1, 2014 to March 31, 2015. Over 99 percent of these contacts were out-of-cell.

From September 1, 2014 to March 23, 2015, the institution was 92-percent compliant with timeliness of initial 3CMS PC contacts and 97-percent compliant with follow-up contacts.  Two percent of initial PC contacts were cell-front, as were 52 percent of follow-up

368

contacts.  Inmates attributed these cell-front contacts to lack of sufficient mental health staff and escort officers, and to avoidance of the discomfort of having contacts while in holding cells. Mental health staff generally attributed cell-front contacts to inmate refusals, insufficient office space, and occasional lack of custody escorts.  Over 99 percent of the out-of-cell contacts took place in private settings.

For 3CMS inmates, from September 1, 2014 to March 23, 2015, timeliness of initial IDTT meetings was 96-percent compliant, and for follow-up meetings it was 100-percent compliant.  Required disciplines attended 100 percent of IDTT meetings from October 1, 2014 to March 31, 2015.

Interviewed inmates reported positive experiences with their IDTT meetings and that as a result they understood their treatment plans.  Some inmates expressed concern with staff reluctance to transfer them to higher levels of care when they expressed need for it.  They also requested group treatment, which was unavailable.

Mental health services for 3CMS inmates were adversely affected by lack of adequate private interview space.  Of three available treatment rooms, one was often used by the ICC and another lacked auditory privacy.  All three had small holding cells instead of therapeutic modules, requiring inmates to use milk crates for seating.  Group treatment space was also insufficient.   Mental health services were also disrupted by a large influx of transfers from other institutions to CTF's administrative segregation unit.  When admissions rose, clinical contacts lagged behind and clinicians from other programs often had to be diverted to administrative segregation in order to comply with requirements.

At the time of the site visit, there were five EOP and 38 3CMS inmates in administrative segregation.  These EOP inmates' stays averaged 64 days and ranged from two to 142 days.

369

These 3CMS inmates' stays averaged 53 days and ranged from one to 177 days.  The 87 3CMS inmates who were in administrative segregation at least some point during the review period had an average stay of 78 days, with a range of four to 538 days.  Four of five or 80 percent of inmates listed as having been in administrative segregation for 150 days or longer as of September 22, 2014 were released or transferred as a result of case-by-case reviews.

There were also five 3CMS on NDS status at the time of the site visit. The institution did not report the lengths of their stays nor the status of property privileges. Four of these inmates were endorsed to other institutions and were awaiting transfer.

Alternative Housing:

The OHU had 17 medical beds and four observation/mental health beds.   The mental health cells had suicide-resistant beds plus a sink and toilet. One was also used for seclusion and restraint and had handrails for mobility-impaired inmates.

Staff reported that the OHU coordinator or another designated mental health clinician evaluated each mental health inmate every day. Three of 22 or 14 percent of OHU stays exceeded 72 hours.

All 17 alternative housing placements were for less than 24 hours.   Eight of them resulted in transfers to MHCBs.

3CMS:

CTF reported compliance rates of 99 percent for both initial and follow-up psychiatry contacts from September 1, 2014 to March 23, 2015.  The three psychiatrists had caseloads of 179, 215, and 236, respectively.

370

During the same period, initial PC contacts were 83-percent compliant for timeliness, and follow-up contacts were 98-percent compliant.  Eleven psychologists' caseloads ranged from 45 to 99, and five social workers' caseloads ranged from 74 to 101.

From September 1, 2014 to March 23, 2015, timeliness of initial IDTT meetings was 79-percent compliant, and for follow-up meetings it was 99-percent complaint.  Required disciplines attended 100 percent of meetings from October 1, 2014 to March 31, 2015.  At observed IDTT meetings on the North yard, required staff were present and had access to necessary information.  Inter-disciplinary discussion was good.  The team constructively engaged the inmates in treatment planning.  At observed IDTT meetings on the South yard, team members were knowledgeable about inmates and included the inmates in their discussions.  However, clinicians were not aware of correct use of the Form 7388B.  There was a lack of discussion about inmates' levels of care.  While treatment goals were relevant to diagnoses, they were not measurable.  Although four clinicians were running groups at the time of the site visit, there were insufficient staff to offer groups to all 3CMS inmates.  Many inmates were unaware of the availability of groups.

Some interviewed 3CMS inmates expressed concerns with serial changes of clinicians and their lack of familiarity with inmates' treatment plans and goals.  Most of these inmates reported seeing their clinicians quarterly in sessions that typically lasted no longer than ten minutes.  Inmates complained of disrespect by custody officers but also reported that custody officers did not interfere with inmates' access to mental health staff when needed.

371

Referrals:

Compliance rates for timely response to mental health referrals were 97 percent for the 32 emergent referrals, 96 percent for the 91 urgent referrals, and 97 percent for the 2,143 routine referrals.

Mental Health/Custody Relations:

Mental health staff reported that their relations with custody staff were generally good and mutually respectful, and that custody leadership emphasized the importance of cooperation with mental health staff.  They also reported that custody officers assigned to administrative segregation were cooperative and capable in the performance of their duties.

Heat Plan:

There were no Stage I, II, or III heat alerts during the review period.  CTF maintained a list of inmates who were prescribed heat-sensitive medications.

RVRs:

The institution did not provide documentation of staff attendance at the training on the new RVR procedures.

Use of Force:

CTF reported compliance rates of 99 percent for training of custody staff and 93 percent for training of mental health staff on the new use-of-force procedures.

Access to Care:

Of the total of 9,918 mental health ducats and add-on appointments, 87 percent were completed.  All 1,319 ducat non-completions were due to non-custodial reasons.

Program Access:

a.        Job and Program Assignments:

372

No EOP inmates had work training assignments.

Institutional data indicated that 572 or 20 percent of available full-time jobs were filled by 3CMS inmates, and 2,234 or 80 percent were filled by non-mental health caseload inmates.

There were no part-time job assignments at CTF.

For part-time academic program assignments, 239 or 21 percent were held by 3CMS inmates, and 898 or 79 percent were held by non-mental health caseload inmates.

For voluntary academic program assignments, 74 or 21 percent were held by 3CMS inmates, and 275 or 79 percent were held by non-mental health caseload inmates.

For full-time vocational education assignments, 92 or 22 percent were held by 3CMS inmates, and 322 or 78 percent were held by non-mental health caseload inmates.

For part-time vocational education assignments, 16 or 25 percent were held by 3CMS inmates, and 48 or 75 percent were held by non-mental health caseload inmates.

There were no voluntary vocational education assignments at CTF.

For re-entry substance abuse treatment program assignments, 127 or 32 percent were held by 3CMS inmates, and 267 or 68 percent were held by non-mental health caseload inmates.

There were 174 3CMS inmates and 359 non-mental health caseload inmates who were eligible for work training assignments, but were unassigned.

    b.    <u>Milestone Credits</u>:

One of two EOP inmates was eligible for milestone credits but did not earn them, as CTF did not have an EOP program.  As of February 28, 2015, of 1,307 3CMS inmates, 336 were eligible for milestone credits.  Sixteen percent of those eligible actually earned milestone credits.  Additionally, 727 of 3,319 non-mental health caseload inmates were eligible for milestone credits.  Nineteen percent of those eligible actually earned milestone credits.

c.      Out-of-Level Housing:

As of March 16, 2015, no EOP inmates were in out-of-level housing at CTF.

There were 47 3CMS and 83 non-mental health caseload Level I inmates in Level II housing.

Seven 3CMS and 39 non-mental health caseload Level II inmates were in Level I housing.

Eighteen 3CMS and 27 non-mental health caseload Level III inmates were in Level II housing.

d.      ADA Reasonable Accommodation and Grievance Procedures:

CTF reported that the ADA Reasonable Accommodation and Grievance Procedure were

inapplicable to the institution, and did not provide any pertinent data.

e.      Periodic Classification Score Reductions: EOP Inmates:

CTF did not have an EOP.

*Coleman* Postings:

All three floors of the administrative segregation unit at CTF contained *Coleman*

postings.

**California Men's Colony (CMC)**
May 26, 2015 – May 28, 2015

Census:

On May 26, 2015, CMC's total inmate population was 3,878, including 1,333 inmates on

the mental health caseload.

There were 48 inmates in the MHCB.  The EOP mainline population was 521 and the

3CMS mainline population was 679.

There were 75 EOP inmates in the administrative segregation hub.   Ten 3CMS inmates

were in administrative segregation.

Staffing:

The chief psychiatrist and chief psychologist positions were filled.  Another chief psychologist position was kept open per headquarters' directive for cost savings.

The senior psychiatrist position was filled. Of the 20.3 psychiatry positions, 18.3 were filled, for a ten-percent vacancy rate.  With use of a .8 FTE contract psychiatrist, the functional vacancy rate in psychiatry was reduced to six percent.

Eleven of the 11.3 senior psychologist positions were filled.  Forty-three of the 46 psychologist positions were filled, for a six-percent vacancy rate.  CMC reported utilizing a .79 registry psychologist, which decreased the functional vacancy rate to five percent.

The supervising psychiatric social worker position was filled.  Nineteen of the 20 social worker positions were filled, for a five-percent vacancy rate.  The institution utilized a .36 registry social worker, thereby decreasing the functional vacancy rate to 3.2 percent.

The unit supervisor position and the three senior psych tech positions were filled.  Of the 40 psych tech positions, 39 were filled, leaving a vacancy rate of less than three percent.

Sixteen of the 23.6 recreation therapist positions were filled, for a 32-percent vacancy rate.  Use of one registry recreation therapist decreased the functional vacancy rate to 28 percent.

Of the 22.5 MHSDS clerical positions, 19.5 were filled for a 13-percent functional vacancy rate.

Quality Management:

The quality improvement process at CMC was useful.  It showed improvement since the preceding monitoring period, with increased staff participation.

The local governing body met twice during the review period.  Minutes were provided for review.  Agenda items included medical staff reports, peer review, policies and procedures,

375

financial and budgetary data, progress reports on current litigation, the CEO's report, pharmacy reports, and HCFIP.

The quality management committee met monthly, with a quorum at all meetings. Minutes were provided for review.  Agenda items included reports from the medical, mental health, and dental subcommittees, policies and procedures, dashboard review, reports/audits/inspections by outside entities, medication management, alternative housing, and ACA audits.

The mental health subcommittee met twice per month, with good attendance.  Minutes were provided for review.  Agenda items included QIT reports, SPRFIT reports, QMC reports, the Performance Improvement Work Plan (PIWP), and mental health policies.  The mental health subcommittee also reviewed results of audits, which appeared to be methodologically sound and related to *Coleman* issues.  The mental health subcommittee also implemented and monitored CAPs.

Three QITs were chartered during the review period.  One worked on moving alternative housing out of the administrative segregation unit and improving the alternative housing process overall.  Another worked on management of high-risk patients and barriers to treatment in the administrative segregation EOP hub.  The third QIT addressed the reduction in EOP treatment hours that was related to psych tech staffing allocations.  Minutes of these QITs were provided for review and were useful.

An active FIT on suicide prevention addressed audits of five-day clinical follow-ups and reviewed cases of inmates who had attempted suicide.

Other than for the MHCB clinicians, peer review was on hold from October 2014 through February 2015 due to the conversion of CMC's GACH to a CTC and the subsequent

376

reorganization of the medical staff.  The LOP establishing the revised peer review process was approved on March 2, 2015.  CMC was in the process of developing its peer review committees for psychiatry, psychology, and social work.

The MHCB psychology and social work peer review committee conducted four meetings during January and February of 2015, when it reviewed three psychologists.  The MHCB psychiatry peer review committee met on March 3, 2015 and reviewed four psychiatrists.  Staff reported that they found the process useful.

Medication Management:

MAPIP was implemented at CMC and was working well to help identify and resolve medication management issues.

Audit results indicated that medication continuity following inmate returns from DSH inpatient programs and community hospitals was noncompliant.

Following intra-institutional moves, compliance rates for continuity of medications were above 90 percent, except following moves out of administrative segregation and discharges from the MHCB, which was attributed to inmate refusals.

The institution's level of compliance with policies and procedures on response to inmate medication noncompliance was above 90 percent for four of the six months of the review period.

Inmates' waits in pill lines were under 30 minutes.

Orders were written for no longer than 90 days, and bridge orders were written for no longer than 14 days.

Audits indicated that signed medication informed consent forms were being obtained.

MAPIP audits indicated compliance with laboratory testing of blood levels of inmates prescribed psychotropic medications.

377

DOT medication administration was carried out appropriately.

At the time of the site visit, 52 inmates were on orders for involuntary medications.  For approximately 30 of those inmates, orders were either initiated or renewed during the review period.  No petitions for involuntary medications were denied.  Refusals of involuntary medications averaged approximately one per month.  They resulted in clinical management or admissions to the CTC or East Clinic for medication administration.

The 278 inmates on HS psychotropic medications were receiving them no earlier than 8:00 p.m.

Provision of 30-day supplies of medications to paroling inmates was over 90-percent compliant.

<u>Transfers</u>:

CMC continued to have a full-time DSH coordinator.  The DSH referral and non-referral logs were complete and contained all necessary data.  Rationales for the non-referrals entered into the non-referral log were clinically appropriate.

Of the 785 inmates identified as meeting one or more indicators for consideration for DSH referral, 174 or 22 percent were referred to DSH inpatient acute or intermediate care programs.

CMC referred 127 inmates to acute inpatient care.  Of these, 115 transferred, eleven were rescinded, and one was awaiting an RVR hearing.  Of the 115 who transferred, 95 were sent to VPP and 20 were sent to the CHCF.  Completion of 23 or 18 percent of the acute care referral packets did not comply with Program Guide timelines.  The average time from referral to transfer was 10.9 days, with 46 or 40 percent noncompliant with the ten-day transfer timeline.  Late transfers ranged from 11 days to 45 days and were largely attributed to delays between DSH

patient acceptances and bed assignments.  Once bed assignments were made, transfers of five inmates or four percent were not completed within 72 hours of bed assignment.

There were 68 inmates referred to intermediate inpatient care during the review period. Five were rescinded and one was rejected.  Twenty-six or 38 percent of referral packets were not completed within Program Guide timelines.  It was reported that once the packets were sent to headquarters, there were delays in posting them to SharePoint.  Of the 62 inmates who transferred, 45 or 73 percent transferred within 30 days, with an average transfer time of 24.77 days.  Seventeen or 27 percent of inmates were transferred beyond the 30-day timeframe, with transfer times ranging from 31 to 59 days.  The late transfers were attributed primarily to delays between acceptances and bed assignments.  Three or five percent of intermediate care transfers were not completed within 72 hours of bed assignment.

At the time of the site visit, three patients accepted to acute inpatient care and three patients accepted to intermediate inpatient care were awaiting transfer.  Transfer times for two of these acute care referrals were already over 30 days.  The remaining four referrals were still within transfer timeframes.

The DSH coordinator reported that CMC received timely notifications of DSH patient discharges back to the institution.  Discharging DSH programs other than ASH timely posted patients' discharge summaries on SharePoint.  Discharge plans from ASH were usually produced late and did not comport with inmates' behaviors.

Data indicated that during the review period, 24 inmates transferred from CMC to outside MHCBs.  The average transfer time was 25.6 hours, with a range of 3.2 to 48.53 hours.  Twelve or 50 percent of these transfers took longer than 24 hours.  These late transfers were attributed to lack of bed availability.

379

Documentation indicated that 380 inmates were placed into alternative housing from November 2014 through April 2015.  It also indicated a compliance rate of 88 percent for transfers out of alternative housing within 24 hours.   Overly-long stays lasted beyond the 24-hour timeframe by a range of .04 to 2.5 days.

All 14 transfers to a PSU during the review period were timely.

Other Areas:

Administrative Segregation EOP:

The administrative segregation EOP hub was located on B yard.  Program capacity was 50, but it was running at approximately 67 percent over capacity with an average of 80 inmates during the review period.  The institution planned to increase capacity to 100 by June 15, 2015.

Mental health pre-screen chronos and 31-item questionnaires were conducted timely in more than 90 percent of cases.  Ninety-seven percent of intake assessments were completed within five days of placement in administrative segregation.

Timeliness of initial and follow-up psychiatry contacts was 98-percent compliant.

Ninety-six percent of initial PC contacts and 98 percent of follow-up contacts were timely.  Each of five clinicians had caseloads of 19.  Three other clinicians handled RVRs, modified treatment programs, five-day clinical follow-ups, Level I 602 inmate appeals, crisis intervention, and treatment refusals.

Observed daily psych tech rounds were well-conducted, with appropriate documentation on caseload inmates.

Observed ICC meetings began on time and were chaired by the CMC warden.  Mental health clinicians played a major role at these meetings and explained the purpose of their

presence to the inmates.  The ICC team was knowledgeable, but significant use of custodial terminology during the meetings caused some unnecessary anxiety for the inmates.

 For EOP inmates, 96 percent of initial IDTT meetings and 95 percent of follow-up meetings were conducted timely.  Required disciplines attended 92 percent of meetings. According to staff, absences by psych techs were due to recent changes in staffing.   Ninety-six percent of initial IDTT meetings were conducted before initial ICC meetings.

Observed IDTT meetings were well-attended and utilized a team approach throughout the process. Treatment plans and goals were individualized and measurable.  The IDTT process was explained to the inmates, who were given the opportunity to ask questions and be included in the treatment planning process.  The team discussed and reached consensus on inmates' levels of care and treatment goals.

EOP hub inmates were offered an average of 15 hours of structured therapeutic activity per week, refused an average of 6.77 hours, and attended an average of 8.15 hours.  A process group session was observed during the site visit.  It was well-conducted and clinically relevant. Interviewed inmates reported that the mental health program was beneficial and had a positive effect on their behaviors.

The EOP hub was certified for the second consecutive month during September 2015. Thereafter, monthly self-certification reviews were conducted.   The dashboard was also reviewed regularly by supervisory staff and intermittently by line staff.  They identified problems with treatment hours which were corrected by December 2015.

At the time of the site visit, 75 EOP inmates, ten 3CMS inmates, and 77 non-mental health caseload inmates were in the hub.  Fifty-four inmates' stays exceeded 90 days, with a range of 90 to 426 days. Staff reported that pending RVRs and safety concerns were the primary

reasons for the extended stays. ICC meetings were conducted every two weeks or more frequently if needed.

MHCB:

CMC reported 640 admissions to its own MHCB during the review period.  The average stay lasted 12.5 days, with a range of 1.3 days to an outlier of 83.2 days.  The outlier was caused by a variety of reasons including pending parole, possible MDO placement, and medical complications.   Fifteen percent of admitted inmates had had at least two MHCB admissions during the preceding six months.

The MHCB had two wings with 25 beds each.  Each wing had two observation rooms, one seclusion room, two ADA-compliant cells, and two group rooms equipped with three therapeutic modules.  Beds were suicide-resistant.

Audits confirmed that newly-admitted MHCB patients received histories and physicals within 24 hours in 93 percent of cases.  If admitted for suicidality, they received timely SREs 98 percent of the time.

Audits indicated that timeliness of mental health evaluations, psychiatry contacts, PC contacts, IDTT meetings, and development of treatment plans was compliant.  Property, mechanical restraints, and movement restrictions were reviewed timely and relaxed when clinically appropriate, except for inmates who were on SNY status.

Follow-up IDTT meetings were conducted at least weekly.  All required disciplines attended IDTT meetings over 90 percent of the time.  Meetings were held in a multi-purpose room with adequate space and computer access.  The five observed IDTT meetings and the resulting treatment plans were clinically meaningful.

382

There were eight outdoor walk-alone yards and two larger yards designed for group recreation.  Inmates reportedly had access to either group treatment or outdoor recreation three times per week.  Recreation therapy was provided with groups of three inmates in treatment modules.

Legible and clinically meaningful discharge summaries were completed timely.

Seclusion and Restraint:

There was one use of restraints, which lasted for 16 hours during October 2014.  There were four episodes of seclusion, lasting from 15 hours to 120 hours.

Alternative Housing:

Alternative housing was located in the former locked observation unit.  Treatment consisted of daily rounds by either a psychiatrist or psychologist.

EOP:

The EOP was housed on D-Yard in Buildings 7 and 8.  Program capacity was 580.

All initial psychiatry contacts and 95 percent of follow-up contacts were timely.

Initial PC contacts were timely in 96 percent of cases, and follow-up contacts were timely in 98 percent of cases.

Ninety-six percent of initial IDTT meetings preceded ICC meetings.  Staff reported that the compliance rate for timeliness of initial IDTT meetings was 75 percent, due to holidays and increasing influx of new arrivals.  Follow-up meetings were conducted timely 96 percent of the time.  The rate of attendance by required disciplines was 84 percent, due largely to absences by psychiatrists and correctional counselors.

At observed IDTT meetings, clinical and custodial staff engaged inmates in all aspects of the IDTT process.  Inmates' strengths, levels of care, and treatment goals were discussed.  All

team members were given the opportunity to converse with the inmates.  However, there were some issues with the team's use of Form 7388B.

On average per week, 13.72 treatment hours were offered, 8.15 were attended, and 5.56 were refused.  Observed groups were clinically relevant and well attended.  Participating inmates expressed appreciation for the mental health program.  Group activities included various types of leisure and process groups for inmates arriving, paroling, and/or serving extended sentences. EOP activities also included multiple vocational programs.

3CMS:

Reviewed audits indicated that psychiatry contacts, PC contacts, IDTT meetings, and mental health treatment plans were completed timely. Both staff and inmates indicated that a significant proportion of 3CMS inmates were seen more frequently than every 90 days for clinical reasons.  Psychiatry and PC contacts took place in private settings.

Audits also found that timeliness of mental health evaluations for level-of-care changes from EOP to 3CMS was noncompliant.

Psychiatrists reportedly completed intake evaluations before initial IDTT meetings. Required disciplines attended initial and follow-up IDTT meetings in 96 percent of cases. Computers were accessible and used during the meetings.  During five observed IDTT meetings, all required members were present and contributed to the discussion.  It appeared that inmates found the process helpful.

Approximately one-third of mainline 3CMS inmates participated in groups.  There were 27 weekly process and leisure groups offered to 3CMS inmates, Monday through Friday from 8:00 a.m. to 3:00 p.m.   Waitlists ranged from one to 86 and wait times lasted as long as several months.  EOP inmates were accorded priority for all group openings.

384

During the site visit, twenty 3CMS inmates were interviewed in groups of ten. Approximately 25 percent had either attended or were currently in group treatment and another 25 percent were on waitlists. They uniformly described access to their psychiatrists and PCs and their continuity of care as good, and their treatment as helpful.  Their most significant request was better access to group treatment and more programming.  Review of records of seven of these inmates indicated consistency with the information they reported, and that their treatment plans were adequate.

3CMS Inmates in Administrative Segregation:

The administrative segregation 3CMS program was housed in B yard.

All initial psychiatry contacts and 99 percent of follow-up contacts were timely.

Ninety-eight percent of initial PC contacts and 97 percent of follow-up contacts were timely.

Initial IDTT meetings were timely in all cases.  Follow-up IDTT meetings were timely in 96 percent of cases.  The compliance rate for attendance by required staff was 96 percent.  Staff reported that psych techs' attendance was inconsistent because of changes in psych tech staffing.

Inmates were offered a movie night but not groups.

As of May 27, 2015, 14 inmates had stays over 150 days in administrative segregation. Five of them were on NDS and were granted approved privileges.  One was endorsed to a PSU, one was endorsed to the SHU, two were endorsed to an SNY, two were referred to the CSR for endorsement to transfer, one was pending RVR adjudication, one was pending a DA review, and one was pending imminent parole.

STRH had not been implemented as of the time of the site visit.

Referrals:

385

During the review period, timeliness of response to the 391 emergent referrals was 100-percent compliant. Response to the 178 urgent referrals was 94-percent compliant, and response to the 911 routine referrals was 95-percent compliant.

Heat Plan:

The institution's monthly report for October 2014 that was submitted to headquarters indicated that during the review period there were six Stage I heat alerts and three Stage II heat alerts. Cooling measures were used during the Stage II alerts.

All inspected units had thermometers located on their highest floors. All logs were up to date.

The heat plan produced to the monitor during the site visit was one year out of date.

Use of Force:

As of November 19, 2014, 95 percent of custody staff had been trained on the new use-of-force policies and procedures. Mental health staff were trained in November 2014. Proof-of-practice documentation indicated a compliance rate of 90 percent.

Access to Care:

Mental health staff followed up on appointment "no shows" and refusals by sending staff to find the inmate. Working relationships between mental health staff and access-to-care staff were good.

Construction:

Headquarters information indicated that bids had been received for the construction of an 11,000 square foot building that would accommodate 50 inmates who would receive 14 hours of treatment per week. The building would include four group rooms, an IDTT room, four clinicians' offices, other staff offices, and support areas.

386

Program Access:

a.       Job and Program Assignments:

There were 1,768 full-time job assignments, of which 230 or 13 percent were filled by EOP inmates, 327 or 18 percent were filled by 3CMS inmates, and 1,211 or 69 percent were filled by non-MHSDS inmates.  Of the total 1,768 full-time job assignments, 1,463 were paying positions.  Of these, 153 or ten percent were held by EOP inmates, 274 or 19 percent were held by 3CMS inmates, and 1,036 or 71 percent were held by non-MHSDS inmates.

There were 138 part-time job assignments, of which 36 or 26 percent were held by EOP inmates, 25 or 18 percent were held by 3CMS inmates, and 77 or 56 percent were held by non-MHSDS inmates.

Of the 77 part-time paid job assignments, one or one percent was held by an EOP inmate, 17 or 22 percent were held by 3CMS inmates, and 59 or 77 percent were held by non-MHSDS inmates.

There were no full-time academic work training assignments at CMC.  Of the 582 part-time academic positions, 55 or ten percent were filled by EOP inmates, 83 or 14 percent were filled by 3CMS inmates, and 444 or 76 percent were filled by non-MHSDS inmates.

Of the 212 full-time vocational education positions, 13 or six percent were filled by EOP inmates, 49 or 23 percent were filled by 3CMS inmates, and 150 or 71 percent were filled by non-MHSDS inmates.   All 53 part-time vocational education positions were filled by non-MHSDS inmates.

One 3CMS inmate and seven non-MHSDS inmates participated in full-time substance abuse programs.   Among the 113 participants in part-time substance abuse programs, five or

four percent were EOP inmates, 25 or 22 percent were 3CMS inmates, and 83 or 74 percent were non-MHSDS inmates.

The institution reported that 2,005 inmates participated in voluntary education programs. Of these, 119, or six percent were EOP inmates, 309 or 15 percent were 3CMS inmates, and 1,577 or 79 percent were non-MHSDS inmates.

      b.      <u>Milestone Credits</u>:

CMC reported that a total of 1,115 inmates were eligible for milestone credits.  Of those eligible, 150 or 13 percent were EOP inmates, 157 or 14 percent were 3CMS inmates, and 808 or 72 percent were non-MHSDS inmates.

Data indicated that from October 1, 2014 through April 21, 2015, milestone credits were actually earned by 26 percent of eligible EOP inmates, 24.84 percent of eligible 3CMS inmates, and 41.96 percent of eligible non-MHSDS inmates.

      c.      <u>Out of Level Housing</u>:

There were 51 Level III EOP inmates and nine Level III 3CMS inmates in Level I housing.  There were 312 Level III EOP inmates and 235 Level III 3CMS inmates in Level II housing.  There were 17 Level III EOP inmates and 18 Level III 3CMS inmates in Level IV housing.

      d.      <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

Institutional data indicated that training on the ADA Reasonable Accommodation and Grievance Procedures was completed on May 12, 2015.  The new procedures were implemented on May 18, 2015.  The Reasonable Accommodation Panel (RAP) met weekly if appeals were filed.

e.    <u>Periodic Classification Score Reductions: EOP Inmates</u>:

A review of eight reclassification sheets found that EOP inmates' classification scores were being reduced upon program completion.

<u>*Coleman* Postings</u>:

Among all units monitored, one floor within one unit did not have a *Coleman* posting. Many of the postings were outdated.

**<u>Wasco State Prison (WSP)</u>**
March 3, 2015 – March 5, 2015

<u>Census</u>:

On March 1, 2015, WSP housed 4,978 inmates, which was a decline by approximately two percent since the preceding monitoring period.  There were 4,053 inmates in the reception center, including 101 EOP inmates and 879 3CMS inmates.  There were 109 inmates in administrative segregation.

The mental health caseload population of 1,260 inmates had increased by 100 or nine percent since the preceding monitoring period and comprised 25 percent of the institution's population.

Five inmates were in the MHCB.  The sole EOP inmate was in administrative segregation and awaiting transfer to an EOP hub.  The mainline 3CMS population was 246.  Twenty-three 3CMS inmates were in administrative segregation.

<u>Staffing</u>:

The chief psychiatrist had been on leave since December 2014.  The chief psychologist and both senior psychologist supervisor positions were filled.  One psychologist supervisor

position was vacant for the final two months of the reporting period.  One of the two senior

psychologist specialist positions was filled.

Only three of ten psychiatry positions were filled, but all were covered by registry staff.

The part-time psychiatrist in the mainline 3CMS program had a caseload of 236.

Twenty-seven of 31 psychologist positions were filled, for a 13-percent vacancy rate.

Eleven psychologists were unlicensed and one was on long-term leave.  The supervising social

worker position was filled, as were 12 of 14 social worker positions, for a 14-percent vacancy

rate.  Use of 0.5 contractors reduced the functional vacancy rate in social work to 11 percent.

Nine social workers were unlicensed.  The two assigned PCs in the mainline 3CMS program had

caseloads of 93 to 111.

Positions for the senior psych tech and 13 of the 15 line psych techs were filled, for a 13-

percent vacancy rate.

One of the 2.5 recreational therapist positions was filled, for a 60-percent vacancy rate.

Use of 0.25 contractors reduced the functional vacancy rate to 50 percent.

Ten of 10.5 mental health clerical positions were filled.  One office tech was on leave

during the review period.  One HPS I position was filled and the other was covered by a staffer

working in an acting capacity.  The OSS II position was filled.

Quality Management:

Minutes of five of the six quality management committee meetings during the review

period indicated that a quorum was present for all meetings and that the committee had approved

several operational procedures related to suicide prevention and medication management.

Mental health subcommittee reports were submitted to the quality management committee for

two months of the review period.

390

The mental health subcommittee met six times during the review period.  Minutes indicated that fewer than all required members were present during the meetings and that designees did not attend in their stead.  Minutes indicated that the subcommittee took up issues in suicide prevention, continuity of care, access and transfers to higher levels of care, and treatment in administrative segregation.  The subcommittee did not charter any QITs during the review period.  It was unclear whether the subcommittee was functioning as intended or able to address the operational issues at WSP.

WSP was paired with DVI for peer review.  Psychiatrists at the two institutions reviewed each other's work, and a DVI supervising psychologist reviewed progress notes for each of the WSP clinicians.

<u>Medication Management</u>:

 Medication continuity for newly-arriving inmates was 97-percent compliant within the reception center, and was 100-percent compliant following transfers from the reception center.  Continuity following other moves was variable and noncompliant.

Continuity of NA and DOT medications after intra-institutional transfers other than administrative segregation ranged from 27 percent in October 2014 to 100 percent in January 2015.

Inmates' compliance with their medications was reported as 64.7-percent compliant.  Medication administration was reported as 79.3 percent compliant.  Staff attributed these rates to the degree of availability of accurate documentation, and timeliness of document preparation, appropriate routing, and scanning of eUHR documents.

QITs on medication noncompliance counseling, intra-institutional moves, transfers of inmates with KOP medications, and medical records scanning were chartered.  The institution also implemented staff and inmate education to reduce no-shows and refusals.

Transfers:

A senior psychologist specialist position was assigned responsibilities as the DSH coordinator and SPRFIT coordinator, among other things.  The DSH referral log was generally complete and significantly improved since the preceding monitoring period, but information on DSH returns was incomplete or missing.

There were 20 referrals to acute inpatient care, two of which were completed untimely.  One was rescinded due to the inmate's medical diagnosis.  Of the 19 acute care transfers to DSH, seven did not transfer within ten days of referral.  The average time from referral to admission was 14.9 days.  All but one of the transfers was within 72 hours of a bed assignment.

There were 11 referrals to intermediate inpatient care, three or 27 percent of which were not completed timely.  One was rescinded without any rationale provided and one was referred to acute care.  Four transferred to DSH during the review period, two were awaiting beds, one was still pending DSH acceptance, and two inmates transferred to other institutions before notice of DSH acceptance.  Three of the transfers did not occur within 30 days of referral.  The average time from referral to admission was 34.3 days.

Review of the DSH referral log indicated that nine cases remained with CDCR health care services at headquarters for more than one day after submission to utilization management, for an average of 10.4 days and a range of four to 20 days.  Reasons were unknown.  DSH notified the institution of acceptances within Program Guide timeframes.

The Special Master's expert conducted a review of a random sample of cases in the DSH non-referral log. This review identified various areas of concern with regard to referrals. Overall, the institution appeared to continue to underutilize DSH referrals, although there was more use than during the preceding monitoring period. A significant number of Form 7388Bs were not completed correctly. Observed IDTT meetings indicated a range of teams' levels of performance with use of the form. Some of the teams failed to note objective criteria when present. Except in the MHCB IDTT, subjective criteria were underutilized. When inmates did satisfy criteria for consideration for DSH referral, some IDTTs failed to provide adequate rationales for non-referral and/or adequate treatment modifications to address the reasons why the patient was originally identified.

Of 227 inmates transferred to an outside MHCB during the review period, 146 or 64 percent had a bed assignment within 24 hours of MHCB referral. Seventy-one or 31 percent were transported within 24 hours of referral. Mental health staff reported that MHCB unavailability was the major reason for the delays.

No EOP inmates were endorsed for transfer to the PSU during the review period. From July 1, 2014 to January 25, 2015, 58 of 60 or 97 percent of EOP transfers to hubs were timely. The two late transfers occurred after 46 and 47 days, respectively. One was delayed due to MHCB unavailability and the other was due to the inmate's multiple MHCB admissions.

WSP was unable to accurately report alternative housing stays. This was attributed to inaccuracies in data provided by headquarters that contained MHTS system errors, documentation errors, and data entry errors.

The institution reported that during the review period, the average length of stay for the 412 EOP inmates housed in the reception center was 56 days. From July 1, 2014 to January 25,

2015, 336 EOP inmates were moved out of reception center.  Two of the eight clinically-indicated transfers were timely.  Only 35 percent of the remaining 328 transfers were timely.  They ran overdue by an average of 32 days, typically due to bed unavailability.  At the time of the site visit, 17 reception center EOP inmates were pending transfer for more than 60 days.  These had been pending for an average of 87 days, with a range of 73 to 102 days.

WSP reported that the average stay in reception center for 3CMS inmates during the review period was 65 days.  At the time of the site visit, 132 3CMS inmates were pending transfer for over 90 days, with the longest stay at 134 days.  Staff attributed the delays to problems with staff training on implementation of SOMS.

Produced data on stays in administrative segregation covered the period of August 1, 2014 to January 31, 2015.  Within these limitations, the institution reported that there were 179 inmates in administrative segregation during the review period, including 16 EOP and 39 3CMS inmates.  EOP stays averaged 34 days, and the five longer than 30 days lasted from 48 to 87 days.  The 3CMS stays averaged 71 days, with the longest at 159 days.  By comparison, stays in administrative segregation for non-caseload inmates averaged 77 days.  All five 3CMS inmates with stays over 150 days were seen by the ICC, resulting in one being transferred.

Other Issues:

Reception Center:

In the RC EOP, two contract psychiatrists shared a caseload of 107. Initial psychiatry contacts were 90-percent compliant and follow-up psychiatry contacts were 71-percent compliant.

Five PCs had caseloads ranging from 14 to 17, and an additional clinician had a caseload of 14 and also provided pre-release planning services. Initial PC contacts were 86-percent

compliant, and follow-up PC contacts were 99-percent compliant. Staff reported that 84 percent of clinical contacts were conducted in private settings.

Initial and follow-up IDTT meetings for EOP inmates were 91-percent and 100-percent compliant, respectively. The attendance rate of required staff at IDTT was 97 percent.

EOP inmates in the reception center attended an average of 4.4 hours of weekly group treatment, which represented 73 percent of offered hours.

Initial and follow-up IDTT meetings for reception center EOP SNY inmates were observed. All required disciplines were present and had computer access to relevant inmate information. Attendees interacted with each other but less so with the inmates. Discussion of the Form 7388B involved only the objective indicators.

For 3CMS inmates in the reception center, psychiatric care was provided by a total of four psychiatrists, including one contract psychiatrist, one part-time psychiatrist, and a psychiatrist who was also assigned to another program. Data indicated that initial and follow-up psychiatry contacts for 3CMS inmate were 100-percent compliant and that initial and follow-up PC contacts were 95-percent compliant.

MHSDS Inmates in Administrative Segregation:

A psychiatrist who also had an assignment to another program had a caseload of eight EOP inmates and 29 3CMS inmates. The two full-time assigned PCs had caseloads of three to five EOP inmates and 12 to 13 3CMS inmates, and a PC who also had other assignments provided care to five 3CMS inmates. Staff reported that EOP inmates in administrative segregation were offered six hours per week of structured therapeutic activities and received an average of 4.4 hours.

For 3CMS inmates, institutional data indicated 100-percent compliance for initial psychiatry contacts and 99-percent compliance for follow-up contacts. For PC contacts, the compliance rate for both initial and follow-up contacts was 99 percent.

Initial IDTT meetings for 3CMS inmates were 81-percent compliant, and follow-up meetings were 99-percent compliant. Data indicated that required staff attended 84 percent of meetings, but that psych techs frequently did not attend. Attendance was satisfactory at observed meetings. The psychiatrist and correctional counselor had computer access to patient information. When solicited, the psychiatrist's contribution to the meeting was good. Use of Form 7388B was inadequate, as only one team member reported the results of consideration for a higher level of care, with no further discussion.

Staff further reported that 3CMS inmates were offered three hours of structured out-of-cell activities per week, but they did not track the number of hours received.

No information was provided on whether clinical contacts occurred in private areas.

MHCB:

WSP continued to operate six MHCBs in the CTC. Two additional rooms were used for restraint and seclusion, respectively. Two contract psychiatrists provided care in the MHCB. Seven PCs provided care in the MHCB as well as in alternative housing.

From July 28, 2014 to January 25, 2015, 99 inmates had a total of 133 admissions to the MHCB, including nine with three or more stays. Stays lasted 8.4 days on average. From August 1, 2014 to February 16, 2015, 39 inmates had stays that exceeded ten days. Several inmates who reportedly had significant mental health and medical issues had stays as long as 54 days.

Two treatment teams in the MHCB covered seven-day operations. One psychiatrist and one psychologist were scheduled during the week, and a licensed social worker also worked on

396

weekends.  Staffing documentation indicated that an additional psychologist was assigned to the MHCB.

MHTS.net data indicated that initial psychiatry contacts were 100-percent compliant, although this was not corroborated by review of randomly sampled records.  MHTS.net data further indicated that initial PC contacts were 86-percent complaint and follow-up contacts were 75-percent compliant.  Initial SREs were timely in 63 percent of cases.  Follow-up SREs were completed timely in 67 percent of cases.

IDTT meetings were 77-percent compliant for initial meetings, and 83-percent compliant for follow-up meetings.  At an observed IDTT meeting, the CC I was not the inmate's CC I and did not have the relevant case factor sheets.  Team members did not access patient information by computer until prompted to do so.

Seclusion and Restraint:

Seclusion and restraint were not used during the period of October 2014 through January 2015.  During the entire review period, there were 11 uses of restraint involving two inmates. Review of a sample of medical records indicated compliance with nursing documentation requirements.  Restraint use averaged five hours in duration.  However, the psychiatrist's orders did not always indicate the maximum duration of the restraint, the behavioral criteria for release from restraint, the inmate conduct that led to the use of restraints, nor the type of restraint used.

There were 13 uses of seclusion during the review period involving four different inmates.  Again, the psychiatrist's orders did not always indicate the maximum duration of the seclusion nor the inmate conduct that led to it.  Uses of seclusion averaged 5.5 hours in duration. Treatment plans targeted the underlying inmate behaviors while these inmates remained in the MHCB.

397

Alternative Housing:

WSP had two areas that were designated for alternative housing when the MHCB was fully occupied.  One was in housing unit B-2, side B, and was used for SNY inmates.  They were lower tier cells and began at the cell closest to the officers' office.  The other was in housing unit B-6, side A, and was also on the lower tier.  These were standard, non-retrofitted cells.

Placement in the overflow/alternative housing cells required a physician's order.  Mental health staff had a private office for interviews and clinical contacts on each unit. Inmates were required to be seen daily until admitted to the MHCB or returned to their housing units.  While in overflow cells, inmates were on one-to-one observation by a CNA.

Referrals:

There were 9,080 mental health referrals.  Headquarter-generated reports indicated 96-percent compliance for referral response times for the 325 emergent referrals, 40-percent compliance for response to the five urgent referrals, 43-percent compliance for response to the 5,720 routine referrals, and 62-percent compliance for response to the 3,030 referrals for medication refusal.

Staff reported that compliance levels were tracked during the review period, but the causes of noncompliance were not identified.  Staff attributed this to the amount of time devoted to training, inordinate attention to improving times for response to medication refusals, and logistical problems in the reception center that negatively affected response times.

MHTS.net:

Mental health staff reported that MHTS.net was used to track inmate arrivals, level-of-care changes, PC contacts, IDTT meetings, EOP group offerings and participation, DSH referrals and non-referrals, and response to urgent and routine referrals, among other things.  Interviewed

398

mental health staff were familiar with tracking of information related to suicidal behavior, including the red alerts for inmates at high risk.

Staff further reported having access to MHTS.net data through various work stations. However, some staff indicated problems with the accuracy of MHTS.net for some functions, including tracking of alternative housing stays.

Staff also reported familiarity with other information management systems, including SOMS, ERMS, the Portable Health Information Program, Maxor, and eUHRs.

Mental Health/Custody Relations:

Relations between mental health staff and custody varied by area/program, with mental health staff reporting both very good and troubled interactions with custody.

Heat Plan:

There were 64 Stage I heat alerts at WSP during August, September, and October 2014, but no Stage II or Stage III heat alerts.  There was only one housing unit that was not air conditioned, where the institution reported it did not house inmates who were prescribed heat-sensitive medications.  The institution reported that it maintained a list of, and provided heat-risk accommodations to, those inmates who were prescribed heat-sensitive medications.

Access to Care:

Access to care reports indicated that 26 to 30 percent of ducated inmates refused their mental health appointments, far in excess of refusal rates for medical, dental, and diagnostics/specialty services.  Only rarely were appointments canceled due to custody.

Mental health staff stated that when inmates did not appear for their appointments, clinicians went to their housing units to see them.  Some clinicians said they notified custody when they completed the appointment.

399

Program Access:

a.      Job and Program Assignments:

WSP reported mental health work training assignments as of February 12, 2015.  On that date, no EOP inmates had work training assignments.

There were 164 3CMS inmates with full-time employment positions, 18 3CMS inmates enrolled in full-time education programs, and 12 3CMS inmates enrolled in full-time substance abuse treatment programs.

There were 536 non-mental health caseload inmates with full-time employment positions, 40 non-mental health inmates enrolled in full-time vocational education programs, and 59 non-mental health inmates enrolled in full-time substance abuse programs.

Eleven 3CMS and 11 non-mental health inmates were eligible for work training assignments, but were unassigned.

b.      Milestone Credits:

From August 1, 2014 to January 31, 2015, 73 of 121 EOP and 669 of 1,211 3CMS inmates were eligible to earn milestone credits, as were 2,349 of 3,656 non-mental health inmates.

WSP reported that the milestone completion credit program for EOP inmates had not been implemented during the review period, and consequently no EOP inmates earned milestone credits.  On February 9, 2015, CDCR headquarters issued a memorandum to initiate the milestone completion credit program for EOP inmates housed in WSP's reception center.

Documentation demonstrated that 2.4 percent of 3CMS inmates and 4.9 percent of non-mental health inmates earned milestone credits.

c.      Out-of-Level Housing:

No EOP inmates were in out-of-level housing.  Among 3CMS inmates, one Level I inmate and 32 Level II inmates were housed in Level III housing.  One Level IV 3CMS inmate was housing in Level III housing.

*Coleman* Postings:

The administrative segregation unit contained *Coleman* postings.

**Kern Valley State Prison (KVSP)**
March 24, 2015 – March 26, 2015

Census:

As of March 23, 2015, KVSP housed a total of 3,732 inmates, which was 452 inmates or 11 percent fewer than during the preceding monitoring period.  The total MHSDS inmate population declined by 32 or two percent to 1,394 inmates since the preceding monitoring period.  There were 119 SNY EOP inmates and six EOP inmates in administrative segregation.  The 3CMS population consisted of 1,102 mainline 3CMS inmates and 150 3CMS inmates in administrative segregation.  Twelve inmates were in the MHCB.

Staffing:

Due to the chief psychiatrist being on long-term sick leave, a full-time staff psychiatrist served as the acting chief while also carrying an active caseload. Of the two authorized chief psychologist positions, one was filled and the other was vacant per direction from headquarters. Of the 4.4 senior psychologist positions, 3.4 were filled, for a 20-percent vacancy rate.

Only one of the nine authorized staff psychiatrist positions was filled, representing an 89-percent vacancy rate.  Contract staff covered five of these vacancies, reducing the functional

vacancy in psychiatry to 33 percent.  The institution reported that there were eight contact psychiatrists providing services within the institution, but their caseloads were not specified.

Fifteen of 19 staff psychologist positions were filled, leaving a vacancy rate of 21 percent.  Contract coverage of 2.5 vacancies reduced the functional vacancy rate in psychology to eight percent.

The sole authorized supervising social work position and all 13 staff social work positions were filled.  Seven of the social workers were unlicensed.

Three of the four authorized recreation therapist positions were filled, for a 25-percent vacancy rate.

The senior psych tech position was filled.  Nineteen of the 27.5 psych tech positions were filled, leaving a vacancy rate of 31 percent.  Contract coverage of two vacancies reduced the functional vacancy rate to 24 percent.

Fourteen of the 15 mental health clerical positions were filled, leaving a vacancy rate of seven percent.

The CHSA II position was kept vacant, per headquarters' directive.

Quality Management:

During the review period, the quality management committee met monthly, with a quorum present and minutes kept for all meetings.  Meetings were chaired by the CEO and attended by the chief of mental health.  Minutes reflected discussions including mental health subcommittee reports and headquarters' dashboard compliance issues.

Provided minutes for four of the six meetings of the mental health subcommittee during the review period indicated the presence of a quorum and attendance by the chief of mental

health.  These minutes reflected comprehensive discussion of the various mental health program areas and compliance levels, among other things affecting delivery of mental health services.

KVSP reported five active QITs/FITs during the monitoring period.  They covered MHCB re-admissions within 30 days and repeat admissions due to safety concerns, cancelled appointments, initial contacts, three-day custody and five-day clinical follow–ups, and non-formulary psychotropic medications.  The QIT on non-formulary psychotropic medications was organized because of the large number of non-formulary medications prescribed by psychiatrists, but it appeared that this committee did not meet consistently and did not address the concern by psychiatrists reported during the site visit about delivery delays about these medications.  During August 2014, it was determined that the QITs on cancelled appointments and initial contacts had fulfilled their purposes and were concluded.

Audits of concordance between eUHRs and MHTS.net were conducted monthly.

No documentation indicating peer review during the review period was provided.

Medication Management:

Monthly MAPIP audits indicated that medication continuity following inter-institutional transfers was only 60-percent compliant.  Medication continuity following DSH and community hospital discharges was 86-percent compliant, and following MHCB discharges, it was 87-percent compliant.  Medication continuity after moves into administrative segregation was only 35-percent compliant.

Documentation in MARs of referrals for medication noncompliance was 65-percent compliant.  Seven-day follow-up by the provider after medication noncompliance was documented in only 60 percent of cases.

Audits of continuity of nurse-administered and DOT medication administration indicated a compliance rate of only 35 percent. New medications ordered by outpatient providers were administered timely 75 percent of the time.

Transfers:

During the review period, 20 inmates were referred to acute inpatient care, with one referral rescinded. Seven of the remaining 19 inmates transferred within timelines, for a compliance rate of 37 percent.

Only one of the four inmates referred and accepted for intermediate inpatient care was transferred within timeframes.

Documentation indicated that three headquarters' sustainable process reviews took place during the review period. Recommendations generated from those reviews included having the institutional DSH coordinator attend IDTT meetings in the MHCB, EOP, and administrative segregation, and training IDTTs on composition of indicator-specific treatment rationales and integration of indicators into each inmate's treatment plan.

The monitor's expert examined 14 randomly selected cases from the DSH non-referral log to assess rationales for non-referrals. They found six to be clinically sufficient. In seven cases, at least one of the considerations for referral was selected, but no reasons for non-referral to DSH were provided other than conclusory statements that these inmates' current levels of care were indicated. In one case, the provided documentation offered no explanation for the non-referral.

Data in the DSH referral log indicated that four patients returned from DSH to KVSP during the review period. Three cases were reviewed for assessment of the discharges summaries' legibility, clinical usefulness, and incorporation into the initial IDTT reviews. In one

404

case, the DSH discharge summary was missing from the eUHR, but in the other two cases, the discharge summaries were typed and appeared to be clinically useful.  A review of the eUHRs for these cases indicated that the clinician referenced the discharge summaries and that findings were addressed and incorporated into these patients' treatment plans.

Of the total 146 EOP inmates transferred during the review period, 135 or 92 percent occurred within timeframes.  Eleven EOP inmates were not transferred out of the administrative segregation unit within 90 days.  These stays ranged from one to 37 days over the time limit and were attributed to unavailability of EOP hub beds, medical holds, out-to-court, and lack of action by the ICC.

Other Issues:

MHSDS Inmates in Administrative Segregation:

New intakes in administrative segregation were housed in Unit B-1, cells 116 through 120, for the first three weeks.  These cells had two bunks and were retrofitted and clearly identified.  They were also used as alternative housing cells.  Office and private treatment space were insufficient, and mental health staff did not have assigned offices.  Clinicians conducted individual contacts on the dayroom floors in the pods, with inmates in holding cells that did not provide auditory or visual privacy.  IDTT meetings were held in a room which did not offer sufficient privacy and was overcrowded.

Group treatment space was also inadequate, located in the previous dining area which was noisy and did not provide for privacy of patient-clinician communications.  Individual therapeutic modules located in the same area had the same limitations.  Other therapeutic modules located on the dayroom floor of the housing unit were used primarily for individual clinical sessions, but again, the area provided no visual or auditory privacy.

405

Eight PCs were assigned to the unit and had caseloads ranging from ten to 23 patients, which allowed clinicians to carry out necessary functions and responsibilities. At the time of the visit, mental health programming consisted of weekly PC contacts, psych tech rounds, medication management, and some groups. Audits indicated that psychiatry contacts were timely for EOP and 3CMS inmates. Clinical contacts for 3CMS inmates were timely for initial and weekly follow-up contacts. Inmate interviews indicated that EOP inmates were seen weekly out-of-cell by their PCs, and received psych tech rounds. They reported no medication discontinuity. Group offerings had been initiated during preceding months and appeared to greatly benefit caseload inmates. Inmates had electrical appliances.

IDTT meetings were timely, although no data was provided to indicate whether initial IDTT meetings took place before ICC meetings, as required. In 94 percent of cases, required participants attended IDTT meetings. The entire administrative segregation mental health clinical team attended observed IDTTs. The CC I participated in discussion and provided relevant custody and classification information, and the administrative segregation lieutenant provided significant information on inmates' behavior in the unit. Clinical staff used a projector to display the Form 7388s, which were updated during the meeting based on extensive discussion among the inmate and team members.

Observed psych tech rounds in administrative segregation and in the stand-alone administrative segregation unit were compliant and logged as required. Observed Guard One checks were also conducted as required. The Guard One pipe used on first watch was not audible, but there were inmate complaints and appeals about the noise caused by the checks, of which staff was aware.

Review of CDCR 114-As for all EOP inmates indicated that their initial offers of yard were generally delayed by one week pending initial ICC review. Most inmates were offered and attended a minimum of ten hours of yard per week, although all yard offerings were in five-hour increments.

During the review period, 16 inmates housed in the stand-alone unit were identified as MHSDS. Eleven or 69 percent of these inmates were transferred out within timeframes. Stays for the five who were not transferred within 24 hours were overdue by 40 minutes to two days, or by six hours on average.

There were no inmates on NDS status at the time of the site visit. Staff reported that the C&PR notified custody staff of any inmates designated as NDS. The list was provided to the lieutenant who was responsible for ensuring that these inmates received the additional property and privileges attendant to their NDS status pending transfer.

MHCB:

KVSP operated a 12-bed MHCB in its CTC. Institutional data indicated that during the review period, 160 patients were admitted to the MHCB, with an average stay of 7.9 days. View of the MHCB indicated that all beds were suicide-resistant.

The MHCB was staffed by a chief psychiatrist, staff psychiatrist, social worker, and four psychologists, with coverage seven days a week, including for patients in alternative housing areas awaiting MHCB placement. A recreation therapist was assigned to the MHCB during the preceding month.

Institutional data indicated that initial and follow-up psychiatry and PC contacts were 100-percent compliant. Initial SREs were completed timely in 99 percent of cases.

Patients received nursing assessments, physical examinations, SREs, individualized treatment planning, daily clinical monitoring, and twice-weekly psychiatric evaluations for medication issues.  The recreation therapist provided daily contacts, which may be cell-front and consist of a game or exercise activity.  For patients not restrained or under suicide observation, the recreation therapist offered a period of outside activity in three cells.

Institutional data indicated that 97 percent of initial IDTT meetings occurred within 72 hours of admission, as required.  Weekly follow-up IDTT meetings were 100-percent compliant.  At observed IDTT meetings, all required staff and the DSH coordinator were present.  The PC led the meetings and solicited input from other team members who appeared to leave decisions on referrals to higher levels of care to the PC.  The PC reported on the Form 7388B.  A number of patients were elevated to the EOP level of care from their pre-admission 3CMS status, and one non-MHSDS inmate was discharged to 3CMS.

No information on timeliness of discharge SREs was provided.

Seclusion and Restraint:

Staff reported that all uses of five-point restraint and seclusion were in the CTC.  Data indicated that three patients were placed in five-point restraints during the review period.  One placement, due to an attempted hanging, lasted four hours.  Another was due to the patient's self-harming behavior and lasted 3.75 hours.  The third placement was due to the patient's attempt to remove his own pacemaker and lasted 3.25 hours.

The institution indicated that eight inmates were placed in a seclusion cell during the review period.  Durations ranged from three hours and 20 minutes to 17 hours and 35 minutes.

<u>Alternative Housing</u>:

KVSP identified as alternative housing Units B-1 and B-2, C-7 cells 117 through 120, and Unit D-6, cells 114 through 117, but the vast majority of alternative housing placements was in B-1.  HCPOP was contacted timely for new placements into alternative housing.

TTA staff provided inmates in alternative housing with a mattress, blanket, and smock. Institutional staff reported that cells were searched and cleaned before inmates were placed in them.  If the stay lasted overnight, the inmate was escorted in the morning to the health care building for an interview/evaluation with the PC.

Of the 210 inmates placed in alternative housing during the review period, 58 or 28 percent were transferred out within timeframes.  The average overdue stay went six hours over, with the longest stay lasting 3.2 days.  Provided data did not specify whether the discharges were to MHCBs or back to yards.

Institutional data indicated a compliance rate of 96 percent for post-discharge follow-ups for alternative housing, MHCB, and DSH discharges.

<u>SNY EOP</u>:

KVSP had its Level IV SNY EOP in housing unit C8, with a capacity of 96.  On average, another eight inmates were housed in overflow in C7.  The average program census during the review period was 111.  Mental health services were provided in a private setting, but space was limited, resulting in office sharing and dislocations.

Inmates in both housing units received treatment in the mental health building on C-Yard. Inmates in the overflow unit were on modified programming.  Although it was reported that they were offered the same programming as in the main EOP housing unit, information gathered during the site visit indicated otherwise.

Provided data indicated compliance rates of 94 percent for initial psychiatry contacts and 85 percent for follow-up psychiatry contacts.  Ninety-two percent for PC contacts were timely.

Compliance rates for IDTT meetings were 99 percent for timeliness and 97 percent for attendance by required disciplines.

Audits of group treatment indicated that 94 percent of inmates on full programming were offered at least the minimum required ten hours per week, but only 57 percent attended at least ten hours.  Ten percent of inmates refused group treatment.  No groups were cancelled.  Two observed group sessions on C-Yard were interactive and didactic, with eight to ten participants and good involvement and encouragement of participation by the facilitator.  However, audits indicated that only 51 percent of EOP inmates on modified programming were offered at least ten hours of group treatment per week, only 11 percent attended as many hours, and 15 percent refused group treatment.  For this same group, audits of the provision of five hours of group treatment indicated that 60 percent were scheduled for five hours, 60 percent were offered five hours per week, 36 percent attended five hours, 46 percent refused treatment, and six percent of hours were cancelled.  This information indicated that the overflow EOP inmates were not offered comparable group therapy in comparison to the EOP inmates housed in the main EOP housing unit.

The six PCs in the EOP had caseloads of 17 to 18. An additional two psychologists and one social worker who also had other assignments had caseloads of one, two, and eight, respectively.

3CMS:

3CMS treatment was provided to mainline 3CMS inmates in Facility A and to 3CMS SNY inmates in Facilities C and D.  Patients met with the PC in an office on the housing unit,

410

which provided limited visual privacy, as the ceiling contained an overhead hatch operated by the officer stationed in the above control center. The eight PCs had caseloads ranging from 131 to 143. Interviewed 3CMS inmates indicated concerns about lack of privacy there.

Institutional data indicated that initial psychiatry contacts were 99-percent compliant and follow-up psychiatry contacts were 96-percent compliant. Initial PC contacts were 94-percent compliant, and follow-up PC contacts were 99-percent compliant.

Initial treatment plans were completed timely in 99 percent of cases, while follow-up treatment plans were completed timely 96 percent of the time. Attendance by required staff at IDTT meetings was 94-percent compliant.

At the time of the site visit, there was a pilot program developed and led by a psychologist for selected 3CMS inmates and non-caseload inmates on the SNY in the Transitional Housing Unit (THU). Interviewed inmates voiced concern with lack of any regularly scheduled group therapy, privacy, custody responsiveness without resort to extreme measures to gain their attention, and overall institutional ability to respond to these inmates' needs.

Mental Health/Custody Relations:

There were pervasive and consistent SNY EOP inmate reports of officer harassment, intimidation, and insensitivity. Interviewed EOP inmates expressed a belief that custody staff unduly influenced mental health staff to remove inmates from the EOP. They reported being told by custody and clinical staff that they were too high-functioning to remain in the EOP, although a review of EOP lengths of stay did not indicate significant downgrades to the 3CMS program.

Heat Plan:

All eight reviewed housing units were compliant with the heat plan.  Each housing unit took temperature readings in each pod.  COs were familiar with the inmate heat risk list, which was produced from May through October.

Use of Force:

At the time of the site visit, the current approved lesson plan for use-of-force training was being used.  Provided documentation indicated that all 35 mental health staff received the training.  Of the 134 custody supervisors and managers requiring training, 104 or 78 percent received it.  No data on training of COs was provided.

Collectively, only ten percent of RN supervisors, RNs, LVNs, and psych techs attended use-of-force training.  This included only eight of the 13 RN supervisors, one of the 32 RNs, none of the 38 LVNs, and one psych tech.

Program Access:

a.      Job and Program Assignments:

KVSP provided its MHSDS inmate work training assignments for February 27, 2015.  In total, there were 1,299 full-time job assignments at the institution.  Of these, 18 or one percent were held by EOP inmates, 270 or 21 percent were held by 3CMS inmates, and 1,011 or 78 percent were held by non-MHSDS inmates.  Non-MHSDS inmates held all 36 part-time job assignments.

There were 41 full-time academic assignments, including none held by EOP inmates, seven or 17 percent held by 3CMS inmates, and 34 or 83 percent held by non-MHSDS inmates.  Of the 196 full-time vocational education assignments at KVSP, none were held by EOP inmates, 58 or 30 percent were held by 3CMS inmates, and 138 or 70 percent were held by non-

412

MHSDS inmates.  Among the 741 part-time academic assignments, one was held by an EOP

inmate, 178 or 24 percent were held by 3CMS inmates, and 562 or 75.87 percent were held by

non-MHSDS inmates.

      b.        <u>Milestone Credits</u>:

According to provided data, from August 1, 2014 to January 31, 2015, 18 EOP inmates,

148 3CMS inmates, and 381 non-MHSDS inmates were eligible to earn milestone credits.  None

of these EOP inmates, 6.08 percent of these 3CMS inmates, and 7.61 percent of these non-

MHSDS inmates actually earned milestone credits during that period.

      c.        <u>Out-of-Level Housing</u>:

On February 19, 2015, three Level III EOP inmates, and five Level I, 11 Level II, and 74

Level III 3CMS inmates were housed in Level IV housing.

      d.        <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

KVSP did not provide information on its ADA Reasonable Accommodations and

Grievance Procedures.

      e.        <u>Periodic Classification Score Reductions:  EOP Inmates</u>:

KVSP did not provide information related to its Periodic Classification Score Reductions,

EOP Inmates.

      <u>*Coleman* Postings</u>:

All ten reviewed housing units were compliant with *Coleman* postings.

## North Kern State Prison (NKSP)
March 17, 2015 – March 19, 2015

Census:

Since the preceding monitoring visit, the total population at NKSP declined by 15 percent to 4,034.  The total mental health caseload population fell by nine percent to 1,062.

The MHCB held ten inmates at the time of the site visit.  There were 115 inmates in administrative segregation, including 24 3CMS inmates and one EOP inmate pending transfer.  There were 212 mainline 3CMS inmates, for an increase by 44 percent.

The total reception center population was 3,224.  Its 3CMS population fell by 23 percent to 703, while its EOP population increased by 87 percent to 105.

Staffing:

Positions for the senior psychiatrist, the two chief psychologists, and the four senior psychologists were all filled.

Nine of the ten staff psychiatrist positions were filled, and the remaining vacancy was covered by a contractor.

Of the 28 staff psychologist positions, 22 were filled.  Contractors covered 3.25 of the vacancies, for a functional vacancy rate of ten percent in psychiatry.

The supervising social worker position was filled.  Of the 12 social worker positions, ten were filled.  The 17-percent vacancy rate was reduced to a functional vacancy rate of 13 percent with use of a half-time contractor.

The two recreational therapist positions were vacant.  With coverage of only .25 of the recreational therapist vacancies, the functional vacancy rate was 88 percent.

The two HPS I positions and the OSS II position were filled.  Ten of the 12 clerical positions were filled, resulting in a 17 percent vacancy rate, but with one employee working in a "blanket" position, the functional vacancy rate was reduced to eight percent.

Quality Management:

NKSP maintained a QMC that met monthly during the review period, except in November due to the Thanksgiving holiday.  Two meetings were scheduled for the month of January 2015.  A quorum was documented as present at each meeting.  A modified format for QMC meeting minutes made it difficult to determine whether required members had to attend or could send designees.  The minutes were sparse and provided little information on committee actions beyond the occasional approval of policies, with no content from reports received by the QMC.  They covered primarily information from other committees' minutes, but it was unclear whether the QMC was actually approving or merely accepting the other committees' minutes.

The mental health subcommittee met monthly for a total of six meetings during the review period.  Attendance was good, with excellent representation by custody throughout.  Meeting minutes were well detailed, indicating that the meetings provided a meaningful forum for identifying operational obstacles and opportunities for improvement that were acted upon by the subcommittee members.

There were four active QITs, all of which had been initiated before the review period.  Minutes for three of the QITs were provided.  The QIT on alternative housing was chartered on February 13, 2014 and was tasked with bringing alternative housing stays into compliance with Program Guide timeframes.  The QIT on completion of Form 128-MH7, which is the administrative segregation pre-placement screen, was chartered on May 28, 2014 and was tasked with resolving problems with tracking relevant forms through the MHTS.net database.  The QIT

415

on MHCB/DSH returns was chartered on April 10, 2014 and was tasked with identifying processes to ensure that inmates returning from MHCB/DSH were initially housed only in the MHCB or alternative housing, as per NKSP operational procedure.  Based on provided documentation, the QITs on pre-placement screening for administrative segregation and returns from MHCB/DSH appeared to have completed their missions, with the remaining last step of submission of final paperwork.

Peer review was suspended during the review period pending implementation of a new standardized statewide process by CDCR.

Interviews of supervisory and line staff indicated a lack of feedback to line staff from the work of the quality management process at NKSP.  Few staff were aware of the mental health subcommittee, and almost none had participated in a QIT.  Among supervisory and administrative support/clerical mental health staff, the quality management process was utilized well, but only two line staff members who attended a meeting with the Special Master's team at NKSP had seen the results of a QIT or mental health subcommittee meeting minutes.

<u>Medication Management</u>:

Without explanation, provided data on medication management covered the period of July through December 2014, which only partially included the review period of August 2014 through January 2015.  Regular comparative analysis reports were not included.  A cover memorandum provided a broad overview of MAPIP, with some mention of areas of strengths and weaknesses.

Continuity of medications following new arrivals was 90-percent compliant or better throughout the period for which data was provided.

416

Continuity of medications following intra-institutional transfers, including MHCB discharges but excluding administrative segregation, was also 90-percent compliant or better. In September 2014, following transfers to administrative segregation, medication continuity was 80-percent compliant. For inmates returning from DSH inpatient care or from community hospitals, medication continuity was 85-percent compliant for the month of December 2014, but was otherwise at least 90-percent compliant.

The average rate of compliance for involuntary medications from August through December 2014 was 81 percent, with noncompliance during four of these five months.

<u>Transfers</u>:

The number of referrals to DSH inpatient programs had increased since the preceding monitoring period. Review of a sample of eUHRs found no systemic issues related to DSH referrals at NKSP.

There were 40 referrals to acute inpatient care. Thirty-four or 85 percent were submitted to headquarters' utilization management within Program Guide timeframes. Twenty-eight of the 34 were submitted to DSH in accordance with Program Guide timeframes, for an overall compliance rate of 70 percent for timeliness. Seventeen or 43 percent of acute care referrals were admitted timely within ten days of the date of referral. Eight or 20 percent of the acute care referrals were not transferred within the 72 hours of a bed assignment. The inmate did not prevail at the sole Vitek hearing for acute care referrals.

There were 28 referrals to intermediate inpatient care, two of which were rescinded. Twenty-one or 81 percent of intermediate care referrals were submitted timely to headquarters utilization management, but only three or 14 percent were submitted to DSH in accordance with

Program Guide timelines, for an overall compliance rate of 12 percent for timeliness. Three or 12 percent of the intermediate care referrals were admitted within 30 days of the referral date. Only four or 15 percent of the intermediate care referrals were not admitted within 72 hours of a bed assignment. The inmates did not prevail at any of the seven Vitek hearings for intermediate care referrals.

According to data provided by the institution, 19 inmates were transferred to a mainline EOP program during the reporting period. Seventeen or 89 percent were transferred timely. There were no mainline EOP inmates pending transfer at the time of the site visit.

Seventy-four inmates were referred to administrative segregation EOP hubs during the review period, with 70 or 96 percent transferred timely. One inmate was awaiting transfer to a hub at the time of the site visit.

Of the 301 EOP inmates transferred from the reception center during the review period, 129 inmates or 43 percent were transferred timely. At the time of the site visit, there were 105 EOP inmates in the reception center, including 51 or 49 percent who had been awaiting transfer for more than 60 days. According to institutional staff, the majority of these delays were attributable to pending CSR and CC II reviews.

Of the 1,690 3CMS inmates transferred from the reception center during the reporting period, 963 or 57 percent were transferred timely. At the time of the site visit, there were 703 3CMS inmates in the reception center, including 252 or 36 percent who had been there for over 90 days.

Other Issues:

Reception Center:

According to staff, EOP inmates were housed on the B-4 mainline housing unit or the D-4 SNY housing unit.  The average length of stay in the reception center EOP during the review period was 32.5 days.

Staff reported that access to space for clinical contacts with EOP inmates was sparse, with one private office on the housing units that was shared by the psychiatrist and the PCs.  At times, staff could also use the custody officer's office or the multi-purpose room. For groups, they used the chapel in D-building, which was a private space where inmates sat on wooden pews and the group facilitator was at the front of the room.

The institution reported that 8.2 PCs provided clinical services for up to 110 EOP patients, for an average caseload of 13.4 patients per PC.  The caseload for the sole assigned psychiatrist was 110 patients.

Initial psychiatry contacts for EOP inmates were timely in 249 of 258 cases, for a 97-percent compliance rate.  Late contacts ranged from one to 18 days overdue.  Follow-up psychiatry contacts were at 95-percent compliant for timeliness, with 2,423 of 2,540 contacts completed within timeframes.  Overdue contacts ranged from one to 59 days overdue.

Provided data indicated that 315 of 320 or 98 percent of initial PC contacts for EOP inmates were timely.  The five overdue contacts were seven days past due.  For follow-up PC contacts, 2,944 of 2,983 or 99 percent were timely, and the 39 past due contacts were seven days late.

Staff reported that IDTT meetings were conducted every 30 days.  Before the initial meeting, staff typically met to discuss the inmates' treatment needs and any pertinent clinical issues.  The inmate's first meeting with his assigned psychiatrist was usually at the initial IDTT meeting.  Provided data indicated that 295 of the 300 or 98 percent of initial IDTT meetings were

419

timely, and that the five late meetings ranged from one to 19 days late. Provided data also indicated that from August 1, 2014 through January 31, 2015, all required staff attended every IDTT meeting and that 2,875 of 2,880 or nearly 100 percent of IDTT meetings were timely. The five overdue follow-up IDTT meetings ranged from one to 29 days late.

At three observed IDTT meetings, the psychiatrist, two psychologists, the psych tech, the correctional counselor, and at times a custody officer were present. The PC presented the inmate's psycho-social history before his arrival. Once the inmate arrived, he was asked if he had any mental health concerns. In each case, the designated level of care appeared appropriate for the inmate's treatment needs. Team members discussed the inmate's symptoms, but the treatment goals had essentially been determined before the meeting and the treatment plan was not discussed further, regardless of the inmate's presence. Staff did not discuss all six factors on the Form 7388B. Custody staff offered their observations, which appeared to be appropriate and were well received by clinical staff. At the end of the meetings, inmates were asked to sign the last page of their treatment plans. When asked about this practice, staff explained they discuss treatment goals with the inmate before the meeting. However, the inmates had not read the documents before signing.

Analysis of data provided pre-visit indicated that inmates were offered at least one to two EOP groups during the week. Staff reported that 25 to 30 inmates attended EOP groups. Additional data generated on site indicated that from September 1, 2014 to February 21, 2015, EOP inmates were offered an average of 8.2 hours of groups and attended an average of six hours of groups per week. The cancellation rate was two percent, and the refusal rate was 19 percent. Inmates on B-yard were offered seven groups per week, including four psycho-educational groups in the B-yard chapel, two socialization groups in the Facility-B Building 4

420

housing unit, and one on the EOP yard.  Inmates on the D-yard were offered eight EOP groups per week, including four psycho-educational groups held in the D-yard chapel, three socialization groups held in the Facility-D Building 4 housing unit, and one EOP yard.

A group in the D-Yard chapel entitled "Commitment to Change" was observed during the site visit.  It was attended by 20 to 25 inmates.  The inmates were attentive but at times it appeared that the content and language of the group exceeded the educational level of the inmate population.  A few inmates spoke to the psychologist leading the group and at times directed advice to fellow inmates, but overall interaction among group members was limited.  Participants interviewed after the session indicated that they knew how to access mental health services, that they were offered one-hour groups daily, and that mental health or custody staff would sometimes check in with them if they refused groups.  They reported seeing their PCs weekly but estimated that about half of these contacts were in an open area in the dormitory, a non-private space.  Inmates also reported some intimidation by non-EOP inmates on B-yard, which interfered with group attendance and day room use.  Overall, they rated mental health services highly.

Staff reported that yard and religious activities were also provided to EOP inmates. Inmates taking heat-sensitive medications were offered dayroom or chapel instead of yard on heat-alert days.  Other information indicated that educational programs, structured substance abuse treatment, vocational education, and job-related activities were not available to the EOP inmates in reception center.

According to staff reports, EOP inmates rarely paroled from reception center and mental health staff were not routinely aware of when an EOP inmate was due to parole.  Data provided on site indicated that 13 inmates paroled from the reception center during the review period.  Re-

entry plans were not done routinely.  Staff reported concern that twice during the preceding

month, DSH had discharged two EOP inmates to the reception center within a week of parole

and had not done any re-entry planning, leaving CDCR very little time to complete this task

effectively.

For 3CMS inmates in reception center, there were 4.5 psychiatrists and 14 PCs.

Psychiatry caseloads numbered 156 and PC caseloads numbered 47 during the review period.

The average stay for 3CMS inmates in reception center was 54.3 days.

Provided data on psychiatry contacts indicated that all 448 initial contacts and nearly all

90-day follow-up contacts were timely.  The 13 late follow-up contacts ranged from three to 45

days overdue.

For initial PC contacts, provided data indicated that 1,401 of 1,525 or 92 percent were

timely during the review period.  Late initial contacts ranged from one to 80 days overdue.

Follow-up PC contacts were completed timely in 20,170 or 90 percent of the 20,284 contacts

during the review period.  Late follow-up contacts ranged from one to 361 days overdue.

MHSDS Inmates in Administrative Segregation:

There were .67 psychiatrists and 2.67 PCs providing mental health care to the 25 mental

health caseload inmates in the administrative segregation unit, yielding caseloads of nine for the

PCs.

Pre-placement screens were completed timely in 366 of the 398 total screens, or 92

percent of the time.  The 32 late screens were overdue by a range of one to 61 days.  Provided

data on the 31-item screens for 122 inmates indicated a compliance rate of 58 percent for

timeliness.

All initial and follow-up psychiatry contacts were timely. Initial PC contacts were conducted timely in 52 or 98 percent of the 53 cases. The sole overdue contact was completed within two days after the due date. For follow-up PC contacts, 818 or 97 percent of the 841 contacts were completed timely. All of the late contacts were seven days overdue.

The area for clinical contacts was observed to have three therapeutic modules where weekly PC contacts were conducted. The modules were separated by partitions on two sides and did not afford full visual and auditory privacy. Clinical staff reported that they could also use the psych techs' office, if available.

There were a total of 645 cell-front contacts during the review period, involving 123 inmates. Over 500 were follow-up contacts, and over 100 were for five-day-clinical follow-ups. The few remaining were crisis contacts, initial contacts, and a PC "special follow-up." Over 500 involved 3CMS inmates, over 90 involved EOP inmates, and four involved inmates at the MHCB level of care. There were 162 cell-front psychiatry contacts among 86 inmates, most of whom were 3CMS. Over 100 of these were follow-up contacts, followed by over 20 initial contacts and over 20 "special follow-up" appointments. The remainder were crisis, medication non-compliance, and medication expiration contacts.

There were 168 out-of-cell non-private psychiatry appointments among 104 inmates during the current round. Staff also reported that the psychiatrist ran a "med line" at which he met with inmates individually to discuss any concerns that arose between their scheduled psychiatry appointments. There were 77 PC contacts among 44 inmates that were conducted out-of-cell in non-private areas.

During the review period, all 49 initial and all 792 follow-up IDTT meetings were completed timely, with all required staff in attendance. At observed IDTT meetings during the

423

site visit, a psychiatrist, two psychologists, the supervising psychiatric social worker, a psych

tech, and the correctional counselor were present.  Line custody staff were also present for

several case discussions.  The team essentially decided on treatment goals before the meeting,

with no further discussion about treatment planning, regardless of the inmates' presence.  Factors

on Form 7388B were not discussed.  In some cases, discussions covered behaviors/symptoms

that were not included as goals in the treatment plan, and rationales for diagnoses did not align

with inmates' reported symptoms or mental status.  Eight inmates, including three who were

absent, were discussed by the team.  Two of those absent refused to attend due to gang concerns.

The PC presented the inmates' psycho-social histories before they arrived.  Once they arrived,

they were asked if they had any mental health concerns.  Two inmates asked questions about

psychiatric medication and were told they would be scheduled for "med line" with the

psychiatrist instead of the concern being discussed during the IDTT meeting.

Although the administrative segregation unit was not an EOP hub, staff reported that they

provided EOP groups when sufficient numbers of EOP inmates were in the unit.  No groups

were available for the 3CMS inmates.  Offering and documentation of education for inmates

needed improvement in the July to September quarter, and improved during the October to

December quarter.

Documentation provided by the institution indicated that four psych techs were assigned

to administrative segregation.  Their office was in the unit, which facilitated observation of

inmates throughout the day.  It was reported that they checked SOMS, DECS, and the housing

roster and identified any new inmates before conducting rounds.  Reviewed documents indicated

that psych techs attending the custody/mental health morning check-in meetings, took sufficient

time while meeting with inmates, and entered their documentation upon completion of each

424

contact.  Documentation of morning check-in meetings indicated all present every day except one.  Staff indicated that while psych techs made verbal referrals to clinical staff, they were being encouraged to document them.

Reception center EOP inmates in administrative segregation stayed for an average of 42 days, and none stayed longer than 90 days.  3CMS inmates in administrative segregation during the review period stayed for an average of 87 days.  Provided data indicated two 3CMS inmates whose stays exceeded 150 days.  Neither were designated as NDS.  One was retained there pending adjudication of an RVR, and the other was retained as a gang member pending the Departmental Review Board process.  Non-mental health caseload inmates in administrative segregation stayed for an average of 96 days.

There was no administrative segregation overflow or STRH at NKSP.

MHCB:

The ten-bed MHCB at NKSP was staffed with one full-time psychiatrist and two full-time PCs.  Although staff reported that most individual contacts were conducted in private settings, treatment space was limited, with one multi-purpose room used for IDTT meetings and individual clinical contacts.  Supervisory staff reported that every morning, mental health, custody, nursing and medical staff met in what was comparable to a "shift-change" meeting in the inpatient programs, wherein staff discussed pertinent patient information and administrative issues.  It was observed to be very valuable and beneficial to patient care for all involved.

According to MHTS.net data, initial and follow-up psychiatry contacts were 100 percent complaint for timeliness.  Initial PC contacts were 93-percent compliant, and follow-up PC contacts were 99-percent compliant.  A sample of eUHRs corroborated compliance for both disciplines, albeit at less than 100 percent for psychiatry.

425

An observed IDTT meeting was well-facilitated, with all disciplines interacting meaningfully with the patient.  The team appropriately utilized the CDCR form 7388B for consideration of referral of the patients to higher levels of care.  Most of the referrals from NKSP to DSH inpatient programs were generated within the MHCB.

No group treatment was provided in the MHCB.  Inmates who remained there beyond ten days were eligible to participate in outside yard.  Staff reported that due to vacancies, the recreational therapist who worked in the MHCB was part-time on the weekends.  Inmates expressed gratitude for this activity and emphasized its value.

Seclusion and Restraint:

The MHCB contained rooms for seclusion and restraint.  Logs indicated 12 uses of restraint from July 2014 through February 2015.  These involved four inmates, two of whom were restrained four times and two of whom were restrained twice.  One inmate, whose restraint order was renewed twice, was kept in restraints over four hours following the second renewal. Logs indicated seven placements in safety cells, including two inmates placed there twice, from July 2014 through February 2015.

Alternative Housing:

Alternative housing was situated in Facility-A, Building 4, cells one through ten.  They had flushable toilets and running water, but no beds.  Staff reported that, in conjunction with use of staff observation, these cells had been partially retrofitted to reduce risk of suicide.  They were identical to typical double cells throughout the institution, with reduced-size ventilation grates, safety sprinklers, and welded-closed fixtures to inhibit attachment of any ligature.  Overflow would be placed in TTA holding cells, contraband watch cells, diagnostic holding cells, and receiving & release cells.

426

At the time of the site visit, the institution reported that it had 5.25 PCs providing care in alternative housing.  Their caseloads ranged from 0.71 to 2.35 patients.  The institution reported that each patient was required to be under direct visual observation by a health care staff member.

NKSP was noncompliant with the 24-hour timeframe for moving inmates out of alternative housing, with 53 percent of the 600 placements exceeding 24 hours.

3CMS:

A part-time psychiatrist assigned to the 3CMS mainline program was reported to have a caseload of 100 patients.  The two PCs each had an average caseload of 106.  Staff reported that there was one office in the medical clinic and two in the counseling center where they could meet with inmates.

Institutional data indicated for the review period a 100-percent compliance rate for timeliness of the 45 initial psychiatry contacts, and a rate of 97-percent for timeliness of 2,103 of the 2,165 follow-up contacts.  Missed appointments ranged from four to 39 days late.  One psychiatry contact, to address medication noncompliance, was cell-front.  Five psychiatry contacts were in non-private settings and occurred from December 31, 2014 through January 4, 2015.

Provided data also indicated that 77 of 84, or 92 percent of, initial PC contacts were timely.  The seven late initial contacts ranged from two to 33 days late, with two still outstanding at the time of the site visit.  The compliance rate for timeliness of follow-up PC contacts was 92 percent, with 4,848 of 5,255 contacts completed quarterly.  The 407 late follow-up contacts ranged from two to 105 days overdue.  There were four cell-front contacts with three inmates, for three "unspecified" reasons and one inmate refusal.  Three of the four contacts were for five-day

427

clinical follow-up after discharge from the MHCB.  PCs had 11 non-private contacts among six inmates.  These contacts included seven for five-day clinical follow-up after discharge from the MHCB, and six which occurred from December 5, 2014 through January 28, 2015.

All IDTT meetings during the review period were attended by required staff except one, at which the psychiatrist was absent, for a 99-percent compliance rate.  Initial IDTT meetings were 98-percent compliant for timeliness, with 86 of 88 meetings held timely.  The overdue meetings were one to two days late at the time of the site visit.  Only two of 5,222 follow-up IDTT meetings were late and were held within two days of the due date, for a nearly 100-percent compliance rate.

Staff reported that three groups were provided to 3CMS inmates.  These were a weekly support group, parole planning group, and lifers group, in which seven to eight inmates participated.  They were cancelled during any lockdowns.  There was no wait list for groups.

Referrals:

Of the 151 emergent referrals during the review period, all but one resulted in a timely response.  There were 32 urgent referrals, of which 30 or 94 percent drew a timely response.  The 3,221 routine referrals resulted in timely responses in 2,910 or 90 percent of cases.

MHTS.net:

Staff generally reported no problems with access to or use of MHTS.net.  They suggested adding an alert identifying patients who spoke only foreign languages.

Mental Health/Custody Relations:

Staff reported that the overall institutional climate and the relationships between custody and mental health were positive.  Custodial input and exchange of information that was noted in eUHRs and observed during IDTT meetings promoted good collaborative working relationships

428

at NKSP.  It was observed during the tours of various units that custody and mental health staff knew each other and appeared to communicate comfortably about particular inmates' referrals and functioning levels, among other things.

Heat Plan:

The monthly reports for August through October 2014 were provided for review and indicated 64 Stage-I heat alerts and one Stage-II heat alert.  There were no Stage III heat alerts or heat-related incidents during the review period.

NKSP was compliant with the heat plan during the review period.  Indoor and outdoor temperatures were logged and forwarded to the litigation coordinator during the heat season. When interviewed during the site visit, the litigation coordinator indicated that, if necessary, the heat plan would be activated during the off-season.  One example of this was the pharmacist's precautionary distribution of a list of inmates on heat-sensitive medications because 90-degree temperatures were expected that week.

Staff reported that the litigation coordinator reviewed the temperature logs daily, and planned to visit the units to ensure temperatures were being logged properly during the upcoming heat season.  Toured housing units had thermometers appropriately placed high on the walls near the ceilings.

During the heat season, the pharmacy generated a daily list of inmates prescribed heat-sensitive medications which was distributed to facility lieutenants, mental health staff, the litigation coordinator, facility captains, associate wardens and medical staff.  Per policy, a monthly heat report was submitted to CDCR headquarters during the heat season.

Use of Force:

NKSP was compliant with use-of-force training for custody and mental health staff.

Access to Care:

Over the course of the review period, the total number of ducats decreased from over 5,000 to fewer than 3,000.  Further, the percentage of mental health ducats that were completed declined through the review period until January 2015 when it rose modestly.  The institution's monthly health care access reports indicated mental health ducat completion rates of 85 percent for August 2014, 83 percent for September 2014, 71 percent for October 2014, 67 percent for November 2014, 66 percent for December 2014, and 72 percent for January 2015.

Program Access:

a.    Job and Program Assignments:

Institutional data indicated that 441 or 79 percent of the available full-time jobs were filled by non-MHSDS inmates, and 114 or 21 percent were filled by 3CMS inmates.  There were no part-time jobs at NKSP.

For the part-time academic program assignments, 89 or 74 percent were held by non-MHSDS inmates, and 31 or 26 percent held by 3CMS inmates.  There were no voluntary academic assignments at NKSP.

Fifty-one or 70 percent of the full-time vocational educational assignments were filled by non-MHSDS inmates, and 22 or 30 percent were filled by 3CMS inmates.  There were no part-time vocational educational assignments at NKSP.

Provided training materials and attendance sheets regarding functional evaluation of EOP inmates for program assignments indicated that training was completed as of December 4, 2014.

b.   Milestone Credits:

Information provided via CDCR headquarters indicated that during the review period, 2.82 percent of the 118 eligible EOP inmates, 3.69 percent of the 985 eligible 3CMS inmates, and 4.47 percent of the 3,058 eligible non-caseload inmates earned milestone credits during the review period.

    c.  Out-of-Level Housing:

Institutional data indicated that on February 24, 2015, one Level I 3CMS inmate was housed in Level III housing, 18 Level III 3CMS inmates were housed in Level II housing, and five Level IV 3CMS inmates were housed in Level III housing.

    d.  ADA Reasonable Accommodation and Grievance Procedures:

NKSP reported that the new 1824 process was still a pilot program, and accordingly no policies, training materials, or training rosters were yet available for review.

    e.  Periodic Classification Score Reductions: EOP Inmates

NKSP did not have an EOP mainline program.

*Coleman* Postings:

The January 2015 revised *Coleman* posters, in both English and Spanish, were found in all of the toured housing units, including administrative segregation and buildings housing reception center EOP and mainline 3CMS inmates.  All posters were placed in common areas accessible to class members.  *Coleman* posters were also located in mental health office spaces.

**California State Prison, Los Angeles County (CSP/LAC)**
February 3, 2015 – February 5, 2015

Census:

On February 4, 2015, CSP/LAC housed 3,491 inmates, for a decline by 11 percent since the preceding monitoring period.  The mental health caseload population of 1,667 was two percent lower than during the preceding monitoring period.

Nine inmates were in the MHCB.  There were 329 EOP inmates and 1,090 3CMS inmates in mainline.

The administrative segregation population of 311 included 115 EOP inmates in the hub, where one inmate with a SHU term was pending transfer to a PSU.  The 124 3CMS inmates in administrative segregation included one with a SHU term pending transfer.

Staffing:

The chief psychiatrist position was filled.  One of two chief psychologist positions was filled and the other was held vacant at the direction of CDCR headquarters.  All nine senior psychologist positions were filled.

Eight of 12 psychiatrist positions were filled, for a 33-percent vacancy rate.  Use of 3.74 contractors reduced the functional vacancy rate to two percent.

Thirty-one of 33 psychologist positions were filled.  Use of 3.5 contract psychologists provided full coverage.

The supervising social work position was filled.  Seven of 19 social work positions were vacant, for a 37-percent vacancy rate.  One social worker was on long-term leave.  Two were unlicensed.

432

Four of 11 recreation therapist positions were vacant, for a 36-percent vacancy rate. Use of contractors reduced the vacancy rate to 14 percent.

The institution reported that it employed a psych tech unit supervisor, two senior psych techs, and 23 psych techs. Three psych tech vacancies were covered by contractors. The total number of positions was not provided.

Of 17 mental health clerical positions, 3.5 were vacant, for a 21-percent vacancy rate. Both OSS II positions were filled, as were all three HPS I positions, and the one CHSA position. The 0.1 AGPA position was vacant.

Quality Management:

The CSP/LAC quality management committee met monthly and achieved a quorum for all meetings during the review period. Representatives of subcommittees including the mental health subcommittee presented information and monthly compliance reports on their respective areas.

The mental health subcommittee met weekly and always achieved a quorum during the review period. It routinely received compliance reports. Agenda items included audits and performance reports for program areas, expedited transfers for EOP inmates, administrative segregation, and suicide prevention.

At the time of the site visit, there were four active QITs and FITs. They addressed peer review, the administrative segregation EOP hub, Guard One checks, custody five-day step-downs, alternative housing, and pre-screens for placements in administrative segregation. No QITs were chartered or resolved during the review period.

Peer review was suspended during the latter half of 2014 due to concerns about effectiveness and lack of anonymity. The institution began a peer review pilot project in

433

December 2014 and was in the process of revising its peer review LOP at the time of the site visit.

<u>Medication Management</u>:

Since the preceding monitoring visit, the institution had fully implemented MAPIP. Audit results indicated that most mental health-related areas reported compliance rates of 90-percent or better.  Medication continuity for DOT and NA medications was 84-percent compliant except following transfers to the MHCB, administrative segregation, the SHU, and the PSU.  A large number of discarded pills were found in the area near the pill window on D-Yard, indicating a significant problem with medication administration at least on that yard.

<u>Transfers</u>:

There were 15 referrals to acute inpatient care and 41 referrals to intermediate inpatient care during the review period.  All 56 referral packets were completed timely.  One acute care referral was rescinded.  DSH accepted the remaining 14 acute care referrals and 36 of the 41 intermediate care referrals.

Of the 12 acute care referrals who transferred during the review period, four were timely.  The eight late transfers took 16 days on average.

Thirty of the 36 intermediate care referrals transferred during the review period.  Five of these were timely.  The 25 late transfers took 42 days on average and as long as 51 days.  Of the 11 intermediate care referrals pending at the end of the review period, six were pending transfer and five were pending acceptance.

At the time of the site visit, six inmates were on the DSH wait list.  Four were in the administrative segregation EOP hub, one was in the EOP mainline, and another was in the MHCB.

Logs and staff reports indicated that the institution received timely notice of impending DSH discharges and that discharge summaries were available on SharePoint. Formal case conferences between CDCR and DSH clinicians were conducted for inmates discharged to administrative segregation, as per CDCR policy and an LOP. Review of five discharge summaries on SharePoint found that they were legible and clinically useful. They included DSH clinician contact information and digital signatures by all disciplines. The most recent medication reconciliation sheets and MARs were attached. However, it was observed that discharge summaries were not being consistently reviewed and considered in treatment planning.

During the review period, there were 230 MHCB referrals and 165 admissions among 139 inmates. Fifty-nine of these admissions were from other institutions. Eight inmates had three admissions and two had four admissions. Stays averaged 12.1 days.

There were 230 alternative housing placements, of which 122 or 53 percent lasted no longer than 24 hours. Overall, alternative housing says exceeded the 24-hour timeframe by an average of 14.4 hours. MHCB unavailability was the predominant reason for the overly-long stays.

All 28 transfers of EOP inmates to the PSU were completed within 60 days of endorsement.

All 53 transfers to administrative segregation EOP hubs were timely. Fifty-seven of 101 or 56 percent of transfers to EOP programs were timely. The 44 late transfers exceeded timeframes by an average of 59 days, typically among SNY EOP inmates.

The institution did not report lengths of stay in administrative segregation during the review period. On January 5, 2015, 329 inmates including 109 EOP inmates were housed in administrative segregation. The EOP inmates had stays that averaged 120 days, and included 41

435

EOPs whose stays exceeded 90 days.  Those over 90 days were given 30-day reviews, according to interviewed custody staff and reviewed documentation.

There were 127 3CMS inmates in administrative segregation.  Their stays averaged 137 days, and lasted as long as 697 days.

Other Issues:

Administrative Segregation EOP:

The new administrative segregation EOP treatment building provided adequate appropriate treatment and office space.  Interviewed inmates spoke favorably of the program. Group rooms had therapeutic modules, restart chairs, or Colorado tables, which were being piloted.  Inmates reported a preference for use of the therapeutic modules or restart chairs over the Colorado tables.  Custody staff also disfavored the Colorado tables for potential safety reasons.  Plans to discontinue their use were underway.

Monthly psychiatry contacts were 90-percent compliant.  For PC contacts, audits found 90 percent or greater compliance rates for initial and follow-up contacts.  In 84 percent of cases, appointments following inmate treatment refusals were completed.  Psych tech rounds were completed as required.

Audits indicated that IDTT meetings were timely and attended by required members.  At an observed meeting, interaction between clinical and custody staff was good and inmates were involved in their treatment planning.  However, inmates were cuffed and placed in therapeutic modules for their entire meetings.  Supervisory staff indicated that this cuffing practice was not authorized and may have been the result of mistake by new officers.

Ninety percent of inmates were offered at least ten hours of group therapy per week. Thirty percent actually attended at least ten hours.  No reasons were provided for the low

436

attendance rate, but there were schedule conflicts between groups and individual psychiatry and PC contacts.

For the month of November 2014, daily morning meetings between mental health and custody were only 40-percent compliant.  An observed morning meeting in the D-5 housing unit was attended by the PC, psych tech, and sergeant.

Seven ground floor cells were used as both new intake cells and as alternative housing. Staff reported that the number of these cells was insufficient during high intake times, when inmates were either double-celled or placed in non-retrofitted cells into which custody could see.

All cells had working electrical outlets.  Inmates were offered adequate yard time.

MHCB:

CSP/LAC operated a 14-bed MHCB.  It included one restraint and seclusion cell and one safety cell.  The MHCB was staffed by a full-time psychiatrist, a senior psychologist supervisor, and three psychologists.  Caseloads were 14 for the psychiatrist, two for the senior psychologist supervisor, and four for each of the psychologists.

Logs indicated compliance with initial and follow-up psychiatry contacts.  Initial PC contacts were 60-percent compliant.  Follow-up PC contacts and both initial and follow-up IDTT meetings were all compliant.

Alternative Housing:

Psychiatric care was provided in alternative housing on an on-call basis among seven full-time psychiatrists and two contract psychiatrists.

Seclusion and Restraint:

Review of logs indicated that past problems with documentation of number and duration of applications of restraint and seclusion had been corrected.

437

EOP:

Psychiatry and PC contacts were at least 90-percent compliant.  Space for individual treatment was inadequate, resulting in more cell-front contacts.  Staff sometimes waited for office space to become available for treatment sessions.

IDTT meetings were timely, according to audit results.

EOP inmates were scheduled for 14.75 hours of structured therapeutic activities per week.  Approximately 90 percent of these inmates were offered at least ten hours per week, but only 20 percent attended at least ten hours.

At the time of the site visit, 24 EOP inmates designated as SNY were housed on C yard and were on a list for expedited transfer to an SNY EOP.  Review of the wait list indicated average wait times of 177 days with a range of seven to 544 days.  Thirteen inmates had been waiting for over 100 days.  Six interviewed SNY inmates expressed concerns surrounding their proximity to general population inmates.

SNY EOP inmates received weekly PC contacts.  According to audit results, they also received five hours of group therapy per week on a modified program, but this had been reduced by the time of the site visit.  Staff and inmates attributed this to lack of escort officers and group therapy space.  SNY EOP inmates on C yard were provided with groups in the C-Yard gymnasium, but availability of this space was problematic.

One interviewed SNY EOP inmate presented as psychotic and poorly functioning but had not been adequately evaluated for a higher level of care.  During the site visit, he was brought to the attention of supervisory staff for an emergency assessment.

438

<u>3CMS</u>:

3CMS inmates received timely initial and quarterly psychiatry and PC contacts, and more frequent contacts if needed.  However, psychiatry contacts took place in an old medical examination room which lacked a door, compromising privacy.  With PCs' large caseloads of 157 to 213 inmates, it appeared that they were unable to devote sufficient time to individual inmates' needs.

Annual follow-up IDTT meetings were compliant with timeliness and attendance by required disciplines.  Meetings were held in a former dental office in which staff and inmate seating was awkward, and with no door to the room, privacy was compromised.  Two observed IDTT meetings were attended by all required staff who were familiar with the inmates, made appropriate introductions, and explained the purpose of the meetings to the inmates.  Inmates' progress was assessed through their subjective self-reports and their answers to questions about their daily activities.  The psychiatrist followed inmates' medication compliance levels on an available computer.  Form 7388B indicators were reviewed.  Treatment goals were communicated to inmates in understandable terms, but diagnoses and treatment objectives were communicated in terms that were too general.

Group therapy was not offered.  Educational classes and self-help groups were available on A-Yard.

<u>3CMS Inmates in Administrative Segregation</u>:

3CMS inmates in administrative segregation were housed in A-4.  Audits and inmate interviews indicated that psychiatry contacts were provided monthly.  They also confirmed that PCs saw inmates weekly, out of cell at least once a month but more often at cell-front.     IDTT meetings were timely.  Required disciplines attended 82 percent of meetings.

439

Group therapy was not provided.  Shortages of clinical and custody staffing were cited as the reason.  Interviewed inmates expressed a desire for group therapy and frustration with lack of treatment.

Working electrical outlets were lacking in A-4.  Staff reported that crank radios were available to inmates, but functionality was unreliable.

Medical Records/MHTS:

Institutional staff used MHTS.net to track clinical contacts, IDTT meetings, EOP group offerings and participation, and DSH referrals and non-referrals.  Staff indicated that they had access to MHTS.net through conveniently located work stations, but that MHTS.net was "slow" at times.  Opened MHTS.net records for inmates at high suicide risk alert bore a red notation at the top of the view.  Staff also used DECS, SOMS, and eUHRs.

Referrals:

Review of referral logs for mainline 3CMS inmates indicated compliance with response to urgent, emergent, and medication refusal referrals, but not for routine mental health referrals.  This was consistent with inmate reports that wait times to see the PC took several weeks.

Mental Health/Custody Relations:

Interviews of staff across disciplines indicated an overall collaborative, problem-solving atmosphere at CSP/LAC.  Custody line staff appeared to have a clear understanding and appreciation of clinicians' value to enhancing institutional safety and security.  Some clinical staff reported that custody was not as responsive to escort needs as clinical staff would have preferred.

Heat Plan:

During the site visit, functional thermometers were observed near upper tier cell fronts in housing units.  Documentation indicated no days when inside temperatures exceeded 90 degrees and no Stage III heat alerts during the review period.  The litigation coordinator provided copies of monthly heat reports to headquarters.  Copies of the LOP and lists of all inmates on heat sensitive medications were provided by the litigation coordinator.  Interviewed staff was knowledgeable and well-trained on heat plan protocols.

Use of Force:

At the time of the site visit, CSP/LAC was compliant with the mandatory training on controlled use of force.

Access to Care:

Interviewed line staff reported insufficiency of escorts to clinical appointments.

Program Access:

a.      Job and Program Assignments:

Seventeen EOP inmates had full-time employment positions.  One EOP inmate had a part-time academic position.  An additional 17 EOP inmates were eligible for work training assignments but were unassigned.

Among the 3CMS inmate population, 310 had full-time jobs, 25 participated in full-time vocational education, 19 participated in part-time vocational education, and 103 had part-time academic positions.  An additional 370 3CMS inmates were eligible for work training assignments but were unassigned.

Among the non-mental health caseload inmate population, 791 inmates had full-time jobs, 42 participated in full-time vocational education, 13 participated in part-time vocational

441

education, and 155 had part-time academic positions.  An additional 421 non-mental health inmates were eligible for work training assignments but were unassigned.

CSP/LAC staff were aware of the 2014 memoranda requiring IDTTs to evaluate EOP inmates' ability to participate in program assignments.

      b.    <u>Milestone Credits</u>:

Provided documentation indicated the availability of milestone credits for mental health caseload inmates including EOP inmates, but it did not report the number or percentage of inmates who were eligible for, or who had earned, milestone credits.

      c.    <u>Out-of-Level Housing</u>:

Two 3CMS and 14 non-mental health caseload Level I inmates were housed in Level III housing.  Three 3CMS and five non-mental health caseload Level I inmates were housed in Level IV housing.

Fifteen 3CMS and 42 non-mental health caseload Level II inmates were housed in Level III housing.  Nine EOP, 11 3CMS, and 28 non-mental health caseload Level II inmates were housed in Level IV housing.   Fifty-five non-mental health caseload Level II inmates were housed in Level I housing.

There were 26 EOP, 80 3CMS, and 71 non-mental health caseload Level III inmates housed in Level IV housing.

Twenty-five 3CMS and 43 non-mental health caseload Level IV inmates were housed in Level III housing.

      d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CSP/LAC had not yet implemented the revised ADA Accommodation and Grievance Procedures to include appeals regarding accommodations for psychiatric disabilities.

442

e.      <u>Periodic Classification Score Reductions: EOP Inmates</u>:

CSP/LAC did not provide information on periodic classification score reductions indicating whether EOP inmates were granted semi-annual classification score reductions for successful programming.

**<u>California Correctional Institution (CCI)</u>**
April 1, 2015 - April 3, 2015

<u>Census</u>:

As of March 30, 2015, CCI housed 4,107 inmates, for a 12-percent decline since the preceding monitoring period.  The mental health caseload population rose by four percent to 1,112.

The administrative segregation population of 284 included 52 3CMS inmates.  There were no EOP inmates pending transfer to an administrative segregation EOP hub.  The SHU population of 1,057 included 118 3CMS inmates.

The two inmates in the OHU for mental health reasons both of whom transferred out on the first day of the site visit.

There were 935 mainline 3CMS inmates and five mainline EOP inmates

<u>Staffing</u>:

The senior psychiatrist position was vacant.  One of the two chief psychologist positions was filled and the other was held open per a cost-savings directive from headquarters.  The unused funds were used to support other positions.  The two senior psychologist positions and the supervising social worker position were filled.

Only one of the five psychiatrist positions was filled.  Use of 2.5 contract psychiatrists reduced the functional vacancy rate to 30 percent.

443

Thirteen of the 15 psychologist positions were filled.  One of the two vacancies was covered by contractors, reducing the functional vacancy rate in psychology to seven percent.

All 14 social worker positions were filled.

The two senior psych tech positions and 22 of the 38.9 psych tech positions were filled. The vacancy rate among psych techs was 43 percent.

Of the 2.5 recreational therapist positions, one was filled, resulting in a 60-percent vacancy rate.

The office services supervisor II position and the two office tech positions were filled. Of the seven clerical positions, 5.5 were filled, for a 21-percent vacancy rate.

CCI used primarily telemedicine for its delivery of psychiatric care.

Quality Management:

Quality management at CCI was robust and useful to staff, and showed continued improvement since the preceding monitoring period.  Relevant information was disseminated to line staff via supervisors and staff meetings.

As CCI did not have a CTC, there was no local governing body at the institution.

The quality management committee met monthly, with attendance by required staff ranging from fair to good.  Comprehensive minutes were maintained.  Agenda items included numerous committee reports, LOPs, QIT progress reports, statewide policy updates, dashboard reviews, trends detected via use of MAPIP, and a performance improvement work plan. Corrective actions were taken as indicated and documented.

The mental health subcommittee met monthly and maintained minutes. Agendas included results of MAPIP audits, psych tech rounds, 31-item screens in administrative segregation, audits of eUHR-MHTS.net concordance, review of performance reports, transfer timelines, RVRs, peer

review, suicide prevention, and data regarding administrative segregation, SHU, MHCB, and OHU.

Audits of the OHU, MHCB, administrative segregation, the SHU, involuntary medications, MAPIP results, and psych techs were conducted regularly.  The mental health subcommittee also took up audit reports on backlogs in psychiatry, medication hoarding, effective communications, census, EOP transfer timelines, and closed appointments.  The methodologies in the referenced audits were reviewed by the two mental health subcommittee coordinators, who had significant experience in this area.  Audit results were reviewed and CAPs were implemented as appropriate. They were addressed during meetings, as reflected in minutes.

QITs and FITs were used appropriately and were effective.  Active QITs at the time of the site visit were addressing exhibitionism, alternative housing, medication distribution, access to narcotics, and health information management.

Peer reviews of one psychiatrist, two psychologists, and one social worker were conducted during the review period.  LOPs for peer review were under revision.

Medication Management:

MAPIP was coordinated in part with the mental health subcommittee and was used well. Issues with medication management were identified timely and addressed with CAPs that were implemented.

Continuity of medications following transfers to administrative segregation, the SHU, and the PSU were noncompliant.  Corrective actions were being taken.

Medication orders were for no longer than 90 days, and bridge orders were for no longer than 14 days. New prescription orders and renewals upon discharges from the MHCB and OHU were compliant.

445

Protection from inclement weather for outdoor pill lines remained problematic.

Informed consents were being obtained from inmates who were prescribed psychotropic medications.

Laboratory testing of blood levels of inmates prescribed psychotropic medications was compliant.

At the time the site visit, there were 654 inmates receiving medications by DOT. A centralized list of non-MHCB inmates with DOT orders was maintained by the pharmacy. Supervisory staff monitored the process.

Involuntary medication orders were very rare at CCI, and there were no instances during the review period when force was used for administration of involuntary medications. At the time of the site visit, only one inmate was on an involuntary medication order.

Supplies of medications were prescribed and provided to paroling inmates.

Transfers:

According to data provided by the institution, there were no referrals or transfers to acute or intermediate inpatient care during the review period.

Only nine or five percent of the 53 transfers to MHCBs were timely during the review period.  Delays were attributed to lack of bed availability.

Of the 94 placements into OHUs, 17 or 18 percent lasted longer than 72 hours.

The sole inmate referred to a PSU during the review period was transferred timely.

There were 14 EOP inmates in administrative segregation who were referred to EOP administrative segregation EOP hubs.  Ten or 71 percent were transferred timely.  None were awaiting transfer at the time of the site visit.

446

Twenty-four EOP inmates were transferred to mainline EOPs during the review period. Sixteen or 67 percent of these inmates were transferred timely.  At the time of the site visit, five EOP inmates were pending transfer to mainline EOPs, including one who had been waiting longer than 60 days due to lack of bed availability at the receiving institution.

Other Issues:

3CMS Inmates in Administrative Segregation:

CCI's administrative segregation unit, in which 3CMS inmates were housed, did not have an STRH or LTRH for 3CMS inmates.   The unit was on A-Yard, which was scheduled for conversion to an SNY in May 2015.

During the review period, pre-screens of incoming inmates were completed timely in only 61 percent of cases. This was attributed to a misinterpretation of Program Guide requirements regarding transfers from the SHU to administrative segregation. This problem was addressed and resolved by a QIP within a month or two before the site visit.

The 31-item screens were conducted timely 95 percent of the time.

A contract psychiatrist had a caseload of 26. Close to 100 percent of 3CMS inmates were seen at least quarterly by a psychiatrist, in nearly all cases in a private setting in the chapel building. During the three-month period preceding the site visit, 40 percent of inmates on the psychiatrist's caseload were seen at least twice.

The two PCs had caseloads of 51 and 56, respectively.  Ninety-eight percent of 3CMS inmates were seen at least weekly by their PC during the review period. Approximately 68 percent of these contacts were in private office settings in the chapel building.  Some contacts were conducted in non-private settings due to inmate refusals.  A conversion of the SHU on A-Yard scheduled for May 2015 would make the chapel no longer available as treatment space.

447

The HCFIP process was being explored to come up with replacement space.

Only approximately 20 percent of initial IDTT meetings took place before initial ICC meetings, due to lack of timely notice from custody as to which inmates were scheduled for ICC meetings.  Follow-up IDTT meetings were conducted at least quarterly in 98 percent of cases during the review period.  Attendance by required disciplines was nearly 100-percent compliant.  Meetings were conducted in a board room which was equipped with computers to provide access to UHRs and SOMS.

There was one therapeutic group offering.  Increased group offerings were planned to begin in the near future.  Group programming space was limited.

Observed psych tech rounds were conducted competently, with good interactions with inmates.

None of the administrative segregation housing units in Buildings 6, 7, and 8 on B-Yard had electrical outlets.  Crank radios were supplied to inmates.  In Building 5, which was used for administrative segregation and SHU overflows, cells had electrical outlets and inmates had access to radios and televisions.

The warden's administrative segregation population report indicated that 21 NDS inmates were identified as eligible to receive property and privileges and as meeting criteria for accelerated transfer.  The institution did not report any obstacles to providing these inmates with property and privileges.

Seclusion and Restraint:

No orders for use of restraints were written during the review period.

448

<u>Alternative Housing</u>:

CCI maintained a 16-bed OHU with eight suicide-resistant beds designated for mental health inmates, plus two medical beds that could be used for mental health care if necessary. During the review period, five inmates had OHU stays, although provided documentation was unclear as to whether the beds were actually in the OHU.

For alternative housing, CCI used two "wet" cells in the medical clinic holding area, and if necessary, two cells in Receiving and Release. Staff reported and verified that no alternative housing was used during the review period, contrary to information appearing in MHTS.net documentation that was produced as proof-of-practice.

Staff reported that all mental health patients placed in designated medical beds in the OHU were seen daily by mental health clinicians. Clinical intakes, and psychiatry and PC contacts in the OHU were all conducted in private settings.

<u>SHU</u>:

During the review period, 278 3CMS inmates were placed in the SHU for an average length of stay of 91 days.

All initial psychiatry contacts and 98 percent of follow-up psychiatry contacts were conducted timely. Psychiatry contacts were conducted in private settings 98 percent of the time. The psychiatrists' caseloads averaged 14 patients on A-Yard, where the SHU was located.

The rate of compliance for timeliness of initial PC contacts was 100 percent. For follow-up contacts it was 99 percent. Eight-eight percent of PC contacts were conducted in private settings. Eighty-three percent of cell-front contacts were due to inmate refusals.

Follow-up IDTT meetings had compliance rates of 100 percent for timeliness and 98 percent for attendance by required members. Ninety percent of meetings were conducted

449

according to Program Guide requirements, but only 16 percent of initial meetings preceded initial ICC meetings.   At observed meetings, required members attended and participated fully without prompting.  Overall, the meetings were well-conducted except in a few respects. Some team members had "side" discussions and ringing mobile phones, and documents were passed while inmates were speaking.   One clinician did not present a succinct presentation of the concerns which led to the meeting, nor did this clinician address the possible connection between the condition of the inmate's cell and his need for a change of level of care.  The senior psychologist appropriately refocused the meeting.

Therapeutic groups were provided five days a week.

3CMS:

Compliance rates for initial and follow-up psychiatry contacts were 100 percent and 98 percent, respectively. Psychiatrists completed routine, urgent, and emergent referrals within Program Guide timeframes 90 percent of the time.   No information was provided with regard to completion of psychiatry intake evaluations before initial IDTT meetings.

For primacy clinician contacts, compliance rates were 98 percent for initial contacts and 100 percent for follow-up contacts.  Caseloads for PCs averaged 30 inmates.

Psychiatry and PC contacts took place in private settings in 99 percent of cases.

Compliance rates for timeliness of IDTT meetings were 97 percent for initial meetings and 100 percent for follow-up meetings.  Required members attended in 86 percent of cases. Computer access to UHRs and SOMS records was available during meetings.  At observed IDTT meetings on C-Yard, all required members were present, including the telepsychiatrist on-duty. Interdisciplinary discussion was good.  Each inmate was presented with a coherent treatment plan.

450

3CMS inmates on C-Yard were offered two groups, for which there were wait lists.  No groups were offered on D-Yard or E-Yard.

An interview of ten 3CMS inmates on D-Yard revealed that all of them had been seen by a telepsychiatrist, usually the same one.  These inmates were generally satisfied with the telepsychiatry process as well as with their PCs.  They expressed dissatisfaction with access to group therapies and reported that custody staff and, at times, nursing staff's interactions with inmates were provoking.

Ten 3CMS inmates on E-Yard were also interviewed.  They too expressed general satisfaction with the telepsychiatry process, particularly with their current telepsychiatrist. They reported receiving clinical contacts with their PCs generally every 90 days and having good access more frequently if necessary via the sick call process.  Many expressed a desire for group therapy.  Several inmates were involved in the substance abuse program, which they described as helpful. They complained of being called as a group for their telepsychiatry and PC sessions, which resulted in wait times of 25 minutes to four hours.  The ducating process clearly needed to be modified to reduce these long wait times for scheduled mental health appointments.   Inmates also indicated that custody staff were problematic but were unwilling to provide details.  Again, there were reports of provocative comments from COs and nursing staff.

Referrals:

CCI was compliant with timeliness of response to mental health referrals.  Ninety percent of the 29 emergent referrals drew a timely response.  Eighty-eight or 98 percent of the 90 urgent referrals, and 2,422 or 96 percent of the routine referrals also received timely responses.

451

Heat Plan:

CCI was compliant with the heat plan during the review period.  Monthly heat plan reports and temperature logs were provided for review.  The heat season at CCI was September and October 2014.  There were no Stage II or III heat alerts and no reported heat-related incidents during the review period.  The pharmacy prepared and distributed weekly lists of heat-risk inmates to mental health staff, lieutenants, captains, and C&PRs, among others.

Access to Care:

The institution's monthly Health Care Access Quality Reports from September 2014 through February 2015 indicated that .37 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 52 percent were not completed due to non-custodial reasons other than inmate refusals.

Program Access:

a.      Job and Program Assignments:

Institutional data indicated that 1,217 or 78 percent of available full-time jobs were filled by non-mental health caseload inmates and that 346 or 22 percent were filled by 3CMS inmates. There were no part-time job assignments at CCI.

For part-time academic assignments, 379 or 75 percent were held by non-mental health caseload inmates and 135 or 26 percent were held by 3CMS inmates.  There were no voluntary academic program assignments at CCI.

For full-time vocational education assignments, 229 or 75 percent were held by non-mental health caseload inmates and 78 or 25 percent were held by 3CMS inmates.  For part-time vocational education assignments, 27 or 75 percent were held by non-MHSDS inmates and nine or 25 percent were held by 3CMS inmates.  Seventy-three or 79 percent of the voluntary

452

vocational education assignments were held by non-mental health caseload inmates and 19 or 21 percent were held by 3CMS inmates.

For full-time substance abuse treatment program assignments, 121 or 80 percent were held by non-mental health caseload inmates and 30 or 20 percent were held by 3CMS inmates.

b.      Milestone Credits:

Institutional information indicated that from August 1, 2014 through January 13, 2015, 13.14 percent of non-mental health caseload inmates, 20 percent of eligible EOP inmates, and 14.93 percent of 3CMS inmates earned milestone credits.

c.      Out-of-Level Housing:

Institutional data indicated that as of February 19, 2015, there were 14 Level I 3CMS inmates in Level II housing and four in Level III housing.  There were three Level II 3CMS inmates in Level I housing and 44 in Level III housing.  There were nine Level IV 3CMS inmates in Level III housing.

There was one Level II EOP inmate in Level III housing.

d.      ADA Reasonable Accommodation and Grievance Procedures:

No information was provided with regard to ADA reasonable accommodation and grievance procedures.

e.      Periodic Classification Score Reductions: EOP Inmates:

CCI did not have an EOP program.

*Coleman* Postings:

*Coleman* postings in both English and Spanish languages were found in all buildings toured by the monitor, including the SHU and the administrative segregation units.  All postings were found in common areas accessible to *Coleman* class members.

453

<u>California Institution for Men (CIM)</u>
March 10, 2015 - March 12, 2015

<u>Census</u>:

As of March 9, 2015, CIM's total inmate population was 4,138.  This included 1,402 MHSDS inmates who made up 33.8 percent of the institution's entire inmate population.

Thirty-three of the institution's 36 MHCBs were occupied.  None of the 43 patients in the OHU were there for mental health reasons.  There were two EOP inmates in general population, and 1,142 mainline 3CMS inmates.

Among the 626 inmates in the reception center were 24 EOP inmates, 135 3CMS inmates, and five parole violators on the mental health caseload.  There were five additional reception center MHSDS inmates housed in administrative segregation, which was being used as reception center overflow.

In administrative segregation, there was one EOP inmate pending transfer to a hub and 47 3CMS inmates among the total population of 106.  The sole NDS inmate was not on the mental health caseload.

<u>Staffing</u>:

One of the two chief psychologist positions was filled.  The chief psychologist also served as the chief of mental health.

There were no senior psychiatrist positions.  The three senior psychologist supervisor and two senior psychologist specialist positions were filled.

Eleven or 84.6 percent of the 13 staff psychiatrist positions were filled, for a functional vacancy rate of 15.4 percent.  Staff reported that CIM had recently received approval to utilize registry psychiatrists to cover these vacancies.

454

Thirty-one of CIM's 35 psychologist positions were filled, leaving a vacancy rate of 11.5 percent.  The institution was authorized to hire four limited-term psychologist interns in August 2015 to cover two of these vacancies.

The supervising social work position and 17 of the 19 social work positions were filled, resulting in a vacancy rate of 9.5 percent.  Additionally, CIM reported that it was authorized to hire four unlicensed social workers, two of whom were already on staff at the time of the site visit.

The position of unit supervisor, who supervised psych techs, and the two senior psych tech positions were filled.  Only one of the 36.8 psych tech positions was vacant.

Positions for the OSS II and CHSA and one of the two HPS positions were filled. Sixteen of the 17 clerical workers in the mental health program were also filled, leaving a six-percent vacancy rate.

Quality Management:

The quality improvement process at CIM had improved since the preceding monitoring period and was working well.  The chief psychologist provided a summary of the institutional mental health QIP.  It addressed completion of SREs, suicide prevention practices, treatment planning, alternative housing issues, 30-day MHCB re-admissions, MHCB discharge planning, treatment refusal rates in administrative segregation, and mental health assessments for use in the RVR process.

The QMC met monthly.  Staff reported that all pertinent disciplines including custody attended meetings.  Meeting minutes were useful and indicated that this committee reviewed reports from the ERRC, the mental health subcommittee, Quality Improvement Plans (QIT), and the pharmacy and therapeutics committee, among other things.  Staff reported finding the QMC

455

process helpful and that information from the committee was conveyed to line staff during meetings.  QITs on MHCB utilization management, EOP processing, alternative housing, and medication review for newly arriving inmates, among others, were chartered.

The mental health subcommittee met monthly, with good attendance by required staff including high-level custody staff.  Reviewed agendas were comprehensive and often included performance and program dashboard reports, health care access quality reports, the sustainable process for identifying and referring patients to DSH programs, the SPRFIT, MAPIP, special case conferences, revisions to LOPs, mental health department initiatives, QIPs and related QITs, and audits of compliance with Program Guide requirements.  The Program Guide audits were found to be methodologically sound and served both management and quality improvement purposes.

The most recent peer review was conducted during January 2014.  The LOP was revised in December 15, 2014 and required mandatory training on peer review.  Henceforth, peer review was scheduled to be conducted annually.

<u>Medication Management</u>:

MAPIP generally worked very well at CIM.  The few medication management problems at CIM were usually identified by MAPIP, with corrective actions implemented.

With use of MAPIP measures, noncompliance was found in the areas of medication continuity for newly-arriving inmates, following intra-institutional moves into MHCBs and administrative segregation, and following discharges from outside hospitals.  Staff indicated that corrective actions had been developed and implemented to address this.

Pill line wait times lasted up to 30 minutes.

Non-formulary medications comprised less than five percent of all prescribed psychotropic medications. Medication orders could be written for up to 90 days. Bridge orders were limited to 14 days. With adequate verification and/or clinical history, prescriptions could be written without patient contact, but under these circumstances timely appointments with a care provider would be made. The chief psychiatrist audited laboratory testing and documentation of prescribing rationales in cases of polypharmacy. Other medication parameters relevant to mental health were audited by nursing staff.

At any given time during the review period, four to seven inmates were on involuntary medication orders on a non-emergency basis.

MAPIP results indicated that parole medications were being provided.

<u>Transfers</u>:

During the review period, CIM referred 27 inmates to DSH acute inpatient care. Documentation indicated that 26 or 96 percent of these referrals were accepted timely by CDCR headquarters. The institution reported that 23 or 85 percent of these referrals were submitted timely to DSH. Two of the 27 referrals were rescinded. Provided data showed that 24 or 89 percent of the acute care referrals were accepted by DSH. Beds were assigned to 22 of the 24 accepted inmates. Eleven of the 22 inmates were transferred within 72 hours of bed assignment. Among the total 22 inmates who were assigned beds, 11 transferred within ten days.

During the review period, CIM referred 53 inmates to DSH intermediate inpatient care. Documentation indicated that 50 of these referrals were accepted timely by CDCR headquarters, two were accepted untimely, and no data was provided on the remaining one. The institution reported that 19 of the referrals were submitted timely to DSH, 30 were submitted late, and no data was provided on the remaining four referrals. Four referrals were rescinded, one was

redirected to acute care, one was transferred to another institution, and three paroled.  The

remaining 44 inmates were accepted by DSH intermediate care during the review period.  Beds

were assigned to 38 inmates, among whom 23 transferred within 72 hours of bed assignment and

13 did not.  No information was provided on the remaining two.  Of the total 44 inmates

accepted into DSH intermediate care, 34 or 77 percent transferred within 30 days of referral, four

or nine did not transfer within 30 days, and six or 14 percent were re-directed to acute care

referral.

At the time of the site visit, as of March 9, 2015, the institution provided a list of six

inmates who had been referred and accepted for DSH intermediate care and were awaiting

placement.  One was scheduled to parole as an MDO at ASH on March 10, 2015, one was out to

court, one refused transportation on March 9, 2014, one had special transportation arranged for

March 11, 2015, and one was re-directed to acute care.  All six were still within the 30-day

intermediate care transfer timeframe.  The inmate re-directed to acute care was beyond the ten-

day timeframe, and two other inmates referred directly to acute care were still within the ten-day

timeframe.  All three were awaiting transfer.

Information gleaned from CIM's referral log for the review period indicated that 118 or

60 percent of the 198 inmates considered for referral to higher levels of care were not referred.

The predominant reason for the non-referrals was that the inmate's existing LOC was clinically

indicated.  Other reasons included assessment for admission to an MHCB, change of medication,

discharge planning, and initiation of involuntary medication procedures.  CIM reported that some

non-referred inmates were provided "enhanced treatment."

CIM reported timely transfers to its internal MHCB for all of its crisis bed referrals.  Data

on transfers during the review period to outside MHCB beds indicated 36 transfers, of which 15

458

or 42 percent were timely and the rest were untimely.  The late transfers ranged from 6.5 hours to four days overdue.  Staff reported that the predominant reason for delays in transfers was unavailability of MHCBs.

The institution reported that it had placed 193 inmates in alternative housing pre-crisis bed transfer during the review period.  There were 51 in August, 42 in September, 41 in October, 16 in November, 25 in December, and 18 in January.  All later transferred to an MHCB, either at CIM or at other institutions.  One hundred fifty seven or 82 percent transferred within the Program Guide 24-hour timeframe.  Among the 36 late transfers, 12 or one-third were overdue by one to 5.2 days, or by an average of 2.06 days.  The remaining 24 or two-thirds of overdue transfers occurred within less than one day beyond the 24-hours timeframe, i.e. within 48 hours of placement in alternative housing.

CIM reported one transfer to a PSU, which was timely.

During the site visit, samples holding cell logs were reviewed for compliance with the four-hour time limit and for direct line-of-sight visibility.  These placements included cases of suicidality, psych evaluations, and MHCB admissions.  All of the sampled log entries indicated compliance with timeframes for movement out of the holding cells and documentation of the required observations.

CIM referred 51 inmates to EOP hubs during the review period.  Ninety-four percent transferred within 30 days.  At the time of the site visit, there was one EOP inmate in administrative segregation awaiting transfer to a hub for less than 30 days.  No EOP inmates in administrative segregation during the review period had been there longer than 90 days.

Of the 154 EOP inmates transferred from the reception center during the review period, 43 or 28 percent had waited longer than 60 days.  Overdue stays in reception center ranged from

459

one day to 161 days beyond the 60-day transfer timeframe.  Staff attributed the delays to lack of beds at receiving institutions.  Among the 24 EOP inmates in the reception center at the time of the site visit, none had been there longer than 60 days.

During the review period, 432 3CMS inmates transferred from the reception center.  Of these, 126 or 29 percent were beyond the 90-day timeframe, by a range of one to 154 days.  Staff attributed the late transfers to institutional processing delays.  By the time of the site visit, the process of transferring 3CMS inmates out of reception center had been improved.  At the time of the site visit, there were nine 3CMS inmates in the reception center who had been there longer than 90 days, by a range of two to seven days.

Other Issues:

Reception Center:

No data on timeliness of nurse transfer-screening or medication continuity reviews of reception center inmates was provided.  Staff reported that the 31-item mental health questionnaire was administered within inmates' first 24 hours after arrival.  Patients who had received prior treatment in county jails or while on the CDCR mental health caseload were identified by transfer records or patient self-report.  No data was provided on automatic referrals for mental health evaluations of patients who had prior CDCR treatment histories.  Staff reported that all reception center mental health evaluations were completed timely, but no data was provided.

Most of the EOP inmates in reception center were housed in the Birch, Madrone, and Sycamore housing units.  Initial psychiatry contacts were 99-percent compliant and follow-up psychiatry contacts were 98-percent compliant.  Initial PC contacts were 97-percent compliant, and follow-up PC contacts were 98-percent compliant.

460

Initial IDTT meetings were timely in 94 percent of cases, and follow-up IDTT meetings were 100-percent compliant.  IDTT composition and attendance complied with Program Guide requirements.  No data was provided on whether initial psychiatric evaluations were completed before initial IDTT meetings, but staff reported that a QIT was working on this.

Minutes of the institution's quality management committee meetings indicated that 93 percent of RC EOP patients were offered at least five hours per week of structured therapeutic activities, and 82 percent actually participated in offered treatment.  Eleven patient contacts were in non-private cell-side settings.  These consisted of ten discharge follow-ups by the psych tech and one PC follow-up contact.  Staff also reported that no reception center EOP patients were released to parole or community supervision during the review period.

 Interviewed EOP inmates in the RC knew how to submit requests for clinical or medical services.  They reported general satisfaction with the quality of their treatment by PCs and psychiatrists, but they also reported several concerns.  Patients reported having to choose between yard and out-of-cell therapeutic activities, not receiving legal or personal mail timely, and having no visiting or telephone privileges.  Senior custody staff corroborated these patients' reports.

3CMS inmates in RC received initial screenings, mental health evaluations, preliminary treatment planning, and psychotropic medication when indicated.  Initial and follow-up psychiatry contacts were both 100-percent compliant.  Initial and follow-up PC contacts were 99-percent and 98-percent compliant, respectively.  IDTT composition and attendance at team meetings satisfied Program Guide requirements.  No information on timeliness of meetings was provided.  Group therapy was not provided to 3CMS inmates during the review period or at the time of the site visit.

461

The five 3CMS RC inmates housed in overflow in Cypress, an administrative segregation unit, were reported to be receiving mental health care from reception center clinicians and were not subjected to any of the administrative segregation restrictions.

MHSDS Inmates in Administrative Segregation:

In administrative segregation, the assigned psychiatrist had a caseload of 69 and the full-time PCs had caseloads of 13 to 14.  There was one assigned recreational therapist.

Initial psychiatry contacts were 99-percent compliant, and follow-up psychiatry contacts were 100-percent compliant.  Eleven percent, or 128 of 1137, of these contacts were at cell front, which was attributed in all cases to inmate refusals, according to provided documentation.

Initial PC contacts were 96-percent compliant and follow-up PC contacts were 99-percent compliant.  It was reported that 867 of 1661 or 52 percent of PC contacts were at cell front and that 68 percent of these were due to inmate refusals.

Of the total 181 IDTT meetings during the review period, 77 percent of initial meetings and all of the follow-up meetings were timely.  Composition of IDTT was 77-percent compliant, due largely to absence of psych techs.  According to audit results, psychiatrists and psychologists attended all IDTT meetings during the review period.  At observed IDTT meetings for three inmates during the site visit, the team process was found to be generally very good, although there was no discussion about the inmate before or after he joined the meeting.

Cypress Hall and Palm Hall each had a group room.  In Cypress Hall, there were two groups, one of which was held every week and the other was held every other week.  In addition, psych techs provided one group there on Saturdays and on Sundays.

Psych techs were being rotated through housing units weekly, but it was reported that they will be assigned to specific housing units once the post-and-bid process is completed.

462

Observed daily psych tech rounds in Palm Hall were conducted competently.  They were supervised and audited weekly by the psych tech unit supervisor and the supervising psych tech. These audits used both a standardized checklist and qualitative narrative, and were useful.

During the review period, ten inmates had stays in administrative segregation that exceeded 150 days.  Five of them remained there at the time of the site visit.  Prioritized case-by-case reviews of these inmates were performed consistently with applicable CDCR policies and procedures, and results and recommendations were presented to the ICC.

MHCB:

CIM operated a 34-bed MHCB unit in Facility D.  It was staffed by a chief psychiatrist, three full-time psychiatrists, two supervising clinicians, six full-time clinicians, and the equivalent of 50 hours of weekend coverage by two licensed clinicians.  Admissions of both internal and external referrals were managed by HCPOP.

Referrals to the MHCB were screened in the TTA area.  Reports indicated 340 admissions during the review period.  Nine of these patients were admitted three or more times. The average length of stay was 13.6 days.

Audit results indicated that initial psychiatry contacts were 95-percent compliant, and follow-up psychiatry contacts were 85-percent compliant.  They also indicated that initial PC contacts were 89-percent compliant, and follow-up PC contacts were 91-percent compliant.

Patients received daily PC contacts, including one weekly treatment planning meeting.

Based on presented audit results, initial IDTT meetings were 90-percent compliant, and follow-up IDTT meetings were 92-percent compliant.  No data on team composition or attendance was provided, but required staff attended and participated in discussions at observed IDTT meetings.  Staff explained treatment goals to patients in clear, understandable terms and

463

patients participated actively in discussions of how goals would be measured and met.  Form 7388B was routinely discussed.

Cells in CTC Units 1 and 4 remained non-suicide-resistant and continued to have many potential noose attachment points.  Staff reported that patients placed in these cells were under continuous observation and that headquarters' design standards and services department had recently reviewed these cells for improvements.  Results of this review were still pending at the time of the site visit.

Seclusion and Restraint:

Logs indicated that during the review period, one patient was placed in four-point restraints for approximately 2.5 hours.  This placement resulted from a physician's order based on the patient's self-injurious behavior.

Alternative Housing:

CIM reported that patients referred to the MHCB were placed into alternative housing pending placement confirmation from HCPOP, consistently with CDCR policy and procedure. Infirmary stations 1 and 2 were given priority as alternative housing, followed by the large holding cells without water/toilets that were located at the front of the clinic TTA in Facility D.

Staff reported that pending mental health evaluation, patients were kept on continuous direct visual observation by nursing.  They were evaluated and treated by the physician on call and MHCB clinical staff in a private evaluation/treatment area in the MHCB clinic.  Staff also reported that psychiatry was assigned to treat patients awaiting crisis bed placement.  On weekends, the assigned psychologist or clinical social worker was designated to assist the psychiatrist.  An RN was also required to be on duty at all times and an SRN II was required to conduct rounds.

464

<u>3CMS</u>:

There were four psychiatrists assigned to the 3CMS mainline.  They had caseloads ranging from 227 to 388 patients, with an average of 301.4 patients per psychiatrist.  There were 12 psychologist-PCs who had caseloads ranging from 56 to 90, with an average of 75 patients per PC.  There were another five clinical social worker PCs who had caseloads ranging from 50 to 90 patients, with an average of 62 patients per clinician.

Over 99 percent of inmates prescribed psychotropic medication were seen timely by a psychiatrist for both initial and follow-up contacts.  Five of these contacts were conducted in non-private settings.

CIM documentation indicated that 841 of 861 or 98 percent of initial PC initial contacts were completed within ten working days, and 100 percent of quarterly follow-up PC contacts were timely.  Less than one percent of these contacts were conducted in non-private settings.

There were 1,141 completed IDTT meetings for 3CMS inmates during the review period.  Initial meetings were completed timely 93 percent of the time, and follow-up meetings were completed at least annually, and more often if indicated, 100 percent of the time.  CIM reported 88-percent compliance for attendance by required staff.  Absences were largely by correctional counselors, who missed 121 or 10.6 percent of the meetings.

During the site visit, a group of seven 3CMS inmates in C-facility, a Level II SNY, were interviewed.  All of them described access to their psychiatrist and PC as very good, and said that the sick call process was working well from a mental health perspective and that there were no problems with continuity of their medications.  Their most significant recommendation for improving mental health services was to increase "sensitivity" of the correctional staff and to improve communications among health care services.

465

Later the same day, a group of thirteen 3CMS inmates including four serving life sentences in A-facility, also a level II SNY, were interviewed.  At least five of these inmates commented favorably about their PCs.  However, these inmates also had numerous complaints about mental health services, including expirations of medication orders without timely renewals, individual therapy that was not helpful, poor access to group therapy, and disrespectfulness by custody staff.  They also had complaints related to security procedures employed when off-site intervention were needed, for example, being cuffed for many hours on end and not uncommonly being placed in holding cells for up to six hours while awaiting a medical assessment. Nursing staff said they were aware of the concerns surrounding continuity of medications.  They indicated that concerns surrounding expirations and untimely renewals were substantiated, but others were unsubstantiated upon review of inmates' health care records.

Staff indicated that CIM did not have a program for those serving life sentences.  To be considered for parole, these inmates were often required to participate in certain group programs regardless of whether these inmates were on the mental health caseload.  This drove up demand for access to these groups, which affected access for caseload inmates.

Referrals:

CIM reported that there were 2,779 referrals to mental health during the review period. These included four emergent referrals, 24 urgent referrals, and 2,751 routine referrals. Compliance rates for timely response were 75 percent for emergent referrals, 92 percent for urgent referrals, and 95 percent for the routine referrals.

Heat Plan:

The heat plan operational procedure was updated in April 2014.  Monthly heat plan activity reports were prepared and sent to the statewide heat plan coordinator.  Reports for

466

August, September, and October listed inside temperatures above 90 degrees as Stage I heat activations.  Indoor temperatures reached 95 degrees or above on multiple days in facilities A, C, and D, with a high of 102 degrees, and were all inaccurately documented as Stage II heat activations.  Medical records were documented for completed Stage III heat activations and indicated four heat-related incidents on September 16, 2014.

Interviewed inmates complained of improper implementation of the heat plan, particularly when indoor temperatures reached the heat-alert threshold.  Provided documents corroborated these complaints, indicating inadequate implementation of the heat plan on Facility A.

Access to Care:

CIM's monthly health care access reports for August 2014 through January 2015 reported the following findings.

Data for August 2014 showed 80 percent of mental health ducats were completed. Among the non-completed ones, 73 percent were attributed to inmate refusals, 26 percent were attributed to other non-custody reasons, and one percent were attributed to custody reasons.

For September 2014, data showed that 82 percent of mental health ducats were completed.  Seventy-five percent of non-completed ducats were attributed to inmate refusals, 23 percent to non-custody reasons, and two percent to custody reasons.

Data for October 2014 indicated a ducat completion rate of 80 percent.  The non-completions included 68 percent due to inmate refusals, 29 percent due to non-custody reasons, and three percent to custody reasons.

For November 2014, 82 percent of mental health ducats were completed.  Of those not completed, 77 percent were attributed to inmate refusals and 23 percent were attributed to non-custody reasons.

In December 2014, 82 percent of mental health ducats were completed.  Break-down of the non-completed ducats indicated 70 due to inmate refusals, 29.5 percent due to non-custody reasons, and less than one percent due to custody reasons.

For January 2015, 78 percent of mental health ducats were completed.  Sixty-two percent of non-completed ducats were due to inmate refusals, 35 percent were due to non-custody reasons, and three percent were due to custody reasons.

Program Access:

a.      Job and Program Assignments:

Data for March 10, 2015 showed that one EOP inmate, 311 3CMS inmates, and 1,193 non-MHSDS inmates held jobs at CIM.  There were 128 3CMS inmates and 307 non-MHSDS inmates in part-time jobs.  No information was provided on whether jobs were paid or unpaid.

Eighteen 3CMS inmates and 43 non-MHSDS inmates had full-time academic assignments.  In the part-time academic program, there were 231 3CMS inmates and 540 non-MHSDS inmates.

In the full time vocational educational program, there were 65 3CMS inmates and 191 non-MHSDS inmates. There were 20 3CMS inmates and 48 non-MHSDS inmates in the part-time vocational education program.

The institution reported that as part of its re-entry program, 281 3CMS inmates and 531 non-MHSDS inmates were receiving substance abuse treatment.

468

b.    <u>Milestone Credits</u>:

CIM reported that for the period of August 1, 2014 to January 31, 2015, 21 EOP inmates were eligible to earn milestone credits, and 4.76 percent of them actually earned the credits. There were also 696 3CMS inmates eligible for milestone credits, 15.52 percent of whom actually earned the credits.  Of the 1,248 eligible non-MHSDS inmates, 14.1 percent actually earned the credits.

c.    <u>Out-of-Level Housing</u>:

On February 18, 2015, one Level IV EOP inmate was in Level II housing.  There were seven Level IV 3CMS inmates in Level II housing, and three Level IV 3CMS in Level I housing. Fifty Level III 3CMS inmates were in Level II housing.  There were 19 Level II 3CMS inmates in Level I housing.  Sixty-four 3CMS Level I inmates were in Level II housing.

d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

The only information provided on CIM's ADA reasonable accommodation and grievance procedures was that there had been no revisions.

<u>*Coleman* Postings</u>:

No information on *Coleman* postings was provided at the time of the site visit.

**<u>California Rehabilitation Center (CRC)</u>**
May 12, 2015 - May 14, 2015

<u>Census</u>:

As of May 11, 2015, CRC housed a total of 2,388 inmates, for a 34-percent decline since the preceding monitoring period.  The mental health caseload population was 1,136 inmates, an increase by 22 percent since the preceding monitoring period.

Two mainline EOP inmates were pending transfer. There were 1,133 mainline 3CMS inmates.  One 3CMS inmate was in the OHU.

Staffing:

The senior psychiatrist position was filled. Three of four psychiatrist positions were filled, for a 25-percent vacancy rate.

Both positions for supervising senior psychologists and one of the two positions for senior psychologist specialists were filled.  Seven of the nine psychologist positions were filled, for a 22-percent vacancy rate.  With two psychologists out on extended leave, the SNY was adversely affected by a shortage of PCs.

Seven of the nine social worker positions were filled, leaving a 22-percent vacancy rate.

The recreational therapist position and the HPS I position were both filled.

Of the seven clerical positons, six were filled, leaving a 14-percent vacancy rate.

Quality Management:

 The quality management committee met at least monthly during the review period. Minutes were maintained and a quorum was achieved at all meetings.  Discussion topics included mental health-related issues.

The mental health subcommittee met monthly during the reporting period.  Unlike during the preceding monitoring period, they were no longer combined with SPRFIT meetings. Minutes were maintained, but did not indicate whether a quorum was achieved at all meetings. Regular agenda items included review of mental health performance reports, mental health staffing, staff training, SPRFIT issues, mental health program-related audit results, health care access, and status of LOPs.   Regularly audited areas included effective communication, IDTT meeting attendance, OHU documentation, DSH referrals, and medication management.

470

No QITs were chartered during the review period.

No peer review was conducted during the review period.  Staff reported a planned implementation of the statewide peer review process in August 2015.

Medication Management:

Continuity of medications was compliant, except following intra-institutional transfers, for which the compliance rate was 75 percent for the months of November 2014, January 2015, and March 2015.

Response to inmate medication noncompliance was compliant except in cases of urgent referrals for inmates' no-shows and/or refusals of Clozaril, insulin, and HIV medications. Collectively, measures for response to inmate noncompliance with these three medication classes showed compliance rates of 40 percent for October 2014, 50 percent for November 2014, and 60 percent for December 2014.

Medication administration was compliant except for psychiatric chronic care medications, for which rates of compliance were 75 percent for November 2014, 70 percent for January and February 2015, and 85 percent for March 2015.

Laboratory testing of inmates' blood levels for certain psychotropic medications was 99-percent compliant.

Transfers:

There were no referrals or transfers to acute or intermediate inpatient levels of care during the review period.

Twenty-three inmates were transferred to outside MHCBs.  Fifteen or 65 percent of these were timely.  Late transfers were attributed to lack of MHCB availability.

471

All 39 placements into the OHU were moved out timely.  Four of the five stays in alternative housing resulted in timely transfers to MHCBs.

No inmates were transferred to a PSU during the review period.

During the review period, there were four transfers of EOP inmates to an administrative segregation EOP hub, all of which were timely.

All five inmate transfers to mainline EOP programs complied with timeframes.

Other Issues:

OHU:

CRC maintained a ten-bed OHU.  Mental health caseload inmates in the OHU were single-celled.  None of the cells were suicide-resistant.  Patients awaiting evaluations or transfers to MHCBs were placed on one-to-one observation.  There were no seclusion and restraint rooms and no padded rooms in the OHU.

OHU mental health staff used a local form to track inmate placement, team conference(s), level of care, mental health contacts, discharge criteria, and disposition.  The form also included an OHU checklist.

At the time of the site visit, a 3CMS inmate was housed in the OHU. PC contacts were conducted inside the cell, with a custody officers positioned outside of the cell door to provide security while maintaining patient privacy.

3CMS:

All initial psychiatric contacts for 3CMS inmates were conducted timely.  Follow-up psychiatry contacts were 99.7-percent compliant for timeliness.  All psychiatry contacts during the review period took place in private settings.

472

Initial PC contacts for 3CMS inmates were 86-percent compliant for timeliness.  Follow-up contacts were 98-percent compliant.  All PC contacts for 3CMS inmates during the review period took place in private settings.

The compliance rate for timeliness of initial IDTT meetings was 84 percent.  Follow-up IDTT meetings were conducted timely 98 percent of the time.  According to provided data, the compliance rate for attendance by required disciplines was 97 percent.

Clinician-led groups were offered on Tuesdays and recreation therapist-led groups were offered Tuesdays through Thursdays.  Topics of offered groups included coping skills, healthy relationships, social skills, and leisure tasks.

Referrals:

According to data provided by the institution, the three emergent and six urgent referrals generated during the review period all received a timely response.  However, as noted above, MAPIP data indicated that response to urgent referrals for no-shows/refusals of Clozaril was only 40-percent compliant for three months of the review period.  Of the 749 routine referrals generated during the review period, 91 percent received a timely response.

Access to Care:

A review of CRC's monthly Health Care Access Quality Reports from October 2014 through March 2015 indicated that .15 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 7.53 percent were not completed due to non-custodial reasons other than inmate refusals.

Program Access:

a.      Job and Program Assignments:

473

Institutional data indicated that one full-time job was filled by an EOP inmate, 631 were filled by 3CMS inmates, and 662 were filled by non-mental health caseload inmates.  There were no part-time jobs at CRC.

For full-time academic assignments, five were held by 3CMS inmates and three were held by non-mental health caseload inmates.  Of the 525 part-time academic assignments, 271 were held by 3CMS inmates and 254 were held by non-mental health caseload inmates.

For voluntary education assignments, 564 were held by 3CMS inmates and 586 were held by non-mental health caseload inmates.

Of the 134 full-time vocational education assignments, 74 were held by 3CMS inmates and 60 were held by non-mental health caseload inmates.  For part-time vocational education assignments, 21 were held by 3CMS inmates and 33 were held by non-mental health caseload inmates.

b.    Milestone Credits:

Information provided by the institution indicated that as of April 1, 2015, 21.6 percent of eligible 3CMS inmates and 31.88 percent of eligible non-mental health caseload inmates earned milestone credits.  CRC did not have an EOP program.

c.    Out-of-Level Housing:

Institutional data indicated that as of April 23, 2015, there were 37 Level I 3CMS inmates and 40 Level III 3CMS inmates in Level II housing.

d.    ADA Reasonable Accommodation and Grievance Procedures:

CRC provided confirmation through training sign-in sheets, materials, and sample completed forms that the revised ADA accommodation and grievance procedures had been implemented.

474

Use of Force:

According to data provided by the institution, 89 percent of mental health clinicians and 94 percent of custody staff attended the mandatory use-of-force training.

*Coleman* Postings:

*Coleman* postings in both English and Spanish languages were found in all of the housing units toured by the monitor, including Facilities B, C, and D.  All postings were placed in common areas accessible to *Coleman* class members.

## Richard J. Donovan Correctional Facility (RJD)
April 21, 2015 – April 23, 2015

Census:

On April 20, 2015, RJD housed 3,022 inmates, which was eight percent fewer than during the preceding monitoring period.  The total mental health caseload population was 1,961, which was an increase by 54 or three percent since the preceding monitoring period.  There were three NDS inmates in administrative segregation.

Fourteen inmates were in the MHCB.  There were 313 inmates in the mainline EOP, 213 inmates in the SNY EOP, and 60 EOPs in the administrative segregation hub.  Three EOP inmates with SHU terms were pending transfer to a PSU.

There were 1,364 3CMS inmates.  Of these, 129 were 3CMS mainline, 1,160 in the SNY, and 75 were in administrative segregation.

Staffing:

As of April 22, 2015, the chief psychiatrist and two chief psychologist positions were filled.  One of the chief psychologists was designated as the chief of mental health.  All six senior psychologist specialist positions were filled.

475

Of the 16.5 psychiatrist positions, 16 were filled and one was out on long-term leave, for a functional vacancy rate of nine percent. Twelve of the psychiatrists had designated caseloads and the remaining four were "floaters" to meet program needs, work in quality management, or cover in the MHCB during weekends, as needed.

The institution had 47.7 psychologist positions of which 43 were filled, for a vacancy rate of nine percent. At the time of the site visit, four psychologists were on long-term leave, but the institution covered these positions with registry staff.

The supervising social work position and 22 of the 24 social work positions were filled. With three social workers out on long-term leave, the functional vacancy rate in social work was 13 percent.

There were 23.5 established recreational therapist positions, of which 17.7 were filled, leaving a vacancy rate of 21 percent. Use of one registry recreational therapist reduced the functional vacancy rate to 16 percent.

The two senior psych tech positions and 34 of the 44.2 psych tech positions were filled. Use of three registry psych techs reduced the functional vacancy rate to 16 percent.

The institution had 23.5 mental health clerical positions, of which 12 were filled, resulting in a vacancy rate of 49 percent. Use of 5.5 registry staff reduced the functional vacancy rate to 26 percent.

The sole OSS II, CHSA II, AGPA, and HPS I positions were all filled.

Quality Management:

Quality management activities continued to improve and made for an overall robust quality management program at RJD.

476

The local governing body met quarterly with appropriate attendance by required members. The minutes indicated that it took up review/approval policies and procedures and privileging issues, among other things.

RJD also had a health care quality management committee which dealt with some mental health-related matters.  It met monthly, with attendance by all required disciplines.  Covered matters included reports from each clinical discipline, dashboard/PIWG data, specialty services, OHU placements, performance improvement plans, and revisions to LOPs.

Meetings of the mental health subcommittee took place monthly and were attended by required disciplines.  The committee's work included EOP treatment hours, custody wellness checks, clinical contacts, MAPIP results, IEX incidents, QITs, performance reports, and the RVR process.

The mental health program at RJD conducted regular audits for quality management and quality improvement purposes.  They were in addition to audits of the sustainable process for identifying and referring inmates to higher levels of care and the process for certification of the administrative segregation EOP hub. The mental health subcommittee was responsible for implementation and monitoring of any corrective actions which resulted from the mental health program audits.

The institution also implemented a comprehensive performance improvement work plan that was based on a primary care model.  It focused on access to care, continuity of care, medication management, chronic pain management, and the grievance process.  Another project evaluated the MAPIP process.  It held regular meetings among mental health, nursing, and pharmacy staff and reported to institutional leadership and CDCR headquarters.  CAPs were created for medication management areas that were less than 90-percent compliant.

Each week, a QIT looked at specified performance indicators including appointment cancellations due to custody issues, readmissions to the MHCB and DSH within 30 days of discharges, MHCB clinical lengths of stay, alternative housing stays, continuity of psychiatric care, timeliness of mental health referrals, and EOP treatment hours offered.

Staff were trained on the new peer review process but it was not yet implemented consistently with the new model developed by CDCR central office.

Medication Management:

According to MAPIP data, RJD's overall compliance rate in the area of continuity of medications following patient transfers was 65 percent.  Continuity of medications for newly-arriving inmates at the institution was 44-percent compliant. Following discharges from the MHCB, medication continuity was 90-percent compliant, but after discharges from a DSH inpatient program or a community hospital, continuity was 59-percent compliant.  For inmates transferred to locked units, continuity of medications was 80-percent compliant. Continuity of NA and DOT medications following intra-institutional transfers and releases was 52-percent compliant.

For psychiatric chronic care medications, the compliance rate for medication administration was 18 percent, and for newly-ordered psychiatric medications it was 20 percent.

Patient compliance with psychiatrist-prescribed medications was 93-percent compliant overall, with a compliance rate of 97 percent for PC 2602 medications.

For cases of refusals and no-shows, the compliance rate for referrals for urgent medications, including Clozapine, was 42 percent.

Laboratory testing of blood levels for inmates taking psychotropic medications was 98-percent compliant.

478

Continuity of medications for paroling inmates was 86-percent compliant.

Transfers:

The institution continued to have a full-time DSH coordinator.  The referral and non-referral logs were complete and contained all necessary data.  Reasons for the non-referrals were clinically adequate.  It was reported, and verified by data review, that referral packets were completed timely by the institution, but once the packets were sent to health care services at CDCR headquarters, transmission of the packets to DSH was delayed, due mostly to case-by-case reviews.

A total of 535 inmates were identified as meeting one or more indicators for consideration for DSH referral.  Of these, RJD referred a total of 95 or 18 percent to DSH inpatient programs.

Sixty-three inmates were referred to acute inpatient care during the review period.  Two were rescinded and the remaining 61 were transferred.  Forty went to DSH-Stockton and 21 went to acute care at VPP.  Three or five percent of referral packets were not completed within Program Guide timeframes.  The average time from referral to transfer was ten days.  Twenty-nine or 39 percent of acute care referrals were transferred later than the ten-day time limit, with a range of 12 days to 26 days.  Eight or 13 percent of referrals were not transferred within 72 hours of bed assignment, but all transferred within 96 hours.

Thirty-two inmates were referred to intermediate inpatient care.  Three were rescinded.  Of the 29 who transferred, 11 went to DSH-Stockton, 15 went to Salinas Valley Psychiatric Program (SVPP), three went to ASH, one went to VPP, and two were deferred to DSH-Stockton-Acute Care and VPP acute care.  Sixteen or 55 percent of referral packets were not completed

479

within Program Guide timelines.  Of the 29 patients who transferred, 27 or 93 percent,
transferred within the 30-day time limit, with an average transfer time of 24.75 days.  The two
late ones transferred on day 31 and after day 60, respectively.  Two or seven percent of patients
did not transfer within 72 hours of bed assignment.

At the time of the site visit, there were nine patients who had been accepted to a DSH
inpatient program and were awaiting transfer.  Two patients designated for intermediate care and
one patient designated for acute care were scheduled to transfer by the end of the site visit.
Another three patients were awaiting transfer to intermediate care, which was still within
Program Guide transfer time limits.  Of the three additional patients awaiting transfer to acute
care, one had been referred by the IDTT on April 10, 2015 and was number 24 on the waitlist.
The other two were referred by the IDTT on March 16 and March 18, 2015 and were numbers 35
and 40, respectively, on the waitlist.

The DSH coordinator reported that the institution was notified timely when patients were
returning from DSH and that discharge summaries were posted timely on SharePoint.  The DSH
coordinator ensured that the appropriate discharge paperwork was completed and that discharges
complied with policy.  The coordinator arranged, tracked, and reported DSH clinician-to-RJD
clinician contacts for all inmates discharged back to RJD.  Reported audit data indicated that 80
percent of discharges had clinician-to-clinician contacts, although the audit sample consisted of
only five cases.

Data indicated that 159 RJD inmates went to outside MHCBs.  The average transfer time
was 24 hours, with a range of 1.53 to 95.33 hours.  Transfers of 57 or 36 percent of patients took
longer than 24 hours and averaged 43.28 hours in duration.  They were attributed to lack of
available MHCBs.

A document detailing alternative housing stays indicated that of 259 inmates placed in alternative housing during the review period, 140 were transferred to an outside MHCB, 101 were placed in a crisis bed at RJD, and 18 were transferred to housing units.  Data in the document also indicated a compliance rate of 64 percent for transferring inmates out of alternative housing within Program Guide timeframes.  The average stay lasted .928 days. Overdue stays exceeded timeframes by one hour to 6.75 days.

All four transfers of inmates to a PSU during the review period were completed within 60 days of endorsement.

RJD reported 100-percent compliance with transfers of inmates to EOP hub institutions within 30 days of identification.

Other Areas:

Administrative Segregation EOP:

The EOP administrative segregation hub was certified in August 2014.  No further CQIT reviews had been conducted as of the time of the site visit.  Treatment was provided in Housing Unit 6 on the dayroom floor. Only the IDTT meeting room in Unit 6 offered patient privacy. Individual psychiatry and PC contacts and crisis interventions were provided in shared cubicles. The three group treatment areas were holding cells with sound-proof backing that accommodated up to nine inmates. Treatment modules on the dayroom floor were used for group treatment for EOP and 3CMS inmates. Staff indicated that a treatment building for the administrative segregation EOP hub was planned in the HCFIP, with a projected completion date of May 2016.

The sole psychiatrist in administrative segregation had a caseload of 72 patients.  The hub had eight assigned PCs, including one who had additional assignments and one who was part-time.  The six full-time PCs and the one who had multiple assignments had caseloads of seven to

nine patients, and the part time clinician had a caseload of five patients.  One hub PC was on leave during the site visit.

During the review period, the compliance rate for timely completion of pre-placement screens was 70 percent.  A CAP to improve compliance levels was implemented and reportedly had resulted in compliance by the time of the site visit.  The compliance rate for timely completion of the 31-question screen was 97 percent. Data was unavailable on timeliness of completion of the comprehensive evaluations and the comprehensive mental health assessments before initial IDTT meetings.

Ninety-one percent of inmates prescribed psychotropic medication were seen by a psychiatrist every 30 days.  Eighty-nine percent of these contacts were out-of-cell. Compliance rates for timeliness of initial and follow-up PC contacts were 92 percent and 100 percent, respectively.  Sixty-five percent of PC contacts were out-of-cell.

Initial and follow-up IDTT meetings remained timely, with compliance rates of 97 percent and 100 percent, respectively.  Nearly all inmates who refused treatment were given monthly IDTT meetings.  The rate of attendance by required disciplines was 98 percent.  In five of the six meetings without full attendance, the CC was absent.  At an observed ICC meeting during the site visit, the psychologist provided good mental health input.

On average, EOP inmates in the hub were offered 17.97 hours per week of out-of-cell structured therapeutic activities. All inmates were offered five or more hours of treatment, and 1,216 of 1,235 or 98 percent of inmates were offered ten or more hours.  Sixty-one percent of inmates attended ten or more hours, and 86 percent attended five or more hours.  The treatment refusal rate was 38 percent. A small percentage of inmates were on a modified treatment program during the review period, and at the time of the site visit, eight EOP inmates were on it.

482

Most of the inmates on modified treatment were receiving five to ten hours per week of out-of-cell structured therapeutic activities.

During the review period, the average length of stay in administrative segregation was 56 days for EOP hub inmates, 51 days for 3CMS inmates, and 52 days for general population inmates.  The range of stays for mental health caseload inmates was 39 to 170 days for EOP inmates and 39 days to 512 days for 3CMS inmates.

From September 2014 through February 2015, approximately 36 percent of EOP inmates remained in administrative segregation longer than 90 days.  This was an increase over the 32-percent rate that was reported for the preceding monitoring period.  Provided documentation indicated that 30-day reviews were being completed for these inmates.

The institution maintained a tracking log that included the inmate's placement date, days in the hub, reason for placement, reason for retention, and date and actions of the most recent ICC meeting.  Each month, the CC II reviewed the length-of-stay data from COMPSTAT, updated the tracking log, and forwarded it to the facility captain for review.  The CC II and the facility captain contacted the necessary parties for follow-up on completion of items required for moving the inmate out of the hub.  After the captain's review, the information was forwarded to the associate warden and then to the warden for review and signature.  A report was then emailed to CDCR Headquarters.

Review of three months' data showed that nearly half of cases in which EOP inmates were held in the hub longer than 90 days were due to waits for available SNY beds.  Other reasons included pending PSU transfers, investigations by staff, and ICC meetings.  No cases were pending CSR review at the time of the site visit.

RJD conducted prioritized case-by-case reviews for all mental health caseload inmates housed in administrative segregation longer than 150 days.  Beginning in December 2014, each week the CC II reviewed COMPSTAT data to identify and track any EOP inmates whose stays exceeded 150 days.  Any inmate needing an ICC meeting would be scheduled for a case-by-case review.  If his casework were complete and he was pending transfer, his case would be scheduled for a long-term case conference with the DAI associate director at CDCR headquarters.  At these conferences, RJD custody staff provided reasons for the inmate's placement and retention in administrative segregation, and mental health staff provided information on the inmate's mental health status and treatment needs.

At the time of the site visit, there were four EOP inmates and nine 3CMS inmates whose stays in administrative segregation exceeded 150 days.  Case-by-case reviews were conducted. The monitor's review of the ten who had the longest stays found that two were due to the occurence of additional serious RVRs while in the hub.  A case teleconference with the DAI associate director was scheduled for the week after the site visit, when nine of the 13 cases were scheduled for discussion.  Two were follow-ups from prior case conferences and the remaining seven were initial case conferences.

Twelve inmates in two group settings were interviewed.  They confirmed being offered at least ten hours of out-of-cell structured therapeutic activities per week, and another ten hours of outdoor recreational time which included about 3.5 hours of structured recreational activity. They described these offerings as helpful in addition to the weekly individual clinical contacts with their PC. They reported lack of privacy in the locations of their group and individual treatment and excessive use of force by COs.  Mental health staff dismissed the reliability of these reports about correctional staff.

484

Staff reported that crank radios were available to inmates during their first 21 days in administrative segregation.  Several of the interviewed inmates expressed concern about having to forfeit the radios at the end of the three-week period.  It was reported that inmates could purchase a crank radio for $38.00.

3CMS Inmates in Administrative Segregation:

3CMS administrative segregation inmates lived in Housing Units 6 and 7.  Unit 7 also housed non-mental health caseload inmates.  Inmates were seen for treatment in the housing units in which they lived.

The administrative segregation 3CMS program had three assigned clinicians who had caseloads of 22 to 26 inmates. Individual clinical contacts were provided with use of four therapeutic modules in a non-private setting.

Ninety-eight percent of inmates prescribed psychotropic medications were seen timely by a psychiatrist. Seventy-eight percent of psychiatry contacts were out-of-cell.

Completion of initial and follow-up PC contacts was 99-percent compliant during the review period.  Fifty-eight percent of these contacts were out-of-cell.  Each PC in Unit 7 had a dedicated cubicle and holding cell for individual contacts and crisis interventions, but they were not private settings.

 At the time of the site visit, all IDTT meetings for EOP and 3CMS inmates in administrative segregation were conducted in a private setting in a conference room in Housing Unit 6.  Compliance rates for timeliness of initial and follow-up IDTT meetings were 99-percent and 100-percent, respectively.  The compliance rate for attendance by required disciplines declined to 89 percent, due largely to psych tech absences.  An observed IDTT meeting was attended by all required disciplines.  Discussions were informed by UHRs and C-files that were

485

available through SOMS & ERMS, and were clinically meaningful.  Data on the percentage of initial IDTT meetings held before initial ICC hearings was unavailable.

Unit 7 had no group treatment areas, and consequently no groups were provided for 3CMS inmates there.  On average, one group per week was provided for 3CMS inmates in Unit 6.  However, when the EOP hub population was elevated, group offerings to 3CMS inmates were curtailed.

RJD did not have an STRH in its stand-alone administrative segregation units, an LTRH/SHU unit, or a reception center STRH.  The process of transferring 3CMS inmates to an LTRH or STRH had not yet begun during the review period.

On March 2, 2015, RJD amended its OP No. 1 regarding unclothed body searches of inmates.  The institution provided documentation of administrative segregation staff training on the implementation of DOM §52050.16.6 regarding such searches.

During February and March 2015, nine inmates were evaluated jointly by custody and mental health staff because of their refusal of 50 percent of offered treatment in a two-month period.  Review of sample evaluations indicated that these inmates' custodial, mental health, and personal issues affecting their refusals were being considered, and that plans to address the identified concerns were being documented.

Non-Disciplinary Segregation:

As of April 17, 2015 there were 11 NDS 102 inmates, meaning they were not under consideration for expedited transfer.  There were also three NDS 200 inmates, meaning they were accorded accelerated transfer status.  Stays for the three NDS 200 cases exceeded 72 hours because of enemy concerns.  As of April 23, 2015, one was transferred, one was referred to

HCPOP as "difficult to move," and the third was being discussed with staff at CSP/LAC for possible transfer.

Staff indicated that following the weekly ICC meeting, the CC II was responsible for emailing notice of any NDS cases to the administrative segregation captain and the C&PR. New cases were then added to the administrative segregation facility captain, who reviewed and updated the report twice per week. The CC II, C&PR, and facility captain utilized this to expedite transfers of these inmates whenever possible.

MHCB:

RJD had 14 MHCBs plus two swing beds for mental health use, depending on need. Patients in the MHCB were from RJD and other institutions via HCPOP. The MHCB clinical team shared an office just outside of the CTC. The only private space was a room used for IDTT meetings and clinical contacts. The outdoor yard was also used for clinical contacts as well as for outdoor recreation.

The two psychiatrists assigned to the MHCB had caseloads of nine and six patients, respectively. The three assigned psychologists/PCs had caseloads of three to five patients each and together with the assigned social worker they made up the MHCB clinical team. The clinical director was a senior psychologist specialist. All worked under the direction of the chief psychiatrist.

All new admissions received a history and physical within 24 hours, a new or updated mental health assessment (Form 7386), and an SRE if admitted for suicidal behavior.

Psychiatrists made timely clinical contacts at least twice per week, and usually daily, in 100 percent of cases. Patients received clinical contacts with a psychologist twice per week in 98 percent of cases.

487

Initial IDTT meetings were conducted for 99 percent of newly-admitted inmates within 72 hours of admission.  Follow-up IDTT meetings were conducted at least weekly, with updating of treatment plans and consideration of referral to higher levels of care.  All required staff reportedly attended IDTT meetings.  At three observed IDTT meetings, all required participants and two of the three inmates were present. There was good interdisciplinary discussion among staff except the CC I, even when input from the CC I might have been helpful.

Recreation therapy in the CTC outdoor yard was available to MHCB inmates individually about a twice per week during the review period. Similar to offers for medical inmates in the CTC, the LOP had recently been revised to allow for group recreational therapy in the yard for up to six inmates at a time.  Other out-of-cell time consisted of individual clinical contacts.

From September 15, 2014 to March 15, 2015, there were 213 MHCB admissions among 167 different inmates.  One inmate had five admissions, two had four, and 13 had three.  The daily census ranged from 12 to 14.  The average length of stay was 11.6 days, but nearly half of admissions stayed longer than ten days.  Sixty percent of stays exceeding ten days were attributed to waits for DSH beds, 32 percent were due to needed additional time to clinically stabilize, and seven percent were due to PC2602 hearings.  One to two extra days for clinical stabilization were found to be effective for reducing readmissions. Once patients were clinically discharged, their stays were not extended by administrative delays.

Seclusion and Restraint:

Restraints were used for mental health reasons on five occasions.  The longest duration was seven hours.  Four inmates were placed in seclusion but the durations were unclear from the seclusion log.  Audits indicated compliance with Program Guide requirements concerning

488

property, bedding, and timely appropriate review and relaxation of mechanical restraints and restrictions on movement.

Alternative Housing:

RJD did not have a MHOHU or an OHU. Alternative housing for non-SNY inmates was located on Facility A in Cell 28 of Housing Unit 1 and on Facility C in cell 128 in Housing Unit 15. For administrative segregation unit inmates, or when the above-referenced cells were unavailable, alternative housing was provided in cells 123-128 and 222-229 in administrative segregation Housing Unit 6. Additional cells were used according to the policy memorandum and the Program Guide. The average length of stay in alternative housing was .928 days.

All inmates in alternative housing were placed on one-to-one monitoring. Treatment was reported to include daily contact with the PC and contact with the psychiatrist as clinically indicated. Inmates on A or C Yards were sometimes seen for treatment in a private setting in the treatment building and at cell front for other contacts. Inmates in administrative segregation were sometimes seen in a treatment module and at cell front. There was coordination with HCPOP and custody to facilitate efficient transfers to MHCBs at RJD or elsewhere within CDCR.

EOP:

Mainline EOP inmates were housed on Facility A. Unit 14 was being used for EOP overflow, but staff reported that it was scheduled to be designated as an EOP SNY yard as of May 1, 2015. The two psychiatrists assigned to the mainline EOP program had caseloads of 140 and 143 patients, respectively. Institutional data indicated that the mainline EOP had 15 assigned PCs, including ten whose caseloads ranged from 25 to 27 patients, and three who had additional

489

assignments and caseloads ranging from eight to 11 patients.  There were also two post-doctoral psychology interns who had caseloads of eight patients.

SNY EOP inmates were housed in Unit 15 on Facility C.  Two psychiatrists assigned to the SNY EOP had caseloads of 136 and 129, respectively, with the latter including some mainline 3CMS patients.  The SNY EOP had ten assigned PCs, including eight whose caseloads ranged from 22 to 24 patients, plus two who had other assignments and had caseloads of nine and 14 patients, respectively.  In addition, the SNY EOP had one intern who saw one patient, and one clinician who had other assignments and treated two EOP SNY patients.

The institution reported that there were 10,056 total psychiatry contacts during the review period.  Of the total 282 initial psychiatry contacts for EOP inmates, 246 or 87 percent were timely.  Of the 9,774 routine psychiatry contacts, 8,236 or 84 percent were timely.

However, the institution also reported that EOP inmates received a total of 4,267 psychiatry appointments for all mental health services during the review period.[46]  Among these 4,267 reported appointments, 3095 or 91 percent took place in private out-of-cell settings and 218 or five percent took place in non-private out-of-cell settings.  Among the reasons for cell-front psychiatry contacts, 21 were due to unspecified reasons, 15 were due to staff decision, 84 were due to inmate refusals, 24 were due to modified programming, and one was due to lack of escort.

---

[46]This inconsistency in reported data may be due to differences between staff's data entries of 10,056 appointments with regard to the details of these psychiatry contacts themselves, and their entries with regard to the numbers of psychiatry contacts in various settings, i.e. out-of-cell, private versus non-private settings, etc.

Provided data indicated that 99 percent of initial PC contacts and 93 percent of follow-up PC contacts were timely.  Institutional data indicated that for the total 28,321 PC contacts for all mental health caseload EOP inmates, 17,140 or 61 percent took place in private out-of-cell settings, and 7,504 or 26 percent took place in non-private out-of-cell settings.  Among the reasons for cell-front PC contacts, 107 were due to unspecified reasons, 2,810 were due to  staff decision, 593 were due to inmate refusals, 65 were due to modified programming, and 12 were due to lack of escort.

The number of total IDTT meetings for all mental health services was 11,977.  Of the total 364 initial IDTT meetings during the review period, 356 or 98 percent were timely.  Over 99 percent of the 11,613 follow-up IDTT meetings were compliant for timeliness.  Meetings were attended by a full complement of required disciplines in 97 percent of cases.

EOP inmates were offered an average of 12.2 hours of group per week.  Inmates attended an average of 7.23 hours per week and refused an average of five hours per week.  An average of 3.05 hours of scheduled treatment was cancelled.  Inmates on modified treatment plans were offered an average of 9.23 hours of group therapy per week, attended an average of 4.10 hours per week, and refused an average of 5.15 hours per week.  An average of 1.96 hours of their scheduled group treatment was cancelled.

IDTT meetings for EOP mainline and the SNY EOP were observed.  Overall, the meetings were conducted well.  All began timely and were attended by required staff and the inmates. The PCs were knowledgeable about the inmates' histories, treatment plans, and goals. They presented and discussed treatment plans, although only one of the PCs presented treatment goals that were measurable.  The psychiatrist was engaged and knowledgeable about the inmates' medication compliance and answered all questions from inmates and other team

491

members. Medication side effects were discussed.  Recreation therapists, psych techs, and correctional counselors all participated in team discussions without prompting. Inmates and team members were asked if they had any questions before meetings were adjourned.

Review of data for January through March 2015 indicated that among 83 cases, 48 or 58 percent of ICCs and UCCs were conducted within timeframes and 35, or 42 percent, were outside of timeframes.  Custody staff attributed the lateness to staffing shortages in the EOP SNY overflow building.

RJD established a process to track and maintain a list of inmates deemed at high risk of decompensation.  At the time of the site visit, approximately 58 inmates on A-yard, 30 on B-yard, and 30 on C-yard were on the list.  Each month, the coordinator walked the tiers and had face-to-face contacts with the inmates, and met weekly with clinicians to discuss concerns. Staff reported receiving useful input from nursing and custody on observed changes in inmates' behaviors.  Inmates on the list received additional weekly clinical contacts and monthly IDTT meetings.

Interviewed inmates reported that they knew their psychiatrist and PC and that the mental health program was beneficial.  There were concerns about late arrivals at groups because of custody escort issues. About half of interviewed inmates indicated that even if they had ducats, they might not be taken to a mental health appointment because they were not on a list. There were reports of lost property following changes of yard or level of care, and that some housing officers lacked awareness of the impact of mental illness on prisoners and were sometimes disrespectful to inmates.  Inmates expressed a need for groups to assist them with developing skills to function in the community after being released.   They also expressed concerns about

492

remaining on orientation status longer than designated timeframes and thereby being deprived of certain privileges.

3CMS:

Although issues persisted with contacts in non-private settings due to physical plant limitations, treatment for 3CMS inmates was generally consistent with Program Guide requirements.

Data was not available regarding whether intake assessments were completed within ten working days or whether intake evaluations were completed before initial IDTT meetings, but it was reported that timeframes were met.

The psychiatrist in the mainline 3CMS program had an assigned caseload of 228 inmates. Approximately 99 percent of 3CMS inmates taking psychotropic medications were seen at least quarterly by the psychiatrist.

In the 3CMS program, the two assigned clinicians had caseloads of 126 and127 inmates, respectively. In approximately 95 percent of cases, 3CMS inmates were seen by their PCs at least quarterly during the review period.  According to information obtained from staff and inmates, a significant portion of 3CMS inmates were seen more frequently for clinical reasons.

The Facility-A mental health building had private office space for psychiatrists and PCs assigned to 3CMS inmates on A-yard.  Facility-B had two offices for PCs and one for a psychiatrist, but for safety reasons the doors could not be closed.  In Facility-C, a trailer on the yard housed four PC offices and two psychiatry offices.

Nearly 100 percent of initial IDTT meetings were held within 14 working days of inmates' referrals/arrivals.  Ninety-eight percent of IDTT meetings were attended by all required disciplines.

493

Fifty-six groups were offered to 610 different mainline 3CMS inmates during the review period.  Inmates described their group treatment as a helpful process, although long wait lists made it difficult to access groups.  They confirmed that their clinical contacts with psychiatrists and PCs were generally helpful and that they had good access to them.  However, inmates also described interactions with custody staff that were problematic.

The C-Yard 3CMS SNY program had three designated PCs with caseloads of 123, 147, and 150 patients, respectively.  An additional clinician with other assignments provided services to 25 patients in the program.  In the B-Yard 3CMS SNY program, two clinicians had caseloads of 148 and 152 inmates, respectively.  In the D-Yard 3CMS SNY program, PCs' caseloads ranged from 115 to 147 inmates.

Mental Health Referrals:

RJD had a reliable system for tracking response to mental health referrals.  During the review period, RJD staff responded to 60 emergent referrals, 86 urgent referrals and 384 routine referrals, with compliance rates of 100 percent, 97 percent, and 94 percent, respectively, for timeliness.

MHTS.net:

The institution made effective use of MHTS.net for quality management/improvement purposes.  The dashboard was utilized efficiently.  There were some isolated instances of erroneous data entry, but staff corrected the errors at the time of the site visit.

Mental Health/Custody Relations:

Mental health staff generally described relationships with correctional staff as good. However, inmates reported consistently across programs that COs harassed them and interfered with mental health services.

494

Heat Plan:

EOP Units 1 and 2 on A-yard, Unit 6 on B-yard, and Unit 15 on C-yard were monitored for the presence of working thermometers.  All had thermometer sensors hanging from the ceilings on the second floor, and all thermometers were in working condition.

Monthly reports were sent to CDCR headquarters.  The reports for July and August 2014 indicated that there was no weekly list of heat-risk patients, but the litigation coordinator showed the monitor that the lists had in fact been generated for those months.  It was unclear whether the report indicated that the list was generated or whether it was sent to the units.

Documentation indicated that on at least two occasions when a Stage II alert was activated, there was insufficient ice for all inmates on heat-risk medications in one unit, and that ice was not delivered to all inmates in another unit because the count had not been cleared.

RJD produced an addendum to its LOP no. 54 providing mental health caseload inmates with continued access to programs, services, and activities during extreme hot weather conditions.  This would include modified yard times, night yard, additional dayroom program opportunities, and other recreation programs.

RVRs:

SHOs received a two-hour training on mental health assessments that was co-instructed by clinical and custody staff.

Use of Force:

Formal training on the new use-of-force policies remained ongoing.

Construction:

Staff reported that the infill project at RJD was scheduled for completion in March 2016. It consisted of three units that will house 792 inmates and will have a perimeter fence separate

495

from the institution.  One will be designated for 264 Level II EOP inmates and divided into four wings with dormitory-style living arrangements with six inmates per room.  Group rooms and clinicians' offices will be located within the unit, with additional treatment space in an adjacent building.

The HCFIP EOP project to provide four group treatment rooms, 11 interview rooms, and clinicians' offices was under construction on B-yard within the existing perimeter.  Completion was projected for May 2016.

Program Access:

a.      Job and Program Assignments:

There were no full-time academic work training assignments at RJD.  Of the 205 part-time academic positions, 194 or 90 percent were filled by non-mental health caseload inmates, two or one percent were filled by 3CMS inmates, and nine or five percent were filled by EOP inmates.

There were 116 full-time vocational education positions.  Of these, 84 or 72 percent were filled by non-mental health caseload inmates, 23 or 20 percent were filled by 3CMS inmates, and nine or eight percent were filled by EOP inmates.  Of the 51 part-time vocational education positions, 37 or 78 percent were filled by non-mental health caseload inmates, four or eight percent were filled by 3CMS inmates, and ten or 20 percent were filled by EOP inmates.

Thirty-eight inmates participated in part-time programs to address substance abuse. Twenty-three or 60 percent were non-mental health caseload inmates, five or 13 percent were 3CMS inmates, and ten or 27 percent were EOP inmates.

Of the 1,581 full-time job assignments, 1,026 or 65 percent were filled by non-mental health caseload inmates, 522 or 33 percent were filled by 3CMS inmates, and 33 or two percent were filled by EOP inmates.

     b.    Milestone Credits:

RJD reported that a total of 486 inmates were eligible for milestone credits. Of those eligible, 229 or 47 percent were non-mental health caseload inmates, 166 or 34 percent were 3CMS inmates, and 91 or 19 percent were EOP inmates. Of those inmates eligible for milestone credits, 14.85 percent of non-mental health caseload inmates earned credits, 5.42 percent of 3CMS inmates earned credits, and 5.49 percent of EOP inmates earned credits.

     c.    Out-of-Level Housing:

One Level IV and 11 Level III 3CMS inmates were in Level I housing, as were one Level IV and 16 Level III EOP inmates.

There were two Level IV 3CMS inmates, 227 Level III 3CMS inmates, 140 Level III EOP inmates, and 13 Level IV EOP inmates in Level II housing.

In Level III housing, there were 34 Level IV 3CMS inmates and 23 Level IV EOP inmates.

Level IV housing had 57 Level III 3CMS and 12 Level III EOP inmates.

     d.    Periodic Classification Score Reductions: EOP Inmates:

The institution produced sample classification score sheets which indicated that inmates' classification scores were being reduced based upon program completion.

*Coleman* Postings:

497

Monitors' tours of five EOP units found that all five units had *Coleman* postings in visible locations.  There were three postings, dated March 2, 2015, that were 8.5 by 11 inches. The other two postings, dated June 2010, were larger.

### Ironwood State Prison (ISP)
February 26, 2015

Census:

As of February 25, 2015, ISP housed a total of 3,138 inmates, for a nine-percent decline since the preceding monitoring period.  The administrative segregation unit held 148 inmates. There were 33 inmates on the mental health caseload, all at the 3CMS level of care.  One was in administrative segregation and the remainder were in mainline.

Staffing:

Positions for the chief psychologist, the psychiatrist, four psychologists, the senior psych tech, and the HPS I were all filled.  One of the psychologists had been on an extended leave for over three months before the institution was able to cover the position with a contract psychologist.  Two of the 5.3 psych tech positions were filled, for a 62-percent vacancy rate.  Of the three clerical positions, two were filled.

Quality Management:

The combined ISP and Chuckawalla Valley State Prison (CVSP) quality management committee met semi-weekly, with a quorum present at all meetings.  Minutes of meetings were consistently maintained and produced.  Agenda items included changes to policies, training issues, results of Tests of Adult Basic Education (TABEs), staff recruitment and retention, mandatory random urine testing of inmates, ambulance guidelines, need for staff exit interviews, and space issues.

The institution continued its combined monthly mental health subcommittee/SPRFIT meetings with its SPRFIT meetings through October 2014, and thereafter conducted them as separate meetings. A quorum was reached at half of the meetings. Standing agenda items included MHCB transfers, RVRs, mental health audits, transfers of mental health caseload inmates, and mental health staffing.

There were no QITs during the review period.

Because ISP had only one psychiatry staffing allocation, there was no peer review for psychiatrists. Peer review for psychologists was conducted monthly. In the course of the peer review process, it became apparent that a number of records were missing initial progress notes and Forms MH-3 and MH-5. Staff reported that this issue was added to the mental health subcommittee's agenda for resolution.

Medication Management:

Medication continuity following inmate transfers was noncompliant. CAPs were specific but not sustainable, even though multiple trainings were done during the review period.

Follow-ups on medication refusals or no-shows were noncompliant from July through December 2014. Laboratory testing of blood levels of inmates prescribed psychotropic medications was compliant. No inmates were on involuntary medication orders.

Transfers:

There were no referrals or transfers to acute or intermediate inpatient levels of care during the review period.

All inmates requiring placement in an MHCB were placed in the institution's 14-bed OHU while awaiting transfer. There were 34 MHCB transfers, 11 or 32 percent of which were timely. Late transfers were attributed to lack of bed availability.

499

No inmates were transferred to a PSU during the review period.

According to provided data, both of the transfers of inmates to EOPs during the review period were timely.

The sole transfer of an EOP inmate to an administrative segregation EOP hub was late by three days.  Lack of an available bed was cited as the reason for the delay.  No inmates were pending transfer to a hub at the time of the site visit.

Of the 94 transfers to 3CMS programs during the review period, 86 or 92 percent were timely.  Delays were attributed primarily to lack of bed availability. There was one erroneous transfer of a 3CMS inmate to ISP during the review period.

Other Areas:

Alternative Housing:

During the review period, ISP maintained a 14-bed OHU in which mental health patients were reportedly given priority over medical patients.  At the time of the site visit, one 3CMS inmate was on suicide precaution in the OHU and scheduled for discharge after a 20-hour stay.

Staff reported that all inmates in the OHU had access to yard.  Office space was designated for private contacts with PCs, psychiatry, and other clinical staff.  In January 2015, the PIA took over janitorial services and cells were observed to be clean.  Logs were in order.

3CMS:

It was reported that 3CMS inmates at ISP during the review period received timely initial and follow-up IDTT meetings, but no corroborating data was provided.  No information with respect to psychiatry and PC contacts was provided.

MHDSDS Inmates in Administrative Segregation:

It was reported that all psychiatry and PC contacts in the administrative segregation unit were conducted in private settings and that IDTT meetings were held timely. It was also reported that clinical and custody staff worked collaboratively on provision of mental health services in the unit.

At the time of the visit, the sole 3CMS inmate housed in administrative segregation was not prescribed any medications and did not report any mental health concerns.

Referrals:

According to data provided on site, 18 or 69 percent of the 26 emergent referrals during the review period drew a timely response.  There were 66 urgent referrals, of which 44 or 67 percent resulted in a timely response.  For the 682 routine referrals generated during the review period, 516 or 76 percent resulted in a timely response.

The institution reported that its ability to achieve compliance in this area was hindered by lack of sufficient staff to complete referrals in a timely manner.  In addition, the vacancy of one of the three office tech staffing allocations impeded necessary scheduling within the process. Staff reported that mental health referrals in connection with evaluations of inmates returning from out-of-state facilities comprised the majority of emergent and urgent referrals, but existing staffing levels could not keep up with this demand.

Heat Plan:

ISP was compliant with implementation of the heat plan.  The pharmacy generated for distribution a list of inmates on heat-risk medications.  A review of monthly heat plan summary reports submitted to headquarters indicated 92 Stage I alerts and no Stage II or III alerts from July through October, 2014.  There were no heat-related incidents during the review period.

Use of Force:

501

ISP reported that 100 percent of custody and mental health staff had been trained on the new policy and procedure on use of force.  Attendance records for staff training sessions were provided as proof of practice.

Program Access:

a.      Job and Program Assignments:

Institutional data indicated that 1,376 full-time jobs were filled by non-MHSDS inmates and two jobs were filled by 3CMS inmates.  There were no part-time jobs at ISP.

For part-time academic program assignments, 512 were held by non-MHSDS inmates and one was held by a 3CMS inmate.  There were no voluntary academic program assignments at ISP.

All 158 full-time vocational education program assignments were filled by non-MHSDS inmates, as were all 85 part-time vocational education program assignments.

All four substance abuse treatment program assignments and all 203 re-entry substance abuse treatment program assignments were held by non-MHSDS inmates.

b.      Milestone Credits:

Information provided by the institution indicated that during the review period, 30.11 percent of non-MHSDS inmates and 16.67 percent of eligible 3CMS inmates earned milestone credits.  ISP did not have an EOP.

c.      Out-of-Level Housing:

Institutional data indicated that on February 4, 2015, one Level I inmate, six Level II inmates, and one Level IV 3CMS inmates were in Level III housing.

*Coleman* Postings:

Coleman postings in both English and Spanish were found in all buildings, including the SNY yards and the administrative segregation unit, toured by the monitor.  All postings were placed in common areas accessible to *Coleman* class members.

### Calipatria State Prison (CSP)
February 23, 2015

Census:

On February 20, 2015, Calipatria housed 3,711 inmates, for a four-percent decline from the census of 3,852 on June 30, 2012 that was reported for the preceding monitoring period.  The population of 337 inmates in administrative segregation represented a 24-percent increase since the preceding monitoring period.  There were six mainline 3CMS inmates and one 3CMS inmate in administrative segregation.  No EOP inmates were at Calipatria.

Staffing:

The sole line psychiatrist position was filled.

The senior psychologist position and six of the seven line psychologist positions were filled, for a vacancy rate of 14 percent for line psychologists.

The social work position was filled.

The senior psych tech position was filled, but 5.1 of 10.6 psych tech positions were vacant, for a 48-percent vacancy rate for psych techs.  The institution reported that five of these positions were newly-created.

The HPS I position and all 3.5 mental health clerical positions were filled.  The 0.5 office tech position was not covered since September 2014 due to a medical leave.

The institution indicated minimal use of psychiatry telemedicine during the early part of the review period, but it did not report the number of hours of use.

Quality Management

The QMC met twice during the six-month review period, in November and December 2014, with a quorum present each time.  Minutes for the November 2014 meeting were neither signed nor approved, and minutes for the December meeting were unsigned.  The QMC recommended closure of a QIT to examine discrepancies in welfare checks, and continuation of monthly audits by the administrative segregation lieutenant.

The mental health subcommittee met monthly and always achieved a quorum.  Minutes were kept but not signed.  The subcommittee regularly reviewed pending actions and monthly audit reports, among other things.  Agenda items included training announcements, peer review, administrative segregation, hand-crank radios, and improvements in the processing and delivery of mental health evaluations.

No documentation that peer review took place was provided.  The institution reported that peer review was in transition to the new format.

Medication Management:

Calipatria used MAPIP to track medication administration, and RJD performed the MAPIP audits for Calipatria.  Data provided for the review period indicated that medication continuity following intra-institutional moves fell to 75-percent compliance in September 2014.  However, an improvement plan resulted in improvement to 100-percent compliance which was steadily maintained through December 2014.

All other indicators of medication continuity, including continuity of medications following inter-institutional transfers from community hospitals or DSH, and following paroles/transfers to the community, new medication orders, and chronic care medications, showed that Calipatria was compliant.

504

Completion of laboratory studies associated with use of specific psychiatric medications was also compliant.

Transfers:

Calipatria reported that no inmates met one or more criteria for consideration for DSH referral.  There were no referrals or transfers to DSH during the reporting period.

Review of inmate transfer data that was largely headquarters-generated found coding errors that resulted in erroneous reporting of some transfer data.  Further investigation by the monitor and Calipatria staff resulted in some improved transfer data reporting, but some data inaccuracies and conflicts remained unresolved.

Calipatria reported 30 MHCB referrals and transfers to MHCBs at other institutions.  Of the 30 transfers, 18 were assigned an MHCB bed within 24 hours of referral, and 11 of these left Calipatria within 24 hours of referral.

Institutional data indicated a total of 25 mental health OHU placements during the review period.  Four or 16 percent exceeded the 72-hour stay by an average of 0.8 days.  Conflicting data culled from SPRFIT meeting minutes for the five-month period of July through November 2014 indicated 27 OHU placements.  There were no other mental health alternative housing stays during the review period.

 Calipatria identified seven inmates for the EOP level of care.  All transferred within timeframes.  There was conflicting data regarding EOP inmates in administrative segregation. Some data indicated 11 EOP inmates in administrative segregation, with many returns from court.  Their stays averaged 13 days, and none exceeded 30 days.  Other data indicated that one of eight EOP inmates in administrative segregation was housed there for court proceedings and stayed in administrative segregation for 37 days.

505

The 86 inmates identified for 3CMS level of care all transferred within timeframes.  The six identified mainline 3CMS inmates at Calipatria during the site visit had stays ranging from six to 40 days, with an average stay of 21 days, and none exceeding transfer timeframes.  The sole 3CMS inmate in administrative segregation had been there for 11 days.  For the 25 3CMS inmates in administrative segregation during the review period, stays averaged 17 days, with none exceeding 30 days.  Many were returns from court.

The six mental health caseload inmates in the stand-alone administrative segregation unit during the review period were all referred to mental health and were all transferred to Facility A-5 within 24 hours.

Other Issues:

OHU:

Institutional policy on OHU stays was consistent with Program Guide timeframes.  OHU stays that were overly long were the result of MHCB unavailability.

Calipatria reported that its OHU was used primarily to house inmates who were dangerous to themselves or others.  These inmates were placed on suicide precaution or suicide watch consistent with the Program Guide and required referral to an MHCB.

The OHU was also used to temporarily house inmates suspected of having an acute mental disorder that might require MHCB referral pending a mental health evaluation.  These inmates were placed on a status referred to as "psychiatric observation," which is not recognized in the Program Guide.  If clinicians were unable to determine the need for referral to an MHCB within the first 24-hours, the OHU placement was extended to a full 48-hour evaluation period and managed under "psychiatric observation."  Examples of 48-hour evaluation stays included inmates who were acutely intoxicated or who had ingested illegal substances.  It was unclear

506

whether these placements were done in consultation with, or managed by, medical staff in the licensed CTC.  A decision to refer to an MHCB or discharge from the OHU had to be made within the 48-hour evaluation period.  Any decision to refer to an MHCB must result in a transfer within 24 hours of the decision, and thus comply with the 72-hour time limitation for OHU stays.

Review of the OHU census for December 2014 indicated that eight inmates were placed there for danger to self.  Observation logs showed that all were monitored by suicide watch or precaution and none by "psychiatric observation" status.

Referrals:

From July 1, 2014 through January 19, 2015, there were 652 mental health referrals at Calipatria.  The institution reported 100-percent compliance for response to the 23 emergent referrals, 93-percent compliance for the 54 urgent referrals, and 99-percent compliance for the 575 routine referrals.

The Special Master's expert reviewed UHRs of five randomly-selected inmates who had been referred on an urgent basis but not placed on the mental health caseload or placed on suicide watch/precaution.  Many of these referrals were made by housing unit officers.  Review indicated that these inmates did not meet criteria for inclusion on the mental health caseload.  Interdisciplinary progress notes (CDCR 7230-A) were composed for each inmate, and assessments were of adequate quality and contained reasonable conclusions based on available information.  Mental health placement chronos were completed and indicated that these inmates did not meet mental health caseload criteria.

The Special Master's expert also reviewed UHRs for three randomly selected inmates who had been referred on an urgent basis, added to the caseload, placed in the OHU, and referred to an MHCB.  Each was seen timely by a Calipatria clinician, and SREs were completed for

507

those who endorsed suicidal ideation.  Each of these inmates was placed under the appropriate observation level and was seen daily by clinical staff until transferred.

Mental Health/Custody Relations:

Mental health leadership reported good relations between mental health and custody staff.

Use of Force:

Institutional data indicated 100-percent compliance for mental health use-of-force clinical training.  For training on recent revisions to the use-of-force policy, Calipatria indicated 100-percent compliance for custody managers, supervisors, health care, and mental health clinicians, and 85-percent compliance for custody in-service training.

Program Access:

Calipatria reported that on February 3, 2015, one 3CMS inmate had a full-time employment position, one had a part-time academic assignment, and one had a part-time vocational assignment.  Four 3CMS inmates were eligible for inmate work training assignments but were unassigned.  From August 1, 2014 through January 31, 2015, two of nine 3CMS inmates were eligible for milestone credits, but none were earned.

**Centinela State Prison (Centinela)**
February 24, 2015

Census:

On February 23, 2015, Centinela's total inmate population was 3,251, down by 13 percent from the population in June 2012 that was reported for the preceding monitoring period. There were 128 inmates housed in administrative segregation.  The 17 inmates on the mental health caseload were all in mainline at the 3CMS level of care.

Staffing:

508

The institution's staff psychiatrist position was filled.

The chief psychologist position and all five line psychologist positions were filled. The sole social worker position was also filled.

The senior psych tech position was filled, but 3.6 of 10.6 line psych tech positions were vacant, for a 34-percent vacancy rate. Centinela reported that some of the vacant psych tech positions were only recently established.

Three of the 3.5 mental health clerical positions and the HPS I position were filled. One office tech position was not covered for the last three months of the review period due to a medical leave.

The institution reported minimal use of telemedicine for psychiatry during July 2014, when there was an unexpected lack of psychiatry coverage.

Quality Management:

The QMC met monthly during the review period and always achieved a quorum for all meetings. Meeting minutes were kept and approved, but five of the six sets of minutes were unsigned. The QMC did not charter any formal QITs during the review period.

The mental health subcommittee met five times and always attained a quorum. Minutes were kept and approved, but were not signed. The subcommittee regularly reviewed pending actions and monthly audit reports. Agenda items included development and/or updates to LOPs for restraint and seclusion, duty to protect, telepsychiatry, replacement of broken crank radios, and requirements for clinician-to-clinician contacts for patients discharged from the MHCB. The subcommittee had two action items in progress, including a revision of the LOP for five-day clinical follow-ups.

509

Peer reviews of one social worker, four psychologists, and one psychiatrist were conducted.

Medication Management:

New medication orders were timely in 87 percent of cases.

Medication continuity following intra-institutional transfers was 80-percent compliant.

Institutional data indicated that practices with laboratory studies associated with psychotropic medications were compliant.

DOT administration of chronic care medications was 73-percent compliant.

MAPIP audits indicated that psychiatrists were not notified timely when patients refused prescribed medications, and as a result psychiatrists were not meeting the seven-day timeframe for follow-up with patients.

Transfers:

Centinela reported that no inmates met criteria for consideration for referral to inpatient care.  There were no referrals, transfers, or returns to or from inpatient care during the review period or on the day of the site visit.

During the review period, nine inmates awaiting transfer to MHCBs at other institutions were housed in Centinela's CTC.  Four of these patients were assigned MHCBs within 24 hours of the request.  None of the nine left Centinela within 24 hours of their referrals.  CTC stays averaged 1.8 days, with a range of one to 3.2 days, which mental health staff attributed to MHCB unavailability.

No inmates housed at Centinela during the review period were transferred to a PSU.

There were no transfers of mental health caseload inmates from other institutions to Centinela during the reporting period.  Six EOP inmates, including five court transfers, were

510

housed at Centinela during the review period.  There were no transfers of EOP inmates identified by Centinela to administrative segregation EOP hubs during the review period.  The sole EOP inmate in administrative segregation during the reporting period was there for court proceedings.  His stay lasted 34 days.

There were 116 3CMS inmates, including many court transfers, at Centinela during the review period.  All were transferred out within timeframes.  The 16 mainline 3CMS inmates at Centinela at the time of the site visit had stays ranging from 12 to 48 days, with an average stay of 19.6 days.  The sole 3CMS inmate who was erroneously transferred to Centinela had been housed there for 19 days as of the time of the site visit.  One of 26 3CMS inmates, who was at Centinela for court proceedings and was housed in administrative segregation during the review period, had a stay of 38 days.

Two mental health caseload inmates, who were housed in the stand-alone administrative segregation unit during the review period and who were subsequently referred to mental health, were both transferred from that unit within 24 hours.

Other Issues:

Referrals:

From July 1, 2014 through January 17, 2015, there were 849 mental health referrals at Centinela.  For timeliness of response to these referrals, the institution reported compliance rates of 98 percent for the 42 emergent referrals, 100 percent for the 94 urgent referrals, and 100 percent for the 713 routine referrals.

Heat Plan:

There were 111 Stage I heat alerts during the review period, and no stage II or III heat alerts.  For the review period, Centinela produced monthly lists of inmates who were prescribed heat-sensitive medications.

Use of Force:

Centinela indicated 100-percent compliance for mental health staff training, and 99-percent compliance for custody staff training on the recent revisions to the use-of-force policy and the requirement that this training be completed by November 17, 2014.

Program Access:

a.      Job and Program Assignments:

Centinela reported that as of February 3, 2015, no EOP inmates had work training assignments.  One 3CMS inmate had a full-time job and another had a part-time academic position.  Five 3CMS inmates were eligible for work training assignments, but were unassigned.

Among the non-mental health caseload population, 479 inmates were enrolled in part-time academic positions, 1,044 had full-time jobs, 47 participated in part-time substance abuse programming, and 136 were enrolled in full-time vocational positions.  Seven hundred one non-mental health caseload inmates were eligible for work training assignments, but were unassigned.

b.      Milestone Credits:

From August 1, 2014 through January 31, 2015, four of nine 3CMS inmates and no EOP inmates were eligible for milestone credits.  One 3CMS inmate earned milestone credits.  Nineteen percent of the 763 non-MHSDS inmates who were eligible for milestone credits earned them.

*Coleman* Postings:

512

Centinela's chief deputy warden reported that all housing units and dormitories had *Coleman* postings in both English and Spanish in their dayrooms.  It was further reported that all program offices, law libraries, and both administrative segregation units also contained these postings.

**Chuckawalla Valley State Prison (CVSP)**
February 25, 2015

Census:

As of February 23, 2015, CVSP housed a total of 2,199 inmates, including three mainline 3CMS inmates and one mainline EOP inmate. The total institutional population had declined by 17 percent since the preceding monitoring period.

CVSP's administrative segregation unit had recently become a hub for inmates returning to California after being housed in out-of-state correctional facilities. The population of the unit was 116 including 80 out-of-state returns, making the census in the unit 52-percent higher than it was during the preceding monitoring period.  No mental health caseload inmates were housed in administrative segregation at the time of the site visit.

Staffing:

The sole psychiatrist position was filled.

At the time of the site visit, the senior psychologist position was expected to be filled as of April 1, 2015.  Two of the five psychologist positions were filled, for a 60-percent vacancy rate.

The senior psych tech position and only one of the 5.30 psych tech positions were filled. Two of the three clerical positions were filled.   The HPS I position was filled.

<u>Quality Management</u>:

As previously reported, CVSP's and ISP's quality management committees had been merged and alternated their meetings between the two prisons.  This combined quality management committee met twice per week during the review period, with a quorum present at all meetings.  Agenda items included LOPs, educational development projects, a pill line construction plan, pharmacy summary reports, effective communication audits, subcommittee reports, MAPIP reports, and alternative housing transfers, among other items.

As also previously reported, CVSP's mental health subcommittee and its SPRFIT had been holding joint meetings since March 2012.  Six meetings were conducted during the review period, but only two achieved a quorum.  Standing agenda items included inmates' compliance with psychotropic medications, transfers of mentally ill inmates, currently-housed inmates who have mental illnesses, requests for mental health assessments, mental health staffing, and audits.

There were no active QITs during the review period.

There was no peer review for the sole psychiatrist.  Peer review of psychologists consisted of a monthly review of patient records.  It was conducted in a private setting with the clinicians undergoing review present. Results were reported to the mental health subcommittee, and feedback was provided to the clinicians under review.  The peer review process also found that observations from psych tech rounds in administrative segregation were sometimes missing from clinicians' progress notes, but it was reported that such gaps, which may have resulted from the use of templates, had been reduced.

<u>Medication Management</u>:

According to MAPIP audits covering the period of July through December 2014, the rate of continuity of medications following inter-institutional inmate transfers was less than 90 percent.  Staff reported that a QIT had been recently established to address this.

New orders for psychotropic medications were over 90-percent compliant.  Referrals of inmates for noncompliance with their medications were also over 90-percent compliant.

Pill lines were not audited.

Compliance rates pertaining to laboratory testing of blood levels of inmates prescribed psychotropic medications were compliant, with rates higher than 90 percent.

CVSP did not have inmates on PC 2602 medications.

Transfers:

 There were no referrals or transfers of inmates to inpatient levels of care at DSH programs or to MHCBs during the review period.

CVSP reported seven inmate stays in alternative housing, all of which ended within timeframes.

Seven inmates identified as requiring the EOP level of care were transferred timely to EOPs at other institutions.  Three went to administrative segregation EOP hubs and four went to mainline EOPs.

Sixty-eight of the 71 inmates identified as requiring the 3CMS level of care were transferred timely.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Two EOP inmates and seven 3CMS inmates were placed in administrative segregation during the review period.  At the time of the site visit, there was one 3CMS inmate housed there. No information on psychiatry contacts, PC contacts, or IDTT meetings was provided.

Alternative Housing:

There was no alternative housing designated at CVSP.  Because its OHU was deactivated in September 2013, the institution previously had adopted a process whereby inmates awaiting an MHCB were sent to ISP, were returned to CVSP when MHCB bed assignments were made, and then transported to their MHCBs from CVSP. This process was discontinued before the site visit, so that inmates in need of an MHCB were either transferred directly from CVSP, or were sent to ISP from which they were transported directly to their MHCBs.

Mental Health Referrals:

Provided data indicated that of the 16 emergent referrals during the review period, 81 percent drew timely responses.  Eighty-eight percent of the 58 urgent referrals and 93 percent of the 323 routine referrals drew timely responses.

Heat Plan:

CVSP remained compliant with implementation of the heat plan.  The pharmacy generated a weekly list of inmates on heat-risk medications.  A review of monthly heat plan summary reports submitted to headquarters showed 99 Stage I alerts and no Stage II or III alerts from July through October 2014.  There were no heat-related incidents during the review period.

Program Access:

     a.     Job and Program Assignments:

516

Institutional data indicated that 1,000 or 99.8 percent of available full-time jobs were filled by non-MHSDS inmates, and one EOP inmate and one 3CMS inmate filled the remaining two jobs.  All 56 or 100 percent of available part-time jobs were filled by non-MHSDS inmates.

Four hundred eighty four or 99.5 percent of part-time academic program assignments were held by non-MHSDS inmates, and the remaining two assignments were held by 3CMS inmates.  There were no voluntary academic program assignments at CVSP.

All 221 full-time and all 49 part-time vocational education program assignments were filled by non-MHSDS inmates.

All seven full-time substance abuse treatment program assignments were filled by non-MHSDS inmates. One of the 224 re-entry substance abuse treatment program assignments was filed by a 3CMS inmate.

        b.    <u>Milestone Credits</u>:

CVSP was not a designated EOP program facility.  Information provided by the institution via headquarters indicated that during the review period 20 percent of eligible 3CMS inmates and 38.17 percent of non-MHSDS inmates earned milestone credits.

        c.    <u>Out-of-Level Housing</u>:

As of February 4, 2015, no Levels I or II mental health caseload inmates were housed out of their custody levels, and one Level III 3CMS inmate was housed in Level II housing.

<u>*Coleman* Postings</u>:

*Coleman* posting in both English and Spanish were found in all buildings except three on Complex II, one on D-Yard, and two on C-Yard.  They were located in areas commonly accessible to mental health caseload inmates, except in the administrative segregation unit where they were located in a room where committee meetings were held.  When this was brought to the

517

attention of institutional leadership, they began to work on obtaining more copies of the postings and finding a more centralized location for them.

## California Institution for Women (CIW)
May 19, 2015 – May, 21, 2015

Census:

As of May 19, 2015, the total population at CIW was 1,844, including 796 inmates on the mental health caseload.  There were 81 mainline EOP inmates and 626 mainline 3CMS inmates. The administrative segregation population of 33 included six EOP inmates and 28 3CMS inmates.

Nine inmates were in the MHCB and seven were in the PSU.  The SHU population of 41 included one EOP inmate pending transfer to a PSU and 37 3CMS inmates.

All 28 3CMS inmates in administrative segregation were transferred to the STRH upon its activation on April 27, 2015.

Staffing:

The two chief psychologist positions were filled.

The two senior psychiatrist positions were filled, but one was out on long-term leave.  Of the seven psychiatrist positions, 4.5 were filled and two were covered by contractors, resulting in a seven-percent vacancy rate.

Two of three senior psychologist supervisor positions were filled.  Of 17.5 psychologist positions, 12.5 were filled, resulting in a 29-percent vacancy rate.  Hiring of three additional psychologists following the close of the review period reduced the vacancy rate to 11 percent.

518

Positions for the supervising social worker and the unit supervisor were both filled.  Eight of the ten social work positions were filled, for a 20-percent vacancy rate. The hiring of an additional social worker after the close of the review period reduced the vacancy rate to ten percent.

The three senior psych tech positions and all 18 psych tech positions were filled.

Four of the six recreational therapist positions were filled, resulting in a 33-percent vacancy rate.  Following the close of the review period, an additional recreational therapist was hired, reducing the vacancy rate to 17 percent.

One of two office services supervisor positions was filled and both HPS I positions were filled.  Six of the nine office tech positons were filled. With contract coverage of one position, the vacancy rate was reduced to 22 percent.

CIW used 40 hours of psychiatry telemedicine per week during the review period.

Quality Management:

The quality management committee scheduled monthly meetings during the review period.  Minutes from five meetings were provided for review.  They were detailed and comprehensive, and indicated that the quality management process was well-developed and well-utilized at CIW.  All areas of health care operations and security concerns of health care staff were covered.  The format used for minutes made it difficult to determine who the required members of the quality management committee were.

The mental health subcommittee met each month except December 2014 during the review period. All meetings achieved a quorum except in October 2014.  Substantive issues were discussed and identified problems were tracked until resolved.  Comprehensive minutes

519

demonstrated that the mental health program at CIW utilized the quality management process effectively in the delivery of services.

Anecdotal interviews with staff indicated that some of them were unaware of quality management activities or the existence of QITs and their recommendations. A suggested solution would be the inclusion of line staff whenever possible and establishment of a means to disseminate findings and discuss quality management activities with all health care staff.

One QIT and two FITs were active during the review period.  The two FITs, on suicide prevention and the administrative segregation EOP hub, were required by headquarters and were ongoing.  The QIT was established by CIW and focused on improving compliance with completion of Form MH7s, also known as chronos, upon completion of administrative segregation pre-screens.

During the review period, 14 psychiatrists and psychologists underwent peer review within a process that met each month and provided verbal feedback to the clinicians during the meetings.  Social workers did not receive peer review.  Some trends that needed correcting, particularly among new psychiatrists, were resolved after the feedback was received.

Training on the new statewide peer review process was provided at CIW at the end of March 2015.   Work was being done on revising the peer review LOP to comport with the new statewide peer review process.

Medication Management:

CIW had implemented MAPIP.  Average rates of compliance for continuity of medications were 77 percent following discharges from the MHCB, 60 percent following transfers to receiving and release from within the prison, and 84.2 percent following discharges

back to the prison from community or state hospitals, and 75.9 percent following intra-institutional transfers to administrative segregation, the SHU, and the PSU.

CIW was compliant with reporting of medication errors and medication availability, including in the emergency cart in the treatment and triage area and after-hours medication supplies.

Response to urgent referrals for inmates' no-shows and refusals of medications was 86.1-percent compliant.

Laboratory blood testing for inmates taking psychotropic medications was compliant in all areas except for the compliance rate of 79.2 percent for carbamazepine in December 2014.

CIW was 100-percent compliant with all nursing observation procedures for medication administration.

The compliance rate for administration of involuntary medications was 94.5 percent.

CIW was 94.4-percent compliant with provision of a 30-day supply of medications to inmates leaving the prison on parole or release.

Transfers:

Review of the log for referrals to inpatient care indicated 13 referrals from other prisons to the CIW PIP, and 16 referrals of CIW inmates to inpatient care.

Of the 16 inmate referrals initiated by CIW, seven were to acute care.   All had referral packets completed timely and all transferred within ten days.

For the nine referrals to intermediate inpatient care, all were completed and transferred timely.

While the number of referrals to inpatient care had risen, issues with the sustainable process persisted.  IDTTs did not discuss Form 7388Bs or the rationales for non-referrals.  Many

521

reviewed 7388Bs did not have adequate rationales for non-referral and also often had inadequate treatment modifications, yet they were found acceptable by the DSH coordinator.   Refresher training on the roles of the IDTT, Form 7388B, and the stages of the referral process may be helpful.

Provided data indicated that there were 334 admissions to CIW's MHCB during the review period.  The average length of stay was 4.2 days, with 21 or six percent of admissions exceeding ten days.  Of the three admissions to outside MHCBs, one transfer was late due to lack of bed availability.

CIW reported 75 alternative housing placements during the review period.  Thirty-five or 47 percent exceeded 24 hours.  Bed availability was cited as the primary reason for transfer delays.

No inmates were transferred to a PSU during the review period.  At the time of the site visit, one inmate was pending transfer to a PSU.

Four inmates were referred to the administrative segregation EOP hub during the review period.  All transferred timely, and none were awaiting transfer at the time of the site visit.

Other Issues:

Administrative Segregation EOP:

Initial psychiatry contacts were 100-percent compliant for timeliness.  Follow-up contacts were 99-percent compliant.

Data from headquarters indicated that initial PC contacts took place within five days of placement for 93 percent of new intakes.  Follow-up PC contacts were offered to inmates twice per week and were timely 100 percent of the time.  The treatment area consisted of seven

therapeutic modules arranged in a semi-circle and surrounded by a privacy partition.  The treatment space afforded visual privacy and some auditory privacy.  The environment was noisy.

Headquarters data indicated that comprehensive evaluations were completed before initial IDTT meetings in 67 percent of cases.

Timeliness of initial IDTT meetings and completion of them before initial ICC meetings were both 87-percent compliant.  Timeliness of follow-up IDTT meetings was 96-percent compliant.  Attendance by required disciplines was 100-percent compliant.  Meetings were conducted in a small but adequately sized conference room, with computers available for use.

Inmates deemed suitable for ten hours of structured therapeutic group activity by the IDTT were offered an average of 14.5 treatment hours per week and received an average of 7.9 hours.  Inmates deemed unsuitable for the full ten hours were offered an average of 10.8 hours and received an average of 6.9 hours per week.

MHCB:

Ten beds in the CTC were designated as MHCBs and the remaining eight beds were used as "swing beds" for mental health use if needed.  Provided data showed there were 334 admissions to the MHCB during the review period, with numerous repeat admissions.

At observed IDTT meetings, much of the treatment team's discussions took place in the inmates' absence.   Inmates were brought in after the discussion had ended, and then the team had an abbreviated discussion with the inmate.  The treatment plan was either not discussed, or was discussed to varying extent, depending on the individual PC.

Outdoor recreational yard was rarely offered to MHCB inmates. It was offered twice during the month preceding the site visit.  Conversely, medical patients had access to outdoor recreational yard.

Patients were discharged from the MHCB as soon as they reported they were no longer suicidal, with little effort to determine the underlying causes of their initial reports of suicidality. Review of eUHRs indicated that patients were discharged from the MHCB without an IDTT meeting or input.

An MHCB LOP dictated the operation of the MHCB program, including the use of Guard One for tracking rounds.  Custody staff reported that they tracked rounds using paper documentation rather than Guard One.

Seclusion and Restraint:

There were five uses of seclusion, with one inmate secluded on three occasions and another secluded twice.  Record review indicated that these episodes were brief and complied with policy.

SHU:

According to provided data, timeliness of initial psychiatry contacts was 87-percent compliant, and timeliness of follow-up contacts was 97-percent compliant.  One psychiatry contact occurred in a non-private area.

PC contacts were timely in 98 percent of cases for initial contacts and 96 percent of cases for follow-up contacts. Thirty-six percent of PC contacts were cell-front or in non-private settings, due primarily to inmate refusals.

Timeliness of initial IDTT meetings was 83-percent compliant.  For follow-up meetings, timeliness was 97-percent compliant.  Attendance by required disciplines at IDTT meetings was reported as 93-percent compliant.  No data was available on whether initial IDTT meetings were conducted before initial ICC meetings.  Treatment plans for 3CMS inmates and inmates who

524

moved between the MHCB and the SHU needed more individualization and appropriate clinical interventions.

No group therapy was provided in the SHU.

3CMS Inmates in Administrative Segregation:

CIW staff reported that 95 percent of initial psychiatry contacts were timely, and that 97 percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 90 days.

Audit results indicated that 100 percent of initial PC contacts were timely, and that 92 percent of inmates received at least weekly follow-ups with their PCs.

Eighty-eight percent of initial IDTT meetings were timely and 92 percent of follow-up IDTT meetings were timely.  Required staff were present at 95 percent of meetings.

Group treatment and non-structured therapeutic activity services were provided in a dayroom area set off by a privacy partition.  It was equipped with television equipment and restart chairs which could accommodate up to 20 inmates.

There were six inmates designated as being on NDS status during the review period. The two designated for accelerated transfer were both transferred timely.

PSU:

CIW operated a 20-bed PSU. It provided mental health services according to a STEP behavioral incentive program.  STEP consisted of four steps through which inmates progressed with demonstration of increasing self-control and positive coping capabilities.  Each step advancement provided the inmate with more privileges and fewer restrictions.  However, none of the inmates on modified programing in the PSU progressed to full programming during the review period.

525

According to institutional audits, 97 percent of PSU inmates received brief mental health assessments within five days of placement.  In 80 percent of cases, inmates received a psychiatric comprehensive clinical evaluation before their initial IDTT meetings. In 61 percent of cases, inmates received both psychiatric and PC comprehensive clinical evaluations before their initial IDTT meetings.

Ninety-two percent of initial IDTT meetings were completed within 14 calendar days of inmates' arrivals, and 100 percent were completed before inmates' initial ICC meetings. Staff composition and attendance at IDTT meetings were consistent with Program Guide requirements.

Staff reported that therapeutic activities were offered in a variety of modalities including psychoeducational groups, recreation therapy groups, and education classes.  There was sufficient program space to permit outside exercise or therapeutic recreational activities in four fenced-in pods that were situated between the two PSU program buildings.

During the review period, the IDTT found 24 inmates clinically appropriate for modified treatment/programming.  Institutional data indicated that 100 percent of these inmates were given monthly IDTT meetings and that 98 percent were seen daily by their PCs.  Inmates on modified treatment programming were scheduled for an average of 10.6 hours of group treatment each week, offered an average of 9.5 hours, refused an average of 4.2 hours, and received 5.2 hours on average.

Eighty percent deemed appropriate by the IDTT for full programming were prescribed psychotropic medications and were seen by a psychiatrist at intervals consistent with Program Guide standards.  Ninety-seven percent received timely follow up IDTT meetings at 60 days, and all had received them at 120 days.  Thereafter, they received quarterly IDTT meetings in 100

526

percent of cases.  At one observed IDTT meeting during the site visit, required staff attended and participated.  The meeting space accommodated all participants, with computer access available. Form 7388B was discussed briefly with the inmate.

Ninety-eight percent of fully-programming inmates received weekly follow up sessions with the PC consistent within program guidelines. They were scheduled for an average of 13 hours, offered an average of 12.3 hours, refused an average of 3.4 hours, and received an average of 8.9 hours.

EOP:

EOP services were provided in the supportive care unit (SCU), which was comprised of two buildings in a secured area with capacity to house and treat 85 inmates.

Data indicated that 96 percent of initial psychiatry contacts were timely and 92 percent of follow-up contacts were timely.  They were conducted in private settings in 99.7 percent of cases.

According to provided data, 93 percent of initial PC contacts were conducted within 14 days of placement into the EOP, and 94 percent of follow-up contacts were conducted in accordance with Program Guide timeframes.  CIW staff reported that 93.8 percent of PC contacts took place in private settings.

Staff reported that psych techs conducted wellness checks on second watch seven days a week.

Audit results indicated that initial IDTT meetings were conducted timely in 78 percent of cases.  Most overdue initial IDTT meetings were late by one day, but delays were as long as 59 days. There was no indication whether they took place before inmates' initial ICC meetings.

Follow-up IDTT meetings were timely in 99 percent of cases.  Required disciplines attended 93 percent of the time.

Structured therapeutic group activities rotated in eight week cycles.  They covered such issues as mood control, anger management, and medication issues, among other things, and also included educational classes.  Groups had 16 to 20 participants on average.

Inmates deemed suitable by the IDTT for the full ten hours of group activity were offered an average of 13 treatment hours per week and received an average of 10.3 hours per week. Recreation therapy was also incorporated into treatment when indicated.

Inmates found by the IDTT to be unsuitable for the full ten hours of group activity were placed on modified programming.  They were offered an average of 6.9 hours of group per week and received an average of 5.3 hours per week.

3CMS:

Timeliness of both initial and ongoing psychiatry contacts was 97-percent compliant.  All took place in private settings, according to these care providers.

Initial PC contacts were 83-percent complaint for timeliness, but follow-up contacts were timely in 97 percent of cases.  Nineteen of those contacts occurred in a non-confidential setting but no rationale was provided.  Earlier in the review period, staffing vacancies led to difficulties with provision of unscheduled or "walk in" clinical contacts.  At the end of March 2015, mental health leadership assigned a clinician to provide these contacts, which resolved the problem.

 Initial IDTT meetings were timely in 79 percent of cases.  Follow-up meetings were timely in 99 percent of cases.  Attendance by required disciplines was reported as 100-percent compliant, although this figure was based on only about one third of the meetings which took

place, and eUHR reviews indicated that there were IDTT meetings in which the psychiatrist and/or the CC I was absent.

CIW reported that group treatment was provided during the review period, but it did not report the number of groups.  At the time of the site visit, there were four treatment groups with 90 inmates on waitlists.

Referrals:

According to provided data, all 28 emergent referrals during the review period drew a timely response.  Of the 222 urgent referrals, 201 or 91 percent received a timely response, and of the 2,162 routine referrals, 1,720 or 80 percent received a timely response.  A problem with late deliveries of referrals to mental health staff was identified, addressed, and corrected before the end of the review period.

Heat Plan:

There were no heat-related incidents during the review period.

CIW was not fully compliant with heat plan protocols.  It was unable to produce a copy of the memorandum that was issued at the beginning of the heat season.  The relevant LOP was not updated until November 2014 and was not finalized until December 2014, after the May through October 2014 heat season had already ended.

Review of monthly heat reports sent to headquarters during May through October 2014 found that they did not follow the required statewide format.  Instead, they still used an outdated template from 1995, for no apparent reason.

A review of the temperature logs found that temperatures were being logged as required by the heat plan.  Thermometers were placed appropriately in all toured housing units.  Custody officers in each building had access to hand-held thermometers.

529

<u>Use of Force</u>:

CIW reported that 100 percent of custody staff and 96 percent of mental health staff had been trained on the revised use-of-force policy.

<u>Access to Care</u>:

A review of CIW's monthly Health Care Access Quality Reports from October 2014 through March 2015 indicated that 65 percent of mental health ducats and add-on appointments were not completed due to non-custodial reasons other than inmate refusals, and that 2.5 percent were not completed due to custody reasons.

<u>Program Access</u>:

a.      <u>Job and Program Assignments</u>:

Institutional data indicated that four or .93 percent of available full-time jobs were filled by EOP inmates, 179 or 42 percent were filled by 3CMS inmates, and 245 or 57 percent were filled by non-MHSDS inmates.

Of the 58 available part-time jobs, seven or 12 percent were filled by EOP inmates, 28 or 48 percent were filled by 3CMS inmates, and 23 or 40 percent were filled by non-MHSDS inmates.

For full-time academic assignments, one or two percent were held by 3CMS inmates and 42 or 98 percent were held by non-MHSDS inmates.

Of the 283 available part-time academic assignments, two or 0.71 percent were held by EOP inmates, 174 or 61 percent were held by 3CMS inmates, and 107 or 38 percent were held by non-MHSDS inmates.

For voluntary academic assignments, eight or five percent were held by EOP inmates, 117 or 70 percent were held by non-MHSDS inmates, and 43 or 25 percent were held by 3CMS inmates.

Of the 209 available voluntary education assignments, three or one percent were held by EOP inmates, 62 or 30 percent were held by 3CMS inmates, and 144 or 69 percent were held by non-MHSDS inmates.

For full-time vocational education assignments, 50 or 55 percent were held by 3CMS inmates and 41 or 45 percent were held by non-MHSDS inmates.  Of the 29 available part-time vocational educational assignments, 14 or 48 percent were held by 3CMS inmates and 15 or 52 percent were held by non-MHSDS inmates.

For re-entry substance abuse treatment program assignments, 103 or 49 percent were held by 3CMS inmates and 106 or 51 percent were held by non-MHSDS inmates.

b.      Milestone Credits:

Information provided by the institution indicated that as of March 31, 2015, 8.33 percent of eligible EOP inmates, 24.1 percent of 3CMS inmates, and 29.96 percent of non-MHSDS inmates earned milestone credits.

c.      Out-of-Level Housing:

Inmates at custody Levels I through IV were housed together at CIW.

d.      ADA Reasonable Accommodation and Grievance Procedures:

CIW provided confirmation of implementation of Revised ADA Accommodation and Grievance Procedures in the form of training sign-in sheets and materials, as well as examples of completed forms.

e.  <u>Periodic Classification Score Reductions:  EOP Inmates</u>:

EOP inmates were being granted the same semi-annual classification score reductions as non-EOP inmates.  During the site visit, CIW provided a sample of completed reclassification score sheets for review.

<u>*Coleman* Postings</u>:

*Coleman* postings in both English and Spanish languages were observed in all toured buildings, including the PSU and the administrative segregation units.  All postings were located in areas accessible to class members.

**Central California Women's Facility (CCWF)**
May 27, 2015 – May 29, 2015

<u>Census</u>:

As of May 26, 2015, the total population at CCWF was 3,100, including 1,253 inmates on the mental health caseload. There were eight inmates in the MHCB. The EOP mainline population was 64, and the mainline 3CMS population was 949, which included 13 condemned inmates.

Among the 108 inmates in administrative segregation, three were EOP inmates and 76 were 3CMS inmates.  The total reception center population of 567 included 153 3CMS inmates.

<u>Staffing</u>:

The two chief psychologist positions were vacant.

Positions for the senior psychiatrist and the five senior psychologists were all filled. Seven of the ten psychiatrist positions were filled, leaving a 30-percent vacancy rate.

Twenty-two of the 24 psychologist positions were filled, for a vacancy rate of eight percent.

532

The supervising social work position was filled.  Of the 13 social work positions, 11 were filled, for a 15-percent vacancy rate.

The senior psych tech position was filled, as were 13 of the 23.9 psych tech positions, resulting in a 46-percent vacancy rate.

Three of the four recreation therapist positions were filled, for a 25-percent vacancy rate.

The nurse practitioner and the two SRN II positions were filled.  Of the nine RN positions, eight were filled, for a vacancy rate of 11 percent.

The OSS II position and the 14 clerical positions were all filled.  One of the two HPS I positions was filled.  The CHSA II position was vacant.

Quality Management:

Since the preceding monitoring period, CCWF's quality management program was re-directed from its previous CAP model to more closely align with the statewide quality management process.

The local governing body met quarterly and maintained minutes.

The quality management committee met each month except October 2014 during the review period.  A quorum was achieved at all meetings.  Topics for discussion included mental health-related issues.

The mental health subcommittee met at least monthly during the review period.  Minutes were maintained and a quorum was achieved at all meetings.  The subcommittee addressed issues identified by the regional mental health administrative team as well as other matters including suicide prevention, DSH-related issues, involuntary medications, programming areas, MAPIP, and issues related to administrative segregation EOP hub certification.

533

During the review period, a QIT on the administrative segregation EOP was chartered to address compliance with hub certification-related issues.  Although CCWF was not designated as a hub institution, this QIT worked on improving provision of services to EOP inmates during their stays in the CCWF administrative segregation unit.

Peer review was not active at CCWF during the review period.

Medication Management:

Audits found an average compliance rate of 21 percent for continuity of medications following MHCB discharges, and an average compliance rate of 58 percent for continuity of medications following moves into administrative segregation.   The compliance rate for continuity of psychiatrist-prescribed medications was 50 percent.   For continuity of involuntary medications, the compliance rate was 78 percent.

Administration of HS medications accounted for 25 percent of all psychotropic medication prescriptions.  It was compliant, with inmates receiving these medications no earlier than 8:00 p.m.

EOP inmates received their medications at the A-Yard clinic, Building 703, which was shaded and provided with cooling mist during heat alerts.

Transfers:

Inmates in need of inpatient care were transferred to the CIW PIP.  All 11 referrals to acute inpatient care were accepted, and six or 56 percent were transferred timely.   All seven referrals to intermediate inpatient care were accepted, and four or 57 percent were transferred timely.

According to the non-referral log, 182 inmates were reviewed but not referred to inpatient care during the review period.  Documented reasons for these non-referrals did not sufficiently

534

explain their rationales.  The comment section of the log was rarely used to elaborate on the reasons for non-referrals.  Chart reviews during the site visit also found deficiencies in the rationales for not referring inmates to inpatient care.

When inmates were returned to CCWF from inpatient care, the received an evaluation by MHCB staff using Form 7447, five-day clinical follow-up, and hourly checks until the inmate was transferred to the EOP, where five-day follow-up was continued.  Individualized treatment planning was not included as part of this step-down process.

 Of the 24 inmates transferred to a MHCB during the review period, 21 or 87 percent were transferred timely, although two of the three late transfers were late by less than an hour. CCWF did not maintain a log of non-referrals to the MHCB.  Although it was reported that this data was tracked daily, it could be captured easily.  Formal tracking of this data in a format that is easily accessible for utilization management purposes is recommended.

No inmates transferred to a PSU during the review period.

CCWF reported that 287 or 92 percent of the total 311 alternative housing placements during the review period ended within 24 hours.

No data was provided on administrative segregation EOP hub transfers.

All 33 EOP inmate moves out of the reception center were timely.  Of the 570 3CMS inmates moved from the reception center, 444 or 78 percent were transferred timely.

Other Issues:

Reception Center:

Average stays in reception center were 1.9 days for EOP inmates, 47.1 days for 3CMS inmates, and 59.7 days for non-MHSDS inmates.  EOP inmates were transferred to the mainline

535

EOP for programming, while 3CMS inmates were placed at CCWF, CIW, or the Folsom Women's Facility.

Data on the timeliness of bus screens, mental health screens, and mental health evaluations was not provided.

For EOP inmates, psychiatry contacts were timely in over 90 percent of cases and PC contacts were timely in 75 percent of cases. Ninety percent of IDTT meetings were timely.

For 3CMS inmates, timeliness of initial and follow-up psychiatry contacts was 100-percent compliant, and timeliness of initial and follow-up PC contacts was 99-percent compliant. No psychiatry contacts were cell-front or in non-private settings. Two PC contacts were cell-front, and one was in a non-private setting.

Timeliness of initial IDTT meetings was 84-percent compliant, and timeliness of follow-up IDTT meetings was 90-percent compliant. Attendance by required disciplines at IDTT meetings was 100-percent compliant.

MHSDS Inmates in Administrative Segregation:

CCWF's administrative segregation unit was located in Building 504. Supervisory staff reported no need for administrative segregation overflow during the review period.

For EOP inmates, audits indicated compliance rates above 90 percent for timeliness of psychiatry contacts. Due to inmate refusals, six psychiatry contacts were cell-front during the review period.

Audits found timely completion of PC contacts for EOP inmates in 93 percent of cases. Limited office space for individual contacts required careful scheduling. Of the total 1,389 cell-front PC contacts, 1,369 or 99 percent were due to inmate refusals and the remaining 20 or one percent were due to modified programming, lack of escort, staff decision, or other unspecified

reasons.   There were 189 out-of-cell PC contacts in non-private settings.  Of these, 26 or 14 percent were initial contacts, 130 or 69 percent were follow-up contacts, 23 or 12 percent were "unscheduled," and the remaining five percent were crisis responses and special follow-ups.

Both initial and follow-up IDTT meetings were timely in over 90 percent of cases. Required disciplines were present 95 percent of the time.  At observed IDTT meetings during the site visit, the meeting room was sufficiently large and comfortable.  The required attendees were present and computer access was available.  Collaborative treatment planning and discussion of the criteria for consideration for referral to higher levels of care on Form 7388B could have been improved.  Inmates were not asked to sign their treatment plans.

Provision of group therapy for EOP inmates was driven by the number of EOP inmates in the administrative segregation unit at any given time.  At the time of the site visit, only one EOP inmate was in the unit. Group treatment space in the unit was limited.

At the time of the site visit, no EOP inmate had been in administrative segregation longer than 150 days.

3CMS inmates in administrative segregation were seen timely by their psychiatrists and PCs over 90 percent of the time.  Audits found that IDTT meetings were conducted timely in over 90 percent of cases, but required disciplines were present only 64 percent of the time. Groups were not offered to 3CMS inmates in administrative segregation.

At the time of the site visit, no inmates were on NDS status at CCWF.

MHCB:

The MHCB was licensed for 12 beds.  It had four double cells and four single cells.  The average census during the review period was seven, and the average stay lasted eight days.  Pre-

site visit data indicated that 13 inmates had three or more MHCB admissions during the six-month period before April 19, 2015.

Staff reported that they rarely double-celled patients.  Without an applicable LOP, staff considered custodial and clinical contraindications when deciding whether to double-cell patients.  An LOP to standardize the process and provide clinical guidance is recommended.

Provided data indicated that 92 percent of initial psychiatry contacts were timely and that 99 percent of follow-up psychiatry contacts were timely.

Timeliness of initial PC contacts was only 52-percent compliant.  Follow-up PC contacts were timely 82 percent of the time.

Programming in the MHCB unit also included individual and group activities with the recreational therapist and yard time.

Initial IDTT meetings were 86-percent compliant for timeliness.  Follow-up IDTT meetings were 94-percent compliant for timeliness.  Observed IDTT meetings were conducted in a spacious, well-lighted room that provided access to a computer.  Required attendees were present, and all participants engaged in collaborative, supportive, and therapeutic discussions.

Data indicated a compliance rate of 95 percent for completion of five-day clinical follow-ups post-MHCB discharge.

Seclusion and Restraint:

There were two reported instances of seclusion in October 2014.  Reasons were not documented in the log.  Durations ranged from three hours and 55 minutes to 17 hours.  Data provided via nursing assessment records was handwritten and difficult to read.

Restraints were not used during the review period.

Alternative Housing:

All alternative housing cells had running water and toilets.  They were used after hours and when no MHCBs were available.  Staff reported that usage was high after normal work hours.  Alternative housing cells in Building 503 were also used routinely as housing for reception center inmates.

Inmates placed into alternative housing were required to wear safety smocks and were monitored one-to-one by nursing staff.   MHCB staff reported that contacts with inmates in alternative housing in Building 503 were either cell-front or in a non-private open area.

Staff reported that inmates in holding cells were monitored by custody staff.   During normal working hours, holding cells in Building 501 were used for inmates in crisis. This had a disruptive effect on EOP programming.

EOP:

The mainline EOP was located in two wings of Building 501 on the A-Yard.  Rooms were dormitory style, each housing six to eight persons. The average weekly census during the review period was 67 inmates.  There were concerning reports that the housing of several EOP inmates in the dormitory cells resulted in numerous conflicts, crisis evaluations, and inability of some inmates to tolerate this number of sometimes very mentally ill inmates in the same cell.

The other two wings in Building 501 were occupied by reception center and difficult-to-house general population inmates. Due to the need for segregating the different populations, this resulted in limitations on programming for all populations.  At the time of the site visit, the placement of six EOP women in these dormitory cells appeared to be problematic.

 Initial psychiatry contacts were 90-percent compliant and follow-up psychiatry contacts were 96-percent for timeliness. Initial PC contacts were 97-percent compliant and follow-up PC

contacts were 98-percent for timeliness.  Audits indicated that 90 percent or more of psychiatry and PC contacts took place in private settings.

Compliance rates for timeliness of initial and follow-up IDTT meetings were 95 percent and 98 percent, respectively.  Audits indicated compliance rates higher than 90 percent for attendance by required disciplines.  A mainline EOP IDTT meeting was observed during the site visit.  Necessary participants were present and computer access was available.  Interdisciplinary discussion about individual patients' treatment goals, progress, and discharge planning was good.  However, there was consistent lack of formal discussion about criteria for consideration of referral to higher levels of care.

On average, 18.03 group hours were scheduled per week, 15.55 hours were offered, 9.72 hours were attended, 5.83 hours were refused, and 2.48 hours were cancelled.  Approximately 99 percent of inmates were offered at least ten hours per week, 97 percent were scheduled for at least ten hours, 48 percent attended ten hours, 14 percent refused groups, and two percent cancelled.

Several EOP inmates were interviewed during the site visit.  Common themes of expressed concerns were dissatisfaction with the six-person dormitories because of occasional conflicts and placements with less stable persons, lack of diversity in group therapy offerings, and downgrading of patients to the 3CMS level of care before stabilization.

For EOP inmates on modified programming, 96 percent of inmates were scheduled for at least five hours of group per week, 57 percent were offered at least five hours, 19 percent attended five hours, 13 percent refused, and none were cancelled.  On average, EOP inmates on modified programming were scheduled for 12.79 hours per week, offered 11.94 hours, attended 6.79 hours, refused 5.15 hours, and .85 hours were cancelled.

<u>3CMS</u>:

Inmates in the 3CMS program were housed in Facilities B, C, and D.   Programming included individual and group therapy and was offered in Buildings 812 and 813

Provided data on timeliness of initial psychiatry contacts indicated a compliance rate of 95 percent, and for follow-up psychiatry contacts a compliance rate of 89 percent.  There were no cell-front psychiatry contacts during the review period.  There was one follow-up psychiatry contact in a non-private area in administrative segregation.

Initial PC contacts were timely 82 percent of the time.  Follow-up PC contacts were timely 85 percent of the time.  There were 12 cell-front PC contacts among seven different inmates, all in administrative segregation.  Provided data indicated 18 PC contacts in non-private locations among 12 different inmates, all in administrative segregation.

Timeliness of initial IDTT meetings was 76-percent compliant.  Required staff were present 98 percent of the time.

An art therapy group observed during the site visit was informal and unstructured.  Inmates arrived and left as they desired.  They colored and talked among themselves, providing support to each other and/or talking with the group leader, who also provided support and encouragement.

<u>Referrals</u>:

Ninety-six percent of the 337 emergent referrals during the review period drew a timely response.  Of the 367 urgent referrals generated, 94 percent resulted in a timely response.  MHTS.net data showed that 72 percent of the 2,898 routine referrals resulted in a timely response, although several data entry errors were discovered, indicating that the actual compliance rate for response to routine referrals may have been higher than reported.

541

Heat Plan:

CCWF was compliant with heat plan protocols.

Use of Force:

The institution reported that all staff had completed training on controlled use of force.

Access to Care:

Review of CCWF's monthly Health Care Access Quality Reports for October 2014 through March 2015 indicated that eight percent of issued mental health ducats and add-on appointments were not completed due to custody factors, and that 16 percent were not completed for non-custodial reasons other than inmate refusals.

Construction:

The new EOP mainline and administrative segregation treatment facility was under construction at the time of the site visit.  It will serve 54 mainline EOP and ten administrative segregation EOP inmates, and will provide EOP treatment and office space, including group therapy space for EOP administrative segregation inmates.  As of this writing, activation was scheduled for September 30, 2015.

CCWF was also slated for a HCFIP project to include renovation of the reception center comprehensive health screening space.  Work on this project had not begun as of the time of the site visit.

Program Access:

a.      Job and Program Assignments:

Institutional data indicated that seven or .73 percent of available full-time jobs were filled by EOP inmates, 365 or 38 percent were filled by 3CMS inmates, and 590 or 61 percent were filled by non-MHSDS inmates.

542

Of the 54 available part-time jobs, 23 or 43 percent were filled by 3CMS inmates and 31 or 57 percent were filled by non-MHSDS inmates.

There were no full-time academic assignments at CCWF.  For part-time academic assignments, 11 or three percent were held by EOP inmates, 172 or 45 percent were held by 3CMS inmates, and 200 or 52 percent were held by non-MHSDS inmates.  Of the ten available voluntary academic assignments, two or 20 percent were held by 3CMS inmates and eight or 80 percent were held by non-MHSDS inmates.

For full-time vocational education assignments, one or .43 percent was held by an EOP inmate, 80 or 35 percent were held by 3CMS inmates, and 153 or 65 percent were held by non-MHSDS inmates.

Of the 54 available part-time vocational education assignments, 18 or 33 percent were held by 3CMS inmates, and 36 or 67 percent were held by non-MHSDS inmates.

Of the 287 re-entry substance abuse treatment program assignments, 160 or 56 percent were held by 3CMS inmates, and 127 or 44 percent were held by non-MHSDS inmates.

b.   Milestone Credits:

Information provided by the institution indicated that as of April 21, 2015, 6.25 percent of eligible EOP inmates, 22.78 percent of eligible 3CMS inmates, and 18.77 percent of eligible non-MHSDS inmates earned milestone credits.

c.    Out-of-Level Housing:

Inmates at custody Levels I through IV were housed together at CCWF.

d.    ADA Reasonable Accommodation and Grievance Procedures:

As of the time of the site visit, the institution was scheduled to implement the new ADA Reasonable Accommodation and Grievance Procedures in June 2015.

543

e.     Periodic Classification Score Reductions: EOP Inmates:

CCWF reported that CDCR-840 documentation was completed annually and entered in ERMS and SOMS.  Sample CDCR-840s were not reviewed during the site visit.

*Coleman* Postings:

Ten monitored housing units were all were in compliance with *Coleman* postings.

**Valley State Prison (VSP)**
March 10, 2015 – March 12, 2015

Census:

On March 9, 2015, VSP housed 3,007 inmates, for an increase by 1,027 or 52 percent since the preceding monitoring period.

There were 275 SNY EOP inmates and 1,083 3CMS inmates.  In administrative segregation, there were five EOP inmates and 20 3CMS inmates.  One inmate was in the OHU for mental health reasons.

Staffing:

VSP had received additional mental health and custody staffing allocations since the preceding monitoring period to assist with its growing mental health caseload population.  Of 75.4 established mental health positions, 65 were filled and 10.4 were vacant, for a 14-percent overall vacancy rate.  VSP did not use contractors.

The senior psychiatrist position, one of the two chief psychologist positions, and four of five senior psychologist positions were filled.

Four of six psychiatrist positions were filled, for a 33-percent vacancy rate.  Staff reported that psychiatry caseloads were overly large at 300 to 500 per psychiatrist, and that they were having difficulty with recruiting psychiatrists.

544

Of 17 psychologist positions, 15 were filled, for a 12-percent vacancy rate. Five psychologists were unlicensed and two were on extended leaves during the review period.

The supervising social worker position was filled, as were ten of 11 social worker positions, for a nine-percent vacancy rate. Three of the social workers were unlicensed.

The senior psych tech position was filled, as were 11 of 12.4 psych tech positions, for an 11-percent vacancy rate.

All four recreational therapist positions were filled, but one was on leave during the final month of the review period and another worked half-time during the final two months.

Ten of 11 mental health clerical positions were filled. Both HPS I positions and the OSS II position were filled, but the CHSA II position was vacant.

Quality Management:

Except in October 2014, the QMC met monthly during the review period, with a quorum present and minutes maintained. Meetings were chaired by the CEO and were generally attended by the chief of mental health. Minutes indicated that discussions covered EOP overcrowding and medications, among other things.

During the review period, the mental health subcommittee met monthly and always achieved a quorum. Meetings were chaired by the chief of mental health. Agendas were comprehensive.

Meeting minutes for a QIT on the EOP indicated that it addressed the institution's gold coat program, group therapy hours, medication-related matters, and programming challenges. This QIT was converted to a committee in October 2014. A QIT on alternative housing met during July and August 2014 and addressed alternative housing placements and program compliance issues. Further meetings of this QIT were placed on hold. A QIT on suicide

545

prevention held its final meeting in August 2014 and transferred its function to the mental health subcommittee and another QIT for resolution.

There was no formal peer review at VSP during the review period.

Medication Management:

Medication continuity following intra-institutional transfers was 70-percent compliant for nurse-administered and DOT medications.  Following intra-institutional moves to administrative segregation, medication continuity was 77-percent compliant.  Following discharges from community hospitals, it was 71-percent compliant.

Laboratory testing of blood levels for inmates on psychotropic medications was at least 90-percent compliant.

It was reported that pill line times sometimes conflicted with group activities in administrative segregation.  Staff attributed long pill lines to medication preparation time, scheduling conflicts with meals and inmate counts, inconsistencies with escorts, early start times of groups, and staffing shortages.

In the SNY EOP, staff and inmate interviews indicated that medication passes were overly long.  Morning and evening pill lines were reported to last over an hour, which sometimes resulted in the delayed starts of groups and inmates leaving for meals.

Seven to nine inmates were on involuntary medication orders during at least part of the review period.  Staff reported that all court orders were up-to-date and documented in the medical records, and that the inmates were medication-compliant.

Transfers:

VSP maintained DSH referral and non-referral logs, which were accurate and contained required information.

546

During the review period, there were 13 referrals to acute inpatient care, all but one of which were completed timely.  Two of these referrals were rescinded by VSP.  Of the remaining 11 acute care referrals, four were transferred timely.  The average time for the late transfers to acute care was 17 days.  Nine of all 11 transfers occurred within 72 hours of a bed assignment.

There were eight referrals to intermediate inpatient care, four of which were rescinded by the institution.  Of the three completed transfers, one was timely and the other two took 43 and 55 days, respectively.  All three of these transfers occurred within 72 hours of a bed assignment. At the time of the site visit, the sole remaining intermediate care referral had been pending transfer for 56 days and was not yet accepted by DSH.

VSP did not report the number of inmates discharged from DSH back to VSP.  The DSH coordinator reported that typically the institution was notified by email of impending DSH discharges and that discharge packets were posted on SharePoint.  Discharge summaries were legible, detailed, and clinically useful.  A VSP clinician and the DSH discharging clinician communicated about the discharges.

Of 118 inmates who transferred to an MHCB at another institution, 74 or 63 percent were assigned a bed within 24 hours of MHCB referral, and 46 or 39 percent were transported within 24 hours of MHCB referral.  Mental health staff reported that unavailability of MHCBs was the predominant reason for the delays.

VSP reported 85-percent compliance for the 91 mental health OHU stays.  Of these, 59 or 65 percent were referred to the MHCB.

One set of data provided by VSP indicated 82-percent compliance for 107 alternative housing placements, which averaged only .1 day beyond timeframes.  Other provided

documentation indicated 76 alternative housing stays, of which 58 or 76 percent resulted in transfers to MHCBs.

No inmates were referred to the PSU during the review period.  One EOP inmate endorsed for PSU transfer was pending transfer.

VSP reported 94-percent compliance for transfers to EOP administrative segregation hubs.  Four of the five overdue transfers occurred at 44 days on average, and the one outlier, who was at VSP because of legal proceedings, transferred at 170 days.  During the site visit, four EOP and 20 3CMS inmates were housed in administrative segregation.  Three of the EOP inmates had been there for an average of 12 days; the fourth inmate had been there for 128 days due to legal proceedings, but was paroling on March 16, 2015.  The 20 3CMS inmates had been there for an average of 69 days, including six that ranged from 133 to 265 days.

Four EOP inmates and seven 3CMS inmates were housed in NDS from August 1, 2014 to March 11, 2015.  These EOP and 3CMS inmate stays averaged 14 days and 23 days, respectively.

Other Issues:

MHSDS Inmates in Administrative Segregation:

VSP's administrative segregation unit was located in A-4, which also housed EOP inmates pending hub transfers.  Mental health programming consisted of weekly psychiatry and PC contacts and daily psych tech rounds, but no group therapy.  At the time of the site visit, the sole assigned PC had a caseload of 25.

One psychiatrist was assigned to administrative segregation, the OHU, and the 3CMS program and had a caseload of 474.  Audits indicated timely psychiatry contacts for both EOP

and 3CMS inmates.  Interviewed inmates reported weekly contacts with the psychiatrist in a private setting and no problems with medication continuity.

Two psychologists had caseloads of 29 each, and another psychologist who was also assigned to the EOP had a caseload of 22. Initial PC contacts for EOP inmates were 83-percent compliant; follow-up contacts were 98-percent compliant.  For 3CMS inmates, initial and follow-up PC contacts were 96-percent compliant.

Audits indicated that IDTT meetings were compliant for both timeliness and presence of required participants.  At an observed IDTT meeting, there was good engagement with the inmate and interdisciplinary discussion of treatment planning and need for higher levels of care.  The team was clearly very familiar with the inmates.

Inmates had crank radios and electrical appliances in their cells.  There was space for private one-to-one clinical contacts.  An alternative space for clinical contacts was a treatment module on the dayroom floor, which did not provide adequate privacy.

SNY EOP:

The SNY EOP at VSP had undergone significant expansion and change since the preceding monitoring period, with its census reaching 275 inmates and a projected census at full capacity of 372.  The program received additional staffing allocations in both mental health and custody to help accommodate the expansion.  It had two psychiatrists, with caseloads of 137 and 138, respectively.  It also had one senior psychologist supervisor, and one senior psychologist specialist, eight psychologists, five social workers, and four recreational therapists.

During the review period, the growing program census and staffing vacancies and absences led to cancellations, long pill lines, large group sizes, and delays in the delivery of services.

The institution reported that 86 percent of psychiatry contacts and 90 percent of PC contacts were timely.  Only one percent of clinical contacts were conducted in a non-private setting.

IDTT meetings were timely 91 percent of the time, and included necessary participants more than 90 percent of the time.  However, at an observed IDTT meeting, the team was slow to determine the inmate's need for immediate transfer to a higher level of care, despite his obvious severe psychotic symptoms and inability to function in an outpatient setting.

Audits indicated that 92 percent of inmates were scheduled for ten weekly hours of group treatment.  Of these, 83 percent were offered at least ten hours, and 49 percent attended ten hours.  Only one percent of inmates refused group treatment.  Groups were offered in several locations.  At the time of the site visit, it was unclear whether planned additional group spaces would be sufficient for further expansion of the EOP program.

Two group therapy sessions were observed.  Inmate arrivals were delayed by 20 to 30 minutes, which appeared to be a chronic problem.  One was the initial session of a Dialectic Behavioral Therapy group led by a psychologist.  There was good discussion among its nine participants, who expressed having benefitted from the group.  The other observed group was a music group facilitated by a recreation therapist and a gold coat inmate.  It also had good participation and interaction among its participants.

The institution's gold coat program for higher-functioning inmates who were trained to assist some EOP inmates appeared to be beneficial and well-liked by EOP inmates.  Gold coats received 12 hours of training and assisted with activities of daily living, tutoring, co-facilitating recreation-based groups, and getting inmates to appointments, groups, and medication lines.

SNY 3CMS:

The two psychiatrists had caseloads of 327 and 365, respectively.  Psychiatry contacts were 91-percent compliant, and PC contacts were 99-percent compliant.  PCs reported caseloads of 136.

Cell-front contacts were nearly non-existent.  Timeliness of IDTT meetings was 99-percent compliant, and attendance by clinical staff was 100-percent compliant.

Therapeutic groups had been discontinued following the institution's mission change and growth of its SNY EOP.  There were 861 inmates on group wait lists and some inmates had initiated their own group meetings.  Contract clinicians conducted groups for inmates who would be paroling within specified timeframes.

At observed IDTT meetings, a psychiatrist, senior psychologist, two clinicians, and CC I were in attendance.  The meetings were clinically-driven, and the inmates were familiar with the IDTT process and knowledgeable about treatment plans and goals.  One of the clinicians covered the necessary topics but gave inordinate attention to completing paperwork rather than to engaging the inmates.

Ten interviewed inmates reported that they knew their psychiatrist and PC and that the program was beneficial to them.  Some who had medical problems commended the psychiatrist for addressing both their mental health and medical needs.  Several inmates reported not receiving notice of a change of clinician and having had multiple changes during the past year.  Others stated that clinicians were not prepared for their sessions.  All reported concern about the lack of groups

Referrals:

There were 1,953 mental health referrals during the review period.  Compliance rates for response to referrals were 94 percent for emergent referrals, 93 percent for urgent referrals, and 94 percent for routine referrals.

MHTS.net:

Mental health staff reported using MHTS.net to track inmate arrival dates, level-of-care changes, mental health contacts, IDTT meetings, EOP group offerings and participation, and DSH referrals/non-referrals.  They were aware that MHTS.net contained information on suicidal behaviors and indicated that they had access to other information management systems including SOMS and DECS.

Mental Health/Custody Relations:

There were reports by staff and EOP inmates of intimidation, threats, and retaliation by some unit officers.  It was reported that groups sometimes began late due to officers not permitting inmates to leave their housing units timely.

Likewise, half of interviewed 3CMS inmates reported disrespectful comments by some custody officers concerning these patients' mental health medications and/or their level of care.  Most of these inmates voiced the importance of avoiding certain officers who engaged in racially-based verbal abuse.

Heat Plan:

There were no Stage II or Stage III heat alerts during the reporting period.

Use of Force:

Thirty-three of 39 or 85 percent of mental health staff were trained on the new use-of-force policy, as were 445 of 462 or 96 percent of custody staff.

552

<u>Access to Care</u>:

Review of access to care reports for the review period indicated that inmates refused one percent of all mental health ducats and add-on appointments. Ducats were not completed due to custodial reasons less than one percent of the time, and due to non-custody reasons seven percent of the time.

<u>Program Access</u>:

VSP reported that staff training on the functional evaluation process had recently been provided to EOP and 3CMS clinicians.

a. <u>Job and Program Assignments</u>:

Thirty-one EOP inmates had full-time employment and six had part-time employment. The institution was unable to report whether these jobs were paying or non-paying.

For 3CMS inmates, 373 had full-time employment. One hundred seventeen participated in full-time vocational educational programs, one had a full-time academic position, and 114 had part-time academic positions. Again, VSP was unable to report whether these positions were paying or non-paying.

There were 182 eligible but unassigned EOP inmates, 262 eligible but unassigned 3CMS inmates, and 236 eligible but unassigned non-mental health caseload inmates.

The associate warden for housing reported no conflict between mental health programming and inmate jobs or other positions. He reported that mental health and custody staff worked together to ensure that inmates were not missing groups or other treatment due to employment, vocational, or academic positions.

553

Among non-mental health inmates, 1,091 had full-time employment, six had part-time employment, 244 participated in full-time vocational education programs, two had full-time academic positions, and 371 had part-time academic positions.

        b.     <u>Milestone Credits</u>:

VSP reported that EOP inmates were eligible to earn milestone credits as of November 2014.  Previously, entry of milestone credit data into SOMS was delayed as mental health staff lacked access to SOMS data entry, but by the time of the site visit, milestone credit data was being entered into SOMS weekly.

VSP reported that 88 of 288 EOP inmates were eligible for milestone credits.  Among these 88 inmates, 31 percent actually earned milestone credits.  Two hundred thirty nine of 1,154 3CMS inmates were eligible to earn milestone credits, and 49 percent of these 239 inmates actually earned milestone credits.

Of 1,642 non-mental health caseload inmates, 237 were eligible to earn milestone credits and 40 percent of those actually earned them.

        c.     <u>Out-of-Level Housing</u>:

There were 38 EOP, 50 3CMS, and 67 non-mental health Level I inmates in Level II housing.  There were also six EOP, 17 3CMS, and ten non-mental health Level III inmates in Level II housing.

        d.     <u>ADA Reasonable Accommodations and Grievance Procedures</u>:

The revised ADA accommodation and grievance procedure was not implemented at VSP.

        e.     <u>Periodic Classification Score Reductions: EOP Inmates</u>:

Review of periodic classification score reductions indicated that EOP inmates were granted semi-annual classification score reductions for successful programming.

_Coleman_ Postings:

All four housing units on A-Yard, which housed EOP inmates, and all four housing units on B-Yard, which housed 3CMS inmates, had _Coleman_ postings in both English and Spanish.

**<u>APPENDIX B</u>**
**CLINICAL CASE REVIEWS**

EXHIBIT A
California State Prison, Sacramento (CSP/Sac)
February 3, 2015 - February 5, 2015

**Inmate A**

This inmate's medical record was reviewed from a list of inmates housed in administrative segregation for longer than 90 days. The inmate arrived at the administrative segregation EOP hub with diagnoses of Mood Disorder NOS and Antisocial Personality Disorder. The target of treatment was stabilization of his moods with CBT. The inmate was prescribed Geodon, Effexor, and Vistaril. According to the administrative segregation length of stay report, the inmate was placed in administrative segregation on 10/12/14 and as of 2/3/15, had a length of stay of 99 days. His eUHR indicated that he went to the MHCB on 10/12/14, and again from 11/19/14 to 11/20/14, and was placed in the OHU on 12/24/14. The Form 7388 treatment plans, the Form 7388B level of care assessments, SREs, and five-day follow-ups were completed according to policy. When the inmate was not in the MHCB or administrative segregation, weekly confidential sessions were conducted. His clinical documentation indicated improvement as he had not been admitted to the MHCB through January 2015.

Findings

The inmate's care and treatment was adequate to address his mental health needs.

**Inmate B**

This inmate arrived in administrative segregation on 10/3/14 with diagnoses of Bipolar I Disorder with psychotic features, and Intermittent Explosive Disorder. He had a length of stay of 123 days as of 2/3/15. He was interviewed during group and stated that the groups did not address his actual diagnosis of Bipolar Disorder; he indicated that he felt that groups should help him to understand triggers for his illness and obtain coping skills.

Treatment plan goals were to refrain from acting on anger, eliminate cognitive distortion, achieve medication compliance, end substance abuse and resist temptation, and process unresolved issues with his mother and women in general. His prescribed mental health medications were Zyprexa, sertraline, and oxcarbazepine.

PC and psychiatry visits addressed current inmate concerns. The inmate's anxiety increased during January 2015 due to his perceived insufficient yard time and his administrative segregation length of stay.

Findings

The inmate's mental health care and treatment appeared to be clinically appropriate.

**Inmate C**

This PSU inmate's healthcare record was reviewed during a group therapy session when he stated that he frequently remained isolated; his goal was to leave his cell for individual and group treatment. He indicated that this isolative behavior had been present for several years.

He was provided with a diagnosis of Schizoaffective Disorder, depressive type. His prescribed medications were Risperdal and venlafaxine. He was a high refuser of treatment and was on a modified treatment plan during the site visit. He verbalized continued auditory hallucinations and increased paranoia. It was noted that his treatment plans repeatedly stated "Encourage EOP Level of Care and encourage to get out for groups and 1:1 contacts," regardless of the subjective findings, behavior changes, or verbalization from inmate of increased auditory hallucinations. It was also noted that psychiatry notes were on the CSP/Corcoran form, rather than CSP/Sac. It was unclear whether these were notes by a visiting psychiatrist or telepsychiatry. There was no change in the inmate's medications during October and November 2014 or documentation of discussion regarding increased auditory hallucinations with his PC.

Findings

The inmate's documented care and treatment were inadequate for his mental health concerns of isolation due to paranoia. While PC notes discussed his willingness or unwillingness to do homework at times, it was unclear from the documentation whether there was any progress using the existing treatment plan. Medical records documentation did not illustrate adequate treatment plans, treatment team consultation, or plans to change treatment even though auditory hallucinations were increasing. The inmate was, however, seen for clinical contacts at the required Program Guide frequencies.

**Inmate D**

This PSU inmate was interviewed while attending a PSU group. He reported wanting to go to a DSH inpatient program, but his clinician wanted him to begin treatment with clozapine. He was concerned with placement in an inpatient area during a clozapine initiation due to fear of blood draws and other inpatient treatments.

The inmate's diagnoses were Psychotic Disorder NOS, Schizoaffective Disorder bipolar type, and Personality Disorder NOS. His prescribed mental health medications were Zyprexa, Zoloft, Trilafon, and Cogentin as needed. He was transferred to PBSP on 10/1/14, and he was admitted to the CTC on 10/12/14. He was discharged from the CTC on 11/13/14 and returned to CSP/Sac on 12/12/14. He complained of medications being administered too early, causing him to lose sleep, and that he did not have a television for over three months. Psychiatry notes addressed his concern regarding treatment with clozapine and his ambivalence about blood draws, but the inmate agreed to consider this treatment alternative.

Findings

The inmate's care was adequate to address his mental health needs; however, further discussion about the benefits of treatment with clozapine and the inmate's desire to go to DSH should have occurred. Psychiatry stated that additional discussion about clozapine would occur. There was, however, no documentation that psychiatry was informed about the inmate's desire to go to DSH.

559

**Inmate E**

This PSU inmate continued to attend groups to maintain his step four status in the hope of obtaining a television that he had purchased after eight months.  He stated "I only want what I am entitled to according to the step program."

The inmate's diagnoses were Major Depressive Disorder, Dementia NOS with psychotic features, and Polysubstance Dependence.  His prescribed medication was Effexor.  The majority of notes stated "thoughts contained delusional content this session," even though delusional behavior was not documented.  Weekly clinical group notes for September 2014 and November 2014 all stated "I/P was alert, attentive and actively participated in group activities and discussion.  He appeared willing to engage in the group process."  Multiple clinical notes also quoted a psychiatrist's statement from "11/27/13 indicating a PT reported hoarding same day.  He is not a PC 2602 order" even though the PC did not discuss medication noncompliance.  The PC contacts, psychiatrist contacts, and IDTT meetings for this inmate were scheduled and occurred according to Program Guide requirements.  He was on step 4 since June 2014 and told the clinician about his concerns about not getting his television.  The clinician tried to redirect him during group.

Findings

The PC and other members of the team met the Program Guide's contact and IDTT meeting requirements.  Although treatment was adequate, progress notes did not clearly show improvement.  It was implied that the inmate was doing well by maintaining step 4 over eight months.  The inmate's continued success might be jeopardized if his focus was on not receiving his television and his perception of lack of support from the mental health team to rectify his problem with custody concerning his television.

560

EXHIBIT B
Folsom State Prison (Folsom)
May 20, 2015 - May 22, 2015

**Inmate A**

The inmate's healthcare record was reviewed from a list of inmates attending initial and annual IDTT meetings observed during the site visit.  He was diagnosed with possible Anxiety Disorder and was not prescribed mental health medications.  His documented parole date was 1/22/16.

Clinical individual contacts occurred on 10/9/14, 12/26/14, 4/7/15, and 5/11/15; an IDTT meeting was held on 5/20/15.  Clinical contacts occurred at least every 90 days except for between 12/26/14 and 4/7/15, when they exceeded 90 days.  The clinical note in both education and plan discussed basic parole issues and the inmate's concern about ADHD, as well as indecision regarding remaining at the 3CMS level of care.  Treatment plans for the October 2014, December 2014, and April 2015 contacts indicated that clinical contacts should occur quarterly and/or as clinically indicated.

During observation of the IDTT meeting, the clinician did not discuss with the treatment team any changes that had occurred with the inmate during the past 90 days.  Goals were not measurable and, except for the inmate's indecision regarding remaining at the 3CMS level of care, his level of care was not discussed.  The inmate also was not asked if the IDTT process was clear or to repeat what was stated as to the treatment plan.  There was no referral to psychiatry for anxiety or ADHD.

Findings

The clinical documentation was minimally adequate due to the lack of clarity in the notes.  It was unclear what the objectives of any of the documented goals were; and what, if any tools, handouts, or other educational tools were used to reach these goals.  There was no documentation of any positive or negatives changes that had occurred during the past 90 days and the treatment plan did not change from 10/14 to 4/15.  The IDTT process was inadequate.

**Inmate B**

This inmate was chosen from a list of inmates attending observed IDTT meetings during the site visit.  The inmate was present for the initial IDTT meeting.  He had arrived at Folsom on 5/1/15.  The CDCR Form 7277 indicated that he had medical diagnoses of diabetes mellitus II, hepatitis C, and seizures.  He was prescribed metformin, mirtazapine, atorvastatin and Depakote.  He was provided with a mental health diagnosis of Mood Disorder; he was prescribed Buspar and Remeron.

On 5/7/15, the clinician had an individual clinical contact with the inmate.  The clinical documentation under "Assessment" was, "IP is currently stable.  No acute psychological distress is reported/observed.  No acute intervention necessary at this time.  Sx's are caused/related to ____.  Progress is ____."

562

Portions of the SOAPE note were a template and some spaces had been left blank or non-circled portions had not been filled in.  It was observed that use of a template of this nature likely limited development of individualized treatment plans.

The inmate submitted two CDCR Forms 7362 on 5/6/15 for back pain and medication refills for acetaminophen, atorvastatin, and metformin.  On 5/8/15, he submitted a CDCR Form 7362 for eyeglasses.  A CDCR Form 7362 was also submitted on 5/11/15 requesting a dental exam.  An optometry visit occurred on 5/15/15 and another CDCR Form 7362 was submitted on 5/18/15 for back pain.

The IDTT meeting occurred on 5/20/15, when the inmate made multiple inappropriate comments that the treatment team did not address.  During introductions of treatment team members, he asked if he could get the medications that helped him "to fly like superman;" the treatment team ignored this statement.  There was discussion with custody about possible transfer due to his back pain and inability to walk long distances.  The inmate said he was currently residing on the second or third tier and walked back and forth.  The inmate again stated, "Can I get something to make me walk on the walls and fly?  That would really work for me."  The team again ignored these statements.  The inmate's seizures, which affected his ability to work, were not discussed, nor was his inability to sign the IDTT documents; the inmate stated that he had not received glasses.

The inmate's goals discussed during the IDTT meeting were not measurable, and the team did not discuss his appropriate level of care.  Inappropriate comments were not addressed and medical conditions affecting his ability to get a job were also not discussed.  The regional senior psychologist was also concerned about the IDTT meeting and discussed the concerns with the chief of mental health and clinical staff.

Findings

Clinical timeframes were met according to the Program Guide.  However, the IDTT meeting did not address medical or optometry concerns, the goals were not measureable, and the level of care was not discussed.

**Inmate C**

This EOP inmate's medical record was reviewed as one of two EOP inmates awaiting transfer from administrative segregation to an EOP hub.

The inmate was diagnosed with Psychotic Disorder NOS.  He was prescribed Risperdal.  He had been incarcerated for 18 years over three prison terms at the time of the site visit.

The inmate worked as a porter and was single-celled.  He was placed at the EOP level of care on 5/12/15, after a physical altercation and refusal of a cellmate; he was then placed in administrative segregation.  Previous clinical notes revealed the inmate self-referred due to paranoia and increased anxiety four times over approximately five to six weeks prior to the

incident.  The clinical notes also stated that the PC had planned an IDTT meeting to consider referring him to the EOP level of care.

The inmate was on two group waiting lists.  Clinical documentation reflected his acceptance that he needed help, requested groups, and inquired about "The Delancey Program" approximately one month before the incident.

Findings

Clinical timeframes were met according to the Program Guide.  The inmate self-referred four times within six weeks at the 3CMS level of care.  The responses to the four self-referrals were untimely, resulting in the inadequate provision of mental health care for this inmate.

**Inmate D**

This inmate's healthcare record was reviewed following inmate interviews at Folsom's Women's Facility.  The inmate was diagnosed with Major Depressive Disorder and was prescribed Effexor.  Medical records were reviewed from October 2014 to May 2015.  They indicated that during October 2014, the inmate was reluctant to again move to the 3CMS level of care.  She had a history of trauma, related to a motor vehicle accident, with extensive injuries to her leg and face.  She was married, had a four-year old child, and was serving a four-year sentence.

During December 2014, the inmate reported that her prison time was mistakenly calculated by custody by 50 percent; she learned she had two additional years to serve in prison.  The clinician again noted that the inmate was considering returning to the 3CMS level of care and to psychotropic medication.  The IDTT meeting occurred on 12/30/14; at that time, the inmate was removed from the mental health caseload and was referred to the Transitional Case Management Program (TCMP) to assist with parole planning.

During January 2015, the inmate reported that custody informed her that because she was in the mental health program, her security level had changed from minimum to medium.  She was reported to be stable, but her anxiety was increasing.  The clinical plan "Recommended CCCMS LOC at this time - schedule IDTT - completed 7447."  The clinician had a follow-up in 30 days.

In February 2015, a psychiatry visit indicated that the inmate was prescribed Effexor for depression.  The inmate stated the medication was helping and things were going great.  She reported taking college courses, attending AA meetings, and working as a porter.

During April 2015, clinician notes stated that the inmate asked the psychiatrist to discontinue medications; however, she now wanted to continue medications for a month or two because the classification hearing was occurring in June 2015.  The clinician reported the request to remain on medications to the psychiatrist.  The psychiatry visit in April 2015 supported the clinical findings.

In May 2015, the inmate reported that she was doing well on medications in the program.  She nonetheless felt the need to leave the program to qualify for a time reduction slot if one became available, so that she could return to her family.

Findings
The number of PC and psychiatry contacts exceeded Program Guide requirements.  It was unclear when the inmate entered the mental health caseload and at what level of care.  It was also unclear if any clinical or custodial discussions about the inmate's concern that her mental health placement was negatively impacting an early release ever occurred.

EXHIBIT C
California Health Care Facility
July 21, 2015 - July 23, 2015

**Inmate A**

This 23-year-old man was referred from SCC to the CHCF MHCB on 7/11/15 after acting strangely on the yard and complaining of auditory and command hallucinations to harm somebody.  He had been discharged from the 3CMS program approximately five months earlier.  He also had an episode of fecal incontinence and confusion.

A useful initial psychiatric evaluation assessment was present in his eUHR.  His presentation was consistent with the differential diagnoses of Psychotic Disorder NOS, Mood Disorder NOS, Polysubstance Dependence in remission, history of ADHD, and likely Antisocial Personality traits.  His physical examination, which was completed within 24 hours, indicated that the inmate was stable with well-controlled asthma.

An initial psychologist's progress note was written on 7/12/15 and provided a helpful summary of the inmate's history of present illness.  An IDTT was scheduled for the following day.  The inmate was also placed on suicide watch/suicide precaution status.

The inmate's treatment plan included identifying the stages of death and dying, which appeared related to a problem of "grief/loss" listed in his problem list.  However, documentation in his initial assessments relevant to recent losses was not located.

A 7/13/15 note indicated that he was too mentally unstable to be considered for non-mechanical restraints.  A 7/14/15 psychiatrist note reported there was no objective evidence to suggest dangerousness to self or others or grave disability.  However, the inmate remained on suicide precaution.  Informed consent was documented relevant to the use of psychotropic medications.

Prescribed medications included Zydis.  A 7/17/15 psychiatry progress note indicated good clinical improvement.  There were daily progress notes from a mental health clinician.

The inmate's treatment plan was reviewed on 7/20/15.  He was assessed to be functioning at his clinical mental health baseline.  The plan was to discharge him to the EOP level of care.

A 7/20/15 SRE was completed that assessed him to be at moderate chronic risk and low acute suicide risk.  A 7/20/15 psychiatry progress note indicated a diagnosis of Mood Disorder NOS.  The plan included motivational interviewing to identify stage of change.

Findings

This inmate was seen in a timely manner by the psychiatrist and mental health clinician and his treatment plan was developed in a timely fashion.  However, his treatment plan included grief work specific to death and dying issues despite such issues not being documented in any of his mental health assessments.  Document review indicated his cuffed status was only reviewed once, despite clear clinical improvement that his mental health clinicians documented.  He also remained on suicide precaution despite progress notes indicating he was not a danger to himself

or to others.  This inmate was not receiving an appropriate level of mental health treatment due to essentially being locked down within the MHCB.

**Inmate B**

This 24-year-old man was transferred from CSP/Corcoran to the CHCF MHCB on 7/12/15 due to being a danger to himself.  He reported experiencing both auditory and visual hallucinations that told him to cut himself, to hang himself, and to bang his head.

Healthcare record review indicated numerous MHCB placements since February 2015.  Prescribed medications included venlafaxine, Remeron, and Trileptal.  The eUHR contained a comprehensive initial psychiatric evaluation that was written on 7/12/15.  The inmate's presentation was consistent with the diagnoses of Mood Disorder NOS, possible Substance Dependence, Impulse Control Disorder NOS, Antisocial Personality Disorder, and Borderline Personality Disorder.

Suicide precautions were initiated.  The treatment plan also included having the inmate's primary psychiatrist review his psychotropic medications.

The eUHR did not contain a history and physical examination report.  An SRE was completed during the day of his admission.  He was assessed to be at moderate chronic and acute suicide risk.

A 7/12/15 psychologist's note indicated the inmate's custody classification was maximum security and that he was "in ASU for IEX and assault of a CO during past year."

An admission nursing assessment was dated 7/12/15.  The inmate's initial treatment plan was dated 7/13/15.  Mood dysregulation with possible psychotic features was listed as the only problem on his problem list.  His treatment modalities were limited related to the lack of access to out-of-cell structured therapeutic activities.  The Form 7388B was completed.

The inmate's clinicians wrote progress notes on a daily basis.  Medications were adjusted during this admission and appropriate laboratory tests were obtained.  The recreational therapist wrote that "RT will facilitate treatment groups/interventions to assist the inmate/patient to identify and learn some coping skills to assist with managing stress."

A 7/14/15 psychologist progress note indicated the inmate appeared to be using the MHCB for a "vacation" since it was assessed that his Axis II symptoms appeared to be driving his MHCB admission.  The Mood Disorder NOS diagnosis was described as being questionable and an Antisocial Personality Disorder diagnosis was made.  His privileges included receiving normal prison attire and yard privileges.  Suicide precautions remained.

On 7/15/15, the psychiatrist included Adjustment Disorder with mixed disturbances of conduct and emotion and Bipolar Disorder as differential diagnoses.  Medication adjustments were also made.

568

The inmate's treatment plan was reviewed on 7/20/15.  The Form 7388B was completed.  This treatment plan was little changed from the initial treatment plan.  Another SRE was completed at that time.

The psychiatrist wrote a mental health discharge summary on 7/20/15.  The inmate was to be discharged at the 3CMS level of care.

Findings

A history and physical examination was not documented in the inmate's eUHR.  The inmate's treatment was very limited due to the lack of out-of-cell structured therapeutic activities and very limited out-of-cell time.  Treatment was essentially restricted to medication management and individual counseling.

**Inmate C**

A 7/5/15 initial psychiatric evaluation indicated that this 22-year-old man was transferred from WSP to the MHCB due to being "highly agitated, hypomanic and reporting suicidal ideation."

His presentation was consistent with the diagnoses of Schizophrenia and possible Substance Induced Psychosis.  His history and physical examination was completed on the day of his admission.

The inmate's initial treatment plan was completed on 7/6/15.  The provisional diagnosis was Schizoaffective Disorder; his other diagnoses were deferred.  His one listed problem was "inmate patient reports chronic headache to which he is responding to with suicidal ideation."  Treatment interventions included learning relaxation skills, medication adjustments, and recreational therapy.

The Form 7388B was completed during the IDTT meeting.  Progress notes were written by mental health clinicians on a daily basis.  An SRE completed on 7/12/15 assessed the inmate to be at low chronic and acute suicide risk.

The inmate's treatment plan was revised on 7/13/15.  The plan was to retain him in the MHCB for a standard fifteen minute suicide precaution status and to address his headaches and auditory hallucinations.  Interventions included relaxation training, medication evaluation, and recreational therapy.

A 7/20/15 psychiatrist's discharge note indicated that the inmate had reached maximum clinical benefit and was able to function in a less restrictive environment.  His treatment goals were reportedly met.  Discharge medications included Cogentin, Zyprexa, and Zydis.  He was discharged to the EOP level of care.

569

Findings

Although there were concerns about the effectiveness of offered treatment, this inmate received some benefit during his MHCB stay.

**Inmate D**

This EOP inmate's healthcare record was reviewed from a list of inmates housed in administrative segregation for longer than 90 days. His diagnoses were Amnestic Disorder secondary to traumatic brain injury (with vs. without behavioral disturbance), Antisocial Personality Disorder, seizure disorder, traumatic brain injury, and hepatitis C. The inmate was not prescribed psychotropic medications. He was prescribed seizure medications with mood stabilizing benefits. His prescribed medications included Keppra, trileptal, and Topamax. The inmate also had a chrono for and utilized a helmet. He was a DD1 inmate with impaired recent memory by history due to deterioration of cognition and memory skills.

The inmate was transferred from the reception center to CHCF on 2/10/15. On the initial health screening tool dated 2/10/15, nursing reported that he felt depressed and had previous suicide attempts, but he could not remember the dates. The nurse referred him to medical and the inmate was cleared. Mental health staff also saw him on 2/10/15. He denied statements documented on the health screen and stated he was concerned about seizures because he did not receive seizure medication in the morning. The mental health clinician consulted with nursing and was informed he did receive seizure medications in the morning. The clinician assisted the inmate in acclimating to CHCF's administrative segregation unit.

This was the inmate's second prison term; he had been in prison since 5/29/12 and in administration segregation since 1/12/15 for threat to and battery of an inmate. The inmate's expected release date was March 2016. He experienced a closed head injury after a car accident while driving under the influence of alcohol. The date of the car accident was not given. The inmate told CDCR staff that he was in a coma for 907 days, but verification was not provided.

Between December 2014 and July 2015, psychiatry and PCs saw the inmate according to Program Guide timeframes. Clinical notes over the first few months focused on adaptation to CHCF's administrative segregation unit and groups. Clinical notes indicated the inmate initially attended more than 50 percent of groups and yard, but then became "bored." On 5/13/15, a *Clark* hearing was held. Based on the 115 mental health assessment and other information, the ten-day loss of yard privilege was reduced to zero; this decision was based on the inmate's administrative segregation placement and not wanting to increase his isolation, as well as avoiding interference with mental health treatment.

Subsequent clinical notes indicated the inmate's frustration with the noise in administrative segregation; his boredom caused increased frustration, with refusals to attend confidential contacts, groups, or yard. On 7/14/15 the inmate was placed on a modified treatment program, and the clinician initiated a change in groups to support the inmate's needs and to hopefully increase his attendance.

570

On 7/21/15 the expert interviewed the inmate, who complained about not receiving yard.  The expert encouraged him to voice these concerns at the ICC hearing, but on 7/22/15 the inmate refused to attend the ICC hearing.  The inmate was awaiting transfer, but the transfer was delayed due to backlogs at MCSP, CSP/Corcoran, and RJD.  The inmate previously stated the desire to remain close to his family.  Custody discussed the backlog as well as the inmate's desire to remain close to his family, and they planned to discuss this with the warden.

Findings

This inmate's mental health care was timely and adequate.  However, the 128-G custody forms documented conflicting information in the clinical and committee comments regarding the inmate's DDP and medical status.

**Inmate E**

This 59-year-old inmate was housed on D Yard at the EOP level of care.  The May 2015 treatment plan indicated he was diagnosed with Dementia NOS, Alcohol Dependence, and Personality Disorder NOS, with antisocial traits.  He was not prescribed any medications.  His healthcare record was randomly chosen from the DSH non-referral log to review access to care.

The inmate was admitted to CDCR in 2010, but did not receive mental health services until 2014, when it was determined he needed 3CMS level of care.  While in custody, he had a history of depressive symptoms, not attending to his ADLs, and treatment nonadherence.  He was admitted to the MHCB in October 2014 due to auditory and visual hallucinations with paranoia.  He was again admitted to the MHCB from 2/17/15 to 2/26/15 due to grave disability.

The inmate had a history of daily marijuana and heavy alcohol use.  His cognitive decline was attributed to his history of alcohol use.

During the IDTT meeting on 5/28/15, the Form 7388B documented that the inmate attended less than 50 percent of scheduled treatment hours.  However, it was decided that a DSH referral would not be completed because he was able to care for himself, was not in crisis, and did not require DSH placement.  It was further stated that treatment refusals were the result of a "conscious choice," and not due to mental health issues.  Staff reported they would use motivational interviewing to engage the inmate in one weekly treatment activity.

The inmate paroled on 5/30/15 to his sister's house with a plan to receive mental health resources at a county mental health facility.

Findings

Form 7388B documentation regarding the decision not to refer the inmate to DSH was clinically insufficient; more detail was needed.  Without sufficient documentation it was difficult to determine whether this inmate's care was adequate.  The use of motivational interviewing for an

inmate with dementia was likely to be unsuccessful; behavioral interventions were a more appropriate treatment approach.  While the EOP level of care provided frequent monitoring of mental status, it was not the best fit for an inmate with dementia who was unable to learn new coping skills and reasonably participate in a therapy group (recreational therapy was an exception).  However, it appeared that clinical staff were offering the best care available within the constraints of the system.  The more challenging and pressing systemic issue was the lack of clinical programming and housing for inmates with dementia.

EXHIBIT D
Pelican Bay State Prison (PBSP)
April 7, 2015 - April 9, 2015

**Inmate A**

This 28-year-old was selected as an example of an inmate who had been referred to, treated at, and returned from DSH.  In the DSH referral log, the referral reason was listed as a hunger strike; the inmate met referral consideration criteria two and five (in need of 24-hour inpatient care and multiple crisis placements).  Timelines for referral packet completion and submission were not met by PBSP, but the inmate was timely accepted by the DSH acute care program.

The discharge summary was located in the eUHR and was received timely.  It was typed on 2/23/15 and stamped as received on 2/27/15.  The discharge summary elaborated on the reason for the inmate's DSH referral and indicated that the inmate had refused to speak to his treatment team, resulting in a subsequent MHCB admission.  While in the MHCB, the inmate smeared feces and was found with a wet face after attempting to drown himself in the sink.  He was deemed suicidal and referred to DSH with a diagnosis of Depression NOS; staff reported a prior diagnosis of Malingering.

The inmate had 16 prior MHCB admissions; however, the time period was not provided.  The inmate also had a prior VPP admission in 2012; it was unclear if this admission was to acute or intermediate care.  The author of the discharge summary had only been treating the inmate at DSH for approximately four days prior to writing the discharge summary; not surprisingly there was not a lot of information in the section on the inmate's course of treatment.  The inmate was discharged with diagnoses of Depression by history, Malingering by history, and Antisocial Personality Disorder without any substantiation.  The only psychiatric recommendations were that the inmate's level of care be EOP and that he be monitored for signs or symptoms of mental illness.

Despite this, PBSP staff used the DSH discharge summary in their treatment planning for the inmate on 3/12/15 and specifically referenced the document.  The PBSP treatment plan clinical summary for this inmate was extremely well-done and provided strong support for the diagnoses of Malingering (primary), Depressive Disorder NOS (provisional), and Antisocial Personality Disorder (primary).  The treatment plan targeted appropriate problem areas.  The short term treatment goals required greater operationalization, but overall, the treatment plan for this very challenging case was well-constructed.

Findings

This inmate received adequate mental health treatment and was well-treated by PBSP mental health staff.

**Inmate B**

This 32-year-old EOP inmate was selected for review as an example of an inmate who was referred to, treated at, and discharged from DSH acute care for suicidal ideation and met criterion two (need for inpatient care on the Form 7388B).  He was referred on 11/24/14, and his referral packet was completed and submitted timely; DSH accepted the inmate in accordance with

574

Program Guide timelines.  However, his bed assignment in the DSH acute care program was rescinded at one point because the inmate had a court hearing; he was later admitted when the court hearing was completed based on a brief note in the referral log as no further information was available.

The inmate was admitted to acute care on 12/12/14 and the discharge summary was typed on 1/5/15.  The discharge summary elaborated on the reason for referral and explained that the inmate was in the process of being adjudicated for the near-death beating of his cellmate.  The referred inmate had wrapped a sheet around his neck and expressed a wish to die.  Because his commitment offense was attempted murder, the cellmate-related charge could result in life without parole.  However, the inmate learned while admitted to the acute care program (1/3/15) that the charge against him had been dropped.  While the inmate denied suicidal intent after learning that news, he continued to question his life's worth and stated that he was tired of life.

The inmate had nine prior documented suicide attempts by multiple means, including overdose, hanging, and cutting.  He also had a history of psychiatric hospitalizations beginning as a teenager that included an admission to DSH intermediate care.  The DSH treatment team did not recommend intermediate care, and their rationale was unclear and not well-stated.  They documented only that it was in the inmate's best interests "not" to be placed in groups where his vulnerability might be triggered and "as evidenced by his psychological testing, may trigger severe violence."  The inmate was discharged with diagnoses of Mood Disorder NOS, Impulse Control Disorder, history of Polysubstance Abuse, and Antisocial Personality Disorder.  Discharge medications included the following: citalopram 20 mg at night, docusate 200 mg per day, and valproic acid liquid 1000 mg per day.  Based on a handwritten note on the discharge summary, the inmate appeared to have been discharged by DSH sometime after 2/20/15.

The inmate was next seen by the PSU treatment team on 3/4/15.  He had been in the EOP since 2005.  The treatment plan included a comprehensive clinical summary that referenced the discharge summary and actually explained more appropriately and more fully the DSH decision not to refer the inmate to intermediate care.  This treatment plan indicated that the inmate's primary diagnoses were Antisocial Personality Disorder, "psychopathic," and Bipolar Disorder NOS, but it was unclear what symptoms of Bipolar Disorder and psychopathy the inmate experienced.  The treatment plan identified four problem areas, but then inappropriately grouped them on the treatment plan, and failed to properly operationalize them.  While there were some meaningful interventions, the treatment plan required further development for this inmate.

Findings

While treatment plan interventions for this inmate provided adequate treatment, the treatment plan itself required revision so that it met the standards established by CDCR policy and basic treatment plan quality standards.

**Inmate C**

This 30-year-old EOP inmate was selected for review because he was identified as meeting two criteria for higher level of care referral consideration on the Form 7388B while admitted to the PBSP MHCB, but was not referred. The inmate was identified because he required 24-hour inpatient psychiatric care and had three or more crisis care placement requests in the last six months. The inmate was not referred at the time according to the non-referral log because an assessment was still in process. However, the Form 7388B indicated that he had serious safety concerns and was considering harming himself because of the fear of being placed on a yard. The team further indicated that the inmate had reported suicidality subsequent to being told by the medical doctor that his medical issues were "all in his head."

The inmate had previously been diagnosed with Major Depressive Disorder, Adjustment Disorder, "and/or" Polysubstance Dependence. He had a history of two suicide attempts. The team specifically documented that no acute care referral was needed, but did not address intermediate or EOP care. There were no treatment modifications indicated on the Form 7388B, but the treatment plan included daily clinical contacts to address stress management and develop the inmate's ability to verbalize himself properly so that his needs were met.

The treatment team justified the lack of referral by stating that an assessment was still in process. While this was the inmate's first MHCB admission at PBSP, it was his third MHCB admission. There was substantial information in the healthcare record from his prior MHCB admissions. The inmate may not have required a DSH referral, but EOP treatment was not considered by the treatment team despite the inmate's numerous risk factors; they included safety concerns, medical issues, and feeling that medical staff was nonresponsive. The treatment plan dated 9/15/14 included problems that were too broad and vague, while the intervention also required greater specificity. However, the goal was well-specified.

Findings

The lack of higher level of care referral was not properly justified for this inmate. The inmate was a "new" PBSP admission, but was not new to MHCBs overall. There was also documentation regarding those admissions that would have provided further background and allowed the treatment team to provide more detail in their clinical justification for non-referral or perhaps would have supported a higher level of care referral. The team should have considered other levels of care such as intermediate and EOP. Based on available documentation, this inmate was not adequately treated.

**Inmate D**

This 28-year-old inmate was selected for review because he had been on the non-referral log four times after meeting higher level of care referral consideration criteria. Specifically, the inmate met criterion two on 9/29/14 and 10/6/14, two and three on 10/27/14, and five and ten on 11/6/14 while in the MHCB. The inmate was ultimately referred to DSH intermediate care on 11/20/14 due to decompensation (criteria one, five, and six) from the EOP.

576

The inmate had been on a forced medication order for danger to others since 2010, but in March 2014 psychiatry elected not to renew the forced medication order. The order was allowed to expire. On 10/21/14, a forced medication order was initiated due to danger to self and others, and grave disability. The inmate's initial MHCB placement (9/29/14 treatment plan) was due to psychotic behavior with suicidal and homicidal ideation. The inmate was prescribed benztropine and ziprasidone, but a forced medication order was being considered at that time due to nonadherence. The treatment plan was minimal and not fully applicable given the inmate's acutely psychotic state and inability to fully participate in talk therapy. The rationale provided for not referring him to a higher level of care at that time was that the treatment team wanted more time to allow the interventions to have an effect. The MHCB team appeared to only focus on the acute care program as a referral option. Treatment "modifications" included in the Form 7388B of that date were solely the regular MHCB program; there were no individualized modifications for this inmate. The next treatment plan for the same admission (10/6/14) indicated that the inmate was not referred "to APP" because the team was waiting for medications to take effect. The treatment team also indicated in a treatment plan addendum that if the inmate had not stabilized by the next IDTT, he would be referred to DSH acute care. However, the inmate was discharged back to EOP and not referred to DSH.

The inmate was subsequently readmitted to the MHCB on 10/23/14. He was next seen by the MHCB IDTT on 10/27/14 following the 10/23/14 MHCB admission for danger to others (the inmate spit on another inmate) and decompensation due to disorganized thinking and delusions. The inmate reported feeling overwhelmed and angry prior to admission and had insisted that his auditory hallucinations were real. He was prescribed benztropine, haloperidol, and valproic acid during that admission for a diagnosis of Psychotic Disorder NOS. While the treatment team indicated he met criteria two, three, and seven on the Form 7388B, they did not feel that a referral was justified because it was the inmate's initial IDTT meeting and more time was needed to determine the effectiveness of clinical interventions. The treatment modifications specified on the Form 7388B appeared to be standard MHCB treatment.

The inmate was discharged from the MHCB, but then readmitted on 11/4/14. He was seen by the treatment team on 11/6/14 and identified as meeting criteria two and five, but again not referred. The rationale for no DSH referral was again because it was the inmate's initial IDTT; however, at this point the MHCB staff should have been quite familiar with the inmate. In fact, the treatment plan indicated that discussion with the EOP inmate's PC revealed that the inmate stabilized to a degree during the MHCB stay, but was then unable to maintain in the EOP setting. Despite this, the MHCB did not consider him for a higher level of care referral other than for acute care. The justification was clearly insufficient as were the treatment modifications. Luckily, the EOP treatment team recommended referral to DSH intermediate care on 11/20/14. The inmate was found to meet criteria one, five, and six with all 115 evaluations concluding that the inmate's mental disorder appeared to contribute to the RVR behavior. The inmate was prescribed olanzapine 15 mg at night with haloperidol 10 mg intramuscular injection backup and benztropine mesylate 4 mg per day.

577

<u>Findings</u>

This inmate should have been considered for higher level of care referral much sooner and during his MHCB admissions.  His deterioration also could have been avoided had the forced medication order not been allowed to expire.  Prior psychiatry staff had clearly detailed a pattern of the inmate's poor adherence with his psychotropic medication regimen and subsequent mental health status and functional decline.  This was what occurred within several months of the order's expiration in 2014.  Once the inmate was admitted to the MHCB, the forced medication order was quickly pursued again.  However, it should not have been allowed to expire in light of the inmate's long poor adherence history when off of a forced medication order and stability when on a forced medication order.  The inmate also had a prior DSH hospitalization at the intermediate level of care which appeared clearly indicated in this case, yet the MHCB seemed to only consider acute care treatment.  The justification for non-referral while admitted to the MHCB was repeatedly documented as "initial IDTT;" this was wholly insufficient, particularly in light of the inmate's repeated admissions.  MHCB treatment staff also failed to include appropriate treatment modifications to address the positive criteria on the Form 7388B and improve the inmate's functioning.  Fortunately, the EOP treatment team eventually appropriately referred the inmate to DSH intermediate care.  This inmate did not receive adequate care from MHCB staff as he required higher level of care referral and adequate treatment to address his acute symptoms.

**Inmate E**

This 33-year-old PSU inmate was selected for review because the inmate was observed in IDTT during the site visit.  The IDTT meeting was not observed to have been a positive experience; the clinician engaged in a power struggle with the inmate and repeatedly interrupted and disrespected the inmate with the clinician's behaviors.  At times the PC appeared to be mocking the inmate and the inmate's self-report.  This behavior was implicitly supported by the supervisor, further risking escalation of the inmate, but the inmate was able to manage his frustration and articulate his emotional reaction and concerns extremely well.

In a treatment plan dated 2/11/15 and completed prior to the site visit, the treatment team noted criterion six of three or more RVRs in the last three months as positive on the Form 7388B.  However, the non-referral rationale was that the team wanted "to allow for a period of assessment."  It appeared that the inmate had been elevated from 3CMS to EOP level of care when he received the most recent RVR on 1/6/15 and that the treatment team wanted to allow sufficient time for treatment interventions to take effect.  As of 4/6/15, the treatment plan remained vague and needed greater specification.  Treatment targets were overly broad with multiple problems grouped together; treatment goals were also grouped together and overly broad, such as decrease symptoms 50 percent, and could not be fully reviewed because the typed sentences did not print fully due to limitations in the plan's print area.  The PC also used atypical abbreviations and acronyms that were not explained, furthering the difficulty in understanding the treatment plan.

578

The treatment team diagnoses in the April 2015 treatment plan were "no diagnosis" on Axis I, but were followed by Factitious Disorder, rule-out Depressive Disorder NOS, and Antisocial Personality Disorder.  The non-referral justification listed in the April 2015 Form 7388B appeared to confuse treatment for indecent exposure with inpatient treatment at a higher level of care.  There also was some discussion that the inmate was not referred to a higher level of care because the treatment plan had only recently been established, but this rationale did not discuss the interventions that had been employed since the initial RVR and what would be done differently (i.e., treatment modifications).  It was insufficient to state that the inmate would be observed and assessed indefinitely as a basis for denying higher level of care access.  The treatment interventions were highly technical clinical groups that required trained clinicians to deliver the interventions; this made the listed interventions unrealistic given that group treatment was provided by psych techs and a recreational therapist who were unqualified to provide the level of clinical services outlined in the treatment plan and that the inmate clearly needed.

This inmate was prescribed Remeron 15 mg at night and Effexor XR 150 mg every morning with Zyprexa, unspecified dosage added as needed.  The inmate's diagnosis had been "deferred."  A psychiatry progress note dated 3/3/15 listed Antisocial Personality Disorder as the diagnosis, although the inmate had been seen at cell front.  The inmate had a history of 3CMS level of care for three prior terms and had been provided with a diagnosis of depression at that time.  He reported three serious suicide attempts with hospitalization; one was in the community, another occurred while in jail, and one occurred while in prison (2004).  There was no discussion of a behavioral plan for this inmate, but one was clearly indicated.

Findings

There was clearly conflict between this inmate and his clinician.  The most recent treatment plan in the eUHR was not well-developed; it had overly broad problems and goals and included interventions that could not be implemented with the current treatment program in the PSU.  There appeared to be little to no therapeutic relationship between the PC and the inmate when observed in the IDTT and the program supervisor seemed ill-equipped to effectively manage the matter.  Adding to the difficulties, the inmate had engaged in multiple IEX incidents with female staff, which made it difficult to transfer him to another PC since there were no other male PCs.  This inmate needed a more fully developed individualized treatment plan that included a behavioral plan.  His PC required additional supervision or the inmate needed assignment to another male PC so that therapeutic rapport could be established.  This inmate was not adequately treated.

**Inmate F**

This 46-year-old inmate was selected for review because he was housed in the PSU for a 30-day evaluation as part of the SHU-exclusion process.  The inmate had been identified for further evaluation as part of the SHU screening process.  The eUHR contained a lengthy evaluation that referenced psychological testing that was performed as part of the court process, but did not indicate the date of administration.  An SRE was also completed and noted several demographic and situational risk factors, but also a high number of protective factors.  The inmate reported no

plan or desire to die. Despite some negative interactions with custody, including reported staff assaults that he stated were the result of custody staff harassing him, the inmate indicated that his mood was generally euthymic and that he had been functioning well without mental health services.

A 115 mental health assessment was completed on 3/27/15. The assessment noted that the inmate was classified as 3CMS without a SHU exclusionary diagnosis. He was observed during his ICC meeting. The inmate's case was discussed at length and mental health provided extensive appropriate input to custody staff.

Findings

This inmate was appropriately evaluated in accordance with the SHU exclusion process. He was determined not to have a SHU exclusionary diagnosis based on a thorough evaluation process. The inmate was appropriately returned to the SHU as he requested and as was consistent with CDCR policy.

**Inmate G**

This 56-year-old inmate was selected as an example of MHCB treatment. He was admitted to the PBSP MHCB on 8/27/14 and discharged on 9/29/14. No admission diagnosis was listed on the admitting document, although the inmate was admitted for "danger to others" and was placed on suicide watch. An initial psychiatric evaluation was completed on that date and noted that the inmate was receiving duloxetine 60 mg. In contrast to the admitting paperwork, the initial psychiatric evaluation noted that the inmate reported having given up on life as the chief concern at intake, with prior suicidal ideation and a hunger strike secondary to frustration over perceived lack of medical care. Further record review indicated that the inmate had threatened to harm someone while in the housing unit and had reported having command auditory hallucinations directing him to harm someone. The inmate had concerns about being placed on a mainline yard at PBSP while awaiting transfer to a 270 facility and allegedly stated that he wanted to remain in the MHCB until he could transfer. An SRE was completed for MHCB discharge on 9/29/14, but none were performed during the intervening treatment planning periods. The intake SRE did not address all of the relevant factors that resulted in the admission.

During the initial treatment team meeting on 8/28/14, the team accurately noted that the inmate had three or more MHCB placements within the last six months (criterion five) and also indicated that he met criterion two on the Form 7388B. They did not refer him to DSH because it was the inmate's initial IDTT and the team wanted further observation and an opportunity to implement interventions. However, this standard phrase did not acknowledge that the inmate was on his approximately fifth MHCB admission, most at PBSP; this should have allowed the treatment team to already have gathered a significant amount of information to determine whether a higher level of care referral was indicated or provide a more reasoned clinical non-referral rationale. The treatment plan was not modified to provide for the inmate's needs, but was vague and generic. On 9/5/14, the treatment team saw the inmate again. The treatment plan was not updated and remained inadequate to address the complexities of the inmate's

580

presentation.  The inmate was diagnosed with Mood Disorder NOS, but medications were not listed.  The non-referral reason at that time was that the inmate was making statements of homicidal intent for secondary gain, yet a ten-day MHCB extension was granted.  The inmate was not provided with yard or recreation therapy due to "safety."  The inmate had been smearing fecal matter on his walls based on progress notes, writing "PBSP SUCKS."  He also had smeared feces on his face.

The inmate was prescribed Cymbalta 60 mg every morning.  Daily clinical contacts were typically conducted at cell front and were non-confidential.  The inmate often did not interact with the psychologist or terminated the contacts prior to the end of the session.  The inmate continued to be seen weekly by the treatment team, on 9/18/14 and 9/25/14, until discharged.  The 9/18/14 treatment plan referenced that the MHCB team was awaiting a CCAT and information from a prior DSH admission to determine how to proceed.  This treatment plan also noted a diagnostic change from Mood Disorder NOS to Psychotic Disorder NOS and a change on Axis II from deferred to Antisocial Personality Disorder.  Despite the 9/18/14 treatment team noting that the crisis had quickly resolved, the inmate remained in the MHCB for another week.  It appeared that the CCAT was to consult on how to deal with the inmate's continued manipulations.  A CCAT was eventually held, and it was decided that the inmate would be discharged at the EOP level of care, which was an increase from 3CMS.

Recreational therapy was only ordered for this inmate on 9/24/14.  This was very problematic as PBSP was obviously used to dealing with at-risk inmates and staff had repeatedly documented that they did not actually believe that this inmate was at risk of harm to self or to others.  The inmate should have been provided with recreational therapy, and there was no valid clinical or security justification documented to prevent that.  A behavioral plan for the inmate was never discussed based on treatment plan documentation despite clear indications for such.  The inmate was never cleared for yard; there was no clinical justification for this ongoing restriction in light of staffs' belief that he was not at risk and was simply manipulative.

Findings

This inmate was not adequately treated at PBSP.

**Inmate H**

This 30-year-old 3CMS inmate was selected for review as an example of administrative segregation treatment.  The inmate was evaluated and provided with a diagnosis of Depressive Disorder NOS with a provisional diagnosis of Major Depression, recurrent.  The inmate only received this evaluation on 3/25/15, so he had yet to receive a treatment plan and had theoretically not yet been scheduled for IDTT.  As a result, the inmate's ongoing care could not be more thoroughly assessed.

On 2/13/15, a mental health clinician screened the inmate in a confidential space, and he was found to have no mental health needs at that time or a need for further evaluation.  Four days later, the inmate was seen at cell front in administrative segregation due to a mental health

referral (the source was not noted) and reported that he had not slept or eaten in five days and had "disassociated for one year." The inmate may have initiated the referral himself. Understandably, he denied any mental health concerns in the non-confidential discussion on the tier, particularly as he had been placed in segregation due to safety concerns on the yard and because he had expressed a desire to custody staff to disassociate from gang activity based on the building sergeant's report. Unfortunately, while the clinician took the time to interview the sergeant and obtain that valuable information, s/he still determined that no further intervention was necessary. The 3/25/15 evaluation was the result of a referral by ICC/UCC for being uncooperative. The inmate also requested an interpreter which might explain some of the difficulties during previous encounters with mental health and perceived lack of cooperation.

Findings
This inmate may not have been properly screened. The inmate's English fluency was not determined. If he was not fully fluent in English, this may have negatively impacted his initial mental health screening and caused him to have been inadequately treated. The inmate was definitely not evaluated properly as a result of the 2/17/15 referral, when he was seen at cell front. The clinician knew the inmate had safety concerns and was disassociating himself from gang activity, which placed him in a vulnerable position; however, the clinician chose not to interview him in a confidential setting. This inmate did not receive adequate treatment.


**Inmate I**

This 3CMS inmate's healthcare record was reviewed. He was provided with a diagnosis of Psychotic Disorder NOS. He was prescribed Risperdal, benztropine, and fluoxetine. The inmate was compliant with medications and laboratory testing. The PC discussed a substance abuse program as part of the treatment plan. Although the inmate stated he did not use drugs but sold them for income, the PC continued to discuss a substance abuse program for the inmate.

The senior psychologist refocused the discussion to the inmate's upcoming parole in October 2016. The senior psychologist discussed the role of TCMP and a parole officer to assist the inmate with Supplemental Security Income (SSI) and other parole plans.

PC and psychiatry contacts during the reporting period were reviewed. The PC made comments about the inmate's odor, unkempt, disheveled and/or unclean presentation, but did not document discussions with him. In the October 2014 note, the PC discussed concerns with the new psychiatrist to rule out malingering as a diagnosis because of the inmate's history of coming to prison for drug sales. The PC stated "This raises questions for me whether he actually needs the medication or is he drug seeking." The question was posed after the 8/30/14 contact. On the 8/30/14 progress note, the inmate asked to receive all prescribed medications at once, after the administration of one prescribed medication changed from bedtime to afternoon administration. Review of the medical administration record revealed that medical staff had changed Simvastatin from bedtime to afternoon administration while mental health medications were administered at bedtime.

The PC's contacts were approximately 5 to 15 minutes, and the psychiatrist contacts were approximately 30 minutes.  This inmate had three psychiatrists between June 2014 and April 2015.

Findings

The PC's subjective, objective, assessment, plan, and education (SOAPE) notes did not correlate or support the treatment plans, and the treatment plans did not support the subjective and objective findings.  Further discussion with the inmate should have occurred regarding the change in medication administration time.  In light of the minimal time of PC contacts, multiple psychiatrist changes, and problems with the treatment plan, the care provided to this inmate was inadequate.

**Inmate J**

The inmate's healthcare record was reviewed from a list of inmates who were interviewed.  The inmate did not attend the interviews because he was housed in the MHCB.  The inmate was diagnosed with Bipolar II Disorder.  He was prescribed Remeron.  The inmate arrived at PBSP on 3/25/15 at the EOP level of care after he bit his wrist in frustration after not receiving medications.  His level of care was changed from EOP to 3CMS after the IDTT meeting on 4/2/15.  Daily assessments and IDTT meetings occurred timely.  The inmate verbalized problems with a psychiatrist at PBSP.  The inmate was informed that the psychiatrist no longer worked at PBSP; the note stated that the inmate was visibly relieved to learn this information.

Findings

The inmate's clinical care was adequate.  The initial assessments were complete, MHCB IDTTs were appropriately staffed, and treatment plans addressed the inmate's needs.

**Inmate K**

This 3CMS inmate's healthcare record was reviewed from a list of inmates randomly ducated for 3CMS inmate interviews.  The inmate was diagnosed with Adjustment Disorder with depressed mood.  He was prescribed Remeron.  During the reporting period, clinical contacts were performed timely.  Educational materials given to the inmate were explained well and were appropriate and congruent with treatment plans.  The inmate had not previously been prescribed psychotropic medication and he told the PC that he was concerned that his depression would recur.  The clinician provided the inmate with positive self-talk materials, referred him to psychiatry, and followed up to ensure that the visit occurred.  The inmate was seen within one week and was prescribed Remeron.

Findings

The inmate's clinical care was very well done and was adequate.  The PC's documentation was clear, succinct, and supportive of the inmate's needs.  Materials and clinical sessions were congruent with treatment plans and with concerns voiced by the inmate.

**Inmate L**

This 3CMS inmate's healthcare record was reviewed from a list of inmates randomly ducated for 3CMS inmate interviews.  The inmate was provided with a diagnosis of Mood Disorder NOS.  He was prescribed Prozac and Vistaril.  He was seen by a psychiatrist on 6/20/14, but refused subsequent mental health services and contacts during the review period; however, he answered questions posed by clinicians at cell front when the inmate signed the refusal forms.  After five months of refusals, on 1/5/15 the inmate met with the PC in a confidential setting.  The PC documented "...looks like a Mountain man with his long beard."  The clinician met with the inmate for 35 minutes, discussed the treatment plans, and handouts were given to him on CES-Depression scale, "building happiness," and another on rumination.

Findings

The PC provided adequate care, but should have avoided biased statements that could be misconstrued or taken out of context.  The PC took appropriate time with the inmate, allowed the inmate to assist in care, and worked with him to establish an appropriate plan and treatment goals.

EXHIBIT E
High Desert State Prison (HDSP)
May 12, 2015 - May 14, 2015

**Inmate A**

This inmate's healthcare record was reviewed to assess his treatment while housed in administrative segregation at the EOP level of care while awaiting EOP hub transfer.  He was diagnosed with Schizophrenia, paranoid type. He was prescribed oral Risperdal and Risperdal Consta in the event that oral medications were refused.  He was also diagnosed with pulmonary coccidioidomycosis.  He was housed at HDSP temporarily for court, having initially arrived on 9/16/14.  He was transferred between CSP/Sac and HDSP on various occasions since that time. He had been treated at the EOP level of care since 4/18/14.

This inmate's history was significant for a recent CTC stay for an acute medical condition and intermediate inpatient care at DSH in August 2013.  He had multiple MHCB admissions; there was one MHCB admission in 2008, one in 2009, two in 2012, and two in 2013.  He reported homicidal ideation, and he had a history of staff assaults associated with paranoid delusions.  He also had an active court order for forced medication, initiated on 9/3/14; at that time he was delusional, assaultive, and refusing medication.

His most recent IDTT in the healthcare record, dated 3/4/15, indicated his refusal to attend mental health sessions.  The plan was to conduct another IDTT meeting in 90 days and to continue the same goals.  However, additional documentation related to this same IDTT indicated that "since coming back to ASU at HDSP on 9/16/2014 the IP has been far more cooperative towards treatment and more willing to attend treatment sessions outside his cell." That note also indicated that he contributed to the goals and treatment plan, but he refused to participate and wished to be removed from the mental health caseload.  The previous IDTT on 11/19/14 contained similar language and seeming contradictions.

An SRE dated 2/24/15 indicated multiple chronic risk factors including a depressive or psychotic disorder, a chronic medical condition, and a history of abuse and poor impulse control.  Acute suicide risk factors included single-cell placement, recent change in housing, and increasing interpersonal isolation.  He was assessed with low chronic and acute suicide risk.  Since placement at the EOP level of care, psychiatry and clinicians regularly approached him for mental health contacts; however, he generally refused to be seen.

Findings

Psychiatry and PCs regularly attempted to conduct clinical contacts with the inmate in accordance with Program Guide requirements.  However, the inmate's treatment was complicated by his refusal of confidential sessions and IDTT meetings which did not sufficiently address his lack of engagement in treatment.

**Inmate B**

This inmate's healthcare record was reviewed because he was housed in administrative segregation at the 3CMS level of care.  His most recent diagnosis was Depressive Disorder NOS.

586

The inmate was not prescribed psychotropic medications at the time of review; however, he was previously prescribed Paxil and Wellbutrin.

This was the inmate's first incarceration.  He reported increased anxiety following administrative segregation placement in September 2014.  His recent history was significant for an MHCB admission in January 2015 related to suicidal ideation.  He also had a history of childhood abuse which was a focus of treatment.

Notes revealed the inmate's attendance and good participation in an anger management group and weekly PC contacts.  During the PC sessions, he discussed his anger and ideas regarding revenge against those who he perceived to have wronged him.

Findings

This inmate was seen in accordance with Program Guide requirements.  Recently, he also received group treatment.

**Inmate C**

This inmate's healthcare record was reviewed because he received 3CMS level of care while housed in administrative segregation.  He was diagnosed with Adjustment Disorder NOS with mixed anxiety and depressed mood.  He was treated with Remeron.  He had received treatment at the 3CMS level of care since 2009.

The inmate's history was significant for two MHCB admissions, mostly recently in April 2013.  It was also significant for a history of childhood abuse, although he denied this on one occasion.  He refused to attend his IDTT of 4/8/15.  Various SREs noted a low suicide risk.

The inmate was generally noncompliant with routine follow-up attempts.  A 3/19/15 psychiatry note indicated he attributed his medication noncompliance to not wanting to wait in the pill line during inclement weather.  He saw the telepsychiatrist on 1/8/15, but refused follow-up appointments on 3/26/15, 4/2/15, and 4/30/15.  The PC generally saw him weekly, but there were gaps between 1/8/15 and 3/19/15.

Findings

This inmate was generally seen within Program Guide requirements although some lapses in contact existed.  His treatment was complicated by his poor medication adherence and follow-up.

**Inmate D**

This 28-year-old inmate's healthcare record was reviewed because he was housed in the MHCB since 5/10/15.  The expert observed his IDTT meeting.

The inmate was given a diagnosis of PTSD; however, he was alternatively diagnosed with Schizoaffective Disorder, depressed type, Adjustment Disorder with anxious and depressed

587

mood (provisional), and a history of panic attacks.  He was primarily prescribed Depakote and Zoloft.  Prior to arriving at HDSP, he was housed at PBSP where he had received three RVRs since 3/24/15.  He was admitted to the MHCB on 5/10/15 related to suicidal impulses.  He was treated at CHCF's MHCB from 4/16/15 to 5/6/15.

The inmate's remote history was significant for abuse and a prior suicide attempt by overdose, although the date was unknown.

Throughout his incarceration, the inmate was regularly treated at the EOP level of care. Documentation from previous institutions indicated he enjoyed attending out-of-cell groups. Problems which were the focus of treatment included depression, anxiety, anger, and auditory hallucinations.

An SRE dated 4/15/15 noted a number of chronic risk factors including depressive or psychotic symptoms, perception of loss of social support, a history of violence and poor impulse control, and a first prison term.  Acute factors included suicidal ideation, current depression/anxiety or panic symptoms, agitation, disturbance of mood, recent bad news, hopelessness, increasing isolation, current or recent violence behavior, and a recent RVR.  He was noted to have a plan to kill himself and reported a desire to die.  At that time he was considered at moderate chronic risk and high acute risk for suicide.

The inmate was assessed by various clinical disciplines upon arrival at the HDSP MHCB.  Upon admission, he was assessed as requiring a suicide smock and was issued a mattress and blanket. Plans were to renew and reassess issue every 24 hours.  Custody issues and prolonged separation from his mother, who was reported to have multiple serious medical problems, were noted as salient issues to his thoughts of self-harm.

Findings

This inmate was appropriately admitted to the MCHB secondary to concerns about potential suicide risk.  He was appropriately assessed by the various clinical disciplines and was assessed for suicide risk and appropriate issue on an individualized and ongoing basis.

**Inmate E**

This 34-year-old inmate's healthcare record was reviewed because he was housed in the MHCB. The expert also observed his IDTT meeting.

He arrived at HDSP on 4/14/15, and he was placed in the MHCB due to an increased risk of suicide.  He was provided with a diagnosis of Depressive Disorder NOS; he was alternately diagnosed with Adjustment Disorder with anxious and depressed mood and Malingering (provisional).  He was prescribed Remeron, risperidone, and Prozac.  Immediately prior to his MHCB admission, he reported command hallucinations and suicidal impulses accompanied by the belief that following a motor vehicle accident, a chip was implanted in his brain.  His most recent SRE indicated that his chronic and acute risk for suicide were both low.

588

Prior to MHCB admission, he was housed in administrative segregation at the 3CMS level of care. His history was significant for having been in a coma following a 1997 motor vehicle accident and extensive substance abuse. A pertinent negative was his lack of history of mental health treatment prior to incarceration. More recent issues related to difficulties sleeping and anxiety. Assessments indicated he met the criteria for pedophilia, sexually attracted to females limited to incest non-exclusive type, which was added as a diagnosis; however, this was not discussed in subsequent follow-up documentation.

The inmate received evaluations by various clinical disciplines with a focus on his suicidal ideation and the possibility of malingering of symptoms. He was assessed for full issue, but suicidal precautions were maintained.

Findings

This inmate received timely assessments by the various clinical disciplines and individualized evaluation.

**Inmate F**

This inmate's healthcare record was reviewed because his name was on the non-referral log indicating he had been treated in the MHCB on 10/16/14 when he met a criterion for higher level of care referral consideration, but was not reffered. The review was primarily targeted on the IDTT meeting that determined non-referral to a higher level of care and a treatment assessment he received during his short MHCB stay. In the non-referral log, the listed non-referral rationale was that his current level of care was clinically appropriate.

The inmate had been treated at the 3CMS level of care since 2005 and received various diagnoses, including Bipolar Disorder, Schizoaffective Disorder, Mood Disorder and Bipolar Disorder NOS. He was primarily treated with trileptal. His history was significant for multiple suicide attempts.

At the time of review, the inmate was housed in administrative segregation. He was transferred to the MHCB on 10/13/14 secondary to suicidal and homicidal ideation and returned to administrative segregation on 10/16/14. He had two prior MHCB admissions. Prior to the IDTT meeting, he experienced mood instability, irritability, excessive energy, and other symptoms of mania. At that time, he had incurred four RVRS during the preceding two years. Both his chronic and acute suicide risk were assessed as moderate.

The psychiatric discharge summary indicated that he "relented" on reports of suicidal ideation upon arriving at the MHCB. It was noted that he had a difficult time regulating emotions. Assessments showed an unremarkable mental status exam. It was suggested that he would benefit from individual therapy that focused on anger management and assistance with regulating his emotions. At the time of MHCB discharge, he was not prescribed psychotropic medications.

589

Findings

This inmate received adequate MHCB treatment.  Although the non-referral log notation was not informative, assessments indicated that the decision not to refer him to a higher level of care was clinically appropriate.

**Inmate G**

This 67-year-old inmate was housed on A Facility, which was a Level III general population/reintegration hub/3CMS yard.  He had been assessed as requiring the EOP level of care.  He was provided with a diagnosis of Mood Disorder due to a general medical condition (metastatic brain cancer).  While he was prescribed psychiatric medication in the past, it was determined that he did not require treatment with psychiatric medication at the time of review.  His healthcare record was reviewed to assess the identification and provision of mental health services for an inmate identified as requiring EOP level of care.

Until recently, the inmate had received CDCR mental health services at the 3CMS level of care since 2000.  He had a history of mania, bizarre behavior, and agitation.  As a 3CMS inmate, mental health staff saw him at least quarterly, but at times his PC saw him monthly.  In September 2014, he was referred to mental health due to his bizarre behavior.  During this time, he discontinued psychiatric medication and wanted to discontinue all mental health services, which prompted his PC to refer him to the IDTT.  Documentation indicated that he was placed into the EOP level of care in October 2014.  However, one piece of documentation indicated a return to the 3CMS level of care in January 2015.  The inmate had a history of head trauma and seizures, and at the time of review he had been diagnosed with prostate cancer.

After placement into the EOP at HDSP, the IDTT saw the inmate during January and March 2015.  PC contacts were completed weekly and on some occasions twice weekly; this was due to the PC facilitating psychiatry appointments.  Although not prescribed psychiatric medication, the inmate had bimonthly to monthly telepsychiatry appointments.  It appeared that the inmate's mood, behavior, and functioning had stabilized with increased PC support and EOP level of care.

Findings

This inmate's mental health care was adequate and clinically appropriate.  Staff identified that he was decompensating and increased his level of care in a timely manner.  Once the level of care was increased from 3CMS to EOP, IDTT and PC contacts were conducted in accordance with Program Guide requirements.  However, psychiatry contacts were not completed monthly as specified by the Program Guide.  There was also conflicting documentation in the eUHR concerning the inmate's level of care in January 2015.

**Inmate H**

This 50-year-old inmate was housed on B yard, which was a Level IV general population/SNY/3CMS yard.  He was diagnosed by his PC with Mood Disorder.  The most

recent psychiatry diagnoses indicated Mood Disorder NOS and Adjustment Disorder NOS secondary to a general medical condition (leukemia).  Both providers diagnosed the inmate with Antisocial Personality Disorder.  He was prescribed Effexor.  His healthcare record was reviewed to assess identification of and provision of mental health services once an inmate was designated as requiring the EOP level of care.

Prior to incarceration, beginning in 1982, the inmate had a diagnosis of Schizophrenia, paranoid type.  Other diagnoses included Mood Disorder, Psychotic Disorder NOS, Schizoaffective Disorder, Bipolar Disorder NOS, Bipolar Disorder, Malingering and Polysubstance Dependence.  He had previously been prescribed Thorazine, Cogentin, Haldol, and Mellaril.  He had a history of suicide attempts by hanging, overdose, and cutting.  He also had a history of cocaine, marijuana, alcohol, methamphetamine, PCP, and heroin use.  He was additionally diagnosed with leukemia.

Since CDCR admission in 1996, the inmate had 34 level of care changes, including MHCB, EOP, and 3CMS.  He had eight MHCB admissions; there was one for suicidal ideation in March 2015 and another for self-harm in April 2015.  Following his MHCB discharge on 4/21/15, his level of care was changed to EOP.  He was discharged from the MHCB with diagnoses of Major Depression, recurrent, with melancholic features, moderate severity and Personality Disorder NOS.  The five-day follow-up occurred in a timely manner.

The inmate's IDTT meeting was observed during the site visit.  Unfortunately, there was no discussion about his level of care change, how it would impact delivery of mental health services, or transfer to another institution.

Since the inmate's level of care change to EOP, he had a PC contact on 4/26/15, but he missed an appointment on 5/12/15 because he was out of the facility.

<u>Findings</u>

This inmate's mental health care was clinically appropriate.  He was returned to the EOP level of care in a timely manner, and Program Guide requirements were met once he was designated EOP.  However, an area in need of improvement was discussion of the change in his mental health services following his level of care change.  The simultaneous diagnoses of Adjustment Disorder and Mood Disorder were not clinically appropriate.

**Inmate I**

This 30-year-old inmate was housed in B Yard, which was a Level IV general population/SNY/3CMS yard.  The psychiatrist's most recent note dated 4/9/15 indicated that the inmate was provided with diagnoses of Adjustment Disorder and Borderline Personality Disorder.  He was prescribed Buspar, Zyprexa, and Effexor.  His healthcare record was reviewed to assess the provision of services for this 3CMS inmate.

The inmate was admitted to HDSP in April 2014 at the 3CMS level of care.  His first mental health contact occurred prior to incarceration in 2004 due to paranoia from drug use.  He was initially found incompetent to stand trial on the index offense.  He intermittently made reference to a chip being placed in his head and that he was subsequently controlled by the "network."  He had a history of self-injurious behavior and suicide attempts.  Previous diagnoses included Substance Induced Psychotic Disorder, amphetamine with delusions (provisional), Adjustment Disorder with mixed anxiety and depressed mood, Psychotic Disorder NOS, Bipolar I Disorder, most recent episode manic, Antisocial Personality Disorder, and Borderline Personality Disorder.  Previous psychotropic medications included Buspar, Zyprexa, and Effexor.  Regarding substance use, he had a history of alcohol, marijuana, methamphetamine, cocaine, and heroin use.  He was also diagnosed with hepatitis C and allergic rhinitis; additionally there was a history of a head injury from a motor vehicle accident.

In September 2014, the inmate was admitted to the MHCB for suicidal threats.  Documentation indicated that these statements were made to facilitate a housing transfer with his partner.  At the IDTT meeting in October 2014, he requested a PC change, which was granted.

Clinical documentation between October 2014 and May 2015 reflected disclosures of feeling harassed by custody officers.  PC contacts occurred monthly, and at times twice every month as his PC facilitated telepsychiatry appointments.  Telepsychiatry appointments occurred monthly.

Findings

This inmate's mental health care was clinically appropriate.  Mental health clinical contacts exceeded Program Guide requirements.

**Inmate J**

This 39-year-old inmate was housed on A unit, which housed Level III general population/reintegration hub/3CMS inmates.  He was provided with a diagnosis of Adjustment Disorder with Anxiety, in remission.  He was not prescribed psychiatric medication at the time of review.  His healthcare record was reviewed to assess the provision of mental health services at the 3CMS level of care.

The inmate's diagnosis following admission was Adjustment Disorder with anxiety.  His level of care while housed at HDSP had been 3CMS.  For the past six months, his mental status was unremarkable.  With the exception of requesting to see mental health due to distress regarding an interpersonal stressor, during the last few PC contacts on 3/3/15, 4/7/15, and 5/5/15, there were no signs or symptoms of mental illness nor documentation of functional impairment.

Findings

This inmate's mental health care was clinically appropriate.  Given his ongoing stability, it was curious that there had not been any discussion to remove him from the mental health caseload.

592

**Inmate K**

This 22-year-old inmate was housed on B yard, which housed Level IV general population/SNY/3CMS inmates.  The psychiatry progress note documented diagnoses of Schizophrenia, residual type, Trichotillomania, Antisocial Personality Disorder and intellectual disability (provisional).  He was prescribed Zyprexa, Remeron, and hydroxyzine.  His healthcare record was reviewed to assess the treatment provided to this inmate who required the EOP level of care.

The inmate was admitted to HDSP from NKSP on 8/14/14.  He had a history of alcohol and marijuana abuse, but there were no major medical issues.

During his initial IDTT on 9/10/14, he was diagnosed with Adjustment Disorder with anxiety.  This diagnosis was continued at his next IDTT (also marked as initial) on 2/11/15.  At that time, his goal was to work on anger management.  During the psychiatry contact in December 2014, his diagnosis was changed to Schizophrenia, residual type due to the presence of negative symptoms.  A plan was outlined to schedule an IDTT to discuss a level of care change to EOP.  In March 2015, another IDTT meeting was held to change his level of care from 3CMS to EOP, as the inmate was perceived as highly vulnerable, easy to manipulate, and likely to be victimized.  Telepsychiatry saw him regularly.  During the time when the inmate was at the EOP and 3CMS levels of care, he was seen almost monthly.

PC contacts occurred on a monthly basis while the inmate was at the 3MCS level of care.  Once he was changed to EOP, he had weekly PC contacts.  A PC note dated 12/23/15 reflected a diagnosis of Adjustment Disorder with anxiety, which contrasted with psychiatry documentation that indicated a diagnosis of Schizophrenia, residual type.  In addition, PC contacts did not routinely focus on target symptoms.

Findings

This inmate's mental health care was clinically appropriate.  However, a primary area of concern was the stark contrast between the PC and psychiatry diagnoses and lack of documentation explaining the discrepancy, particularly given that both providers simultaneously saw the inmate.  In addition, the IDTTs from both September 2014 and February 2015 were noted as initial IDTT meetings.

**Inmate L**

This 40-year-old was housed in administrative segregation.  He communicated to one of the experts that he had not received requested mental health services.  His healthcare record was subsequently reviewed to assess his level of care; at the time of review, he was not included in the mental health caseload.

The inmate had a history of 3CMS level of care from 12/6/99 to 5/12/00 and from 1/29/10 to 4/23/10.  He had been prescribed Depakote and Zoloft, but at the time of review was not

prescribed psychotropic medication.  He also had a history of daily marijuana use and continued to use alcohol as it was available.  The inmate reportedly lost consciousness as a child after he was hit by a car, and he experienced concussions from injuries while playing football. The mental health evaluation that was conducted in administrative segregation on 4/13/15 indicated that he was provided with diagnoses of Depressive Disorder NOS and Antisocial Personality Disorder.  He was referred for an IDTT meeting.  SRE results indicated low chronic and acute suicide risk.

On 4/29/15, the IDTT decided to maintain the inmate in the general population.  As part of the IDTT meeting's decision that he attend weekly anger management, he attended three anger management group sessions.  It was also noted that the psych tech would see him, and the inmate was to access mental health as needed.

During mental health contacts while he was housed in administrative segregation, the inmate complained of an inability to sleep, auditory hallucinations, which included constant screaming for the past few years, racing thoughts, and recurrent nightmares.  His symptom reports had escalated since the IDTT meeting, but mental health documentation indicated that he might be exaggerating symptoms.  For example, while he reported not sleeping for four days, his mental status was assessed as inconsistent with his self-report.  Documentation also addressed discrepancies in his response to psychiatric medication.  In addition, during mental health contacts, he was focused on his perception that he had been denied mental health care.

Following the IDTT meeting, the inmate submitted a request to see mental health, stating that he was hearing voices telling him to go to the "other side."  When the psych tech directly asked him about self-harm thoughts, he denied any such thoughts.  The mental health request was marked as routine and he was seen four days later; during that contact, he reported command auditory hallucinations to hurt himself.  The inmate remained in the general population.

Findings

This inmate's mental health care was clinically inappropriate.  Of significant concern was the designation of his request to see mental health as routine instead of urgent.  While he may have exaggerated his symptoms, he could have also been experiencing genuine distress.  Reviewed documentation showed a trend of escalation in his self-report with no change in the provision of services.  These concerns were discussed with regional mental health staff to review the case and to reconsider his level of care.  It was reported that his level of care would be changed to 3CMS.

594

EXHIBIT F
California Correctional Center (CCC)
May 15, 2015

**Inmate A**

This 24-year-old inmate's healthcare record was reviewed to assess the process of determining his mental health needs while at CCC, which did not house mental health caseload inmates.  At the time of review, the inmate had been housed in the MHCB at HDSP since 5/11/15.  He was being treated with olanzapine, Haldol and lorazepam as needed.  He received a diagnosis of Psychotic Disorder NOS; additionally, provisional diagnoses of Schizoaffective Disorder, Bipolar type and Schizophrenia, paranoid type were also considered.

The inmate's history was significant for a reported hospitalization in the state of Washington at age 17 for three months because he wanted to hurt his mother.  He was treated with Risperdal since age seven along with other medications, including Depakote and Haldol.  He reported taking Seroquel while in the community and until he was incarcerated.  As described in the healthcare record, his 2014 probation report indicated a history of psychotropic medication treatment and that he received SSI, possibly for a mental disorder.  It also indicated that both the inmate and the victim of his crime reported that he became combative and violent when not taking medications.

Since his arrival in CDCR on 6/26/14, he was not included in the mental health program.  An SRE dated 2/20/15, connected with an incident which ultimately led to a cell extraction and use of pepper spray, showed multiple chronic and acute risk factors for suicide, and a number of protective factors.  He was assessed as being low chronic but moderate acute risk for suicide.  However, a notation indicated that the psychologist completing the risk evaluations did not speak directly with the inmate, but spoke with a supervising psychologist who reported that the acute risk was low.  At the time of this SRE, the inmate was described as pacing, while talking loudly.  Cell extraction protocols were initiated.  The plan to reduce risk included daily follow-up contacts in administrative segregation, psychological assessments if the inmate permitted, and for custody to report any unusual behaviors to mental health as soon as possible.

An accompanying progress note of the same date indicated the inmate had refused to acknowledge or speak with the psych tech for five days, slept too much, was withdrawn, showed poor grooming, and refused to shower.  A significant substance abuse history was also noted.  The psychologist thought it prudent to have his cell searched.  Other notes indicated that the psychologist had received approval for the inmate's admission to the MHCB at HDSP; however, the supervising psychologist in charge of the cell extraction did not view this as clinically indicated.

A mental health chrono dated 3/31/15 indicated a sergeant referred the inmate to mental health because he was demanding to be released from prison.  The resulting evaluation on 4/3/15 showed that with the exception of the cell extraction in February 2015, the inmate had not left his cell for four months and only minimally interacted with others.  The evaluation indicated that during this time, he increasingly exhibited signs of major depression and persecutory delusions.  His current delusional statements were considered similar to the ones made six weeks earlier.  This evaluation assessed that his ongoing situational stressors since November 2014 may have exacerbated this initial self-reported depression, leading to a major depressive episode.  It also

596

noted that his gang affiliation inhibited his involvement in mental health services, although he was seen as having undergone a dramatic decrease in his functional level. He was found to meet criteria for inclusion in the 3CMS program; the plan was to schedule an IDTT as soon as possible and transfer him to a facility with mental health treatment.

The next progress note was by a social worker and was dated 5/1/15. It indicated that a call was received from a senior psychologist because the inmate was not complying with TB testing and was making delusional statements. He was noted to have flat affect, poor hygiene, and no cellmate. He was not oriented to date. It was also noted that he was experiencing depressive symptoms and expressing delusions with auditory hallucinations. An IDTT meeting was to be scheduled to enroll him in the mental health program. He was eventually persuaded to leave his cell for TB testing, incorrectly believing that he spoke to his family and they told him that his charges were dropped and they were coming to get him.

A psychologist evaluated the inmate on 5/5/15 and an IDTT meeting, in which the inmate refused to participate, was conducted on 5/6/15. This IDTT meeting determined that due to a major mental disorder, the inmate was unable to adequately function at his current level of care. He was endorsed to CMF, but on 5/8/15 refused to leave his cell. A prolonged and ultimately successful effort involving mental health and custody collaboration was undertaken to resolve this without the use of force, and the inmate was transferred to the HDSP MHCB.

On 5/13/15, while in the MHCB, the telepsychiatrist conducted an extensive interview in Spanish and acquired significant additional history. The inmate also endorsed suicidal ideation with the intent to get a gun and shoot himself. He was provided with the above mentioned diagnoses. He was also started on Zyprexa, with a one-to-one suicide watch due to active suicidal ideation and erratic behavior.

Findings

This inmate was apparently functioning well until his transfer to administrative segregation, when he experienced a significant decline in functioning. He self-reported depression late in 2014 and was involved in a use of force incident in February 2015, which had been preceded by a deterioration lasting several months. The psychologist and supervising psychologist apparently had divergent views about his need for MCHB admission at that time.

The next evaluation was in early April 2015; it showed ongoing deterioration in his functioning and increased symptoms. He was scheduled for an IDTT meeting so he could be transferred to a 3CMS program, but was not subsequently seen until early May 2015. The IDTT meeting did not occur until after that time and the inmate ultimately required MHCB transfer.

The mental health care provided to this inmate was inadequate. Assessment differences regarding the need for crisis bed admission in February 2015 were not adequately addressed and sufficient follow-up did not subsequently occur. The inmate was assessed as requiring treatment in April 2015, but an IDTT meeting did not occur until a month later. During this time, the inmate was decompensating and deteriorating.

597

**Inmate B**

This 25-year-old inmate's healthcare record was reviewed to assess the provision of mental health services at CCC. He was admitted to CCC in April 2013. Mental health screening documentation from the reception center was not available to review in the eUHR. Documentation from the nurse screening at the time of admission indicated that the inmate denied any mental health history. At the time of the healthcare record review, he was not provided with a mental health diagnosis, was not prescribed psychiatric medication, and was not included in the mental health caseload.

On 10/2/14 the inmate was referred for an evaluation by a CCC psychologist, as he had returned to CCC for administrative segregation placement. The administrative segregation psychologist saw him on the day of referral. Instead of conducting the 31-question mental health screening, a progress note was completed; there was no reference to completion of the 31-item screen. Documentation indicated an absence of mental health symptomatology, and it was recommended that the inmate remain in the general population.

Findings

Available documentation indicated that provided mental health services were inadequate. Staff reported that CCC inmates minimized mental health symptoms. Thus, the clinician's inability to review CDCR records prior to the administrative segregation assessment, due to the lack of a mental health assessment upon CCC admission, along with the absence of the 31-item screen, were problematic.

**Inmate C**

This 22-year-old inmate's healthcare record was reviewed to assess the provision of mental health services at CCC. Mental health screening documentation from the reception center was not available to review in the eUHR. Review of the healthcare record indicated no mental health diagnosis; the inmate was not prescribed any psychiatric medication, and he was not included in the mental health caseload.

Nursing staff received a health care services request (HCSR) form that indicated the inmate was experiencing suicidal ideation on 8/25/14 and command auditory hallucinations to take his life on 8/31/14. On both occasions, he was seen within hours of nursing staff's receipt of the HCSRs. SRE results indicated the risk of chronic and acute suicide risk was low. During both interviews, the inmate claimed that the HCSRs were submitted by peers who were harassing him. Comparison of the inmate's handwriting with that on the HCSRs corroborated that the inmate did not submit the HCSRs. The plan after the first referral was to maintain him in the general population and monitor his needs upon self-referral. After the second HCSR, the inmate remained in the general population with a plan to see mental health as needed. The rationale for the decision to continue monitoring him in the general population was not documented.

The inmate submitted three more HCSRs dated 10/24/14, 10/29/14, and 11/19/14 requesting to speak with mental health.  During these contacts, he did not indicate that peers had completed the HCSRs.  While the HCSRs were not identified as emergent, urgent, or routine, mental health response times ranged from the same day to three days.  The inmate was provided with supportive counseling to assist with management of institutional stressors.  Homework was given and reviewed, suggesting a plan to continue mental health services.  Following each contact, the plan was to continue him in the general population, while accessing mental health as needed.  The inmate was transferred to another institution on 12/31/14.

Findings

Overall, this inmate's care was appropriate and timely.  However, given that he was seen five times by mental health over a three-month period, it was problematic that staff did not complete a mental health evaluation, consider inclusion into the MHSDS, or convene an IDTT to discuss his treatment needs and level of care.

Of note, no policy dictated the frequency that mental health could see an inmate before deciding to place him on the mental health caseload.  This was an area of concern as this inmate was regularly contacting mental health.  Since he was not a mental health caseload inmate, the inmate mental health identifier system would not track him if he were transferred to another facility.

**Inmate D**

This 23-year-old inmate's healthcare record was reviewed to assess the provision of mental health services at CCC.  Mental health screening documentation from the reception center was not available to review in the eUHR.  The inmate was admitted to CDCR on 5/2/14.  He had a history of alcohol and marijuana use.

On 8/18/14, nursing staff referred him to mental health after he exhibited odd behavior and refused to talk to staff.  Around that same time, the inmate submitted a referral that indicated he was "scared" to be around other people.  Based on a mental health evaluation that was completed on 8/20/14, the inmate did not have a mental health diagnosis.

A referral was submitted in September 2014 and the plan was for mental health to see him as needed.  On 10/20/14, custody staff submitted a referral indicating the inmate exhibited odd behavior and was not showering, but had to be "bribed" by peers to shower.  During the mental health contact, he was observed as unkempt and dirty, and participated minimally in the interview.  It was opined that there was no DSM-IV diagnosis present.  The inmate was not added to the mental health caseload, but the plan was for mental health to see him as needed.

There was no documentation of mental health contact until 1/25/15, when the inmate was referred to the MHCB for grave disability.  Similar to the October referral, custody staff reported that he was odd, neglected self-care, and peers were bribing him with soup to shower.

The inmate had not returned to CCC and was subsequently placed at the EOP level of care.

599

Findings

The mental health care that was provided to this inmate was inadequate.  This inmate was referred to mental health staff several times following transfer to CCC.  While mental health timely responded, the care was poor.  Given his presentation and decline in self-care during October, a major area of concern was the lack of adequate assessment by mental health regarding this inmate's level of functioning.  There was a lack of documentation that this assessment occurred, and he was not seen by mental health until his referral to the MHCB in January 2015.

EXHIBIT G
Mule Creek State Prison (MCSP)
March 23, 2015 - March 25, 2015

**Inmate A**

This 3CMS Level 4 inmate reported that his PC had not seen him for at least 90 days.  The inmate's eUHR was reviewed.

This 32-year-old man was serving a 21-year sentence.  His most recent treatment plan was written on 7/1/14.  His problem list included depression, mood instability, auditory hallucinations, and a sleep disturbance.  Interventions included use of antipsychotic and antidepressant medications.  The treatment plan did not reference the frequency of planned individual PC contacts.  Diagnoses listed included Psychotic Disorder NOS and Depressive Disorder NOS.  The psychiatrist was not present at the IDTT meeting that formulated this treatment plan.

Clinical contacts during the review period included assessments by two different psychiatrists on 8/15/14, 11/17/14, 2/4/15, and 3/17/15 and by two different 3CMS clinicians on 11/17/14 and 2/10/14.  The inmate was started on a new medication on 11/17/14 and was seen on an untimely basis on 2/4/15 by the psychiatrist.  The plan was for the psychiatrist to see him again within three weeks, although he was not seen for over six weeks.

Findings

This inmate did not receive timely psychiatric evaluations related to having been started on a new medication during November 2014 and not being seen as planned within three weeks following his 2/4/15 appointment.  His care was further complicated by having a different PC during his two PC contacts and a lack of continuity by his psychiatric provider.  The psychiatrist also was not present at his IDTT meeting, where a treatment plan was formulated that did not reference the frequency of PC contacts.

**Inmate B**

This 3CMS Level 4 inmate reported that he had not been seen by his PC for at least the past 90 days.  The inmate's eUHR was reviewed.

The most recent treatment plan was dated 6/15/14.  The inmate's problem list included depression, anger, auditory hallucinations, and substance abuse.  Medications and group therapy were included in the planned interventions.  A psychiatrist was not present at the IDTT meeting.

Appointments with the psychiatrist during the review period occurred on 8/22/14 and 1/29/15.  Prescribed medications included Remeron, risperidone, and Zoloft.  Listed diagnoses included Mood Disorder NOS, Psychosis NOS by history, Polysubstance Dependence, and Antisocial Personality Disorder.

PC contacts occurred on 10/7/14 and 1/13/15.

Findings

This inmate received mental health clinical contacts that were consistent with Program Guide requirements. However, he did not receive group treatment according to his treatment plan. In addition, a psychiatrist did not attend his annual IDTT meeting. This inmate's care was not consistent with his treatment plan.

## Inmate C

This 47-year-old man, who was at the 3CMS level of care, had his last IDTT on 3/5/15. His previous IDTT meeting was dated 10/23/14. His problem list included mood instability and a history of impulsive behavior. His provisional diagnosis was Bipolar Disorder and Antisocial Personality Disorder. All required disciplines attended the IDTT meeting. Treatment interventions included medications and CBT for anger management.

PC contacts were documented on 10/28/14, 1/14/15, when the inmate was housed in administrative segregation, and 1/28/15. Each of these clinical contacts were with a different PC. None of the progress notes documented use of CBT.

Psychiatry contacts were documented on 12/10/14, 1/4/15, and 1/26/15, for a 602 appeal related to his non-formulary request for Wellbutrin. Medication trials in the past included Effexor, Zoloft, lithium, Wellbutrin, Buspar, and Celexa. He was also noted to have HIV and hepatitis C. Diagnoses listed were Depressive Disorder NOS, Polysubstance Dependence, and Personality Disorder NOS. Two different psychiatrists saw him. Prescribed medications included Remeron.

Two different psychiatrists evaluated the inmate in January and February 2015 to assess whether he met criteria for non-formulary use of Wellbutrin with particular reference to adequate therapeutic trials of antidepressants that were currently on the formulary.

Findings

The treatment plan did not follow the context of providing CBT. There was a significant lack of continuity of care as three different PCs provided the inmate's PC contacts. At the time of review, the inmate did not meet formulary exception criteria for the use of Wellbutrin.

## Inmate D

This inmate was a 49-year-old man who was receiving 3CMS level of care on a Level 4 SNY yard. He reported being prescribed Cymbalta for depression, but perceived that it was documented in his healthcare record that it was being used for chronic pain, and not depression. He reported being seen more frequently than every 90 days. He described his mental health treatment as having been very helpful to him, especially in the context of helping him deal with cancer. The inmate's eUHR was reviewed.

His last treatment plan was dated 9/17/14. Listed problems included depression, suicidal

603

ideation, anxiety, and anger.  Interventions included Cymbalta for depression and 90-day case management or as needed.  His diagnosis was Major Depressive Disorder, recurrent, moderate by history.  He was noted to have chronic back pain and a diabetic neuropathy.  All relevant disciplines attended his IDTT meeting.

There were PC contacts on 8/18/14, 9/17/14, 10/24/14, 12/15/14, and 1/20/15.
The 12/15/14 PC progress note referenced that the inmate had a history of his right kidney being removed due to cancer.

During 10/3/14, the inmate received an RVR assessment related to possession of a syringe.  His diagnoses included Major Depressive Disorder, recurrent, and opiate dependence.  The relevance of the evaluator's 115 RVR assessment to penalty mitigation was unclear.

No psychiatry notes for the review period were located.

Findings

Review of medical progress notes indicated that the inmate was being followed in what appeared to be the equivalent of a chronic pain clinic, which explained the Cymbalta prescription, as it was used for both depression and chronic pain.  The inmate was probably accurate that he was not being seen by psychiatry and that the Cymbalta was being prescribed by the medical clinic.

This inmate was receiving supportive psychotherapy on a frequency based on clinical need, which was helpful to him.  It was unclear why it was so important to him to have the Cymbalta prescribed by a psychiatrist, in contrast to a non-psychiatric physician.  Due to the inmate's depressive disorder, he should be seen by a psychiatrist.

**Inmate E**

At plaintiffs' attorneys' request, this inmate's eUHR was reviewed to specifically assess whether his request to use Wellbutrin, a non-formulary medication, was adequately assessed.

This 42-year-old man had three IDTT meetings since July 2014.  He had served six years of his 24-year sentence.  He had been receiving EOP level of care and had a long history of self-harming behaviors.  His December 2014 treatment plan listed his diagnoses as PTSD, Polysubstance Dependence, and Borderline Personality Disorder.  A psychiatrist did not attend any of his IDTT meetings.

A psychiatrist documented in a progress note dated 8/22/14 that he discussed use of Wellbutrin with the inmate.  However, Wellbutrin was clinically contraindicated due to the inmate's poorly controlled seizure disorder; Wellbutrin lowers the seizure threshold.

The inmate's psychiatric care had been provided by both a telepsychiatrist and an onsite psychiatrist.  At least two psychiatrists agreed that Wellbutrin was contraindicated for reasons previously referenced.  The inmate was also offered alternative medications for treatment of his

604

symptoms.

Findings
This inmate was appropriately assessed relevant to his request for a prescription of Wellbutrin. The decision not to prescribe Wellbutrin was clinically appropriate.

**Inmate F**

The healthcare record of this 25-year-old administrative segregation EOP inmate, who had been housed in segregation for over 160 days, was reviewed at plaintiffs' attorneys' request with specific reference to his current treatment plan.

The inmate was admitted to the MHCB on 1/15/15 due to suicidal ideation with a plan to cut himself. His problem list include auditory hallucinations, mood stability with a thought disorder, and substance dependency. He was paroling soon after serving a four-year sentence.

The inmate's medications included olanzapine, oxcarbazepine, citalopram and lithium carbonate. Diagnoses included Bipolar Disorder.

A 2/18/15 treatment plan indicated that he had been transferred from CSP/Corcoran to MCSP on 2/12/15. He was placed in administrative segregation on that same day due to bed space issues. He described feeling depressed and indicated that his depression had increased since his segregation placement.

Findings

This inmate was housed in administrative segregation for protective custody. Based on eUHR review, it was unclear whether the 160 days of segregation time reported by plaintiffs' counsel was accurate. If so, this placement for nondisciplinary reasons was clinically contraindicated and was not addressed by the inmate's treatment plan.

**Inmate G**

This EOP inmate's healthcare record was reviewed from a list of MHCB initial IDTT meetings held during the site visit. The inmate was diagnosed with Schizoaffective Disorder. He was prescribed Trileptal. During the MHCB IDTT meeting, he was in a suicide resistant smock and was quiet and cooperative. The inmate denied suicidal ideation or auditory hallucinations and agreed with his mental health treatment plan; it included goals of increasing coping skills by verbalizing two self-soothing activities when stressed and two alternative ways of reducing impulsive and other problematic behaviors. The inmate had multiple MHCB admissions that were triggered by family members' hospitalizations and incarceration. He also had received multiple RVRs and was involved in a use of force incident. The IDTT meeting retained the inmate at the MHCB level of care.

The inmate was on a modified treatment program as of 9/26/14, and he stated that he was glad that he was on the high refusers list because the PC visited every Monday.

On 3/10/15, the PC met with him.  The inmate discussed concerns about his cellmate's sexual orientation and made a statement about cutting the cellmate's face if the cellmate approached him.  The PC reported him to custody.  The inmate told the PC that he would end up in the MHCB following the report to custody.

PC and psychiatry contacts timely occurred during the review period.

Findings

Multiple clinicians assessed the inmate during the review period.  Although one of the inmate's RVRs was for the purchase of heroin and the MH-115 documented the need to focus on addiction concerns, the PC did not include substance abuse programming as one of the treatment goals.  The inmate's MHCB admissions were due to incidents that he orchestrated, but nothing in his treatment plan addressed this behavior.  Although his PC saw him more than the required number of contacts, no stated goals addressed his treatment refusal.  This inmate did not receive appropriate mental health care.

**Inmate H**

This EOP inmate's healthcare record was reviewed from a list of MHCB IDTT meetings that occurred during the site visit.  He was diagnosed with Mood Disorder NOS.  He was agitated and concerned about his hepatitis C.  He indicated concern about taking mental health medications due to the hepatitis C and liver concerns.  He was also concerned about family member contacts because of the high transmission rate of hepatitis C, as well as about issues regarding parole, SSI, and other medical and psychological concerns.  Prior to his MHCB admission, he was housed in administrative segregation for safety concerns.  Treatment goals were focused on reducing anxiety by using relaxation techniques and other coping skills.

Findings

PC and psychiatry contacts were timely.  There was no documentation that addressed the inmate's major concern with hepatitis C or collaboration with medical services concerning his medical issues.

**Inmate I**

This EOP inmate was reviewed from a list of inmates who had modified treatment programs.  He was diagnosed with Schizoaffective Disorder, bipolar type and Borderline Intellectual Functioning.  He was prescribed Zyprexa, Depakote, and Cogentin and was placed at the EOP level of care on 11/22/14.  He had difficulty keeping track of group times and dates as they changed; on many occasions, he showed up for a group for which he was not scheduled.  The inmate and his PC worked on group changes, and new times and dates for groups.

606

Findings

Treatment goals focused on group attendance, medication compliance, and grief over the retirement of his assigned psychiatrist.  The PC reevaluated the types of groups for the inmate and explained the purpose and importance of group attendance, and encouraged his participation. The PC established a plan to increase the inmate's group participation by returning him to regular group status.  The inmate' mental health care was adequate.

EXHIBIT H
California Medical Facility (CMF)
April 14, 2015 - April 16, 2015

**Inmate A**

This EOP inmate was housed in administrative segregation.  He transferred to CMF's administrative segregation unit from DVI as an EOP hub transfer.  The inmate had recently paroled from administrative segregation.  He was provided with a diagnosis of Schizophrenia, paranoid type.  He was prescribed hydroxyzine 50 mg per day and Risperdal 2 mg per day.

Progress notes indicated that the inmate had a significant history of mental illness and chronic delusional thinking of paranoid content.  He had a history of receiving medications by court order due to dangerousness to others.

The inmate arrived at CMF on 4/1/15.  At the time of the initial evaluation on the following day, he presented with delusional thinking and report of auditory hallucinations.

This inmate was seen during an initial IDTT meeting.  At the meeting, he presented with cooperative, pleasant demeanor, paranoid delusional thinking, and poor judgment regarding the need for treatment with psychotropic medications.

Findings

There was documentation of timely evaluation upon arrival to CMF administrative segregation.  There was documentation of daily psych tech rounds as well as weekly PC contacts.  Although there was no documentation that the inmate had been seen by the psychiatrist at CMF yet, there was discussion with the attending psychiatrist regarding medications and the need for medication adherence.  It appeared that the care the inmate received at CMF was appropriate.

**Inmate B**

This EOP inmate was housed in the administrative segregation unit.  He was provided with diagnoses of Major Depressive Disorder in partial remission, Opiate Dependence, Cocaine Dependence, Alcohol and Cannabis Abuse, and Personality Disorder NOS.  He was prescribed Paxil 30 mg per day.

Progress notes indicated that the inmate was followed consistently by the PC and the psychiatrist.  The notes detailed discussions regarding the inmate's health-related issues, depression, and medication-related concerns.  There were also discussions regarding transferring him to the 3CMS program; however, this was not pursued due to the inmate's ongoing concerns.

During October 2014, venlafaxine was tapered and eventually discontinued and Paxil was started.  The inmate appeared to tolerate this medication change.  The most recent progress notes detailed the supportive therapy provided after the inmate learned that his brother had recently died.

The inmate was moved to administrative segregation on or about 4/2/15 reportedly due to swallowing narcotics.  A progress note dated 4/8/15 indicated that the facility was awaiting

609

toxicology results and if positive, the inmate would receive an RVR.  If the toxicology results were negative, the inmate would be released from administrative segregation.

Findings

The mental health care that was provided to this inmate appeared to be appropriate.  He was involved in group therapy and was seen weekly by the PC and monthly by the psychiatrist.  The treatment plans were timely and individualized, reflecting the inmate's specific treatment needs.  There was also documentation of daily psych tech rounds and that higher levels of care were considered.

**Inmate C**

This EOP inmate was housed in administrative segregation.  He was provided with diagnoses of Bipolar I Disorder and Borderline Personality Disorder.  He was prescribed Zyprexa, Cogentin, Prozac, gabapentin, and hydroxyzine.

The inmate was transferred from a county jail to WSP in November 2014.  While at WSP, he was placed on suicide observation in the CTC due to suicidal ideation.  He transferred to CMF-DSH in December 2014, and was placed in administrative segregation later that month due to threats to staff after he threatened the psychiatrist.  A 115 mental health RVR assessment of the incident indicated that a mental disorder contributed to the RVR behavior; the inmate's mood was described as unstable and psychotic with mood swings and paranoia.

This inmate had a long history of mental health treatment and self-injurious behavior since childhood.  He had multiple tattoos, including on his face.  He was reportedly a gang drop-out with concerns regarding his safety due to these issues.

The most recent progress notes described the inmate with animated affect and poor insight and judgment.  On the day prior to the site visit, he reportedly drank pruno and was noted to be intoxicated.

Findings

The mental health care that was provided to this inmate appeared to be appropriate.  He was followed consistently by the PC and psychiatrist.  There was documentation of daily psych tech rounds.  Medication management generally appeared to be appropriate, but consideration should have been made for treatment with a mood stabilizer, or documentation should have been provided to explain the current medication treatment course.

**Inmate D**

This inmate was in the EOP.  He was provided with diagnoses of Major Depressive Disorder, recurrent, and Polysubstance Dependence.  He was treated with Thorazine on an as needed basis.

610

This inmate was housed in one of the EOP mainline housing units until February 2015, when he was transferred to administrative segregation for refusing to house. He was very briefly moved to alternative housing prior to administrative segregation placement. The inmate was released from administrative segregation by the captain; however, he refused to house and remained in administrative segregation. It appeared that he was eventually moved to the mainline EOP on or about 2/11/15. A 115 mental health evaluation indicated that mental illness played a role in the inmate's behavior. For reasons that were unclear, the inmate was briefly returned to administrative segregation on 2/12/15 and was returned to EOP on 2/20/15.

The most recent treatment plan was dated 3/5/15. This plan appropriately addressed the inmate's symptoms of mood instability, self-harm depression, and psychosis; however, the plan did not address the inmate's reported reluctance to attend treatment activities. The accompanying Form 7388B indicated that the inmate did not meet the criteria for higher level of care referral. The treatment plan noted that he had moderate chronic and low acute risk of suicide.

Although there was documentation that the inmate presented with lability and impulsivity, the most recent progress notes indicated that he was doing well, but with poor group attendance.

Findings

The mental health care provided to this inmate appeared to be appropriate. He was seen weekly by the PC and at least monthly by the psychiatrist. There was documentation of five-day follow-up after MHCB discharge. There was documentation of daily psych tech rounds in administrative segregation. However, treatment planning should also have addressed the inmate's treatment adherence.

**Inmate E**

This EOP inmate was housed in the N-2 housing unit. He was provided with a diagnosis of Schizoaffective Disorder, depressed type. He received his psychotropic medications by court order due to danger to self; the PC 2602 would expire on 8/7/15. He was prescribed Cogentin, Prozac, and Haldol decanoate. The inmate was also prescribed as needed medications in the event of medication refusal.

A treatment plan dated 3/5/15 noted that the inmate was serving a life sentence. His symptoms included depression, low self-esteem, periods of command auditory hallucinations, and a history of psychosis since childhood. He was hospitalized at DSH-APP from 5/9/14 to 6/30/14.

Due to the inmate's symptomatology that also included overwhelming guilt related to his offense and ongoing auditory hallucinations, he was placed in the High Risk Program. The inmate was on modified programming and provided documentation indicated that he was offered 2.5 hours of weekly group therapy. The recent progress notes indicated that he remained with auditory hallucinations that were improved on medications. He was reportedly compliant with medications and was attending groups. He also worked as a porter, which he indicated satisfied him.

611

Findings

The mental health care that this inmate received at CMF appeared to be appropriate.  The inmate was appropriately placed into the High Risk Program for increased monitoring for decompensation and support.  In addition, he was placed on modified programming due to his inability to tolerate full programming.  There was documentation of weekly PC and monthly psychiatry contacts.  Treatment planning was individualized.  There was also documentation of higher level of care referral consideration.

**Inmate F**

This EOP inmate was housed in the medical unit.  His healthcare record was reviewed as he was on modified programming and the information provided indicated that he only received an average of 0.75 hours of weekly groups.  He was provided with a diagnosis of Schizophrenia.

The inmate was transferred from ASH to CMF on 11/3/14.  His medical issues included diabetes type 2, hepatitis C, hypothyroidism and COPD.  He was classified as DPO and was an intermittent wheelchair user.

Progress notes indicated that the inmate remained in the CTC due to medical concerns.  He appeared to be stable from a mental health standpoint.

Findings

This inmate was consistently followed by the PC and the psychiatrist.  The mental health care that he was provided appeared to be appropriate.  The inmate was placed on modified programming due to his medical condition.

**Inmate G**

This 3CMS inmate was reviewed because his initial IDTT meeting was scheduled during the monitoring visit, but the inmate did not attend.  The IDTT was held in the medical area and all treatment team members were familiar with the inmate's medical problems.  The inmate suffered from seizures and a right hemiparesis, with a history of cerebrovascular accident and craniotomy.  He was described as unable to speak clearly, but adequately responded to questions through both speech and gestures.

The inmate had no history of mental health treatment prior to entering CDCR.  He met eligibility criteria to participate in the mental health program based on a sleep disturbance associated with depression.  He was enrolled in the 3CMS and prescribed mirtazapine to treat symptoms associated with an unspecified depressive disorder.

The inmate discontinued his medication and subsequently met with the psychiatrist to discuss this matter.  He expressed not wanting psychiatric treatment because of prison cultural politics.

612

The inmate's initial IDTT meeting was held during a time when the inmate was in post-operative care. The inmate did not attend due to a two-week headache. He was described as medically compromised. The treatment team appropriately discussed both medical and mental health symptoms and determined that his depression and sleep disturbance were secondary to brain injury. The treatment team scheduled a follow-up meeting in 30 days to review the treatment plan and to assess improvements. The treatment team noted that release planning was important as the inmate would be leaving prison during the following year.

Findings

It appeared that the inmate was receiving mental health treatment at the appropriate level of care in the 3CMS program. He was timely seen by the psychiatrist and PC. Treatment team meetings occurred as required and were scheduled at more frequent intervals as dictated by the inmate's health condition. The focus of treatment appeared appropriate. Overall, the inmate received adequate mental health care.

**Inmate H**

This 3CMS inmate was housed in the G-1 medical area. He was provided with a diagnosis of Major Depressive Disorder, single episode. He was prescribed mirtazapine and hydroxyzine. His healthcare record was reviewed because institutional audits revealed that he had not been timely seen by the PC. The purpose of this review was to assess the adequacy of care provided during the review period.

The inmate had been treated at the 3CMS level of care since arriving in CDCR on 9/5/13. Prominent symptoms were anxiety and sleep disturbances due to case-related issues. The inmate had no history of suicide attempts or treatment for other major mental disorders. On 1/29/14, he transferred to CMF for medical treatment. He was found to be harboring high quantities of gabapentin and morphine. He was placed in administrative segregation where morphine was gradually adjusted until it was discontinued. He was readmitted to the medical area on 9/4/14.

The psychiatrist saw the inmate on 9/4/14. The inmate was mildly depressed and continued to experience disturbed sleep. The psychiatrist adjusted the inmate's medication. The inmate was seen by the 3CMS PC on 9/8/14. The inmate did not participate in mental health caseload groups as reflected in the most current treatment plan. A Form 7388B was completed on 2/11/14, but by the end of this review period, no fully updated mental health treatment plan had been prepared for this inmate.

Medical progress notes indicated that the primary care physician managed the psychiatric medications of Vistaril and Remeron. The inmate was routinely seen by the social worker assigned to the medical CTC. The inmate denied a depressed mood but experienced mild anxiety and sleep disruptions due to ongoing court issues. Overall he was noted to express hope for the future and was deemed a low chronic and acute suicide risk. However, no formal SRE was conducted during this review period.

613

<u>Findings</u>

The inmate was appropriately identified, screened, and evaluated upon arrival.  He received social work rounds and medication management for symptoms associated with a major psychiatric disorder.  Although the treatment team considered factors relevant to the appropriate level of care, the inmate did not have a full annual treatment plan developed until 4/7/15, which was 19 months following his initial plan.  The inmate was deemed to be in full remission of his psychiatric disorder.

There was no formal updated treatment plan, as required by the Program Guide, for this inmate.  However, the 3CMS level of care treatment that he received was appropriate.

**Inmate I**

This 3CMS inmate was provided with diagnoses of Major Depressive Disorder, recurrent, moderate, in partial remission, Polysubstance Abuse, remitted in a controlled environment, and Antisocial Personality Disorder.  He was prescribed mirtazapine and hydroxyzine to treat symptoms associated with his diagnosed psychiatric disorder.  His healthcare record was reviewed because institutional data indicated the IDTT meeting was 14 days overdue.

Healthcare records indicated this 62-year-old inmate was serving a life sentence and had spent most of the time treated at the 3CMS level of care with a lingering sad mood underlying symptoms of major depression.  There was no evidence of the inmate having been treated at a higher level of care such as DSH, EOP, or MHCB.  He consistently endorsed a suicide attempt by hanging at age 14.  A SRE completed on 10/8/14 estimated a low chronic and low acute risk of suicide.

The inmate was cleared for administrative segregation placement on 9/26/14 for possessing an inmate-manufactured weapon.  Upon completion of a mental health evaluation, the inmate was re-enrolled in the 3CMS and an initial treatment plan was developed on 10/14/14.  The diagnosis of record was carried forward.  The inmate declined to attend 3CMS groups, but agreed to attend weekly PC contacts and to continue current medications.  Treatment goals were delineated in reasonably measurable terms.

The inmate was timely seen in weekly PC contacts and daily psych tech rounds. He routinely declined to leave his cell for PC contacts and was seen at cell front, where he was repeatedly described as appropriately engaged with the PC.  The psychiatrist routinely saw the inmate and found him to be without psychotic symptoms or evidence of mania.  The current medication regimen was maintained.

The inmate discharged from administrative segregation to the 3CMS mainline.  The initial IDTT meeting was 14 days late.  Prior to the treatment conference, the PC had prepared a mental health treatment plan wherein interventions and treatment goals were essentially unchanged.  The Form

7388B was completed at the IDTT meeting and no indicators were found to trigger higher level of care referral consideration.

Findings

The inmate appeared to be receiving mental health treatment at the appropriate level of care in the 3CMS program. He appeared to be clinically stable at the time his IDTT was delayed by 14 days, and an updated mental health treatment plan had been prepared and was essentially unchanged. Notwithstanding the late IDTT meeting, the inmate received adequate mental health care.

**Inmate J**

This 3CMS inmate was housed on I wing. He was provided with diagnoses of PTSD, in partial remission and Borderline Intellectual Functioning. He was not prescribed psychiatric medications. His healthcare records were reviewed after the expert observed the inmate's IDTT meeting during the monitoring visit. The purpose of the review was to assess the adequacy and appropriateness of care provided during the review period.

Healthcare records indicated the inmate had been treated in the 3CMS since entering prison in 1992. Historical information revealed a traumatic brain injury that occurred in childhood due to a motor vehicle accident. This injury rendered him a special education student and placement in the CDCR's DD1 program due to low cognitive functioning. However, the diagnosis of Borderline Intellectual Functioning was not supported by psychometric data that was located in the eUHR. The inmate had a history of severe maternal abuse. He had two suicide attempts in his late teens with psychiatric hospitalizations. There was no evidence of prior treatment for a major mental disorder, including psychotic or severe mood episodes. The medical record indicated his mental status had been stable since at least 2011; his last treatment plan was composed on 4/23/14.

The inmate participated in a group activity designed for those experiencing symptoms of PTSD. He also met with the PC at required intervals. Manifestations of symptoms directly linked to his diagnosis and treatment plan were appropriately addressed. Interdisciplinary progress notes reflected adequate attention to trauma-related issues.

The inmate's annual treatment plan was updated on 4/15/14. An SRE update was completed. His chronic suicide risk was deemed moderate based on a history of prior suicide attempts, chronic pain, medical problems, and an overall decline in health. The inmate's acute risk was deemed to be low as he denied any motivation toward harming himself. He was noted to have a strong relationship with the PC, a prison job, strong religious faith, and he expressed hope for the future. He was reviewed for the need for higher level of care referral and was deemed to be appropriately treated in the 3CMS.

Findings

The inmate appeared to receive mental health treatment at the appropriate level of care in the 3CMS program.  The treatment team appeared to provide timely and meaningful clinical services and the inmate was clinically stable.  Overall, the mental health treatment provided to this inmate was adequate.

## Inmate K

This 59-year-old inmate received mental health services at the 3CMS level of care.  He was provided with a diagnosis of Schizoaffective Disorder.  He was prescribed psychiatric medications including Thorazine, Remeron, and Vistaril.  His case was selected for review from a list of inmates whose initial IDTT was overdue.  The purpose of the review was to assess the adequacy of care provided.

The inmate had been psychiatrically hospitalized in another country during his late teens and early 20's.  He reportedly was treated with Electroconvulsive Therapy (ECT).  He came to the United States at 24 years of age, where he was treated with antidepressant medication by county mental health for an unspecified depressive disorder.  He was treated with Haldol during county jail confinement, but had discontinued this treatment before arriving at CDCR.  There was a difference of opinion among forensic examiners as to whether the inmate suffered from a diagnosis within the schizophrenic spectrum of mental disorders.

The inmate arrived at CMF on 8/25/14; an initial IDTT was 14-days late. The inmate reported experiences of auditory hallucinations and depression, but further asserted that perceptual disturbances were adequately controlled by medication.  The diagnosis of record and medication regimen were retained.  The treatment plan was directed at reducing subjective distress through clinical monitoring and treatment groups.

During the review period, no SREs were conducted.  Psychiatry and PC progress notes were timely completed.  There was no documentation showing that the inmate participated in any treatment group as recommended by the IDTT.

The inmate repeatedly complained of problematic relationships with other inmates in the dormitory because of his snoring.  He was evaluated by the primary care physician but found not to require a CPAP.  However, as conflicts persisted, the inmate reported hearing voices with persecutory content.

The clinician responded to the acute situation and found the inmate to be mildly distressed.  He did not report motivation to harm himself or anyone else.  An SRE was not completed.  The clinician documented that there was a plan to coordinate with custody on the matter of a single cell.  The psychiatrist noted the inmate displayed no signs of paranoia or delusional thinking and had been compliant with medication.  The psychiatrist documented that a diagnostic clarification was needed.

At the time of the monitoring visit, healthcare records revealed the inmate had been admitted to a MHCB for six days for suicidal ideation and plan. He had been without sleep for several days and attributed this to being frequently awakened by inmates due to snoring. Initial and discharge SREs were completed. The inmate subsequently admitted he had amplified suicidal statements in the hope of obtaining a single cell. The discharge SRE documented that the inmate would advocate for himself with custody and medical staff concerning his belief that he needed and deserved a single cell. A mental health treatment plan was solo completed by the psychiatrist on discharge; review for higher level of care referral was not completed per the Form 7388B. Five-day clinical follow-up was documented in the medical file; the inmate was noted to be stable and in no apparent distress.

Findings

The initial IDTT meeting was overdue by two weeks, but medication continuity had been maintained and the inmate did not demonstrate any initial adjustment problems to the new prison setting. The initial treatment plan appeared adequate to maintain his stable functioning through the provision of groups, medication, and clinical contacts. Subsequent mental health contacts were timely delivered and the inmate was medication adherent. However, the inmate did not receive group treatment to target problem solving abilities and enhanced correctional adjustment, both of which were promised through the approved treatment plan.

The inmate appeared to have been appropriately treated at the current level of care in the 3CMS. However, conflicts in the dorm environment taxed his ability to cope. As much as the treatment staff may have believed otherwise, the inmate appeared unable to effectively advocate for himself. He received no therapeutic intervention to enhance problem solving abilities. There was no coordinated plan among medical, mental health, and custody staff to address relevant problems. From this vantage point, the care provided to the inmate was inadequate.

**Inmate L**

This 3CMS inmate had been enrolled in the mental health program since 2001. He had a diagnosis of Major Depressive Disorder, recurrent, moderate. He was effectively treated with Paxil during the past three years and his depression was in partial remission. The case was selected for review because institutional audits indicated that his IDTT was 45-days overdue. The purpose of the review was to assess the overall adequacy of care provided to the inmate during the review period.

The inmate's history included child and adolescent mental health services for attention problems and depression. Healthcare records indicated he met DSM-IV-TR diagnostic criteria for Major Depressive Disorder when he entered the CDCR. He was admitted to an MHCB in 2010 after his grandmother died. He had no history of attempted suicide. SREs conducted prior to this review period assessed his chronic and acute risks of suicide as low.

During the review period, the inmate was provided care according to most provisions of the governing treatment plan.  However, treatment interventions were not individualized beyond the provision of medication management, PC contacts, and unspecified group treatment.

The PC saw the inmate in October 2014.  The inmate endorsed experiences of transient visual and auditory hallucinations of non-specific shadows and noises.  The inmate attributed these experiences to prior PCP use.  The inmate did not display objective signs of a psychotic disorder and none was diagnosed.  He was medication adherent without crisis concerns, and he was thought to be coping adequately.

The psychiatrist saw the inmate in September and November 2014; documentation in both instances was nearly identical.  The inmate reported that he was doing well and was not taking prescribed medications on weekends, but still needed the medication.  The inmate was described as stable. When seen again in February 2015, he appeared bored.  There were no recommended medication changes during these months.

There was no documentation that indicated the inmate had been enrolled in or had attended therapeutic groups as reflected in his approved treatment plan.

The inmate was seen for an unscheduled IDTT meeting on 2/12/15.  Several days earlier he had informed the PC that he was still depressed and that his treatment needed to be intensified.  However, during the IDTT the inmate confessed to safety concerns related to an upcoming transfer which he had not previously divulged to the PC.  Treatment team members found no clinical rationale to elevate his level of care and encouraged him to work with the counselor to address safety issues.  The inmate's diagnosis was changed to Adjustment Disorder with mixed anxiety and depressed mood.

At the time of the site visit, the inmate reported improvements in mood, energy, and sleep.  He had resumed psychiatric treatment as prescribed, began an exercise program, and had reunited with an old girlfriend.

Findings

The inmate appeared to be receiving mental health treatment at the appropriate level of care in the 3CMS.  He was seen at intervals that met Program Guide requirements for 3CMS inmates.  Although audit data indicated that the annual IDTT was overdue, this appeared to be inaccurate due to the unscheduled IDTT that took place in February 2014.

During the most recent and unscheduled IDTT meeting, the treatment team added a new diagnosis that was not adequately supported.  More importantly, the historically applied diagnosis of Major Depressive Disorder in partial remission was removed from the healthcare record without adequate clinical rationale.  The hasty addition of one diagnosis and removal of another in an otherwise stable inmate suggested countertransference.  Overall, the care provided to the inmate appeared adequate for medication management.  However, this care was

618

inadequate because it did not implement therapeutic group treatment or give meaningful consideration to diagnostic changes.

**Inmate M**

This 3CMS inmate was provided a diagnosis of Major Depressive Disorder, recurrent, in partial remission.  He was prescribed sertraline and buspirone to treat symptoms of agitation and depression associated with his psychiatric disorder.  This case was reviewed because results of an institutional audit indicated that a psychiatry contact was 38-days overdue.  The purpose of the review was to assess adequacy of care provided to the inmate.

Healthcare records indicated the inmate had been consistently enrolled in the 3CMS program without higher level of care placement.  In addition to the current psychiatric disorder, diagnoses of record in recent years included PTSD, Personality Disorder, and Psychotic Disorder NOS due to vague reports of auditory hallucinations.  The inmate routinely complained of disturbed sleep, depressed mood, and frustrations related to common stressors in the prison environment.  The record indicated he functioned relatively well with minimal clinical intervention and psychiatric medications.

The governing mental health treatment plan of 8/8/14 included quarterly psychiatry contacts.  Healthcare record documentation demonstrated that psychiatric contacts occurred timely on 11/4/14 and 1/28/14 during the review period.  No changes in medication were ordered as a result of psychiatry contacts.  The inmate reported benefitting from psychiatric treatment.

Findings

The inmate appeared to be enrolled in the appropriate level of care for treatment of his psychiatric disorder.  Psychiatric contacts occurred at intervals that met or exceeded MHSDS Program Guide requirements.  The psychiatric care provided to the inmate appeared to be adequate.

**Inmate N**

This 3CMS inmate was provided with a diagnosis of Major Depressive Disorder, recurrent, in partial remission, and Antisocial Personality Disorder.  He was not prescribed psychiatric medications at the time of review.  His medical record was reviewed because the expert observed his IDTT meeting during the site visit.  The purpose of the review was to assess the adequacy and appropriateness of care provided to him during the review period.

Healthcare records contained no historical information about the inmate receiving psychiatric treatment before entering prison.  According to the records, the inmate had been treated at the 3CMS level of care since 2007.  Recently, he had received hydroxyzine and mirtazapine to treat symptoms of sad mood, decreased energy, poor concentration, and disturbed sleep.  Medications were discontinued in January 2015.  An SRE was prepared on 4/15/14 for treatment planning

purposes.  The inmate had no history of suicide attempts; he was deemed a low chronic and acute suicide risk.

According to the governing mental health treatment plan dated 4/15/14, the inmate was noted to be stable and had participated in two treatment groups and attended clinical contacts.  The mental health treatment plan was timely updated during the site visit.  The inmate presented as a small statured 76-year-old male who ambulated in a wheeled walker.  His medical history was remarkable for conditions that might contribute to depressive experiences.  He was characterized as struggling with end of life issues.

Review of the mental health treatment provided during the review period indicated that clinical and psychiatric contacts were provided at intervals consistent with the Program Guide.  The annual updated treatment plan targeted relevant problems concerning the inmate's diminished interest in and enjoyment of activities and his ambivalence about parole.  Specific changes were communicated in behavioral terms that were easy to understand, such as keeping a daily log of mood and feelings and identifying negative thoughts that produced sad feelings and replace them with balanced thoughts.  The inmate stated that he could accomplish goals in the treatment plan.

Findings

The inmate appeared to be treated at the appropriate level of care.  The overall care provided to him appeared to be adequate.

**Inmate O**

This inmate was housed in U wing since arriving at the institution on 1/8/15.  He had been enrolled in the 3CMS at the reception center where he was provided with a diagnosis of Major Depressive Disorder, single episode, mild.  He declined treatment with psychiatric medication.  The case was reviewed because institutional audits indicated the initial IDTT meeting was overdue by 27 days.  The purpose of the review was to assess whether the care provided to the inmate was adequate.

This 18-year-old inmate had no history of mental health treatment in the community prior to entering the CDCR.  He was initially cleared for the general population.  Several weeks later, he requested to meet with the psychiatrist because of trouble sleeping and missing his family.  The psychiatrist provided a provisional diagnosis of primary insomnia, and enrolled the inmate in the MHSDS based on a qualifying mental disorder as indicated by the placement chrono.  A mental health evaluation, SRE, and initial treatment plan were developed, but the initial IDTT meeting did not convene prior to the inmate's transfer to CMF.  A brief mental health evaluation prepared two days before he transferred indicated he did not qualify for an Axis I diagnosis per the DSM-IV-TR.

Upon transfer to CMF, the inmate was timely and appropriately screened by the R&R nurse.  The psychiatrist saw him within two weeks and a mental health treatment plan was prepared in anticipation of the initial IDTT meeting.  It was apparent that the author of the treatment plan had

reviewed historical information and was aware the inmate had requested removal from the MHSDS. The IDTT was held on 1/28/15. Treatment team members recommended that the inmate be reviewed by the PC in 30 days to assess whether removal from the mental health caseload was warranted.

On 2/19/15 the PC saw the inmate, who reported no longer being depressed. The inmate stated he had established contact with his family and that this contributed to improvement in his mood and with his sleep problems. The inmate had not taken psychiatric medication and showed a stable mental status. His level of care was changed to the general population and the correct mental health removal form was submitted effective 2/15/15.

Findings

Problems related to the inmate's initial placement in the mental health caseload were outside of the scope of this review. The mental health care that CMF clinical staff provided to the inmate was thorough, prudent, and adequate.

**Inmate P**

This EOP inmate's healthcare record was reviewed from a list of EOP inmate's housed in the OHU. The inmate was diagnosed with Major Depressive Disorder and PTSD. He was prescribed fluoxetine. Medical problems consisted of a stroke with contractures of the forefinger, middle finger, and ring finger on the right hand, right foot, hearing impairment, expressive aphasia, diabetes, and hypertension. The inmate declined the psychiatrist's physical therapy recommendation. Weekly PC contacts were timely and adequate. IDTT meetings occurred monthly and included the medical primary care physician and the psychiatrist. Treatment goals were to increase the inmate's ability to regulate mood, improve coping skills, and enhance functioning by 40 percent while also reducing depressive symptoms by 40 percent.

Findings

The mental health clinical care provided to this inmate was adequate. IDTT meetings were attended by psychiatry and medical physicians, and documentation was appropriate.

**Inmate Q**

This EOP inmate's healthcare chart was reviewed from a list of EOP inmates housed in the OHU. The inmate's mental health diagnosis was Major Depressive Disorder and Factitious Disorder. His medical problems included a frozen shoulder, an eye problem, and other somatic symptoms that were intermittent. The inmate was not prescribed any psychotropic medications, but he was prescribed diazepam administered by crush and float method. The inmate viewed medical problems as side effects from previous psychotropic medications. PC contacts occurred weekly, and the PC used cognitive behavioral therapy (CBT) to help the inmate with irrational and depressive thoughts and coping skills.

<u>Findings</u>

The mental health clinical care that was provided to this inmate was adequate.

**Inmate R**

This EOP inmate's healthcare record was reviewed from a list of EOP inmates who were housed in the OHU.  The inmate's mental health diagnoses were Depressive Disorder and Borderline Personality Disorder.  His medical diagnoses were hypertension, coronary artery disease, COPD, hypothyroidism, and chronic angina and pain.  He was previously prescribed mirtazapine in January 2015, but this medication was discontinued because the inmate no longer was depressed. The inmate was prescribed morphine, but he was not prescribed psychotropic medications.  The psychiatrist and medical physician attended the IDTT meetings.

<u>Findings</u>

The mental health clinical care that was provided to this inmate was adequate and timely.

EXHIBIT I
California State Prison, Solano (CSP/Solano)
March 17, 2015 - March 19, 2015

**Inmate A**

This 43-year-old inmate was identified as requiring EOP level of care while housed in administrative segregation.  His record was reviewed to assess the treatment he received while awaiting transfer and during the reporting period prior to his EOP designation.  During the review period, he also required transfer to the MHCB.

His primary diagnoses were Major Depressive Disorder, recurrent, severe with psychotic features and PTSD.  He was primarily treated with Remeron, Paxil, and Risperdal.  At other times, he was also diagnosed with Mood Disorder NOS.

The inmate's history was significant for two possible suicide attempts, a history of sexual abuse, and having witnessed the death of a close friend.  More recently, there were ongoing reports of depression, command hallucinations to commit suicide, and variable medication adherence; there were ongoing CSP/Solano staff concerns about the veracity of his self-reported symptoms and history and the need for MHCB housing for five days in early August 2014.

Between August 2014 and March 2015, IDTT meetings were conducted monthly except for October 2014 and February 2015, when none were documented in the healthcare record.  The inmate was admitted to the MHCB on 8/1/14 for suicidal ideation accompanied by feelings of helplessness, depression, and command hallucinations to kill himself.  Prior to this MHCB admission, staff reported what was described as "splitting" behavior and poor medication adherence.  During his MHCB admission, psychiatry saw the inmate regularly.  Following discharge, five-day follow-up was conducted as required.

A treatment plan dated 8/19/14 was developed following his MHCB discharge while he was in administrative segregation awaiting transfer to an EOP hub.  During this brief time, he received regular PC contacts.

Staffs' view of the inmate was encompassed in a note memorializing his five-day follow-up where he was described as "characteristically reckless, [showing a] lack of remorse and uncooperative."  His behavior was assessed as "founded in perceptions of injustice" and possibly as a function of nonadherence.  He refused to attend his IDTT meeting.  His treatment plan was to address irritability and anger through weekly PC contacts.  Borderline traits were to be addressed by establishing a therapeutic alliance.  The need for diagnostic clarification was noted as was his refusal of all medication.  He was assessed with moderate acute and chronic risk for suicide; although much of his behavior was viewed as volitional.  At this time, his diagnosis was Mood Disorder NOS, Polysubstance Abuse, and Antisocial Personality Disorder. The plan was to monitor him weekly for safety; additionally psychotherapy and medication were to be provided.  The treatment plan did not address his medication noncompliance.

CSP/Solano PC notes indicated a focus on the inmate's "manipulative" and "demanding" behavior, complaints of harassment and mistreatment by custody, and noncompliance with prescribed medications.  Despite various notes showing attempts to engage the inmate, he refused many sessions.

624

The treatment plan dated 9/11/14 showed that by this time the inmate had been transferred to CMF and indicated that he was well-engaged in treatment with positive results.

Findings

CSP/Solano staff unsuccessfully attempted to engage the inmate and improve his medication compliance.  Staff viewed much of his behavior as goal-oriented although the inmate described significant symptoms and a history which raised concerns about suicide risk.  His transfer to an EOP hub was apparently beneficial as his engagement in treatment improved.  The timing and frequency of his clinical contacts were within Program Guide requirements.  While adequate in this respect, staffs' negative attitudes concerning him may have contributed to his unsatisfactory engagement while at CSP/Solano.  Despite these limitations, overall treatment was minimally adequate.

**Inmate B**

This inmate was housed in administrative segregation at the 3CMS level of care.  His healthcare record was reviewed to assess the treatment he received in that setting during the review period.

The inmate was primarily diagnosed with Major Depressive Disorder, recurrent, severe without psychotic features and PTSD, and he was treated alternately with Prozac, Celexa, and Depakote.  He was later diagnosed with Bipolar I Disorder, and the possibility of a learning disability was mentioned.  His history was remarkable for Polysubstance Abuse, dyslexia, anxiety, panic attacks, trauma, and losses of social support.  A past diagnosis of Schizophrenia, a history of inpatient psychiatric treatment, and a suicide attempt by overdose were also noted in the healthcare record.

Following his transfer to CSP/Solano on 8/28/14, the inmate's initial treatment plan was dated 10/2/14.  He was being treated at the mainline 3CMS level of care at that time.  His primary symptoms were mood swings, auditory and visual hallucinations, and poor sleep and appetite.  Nightmares and night terrors, hypervigilance, and startle responses were also documented.  Goals were somewhat generic and called for decreasing his symptoms.  No criteria for higher level of care transfer consideration were noted.

A PC note dated 3/4/15 indicated the inmate's transfer to administrative segregation, when he was assessed as not being in psychological distress.  He was seen for a complete IDTT meeting on 3/17/15, but that documentation was not present in the medical record at the time of review.

Review of progress notes beginning in February 2015 showed a psychiatry note dated 2/11/15 which noted that the inmate was housed in the general population.  The inmate had numerous concerns at that time, including a request for single-cell status and questions about a hearing aid.  He was viewed as non-psychotic, "manipulative," and "unreliable," with no apparent difficulty with his hearing.  The psychiatrist's diagnosis was Bipolar I Disorder, stable and possible learning disability.

A psych tech note for the week of 2/23/15 contained a reasonable summary of the week's contacts and indicated that the inmate had been transferred to administrative segregation. The next PC note was dated 3/4/15 and reported that the inmate was ambivalent about seeing the psychiatrist; this was a theme which continued in subsequent notes, which also discussed his loss of close friends and family. His diagnosis was Major Depressive Disorder; the PTSD diagnosis was dropped without explanation.

Findings

Psych tech and PC notes indicated different dates for admission to administrative segregation. At the time of review, there was no indication that the psychiatrist had seen the inmate during his first three weeks in administrative segregation, although the inmate had expressed ambivalence about seeing a psychiatrist. When housed in the mainline 3CMS program, the inmate had primarily been seen as "manipulative" and "unreliable." While generally adequate, this inmate's treatment did not sufficiently reconcile this view of him with the diagnoses of Major Depressive Disorder and PTSD, as well as his reported history and symptoms. Treatment goals were not sufficiently individualized or measurable. Psych tech weekly summaries were adequate.

**Inmate C**

This inmate's healthcare record was reviewed to assess his treatment at the 3CMS level of care. His primary diagnosis was Major Depressive Disorder, recurrent, moderate treated without psychotropic medications. He was housed in the general population mainline 3CMS until his recent transfer to administrative segregation.

During the review period, the PC saw the inmate approximately every two months, but there were no indications of psychiatry contacts. The inmate's annual treatment plan occurred prior to the beginning of the review period.

PC notes generally indicated the inmate's interest in discussing philosophy and enjoyment of his work assignment. Except for Vistaril, he was not prescribed psychotropic medication. It was unclear whether a psychiatrist prescribed the Vistaril he took on an as needed basis for anxiety and depression. Later, the inmate discussed his plans to get married.

A PC note dated 1/28/15 indicated the inmate was not able to get married when planned due to his fiancée's job. He was described similarly as in previous notes. His diagnosis was Depressive Disorder NOS. It was again reported that he was prescribed Vistaril.

Following his transfer to administrative segregation, there was a summary psych tech note for the week of 2/23/15. It indicated, as did summary notes for the following two weeks, that he was not on psychiatric medication and had no mental health concerns. At the time of review, there were no psychiatry or PC notes in the records subsequent to his transfer to administrative segregation. However, the inmate had an IDTT meeting observed during the site visit; these notes had not been posted in the eUHR at the time of the review.

626

Findings

The PC saw the inmate in accordance with Program Guide requirements when he was housed in the mainline 3CMS. His treatment was generally adequate. Although there were no psychiatry notes, the inmate was noted not to be receiving psychotropic medications. It was not clear who prescribed the Vistaril that the inmate was taking for anxiety and depression on an as needed basis. At the time of review, there were no psychiatry or PC notes in the healthcare record following the inmate's transfer to administrative segregation, which psych tech summary notes reported took place during the week of 2/23/15.

## Inmate D

This inmate's healthcare record was reviewed because he was housed in administrative segregation at the EOP level of care while awaiting EOP hub transfer. He was also mentioned in the plaintiffs' attorneys' monitoring memo, which indicated that he had been admitted to the CSP/Solano MHCB on 1/6/15. The inmate remained in the MHCB until his discharge to CSP/Solano's administrative segregation unit on 2/5/15.

This 27-year-old inmate had a primary diagnosis of Bipolar I Disorder, most recent episode depressed, mild. He was primarily treated with Remeron and Risperdal.

During the review period, he had treatment plans dated 9/17/14, 12/30/14, 1/7/15, and 2/17/15. His treatment plan dated 9/17/14 indicated that he was housed in a mainline setting at CSP/Solano at the 3CMS level of care. He was reported to be a poor historian, and it was noted that the information that he provided was not confirmed. He was originally assigned to the 3CMS level of care for depression, which was not treated with medication. The inmate reported inpatient psychiatric admissions and having seen a psychiatrist while living in the community. Delusional content and loose associations were noted, and he appeared to be responding to internal stimuli.

After transfer to administrative segregation, the inmate received a treatment plan dated 12/30/14. At that time, he was refusing medication. Additional pertinent history that was noted included being found incompetent to stand trial, hospitalization at Napa State Hospital, and previously being on court-ordered medication that included Depakote and Zyprexa. The assault which precipitated the administrative segregation admission was thought to be related to his delusions. He was diagnosed with Psychotic Disorder NOS, and he was thought to likely meet the criteria for Schizophrenia. He was found to need a higher level of care for increased monitoring of his symptoms, and he was referred to the EOP level of care. It was noted that he liked to attend groups as he had done while in the hospital. He was found to be laughing inappropriately, and his thought process was tangential.

A note dated 1/7/15 indicated that the inmate was feeling better, was cooperative, and responding well to medication. It also indicated that he was seen at cell front, but in a "confidential setting."

However, he remained delusional, but was not in distress.  The plan was for him to be seen weekly until his transfer to an EOP hub.

A treatment plan progress note of 2/17/15 stated that the inmate was discharged from the MHCB on 2/5/15 and five-day follow-up ended on 2/10/15.  He continued to present with fixed delusions regarding the military and the CIA.  He was not receiving groups because groups were not provided in administrative segregation.  He was prescribed and was adherent with Abilify and Remeron, but he continued with inappropriate affect; his cognition could not be assessed.

An SRE dated 1/6/15 conducted around the time of his MHCB admission found numerous chronic risk factors and various acute risk factors.  The only protective factor noted was that he exercised regularly.  He was viewed as low chronic and acute risk, although the SRE described a psychotic, socially-isolated individual.

The inmate's ICC was completed in absentia as he was housed in the MHCB.  A mental health note associated with the ICC dated 1/28/15 reported that he was treated at the 3CMS level of care and was retained in administrative segregation pending a non-"shuable" offense.  It did not mention the previous finding that his offense was related to his delusions or EOP transfer.  The five-day follow-up notes indicated that the inmate was requesting injectable medications.

While in the MCHB, the inmate was described as bizarre and delusional; this was at least partially a function of his medication nonadherence.  His diagnosis was Schizoaffective Disorder, Bipolar type.  He was being considered for transfer to the EOP level of care.  The inmate refused to come out of his cell on 2/1/15 for a psychiatry contact, but was seen on 2/2/15, when delusions were noted.  On 2/3/15, he was somewhat improved and requested sleep medications.  A psychiatry note dated 2/24/15 indicated that he was interested in the EOP level of care and wished to have a job as a janitor.

A psychologist's note dated 2/5/15 indicated that the inmate was discharged from the MHCB and would be placed in administrative segregation until his EOP transfer.  The importance of expedited transfer was discussed, as were plans to work with custody to facilitate this transfer.

<u>Findings</u>

This inmate at times experienced significant distress and symptoms, but appeared to somewhat respond to MHCB treatment.  Although it had previously been helpful, he did not have access to group treatment while housed in administrative segregation at the EOP level of care.  From available mental health documentation, it did not appear that the assessment that the inmate's RVR was related to a psychotic process was adequately addressed.  The inmate's expedited transfer was eventually pursued, but should have been considered earlier.  Transfer to a higher level of care also should have been more promptly considered.  Although seen regularly, this inmate's treatment was inadequate during the time he was housed in administrative segregation; he did not have access to group treatment, which history indicated might have been helpful, while consideration of expedited transfer to a higher level of care, including possible inpatient care, needed prompter consideration.

EXHIBIT J
San Quentin State Prison (SQ)
May 4, 2015 - May 6, 2015

**Inmate A**

This 51-year-old EOP inmate was discharged from the PIP on 2/9/15.  He was diagnosed with Asperger's Disorder and Psychotic Disorder NOS.  He was prescribed aripiprazole 30 mg per day.  The inmate received his psychotropic medications by PC 2602 order.  One of the recommendations post-discharge was to regularly monitor his weight as he had a history of weight loss while housed in the PIP.

The inmate was seen timely by the EOP treatment team in East Block on 2/17/15.  The initial treatment plan indicated that the PIP records had been reviewed in the development of the treatment plan.  The treatment plan indicated enhanced EOP services that were characterized by increased PC contacts (twice weekly), increased psychiatry contacts (twice monthly), wellness checks as needed, and daily treatment groups to include EOP yard.  However, the treatment plan confused goals and interventions, and, as a result, did not actually list interventions for some problem areas.  In addition, given the inmate's diagnosis of Asperger's and long-standing psychotic symptoms that could impair treatment engagement, the inmate would greatly benefit from behavioral interventions; however, they were not part of the treatment plan.  While the treatment team noted the inmate's motivation for treatment, the inmate had a long history of poor treatment adherence that should have been factored into the treatment plan.  The PC, psychiatrist, and custody counselor were present for the IDTT meeting, but no supervisory personnel, psych tech, or housing unit officer was present.  A subsequent treatment plan dated 4/14/15 was completed on the revised Form 7388 that was much more comprehensive and well-constructed; it addressed the primary problematic behaviors more thoroughly.

The inmate reported to staff that he did not want to return to the PIP.  He was thus maintaining his ADLs and attending most of his treatment to avoid transfer.  He clearly articulated that his participation and ADL maintenance was due to his desire to remain on East Block.  In fact, if he missed a scheduled activity he would ask during the individual session whether he would be returned to the PIP.  He also stated that he enjoyed the discussions in his treatment group.  Review of multiple PC progress notes indicated that it did not appear that individual contacts actually fulfilled the treatment plan's stated interventions; instead, they were more like check-ins or unfocused sessions guided by the inmate's content.  However, there was a PC change in approximately April 2015; thereafter, the content of individual sessions improved and became more focused and intervention-specific.  Group treatment progress notes indicated that the inmate was an active participant and appeared to benefit from those treatment groups.

Findings

This inmate received increased treatment contacts when discharged from the PIP to the EOP condemned program.  This was clinically appropriate and necessary to assist the inmate in transitioning back to the housing unit and lower level of care.  His initial treatment plan was somewhat nonspecific and confused treatment goals and interventions.  Individual contacts were unfocused and individual treatment was inadequate.  Treatment groups appeared to be targeted to the inmate's needs and he appeared to benefit from these groups, despite his primary motivation of avoiding a return to the PIP.  With a PC change in late March/early April 2015, there was a

significant improvement in the treatment plan and individual treatment sessions.  As a result of these changes and an improved treatment plan, this inmate received adequate treatment.

**Inmate B**

This 42-year-old EOP inmate was reviewed as an example of EOP care in the condemned program.  The inmate had been previously identified during the condemned unmet need assessment project.  He had been brought to the assessment team's attention because he was experiencing psychotic symptoms, refusing medication, not maintaining his ADLs, and having trouble taking care of himself.  He also rarely exited his cell and was not engaged in treatment.  At that time his case was reviewed for higher level of care referral consideration, but it was determined that such referral was not necessary.  He had been diagnosed with Schizophrenia.  The inmate had been observed during IDTT during the monitoring visit.  At that time, his affect was considerably brighter and he was able to articulate the benefits of his current EOP level of care, and his likes and dislikes, as well as describing his initial concerns with his EOP designation.

On 10/7/14 there was a PC change and the treatment team increased the inmate's level of care due to his decompensation.  The subsequent treatment plan dated 10/21/14 placed the inmate on a modified treatment program with the goal of attending one mental health yard, one rehabilitation therapy group, routine psychiatry contacts, and weekly individual PC contacts.  The inmate felt that he was being overwhelmed by mental health staff when on a regular EOP treatment plan; thus the team's decision to place him on a modified program.

The treatment plan dated 10/21/14 was adequate and focused on rapport building and assisting the inmate to gain insight.  According to the 11/25/14 treatment plan, the inmate had finally left his cell for one rehabilitation therapy individual session.  However, he continued to meet cell front for his PC and psychiatry contacts.  That treatment plan continued the inmate in the modified program and identified reinforcers that the PC could use in an effort to have the inmate see the PC in a confidential setting.  The PC also began to attend the rehabilitation therapy individual sessions to facilitate rapport and to extend the inmate's participation to PC contacts.  The treatment plan was consistently modified over time as the inmate improved.  While the plan did not always specifically indicate that behavioral interventions were used, that was in fact what staff was implementing in their efforts to increase rapport and out-of-cell activity.  This was fully discovered through the IDTT meeting that was attended during the site visit.  The inmate remained on a modified treatment plan until 2/17/15.  The treatment team moved the inmate to the full EOP program during the IDTT meeting on that date.  The treatment plan used behavioral and cognitive behavioral techniques to continue to increase the inmate's participation in treatment and engagement with treatment providers.  Progress notes supported that the treatment plan was being implemented during therapeutic contacts.

Findings

This inmate had been extremely low functioning when identified by staff during the condemned unmet needs assessment project.  He remained in the 3CMS program, but he was not receptive to

his PC's efforts to engage him in treatment at that time.  There was a change in his PC and level of care to EOP with treatment plan modifications of using more behavioral-type interventions. The inmate began to slowly respond over time, eventually leaving his cell and engaging with treatment staff.  He was able to progress from the modified EOP program to full EOP programming.  This inmate made tremendous progress and received adequate treatment.  This case was an excellent example of staff effectively using behavioral techniques to progress an inmate from almost no mental health treatment participation to full EOP participation solely through that utilization.  This case could be an example for other providers on the effectiveness of team behavioral intervention.

**Inmate C**

This 42-year-old EOP condemned male inmate was observed at an IDTT meeting during the monitoring visit.  His case was reviewed as an example of EOP care in the condemned program. The inmate had also been identified during the condemned unmet needs assessment project; he was in the mental health program for six or more months and had symptoms that had not responded to treatment, had an MHCB stay exceeding ten days during the prior six months (prior to the data pull), had three or more MHCB admissions in the preceding six months, had at least one DSH referral in the prior year, and had been identified by at least one staff member as a possible higher level of care referral.  The outcome of that assessment was that the inmate was not recommended for higher level of care referral at that time.

Treatment planning primarily used CBT interventions to focus on the inmate's primary symptoms and functional deficits.  The inmate's substance abuse was closely tied to his psychotic symptoms and crisis admissions.  He was diagnosed with Psychotic Disorder NOS, Mood Disorder NOS and Antisocial Personality Disorder.  He was prescribed Geodon, benztropine, and Prozac.  He had low program participation during much of the review period that the treatment team did not document with specific figures.  While the inmate did not meet 50 percent treatment attendance, the team noted that he was missing treatment because he was choosing to go to yard, which the team considered an acceptable alternative.  It was unclear why the treatment team did not change the inmate to other group and individual times that did not conflict with yard, or work with custody so the inmate could attend his appointments and then go to yard even if he would not be able to fully participate in yard.  The Form 7388B treatment modifications for this item also did not change over time or note any such custody or treatment modifications.  The clinical summary did not appear to have changed over time, providing little information about the inmate's actual progress or lack of progress.  While the treatment plan changed on 3/3/15 and improved in terms of the specificity of goals and interventions, it was not modified over time; the inmate continued to participate in less than 50 percent of EOP treatment.

A review of progress notes for the reporting period indicated that the inmate sporadically attended treatment groups; the groups he attended varied and there was no treatment continuity. The PC generally saw him in a confidential setting and appeared to focus on several areas of the treatment plan.  However, the content of PC sessions was somewhat hard to address given the limited information in the progress notes.  Much of the progress notes were cut and pasted from the prior note with only the subjective section being substantially different.  It also did not appear

632

that individual sessions actively addressed the inmate's lack of group treatment participation. The psychiatrist met with the inmate in a confidential setting when the inmate agreed, or cell front when the inmate refused to come out of his cell.  It did not appear that the inmate's poor participation was addressed.

When the treatment team discussed the inmate during the monitoring visit, it appeared that there was actually a great deal of work occurring with him that was not documented in the healthcare record.  The inmate reported that he was benefitting from treatment and that it had assisted him with substantial skill development that he used to remain calm and not receive RVRs or use MHCB services.  Given his history of crisis care, this was a significant improvement.

Findings

This documentation of this inmate's care required substantial improvement.  While numerous Form 7388Bs contained extensive detail regarding CBT intervention, the "problem, goal, intervention" section of the treatment plan typically listed only Program Guide standards with little specificity or operationalization of treatment targets and goals.  PC progress notes were primarily cut and pasted and provided little information about the apparent substantial therapeutic work occurring in those sessions.  However, psychiatry notes were more detailed.

The inmate's failure to participate in group treatment was not adequately addressed in treatment planning, but it appeared that the team felt the inmate did not require that intensity of treatment. However, this should have been directly addressed in the treatment plan and the inmate should have been placed on a modified treatment plan or treatment activities should have been rescheduled so that they did not regularly conflict with yard.  Based on the inmate's self-report, review of the 114-D (housing unit inmate-specific log), and staff discussion, the inmate appeared to have been treated adequately.  However, treatment documentation required improvement so that it properly documented that treatment, and the treatment plan needed to specifically address group therapy participation.

**Inmate D**

This case was selected for review from the DSH non-referral log and as an example of reception center care.  This 41-year-old 3CMS reception center inmate arrived at SQ on 1/7/15.  He was screened in a confidential setting on 1/15/15 and referred for further evaluation; this evaluation occurred on 1/23/15.  At that time, the inmate was provided with a diagnosis of Bipolar Disorder NOS.  The inmate was prescribed mirtazapine, ziprasidone, and Depakote.  His SRE of the same date determined that he was at low acute and moderate chronic suicide risk.  He was placed into the 3CMS level of care.

The inmate had repeatedly talked with his PC about his desire to receive SSI and his belief that prison staff could assist him in obtaining SSI benefits when he was released even though he had been denied twice.  The inmate was placed in "enhanced 3CMS" where he received three weekly treatment groups in addition to his individual PC and routine psychiatry contacts.

633

Progress note review indicated that the PC and psychiatrist repeatedly reported that the inmate had been stable at the 3CMS level of care.  On 2/24/15, the inmate told the PC that he really wanted EOP level of care because other inmates had told him that it would help him get "classes and stuff."  The inmate also identified treatment goals such as anger management.  The PC scheduled the inmate for an IDTT to reevaluate his level of care.  The Form 7388Bs for both IDTT meetings held on 2/18/15 and 3/4/15 indicated the inmate was positive for criterion 3 (chronic symptoms that had not sufficiently responded to at least six months of treatment), but this was based solely on the inmate's self-report of community treatment.  However, this was not the intent of this item and the item should not have been marked positive.  As such, the inmate was appropriately not referred to DSH.

At the first IDTT meeting held on 2/18/15, the inmate's level of care was considered and it was determined that he was more appropriate for the 3CMS program.  That initial treatment plan was adequate and progress notes indicated that individual sessions followed the treatment plan.  The next IDTT meeting on 3/4/15 indicated that the inmate was placed into the EOP level of care.  The justification for this was that the inmate was receiving enhanced services that would not be available to him at the 3CMS level of care on the mainline (three groups, two PC contacts weekly).

Findings

This inmate was adequately treated and was appropriately not referred to DSH.

**Inmate E**

This case was selected from the DSH non-referral log and was chosen to review administrative segregation care.  This 35-year-old EOP inmate was housed in administrative segregation at SQ as a 3CMS inmate prior to having his level of care increased and being transferred.  He had multiple MHCB placements while at SQ.  The inmate was provided with diagnoses of Schizoaffective Disorder and Obsessive Compulsive Disorder (OCD).  He was prescribed aripiprazole 15 mg per day and citalopram 20 mg per day.

The treatment plan dated 10/6/14 indicated that the inmate had an increased level of care secondary to a suicide attempt that required sutures.  The inmate's multiple MHCB admissions were due to suicidality and limited coping skills.  He experienced substantial anxiety and frustration regarding his OCD symptomatology that would escalate to suicidality as a coping strategy.  The treatment team documented numerous significant suicide risk factors on the Form 7388B; despite this, they indicated that he was stable at the EOP level of care.  The inmate was on a modified treatment plan "on EOP LOC per ASU protocol," although that was not defined in the treatment plan.  While SQ was not an EOP hub, the inmate was offered group therapy including two rehabilitation therapy weekly groups.  The treatment plan was adequate, but the goals and problems required greater specification and operationalization.

The Form 7388B dated 10/6/14 properly noted that the inmate had three or more MHCB admissions, but the non-referral rationale directly contradicted earlier information in the

treatment plan. The non-referral rationale was that none of the MHCB admissions were influenced by suicidal or homicidal ideation. However, the clinical summary of the plan clearly documented that the admissions had been due to "…suicidal and limited coping skills. He cut his wrist requiring sutures on 4/2/14…" The non-referral rationale was clearly not appropriate or clinically adequate. The treatment modifications were generally appropriate except for one that stated that the team would address secondary gain issues that resulted in multiple MHCB admissions. The issue of secondary gain and MHCB admissions had not been addressed in the clinical summary or main body of the treatment plan; it was not identified as a problem or treatment target as it should have been if it was going to be addressed in treatment.

The inmate also was not participating in 50 percent of offered treatment. The non-referral justification for this item was that the inmate's lack of participation was not influenced by mental health symptoms, but this was not explained or supported. The treatment team indicated that the inmate had not decompensated, but examples of his functioning were not provided to support this. It was unclear how the treatment team had modified the treatment plan to improve the inmate's ability to function. It also was unclear from documentation that this inmate received an objective assessment of his need for a higher level of care. Rather, it appeared that staff believed he was malingering or otherwise manipulating for some secondary gain; however, documentation did not explain why at least some of the treatment team may have thought this or how they would assess whether it was true.

<u>Findings</u>

This inmate's frequent episodes of decompensation requiring crisis inpatient care were not adequately treated. The Form 7388B also was not appropriately completed. This inmate required treatment for suicidality, limited coping skills, and an objective assessment of the need for a higher level of care. Available documentation indicated that he did not receive adequate mental health treatment.

**Inmate F**

This case was selected from the DSH non-referral log as an example of reception center care. This 26-year-old EOP reception center inmate was diagnosed with Bipolar Disorder NOS and Antisocial Personality Disorder. He was prescribed lithium and Buspar. This was his second prison term and he had been included in the mental health caseload at the 3CMS level of care during the prior term. He had a history of explosive, angry outbursts beginning at the age of 14. He began getting into trouble and ultimately served time in the California Youth Authority. His mother subsequently made him a ward of the court, and the inmate then received treatment for depression, which included medication. The inmate reported multiple suicide attempts, with two occurring at ages 15 and 18, requiring hospitalization.

The treatment team saw the inmate on 2/25/15, when they noted that he had arrived in their care at the 3CMS level of care, but had his level of care increased to EOP. Unfortunately, the justification section of the treatment plan was never fully completed to explain the rationale for increasing the level of care. The clinical summary also did not provide explanation or indication

635

for the level of care increase.  Treatment goals did not always appropriately correspond to treatment targets, but otherwise the treatment plan was adequate.

The Form 7388B was not properly completed.  Criterion three (chronic symptoms that have not responded to six months of treatment) was marked positive based on the inmate's self-report of community treatment; the inmate had not been in CDCR for six months at that time.  In addition, the treatment team did not comply with providing a non-referral justification and treatment modifications after noting an item as positive.  There appeared to be some confusion regarding the appropriate utilization of the Form 7388B.

Findings

It was difficult to assess the adequacy of provided treatment due to the paucity of information in the documentation.  There was a lack of justification for increasing the inmate's level of care, while sections of the treatment plan were left blank.  The inmate's level of care was increased, which would provide an increased level of clinical contact and monitoring by mental health.  The inmate should have been seen by his treatment team so that a comprehensive treatment plan could be completed to ensure that the inmate received adequate care.  Without more information justifying the current level of care and an appropriately individualized treatment plan, the adequacy of this inmate's care could not be determined.

**Inmate G**

This inmate was treated in the SQ MHCB from 10/22/14 to 10/29/14.  His healthcare record was reviewed to determine whether relevant Program Guide requirements were met.

At the time of this 33-year-old man's MHCB admission on 10/22/14, his presentation was consistent with Psychotic Disorder NOS.  The initial psychiatrist's examination report occurred two days later.  Subsequent psychiatry progress notes were written on 10/25/14 and 10/29/14.  Psychologist progress notes were dated 10/26/14 and 10/27/14.  A recreational therapist wrote a note on 10/28/14.  An updated treatment plan was also present.

A discharge note indicated that the inmate was subsequently discharged when it was determined that his presenting symptoms were not considered to be due to a psychotic disorder, but were due to environmental factors.  A discharge summary was not located in the eUHR.  An SRE was not located in the inmate's healthcare record nor was there documentation relevant to five-day follow-up.

Findings

Psychiatry and psychology assessments were performed timely, but an SRE was not documented.  It nonetheless appeared that the inmate received clinically appropriate treatment.

636

**Inmate H**

This inmate was treated in the SQ MHCB from 11/24/14 to 12/1/14. His healthcare record was reviewed to determine whether relevant Program Guide requirements were met.

The inmate was admitted to the MHCB on 11/24/15 due to increasing suicidal thoughts and racing and persecutory thinking. A PIP referral packet was prepared on 11/26/14.

A psychiatry noted dated 11/27/14 indicated that current medications included Geodon, Zyprexa, propranolol, and Vistaril. His presentation was consistent with Psychotic Disorder and history of Polysubstance Abuse. The inmate was also seen that day by a psychologist.

On 11/28/14, the psychiatrist wrote that the inmate was clinically improving. The inmate continued to be seen for fifteen minute checks. The plan was for daily clinical visits. Daily psychiatry progress notes were also subsequently documented.

A treatment plan dated 11/1/14 was located and was adequate. Diagnoses were Bipolar I Disorder and Antisocial Personality Disorder. The inmate received recreational cell-front therapy on 12/1/14; an SRE was also performed on 12/1/14. On 12/2/14, the inmate was discharged and returned to the EOP.

Findings

This inmate received appropriate mental health treatment that was consistent with Program Guide requirements. The outcome of the PIP referral was unclear from the record review, although it was later learned from staff that the inmate had been transferred to the PIP.

**Inmate I**

This inmate was treated in the SQ MHCB from 1/28/15 to 2/5/15. His healthcare record was reviewed to determine whether relevant Program Guide requirements were satisfied.

This inmate was self-referred for a crisis evaluation on 1/28/15 following a legal visit. An SRE was completed and found him to be at moderate chronic and high acute suicide risk. He was admitted to the MHCB due to suicidal thinking after completion of a crisis assessment by a psychologist. A psychiatrist evaluated the inmate that same day. The inmate reported having used methamphetamine several weeks earlier. His differential diagnosis included Substance Induced Psychotic Disorder, and possible Major Depressive Disorder and Methamphetamine Dependence.

An initial psychiatric evaluation form was completed on 1/29/15. Prescribed medications included olanzapine. The inmate's IDTT meeting was completed on 1/30/15. His recreational/occupational therapy assessment was also completed that day.

637

The psychiatrist started the inmate on venlafaxine on 1/30/15 and decreased the inmate's clothing restrictions.  Daily psychiatry progress notes were present.  By 2/1/15, the inmate was noted to have clinically improved.  The inmate's methamphetamine-induced symptoms were resolved by 2/2/15.  Another SRE was completed on 2/2/15 and indicated that the inmate's chronic suicide risk was high while his acute risk was moderate.

A Form 7388B was again completed on 2/5/15, which coincided with the inmate's MHCB discharge.  At this time, another SRE and a discharge summary were completed.

Findings

This inmate received appropriate mental health care while housed in the MHCB.

**Inmate J**

This mainline 3CMS inmate was interviewed in a group setting and his healthcare record was reviewed.  The inmate had been incarcerated in CDCR since 1990 and had been housed on the SQ mainline since 2012.  His release date was in 2021.

The most recent treatment plan for this 55-year-old man was dated 8/14/14.  His presentation was consistent with Depressive Disorder NOS and ADHD.  His prescribed medications included Strattera and an antidepressant medication for chronic pain management.  The treatment plan was signed by the PC, psychiatrist, and correctional counselor.  Interventions included group therapy participation.

The psychiatrist evaluated the inmate on 9/5/14.  Due to the inmate's other medications, Prozac was recommended but was not started until EKG results were obtained.  The inmate was seen by a covering psychiatrist on 9/24/14, who recommended a mood stabilizer instead of Prozac due to potential cardiac issues.  The inmate's EKG had yet to be obtained.  The psychiatrist who evaluated the inmate on 10/22/14 deferred the inmate's use of Prozac due to the inmate's EKG and was planning to confer with medical staff as to an increase in his Elavil.

The psychiatrist started the inmate on Prozac on 11/13/14.  The psychiatrist noted little clinical change in the inmate on 12/3/14.  At that time, Prozac 10 mg three times weekly continued to be prescribed.  The inmate had PC contacts on 8/11/14, 8/20/14, 9/30/14, and 11/13/14.  Psychiatric nurse progress notes were also regularly written.

The inmate received an RVR for possession of drug paraphernalia in 2015.  His mental health assessment on 2/4/15 determined that the RVR was not related to his mental health diagnosis.  On 2/23/15, the psychiatrist increased the inmate's prescribed Prozac.  The inmate was again seen by his PC on 3/30/15.  In April 2015 he received an RVR for morphine possession.

<u>Findings</u>

This inmate received mental health treatment consistent with Program Guide requirements. However, despite his treatment plan, he had yet to be placed in group therapy.  His apparent substance abuse disorder also did not appear to have been adequately addressed.

**Inmate K**

This mainline 3CMS inmate was interviewed in a group setting, and his healthcare record was reviewed.  The inmate was a 38-year-old man who was serving a 25-years-to-life term since 1999.  He had been in his current treatment setting since June 2010.  His presentation was consistent with a Substance Induced Psychotic Disorder with auditory hallucinations.  Diagnoses included Psychotic Disorder NOS, Schizoaffective Disorder, Polysubstance Dependence in institutional remission, and Antisocial Personality Disorder.  The inmate's prescribed medications included aripiprazole.

All appropriate staff signed the IDTT and the Form 7388B was completed.  Treatment plan interventions were sparse but adequate.  There were PC progress notes dated 11/12/14, 1/29/15, 2/18/15, and 3/18/15.  Psychiatry notes were dated 11/12/14, 1/29/15, and 4/24/15.  The notes were typed and informative.  Psychiatric nursing notes were dated 9/11/14 and 11/12/14.

<u>Findings</u>

This inmate received mental health treatment that was consistent with Program Guide requirements.

**Inmate L**

This mainline 3CMS man was interviewed in a group setting and his healthcare record was reviewed.  This 62-year-old man was serving a 16-years-to-life sentence.  His last treatment plan was dated 5/19/14.  Diagnoses were Depressive Disorder NOS, Alcohol Abuse in remission and Paranoid Personality Disorder.  Medications include Risperdal.

Psychiatry progress notes during the review period were dated 10/15/14 and 10/28/14.  PC notes were dated 9/30/14, 12/9/14, and 3/3/15.  A psychiatric nursing progress note was dated 10/28/14.  The documentation provided useful clinical information.

<u>Findings</u>

This inmate was not being seen by psychiatry within Program Guide timeframes.

**Inmate M**

This mainline inmate received 3CMS level of care, and his healthcare record was reviewed.

The most recent treatment plan was dated 9/9/14. This 50-year-old man had been incarcerated for the past 18 years. His diagnosis was Mood Disorder NOS. He did not receive psychotropic medications. All appropriate treatment team members signed the treatment plan. A Form 7388B was completed.

The PC saw the inmate on a quarterly basis. Processes indicated that the intervention was essentially supportive therapy. The inmate was not seen by a psychiatrist since he was not receiving psychotropic medications.

Findings

This inmate received treatment consistent with Program Guide requirements.

**Inmate N**

This mainline 3CMS man was interviewed in a group setting, and his healthcare record was reviewed. This 48-year-old man was in his fifteenth year of incarceration, with a release date of May 2017. The inmate's most recent treatment plan was dated 4/9/15. Diagnoses included Major Depressive Disorder, PTSD, and Alcohol Dependence in institutional remission. He was prescribed Prozac.

During the review period, the PC saw the inmate on a monthly basis through January 2015. The inmate then began participating in a weekly substance abuse therapy group. Psychiatry saw him every one to three months. Progress notes written by his clinicians were clinically useful.

Findings

This inmate received mental health services consistent with Program Guide requirements.

**Inmate O**

This mainline 3CMS man was interviewed in a group setting, and his healthcare record was reviewed. The inmate complained about his mental health treatment because he perceived that he was not receiving assistance with his discharge that was scheduled in four months.
PC and psychiatry notes exceeded the frequency of the Program Guide's timeframes. They also provided useful clinical information. The most recent treatment plan was dated 11/20/14. The main issue with the inmate's treatment plan was that it did not address discharge issues, which was consistent with clinical progress notes.

This inmate also complained about a 40 plus pound weight gain related to his use of Remeron.

<u>Findings</u>

The problem with this inmate's treatment was with the lack of adequate assistance with discharge planning.  Otherwise, the inmate's treatment was consistent with Program Guide requirements.

EXHIBIT K
Deuel Vocational Institution (DVI)
February 3, 2015 - February 5, 2015

**Inmate A**

The expert observed this inmate in a reception center EOP group and interviewed him.  He was exhibiting significant psychiatric symptomatology including response to apparent auditory hallucinations and significant grandiose delusional thinking with religious content.

This 27-year old inmate arrived at DVI on 1/13/15, reporting a history of mental illness and treatment, but no information on psychotropic medication treatment was noted.  He was screened on 1/14/15, and placed at the EOP level of care on 1/22/15.  According to the 1/22/15 placement chrono, he was not prescribed psychotropic medication.  On that date, he signed a form indicating that he did not consent to treatment.  He was provided with a diagnosis of Psychotic Disorder NOS with no diagnosis on Axis II.  His intake history and physical were completed on 1/26/15.

The initial evaluation and SRE were completed timely with the placement chrono on 1/22/15.  During the evaluation, the inmate was evasive, with poor eye contact and incoherence at times, and his speech was alternately slow and excessive.  His behavior was irrational, his mood was elevated, and his affect was incongruent and labile.  He was described as exhibiting very poor judgment with no insight.  He had "magical" thinking, believing that others wore masks and impersonated him, while alternately believing he could be other people.  His thought processes were tangential and circumstantial with a flight of ideas.  His thought content was irrelevant, distorted, and filled with grandiose delusions.  While clearly responding to auditory and visual hallucinations in front of the CDCR evaluator, the inmate denied such hallucinations, making his self-report of low credibility.

The inmate refused treatment with psychotropic medications.  He had not yet been seen by an IDTT and had no treatment plan.  He was offered treatment groups despite having no treatment plan.  He initially refused some of those groups but recently had attended on a somewhat regular basis.  Group notes did not appear to accurately reflect his participation.  The expert observed this inmate during a group session where his participation consisted of primarily tangential commentary, response to hallucinations, and expressions of delusional beliefs.  None of these observations were noted in the group notes.

<u>Findings</u>

The mental health care that was provided to this inmate was inadequate.  This inmate was extremely mentally ill and acutely psychotic.  He had not been adequately treated.  He should have been expedited for transfer to an EOP facility and monitored closely for possible DSH transfer.  He also should have been closely monitored for possible victimization due to his psychotic symptoms and difficulty containing behaviors that might irritate other inmates.  A single cell may have been beneficial for this inmate.  His housing status should have been evaluated by mental health with a recommendation made to custody staff.

**Inmate B**

This case was selected for review because the inmate was observed in a reception center EOP treatment group and was interviewed during the site visit.  This 32-year old inmate arrived at DVI from NKSP on 1/9/15.  He had been housed at NKSP since 11/17/14 where he was designated at the EOP level of care on 11/26/14.  In his evaluation at NKSP, he reported multiple community involuntary hospitalizations and one DSH admission during incarceration.  His symptoms included auditory hallucinations, paranoia, magical thinking, thought insertion, and mood liability.  There was a history of suicide attempts; his last attempt occurred in 2008 and the last suicidal ideation reportedly occurred during 2014.

The inmate's first CDCR bus screen indicated that he was HIV positive and noted his history of depression.  The DVI bus screen also indicated that he was positive for HIV and Schizophrenia.  He was reportedly moved to DVI due to susceptibility to valley fever.

Four days after arriving at DVI, staff referred the inmate to mental health services, indicating that he required a medication evaluation.  He had not received an evaluation since his arrival at DVI.  The inmate had already begun treatment groups at that time.  There were no inpatient records in the eUHR.  No treatment plan had been completed since his arrival at DVI.

Based on the healthcare record, the first time this inmate was seen by DVI mental health staff was on 1/12/15 in an EOP group facilitated by the psychologist.  It was unclear how this group could have been considered appropriate for this inmate, who had not been evaluated or given a treatment plan.  Notes written over the typed group note suggested that he may have also had a mini-individual session during group, which would have been highly inappropriate.

The inmate was seen in group the following day and was determined to be stable with no apparent clinical justification.  He was finally seen individually on 1/14/15 for a wellness check in the clinician's office because he had refused group.  No intake assessment was completed, and no real intervention occurred.  The inmate was merely encouraged to attend group.  He was seen the next day by a psychologist; this encounter was documented in a rather scattered, difficult-to-read written note.

A handwritten, nearly illegible psychiatry note from 1/20/15 incorrectly indicated that the inmate was at the 3CMS level of care instead of EOP.  The note suggested that the psychiatrist believed the inmate had Major Depressive Disorder.  He was maintained on Prozac 20 mg every morning.  The psychiatry note consisted of many canned phrases with checkboxes next to them.  The psychiatrist wrote across various parts of the page in short, incomplete phrases that were difficult to read, on a poorly designed form for documentation that did not provide the necessary elements of a psychiatric note, even if it had been fully legible.

The inmate did not regularly attend group, citing numerous reasons including fatigue and yard. Inmates in the reception center SPU had to choose between group and their only outside yard time.  While staff followed up, they developed no comprehensive plan to address this inmate's

lack of treatment engagement.  Many of the follow-up contacts occurred at cell front.  Individual contacts appeared to have been in reaction to missed groups.

On 1/28/15, the inmate was seen in response to a staff referral secondary to a trip to the TTA the prior evening.  He had been waiting for his Geodon to be discontinued, as he had discussed with the psychiatrist on 1/20/15, and had become "slightly panicky" because that still had not been done.  Appropriate referrals were made.

<u>Findings</u>

This inmate had been at the EOP level of care in the reception center process for 79 days.  Although not all of this time occurred at DVI, he should have been transferred expeditiously to his receiving facility.  He was not being treated adequately at DVI.  He had not been evaluated by DVI staff and was not seen timely by his IDTT based on a review of the healthcare record.  The treatment team should have convened immediately, developed an appropriate individualized treatment plan, and implemented this plan.  This inmate's case should have been timely brought to the CSR so this inmate could have been endorsed and transferred expeditiously.

**Inmate C**

This 45-year-old reception center EOP inmate arrived at DVI on 12/31/15 with a history of a seizure disorder, mental illness, and mental health treatment.  He was evaluated on 1/2/15.  An SRE was completed on the same day.  He reported a history of suicide attempts, most by hanging and one by overdose while he was out of prison.  He was assessed with high chronic and low acute suicide risk.  He was recommended for EOP level of care and was scheduled for an IDTT meeting to be re-designated to the EOP level of care.  He had SPU status.

This inmate's diagnosis was Schizoaffective Disorder, with diabetes and hepatitis C.  He reported auditory and visual hallucinations (shadows), with voices worsening after a head injury.  He had a prior admission at ASH as an MDO and multiple involuntary community placements for suicidality.

This inmate was seen by his IDTT timely.  His treatment plan was adequate, with appropriate interventions.  His treatment goals required greater specification, but were acceptable for an initial treatment plan.  He was prescribed Zoloft 200 mg per day and Zyprexa 20 mg per day.  This inmate was seen untimely by the psychiatrist on 1/22/15.  His PC contacts were weekly for two weeks, then he was not seen for one week, and he was then seen by a different PC whose progress note of 2/2/15 was very fragmented, and difficult to understand due to incomplete sentences, use of check boxes, short phrases, and some unknown abbreviations.  The inmate was seen cell-front frequently when he refused to attend group, but his failure to attend did not result in treatment plan modification.

645

Findings

This inmate was seen timely for his bus screen, initial mental health evaluation, and SRE. He was not seen by the psychiatrist for a medical evaluation in accordance with Program Guide timeframes. The IDTT also saw him in accordance with the Program Guide and developed an appropriate treatment plan. However, as the inmate failed to engage fully in treatment and refused many of his treatment groups, he should have been brought back to IDTT so that his plan could be reviewed and updated. On the Form 7388B, staff wrote "…EOP LOC – not a danger to self, others or gravely disabled" as the reason for not referring him to a higher level of care. While the inmate did not appear to require a referral to a higher level of care at that time, it appeared from this note that staff erroneously believed that inmates could be referred only if they were a danger to self, danger to others, or were gravely disabled. The Form 7388B also stated the inmate's group attendance incorrectly. This inmate was adequately treated, but needed a treatment plan modification to address his poor treatment engagement.

**Inmate D**

This case was selected as an example of reception center EOP care apart from the reception center SPU program. This 45-year old inmate arrived at DVI on 10/28/14, with a colostomy bag and mental health history. He was reportedly receiving trazodone, Depakote, and Cogentin. He was screened timely, and received a psychiatric evaluation, a mental health evaluation, and an SRE within Program Guide timeframes. He was initially designated for 3CMS level of care on 11/4/14, and was elevated to the EOP level of care on 1/7/15. On 12/27/14, he was transferred to the PBSP CTC MHCB. He was discharged on 1/7/15, at the EOP level of care, but the bus transfer form, bus screening sheet, and inpatient chart had not been scanned to the eUHR.

As of 1/13/15, the inmate was prescribed benztropine mesylate 2 mg per day, divalproex sodium 500 mg per day, and haloperidol 10 mg per day. He remained at the EOP level of care. Upon the inmate's return from the PBSP MHCB, the IDTT saw him and developed the treatment plan. The clinical summary indicated that he had a long history of mental health care, including inpatient hospitalization in the community, and that his parents had a conservatorship for him from 2005 to 2011. He had committed crimes against his family, been homeless, received SSI benefits since 2005 (although he had a period of 13 years employment), and had a history of suicidality, auditory hallucinations, and paranoid delusions with religious undertones. The summary also included a reported history of visual hallucinations.

The inmate was diagnosed with Schizophrenia, undifferentiated type, Methamphetamine Abuse "[history of 2014 (ICE)]," and Axis II deferred. The identified problem areas were broad and not well-defined, requiring operationalization. Despite that, some interventions were appropriate with acceptable goals, while others were unreasonable and impractical given the inmate's functional level. In light of that, the treatment plan was not truly individualized. At the time of the site visit, the inmate had begun verbalizing that he did not want to be in the EOP and did not want to go to group. He missed group for a variety of reasons, including choosing yard instead. This was significant and could have been viewed as an early sign of decompensation, but clinical

646

staff did not appear to recognize it as such and consequently did not modify the treatment plan and interventions appropriately.

<u>Findings</u>

This inmate was seen timely by clinicians for his initial evaluations (intake, medication, and suicide); screens were completed timely, and the IDTT team saw the inmate promptly upon his return from the crisis bed.  However, the treatment plan was not properly individualized and interventions were not adequately designed.  Consequently, this inmate did not receive adequate mental health treatment.

**Inmate E**

This case was selected for review to illustrate reception center EOP services that were not provided in the SPU program.  This 41-year old inmate arrived at DVI on 12/30/14.  He had a history of mental illness and mental health treatment.  He was prescribed chlorpromazine, divalproex sodium, gabapentin, and perphenazine.  He was seen for his mental health evaluation and suicide risk assessment on 1/2/15.  He was diagnosed with Schizoaffective Disorder, bipolar type; an alternative diagnosis of Mood Disorder NOS was also considered.  He was also provided with additional diagnoses of Polysubstance Dependence (PCP, methamphetamine, cocaine, marijuana, LSD, paint inhalation), and Antisocial Personality Disorder, provisional.  The inmate was sentenced to 95-years-to-life, but his sentence was vacated.  His old CDCR number was discharged, and he was given a new CDCR number with his new sentence of 29 years.

He had been receiving mental health services at the EOP level of care during his prior CDCR incarceration.  The evaluator recommended EOP level of care and an IDTT was scheduled to determine this inmate's level of care.  The initial treatment plan was completed 1/6/15, and included the diagnoses listed above.  None of the diagnoses was fully supported by the documentation.  Diagnostic clarification should have been included in the treatment plan as a top priority; however, this issue was not included in the plan.  The treatment plan was not well-developed, as it was overly broad in problem descriptions with treatment modalities listed as interventions and with no individualization.  This was an inadequate and unacceptable treatment plan.  The IDTT met again on 2/3/15.  The treatment plan was not modified, and the Form 7388B was not completed.

<u>Findings</u>

This inmate was not adequately treated.  The IDTT needed to revise his treatment plan, prioritizing diagnostic clarification.  In addition, the treatment team needed to complete the required Form 7388B at every treatment team meeting.

647

**Inmate F**

This case was selected as an example of administrative segregation 3CMS treatment. This 28-year old inmate was received at DVI on 4/21/14, after being out to court. He had multiple one-day trips to court since that time for hearings while he remained housed in administrative segregation. A mental health evaluation was completed on 7/7/14, indicating a Mood Disorder NOS and Methamphetamine Disorder with provisional diagnoses of Bipolar Disorder NOS and Opiate Dependence. These diagnoses were only minimally supported by documentation in the healthcare record. There was a reported DSH admission in 2009 for 30 days.

A treatment plan completed in August 2014 when the inmate returned from the hospital after having swallowed a razor, simply listed agitation and depression as problem areas for treatment, rather than the self-injurious behavior. While the inmate denied suicidal intent, stating that he was trying to hide evidence, he had a history of serious attempts when in crisis. Clearly, this type of behavior with poor coping during crisis should have been a primary treatment focus. The interventions provided were simplistic and inadequate. Because of the inmate's acuity, more interventions were indicated. The treatment goals required greater specification. The most current treatment plan, dated 11/12/14, was exactly the same as the previous plan. It included the same information, even stating that the inmate had recently returned from the hospital for swallowing a razor, even though that event occurred three months prior. The psychiatrist was not present at the IDTT meetings.

The inmate was prescribed Effexor ER 75 mg per day and Remeron 30 mg per day. Progress notes suggested that the inmate was not seen weekly by his PC. These contacts typically occurred at cell front due to the inmate's refusal to be seen out of cell. He was seen monthly by psychiatry, also at cell front, possibly at the inmate's request. The inmate consistently refused yard, but it was unclear why this occurred and clinical staff had not questioned the inmate regarding this refusal. Psych tech notes were generic and not clinically useful. The clinician did not always clearly indicate whether the sessions occurred at cell front. This inmate would have benefitted from a behavioral plan. He may have been unable to come out of his cell due to negative symptoms of depression. His treatment plan should have been modified to better reflect current functioning.

Findings

This inmate was adequately treated. The IDTT did not seem to recognize multiple signs of possible decompensation and had not modified his treatment plan appropriately. In fact, the previous treatment plan was merely reused, despite its inadequacy and lack of clinical utility.

EXHIBIT L
California State Prison, Corcoran (CSP/Corcoran)
February 17, 2015 - February 20, 2015

**Inmate A**

This 61-year-old inmate's healthcare record was reviewed to assess his treatment at the EOP level of care while housed in administrative segregation.

The inmate arrived at CSP/Corcoran on 11/14/14. He was diagnosed with Exhibitionism, Depressive Disorder NOS, and Polysubstance Abuse. He was treated primarily with Buspar and Luvox. At other times, he received alternative diagnoses including Schizoaffective and Mood Disorders. His most recent GAF score was assessed at 29.

His history was remarkable for physical abuse, two attempted hangings while incarcerated, a family history of attempted suicide and polysubstance abuse. He had at least two MHCB admissions in 2011 and 2012 and two OHU placements in 2012 and 2013. More recently, he was treated in acute care at VPP. In September 2014 he reported daily thoughts of committing suicide with a plan to cut his throat. At that time he was experiencing stress related to his transfer secondary to IEX rules violations and auditory hallucinations.

Shortly after arrival at CSP/Corcoran, he received an SRE which found him to be a moderate chronic risk and between a low and moderate acute risk for suicide. He was noted to have few protective factors. He reported suicidal ideation and a plan, as well as a desire to give EOP level of care "a chance" prior to acting on that plan, and he was amendable to medication treatment. A new SRE dated 2/20/15 documented numerous chronic and acute risk factors not previously mentioned and additional protective factors. He was rated as a moderate chronic and low acute suicide risk. The plan for risk reduction called for a verbal no suicide contract; reassurance regarding the clinician's availability and interest; reinforcement of the inmate's engagement in various forms of treatment; support for his self-improvement; expediting his transfer to a facility where he could receive treatment for exhibitionism; ongoing CBT for depression; and assistance with accessing care and decision-making with regard to his medical concerns.

A mental health screening conducted upon administrative segregation intake on 11/20/14 indicated the inmate had returned from DSH related to treatment for his suicidal ideation and plan. It was noted that he continued to have suicidal ideation and plan, but no immediate intent. He received two IEX RVRs while at DSH. Five-day follow-up was completed appropriately. A PC note dated 11/20/14 indicated he had a low level of social support while serving a life sentence. He had no visits during the course of his 18-year term. He reported having nothing to live for and that if he had a razor he would cut his jugular vein and "bleed out." He reported poor recent medication adherence and indicated that he viewed IEX as his primary problem. At that time he was referred to the psychiatrist, who saw him at cell front three days later. During this time, he refused to attend groups.

An 11/26/14 progress note indicated the inmate attended his IDTT meeting. He continued to report feelings of hopelessness and suicidal ideation with a plan to cut his jugular vein if EOP treatment was not helpful. At this time three previous suicide attempts were noted, as was the continued connection between his depression and his inability to control his IEX behavior.

650

A 12/1/14 PC note indicated he told his PC that he had been sexually assaulted and was hopeful he would be single-celled.  The clinician assessed the inmate as having had dysthymia for a long time with acute exacerbations of depression.

Regular PC notes described the inmate's feelings of guilt and shame related to his IEX behavior, depressive symptoms, and treatment engagement.  In December 2014, it was indicated he would have cell-front contacts for the next two weeks due to holidays/vacation coverage and short weeks.  Psychiatry continued to discuss issues related to his medications.  In January 2015, his PC regularly saw him, during which the inmate's depressive symptoms were noted and were addressed with CBT.  Near the end of January 2015, the inmate again engaged in IEX behavior, and the psychiatrist considered a diagnosis of Major Depressive Disorder.

A PC note dated 2/20/15 indicated the inmate felt good about how he presented himself at his recent IDTT meeting.  He stated that he was not suicidal, but he had not ruled out the possibility if he did not get the help he needed.  IEX and medical issues were discussed, as was an expedited transfer to the PSU.

Portions of the DSH healthcare record were reviewed.  The inmate was admitted from CMC on 11/2/14 with a chief complaint of being suicidal with a plan.  He noted periodically feeling depressed for years with a worsening of symptoms during the prior seven to eight months.  He acknowledged a previous diagnosis of Obsessive Compulsive Disorder.  While at DSH he indicated his frustration with continued IEX problems.  The discharge summary indicated he met his treatment goals, although this was not explained further.  Upon discharge the DSH clinicians indicated he would deteriorate further at the intermediate level of care without explanation.  The inmate continued to endorse auditory hallucinations.

Findings

This inmate was generally seen according to Program Guide requirements during the reporting period as to frequency of contacts, although there were some gaps in psychiatry contacts.  He presented a challenge to staff as he was engaged in treatment, but a primary focus of treatment needed to be his IEX behavior; no specific IEX interventions were available while he was housed in administrative segregation.  His situation required ongoing follow-through on the possibility of an expedited transfer to a PSU where he could receive IEX treatment.  This would have required resolution of pending RVRs before he again infracted in connection with his uncontrolled exhibitionism.  The treatment provided to him was insufficient because the required treatment was not available in the setting.  Given this fundamental limitation, staff provided adequate treatment.

**Inmate B**

This inmate's healthcare record was reviewed to assess the treatment he received at the 3CMS level of care while in administrative segregation following his transfer from ASP to CSP/Corcoran on 7/29/14.  The expert also observed this inmate's IDTT meeting on 2/18/14.

The inmate was diagnosed with Adjustment Disorder with anxiety.  He was primarily treated with Trileptal for mood stabilization.

The inmate's initial IDTT meeting was conducted on 8/7/14, when he was housed in the SHU.  The emphasis of the meeting was on his current crisis related to his wife and children and focused on reducing anxiety and stabilizing mood.  He was not receiving psychotropic medications.  Other IDTT meetings noted discussion of the possibility that he would be removed from the mental health caseload.  It said he was not receiving psychotropic medication; although elsewhere in the record, the inmate's Trileptal was described as being used for its mood stabilization properties.

Another IDTT meeting was conducted on 1/29/15.  At that time the inmate refused to attend and the psychiatrist was not available.  His lack of adherence to indicated contacts with his PC was noted, as was his reason for non-attendance; he did not want to experience unclothed body searches prior to the contacts.  He declined to participate in group therapy.

A follow-up IDTT occurred and was observed by the expert on 2/18/14.  During this IDTT meeting, the PC indicated he had spoken to the inmate at cell front on the previous day.  Without consulting with psychiatry, the psychologist indicated that the inmate would continue to take medication.  Although the psychiatrist was available by way of telepsychiatry, he was not introduced to the inmate.

An initial psychiatric evaluation was conducted on 8/13/14.  The note indicated he was seen cell front due to his refusal of a confidential setting.  Ongoing notes from psychology and psychiatry indicated his refusal of confidential contacts and revealed different and unreconciled diagnoses.

A PC conducted an initial evaluation on 8/14/14, when the inmate's current housing setting was the SHU and his level of care was 3CMS.  It was noted that his CDCR release date was 9/15/15.  At that time he was described as very upset at the news that his wife locked their two children in the house and left them at home with her boyfriend.  The inmate was also noted to have safety concerns.  He reported no history of mental health treatment while in the community.  His mental status was mostly unremarkable but he was noted to have limited insight and judgment.  A summary of the SRE indicated that he appeared immature and had no regrets regarding the people he hurt.

On 9/9/14 the PC noted the inmate was scheduled for an individual session but had gone to the crisis bed the night before, where he was retained.  The plan was to continue current treatment plans without consideration of whether this crisis bed placement required a reevaluation of his treatment plan.  The next progress note dated 10/8/14 indicated the inmate reported he was "doing fine" and did not need to talk.  The crisis bed admission was not discussed or noted.  The note dated 10/27/14 was the same.  Ongoing notes indicated his continued disengagement in treatment.

An administrative segregation pre-screen was conducted on 2/10/15.  While in administrative segregation the inmate continued to refuse confidential contacts, but a number of his

appointments were also cancelled because the provider was unavailable or "out of time." This occurred for a routine PC appointment on 9/4/14, special PC appointments on 1/27/15, 2/4/15, and 2/11/15, an IDTT meeting follow-up appointment on 10/30/14, and a psychiatric appointment on 1/30/15.

Findings

There were regular attempts to see this inmate during the course of the reporting period. However, the inmate often refused confidential contacts and a number of sessions were cancelled because the provider was unavailable or "out of time." Treatment plans should have focused more on engagement with the inmate, exploring whether the crisis with his family had resolved, and his concerns about unclothed body searches. Despite these concerns, when it was provided the treatment he received was minimally adequate, but the frequency of cancelled contacts was unacceptably high.

**Inmate C**

This inmate's healthcare record was reviewed to assess the treatment he received at the EOP level of care while housed in administrative segregation in a 3CMS unit. He arrived at CSP/Corcoran on 7/1/14 after having been transferred from CMF. During the first week of October 2014, he was treated at CHCF.

The inmate was diagnosed with Adjustment Disorder with mixed disturbance of emotions and conduct. He was treated primarily with Effexor and Remeron. Earlier in 2014 he was prescribed Risperdal, which was discontinued in April of that year, and Zyprexa, which was discontinued in August 2014. His history was remarkable for a history of Mood Disorder with psychotic features and numerous crisis bed admissions.

Since the commencement of the review period at the end of July 2014, the inmate had an IDTT meeting on 8/27/14, when he was treated at the EOP level of care and housed on a general population unit. The Form 7388B did not note any positive indicators for higher level of care consideration; however, it was noted that changes to his psychotropic medications were made the previous month to address psychotic features and he would be monitored to see if he started attending individual sessions and groups. He had six MHCB admissions during the prior 180 days. His level of care was increased to 3CMS on 2/24/14 and to EOP on 6/25/14 after multiple MHCB admissions. Some "brief and minimal" reports of cutting and hanging were noted. He refused to participate in the intake interview.

At the time of his 11/26/14 IDTT meeting, the inmate was housed in administrative segregation at the EOP level of care. He refused to attend this IDTT; no correctional counselor was present at this meeting. The inmate was noted to have the positive indicator for higher level of care referral consideration of multiple MHCB admissions. It was noted that he had a history of depression with auditory and visual hallucinations, and that he was moved from the EOP hub to "3B01" yard and returned to the hub after an incident involving a threat to kill a psych tech. He was noted to have a history of refusing medication and of non-participation in groups and

653

individual sessions.  He was believed to fabricate mental health crises for secondary gains.  New Form 7388Bs were completed monthly.

The inmate was housed at CHCF from 9/30/14 to 10/8/14.  Otherwise during the review period, he had regular contact with the psychiatrist and multiple follow-up appointments with his PC.

SREs assessed his acute and chronic risk to range from low to medium.  At times he would refuse to provide sufficient information to assess suicide risk, and at times he would report that he had multiple suicide attempts.  In December 2014 he reported a history of self-injurious behavior dating back to age 15, but he denied an intent to die.

Findings

This inmate was generally seen in accordance with Program Guide requirements, although there were some lapses in contacts with psychiatry and PCs.  He proved challenging for staff to manage effectively because he required frequent MHCB transfers and incrementally higher levels of care.  Although staff often viewed him as exaggerating symptoms for secondary gain, he continued to present with suicide risk, which required frequent intervention.  Overall, the mental health treatment he received was clinically adequate.

**Inmate D**

This inmate's healthcare record was reviewed to assess the treatment he received at the 3CMS level of care, with an emphasis on treatment since his recent transfer to the LTRH unit.

He was diagnosed alternately with Adjustment Disorder with depressed mood and ADHD, hyperactive type.  He was prescribed Paxil and Strattera.  He was placed in administrative segregation in November 2014, and then apparently in the PSU, with a move to the LTRH program in February 2015.

His history was remarkable for sexual abuse and depressive symptoms, poor impulse control, and polysubstance abuse.  More recently, he was noted to have suicidal ideation, anxiety, hopelessness, and disturbance of mood.  He had not had contact with his wife since November 2014.

An SRE dated 2/18/15 noted safety concerns and feelings of hopelessness.  Notably, the SRE assessor was "unable to assess thought content/process due to time limitations.  Unable to assess insight/judgment due to time limitations."  However, the inmate was found to not "currently appear to be a danger to himself or others."  His chronic and acute suicide risk were determined to be low.

The inmate was recently released from the MHCB after making suicidal statements, but then indicated he was anxious about going to the CSP/Corcoran SHU from a low level prison.  There was no evidence of work with mental health staff to assist with this transition by providing information or otherwise addressing his anxiety.

654

He was seen at CSP/Corcoran on 2/14/15 for a new arrival wellness check. At that time he was refusing his medications and requesting a transfer stating he did not receive his medication and was concerned about side effects. He was referred to the psychiatrist. Five-day follow-up occurred as required.

He was seen at cell front by a PC on 2/18/15 shortly after his transfer to LTRH. The cell-front contact occurred "because of time limitations due to a shortage of available clinicians for one on one contact." The inmate was then seen by the psychiatrist in a confidential setting on 2/19/15, when his medication dosage was lowered. He was diagnosed with Adjustment Disorder with depressed mood and ADHD. He was seen in a confidential setting by a PC on 2/25/15, with a focus on anger and impulsivity.

His IDTT meeting on 2/19/15 showed he had no indicators for higher level of care referral consideration. The focus of treatment was anxiety, impulsivity, and concentration through individual and group treatment using CBT techniques. The healthcare record included an alert for suicide risk. The treatment plan stated that one should review the healthcare record regarding information about medications, and psychiatry was not integrated into the treatment approaches noted to address the symptoms. The plan eliminated the Adjustment Disorder with depressed mood diagnosis.

Findings

This inmate's transition to LTRH was insufficient because of a lack of preparation prior to transfer and by cell front contacts related to staffing issues immediately following transfer to the new unit. His SRE was likewise inadequate because of staff limitations.

**Inmate E**

This inmate's healthcare record was reviewed to assess the treatment he received at the EOP level of care while housed in administrative segregation. He was transferred to CSP/Corcoran from SVSP on 2/4/14. He was diagnosed with Adjustment Disorder with mixed anxiety and depressed mood, and treated alternately with Trileptal, Remeron, and Effexor.

His history was remarkable for anger issues, recent suicide attempts, and a history of physical and emotional abuse. He was seen by the psychiatrist on 2/23/15 pursuant to a 2/19/15 referral. It stated that he felt depressed, was paranoid, and was not attending groups. The psychiatrist added the diagnosis of PTSD with provisional diagnoses of Bipolar Disorder and Major Depressive Disorder. Since his transfer to CSP/Corcoran, he was seen by a PC.

An IDTT meeting occurred on 8/20/14. It was noted that the previous month the inmate overdosed on a controlled substance in what was described as a "probable suicide gesture." He believed he would be in segregation for an extended period of time. His depression and anxiety levels were elevated. He requested a level of care change to EOP. IDTT documentation indicated it would be helpful to have a psychiatry evaluation to determine whether there was a psychotic process, but noted the inmate's major treatment focus had to be danger to self and

others with elimination of violence as the primary goal.  The diagnosis was ADHD, with provisional diagnoses of Bipolar Disorder and Adjustment Disorder.  The Form 7388B noted the inmate's inability to function adequately at his current level of care due to a major mental disorder as a factor for consideration for higher level of care referral.  In response, the inmate was changed to the EOP level of care in August 2014.  A psychiatrist did not sign the IDTT, and it was again noted that a psychiatry evaluation would be helpful.  All treatment team members signed a second Form 7388B on 9/3/14.  The accompanying IDTT noted the inmate had more than ten RVRs and over five SHU terms.

The IDTT meeting on 11/26/14 reported the inmate's ongoing anxiety and depression as well as his difficulty controlling his anger.  It noted his motivation for positive change and some progress toward treatment goals such as fewer instances of suicidal thoughts.  He was provided with a diagnosis of Mood Disorder NOS with a provisional diagnosis of PTSD.  The psychiatrist did not attend the IDTT meeting.

Findings

This inmate presented with a complex picture of significant violence and multiple RVRs in the context of fluctuating psychiatric symptoms.  Comprehensive assessment and treatment planning was impeded because psychiatry was not always present at IDTT meetings.  Despite these concerns, overall the inmate was moved appropriately through increasingly higher levels of care, and received minimally adequate care which resulted in some improvement during the course of the review period.

**Inmate F**

This inmate's healthcare record was reviewed from a list of inmates housed in SNY/EOP overflow housing. He had a diagnosis of Bipolar I Disorder.  He was prescribed lithium, Paxil, and Vistaril.  During the first three months of the review period, the PC saw the inmate weekly and the psychiatrist saw him monthly.  Discussions centered around the inmate's endorsement to SVSP, ambivalence with the transfer, paranoid thoughts of inmates and staff conspiring against him, annoyance with multiple lockdowns which interfered with yard, and the inmate's need to stay active.  His symptoms were managed with medication and therapy.

During the last three months of the review period, the inmate's ingrown toenail caused him extreme pain and discomfort; he was diagnosed on 9/24/14 with onychomycosis and prescribed Lamisil.  He discussed the diagnosis with his PC, who encouraged him to continue talking to medical staff.  During the next several weeks, the inmate's attention during PC contacts centered on his medical condition.

On 10/24/14, the inmate was transferred to Mercy Hospital and diagnosed with sepsis and severe left leg cellulitis.  The medical discharge note stated "extreme cellulitis may be due to onychomycosis."  The inmate was discharged on 10/28/14.  On 10/29/14 he was categorized as a high fall risk.  Subsequent encounters during November 2014 with mental health clinicians continued to focus on his medical condition (concerns with immobility), access to a television

656

and other property and their influence on his mental health, and notably growing paranoia.  This pattern continued in December 2014.  A progress note dated 1/2/15 contained the following: "I'm all right … Denies SI/HI/AH/VH/Paranoia.  He has nothing else to discuss at cell front."

As of January 2015, the inmate was still using a wheelchair, and he had filed and adjudicated a grievance for usable shoes and a television.  The inmate's cell-front contacts also occurred more frequently.

Findings

The psychiatrist and PC regularly saw the inmate.  His underlying concerns of pain, immobility, and lack of appropriate shoes, which appeared to aggravate his feelings of paranoia and hopelessness, were not resolved.  No consultation between medical and mental health staff occurred to address underlying issues, even after the inmate filed a grievance for shoes.  Although he was told how to access medical care, the PC did not seem to recognize the need to advocate with medical staff for the inmate; however, mental health staff advocated with custody for a television.  The inmate's immobility coupled with the lack of appliances may have contributed to his mental health condition.  The inmate nonetheless received adequate care according to the Program Guide, but he would have benefitted from a consultation between medical and mental health staff.

**Inmate G**

This inmate's healthcare record was reviewed as he was housed in the MHCB and his MHCB IDTT had been observed.  He was diagnosed with Schizoaffective Disorder.  His prescribed medications included Zyprexa and Imitrex.  His healthcare record was remarkable for numerous suicide attempts beginning at age 12 and multiple DSH stays.  On 2/4/15, he was transferred from CSP/Corcoran to Mercy Hospital for attempted suicide by hanging using shoestrings.  He believed he could not survive outside of prison.  An SRE was completed on 2/7/15 and indicated moderate chronic suicide risk and high acute suicide risk.

The initial decision of the MHCB IDTT was to retain the inmate in the MHCB.  He returned to the MHCB cell and smeared feces in the cell, writing "I am an Animal Life is Suffering."  The psychiatry note dated 2/7/15 addressed his anxiety and significant hearing loss since childhood and indicated that he was awaiting a hearing aid.  The psychiatrist prescribed Haldol intramuscular injection, Ativan, and Benadryl.

Between 2/7/15 and 2/17/15 the inmate was seen by at least five different clinicians.  Clinical notes outlined continued suicidal ideation, his anxiety regarding his upcoming release in October 2015, fear of a lack of support upon release, depression, feelings of hopelessness, and fear of custody.  One clinical note dated 2/8/15 reported "eating and sleeping within normal limits.  He reported he will be seen out of cell tomorrow."

Psychiatry notes dated 2/9/15 and 2/10/15 were not in agreement with the note dated 2/16/15.  The psychiatrist's note of 2/9/15 reported the inmate's multiple MHCB admissions and multiple

DSH stays.  The psychiatrist note dated 2/10/15 acknowledged that the inmate had significant problems adjusting to prison life.  The 2/16/15 note indicated suspicion of manipulation for a DSH referral, but did not initiate established protocols related to suspected manipulation.  The psychiatrist appeared to imply that early parole might be an impediment to DSH referral, but this was not the policy.

Findings

Although mental health was aware that the inmate needed a hearing aid, there was no documentation of obtaining a hearing aid or follow-up discussion with custody about the inmate's concerns with custody staff.  Higher level of care referral was appropriate for the inmate; however, the psychiatrist note dated 2/16/15 was clinically inappropriate and raised questions about the psychiatrist's familiarity with policy regarding suspected manipulation or DSH referral when there was an impending parole.

**Inmate H**

This EOP inmate's healthcare record was reviewed from a list of inmates who participated in a group interview.  The inmate was diagnosed with Major Depressive Disorder with psychotic features.  He was prescribed fluphenazine, sertraline, and Vistaril.  He was admitted to VPP on 3/21/14 for attempted suicide by hanging and discharged to CSP/Corcoran on 6/26/14.  PC contacts were mostly conducted at cell front during July and August 2014.

During PC contacts, the inmate stated he was medication compliant even though the Medication Administration Record (MAR) did not support this statement.  On 8/27/14, the psychiatrist saw the inmate for medication noncompliance and changed the medication dosages.

Progress notes indicated the inmate continued to believe a judge would release him in the next few months even though his parole year was 2050, and he had been informed of the 2050 parole year by clinicians and custody staff.  He was seen in the TTA on 9/1/14 because he had problems with his cellmate who he claimed threatened him.  He received five-day follow-up.  He was admitted to the CHCF MHCB on 9/16/14 for a problem with his cellmate; he apparently said he was suicidal or homicidal to get out of the cell.  He was discharged back to CSP/Corcoran and underwent five-day follow-up.  The inmate continued stating that his release date was in the next few months.  The inmate was housed with a different cellmate and was reported to be doing well.

Findings

The inmate's clinical care was adequate, but mental health did not seem to have a plan to address his delusions about his release date.

**Inmate I**

This EOP inmate's healthcare record was reviewed from the list of inmates on the restraint log. He was diagnosed with Schizoaffective Disorder, bipolar type and Polysubstance Dependence, in

a controlled environment.  The inmate received his psychotropic medications by court order (PC 2602), including Trileptal, Risperdal Consta, or Zyprexa injection.  The restraint log documented that the inmate was in restraints beginning at 1445 hours on 7/7/14 until 1330 hours on 7/8/14.

The psychiatrist's progress note on 7/2/14 stated "Cancel 5 point hold in crisis unit."  Another note written five minutes later stated "Discontinue the previous order of STAT Zyprexa injection and Risperdal Consta.  Inmate received Risperdal Consta in the yard today."  The restraint log did not indicate the 7/2/14 restraint.

Documentation on another clinical progress note dated 7/2/14, under subjective findings, stated that custody informed the clinician that the inmate refused his PC 2602 medication and refused to comply with instructions.  On a subsequent document also dated 7/2/14, there was a 128C-2 request by custody for pepper spray.

On 7/7/14, staff requested the inmate to allow a laboratory blood test, but he refused.  Documentation indicated the inmate was naked in his cell, refused to cover himself, and became verbally abusive to medical staff and the psychiatrist.  Clinical intervention was attempted and deemed unsuccessful.  Custody requested the OC pepper spray document form; medical risk was scored as "increased risk."  The inmate was extracted from his cell and placed into five-point restraints.

Findings

The inmate appeared to have been restrained on 7/2/14, but this was not documented on the restraint log presented for review, even though it was within the review period.  It did not appear that the 7/2/14 restraint was appropriately documented as required.

EXHIBIT M
California Substance Abuse Treatment Facility (CSATF)
April 27, 2015 - April 29, 2015

\

**Inmate A**

This 3CMS inmate's healthcare record was reviewed because he was newly transferred to the STRH to assess the treatment he received while housed in administrative segregation during the period prior to transfer, and during STRH placement.

This 58-year-old male was diagnosed with Major Depressive Disorder, recurrent, moderate. He was prescribed Prozac. He arrived at CSATF on 3/11/14. His remote history was significant for commencing mental health treatment at age nine, a reported court-ordered psychiatric hospitalization, significant substance abuse, a family history of mental illness, a head injury with loss of consciousness at age 15, and three reported suicide attempts in the early 1990s coinciding with his life sentence. At various times during incarceration, he reported auditory hallucinations and required EOP treatment and DSH placement.

The inmate was in administrative segregation following a 3/4/15 incident and subsequently was moved to the STRH. More recently, he experienced depressive symptoms including excessive sleep, low energy, and loss of motivation. During his March 2015 IDTT meeting, he was described as not interested in attending groups, but was noted to be willing to leave his cell for yard and PC weekly contacts.

At the time of his 4/1/15 PC contact, which was conducted at cell front due to "time constraints," he was upset about various issues not directly related to mental health treatment. This contact was not clearly connected with his treatment plan of reducing depression. A telepsychiatry contact on 4/6/15 focused on his history of multiple hospitalizations and PTSD, and noted medication trials of Abilify and Risperdal. Prozac was described as helping him be less angry and he was seen as fairly stable. In subsequent weeks, he refused confidential contacts and was seen at cell front.

There was a group note from the STRH dated 4/22/15 that indicated the inmate participated in group. However, the following day he refused a PC contact stating "I know that you are busy today … I don't have anything to talk about anyways."

Psych tech rounds regularly occurred following STRH transfer, but notes contained limited narrative.

Findings

Mental health staff saw the inmate at required Program Guide intervals. The mental health treatment he received was adequate while housed in administrative segregation and following transfer to the STRH. He apparently responded well to medication. However, his engagement in individual treatment was limited by his refusals and clinical time constraints. There also was no preparation for his transfer to the STRH either before or directly after this transfer. The treatment he received was not clearly connected with the IDTT's stated treatment goals.

**Inmate B**

This inmate's healthcare record was reviewed because he was recently transferred to the newly opened STRH.  He was transferred to CSATF at the 3CMS level of care on 12/10/13.  He had been treated at that level since 2011 due to anxiety and depression.  His diagnosis was Major Depression, recurrent, severe with psychotic features.  He was treated primarily with Wellbutrin.

The most recent IDTT meeting dated 4/2/15 did not have a psychiatrist's signature, but noted the inmate would be referred to psychiatry on an as needed basis.

An SRE dated 4/1/15 indicated multiple risk factors including a history of abuse, depressive or psychotic features, chronic medical illness, chronic pain, a history of suicide attempts, violence and substance abuse, and poor impulse control.  Acute risk factors included current or recent depressive symptoms, anxiety, mood disturbance, recent bad news, hopelessness/helplessness, current/recent violent behavior, recent change in housing, safety concerns, recent negative staff interactions, and recent disciplinary charge.  Protective factors included family support, the inmate's belief system, future orientation, regular exercise, having children at home, insight into his problems, a sense of optimism, and a job assignment.  He was assessed with a moderate chronic and low acute suicide risk.  An evaluation of the same day noted that he was prescribed Wellbutrin, his mother was sick, his children were being cared for by a sister, and during the preceding year his son was killed in a car accident.  The inmate's remote history was significant for childhood trauma and a 2012 admission to Patton State Hospital (PSH) for a competency evaluation.

Progress notes for March and early April 2015 indicated that the inmate was released by committee "back to the yard," was coping well, and did not wish to participate in group treatment.  However, on 4/22/15 a psychiatry progress note revealed that he had been returned to administrative segregation, which was a significant stressor for him.  His history of self-injurious behavior and his feelings of depression were noted.  It was thought that he would benefit from an increase in medication, and the plan was for his continuation in individual and group treatment.  A 4/22/15 PC progress note indicated he was feeling stressed and wanted to resume medications again.  No mention was made of his move to the STRH, which apparently occurred during a period of increased stress.

<u>Findings</u>

This inmate generally received adequate mental health treatment.  However, management of his transition to a new program at a time of increased risk was insufficient.

**Inmate C**

This inmate's healthcare record was reviewed as he was housed in administrative segregation while awaiting EOP hub transfer.  At the time of review, institutional documentation indicated he had been waiting 15 days to transfer, but the healthcare record review noted that he had been waiting for approximately four weeks.  His record was reviewed to evaluate the treatment he

received during this time. His diagnoses were Psychotic Disorder NOS and Polysubstance Dependence.

This inmate's history was remarkable for response to internal stimuli and command auditory hallucinations to commit suicide. His more immediate history was significant for an MHCB admission from 1/8/14 to 1/13/14 due to symptoms of psychosis and mania, which may have been related to substance abuse, and an additional MHCB referral on 2/25/15 for bizarre behavior which did not result in admission. Recent stressors included learning that his daughter might not be his biological child. His symptoms also led to confrontational behavior which required multiple housing changes.

The inmate's treatment plan was somewhat generic; it emphasized that his problem was psychotic symptoms and the goal was to decrease them. He was noted in some places to require language translation. He did not attend his most recent IDTT meeting on 4/22/15. A 4/9/15 IDTT meeting documented his placement in the EOP on 4/1/15 due to increased psychotic symptoms. He was noted to be a poor historian, but this was considered to be related to his impaired mental status.

A 4/3/15 PC note indicated that the inmate was not receiving psychotropic medications. At that time, he was diagnosed with Mood Disorder NOS. He was noted to have tape on his arm which he described as "activating the flat screen for his computer." He was described as malodorous, paranoid, illogical, delusional, and responding to internal stimuli. A PC saw him again on 4/8/15 related to an RVR for a battery on 2/16/15. At this point, he reported willingness to engage in a medication trial; documentation further indicated he was compliant with medication for 30 days in an effort to reduce symptoms.

During a contact on 4/9/15, he mimicked robot-like movements and delusional content was noted. On 4/15/15 he refused a telepsychiatry appointment. He was noted not to be on psychotropic medication at that time, and the psychiatrist informed staff to reschedule as needed. A 4/16/15 note indicated he was seen at cell front while resting on his mattress; the note indicated a mental disorder contributed to his RVR and that he reported medication compliance but did not appear to be taking medication. An additional note dated 4/16/15 stated that mental disorder did not appear to contribute to his RVR and if found guilty there were no mental health considerations for penalty mitigation. The inmate refused to leave his cell on 4/17/15 for an SRE, but was noted to appear stable. The most recent note at the time of review was dated 4/22/15 and was from an IDTT meeting which neither documented that inmate's level of care nor referenced psychiatry.

<u>Findings</u>

The mental health care that was provided to this inmate was insufficient. He did not receive sufficiently focused or sustained mental health follow-up or psychiatry referral during the time he awaited EOP hub transfer. There were conflicting RVR evaluations and differing reports of the start date for administrative segregation placement, while the issue of a possible language barrier with the inmate was not addressed in an ongoing fashion.

663

**Inmate D**

This inmate's healthcare record was reviewed because he was a 3CMS inmate housed in administrative segregation who was newly transferred to the STRH.  He was placed in administrative segregation secondary to enemy concerns.  His remote history was significant for substance abuse, child abuse, and witnessing domestic violence at home.  While incarcerated, he had a history of conflicts and cutting behavior leading to an MHCB admission in October 2014.  He had received various diagnoses, which were well-summarized in a recent IDTT meeting.  These diagnoses included PTSD, Bipolar Disorder, Mood Disorder NOS, Anxiety Disorder, Polysubstance Dependence, and ADHD.  More recently, he was prescribed Vistaril as needed for sleep.  He was provided with diagnoses of Adjustment Disorder NOS and Borderline Personality Disorder.  Problems which were to be a focus of treatment included anxiety, decreased sleep, and racing thoughts.

A recent IDTT meeting indicated a short-term goal of having the psychiatrist inquire of the inmate as to past experiences of anxiety, but the psychiatrist did not sign the treatment plan.  An IDTT from earlier in the year documented moderately depressed mood and indicated the inmate had weekly PC and monthly psychiatry contacts, and group treatment.  Notes from the first quarter of 2015 showed that he was referred to TCMP related to a planned release date in May 2015, and he was seen on 4/1/15 due to an emergency when he was concerned for his safety and stated that he would cut his wrist as needed to address the situation.  At that time he was placed in a holding cell.  His diagnosis was Mood Disorder NOS and hypothyroidism.  Around this time he was transferred to administrative segregation, where he refused a telepsychiatry appointment on 4/6/15, and it was noted his medication would expire on 6/8/15.  The ICC saw him on 4/9/15 regarding his safety concerns.  He was seen by the telepsychiatrist  on 4/14/15, when he was noted to be in no distress and talking about his release the following month.  Following his move to the STRH program, he was described as unhappy as he felt more isolated.

<u>Findings</u>

This inmate received minimally adequate mental health treatment which was hampered by a lack of diagnostic clarity and more clearly defined treatment goals.  Although he received a TCMP referral regarding a benefits' application, his pending release and preparation for that transition were not sufficiently addressed by his clinical contacts.  His healthcare record indicated insufficient attention to his transition to the STRH.

**Inmate E**

This inmate's healthcare record was reviewed because he was recently transferred to the STRH unit.

According to his most recent treatment plan dated 3/4/15, the inmate, who was serving a life sentence without parole, had been transferred to administrative segregation on 2/14/15.  He was

diagnosed with Anxiety Disorders NOS and Depressive Disorders NOS.  He was prescribed Remeron.

His history was significant for anxiety, depression, and difficulty functioning in the prison system.  He was assessed with low risk for suicide.

Progress notes from March 2015 indicated that the inmate was upset about his pending transfer to the STRH unit.  On 3/27/15 it was noted that he was depressed because his daughter reportedly stated she would commit suicide if he received a life sentence.  He reportedly felt pressure due to having a new cellmate and the move to the STRH program.  Progress notes later in April 2015 documented his increased anxiety, inability to focus, and generalized feelings of sadness.  A 4/14/15 telepsychiatry note discussed his ongoing depression and again focused on his distress about the pending move to the STRH program.  Remeron was started.  The theme of his distress about changing buildings was again prominent during a 4/17/15 session with his PC.  On 4/23/15 a psychiatrist was not present during his IDTT meeting, but the psychiatrist subsequently saw the inmate.

<u>Findings</u>

While overall this inmate received minimally adequate treatment, his difficulty with the transition to the STRH unit was not sufficiently addressed.  The expert observed the inmate attending and making constructive use of a group treatment session during the site visit.

**Inmate F**

This inmate's healthcare record was reviewed because he was newly transferred to the STRH unit.  He was also interviewed by the expert after refusing to attend group.

This 51-year-old arrived in administrative segregation on 2/27/15.  He was subsequently released to the yard, but returned to administrative segregation secondary to enemy concerns.

The inmate was diagnosed with Bipolar Disorder NOS and Borderline Personality Disorder.  His medication history included the following psychotropic medications:  Zoloft, lithium, Haldol, Thorazine, Wellbutrin, and Buspar.  He also received hormone replacement treatment.  He had an extensive psychiatric history that included a number of inpatient hospitalizations, including a 2013 stay at DSH during his incarceration, and outpatient community treatment since early childhood.  His history was also significant for sexual abuse and a family history of schizophrenia.  He reported over 100 suicide attempts, mostly related to a period more than ten years ago when he underwent significant stress related to gender identity issues.

He was assessed with moderate risk for suicide; some mental health assessments also discussed possible Parkinson's disease and signs of dementia.  He was described as resistant to engaging in clinical interviews, but was at times eager to discuss issues related to his confinement, which he found relevant to his emotional well-being.  Relatedly, he requested removal from the mental

health caseload. Although most suicide attempts occurred during the 1980s, there had been a recent suicidal threats "for secondary gain."

Weekly progress notes for April 2015 revealed that the inmate was seen at cell front after refusing to attend his IDTT meeting. He attempted to discuss custody issues and requested removal from the mental health caseload. He also refused a telepsychiatry appointment in March 2015.

Findings

This inmate was offered mental health services on a regular basis, but was not engaged in treatment. His focus was on issues related to being a transgendered individual in prison and with various custody issues. Attempts should have been made to engage him regarding these issues. Overall, his treatment was minimally adequate, but efforts were hampered by his ongoing treatment refusal. There was also a need for diagnostic clarity, which would have helped to better focus his treatment planning.

**Inmate G**

This EOP inmate's healthcare record was reviewed from a quarterly list of inmates discharged from DSH to CSATF. He was diagnosed with Schizoaffective Disorder, depressed type, and he was prescribed loxapine, Remeron, and Melatonin.

The inmate arrived at CSATF on 2/11/15. The bus screen was completed and noted that the inmate utilized a wheelchair. The Form 7230A dated 2/11/15 stated that wellness checks were completed, and the inmate was seen in the TTA treatment modules, retained at the EOP level of care, returned to custody, and sent to the EOP yard. Five-day follow-up began on 2/12/15.

The inmate was hospitalized at DSH from 8/20/14 to 2/11/15. He was struck by a car at age ten, sustaining an unspecified brain injury, and thereafter experienced ongoing auditory hallucinations. He began using illicit drugs and by the age of 20, was addicted to intravenous heroin. The inmate had received mental health services at all levels of care in the past including DSH stays at Metropolitan Hospital and most recently at ASH. In the DSH discharge summary, the inmate stated he attempted suicide by overdose on many occasions, but he also told CDCR staff that there were no suicide attempts in the past. The mental health section of the ASH discharge summary reported that the inmate looked "dis-shelved, unshaven, long uncombed hair, poor grooming." The discharge plan was written and signed on 1/30/15, two weeks prior to the transfer from DSH.

On 2/15/15 the inmate was seen in the TTA for suicidal and homicidal threats. He reported that voices were telling him that if he was returned to the general population yard, he would kill himself and others if he felt threatened. The inmate was recommended for MHCB treatment.

<u>Findings</u>

This inmate's clinical documentation was adequate.  However, the near two-week lag between the ASH-documented discharge plan and his actual DSH discharge, the inmate's report of ongoing auditory hallucinations, and inadequate monitoring after DSH discharge were problematic.

**Inmate H**

This EOP inmate's healthcare record was reviewed from a quarterly list of inmates discharged from DSH to CSATF.  The DSH coordinator's roster indicated that he did not receive the mental status exam or SRE within Program Guide timeframes.  He was diagnosed with Schizoaffective Disorder, bipolar type.  He was prescribed olanzapine, Remeron, Buspar, and chlorpromazine. The Form 7277 was completed on the correct form and the inmate was appropriately referred for mental health services.  He arrived at CSATF on 3/17/15 and was seen in the TTA in a treatment module on 3/18/15.  The clinician noted his history of significant suicide attempts.

The Form 7388 was completed on 3/26/15.  PC contacts were completed on 3/26/15, 4/1/15, 4/6/15, 4/13/15, and 4/20/15.  No other scanned documentation was available after the Form 7230A dated 4/20/15.  On 4/6/15, the inmate continued to report auditory and visual hallucinations that were not addressed by prescribed medications.  The PC documented in the treatment plan that the clinician would work to have the inmate see a psychiatrist.  The 4/13/15 PC contact indicated the inmate continued to have auditory hallucinations with paranoia and delusions, but there was no mention of referring him to the psychiatrist for medication evaluation.  The 4/20/15 PC note stated the inmate was anticipating leaving prison, noting "I just want to get the last six months over with and get out of here."  The clinician reported the inmate had auditory hallucinations with paranoia and delusions.  The clinician's plan stated "Continue with EOP level of care and working on reality testing with I/P, work on coping skills to help I/P manage stress related to college and EOP program."  There was no mention of a psychiatry referral, and a psychiatry note following DSH discharge was not located in the healthcare record.

Clinical documentation indicated the inmate transferred to Coalinga State Hospital on 2/14/15. There were group notes dated 2/24/15, 2/25/15, 2/26/15, and 2/27/15, and an SRE was completed on 2/23/15.  The chief of mental health reported problems with staff documenting that the inmate refused groups even though he had been transferred from the institution.  The chief of mental health also reported that the clinician completed the SRE on 3/24/15, not 2/24/15, and that this error would be corrected.

<u>Findings</u>

The clinical care provided to the inmate was inadequate due to the lack of a PC referral of the inmate to psychiatry when he continued to experience auditory hallucinations with only six months to parole.  There also was inaccurate documentation of the inmate's group refusal when he was no longer at the institution.  The chief of mental health stated that supervisors were correcting group documentation errors.

**Inmate I**

The inmate's healthcare record was reviewed from a list of MHCB inmates awaiting IDTT meetings.  He was admitted to the MHCB on 3/4/15 and was awaiting an acute care DSH bed.  He was diagnosed with Schizophrenia, undifferentiated type; he was prescribed Zoloft and Vistaril, but he was nonadherent with these medications.

On 3/3/15, the PC received a psych tech referral that stated the inmate was confused, disoriented, withdrawn, hearing and seeing things; a recommendation was made for a psychotropic medication review.  The referral stated that the inmate had not taken his medications for several days.  The same note indicated that he stated he had not taken medication for approximately two weeks.  The healthcare record included two clinical notes by the PC with the same date and time that documented the inmate's level of care as 3CMS in one area of the note, and EOP level of care in another section.  The SRE, mental health evaluation, and Form 7320A (referring to MHCB) all completed on 3/5/15 noted the inmate was receiving services at the EOP level of care.  The only documentation dated 3/4/15 was of psych tech daily rounds and a refusal form for Zoloft and Vistaril; there were no clinical notations for 3/4/15, which was the day after the psych tech referral.  The inmate was housed in administrative segregation prior to the MHCB referral.

Prior documentation noted that the inmate heard at least 50 voices.  Some voices were protective of him, while others were trying to hurt him.  He was seen by a clinician and referred to the MHCB on 3/5/15.  A psychiatric progress note dated 3/14/15 noted the inmate reported not wanting to take his medications.  Staff also reported that the inmate exhibited manic and psychotic behaviors when housed in administrative segregation, and this bizarre behavior continued.

On 3/30/15 a DSH referral packet was completed and sent to headquarters.

The progress notes indicated the inmate wanted to return to administrative segregation.  On 4/1/15 he continued to state that he was being held against his will; he was also upset that the usual clinician was not conducting rounds.  On 4/2/15, the clinician completed a 115 mental health assessment, concluding that the inmate's mental illness impacted his behavior.

The healthcare records review noted that either Friday or Saturday progress notes were absent for 4/4/15, 4/10/15, and 4/15/15, indicating that the inmate was not seen daily while housed in the MHCB.

<u>Findings</u>

The inmate's clinical care was inadequate.  Daily MHCB clinical rounds were not consistently conducted in accordance with the Program Guide.

**Inmate J**

This inmate's healthcare record was reviewed following his identification on a MHCB length of stay report.  He was admitted to the MHCB on 12/18/15.  His DSH referral package for intermediate care was completed on 1/27/15 and sent to headquarters on 2/5/15.  A CCAT meeting was held on 3/19/15 and the DSH referral was rejected.  The institution appealed the rejection and, at the time of the site visit, a final decision had not yet been received.

The inmate was diagnosed with Schizophrenia, paranoid type.  He was prescribed Zyprexa and chlorpromazine.  He was referred to the MHCB for suicide ideation, discharged on 4/2/15, readmitted on 4/3/15, and released to the yard on 4/8/15.  On 4/21/15, a mental health prescreen was conducted, and the inmate was placed in an alternative housing cell on 4/22/15.  The suicide watch reports in the healthcare record indicated that the inmate remained in the alternative housing cell from 4/22/15 to 4/24/15; he was transferred to CHCF on 4/25/15.

The inmate's prior DSH stay occurred from 3/26/14 to 9/22/14, when medication nonadherence was noted.  There was a lack of documentation in the healthcare record from 9/22/14 to 10/15/14.  Documentation indicated that the inmate returned to CSATF on 10/15/14, when he was placed on the yard for one hour and was then placed into an alternative housing cell for an evaluation.  Although he was housed in alternative housing and the MHCB, there were no clinical notes on 10/21/14, 10/23/14, or 10/24/14.  A CDCR clinician's verbal report indicated that the inmate had a history of using mental health services for secondary gain to avoid programming, housing refusals, and for safety concerns.

Findings

The inmate's clinical care was inadequate because daily MHCB contacts were not performed and documented as outlined in the Program Guide.

EXHIBIT N
Pleasant Valley State Prison (PVSP)
April 21, 2015 - April 23, 2015

**Inmate A**

This inmate was selected for review as the rationale for his extended MHCB stay was unusual; the rationale was "continued monitoring of behavior given incongruent presentation." This 29-year-old first term inmate was receiving mental health services at the 3CMS level of care prior to his MHCB admission. He had been housed in administrative segregation at PVSP when he was admitted at 1815 hours on 11/18/14, on suicide watch. According to the history and physical completed the next day, he was found in his cell in a pool of blood and had required a transfusion of four units of blood. The CDCR treating physician estimated blood loss due to the cutting of his left arm to be one liter. The inmate also experienced fecal incontinence during his suicide attempt. He was sent to an outside hospital for treatment and was admitted there for ongoing care. He returned to PVSP on 11/18/14, and was admitted to the MHCB.

This inmate was diagnosed with Schizoaffective Disorder. He had previous psychiatry referrals for medication nonadherence after he was prescribed Haldol 10 mg at night on 9/8/14 for auditory hallucinations. He reportedly had feelings of suicidality during September 2014, but he subsequently denied this, stating to the clinician on 9/5/14 that the auditory hallucinations had become severe and he wanted to resume medications. He, however, did not remain medication adherent. A handwritten progress note dated 11/15/14 in the eUHR suggested that the inmate may have been seen due to medication nonadherence. The clinician indicated continuation with the current treatment plan. The treatment plan, however, at that time was inadequate and did not include specific recommendations beyond self-help.

Once admitted to the MHCB, the initial treatment plan was completed within 72 hours. The treatment plan dated 11/20/14 noted the recent death of the inmate's brother. The inmate reported conflicting information regarding his inpatient history prior to CDCR admittance, although that was his first MHCB admission. The treatment plan did not include an actual clinical summary or conceptualization of the inmate's care.

The inmate had had an impending release date of either February or April 2015, but reported feeling anxious about the release date and feeling isolated from his family. The treatment plan merely reiterated the Program Guide MHCB requirements. When seen by the psychiatrist on 11/20/14, the inmate was prescribed Zoloft 50 mg per day in addition to Haldol 10 mg per day and Cogentin 1 mg per day.

The treatment team met with the inmate again on 11/26/14, when he continued to deny a history of substance abuse; this was consistent with the absence of drug-related charges located in his C-file. He reported improvement to the treatment team, although they acknowledged his self-report was not consistent with his history and the serious suicide attempt. This was clearly what was referenced when the treatment team decided to retain the inmate beyond ten days. However, the final treatment plan dated 12/1/14 was identical to the previous one dated 11/26/14; it appeared to be cut and pasted with minimal changes, merely providing Program Guide standards in lieu of actual treatment interventions. The Form 7388B noted that the inmate met criterion four of more than ten days in an MHCB, but further stated that he was only maintained in the MHCB to allow

671

for the removal of sutures.  However, it was observed that this reason was contradicted in other documents and that the sutures were removed on 11/19/14.  While no SRE was completed upon the inmate's admission, one was completed at discharge; the inmate was assessed with moderate chronic and low acute suicide risk.  This assessment, however, appeared to be based on incorrect information and it appeared more likely that he had a higher acute suicide risk.

Based upon the progress notes by the psychologist, it appeared that the eUHR was not reviewed or that communication with the psychiatrist occurred.   For example, on 11/23/14 the psychologist stated the inmate was not taking psychotropic medication when he had been prescribed Zoloft since 11/20/14; the inmate had been refusing Haldol and Cogentin.  The inmate was not seen at all on 11/25/14 or 11/26/14.  Most of the psychology progress notes appeared to have been cut and pasted, including the same information each day, with little relevant clinical content and no documentation that appropriate treatment had occurred.  Despite the severity of the inmate's suicide attempt, the report of his brother's death as a trigger and the seeming relationship of the increase in hallucinations to the timing of the suicide attempt, document review indicated that MHCB clinical staff never addressed these important issues during the inmate's treatment.  Eventually the inmate's level of care was increased, and he was transferred to another facility.

Findings

This inmate received inadequate treatment while housed at PVSP.  He did not have an appropriate treatment plan while at the 3CMS level of care.  When he reported increased symptoms while still in the 3CMS program, the treatment plan was not modified in response.  His treatment remained inadequate once he was admitted to the MHCB following a very serious suicide attempt.  The treatment plan was minimal and contained only the Program Guide minimum standards for clinical contact rather than actual therapeutic interventions.  He was not properly evaluated while in the MHCB and did not receive an accurate SRE upon discharge; he received no SRE at admission.

**Inmate B**

This 34-year-old 3CMS inmate was selected for review as his length of stay in the MHCB exceeded ten days.  He was housed in the MHCB for 20 days due to initial "non-compliance."  He was admitted on 1/28/15, with an admission diagnosis of Adjustment Disorder with mixed anxiety and depressed mood.  The nursing admission assessment and history and physical were completed timely.  An SRE was completed at admission which assessed moderate acute and chronic suicide risk.  An initial psychiatric evaluation completed on 1/29/15 noted that he was admitted after reporting that he had been cutting on his arm the day prior to admission.  He was angry because his original release date was during that time, but an RVR had extended that date.  He reported conflict on the yard that he had reported to custody which had not been resolved, and increased isolation due to reduced programming status.  He was not prescribed psychotropic medication.

672

The initial treatment plan dated 1/29/15 included Program Guide standards as interventions and did not operationalize treatment targets or goals. It did not address the inmate's poor frustration tolerance. The treatment team saw him next on 2/2/15, and the clinical summary in the treatment plan dated 2/2/15 was cut and pasted from the prior treatment plan dated 1/29/15. In fact, the entire treatment plan was identical to the initial treatment plan. This was also true for the subsequent treatment plan dated 2/9/15. The Form 7388B for 2/9/15 indicated the reason for DSH non-referral was that the inmate "became accepting of treatment one day prior to this IDTT." However, there were no treatment modifications or indications of a difference in the inmate's behavior. The inmate was also not seen on 1/30/15.

At the time of review, the inmate had less than 60 days until parole; he was concerned because he had only 24 points, but he was on a Level III yard. He stated that he felt he had previously been mistreated when he received five months of "c status" for fighting due to what he considered an act of self-defense. The inmate expressed a desire to serve the remainder of his time in MHCB. He reportedly planned to spend the remainder of his time in his cell except for meals. Progress notes documented no acute symptoms and high functional ability. There appeared to be no clinical reason to maintain this inmate in the MHCB. However, mental health staff did not address his anxiety regarding problems on the yard which interfered with his release or work with custody staff prior to his return to the yard as would have been indicated. The inmate admitted that the self-inflicted injury on his arm was due to frustration and was not an attempt to kill himself.

On 2/7/15, restraints and emergency medications (Haldol 10 mg injection and Cogentin 1mg injection) were ordered due to agitation and yelling with blood present on the floor and on the inmate. He verbally refused medication and an evaluation. It was ultimately determined that he had a 1 cm self-inflicted injury on his elbow. He was not immediately removed from restraints; although he met removal criteria. While the order clearly allowed the inmate to be removed once he met criteria, nursing notes documented a request for an order to release prior to removing the inmate; this resulted in the inmate remaining in restraints longer than necessary. He also had a dystonic reaction from Haldol involving his tongue; this was treated with Benadryl.

Following the restraint episode, the inmate reported to his treatment team that he had been struggling with depression since his father's death approximately one year prior. Custody staff reported that he was increasingly isolative with poor hygiene since that time. The psychiatrist initiated a trial of Geodon 40 mg twice per day.

After days of improvement, the inmate asked to speak to the psychologist and shared delusional thoughts that he was the planet Neptune and other thoughts about his tattoos being affected by inmates from other institutions. He also was described as ruminating on his case and his release from prison. The psychology progress note suggested that the inmate was not psychotic and might be expressing what he believed were delusional thoughts in an effort to remain in the MHCB. Documentation did not support that an adequate assessment of these new symptoms occurred. The inmate maintained some of these delusional beliefs with the psychologist, but there was no evidence that he reported them to the psychiatrist, although the psychiatrist

673

maintained a provisional diagnosis of Psychosis NOS.  The progress notes did not support
continued MHCB placement prior to the delusional symptoms or a reason why the inmate was
not discharged with a plan for diagnostic clarification within the 3CMS or EOP.

No actual treatment occurred during the MHCB admission and the underlying reason for the
inmate's MHCB admission was never addressed.  The discharge treatment plan dated 2/17/15
remained the same as the initial treatment plan, except it stated that the inmate was being
discharged.  While it indicated the inmate was of sufficient stability for discharge, it contained
no further information to support the discharge decision or to distinguish it from prior treatment
plans.  Not surprisingly, the inmate was readmitted on 2/18/15, yet he was not seen by the
treatment team until 2/23/15.  That treatment plan noted that the inmate lied about planning to
cut himself if not released from prison that day because he wanted to get off the yard for his
safety.  It was unclear how the team determined that the inmate was lying.  His safety concerns
were noted to possibly be valid.  Although the clinician indicated that the inmate had genuine
delusions, the diagnosis remained Adjustment Disorder with mixed anxiety and depressed mood
and only a rule-out diagnosis of Delusional Disorder.  There was a high degree of secondary gain
that this inmate had readily admitted to and he required a comprehensive diagnostic evaluation.
There was no such evaluation located in his eUHR, and no treatment plan was located beyond
that in the MHCB.

Findings

This inmate was not adequately treated.  While he had a high degree of secondary gain, he also
presented with serious and complex symptoms that required a comprehensive diagnostic
evaluation, which did not occur.  He also presented staff with several reasons underlying his self-
injurious behavior that should have been a treatment target during his initial MHCB admission,
but were not.  There really was no treatment plan as the plan itself simply restated Program
Guide standards.  Progress notes documented that no treatment occurred until far into the MHCB
admission when medication was initiated and medication management began.  The lack of
treatment was blamed on the inmate according to the Form 7388B dated 2/9/15, but
documentation indicated that it was actually due to the lack of a treatment plan.  The inmate was
then maintained in the MHCB beyond ten days without clinical justification when documentation
indicated that he was stable.

If the inmate did not have a major mental illness and was trying to manipulate staff for secondary
gain to remain off the yard, this made it all the more important that a targeted treatment plan be
developed and implemented.  If he was experiencing acute mental illness symptoms, then proper
higher level of care referral consideration should have occurred; however, this did not occur
based on available documentation such as the Form 7388B.  The staff used inappropriate
justifications for non-referral and did not modify treatment to address the factor(s) that initially
resulted in referral consideration. The inmate was also maintained in restraints longer than
necessary because nursing staff would not remove them until they had a physician's order;
despite the original order allowing removal when the inmate met specific criteria.

**Inmate C**

This case was selected for review because it had been included in the DSH coordinator's audits of Form 7388Bs. The inmate was admitted to the MHCB on 2/2/15 and he remained there for 11 days due to transport problems with his sending facility. He was a treat and return from WSP who had been clinically discharged on his tenth day of admission. His initial treatment plan was completed timely on 2/5/15 and included Program Guide requirements, as well as an effort to address one of the underlying causes of his MHCB admission, which was his anxiety over his impending release. The treatment plan identified in the audit (2/12/15) noted criterion four, which was ten or more days in the MHCB, although the inmate was being discharged that day. He was prescribed Buspar and venlafaxine. He was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood. The justification for retaining him in the MHCB was that staff wanted to observe him after his antipsychotic (Risperdal) medication was discontinued on 2/5/15.

Findings

This inmate received appropriate care while at PVSP's MHCB. His medication regimen was reviewed and modified based on his reported symptoms. The treatment plan, while still inappropriately including Program Guide requirements, addressed one of the underlying areas of concern that precipitated his MHCB admission and was a focus of treatment during the MHCB admission. The inmate's length of stay appeared appropriate in light of treatment and was supported by clinical documentation.

**Inmate D**

This case was selected as an example of MHCB care and an audit case from the PVSP DSH coordinator. This 24-year-old EOP inmate was admitted to the MHCB on 12/30/14 and discharged on 1/5/15 after swallowing two razor blades. His SRE indicated that this was his fifth MHCB admission during 2014. However, the Form 7388B dated 1/2/15 did not note the multiple MHCB admissions within 6 months (criterion five). The inmate's nursing assessment and history and physical were completed timely. The SRE and initial psychiatric evaluation were performed on the day after admission. No SRE was completed at discharge, as required. The initial psychiatric evaluation indicated the inmate had the razor blades removed by an outside hospital prior to arriving at PVSP.

The inmate had a long history of self-injurious behavior and prior suicide attempts. He was prescribed oxcarbazepine and risperidone   He was provided with a diagnosis of Adjustment Disorder with mixed emotions and conduct chronic with a provisional diagnosis of Schizoaffective Disorder, bipolar type. Only one treatment plan was located during the review period which included only Program Guide requirements, rather than actual interventions. There was no discharge treatment plan, which suggested that the inmate was discharged without the treatment team convening. The MHCB treatment team diagnosis remained Adjustment Disorder despite the inmate's EOP level of care and symptomatology. The EOP treatment team had

675

previously provided the inmate with diagnoses of Major Depressive Disorder, moderate and Antisocial Personality Disorder (CDCR 7388 addendum 12/03/14).

Findings

This inmate was not properly considered for a higher level of care because the MHCB treatment team failed to recognize his multiple crisis placements within the last six months. In addition, he was not adequately treated while in the MHCB. He had multiple crisis placements and his self-injurious behavior continued to escalate to the point that he required medical intervention. Nonetheless, his MHCB treatment plan included no operationalized treatment targets or goals and listed only Program Guide requirements as interventions. It did not address his reason for returning to the MHCB. The inmate needed an improved treatment plan and consideration for DSH level of care. This inmate did not receive adequate treatment.

**Inmate E**

This 59-year-old EOP inmate was selected for review because he had been in the PVSP MHCB and was listed in the DSH coordinator's audits because he had been in the MHCB for more than ten days. He was admitted to the MHCB on 12/21/14 and was physically discharged on 1/16/15. He had been extremely disruptive at his home institution, refusing to wear clothes, laughing loudly to himself and engaging in conversations with himself, and urinating on the floor, with erratic mood swings. He had reportedly been nonadherent with medication because he had wanted to prove that he could function without them. He had a history of acutely psychotic behavior when not taking psychotropic medication that dated back three decades.

While in the MHCB the inmate became increasingly agitated during a medical exam on 12/24/14 and assaulted an officer, necessitating the use of restraints with Haldol and Benadryl injections. He was started on emergency medication on 12/26/14 for danger to others after refusing medication on 12/25/14. He was prescribed Risperdal and Cogentin with intramuscular backup if oral medications were refused. This was changed on 12/29/14 to Haldol and Cogentin, and a PC 2602 order was granted on 1/15/15. All initial assessments were completed timely. An SRE was also completed at discharge. The inmate was diagnosed with Schizoaffective Disorder.

The inmate's treatment plan was inappropriate for the MHCB because it provided 3CMS Program Guide requirements as interventions. The treatment plans remained unchanged throughout the inmate's MHCB stay. The Form 7388B dated 1/8/15 indicated that a DSH referral was not initiated because the PC 2602 was pending. No treatment modifications were listed, only the continued same treatment interventions that had been in place since the prior treatment plan (12/29/14); however, the DSH coordinator had incorrectly indicated that this Form 7388B listed treatment modifications. The next Form 7388B, dated 1/15/15, continued with the same limitations and the associated 7388B (positive criteria two and four) noted that the inmate remained in the MHCB so the treatment team could observe the effects of involuntary medication and await a PC 2602 hearing. The explanation also indicated that the team would continue to assess the inmate's baseline with medications to determine whether EOP or DSH was the most appropriate level of care and that the inmate would next be seen by the IDTT on

676

1/20/15. However, the inmate was never seen again by the treatment team. There were no actual treatment modifications, but audit results incorrectly indicated that the Form 7388B had included treatment modifications.

Findings

Involuntary medications were appropriately initiated for this inmate while he was housed in the PVSP MHCB; however, his treatment plan did not include other appropriate interventions and was overly vague. The treatment plans did not change over time and were simply cut and pasted for each treatment team meeting. The Form 7388B provided adequate clinical justification for not referring the inmate to a higher level of care, but did not include treatment modifications; instead it simply restated the standard MHCB treatment or the pending PC 2602. The DSH coordinator's audit findings were inaccurate. With the exception of medication management and initiation of the PC 2602, this inmate's treatment while in the MHCB was inadequate.

**Inmate F**

This case was selected as an example of MHCB care and a case that was audited by the DSH coordinator. This 49-year-old EOP inmate was admitted to the MHCB on 10/10/14 and discharged on 10/20/14. The nursing assessment was timely conducted, but the history and physical was completed late. The initial psychiatric evaluation was completed by a psychologist. No SRE was conducted upon MHCB admission, but one was performed at discharge.

The inmate's initial treatment plan dated 10/13/14 included a clinical summary that could not be fully viewed. The inmate had a history of state hospital admissions with two occurring at ASH and one occurring at Napa State Hospital; the longest hospitalization occurred for six years. He also had four community hospitalizations for Welfare and Institutions Code 5150. The treatment team diagnosed him with Schizoaffective Disorder, depressed type, and identified depression and psychosis as problem areas. Short term treatment goals were actually Program Guide requirements for mainline 3CMS inmates. The treatment plan was clearly inadequate. The Form 7388B indicated the inmate had three or more MHCB admissions and should be considered for higher level of care referral. The clinical justification for not referring him to DSH was that it was his initial IDTT meeting; given the volume of available information, this was an inadequate justification. There were no treatment modifications, but only the standard MHCB treatment was listed.

The subsequent treatment plan dated 10/20/15 contained the same limitations as it was cut and pasted without changes. The Form 7388B indicated that he met criteria four and five (MHCB admission for ten or more days and three or more MHCB admissions). The reason provided on the Form 7388B for non-referral was generally appropriate, although somewhat confusing; the rationale was that he was stable and had responded to treatment. The treatment team also reported the inmate had exhibited no acute symptoms during his admission. It was unclear why the team believed that a ten-day hospital stay was necessary if the inmate demonstrated no acute symptoms, and the rationale did not address his multiple MHCB placements. As this was a discharge IDTT, the listed treatment modifications were actually standard discharge orders.

Findings

This inmate's treatment was adequate.  However, it was unclear whether he should have been referred to a higher level of care because the non-referral rationales were not clinically sound.  If the inmate truly did not need a higher level of care, then the treatment team should have more appropriately documented the clinical rationale and addressed the positive criteria.  The same was true for the treatment modifications.  The treatment plan was poor and did not specify any actual therapeutic interventions beyond medication management.  The inmate responded well to psychotropic medication and improved during his MHCB admission.

**Inmate G**

This case was randomly selected from the PVSP roster of inmates at the 3CMS level of care. The purpose of the review was to assess the mental health care provided to this inmate during the review period.

The inmate was housed on D-3.  He was provided with a diagnosis of Adjustment Disorder with depressed mood and was not prescribed psychiatric medication.

Medical records indicated the inmate received mental health counseling for child behavior problems.  There was no history of psychiatric hospitalization before coming to prison in 2004. He was initially enrolled in the 3CMS in 2005 when he was prescribed Paxil to treat symptoms of depression following his grandmother's death.  He was routinely re-enrolled in the 3CMS based on a diagnosis of Adjustment Disorder with depressed mood.

During the review period, the inmate was seen by the PC on 9/11/14 and 12/18/14. Progress notes on both dates were brief and identical to one another.  On 1/22/15, a progress note consisted of checked boxes.  Treatment team members retained the inmate at the 3CMS level of care and directed the reader to an undated Form 7386.  However, no Form 7386 was located among available records.  A Form 7388B note was completed.

The inmate's annual mental health treatment plan of 1/22/15 was sparse.  It documented a normal mental status.  The diagnosis of record was retained.  Although inmate progress was not discussed, review of past treatment plans indicated he had been functioning adequately without medications since 2011.  The current plan did not refer to other adjunct services which might benefit him.  His name was not included on any of the eight group treatment waiting lists.  No evaluation of suicide potential or violence was found in the medical record.  There was no discussion of whether the inmate's Adjustment Disorder had been effectively resolved.

Findings

There was no meaningful review of the inmate's progress to ascertain the need for his repeated re-enrollment at the 3CMS level of care.  It was not apparent from review of the treatment plan or progress notes whether any meaningful clinical intervention was being provided.  There was inadequate clinical documentation to support the diagnosis of record.  There was no mental

678

health evaluation or suicide risk assessment found in the healthcare record. The inmate was not receiving clinical services consistent with Program Guide requirements.

**Inmate H**

This case was randomly selected from the PVSP roster of inmates enrolled in the 3CMS during the site visit. The purpose of the review was to assess mental health care provided to the inmate. According to chronological records as far back as 2007, the inmate was enrolled in the 3CMS based on a qualifying diagnosis of Bipolar Disorder. He was treated with antidepressant medication. On 3/4/08, he was cleared for placement in the general population; he was removed from the mental health caseload on 10/8/08.

On 1/15/15, the inmate was placed in administrative segregation due to a kite on the yard. A pre-placement chrono was timely completed and he was cleared for administrative segregation placement. He was either unable or unwilling to participate in routine mental health screening. He was referred for further evaluation, but no mental health evaluation was located in the eUHR.

On 1/16/15, the inmate submitted a healthcare request stating he was stressed out and needed to get back on his medication. He described his mood as depressed. All other aspects of mental status were documented within normal limits. He was placed in the 3CMS program pending IDTT approval with a diagnosis of Major Depressive Disorder, moderate. He was seen in regular psych tech rounds until 1/22/15, when he transferred to the yard. A formal SRE was not located in the eUHR.

The IDTT met on 4/16/15. The inmate's inclusion in the 3CMS was affirmed based on a diagnosis of Bipolar Disorder. This diagnosis appeared predicated on historical experiences of depression, anger, mood swings, and a 25-year history of methamphetamine use. During the team meeting, the inmate reported stable symptoms, and the treatment team noted he did not appear to be in acute psychiatric distress. No psychotic symptoms were observed or reported.

<u>Findings</u>

The inmate received timely psych tech rounds and PC contacts consistent with the Program Guide. However, there was no updated mental health evaluation or suicide risk assessment. The inmate's current inclusion in the 3CMS program appeared predicated on historical factors. Conflicting diagnoses were offered, but there was no discussion of efforts to reconcile them, or plan to evaluate further. The inmate did not continue to report stress or significant mood problems. He declined treatment with psychiatric medication, and none was prescribed. Records did not contain documentation of symptoms that met diagnostic criteria for a major mental disorder. Based on these factors, it was not possible to determine whether this inmate had been appropriately placed in the mental health caseload or whether provided care was adequate.

**Inmate I**

This case was reviewed because the expert attended the inmate's IDTT meeting. The inmate also participated in a group interview conducted by the expert. The purpose of the review was to assess mental health care provided to the inmate.

The inmate was housed on D-3. He was provided a diagnosis of Major Depressive Disorder, recurrent, mild. He declined treatment with psychiatric medication.

The inmate was previously treated in the 3CMS program from 2011 to 2013. This followed admission to the crisis bed in July 2011 for suicidal ideation. His history included a 2007 attempted hanging and an attempted overdose at age 13. He was prescribed Risperdal and Zoloft to treat a Major Depressive Disorder with psychotic features. By 2012, the psychiatric disorder was in full remission. He was removed from the mental health caseload on 10/3/13. Since that time, he had participated in institutional groups consisting of art therapy, writing, and poetry. He also participated in a religious group activity and held a prison job in the dining hall.

The inmate's re-enrollment in the 3CMS was predicated on results of a mental health evaluation which diagnosed recurrence of depressed mood associated with family problems and an upcoming prison transfer. He was noted to dwell on negative thoughts and isolated himself when depressed. He presented with a sad mood and appeared to be continually on the verge of tears throughout the IDTT meeting. There was no psychiatrist in attendance, but the clinician offered him a psychiatric referral, which he declined. A treatment plan was developed with goals written in language that he could understand. Factors indicating the need for more intensive care in the EOP or DSH were not directly discussed with him, but were considered and placed in the record. The clinician appropriately addressed the inmate's concern about continuity of treatment once he arrived in the new prison. The PC offered to meet with him more frequently prior to his transfer. The CC I attempted to provide him with an anticipated transfer date. The inmate positively received both interventions.

Findings

The inmate was appropriately enrolled at the 3CMS level of care to treat a recurrent episode of Major Depressive Disorder. The mental health care provided to the inmate was adequate.

**Inmate J**

This case was randomly selected from the PVSP roster of inmates enrolled in the 3CMS at the time of the site visit. The purpose of the review was to assess the mental health care provided to the inmate.

The inmate was housed on D-2. He was provided a diagnosis of Bipolar Disorder, most recent episode unspecified. He was prescribed Celexa to treat symptoms of his psychiatric disorder.

The inmate was initially enrolled in the 3CMS on 3/18/13 predicated on a diagnosis of Bipolar Disorder.  Records reflected a 10-year history of community psychiatric treatment, including several emergency detentions per W&IC 5150 and outpatient medication management.  Past psychiatric medications included Lamictal, Remeron, Vistaril, and Abilify.  An initial SRE assessed a low chronic risk of suicide, with the inmate denying a history of suicide attempts, and a low acute suicide risk.  There was no history of treatment in the MHCB, EOP, or DSH during this prison term.

The governing mental health treatment plan was prepared on 7/22/14.  The inmate was noted to have benefitted from current psychiatric medications.  Long-term and short-term goals reflected the inmate's educational aspirations, such as completing college level courses.  He was on the waiting list for an anger management group.  Treatment team members reviewed indicators that could suggest consideration for higher level of care treatment.  There were no positive indicators and his level of care was reaffirmed at 3CMS.

A psychiatric consultation on 9/5/14 included a diagnosis of Mood Disorder NOS, which was not consistent with the diagnosis of record.  The psychiatrist considered a possible diagnosis of Bipolar Disorder, noting the inmate had self-reported the diagnosis and attributed it to a single manic episode while on cannabis.

A medication adjustment was made due to reported side effects.  Psychiatric follow-up on 9/26/14 noted the inmate was satisfied with medication changes.  Follow-up on 12/2/14 reflected that he continued to benefit from prescribed medications.

The clinician saw the inmate on 10/3/14.  He reported that he was doing well, but was experiencing undefined stress and anxiety.  The clinician's plan was to continue with treatment goals as developed in the IDTT meeting and follow-up with the inmate in 90 days.

He was seen by the clinician on 12/31/14.  There was relatively little new information and the inmate complained mostly of pain problems that he believed CDCR was ineffectively treating.

On 1/28/15, the inmate signed the informed consent form for mental health care.  He was seen in psychiatric follow-up on 2/8/15.  He reported continuing to do well on the current medication regimen.

Findings

The inmate was appropriately treated at the 3CMS level of care.  Clinical and psychiatric contacts occurred at timely and responsive intervals.  The inmate was satisfied with the care he received and appeared to benefit from it.  The mental health care provided to him was generally consistent with the Program Guide.  The inmate received adequate mental health care.

**Inmate K**

This case was reviewed because the expert attended the inmate's annual IDTT meeting.  The purpose of the review was to assess the care provided to the inmate.

This 3CMS inmate was housed on D-3.  He was provided a diagnosis of Adjustment Disorder with mixed anxiety and depression.  He was prescribed Prozac to treat his psychiatric disorder.

According to medical records, the inmate had a history of prior treatment in the 3CMS.  He purportedly cut his wrist in 2013 to seek attention, but without an intention to commit suicide.  He reported a history of taking psychiatric medication to treat depression and anxiety.  No symptoms were elaborated.

The governing treatment plan was prepared on 5/22/14.  The mental status exam was unremarkable in all aspects.  Long term goals were noted as improving depressed mood and everyday functioning as evidenced by the absence of RVRs and interpersonal conflicts.  Short-term goals were documented in behavioral terms.

The PC saw the inmate on 9/29/14.  The inmate stated he had been doing okay but missed his daughter.  He was seen again on 12/1/14, when he expressed sadness about missing his daughter.  He participated in an institutional program known as YAAP.  The PC saw him on 1/26/15.  The inmate reported problems managing anger and discussed coping strategies with the clinician.

The inmate saw the psychiatrist at intervals that were consistent with the Program Guide.  He was adherent to his medication regimen.

The inmate actively participated in the IDTT meeting.  An SRE assessed him as a low chronic and acute suicide risk.  The inmate stated his depressive symptoms were less intense due to meetings with the PC and working on his catastrophic thoughts.  He kept in contact with his family and benefited from these contacts.  His enrollment in the 3CMS was reaffirmed.

Findings

The inmate was appropriately placed at the 3CMS level of care to treat his psychiatric condition.  He was timely seen in clinical contacts and the annual IDTT meeting.  He appeared to benefit from psychiatric and psychosocial interventions.  The mental health care provided to him was adequate for the symptoms of his mental disorder.

**Inmate L**

This 3CMS inmate was housed on A-2.  He was provided a diagnosis of Mood Disorder NOS according to the governing treatment plan of 10/13/14.  He was not treated with psychiatric medication at the time of the site visit, but had been prescribed Vistaril during the review period.  The Form 7388B showed no positive indicators to trigger higher level of care referral consideration.

682

Healthcare records indicated that he had an extensive substance abuse history and received counseling during childhood.  Also noted was a contributing social history that included being placed in the care of an aunt during infancy after his father murdered his mother.  Reportedly, he was subjected to primitive forms of abuse.  He was removed from that environment and raised in foster care.  There was a history of two suicide attempts in the 1990s.  He had no history of treatment at the EOP level of care, or in the MHCB or DSH.

Current mental health symptoms included a persistently sad mood, feelings of hopelessness, lack of motivation and low energy, loneliness, feelings of uselessness, sleep disturbance, and racing thoughts, all of which occurred three times weekly.  The treatment plan included long-term goals that were written in behavioral terms and could be objectively measured.  The inmate was involved in institutional programs, including a variety of therapeutic and rehabilitative groups.

An SRE dated 10/3/14 assessed moderate risk of suicide on both the chronic and acute levels.  Chronic risk factors included suicide of an older brother, chronic pain due to migraines, and history of impulsive behavior.  Acute risk was predicated on a plan to overdose on heroin if he were to be unsuccessful in court-related petitions and appeals.

The inmate signed the CDCR consent for mental health care.  He was seen by the PC at timely intervals.  Discussions addressed topics that were relevant to mood fluctuation.

Findings

The inmate was appropriately treated at the 3CMS level of care.  Record review indicated he received adequate care.  He reported a conditional suicide plan pending the outcome of his legal case.  Proper care required that the details and nature of suicide risk be carefully monitored, carried forward in subsequent documentation, and clearly addressed in future clinical contacts.

**Inmate M**

This 3CMS inmate was housed on C-4.  He was provided a diagnosis of Psychotic Disorder NOS and Polysubstance Dependence remitted in a controlled environment.  He was prescribed Haldol and Vistaril to treat symptoms associated with his psychiatric disorder.  There was a history of treatment with Zyprexa.

According to the governing treatment plan dated 6/22/14, the inmate had no history of evaluation or treatment for a psychiatric disorder before coming to prison.  He was cleared for the general population based on the reception center screening in May 2013.

The inmate referred himself for mental health evaluation on 12/11/13.  He reported seeing a lonely man who wanted the inmate to talk to him.  The inmate said he had previously experienced perceptual disturbances while using methamphetamine as early as age 13.  The clinician described the inmate as confused and internally preoccupied.  He was enrolled in the 3CMS program and referred for psychiatric evaluation.

683

The psychiatrist saw the inmate on 10/1/14 following staff referral for his refusal of Haldol.  The inmate said he disliked the medication and that auditory hallucinations had decreased.  The psychiatrist discontinued Haldol at the inmate's request.

On 10/22/14, the inmate said he continued hearing voices at night and seeing a ghostlike figure who talked to him.  Treatment with Haldol was resumed as the inmate stated he benefitted from the medication.

On 10/31/14, the inmate told the psychiatrist he was taking Haldol as prescribed and said it was helpful in reducing hallucinations.  He reported working as a custodian and stated he was able to get his job done without being distracted by visual or auditory hallucinations.

On 1/6/15, the inmate again reiterated that auditory hallucinations were not intrusive since he resumed antipsychotic medication.  The psychiatric diagnosis was Substance Induced Psychotic Disorder (methamphetamine) with consideration of an alternative diagnosis of Schizophrenia.

The PC routinely saw the inmate.  On 2/26/15, he reported that hallucinations prevented him from focusing on his school work.  The inmate was noted to understand the clinician's questions and responded appropriately.

The following day, on 2/27/15, the inmate told the psychiatrist he always heard voices and if symptoms became unbearable, he would cope by staying in his room or going to yard.  The inmate continued to report that he did well at his job as a clinic porter.

Findings

The inmate was appropriately placed in the 3CMS to treat symptoms of his psychiatric disorder.  He was followed at required intervals and mental health staff responded promptly to his needs and to staff referrals.  The annual treatment plan had not yet been updated at the time of the site visit.  The mental health care provided to him was adequate.  Prudent care suggested that the treatment team attempt to clarify the inmate's diagnosis at the annual update.

**Inmate N**

This 3CMS inmate was housed in administrative segregation.  He was provided a diagnosis of Adjustment Disorder with depressed mood at a desert institution.  He transferred to PVSP on 12/24/14.  The initial IDTT meeting was held 17 days late on 1/26/15.  The purpose of the review was to assess the adequacy of the mental health care provided to the inmate.

According to the mental health treatment plan prepared at the sending institution, the inmate presented himself for evaluation four months after returning to California from an out-of-state institution.  Presenting problems included initial and middle insomnia, weight loss, impaired concentration, and depressed mood due to the distance from his family.  There was no history of

suicide attempts and no mental health treatment before coming to prison.  The psychiatric evaluation did not indicate any medications.

After arriving at PVSP, the inmate participated in an initial IDTT meeting on 1/26/15.  He reported that depressed feelings had been resolved now that he was physically closer to his family.  He endorsed no symptoms of depression.  However, the mental health treatment plan was incomplete and did not include treatment goals or interventions.

The inmate was seen for psychiatric evaluation on 2/7/15.  He declined psychiatric medications and was described as stable by the psychiatrist.

Findings

The inmate was appropriately placed in the 3CMS for treatment of his psychiatric disorder.  It appeared that his symptoms were situational and resolved once he transferred to an institution closer to his family.  No psychiatric treatment was indicated.  His initial IDTT meeting was not timely, but the inmate had communicated by telephone with the chief psychologist at the sending institution after he transferred.  The inmate reported that his needs had been met.  The inmate's care at the current institution was minimally adequate.

**Inmate O**

This 3CMS inmate was housed on D-3.  He was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood.  He was not treated with psychiatric medication.

The inmate reported a history of depression, anxiety, and difficulty trusting others.  His best friend committed suicide by gunshot to the head when the inmate was 12 years old.  His father left the family when he was a child.  He used multiple substances over a long time period to cope with anxiety and depression.  He did not receive mental health care before coming to prison and had no history of suicide attempts.

Healthcare records indicated the inmate was active in group treatment programs.  He maintained ties with his family.  He participated in yard activities.  Progress notes indicated a tendency to dwell on the negative when he was depressed or frustrated.  These were associated with treatment targets as outlined in his mental health treatment plan.

Findings

The inmate was appropriately placed in the 3CMS to treat a psychiatric disorder.  He received adequate care.

**Inmate P**

This 3CS inmate was housed on B-2.  He was provided with a diagnosis of Dysthymic Disorder according to the governing treatment plan dated 6/17/14.  Current psychiatric medications included Zoloft to treat depressed mood and Vistaril for night time anxiety.

Medical records indicated the inmate denied a history of inpatient or outpatient psychiatric treatment in the community before coming to prison.  However, he was treated with antidepressant medication during periods of confinement in federal prison and the county jail.  He had no history of suicide attempts.

He was enrolled in the 3CMS program based on his daily experiences of sadness, despair, hopelessness, regret, and apathy since teenage years.  The initial SRE assessed low chronic and acute suicide risk.  The inmate had many protective factors including a support system, religious beliefs, and adequate coping skills.  Treatment goals included improvement in overall mood and reduction in depressive experiences as reflected by the inmate's self-report.  Short-term goals included maintaining spiritual activities and increasing exercise and social activities.

On 9/3/14, the inmate told the psychiatrist he experienced excessive guilt and nighttime rumination.  The psychiatrist made an upward medication adjustment.  On 9/18/14, the psychiatrist further adjusted medication administration times based on the inmate's request.

On 10/6/14, the psychiatrist documented the inmate's continued report of fatigue with a request for further medication adjustment.  The psychiatrist indicated the inmate would need to be seen to rule out SSRI induced hypomania symptoms.  In a follow-up on 10/29/14, the inmate reported experiencing the same depression with dark thoughts and a gray outlook on life.  He said he thought he would be all right.  The psychiatrist discontinued Paxil and started the inmate on Zoloft.

On 1/26/15, the inmate's psychiatric medications included Vistaril and Zoloft.  The inmate reported the change had been helpful.  He was experiencing a better outlook on life and stated that racing thoughts at bedtime had diminished.

The PC saw the inmate on a monthly basis from September to December 2014.   The inmate reported symptoms and medication issues in detail and the PC appropriately followed-up by referring him to the psychiatrist.  Progress notes were detailed and related to the inmate's governing treatment plan.

<u>Findings</u>

The inmate was appropriately placed in the 3CMS program to treat his psychiatric disorder.  The mental health treatment plan was developed with detail sufficient to address his treatment needs.  Short-term goals were written in behavioral terms which could be objectively measured.  The PC met with him at intervals beyond requirements of the Program Guide as determined by the inmate's needs.  Psychiatric contacts were frequent as determined by inmate requests and needs.

The psychiatrist was responsive to inmate concerns and symptoms. Medication adjustments were made in accordance with inmate wishes and psychiatrist opinions. The inmate appeared to benefit from the treatment and was described as stable by the end of the review period.  The care provided to the inmate was adequate.

EXHIBIT O
Avenal State Prison (ASP)
July 21, 2015 - July 23, 2015

**Inmate A**

This inmate was one of two EOP inmates housed at ASP at the time of the site visit.  His healthcare record was reviewed to assess the treatment he received while awaiting transfer to an institution which could provide EOP treatment.  At the time of review, he was housed in a mainline program with an SNY designation.  He arrived in CDCR on 3/27/14 and at ASP on 07/23/14; on 5/20/15 he was assessed as requiring EOP level of care.  His diagnosis was Schizophrenia, paranoid type and Amphetamine Dependence, treated primarily with risperidone.  His history was remarkable for having been sexually abused as a child, multiple risk factors for suicide, and a reported history of hallucinations since age six.  More recently, he experienced suicidal ideation and fantasies concerning suicide and hallucinations.  He had a pending release on 8/1/15.

An SRE dated 5/19/15 indicated that he showed a number of chronic risk factors.  These risk factors included a family history of suicide, a history of abuse, a depressive or psychotic disorder, a history of suicide attempts with the first occurring in 2012 when he was in the county jail, a perception of loss of social support, a history of poor impulse control, being older than 35 and male, having a history of violence and substance abuse, serving a first prison term, and being a sex offender.  Acute factors included suicidal ideation, a current or recent depressive episode, current or recent psychotic symptoms, current and recent anxiety or panic symptoms, and demonstrated hopelessness or helplessness.  Protective factors were assessed to include the inmate's belief system, interpersonal support, having a future orientation, engaging in regular exercise, positive coping skills, having a job or school assignment, and being active and motivated for treatment.

At the time of the SRE, the inmate had thoughts of committing suicide twice daily that lasted about 30 minutes.  He endorsed auditory hallucinations concerning self-harm, but described them as passive thoughts and demeaning statements.  The voices also told him that if he ended his life "halfway" he would go to heaven.  The summary indicated that he found suicide morally and religiously acceptable and an option should he become emotionally overwhelmed; this required consideration in the context of the assessment that his belief system would be protective of suicide.  He reported five suicide attempts and noted that he would be "more happy" if he committed suicide.  Both his chronic and acute suicide risk were considered moderate.  The SRE noted that he had no family support.  A subsequent note indicated that he socialized with two other inmates on the yard but preferred to isolate.  An IDTT was planned for 5/20/15 to consider transfer to the EOP level of care.  The plan was to engage the inmate, to develop rapport and trust, and to develop an understanding of precipitants of thought hallucinations and delusions and depression.  Issues of medication adherence were also to be explored.

The IDTT was conducted on 5/20/15 and found that, due to a major mental disorder, the inmate was unable to function adequately at the 3CMS level of care and that transfer to EOP care was required.  In the meantime, the plan was for him to be housed with other EOP inmates and be seen by his PC to develop trust and rapport.  He was to have weekly PC meetings, daily groups, quarterly IDTT meetings, and "meetings with his psychiatrist."  There was no specific plan to

monitor his suicidal ideation and risk or to improve his medication adherence.  A PC saw him on 5/20/15.

Since the decision to transfer the inmate to the EOP level of care, he received the following treatment.  He attended a group on 5/22/15 that focused on coping strategies and was found to have participated well.  He attended group on 5/28/15, arriving late after a session with his PC, 6/3/15, but only for ten minutes, 6/5/15, 6/11/15, 6/18/15, and 6/19/15, when he was noted to have auditory hallucinations.  He also attended group on 6/25/15, 7/2/15, and 7/10/15, when he was described to be in good spirits, and on 7/16/15.

The PC assessed the inmate on 5/28/15, when the inmate expressed concern about transferring to EOP, as he might be committed to inpatient care as an "MDO" following release.  In discussing his plans following a possible pending release in August 2015, he noted a lack of family support and not having a place to live.  He endorsed fantasies about hanging himself and reported that two weeks prior, the voices were telling him to hang himself; however, he could not find a place to do it.  Risperdal had helped to reduce the hallucinations and thoughts of self-harm.  He was seen again on 6/4/15 when he appeared more stable with respect to hallucinations.  He was also seen on 6/10/15, when he reported feeling better and that the medications were working well.  He enjoyed attending groups.  The PC saw him on 6/17/15, when he denied having suicidal thoughts or hallucinations.

During a 6/24/15 contact with his PC, the inmate again expressed concern about civil commitment.  If released, he noted that he would go to his mother's house but that it would be transient.  Other notes indicated that he had no contact with her.  The provisional PTSD diagnosis from the psychiatric note was not continued or addressed.  The inmate was thought to be improving.  On 7/1/15 the inmate noted that he had no means of transportation if released.  His constricted affect was not congruent with his description of how he was feeling.  On 7/9/15 the psychologist discussed the inmate's desire to get a job upon release.  Passive suicidal thoughts continued.  He was seen by his PC on 7/16/15, when his upcoming release date was discussed.  The MDO evaluation was discussed.  His hallucinations continued but were decreased, as was his depression.

The inmate was seen by a psychiatrist on 5/30/15, at which point he did not endorse depression, but noted that voices always asked him to hurt himself.  He also heard the voice of a priest who abused him for two years.  He noted having nightmares about those incidents.  He again was evaluated by the psychiatrist on 6/13/15.  The provisional diagnosis of PTSD was noted, but these issues were not directly addressed in the treatment plan.  Hallucinations instructed the inmate to hurt himself, but he stated he would not do it.  Risperdal was continued with a plan to follow-up in one month.  The inmate was seen by a different psychiatrist on 7/6/15 regarding pre-release follow-up and parole medication.  He was reported to be eager for release and to be doing well.  He found Risperdal helpful and was open to receiving it in the community.  He continued to have auditory hallucinations and paranoia, but they were improved on medications.  The provisional PTSD diagnosis was not continued.

A request for transportation upon release was made on 7/7/15.  On 7/8/15, a note was included in the record indicating that transitional case management was to assist with the Medi-Cal application.

Findings

This inmate was at an elevated risk for suicide, and his suicide risk assessment contained some inconsistencies with other documentation.  However, he was somewhat stabilized on medication, which was effective in reducing but not entirely controlling his auditory hallucinations and self-harm thoughts.  He was seen regularly by a PC and psychiatrist while awaiting transfer, and he regularly attended group.  Some attention was paid to pre-release planning for this inmate, who was due for release imminently, but given the severity of his needs it did not appear to be of sufficient intensity.  Given his elevated risk and pending release, his transfer to EOP should have been expedited as he was assessed as requiring EOP level of care on 5/20/15 and was scheduled for release on 8/1/15.  Some clinicians noted PTSD symptoms but this provisional diagnosis was not continued by subsequent clinicians, and trauma issues were not addressed.  The reviewer discussed this case and these concerns with CDCR regional headquarters staff.  Overall, while the frequency of his mental health contacts were within minimal Program Guide requirements, the care and attention to transfer to a higher level of care he received was insufficient to address his situation and risk.

**Inmate B**

This 40-year-old inmate's healthcare record was chosen at random to review to assess the 3CMS level of care treatment he received during the review period.  His expected release date was 9/28/15.  He was primarily diagnosed with Depressive Disorder NOS and Anxiety Disorder NOS.  He was treated with Prozac.  He was alternatively diagnosed with Mood Disorder NOS and Amphetamine Dependence in a controlled environment, and Adjustment Disorder with mixed symptoms with a provisional diagnosis of PTSD.

The psychiatrist saw the inmate on 5/17/15, when he was noted to have high anxiety and increased depression.  His Prozac was increased.  A SRE was conducted on 5/21/15 in conjunction with his annual review.  It showed a number of chronic risk factors including a history of abuse, depression or psychosis, chronic medical illness, a history of suicide attempts including an attempt in 2012 when dealing with parole issues, a perception of loss of social support, a history of poor impulse control, violence, and substance abuse, and being a sex offender.  Acute factors included a current or recent depressive episode and anxiety, disturbance of mood, recent bad news, and hopelessness or helplessness.  Protective factors included a future orientation, regular exercise, positive coping skills, children at home, insight, having a job or school assignment and sense of optimism, and being motivated for treatment.  At the time, his focus was on trying to obtain SSI, Medi-Cal, and transitional housing before his release.  His acute and chronic risk for suicide was rated as moderate.  There was no mention of the connection between the current parole-related issues he was attempting to address and the percipient of his most recent attempt, which was related to parole issues.  The plan was to see him in between 60 and 90 days, or as needed, to continue treatment at the 3CMS level of care, to

691

take medication, to monitor his mood, and to practice coping skills, and for the inmate to contact the PC in an emergency.

A PC assessment dated 5/21/15 found the inmate to be feeling depressed and "struggling to get through each day." He was feeling stress related to obtaining SSI, Medi-Cal, and transitional housing. He wrote to a housing provider, but he had not received a response. He noted that he had no family support upon release.

The inmate's IDTT meeting was conducted on 5/27/15, when he was not thought to meet any of the criteria for higher level of care referral consideration. Also noted was his history of childhood abuse and parental abandonment. He was seen as having a profound lack of trust in others and as reluctant to actively engage in treatment, although treatment motivation was listed as a protective factor in the SRE. The diagnosis was changed to Mood Disorder NOS and Amphetamine Dependence in a controlled environment. Problems listed were depression and substance abuse. Although this was noted to be an update, there was no indication whether he made progress toward these goals during the previous period. A noted strength was that he was motivated for treatment, in contrast to documentation that indicated he was reluctant to engage in treatment. There was no mention of his recent SRE indicating moderate acute and chronic suicide risk.

On 5/30/15 the inmate refused his morning dose of Prozac. On 6/8/15 nursing referred him to the psychiatrist because he was exhibiting a pattern of medication nonadherence, and he had missed 50 percent of medication or showed a pattern of unexplained missed medications. The psychiatrist saw him on 6/10/15 when he indicated he wanted to cope with his depression without medication. He reported few symptoms except for a general distrust or paranoia, and he denied suicidal ideation. The diagnosis was changed to Adjustment Disorder with mixed symptoms.

The inmate was next seen by a different psychologist on 7/12/15, when he again reported being anxious about his post-release plans. He discussed how difficult parole was for him the last time he attempted to adjust to community living and how he cut himself in an effort to obtain mental health treatment. He discussed possible triggers for traumatic memories, not being in crisis but having anxiety regarding his future, experiencing difficulty trusting others, and re-experiencing trauma. The psychologist noted PTSD symptoms and that Prozac was discontinued at the inmate's request. Possible PTSD was added as a diagnosis. His PC saw him on 7/17/15, when the inmate reported that he was ineligible for SSI but was able to receive Medi-Cal. He also reported that the homeless shelters he contacted did not accept sex offenders, and that he had no family support. Although he denied suicidal ideation, suicide risk was not assessed in light of the SRE findings that he was at moderate risk. At this point, he was diagnosed with Depressive Disorder NOS. He was provided with mental health resources, but no concrete assistance in exploring options for treatment or housing.

Findings

This inmate was evaluated as having a moderate acute and chronic suicide risk; his most recent attempt was connected with his parole difficulties. He was expected to parole in September 2015. He received assistance with Medi-Cal and was provided with some mental health resources. He remained concerned about his lack of family support and of being undomiciled upon release. His IDTT, which was conducted shortly after the SRE, did not specifically address suicide risk reduction. At his request, Prozac was discontinued. Different clinicians gave different diagnoses, without efforts to reconcile. One psychologist appropriately noted the possibility of PTSD, but this was not subsequently followed. The inmate was seen in accordance with Program Guide requirements with respect to the frequency of mental health contacts. However, the assessed moderate suicide risk was not adequately targeted in treatment in light of his pending parole. Treatment was otherwise adequate.

**Inmate C**

This inmate's healthcare record was chosen at random to assess the treatment provided at the 3CMS level of care. This 40-year-old inmate transferred to ASP on 6/15/15 with a diagnosis of Adjustment Disorder with depressed mood. He previously was treated with Remeron. He was not receiving psychotropic medication at the time of review. He was scheduled for release from prison on 9/1/16.

The inmate signed a consent for mental health treatment on 6/16/15, and an SRE was conducted on that day. Chronic risk factors included a history of abuse, chronic pain, a history of poor impulse control, a history of violence and substance abuse, and this being a first prison term. The sole acute risk factor was a recent housing change. Many protective factors were present. He was thought to be adjusting well to ASP, had no history of suicide attempts, and was married with seven children.

The inmate's history was significant for Polysubstance Abuse, and he was receiving SSI for a learning disability. He had no community mental health treatment history or suicide attempts. He was treated at the 3CMS level of care since December 2014 without MHCB admissions. Past medications included Remeron and Xanax. He declined group therapy and requested that he be removed from the 3CMS level of care as he was stable. The plan was to continue him at the 3CMS level of care, but to consider discontinuation after three to six months. He was to be seen every 60 to 90 days, during which time his symptoms would be monitored.

A treatment plan dated 7/2/15 indicated that his committing offense was for inflicting corporal injury on his spouse. He reported that his parents were alcoholics and abusive and that although the SRE noted his wife and children to be a source of support, he was in the process of getting divorced. He had been on suicide watch in the county jail, but had no suicide attempts. He appeared to be asymptomatic and contrary to the SRE report, and he was not prescribed psychotropic medications.

693

Findings

This inmate was assessed following transfer to ASP and request for removal from the 3CMS level of care.  An appropriate plan for monitoring followed by consideration of removal from the 3CMS program was made.  The inmate's treatment was adequate and within Program Guide requirements.

**Inmate D**

This 38-year-old inmate's healthcare record was randomly selected to assess the 3CMS level of care that he received.  He was primarily diagnosed with Major Depressive Disorder, recurrent, moderate, which had historically been treated with Wellbutrin, Seroquel, and risperidone.  However, at the time of review, the inmate had not been prescribed psychotropic medication for a number of years.

During his incarceration, the inmate experienced depressive symptoms with intermittent psychotic features.  He was treated alternatively at the 3CMS and EOP levels of care.  He also required MHCB placement.  His history was significant for sexual abuse around the age of 12 and an extensive history of mental health treatment since 2000.  He reported a suicide attempt by overdose in 2001 related to the pressure of homelessness.

The inmate had a number of chronic risk factors for suicide including a history of abuse and depressive or psychotic disorder, chronic pain, perceived loss of social support, a history of suicide attempts in 2001 due to the overwhelming pressure of becoming homeless, a history of substance abuse, and being a sex offender.  His single acute risk factor was a depressive episode.  Protective factors included his belief system, regular exercise, positive coping skills, having insight into his problems, being actively involved in treatment, and having a sense of optimism.  His acute risk for suicide was assessed as low and his chronic risk as moderate.  The plan to reduce risk included more frequent contacts with mental health as needed or requested.

An assessment dated 3/3/15 indicated that the inmate was making good adjustment to ASP.

The psychologist saw him on 5/9/15.  He was described as talkative with acute memory for details of his life history and was seen as making an adequate adjustment to ASP.  A history of sexual molestation by a family member at age 13 was noted.  He believed that his mother was aware of this, but did not protect him because she loved him "the least."  He described himself as mentally incapable of holding a job for long and was noted to have chronic paranoid ideation, which interfered with his relationships.  He was reported to have chosen to be homeless to lessen his stress.  He received diagnoses of Major Depressive Disorder by history, Alcohol Dependence in remission and possible Paranoid Personality Disorder.  The plan was for the PC to see the inmate in 90 days.

<u>Findings</u>

This inmate received mental health contacts in accordance with minimum Program Guide requirements during the reporting period.  His overall mental health treatment was adequate.

**Inmate E**

This inmate's healthcare record was reviewed after being randomly chosen to assess the treatment he received at the 3CMS level of care.  He had a history of depression, anxiety, and ADHD symptoms.  He was diagnosed with Mood Disorder NOS, possible Delusional Disorder, persecutory type, and Amphetamine Dependence.  He was previously diagnosed with ADHD, and was prescribed Zoloft and Strattera.  He required hearing aids and a walker to ambulate.

A psychiatrist saw the inmate on 5/17/15, when he was reported to be "stressed" by COs but not depressed.  He received an RVR on 4/19/15 for "striking someone."  His mental status examination was generally within normal limits.  Mental health staff saw him on 6/3/15, in what was referred to as a re-referral session.  He was interested in being removed from the 3CMS program, and he had custody-related concerns.  The clinician and the inmate had not met since the time of his treatment plan as he was seen according to this note by another clinician during the PC's absence.  He was informed that he would need to be seen at least once again in 90 days and that providing he was symptom-free and remained off of medications, he would be eligible for removal.  The note did not discuss history or what had occurred during his absence.  The diagnosis of Major Depressive Disorder, recurrent, moderate was continued.  An IDTT meeting was not considered to be the forum for this decision to be made.  The plan continued to use CBT with an emphasis on making better decisions and minimizing the inmate's depressive symptoms.

The inmate was seen on 6/5/15 by a psychologist, when he reported no major distress.  His speech was pressured, but his thought process was coherent.

On 7/8/15 a correctional counselor referred the inmate to mental health, noting that he appeared confused, engaged in unprovoked hostility, exhibited bizarre behavior, showed poor self-control, and believed that he worked for the internal affairs division.  His sleep was poor, and he was reportedly bothering other inmates.  A psychologist saw him later that day and stated that the inmate believed that custody had targeted him for many years.  He was admitted to the TTA for further assessment for medical conditions or psychotic symptoms.  An SRE was conducted in conjunction with this evaluation.  The inmate was noted to have a number of chronic suicide risk factors including chronic medical conditions, chronic pain, a history of poor impulse control, a history of violence and substance abuse, a long sentence, and being a sex offender.  His only acute factor was a recent disciplinary action.  Multiple protective factors were noted including family support, treatment motivation, a future orientation, and his belief system.  He was assessed with moderate acute and chronic suicide risk.  He was admitted to the TTA for further assessment.

The inmate was seen in the OHU later that day where he described what the clinician noted to be "many conspiracy theories."  He reported staying up late at night because "something fishy" was

going on.  He exhibited hyperverbal speech with loose associations and paranoia.  His mood was described as "very good."  The inmate "was cleared to return to his unit at a 3CMS level of care with five day follow up to provide additional support."  The OHU clinician noted that the inmate would be discussed with his PC, as would the possibility of EOP level of care if it appeared to be warranted.  It was noted that the inmate preferred 3CMS treatment to transfer.  This planned discussion was not documented in the healthcare record at the time of review.

The inmate was seen on 7/9/15 for the first day of five-day follow-up after returning from what was described as the MHCB.  He was referred to mental health by custody, and mental health referred him to the TTA for "continuation of care."  The inmate stated that he spoke with a clinician at the TTA, who reduced his stress and transferred him to another building.

The inmate was seen on 7/10/15 for the second day of five-day follow-up.  He reported good sleep and appetite, involvement with prayer, and no acute symptoms.  He was also seen on 7/11/15 for five-day follow-up, when he stated that he was doing well but had "got at the CO the wrong way."  It was noted that he had Meniere's disease.  The plan was to continue with the 3CMS treatment plan.  He was seen on 7/13/15 for what was described as five-day follow-up.  He had recently been transferred to a new building and was described as stable.

The psychiatrist saw the inmate on 7/13/15, when he was described as stable.  Prior to that, he had last been seen by "psych" on 3/25/15.  The plan was to see him again in two months and to continue medication.

Findings

In a brief period of time, this inmate went from requesting removal from the 3CMS program to requiring crisis care intervention following apparent decompensation.  He was assessed with moderate acute and chronic risk for suicide, and he was referred to the TTA for admission.  Upon arrival and interview, he apparently felt calmer, and he was released with five-day follow-up and plans for clinician-to-clinician discussion concerning possible transfer to the EOP.  An SRE was not performed in conjunction with the TTA assessment, although one was conducted upon referral.  The five-day follow-up was not an adequate substitution for MHCB admission and/or consideration of higher level of care transfer.  One planned follow-up was not documented in the healthcare record at the time of review.  Although the inmate stabilized, the response to his apparent decompensation was insufficient.

**Inmate F**

This inmate's healthcare record was reviewed to assess the treatment he received at the 3CMS level of care.  This 47-year-old inmate was diagnosed with Adjustment Disorder with mixed anxiety and depressed mood, chronic, and Polysubstance Abuse.  He was prescribed psychotropic medications at the time of review.

An SRE was conducted on 4/2/15.  Chronic risk factors included a history of depressive or psychotic disorder, perception of loss of social support, being older than 35 and male, and a

history of violence and substance abuse.  One acute factor present was that the inmate was agitated or angry.  Numerous protective factors were present.  His acute and chronic suicide risk were assessed as low.  An SRE dated 7/17/15 found similar chronic risk factors with one acute factor, namely, a housing change.  All listed protective factors were noted.  The primary reason for this inmate's inclusion in the 3CMS program was related to his reaction to his mother dying from a heart attack in 2013 and the associated depression he experienced.

A treatment plan developed at VSP on 4/14/15 indicated that the inmate, who was scheduled for release on 1/18/18, had a history of psychiatric treatment as a child for attention-related issues.  In 2014 he was depressed secondary to missing his family and the possibility he would be transferred out of state.  At that time, he required MHCB admission due to passive suicidal ideation.  Problems noted on the April 2015 treatment plan included sadness, anxiety concerning family relation conflicts, and substance dependence.

Upon transfer to ASP, the inmate received an updated mental health assessment.  At that time, he had an unremarkable mental status examination.  The primary mode of individual treatment was to be Gestalt psychotherapy in conjunction with a Gestalt group.  Additionally, CBT would be used in conjunction with home assignments and literature handouts.

Findings

The inmate responded well to 3CMS level of care intervention.  The mental health care that was provided to him was clinically adequate.

**Inmate G**

This case was selected for review because the inmate had been identified on the DSH non-referral log.  This 51-year-old EOP SNY sixth-term sex offender was seen in IDTT on 1/20/15 and identified as meeting criterion seven, for attending less than 50 percent of treatment, on the Form 7388B.  He was not referred to DSH because the treatment team thought he was functioning well, and he was going to be considered for a possible level of care reduction.  Specific criteria were discussed with him to demonstrate his stability, and he was going to be brought back before the IDTT in one week following a case consultation for consideration of the level of care reduction.  No treatment modifications were listed.  On a corrected Form 7388B of the same date, this section was completed, and included appropriate treatment modifications; however, under treatment modification on the first page (1-6B), none of the items on that page were positive.  The entry on the first page should have been included in section 7B.

The inmate's treatment plan was vague and did not include treatment interventions that matched the stated problem area.  The plan was poorly developed and did not target the primary issue.  Specifically, the inmate was refusing treatment, but this was not identified as a treatment target, and interventions listed required a cooperative and engaged client.  The inmate's suicide risk level was based on outdated information (7/30/14).  The inmate was provided with a diagnosis of Psychotic Disorder NOS with a deferred diagnosis on Axis II.  The treatment plan also noted that

697

the inmate only participated with the treatment planning process because he had been hoping to have his level of care reduced.

The treatment team again saw the inmate on 1/27/15, and his treatment plan was unchanged. However, documentation on the Form 7388B described him as continuing to exhibit bizarre and perseverative behaviors with no insight and an unwillingness to participate in treatment, including a refusal to take medication. Custody staff reported to the treatment team that he functioned adequately without troublesome behavior. As the treatment team saw the inmate as relatively stable, his level of care was reduced to 3CMS. However, the discharge section of the treatment plan was confusing with noted 3CMS and EOP levels of car without further narrative discussion or justification. This was extremely confusing and made determination of the inmate's level of care unclear. If the inmate was being reduced to 3CMS, his treatment plan should have been modified in accordance with that level of care.

Findings

This inmate was appropriately not referred to DSH. However, his level of care was unclear due to contradictory information in the treatment plan. It appeared that his level of care had been reduced to 3CMS from EOP, but there was insufficient clinical rationale to justify such a reduction. The inmate's treatment plan was also poorly constructed and inadequate for either level of care. It was vague, did not target the primary treatment issue, and did not include specific effective interventions. This inmate was not adequately treated.

**Inmate H**

This case was selected for review from the DSH non-referral log. This 62-year-old divorced EOP SNY inmate was serving his third term. The IDTT saw him on 1/20/15, when he was identified as meeting criterion seven on the Form 7388B for not participating in 50 percent or more of treatment. The inmate's treatment plan was confusing as it indicated that it may have been more beneficial to refer him to DSH to address his current symptoms and treatment nonadherence, but the plan also stated that he was functioning adequately at the current level of care. He refused to attend treatment groups and to take psychotropic medications. He was placed in the EOP due to a lengthy mental health history that included community outpatient and inpatient treatment, delusions regarding medical treatment, and treatment nonadherence. The Form 7388B indicated that he was functioning adequately at the current level of care and provided specific examples. Treatment modifications were appropriate and specific to the inmate, but were unfortunately not incorporated into the actual treatment plan.

The treatment plan was overly broad and vague; it relied on treatment adherence by the inmate and did not appear to be realistic given his refusal to engage and lack of insight. The treatment plan did not address the primary treatment issue of treatment nonadherence. An SRE was not completed; rather, one completed three months prior was used to determine that the inmate was at low acute and moderate chronic suicide risk. He was provided with a diagnosis of Schizophrenia, undifferentiated type.

698

Progress notes suggested that the inmate was receiving care that was more consistent with descriptions in the Form 7388B documentation than the vague and inappropriate treatment plan interventions.

Findings

This inmate was appropriately not referred to DSH. His treatment plan required modification so that it was more individualized and specific. The Form 7388B actually contained more detailed treatment interventions than the treatment plan. The treatment plan could have included the same information and would have been adequate. Based on review of progress notes, the inmate received adequate mental health treatment.

**Inmate I**

This case was selected for review at the request of plaintiffs' attorneys due to concerns regarding the mental health care provided. This 32-year-old 3CMS inmate arrived in CDCR on 2/20/15. He was admitted twice to the OHU; on one occasion, he stayed beyond 72 hours without an MHCB referral.

The inmate was evaluated on 5/10/15, following OHU admission on 5/9/15. The admission on 5/9/15 was due to a report of suicidality, reportedly in part because he was being pressured for money by other inmates on the yard (progress note 5/9/15). However, it was nursing that reported that he was being pressured for money, and it was unclear where that information originated. It was also uncertain from healthcare records documentation whether staff understood that this issue could actually be a risk factor for suicide, increasing rather than reducing his suicide risk. The inmate was placed on 30-minute staggered checks by the psychiatrist-on-call beginning at 2241 hours, pending evaluation. He was placed in a cell with no metal bed frame. It appeared that he was placed in cell 01, which had a concrete bed. This was ultimately discontinued at 1220 hours on 5/10/15 by the evaluating OHU psychologist.

An interdisciplinary progress note dated 5/11/15 indicated that the inmate had been assaulted on the yard. The incident occurred after he found some of his paperwork, which he had locked in his locker, left on his bed. He reported having a trust slip showing $10,000 in his trust account, and he was told that he needed to give some inmates money or his throat would be cut. The primary extorting inmate was perceived by this inmate to have friends from different gangs and also have an "in" with a corrupt custody sergeant. The OHU psychologist seemed to conclude in this progress note that the inmate was not at acute risk of suicide because the statement was due to safety issues. The clinician noted that he appeared to have possible grandiose and paranoid delusions. A history of outpatient and inpatient treatment with a Bipolar Disorder diagnosis was also reported.

The inmate also reported a history of significant depression and mood swings but denied any current symptoms. He was diagnosed with Psychotic Disorder NOS; a diagnosis of Mood Disorder NOS was also considered; there was clearly a need for diagnostic clarification. While this progress note initially indicated that the inmate had been discharged from the OHU at the

3CMS level of care on the prior day, the plan was to place him into the EOP and maintain him in the OHU pending transfer. He had refused to return to the yard because he did not trust the yard sergeant that he would have to speak to about his concerns. He indicated that he would continue to report suicidal ideation, to stop eating, and to throw "piss and blood" on the COs in an effort to not return to the yard.

A progress note dated 5/13/15 indicated the inmate was seen for IDTT, and his endorsement to VSP was discussed. The treatment team planned to retain him in the OHU pending VSP transfer. The Form 7388B was completed on that date, but a full 7388 treatment plan was not located in the healthcare record. The Form 7388B indicated that he had been at the EOP level of care and was recently downgraded to 3CMS. The Form 7388B also explained that maintaining him in the OHU would allow for closer monitoring of symptoms and address his safety concerns. Only the psychologist and CC I were present at this IDTT meeting. The inmate also refused to see the psychiatrist for his appointment. On 5/15/15, the inmate attended the IDTT meeting and a treatment plan was completed. This treatment plan was well-constructed with well-conceived goals and interventions.

Review of mental health chronos revealed that the inmate was admitted to the OHU on 5/9/15, discharged to the 3CMS level of care on 5/10/15, placed into the EOP level of care for medical necessity while still housed in the OHU on 5/11/15, and placed into the EOP without qualifiers on 5/15/15.

According to a progress note dated 5/18/15, the inmate began to request a return to the yard so he could access canteen after he was told it could be several weeks before he could receive canteen in the OHU. A handwritten progress note documented psychiatric contact on 5/20/15. Psychotropic medications were not prescribed, and the diagnosis could not be identified due to legibility difficulties. The inmate had incidents in the OHU when he covered his cell window twice on 5/22/15. It was determined that it would be best to release him to a yard where the inmate did not feel that his safety was threatened. The inmate agreed with this plan. According to a progress note dated 5/23/15, he was seen the following day for follow-up when he reported no safety or suicidality concerns. However, on 5/24/15, the on-call psychiatrist received a report from nursing staff that the inmate had told custody that he would cut himself. Once at the TTA, he denied suicidality. However, the psychiatrist ordered admission to the OHU for a crisis evaluation. He was evaluated on 5/25/15 and discharged from the OHU following that evaluation.

Findings

This inmate was placed into the EOP during his initial OHU stay. However, the documentation in this case was poor and not always accurate. The inmate was retained in the OHU pending endorsement to an EOP institution. He had concerns about going to the mainline yard, but did not require acute crisis placements. Consequently, he did not need to be admitted to an MHCB or to acute care, both of which targeted self-injurious behaviors. The inmate received minimally adequate care, but the documentation of care was poor. Documentation needed to be reviewed

700

and a comprehensive clarification progress note entered into the healthcare record to summarize the complicated history for subsequent providers.

## Inmate J

This case was selected for review as an example of OHU care and because the plaintiffs' attorneys had identified the case due to concerns regarding the care provided. This 62-year old inmate was admitted to the OHU on 3/26/15. An SRE completed by the yard clinician on that date indicated he had multiple chronic, two acute, and several protective factors for suicide with no plan or desire to die. He was found to be at low acute and chronic suicide risk. He exhibited pressured, circumstantial speech with daily visual and auditory hallucinations and slightly depressed mood. He was referred to mental health due to increasingly bizarre behavior, including defecating in his pants, touching his feces, increased aggression, poor self-control, and "bothering" others. A mental health evaluation completed in the OHU on an add-a-page dated 3/26/15 noted that the inmate had originally been referred by correctional staff to the yard clinician, who subsequently made the OHU referral. The inmate reported that he had accidentally defecated in his pants. He was diagnosed with Major Depression, moderate, recurrent, by history with Axis II deferred. He was prescribed mirtazapine 15 mg per day. He was admitted to the OHU for further evaluation.
.

On 3/27/15, the inmate was placed into the EOP for medical necessity but was maintained in the OHU pending transfer due to poor adaptive functioning in his assigned housing. The transfer was not expedited. Psychiatric observation was initiated by the OHU psychologist on 3/26/15 at 1800 hours (staggered checks not more than 30 minutes apart) and was terminated at 1245 hours on 3/27/15. Based on review of the observation sheet, namely the Form 7385, the checks exceeded 30 minutes on multiple occasions without explanation. The treatment team saw the inmate on 4/2/15. The treatment plan focused on appropriate symptomatology, but did not address the primary symptoms and behaviors that resulted in the initial referral, the need for increased level of care, and OHU retention pending transfer. The treatment plan also did not address the inmate's hallucinations. The Form 7388B of that same date indicated that the inmate was being retained in the OHU so he could be observed more closely and provided with more support. According to the Form 7388B, if the inmate was doing well, he could be considered for transfer to ASP Facility C pending EOP transfer. While in the OHU pending transfer, the recreation therapist provided in-cell activities, but based on the progress notes, clinical contacts did not appear to adhere to the treatment plan.

<u>Findings</u>

This inmate's EOP transfer should have been expedited. His treatment plan did not address the specific symptoms and behaviors that resulted in the initial OHU referral and level of care increase. This inmate did not receive adequate treatment.

701

EXHIBIT P
Salinas Valley State Prison (SVSP)
February 17, 2015 - February 20, 2015
June 12, 2015

**Inmate A**

This EOP inmate was housed in the administrative segregation EOP hub.  He was provided with a diagnosis of Schizophrenia, residual type.  He was housed in administrative segregation due to the battery of an officer and was pending transfer.

A treatment plan dated 11/24/14 noted the inmate exhibited intermittent agitation with disorganized thinking, tangential content, and loose associations.  The problem list noted psychosis and poor anger management; Program Guide requirements for clinical contacts were the provided interventions.  The Form 7388B did not note any criteria for higher level of care referral consideration.

The inmate was housed in administrative segregation for the entire review period.  Progress notes indicated the PC saw him weekly and that most sessions occurred out of cell.  A psychiatry contact dated 12/9/14 indicated the inmate presented predominately with negative symptoms and disorganization.  He previously had not been prescribed psychotropic medications.  At that time, he was prescribed 2 mg of Haldol at night.  The most recent progress notes indicated that he had shown improvement and was stable.

Findings

The inmate appeared to be receiving mental health services at the appropriate level of care.  The treatment plan was individualized with good identification of problem issues and treatment interventions.  Documentation indicated that he consistently participated in group therapy.  There was also documentation of consistent psych tech rounds.

**Inmate B**

This EOP inmate was housed in the EOP program on D yard.  He was provided with a diagnosis of Schizophrenia, paranoid type.  He was prescribed hydroxyzine and Invega.

A treatment plan dated 12/11/14 noted the inmate had psychotic symptoms, but was treatment adherent with decreased distress due to "whispering and buzzing" that he experienced.  He was actively involved in 79 percent of his scheduled treatment groups and consistently attended individual therapy.  Treatment goals and interventions were clinically appropriate.  The Form 7388B did not note criteria for higher level of care referral consideration.

Progress notes indicated the PC saw the inmate consistently, but not weekly.  The psychiatrist also followed the inmate consistently, and there were occasional medication adjustments to address symptoms, including nightly auditory hallucinations.  Some psychiatry contacts occurred by way of telepsychiatry.

703

<u>Findings</u>

The mental health care provided to this inmate was generally adequate, but there were noted lapses in weekly PC contacts.  The psychiatrist consistently followed the inmate with appropriate medication management to address his persistent psychotic symptoms.

**Inmate C**

This inmate's healthcare record was reviewed to assess the adequacy of his level of care.  CDCR data provided prior to the site visit indicated he was admitted to the MHCB more than three times during the review period.  He arrived at the SVSP MHCB from ASP as a psych and return on 12/12/14.  While in the MHCB, he was delusional and paranoid and made threats that if housed with another inmate he would kill him.  He was diagnosed with Psychotic Disorder NOS with provisional diagnoses of substance induced persisting psychosis and Schizophrenia for consideration.  Medication initiated at the MHCB included Risperdal, benztropine mesylate, and buspirone.  On 12/26/14, the inmate was referred to acute care.  The discharge summary in the eUHR indicated that he was discharged from the MHCB on 1/27/15, but conflicting documentation indicated that he was in the MHCB until 1/30/15.

ASP background data indicated that the psychotic symptoms were evident in September 2014, but the inmate had refused psychiatric medication.  His level of care remained 3CMS until he was transferred to the MHCB.  ASP documentation from October 2014 supported a diagnosis of Bipolar Disorder by history with a rule-out of Schizophrenia, paranoid type, and 3CMS care was continued.  A largely illegible psychiatric note dated November 2014 indicated that the inmate refused psychiatric medication.  He was referred to psychiatry on 12/10/14 due to psychosis with a plan to discuss moving him to the EOP level of care.  That same day he was seen for a crisis referral due to psychosis, and he was referred to the MHCB.

<u>Findings</u>

There was a discrepancy between provided documentation and the eUHR.  The data indicated that the inmate had three separate MHCB admissions, but the eUHR indicated only one MHCB admission.  The diagnostic rule-out of a substance induced persisting psychosis was unclear given the documentation of psychosis in the three months prior to MHCB admission, which was not consistent with diagnostic criteria for this diagnosis and provided no rationale (i.e. no documentation supporting that the inmate disclosed recent drug use or tested positive).  Overall, the level of care for this inmate, while delayed, was appropriate.  The date of DSH referral exceeded the 10-day Program Guide timeframe, and the rationale for the delay was unclear.  The date of DSH acceptance and the reason for the delay in transfer to DSH from the MHCB were also unclear.

**Inmate D**

704

This inmate's eUHR was reviewed at plaintiffs' attorneys' request, who expressed concern that he had been in the SVSP administrative segregation EOP for 501 days. He had been in acute care at DSH-Stockton from 3/19/14 to 5/29/14, when he was transferred to intermediate care. He was discharged on 8/6/14. To facilitate increased family support, a transfer close to Sacramento was recommended.

At the time of discharge the inmate was prescribed Mirtazapine. He was discharged to the EOP level of care. He was subsequently placed in administrative segregation on 8/22/14 after he received an RVR for indecent exposure. He remained in administrative segregation on D2 yard at the EOP level of care.

The inmate was provided with diagnoses of Borderline Personality Disorder and Major Depressive Disorder, recurrent, severe without psychotic features. He had a history of manipulating staff through splitting and had made mental health complaints to facilitate housing changes. He had a history of self-harm behavior, including head banging and cutting, as well as suicidal ideation and two near lethal suicide attempts. In the past, he indicated that he was unsure if he would disclose suicidal ideation. It was recommended that all self-harm attempts be taken seriously.

While at SVSP, he attended his IDTT on 9/3/14 and a treatment plan was completed. There was some confusion in the healthcare record as both treatment plans dated 9/3/14 and 11/13/14 were marked as initial. He did not attend the IDTT meeting on 11/13/14. Treatment team members at the 11/13/14 IDTT meeting were his PC and correctional counselor; the psychiatrist was not present.

The inmate was placed on suicide watch on 11/3/14 in the CTC. This was initiated due to concerns that he posed a danger to himself and had mood lability. He was not admitted to the MHCB. Since his placement at SVSP, he had a pattern of refusing groups. This was discussed at his IDTT meeting on 1/21/15, which was attended by his PC, correctional counselor, telepsychiatrist, and psych tech. Since his last IDTT on 11/13/14, he had refused 72 percent of groups and intermittently attended individual sessions. His group treatment refusal was reportedly due to being ashamed of wearing the IEX jumpsuit. A referral to a higher level of care was considered but not made with the rationale that he was functioning adequately and attending to his ADLs. He was placed on a modified treatment plan. The plan was unclear but indicated that the inmate would attend one or more of the scheduled weekly groups. The short-term objective was having him attend 50 percent or more of scheduled weekly groups over 30 days or more by 2/25/15, 4/15/15, and 8/30/15.

PC weekly clinical contact progress notes appeared to be based upon the use of templates. For example, under the stated reason for treatment refusal, documentation indicated that he "reported he had been having a difficult week, but that he was going to start going back to groups." This documentation was present in a random sampling of group notes dated 11/25/14, 12/19/15, 1/2/15, 2/6/15, and 2/10/15. The inmate was prescribed Clonidine.

Findings

The inmate had been in the administrative segregation EOP since 8/22/14. The timeliness of IDTT meetings was within the Program Guide's 90-day timeframe. As documented on the treatment plan, attendance of all treatment team members was not consistent. While the EOP level of care was appropriate for this inmate, given his ongoing pattern of treatment noncompliance that occurred in close proximity to his DSH discharge, a modified treatment plan should have been considered sooner than 1/21/15. The treatment plans dated 9/3/14 and 11/13/14 were both marked as initial, while PC notes used templates as opposed to an individualized conceptualization and documentation of the inmate's specific treatment needs, which was problematic.

**Inmate E**

This case was reviewed due to inconsistent MHCB staff reports for the reason for alternative housing placements during the site visit. This EOP inmate had a prior MHCB placement from 9/18/14 to 9/22/14 due to a threat that he would kill himself if he were returned to his then-current housing. He later recanted the suicidal statement. It was apparent to staff that he was having safety concerns which he was having difficulty managing. Staff reviewed his coping skills. He was provided with diagnoses of Major Depressive Disorder and Mood Disorder NOS. He was prescribed Effexor ER and Risperdal.

On 2/17/15, the inmate was on one-to-one suicide watch in the CTC in an alternative housing cell. When MHCB staff was asked about his status, it was reported that he was not on suicide watch but was placed on one-to-one due to a PREA security policy. Monitors and regional headquarters staff were told that a copy of the PREA policy would be provided. It was later learned that a policy was being developed through QMSU and there was no current LOP. The DOM (S4040.8) required that when an inmate disclosed a PREA incident, a nurse shall request an urgent suicide assessment and until it was completed, the inmate was placed on suicide precaution status. This must occur within four hours of the nurse's assessment. There was no mention of a security watch.

A nursing note on the triage and treatment services flow show sheet indicated that the inmate was placed on suicide watch on 2/16/15 at 8:50 p.m. in the CTC. It was unclear if HC-POP was notified. On the morning of 2/17/15, the inmate told mental health staff he was not suicidal and disclosed a PREA incident. He was evaluated at an outside hospital that afternoon and returned to the CTC on 2/17/15 at 9:20 p.m. and the suicide watch was continued. He reported to mental health staff that he was suicidal with a plan. MHCB staff reported that HC-POP was not notified until 2/18/15. The inmate was transferred to an MHCB at CSP/Solano on 2/18/15.

Findings

While there was confusion about the logistics of this case, the inmate's care was appropriate. The reason for the suicide watch was unclear to MHCB staff.  There was delay in the notification to HC-POP.  There was also confusion regarding the PREA policy, which at the time of review did not exist, that warranted a security watch.

EXHIBIT Q
Correctional Training Facility (CTF)
April 30, 2015 - May 1, 2015

**Inmate A**

This inmate's healthcare record was reviewed because he was identified as being housed in administrative segregation while at the EOP level of care and awaiting transfer to an administrative segregation hub.  He was diagnosed with Bipolar I Disorder, most recent episode hypomanic, and Polysubstance Abuse.  A previous diagnosis of PTSD was discontinued.  He was treated unsuccessfully with Geodon, which he did not take regularly.

Overall the inmate had an extensive history of mood and thought disorder accompanied by depression and aggressive behavior and what was noted in the record as "unmanaged psychosis." His history was significant for over twenty suicide attempts, some related to auditory hallucinations, starting at age nine; the most recent was a near fatal attempt in 2014 which resulted in the inmate lapsing into a coma and requiring intensive care unit treatment.  Chronic daily suicidal ideation was noted, although the inmate reported that generally he did not inform staff as he did not want to be sent to an OHU/MHCB.  His history was also significant for sexual abuse and multiple head injuries with loss of consciousness.  He was described as a motivated and active treatment participant and as adherent with medications, although other documentation indicated that his compliance with medications was inconsistent.  He was scheduled for CDCR release on 12/21/15.

A 4/3/15 psychiatry note indicated that the inmate started refusing medication two days earlier and that he was not going to yard.  At the time of his 4/7/15 IDTT meeting, he was treated at the 3CMS level of care.  At that time, it was noted that he did not want medication and felt that staff was trying to torture him.  A 4/15/15 PC note indicated weekly 3CMS contacts but also that the inmate remained in bed with a sheet pulled over his face and would not get out of his bed, and communicated by nodding.  He was changed to the EOP level of care at his 4/28/15 IDTT meeting.  At that time, he was noted to have "refractory command hallucinations that told him to assault others."  His chronic suicidal ideation was noted.  It was also reported that he had been tried on an antipsychotic medication but found it uncomfortable and did not want to continue taking it in his current setting.  Staff noted he would benefit from increased group interactions. The risk of danger to self and others was found to be too high for him to be managed at the 3CMS level of care, resulting in the change to the EOP level of care.  A diagnosis of Schizoaffective Disorder was added.

Findings

This inmate was being transferred to the EOP level of care.  This was an appropriate decision although, given his history, symptoms, and treatment non-adherence, the inmate would have likely benefitted had it been made earlier in his course of treatment.  However, once designated as EOP, the inmate's management plan was insufficient in that it did not provide for intensive monitoring and efforts for an expedited transfer to a higher level of care.

**Inmate B**

This inmate's healthcare record was reviewed because he was treated in administrative segregation at the 3CMS level of care.  He also indicated during a group interview that he became paranoid and requested EOP level of care from his treatment team, but their response was to offer him higher dosages of medications.

The inmate was diagnosed with Schizophrenia, paranoid type.  He was treated primarily with Effexor and Haldol.  He also had been treated with Zyprexa, Abilify, Wellbutrin, and Geodon.

The inmate was scheduled for release on 9/27/15.  His treatment plan indicated no need or indications for a higher level of care.

The inmate's history was significant for witnessing what he described as a massacre when he was younger; this marked the beginning of his auditory hallucinations.  He reported multiple suicide attempts starting at age 11.  More recently, he reported numerous fights with cellmates and was assessed as paranoid with persecutory auditory hallucinations.  His plan after parole was to live with his brother or sister.

Findings

This high risk inmate was seen frequently and monitored closely while housed in the CTC's administrative segregation unit.  While he continued to require intensive treatment and ultimately a higher level of care and more intensive parole planning, his treatment was adequate as of the date of review.

**Inmate C**

The inmate's healthcare record was reviewed from a list of inmates having an initial IDTT meeting.  His EPRD was 11/20/15.  The inmate was housed on the South Facility.  He was diagnosed with Anxiety Disorder NOS and Polysubstance Abuse in a controlled environment with a provisional diagnosis of PTSD.  He had the medical condition of hypertension.  The inmate was prescribed a low dose of Prozac and ranitidine.

On 3/19/2015 the inmate self-referred because of anxiety.  He had a history of long-term drug and alcohol use; his father was diagnosed with Bipolar Disorder and was prescribed psychotropic medications.

On 3/25/15 the inmate submitted a Form 7362, and nursing saw him for bowel movement urgency and painful stool evacuation.  He was referred to a nurse practitioner that day and then seen on 4/6/15 by a physician who ordered laboratory testing to address this issue.

On 4/2/15 another Form 7362 was submitted to see the psychiatrist for anxiety.  Mental health had previously seen the inmate on 3/17/15, and he was concerned because the clinician had

710

stated that the inmate would be seen in one week about a medication referral. The inmate was seen on 4/6/15. The clinician informed the inmate that there was a staff shortage and that this was the reason for the delayed appointment. The clinician stated "The IM appeared to receive this information without emotional upset." The session included discussions about positive and negative factors concerning life outside of prison, the inmate's low self-esteem, and concerns about the inmate's ability to keep a job. The clinician referred the inmate to a psychiatrist. The IDTT pre-interview was scheduled for 4/15, and the IDTT meeting was scheduled for 4/23.

The inmate was informed on 4/14/15 that medical test results were negative. The inmate was seen on 4/15/15 for an initial mental health evaluation and SRE as scheduled. He reported that Prozac was helping with depression, but that anxiety was still very high because of his fear of not remaining sober after parole. The inmate's IDTT meeting occurred as scheduled on 4/23/15 and the inmate stated that the mental program was helping him with anxiety concerns. The inmate's medical and mental health concerns were intertwined due to physical and mental anxiety symptoms.

Findings

The 3CMS inmate's clinical care was appropriate. He was seen more frequently than every 90 days and was placed in one of the few groups that was offered to 3CMS inmates. He was also seen by psychiatry. Regional staff were informed about staff inappropriately discussing staffing shortages with inmates seeking support. This inmate would benefit from a medical/mental health case conference.

**Inmate D**

This 3CMS inmate's healthcare record was reviewed from a list of inmates having IDTT meetings on South facility during the site visit. The inmate was diagnosed with PTSD and ADHD. He was prescribed Zoloft and Strattera.

The inmate had previously sued CDCR for medication mismanagement for ADHD and won. He used the money to start a marijuana dispensary. The inmate had arrived in CDCR on 1/07/15 and had a release date of 11/20/15. He had a history of methamphetamine use as well as alcohol and marijuana use to offset the effects of the methamphetamine. His symptoms included difficulty focusing, flight of ideas, distractibility, and impulsivity. The inmate was under the influence for all of his three term offenses. On average he was seen every four to six weeks by the PC and monthly by the psychiatrist.

Findings

The inmate's clinical care was adequate. He was seen more often than the Program Guide required.

**Inmate E**

The inmate's healthcare record was reviewed following a request from plaintiffs' counsel.  The inmate was admitted to the OHU on 1/9/15 due to grave disability and he was discharged on 1/12/15 at the 3CMS level of care.  He was then admitted to the MHCB on 1/23/15 and discharged five days later.  Following MHCB discharge, he was seen for five-day follow-up.  The inmate was again admitted to the OHU on 2/1/15 with a diagnosis of Psychotic Disorder.  Other diagnoses during the OHU stay were Generalized Anxiety Disorder and the latest diagnosis of Adjustment Disorder with anxiety symptoms, along with drug and alcohol dependency.  The only medication he was prescribed was Vistaril as needed.  The SRE was completed on 2/2/15 and indicated low acute and chronic suicide risk.

The inmate had a history of chronic drug and alcohol abuse for more than 20 years.  His clinical care between February and March 2015 was appropriate, focusing on the problems of finding appropriate housing and security level of care changes.  He was designated EOP level of care due to bizarre behavior and an inability to program on South facility yard and to adjust to prison life.  The clinicians attended the UCC and ICC meetings and advocated for appropriate and prompt placement of the inmate.  The clinicians also reached out to family members to assist in understanding the family and societal dynamics that affected the inmate's mental status.  He was seen daily for five-day follow-up, and weekly or more frequently as needed.  The inmate was housed in the OHU for housing purposes, but not for mental health purposes.

The OHU coordinator reported that it was very difficult to find appropriate housing for this inmate due to his security level and EOP status.  The inmate went from a custody level 1 to level 2 and then to level 3, and then back to level 2.  He also transitioned from the 3CMS to EOP level of care.  As bed availability was extremely problematic, the inmate was housed in the OHU until 3/11/15, when he was transferred to CMC.

<u>Findings</u>

The inmate received appropriate mental health care while housed in the OHU.

712

EXHIBIT R
California Men's Colony (CMC)
May 26, 2015 - May 28, 2015

**Inmate A**

The inmate's medical record was reviewed from a list of EOP inmate IDTT meetings that were observed during the site visit.  The inmate's diagnosis was Adjustment Disorder with mixed and depressed mood.  He was not prescribed psychotropic medication.

The inmate arrived at CMC on 5/8/15.  His IDTT goals focused on depression as it related to adjustment to prison life and defiant behavior toward custody.  On a scale of one to ten, the plan was to reduce depression below five and reduce anxiety below four within 90 days.  The inmate's last SRE was completed on 2/12/15.

The inmate's mental health history began at age 12 when he witnessed a fellow passenger being shot to death.  He stated he had no other mental health treatment until his second prison term.  He told the IDTT treatment team of winning an appeal to overturn a third strike conviction, resulting in a new release date in November or December 2015.  Custody was not aware of the appeal or new release date.

There was no discussion during the IDTT meeting or documentation about the death of the inmate's grandmother one week prior to his arrival at CMC.  On the progress note dated 5/20/15, the clinician reported being unable to give clinical input on the inmate's medication compliance even though the medication noncompliance was documented.  The clinician also stated the Form 7388 discussion regarding level of care was not necessary because the inmate was a new arrival.

<u>Findings</u>

The clinical assessment and IDTT occurred timely.  However, lack of discussion during the IDTT meeting of the immediate stressor of the inmate's grandmother dying the week prior to arrival, lack of review and utilization of information gleaned from previous documentation, and the statement that the higher level of care discussion was not relevant due to the inmate's new arrival status made this assessment inadequate.

**Inmate B**

This inmate's medical chart was reviewed from a list of EOP inmate IDTT meetings that were observed during the site visit.  The inmate's diagnosis was Schizophrenia Paranoid Type.  Prescribed mental health medication was Risperdal and Cogentin.

The inmate was serving a ten-year sentence for burglary and had amphetamine and PCP abuse and dependency.  He had a history of inpatient hospitalization and intermittent auditory and visual hallucinations, and in the past, was observed responding to internal stimuli.  At a previous prison, gang members pressured him not to take mental health medications and to support gang activities.  Review of previous notes revealed that he was observed snorting something, and these concerns were discussed with him.  However, no other discussion or observation of any illicit drug use was discussed in successive notes.

714

The inmate had been housed in CMC's ADL housing for low functioning EOP inmates, but was recently transferred to regular housing.  The treatment plan addressed a history of psychotic symptoms; one goal was to reduce auditory hallucinations from three to one on a scale of one to ten.  The inmate reported not having auditory hallucinations for more than nine months.  A second goal was to increase positive learned coping skills by identifying and performing three positive coping skills; the inmate maintained more than three positive coping skills for more than six months.  The third goal, which was also met, was to maintain sobriety.

The SRE dated 3/3/15 indicated low risk for acute and chronic suicide risk.

Since the last 90-day follow-up IDTT meeting, the inmate received milestone credits, resulting in a four-week sentence reduction.  He was reported to have attended 17 weekly hours of treatment.  He also had not experienced any psychotic symptoms for almost one year according to the Forms 7388 and 7388B dated 3/3/15.  The inmate worked as a dining room porter and attended stress management, substance abuse, documentary films, and depression management groups, as well as yard.  He stated at the IDTT meeting that he had recently joined AA.

<u>Findings</u>

The primary care and psychiatry contacts were conducted timely for the reporting period and the IDTT meeting was appropriate.  Clinical staff would benefit from a reevaluation of new goals for the inmate; previous goals were met over six months ago.

**Inmate C**

This EOP inmate's healthcare record was reviewed from a list of inmates housed in administrative segregation for longer than 90 days.  His diagnosis was Psychotic Disorder NOS, and he was prescribed Thorazine.

The inmate was discharged from the MHCB and arrived at CMC on 1/30/15.  He denied any history of mental illness or contact with the mental health system prior to prison, but also reported previously receiving SSI for mental health disability.  His mental illness began in his late 20s with a bipolar diagnosis and six involuntary admissions due to being "stressed out," two MHCB admissions while in prison for bizarre behavior, and hearing voices.  Custodial charges included sexual battery and administrative segregation placement in response to a 115 on 3/11/15 for battery of a peace officer and IEX.  He had two prior 115s for IEX.  The MH-115 indicated the clinician assessed the inmate's insight and judgment "appear to be impaired by a chronic mental disorder and mental illness was a factor in the inmate's behavior."  An SRE indicated a previous documented suicide attempt, but the inmate denied it in subsequent clinical sessions.  The history also included an intermediate care referral on 4/22/15 and consistent refusal to come out of his cell for confidential PC contacts.

715

<u>Findings</u>

The inmate's clinical care was adequate.  The MH-115 was also completed timely and was clinically relevant based on sound clinical judgement.

**Inmate D**

This EOP inmate's healthcare record was reviewed from a list of inmates who were housed in administrative segregation for longer than 90 days.  His diagnosis was Adjustment Disorder, with mixed disturbance of emotions.  He was prescribed Remeron and Vistaril.  He was an undocumented 27-year-old DD2 inmate.  He had been housed in multiple administrative segregation units for 426 days.  He was placed on NDS 102 status on 3/19/15.  He also had a long history of suicidal ideation and immediate recanting of suicidal ideation upon MHCB admission.  His latest MHCB admission was from 3/14/15 to 3/16/15; prior MHCB admissions during this review period were from 12/4/14 to 12/11/14, 1/20/15 to 1/28/15, 3/1/15 to 3/3/15, and 3/6/15 to 3/9/15.  The medical record indicated the inmate was not referred to a higher level of care due to his immediate recanting of suicidal ideations.  The inmate received two IEXs in three months.

An interpreter was used during most contacts as the inmate spoke very limited English.  Treatment goals were to improve insight, treatment compliance, and coping skills.  Psychoeducational materials were provided in Spanish.  In April 2015, the inmate stopped taking medication with a goal of moving to the 3CMS level of care.  The clinician suspected peer pressure, but the inmate adamantly denied any peer pressure.  According to the medical record, the inmate was victimized and housed for safety concerns along with IEX 115s.  The inmate was transferred to RJD on 5/8/15.

<u>Findings</u>

The inmate's clinical care was adequate and he was seen consistently while housed in administrative segregation.

716

EXHIBIT S
Wasco State Prison (WSP)
March 3, 2015 - March 5, 2015

**Inmate A**

This case was selected for review because the inmate had been identified as meeting DSH referral criteria on at least three different occasions, but was not referred to DSH. This 26-year-old EOP inmate reported a history of mental health treatment. He was placed into the EOP at the time of intake. By the time of the inmate's first treatment team meeting, his treatment participation had already fallen below 50 percent; it was noted that his auditory hallucinations had increased and that he chose to lay down on his bunk to try to control the voices and to cope with them. The PC accommodated the inmate by developing homework for him to make up for the group time he missed, to increase individual contacts to twice weekly, and to work on increasing coping skills to address the auditory hallucinations. At that time, no information was located in the healthcare record regarding medications or discussions with the psychiatrist about the auditory hallucinations.

The inmate had been diagnosed with Schizoaffective Disorder, Amphetamine Dependence, and Cannabis Abuse. He was prescribed Depakote, olanzapine, and hydroxyzine. The Form 7388Bs completed on 8/5/14, 8/12/14, and 9/9/14 were identical and clearly cut and pasted. The treatment plan was not revised when the inmate did not improve, and the treatment team referred to the inmate's lack of an intent to harm self or others as though this were the only criterion for DSH referral consideration. The inmate clearly stated to his PC that his symptoms were worsening, but the treatment plan was not modified; however, the inmate was eventually referred to the psychiatrist for a medication evaluation for a possible medication adjustment. This should have occurred when the inmate first disclosed an increase in auditory hallucinations. The treatment plan indicated that the inmate would be seen twice weekly by his PC, but the progress notes did not support this frequency of clinical contacts. The PC also apparently did not review the objective data (on-demand reports) available regarding the Form 7388B items (i.e.., treatment participation) as the PC simply accepted the inmate's statement that he had returned to groups; this despite the fact that the on-demand reports indicated that he continued to refuse more than 50 percent of treatment. The treatment plan also remained unchanged even though several items on the plan should have been achieved (e.g., see psychiatrist and complete specific homework assignment).

By the end of August 2014, the two weekly PC visits were finally implemented. Despite the inmate's report to the PC that he would attend groups and evidence to the contrary, the treatment plan was not modified to address the inmate's lack of participation and decompensation.

Findings

The inmate was decompensating as his symptoms increased. His treatment plan was not modified to address this decompensation. The inmate should have been considered for DSH referral. At a minimum, the treatment team should have revised the treatment plan to adequately address the decompensation. This inmate did not receive adequate mental health treatment.

**Inmate B**

This case was reviewed because the inmate was identified as meeting criteria for DSH referral consideration on four different occasions, each time for treatment participation of less than 50 percent, but the inmate was never referred.  The 54-year-old EOP inmate was admitted to the MHCB at CSP/Corcoran on 7/25/14, and he was not discharged until 8/12/15.  The inmate had suicidal ideation at the time of admission with grandiose delusional thinking and manic behaviors.  He was provided with a diagnosis of Bipolar I Disorder, most recent episode manic by history, Alcohol Dependence, institutional remission, and Cannabis Dependence, institutional remission.  He was prescribed Risperdal, Vistaril, Depakote, and Zyprexa.

The inmate's treatment plan dated 8/26/15 was somewhat confusing in that it referenced the inmate seeing the PC twice weekly "until he transfers to DSH;" however, another section in the plan stated that no DSH referral was indicated.  The treatment plan also indicated that the inmate would be placed at the EOP level of care.  The Form 7388B of that date did not indicate a DSH referral.

The next treatment plan was dated 9/23/14.  At this treatment team meeting, the inmate clearly had not improved and was not attending group treatment due to symptoms of his mental illness.  This treatment plan was unchanged from the plan one month prior; the plan even included the confusing "DSH" statement previously described.  The reason provided for DSH non-referral was that the inmate was able to care for and advocate for himself.  However, in the same treatment plan, the clinician noted that the inmate's speech was frequently tangential and repetitive and that he had poor memory; these findings brought into question whether the inmate actually could adequately advocate for himself in the prison setting.  The clinician also stated that the inmate was programming normally when in actuality he was not.  The treatment plan's narrative clearly stated that the inmate was not attending treatment groups and that he spent much of his time telling people that he was God and had created the world, among other grandiose statements.  The rationale provided for non-referral was clinically inadequate.  The clinician also did not appear to recognize that the inmate's stated reasons for avoiding groups were reflective of his mental illness (e.g., avoidance, religious preoccupation).

The next treatment plan dated 10/21/14 included some changes; this plan added delusions and upcoming parole to the plan, but again portions were cut and pasted including previously described working.  Some aspects of the additional treatment targets and interventions were clinically relevant, but they required greater specification and operationalization.  Based on handwritten notes in the treatment team document, the inmate was very psychotic during the IDTT meeting and was actively responding to internal stimuli.  Overall, this was not reflected in the document, but the inmate was apparently scheduled for psychiatric contact later in the week.  It was unclear why the inmate was not seen by the psychiatrist later that day given the acute nature of his symptoms.  Again, the exact same reasons were provided for DSH non-referral as were provided the prior month.  There were no new treatment plan modifications, despite the failure of prior interventions and the inmate's continued decompensation.

719

The treatment plan dated 11/18/14 was identical to the October 2014 treatment plan.  The DSH non-referral rationale was unchanged, and the treatment plan appeared to be cut and pasted from prior treatment plans.  It should also be noted that the DSH coordinator determined that the November Form 7388B was acceptable during the DSH audit procedures; however, when this expert utilized the same criteria for audit, the Form 7388- B was determined to be unacceptable as it was not completed appropriately.

Findings

This inmate did not receive adequate mental health treatment.  Treatment planning was poor. The inmate was not adequately considered for DSH referral for which he met criteria consideration.  The Form 7388B was not appropriately completed as evidenced by the use of the cut and paste process, and by the failure to utilize appropriate clinical interventions and to adequately address the inmate's continued decompensation.

**Inmate C**

This case was selected for review because the inmate had been identified three times as meeting DSH referral criteria but had not been referred.  This 33-year old reception center EOP inmate was not referred because he was reportedly programming appropriately despite meeting criterion seven as he had refused more than 50 percent of his treatment.  He was prescribed Celexa, trileptal, Clonidine, and Prolixin.  The treatment plan dated 9/10/14 revealed that the inmate stated that he was not attending treatment groups because the groups occurred at the same time as day room time.  On the Form 7388B, the non-referral reason indicated that the inmate was programming appropriately when in actuality he was not.  In the modifications section of the treatment plan, it was noted that the inmate would receive one extra weekly PC session "as needed" because he had not been attending group as much due to self-reported increases in depression and social anxiety.  The inmate would also be provided with "resource materials" related to anxiety and depression instead of groups.  The plan was silent, however, regarding how these materials would be beneficial in addressing these issues.  Subsequent treatment plans dated 10/8/14 and 11/4/14 were unchanged even though the inmate did not improve and may have actually decompensated.

Findings

The Form 7388B was not appropriately completed or revised, despite the inmate's failure to improve over time.  This inmate did not receive adequate mental health treatment.

**Inmate D**

This case was selected for review because the inmate had been identified eight different times as meeting criteria for DSH referral, but was never referred.  The inmate had been admitted to DSH on 6/25/14, but he was immediately clinically discharged because he reported to staff that he had used suicide to obtain a housing change and that he wanted to do his time in a hospital instead of

a prison.  The initial documentation at WSP noting possible DSH referral consideration occurred during September 2014.

This 28-year-old EOP inmate was placed on a PC 2602 order due to danger to self on 10/1/14.  He had multiple MHCB admissions dating back to April 2014.  He was frequently admitted with a diagnosis of Adjustment Disorder, and clinical staff typically noted that the inmate had secondary gain for the admission.  However, the 8/19/14 psychiatry discharge summary indicated that psychological testing revealed the inmate had a psychotic disorder with prominent delusional thinking.  He was provided with a diagnosis of Psychotic Disorder NOS and Personality Disorder NOS with antisocial, narcissistic, and borderline traits.  The inmate remained in the MHCB for two months, reportedly in part because clinical staff was attempting to obtain a PC 2602.  The inmate's diagnoses were also changed during that admission to Bipolar Disorder, most recent episode manic, severe with psychosis and Antisocial Personality Disorder with borderline and narcissistic traits.  The inmate was described as manic for one month during this time in the MHCB; he exhibited grandiose and bizarre delusions.  The inmate clearly met criteria for acute care during those 30 days.  He subsequently demonstrated significant depressive symptoms; again, sufficient rationale for referral for acute care.  It was of concern that this inmate was maintained in the MHCB for this prolonged period of time when he required referral to a higher level of care.

A PC 2602 was finally initiated on 10/1/14; at that time, the inmate was described as more stable.  He was discharged to the EOP level of care with a recommendation for a single cell.  However, the inmate returned to the MHCB within two days.  His primary diagnosis was changed from Bipolar Disorder to Psychotic Disorder NOS.

The MHCB treatment plans were inadequate.  On 8/25/14, the Form 7388B was not appropriately completed; no rationale was provided for DSH non-referral despite the fact that the inmate met multiple criteria, and no treatment modifications were listed as the Form required.  On 9/3/14, the rationale for non-referral was not clearly explained.  The treatment modifications were little more than required treatment.  The subsequent treatment plan, which was dated 9/10/14, included more information, but it was not well-organized with interventions, treatment goals, treatment targets, and progress in the correct areas.  The associated Form 7388B did not provide an adequate non-referral justification, but indicated that the inmate stated he would remain suicidal for his entire sentence because he was unable to accept the current sentence and suffered from Bipolar Disorder, yet he declined medication.  The Form 7388B indicated that the treatment plan continued to be "revised."  These two sections were cut and pasted and remained identical on 9/16/14, 9/23/14, and 9/30/14.

The Form 7388B of 10/7/14 was handwritten but was effectively the same as the prior Form 7388B.  The only addition was that the inmate had recently been prescribed medications, but should be noted that the inmate also completely refused treatment.  There was no clear clinical rationale for DSH non-referral.  Due to the cut and paste nature of the Form 7388Bs, there was no accurate assessment of the number of MHCB placements, although there were clearly more than three.  The Form 7388B of 10/15/14 was nearly complete, but there was no treatment plan that accompanied it.  On 10/27/14, the treatment plan included interventions that were

unavailable within the MHCB, which made the plan obsolete and inadequate; this plan was developed at another facility.  The 11/4/14 treatment plan was much more thoroughly developed, although some of the interventions also were not available in the MHCB.  The associated Form 7388B was also more clinically appropriate and adequate.  The inmate had since transferred to CSP/Corcoran.

Findings
While the decision not to refer the inmate to DSH may have been clinically appropriate, the documentation to justify that decision was inadequate.  Documentation varied between describing the inmate as a malingerer with an Adjustment Disorder to an extremely mentally ill inmate with Bipolar I Disorder who at times exaggerated his symptomatology to cope with some of his fears and difficult situations.  At one point the inmate was maintained in the MHCB for two months due to his acute symptoms, which clearly justified acute care referral.  It was during that time that clinical staff finally sought and acquired a PC 2602 for the inmate.  This inmate did not receive adequate mental health treatment.

**Inmate E**

This case was selected for review because the inmate was identified as meeting criteria for DSH referral on at least five different occasions, but was never referred.  This 54-year-old reception center EOP inmate was diagnosed with Schizophrenia, paranoid type.  He was prescribed risperidone, mirtazapine, and hydroxyzine.  The inmate's treatment plan dated 8/6/14 was generally adequate except that it referenced "weekly" groups rather than daily group therapy.  The Form 7388B did not explain why the DSH referral was not made, but only stated that the inmate did not meet DSH criteria and did not attend groups because he wanted to view his cell at all times.  It appeared that the only treatment modification was the addition of homework assignments; it was unclear from the documentation whether the inmate benefited from them.

The next treatment plan, dated 9/3/14, indicated that treatment participation had decreased from approximately 37 percent to 26 percent, but the treatment plan remained unchanged.  The Form 7388B was unchanged from prior months, with obvious cut and pasted sections.  This pattern was repeated for the two subsequent treatment plans of 10/1/14 and 10/29/14, despite the inmate's decreasing participation of 23 percent and 13 percent, respectively.  These treatment plans remained unchanged despite the inmate's paranoia, continued withdrawal from treatment and ever-worsening clinical condition.  By 11/25/14, the inmate's treatment participation had decreased to 11 percent; however, there were no substantive changes made to the treatment plan or the Form 7388B.  The same was true for the 12/22/14 treatment plan, when participation remained at 11 percent, and effectively the same for 1/20/15, when participation was 12 percent.  This was of extreme concern because the inmate was clinically deteriorating in his cell while his negative symptoms dominated and interfered with his ability to access treatment.  It was unclear why mental health staff failed to recognize the connection between the inmate's paranoia, refusal to engage fully with treatment, and rationale for refusing treatment ("I want to see my cell at all times…somebody put a knife in my cell when I was at Chino.").  Staff continued to "encourage" the inmate to participate in treatment for six months, despite the lack of efficacy of

722

this method of prompting.  This inmate would have benefitted from a behavioral intervention; however, this was not provided by the treatment team.

Findings

This inmate should have been referred to DSH for a higher level of care.  He did not receive adequate mental health care at WSP.  The inmate's treatment plan was clinically inadequate based on his serious symptoms and continued lack of treatment engagement.  This inmate was discussed with supervisory staff to address the issues identified.

**Inmate F**

This case was selected for review as an example of MHCB care.  This 57-year-old inmate was admitted to the MHCB on 2/26/15, with a provisional diagnosis of Schizoaffective Disorder.  His discharge diagnosis was Schizophrenia, paranoid type and Depressive Disorder NOS.  The inmate was admitted to the MHCB due to experiencing suicidal ideation and auditory hallucinations.  The history and physical was completed timely, but the psychiatric intake evaluation was performed one day late.  The initial treatment team timely saw the inmate on 2/26/15.  That treatment plan noted that the inmate had multiple suicide attempts in his history and monthly attempts while at WSP, in November and December 2014, and January and February 2015.  However, some staff did not view the suicide attempts as genuine, but rather as a way for the inmate to obtain placement in a state hospital.  There was only one recreational therapist note in the healthcare record from the MHCB admission.  Otherwise, the inmate was only seen by the psychologist and psychiatrist during his stay.  The psychologist progress notes did not always indicate whether the contact was in a confidential setting, although the psychiatry notes did.

The inmate was prescribed Depakote, Remeron, Risperdal Consta, and oral Risperdal (on a tapering dosage regimen) and Cogentin.  A progress note dated 2/27/15 by the MHCB psychologist indicated that the psychologist incorrectly believed that DSH placement might add time to the inmate's overall prison term.  This issue was brought to the attention of the DSH coordinator to address with staff training.  The documentation of MHCB treatment suggested that clinical contacts with the psychologist and psychiatrist were brief in duration and did not occur daily.  The most recent treatment plan dated 3/2/15 mischaracterized the inmate as a 49-year-old man, and it was unclear whether the treatment plan was for this inmate or another individual.  The Form 7388B did not properly identify the inmate as having had three MHCB placements in the numbered criteria, although it was noted in the narrative section.  An adequate non-referral rationale was not provided, and no treatment modifications were listed.

Findings

MHCB treatment primarily involved isolation and medication management.  Clinical contacts did not occur daily based upon documentation in the healthcare record.  Consequently, this inmate did not receive adequate mental health treatment.

**Inmate G**

This case was selected for review at the request of the plaintiffs' attorneys. This 22-year-old 3CMS inmate complained about his placement in the reception center after returning from out of state as a mainline 3CMS inmate. While housed in the reception center, which was a WSP practice for returning out of state inmates, the inmate did not have access to the phone or to his property. Mental health staff saw the inmate frequently; there were eight visits immediately following his return in April 2014, one monthly in May, June, July and August 2014, and then every other month during October, December 2014 and February 2015.

The inmate had no history of prior mental health treatment, but he reported vague auditory hallucinations and symptoms of depression. His diagnosis was Mood Disorder NOS, and he was prescribed Trazodone and Benadryl.

The initial treatment plan dated 5/7/14 was clinically inadequate. The most recent treatment plan dated 1/14/15 was handwritten and was difficult to read; although improved from the previous treatment plan, this plan also was clinically inadequate. The treatment plan required measureable goals, greater specificity with interventions and treatment targets, and realistic interventions given the expected frequency of contacts. The inmate did not attend the IDTT, and the reason provided for his absence was nonsensical, namely, that he "was not present due to COCF." The most recent psychiatry contact progress note was handwritten and mostly illegible.

<u>Findings</u>

This inmate was seen timely for clinical contacts; however, the inmate was not appropriately treated as his initial treatment plan was inadequate, and the subsequent plan had not been fully implemented.

**Inmate H**

This case was selected for review at the request of plaintiffs' attorneys. This 49-year-old inmate complained that he had difficulty being seen by a psychiatrist. There were bridge orders written for mirtazapine 15 mg at night and fluoxetine 20 mg on 11/21/14. He was scheduled to be seen on 12/9/14, but the provider cancelled that appointment. The inmate was next scheduled to be seen on 12/11/14, but he did not did not show for the appointment. The provider generated a refusal form, but the inmate refused to sign it.

The inmate was provided with a diagnosis of Major Depressive Disorder. On 1/20/15, he was scheduled to be seen by his PC for a 90-day contact, but he refused. While signing the refusal, he mentioned to his PC that he did not have a refill of his medication. According to the PC, his medication was discontinued on 12/4/14. The PC did not generate a referral to psychiatry. The inmate was seen on 2/12/15 as the result of an inmate request to be seen. The PC noted mild depressive symptoms and that the inmate reported that he believed he was functioning well without medication at that time. A psychiatric referral was not generated. As the inmate was

housed in the reception center, there was no treatment plan.  This case was discussed with mental health management, and the inmate was scheduled for a psychiatric medication evaluation.

Findings

This inmate was not seen as indicated by psychiatry.  He was not appropriately seen for follow up evaluation, and his medications were discontinued without a face to face evaluation and without his knowledge. There was no information why the inmate refused to sign the refusal form and it did not appear that the psychiatrist attempted to obtain his signature.  As such, the inmate did not receive adequate mental health treatment.

**Inmate I**

This 49-year-old first term inmate had multiple MHCB admissions beginning in July 2014.  This case was selected for review to review his restraint placement; at times there were only hours or even minutes between restraint episodes for this inmate.  During July 2014 he swallowed a razor blade, requiring treatment at an outside hospital for removal.  The inmate had a significant history of this behavior, beginning at age 20, and he was receiving SSI in the community for depression.  He was diagnosed with Mood Disorder NOS, Adjustment Disorder with depressed mood, and Borderline Personality Disorder.  He was prescribed Zyprexa, Depakote, and Prozac. The inmate was readmitted to the MHCB on 8/21/14 after hearing voices telling him to "do something…to swallow razor."  The inmate swallowed a small pencil and then removed his indwelling Foley catheter.  He also swallowed a metal clamp from the Foley catheter.

The physician's orders for restraints did not always include the release criteria.  The restraint log revealed that one episode of restraints included what appeared to be a standing order for restraints use, which was not clinically appropriate.  It also appeared that the only release criterion documented was when the inmate was sleeping.  Another restraint episode had release criteria that was too vague (i.e., when inmate "calm(s) down").  The underlying behaviors prompting the use of restraints appeared to be appropriate, and it appeared that nursing staff removed the inmate from restraints as soon as was clinically indicated.

Findings

The inmate was not treated adequately in light of the documentation errors regarding restraint orders.  Nursing documentation was in accordance with policy.  The inmate was also an appropriate candidate for DSH intermediate care referral consideration.

**Inmate J**

This case was randomly selected from a list of EOP inmates identified as high refusers in order to review the care provided.  Jail transfer records noted the inmate's history of psychiatric hospitalization since five years of age, receipt of SSI benefits based on psychiatric impairment, treatment in the county mental health system prior to coming to prison, and a record of PC 1370

commitment. The inmate arrived at the WSP reception center on 5/30/14.  He was treated with ziprasidone upon arrival from the county jail; continuity of care was effectively achieved.

On 6/3/14, a custody officer referred the inmate on an emergency basis to the psychiatrist.  The inmate had refused to enter the housing unit, and the officer found his manner to be bizarre.  The inmate told the psychiatrist he was experiencing auditory hallucinations.  The inmate further expressed the belief that he could become violent if forced to live in dorm housing.  The psychiatrist recommended 3CMS level of care and scheduled a follow-up in seven days.

Several days later, the inmate threatened his cell mate.  He reported being unable to contain violent urges.  An SRE was attempted, but the inmate was vague or non-responsive.  The inmate told the evaluator he had no wish to die and no plan to kill himself.  The evaluation was inconclusive about the inmate's level of suicide risk because of the inmate's inability or unwillingness to participate in the interview.

On 6/8/14, the inmate was admitted to the crisis bed and placed on suicide precautions.  He maintained a bizarre presentation throughout his 22 days in the CTC.  He was noted to frequently speak gibberish.  He appeared unable or unwilling to converse intelligently.  He was variably described as mumbling, smiling, or animated.

An initial treatment plan dated 6/11/14 provided a diagnosis of Psychotic Disorder NOS and Adjustment Disorder.  A level of care decision documented no positive indicators to suggest that a DSH referral should be considered.

A treatment plan prepared on 6/18/14 indicated no progress.  Treatment team members were unable to state whether the inmate suffered from a psychotic disorder or displayed exaggerated symptoms of mental illness for other purposes.

A treatment plan dated 6/25/14 concluded the inmate was unable to function in the MHCB.  The treatment team referred him to DSH.  While on the waiting list, an interim treatment plan provided for him to be offered psychosocial groups and stated that he could receive individual therapy if he requested it.

On 6/30/14, the inmate was admitted to acute care at VPP.  The initial treatment plan considered the CDCR's findings of his bizarre presentation, minimal cooperation, lack of progress in the CTC, and held out as a possibility that the inmate's presentation could be motivated due to housing concerns.  His acute risk for self-harm was assessed as low; chronic risk was assessed as moderate.  The inmate was considered an unreliable historian.  He was eating meals and completing some ADLs, but he stood in the shower without cleaning himself.  He was malodorous.

The inmate was diagnosed with Schizophrenia, undifferentiated type, Alcohol and Cannabis Dependence, and Antisocial Personality Disorder.  The Axis I diagnosis was predicated on numerous factors, including disorganized thought process, thought blocking, and tangential speech.  Psychiatric documentation indicated the inmate had a pattern of consenting to

726

psychiatric medications and then refusing to take them on 7/3/14, 7/7/14, 7/23/14, 7/25/14, 7/30/14, and 8/1/14. On 8/5/14, a PC 2602 was filed. While awaiting the hearing, the inmate became compliant on olanzapine following considerable staff prompting. A hearing was held on 9/4/14 and because the inmate appeared much better, the petition was denied.

On 11/5/14 the inmate discharged to CDCR's EOP SNY. DSH discharge information showed that the inmate had not displayed major behavioral problems and had continued to comply with recommended psychiatric treatment. He was better able to communicate his needs, but remained fearful about programming with other inmates. The risk was noted that if he did not continue with treatment, he could easily return to a paranoid state.

Six days later, the inmate received two RVRs for fighting, resulting in 90 days loss of credit. He began a pattern of refusing antipsychotic medication. He was routinely seen by the PC, but the documentation was not meaningful and shed no light on what was being done to avert a further downward spiral. The inmate was seen by the psychiatrist, but the notes had no clear plan of action other than to prescribe the same medication.

<u>Findings</u>

Significant problems were noted regarding the mental health care provided to this inmate. The inmate entered prison with a substantial history of psychiatric impairment, but this was not taken into consideration during the first emergency psychiatric contact. He was appropriately referred to DSH, but the interim treatment plan inappropriately left the decision for PC contacts in the hands of this severely disturbed MHCB inmate. There was a lack of continuity upon the inmate's return from DSH. It was not clear whether the CDCR providers considered the DSH discharge summary. The inmate became medication nonadherent very soon after he returned to CDCR. The RVRs which were committed soon after his return should have been mitigated by medication nonadherence and his deteriorating mental state. The PC documentation was written in boilerplate fashion and consisted of little more than serial mental status examinations. The psychiatric response to medication nonadherence was inarticulate. A thorough review of the inmate's course of DSH treatment clearly showed how his medication nonadherence had improved. This information was neither noted nor considered by CDCR providers.

**Inmate K**

This case was randomly selected from a list of inmates who attended their IDTT in the administrative segregation unit. The inmate was a 28-year-old male who came to prison on 12/29/14. Jail transfer records showed he had not received mental health treatment in jail. The inmate denied a history of suicidal ideation or attempt, denied any current experience of psychiatric symptoms, had not received bad news, and reported that he had not been treated for a mental health problem.

The inmate was screened by the reception center mental health clinician within several days of arrival. The reception center clinician referred the case for further evaluation based on responses to selected screening items; these included the inmate's report of an alcohol-related

hospitalization at age 15, prior treatment with Remeron in Juvenile Hall, and endorsement of prior experiences of racing thoughts, guilt feelings, and the decreased need for sleep.

Based on a mental health evaluation in which the inmate refused to participate, the clinician concluded that he warranted the diagnosis of a severe mental disorder and met enrollment criteria for treatment in the 3CMS. The assigned diagnosis was not supported by the inmate's report of current symptoms or the clinician's observation of active symptoms. His enrollment was based solely on results of mental health screening and a brief inmate evaluation. The inmate signed a refusal to receive mental health treatment or meet with the psychiatrist. He politely explained his rationale as owing to an ethnic affiliation and the associated prohibition concerning mental health treatment.

The inmate was issued an RVR and placed in administrative segregation. A pre-placement screening was negative for suicide risk or decompensation, and he was cleared for segregated housing.

The inmate's first mental health treatment plan was prepared on 3/4/15, a date which was outside the scope of this review. Noteworthy, however, was documentation in the treatment plan which indicated the inmate's history of depression, mania, euphoria, mood lability, restlessness, insomnia, racing thoughts, and irritability. While further noting that the inmate displayed a stable mood and neither reported nor showed active symptoms of a psychiatric disorder, treatment goals were elaborated. These included such things as reducing emotional distress, learning coping skills to manage symptoms, and changing disordered thoughts. The inmate was described as denying acceptance of treatment.

Findings

The inmate was enrolled in CDCR's mental health program by qualifying mental disorder without adequate justification. The inmate's self-reported lifetime experiences on a prison screening tool did not constitute a substantial basis to diagnose a serious psychiatric disorder. The clinician did not include a progress note describing efforts made to complete the evaluation and a recommendation about how to proceed as stated in the Program Guide. Maintaining inaccurate or unsubstantiated diagnostic information without discussion of the provider's attempt to clarify the diagnosis harmed the inmate in the long run. This inmate was characterized as not accepting the need for treatment of a condition that had not been competently established. The treatment team could have included him in the mental health treatment program, based on medical necessity, with the aim of clarifying the diagnosis.

**Inmate L**

This case was randomly selected from a list of EOP inmates identified as high refusers. The inmate arrived in prison on 10/03/14 and was timely screened by the R&R nurse. Transfer records indicated the inmate arrived under treatment with Zyprexa. He endorsed symptoms of racing thoughts and insomnia. The nurse noted inappropriate responses to questions.

The inmate was seen for an SRE on 10/8/14. Mental health history was noted for at least one temporary involuntary medication order to treat symptoms of paranoia, grandiose delusions, and agitation during a previous term. The inmate was deemed a low acute risk and moderate chronic risk of suicide. The risk reduction plan was to provide brief cognitive behavioral therapy to reduce anger and aggression, and teach stress management.

The inmate was seen timely for his mental health evaluation. He was noted to have prior treatment in CDCR including treatment in DSH in 2006 and multiple MHCB admissions from 1999 to 2010.

The inmate was enrolled in the EOP based on a qualifying mental disorder. This was predicated on his psychiatric treatment history and current display of delusional thinking and magical beliefs. Treatment interventions consisted of medication management and psychosocial groups. Risk reduction strategies from the SRE were not carried forward in the inmate's treatment plan.

The inmate began a pattern of refusing psychiatric medications soon after his enrollment in the treatment program. Numerous referrals were made to mental health which were scheduled with the psychiatrist, but the inmate refused to attend. Timely psychiatry notes were prepared, but it was not always clear that the inmate was present. The psychiatrist frequently referred the reader to past documentation to indicate that the inmate was not doing well and should be referred to DSH. However psychiatric recommendations were not explicitly reflected in the level of care decisions associated with monthly treatment plans. Through the end of 2014, the treatment team consistently rated the inmate as showing no indicators for DSH referral consideration.

On 10/27/14, the inmate was placed on a high refuser list which in CDCR customarily implied that the treatment team should consider whether the treatment plan required modification. The documentation did not clearly indicate that the inmate was placed on a modified treatment plan. During subsequent clinical contacts, the inmate continued to refuse psychiatric treatment but told the clinician he was attending groups. Record review showed that he regularly refused to attend groups, but the clinician appeared to accept his word anyway.

On 1/6/15, the IDTT documented that the inmate was unable to adequately function in the EOP and had not responded sufficiently to treatment of psychotic symptoms. The treatment team referred the inmate to DSH noting his steady decompensation over the past three months; this included refusal to shower, being malodorous in person and cell, circumstantial thought process, and increasing paranoia that interfered with his ability to conduct himself in common areas.

The treatment team noted that he would be placed on a modified treatment plan with twice weekly PC contacts until his admission to DSH. The inmate was transferred to intermediate care at CHCF on 2/11/15.

Findings

The inmate was appropriately transferred to DSH based on his refusal of psychiatric treatment, poor participation in psychosocial activities, and decompensation leading to grave disability.

729

The inmate should have been considered for modified treatment once he was identified as a high refuser of psychiatric medications in light of his significant CDCR treatment history.  Psychiatric recommendations were not readily identified in the level of care decisions and the PC accepted the inmate's word without verification.  The lack of treatment team cohesiveness contributed to delay of his higher level of care transfer.  It was apparent that the inmate was not benefitting from offered EOP treatment services very soon after his arrival.

**Inmate M**

This case was randomly selected from a list of EOP inmates identified as high treatment refusers.  The inmate arrived in the reception center on active treatment with valproic acid for an unspecified Mood Disorder.  The inmate was timely screened and referred for evaluation based on medication status and prior treatment in the MHSDS.

The inmate's history included a one year involuntary medication order from 2013 to 2014.  He had been previously hospitalized at VPP for grave disability and danger to others.  He had been variably enrolled in the 3CMS and EOP during a prior term and was treated with limited treatment adherence.

The intake SRE indicated no current motivation toward suicide.  The inmate denied a history of prior suicide attempts, but was guarded and would disclose only limited personal information.  He was deemed a low suicide risk on both the acute and chronic level.

The inmate was enrolled in the MHSDS at the EOP level of care.  Members of his institutional treatment team provided a diagnosis of Schizophrenia, paranoid type, by history.  This was predicated on his treatment history and receipt of antipsychotic medications inclusive of court-ordered treatment and current evidence of paranoid ideation.

The inmate was classified as DDI due to problems understanding basic directions and an inability to cope with the pressures of prison life.  Healthcare record information indicated that he had poor stress tolerance due to significant deficits in cognitive ability.

Within the first 30 days of arrival, the inmate showed increasing signs of anxiety and pressured speech.  His hygiene deteriorated.  He discontinued psychiatric treatment and refused to meet with the psychiatrist.  He became gravely disabled and smeared feces in the cell, leading to a fight with his cellmate.  The inmate was admitted to the MHCB on 6/12/14, but was unable to achieve stability.  An involuntary medication order was granted on 7/2/14.

The inmate was admitted to acute care at VPP on 7/28/14.  His admission medications were Invega Sustenna, Cogentin, and Thorazine every eight hours for agitation.  He remained on this regimen through discharge on 9/9/14.  He was discharged to the EOP reportedly having gained maximum benefit from treatment.

On return from DSH, the inmate was seen in five-day follow-up where he complained that his cellmate was looking at him in sexually inappropriate ways.  He expressed suicidal thoughts and a plan.  On 9/26/14, he was placed on suicide watch in alternative housing upon results of an SRE.

730

On 10/8/14, he was admitted to the MHCB but minimized suicidal ideation soon after.  He expressed the belief that he could now function in the EOP because he was no longer with his cellmate.  The treatment team considered his long history of psychiatric impairment and treatment nonadherence and concluded that he should remain in the MHCB to ensure his stability.

The inmate discharged on 10/15/14.  He returned to the reception center at WSP where PC 2602 medication continuity was initially problematic.  As a result, his initial readjustment to the reception center was poor.  He required readmission to the MHCB on 11/7/14 with an expected short term stay.  On 11/12/14, he discharged to the EOP, where he was seen for five-day follow-up.  The discharge SRE recommended a risk reduction plan that included stress management techniques to improve impulse control.

He was seen by the psychiatrist on 12/10/14 where he was noted to be adherent with medications.  He offered no mental health complaints.  There was no evidence that recommendations from the most recent SRE had been implemented.

On 12/17/14, treatment team members considered the inmate's multiple MHCB admissions during the last six months.  The treatment team decided not to refer him to DSH based on his adherence with court-ordered medications and improvement in attending group and individual clinical services.

On 1/8/15, the inmate was admitted to the MHCB after he endorsed suicidal ideation with a plan in the context of his cellmate exposing himself and propositioning him.  After admission, the inmate quickly retracted any motivation toward suicide.  He did well on court-ordered medications and within one week expressed the belief that he was ready to discharge and involve himself in the EOP.

Findings

This chronically mentally ill inmate was unable to achieve any substantial period of stability over the nine months he remained in the reception center.  This was largely due to numerous transfers to the MHCB and an acute care DSH treatment facility.  The transfers to a higher level of care were appropriate responses to his diminished capacity to cope in the prison environment.  His diminished capacity to cope was influenced by symptoms of his severe mental disorder.  Poor medication continuity during transfer contributed to decompensation in the CDCR on one occasion.  Documentation showed that higher level of care referral consideration was inadequate.  There was no consideration of recommending a single cell for the inmate.  The omission of such a recommendation was striking in light of his numerous MHCB admissions related to cellmate issues and his extended stay in a temporary housing area such as the reception center.

731

EXHIBIT T
Kern Valley State Prison (KVSP)
March 24, 2015 - March 26, 2015

**Inmate A**

This case was selected for review as the inmate had participated in less than the minimum number of weekly structured treatment hours for an EOP inmate.  Review of the Form 7388B indicated that on 1/18/15 a DSH referral was considered due to his participation in less than 50 percent of offered structured therapeutic activities.  However, the inmate was not referred.  The provided rationale was that the current level of care was clinically indicated.  This review's purpose was to determine whether information on the Form 7388B was clinically adequate.

The inmate had been variably diagnosed with Mood Disorder NOS, Major Depressive Disorder, Psychotic Disorder NOS, Schizophrenia, paranoid type, and Borderline Personality traits.  There had been no reconciliation of these varying diagnoses over the course of his treatment.

The inmate's history was positive for three suicide attempts and DSH admissions.  According to the psychiatric discharge summary for the most recent DSH treatment, he had modest improvement in mood and psychotic symptoms with a recommendation for discharge to the CDCR's EOP program.

The inmate arrived at the KVSP EOP on 10/28/14.  He repeatedly showed little motivation to participate in offered treatment.  On 11/29/14, he was brought to the TTA after complaining of hearing voices.  He was admitted to an alternate housing cell and placed on suicide watch under direct one-to-one observation and prescribed medications.  On 11/30/14, he was discharged to the yard because he was taking medications as prescribed and denied any motivation toward suicidal behavior.  He received timely five-day follow-ups, where he reported doing well.

Throughout December 2014, he continued a pattern of refusing mental health treatment; he answered his PC's questions by denying problems and symptoms.  His living area was routinely described as neat and orderly and he was attending to ADLs without difficulty.  Consistent mental health contacts continued during December 2014 and January 2015.  He refused contact with the psychiatrist or medications, but was found to be in no acute distress and was described as mentally stable.

On 1/28/15, the treatment team concluded that the inmate had reached maximum benefit from the EOP and was not gravely disabled because his ADL functioning was adequate.  On this basis, the team concluded that he no longer met EOP enrollment criteria.  The team acknowledged his non-participation on the Form 7388B, but did not summarize specific treatment modifications to improve his ability to function at the current level of care.  The team's recommendation was to immediately reduce him to the 3CMS level of care.

Findings

This case involved an inmate with a significant CDCR treatment history that included involuntary medications and two transfers to the state hospital involving a total of approximately 15 months of higher level of care treatment.  The diagnostic picture was not clear.  The inmate may have benefitted from a DSH referral for diagnostic clarification.  It was not readily apparent

that treatment providers modified the inmate's treatment plan to improve his participation.  The Form 7388B was used to justify reduction of his care based on the inmate not being gravely disabled, but grave disability was not an inclusion criterion for EOP enrollment.  Form 7388B documentation was not clinically adequate and offered insufficient justification for a lower level of care for this inmate.  The inmate did not receive appropriate care.

**Inmate B**

This inmate's case was randomly selected for review from a list of inmates on the DSH non-referral log.  The Form 7388B dated 1/5/15 indicated consideration of DSH referral based on the inmate requiring 24-hour nursing due to a mental health disorder.  However, the inmate was not referred; the provided rationale was that the MHCB assessment was in process.  The Form 7388B dated 1/8/15 again noted consideration of a DSH referral, noting the inmate's participation in less than 50 percent of offered structured therapeutic activities.  Again, the inmate was not referred; the rationale was that the current level of care was clinically indicated.  The purpose of this review was to determine whether Form 7388B documentation was clinically adequate.

The inmate was placed in alternative housing on 1/1/15 for suicidal and homicidal ideation.  An initial SRE noted high chronic suicide risk, but marked the checkbox as low.  His acute risk was assessed as high.  He was placed on suicide watch under direct one-to-one observation and admitted to the MHCB on 1/2/15.

The initial mental health treatment plan was developed on 1/5/15.  Members of the institutional treatment team provided a diagnosis of Schizoaffective Disorder, bipolar type.  The inmate was prescribed psychiatric medications including Remeron, Zyprexa, and Trileptal.  A level of care decision form completed the same day indicated he required inpatient psychiatric care with 24-hour nursing supervision due to his major mental disorder.  The rationale for the decision not to refer him to DSH was that interventions would be provided in the MHCB.  These interventions included daily clinical contact using CBT to target admission symptoms, psychiatric medication management, nurse monitoring, and suicide precautions.

The PC saw the inmate regularly and educated him with CBT to improve coping strategies.  The psychiatrist regularly met with him, documented symptoms, and made needed medication adjustments.  Levels of suicide observation were assessed and appropriately adjusted.

On 1/8/15 members of the treatment team completed the level of care decision form to evaluate whether the inmate should be referred to a higher level of care in DSH.  The form was a duplicate of that prepared on 1/5/15 and continued to indicate that he required 24-hour nursing care due to his severe mental disorder.  The rationale for the decision not to refer was not individualized and was a duplicate of the previous form.

A discharge SRE dated 1/11/15 still reflected the aforementioned incongruence in chronic risk assessment.  The acute risk was assessed as low based on the inmate's denial of suicidal thoughts

and noted improvement in depression and anxiety symptoms.  Risk reduction plans were not individualized.  Homicidal ideation was not addressed.

The inmate was discharged to the 3CMS level of care on 1/11/15.  He received timely daily follow-ups.

Findings

The inmate was stabilized and received adequate observation for potential threat to self during his MHCB stay.  Medication adjustments were made and appeared to contribute to his stability at discharge.  However, Form 7388B documentation was not clinically adequate.  The treatment team did not meaningfully consider higher level of care referral and boilerplate language was used in the documentation.

**Inmate C**

This case was selected for review from the DSH non-referral log because the inmate had three or more MHCB admissions during the last six months, but was not referred to a higher level of care.  IDTT documentation dated 12/24/14 concluded that he was an unreliable reporter and historian of his mental health symptoms.  He had a strong history of feigning mental health symptoms for secondary gain due to custody-related safety concerns.

The inmate was previously enrolled at the EOP level of care, but was found to have reached maximum benefit on 6/25/14.  He had numerous MHCB admissions from 10/6/14 to 12/11/14 and his level of care was reviewed six times during that period.  Each time the treatment team concluded that the current level of care was clinically indicated and the inmate was discharged from the MHCB to the 3CMS level of care.  Following his admission on 12/6/14, he was elevated to the EOP level of care.  In a level of care review on 12/24/14, the treatment team decided to retain him in the EOP with a focus on helping him to improve impulse control and learn effective ways of communicating safety concerns to custody staff.  The treatment goal was to reduce the number of times he relied on the MHCB as a way of coping with stress.

Subsequent mental health progress notes indicated that the inmate was treated with Mirtazapine, risperidone, and Trileptal to manage symptoms associated with a diagnosis of Bipolar I Disorder, most recent episode depressed.  Psychiatric consultation on 1/17/15 indicated he was semi-compliant with medications and adjustments were made with the inmate's agreement and consent.

During weekly clinical sessions, the inmate reported an increase in depressed mood associated with discontinuing his antidepressant medication.  The clinician described him as able to collaborate with treatment and noted he had been exercising as a way to improve his mood.  He did not express any motivation toward harming himself or require transfer to a crisis bed in the weeks following his last discharge.

<u>Findings</u>

The inmate appeared to be receiving mental health services at the appropriate level of care. Referral to a higher level of care in DSH did not appear to be clinically indicated.

**Inmate D**

This case was selected for review as the inmate had recently returned from DSH.  The purpose of the review was to evaluate continuity of care upon his return to prison.

The inmate was admitted to DSH on 10/1/14 from the KVSP MHCB, where he had been treated for depressed mood, suicidal ideation, and a suicide attempt that involved cutting both forearms and required sutures.  He also reported command hallucinations telling him to kill himself.  He was treated with bupropion, olanzapine, and oxcarbazepine associated with a diagnosis of Bipolar I Disorder, most recent episode mixed with psychotic features.  At the time of discharge on 11/25/14, the inmate continued to experience auditory hallucinations, which were disturbing and of a command nature.  He also had racing thoughts at various times, but denied any motivation to harm himself.

Recommendations at discharge were to place the inmate at the EOP level of care and monitor mood swings, signs of social isolation, irritability, and racing thoughts.  The current plan at discharge was to reduce antidepressant medication as it might be destabilizing his condition.  It was suggested that he might qualify for a diagnosis of ADHD, which might warrant treatment.

On returning to KVSP, there was no documentation that the inmate received five-day follow-up. A completed SRE assessed moderate chronic and acute suicide risk.  The risk reduction plan considered DSH discharge recommendations and noted the inmate's connection with the PC who was known to him.  The PC completed an addendum to a mental health evaluation which she had authored in July 2014.  The PC discussed with the inmate that the treatment plan would introduce other ways of coping that did not rely on interaction with custody staff.  The inmate was cooperative and in agreement with the plan.

The inmate attended most of his groups led by the clinician and recreation therapist.  He was described as variably involved in discussions.

Psychiatry notes indicated the psychiatrist had reviewed medications and the DSH discharge summary and also monitored medication changes made by other psychiatrists.  The inmate appeared capable of expressing his needs and frustrations with the PC and discussed mood issues associated with not hearing from his family.  He expressed no suicide motivation and was not transferred to a crisis bed in the two months following his return from DSH.

<u>Findings</u>

The DSH discharge summary was available and considered by key members of the inmate's treatment team.  Continuity was established in terms of medication and a strong connection was

established with the PC.  According to the healthcare record, the inmate did not receive a period of follow-up visits after his return from DSH.  This aside, he otherwise appeared to receive adequate care in the EOP and there was good treatment continuity between the DSH facility and KVSP.

## Inmate E

This case was selected for review because the inmate was on the DSH non-referral list on 12/25/14 and 1/5/15; on both dates, it was noted that he required 24-hour nursing due to a mental health disorder.  The non-referral rationale was that an MHCB assessment was in process.  This review's purpose was to determine whether Form 7388B documentation was clinically adequate.

The inmate was admitted to the MHCB on 12/24/14 after discharge from an outside hospital, where he was evaluated for altered mental status.  Findings from the hospital discharge report included altered mental state with global amnesia, uncertain etiology, right basal ganglia calcification, and evidence of amphetamine and cannabinoid abuse on the toxicology screen.  When he returned to the crisis bed, he remained in an altered state and was unable to provide any information.

An initial treatment plan was timely developed on 12/25/14.  The inmate did not attend the IDTT meeting.  The provisional diagnosis was Neurocognitive Disorder NOS.  The interventions and goals on the problem list were left blank because the inmate could not participate in treatment planning due to his mental status.  The Form 7388B indicated higher level of care referral consideration.  Specific modifications to the treatment plan to improve the inmate's ability to function were not individualized.  His status was documented as suicide watch.

The inmate was transferred back to the hospital on 12/26/14 and returned to the crisis bed on 12/29/14.  He continued under one-to-one observation for suspected seizure activity and then medically cleared for MHCB placement due to complaints of depression and suicidal ideation.  When seen by the psychiatrist, he denied any suicidal motivation and denied violent ideations and psychotic symptoms.  He was placed on suicide watch in the MHCB.

A treatment plan developed on 1/1/15 noted the inmate was alert, oriented, and coherent.  He reported no memory of events leading up to the MHCB admission or time spent in the hospital.  The diagnosis of record was retained.  Again, interventions and goals on the treatment plan were left blank.  The Form 7388B was completed on 1/5/15, one day prior to his discharge on 1/6/15.  However, it was a duplicate of the Form 7388B composed on 12/25/14 and did not realistically conclude whether the inmate would be referred to a higher level of care.

Findings

Form 7388B documentation dated 12/25/14 was clinically adequate as a higher level of care referral assessment was underway.  However, the form was deficient in terms of documenting treatment plan modifications because it provided information that was incongruous with the

inmate's mental status; the inmate was non-responsive, but treatment modifications included cognitive behavioral interventions.

Documentation on the Form 7388B dated 1/6/15 was deficient and was a duplicate of that composed on 12/25/14.  There was no conclusion of the assessment presumably underway in the MHCB.  Any future treatment provider who wished to know whether the inmate had been considered for higher level of care transfer during this MHCB treatment would not be able to obtain this information by examining the documentation.  The treatment team did not meaningfully document higher level of care referral consideration.

EXHIBIT U
North Kern State Prison (NKSP)
March 17, 2015 - March 19, 2015

**Inmate A**

This 35-year-old male inmate was reviewed because he had more than three alternative housing placements and at least one MHCB referral due to self-injurious behavior or suicidal ideation during the review period. He had also been referred to the DSH acute care psychiatric program in early July 2014 due to depression and command auditory hallucinations to harm himself. He was admitted to DSH, returning to CDCR at the EOP level of care on 9/15/14. He was placed in alternative housing on 9/23/14 due to scratches across his lower arm that his PC observed. When evaluated by alternative housing staff, he stated he was not suicidal but was feeling depressed because he had received news that his father had been hospitalized. He expressed that he was looking forward to seeing his father when he was released from prison after Christmas. He was reported to have been "inconsistent" in reports of prior attempts and was returned to regular housing.

On 10/8/14, the inmate was in alternative housing again for danger to self with scratches and abrasions on his wrist that were made with a plastic toothpick. He reported that his aunt had recently died. The alternative housing log indicated he was there from 10/6/14 to 10/8/14. He was then transferred to the MHCB at CHCF. There was no documentation in the inpatient section of the eUHR from CHCF to indicate how long he was housed in their MHCB.

The inmate was again placed in alternative housing on 11/5/14 due to a cut on his wrist secondary to feelings of stress and depression. When evaluated 30 minutes later he stated that he felt better and just wanted to go back to his cell. He had multiple abrasions and superficial cuts. He was maintained in alternative housing and placed on suicide watch. He was returned to housing on 11/6/14 and was continued at the EOP level of care.

The inmate returned to alternative housing on 11/29/14, following ingestion of Tylenol that necessitated a trip to an outside hospital. He was released later that day. He was again placed in alternative housing on 12/16/14, for danger to self, though the initial placement nursing note did not indicate suicidal ideation. The inmate stated he was "just going through some stuff." He was released from alternative housing the next morning, on 12/17/14, and returned to his cell.

The inmate was prescribed Buspar 45 mg per day, Prozac 20 mg per day, and Zyprexa 20 mg per day; he was provided with a diagnosis of Schizoaffective Disorder, bipolar type. The healthcare record also documented additional diagnoses of Psychotic Disorder NOS and Major Depressive Disorder with psychotic features. His 9/25/14 treatment plan referenced a recommendation by the NKSP MHCB in July 2014 that he would benefit from placement in a DSH intermediate care facility following acute care treatment at DSH. DSH did not address this recommendation in their discharge paperwork. The 9/25/14 treatment plan from the reception center EOP, while detailed, did not sufficiently operationalize goals or target behaviors. Interventions were too vague to address the overly broad treatment targets. The treatment plan also did not address the recommendation for intermediate care.

The next treatment plan, dated 11/20/14, was overdue as the IDTT was to see the inmate monthly. The clinical summary noted his history of rapid decompensation without any obvious

740

precipitants. This would underscore the inaccuracy in the clinician's perception of the inmate's stability and highlight the need for enhanced treatment in light of his frequent crisis placements. The treatment plan continued to reference the intermediate care facility referral recommendation from the MHCB, but did not address the need for such a referral. The Form 7388B did not note this inmate's multiple crisis placements, so he did not appear on the non-referral log. This was also true for the final treatment team meeting on 12/18/14. It was unclear whether the crisis placements resulted in a call to HC-POP to request an MHCB. If staff did not call HC-POP, the inmate might not appear on the on-demand report. The clinical summary for that treatment plan indicated that the inmate had decompensated but again, no consideration of DSH referral was documented.

Findings

This inmate should have been referred to DSH intermediate care. His treatment plan was not properly individualized and operationalized, despite the extensive detail included in the narrative summary. There may have been issues with staff appropriately tracking his alternative housing placements. The inmate was not adequately treated.

**Inmate B**

This 28-year-old inmate was selected for review because he had more than three crisis placements in alternative housing and two MHCB referrals during the review period. NKSP clinical staff properly noted that he met criterion five on the Form 7388Bs in December 2014, January 2015, and February 2015. The inmate had a PC 2602 forced medication order, and he was prescribed Haldol 20 mg per day, Cogentin 2 mg per day, Vistaril 50 mg every six hours as needed and Depakene elixir 750 mg per day. He was provided with diagnoses of Bipolar Disorder NOS and Antisocial Personality Disorder. He was initially referred to DSH acute care during the review period, in September 2014; however, this referral was initiated by CHCF. The inmate had three prior state hospital admissions, including two for competency restoration.

The inmate had an extensive history of self-injurious behavior and substance abuse as reported in his treatment plans. Initial treatment plans, dated 12/11/14 and 1/8/15, developed upon his return included helpful interventions, but required greater operationalization of treatment targets and goals. The most recent treatment plan dated 2/5/15 was more fully operationalized in its treatment goals and well-developed, but did not include operationalized treatment targets. The Form 7388B provided generally adequate justification for DSH non-referral. The most recent Form 7388B, dated 2/5/15, included the clinically justified rationale.

Findings

This inmate was appropriately referred to DSH acute care in September 2014. NKSP mental health staff appropriately did not refer him to DSH at treatment team meetings held in December 2014, January 2015, and February 2015. The inmate was appropriately treated by NKSP.

741

**Inmate C**

This 25-year-old EOP inmate was selected for review because he had three or more crisis placements in alternative housing, but no MHCB referrals despite multiple MHCB placements. There were no treatment plans in the outpatient section of the medical record.  Based on review of eUHR documentation, on at least one occasion, on 12/2/14, he was moved to the CTC from alternative housing.  A progress note indicated the inmate was moved to the MHCB following HC-POP assignment.  He had been housed in the CHCF MHCB and in the MHCB at NKSP immediately upon return from the MHCB at CHCF.  He had tried to assault an officer while in the TTA upon his return from the CHCF MHCB.  Staff had to extract him to move him to the NKSP MHCB.

While in the MHCB, where he was admitted on 12/3/14, the inmate was observed responding to internal stimuli, refused to dress properly and often remained naked, was "posturing" (e.g., bending over and touching his toe, raising his arms up), and exhibiting periods of mutism, while at other times he made illogical statements or demonstrated delusional beliefs.  He had not completed the reception center process, but during a prior incarceration had been evaluated as DD2.  He refused at times to engage with mental health staff.  By 12/10/14, he was considered to have improved sufficiently that, although still considered a danger to others, he could be discharged at the EOP level of care.

The inmate was readmitted to the MHCB on 12/15/14 due to statements to officers that he was going to hang himself.  He was provided with diagnoses of Psychotic Disorder NOS as the referring diagnosis and Adjustment Disorder with mixed disturbance of emotions and conduct.  He was properly identified by staff as meeting criterion five on the Form 7388B, though the on-demand report did not identify him.  MHCB clinical staff also noted that he met subjective criterion two.  They did not indicate the reason for not referring him to DSH on 12/15/14, but only indicated he was being reassessed.  He was to receive daily clinical contacts and ongoing psychiatry contacts for medication management.  On 12/19/14, the treatment team met with him, and a DSH acute care referral was initiated.

Findings

This inmate was appropriately referred to DSH.  His treatment pending DSH referral was adequate.

**Inmate D**

This 44-year-old EOP inmate was selected for review because he was listed on the NKSP DSH non-referral log three times in October for criteria one, two, four, and five on the Form 7388B. He was diagnosed with Psychotic Disorder NOS and Antisocial Personality Disorder.  He was not prescribed any psychotropic medication; they were discontinued due to cheeking and noncompliance.  While housed in the NKSP MHCB, the IDTT regularly saw him in accordance with the Program Guide; treatment plans were adequate.  The inmate was provided outdoor

742

recreation when available on weekends with a recreational therapist. He was expected to parole on approximately 10/19/14.

While the inmate continued to meet multiple criteria for DSH referral consideration, MHCB staff felt he needed continued treatment at a lower level of care to address his inappropriate fear of other inmates, suspected to be due in part to his prior sex offense. Clinical staff did not believe that he required a higher level of care; the inmate readily acknowledged that threatening to harm himself if forced to room with a cellmate was due to this fear. Given that he was scheduled to be picked up on 10/21/14 by Immigration and Customs Enforcement officers, clinical staff chose to retain him in the MHCB pending parole to address his fear and anxiety regarding other inmates in an effort to maintain his stability.

<u>Findings</u>

This inmate was appropriately not referred to DSH. He received adequate treatment while housed in the MHCB at NKSP.

**Inmate E**

This case was selected for review because the inmate was identified twice on the DSH non-referral log. This 26-year-old EOP inmate was identified as having three or more MHCB admissions. However, he was not referred to DSH because he was increasing his EOP participation and becoming more engaged with his treatment providers. He was seen as improving. He was diagnosed with Hypochondriasis, but was not medicated because the inmate feared heart complications from the psychotropic medications. The documentation indicated bizarre delusions such as glass in his brain, blood poisoning following an unexplained tooth infection, brain damage from a contusion, an enlarged heart, and the ability to control all of these symptoms with his mind. The inmate stated that some of his five prior MHCB admissions were due to people not believing that he was sick and that he had a heart attack. The treatment plan dated 10/2/14 was not appropriate in light of the severity of the symptoms, and the diagnosis was also questionable. The inmate appeared to have a psychotic disorder with somatic delusions, not Hypochondriasis.

At his next treatment team meeting on 10/30/14, the PC believed the inmate was more receptive to factual contrary evidence regarding his delusional beliefs about his health concerns. However, progress notes indicated that he was strongly maintaining his delusional somatic beliefs and added a belief regarding an enlarged blood vessel that might burst, causing him to get very little sleep. He also shared that he believed he was dying and worried about getting released so that he could see his family first. He reported hearing screaming in his mind. He was described as having blunted affect with loose and circumstantial thought process at times. However, these observations were contrary to the treatment team's decision to maintain a diagnosis of Hypochondriasis and to eliminate Delusional Disorder as a diagnosis. The inmate appeared psychotic. He did seem to be engaging more with his treatment providers and had been stable with no MHCB admissions for almost two months.

743

The treatment plans dated 10/2/14 and 10/30/14 required greater specification in the interventions, problem targets, and goals to be adequate.  The treatment plan developed in November 2014 was not adequate for this inmate.  It continued with rule out or provisional diagnoses and listed Program Guide requirements and referrals as interventions.  The inmate was eventually transferred to CMC.

Findings

This inmate should have been referred to intermediate care.  His treatment plan at NKSP required substantial improvement.  He needed to be seen by the treatment team and have a more comprehensive operationalized treatment plan developed that adequately addressed his serious symptoms.  He also required diagnostic clarification.  Staff documented symptoms that were consistent with a psychotic disorder as the primary diagnosis.  The inmate did not receive adequate treatment at NKSP.

**Inmate F**

This case was selected as an example of DSH non-referred cases reviewed by the DSH coordinator to assess the adequacy of this aspect of the sustainability process.  This 25-year-old EOP inmate was in the MHCB during the month of December 2014, when he was identified as a possible DSH referral based initially on criterion two of the Form 7388B.  The initial treatment plan dated 12/26/14 was thoughtfully constructed, though the treatment targets were overly broad, as were some of the treatment goals.  However, the MHCB treatment team provided an adequate non-referral rationale, and treatment modifications were adequate in light of the inmate's early stage of admission.

Findings

The inmate was appropriately not referred to DSH.  The treatment plan required greater specification but included appropriate treatment interventions.  The inmate was appropriately treated.

**Inmate G**

This case was selected for review as an example of an inmate who was identified as a possible DSH referral, but was not referred.  The case was reviewed by the DSH coordinator and documents were determined to have been appropriately completed.

This 29-year-old EOP inmate was seen by his treatment team on 12/18/14 and identified as a possible DSH referral due to multiple MHCB admissions in accordance with criterion five of the Form 7388B.  His treatment plan indicated diagnoses of Psychotic Disorder NOS, Depressive Disorder NOS, Amphetamine Dependence in a controlled environment, Alcohol Dependence in a controlled environment, and Axis II was deferred.

744

The treatment plan dated 12/18/14 included overly broad treatment targets that were not properly operationalized; although treatment goals were measurable. Some of the treatment interventions were too vague (i.e., "Group Therapy – various"), but the treatment plan documented the inmate's progress status. On the Form 7388B, the non-referral rationale included that the inmate had not had another MHCB admission "since his return." However, he had only recently returned on 12/9/14 and this was really not a non-referral rationale. The treatment team indicated that the clinician would see the inmate twice weekly instead of once weekly. However, this section of the Form 7388B also added "as needed," which suggested that the PC might not always have the increased contact with the inmate as the treatment plan indicated; this effectively resulted in no treatment modifications at all. The Form 7388B thus required further clarification.

The subsequent treatment plan dated 1/15/15 failed to note that the inmate met criterion five and should have been reviewed for possible DSH referral. The clinical summary for that treatment plan included a tremendous amount of redundant information that had been cut and pasted and which obscured the updated pertinent information. While treatment targets were still broad, the goals were properly operationalized and measurable; treatment progress was noted, and interventions were specified. The inmate was prescribed Effexor 75 mg per day and Abilify 10 mg per day. Progress notes indicated that he was improving in the reception center EOP.

Findings

While the inmate appeared to have been appropriately not referred to DSH, the documentation supporting that non-referral was inadequate.

**Inmate H**

This inmate's healthcare record was randomly selected and reviewed to assess compliance with reception center guidelines. He was admitted to NKSP on 1/4/14. The mental health screen, which was not conducted in a confidential setting, was completed on 4/3/14. The inmate was screened positive, and the mental health evaluation was completed on 5/1/14. He was placed into the 3CMS program, and he was provided with a diagnosis of Mood Disorder NOS with a provisional diagnosis of Psychotic Disorder by the clinician. The psychiatrist saw him on 5/10/14, but a diagnosis was not provided. The PC saw him on 7/24/14 as a documented 90-day follow-up and again on 10/24/14. Overall, the inmate was viewed as stable. A diagnosis of Mood Disorder was provided, and he was continued at the 3CMS level of care. He remained at NKSP due to a medical hold. On 1/7/15, he was seen for a PC contact. At that time he was provided with a diagnosis of Mood Disorder NOS; there was also a reference to the presence of psychotic thinking.

Findings

Clinical services during the intake process were inadequate because the mental health screen was not completed in a confidential setting. Moreover, the mental health screen, mental health evaluation, and 30-day PC follow-up were not completed in accordance with the Program Guide. Reasons for the delay were not documented. However, ongoing treatment was completed within

745

appropriate timeframes.  Among areas in need of improvement were the rationale for the provisional diagnosis of Psychotic Disorder NOS after completion of the mental health evaluation, while the reference on 1/7/15 to psychotic thinking was unclear.  There also was marked discrepancy between the clinician's and the psychiatrist's diagnoses.

## Inmate I

This inmate's healthcare record was randomly selected and reviewed to assess compliance with reception center guidelines.  Upon admission to NKSP on 2/12/15, he was referred to emergency mental health by the nurse and sent to the HDSP MHCB for suicidal ideation.  The MHCB admission note indicated he was experiencing suicidal ideation with a plan to cut himself.  He was described as irritable, and he was provided with a diagnosis of Psychotic Disorder NOS.

The inmate was discharged from the MHCB on 2/24/15; at that time he was given a diagnosis of Mood Disorder NOS.  He was assessed as requiring the 3CMS level of care.  He returned to NKSP on 2/25/15, and five-day follow-up was completed.  During five-day follow-up, the inmate requested to be returned to the EOP level of care as he had been an EOP inmate during a previous incarceration.  On 3/2/15, the last day of the five-day follow-up, he disclosed auditory hallucinations and presented as disheveled.

The inmate was seen on 3/4/15 following a routine self-referral, and it was determined that he required an EOP referral.  On 3/12/15, due to suicidal ideation, he was referred to the MHCB after he was not accepted into the EOP.  On 3/12/15, the mental health screen and mental health evaluation were completed.  The inmate was diagnosed with Mood Disorder NOS, and it was determined that he would remain at the 3CMS level of care.  Psychiatry also saw him on 3/12/15 and provided him with a diagnosis of Psychosis NOS; although he denied any hallucinations or delusions, and his behavior was described as appropriate.  The inmate was prescribed Vistaril 100 mg per day, perphenazine 8 mg per day, and Risperdal 1 mg per day.

### Findings

This inmate's urgent mental health needs were appropriately addressed.  While the ongoing mental health care was appropriate, there was a delay in completion of the mental health screen and mental health evaluation, which were not completed in accordance with the Program Guide.  Also problematic was the rationale for the psychiatrist's diagnosis of Psychosis NOS, which contrasted with the clinician's diagnosis.  The diagnostic discrepancy between the psychiatrist and psychologist needed resolution.

## Inmate J

This inmate's healthcare record was randomly selected and reviewed to assess compliance with reception center guidelines.  He was admitted to NKSP on 11/13/14 for attempted murder (second term), and his ERPD was 2020.  The mental health screen was completed on 11/14/14; he screened positive, and the mental health evaluation was completed on 12/9/14.  The inmate's level of care was 3CMS.  He reported symptoms of crying, decreased appetite and sleep, and

overactive thinking.  He had a history of numerous suicide attempts; the most recent was two months ago.  He had a history of EOP level of care and a prescription for Prozac, but he was not prescribed psychiatric medication at the time of admission.  He was diagnosed with Major Depressive Disorder and referred to the psychiatrist.  The clinician indicated a plan to see him in three weeks.  The psychiatrist evaluated him on 12/12/14, when he complained about feeling anxious, but he was described as calm with no evidence of depression or anxiety.  He asked for medication and was prescribed Buspar.  He was provided with a diagnosis of Anxiety Disorder NOS.

The clinician saw the inmate for a 30-day follow-up on 1/6/15.  During that appointment, the inmate reported seeing moving shadows and hearing things moving, while he was noncompliant with Buspar.  He reported that two days prior he experienced suicidal ideation with a plan to save pills and overdose.  His mood was depressed, and he was described as anxious and hyperverbal.  His sleep and appetite were adequate.  He was diagnosed with Psychotic Disorder NOS and referred for an EOP evaluation due to his history of suicide attempts and recent suicidal ideation.

The inmate was seen for his initial PC session on 1/14/15.  He reported auditory hallucinations and presented as disheveled, but was compliant with psychotropic medication.  The unit officer described him as disruptive on the unit, stating that he needed to be redirected multiple times.  The officer reported that he intermittently went to the dayroom and to yard.  The inmate reported suicidal ideation a week earlier with a plan of cutting himself with a razor he had in his cell.  At mental health's request, custody staff searched the cell, but no razor was found.

The psychiatrist met with the inmate on 1/18/15 when Buspar was increased and Remeron was added to address depressive symptoms.  He was diagnosed with Anxiety Disorder NOS.  He was seen again on 1/20/15 by his PC.  At that time there was no report of hallucinations, and the inmate was compliant with psychiatric medication.  The custody officer indicated he was adequately programming.  There was no bizarre behavior.  He was diagnosed with Psychotic Disorder NOS.

The IDTT met on 1/22/15 to address the EOP referral.  The inmate was described as sleeping all day, but there was no indication of bizarre behavior by custody staff.  It was determined that he was adequately using services provided by the 3CMS level of care and was not appropriate for the EOP level of care.  He was diagnosed with Psychotic Disorder NOS due to vague reports of psychotic symptoms, and further evaluation was warranted.  The plan was for the reception center clinician to see him in 30 days to monitor his stability.  This follow-up was conducted on 2/2/15, when he presented with improved coping and mood.  The psychiatrist met with him on 2/21/15.  At that time, he denied anxiety and depression.  He was provided with a diagnosis of Anxiety Disorder NOS.

Findings

There was good communication between custody and mental health staff.  While there was a delay in completion of the mental health evaluation, overall the level of care provided exceeded Program Guide requirements.  However, given the inmate's reported symptoms, the frequency of

mental health contacts was clinically inadequate.  There was also a marked discrepancy between clinician and psychiatrist diagnoses, which was problematic and needed resolution.

**Inmate K**

This inmate's healthcare record was randomly selected and reviewed to assess compliance with reception center guidelines.  He was admitted to NKSP on 1/6/15 and had a release date of 8/6/15.  The mental health assessment was completed in a confidential setting on 1/8/15.  The inmate screened positive, and the mental health screen was conducted on 1/15/15.  He reported intermittent depression.  He had been prescribed amitriptyline for sleep, which was discontinued on 1/13/15.  He was provided with a diagnosis of Adjustment Disorder with depressed mood, and he was receiving mental health services at the 3CMS level of care.

On 2/9/15, during the 30-day follow-up, the inmate reported feeling anxious, tired, and waking early.  He reported talking in his sleep and experiencing nightmares.  He was diagnosed with Anxiety Disorder NOS and referred for a psychiatric evaluation.  The psychiatrist saw him on 2/18/15, but the handwriting was difficult to read.  The inmate's mental status assessment indicated that his mood and thoughts were within normal limits, and he denied hallucinations and paranoia.  The psychiatrist's impression was that there was no evidence of PTSD, but the inmate had mild anxiety and evidence of a thought disorder.  The diagnosis was "no signif/thought as mood disorder."  Psychiatric medication was not prescribed.

Findings

The level of care for this inmate was appropriate.  The mental health screening, mental health evaluation, and 30-day PC follow-up were completed in accordance with the Program Guide. The psychiatrist's evaluation exceeded the five-day timeframe mandated by the Program Guide for routine referrals.  Also problematic was the rationale provided for the presence of a thought disorder which was unclear and contrasted with the inmate's mental status assessment.

748

EXHIBIT V
California State Prison, Los Angeles County (CSP/LAC)
February 3, 2015 - February 5, 2015

**Inmate A**

This SNY EOP inmate was housed on C yard, which was a general population SNY yard.  He was provided with a diagnosis of Psychotic Disorder NOS and Polysubstance Abuse.

An IDTT meeting dated 1/29/15 indicated he was placed at the EOP level of care in December 2014; he exhibited poor insight and judgment, odd affect, and difficulty expressing himself.  On 1/26/15 there was a fire in his cell for which he received a 115 for arson.  The Form 7388B nonetheless indicated that he was able to adequately function at his current level of care and did not include any criteria for higher level of care referral consideration.

A treatment plan dated 12/31/14 noted the inmate had previously been in the 3CMS program and was recently discharged from administrative segregation, where he had been placed for fighting.  He had a history of multiple MHCB admissions and was prescribed Zyprexa for reduction of psychosis and auditory hallucinations, but he later refused to take psychotropic medications.  He was referred to mental health as he was refusing medications for valley fever.  The clinician noted that his refusal was probably due to paranoia, and custody reported that he isolated himself in his unit.  The Form 7388B did not indicate any DSH referral criteria.

A progress note dated 1/28/15 reported that the inmate was referred to the psychiatrist on call after he set a fire in his cell.  The lieutenant was told that the psychiatrist advised the nurse to send the inmate back to his cell and that he would be seen in the morning.  The progress note indicated that this was a non-encounter record review.  The clinician indicated that this was not his/her patient, but that he was stable and the fire-setting incident could have been accidental.  The inmate was not prescribed psychotropic medications at the time of the site visit.

The inmate was seen in a group interview.  He presented with flat, odd affect, poverty of speech, disorganization, and uncooperative behavior.  He left the interview prior to completion.  His insight and judgment were poor.

<u>Findings</u>

This EOP inmate required a higher level of care.  However, he was maintained in a general population setting with insufficient treatment and poor crisis intervention.  Treatment planning was poor.  A recommendation was made to mental health supervisory staff that he be evaluated for a higher level of care and that housing him in the general population was inappropriate and dangerous.

**Inmate B**

This 3CMS inmate was provided with a diagnosis of Bipolar II Disorder, Antisocial Personality Disorder, and Narcissistic Personality Disorder.  He was housed in the general population.  His healthcare record was reviewed at the request of plaintiffs' attorneys regarding his prolonged stay in administrative segregation and to assess his level of functioning.  He had a long history of treatment at the EOP and 3CMS levels of care.  It appeared that he continued to receive

750

additional 115s for "gassing" and IEX. The most recent administrative segregation treatment plan dated 11/6/14 indicated that he appeared to be in a hypomanic state. He was reportedly compliant with medications, ADLs, meals, and yard time. He was treated with Trileptal and Vistaril. The IDTT determined he would remain at the 3CMS level of care. The Form 7388B indicated he met no criteria for DSH referral consideration.

It appeared that the inmate was moved from administrative segregation on or about 1/22/14 to the general population. The most recent progress note indicated he had some concerns regarding his property after returning from court as the district attorney picked up his case for battery. He was seen in response to a referral from the R&R nurses, who noted that he had recently received bad news, namely, the district attorney referral. He was not suicidal at that time and expressed a desire to obtain better control of his impulsivity.

Findings

The inmate was no longer housed in administrative segregation; he had been moved to the general population. The most recent progress note indicated that he was upset regarding a recent district attorney referral and clothing issues, but was not suicidal. Nursing staff appropriately referred him to mental health after the receipt of bad news.

**Inmate C**

This case was selected for review to address whether institutional treatment staff reviewed and considered DSH discharge information to plan treatment for returning inmates. This 29-year-old inmate had previously been treated at the EOP and 3CMS levels of care. His institutional history was notable for resistance and minimal cooperation with treatment. There was a reported history of prior admissions to DSH as well as hospital admissions in the community pursuant to W&IC 5150. He was a high school graduate with a history of foster care and substance abuse.

The inmate was admitted to the MHCB at CHCF from CSP/LAC on 7/29/14 for suicidal ideation secondary to the death of his mother. He received diagnoses of Mood Disorder NOS and Personality Disorder NOS. He was treated with psychiatric medications including Effexor, Tegretol, Amitriptyline, and Vistaril; and he declined psychiatric recommendations to add an atypical antipsychotic medication.

The inmate had an extended stay in the MHCB due to his adamant refusal to accept psychosocial interventions that were not to his liking. He repeatedly expressed the desire to be treated at the intermediate level of care. During the course of his stay, he cut his wrist with a piece of hard plastic. He received an RVR following a physical altercation with correctional staff. Members of his treatment team felt he would do better in a setting where he could establish a therapeutic alliance while receiving long term care to resolve issues with trauma and characterological pathology.

The inmate was transferred to acute care at DSH Stockton on 9/8/14 to treat chronic depression and an ongoing expressed intention to die. Improvements were gradually noted over several

weeks as he began to participate in treatment and agreed to add Olanzapine to his medication regimen.  On 9/30/14, he threatened to bite a custody officer while resisting stabilization.  On 10/2/14, he was elevated to maximum custody status, which limited his program participation to weekly one-to-one individual contacts with treatment providers.  He was not able to attend groups and began to refuse prompts to participate in yard and television time.

On 10/17/14, the inmate refused to attend his 30-day IDTT meeting.  The treatment team submitted a referral for intermediate care treatment at VPP.

The inmate was discharged from DSH Stockton on 10/23/14.  He was transported to CSP/LAC on 11/14/14, where he was re-enrolled at the EOP level of care.  A psychiatrist saw him within 24 hours on 11/15/14.  The inmate stated he felt well-treated at DSH and was glad to be back at CSP/LAC.

On 11/18/14, the inmate boarded up his cell, fashioned a noose, and expressed the wish to die.  He required a cell extraction and was sent to the TTA for further evaluation.  A SRE assessed a high acute and chronic suicide risk.  He was admitted to the MHCB on 11/19/14 and placed on suicide watch.  He was evaluated by the treatment team three times, on 11/20/14, 11/26/14, and 12/1/14.  The Form 7388Bs associated with the treatment plans of 11/20/14 and 11/26/14 showed no endorsement of indicators, suggesting that the team should consider higher level of care referral.  It was not until 12/1/14 that the treatment team concluded that a higher level of care referral was indicated, including a reassessment for acute care readmission.  There was no documentation indicating that the treatment team had been aware of the VPP intermediate care referral, which had been initiated by DSH Stockton on 10/20/14.

Institutional logs indicated that CSP/LAC sent a complete DSH referral packet to CDCR headquarters on 12/3/14, and the referral was forwarded by CDCR headquarters to DSH on 12/4/14.  Logs maintained by CSP/LAC indicated the inmate had been placed.  At the time of the site visit, the inmate's name was not found on the CSP/LAC housing roster.

Findings

This inmate was clinically discharged from DSH Stockton, but not transferred for 22 days.  It was unclear what, if any, treatment he received during this administrative hiatus.  Moreover, he was transferred to a lower level of care at CDCR even though an intermediate care referral was in place.  There also was no evidence that CDCR treatment staff reviewed or considered the DSH Stockton psychiatric program treatment recommendations.  There was no documentation indicating that the IDTT was aware that a VPP referral had been established on 10/20/14.  The CDCR treatment team improperly conducted two reviews of referral to higher level of care.  The inmate decompensated in a crisis state upon returning to CDCR and required an extended MHCB stay until the treatment team initiated an intermediate care referral 19 days later.  This case represented a deficiency in inmate treatment continuity of care.

EXHIBIT W
California Correctional Institution (CCI)
April 1, 2015 - April 3, 2015

**Inmate A**

This inmate was randomly selected for eUHR review.  Treatment plans for this 45-year-old man housed in administrative segregation were dated 9/18/14, 12/15/14, and 3/9/15.  The December 2014 treatment plan listed current problems as mood instability and program compliance.  Interventions included weekly PC contacts to assist him dealing with administrative segregation isolation.  All appropriate clinicians attended the IDTT meeting, as well as the CC I; however, the inmate refused to attend.  The Form 7388 was appropriately completed.  The inmate had recently been transferred to administrative segregation after completing his SHU term.  He was awaiting transfer to a general population housing unit, making him a non-disciplinary segregation (NDS) inmate.  He was receiving mental health services at the 3CMS level of care.  Diagnoses included Major Depressive Disorder, recurrent, mild and Amphetamine Dependence.

Progress notes documented weekly PC contacts, which generally were at cell front, because the inmate refused to come out of his cell for a private interview.  Daily psych tech rounds were also documented.

Findings

This inmate was receiving mental health services consistent with Program Guide requirements.

**Inmate B**

This 37-year-old man was placed in the SHU as an administrative segregation overflow inmate on 1/31/15.  He had completed his SHU term for weapon possession and was classified as an NDS inmate at the time of review.  He had been evaluated on 2/2/15 following a call from his mother, who reported that he was suicidal.  His 2/6/15 treatment plan listed his only problem as "self-reported negative thoughts and worries as a result of being incarcerated away from his family and uncertainty regarding his pending transfer." The treatment plan outlined as an intervention that PC contacts would occur at least every 30 days to further monitor and evaluate the inmate's mental health symptoms, suicide risk, and protective factors.  All members of the treatment team were present at the IDTT meeting, and the Form 7388 was appropriately completed.

A treatment plan dated 10/9/14 was reviewed.  The inmate was receiving mental health services at the 3CMS level of care at that time, and he was housed in administrative segregation.  The treatment plan included "continue weekly contact with LPT, see PC on a monthly basis (at minimum) see psychiatrist PRN and as scheduled."

The psychiatrist evaluated the inmate on 10/21/14, when Zoloft was increased.  Diagnoses were Adjustment Disorder with depressed mood and Antisocial Personality Disorder.  The plan was to see the psychiatrist again in ten weeks.  The inmate was again seen by the psychiatrist on 10/16/14.  It appeared he was intermittently noncompliant with his medications, and appropriate laboratory tests were ordered.  The inmate was noted to be an unreliable historian.  The plan was to taper and discontinue the Zoloft.

A 12/30/14 progress note by the same psychiatrist was reviewed. The history that the inmate reported was considered to be inconsistent and unreliable. His depression was assessed to be in remission. He was to be seen again in three weeks. There were no other psychiatric progress notes in the eUHR for the reporting period.

On 10/30/14, the PC saw the inmate, who was on NDS status at that time. The inmate was serving four life sentences. He was assessed not to have current programming needs. The plan was to see him again in 30 days. He was again seen by his PC on 11/25/14 when he was noted to be doing well. The PC saw him again on 12/16/14. The inmate refused an out of cell PC contact the following week. A 12/31/14 PC progress note indicated incorrectly that the inmate was still taking Zoloft. He was seen in a non-confidential setting due to "staff decision." During January 2015, the PC saw the inmate in a confidential setting. Subsequent PC contacts occurred every one to two weeks.

A 12/11/14 Form 7230-A documented that the inmate had previously received mental health services at the 3CMS level of care until he was removed from the caseload in July 2014. He subsequently self-referred in October 2014 and was again placed on the mental health caseload due to depression symptoms.

Daily psych tech mental health rounds were documented.

Findings

It was unclear why the PC did not see the inmate on a weekly basis when the inmate was in segregation, even though he was on NDS status. The inmate was not receiving mental health services that were consistent with Program Guide requirements related to the frequency of his PC meetings.

**Inmate C**

A 1/23/15 treatment plan from Folsom State Prison indicated that this 31-year-old man had a release date the following month, and he was requesting to remain at the 3CMS level of care. He had a history of Schizophrenia, but was refusing medications. His problem list included paranoia/racing thoughts and poor judgment/coping. Notably, the problem list did not address medication noncompliance. All appropriate IDTT members were present at the treatment team meeting.

Another IDTT meeting was held on 2/6/15. The mental status examination indicated that the inmate was responsive to internal stimuli and was feeling paranoid. Diagnoses were Paranoid Schizophrenia and Polysubstance Dependence (provisional). His level of care was changed to EOP with the plan to have him seen weekly and referred for pre-parole planning services.

The inmate was subsequently transferred to administrative segregation at CCI on 2/12/15 for reasons that were unclear based on eUHR review. A 2/13/15 Form 7230-A indicated that he was discussed during the administrative segregation morning meeting. An email was sent on 2/13/15

from a CCI clinician to mental health services at Folsom State Prison in order to receive a transfer summary. A response received five days later indicated that the 2/6/15 IDTT progress note was attached. A 2/19/15 progress note indicated the inmate was paroling in two days; he paroled on 2/21/15.

Findings

This inmate received mental health treatment consistent with Program Guide requirements.

**Inmate D**

An 8/25/14 IDTT meeting indicated this 56-year-old man was housed in administrative segregation due to safety concerns. He was prescribed Celexa for depression. The problem list only included a "history of depression." Diagnoses included Adjustment Disorder with depression and anxiety and Alcohol Dependence. All appropriate IDTT members were present. The Form 7388B was completed appropriately. A 2/9/15 IDTT meeting provided a similar history and noted very little change.

An 8/6/14 psychiatrist's note indicated that current medications prescribed included Buspar, Celexa, and Vistaril. Diagnoses were as already referenced. Informed consent had previously been obtained relevant to the inmate's medications. The plan was to see him again in four weeks. He was again seen by the psychiatrist on 8/19/14. The inmate reported being in administrative segregation after allegedly threatening a nurse. He was noted to need significant support. His Buspar was discontinued, and Celexa was tapered with the plan to discontinue it. The rationale for these medication changes was not documented. He was again seen by the psychiatrist on 9/10/14. The inmate's Vistaril dosage was increased at his request.

Subsequent psychiatry progress notes were dated 12/3/14, 2/4/15, 2/6/15, and 2/18/15. The inmate was started on Remeron on 12/3/14. He remained in administrative segregation at that time. A 2/18/15 typed progress note, which was more legible than previous handwritten progress notes, provided a useful summary of the inmate's history of present illness. Personality Disorder NOS was added to his diagnoses.

A PC note dated 8/26/14 reported that the inmate was in administrative segregation for safety concerns. He also reported multiple medical issues. Weekly PC contacts were subsequently documented; they generally occurred at cell front due to the inmate's refusal to meet in a private setting.

Psych tech rounds were documented in the eUHR.

Findings

This inmate received 3CMS level of care that was consistent with Program Guide requirements.

**Inmate E**

This 26-year-old man was serving his first prison term.  He was admitted to CDCR on 1/25/11.  He was placed in the CCI SHU on 12/14/11 to serve a SHU term for battery on an inmate with a weapon at NKSP.  There was a history of feigning mental health symptoms while in the county jail.

The inmate was placed at the 3CMS level of care on 11/20/14 after returning from the OHU, where he was placed on suicide precaution for two days beginning on 11/18/14 after he was found in a cell with a tourniquet on his legs.  He reported that he was pending SNY transfer.  His primary diagnosis was Antisocial Personality Disorder.

This problem list only reported the following problem: "Not consistently communicating mental health symptoms."  All appropriate disciplines attended his IDTT meeting.  The Form 7388B was completed.

There were PC progress notes dated for a total of eight days from November 2014 to February 2015.  A SRE was completed on 11/19/14.  The inmate denied suicidal thinking. Following consultation with treatment team members, he was released to the general population with five-day follow-up, which was implemented based on eUHR review.  PC contacts generally occurred at cell front because the inmate refused to come out of his cell.  The plan was to see him at least every 30 days.  Diagnoses were Adjustment Disorder with mixed disturbance of emotions and conduct and Antisocial Personality Disorder.

A psychiatrist evaluated the inmate on 11/21/14.  Diagnoses were as above along with Polysubstance Dependence.  The psychiatrist indicated that psychotropic medication was not indicated.

There was documentation of SHU psych tech rounds.

<u>Findings</u>

This inmate received 3CMS level of care that was consistent with Program Guide requirements.

**Inmate F**

This 26-year old inmate was serving a long sentence for second-degree murder.  He was housed in the SHU after threatening a peace officer and gassing a peace officer with urine.  Diagnoses included an Impulse Control Disorder and Adjustment Disorder with anxiety.  Bipolar II Disorder was also in the differential diagnosis, and he was additionally diagnosed with an Antisocial Personality Disorder.

The most recent treatment plans for the review period were dated 12/4/14 and 12/18/14.  The inmate's problem list included depression/anxiety and a history of false claims of mental health symptoms for secondary gain.  All appropriate disciplines attended his IDTT meeting.

Clinical contacts were dated 11/26/14, 12/1/14, 12/8/14, 1/7/15, and 2/3/15.

The inmate was transferred from the OHU to a general population yard on 11/26/14.  Five-day follow-up was subsequently implemented.  On 12/1/14, he announced that he was about to start a hunger strike.  Although the PC note indicated that he did not require a psychiatrist, a psychiatrist saw him that same day.  He was provided with a diagnosis of Antisocial Personality Disorder, and it was determined that he did not require treatment with psychotropic medications.

On 12/8/14, the inmate reported that he continued to "be stressed out".  He reported on 2/3/15 that he received SNY status.  On 2/26/15, he reported doing well during a PC contact.

There was documentation of SHU psych tech rounds.

Findings

The inmate received 3CMS level of care consistent with Program Guide requirements.

**Inmate G**

This 49-year-old inmate, who was interviewed in a group setting, complained that he had three different PCs during the past year.  He described his symptoms as being exacerbated due to these changes, which occurred without advance notice.  He reported that at his most recent IDTT meeting, his PC was not present and he did not understand his treatment plan.  He also stated that his newest PC indicated that he would be seen every 90 days, in contrast to the previous frequency of at least monthly contacts.

The inmate's eUHR was reviewed.  He was incarcerated in CDCR for the seventh time and was transferred from NKSP to CCI on 11/25/14.  His problem list included depression and mood swings.  Diagnoses included Bipolar I Disorder, recently depressed type, severe without psychosis, Polysubstance Dependence, and Antisocial Personality Disorder.  Medications were not prescribed at the inmate's request.

The inmate's PC was not present at his IDTT meeting.

PC contacts during the review period were dated 12/10/14, 12/17/14, 2/17/15, and 2/26/15.  Progress notes indicated he would at least be seen on a monthly basis.

The psychiatrist evaluated the inmate on 10/13/14, who agreed with his decision not to receive psychotropic medications at that time.  The inmate's Mood Disorder NOS was assessed to be in remission.

Findings

This inmate received 3CMS level of care that was consistent with Program Guide requirements.

758

**Inmate H**

This 38-year-old man, who was interviewed in a group setting with other 3CMS inmates, essentially stated that CCI's mental health services had not significantly changed during the past five years. He did not think that offered treatment was very helpful.

The inmate's eUHR was reviewed. His most recent treatment plan was dated 8/27/14. The only problem listed was depression; planned intervention was CBT. Diagnoses included Bipolar Disorder, now resolved, Polysubstance Dependence, and Antisocial Personality Disorder; Alcoholics Anonymous was a planned intervention as well. All required IDTT treatment team members were present at his last treatment meeting.

PC progress notes were dated 7/29/14, 8/25/14, 8/27/14, 11/4/14, and 1/23/15. However, the inmate was seen by four different clinician's during this time period.

Findings

This inmate received treatment within Program Guide timeframes; however, the reason why he did not find mental health treatment useful was apparent due to the lack of continuity of care. Specifically, he essentially had a different PC every time he had clinical contact. Such treatment was not consistent with the spirit of the Program Guide.

**Inmate I**

This 31-year-old man was interviewed in a group setting with other 3CMS inmates. He indicated global problems with COs, but was not comfortable providing more specific details. The inmate's eUHR was reviewed.

The inmate's most recent IDTT meeting occurred on 12/10/14. Listed problems included substance abuse, depression, and psychosis. Medications included Zyprexa and Remeron. Diagnoses were Major Depressive Disorder and Polysubstance Dependence. All required treatment team members were present at the IDTT meeting.

A psychiatrist evaluated the inmate on 10/15/14, 11/3/14, 11/26/14, 12/21/14, and 2/24/15. Clinical progress notes were dated 12/2/14, 12/24/14, and 2/17/15.

Findings

This inmate received 3CMS level of care that was consistent with Program Guide requirements.

759

EXHIBIT X
California Institution for Men (CIM)
March 10, 2015 - March 12, 2015

**Inmate A**

This inmate was randomly selected for review from a list of reception center EOP inmates who were not timely seen by their PC.

The inmate arrived at CIM from DSH-Stockton on 3/19/14.  The initial health screen showed that when he arrived he was prescribed olanzapine, sertraline, and carbamazepine.  A detailed DSH discharge summary indicated he had been admitted to intermediate care on 8/2/13 for unremitting symptoms of PTSD associated with a self-reported rape at another prison in 2010.  He attempted suicide at RJD in 2012.  In 2013, he cut his arm when his single cell status was about to expire.  This led to an RVR and crisis bed placement, and ultimately led to the admission to DSH-Stockton.

A discharge SRE prepared by DSH on 2/28/14 recommended CDCR treatment in the EOP on single cell status, continued safety precautions, medication management, and frequent check-ins with his treatment team.  The evaluator noted that the mere idea of being placed in a double cell was traumatic for the inmate and could lead to rapid decompensation.

The inmate was discharged to CDCR with documentation of his persistent intention to kill his cellmate if he were placed in a double cell.  Psychology and psychiatric discharge recommendations included retaining him in single cell status upon return to prison.  Discharge diagnoses were PTSD and Antisocial Personality Disorder.

On 3/28/14, a SRE assessed a moderate chronic and low acute risk of suicide.  However, the inmate was described as agitated, hopeless, and concerned with his safety to the degree that he was very preoccupied with not letting anyone rape him.  Treatment recommendations included encouraging him to come out of the cell twice weekly to make contact.

Throughout April and May 2014, the inmate repeatedly told the clinician he would kill anyone who was put in a cell with him.  He expressed thoughts of suicide depending on whether he would receive a life sentence for killing his next cellmate.

On 4/1/14, the inmate told the psychiatrist he wanted to discontinue prescribed medications; the psychiatrist asked him to wait until he could review the DSH discharge summary, but adjusted his medications.  The psychiatrist noted that the inmate appeared fragile.  The PC stated that the inmate was concrete in thinking and of apparent lower intellectual functioning, and increased contacts to two times weekly.  The inmate's group attendance was sporadic.

On 5/13/14, an interdisciplinary progress note indicated that there was no clinical basis to grant continuation of single cell status, with the clinician reporting the inmate was not homicidal.  There was no documentation to indicate the clinician had considered the DSH estimation of the inmate's high chronic risk of causing serious physical harm to others.  The inmate requested copies of his file, which he said he would use when he went to court for cutting his cellmate.

761

On 6/4/14, the inmate was placed in administrative segregation for threatening to harm any cellmate. On 7/28/14, a staff referral was made, resulting in restoration of the inmate's single cell status until 8/4/14.

A mental health evaluation completed on 8/5/14 recommended adding a diagnosis of Psychotic Disorder NOS, without elaboration. On 8/13/14, the inmate was classified as SNY EOP. He continued to express the belief that everyone wanted to harm him. He was willing to work on these issues if he felt safe. A Form 7388B completed on that date was negative for indicators that could trigger DSH referral consideration.

On 9/25/14 the inmate transferred to the San Diego County Jail. He threatened to kill himself by heroin overdose if he were to learn of his son's rejection of him during the course of the child's scheduled custody hearing. The PC notified medical staff at the San Diego County Jail.

Findings

The inmate did not receive a timely clinical contact on a date that coincided with his transfer to the county jail. However, the primacy clinician contacted the jail nurse to advise of threats and the single cell issue. It was unclear how closely CDCR staff considered DSH discharge recommendations in planning the inmate's treatment environment. The inmate was destabilized as loss of his single cell status loomed. There was no evidence that members of his treatment team considered the contribution of his mental disorder to the behavior leading to his placement in administrative segregation. An SNY housing designation appeared to be the intervention of choice for this chronically unstable inmate, rather than addressing the underlying mental health issues. There was no modification of the treatment plan to target the inmate's high risk of physical violence. This inmate did not receive adequate care.

**Inmate B**

This inmate was randomly selected from a list of reception center EOP inmates who were not timely seen by their PC.

The inmate arrived from county jail on 10/9/14 and had not been prescribed psychiatric medication during jail confinement. An initial nursing screen reflected the inmate's denial of a mental health treatment history except for two suicide attempts during early adolescence.

An SRE was timely completed. The inmate was assessed as a moderate chronic risk of suicide and a low acute risk. On 10/15/14, he underwent a mental health evaluation based on positive screening results that suggested a mood disorder. He met eligibility requirements for mental health care at the EOP level of care.

Members of the institutional treatment team provided a diagnosis of Major Depressive Disorder, moderate and Anxiety Disorder NOS. The inmate was treated with antidepressant medication. Over the next two weeks, he showed gradual improvement as he continued to cope with an impending divorce and the reality of a life term.

On 11/6/14, the inmate was noted to be attending and participating in group treatment.  He reported mood variability, especially at night, with occasional displays of anger and frustration which were characterized as congruent with his life circumstances.

A level of care decision associated with his treatment plan on 12/4/14 showed no positive indicators to trigger DSH referral consideration.  The inmate continued to adhere to prescribed medications.  By 1/5/15 he continued to display reasonable coping skills in light of family circumstances.

On 1/14/15, clinical documentation indicated that the inmate was seen at cell front, but the reasons were unclear.  He was noted to be on a modified program for reasons not readily apparent from the healthcare record documentation.  The psych tech saw the inmate daily.

The PC saw the inmate on 11/21/14.  On 12/4/14, the inmate presented to the IDTT for a 30-day follow-up.  The PC note indicated the inmate was programming at an appropriate level and was relatively stable.  On 1/30/15 the inmate was transferred to the mainline EOP.

Findings

It appeared that the inmate was receiving mental health treatment at the appropriate level of care in the reception center.  Although a PC contact was seven days overdue on 11/23/14, the inmate was seen by a substitute clinician in the PC's absence and continuity of care was achieved.  Psychiatry and initial and follow-up IDTT meetings were timely completed and attended by required staff.  Treatment team members routinely opined that there were no indicators that suggested that a higher level of care should be considered.  It was appropriate for good treatment planning that the reason for modified treatment be clearly stated in the healthcare record.

**Inmate C**

This inmate was randomly selected for review from a list of inmates who were discharged from the MHCB and required five-day follow-up.

The inmate was a 3CMS inmate housed in the reception center, where he was being treated for Bipolar I Disorder, most recent episode depressed.  He was prescribed Risperdal and Vistaril.

On 11/10/14, the inmate told the psychiatrist he had experienced suicidal thoughts since he was 17-years-old and more frequently during the past two to three weeks; he reported that they often lasted all day.  He stated that he was able to tolerate these thoughts and indicated that he was not inclined to act on them.  Psychiatry follow-up was scheduled for four weeks.

On 12/4/14, the inmate was seen in the TTA for depressed mood and suicidal ideation.  He reported experiencing racing thoughts, paranoia, and severe depression all week and wanted to hang himself.  A SRE was completed, but the evaluation contained no risk assessment; however, it documented that the inmate had been admitted to the MHCB.  The SRE referred the reader to

multiple other documents for information on mental status, estimate of risk, and a risk reduction plan.  The SRE was not appropriately completed.

The inmate was on that same day admitted to a crisis bed and placed on suicide watch on continuous one-to-one observation.  A mental health treatment plan was timely completed on 12/5/14.  The IDTT convened on that date and signed the treatment plan, absent the presence of the PC and correctional counselor.

On 12/11/14, a psychiatry note indicated that suicide precautions had been discontinued.  The inmate was adherent with prescribed medications, with no side effects, and showed symptom improvement in sleep and motivation.  On 12/12/14, documentation indicated that he was being considered for an increase in level of care to EOP.  He was not seen as a candidate for DSH referral.

On 12/15/14, the PC described the inmate as alert and oriented, with linear thinking.  An antidepressant medication had been added to the medication regimen.  He rated himself as less depressed and he no longer experienced suicidal thoughts.

On 12/16/14, the IDTT recommended the inmate's discharge to the reception center 3CMS, rejecting the level of care change to EOP due to the likelihood that this would prolong the inmate's reception center stay.  The treatment team determined it would be more beneficial for the inmate's mental health to discharge him to the 3CMS in order not to delay the endorsement process.  This was in keeping with the inmate's expressed desire.  A discharge SRE assessed the inmate with high chronic and low acute suicide risk.  Safety/risk reduction recommendations were not individualized.

In sum, the inmate was treated in the crisis bed for 11.8 days and discharged on 12/16/14.  The treatment team recommended that he be considered for an increase to the EOP level of care once he arrived at his new institution.  Upon discharge, the inmate was timely seen in follow-up for the required five days.

Findings

An SRE should have been completed following the 11/10/14 psychiatric contact, and the reason for its absence was not discussed in the record.  The inmate was scheduled for follow-up in four weeks, but this was pre-empted by his MHCB admission with suicidal thoughts and uncontrollable crying.  The quality of the initial SRE was poor.  The discharge SRE was not individualized.  The treatment team inappropriately made a discharge decision that discounted mental health needs in favor of expediting the inmate's transfer.  Despite these omissions, overall the inmate received appropriate care.

**Inmate D**

This inmate was randomly selected for review from a list of reception center EOP inmates who were not timely seen by their PC.

The inmate entered the reception center on 10/23/14.  The initial nurse screening found that he did not have a mental health history, had no previous psychiatric treatment in the county jail, and had no suicide history.  On the same day, a mental health evaluation recommended the inmate's placement on the mental health caseload with a diagnosis of Major Depressive Disorder, recurrent.

The inmate saw the psychiatrist on 10/28/14.  The inmate reported sad mood, intermittent sleep, obsessive thoughts, and occasional nightmares.  He ruminated about wanting to be a good person.  A history of marijuana and alcohol use was noted.  The inmate declined treatment with psychotropic medication.

On 10/29/14, a staff referral indicated the inmate wanted a medication review.  A timely psychiatry response resulted in treatment with an antidepressant medication to target sleep disturbance symptoms.

The inmate was seen timely for initial and follow-up IDTT meetings.  Treatment plan reviews repeatedly did not document indicators for higher level of care referral consideration.  The inmate continued to receive timely PC and psychiatry contacts.  The inmate received regular recreational therapy services and therapeutic group activities while in the reception center.  Psych tech rounds often noted fair hygiene and cell condition with the inmate showing poor eye contact, a negative attitude, and requiring redirection.

Findings

The inmate was not timely seen for one clinical contact, but continuity of care was not significantly impacted.  The inmate received adequate mental health care in the reception center.

**Inmate E**

This inmate was randomly selected for review from a list of inmates discharged from the MHCB for whom five-day follow-ups were overdue.

The inmate was admitted to the MHCB three days after arriving in prison.  He was enrolled in the mental health caseload with a diagnosis of Bipolar I Disorder, most recent episode depressed, and Cocaine Abuse.  He had a history of mild to severe depression beginning in childhood.  He threatened suicide when he was charged with his crime and was treated with antidepressant medication in the county jail.

The inmate was assessed as having low chronic and acute suicide risk in the reception center.  Three days after arrival, he was brought to the TTA for evaluation of suicidal ideation.  He was admitted to the OHU pending MHCB placement.  He was placed on suicide precautions including one-to-one continuous observation as per policy.  An SRE conducted on 11/24/14 again determined low acute and chronic suicide risk.

765

Members of the IDTT provided diagnoses of Major Depressive Disorder, recurrent, moderate, ADHD, inattentive type, and Sexual Abuse of a Child. There were no indicators suggesting that referral to a higher level of care should be considered.

During MHCB treatment, the inmate was timely seen by the PC and psychiatrist. He was treated with psychiatric medication to target symptoms of depression and attentional problems. He began feeling better but continued to worry that people were talking about him because of his crime.

Discharge treatment planning indicated that the inmate was unable to function in the 3CMS and required treatment at the EOP level of care. A discharge SRE noted minimal acute and chronic risk factors. The inmate was temporarily stepped down to the OHU pending transfer to a mainline EOP. Five-day follow-ups were timely delivered. The inmate was rehoused in the reception center EOP pending transfer. There was evidence of good PC intervention in delivering CBT interventions and the inmate was positively engaged and appeared to benefit.

The inmate was transferred to a mainline EOP on 2/2/15.

Findings

There was no evidence in the eUHR to indicate untimely five-day follow-up following the inmate's MHCB discharge. There was one five-day follow-up contact on 1/2/15 which was not associated with a crisis bed admission. Overall, the inmate received adequate care in the MHCB and appropriate follow-up care in the reception center until his transfer to the EOP.

766

EXHIBIT Y
California Rehabilitation Center (CRC)
May 12, 2015 - May 14, 2015

**Inmate A**

This inmate's healthcare record was reviewed from a list of 3CMS inmate initial IDTT meetings during the site visit.  According to the CDCR Form 7277 bus screen completed with the required chrono, the inmate arrived at CRC on 4/29/15.  He was diagnosed with Schizoaffective Disorder with depressive features.  Previously prescribed medications were Remeron and Zyprexa, but the inmate was noncompliant with them.

This was the inmate's first prison term.  His mother was diagnosed with Schizophrenia, and his father was an alcoholic.  He was hospitalized in 2001 and 2007 for auditory and visual hallucinations and depression.  Since 2005, he had dealt with multiple losses of family and friends.

The treatment plan addressed decreasing auditory and visual hallucinations from multiple times daily to two times daily over the course of the next three months.  It also sought reduction of depressive symptoms to between one and two on a zero to ten scale through medication compliance, CBT, and monthly clinical contacts.

The clinician allowed the inmate to voice his concerns and discuss his strengths and weakness, which were addressed during monthly contact visits.

<u>Findings</u>

The clinician clearly defined and outlined the IDTT's purpose and benefit to the inmate.  Relevant clinical history was discussed and the clinician praised the inmate for taking the first step of beginning the process of healing through mental health services.  The IDTT meeting was appropriate.

**Inmate B**

This 3CMS inmate's healthcare record was reviewed from a list of 3CMS inmate initial IDTT meetings that were conducted during the site visit.  The inmate arrived at CRC on 4/22/15 from a reception center, and the initial IDTT meeting was timely held 5/12/15.  The inmate was provided with a diagnosis of Schizophrenia, paranoid type.  He was prescribed Remeron and Geodon.

On 5/6/15, the PC conducted a mental health evaluation that included signing the informed consent for mental health services and ensuring all forms were completed according to the Program Guide.  The inmate met criteria for entering the mental health caseload on 1/8/15 at the reception center due to medical necessity.  While at the reception center, he verbalized symptoms of anxiety, tearfulness, anger, agitation, paranoia, auditory hallucinations, and other unmanageable symptoms.  He was referred to psychiatry.  The inmate met with a psychiatrist, but declined medications.  On 4/15/15, he was seen by psychiatry and was prescribed Remeron and Risperdal.

According to a psychiatry note dated 5/4/15, the inmate had a poor response to Remeron.  He stated that Risperdal helped control anger but caused facial twitching, and he stopped taking it. Previous documentation indicated the inmate told the reviewer there were shadows and a lot of evil spirits in the dorm.  The inmate also received messages through the radio.  The psychiatrist added Geodon for psychotic symptoms, and Risperdal was discontinued.

During the IDTT meeting, the inmate voiced concern about mental health medications interfering with his ability to get a job.  He had been accepted as a taxi driver, but was removed from the list because he was taking heat risk medications.  He also felt penalized for being in the mental health system because the custody classification and criteria under Minimum B stated "None in the Mental Health Services Delivery System."  The CC I agreed and stated he was ineligible for half-time status due to his participation in the MHSDS.  The inmate agreed to attend groups and work with psychiatry.  The recreational therapist verbalized the importance of groups, particularly those that addressed the inmate's symptoms; he was provided with a group schedule and was advised regarding successful group therapy participation.

During the IDTT meeting the clinician explained the IDTT meeting's purpose and, based on the inmate's diagnosis, introduced a general plan and goals for the following year.  The clinician, however, did not state clear, measurable goals to address the inmate's symptomatology over the next 90 days, nor was the inmate's current or future levels of care discussed.  The presenting clinician was not the inmate's PC; the senior psychologist facilitating the IDTT explained that the PC was out and the clinician present was covering until the PC returned.  The treatment plan was signed by all; however, discussion of medications that interfered with the taxi driver position and concerns about the inmate not receiving half-time status due to receiving mental health services were not documented.

Findings

The clinical care noted during the IDTT meeting was inadequate as the clinician did not discuss the inmate's level of care and did not address measureable goals; additionally, IDTT documentation did not fully reflect discussions that occurred during the IDTT meeting.  Without adequate documentation of the IDTT meeting, the returning PC might miss the salient points discussed or rehash them during the next session, which was unlikely to be beneficial.  However, clinical timeframes for clinical contacts and other paperwork requirements were consistent with Program Guide requirements.

**Inmate C**

This 3CMS inmate's healthcare record was reviewed from a list of 3CMS inmate initial IDTT meetings during the site visit.  The inmate was diagnosed with Depressive Disorder NOS, and he was prescribed Remeron.

The inmate was included in the MHSDS on 11/26/14, and he arrived at CRC on 4/22/15 from the reception center.  He reported two psychiatric hospitalizations as a teen for outbursts and verbal threats.

On 5/6/15, the PC completed the Form 7386-B, which contained standard language for the subjective, plan, and education portions of the progress note.  The Forms 7230-D and 7388 were completed timely.  It was noteworthy that the first paragraph, addressing subjective findings of the plan and education documentation were identical to the previously reviewed healthcare record entry; the only difference was the objective findings reported.

Findings

Clinical care was appropriate.  Clinical notes were timely documented, but the lack of individualized documentation was problematic.

**Inmate D**

The inmate's healthcare record was reviewed from a group of inmates interviewed during the site visit.  The inmate was diagnosed with Major Depressive Disorder, recurrent with psychotic features, and he was not prescribed psychotropic medications.

The PC evaluated the inmate on 12/16/14.  The inmate stated that he was pleased to have received the ducat for the PC visit due to feelings of being overwhelmed; such feelings were possibly due to medical concerns, and the inmate did not know how to make an appointment with the clinician.  He denied any significant depressive symptoms.  He discussed enjoying his job as a dorm porter, and he enjoyed and benefitted from the social skills and leisure groups he attended.  The PC explained to him how to access mental health services.

On 3/17/15 the inmate saw a different clinician for an individual clinical contact; however, the documentation of this encounter was sparse.  The subjective findings stated "I was referred to Health Relationships Group.  I just wanted to know what it is all about.  I would like to come to group."  The objective findings were appropriate except for mood and affect.  His mood was described as sad, depressed, anxious, pleasant, and flexible with anhedonia; and his affect was described as congruent with his mood.  The assessment indicated that the inmate was a suitable candidate for the health relationship group that commenced on 3/24/15.  The inmate was assessed with a GAF score of 65.  The plan was to schedule him for the healthy relationship group, and the clinician discussed this group's expectations.

Findings

The 12/16/14 clinical contact was appropriate, but the 3/17/15 clinical note was inadequate.

770

EXHIBIT Z
Richard J. Donovan Correctional Facility (RJD)
April 21, 2015 - April 23, 2015

**Inmate A**

The inmate's eUHR was reviewed at plaintiffs' attorneys' request.  The inmate had received multiple RVRs in March 2015 based on his reports of mental health symptoms.

This 28-year-old male was serving a 12-year sentence; this was his first prison term. He was admitted to RJD on 12/18/14 and had been prescribed Trileptal for mood instability and Zoloft for depression.  Zoloft was subsequently discontinued due to the inmate's nonadherence.  His diagnosis was Major Depressive Disorder with psychotic features.  He was subsequently prescribed Celexa.

The psychiatrist saw the inmate on 1/6/15 due to his nonadherence with Trileptal, which had been discontinued.  His request for Abilify and Wellbutrin was not granted.  On 2/28/15, he again requested Wellbutrin.  He was subsequently prescribed Strattera for concentration difficulties.

The inmate was admitted to the CTC on 3/4/15, where he remained for six days.  His Strattera was subsequently discontinued.

He received an RVR on 3/4/15 when he informed a clinical psychologist that he was feeling homicidal and wanted to kill a nearby social worker.  A CO subsequently charged him with threatening a staff member.  A 115 mental health assessment completed on 3/26/15 recommended mitigation.

A psychiatric examination was completed on 3/4/15 in the CTC.  The inmate reported feeling suicidal and homicidal for "a while now."  He described auditory command hallucinations.  A history of a substance abuse disorder was present.  Diagnoses were history of Major Depressive Disorder with psychotic features, Adjustment Disorder, and Antisocial Personality Disorder.  The evaluation note did not indicate the medications that were subsequently prescribed.

The next day this inmate, who was still in the CTC, received another RVR after informing a nurse that "he was going to kill [her] because his voices did not like [her]."  The nurse felt threatened and reported the incident to her supervisor, resulting in an RVR.  A mental health assessment completed on 3/26/15 in connection with this RVR appropriately indicated that there were mitigating mental health factors the hearing officer should consider during penalty assessment.  Specifically, the inmate was experiencing active psychiatric symptoms typically associated with a mental disorder at the time of the offense, and there was a direct connection between the active psychiatric symptoms and the inmate's alleged behavior.

The inmate was admitted to administrative segregation on 3/10/15 due to the pending RVRs that were being investigated.  At the time of the 3/13/15 treatment plan, he was described as being depressed and experiencing psychotic symptoms that included auditory hallucinations and delusional thinking.  There was a history of six crisis bed placements and one DSH placement and of a suicide attempt on 12/17/14 that involved swallowing 200 pills.  He had a prior suicide attempt by hanging in October 2010.  However, he was not prescribed psychotropic medications

at the time of his treatment plan's development; although it included a psychiatry referral for medication evaluation. Diagnoses included Major Depressive Disorder, recurrent, severe with psychotic features and Antisocial Personality Disorder. He was assessed to continue to need EOP level of care.

On 3/20/15, the psychiatrist again saw the inmate, noting that he had some significant depressive symptoms at that time. His diagnoses remained unchanged. Abilify was started, and Strattera was discontinued.

On 4/23/15, the inmate learned that his second RVR hearing had resulted in another 128-B. At the ICC, the initial plan was to transfer him to another prison since the nurse requested this transfer. The ICC postponed the transfer decision for one week to explore various options.

Findings

The RVR process that occurred during this inmate's CTC stay was very concerning, as was his continued administrative segregation stay even after the RVR disposition resulted in a 128-B disciplinary chrono. The expert discussed this case in detail with pertinent custody and mental health staff.

**Inmate B**

The healthcare record of this administrative segregation EOP inmate was randomly selected for review with specific reference to the timeliness of psychiatry clinical contacts. The most recent treatment plan was dated 1/14/15. This 52-year-old inmate was serving a three-year sentence. During a past incarceration, he was placed on a court order for involuntary medications. He had a history of substance abuse. His diagnoses were Schizoaffective Disorder, Polysubstance Abuse, and Antisocial Personality Disorder.

A psychiatrist evaluated the inmate on 8/12/14 due to his complaint of gynecomastia. The inmate received appropriate information from the psychiatrist and was to be seen again in 28 days. However, his next psychiatric appointment occurred on 10/3/14. His medications were continued at that time, and he was again to be seen in 28 days.

A psychiatry note dated 11/1/14 reported the inmate had very poor hygiene. He described auditory hallucinations. Diagnoses were consistent with Schizoaffective Disorder, tardive dyskinesia, and Antisocial Personality Disorder. Medications included Cogentin, Depakote, Remeron, and Risperdal. He continued to receive mainline EOP care.

Group treatment progress notes were present on a regular basis.

Another psychiatrist's note was dated 12/16/14. The inmate reportedly stopped taking his medication several days earlier and was becoming agitated and talking to himself. On that same day, a psychologist described him as being very agitated and psychotic. He apparently was going to be admitted to the CTC. He was discharged from the CTC on 12/30/14 and

773

subsequently received five-day follow-up.

On 1/15/15 the inmate remained in the mainline EOP.  He continued to experience auditory hallucinations.  Medications remained as previously summarized.  Little change was noted by the psychiatrist during the 2/12/15 mental health contact.  The plan was to see him again in 28 days or sooner if clinically indicated.

The inmate was transferred to administrative segregation on 3/13/15 after he assaulted a staff member with a retractable needle.

Findings

This inmate's healthcare record was reviewed with specific reference to assessing whether psychiatry visits were timely and clinically appropriate.  The inmate was seen on a regular basis by psychiatry, but on two occasions the appointments were more than 30 days apart. Otherwise, his treatment was consistent with Program Guide requirements.

**Inmate C**

This 26-year-old administrative segregation EOP inmate's eUHR was randomly selected for review with a focus on his treatment plan and its implementation.  The only treatment plan during the review period was dated 11/12/14; the inmate was housed at CSP/Corcoran at that time.  He had initially been placed at the 3CMS level of care during September 2008 due to an adjustment disorder.  He requested discharge from mental health services and was assessed to meet discharge criteria.  A Form 7388B was completed.  His level of care was changed from 3CMS to no mental health treatment.  Diagnoses were depression, resolved and Antisocial Personality Disorder.

A discharge summary from acute care at DSH-Stockton indicated that the inmate was admitted on 1/23/15 due to suicidal ideation and auditory hallucinations.  He had attempted to stab himself with a knife and a pen, which resulted in an RJD CTC admission for about six weeks prior to transfer to DSH-Stockton.  The transfer was precipitated by his continued symptomatology at the CTC.  Significant medical problems included asthma, a left below the knee amputation, status post multiple gunshot wounds, right leg weakness, and possible traumatic brain injury. Prescribed medications included risperidone, gabapentin, Prozac, and Remeron.  His listed diagnosis was Major Depressive Disorder with psychotic features.

The next mental health progress note was dated 3/24/15.  A 3/25/15 treatment plan indicated that the inmate had arrived at RJD on 3/18/15 and was now receiving EOP level of care in administrative segregation.  He apparently attempted to kill himself about one month after being removed from the mental health caseload, which resulted in an apparent DSH transfer on 1/23/15.  His diagnoses at that time were Depressive Disorder NOS, Cannabis Dependence in sustained remission, and Antisocial Personality Disorder.  Stressors included a pending RVR and his brother's recent death.  Planned interventions included medication management, cognitive

774

therapy, and skills building.  The major problem with this treatment plan was the lack of reference to the discharge summary and records from DSH.

Group therapies that the inmate attended included criminal thinking and addiction, pre-release planning, and social skills training.  Individual clinical contacts were consistent with treatment plan interventions.

Findings

The inmate received treatment that was consistent with his treatment plan.  However, the treatment plan was problematic from the perspective of not referencing his most recent treatment at DSH and the DSH discharge summary recommendations.

**Inmate D**

The record of this inmate, who had recently been treated in the CTC, was randomly selected for review to focus on treatment surrounding his MHCB admission.

This 57-year-old inmate had a diagnosis of Major Depressive Disorder, severe with psychotic features.  He was admitted to the CTC on 3/18/15 and remained there for almost one month.  He was noted to have had multiple recent crisis bed admissions due to suicidal thinking that had been exacerbated by his transition from the jail to prison system.  He was subsequently transferred to DSH for further stabilization due to his multiple crisis bed admissions over a short time period.

Review of a prior CTC admission note indicated that the inmate had been transferred from WSP-RC to RJD on 2/27/13.  Due to his reception center status and multiple CTC admissions, the only mental health notes for 2015 were from the CTC.  However, there was a large back file of mental health notes from 2011 and earlier.

Findings

Review of this inmate's CTC record indicated that the inmate's treatment was consistent with Program Guide requirements.

**Inmate E**

This 3CMS SNY inmate was interviewed in a group setting.  He generally was complimentary regarding the mental health treatment that he was received, but was very critical about interactions with COs; he believed that custody staff interfered with mental health treatment.

The inmate's eUHR was reviewed.  The most recent treatment plan was dated 3/12/15.  The inmate was described as a 44-year-old fourth termer.  He reportedly expressed suicidal thinking in the past to obtain medications.  He was provided with a diagnosis of Depressive Disorder

NOS and Axis II was deferred.  His treatment plan included medications for treatment of depression and CBT for managing depression.

PC contacts during the review period were dated 9/16/14, 11/19/14, and 12/10/14.  Psychiatry contacts were dated 8/22/14, 11/3/14, and 1/5/15.  Group therapy contacts were dated 9/25/14, 10/30/14, 11/20/14, 12/11/14, 12/18/14, and 12/19/14.  The progress notes were informative in the context of describing his mental health treatment and issues.

Findings

This inmate received mental health treatment consistent with Program Guide requirements.

**Inmate F**

This SNY 3CMS inmate was interviewed in a group setting.  He described his mental health treatment as being helpful.  The inmate's eUHR was also reviewed.

The most recent treatment plan was dated 7/25/14.  It was the third term for this 52-year-old inmate.  Diagnoses included Schizoaffective Disorder, bipolar type, Polysubstance Dependence, and Antisocial Personality Disorder.  He received treatment at the 3CMS level of care.

Clinical contacts were dated 9/25/14 and 12/5/14.  Due to several medical issues, psychiatry notes were more frequent; psychiatry contacts were dated 10/6/14, 12/9/14, 1/2/15, 1/6/15, and 3/10/15.  Progress notes and documentation were good.

Findings

Review of the inmate's eUHR supported his report of good access to mental health care treatment.  The treatment was also consistent with Program Guide requirements.

**Inmate G**

This 3CMS inmate was interviewed in a group setting on Facility A.  He was fairly quiet during the interview process.  His eUHR was also reviewed.

The inmate's most recent treatment plan was dated 12/10/14.  This 76-year-old man was reported to have numerous medical difficulties.  A wheelchair was generally used for ambulation.  He had been 3CMS since 2009 due to mild depression, anxiety, chronic pain, and a sleep disturbance.  Medications included an antidepressant and narcotic medications for chronic pain.  Treatment interventions included individual and group therapies and medication management.  Remeron was prescribed.  Diagnoses were depression, mild, situational and narcissistic and borderline features.

Psychiatry notes were typed and summarized relevant clinical findings.  They were dated 10/18/14, 11/26/14, 12/3/14, 2/12/15, and 3/12/15.  Clinician notes were dated 8/4/14, 11/17/14,

12/10/14, and 2/24/15 and were comprehensive in nature.  However, group therapy notes were not located.

<u>Findings</u>

This inmate received adult treatment consistent with Program Guide requirements.  However, his treatment plan was not followed concerning group therapy participation, which likely was a reflection of current waiting lists.

**Inmate H**

This 3CMS inmate was interviewed in a group setting on Facility A.  He was quiet during the interview.  His eUHR was also reviewed.

The inmate's most recent treatment plan was dated 8/13/14.  This 69-year-old inmate was serving a life sentence without parole.  He was a lower leg amputee from a motorcycle accident and also had other significant medical problems.  Diagnoses included Delusional Disorder, Polysubstance Dependence, and Antisocial Personality Disorder.  His treatment plan included individual treatment, therapy, and medication management.  Vistaril was prescribed as an anti-anxiety agent.

Psychiatry progress notes were dated 8/25/14, 12/3/14, 2/12/15, and 3/12/15 and were comprehensive in nature.  Clinician notes were dated 8/29/14, 9/5/14, 10/13/14, 11/29/14, and 2/23/15.  These notes were also comprehensive in nature and included at least one response to an urgent referral.

<u>Findings</u>

This inmate was receiving 3CMS treatment that was consistent with Program Guide requirements.  Except for planned group therapy, his treatment plan had been implemented.

**Inmate I**

The inmate's healthcare record was chosen from a list of inmates who did not receive a timely initial IDTT; his was 13 days late.  The inmate had been transferred from DSH to RJD.  He was diagnosed with Major Depressive Disorder with psychotic features and prescribed Zoloft, Remeron, and Trileptal.  His medical diagnoses included chronic neutropenia and thrombocytopenia, hepatitis C, both lower extremity cellulitis, coronary artery disease, hypertension, hypothyroidism, chronic obstructive pulmonary disease, lumbago, ventral hernia, and morbid obesity.  Due to his physical condition, he used a wheelchair and walker.

The inmate had a history of Bipolar I Disorder, with hypomania.  The healthcare record noted an allergy to Depakote.  He was hospitalized at DSH from 12/12/13 to 10/17/14.  He transferred to RJD on 10/17/14 and was housed in the CTC as a DSH medical return.  Although the bus screen was completed on 10/17/14, , the incorrect form was used and the inmate was not referred to

mental health even though two mental health questions were answered in the affirmative. An SRE was completed on 10/18/14 and indicated moderate acute and chronic suicide risk levels. The treatment plan focused on suicide prevention, individual and group CBT therapy for depression, anxiety, and anger. A mental health examination was also completed on 10/18/14.

On 10/21/14, another SRE was completed and indicated high chronic and moderate acute suicide risk. The SRE reported the inmate's DSH stay as 12/2/13 to 9/27/14, which was a different time period than other eUHR records indicated. The inmate was also being weaned from methadone. He complained of severe pain. The IDTT completed on 11/13/14 was two weeks late. Mental health PC notes from 10/22/14 to 11/13/14 were not available in the eUHR for review during the site visit. The inmate was transferred to VSP on 12/17/14.

Findings

This inmate's care was inadequate. His initial IDTT following DSH discharge was untimely. His medical problems that caused severe pain were not addressed by his mental health care as part of his treatment plan. There was no collaboration between medical and mental health to manage the inmate. Documentation in the eUHR was contradictory and not up-to-date.

**Inmate J**

This SNY/EOP inmate's healthcare record was chosen from a list of inmates who had initial IDTT meetings. He was diagnosed with Bipolar 1 Disorder with mixed psychotic features. Prescribed psychotropic medications were Zyprexa, lithium, and Vistaril. The initial PC contact occurred on 4/16/15; the only documentation on the note was, "Psychology note. 1:1 interview in C yard 3CMS mental health clinic unless otherwise indicated. The inmate was seen today for IDTT prep. IDTT will be this week".

The inmate's initial IDTT meeting was observed on 4/21/15; all of the appropriate staff were in attendance. The inmate discussed a special accommodation for shoes due to a sprained ankle and flat feet. The treatment goal was to learn to recognize, accept, and cope with feelings of mood disorder using an intensity scale. Adherence with prescribed medications at least 90 percent of the time was also a goal. In addition, as part of the treatment plan, the PC would use CBT to reduce negative thoughts and increase positive ones.

Findings

The PC's documentation regarding the 4/16/15 contact was of little clinical value. The clinician did not explain the IDTT meeting's purpose or benefit to the inmate. The clinical presentation during the IDTT meeting was mostly about the inmate's criminal and mental health history, with no substantive discussion about his treatment plan. The clinician stated multiple times during the IDTT meeting that "we are both new." According to the Form 7388, the next IDTT meeting would occur in twelve months. The documentation and IDTT presentation were both inadequate.

778

**Inmate K**

This mainline EOP inmate's healthcare record was identified for review from a list of inmates who had follow-up IDTT meetings during the site visit.  He attended the IDTT meeting in a wheelchair.  He was diagnosed with Major Depressive Disorder with psychotic features, severe.  The medical diagnoses included scoliosis, seizures, and hypertension.  The inmate received his psychotropic medications by PC 2602 court order.  He was prescribed Prozac, Haldol (with PC 2602 back up), and benztropine (also with PC 2602 back up).  The inmate had support from a brother in Los Angeles who visited frequently.

The PC spoke the inmate's first language and praised him for good group attendance, medication adherence, and for leaving his cell to attend PC contacts.  The PC stated the inmate's major problem was depression; the inmate corrected the PC and stated that the main problem was chronic pain due to scoliosis.  The psychiatrist reported that the inmate was not medication adherent and did not believe he was psychotic at any time.  The psychiatrist discussed the inmate's behavior when not taking psychotropic medications as disheveled, unkempt, and malodorous, and that he failed to bathe.  The inmate and psychiatrist discussed the different views, and the psychiatrist stated that the discussion would continue after the IDTT.  The correctional counselor told the inmate that he was endorsed to CHCF and would go to the Special Outpatient Program.  The recreation therapist arrived 15 minutes late and did not speak during the IDTT meeting, but signed the Form 7388.

Findings

The PC was bilingual and alternated between languages while engaging the team and the inmate, explaining the IDTT meeting's purpose and benefit to the inmate.  The psychiatrist also spoke the inmate's native language and communicated well with him and the team.  It was concerning that the inmate's transfer to Stockton could negatively impact the inmate's support system.  The inmate's mental health care was appropriate.

**Inmate L**

This mainline EOP inmate's healthcare record was chosen from the IDTT meeting follow-up list.  The inmate's diagnosis was Depressive Disorder, and the prescribed medication was Prozac.

The inmate's first interaction with the mental health system occurred in February 2014 while housed in administrative segregation for threatening staff.  The inmate stated that he wanted to leave administrative segregation.  He also reported having three MHCB admissions.  The first admission occurred after his sister committed suicide, and the other two stays reportedly occurred in an attempt to leave administrative segregation.

The inmate's parole date was July 2015, but he had a pending RVR which could delay his release.  The psychiatrist reported that the inmate was prescribed psychotropic medications at the time of arrival to RJD, but he was uncertain whether he needed the medication.  The inmate

asked that Prozac be discontinued; the psychiatrist agreed and scheduled an appointment with the inmate to discuss this further.  A pre-release treatment plan was conducted on 3/19/15.

Findings

This inmate's clinical care was appropriate.

## Inmate M

This SNY EOP inmate's healthcare record was chosen from a list of interviewed inmates who were housed in the EOP overflow building during the review period.  He was diagnosed with Adjustment Disorder with mixed disturbance of emotions and conduct.  He arrived at RJD on 3/19/15 from CHCF.  His mental health history included an MHCB admission on 12/24/14 due to suicidal thoughts; at that time, he was placed on the mental health caseload at the 3CMS level of care.  The most recent MHCB admission occurred on 3/19/15; the inmate reported that this admission occurred after he reported being suicidal and that this was an attempt to avoid a fight.  The treatment plan indicated that the inmate should use two adaptive coping skills, namely relaxation techniques and medication adherence to manage depression.

The inmate was concerned that he had not been seen by the ICC to be removed from orientation status so he could receive all of his property.  He also stated that a package was inadvertently sent to another institution.  During the weekly PC contact, he was concerned that he was still on orientation status and wanted to know why the clinician had not addressed this issue during the IDTT meeting.  The inmate also indicated that the 3CMS level of care was his appropriate level of care.

The PC spoke to the correctional counselor on 4/21/15, who stated that he was working on getting the inmate's paperwork ready.  As of 4/23/15, the inmate still was not scheduled for ICC due to a backlog, and he remained on orientation status.

Findings

The inmate's clinical care was adequate.  The PC advocated for the inmate with custody to complete the ICC paperwork so he could be removed from orientation status.

EXHIBIT AA
California Institution for Women (CIW)
May 19, 2015 - May 21, 2015

**Inmate A**

This case was selected for review because the inmate had been identified at least once on the facility's log as having met one or more criteria for inpatient care referral, but was not referred. This 22-year-old EOP DD2 inmate received her psychotropic medications by court order granted on 1/16/15 due to danger to others. She had received an RVR on 12/23/14 for aggravated battery on a peace officer (gassing). The mental health assessment, completed 1/13/15, indicated that she was experiencing psychosis at the time of the RVR due in part to nonadherence with psychotropic medications; she was initiated on involuntary medications on 12/31/15. The evaluator reported the inmate had significant mental health needs that would best be served at the EOP level of care or in the PSU, and prolonged administrative segregation placement was not recommended. No associated progress note was included in the healthcare record for that mental health assessment. There also was no associated progress note for the forced medication initiation. However, on 12/31/14, there was a physician's order by the chief psychiatrist for fluphenazine 5 mg every morning and 5 mg every afternoon with fluphenazine 2.5 intramuscular ordered for medication refusal. The inmate was found guilty of the RVR and she was assessed a penalty that included a loss of 181 days forfeiture of credit. At some point, the RVR was ordered reissued and reheard during March 2015, and the outcome was pending at the time of this review. The matter was also referred to the district attorney. The inmate was out to court during the monitoring visit.

The inmate's diagnoses were Schizophrenia, undifferentiated type and Amphetamine Dependence. She had an extensive history of mental illness, including psychiatric hospitalizations in the community. She was quickly admitted to the MHCB following her arrival at CIW from the county jail. The CIW MHCB had referred her to the CIW PIP, but on 6/14/14 the referral was rescinded; however, reviewed records did not indicate the reason for referral. The inmate had a history of medication nonadherence, poor activities of daily living (ADLs), paranoia, persecutory delusions, aggressive and erratic behaviors, and depression. She had difficulty engaging with others due to her psychotic symptoms. She was described by clinicians as requiring frequent prompts to finish sentences; she often stopped midsentence or trailed off.

The treatment team saw the inmate on 12/30/14, when she was identified as meeting criterion one (unable to function at the current level of care due to a mental disorder) and three (chronic psychiatric symptoms that have not responded to at least six months of treatment). The non-referral rationale was inadequate. Alternative interventions were considered and some were implemented. The treatment team indicated that the inmate had been re-evaluated for the *Clark* developmental disability program and was determined to meet the criteria for DD2 status. The treatment team also noted that she was being considered for a forced medication order.

The IDTT saw the inmate again on 1/9/15. The treatment plan from this encounter indicated that the DDP re-evaluation was in response to the inmate's low functioning and poor ADLs. Due to her DD2 status, she would have more daily contact and support with ADLs and basic tasks. The inmate was described as very guarded when discussing her mental illness. Her treatment plan required greater specification and operationalization of treatment targets and goals, but otherwise was adequate. The Form 7388B of that same date noted that criterion three was met (chronic

782

psychiatric symptoms that had not sufficiently responded to at least six months of treatment). The non-referral rationale included the same reasons as the Form 7388B of 12/30/14 (pending interventions), none of which properly addressed the indicator or non-referral rationale. While the non-referral may have been appropriate, the rationale was inadequate. The treatment modifications were also inadequate. The treatment team generally indicated what would be addressed and what the inmate was receptive to; however, given that the inmate's symptoms had been resistant to treatment for at least six months, specific interventions should have been identified in this section.

This inmate continued to function poorly and to deteriorate. She was admitted to the MHCB twice, from 3/1/15 to 3/4/15 and from 3/30/15 to 4/1/15; she again returned to the MHCB on 4/1/15, at 1700 hours, and was hospitalized there until 4/2/15. A progress note in the eUHR stated the inmate was also seen in the MHCB on 3/11/15, but a SOMS review indicated that she was not there on that date. Review of progress notes since January 2015 indicated the inmate had not improved and appeared to have worsened; this suggested that a CIW PIP referral was indicated.

Findings

This inmate was not adequately treated. It was unclear from documentation why the original CIW PIP referral was rescinded when it appeared to be clinically indicated. The inpatient referral did not require a forced medication order, but the inmate certainly benefitted from that order and revised DD2 status. Despite these treatment modifications, the inmate continued to experience serious psychiatric symptoms that interfered with her ability to function within the prison setting, which clearly necessitated a referral for inpatient care. This inmate's treatment plans were not sufficiently developed, and they did not include appropriate specific goals and interventions to address the very serious symptoms and functional impairments that she experienced. Consequently, she did not receive adequate treatment. The behavior underlying her RVR (throwing a damp sponge at an officer) was determined to be due to mental illness. She was subsequently hospitalized and a forced medication order was initiated.

**Inmate B**

This case was identified for review as the inmate met at least one or more criteria for higher level of care referral consideration, but was not referred. This 34-year-old 3CMS SHU inmate was admitted to the MHCB on 3/11/15 for suicidality. She had a history of prior MHCB admissions for self-injurious behaviors. She had been housed in the CIW SHU since November 2013 for battery on a non-peace officer and she was functioning well. She was medication adherent; she was prescribed Cymbalta, Buspar, and Vistaril. She was provided with diagnoses of Depressive Disorder NOS and Amphetamine Dependence in a controlled environment.

The MHCB treatment team met on 3/13/15 and developed an appropriate treatment plan. On the Form 7388B, the team identified that the inmate had three or more MHCB admissions during the last six months (criterion five). The non-referral rationale was clinically adequate. Treatment modifications could have been better articulated, but were adequate. The 3CMS treatment team

evaluated the inmate after her return from the MHCB on 3/25/15 and treatment planning was adequate. However, the treatment team did not use the most recent version of the Form 7388B, so there were some improvements that were needed that would have been corrected with the use of the most recent version. The Form 7388B indicated that the inmate met criterion five (multiple MHCB placements), but did not have an appropriate non-referral rationale or treatment modifications.

Findings

This inmate was appropriately treated. The 3CMS treatment team did not, however, appropriately document their decision not to refer the inmate to a higher level of care. They also did not appropriately document the alternative interventions that would be used to target the reason (Form 7388B, item five) that identified her for higher level of care referral consideration.

**Inmate C**

This 43-year-old EOP inmate was admitted to the MHCB on 1/24/15 for bizarre, hostile, and agitated behavior; she remained there for 17 days. She had a history of multiple community psychiatric hospitalizations for suicidal ideation and suicide attempts, as well as psychotic symptoms. She also had a history of marijuana and methamphetamine abuse with her first incarceration, for assault of her mother, which reportedly occurred while she was under the influence of methamphetamine. She had a brother with schizophrenia and had received social security disability insurance since she was 18 years of age. She had poor hygiene and was described as responding to internal stimuli and experiencing delusions. She experienced both visual and auditory hallucinations. She had eight suicide attempts, with the last one occurring in 2013.

The MHCB intake nursing assessment and history and physical were timely completed, as was the admission and discharge SRE. The initial SRE completed on 1/25/15 indicated high chronic risk and low acute suicide risk. The treatment plan, which was dated 2/2/15, identified one treatment target, mood instability, and overly broad treatment goals. The only treatment interventions listed were daily treatment team contact and medication adjustment; these interventions were clearly inadequate to address the inmate's mood instability. The inmate was provided with a diagnosis of Psychotic Disorder NOS. She was prescribed benztropine mesylate 2 mg per day, divalproex sodium ER 2000 mg per day, olanzapine 40 mg per day, and hydroxyzine 150 mg per day.

On 2/2/15, the treatment team noted that the inmate met criterion two (requiring highly structured inpatient psychiatric care) for higher level of care referral consideration, but she was not referred. The non-referral rationale was adequate, but the team did not thoroughly articulate the treatment modifications beyond the typical MHCB program standards that would be provided to her to address the positive criterion. The inmate was next seen on 2/9/15 by the treatment team; the team noted that while improving slightly, her mood was still labile with rapid fluctuations from calm to manic and she continued to have acute psychotic symptoms. The treatment team had added the problem area of psychosis to the treatment plan, but treatment

784

goals were unrealistic given her current level of functioning. There was no documentation indicating that she was going to be discharged, but the inmate in fact was discharged the following day. The team indicated on the Form 7388B dated 2/9/15 that the inmate met criterion two, which required 24-hour structured inpatient care, and criterion four, for being in the MHCB for ten days or more, but the inmate was not referred to a higher level of care. The non-referral reason was the same as the reason from the prior Form 7388B, namely, that the team continued to wait for the medication changes to take effect. However, this was only minimally sufficient given the descriptions of the inmate's behavior at that time. While there had been medication changes, the inmate's behavior continued to necessitate a higher level of care referral. Ongoing medication adjustments could have been addressed in the inpatient setting. The treatment plan included no treatment modifications; instead the standard treatment provided to MHCB inmates was listed in the modification section. The lack of appropriate documentation on the last Form 7388B dated 2/9/15 was of particular concern given that the inmate was discharged the following day when there was no documentation that this discharge was imminent or clinically appropriate.

On 2/9/15, a psychiatric note indicated that the inmate appeared "heavily under the influence of drugs upon admission" by a psychiatrist who had not seen her on the day of admission nor soon after. She was given drug screens on 1/24/15 and 2/4/15; both were negative. In the 2/9/15 psychiatric progress note, the psychiatrist noted that the inmate wanted to return to yard and was upset when she learned she would not be discharged that day. In the psychiatric plan, the psychiatrist noted that she might be discharged early that week, but did not provide a clinical rationale since it was not congruent with the clinical picture in all other treatment documents at that point. In the psychiatric discharge summary dated 2/10/15, the psychiatrist wrote that she had improved "significantly" and her thinking was clear, coherent, organized, and logical, and she was calm. This directly contradicted documentation from the treatment team conducted the day before, on 2/9/15. There was significant contradiction throughout the documentation related to this inmate's discharge.

Findings

This inmate was not appropriately treated. She had a clear and lengthy mental health history that resulted in community hospitalizations for suicidality and psychotic symptoms. Treatment plans did not appropriately target her serious symptoms and functional impairment. Documentation did not adequately justify the reason for non-referral to a higher level of care; it also did not specify the alternative interventions implemented to address those areas that identified the person for higher level of care referral consideration. There were also some contradictions within the MHCB record where the primary treatment team indicated that she remained highly psychotic and unstable as of 2/9/15; yet a second psychiatrist documented completely contradictory information the following day and appeared to believe that she had been under the influence of drugs rather than psychotic. Test results noting that the inmate had been tested twice and was negative for multiple substances were readily available in the healthcare record. Despite this, she was abruptly discharged on 2/10/15. This inmate did not receive adequate care and did not appear appropriate for discharge.

**Inmate D**

This 39-year-old mainline 3CMS inmate was selected for review because she was identified as having met one or more criteria for higher level of care referral, but was not referred.  She was discharged from the CIW PIP to the SHU at the 3CMS level of care on October 2014.  She was originally admitted to the PIP after a serious suicide attempt by hanging, which required Cardiopulmonary Resuscitation (CPR).

Medical record documentation indicated the inmate had multiple stressors prior to her most recent suicide attempt, including a parental death within the last year, an inmate friend who died by suicide, and a long-time cellmate, who was also her girlfriend, who paroled within the last six months.  The inmate had two other prior suicide attempts when she was in her 20s.  She had a history of extreme mood fluctuations between depression and anger with poor impulse control and aggressive behaviors.  She had been aggressive toward staff and peers and had a history of poor problem-solving skills and self-injurious behaviors.

Once in the SHU, her initial treatment plan dated 10/29/14 noted she had reported to the treatment team that she was "in a good place;" however, the healthcare record documented frequent fluctuations between positive and negative reports in rapid succession.  The treatment plan was an "enhanced" 3CMS plan that included weekly PC contacts, daily psych tech contacts, and placement on the CIW high risk list.  Some of the treatment goals were too broad to formulate an actionable plan, but the treatment plan at least acknowledged her high risk for suicide and decompensation.  It was unclear why the inmate was not placed into the EOP level of care, particularly since the "enhanced" plan was consistent with EOP care with the addition of placement on the high risk list.

The inmate was diagnosed with Mood Disorder NOS, Opiate Dependence, with institutional use, Amphetamine Dependence, institutional use, and Antisocial Personality Disorder.  The Form 7388B correctly noted criterion five of multiple MHCB admissions as positive, but she was not referred for a higher level of care.  The rationale for non-referral appeared to be her recent PIP discharge, medication adherence, and motivation to work toward treatment goals.  As the Form 7388B addressed referrals to all higher levels of care, the rationale for EOP non-referral was necessary and absent.  The rationale provided was inadequate and needed to more clearly articulate how the inmate was otherwise stable at the 3CMS level of care.  The treatment modifications were appropriate.  Based on review of the healthcare record and treatment progress notes, the PC did not consistently see the inmate weekly as outlined in the treatment plan.  This was of significant concern given the inmate's high level of risk and treatment needs.  Some of the initial PC contacts indicated the PC was addressing issues from the treatment plan and these contacts were not merely "check-ins," but were meaningful clinical contacts.  Daily psych tech contact documentation suggested they were superficial contacts; it was unclear how they would further the treatment plan and reduce risk.

The inmate's initial psychiatric contact after discharge from the PIP on 11/21/14 was the first time that the EOP level of care was discussed.  During this clinical contact, the inmate reported that she was not happy to be alive and made other statements suggesting suicidal ideation.  There

was no associated SRE or clear assessment of suicide risk.  The psychiatrist included a "5-day step down" in the plan of this progress note.  The inmate was never referred for evaluation for MHCB admission nor was the decision not to refer her to the MHCB justified.  The five-day step down was not an authorized procedure for CIW or any other CDCR facility, and it appeared to be utilized as an alternative to MHCB referral.  The psychiatrist clearly recognized this inmate's risk level to commit suicide or engage in other self-injurious behavior, but inexplicably chose not to refer or admit her to the MHCB; however, there was no clinical justification for the decision not to refer.  The psychiatrist's action suggested that the inmate was not safe enough to remain in the setting under normal circumstances, but appropriate protocol was not implemented.

The subsequent treatment plan dated 12/3/14 was an initial treatment plan for administrative segregation after the inmate was moved from the SHU.  This treatment plan contained information that contradicted other information in the healthcare record (e.g., the inmate had been 100-percent compliant with medications while other documentation and MARs indicated this was inaccurate).  This treatment plan remained the same as the prior plan, dated 10/29/14, with the addition of substance abuse as a problem area.  The treatment plan required actual interventions, but instead only listed treatment modalities such as individual and group therapies.  Treatment goals also required better specificity and operationalization.  As such, the treatment plan was overly broad and vague, making it very unclear what the treatment team would do to improve the symptom presentation and functional level of the inmate.  The Form 7388B indicated that the inmate met criterion five, but the inmate was not referred to a higher level of care.  The non-referral rationale provided was the inmate's treatment adherence, active treatment participation, and stability.  Although the non-referral rationale was clinically reasonable, given the continued weekly PC and daily psych tech contacts with the intention of releasing her to a 3CMS yard, it was unclear why EOP level of care was not considered.  The inmate clearly did not appear stable at the 3CMS level of care and contradictory information wsa present in the healthcare record as to treatment adherence.  The treatment modifications were appropriate.

Findings

The inmate did not receive adequate care.  If she had received all the care indicated in the first treatment plan following discharge from the CIW PIP on 10/29/14, with enhanced clinical contacts and monitoring, the care may have been adequate.  However, available documentation indicated that this level of care did not occur.

It was unclear why the inmate was not treated at the EOP level of care.  The level of clinical contact and monitoring she received was standard for an EOP, not 3CMS, level of care.  She was also inappropriately placed on a five-day "stepdown" or follow-up without having been housed in alternative housing or the MHCB and with no SRE completed.  It appeared that she required MHCB referral, particularly in light of her suicide risk, but was instead placed on a procedure of a "five-day follow-up" that did not follow inpatient discharge.  The treatment plans were minimally adequate only because of the frequency and general areas of focus; they needed greater specification and operationalization of treatment goals and greater specification of interventions.  While the inmate may not have required inpatient care referral, the justification

787

was inadequate and no justification for a failure to refer to the EOP was provided on the Form 7388B.

## Inmate E

This case was selected for review in part because of an inquiry by plaintiffs' counsel, but also as an example of MHCB care where the inmate returned quickly after discharge. This 28-year-old first-term inmate had multiple MHCB admissions, and available healthcare records indicated that these admissions averaged almost monthly since December 2014. SREs were not consistently completed at each admission and discharge.

The first initial mental health evaluation located in the inpatient healthcare record (3/1/15) was from the inmate's third MHCB admission within six months at CIW, where she had transferred due to CCWF MHCB lack of capacity. The nursing assessment, history and physical, initial mental health evaluation, initial psychiatric evaluation, and SRE were all completed timely. The reason for admission was a suicide attempt by overdose; the inmate had recently learned of a grandparent's death. She had a long history of impulse control problems and mental health issues dating back to when she was 13 years old. She reported multiple suicide attempts and had visible scars on her arms and neck. She was provided with a diagnosis of Mood Disorder NOS and was prescribed Thorazine 300 mg per day, trileptal 200 mg per day, and Vistaril 50 mg per day.

The initial treatment plan dated 3/2/15 was clinically appropriate and Borderline Personality Disorder was added as a diagnosis. The Form 7388B noted correctly that the inmate met criterion five (multiple MHCB admissions), but the inmate was not referred to a higher level of care. The non-referral rationale was that the MHCB admissions were initiated by situational stress and avoidance of administrative segregation housing. The inmate had also agreed to start taking an antidepressant and her mood had improved; these rationales were clinically adequate. No treatment modifications were included, but instead listed the standard MHCB program.

On 3/9/15, the treatment team saw the inmate again. The treatment plan was unchanged from the previous one and appeared to be cut and pasted. The Form 7388B continued to identify criterion five and used the same rationale without providing updated information regarding medication changes. This treatment plan indicated the inmate was going to be discharged that date to the EOP level of care. The treatment modification section included recommendations for the EOP treatment team. The inmate was not physically discharged until the afternoon of 3/11/2015. Despite being discharged from the MHCB at the EOP level of care, the inmate received a 31-item screen upon arrival in administrative segregation. She was treated by the psych tech as if she were a non-mental health caseload inmate; the psych tech's progress note reported that the inmate had screened positive and a mental health referral would be completed. The psych tech also appeared to have some misconceptions regarding the PIP and recommended that the inmate be considered for the program.

The inmate was seen by a different psych tech on the following day. The inmate was acting oddly, screaming while placed into a therapeutic module, shouting she wanted a dog, yelling

about hearing voices and that she did not want to hurt herself.  She yelled that she did not want to go to the MHCB and would not hurt herself.  She became increasingly agitated, banging her head and hands against the module, and biting on her wrists, causing indentations.  After the staff provided her with space and time to calm down, she was escorted to the CTC and was eventually readmitted to the MHCB.

The inmate was readmitted to the MHCB on 3/12/15 and, except for the initial psychiatric evaluation, all admitting documents were completed timely.  Upon arrival at the MHCB, she was banging her head, biting herself, and attempted to swallow a spoon.  She was placed into seclusion and was provided with intramuscular emergency medications.  After approximately 90 minutes she had calmed sufficiently and was escorted to her room.  The following day she covered her window, was biting herself, and engaged in other problematic behaviors, necessitating emergency medication and seclusion again.  She was demanding to staff that she not be returned to administrative segregation.  The treatment team saw her on 3/13/15 and changed her diagnosis to Major Depressive Disorder without psychotic features, PTSD, and Borderline Personality Disorder.  The treatment plan was the same as the prior MHCB admission and in light of the inmate's rapid return, should have been revised and not cut and pasted into this treatment plan.  The Form 7388B of this date indicated the inmate met criteria two (required highly structured inpatient care) and five (multiple MHCB admissions), but the inmate was not referred to a higher level of care.  The rationale for non-referral included some of the same reasons from the last MHCB admission and was inadequate.  However, the treatment modifications were acceptable.

The treatment team next saw the inmate on 3/23/15.  The clinical summary indicated that a forced medication order had been initiated on 3/15/15, despite the fact that the previous treatment plan reported the inmate to be medication adherent.  The forced medication order was sought due to danger to self and others and was granted on 3/26/15 for one year.  The clinical summary in this treatment plan did not note the initiation of forced medication, and the treatment plan remained unchanged from the prior plan.  The forced medication order was noted in the medication section.  The Form 7388B noted that the inmate met criteria four (MHCB stay of 10 or more days) and five (three or more MHCB admissions in the last six months), but the inmate was not referred to a higher level of care.  The non-referral rationale was appropriate; it noted that after placement on involuntary medications, the inmate's mood had improved and she had not engaged in any subsequent self-injurious behavior.  The treatment modifications were also appropriate.

Findings

While documentation was problematic and needed significant improvement, the inmate was adequately treated.  There was contradictory information in the healthcare record that needed to be remedied, such as the documentation that the inmate was medication adherent when an involuntary medication order was sought.  In addition, treatment plans were too frequently cut and pasted, including outdated treatment plans and treatment summaries that were no longer relevant for the inmate.  There also needed to be better specification and operationalization in the

treatment plans so that treatment could be clearly identified and progress notes linked back to the treatment plan.  Despite these limitations, this inmate was adequately treated.

**Inmate F**

The inmate was housed in the PSU, where she was serving a term for battery of a peace officer and gassing.  The Special Master's expert interviewed her at cell front as she had declined to participate in a group interview.  The purpose of this review was to assess mental health care provided during the review period.

The inmate received inpatient psychiatric treatment before entering CDCR and was treated three times in PSH per PC 1370 during this incarceration.  She was treated at the EOP level of care since 2009.  Immediately prior to PSU placement, she was treated for eight months in the PIP.  She required court-ordered medications to target persecutory delusions about imaginary custody staff, hostile behavior, and threats.

Healthcare record documentation indicated the PSU treatment team reviewed the PIP discharge report and incorporated recommendations made therein, including renewal of PC 2602 medications.  She was maintained on olanzapine 30 mg per day to treat symptoms of her historically diagnosed mental disorder, Schizophrenia, paranoid type.

The inmate was adherent with court-ordered treatment and participated in full PSU programming at the highest level even though she continued to harbor paranoia about correctional staff.  She was eager to participate in PSU programming to avoid discharge to the EOP where she claimed to feel unsafe without the protective barrier afforded by treatment modules.

In January 2015, she exhibited increased paranoia and refused to attend treatment groups due to what was described as increased chaos in the housing unit.  Her refusal to attend treatment groups was based on irrational beliefs associated with her severe mental illness, i.e. housing officers planned to injure her.  On that basis, she was placed on a modified treatment plan consisting of four weekly groups.

According to subsequent treatment records, the inmate successfully accomplished the modified treatment goals, but was retained on the modified plan without explanation.  The Special Master's expert interviewed her on 5/19/15.  She was grossly psychotic as characterized by healthcare records and oral staff reports.  She continued to express delusional beliefs about custody staff, whom she believed wanted to harm her.

<u>Findings</u>

The inmate was appropriately placed in the EOP to treat a chronic and severe mental illness.  Within the limits of the review period, the care provided appeared adequate.  Treatment plan meetings were timely held, as were PC and psychiatry contacts and psych tech rounds.  The inmate's persistent psychosis was managed at the EOP level of care within restricted PSU housing and augmented by court-ordered medication.  These parameters appeared necessary to

reduce the intensity of symptoms and eliminate assaultive behaviors.  However, the issue of treatment interventions needed to return the inmate to a less intense level of care as required by the Program Guide (12-9-6) was not directly considered by the treatment team.

**Inmate G**

This case was randomly selected from the roster of PSU inmates at the time of the site visit.  The purpose of the review was to assess the mental health care provided to the inmate during the time she received EOP level of care treatment in the PSU.

Healthcare record review noted the inmate's long history of psychosis, amphetamine abuse, and numerous psychiatric hospitalizations in the community.  Past psychiatric medications included Seroquel, Abilify, Haldol, Buspar, Prozac, Vistaril, Risperdal, and Cogentin.  Her history was notable for seven suicide attempts, with the most recent occurring three years earlier in the county jail.

The inmate was previously treated in the EOP, but transferred to the PIP after receiving three RVRs within a six-month period.  The treatment team provided a diagnosis of Schizoaffective Disorder based on reported experiences of auditory hallucinations, paranoid thinking, mood instability, and poor self-care.  She was prescribed Zyprexa to treat symptoms of her severe mental disorder.  She discharged to the EOP on 10/29/14, but went to administrative segregation on 1/8/15 for fighting.  She was placed in the PSU on 2/12/15.

Upon arrival in the PSU, an initial brief evaluation, a comprehensive clinical assessment, and the initial IDTT were completed within Program Guide timeframes.  The institution did not track whether the initial IDTT occurred prior to the initial ICC.

The initial treatment plan dated 2/17/15 identified problem areas and provided relevant clinical interventions.  However, it did not contain specific discharge plans or recommendations for discharge to a less restrictive level of care as required by the Program Guide (12-9-6).

During her first month in the PSU, the inmate participated in full PSU/EOP programming with sufficient documentation.  PC contacts were provided as required by the Program Guide.  However, the inmate was immediately concerned about reducing her level of treatment to the 3CMS; this topic was allowed to monopolize the discussion in all clinical contacts during the first month, despite there being no clinical plan in place for discharging her to a less intensive level of care.

During March 2015, the PC timely saw the inmate.  She had an initial contact with the psychiatrist, which was overdue.  The inmate wanted to discontinue medication, but was amenable to striving for a six-month period of no hallucinations and optimal personal functioning before discussing future medication changes.  She continued to actively participate in group treatment and remained focused on reducing level of care to 3CMS.

791

The follow-up IDTT occurred on 3/17/15 and was attended by all required participants. The inmate was unkempt and presented with anxious mood, blunted affect, and evidenced paranoid delusions. Treatment progress was discussed. The inmate denied experiences of perceptual disturbances; insight was deemed poor. The Form 7388B stated the opinion of the clinical team that there were no indicators suggesting higher level of care referral should be considered.

Findings

The inmate appeared to be appropriately placed in the EOP for treatment of her serious mental disorder. Most Program Guide requirements were met, except for inclusion of an initial discharge plan that was incorporated into the initial treatment plan. The psychiatrist's intervention was paramount in gaining the inmate's acceptance of behavioral and symptom changes needed before less intensive care could be considered. Overall, the inmate received adequate care in the PSU during the brief period reviewed.

**Inmate H**

This inmate was housed in the PSU. She was repeatedly diagnosed with Mood Disorder NOS by institutional treatment teams. She was treated with lamotrigine and olanzapine to target symptoms of her psychiatric disorder. A rule out diagnosis of Substance Induced Mood Disorder was considered due to her frequent drug use while incarcerated.

Healthcare records indicated the inmate had no history of mental health treatment before coming to prison. She began receiving treatment at the 3CMS level of care in 2003. She was admitted to the MHCB from administrative segregation for suicide gesture and volatility. On 2/26/15, she discharged to the PSU because her level of care was elevated to EOP.

Upon arrival in the PSU, she received a comprehensive clinical assessment and initial clinical contact within Program Guide timeframes. An initial SRE assessed a moderate chronic and acute suicide risk. Justification for acute risk appeared to be based on recent MHCB discharge and a history of gestures and using suicidal ideation for secondary gain. A meaningful and individualized risk reduction strategy was recommended.

The initial treatment plan was timely completed and included appropriate considerations regarding inclusion on the high risk list and level of care decisions. Suicide risk reduction recommendations were incorporated into the treatment plan. Follow-up treatment plans identified problem areas, included relevant and measurable goals, and provided succinct and useful information on inmate progress to date.

The psychiatrist and inmate worked collaboratively to address the inmate's medication concerns. The psychiatrist skillfully worked with her to engage her motivation.

The inmate's two-week review IDTT meeting was observed on 5/19/15. The treatment team meeting included attendance by all required staff. Staff introductions were made and the reason for the meeting was reviewed with the inmate. The PC summarized her recent history and

progress during the review period.  The inmate aptly summarized treatment progress in her own words.  Future goals were also discussed in language she could understand.  Team members provided positive feedback to her about progress to date.  Eligibility for early release under Prop 47 was discussed and noted attention to release planning issues.

Findings

The inmate was appropriately enrolled at the EOP level of care.  She received adequate care because timelines were consistently met, treatment goals were individualized and included parole release planning, and treatment team members used a collaborative approach which was successful with this inmate.

**Inmate I**

This inmate was treated in the EOP and housed both in the PSU and the Special Care Unit (SCU) during the review period.  The purpose of this review was to assess the overall care provided with special attention to continuity of care and treatment planning.

Healthcare records revealed the inmate's longstanding documented history of serious mental illness that included three admissions to PSH pursuant to PC 2684, 13 months in the PIP during 2012 and 2013, and a history of involuntary medication with the most recent order terminating on 11/20/14.  There was a documented history of fixed erotomanic delusions, mood lability, assaultive and aggressive behavior toward staff, and paranoid delusions.

During the course of EOP treatment, the inmate required two MHCB admissions in May and June 2014.  After transfer to the PSU on 9/12/14, she was admitted to the MHCB on 10/4/14 for agitation and suicidal threats.  Following release to the SCU on 2/19/15, she had two MHCB admissions in March 2015.  She was readmitted to the crisis bed in April 2015, prior to the monitoring visit.

Members of the inmate's IDTT routinely provided a diagnosis of Bipolar Disorder, mixed type, severe with psychotic features.  Diagnoses on Axis II were intermittently noted as Borderline and Antisocial Personality Disorders.  Prescribed medications under an involuntary order included Abilify, lithium, and Zyprexa as needed for medication refusal.

A renewal of involuntary medication notice was prepared on 10/28/14 recommending that the inmate be free of crisis mental health visits for one year before involuntary medications were discontinued.  This recommendation was made in the context of her significant history of refusing medications even though she could articulate positive intentions.  The medical opinion was that her mental state rapidly deteriorated when she was not medicated, resulting in a risk of danger to others.  The petition to renew per PC 2602 was denied on 11/20/14.

Treatment plans composed from October 2014 to January 2015 identified three problem areas, including suicide gestures and attempts for secondary gain, mood instability with psychosis, and

high utilizer and inappropriate MHCB use for secondary gain. Interventions were measurable, and appropriate to problem areas, but progress was reported in only very general terms.

Follow-up treatment plans reflected a general upward progress, with a temporary setback in December 2014 which the inmate managed adequately. By January 2015, the inmate had not endorsed suicidal ideation, been admitted to the MHCB, or exhibited significant mood instability for three months. She was adherent with prescribed psychotropic medications and demonstrated insight regarding the need for medication adherence.

Inappropriate use of the crisis bed was removed from the treatment plan problem list on 2/17/15 without documented discussion. This change was made notwithstanding a psychiatric recommendation to retain as a treatment goal for one year.

On 2/19/15 the ICC suspended the remainder of the inmate's SHU term and released her to the SCU. A clinical assessment was completed prior to the initial EOP IDTT meeting as required by the Program Guide. Her initial treatment plan was timely prepared. The diagnosis of record was retained, as were the treatment goals, absent the goal related to inappropriate use of the crisis bed.

The inmate was admitted to the MHCB 17 days after arriving in the SCU. The admission was based on threats to harm staff, anxiety, and fear about returning to the cell. The psychiatrist discontinued psychiatric medications based on the inmate's wishes. A discharge treatment plan was not located in the inmate's healthcare record.

On 3/25/15 the inmate was readmitted to the MHCB because of agitation and manic behavior after not having taken psychiatric medications for two weeks. She admitted she had become out of control and agreed to restart treatment. Discharge occurred on 4/2/15 without a discharge treatment plan.

On 4/20/15 the inmate was readmitted to the MHCB when she was discovered with underwear tied around her neck because of threats made by another inmate. She had been adherent with her medications and there were no manic or psychotic symptoms during this admission. No medication changes were made, and she was discharged on 4/22/15.

Findings

The inmate was appropriately enrolled in the EOP to treat a serious mental illness. The care provided to her was inadequate due to a lack of meaningful continuity across housing placements, lack of transitional care recommendations from the PSU to SCU, and no transitional care provided in the SCU as per Program Guide 12-4-8. Treatment planning as to her chronic MHCB use was fragmented and inadequate. The PSU clinician did not document recommendations as to the inmate's specific treatment needs or express concerns about how to facilitate her successful transition to the general population as Program Guide 12-4-8 required.

**Inmate J**

This case was randomly selected for review from the roster of 3CMS inmates housed in administrative segregation.  The inmate was diagnosed with Major Depressive Disorder, recurrent, mild, Bulimia Nervosa, Panic Disorder with Agoraphobia, and Amphetamine Dependence.  Psychiatric medications included hydroxyzine as needed at bedtime to treat insomnia and anxiety.

The inmate was timely cleared for administrative segregation placement on 3/26/15.  She was timely screened for mental health issues and referred for further evaluation based on positive screening results.

A mental health evaluation addendum was timely completed.  The inmate was already included in the 3CMS.  She appeared mildly distressed due to the lockup but without exacerbation of psychiatric symptoms.  She was followed in daily psych tech rounds upon her immediate placement.  Documentation indicated she was typically observed laying on her bed and she reported that she was doing well.

Findings

The inmate appeared to be appropriately enrolled in the 3CMS for treatment of a psychiatric disorder.  Treatment protocols governing administrative segregation placement were followed.  Review of the inmate's healthcare record indicated she received adequate mental health care.

**Inmate K**

This 3CMS inmate was randomly selected for review from a roster of inmates housed in administrative segregation.  She was provided diagnoses of PTSD, chronic, Impulse Control Disorder NOS, and Polysubstance Dependence with institutional drug use.  The inmate was prescribed Zoloft to treat depressed mood and Vistaril to treat insomnia.

The inmate was referred to the psychiatrist for medication nonadherence.  Medication adjustments were made to achieve better adherence.

The psych tech regularly saw the inmate during rounds.  She was described as reclusive to the cell, not attending yard or treatment groups, and laying on her bed with limited interaction with staff.

The PC saw the inmate at intervals consistent with the Program Guide.  She was capable of engaging in therapeutic discussion.  Among other topics, she addressed issues of getting along with cellmates, RVR circumstances, and minimizing conflict with custody staff. The observations of the psych tech were not incorporated into discussions with the clinician.

This brief review covered the period of 2/24/15 to 3/31/15.  Prior to administrative segregation placement, she was treated at the 3CMS level of care in the general population.  She had been placed on C/C status for a history of multiple RVRs.  The inmate had fair insight into her difficulties maintaining emotional stability.

Findings

The inmate was appropriately placed in the 3CMS for treatment of her psychiatric disorders.  She received adequate but not optimal care in the 3CMS in administrative segregation.  It was noted that full programming for STRH had not been implemented during the review period.

**Inmate L**

The inmate was housed in administrative segregation at the 3CMS level of care.  She was provided diagnoses of Depressive Disorder NOS, Polysubstance Dependence with institutional drug use, and Personality Disorder with antisocial and borderline features.  She was most recently prescribed Remeron, Vistaril, and Zoloft.

The healthcare record review indicated a history of five or six suicide attempts beginning at seven years of age.  She had two psychiatric hospitalizations during early and late adolescence and was diagnosed with Bipolar Disorder and Schizotypal Personality Disorder.  Past medications included Zoloft, Abilify, Depakote, lithium, Seroquel, and Remeron.

The inmate's treatment response was consistently poor since initial enrollment in 2010, exemplified by long periods of medication refusals and chronic refusals to attend mental health appointments.  She was never considered for transfer to a higher level of mental health care, and had one MHCB admission in 2013 for suicidal thinking.

The inmate was placed in C/C status and complained of rapid and severe mood swings and requested to be placed on medication.  The psychiatrist recommended Zydis 7.5 mg and lithium carbonate 300 mg, but the inmate refused to attend pill line and follow-up appointments and labs.

The inmate required outside medical treatment for a head injury.  She frequently refused follow-up medical appointments.  She was reevaluated for psychotropic medication at her own request due to ongoing severe mood swings.  Zoloft and Remeron were recommended.  She was informed of the institution's random drug screening policy.  She subsequently refused recommended treatment.

In February 2014, the inmate refused to attend groups in the 3CMS administrative segregation unit.  She refused to attend the IDTT and refused to be interviewed for a 115 mental health assessment.  The PC planned to meet with her at least weekly to address anger issues; there was no plan in place to consider the chronically poor treatment alliance.
The inmate received three RVRs from January to March 2015, for fighting, distribution of drugs, and indecent exposure.  These were noted on the Form 7388B dated 4/22/15.  She was

796

considered for a higher level of care referral, but a referral was not made.  The rationale offered was that the behaviors leading to the RVR were not due to the inmate's mental disorder.

Findings

The inmate was appropriately enrolled in the 3CMS to treat a psychiatric disorder.  However, her chronic refusal to participate in treatment services, even after requesting treatment for severe mood swings, was not adequately addressed by the treatment team.  The IDTT's rationale for not referring her to a higher level of care based on three RVRs in six months showed a faulty understanding of this indicator and was not in keeping with Program Guide requirements.  The most recent treatment plan lacked modifications to address the RVR behaviors.

The inmate floundered in the mental health program during the review period.  She would have benefitted from a trial in a more intense treatment environment paying attention to substance abuse, therapeutic alliance, decreased motivation, and resistance.

EXHIBIT BB
Central California Women's Facility (CCWF)
May 27, 2015 - May 29, 2015

**Inmate A**

This EOP inmate was housed in the mainline EOP housing unit.  She was provided with a diagnosis of Schizophrenia, paranoid type.  She was not prescribed psychotropic medications at the time of the site visit.

The inmate arrived at CCWF on 4/21/15 from a county jail.  She was described as challenging, angry, and aggressive.  She had a long history of treatment with psychotropic medications, but was not taking medication at the time of arrival.  She paroled from CIW in January 2015 and had been medication noncompliant since that time.  She was previously treated with Depakote and Trilafon.

A treatment plan dated 4/29/15 provided the above diagnosis.  Goals included mood management with interventions that included "cooperate with psychiatrist and taking medications daily, attending anger management groups, working out and developing coping skills."  The problem list included "explosive anger and behaviors as active problems on 4/29/15."

A psychiatric progress note dated 4/29/15 indicated the inmate was disorganized and unable to tell the day and date.  She had not been on psychotropic medications, "but believes she needs them."  The psychiatrist indicated at that time that the inmate was not on any medications and "feels fine without them."  There was no documentation that the psychiatrist attempted to prescribe psychotropic medications, or to convince the inmate regarding the need for treatment.

Subsequent progress notes indicated that the inmate expressed concern regarding sexual behavior among her dorm mates and had periods of agitation and continued psychosis.

Findings

The mental health care provided to this EOP inmate was inadequate and of concern.  She presented with severe psychotic symptoms.  There was a lack of documentation that the psychiatrist worked to treat the inmate with needed antipsychotic medications as well as education aimed at helping her understand the need for treatment.

There was also a lack of documentation that there was ongoing assessment for referral to a higher level of care or more aggressive attempts to stabilize this unstable EOP inmate. The inmate was seen during a group therapy session where she presented with inappropriate, loud laughter, loud cursing with response to auditory hallucinations, and disorganized thinking and behavior.

**Inmate B**

This EOP inmate was housed in the mainline EOP housing unit.  She was provided with a diagnosis of Schizoaffective Disorder, bipolar type.  Her healthcare record was reviewed due to concerns that she would be prematurely downgraded to the 3CMS program.
Progress notes indicated that she presented with constricted affect, but with calm behavior.  She did not exhibit evidence of delusional thinking, but her memory was impaired.  She was recently discharged from the CIW PIP and, on the most recent treatment plan dated 5/13/15, was identified with an inability to function in a complex social setting.  The medical record contained documentation regarding plans for her transfer to the 3CMS program; the inmate indicated her desire for such transfer during an EOP group therapy session.

The most recent Form 7388B dated 5/13/15 indicated that she did not meet higher level of care referral criteria.  She was placed on a modified treatment plan due to her inability to fully participate in programming on 11/26/14; her group participation ranged from 5.5 to 10.75 weekly hours from March to April 2015.

The treatment plan indicated that she would not be downgraded to the 3CMS program at that time, and the treatment team would continue to prepare her for that goal.

Findings

There was documentation that the PC saw the inmate weekly.  Treatment planning was clinically appropriate.  This inmate was appropriately placed in the EOP and there did not appear to be immediate plans to downgrade her to the 3CMS level of care.

**Inmate C**

This 21-year-old inmate was housed on B yard, which was a mainline 3CMS yard.  She was provided with a diagnosis of Mood Disorder NOS.  She was prescribed Effexor and Abilify.  Her healthcare record was chosen from the DSH non-referral log to assess access to a higher level of care due to her multiple MHCB admissions.

There was a report of intermittent depression since early adolescence, which coincided with foster care placement.  The inmate had a history of a suicide attempt by overdose.  There was no history of mental health treatment until she was admitted to CDCR.  She also had a history of alcohol and methamphetamine use.

While in the mental health program, she had multiple MHCB admissions; they were typically initiated by a report of suicidal ideation to custody staff combined with complaints about her medication.  While in the MHCB, she had multiple medication changes involving Prolixin, Geodon, Zyprexa, Prozac, Effexor, and Buspar over several months.  Symptom complaints were generally documented as anxiety, depression, and auditory hallucinations; however, specific symptoms were not documented.  Overall, MHCB documentation did not routinely explain the rationale for the decision not to refer her to the CIW PIP.  Diagnoses included Adjustment

800

Disorder and Psychotic Disorder.  Treatment goals were directed at the inmate abstaining from self-injurious behavior, managing impulsive behavior, and depressed mood.

The inmate had three MHCB admissions in October 2014, and each time she was discharged to the 3CMS level of care.  After her fourth MHCB admission, in early November, she was discharged to the EOP level of care.  While she was in the EOP, she stabilized; there were no subsequent MHCB admissions, and she discontinued psychiatric medications in December 2014. In February 2015, she was discharged from the EOP after she was involved in an altercation. However, just prior to the discharge, there was documentation supporting her need for continued treatment at the EOP level of care.  However, a progress note indicated she had been informed that she did not require EOP level of care, but staff maintained her at the EOP to continue parole planning.

When the inmate was told that EOP level of care would be discontinued, she superficially cut her wrist with a razor.  During two more subsequent MHCB admissions; although documentation revealed that the inmate requested EOP level of care, a referral was not made.  The plan was to continue the patient at the 3CMS level of care as she would parole in less than one month.

Findings

This inmate's care was generally adequate in that she did not appear to require inpatient level of care.  However, the delay in change from 3CMS to EOP level of care and subsequent change from EOP back to 3CMS after fighting was questionable.  In addition, the lack of documentation regarding specific symptomatology was problematic and did not support documented diagnoses. There also was a lack of documentation that the inmate was educated about facilitating medication changes through routine referrals, as opposed to MHCB admissions.  Lastly, the inmate exhibited some behaviors consistent with Borderline Personality Disorder, and this diagnosis was worth consideration.

**Inmate D**

This 35-year-old inmate was currently at DSH.  Her healthcare record was reviewed to assess access to a higher level of care given her multiple MHCB admissions.  She was diagnosed with Schizoaffective Disorder.

The inmate had a long history of mental health treatment prior to CDCR admission, including ten psychiatric hospitalizations and outpatient mental health treatment since the age of 20.  She had a history of alcohol, methamphetamine, Klonopin, Valium, Soma, and Norco abuse.

Shortly after admission to CCWF in May 2014, she was admitted to the MHCB.  She was deemed a danger to others due to delusions and engaging in inappropriate sexual behavior.  She was discharged to the EOP level of care.  However, due to her sexual aggression, she could not be maintained in EOP housing where six inmates were in each room.  She was subsequently placed in administrative segregation reportedly for her own and others' protection.

She exhibited similar behavior in October 2014, resulting in another MHCB admission.  A referral to intermediate care was submitted on 10/3/14.  There was a discrepancy in the documentation about the referral's status; documentation showed that the CIW PIP rejected the referral on 10/15/14, but also indicated that acceptance was pending clinical consultation and recommendation of a trial stay in the EOP.  During the IDTT meeting on 10/16/14, it was documented that the inmate's mental status had stabilized during MHCB admission, and the team did not appeal the CIW PIP's decision.  The inmate was discharged to the EOP level of care.  She subsequently returned to the MHCB on 10/23/14, where she remained until 10/30/14, when she was discharged back to the EOP.  Another MHCB admission occurred on 11/13/14 after she had attempted suicide by hanging.  She was accepted to the PIP on 11/14/14, and she was admitted on 11/17/14.  During the site visit, she was hospitalized at the CIW PIP.

<u>Findings</u>

This inmate's care was inadequate.  The discrepancies in documentation regarding the status of the CIW PIP referral and delay in acceptance to the PIP were areas of concern.  Furthermore, the decision to house her in administrative segregation due to behavior stemming from her mental illness was of grave concern.

EXHIBIT CC
Valley State Prison (VSP)
March 10, 2015 - March 12, 2015

**Inmate A**

This 3CMS inmate's healthcare record was reviewed from a list of inmates housed in the administrative segregation overflow unit who were on suicide watch and awaiting transfer to a MHCB during the site visit. The inmate's diagnosis was Major Depressive Disorder NOS and Major Depressive Disorder with psychotic features. His prescribed mental health medications were mirtazapine, risperidone, and Buspar. A CNA was seated in front of the cell, maintaining good visual sight of the inmate. The behavioral documentation appeared adequate and accurate. The CNA was able to answer all questions regarding the inmate's behavior.

During the review period, the inmate was housed in the MHCB from 8/13/14 to 8/26/14 for suicidal ideation and danger to self. He was again placed in the MHCB from 2/1/15 to 2/26/15 for suicidal ideation and danger to self, and in the OHU awaiting MHCB transfer on 3/10/15, also for suicidal ideation and danger to self.

The inmate's original parole date was 3/14/15, but it was extended to May 2015 due to an RVR that was given to all inmates in the housing pod for pruno production. He stated that he would prefer to go into a diabetic coma and die rather than to remain in prison longer. He arrived in the administrative segregation overflow unit on 3/9/15 after making suicidal statements and refusing insulin and meals. The nurse practitioner educated him about the dangers of medication noncompliance, and he agreed to have his blood glucose checked and take the insulin. His blood glucose level was 258; normal values were from 60 to 100. He was accepted to MCSP on 3/10/15, and he timely transferred to the MHCB.

Findings

Psychiatry notes were very detailed and succinct; treatment goals addressed the use of conflict resolution skills to minimize the number of monthly conflicts and use of appropriate coping skills that did not put the inmate's health at risk. Psychoeducational plans correlated with treatment goals and were appropriate for the inmate's diagnosis, history, and future release. The PC's treatment goals monitored symptoms of depression according to CBT and supportive therapy strategies, and focused on parole planning. This inmate received appropriate mental health care.

**Inmate B**

This EOP inmate's healthcare record was reviewed from the list of inmates housed in the administrative segregation overflow unit who were on suicide watch during the site visit. He was provided with a diagnosis of Schizoaffective Disorder, depressive type. His prescribed mental health medications were Vistaril, Zyprexa, and Zoloft. He had a history of auditory and visual hallucinations; the latter appeared as legions, demons, and/or Satan. He believed the demons channeled through people of color and told him to hurt himself. The inmate had numerous perceptual disturbances, resulting in admission to the MHCB in August 2014 and again on 3/10/15. He was evaluated on 3/9/15 for suicidal ideation and danger to self, and he was accepted to the CHCF MHCB on 3/10/15.

804

Findings

The PC's progress notes were very thorough and consistent, documenting discussion with the inmate regarding education of the disease process.  Treatment goals focused on medication compliance and use of coping skills to help manage auditory hallucinations.  This inmate received appropriate mental health treatment.

**Inmate C**

This inmate's healthcare record was reviewed from the list of 3CMS inmates who had annual IDTT meetings at the time of the site visit.  His diagnosis was Mood Disorder NOS; in addition, he had diabetes mellitus and a colostomy.  Prescribed medications were Trileptal and Prozac.  He was previously treated with lithium; however, reportedly this medication caused seizures, and it was discontinued.  The documented treatment goals were to address ongoing anxiety issues and stress due to medical issues, and management of prison life through the coping skills of deep breathing and thinking before acting.  The inmate remained at the 3CMS level of care and was praised for his positive mental health programming.  He had an intestinal rupture in 2009 and an attempted resection with complications.  He was scheduled for a colostomy reversal on 3/27/15, and he hoped this would alleviate many of his medical and mental health stressors.

Findings

The PC and psychiatry notes were adequate.  The psychoeducational plans focused on self-monitoring, identifying triggers, applying coping strategies and positive self-talk.  The inmate received appropriate mental health care.

**Inmate D**

This 3CMS inmate's healthcare record was reviewed from a list of annual IDTT meetings.  He was diagnosed with Anxiety Disorder NOS and Generalized Anxiety Disorder.  He was prescribed Vistaril and Zoloft.  The inmate was alert and talkative during the annual IDTT meeting.  He expressed concern about losing work and of being idle.  The treatment team was beneficial in providing the inmate with helpful advice regarding this issue. The inmate was serving a life sentence.

PC contacts were timely and adequate, but the clinician was informed that the inmate was having problems obtaining chronic care medical appointments.  The PC documented the need to discuss these medical delays with a supervisor.

Findings

PC and psychiatry care was adequate.  The treatment team provided appropriate interventions to assist the inmate find another job, and medical concerns were elevated and resolved.  The inmate received appropriate mental health care.

**Inmate E**

This EOP inmate's healthcare record was reviewed from a list of inmates receiving PC 2602 involuntary medications.  The inmate was diagnosed with Schizoaffective Disorder, bipolar type.  He was prescribed Depakote, lithium, Cogentin, Haldol as well as Haldol injectable, if required.  During the review period, he attended groups 80 percent of the time and was compliant with medications 90 percent of the time.  He did not receive any RVRs, and did not have any MHCB admissions.  Clinical and psychiatric documentation throughout the reporting period supported findings of internal stimuli due to either auditory or visual hallucinations, but the inmate continued to deny any mental illness.  Involuntary medications were not given to the inmate during the review period.

Findings

Clinical, psychiatry, and group documentation reviewed were adequate.  The inmate had received PC 2602 involuntary medications since 2010; court orders were in place, and the last renewal occurred during March 2015.  The inmate was compliant with medications and groups.  He denied auditory hallucinations and having a mental illness; however, during clinical contacts and IDTT meetings, clinicians and treatment teams noted that he displayed behaviors indicative of response to internal stimuli with incongruent affect and mood.  Treatment goals were focused on reality-based strategies of obtaining trusted supports to ground the inmate and help him to distinguish reality from non-reality.  The inmate received appropriate mental health care.

**APPENDIX C**

The following are offered for discussion and consideration for monitoring by the Special

Master in the Twenty-Seventh Round:

1.  The status of implementation each of the plans, policies, and protocols which emanated
    from the Order entered April 10, 2014 concerning use of force and the inmate
    disciplinary process against mentally ill inmates and the use of segregated housing for
    mentally ill inmates.

2.  Regarding EOP administrative segregation:

a.  Compliance with Program Guide requirements in the EOP administrative segregation
    hubs.

b.  CDCR's process for monitoring conduct of case-by-case reviews to reduce the lengths of
    EOP inmates' stays in administrative segregation.

c.  Examination of ICCs' chronos for EOP inmates with long stays in administrative
    segregation to determine whether the evaluations required by the September 15, 2014
    memorandum were conducted timely and whether ICCs' decisions were documented with
    appropriate rationales.

d.  Examination of whether mental health input was provided and considered at ICC
    meetings, including whether the CDCR Form MH-10 or ICC chronos documented review
    of mental health factors influencing the inmates' behaviors at the time of rules violations
    and issuance of RVRs,  and whether appropriate treatment plans were developed and
    implemented to address the behaviors at issue.

e.  Examination of lengths of stay of NDS cases, including review of CDCR Form 114-As
    and tracking sheets for property and privileges in administrative segregation units, and
    assessment of NDS patient classification chronos in SOMS.

f.  Examination of cases of high numbers of treatment refusals attributed to custody issues,
    including determination of whether a plan of action to address these issue was
    documented, and interviews of staff to gauge their awareness of the high-refusal policy
    and its requirements.

g.  Regarding the requirement of 120-day pre-MERD reviews, examination of the warden's
    administrative segregation unit report indicating inmates' projected MERDs and sampling
    of ICC chronos for inmates within 120 days of their MERDs to assess compliance with
    the pre-MERD review.

**The Third Re-Audit and Update of Suicide Prevention Practices
in the Prisons of the California Department of
Corrections and Rehabilitation**

Lindsay M. Hayes, M.S.
November 5, 2018

## Executive Summary

I.     **Introduction**

This report is submitted as an update to this reviewer's preceding report, "The Second Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation [CDCR]" (ECF No. 5672, filed September 7, 2017).  The preceding report covered this reviewer's findings from a second re-audit of suicide prevention practices at 23 selected CDCR prisons.  The report recommended that prisons which chronically struggled with their suicide prevention programs, as well as almost all prisons that contained Mental Health Crisis Bed (MHCB) units, undergo continued re-inspection, and that the defendants continue to work with the Special Master and Suicide Prevention Management Workgroup (SPMW) on outstanding initiatives previously committed to by CDCR.  On January 25, 2018, the *Coleman* court issued an order adopting the report in full (ECF No. 5762).

This report is the fourth on an audit of CDCR suicide prevention practices and covers this reviewer's recent re-audit at 23 selected CDCR prisons.  The on-site re-audit began on May 23, 2017 and concluded on February 15, 2018.  The details and methodology of the re-audit/review process are discussed in Part II, below.  Part III of this report contains a summary of this reviewer's findings during the re-audit, including a status update on defendants' progress in implementing prior recommendations as contained in this reviewer's initial audit report and the accompanying report by the Special Master (ECF No. 5258, filed January 14, 2015).  Part IV is this reviewer's inspection and findings regarding defendants' proposal to build temporary unlicensed MHCB units at the California Institution for Women (CIW) and the R.J. Donovan Correctional Facility (RJD).  Part V covers this reviewer's conclusion and recommendations. Lastly, Appendix A presents a prison-by-prison discussion of this reviewer's findings at each of the 23 re-audited prisons, together with summaries of CDCR Suicide Case Reviews of the 29 inmate suicides in those prisons during 2017.[1]

Finally, it should be noted that CDCR, its management team (including statewide mental health staff) and legal counsel, as well as local custody, medical, and mental health leadership at each of the prison facilities assessed during 2017-2018, continued to demonstrate full cooperation during this reviewer's suicide prevention assessment process.

---

[1]Although there was a total of 30 suicides within CDCR facilities during 2017, review of the inmate suicide that occurred in the California Correctional Center (CCC) in October 2017 was not included in this report because the CCC was not chosen for review during this most recent suicide prevention assessment.

II.   **Methodology**

This reviewer's selection of 23 CDCR prisons for on-site re-auditing was based on a variety of reasons, including their operation of MHCB units, findings during previous audit(s) that their suicide prevention practices were chronically problematic, having a significant population of inmates on the Mental Health Services Delivery System (MHSDS) caseload, and/or the facility experiencing multiple inmate suicides.  As in the previous audits, this reviewer's re-audit consisted of a two-day on-site examination of suicide practices at each of the prisons.  There were two exceptions: California State Prison, Sacramento and California State Prison, Los Angeles County each necessitated three-day on-site examinations.  The 23 re-audited prisons and the dates of their on-site assessments were:

1.   California State Prison, Sacramento (CSP/Sac):  May 23-25, 2017
2.   Wasco State Prison (WSP):  June 8-9, 2017
3.   California Institution for Women (CIW):  June 19-20, 2017
4.   California Institution for Men (CIM):  June 21-22, 2017
5.   Kern Valley State Prison (KVSP):  July 11-12, 2017
6.   North Kern State Prison (NKSP):  July 13-14, 2017
7.   Richard J. Donovan Correctional Facility (RJD):  July 25-26, 2017
8.   California Health Care Facility (CHCF):  August 8-9, 2017
9.   Mule Creek State Prison (MCSP):  August 10-11, 2017
10.  California State Prison, Solano (CSP/Solano):  August 23-24, 2017
11.  California State Prison, Corcoran (CSP/Corcoran):  October 10-11, 2017
12.  California Substance Abuse Treatment Facility (CSATF):  October 12-13, 2017
13.  High Desert State Prison (HDSP):  November 2-3, 2017
14.  California State Prison, Los Angeles County (CSP/LAC):  November 13-15, 2017
15.  California Correctional Institution (CCI):  November 16-17, 2017
16.  Deuel Vocational Institution (DVI):  December 5-6, 2017
17.  Central California Women's Facility (CCWF):  December 7-8, 2017
18.  San Quentin State Prison (SQ):  January 2-3, 2018
19.  California Medical Facility (CMF):  January 4-5, 2018
20.  California Men's Colony (CMC):  January 16-17, 2018
21.  Pleasant Valley State Prison (PVSP):  February 6-7, 2018
22.  Salinas Valley State Prison (SVSP):  February 8-9, 2018
23.  Pelican Bay State Prison (PBSP):  February 14-15, 2018

At each site, this reviewer again examined the prison's performance with the following suicide prevention measurement tools:

- Thoroughness and degree of privacy afforded during the intake screening process
- Psych Tech (PT) practices in restrictive housing units
- MHCB practices, including verification of required observation of suicidal patients

2

- Use of suicide-resistant, retrofitted cells for MHCB patients and new intake inmates assigned to administrative segregation units
- Use of alternative housing for inmates awaiting transfer to MHCBs
- Suicide risk assessments for emergency mental health referrals and admittance/discharge from a MHCB/alternative housing
- Safety planning for suicidal inmates
- Appropriate follow-up services provided by clinical and custody staff to inmates discharged from a MHCB or alternative housing
- Custody rounds in restrictive housing units
- Emergency medical response equipment in housing units
- Compliance with suicide prevention training
- Review of meeting minutes of the local Suicide Prevention and Response Focused Improvement Teams (SPRFITs)

All inmate suicides which occurred during the review period in the 23 audited facilities were reviewed through examination of the inmates' health care records via Electronic Unit Health Records (eUHRs) or the Electronic Health Record System (EHRS), CDCR Suicide Reports, and Quality Improvement Plans (QIPs).

In addition, this reviewer and several other members of the *Coleman* Special Master team attended the CDCR Statewide Mental Health Program's three-day Suicide Prevention Summit from October 17-19, 2017, at which, this reviewer presented preliminary findings from this most recent suicide prevention audit.  On January 18, 2018, the Special Master held a SPMW meeting with his experts, the parties, and CDCR management officials, to assist in effectuating defendants' implementation of the recommendations contained in this reviewer's prior audit reports.

Finally, pursuant to the *Coleman* court's January 25, 2018 order adopting this reviewer's preceding report, defendants were ordered to "continue to implement the remaining recommendations in the initial audit report and develop corrective action plans based upon deficiencies found in Mr. Hayes' most recent assessment."  (ECF No. 5762 at 4.)  The Special Master was directed to "provide an updated report to the court on the state of defendants' continued implementation of the initial recommendations and the development of related corrective action plans." (*Id.*)  In response, during *Coleman* All-Parties Workgroup teleconference calls held by the Special Master on February 26, 2018 and April 9, 2018, defendants provided updates on anticipated corrective actions for several suicide prevention issues.  On May 14, 2018, defendants provided this reviewer with an updated corrective action plan ("May 2018 CAP") for resolving suicide prevention deficiencies found in this reviewer's prior reports.  Consistent with the court's order, this report provides an update on current suicide prevention practices within CDCR facilities and the status of current and anticipated corrective actions to resolving existing deficiencies.

## III.   Summary of Suicide Prevention Practices in CDCR Facilities

Although the current reassessment again found continued progress at varied speeds, certain problematic practices continued to fester.  Significant improvement was found in the

areas of PT practices, use of alternative housing, and completion rates for annual suicide prevention block training of custody personnel.  In addition, all 23 audited facilities had compliance rates of over 90 percent for custody checks in restrictive housing units via Guard One, but these high compliance rates were tempered by the fact that four inmates who committed suicide in restrictive housing units during 2017 were found to be in various states of rigor mortis and not observed at 30-minute intervals as required.  High rates of compliance were also found in Cardiopulmonary Resuscitation (CPR)/Automated External Defibrillator (AED) training of custody and medical staff.

In the areas related to initial health screening, use of suicide-resistant cells for newly-admitted administrative segregation inmates, and completion of suicide risk assessments for emergency mental health referrals related to suicide risk, there were varying degrees of progress. The review found little improvement with safety planning and local SPRFIT practices. Lingering problems regarding suicide-resistant MHCBs necessitated involvement by the court. Results were also mixed within the areas related to clinically-ordered possessions and privileges for MHCB patients, whereas significant problems remained related to five-day clinical follow-up and custody welfare checks for patients discharged from MHCBs and alternative housing. Finally, a new and systemic deficiency was found, the failure of nursing staff to adequately observe suicidal patients in MHCBs at required 15-minute intervals in most of the audited facilities.

The failure of nursing staff to adequately observe suicidal MHCB patients was particularly concerning and, as indicated below, inadequate observation of these patients was found in 18 of 21 or 86 percent of the audited facilities.  This finding includes two facilities in which this writer observed nursing staff falsifying observation forms.  As the *Coleman* court warned defendants when adopting this reviewer's previous report on January 25, 2018 (ECF No. 5762), it was "deeply troubled" and "expects defendants will make clear to all staff that falsification of information required by court order is unacceptable."  (ECF No. 5762 at 2-3).

The following provides (1) a brief summary of each of the main suicide prevention measurement tools and their relationship to this reviewer's original 29 recommendations,[2] (2) current findings related to CDCR's adoption and implementation of the recommendations and the reassessment of the 23 audited CDCR facilities, and (3) further recommendations for the remedy of outstanding deficiencies.

A)   <u>Initial Health Screening and Receiving and Release Unit Environment</u>

<u>Summary</u>:

The original recommendations focused upon two areas of intake screening in receiving and release (R&R) units: (1) the adequacy of the intake screening form and ensuring that all questions were asked during the process, and (2) the adequacy of inmate privacy and confidentiality during the process.  The issue of intake screening form adequacy was related to

---

[2]This reviewer subsequently recommended the withdrawal of three of the original 32 recommendations (Recommendations 14, 15, and 16).  (ECF No. 5672 at 7, 23.)  The recommendation was adopted in the court's January 25, 2018 order (ECF No. 5762 at 3).

the presence of certain compound questions on the form, as well as the thoroughness of form completion by nursing staff. The issue of privacy and confidentiality was related to the practice of the door to the nurse's office remaining open during the screening process and/or officers stationed inside the office or at the door.

**Current Findings**:

Although compound questions are no longer contained within the Intake Screening Form embedded in the new EHRS, there has been mixed progress in resolving privacy and confidentiality issues in the R&R units. In the preceding assessment, 18 of 23 or 78 percent of audited facilities had adequate intake screening practices in their R&R units. During the current assessment, previous problems found in five facilities (CIW, CSP/Corcoran, CSATF, KVSP and PVSP) had mostly been resolved. However, issues of privacy and confidentiality remained at one facility (CSP/Corcoran) and were found at three *different* facilities (CCI, CMC, and RJD), while inadequate abbreviated screening practices were found at another facility (DVI). For example, at CCI, there was no door to the nurse's office and the desk where the newly-admitted inmates were positioned was adjacent to a high-traffic area with other staff and inmates passing through, creating both excessive noise and the absence of privacy and confidentiality. In the other three facilities, the door to the nurse's office remained open with an officer straddling the doorway. At DVI, this reviewer observed a nurse failing to ask all of the mental health and suicide risk questions during the intake screening process. When asked why all the questions were not asked, this reviewer was informed by the nurse that an "abbreviated" screening was completed if the county transfer form did not include any documentation of prior mental health or suicide history. Such a response was problematic for several reasons: CDCR policy required that all questions be asked; an individual could certainly become suicidal following their county jail confinement and transfer to CDCR; and despite not asking all of the required questions, the nurse entered "no" to all mental health and suicide risk responses in the EHRS for the screened inmates observed by this reviewer. In sum, 18 of 23 or 78 percent of audited facilities had adequate intake screening practices in their R&R units, the same level of compliance that was found during the previous assessment.

Defendants' May 2018 CAP indicated that a regional chief nursing executive (CNE) meeting had been held to resolve the issue of inadequate privacy and confidentiality. The CNEs were instructed to monitor compliance with the CAP. The status of the CAP was incorrectly marked "completed." This CAP item should have been marked as "ongoing" rather than "completed" because there was no indication that any monitoring had been initiated to verify full correction of the problem.

**Recommendation**:

Aside from the development of CAPs for the five facilities (CCI, CMC, CSP/Corcoran, DVI, and RJD) referenced above, no further recommendations are offered related to this issue. The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the defendants' CAP has sufficiently resolved the deficiencies.

**B)**     **Psych Tech Practices**

**Summary**:

According to the MHSDS *Program Guide* (*Program Guide*), PTs are required to conduct daily rounds in all administrative segregation units and weekly rounds in Security Housing Units (SHUs)/Psychiatric Services Units (PSUs) "to attend to the mental health needs of all inmates, with documentation of their observations for each MHSDS inmate recorded on a Psych Tech Daily Rounds Form." This reviewer's previous audits found inconsistent and problematic PT rounding in these units, ranging from "drive-by" rounds with little interaction with caseload inmates, to practices of PTs often completing the required forms following the completion of rounds rather than immediately following each inmate encounter as required by policy.

**Current Findings**:

This reviewer's current assessment found that all 23 audited facilities had adequate PT rounding practices in their restrictive housing units (administrative segregation, SHU, and PSU). PTs were consistently observed to be conversing with both MHSDS and non-MHSDS inmates, and correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Recommendation**:

No recommendations are offered related to this issue.

**C)**     **Suicide-Resistant MHCBs**

**Summary**:

Previous audits found that, although most MHCBs were suicide-resistant, some were not. Problems found in several MHCB units included rooms with square-shaped stainless-steel sinks protruding from the wall which could be used as attachment points for a noose and thus were conducive to suicide attempts by hanging. Other hazards included some rooms containing wall ventilation grates with holes that were larger than the industry standard 3/16-inch diameter, allowing for the possibility of being conducive to suicide attempts by hanging, as well as rooms with small gaps between the wall and window frame. Previous recommendations to CDCR included the development of a CAP for each facility that had hazards in its MHCB units.

**Current Findings**:

This reviewer's current assessment found that 18 of 21 or 86 percent of the audited facilities with MHCB units had suicide-resistant MHCBs. Problems at two facilities (CIM and CSP/Corcoran) have been long-standing.

First identified by this reviewer in 2013, all of the MHCB rooms at CIM continued to be hazardous and were not suicide-resistant.  In one wing, rooms had small gaps between the wall and window frame, faucet handles, and ventilation grates with large holes in the ceiling (although the ceilings were high and not within easy reach) that were conducive to suicide attempts by hanging.  In another wing, there were rooms with small gaps between the wall and window frame, faucet handles, exposed toilet chase piping, and ventilation grates with large holes in the ceiling that were conducive to suicide attempts by hanging.  A patient attempted suicide by hanging in one of the MHCB rooms on January 6, 2017.  At CSP/Corcoran, when the MHCB unit was temporarily closed for renovation in 2016, this reviewer inspected the unit and found that some rooms had wall ventilation grates containing holes that were in excess of 3/16-inch diameter, and there was not a pending work order to correct these hazards.

As a result of these long-standing MHCB safety concerns at CIM, the court ruled on January 25, 2018 that "[t]he ongoing existence of these conditions is unacceptable.  Good cause appearing, defendants will be directed to provide to the Special Master and file with the court a detailed plan for completion of all the necessary work at CIM…." (ECF No. 5762 at 2.)  On February 23, 2018, defendants submitted a plan to the court which included the planned start (March 5, 2018) and the planned completion (August 6, 2018) dates of the CIM renovation project.  Defendants have since filed monthly updates regarding the CIM project; as of the August 15, 2018 update, the renovation project was slightly behind schedule with an anticipated completion date now scheduled for September 21, 2018.

As a result of the MHCB safety concerns at CSP/Corcoran, the court's January 25, 2018 order directed that "[w]ithin 14 days from the date of this order defendants shall show cause in writing why the inadequate wall ventilation grates at CSP-Corcoran cannot be replaced within six months."  (ECF No. 5762 at 4).  On February 7, 2018, defendants submitted a plan to the court which indicated that the project would be completed within six months.  On February 22, 2018, defendants informed the Special Master that the 24-bed MHCB unit at CSP/Corcoran would be temporarily closed and that the renovation would commence by March 19, 2018, with estimated completion within three to four weeks.  On April 24, 2018, defendants notified the Special Master that the renovation project at CSP/Corcoran had been completed and that all MHCB unit beds were reactivated on April 24, 2018.

Finally, during the recent PBSP assessment, this reviewer was able to conduct a thorough inspection of each MHCB room due to a low census (i.e., one patient) at the time of the audit.  The inspection found a previously unidentified deficiency of wall and ceiling ventilation grates in each room having holes that were greater than the industry standard of 3/16 inches wide.  The MHCB rooms were otherwise suicide-resistant.

**Recommendation**:

CDCR should develop a work order for replacement of the wall and ceiling ventilation grates in the MHCB unit at PBSP.

**D)**     **Use of Suicide-Resistant Cells for Newly-Admitted Inmates in**
**Administrative Segregation Units**

**Summary**:

Pursuant to CDCR policy, all inmates initially placed in administrative segregation in single-cells are required to be placed in cells that have been retrofitted to be suicide-resistant for the first 72 hours. This reviewer's previous audits found several problems regarding the housing of newly-admitted inmates in administrative segregation. Original recommendations offered to address these deficiencies included ensuring there were a sufficient number of suicide-resistant retrofitted cells to house newly-admitted inmates and enforcing existing policy requirements of only housing newly-admitted inmates in retrofitted cells (and re-housing other inmates into other cells).

**Current Findings**:

Although there has been both a reduction in the overall administrative segregation census population statewide, as well as further retrofitting of additional new intake cells, this reviewer's preceding assessment found that only 15 of 23 or 65 percent of the audited facilities had adequate practices regarding the placement of newly-admitted administrative segregation inmates in new intake cells. Problems continued during this most recent audit when only 13 of 23 or 57 percent of the audited facilities were found to have adequate practices. Problems found in ten facilities (CIM, CMF, CMC, CSATF, DVI, HDSP, KVSP, PVSP, SVSP, and WSP) included new intake inmates housed in unsafe, non-intake single cells during the first 72 hours of administrative segregation confinement. In most cases, inmates were placed in an unsafe cell because all new intake cells were occupied; in other cases, new intake cells were available, but custody staff had not appropriately relocated the inmates. In two facilities (WSP and DVI), cells identified for new intake inmates were not completely suicide-resistant.

The issue was particularly acute at DVI. The facility's administrative segregation unit housed general population (GP), 3CMS, and Enhanced Outpatient Program (EOP) inmates. The unit originally had five retrofitted new intake cells, but that number had been increased to 11 in the past year. However, the 11 new intake cells were not completely suicide-resistant. One cell had a gap between the bunk and wall, and all 11 cells had ventilation grates with holes in excess of 3/16-inch in diameter. In addition to these new intake cells not being completely suicide-resistant, this reviewer observed three new intake inmates in unsafe non-intake cells. This finding was problematic because two inmates who committed suicide in DVI's administrative segregation unit in October and November 2017 were not placed in suicide-resistant new intake cells upon admission as required. At another facility (CSP/LAC), a new intake inmate committed suicide in an unsafe non-intake cell in the EOP administrative segregation unit in August 2017 even though a suicide-resistant new intake cell was available for use at the time of admission.

Defendants' May 2018 CAP indicated that CDCR was in the process of developing a "methodology for determining appropriate number of intake cells [due March 2018]…Report in development to determine which cells intake inmates are placed in time frame [due September 2018]." The status of this CAP item was marked "in process."

Finally, a previous issue of administrative segregation cells in two facilities (CSP/Solano and WSP) containing frosted exterior window glazing that reduced natural light was resolved when CDCR's Division of Adult Institutions (DAI) decided that "safety and security reasons" prohibited the removal of the glazing material, and that MHSDS inmates would not be housed in administrative segregation cells that contained the glazing material.

**Recommendation**:

Similar to the previous assessment, CDCR should develop CAPs in each of the ten facilities identified above to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in new intake cells for the first 72 hours of administrative segregation confinement. Some of the CAPs may involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available.

## E)   Use of "Alternative Housing" for Suicidal Inmates

**Summary**:

According to the *Program Guide*, an inmate who meets the criteria for MHCB placement is required to be transferred to a crisis bed within 24 hours of referral. In the interim, as well as in those cases in which physical transfer does not occur within that time frame, the inmate is required to be placed in "alternative housing." The most recent policy enacted following issuance of the *Program Guide* relevant to alternative housing is Policy 12.05.301 ("Housing of Patients Pending Mental Health Crisis Bed Transfer"), revised October 15, 2015. The policy listed the following preferred locations for housing suicidal inmates pending transfer to an MHCB: Correctional Treatment Center (CTC) licensed medical beds; Outpatient Housing Unit (OHU); OHU overflow cells; Large holding cells with toilets; Large holding cells without toilets; Triage and Treatment Area (TTA) or other clinic physical exam room; Other unit-housing where complete and constant visibility can be maintained; and CTC holding cells.

This reviewer's previous assessments found that suicidal inmates placed in alternative housing were often placed in hazardous, unsafe cells and observed at intervals that varied between constant observation and 15-minute intervals. In addition, many suicidal inmates were housed in these locations for more than 24 hours and oftentimes not provided a bunk, instead having to sleep on a mattress on the floor thus increasing the possibility that an otherwise suicidal inmate would deny their suicidal ideation to avoid continued perceived punitive conditions. As a result, previous recommendations by this reviewer focused on requirements for suicide-resistant alternative housing and/or constant observation of inmates placed in hazardous,

unsafe alternative housing locations, as well as issuance of suicide-resistant bunks for any inmate housed in alternative housing for more than 24 hours.

Defendants agreed to implement the above recommendations and issued various directives indicating that all suicidal patients placed in alternative housing would be placed on continuous 1:1 observation until they were transferred to a MHCB, as well as provided portable suicide-resistant beds (referred to as "stack-a-bunks") in those locations that did not already have available bunks.

**Current Findings**:

With the exception of alternative housing lengths of stay in four facilities greatly exceeding 24 hours, previous deficiencies in this area have been corrected. This reviewer's preceding assessment found that 14 of 23 or only 61 percent of the audited facilities had adequate practices regarding the use of alternative housing for suicidal patients referred for MHCB placement. Significant problems found in nine facilities included use of Board of Parole Hearings (BPH) cells, some of which were dry cells (i.e., without sinks and toilets), as well as dry holding tanks and holding cages. All of these housing locations had no access or limited access to bunks, showers, and bathrooms.

During the most recent assessment, this reviewer did not observe any alternative housing inmates placed in BPH cells or any dry cells in the 23 audited facilities. In addition, the assessment found that most alternative housing placements occurred in either CTC licensed medical beds, GP housing unit cells, administrative segregation unit cells, TTA holding cells, or OHU cells. Inmates in alternative housing were provided beds and required to be observed on a continuous 1:1 basis (except in CMC where all cells were suicide-resistant because the location had been previously utilized as an unlicensed MHCB unit and inmates were required to be observed at 15-minute intervals).

Finally, the most recent assessment found that 18 of 22 or 82 percent of the audited facilities housed inmates in alternative housing for 24 hours or less, with nine facilities having an average length of stay of 16 hours or less. However, four facilities had average lengths of stay that far exceeded 24 hours: CIW at 67 hours, CCWF at 51 hours, RJD at 50 hours, and CSP/Corcoran at 35 hours. The overall length of stay in alternative housing for inmates in the 22 audited facilities was 23 hours.[3] This was a marked improvement from prior assessments which found a significant percentage of inmates placed in alternative housing well in excess of 24 hours.

**Recommendation**:

CDCR should develop CAPs in each of the four facilities (CIW, CCWF, CSP/Corcoran, and RJD) that continue to have alternative housing lengths of stay well in excess of 24 hours. In

---

[3]The overall average length of stay in alternative housing at CIM could not be calculated due to the unreliability of the reviewed data. As detailed later in this report, this reviewer examined several cases in which data indicated that inmates were held in alternative housing for "zero" time whereas observation sheets examined indicated that the inmates were actually held for 26 to 28 hours.

addition, a CAP should be developed at CIM to ensure the correct calculation of length of stay data in alternative housing of that facility.

### F)   Practices for Observing MHCB Patients

**Summary**:

Previous assessments by this reviewer found that, despite clear *Program Guide* requirements for two levels of observation (i.e., Suicide Watch requiring continuous 1:1 observation and Suicide Precaution requiring observation at staggered 15-minute intervals), some suicidal patients were being observed in MHCB units at 30- and 60-minute intervals under observational terms such as "psychiatric observation" or "crisis evaluation." In addition, inadequate practices were found in the timely completion of required "Suicide Watch/Suicide Precaution Record" observation forms by nursing staff, including the falsification of observation forms for patients on Suicide Precaution status. Recommendations were provided for CDCR to enforce *Program Guide* requirements utilizing only two levels of observation, to provide better guidance and consistent guidelines regarding an acceptable level of observation for non-suicidal patients housed in MHCB units, and to develop a process by which the observation of suicidal MHCB patients was audited on a regular basis.

**Current Findings**:

On March 15, 2016, CDCR issued a memorandum entitled "Level of Observation and Property for Patients in Mental Health Crisis Beds" requiring that for those MHCB patients who did not meet criteria for either Suicide Watch or Suicide Precaution, or who were no longer suicidal, orders were "not to be written for a frequency of more than twice an hour (30 minutes)," and that vague terms such as "psychiatric observation" or "behavioral observation" were not permitted. A more recent memorandum dated April 18, 2018 entitled "Reminder: Level of Observation for Patients in Mental Health Crisis Beds" specified that orders for observation of non-suicidal MHCB patients "shall not be written for a frequency less often than permitted by the program's licensing requirements."

This reviewer's most recent assessment found that observation levels of non-suicidal patients housed within all 21 facilities containing an MHCB unit were set at either 15- or 30-minute intervals. In addition, vague terms such as "psychiatric observation" or "behavioral observation" had been eliminated from most local operating procedures at these facilities.

However, the problem of non-compliance with required observation of suicidal patients had not been resolved and, in fact, had been exacerbated. CDCR's new EHRS easily allows for accurate verification of nursing rounds performed within MHCB units because the observation is recorded in real time when entered by the user and cannot be altered. During this assessment period, 16 facilities with MHCB units had implemented EHRS. At the remaining five facilities with MHCB units, nursing staff were still utilizing hard-copy Suicide Watch/Suicide Precaution Record forms to document the observation of patients on suicide observation status. As such, accuracy of observation rounds in non-EHRS facilities could only be verified through on-site observation of nursing rounds.

11

While on-site at the 16 facilities utilizing the EHRS, this reviewer was able to verify the accuracy of observation rounds of patients on Suicide Precaution status (and requiring observation at staggered 15-minute intervals) by reviewing each patient's EHRS chart. Typically, four patient charts were selected at each facility for nine-hour periods ranging from 12:00 a.m. through 8:59 a.m. The findings were problematic, with violations found in all 16 facilities—attributable to multiple nursing personnel during multiple days at each facility. Although three facilities (CMC, CSATF, and CSP/Sac) were found to have only minor problems, with chart reviews finding only a few observation checks (e.g., two or three per patient) that were in excess of required 15-minute intervals, with the longest gap between checks typically being less than 30 minutes—the remaining 13 facilities had significant problems. Many facilities typically had between ten and 14 observation checks that were in excess of the required 15-minute intervals during a nine-hour period. Some of the worst practices were found at CSP/LAC. The chart review found numerous observation checks (between eight and nine per patient) that were in excess of required 15-minute intervals in two of the four cases, with the longest gap between checks being 28 minutes. The violations in the other two cases were alarming. In one case, there were multiple time gaps including two and three hours (from 12:12 a.m. to 2:05 a.m. and then from 2:07 a.m. until 5:38 a.m. on one date). In the other case, there were multiple time gaps that included a five-hour period (12:19 a.m. until 5:28 a.m.) on one date. Later that morning, the patient was observed with a piece of cloth tied around his neck and had been last observed 24 minutes earlier.

In addition, this reviewer observed the falsification of observation forms in two (CIM and MCSP) of the five facilities that had not yet implemented EHRS. ***In sum, the most recent assessment found inadequate observation of suicidal MHCB patients in 18 of 21 or 86 percent of the audited facilities.***[4] Possible explanations for these systemic deficiencies include an inadequate number of nursing staff assigned to conduct observation rounds, inadequate number of laptop or desktop equipment to record observation rounds on a timely basis, inadequate training of nursing staff (with some believing that documentation could be recorded at a later time), and simply neglectful practices.

Defendants' May 2018 CAP indicated that "EHRS modification to trigger tasking of MH observation orders was built. This will trigger staggered rounding and allow determination of at what point the task was completed (real time). Training via webinar was conducted [in February 2018]. CQIT contains indicators to assess if rounding was staggered and if documentation occurred in real time. Regional mental health teams will audit to ensure entries are completed in real time by comparing task time and documentation time. CNA training on conducting suicide watch and suicide precaution." The status of this CAP item was marked "in process."

**Recommendation**:

---

[4] The 18 facilities were CCWF, CHCF, CIM, CIW, CMF, CMC, CSATF, CSP/LAC, CSP/Solano, CSP/Sac, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, SQ, and SVSP.

Deficiencies surrounding the observation of suicidal MHCB patients is both acute and potentially dangerous.  In addition to Continuous Quality Improvement (CQI) and regional mental health team audits, nursing supervisors at each facility containing a MHCB unit should conduct regular EHRS audits to ensure that suicidal patients are being consistently observed as required.  The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the CAP has sufficiently resolved the deficiencies.

## G)    MHCB Practices for Possessions and Privileges

**Summary**:

Previous assessments by this reviewer found disparate practices with regard to privileges provided to medical versus mental health patients within CTCs.  Whereas patients admitted into a CTC for medical purposes were generally eligible for recreation, visits, or telephone calls, such privileges were generally prohibited for MHCB patients.  Recommendations were provided for CDCR to develop a directive(s) regarding guidance on clothing and allowable privileges for both suicidal and non-suicidal MHCB patients.

CDCR subsequently issued several memoranda to address the issue.  One such memorandum, "Level of Observation and Property for Patients in Mental Health Crisis Beds" was issued on March 15, 2016.  The directive required that "all orders shall detail what specific items may be issued to a patient.  Staff shall ensure all patients are provided with the clothing, bedding and allowable items permitted at the patient's level of observation."

On June 23, 2016, CDCR issued a memorandum on MHCB privileges available to MHCB patients entitled "Mental Health Crisis Bed Privileges."  The directive stated that "IPs admitted to the MHCB may be authorized for out-of-cell activities when specifically approved by the MHCB IDTT."  Out-of-cell activities included, but were not limited to, dayroom, recreational activities, and yard.  These activities would be the responsibility of the recreation therapist (RT) assigned to each MHCB unit, and "custody staff may provide supervision for unstructured out-of-cell activity to include yard in dayroom."  In addition, the memorandum stated that MHCB patients were entitled to both telephone access and visiting privileges "unless specifically restricted by the MHCB IDTT."  In late 2016, the memorandum was revised on several occasions to strengthen authorizing language.  The final version of the "Mental Health Crisis Bed Privileges" memorandum was issued on February 14, 2017.  The memorandum reiterated that "the recreational therapist shall be responsible for facilitating all structured out-of-cell activity and is expected to remain with the IP during these activities."

**Current Findings**:

Although there has been improvement since the 2016 audit when only three of 21 or 14 percent of the audited facilities with MHCB units had adequate practices with regard to the issuance of clothing and privileges for patients, problems remained at many facilities.  During the most recent assessment, this reviewer found that only 12 of 21 or 57 percent of facilities with MHCB units had adequate practices regarding the issuance of clothing and privileges for patients.  Practices at the remaining nine facilities (CIM, CMF, CSP/Corcoran, CSATF,

CSP/Sac, CSP/Solano, PVSP, SVSP, and WSP) were problematic. For example, at WSP, MHCB patients were not consistently receiving out-of-cell activities, including telephone calls and visits. In fact, a local operating procedure (LOP) at the facility still indicated that MHCB patients on either Suicide Watch or Suicide Precaution status were not eligible for yard activities. In addition, there was a shortage of RT personnel at the facility, resulting in few opportunities for out-of-cell activities. Although an RT at WSP informed this reviewer that MHCB patients received 30 minutes out of their rooms a few times each week in the yard or the program office, a records review suggested otherwise. The records indicated that patients were given the option of either receiving yard or program office privileges, but not both. In fact, most patients were not even given the option of recreating in the program office, rather the RT interacted with them cell-side. There was little use of the yard. In sum, except for the periodic opportunity to shower, this reviewer found that MHCB patients at WSP spent an inordinate amount of time confined in their rooms.

At CSP/Solano, there were multiple deficiencies found, including (1) a significant shortage of RT availability resulting in limited interaction with MHCB patients, (2) lack of a program room resulting in RT programming limited to board games either cell-side or in the therapeutic treatment module; (3) records indicated that none of nine patients had been offered yard consistent with CTC policy, there was documentation for only three of the patients being offered yard during their entire MHCB placement, and records indicated that no patients had been out into the yard during a recent four-day period; (4) custody staff reported that telephone and visiting privileges rarely occurred in the MHCB unit; (5) only four of nine patients had been offered showers consistent with policy; and (6) a patient not on suicide observation status and clinically ordered to receive "full-issue" clothing (shirt/pants or jumpsuit) observed wearing only a T-shirt, boxers, and a smock.

At CSP/Corcoran, there were also multiple deficiencies found, including (1) no patients on full-issue clothing status were issued either a uniform or shirt/pants because such clothing was not available in the MHCB unit, with this reviewer being informed by interdisciplinary treatment team (IDTT) members that safety smocks were issued to each patient for "privacy"; (2) multiple contradictory and/or incorrect orders that allowed for both issuance of a safety smock and "partial-issue" (i.e., shorts and t-shirt), orders to disallow both yard and telephone privileges without clinical justification for patients not on suicide observation status, and orders that incorrectly automatically denied yard privileges for patients on administrative segregation status; (3) limited RT availability resulting in patients only seen for approximately one hour every three days, and patients approved for out-of-room activities being forced to choose between the program office or yard; and (4) only approximately one third of MHCB patients approved for yard (with no administrative segregation patients ever approved), and non-administrative segregation patients not approved for telephone privileges.

Defendants' May 2018 CAP did *not* contain any proposed remedies to correct these deficiencies. However, during the SPMW meeting on January 18, 2018 and the *Coleman* All-Parties Workgroup teleconference on April 9, 2018, CDCR officials suggested that a webinar would be held for MHCB clinicians to reiterate the requirement for granting possessions and privileges to MHCB based upon clinical judgment, and that consideration would be given to again reissuing the "Mental Health Crisis Bed Privileges" memoranda. Defendants also

acknowledged that a shortage of RT personnel adversely affected the provision of out-of-cell activities even when ordered by the IDTT.

Although the final version of the "Mental Health Crisis Bed Privileges" memorandum issued on February 14, 2017 requires that "the recreational therapist shall be responsible for facilitating all structured out-of-cell activity and is expected to remain with the IP during these activities," this reviewer remains concerned about full patient access to out-of-cell activity in MHCB units with inadequate RT staffing.  Further, although CDCR previously contended that "custody staff may provide supervision for unstructured out-of-cell activity to include yard and dayroom" in the absence of the RT, this reviewer continued to find this option was not consistently used during the most recent audits.  Finally, given the frequent turnover of MHCB clinical personnel, this reviewer is also not convinced that re-training of such personnel through a webinar will adequately address the issue.

**Recommendation**:

MHCB supervisors in each of the nine facilities identified above should audit the possessions and privileges clinically-ordered to MHCB patients and report findings to the local SPRFIT committee until the issue is resolved.  It is also recommended that CDCR develop a CAP for recruiting a sufficient number of RT staff that can be assigned to MHCB units or, in the interim, find additional non-RT staff to provide such services.  Finally, the issue should be monitored again by this reviewer during a proposed reassessment to ensure that the issue has been resolved.

> **H)** **30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs, and Condemned Units**

**Summary**:

CDCR's requirement that inmates housed in administrative segregation be observed at 30-minute intervals has been in place since 2006, with inmates housed in SHUs requiring the same level of observation since 2013.  Documentation was historically recorded by handwritten housing logs.  In 2014, CDCR implemented the Guard One system to electronically verify 30-minute welfare checks of all inmates in administrative segregation during the first 21 days of their stays.  Via a memorandum issued on May 9, 2014, the policy was subsequently revised to extend use of the Guard One system to all inmates in administrative segregation units, SHUs, PSUs, and condemned units at staggered intervals not to exceed 35 minutes for the duration of their stays.  This expansion was a significant and commendable policy change.  Due to unique architectural features of the SHU at PBSP and complaints of excessive noise generated from Guard One, particularly during First Watch (10:00 p.m. to 6:00 a.m.), the parties agreed to a permanent policy specific to the SHU at PBSP allowing for Guard One observation at 60-minute intervals during First Watch.  The permanent stipulation was approved by the *Coleman* court on September 1, 2016 (ECF No. 5487).

**Current Findings**:

15

This reviewer's most recent assessment found all 23 audited facilities had Guard One compliance rates of 90 percent or higher in administrative segregation, SHUs, and PSUs. This was an improvement from the preceding assessment which found four facilities with Guard One compliance below 90 percent. This high rate of compliance in all audited facilities was tempered by the fact that three facilities (CSP/Sac, CSP/LAC, and PBSP) experienced four inmate suicides in PSU and administrative segregation units during 2017 in which each decedent was found in rigor mortis despite completion of a timely Guard One check, indications that correctional staff did not adequately observe the interior of the cell to verify "a living, breathing inmate" as required by policy.

**Recommendation**:

No recommendations are offered related to this issue. Correctional officers are already trained in the current CDCR policy requirement to verify "a living, breathing inmate" during each Guard One round. In addition, violations of the policy found during a CDCR investigation of an inmate suicide results in a recommendation for a Quality Improvement Plan (QIP) during the Suicide Case Review process.

    **I)**      **Suicide Risk Evaluations**

**Summary**:

This reviewer's previous assessments found that, although all emergency mental health referrals for reported suicide ideation (SI) and self-injurious behavior (SIB) resulted in an almost immediate response from mental health clinicians, these emergency referrals did not always result in completion of the required suicide risk evaluations (SREs) or Suicide Risk and Self-Harm Evaluation (SRASHE).[5] In addition, the quality of completed SREs was problematic. Previous recommendations included revision of the SRE mentoring program and better auditing of SRE quality on a monthly basis by local SPRFIT committees. Defendants previously agreed with this reviewer's assessments that the quality of completed SREs throughout CDCR was problematic and agreed to issue the "Revision to the Suicide Risk Evaluation Mentoring Program" memorandum, last revised on March 10, 2016, and the "Clarification of Suicide Risk Evaluation Training Requirements" memorandum, last revised on March 24, 2016. The memoranda included requirements for seven-hour SRE training every two years by clinical staff, and annual training for clinicians regularly assigned to a MHCB unit, and the auditing of at least one of a clinician's SREs every six months.

**Current Findings:**

This reviewer's most recent assessment found improvement in both the degrees of compliance with seven-hour SRE training and mentoring programs, as well as the completion of SREs and SRASHEs following an emergency mental health referral. The review found that 21 of 23 or 91 percent of audited facilities had compliance rates at 90 percent or more for either or both the seven-hour SRE training and the mentoring programs, including nine facilities having compliance rates above 90 percent for both programs. Only two facilities (CSP/Corcoran and

---

[5] Of note, Suicide Risk and Self-Harm Evaluations (SRASHEs) have replaced SREs in the new EHRS.

CMF) had compliance rates below 90 percent for both training programs, an improvement from the preceding assessment when eight facilities were found to have compliance rates below 90 percent. For the current assessment, the overall rate of compliance for seven-hour SRE training in the 23 audited facilities was 90 percent, whereas the compliance rate for the SRE mentoring program in the same facilities was 85 percent.

In addition, 17 of 23 or 74 percent of the audited facilities had required SRE/SRASHEs completed for emergency mental health referrals for SI and SIB in 90 percent or more of sampled cases. In those six facilities (CMF, DVI, KVSP, CSP/LAC, NKSP, and PVSP) below 90 percent, compliance rates ranged from 76 to 85 percent. These findings are an improvement from the preceding assessment when only 11 of 23 or 48 percent of the audited facilities had completed SREs in 90 percent or more of the cases. With that said, however, completion of suicide risk assessments for inmates presenting as possible risks for suicide should be automatic, with compliance rates near or at 100 percent throughout CDCR—yet this issue continues to be problematic.

Defendants' May 2018 CAP stated that "[t]raining compliance is now provided to HQ by the institutions and reviewed monthly in SPRFIT. Institutions [that] consistently are not in compliance or [that] demonstrate downward trends will be required to develop CAPs in conjunction with the regional teams." With regard to completion of SRE/SRASHEs for emergency mental health referrals involving SI and SIB, the CAP stated that "SRE [t]imeliness is now reviewed monthly in SPRFIT. Institutions [that] consistently are not in compliance or demonstrate downward trends will be required to develop CAPs in conjunction with the regional teams." The status of these CAPs was marked ongoing.

**Recommendation**:

Develop CAPs for the six facilities outlined above that continue to struggle with completion of required SRE/SRASHEs for emergency mental health referrals involving SI and SIB. The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies.

### J)    **Safety Planning for Suicidal Inmates**

**Summary**:

This reviewer's previous assessments found that safety planning to reduce a MHCB patient's suicide risk was inconsistently observed during IDTT meetings, and the vast majority of treatment plans developed by MHCB clinicians for suicidal patients were grossly inadequate and often simply repeated *Program Guide* requirements (e.g., "discharge from MHCB, provide 5-Day Follow-Up by Primary Clinician (PC), provide daily rounds by the PT, and medication management"), rather than a specific plan to reduce the inmate's suicide risk. In addition, there was little concordance between safety planning strategies developed within the SRE/SRASHEs that justified the discharge from a MHCB unit and subsequent five-day follow-up progress notes written by clinicians to indicate that safety plan objectives were being addressed. Initial previous

recommendations included additional "safety planning" training for clinicians which became mandatory in 2016.

When this reviewer's preceding assessment found continuing, and even worsening, problems with adequate treatment planning, it was recommended that CDCR develop a process by which each safety plan contained within the discharging SRE/SRASHE of a patient released from a MHCB was reviewed by an SRE mentor at that facility. Without interfering with the physical and administrative discharge of the patient from the MHCB, any safety plan found to be deficient (i.e., not containing a reasonably specific strategy to reduce SI) should immediately be returned to the authoring clinician for revision.

Finally, during a presentation to CDCR's Suicide Prevention Summit held on October 18, 2017, this reviewer offered examples of both inadequate and adequate safety planning. An *inadequate* safety plan was narrative that: (1) simply recited Program Guide requirements, (2) recommended specific groups which were not available at the facility, (3) simply instructed the patient to report any future suicidal ideation to CDCR staff, and (4) simply deferred the safety plan to the transferring clinician. In contrast, an *adequate* safety plan: (1) addressed modifiable risk and protective factors and warning signs, (2) flowed directly from assessed level of care, (3) was specific and individualized, and (4) could be seen in five-day follow-up progress notes and subsequent notes of the transferring clinician.

**Current Findings**:

This reviewer's most recent assessment found continuing problems with adequate safety planning for SI in 20 of 21 or 95 percent of audited facilities with MHCB units. The only facility demonstrating consistently adequate safety planning was RJD. One example of such safety planning at RJD was the following:

> D/C to EOP LOC. Start MH 5-day follow-up procedures. Add up to 10+ hours of groups including life skills, conflict resolution and stress management. Add to high risk list for at least 14 days to monitor for transition to ASU and to EOP. Teach IP warning signs of stress (emotional, physical and psychological), as well as coping skills for stress, including breathing techniques/meditation, mindful drawing, encourage singing, puzzles for distraction, SMART goal setting, and techniques to manage worrying (such as create a 'worry' period). Teach coping skills to reduce impulsivity to reduce future 115s such as counting, breathing or distraction. Teach DBT distress tolerance skills to reduce possible distress from receiving 115, such as positive self-talk, engaging in activities, or prayer. Monitor and encourage regular contact with family/support system. Inmate has already been referred and accepted to DSH-ICF for further support.

The challenge at RJD (as well as at other audited facilities) was that, although clinicians demonstrated adequate safety planning, there were often problems with concordance between safety plans contained within discharging SRE/SRASHEs and safety plan summary sections contained within accompanying Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR

18

MH-7230-B) forms.  For example, the safety plan contained on the first day of the 5-Day Follow-Up Progress Note for the above case stated the following:

> MH staff will continue 4 more days of follow-up, or more, as needed.  His dx now is adjustment DO with depressed mood.  He has no rx'd psychotropic meds now, that several rx'd medical meds.  He will continue taking them as rx'd and ask for meds' eval as needed.  He will be monitored by CO staff hourly while in Ad Seg.  He will get and use a pencil and puzzles as distractions from his reported boredom.  He will ask for additional help as needed.  He knows how to do so.

Although pockets of adequate safety planning by individual clinicians continued to be found in the other 20 audited facilities throughout the CDCR system, none of these facilities other than RJD demonstrated consistent safety planning.  Continued examples of poor safety planning included simply repeating *Program Guide* requirements, deferring the development of a specific safety plan to the outpatient clinician rather than the MHCB clinician developing a safety plan with the patient during their MHCB placement, and creating non-individualized safety plans by cutting and pasting the same narrative for multiple patients.  For example, at WSP, one MHCB clinician simply wrote a narrative in several safety plans that the patients "should identify at least 5 coping skills to decrease depression, anxiety, and impulsivity, promote successful prison incarceration with decreased ability of self-injurious behavior, identify at least 3 goals for his incarceration," thereby deferring the identification of appropriate coping skills to other clinicians.

At CSP/Corcoran, a MHCB clinician wrote the following in the safety plan section of the discharging SRASHE:

> I/P is already on a 5-day f/u and to continue daily PC contact to address s/s and monitor SI/HI.
> 1) Psychiatrist will prescribe and adjust medication as needed.
> 2) PC provide patient with Bible to read while in his cell.
> 3) PC will teach IP stress management and relaxation techniques to help decrease stress and anxiety that seem to be increasing SI.

In addition, the first day of the patient's Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form stated the following under safety plan: "If sxs increase, IP to contact staff/mental health staff immediately.  Continue with current tx. plan."

At HDSP, a MHCB clinician wrote the following in the safety plan section of the discharging SRASHE: "His prior safety plan/treatment plan focused on stabilizing his mood, developing goals for the future, and developing alternative strategies for relief besides cutting (self-harm).  The Pt currently states a safety plan is adequate for keeping him safe."  Such narrative failed to identify the specific "goals" and "strategies" contained within either the current or previous safety plan that was effective for the patient.

All of the above described examples were deficient because, contrary to CDCR's safety planning training, these safety plans did not (1) address modifiable risk and protective factors

and warning signs, (2) flow directly from assessed level of care, and (3) were not specific and individualized.

Further, this reviewer's most recent assessment also included observation of IDTT meetings within MHCB units.  Although most meetings were found to be well-attended by mental health, medical, and custody staff, discussion regarding safety planning was often disjointed or non-existent.  In one example from PVSP, the patient had been admitted into the MHCB for suicidal ideation with a plan ("to use razors to cut his wrist").  His diagnosis was Bipolar Disorder with depressed mood.  The patient had stopped taking his psychotropic medication a few months earlier which resulted in increased depression and suicidal ideation.  He was at the 3CMS level of care and had a previous MHCB admission during 2017.  According to a recently completed SRASHE, the patient was assessed as having both a "moderate" chronic and acute risk for suicide based on risk factors that included a prior suicide attempt, family history of suicide, increased depression, and on-going auditory hallucinations.  During the IDTT meeting observed by this reviewer, the patient was observed to be in "full-issue" clothing but had not been granted any privileges other than periodic showers.  Although he denied any current suicidal ideation or auditory hallucinations, there was no discussion regarding safety planning.

Following the IDTT meeting, this reviewer asked the treatment team why the patient had not received consideration for any privileges during his 12-day MHCB stay.  The PC replied that privileges had not been granted until that meeting because "he was still experiencing hallucinations."  When this reviewer then asked if the patient was going to remain in the MHCB unit or referred to a higher level of care, the response was that the patient had been discharged to EOP level of care.  Such a response was surprising since it was not discussed during the IDTT meeting.

With regard to safety plan training for mental health clinicians, the most recent assessment found that only 12 of 23 or 52 percent of the audited facilities had compliance rates of 90 percent or more.  The overall rate of compliance for safety plan training in the 23 audited facilities was 80 percent.

Finally, with regard to this reviewer's previous recommendation that CDCR develop a process by which each safety plan contained within the discharging SRE/SRASHE of a patient released from a MHCB was reviewed by an SRE mentor at that facility, the recommendation was accepted by the defendants, but implementation was initially delayed.  In April 2018, CDCR presented data from the Monthly MHCB Discharges Lists to this reviewer indicating that five facilities (CHCF, CMC, CMF, CSP/Corcoran, and CSP/Sac) had multiple MHCB discharges each day and it would be unduly burdensome and require additional staff to review every discharging SRASHE in these MHCB units.  After careful consideration, the following corrective action was agreed to:  (1) With the exception of CHCF, CMC, CMF, CSP/Corcoran, and CSP/Sac, MHCB clinicians in all other CDCR facilities would be required to have all SRASHEs reviewed by a mentor to ensure that each assessment contains an adequate safety plan for reducing future suicidal ideation; (2)  At CHCF, CMC, CMF, CSP/Corcoran, and CSP/Sac, each MHCB clinician would be required to have at least one SRASHE reviewed by a mentor on a weekly basis to ensure that each assessment contains an adequate safety plan for reducing future suicidal ideation; and (3) At all facilities with an MHCB unit, the above safety plan review

20

process would continue until 90-percent compliance has been achieved and maintained as verified by quarterly audits.

Defendants' May 2018 CAP was revised accordingly to incorporate the auditing process for review of safety plans.  The start date for the auditing process was not specified and was pending revision of the EHRS, issuance of a "memorandum with new instructions," and webinar-based training for MHCB supervisors or designees responsible for the auditing.

In sum, safety planning to reduce the suicide risk of patients discharged from MHCB units continues to be problematic throughout CDCR.  As noted below in a forthcoming section of this report (Section O:  Suicide Case Reviews), approximately 25 percent of the quality improvement plans resulting from inmate suicides during 2017 were in response to inadequate SRE/SRASHEs and safety planning.

Finally, this reviewer and other members of the Special Master's team attended a Safety Planning Webinar conference call with staff from the Clinical Support Unit of the CDCR's Division of Correctional Health Care Services on July 19, 2018.  The purpose of the webinar was for CDCR to present a proposal that would allow clinicians a more reasonable and practical way to develop safety plans through a concept entitled Safety Planning Intervention (SPI).[6]  Although the SPI would include a "My Safety Plan" template, each plan would be individualized to the patient's needs.  Overall, the Special Master's team was impressed by the presentation and, with some revision, encouraged the Clinical Support Team to implement the SPI model.[7]

**Recommendation**:

Initiation of safety plan auditing by MHCB supervisors or designees should be expedited and a start date identified in the CAP.  In addition, develop CAPs for safety plan training of mental health clinicians in the 11 facilities that were below 90-percent compliance.  The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies.

---

[6]See Stanley, B. and Brown, G. (2012), "Safety Planning Intervention: A Brief Intervention to Mitigate Suicide Risk," *Cognitive and Behavioral Practice*, 19 (2012) 256-264.

[7]The revisions included ensuring that the "My Safety Plan" template would include instructions (and training) to ensure that the safety plan would be developed by both the patient and clinician, and not by the patient alone as currently written.  In addition, the 7-step template needed to be enlarged to include a step for specific group(s) intervention.  Further, Step 6 ("Making the Environment Safe") needed to be revised for clarification (or even deletion) to ensure that clinicians did not interpret this step to mean that the patient's cell would be made physically safe and/or means restrictions initiated in lieu of a MHCB referral for an otherwise suicidal patient.  Finally, the Clinical Support Team proposed that definitions needed to be created for "low," "moderate," and "high" suicide risk to be incorporated into the SRASHE instructions, and that any patient assessed as being "low" acute suicide risk would not be required to have a safety plan developed (unless they were being discharged from a MHCB).  The Special Master team supported this proposal with the stipulation that all patients discharged from an MHCB, regardless of risk level, would continue to be required to have a safety plan developed.  The Clinical Support Team staff also suggested that there had been preliminary discussion within CDCR to revise the SRASHE template at some point in the future to include revision of the chronic and acute risk factor checklists.  The Special Master team had concerns regarding substantial revision of the SRASHE but would defer any opinion until more information was made available.

**K)** **MHCB and Alternative Housing Discharge and Efficacy of Five-Day**
**Clinical Follow-Up and Custody Welfare Checks**

**Summary**:

Consistent with the need for continued safety planning of patients released from MHCB units and alternative housing to general population, administrative segregation, and other housing units, this reviewer's prior recommendations included strengthening existing procedures for follow-up assessments by mental health clinicians and welfare checks by custody staff. Defendants developed several memoranda and compliance forms to strengthen the follow-up process. In March 2016, the "Interdisciplinary Progress Note – 5-Day Follow-Up" CDCR MH-7230-B form was released in final format. The accompanying policy, entitled "Release of Revised 5-Day Follow-Up Form," was released on May 31, 2016. On January 27, 2016, CDCR released a joint memorandum from the Director of the Division of Adult Institutions (DAI) and Deputy Director of the Statewide Mental Health Program entitled "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy." The policy required custody staff to observe an inmate at 30-minute intervals for a minimum of 24 hours following MHCB discharge. The policy also required that a clinician perform daily mental health assessments to determine whether the 30-minute discharge checks were necessary beyond the minimum 24-hour requirement (up to 72 hours), or whether the inmate required a referral back to a MHCB. On September 1, 2017, CDCR officials released a slightly revised memorandum to include inmates expressing SI and referred to, and discharged from, alternative housing "when clinically indicated."

**Current Findings**:

This reviewer's most recent assessment included an audit of both the "Interdisciplinary Progress Note-5-Day Follow-Up" (CDCR MH-7230-B) form process by clinical staff, as well as the "Discharge Custody Check Sheet" (CDCR MH-7497) form process by both clinical and custody staff. Overall, this reviewer found that clinicians (and nursing staff in their absence) almost consistently completed "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) forms in all 23 audited facilities. However, similar to the chronic problem of safety planning found in all of the facilities that had MHCB units, this reviewer continued to find problems with concordance between the safety plans contained within discharging SRE/SRASHEs and the safety plan summary sections of the CDCR MH-7497 forms. Although some progress was noted, the safety plan summary sections of most forms simply recited *Program Guide* requirements or contained narrative that was inconsistent with the safety plan of the discharging SRE/SRASHE.

With regard to the discharge custody check process, a two-page "Discharge Custody Check Sheet" (CDCR MH-7497) form was required to be completed on any inmate released from a MHCB or alternative housing ("when clinically indicated") placement. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer's most recent assessment found that only three of 23 or 13 percent of the audited facilities had clinicians and custody personnel correctly complete both pages of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms in 90 percent or more of the cases. These three facilities were CCI, CCWF, and CMC.  These findings were similar to those found during the preceding review in which only 15 percent of the facilities audited for compliance after mid-May 2016 had adequate practices for "discharge custody checks."  During this most recent assessment, problems found in the remaining 20 facilities included clinicians not completing the first page; clinicians discontinuing custody checks in less than the required 24 hours; custody checks performed at 60-minute, rather than 30-minute intervals, large gaps in performed checks, and/or custody checks not being completed during the First Watch.  The overall compliance rate for the correct completion of Page One by clinical staff was 67 percent, whereas the compliance rate for the correct completion of Page Two by custody staff was 77 percent.  Finally, clinicians ordered discontinuation of 30-minute custody checks after the initial 24 hours in 48 percent of the cases, at 48 hours in 30 percent of the cases, and at 72 hours in 22 percent of the cases.

Defendants' May 2018 CAP stated: "Workgroup formed to develop a statewide template outlining the process, using CMC and SATF as models.  This item will be monitored ongoing."

**Recommendation**:

Utilize the Defendants' May 2018 CAP for the "Discharge Custody Check Sheet" (CDCR MH-7497) form process in the 20 facilities identified above that were below 90-percent compliance.  The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies.

L)      **Local SPRFITs**

**Summary**:

Each local SPRFIT is required to meet at least monthly and carry out various responsibilities including ensuring compliance with all CDCR suicide prevention policies and procedures, five-day clinical follow-ups, safety plans, etc.  Previous assessments by this reviewer found that although the local SPRFIT concept was a valuable tool in CDCR's suicide prevention program, the process was not functioning as intended and needed to be rebooted.  Most importantly, many of the deficiencies identified by this reviewer in each prison were easily observable and should not have been identified for the first time by a Special Master's expert and/or monitor, but rather by the local SPRFIT.  Therefore, this reviewer's previous recommendation was for CDCR, under the guidance of the Special Master, to re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.  In February 2017, this reviewer's critique of a revised draft SPRFIT policy was submitted to CDCR.

**<u>Current Findings</u>**:

In both February 2016 and October 2017, CDCR's Statewide Mental Health Program held multiple-day Suicide Prevention Summits to further discuss refinement of the SPRFIT's role in overall suicide prevention efforts within the department.  All chiefs of mental health, wardens, local SPRFIT coordinators, and supervisory custody personnel from the Mental Health Compliance Team were invited to the meetings, among others, which were also attended by several members of the Special Master's team.

The court ruled on January 25, 2018 that "[g]ood cause appearing, defendants will be directed to provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, not later than thirty days from the date of this order."  (ECF No. 5762 at 3.)  On February 2, 2018, CDCR issued the "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum that "clarifies, modifies, and establishes requirements and responsibilities."  The revised memorandum became effective on March 1, 2018 and contained 19 responsibilities that included, but were not limited to, monitoring suicide prevention training, treatment planning, and five-day follow-up compliance; conducting root cause analyses of suicides and serious suicide attempts; providing assistance and coordination for the activities of visiting Statewide Mental Health Program (SMHP) and DAI suicide case reviewers following an inmate suicide; conducting self-assessments related to compliance with suicide prevention items developed by the SMHP's Quality Improvement Unit; and maintaining a High Risk Management Program consistent with CDCR policies and procedures.

Because the above memorandum was issued subsequent to completion of this reviewer's most recent suicide assessment, compliance with the new responsibilities of the local SPRFITs was not audited.  With that said, this reviewer's most recent assessment continued to find few positive SPRFIT practices at each facility.  For example, the February 2, 2018 memorandum clarified attendance requirements, including mandatory members and establishment of a quorum.[8]  Had the memorandum been in effect at the time of the most recent facility assessments, only three facilities (CMC, RJD, and PBSP) would have met quorum requirements for the three consecutive monthly meetings that were reviewed.  Of note, however, although most local SPRFITs did not meet quorum requirements, a few, such as CIW, were quite active.  Review of SPRFIT meeting minutes at CIW reflected updated CAPs for continued suicide prevention deficiencies, as well as regular discussion regarding SRE/SRASHE audits, High Risk List, safety planning, Crisis Intervention Team, a planned Suicide Prevention Week, suicide prevention posters and brochures, and robust summaries of recent serious suicide attempts, among other issues.  In addition, each meeting (which was 90 minutes in length) allowed time for an inmate representative of the Suicide Prevention Outreach Committee to make a brief presentation.  Overall, however, SPRFIT monthly minutes in most of the 23 audited facilities were unremarkable and continued to collect more quantitative than qualitative data, with only a few establishing CAPs based upon this reviewer's previous assessments.

---

[8]According to *Program Guide* requirements for local SPRFITs (including the February 2, 2018 revision), a monthly meeting quorum consists of attendance of mandatory members (SPRFIT coordinator, chief psychiatrist, chief psychologist, supervising RN, senior PT or PT, correctional health services administrator, inpatient coordinator, and associate warden for health care access) or approved designees.

**Recommendation**:

No recommendations are offered related to this issue.  The above described new local SPRFIT responsibilities should be monitored again by this reviewer during a proposed reassessment.

**M)**     **Suicide Prevention Training**

**Summary**:

Previous assessments of both pre-service and annual suicide prevention block training, including the *Mental Health Services Delivery System Instructor Guide*, found some concerns regarding content, length of training, and low completion rates for non-custody staff.  As a result, this reviewer initially made recommendations to expand the length and content of both the pre-service and annual training workshops to include the following topics:  (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative, (2) identifying inmates at risk for suicide despite their denials of risk, (3) updated research on CDCR suicides, (4) identified problem areas and corrective actions from previous CDCR Suicide Reports, and (5) results of recent *Coleman* audits of suicide prevention practices.  This reviewer made further recommendations that CDCR ensure that all custody and health care staff received both pre-service and annual suicide prevention training, and that the workshops were conducted by qualified mental health staff.

As previously reported, CDCR did not agree to expand the length of the pre-service suicide prevention curriculum beyond 2.5 hours of the eight-hour pre-service *Mental Health Services Delivery System Instructor Guide* curriculum.  The curriculum was revised on several occasions to include the recommended topics, and then again following this reviewer's critique of a full-day workshop at the Basic Correctional Officers Academy Training on December 7, 2015.

In addition, the annual suicide prevention training curriculum has been revised on several occasions.  This reviewer's preceding assessment recommended—based upon observations during several workshops that instructors were struggling to adequately present all of the PowerPoint slide material within the two-hour allotted time frame and often using different versions of the material—that CDCR should determine the adequate number of PowerPoint slides that can reasonably be covered in a two-hour format and ensure instructors utilize the same PowerPoint presentation.

**Current Findings**:

As offered in the preceding assessment, this reviewer most recently critiqued the eight-hour pre-service MHSDS training at the Basic Correctional Officers Academy in Galt on November 10, 2016.  There were concerns about time management during the workshop, with only 110 minutes (and not the required 150 minutes, i.e., 2.5 hours) devoted to the topic of suicide prevention as required.  In addition, only one of four role-playing scenarios was

25

presented during the suicide prevention section. To date, this reviewer was informed that the suicide prevention section of the pre-service *Mental Health Services Delivery System Instructor Guide* curriculum has been again revised, but it has *not* been provided for review. In addition, this reviewer has *not* been provided any scheduled dates to critique the revised full-day workshop at the Basic Correctional Officers Academy Training. This reviewer continues to have concerns as to whether the critical topic of suicide prevention can be adequately presented within the currently allotted 2.5-hour time frame of the pre-service training curriculum.[9]

With regard to annual training, this reviewer's most recent assessments found that 22 of 23 or 96 percent of the audited facilities had compliance rates for annual suicide prevention block training of *custody* personnel that were at or above 90 percent, with the overall rate of compliance in these 23 facilities at 97 percent.[10]

However, compliance rates for annual suicide prevention block training of both medical and mental health staff remained very problematic. The most recent assessment found that 14 of 23 or 61 percent of the audited facilities had compliance rates for annual suicide prevention block training of *medical* staff that were at or above 90 percent, with the overall rate of compliance in these 23 facilities at 87 percent. The most recent assessment also found that 12 of 23 or 52 percent of the audited facilities had compliance rates for annual suicide prevention block training of *mental health* staff that were at or above 90 percent, with the overall rate of compliance in these 23 facilities at 85 percent. Compliance rates for suicide prevention block training of medical and mental health staff were particularly anemic in three facilities (CMF, CSP/LAC, and CSP/Sac), where compliance ranged from a low of 36 percent to a high of 80 percent.

***Overall, only 10 of 23 or 43 percent of audited facilities were at or above 90 percent compliance for annual In-Service Training (IST) suicide prevention block training of both medical and mental health personnel. During this reviewer's 2016 assessment, only 12 of 23 facilities had compliance rates at 90 percent or more. As such, this issue continues to remain very problematic within CDCR.***

In addition, during the most recent assessment, this reviewer and colleagues observed 16 IST suicide prevention training workshops. The strength of the IST workshops was the instructors, all mental health clinicians who competently presented the required material. The instructors were enthusiastic and engaged with workshop participants. However, problems observed during the workshops included presentation of varying revisions of Version 3.1 of the PowerPoint slides (ranging from 58 to 74 slides).[11] The six case scenarios of suicidal inmates

---

[9]This reviewer was recently informed that the suicide prevention portion of the Basic Correctional Officers Academy Training was increased to four hours. A revised curriculum is in development.

[10]Of note, the assessment also included compliance with CPR/AED training for both custody and medical personnel. All of the 23 audited facilities had compliance rates for both custody and medical personnel that were at 90 percent or more, with custody personnel having an overall compliance rate of 96 percent and medical personnel having an overall compliance rate of 99 percent.

[11]Version 3.1 was approved May 2016 and last revised in December 2017.

were often either not presented or presented inadequately (e.g., the instructor choosing one case and presenting it in a large group; at one workshop, case scenarios were not distributed and participants broke into smaller groups and created their own case examples).  Due to time constraints predominantly caused by excessive slides, instructors rushed through the slides, did not adequately present the case scenarios, and the post-test Knowledge Review either was not completed at all or completed quickly as a group.  Suicide Prevention Participant Workbooks were rarely distributed during the workshops.  Finally, each workshop generally had a small group of participants that sat toward the back of the classroom and were disengaged from the presentation, at times creating a distraction for the instructor.

In sum, the IST suicide prevention workshops were conducted by very competent and enthusiastic instructors, but the sessions were compromised by the amount of information forced into an allotted two-hour time period.  In both February and October 2018, this reviewer provided a written critique of the most recent version of the IST suicide prevention PowerPoint slides to CDCR that included several specific recommendations for improvement.[12]

Defendants' May 2018 CAP provided a schedule for revision and approval of the revised IST suicide prevention training curriculum by various entities, including DAI, nursing leadership, CDCR's Office of Legal Affairs (OLA), and the Office of Training and Professional Development.  The CAP was estimated to be completed by December 2018.

**Recommendation**:

---

[12]These recommendations included: (1) Slides 2.12 through 2.16 dealing with retrofitted new intake cells should be deleted.  All correctional personnel that work in administrative segregation units should already know what a new intake cell looks like.  The issue within CDCR is availability of new intake cells; (2) Slides 3.5 through 3.9 should also be deleted.  If needed, 3.8 and 3.9 can be moved into a previous slide dealing with warning signs and risk factors; (3) Slide 4.4 regarding "denials of intent to self-harm" needs to be supplemented with additional slides that provide an overview of why suicidal inmates deny their suicidal intent; (4) Consider consolidating or reducing emergency response slides 5.3 through 5.8, while providing emphatic instruction that 911 needs to be called immediately and can be initiated by authorized non-medical personnel.  In addition, a slide needs to be revised with new instructions that the cut-down tool is now in the emergency response bag and the entire bag should be brought to the emergency; (5) Slides 6.1 thru 6.4 regarding the Suicide Case Reviews need to be revised to change the intent.  Most instructors who present these slides simply present them as a summary of good practices, rather than examples of deficiencies identified in Suicide Case Reviews.  For example, in Slide 6.2, instead of the narrative being "bring the AED to the emergency scene and document its usage carefully," the slide should read: "A significant number of reviewed cases found that the AED was not brought to the scene and/or its use was not adequately documented"; (6) Slides need to be created that visually demonstrate the serious repercussions from staff deficiencies.  For example, slides that show the number of staff that had been referred for investigation or other professional disciplinary action might be of interest to an otherwise non-interested participant.  For example, staff had been referred for investigation or other professional disciplinary action for the following issues:  failure to complete timely Guard One checks and/or 30-minute discharge custody checks, failure to complete timely rounds of MHCB patients, failure to take the inmate's suicide threat seriously, failure to enter the cell and/or initiate 911 notification in a timely manner, etc.; (7) Consideration for creating a few slides that provide summaries of several of the more egregious and preventable suicides that have recently occurred within CDCR facilities; and (8) Consideration for local instructors to create a few slides specific to their facility that provides a summary of recent *Coleman* and CQIT suicide prevention assessments.  There was a general feeling that most line staff attending the IST workshops had little appreciation and/or knowledge of the suicide prevention audits.

CDCR should provide the revised pre-service *Mental Health Services Delivery System Instructor Guide* curriculum to this reviewer, as well as provide a schedule of possible dates in which presentation of the revised curriculum can be observed at the Basic Correctional Officers Academy Training.  In addition, CDCR should develop CAPs for annual suicide prevention training in the 13 facilities (CCI, CIW, CHCF, CMC, CMF, CSP/Corcoran, CSATF, DVI, HDSP, CSP/LAC, PBSP, RJD, and CSP/Sac) that were below 90-percent compliance for suicide prevention training for either medical and/or mental health personnel.  Finally, CDCR should incorporate this reviewer's recommended changes to the annual IST suicide prevention training curriculum that was previously forwarded in both February and October 2018.

### N)     Continuous Quality Improvement

**Summary**:

By order of the *Coleman* court (ECF No. 4232, filed August 30, 2012; ECF No. 4561, filed April 23, 2013; ECF No. 5092, filed March 3, 2014), defendants were directed to develop an improved quality improvement process by which CDCR could identify issues and improve its performance levels in the delivery of mental health care.  The result was the development of a Continuous Quality Improvement Tool (CQIT).  During the course of the SPMW process, CDCR agreed to incorporate this reviewer's suicide prevention audit checklist into its overall CQI process.  The checklist included 19 measures.[13]

**Current Findings**:

A review of CDCR's revised Continuous Quality Improvement On-Site Audit Guidebook, last revised on July 2, 2018, found it included many, but not all, of this reviewer's suicide prevention audit measures.  During SPMW and All-Parties Workgroup meetings in 2017-2018, CDCR consistently confirmed that the 19 suicide prevention audit measures would be incorporated into either the CQIT or other CQI processes.  To date, CDCR has not had the opportunity to produce a CQIT report that includes findings from all of these 19 suicide prevention audit measures.

Defendants' May 2018 CAP stated that "CDCR to work with [Office of the Special Master] on final report format, items are all added in the CQIT on-site tool.  All items related to timeliness are in the performance report.  Training items are not automated but are collected by our training unit and will be included in regional reports. New onsite items such as MHCB

---

[13]The 19 measures were: Observation of R&R intake screening, confirming screening completeness and privacy and confidentiality; Administrative segregation new intake inmates housed in retrofitted new intake cells for 72 hours; Clothing allowance for MHCB patients; Treatment/safety planning for suicidal ideation in MHCBs; Use of alternative housing; Annual suicide prevention training for custody staff; Five-day clinical and custody follow-ups for MHCB returns; Guard One compliance; PT rounds in administrative segregation, SHU, and PSU; Suicide-resistant design of MHCBs; Five-day clinical and custody follow-ups for alternative housing, DSH, and Psychiatric Inpatient Program (PIP) returns; SREs required for emergency mental health referrals/TTA Log for suicidal ideation; SREs required for admission/discharge in MHCB and alternative housing; Observation and Privileges for MHCB patients; Emergency response equipment in housing units; Annual suicide prevention training for medical and mental health staff; CPR training for medical staff; SRE Mentoring/Seven-hour SRE training and Safety Planning training for clinicians; and SPRFIT responsibilities.

privileges are in the on-site tool but are not yet coded.  The findings will be included in the written regional report and on the list to be coded for quantitative information.  All new onsite items will be completed by regional when onsite visits occur."

**Recommendation**:

The reporting out of all of this reviewer's 19 suicide prevention audit measures should be encompassed in one final CQIT-formatted report for each facility, and not in various "regional reports" as described in defendants' May 2018 CAP.

> **O)**     **Suicide Case Reviews**

**Summary**:

The MHSDS *Program Guide* provides detailed procedures in the event of an inmate death by suicide.  Following a suicide, the Division of Correctional Health Care Services' (DCHCS) SPRFIT coordinator appoints a Suicide Reviewer to begin reviewing the case.  The primary purpose for the suicide review is to try to understand how the death occurred, what was the precipitant(s) to the suicide, as well as any system failures that, once corrected, will allow the agency to improve the suicide prevention program.  The Suicide Reviewer examines all relevant documentation in the case, including, but not limited to, the decedent's central file, health care record, and all relevant CDCR policies and procedures.  The Suicide Reviewer is assisted by both a custody supervisor from the Mental Health Compliance Team (MHCT) and a Nurse Consultant Program Reviewer.  The review also includes inspection of the decedent's cell and its contents, as well as interviews with select custody, medical, and mental health personnel, inmates, and family members of the decedent when appropriate.  Within approximately 30 calendar days of the suicide, the Suicide Reviewer is required to complete a preliminary Suicide Report that contains relevant findings and recommendations, if any, for a quality improvement plan (QIP) regarding the suicide.  The preliminary report is forwarded to the DCHCS SPRFIT Coordinator and the report is subsequently discussed at a Suicide Case Review subcommittee meeting.  Members of the subcommittee include SMHP staff, DAI and nursing leadership, MHCT members, and OLA representative(s).  In addition, leadership from the facility where the suicide occurred is represented at the meeting.  Members of the Special Master's team are also invited to observe the process.  Following the subcommittee meeting, the Suicide Report is finalized, and local facility leadership is required to implement any QIPs pursuant to a defined schedule.

**Current Findings**:

A considerable strength of the CDCR suicide prevention program is the Suicide Case Review process.  Since at least June 2015, members of the Special Master's team have reviewed each preliminary Suicide Report and observed, as well as often participated in, the Suicide Case Review subcommittee meetings.  Although members of the Special Master's team have provided critiques of individual preliminary reports that have resulted in some revision of those reports, overall, the Suicide Reports have been found to be not only very comprehensive but have

provided thoughtful and targeted QIPs for correcting deficiencies and improving suicide prevention practices.

During 2017, CDCR sustained 30 inmate suicides, with Suicide Reports developed in each case. These reports, in turn, generated approximately 193 QIPs, which are listed in the facility assessment sections in Appendix A of this report. The following list of categories encompassed approximately 144 of the QIPs:[14]

- Inadequate SRE/SRASHEs and/or Safety Plans: 36
- Missing mental health documentation: 25
- Nursing documentation (general): 21
- Delay in 911 activation: 16
- Delay in CPR initiation, cut-down kit retrieval, other: 16
- Level of clinical care errors: 9
- Psychiatric medication errors: 5
- Nursing errors during emergency response: 5
- Deficiencies in Guard One observation: 4
- Failure to place inmate in new intake cell: 3
- Inadequate housing of suicidal patient: 2
- Nursing observation of suicidal patient: 2

Of significance, 25 percent (36 of 144) of the QIPs listed above involved inadequate development of SRE/SRASHEs and/or safety plans.

**Recommendation**:

No recommendations are offered related to this issue.

### P)    **Reception Center Suicides**

**Summary**:

During 2017, 30 percent (nine of 30) of the CDCR suicides occurred when inmates were on Reception Center (RC) status. The suicides occurred at the following RC facilities: SQ (two), WSP (three), and DVI (four). The number of RC suicides far exceeded those in recent prior years.

**Current Findings**:

As a result of the high number of RC suicides within the CDCR system during 2017, an RC Workgroup was initiated and has met periodically to study the issue. According to CDCR,

---

[14]Of the 193 reported QIPs, many were duplicative (e.g., multiple QIPs generated for custody and nursing staff based upon the same deficient emergency response, etc.), resulting in approximately 144 specific deficiencies requiring a QIP.

the workgroup was still gathering information, with plans to tour an RC facility in June 2018 and then issue recommendations in the future.

During this reviewer's most recent assessment, the mental health screening and diagnostic evaluation process within the RC facilities (CCWF, CIM, DVI, NKSP, SQ, and WSP) was observed.  In addition, select RC housing units were inspected to determine whether suicide prevention posters were located in visible locations.  Overall, this reviewer observed that all diagnostic clinicians conducted appropriate screenings in private offices that ensured both privacy and confidentiality.  With regard to the suicide prevention posters, pursuant to an earlier CDCR initiative to increase suicide prevention awareness system-wide by distributing posters to each CDCR facility, a memorandum to each facility's chief of mental health (CMH) dated April 21, 2014 stated that "posters should be visible throughout your institution, particularly where inmates congregate.  They can be mounted near canteens, clinics, dayrooms, housing units, workplaces, and Prison Industries Authority work areas."  Because the risk of suicide can be particularly acute to an inmate newly-admitted into CDCR, placement of suicide prevention posters in RC housing units should be considered a priority.  This reviewer found that there were inconsistent practices regarding the presence of posters within RC housing units in the toured facilities, ranging from posters found in each unit, posters that were not prominently displayed nor located in high-traffic areas, to an ill-informed decision to remove posters from bulletin boards to allow room for other important announcements.

In addition, this reviewer's review of a handful of cases involving RC inmates raised an issue regarding both the availability and review of county jail records by diagnostic and other mental health clinicians during the RC process.  In one case involving the subsequent suicide of an inmate at WSP in July 2017, the inmate was transferred to an MHCB the day after his RC admittance.  The suicide review found that MHCB clinicians did not have an opportunity to review the inmate's health care records from the county jail, presumably because the records were not available for review at the time of the inmate's MHCB placement.  The review also found that "policy and procedures for reviewing records received after evaluations have not been clearly identified or communicated."  As a result of this case, a CDCR headquarters QIP was developed and required that "HQ SPRFIT will evaluate the process used by clinicians when reviewing jail records.  Specifically, processes for reviewing jail records received after an evaluation will be addressed.  In addition, conditions that require further checks or an alert system will be explored."

In another case not resulting in suicide, this reviewer observed the mental health screening and diagnostic testing process at CCWF in which one particular RC inmate self-reported an extensive history of mental health and suicidal behavior.  Based upon the affirmative responses, the inmate was referred for further mental health evaluation.  Following the screening, when the clinician was asked if they routinely reviewed both the intake health screening form and any available discharge information from the county jail, the clinician responded by stating that they and their colleagues responsible for the initial mental health screening waited until the Mental Health Evaluation was completed before reviewing any previous records, including county jail records.[15]  This reviewer's concern with this clinician's response was twofold: first,

---

[15]This reviewer's subsequent examination of the available county jail records indicated that the inmate had attempted suicide by drug overdose approximately ten days prior to her arrival into CDCR, with a note indicating

the MHSDS *Program Guide* only required a Mental Health Evaluation ("psychological evaluation") to be completed if the inmate answered affirmatively to any mental health questions on the 31-item mental health screening form, and second, the *Program Guide* required the initial Mental Health Evaluation to be completed within "18 calendar days," although the process was historically completed earlier. Under such a scenario, an inmate (not the one referenced above) who provided all "no" responses to the mental health screening would not be referred for completion of a Mental Health Evaluation and would not have either the initial intake screening form or available county jail records reviewed by a mental health clinician. Of note, this reviewer's observation of the mental health screening and diagnostic testing process by another CCWF clinician found that the county jail records were reviewed during the process.

<u>Recommendation</u>:

It is strongly recommended that the RC Workgroup include the following during its deliberations: (1) CAPs in each RC facility to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, nurse's offices where intake screening is administered, and pill call windows; (2) ensure review and distribution of the HQ SPRFIT memorandum regarding the results of the evaluation of "the process used by clinicians when reviewing jail records" as related to the WSP suicide in July 2017; (3) the necessity to provide direction to clinicians assigned to the RC diagnostic testing areas to ensure that they consistently review both the most recent initial intake screening forms and any available county jail records prior to and/or during completion of the 31-item mental health screening form; and (4) review Chapter 2 ("Reception Center Mental Health Assessment") of the MHSDS *Program Guide* to determine if unclear language regarding requirements for review of health care information from both county jails and prior CDCR confinements is in need of clarification.

## IV. <u>Defendants' Proposal to Build Temporary Unlicensed MHCB Beds at the California Institution for Women and the R.J. Donovan Correctional Facility</u>

In an effort to create more temporary MHCB options in CDCR's southern region, as well as reduce the length of stay in alternative housing system-wide, defendants identified two facilities, California Institution for Women (CIW) and R.J. Donovan Correctional Facility (RJD) for the temporary use of unlicensed MHCBs. At defendants' request, this reviewer and another member of the Special Master's team inspected both proposed locations on April 11, 2018. Specifically, the proposed locations were the GP Walker A Unit at CIW and a portion of the 3CMS and GP administrative segregation unit in Building 7 at RJD.

---

that "she is depressed about being here but does not want to die. Upset and emotional." The county records also indicated she had been prescribed an antidepressant. This reviewer's examination of the EHRS indicated that the inmate had recently been incarcerated at CIW and placed on suicide precautions. In addition to the recent county jail suicide attempt, the inmate also had two recent suicide attempts by drug overdose in the community. This information was available to, but not reviewed by, the mental health clinician at CCWF during the RC diagnostic testing. Based upon this reviewer's findings, the inmate was subsequently referred for completion of a SRASHE which found a "high" chronic risk and "moderate" acute risk for suicide. Following review of all available records, the clinician completing the SRASHE found "*more concerning from information gleaned was IP actually was minimizing history more than originally determined during the RC process.*"

The Walker A Unit at CIW is a one-story building with several wings, including an outpatient housing unit and GP programming and office space. The proposed 18-bed unlicensed MHCB unit would be located in a wing of the unit. To date, the 18-bed wing has already undergone significant renovation, including repainting of walls and ceiling in each cell, replacement of sink and toilet in each cell, and enlargement of exterior cell windows in each cell. Such enlargement included three vertical exterior windows in the cells, each window measuring approximately two-to-three feet in length. These windows provide a good amount of natural light into all cells. Remaining renovation would include replacement of wall ventilation grates with holes 3/16 in diameter in each cell, and installation of regular MHCB beds. The rooms were otherwise suicide-resistant. Although slightly smaller than regular licensed MHCB rooms, the cells would accommodate the new beds. In addition, the unit already contained two large rooms that would be utilized for IDTT meetings, group programming, and other multi-purpose reasons, including individual treatment. One cell would be converted into a nursing station in the center of the wing, with another cell converted into an observation/seclusion room. Offices for mental health clinicians would be located outside the MHCB unit in another wing of the Walker A Unit. A medical examination room would also be located on the unit, but medical providers would come onto the unit for most services. As proposed, the Unit courtyard would be converted into a yard and designated only for MHCB patients. The courtyard would be landscaped. An undetermined number of special management "walk-alone" yards would be installed for patients on maximum security/administrative segregation unit statuses.

As proposed, this reviewer found CDCR's proposal to convert CIW's Walker A Unit into a temporary unlicensed MHCB unit to be reasonable.

In stark contrast to the CIW proposal, defendants also proposed a temporary unlicensed MHCB unit within the Building 7 administrative segregation unit at RJD. The proposed 20 cells designated for MHCB patients would be located on the right side of the building. A chain-link fence would be the only separation between the administrative segregation section and the MHCB unit. As proposed, the administrative segregation section of the building would be downsized to reduce the opportunity of administrative segregation inmates having visual sightlines into the MHCB unit. However, as explained to the Special Master's team, there were no guarantees that an unforeseen increase in the administrative segregation population would negatively impact sight and sound separation, and thus MHCB treatment.

As proposed, ten cells on both the first and second tier would be designated as MHCB beds. Three cells on each tier (total of six) would be converted into clinical staff offices. One cell on the first tier would be designated as an observation/seclusion room. Two cells, one on each tier, would be converted into nursing stations. Two cells, one on each tier, would be converted into interview rooms for clinicians. Additional cells would be converted into property storage, medical supply, linen supply, and utility rooms.

As proposed, both therapeutic treatment modules (for patients on maximum-security/ administrative segregation statuses) and partition space (for patients on non-administrative segregation status) would be created in the open dayroom for out-of-cell programming. MHCB patients would be escorted outside the building to a conference room located in Building 6 (the administrative segregation unit for EOP inmates) for their IDTT meetings. Although scheduled

33

separately, the yard for MHCB patients would be the same as that designated for administrative segregation inmates in Building 6 (3CMS/GP) and Building 7 (EOP).  MHCB patients with medical needs/appointments would be escorted to the Health Care Treatment Building located on the opposite side of Building 6.  Contrary to regular licensed MHCB units where most services are provided internally, the anticipated increase in correctional officer responsibilities for escorting patients in and out of the proposed MHCB unit has not been presented to the Special Master's team.

This reviewer found the following significant concerns during the inspection and discussion (with CDCR headquarters and RJD officials) of the proposed unlicensed MHCB unit at RJD on April 11:

- Although all 20 cells would be retrofitted to be suicide-resistant (i.e., wall ventilation grates replaced; desk, stool, and wall cabinet units removed; anti-squirt slit faucets replaced, and bunks replaced with suicide-resistant beds), these cells would not be enlarged (because the building could not structurally withstand removal of more than one wall in the entire unit).  In addition, although there was a proffer during a subsequent conference call to install new cell doors with a larger window diameter, natural light would still be very limited.  The cells would remain dark, even with the offer to paint cement walls, ceilings, and floors.  In sum, ***the 20 cells that comprise this proposed MHCB unit would simply resemble retrofitted new intake cells commonly found in administrative segregation units.***

- The floor size of each cell would be that of an administrative segregation cell and, as such, dramatically less than the traditional MHCB room found in licensed facilities.  Although initially informed that regular MHCB suicide-resistant beds would be installed in each cell, with these beds taking up considerable floor space leaving significantly reduced unencumbered space for patients to freely move about their cells, the Special Master's team was subsequently informed that MHCB suicide-resistant beds regularly found in licensed MHCB units would *not* fit in these cells.

- As noted above, two cells would be converted into clinical interview rooms.  In addition, two cells would be converted into nursing stations.  Given the fact that inmates freely converse through the ventilation grates and cell doors, even with clinical offices and interview rooms located at the end of each tier, privacy and confidentiality could still be compromised by the proposed location of these offices on each tier.

- CDCR/RJD representatives informed the Special Master's team that it would be very challenging to schedule adequate yard time for MHCB patients because they would be competing with administrative segregation inmates in Buildings 6 and 7 who are required to attend yard separately.  In addition, all MHCB patients (regardless of security classification level) would be required to be placed in the special management "walk-alone" yards because it is the *only* option available in the administrative segregation unit yard.

- There were no plans offered to install fencing/netting on second tier railing to eliminate the possibility of a suicidal patient jumping from the second tier in a suicide attempt.

This reviewer summarized the above serious concerns during an All-Parties Workgroup meeting on April 23, 2018.  In addition, the Special Master's team had three other conference calls with CDCR's Statewide Mental Health Program leadership staff on May 1, June 7, and June 26, 2018.  As noted above, defendants revised their proposal during these calls to include the painting of ceilings and walls in each cell, changing the cell doors to replicate new intake cell doors, and proposing an increase of out-of-cell time to compensate for the extremely reduced square footage of the cells compared to regular MHCB units.  The latter proposal did not include specifics, such as the type of out-of-cell time offered, schedules, and anticipated staff resources necessary to accomplish increased out-of-cell time for 20 patients.

Following careful consideration of defendants' proposal, including on-site inspection of the administrative segregation unit at RJD and subsequent teleconference calls with Statewide Mental Health Program leadership staff, as well as a review of both the defendants' most recent letter to the *Coleman* Special Master dated July 30, 2018 and plaintiffs' letter in opposition to the proposal dated August 8, 2018, this reviewer's initial concerns remain unchanged.  Despite the best efforts of the CDCR leadership team, the proposed MHCB unit within an administrative segregation unit at RJD would be stark and anti-therapeutic.  Although cells would be retrofitted to be suicide-resistant, they would remain cold, dark, and contain limited floor space well below that of any licensed MHCB unit.  They would simply resemble retrofitted new intake cells found in administrative segregation units.  Confidential office space could be severely compromised.  Availability for out-of-cell time, particularly yard, would also be extremely challenging.  In sum, activation of defendants' proposal at RJD would result in deplorable conditions – unacceptable for class members needing an MHCB level of care.

As detailed later in this report, the temporary and unlicensed 20-bed Mental Health Outpatient Housing Unit (MHOHU) located at CSP/Sac has been problematic for many years.  There appears to be universal agreement among both parties that the MHOHU should be closed.  It would be this reviewer's opinion that a proposal to transfer similar problematic conditions historically seen within the MHOHU at CSP/Sac to RJD is simply not acceptable, and that another non-administrative segregation setting should be considered.

## V.   Conclusion and Recommendations

As stated in all of this reviewer's previous assessments, it continues to be noteworthy that CDCR, its management team (including statewide mental health staff) and legal counsel, as well as local custody, medical, and mental health leadership at each of the prison facilities assessed during 2017-2018, displayed total cooperation during this most recent suicide prevention assessment process.  CDCR's implementation of this reviewer's initial recommendations, as well as the correction of existing and often chronic ongoing deficiencies, continues to progress at varying speeds.

As shown in the table below, there continued to be an increase in the number of inmate suicides in CDCR during 2017, a great source of distress for all parties in the *Coleman* case. As of December 27, 2017, CDCR housed 118,232 inmates (in-state within its institutions and camps) and experienced 30 inmate suicides, resulting in a suicide rate of 25.3 deaths per 100,000 inmates.[16]

**TABLE**
**AVERAGE DAILY POPULATION, OVERALL SUICIDES/RESTRICTIVE HOUSING SUICIDES, AND SUICIDE RATES WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION 2013 THROUGH 2017***

| Year | ADP[17] | All Suicides/Rate | Suicides in Restrictive Units/Percent[18] |
|------|------|------|------|
| 2013 | 122,896 | 31/25.2 | 15/48.3 |
| 2014 | 119,069 | 23/18.7 | 14/60.8 |
| 2015 | 116,467 | 23/19.7 | 9/39.1 |
| 2016 | 117,612 | 27/22.9 | 10/37.0 |
| 2017 | 118,232 | 30/25.3 | 11/36.6 |
| 2013-2017 | 594,276 | 134/22.5 | 59/44.0 |

*Source: California Department of Corrections and Rehabilitation

Caution should always be exercised when viewing the above data.  Suicide rates are most meaningful when viewed over a sustained period of time and, as stated in this reviewer's earlier reports, although the total number of inmate suicides and the corresponding suicide rate in any prison system can be important indicators, they are not the sole barometer by which adequacy of suicide prevention practices should be measured.  The best methodology for determining whether a correctional system has fully implemented its suicide prevention program continues to be (1) the assessment of suicide prevention practices within each prison, and (2) a review of each inmate suicide in relation to practices in the prison and determining its degree of preventability.

In conclusion, it is again recommended that CDCR continue their efforts to fully implement this reviewer's previous recommendations, as well as develop CAPs based upon deficiencies found in this most recent assessment.  As shown below, ***most of these necessary corrective actions are not necessarily based upon new recommendations, but rather by CDCR's continuing challenge of implementing and sustaining adequate suicide prevention***

---

[16]By comparison, the suicide rate in state prison systems throughout the country was approximately 20 deaths per 100,000 inmates in 2014.  See Noonan, M. (2016), *Mortality in State Prisons, 2001-2014 Statistical Tables*, Washington DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (BJS). As of August 2018, more recent BJS data was unavailable.

[17]As of midnight, last Wednesday of year, includes in-state CDCR institutions/camps only.

[18]Percent of suicides in administrative segregation, short-term restrictive housing, long-term restrictive housing, SHU, PSU, and Condemned units compared to total CDCR suicides.

*practices.*  As such, CDCR should continue to cooperate with the Special Master and his experts through the SPMW process to:

- Develop CAPs for the intake screening process in the five facilities outlined above in Section III. A;

- Develop a work order for replacement of the wall and ceiling ventilation grates in the MHCB unit at PBSP;

- Develop CAPs in each of the ten facilities identified in Section III. D above to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in new intake cells for the first 72 hours of administrative segregation confinement.  Some of the CAPs may involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-intake cells when new intake cells are available;

- Develop CAPs in each of the four facilities identified in Section III. E above that continue to have alternative housing length of stays well in excess of 24 hours.  In addition, a CAP should be developed at CIM to ensure the correct calculation of length of stay data in alternative housing;

- In addition to CQI and regional mental health team audits, nursing supervisors at each facility containing a MHCB unit should conduct regular EHRS audits to ensure that suicidal patients are being consistently observed as required;

- MHCB supervisors in each of the nine facilities identified above in Section III. G should audit the possessions and privileges clinically ordered to MHCB patients and report findings to the local SPRFIT committee until the issue is resolved.  It is also recommended that CDCR develop a CAP for recruiting a sufficient number of RT personnel that can be assigned to MHCB units or, in the alternative, find additional non-RT personnel to provide such services;

- Develop CAPs for the six facilities identified in Section III. I above that continue to struggle with completion of required SRE/SRASHEs for emergency mental health referrals involving SI and SIB;

- Initiation of safety plan auditing by MHCB supervisors or designees should be expedited and a start date identified in defendants' May 2018 CAP.  In addition, CAPs should be developed for safety plan training of mental health clinicians in the 11 facilities identified above in Section III. J.

- Utilize the Defendants' May 2018 CAP for the "Discharge Custody Check Sheet" (CDCR MH-7497) form process in the 20 facilities identified above in Section III. K that were below 90-percent compliance;

- CDCR should provide the revised pre-service *Mental Health Services Delivery System Instructor Guide curriculum* to this reviewer, as well as provide a schedule of possible dates in which presentation of the revised curriculum can be observed at the Basic Correctional Officers Academy Training.  In addition, CDCR should develop CAPs for annual suicide prevention training in the 13 facilities identified above in Section III. M that were below 90-percent compliance for suicide prevention training for either medical and/or mental health staff.  Finally, CDCR should incorporate this reviewer's recommended changes to the annual IST suicide prevention training curriculum that was previously forwarded in February and October 2018;

- The reporting out of all of this reviewer's 19 suicide prevention audit measures should be encompassed in one final CQI-formatted report for each facility, and not in various "regional reports" as described in defendants' May 2018 CAP;

- The RC Workgroup should incorporate the following issues during its deliberations:  (1) CAPs in each RC facility to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, nurse's offices where intake screening is administered, and pill call windows; (2) ensure review and distribution of the HQ SPRFIT memorandum regarding the results of the evaluation of "the process used by clinicians when reviewing jail records" as related to the WSP suicide in July 2017; (3) the necessity to provide direction to clinicians assigned to the RC diagnostic testing areas to ensure that they consistently review both the most recent initial intake screening forms and any available county jail records prior to and/or during completion of the 31-item mental health screening form; and (4) review and revise Chapter 2 of the MHSDS *Program Guide* ("Reception Center Mental Health Assessment) and/or Program Guide revision to better clarify language regarding requirements for review of health care information from both county jails and prior CDCR confinements; and

- Defendants' May 2018 CAP should be revised accordingly to incorporate the recommendations contained within this assessment report.

Finally, as stated in previous reports by this reviewer, continuing re-inspection of select CDCR facilities which chronically struggle with their suicide prevention programs is recommended as it would allow for continued provision of technical assistance, a measurement of the sustainability of CDCR's corrective actions, and observation of the department's CQI process at individual facilities, leading to decreased future monitoring and hopefully continued reduction of inmate suicides throughout the prison system.

# APPENDIX A

**Findings and Summaries of CDCR Suicide Case Reviews at 23 Re-Audited Prisons During 2017-2018**

**1)** **California State Prison - Sacramento (CSP/Sac)**

**Inspection**:  May 23-25, 2017 (previous suicide prevention audit was on April 4-5, 2016).  CSP/Sac housed approximately 2,383 inmates at the time of the most recent on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on May 24, 2017.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was closed during the process, thus ensuring both privacy and confidentiality.

Daily PT rounds in the short-term restricted housing (STRH) unit and one of the PSUs were observed.  The PT rounds were performed appropriately, with Psych Tech Daily Rounds information entered into EHRS for each caseload inmate.  The documentation process was slowed by the recent implementation of EHRS (on May 9, 2017).

**Housing**:  CSP/Sac had two CTCs; CTC-1 had 15 MHCBs and CTC-2 had ten MHCBs.  This reviewer previously found that all patient rooms within CTC-1 and CTC-2 were suicide-resistant.

In addition, all cells in the 20-bed MHOHU (Mental Health Outpatient Housing Unit) were previously designated to provide temporary, unlicensed MHCB level of care.  Each cell was suicide-resistant, and had solid cement beds, ventilation grates, and light fixtures.  However, as previously reported in the November 2013 assessment, the environment of the MHOHU remained sterile.  Cells still appeared dirty and dark, and offered limited visibility of their interiors.  Further, although IDTT meetings were conducted in an area outside of the housing unit, there continued to be no clinician offices in the MHOHU, therefore, clinical assessments were regularly conducted at cell-front or in therapeutic modules in the MHOHU.  The modules were located adjacent to large industrial floor fans (i.e., swamp coolers).  Due to the excessive noise, this reviewer observed that clinicians and IPs had a great deal of difficulty hearing each other, negatively impacting the assessment process.  In addition, because both nursing and custody workstations were also located in the small high traffic dayroom area, adequate privacy, confidentiality, and programming were severely compromised.  As a result, many inmates refused out-of-cell clinical appointments in the modules.  Other observed deficiencies within the MHOHU will be discussed below.

There were nine designated new intake cells (114-120, 217-218) in the administrative segregation EOP unit (A-5) previously found to be suicide-resistant.[19]  In addition, there were nine designated new intake cells (100-108) in the STRH unit previously found to be suicide-resistant.  This reviewer did not observe any new intake inmates in non-new intake cells in the STRH unit during PT rounds.

---

[19]For purposes of this report, "new intake cells" refer to designated cells in administrative segregation units that are retrofitted to be suicide-resistant and house new intake inmates during the initial 72 hours of their confinement.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were used on almost a daily basis and primarily found in the B-7 Unit.  This reviewer was informed that the use of ZZ cells for inmates in alternative housing had ceased in November 2016.  From February 24 through May 17, 2017, there were approximately 223 inmates placed in alternative housing, and all were provided beds and required to be observed on a continuous 1:1 basis.  Due to a shortage in nursing staff, all inmates were being observed by custody staff.  According to the available data, approximately 77 percent of inmates were discharged from alternative housing within 24 hours, with 18 percent of inmates held over 24 hours and five percent over 48 hours.  The overall length of stay for all 223 inmates placed in alternative housing was 18 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs and MHOHU.  In addition, patients not on suicide observation statuses were required to be observed at 30-minute intervals.  Nursing staff were observed to be using the new EHRS to log observation rounds.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of three patients (SAC 1, SAC 2, and SAC 3) on Suicide Precaution status in CTC-1, CTC-2, and the MHOHU during a nine-hour period from 12:00 a.m. through 8:59 a.m. on May 23, 2017.  The chart review found very few observation checks (i.e., two or three per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 25 minutes in one case (SAC 3).

In addition, although this reviewer did not observe any obvious problems with the issuance of possessions and privileges for patients assigned to CTC-1 and CTC-2, there were numerous problems found within the MHOHU.  For example, although an RT was assigned to the MHOHU for 20 hours per week, the RT informed this reviewer that much of that time was devoted to "assessments," with only eight hours available for programming, resulting in most MHOHU patients locked down in their cells 24 hours a day (with the exception of occasional shower time).  MHOHU patients were given the "choice" of either yard or therapeutic treatment modules (TTMs).  As described above, use of these TTMs was problematic.  Review of custody files for MHOHU patients indicated that access to the yard was rarely offered.  Although telephone privileges were often recommended by clinicians, telephone usage was non-existent because the only telephone in the MHOHU dayroom had been deactivated since the unit opened in 2009.  The RT rarely attended IDTT meetings.

Finally, a review of Guard One data for a recent 24-hour period found an overall combined 99-percent compliance rate with required checks not exceeding 35 minutes in STRH, administrative segregation EOP, and PSU-A.

Despite these high completion percentages, it was noteworthy that the inmate suicide (SAC 8) occurring in the PSU in June 2017 was found in rigor mortis despite completion of a timely Guard One check, an indication that correctional staff did not adequately observe the interior of the cell to verify "a living, breathing inmate" as required.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the Mental Health Tracking System (MHTS) from April 1 through May 8, 2017.  This reviewer's sample eUHR review of 83 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SREs in

41

96 percent (80 of 83) of the cases, a significant improvement from the 87 percent completion rate found during the 2016 assessment.

However, this reviewer examined 25 charts of patients recently discharged from the MHCB units.  The sample findings were problematic.  Of the 25 cases, two (eight percent) were missing discharging SREs.  Of the remaining 23 cases, there was inconsistency ranging from adequate safety plans to a safety plan narrative that simply recited *Program Guide* requirements.  An example (SAC 4) of an adequate safety plan of a CTC-2 patient was the following:

> A plan to reduce his overall suicide risk includes: 1) Continue to help pt. develop healthy lifestyle skills (sleep hygiene, appropriate exercise, spiritual activities, ongoing skill-building around reality testing and sx recognition) to promote maintenance of tx gains and to foster sense of self-efficacy in sx management.  Because his past reported SAs occurred as a result of CAH and psychotic-related distress, the greater his sense of self-efficacy in managing these sxs, the less likely he may be to feel overwhelmed or hopeless when experiencing sx recurrence; 2) Pt expresses interest in further developing his reality testing and sx discernment/ recognition skills.  Helping him to develop insight into his condition will likely aid in this area, as well as development of concrete specific reality-testing strategies; and 3) Help pt identify areas of hope and optimism in his life, CBT to help him challenge rigid and distorted negative beliefs appear useful.

Unfortunately, this thoughtful safety plan was offset by the fact that subsequent five-day clinical follow-up notes, as well as weekly PC progress notes, did not adequately reflect such safety planning efforts.

Further, safety planning developed by MHOHU clinicians was consistently inadequate.  Similar to findings from the preceding assessment, at least one MHOHU clinician continued to use virtually the same safety plan template for three patients (SAC 5, SAC 6, and SAC 7):

> 1)  IP will be released from MHCBU to EOP LOC.
> 2)  He will receive weekly visits with a primary clinician.
> 3)  Housing will include custody checks/monitoring q 30 mins.
> 4)  He will receive weekly groups.
> 5)  He will be released on a 5/8 day follow-up to monitor for reemergence of suicidal ideation or crisis.
> 6)  He will receive an IDTT within 14 days.
> 7)  IP will work with clinician to develop coping skills for anxiety, mood changes, and increased frustration tolerance.
> 8)  It is recommended he work on managing frustration/anxiety and increase distress tolerance. Also, utilizing time in prison positively by learning new coping skills. Teach physical and mental activities that would increase self-esteem, positive coping, and positive thinking.

The above safety plan is simply a restatement of *Program Guide* requirements, as well as recommending that the patient "develop coping skills" without identifying any coping skills

(which should have been part of the patient's treatment during ten plus days of crisis bed placement).

In addition, this reviewer was able to observe the IDTT processes in both CTC-1and CTC-2, and to a lesser degree, in MHOHU, on May 25, 2017.  IDTTs observed in CTC-1and CTC-2 were adequate, with good case presentations and active participation from most treatment team members.  The IDTT process within the MHOHU was quite different, exemplified by an atmosphere of harsh attitudes toward patients by treatment team members, including a few unnecessary confrontational discussions.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 79 cases of inmates discharged from a MHCB or alternative housing placement that remained at CSP/Sac and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during March 1 through May 17, 2017.  The review found that only 14 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Most of the custody checks were recommended for discontinuation after 24 hours by clinicians. In addition, only 42 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, whereas 58 percent of the forms were completed in excess of 30-minute intervals or completed in part or not at all.  Due to the low percentage of Page One of the forms being completed, the percentage of custody checks discontinued by the clinician after 24 hours could not be determined.

**Intervention**:  Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  Similar to prior assessments, a review of three months of SPRFIT meeting minutes (February through April 2017) found that meetings consistently lacked all required mandatory members or designees and quorums were not reached in any of the months.  The issue of "poor SPR-FIT meeting attendance" had been a monthly agenda item since 2012.  With the exception of discussing continuing problems with adequate completion of Discharge Custody Check Sheets" (CDCR MH-7497), the meetings were otherwise unremarkable.

**Training**:  According to training records, approximately 95 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 93 percent of custody staff had received annual suicide prevention block training during 2016, but only 65 percent of medical and 36 percent of mental health staff received comparable suicide prevention training during 2016.  The completion percentages for annual training of medical and mental health staff continued to remain low.  Finally, as of May 2017, only 69 percent of mental health clinicians

had completed the SRE mentoring program, 90 percent had received the seven-hour SRE training, and only 78 percent had received safety plan training.

**Recent Suicides**:  CSP/Sac experienced one inmate suicide during the review period.  In that case (SAC 8), the inmate was found to have asphyxiated himself with a sheet in his PSU cell during the afternoon of June 19, 2017.  He was found in the state of rigor mortis.  The inmate entered CDCR for a third term on August 31, 2015 to serve a life sentence (with the possibility for parole) for first-degree murder (of his mother's boyfriend).  He was transferred to CSP/Sac on January 27, 2017.  The inmate incurred 11 rules violation reports (RVRs) during his almost two-year confinement, the most recent of which occurred on April 21, 2017 involving an assault on another inmate.  Of note, a subsequent mental health assessment found that there was an association between the behavior that triggered the RVR and the inmate's mental health issues.  The inmate was known to be gang-affiliated.  He was unmarried and had one teenage son.  The inmate had family support from both his grandparents and son, and most recently received a visit from his grandparents the day before his death.

The inmate had a difficult relationship with his parents and was primarily raised by his grandparents.  He had an extensive history of substance abuse and gang involvement as a teenager but did not have any known mental health issues or treatment in the community. During his two previous CDCR commitments, the inmate was treated at the 3CMS level of care within the MHSDS.  Upon entry into CDCR for the third term, he was initially treated for both depression and anxiety at the 3CMS level of care beginning in late September 2015.  The inmate was subsequently placed in a MHCB six times for suicidal ideation, severe mood swings, depression, anxiety, and long-term symptoms resulting from trauma.  He was elevated to the EOP level of care on April 25, 2016.  His most recent MHCB placement was from May 6 through June 12, 2017 for danger to self and grave disability.  Of note, the final day of his five-day clinical follow-up was scheduled for June 19, the day of his death.  The inmate had various diagnoses during his CDCR confinement and was most recently diagnosed with Schizoaffective Disorder (bipolar type), Substance Abuse Disorder, and Antisocial Personality Disorder.

The inmate had a history of suicidal ideation within CDCR, as well as a suicide attempt at the NKSP Reception Center in late 2015 and an overdose from various medications in April 2016. The majority of SREs determine his chronic risk as "moderate" and his acute risk as "low."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and other than chronic back pain, the inmate did not have any significant medical issues that could be viewed as contributory to his suicide.  However, as previously stated, the inmate had a visit with his grandparents the day before his death and they told a custody officer in a posthumous telephone interview that he had apologized to them for the problems he had caused and stated sometimes "he no longer wanted to be part of this world."  During interactions with staff and other inmates on a morning of his death, the inmate was observed to be calm, alert, and cooperative.  The CDCR reviewer theorized that the suicide might have been influenced by the inmate's "concerns regarding his role in the family.  Due to the fact that he murdered his mother's boyfriend, he was rejected by his mother and a number of his maternal family members.  Several documents provide insight into his feelings of profound guilt and having torn his family apart.  Although he found comfort

44

in a relationship with his paternal grandparents, who are now raising his son, he stated during numerous encounters that he felt sad for not being able to be the father he wanted to be while in prison."

The Suicide Report contained seven recommendations for corrective action through a QIP:

1) An area of concern involves the condition which the inmate was discovered. Based on reports submitted by responding staff, the inmate was discovered rigid, with signs of rigor mortis and displayed a pale and bluish face, bluish bruise/ discolored areas on his shoulders, upper torso, upper/lower back, arms and feet. Additionally, it was noted his neck was firm, eyes were bloodshot, and his jaw was firmly shut with substantial rigidity.

This calls into question the thoroughness of the Security/Welfare checks completed on Second Watch.  Review of the Guard 1 'Rounds Tracker Summary' identifies all checks were completed.  However, it appears the visual/physical observation of a living, breathing inmate, free from obvious injury as required did not occur.

2) Prior to the arrival of the Ambu bag, no rescue breaths were provided through the use of the CPR micro-shield which all custody staff are mandated to carry on their person in the event of a medical emergency requiring its use.

3) Staff initiating CPR was observed conducting chest compressions using one hand.  Per CPR training, chest compressions shall be completed by placing the heel of one hand in the center of the chest on the breastbone, while placing the heel of the other hand directly on top of the first with fingers lifted or interlaced.

4) Per the CDCR 837s, staff discovering the inmate informed their partner the sergeant was needed in the unit.  The staff member walked away in order to notify the sergeant their presence was needed in the unit via institutional radio.  Upon arrival the sergeant was informed by staff of the unresponsive inmate leading to the sergeant instructing staff to retrieve the extraction gear.  The sergeant observes the inmate unresponsive and makes a radio announcement approximately four minutes after discovery.

Sac's OP 139 'Emergency Medical Response System' identifies a custody first responder shall briefly evaluate the inmate and situation and summon the appropriate assistance by the most expeditious means available (e.g., personal alarm device, two-way radio, whistle, shouting or telephone).

Requesting the sergeant to report to the housing unit via radio is not a valid means of notifying necessary staff of the emergency.

5) Nursing Documentation, Multidisciplinary: 2/3/17, 2100-2135, no Suicide Watch observations documented.

6) Nursing Documentation, Nursing System Issue: 3/8/17, no PT Daily Rounds located in the eUHR.

7) Nursing Documentation, Nursing System Issue: 5/5/17, 1000-1540, no Suicide Watch documentation located in the eUHR.

### 2)  **Wasco State Prison (WSP)**

**Inspection**:  June 8-9, 2017 (previous suicide prevention audit on August 16-17, 2016).  WSP housed approximately 5,265 inmates at the time of the most recent on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during both the medical intake screening process and the mental health diagnostic testing in the RC on June 8. The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions.  The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality.  The door to the RC psychologist's office was also closed and the clinician was observed to be conducting thorough assessments.  The psychologist was observed to have access to (and used) the Patient Health Information Portal during the process.

Daily PT rounds in the administrative segregation unit were observed on June 9.  The rounds were unremarkable, and both PTs were observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates, as well as appropriately interacting with non-caseload inmates.

**Housing**:  WSP had an 18-bed CTC, with six rooms designated as MHCBs.  A previously identified problem of several rooms not being suicide-resistant because of antiquated ADA grab bars (with openings between the bars and the walls that were conducive to suicide attempts by hanging) were corrected less than a month prior to this writer's assessment.

The administrative segregation unit had 14 cells identified for new intake inmates.  Although 12 of the cells had previously been retrofitted as suicide-resistant cells and found to be appropriate by this writer during previous assessments, two ADA cells (117-118) were recently designated for new intake inmates and not suicide-resistant.  These cells each contained two bunks, one of which was situated in front of the exterior window allowing for a gap that was conducive to a suicide attempt by hanging.  In addition, each of the cells had antiquated ADA grab bars that were not suicide-resistant.  (During the exit meeting on June 9, this reviewer was informed that the bunks situated in front of the exterior windows of cells 117-118 had been removed, and the ADA grab bars would be replaced in the near future.)  Further, this reviewer observed that all new intake inmates were in new intake cells.  Of note, a previous concern of exterior cell windows containing frosted screening that obscured natural light into the cell had been resolved with the screening removed from most exterior cell windows.  The facility had received a variance to allow for continued frosted screening on one section of the unit (Section A) due to continued gang signage by inmates.

46

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was used regularly on a daily basis.  Most inmates were housed in Unit B-2.  From March 1 through May 31, 2017, there were approximately 179 inmates placed in alternative housing.  According to available data, approximately 87 percent of inmates placed in alternative housing were released within 24 hours, with 13 percent held over 24 hours. Very few inmates were held in alternative housing over 30 hours.  All inmates were provided beds and observed on a continuous 1:1 basis.  The overall length of stay in alternative housing for these 179 inmates was approximately 15 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were required to be observed at 15-minute intervals by nursing staff.  This reviewer was not able to verify the accuracy of observation rounds because WSP had not yet implemented EHRS at the time of the on-site assessment.

This reviewer was unable to observe any IDTT meetings in the MHCB unit because none were scheduled during this on-site assessment.  During the previous assessment in August 2016, this reviewer had been informed by the IDTT that telephone calls and visits were not permitted in the MHCB unit, and that they were awaiting further direction from CDCR headquarters regarding the memorandum on "Mental Health Crisis Bed Privileges," which was issued on June 23, 2016. Yard privileges, however, were permitted and an RT was assigned to the CTC on a full-time basis.

Upon return to the facility in June 2017, this reviewer again found that MHCB patients were still not consistently receiving telephone calls and visits.  In fact, a current Operational Procedure for the CTC (No. WSP-013) still indicated that MHCB patients on either Suicide Watch or Suicide Precaution status were not eligible for yard activities.  In addition, a RT note dated April 18, 2017 regarding a patient's (WSP 1) request for a telephone call stated that "custody explained to I/P the protocol of not getting phone calls on MHCB.  I/P refused session after learning this." This reviewer interviewed the RT assigned to the MHCB and found that only one of three current RT positions were filled at the facility and the RT was dividing time between the CTC, administrative segregation unit, and EOP program.  As such, the RT spent only a few hours three times a week in the CTC.  The RT further stated that most MHCB patients did not refuse yard when offered, although incorrectly stated that patients on Suicide Watch were not eligible for yard.

Further, although the RT stated that MHCB patients received 30 minutes out of their room a few times each week in the yard or the program office, a review of records suggested otherwise.  For example, this reviewer examined the records of 15 patients who each spent approximately nine days in the MHCB during May 2017.  The records indicated that patients were given the option of either receiving yard or program office privileges, not both.  In fact, most patients were not even given the option of recreating in the program office, rather the RT interacted with them cell-side.  Of the 151 patient days for these 15 patients during May, there were only 39 RT encounters, with 14 uses of the yard and 25 cell-side visits.  In sum, except for the periodic opportunity to shower, this reviewer found that MHCB patients spent an inordinate amount of time confined in their rooms.

47

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found 99-percent compliance with the required checks that did not exceed 35-minute intervals.  This was a significant improvement from the previous year in which only 88-percent compliance was found.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of December 1, 2016 through June 5, 2017.  The reviewer also reviewed the TTA log for the same time period.  The subsequent sample eUHR review of 41 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in 90 percent (37 of 41) of the cases.

A review of 15 charts of patients discharged from the MHCB unit continued to reveal problematic safety planning.  One clinician simply wrote a narrative in several safety plans that the patients' "should identify at least 5 coping skills to decrease depression, anxiety, and impulsivity, promote successful prison incarceration with decreased ability of self-injurious behavior, identify at least 3 goals for his incarceration" (see, for example, WSP 2 on May 11, 2017), thereby deferring the identification of appropriate coping skills to other clinicians.  Other safety plans continued to be limited to reciting *Program Guide* requirements and/or safety plans not transferred from the discharging SRE onto the first page of the Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form.

Of note, inadequate safety planning was listed as a prominent deficiency in one of the recent WSP suicides (WSP 3).

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 136 cases of patients discharged from a MHCB or alternative housing placement that remained at WSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from March 1, 2017 through June 2, 2017.  The review found that only 37 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, although it should be noted that clinicians had high compliance rates for accurate completion of Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms.  Approximately 80 percent of the custody checks were recommended for discontinuation after 24 hours by clinicians.  In addition, only 84 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, including approximately 16 percent of these cases involving checks not completed during the First Watch.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months (March through May 2017) of SPRFIT meeting minutes found that quorums were not reached in any of the months, with psychiatry staff not in attendance at any of the meetings.  Meeting minutes were very brief and otherwise unremarkable.

**Training**:  According to training records, both custody and nursing staff were at 100-percent compliance with current CPR certification.  In addition, 99 percent of custody staff, 91 percent of medical staff, and 91 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of June 2017, approximately 90 percent of mental health clinicians had completed the SRE mentoring program, 90 percent had received the seven-hour SRE training, and only 84 percent had completed safety plan training.

**Recent Suicides**:  WSP experienced four inmate suicides during the review period.  In the ***first*** case (WSP 3), the inmate was found hanging from the top bunk of his general population cell by a sheet during the early morning of April 26, 2017.  The inmate entered CDCR through the RC at WSP for his first term on February 28, 2017 to serve a 15-year sentence for assault with a firearm.  The committing offense involved holding his wife and several members of her family hostage at gunpoint.  He did not have any RVRs during his brief confinement.  The inmate was not known to be gang-affiliated and was raised by his mother.  He experienced substance abuse as a teenager but did not report any mental health issues in the community.  He had no known juvenile arrest history.  At the time of the instant offense, the inmate was married and had a young adult daughter.  He did not have any visits or telephone calls during his brief confinement, although there was some letter correspondence from a few of his family members, including his mother.

During the RC assessment process, the inmate was diagnosed with Major Depressive Disorder, recurrent, severe with psychotic features.  He was initially placed at 3CMS level of care but elevated to EOP a few weeks later after presenting with tearfulness, racing thoughts, sleeping difficulties, and mild paranoia.  Records also indicated that the inmate sustained a very serious suicide attempt in the county jail on September 13, 2016, whereby he attempted suicide by tying a ligature around his neck and jumping off the second tier of a housing unit.  The attempt resulted in the inmate being comatose for six days.  He also self-reported another suicide attempt by drug overdose in 2015 following an arrest on domestic violence charges.

The inmate began refusing both group treatment and psychotropic medication shortly after his elevation to EOP on March 16, 2017.  He denied any current suicidal ideation during two separate SREs in February and March 2017 and was assessed as being "moderate" chronic and "low" acute risk for suicide on both occasions.  Apart from being served with divorce paperwork approximately two weeks prior to his suicide, the CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  Posthumous interviews with both staff and inmates indicated that the inmate was quiet and often kept to himself.  He did not have any significant medical issues that could be viewed as contributory to his death.

The Suicide Report contained three recommendations for corrective action through a QIP:

> 1) On February 28, 2017, the inmate was placed in the CCCMS program while simultaneously being referred for placement in an EOP level of care. When asked about this, senior mental health staff stated this placement and referral process was put in place because inexperienced clinicians frequently make inappropriate referrals and the process ensures appropriate placement referrals are made. However, this additional process is not discussed in the MHSDS *Program Guide* and may delay provision of EOP services and timelines meant for RC settings.

> 2) On March 14, 2017, a Suicide Risk Evaluation was completed that incorrectly identified the inmate as not being a participant in the MHSDS and contained an inadequate Safety Risk/Reduction Plan, stating only 'No imminent risk symptoms present during this evaluation.'

> 3) Activation of 911/Multisystem issue (Custody and Nursing): On April 26, 2017 at 0243 hours, the patient was found by custody to be hanging from his neck in his cell.  911 was not activated until 0307 when TTA RN called Hall ambulance to verify that call had been made.  A 24-minute delay in activation of 911.

In the **_second_** case (WSP 4), the inmate was found hanging from the top bunk of his RC cell by a sheet during the late evening of June 20, 2017.  The inmate entered CDCR through the RC at WSP for his first term on March 23, 2017 to serve a nine-year sentence for carjacking.  He did not have any RVRs during his brief confinement.  The inmate was not known to be gang-affiliated.  He was not married and did not have any children.  The inmate did not have any visits or telephone calls during his brief confinement, and had limited family contact, with no letter correspondence found in his cell.

According to limited available records, the inmate was raised with three other older siblings by an aunt who took guardianship when he was approximately six-months old.  He was known to struggle in grade school and became involved with substance abuse at an early age.  As an adult, a family member reported that he had been diagnosed with "borderline schizophrenia and depression," and periodically reported hearing "voices."

During the RC assessment process, the inmate was diagnosed with Mood Disorder NOS, with county jail records indicating a diagnosis of Schizoaffective Disorder.  Psychotropic medication was ordered, and the inmate was placed at 3CMS level of care.  He quickly refused any mental health treatment, including psychotropic medication.  He denied any current or prior history of suicidal ideation or suicide attempts (although there was an unconfirmed report by a family member that he had attempted suicide in the community).  The inmate refused to participate in the completion of an SRE.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant

medical issues that could be viewed as contributory to his death.  Posthumous interviews with both staff and inmates indicated that the inmate was quiet and often kept to himself.

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) Activation of the Emergency Medical System (calling 911) did not take place until approximate 9 to 12 minutes into the emergency which caused significant delay inappropriate medical response.

> 2) Medication non-compliance/non-adherence chronos were submitted (on 3/29, 4/18, 5/3, 5/9, 5/10, and 5/16); however, the inmate was not seen by psychiatry until May 16, 2017.  Medication non-compliance/non-adherence rules require the patient to be scheduled for an appointment with a psychiatrist within five days of the first refusal chrono.  An appointment with a psychiatrist did not occur for approximately seven weeks following the first medication refusal by the inmate.

In the ***third*** case (WSP 5), the inmate was found by his cellmate to be hanging from the top bunk of his sensitive needs yard (SNY) cell by a sheet during the afternoon of July 6, 2017.  The inmate entered CDCR through the RC at WSP for his first term on March 24, 2017 to serve a two-year sentence for corporal injury (on his spouse).  He had one RVR during his brief confinement, a battery on another inmate on May 13, 2017.  He was not known to be gang-affiliated.  The inmate had strong family support, including that of a fiancé.  He also had a 7-month-old baby and 7-year-old stepson.  The inmate did not have any visits or telephone calls during his brief confinement, but a significant number of cards and letters from his family were found in the cell.

According to available records, both the inmate and his brother were primarily raised by his mother, and all family members struggled with both substance abuse and mental illness.  The inmate, however, completed high school, was named salutatorian (second-highest in class), and attended several colleges.  He later became an avid bodybuilder and personal trainer, but his escalating use of drugs, particularly methamphetamine, resulted in numerous arrests.  These records also indicated that the inmate had been hospitalized at least three times in the community for psychosis.  In the county jail, he had received treatment for "anxiety, mood swings, and depression."  For the most part, the inmate consistently denied any current or prior history of suicidal ideation or suicide attempts.  The lone reference to a history of suicidal behavior was a self-report in May 2017 that he had a "5150 commitment related to a serious suicide attempt by hanging five years ago."

Within a day of arrival to WSP RC, the inmate was admitted into a MHCB at CHCF for grave disability following a custody mental health referral indicating that he "appears to be confused, he is not able to respond to directions, he had a hard time focusing, he can't think straight, he does not want to go to SNY, first time in prison for corporal injury on his spouse."  During an evaluation for MHCB admission, the inmate endorsed auditory hallucinations and appeared both confused and highly disorganized.  Although adequate documentation of his MHCB treatment was lacking, he was viewed as an unwilling participant and refused most of the programming, including his initial IDTT.  He was discharged from the MHCB on April 7 at the EOP level of

care after being assessed as "psychiatrically stable" because he was able "to maintain activities of daily living, denying hallucinations, and denying suicidal and homicidal ideation." The inmate was returned to WSP to complete the RC process with a diagnosis of Psychotic Disorder NOS.

During the next few months, the inmate was frequently non-compliant with the psychotropic medication. He also refused several IDTTs, group sessions, and psychiatry appointments. However, the CDCR reviewer in this case found several inconsistencies in the documentation of the inmate's mental health treatment. For example, although the inmate's Treatment Plan completed on May 11, 2017 indicated that "I/P has been showing up to 1:1 sessions with PC in a cooperative manner……IP recently (as of last week) has stopped taking his psychotropic medication and has been programming adequately per PC's assessment and custody's assessment." The CDCR reviewer found the Treatment Plan contained "several contradictions and errors and does not summarize past mental health treatment (community hospitalizations, county jail or MHCB) or ongoing problems related to refusing treatment (groups and tele-psychiatry appointments)." During June 2017, the inmate continued to refuse most (25 of 27) group sessions but did meet regularly with his PC. In a progress note dated July 5, 2017, one day before the inmate's suicide, the clinician wrote, in part, that:

> I/P reported that he's doing okay. I/P expressed that he does not get phone calls and would like to speak with a counselor regarding if his father has passed away. I/P reported that he does not like attending group but would make an effort on attending. I/P expressed that no one directly told him that his father has passed away, but he heard it through the air vents. I/P reported sleeping six hours per night. I/P reported eating all of his meals. I/P reported that his cellmate can be annoying at times. I/P denied being victimized by other inmates. I/P reported being medication compliant but reported that he is going to stop taking his medication because he heard through the air vents that staff is feeding him estrogen. I/P expressed trying to distinguish reality from his hallucinations. I/P reported that he believes riots are caused by him. I/P denied feeling SI or HI. He expressed that he is not depressed, anxious, or manic. I/P denied having any questions from the clinician.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant medical issues that could be viewed as contributory to his death. However, the reviewer found that there were several identifiable contributory causes to his death, including continuing struggles with paranoia and auditory hallucinations. According to the reviewer:

> It is likely his paranoia, auditory hallucinations, and depression prevented any disclosure of suicidal thinking. While he appeared to have supportive family, there were indications he was unsettled about his life (recently asking for probation officer records and commenting to MHCB nursing staff that his situation and his life was 'bull....'). His perception of the status of his relationship with the victim (fiancé) is unknown, but he mentioned to mental health he received paperwork requesting child support.

Posthumous interviews with both staff and inmates indicated that the inmate was quiet and often kept to himself.  However, his cellmate did indicate that he found the inmate lying on his bed with a ligature around his neck three or four days prior to his suicide.  For unknown reasons, the cellmate never reported the incident to staff.

The Suicide Report contained nine recommendations for corrective action through a QIP:

1) The Mental Health Evaluation was not completed per policy at WSP.  The Brief Mental Health Evaluation submitted for the inmate's MHCB referral package did not include a review of records and was barely legible.  The Mental Health Evaluation that was completed on April 12, 2017 was based on limited information because the inmate refused the interview and the evaluation did not include a summary of jail records, MHCB treatment or review of the 5-day follow-up or plan to rectify the incomplete evaluation.

2) The SREs dated March 25 and April 12, 2017 were incomplete, inaccurate, and contained many inconsistencies.  Subsequent documentation did not include a thorough review of records, provide further clarification or address the poor quality.

3) The WSP Mental Health Treatment Plans were not adhered to or updated to reflect the inmate's individual risk factors or problems.  Information contained in the Treatment Plans was inconsistent and at times inaccurate and did not include a thorough review of the records or summary of treatment progress.

4) In review of his scheduled primary clinician appointments, there were several progress notes missing from the unit health record.  The dates of the missing notes were the following: April 21, April 26, May 3, May 10, May 12, May 16, May 19, May 23, and May 24.

5) The inmate refused four tele-psychiatry appointments (April 17, April 24, May 1, and June 5).  Following his June 5 refusal his medication was stopped (Zoloft) without having any contact with the patient or documented consult with unit officers or primary clinician.  There were also medication non-compliance referrals submitted by nursing staff (on May 3, May 10, and May 17).  The May 11, 2017 Treatment Plan mentions medication non-compliance but does not discuss his tele-psychiatry refusals or discuss whether tele-psychiatry is appropriate for this patient.

6) A Mental Health Evaluation was not completed at CHCF MHCB and the submitted IPE was lacking in several areas (did not include a review of the available records) and did not document any plan for additional follow-up to rectify the inadequate evaluation.

7) At CHCF MHCB, the SRE dated April 4, 2017 was incomplete and did not provide a summary or analysis of available information.

8) The CHCF MHCB Initial and discharge Treatment Plans and Discharge Summary were inadequate and did not include a summary of the treatment in the MHCB, clear analysis of the presenting or current problems or a review of available records.

9) When the inmate was admitted to CHCF MHCB in March 2017, jail records were not available for review.  Policy and procedures for reviewing records received after evaluations have not been clearly identified or communicated.

In the **_fourth_** case (WSP 6), the inmate was found hanging from the top bunk of his general population cell by a sheet during the late evening of October 15, 2017.  The inmate entered CDCR for his first term on August 15, 2016 to serve a six-year sentence for assault with a deadly weapon.  He was transferred to WSP on October 25, 2016.  The inmate received 15 RVRs during his 14-month confinement, the most recent of which occurred on September 14, 2017 involving possession of alcohol.  Due to his increasing disciplinary record, the inmate was pending transfer to a Level IV facility at the time of his death.  He was not known to be gang-affiliated.  The inmate had the limited family support from his grandparents and two uncles who provided letter correspondence.

According to available records, the inmate was raised by his mother and several male companions during his early years. Of note, his father committed suicide when he was only 6 years old.  His grandfather described the inmate's childhood as "dysfunctional at best."  He was often physically abused by his step-father, and both drugs and alcohol were often used by his mother and her male companions in the home while he was growing up.  His grandfather described him as a "lost soul."  The inmate was single and never married, and although records indicated he had two children, the grandfather did not believe that such information was accurate.  The inmate had a significant substance abuse history, as well as a lengthy history of arrests.

Records also indicated that the inmate had been diagnosed with Adjustment Disorder with Depressed Mood in July 2016 while confined in the county jail system.  Those records also indicated a history of alcohol, methamphetamine, and heroin use, as well as two previous suicide attempts.  The suicide attempts apparently occurred in the community, the last of which occurred at age 16 by drug overdose.  Despite this information being documented in both the Initial Health Screening and Mental Health Screening interviews, both dated August 15, 2016 at CIM RC, as well as the mental health clinician noting that inmate's "adaptive functioning was fair/poor and that he had "continuing" mental health needs, the inmate was not considered for placement in the MHSDS.  He never requested any mental health services while confined at either CIM or WSP.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant medical issues that could be viewed as contributory to his death.  Posthumous interviews with both staff and inmates did not uncover any significant information.  However, in a subsequent

interview with the inmate's grandfather, the CDCR reviewer noted that his grandson had "discussed concerns about his pending transfer to the Level IV institution in a letter received a few weeks prior to his suicide.  He thought this may have contributed to the suicide, in addition to the remembering that his father (did commit suicide)."

Although the Suicide Report did not contain any recommendations for corrective action through a QIP, the report noted several mental health and custody concerns.  The mental health concern was related to the inmate's mental health and suicide attempt history not resulting in further consideration for entry into the MHSDS, whereas the custody concerns were related to inadequate emergency responses to the suicide.  According to the CDCR reviewer, "all of the concerns noted in this review have been addressed and action plans were implemented or completed."

### 3)   California Institution for Women (CIW)

**Inspection**:  June 19-20, 2017 (previous suicide prevention audits on March 22-23, 2016 and January 25-26, 2017).  CIW housed approximately 1,907 inmates at the time of the on-site assessment.

**Screening/Assessment**:  The intake screening process within the R&R unit was not observed because there were not any new inmates admitted into the facility during the two-day assessment.  In addition, this reviewer observed daily rounds by two PTs assigned to administrative segregation, SHU, and PSU on June 20, 2017.  The rounds in both units were unremarkable and the two PTs were observed to be correctly entering Psych Tech Daily Rounds information into EHRS for each caseload inmate.

**Housing**:  CIW had a CTC with ten designated MHCBs.  A previous deficiency of hazardous faucets and sharp-edged sinks had been corrected and all MHCB rooms were now reasonably suicide-resistant.

The administrative segregation unit contained seven retrofitted cells for inmates on new intake status.  Due to a low census during the on-site inspection, this reviewer observed very few new intake inmates, and all were appropriately assigned to new intake cells.

Finally, the four "swing" medical beds (Rooms 7, 8, 9, and 11) in the CTC were primarily used as **alternative housing** cells to temporarily house inmates awaiting MHCB placement.  The designated cells in the TTA and PSU could also be used for alternative housing.  All inmates in alternative housing within the CTC were observed on a 1:1 basis and were furnished beds.  Alternative housing continued to be used extensively at CIW.  For the approximate six-week period from May 1, 2017 through June 20, 2017, there were 59 inmates placed in alternative housing, with only 20 percent discharged within 24 hours.  The vast majority (80 percent) of inmates averaged approximately 79 hours in alternative housing, and the overall length of stay for all 59 inmates was 67 hours.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were regularly used in the CTC for patients identified as being suicidal.  In addition, inmates not on suicide observation

status were required to be observed at 15-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of five patients (<u>CIW 1</u>, <u>CIW 2</u>, <u>CIW 3</u>, <u>CIW 4</u>, and <u>CIW 5</u>) on Suicide Precaution status in the CTC during an eight-hour period from 12:00 a.m. through 7:59 a.m. on June 19, 2017.  The chart review found several observation checks (between three and eight per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 86 minutes in one case (<u>CIW 5</u>).  In another case (<u>CIW 1</u>), there were seven violations of 25-, 38-, 17-, 53-, 36-, 19-, and 22-minute gaps between the required 15-minute intervals.  Violations in the five cases were committed by multiple nursing staff.

In addition, this reviewer observed the IDTT process in the MHCB on June 19-20, 2017 and found that there were sound practices regarding approval of both possessions and privileges to patients.  MHCB patients were assigned clothing that was consistent with their level of observation.  A full-time RT was assigned to the unit and there appeared to be full use of both the program office and yard for patients.  This reviewer observed both a book cart and radio in the yard.  There also appeared to be full use of both telephone and visiting privileges, a significant improvement from the previous assessment which had found confusion and uncertainty regarding such privileges afforded to MHCB patients.

Five IDTT meetings were observed in the CTC.  Overall, good discussions regarding suicide risk and safety planning to reduce future recurrence of SI were observed, although most of the discussion regarding safety planning was initiated and/or prompted by the MHCB supervisor who was accompanying this reviewer.

Finally, a review of Guard One data for a recent 24-hour period found a combined 95-percent compliance with required checks not exceeding 35-minute intervals in administrative segregation, SHU, and PSU.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS and TTA log for the period of January 1 through May 31, 2017.  A total of 40 emergency mental health referrals were randomly reviewed, with required SRASHEs completed in 93 percent (37 of 40) of the cases, an improvement from the preceding assessment when only 89 percent of reviewed cases had SRASHEs.

In addition, although this reviewer observed adequate discussion of safety planning during IDTT meetings in the MHCB, subsequent review of ten charts of patients discharged from the MHCB unit found uneven formulation of safety plans to reduce continued suicidal ideation.  For example, one case (<u>CIW 6</u>) provided the following adequate safety plan:

> 1) IP will use letter writing with peer in community as a way to keep hopeful and will start first letter w/5 days and IP will share plan with PC.

> 2) PC will encourage IP to utilize journaling, with positive reframing, as a positive coping skill to reduce anxiety/emotional distress and decrease SIB.

3) PC will assist IP in utilizing MH staff when feeling depressed or urges to harm self.  PC will review co-pay and staff assistance process with IP at first contact to work with IP on steps needed to make contact with PC and/or MH staff as needed for emotional distress.

4) PC will work with IP on developing an exercise program that she can use during heat warnings to maintain physical activity as this is a source of positive relaxation as IP states that 'exercise walking keeps my anxiety under control.'

5) PC will provide assertive communication skills and boundary skills to help IP effectively verbalize needs related to self-care and setting limits with peers and family.

The above safety plan was offset by another case (CIW 7) in which the clinician used the following boilerplate safety plan on multiple patients discharged from the MHCB, as well as deferred much of the safety planning to the primary clinicians of discharged patients:

1) IP will be on a 5-day step down.

2) PC will encourage and educate IP on medication compliance issues.  PC will discuss the importance of compliance with medication in stabilizing mood which will assist IP in decreasing SI.

3) PC will explore with IP adaptive approaches to distressing situations in order to increase her ability to problem solve during times of stress which lead to a crisis state.

4) PC will provide anger management education and skill building to reduce aggressive BX toward self and others and decrease negative thoughts that may lead to self-harm.

5) PC will assist inmate in developing adaptive coping skills to cope with situational stressors (anniversary dates) that may lead her to endorse suicidal ideation, and to educate IP on grief/loss which will assist inmate in decreasing negative thoughts which can lead to SI.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 155 cases of patients discharged from a MHCB or alternative housing placement that remained at CIW and were not transferred to

administrative segregation (where observation at 30-minute intervals was required) from March 1 through May 31, 2017.  The review found that 85 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 70 percent of the custody checks recommended for discontinuation after 24 hours by clinicians.  In addition, only 75 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to checks completed at 60-minute intervals, gaps in documentation, and/or checks not completed during the First Watch.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months (March through May 2017) of SPRFIT meeting minutes found that, although there were between ten and 12 participants at each meeting, meetings consistently lacked all required mandatory members or designees and quorums were not reached in any of the months.  With that said, the SPRFIT at CIW remained very active and meeting minutes reflected updated corrective action plans for continued suicide prevention deficiencies, as well as regular discussion regarding SRE review, High Risk List, safety planning, Crisis Intervention Team, a planned Suicide Prevention Week, suicide prevention posters and brochures, and robust summaries of recent serious suicide attempts, among other issues.  In addition, each meeting (which was 90 minutes in length) allowed time for an inmate representative of the Suicide Prevention Outreach Committee to make a brief presentation.

**Training**:  According to training records, 100 percent of custody staff and 94 percent of nursing staff were certified in CPR.  In addition, 98 percent of custody, 80 percent of medical, and 76 percent of mental health staff had completed annual suicide prevention block training during 2016.  Finally, as of June 2017, 95 percent of mental health clinicians had completed the SRE mentoring program, 90 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**:  CIW experienced one inmate suicide during the review period.  In that case (CIW 8), the inmate was found hanging by another inmate from the bunk by a shoelace in her general population cell in the Fire Camp program during the early afternoon of August 23, 2017. The inmate entered the CDCR system on January 17, 2017 to serve a four-year sentence for burglary and stalking.  She was transferred to CIW on March 29, 2017 and assigned to the Fire Camp.  The inmate did not incur any RVRs during her confinement and was not gang-affiliated. She had telephone and letter correspondence with her mother, who she called on the morning of her suicide.

According to limited available records, the inmate was raised by her mother following the separation of her parents when she was a young girl.  Her father subsequently died when she was 25-years-old.  She was a high school graduate and reportedly obtained two college degrees, but the accuracy of such information could not be verified.  The inmate had a history of substance abuse which was directly related to her instant offense.  She had been in a 13-year relationship with the victim of the crime, and the two had one daughter approximately 10-years-old.

The inmate had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) as a young child and diagnosed with both Depression and Bipolar Disorder beginning at age 14. She reported taking various psychotropic medication until 2013 when she lost her medical insurance and began using methamphetamine. Prior records also indicated several residential treatment programs for substance abuse, as well as reports of threatening suicide and engaging in self-injurious behavior while attending these residential programs. Shortly after entering CDCR, the inmate was placed in MHSDS at the 3CMS level of care on February 1, 2017 based upon "medical necessity" of being previously prescribed psychotropic medication. Several days later on February 6, 2017, she met with a psychiatrist, denied any current mental health symptoms and requested a discontinuation of current medication. She was diagnosed with Stimulant Use Disorder and Alcohol Use Disorder, moderate, "in a controlled environment," and recommended "continue therapy." The following week on February 15, the inmate was removed from the MHSDS, with no documented rationale for the removal. Although her prior history of self-injurious behavior in residential treatment was known to clinicians, the inmate continued to deny any current or prior suicidal ideation and behavior. There were no other documented reports of self-harm or suicide attempts, and no SREs were completed during her incarceration. On March 29, 2017, the inmate was transferred to the Fire Camp program.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and she did not have any significant medical issues that could be viewed as contributory to her death. Posthumous interviews with staff and inmates generally found they were all "shocked" by the suicide, although one inmate peer stated that the inmate had "seemed more down" in the days leading up to her death. Several un-mailed letters found in the inmate's cell also did not give any indication of her impending suicide. The inmate's mother, who conversed with her daughter by telephone the morning of her death, subsequently told the CDCR reviewer that she did not express any suicidal ideation during the call but appeared depressed and physically exhausted from the Camp program. Following discovery of her body on August 23, 2017, the following was written in ink on her left forearm: "I'm tired…too just done."

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) A MHPC initial assessment was conducted on February 1, 2017. This assessment reference a review of the POR and included some general statements about non-compliance with mental health treatment and psychiatric medication; however, the assessment omitted information pertaining to the inmate's prior self-harm, prior diagnosis and medication (since 14), and the progression of mental health symptoms since 2013.

> 2) A February 6, 2017 psychiatric note indicated the inmate's medication would be decreased and discontinued and she should 'continue therapy.' However, the inmate was removed from the MHSDS on February 15, 2017. There was no documentation of the rationale for the decision to promptly remove the inmate from the MHSDS.

### 4)   California Institution for Men (CIM)

**Inspection**: June 21-22, 2017 (previous suicide prevention audit was on March 24-25, 2016). CIM housed approximately 3,637 inmates at the time of the on-site assessment.

**Screening/Assessment**:  Due to scheduling conflicts, this reviewer was unable to observe both the R&R unit intake screening by nursing staff and 31-item mental health screening by a clinical psychologist during the RC process.  There were, however, no issues raised in this area during the preceding assessment.

Daily PT rounds in the administrative segregation unit (Palm Unit) were observed on June 22. The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.  Of note, a STRH program had been activated in the Palm Unit subsequent to the preceding assessment.

**Housing**:  Two units of the CTC at CIM contained 34 MHCBs.  All of the MHCB rooms continued to be hazardous and were not suicide-resistant.  For example, Unit 1 had rooms with small gaps between the wall and window frame, faucet handles, and ventilation grates with large holes in the ceiling (although the ceilings were high and not within easy reach) that were conducive to suicide attempts by hanging.  Unit 4 also had rooms with small gaps between the wall and window frame, faucet handles, exposed toilet chase piping, and ventilation grates with large holes in the ceiling (although the ceilings were high and not within easy reach) that were conducive to suicide attempts by hanging.  In fact, a patient attempted suicide by hanging from one of the MHCB rooms on January 6, 2017.  Each MHCB contained suicide-resistant beds.

The above deficiencies were first reported by this reviewer during an assessment in December 2013.  During the March 2016 assessment, this reviewer was informed that although a work order request was initiated by CIM officials sometime in 2014, the final design of the project had not yet been approved.  Although the headquarters work order schedule for MHCB renovation previously examined by this reviewer did not contain reference to the CIM work, CDCR informed this reviewer that the anticipated start date would be December 2016.

During the most recent assessment on June 21, 2017, this reviewer was presented with a ten-page "Central Health Services Mental Health Crisis Bed (MHCB) Modification" plan dated December 21, 2016.  The document was unsigned and CIM officials were unable to give this reviewer any estimate as to when the MHCB renovation project would commence.[20]

In addition, this reviewer found that the Palm Unit contained 13 new intake cells that had been retrofitted to be suicide-resistant.  Although the unit had a low census, with only 78 inmates in

---

[20]On January 25, 2018, the *Coleman* court ruled that "The ongoing existence of these conditions is unacceptable. Good cause appearing, and defendants will be directed to provide to the Special Master and file with the court a detailed plan for completion of all necessary work at CIM…"  ECF No. 5762 at 2.  On February 23, 2018, defendants submitted a plan to the court which included the planned start (March 5, 2018) and the planned completion (August 1, 2018) of the CIM renovation project.  ECF No. 5795.  On September 27, 2018, defendants notified the Special Master that the MHCB unit renovations at CIM were complete.

the 185-bed capacity unit, all of the new intake cells were occupied and this reviewer observed two new intake inmates housed in unsafe, non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were used on almost a daily basis at CIM.  Following this reviewer's previous finding in March 2016 that inmates on alternative housing status were often placed in TTA tanks and holding cages without access to water, toilets, or showers for extended periods of time, CDCR and CIM officials relocated alternative housing options to Cypress Hall in Facility B (the RC building), while still maintaining alternative housing in Cell 175 of the CTC and any available OHU room within the CTC.  This reviewer was provided data indicating that there were approximately 40 inmates placed in alternative housing during the three-month period of March 18 through June 18, 2017.  However, the average length of stay in alternative housing could *not* be calculated because of the unreliability of the data.  For example, data indicated that one inmate (CIM 1) was held in alternative housing for "zero" time on May 30, 2017, whereas observation sheets examined by this reviewer indicated that the inmate was actually in alternative housing from 12:35 p.m. on May 30 through 2:15 p.m. on May 31, 2017, a period of almost 26 hours.  In another case (CIM 2), the inmate was listed as being held in alternative housing for "zero" time on May 17, 2017, whereas observation sheets examined by this writer indicated that he was actually in alternative housing from 3:00 p.m. on May 17 through 7:15 p.m. on May 18, 2017, a period of approximately 28 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals.  At the time of the on-site assessment, CIM had not yet implemented EHRS, and nursing staff were still utilizing Suicide Watch/Suicide Precaution Record forms to document the observation of patients on suicide observation status.  Nursing staff still maintained a poor practice of keeping the observation forms on a clipboard in the nurse's office, and not located on the outside of each patient's room door.  There were two patients on Suicide Precaution status in Station 4 of the MHCB on June 22, 2017.  A regional representative of the CDCR Mental Health Compliance Team (MHCT) observed nursing rounds for these two patients for approximately 90 minutes.  Although nursing staff documented on the Suicide Watch/Suicide Precaution Record forms that 15 checks were completed for both patients during this time period, the MHCT representative observed nursing staff only completing four checks on both patients during this period.

In addition, although this reviewer did not observe any obvious problems with the issuance of possessions and privileges for inmates in the MHCBs during the 2016 assessment, there were problematic practices found during the current assessment.  This reviewer observed eight IDTT meetings in the MHCBs on both June 21-22, 2017 and found that patients were assigned clothing that was consistent with their level of observation.  There was one full-time RT assigned to the CTC, but this individual was responsible for providing services to up to 34 MHCB patients and 38 OHU patients.  During several IDTT meetings, patients were either not informed about yard and/or out-of-cell privileges, or in one case (CIM 3), informed that they were not eligible for yard because they were on RC status, but because "you are no longer on Suicide Precaution status, you're eligible for groups."  Both instructions were incorrect.  RC patients housed in the

MHCB were eligible for yard, and all patients, regardless of their suicide observation status, were eligible for groups, pursuant to the clinical judgment of IDTT members.

Observation of the eight IDTTs in the MHCBs showed mixed results.  In some cases, there was adequate discussion regarding patients' current suicidal ideation and development of coping skills to reduce such ideation, and other cases in which suicide risk and safety planning were not discussed whatsoever.  Two cases symbolize the uneven practices.  In the first case (CIM 4), the patient had written out his safety plan goals the previous night, discussed them with the PC in the morning, and recited them during the IDTT meeting.  The patient was discharged from the MHCB that day (June 22), and the safety plan outlined on the discharging SRE stated the following:

> Pt. is optimistic about moving to the CCCMS LOC.  He stated that he is willing to actively participate in individual and group sessions.  Pt. was motivated to create a safety plan that includes the following items that he believes will help him to cope with overwhelming emotions: reading, exercise, and using positive affirmations that will help him remember to remain hopeful.

> Pt. plans to decrease future conflict with staff, such as pending 115.  He also plans to find someone at his new facility that he feels he can establish rapport.  This person may be his PC, or someone in a CCCMS group, or an inmate or teacher within an education or work-related program.

> Pt. plans to focus on the positive aspects of his life and to start working on his upcoming parole and family difficulties from a solution-focused perspective, rather than problem focused.

In the second case (CIM 5), when asked during the IDTT what the triggers to his anxiety and suicidal ideation were, as well as coping skills previously discussed with his PC, the patient stated that he could not remember and appeared to be unfamiliar with the term "coping skills." Because neither the patient nor PC had previously written down any triggers or possible coping skills, the awkward interchange ended.

A review of Guard One data for a recent 24-hour period found a combined 91-percent compliance in the Palm Unit with required checks not exceeding 35 minutes.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of December 1, 2016 through June 15, 2017.  In addition, the TTA log for a similar period was also reviewed. This reviewer's sample eUHR review of 50 emergency referrals for suicidal ideation/behavior found that clinical staff subsequently completed the required SREs in 92 percent (46 of 50) of the cases, a significant improvement from the 80-percent completion rate found during the preceding assessment.

However, similar to the uneven presentation observed during the IDTT meetings, this reviewer's examination of ten sample SREs of patients released from a MHCB during April through June

2017 found a mixture of adequate safety plan strategies to reduce SI with safety plan narrative that simply deferred identification of coping skills strategies to the receiving PC.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 38 cases of inmates discharged from a MHCB or alternative housing placement that remained at CIM and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during December 2016 through May 2017.  The review found that only 79 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians.  Of significance, approximately 71 percent of the custody checks were recommended for discontinuation by clinicians after the maximum allowable 72 hours.  In addition, only 82 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to checks completed at 60-minute intervals, gaps in documentation, and/or checks not completed during the First Watch.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings, with consistent lack of attendance from the correctional health services administrator, associate warden for health care access, or their respective designees.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, approximately 91 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, approximately 89 percent of custody staff, 97 percent of medical staff, and 99 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of June 2017, 94 percent of mental health clinicians had completed the SRE mentoring program, 83 percent had received the seven-hour SRE training, and 96 percent had completed safety plan training.  For the most part, these completion rates for training were an improvement from the 2016 assessment.

**Recent Suicides**:  CIM did not experience any inmate suicides during the review period.

### 5)    Kern Valley State Prison (KVSP)

**Inspection**:  July 11-12, 2017 (previous suicide prevention audit was on February 23-24, 2016). KVSP housed approximately 3,642 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on July 11, 2017.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was closed during the process, the inmate was placed in a TTM, and an officer was stationed in the hallway.  Privacy and confidentiality were maintained.

In addition, this reviewer observed daily rounds by two PTs assigned to administrative segregation and STRH units on July 12, 2017.  The rounds in both units were unremarkable and the two PTs were observed to be correctly entering Psych Tech Daily Rounds information into EHRS for each caseload inmate.

**Housing**:  KVSP had a 20-bed CTC, with 12 designated MHCBs.  Previously identified hazards (square-shaped stainless-steel sinks protruding from the wall and ventilation grates with holes larger than the industry standard 3/16-inch diameter) were corrected in November 2016.

The two administrative segregation units (ASU-1, which housed EOP and 3CMS inmates and ASU-2, which housed GP inmates) contained 13 retrofitted cells for inmates on new intake status.  During the tour of ASU-2, which contained five retrofitted cells and were all occupied, this reviewer found that two new intake inmates were housed in unsafe, non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in ASU-1 and SNY units, as well as occasionally in other designated cells throughout the facility.  Alternative housing was used on a daily basis, and inmates were all furnished beds and observed on a 1:1 basis.  From April 1 through June 30, 2017, there were approximately 167 inmates placed in alternative housing, and the vast majority (83 percent) was released within 24 hours.  Few inmates were held in alternative housing over 48 hours.  The overall length of stay in alternative housing for these 167 inmates was 19 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (<u>KVSP 1</u>, <u>KVSP 2</u>, <u>KVSP 3</u>, and <u>KVSP 4</u>) on Suicide Precaution status in the CTC during an eight-hour period from 12:00 a.m. through 7:59 a.m. on July 10 or July 11, 2017.  The chart review found numerous observation checks (i.e., between 11 and 12 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 66 minutes in one case (<u>KVSP 1</u>).  The following case (<u>KVSP 4</u>) exemplifies the significance of the problem:  There were 11 violations of 18-, 28-, 33-, 21-, 27-, 18-, 29-, 32-, 25-, 23-, and 18-minute gaps between the required 15-minute intervals.  Violations in the four cases were by multiple nursing staff.  This reviewer was subsequently informed by nursing staff that (as part of the issue, but certainly not a full explanation) there was a shortage of available laptops to enter observation rounds into EHRS, resulting in staff making handwritten notes and entering the information when a laptop became available.

A previous problem with patients being clothed in safety smocks while being observed at 30-minute intervals had been corrected, and all patients were observed to be appropriately clothed consistent with their level of risk.  An RT was assigned to the MHCB unit for 30 hours per week

and attempted to allow each patient yard privileges at least once a week (on Thursdays).  In addition, custody staff assigned to the MHCB was available to provide yard during other days. Patients were said to be afforded both visitation and telephone privileges.

Three IDTT meetings were observed in the CTC.  Overall, there was adequate discussion regarding suicide risk and safety planning to reduce future recurrence of SI in each case. However, as indicated below, the adequacy of safety planning discussed during IDTT meetings was not transferred into adequately written safety plans upon discharge from the MHCB.

Finally, a review of Guard One data for a recent 24-hour period found a combined 99-percent compliance in both ASU-1 and ASU-2 with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a list of emergency mental health referrals from the MHTS for the two-month period of May and June 2017.  This reviewer's sample EHRS review of 21 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SREs in only 76 percent (16 of 21) of the cases.  Completion of SREs for inmates housed in alternative housing was also audited.  The sample review found that required SREs were completed in 90 percent (73 of 81) of cases.

This reviewer examined a sample of ten SRE/SRASHEs from patients released from a MHCB between April and July 2017.  Only two SRE/SRASHEs were adequate.  Most of the remaining assessments were written by one particular clinician assigned to the CTC at the time.  The following are the entire safety plans from this clinician for five patients discharged from the MHCB:

> KVSP 5:  IP will return to previous level of care.  It is recommended IP treatment plan should include effective communication, 5-day FU, 3-day custody FU.

> KVSP 6:  Return to CCCMS, reinforcement of positive coping skills to manage stress.  Weekly contact and groups while in Ad Seg for continuity of care. Psychoeducation on the importance of alerting staff before SIB of biting self.

> KVSP 7:  Return to EOP for weekly therapy and groups.  Psychoeducation for reinforcement of positive coping and CBT for challenging faulty thinking and management of AH.

> KVSP 8:  Placed IP in MHSDS for treatment.  Ongoing contact with clinician to discuss additional coping to manage reported anxiety/stress/paranoia.  Continue medication regime.

> KVSP 9:  EOP level of care, increase from CCCMS.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 207 cases of inmates discharged from a MHCB or alternative housing placement that remained at KVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1 through June 30, 2017. The review found that only 48 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 72 percent of the custody checks recommended for 48 hours or more by clinicians. In addition, only 79 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation and/or checks not completed during the First Watch.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu Bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings. The meeting minutes were otherwise unremarkable.

**Training**: According to training records, approximately 95 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, approximately 98 percent of custody staff, 92 percent of medical staff, and 93 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of June 2017, only 47 percent of mental health clinicians had completed the SRE mentoring program, 92 percent had received the seven-hour SRE training, and only 72 percent had completed safety plan training.

**Recent Suicides**: KVSP experienced one inmate suicide during the review period. In that case (KVSP 10), the inmate was found hanging from the top bunk by a sheet in his GP cell shortly before midnight on March 21, 2017. The inmate entered the CDCR system in February 2010 to serve a 77-year-to-life sentence for first-degree murder and attempted murder. He was transferred to KVSP in January 2013. The inmate incurred four RVRs during his confinement, the most recent of which occurred in April 2015 for possession of a controlled dangerous substance. He was not known to be gang-affiliated. The inmate had good support from family, including monthly visits from his grandmother, periodic visits from his mother, sister, and son; as well as letter correspondence.

According to available records, the inmate had a dysfunctional childhood, his father was in prison and he was raised initially by his mother, and then by his grandparents when his mother remarried, and he did not get along with the stepfather. The inmate was never married and was estranged from the mother of his 4-year-old son at the time of the instant offense. He had a history of substance abuse beginning at age 14 and his addiction escalated following two serious motorcycle accidents when he was 21.

The inmate did not have a history of any mental health treatment in the community. Upon entry into CDCR, the inmate answered affirmatively to several questions which triggered further mental health evaluation for a possible mood disorder. He was initially diagnosed with Polysubstance Dependence, Hallucinogen Persisting Perception Disorder, with a rule out of Bipolar Disorder. The inmate denied any current SI, and records indicating two prior suicide attempts in the community were unconfirmed. He was discharged from the MHSDS several months later in July 2010 when he refused further treatment and was found to be stable. The inmate's final contact with mental health staff occurred in January 2012 following a custody referral. He was found not to meet the criteria for MHSDS.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although he continued to suffer from severe chronic back and knee pain sustained from motorcycle accidents at age 21, these medical issues were not viewed as proximate causes of his death, but perhaps as contributory. In addition, there was information found in his cell after the suicide to indicate he might have accrued gambling and/or drug debts that he could not repay. In a suicide note found in the cell and addressed to his grandmother, the inmate wrote: "I'm sorry but I just can't do this anymore. I am sick of being a burden and I need to be free and see what comes next. I made it further than I ever thought I would. Thanks to your undying love and support."

The Suicide Report contained three recommendations for corrective action through a QIP:

> 1) While the check boxes on the SRAC (11/10/2010) and SRE (11/23/2011) were marked correctly and individualized risk factors appeared to be considered in the assessment of risk, the second pages containing the mental status exam, justification of risk, and safety planning/risk reduction were poorly completed on both evaluations. The suicide risk assessments contained inadequate case and risk formulation and safety planning/risk reduction. Further, despite improvements in policies, procedures and trainings, insufficient case/risk formulation and safety planning continues to be an ongoing statewide issue.

> 2) The CDCR 837s submitted by responding staff identifies a cut down kit was not taken to the scene of the emergency in its entirety.

> 3) Activation of the Emergency Medical System (calling 911) did not take place until approximately five minutes into the emergency which caused a delay in appropriate medical response.

### 6)   North Kern State Prison (NKSP)

**Inspection**: July 13-14, 2017 (previous suicide prevention audit was on February 25-26, 2016). NKSP housed approximately 4,583 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on July 13, 2017. The nurse was observed to be asking all of

the questions and correctly entered the information into the EHRS.  The 31-item mental health screening by a psychologist in the RC was also observed and found to be thorough.  Doors to both the nurse's and clinician's offices were closed during the processes, thus ensuring privacy and confidentiality.

Daily PT rounds in the administrative segregation unit (D-6) were observed on July 13.  The rounds were unremarkable, and the PT correctly entered the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  NKSP had a 16-bed CTC, with ten designated MHCBs.  A previously identified hazard of ventilation grates with holes larger than the industry standard 3/16-inch diameter were corrected prior to this current assessment in October 2016.

In addition, the administrative segregation unit (D-6) had a total of 13 new intake cells that had been retrofitted to be suicide-resistant.  This reviewer observed that all new intake inmates were correctly housed in new intake cells.

Finally, **alternative housing** cells continued to be designated in A-4 Unit to temporarily house suicidal patients prior to transfer to a MHCB, although some were occasionally held in the administrative segregation unit.  This reviewer observed two inmates on alternative housing status on July 13.  Both were being observed on a 1:1 basis and bunks were found in each cell.  During the three-month period of May 1 through July 10, 2017, there were approximately 101 inmates placed in alternative housing, with 91 percent released within 24 hours.  Only one inmate was held more than 48 hours.  The overall length of stay in alternative housing for the 101 inmates was 16 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were required to be observed at 15-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (NKSP 1, NKSP 2, NKSP 3, and NKSP 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on July 13, 2017.  The chart review found numerous observation checks (between nine and 15 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 59 minutes in one case (NKSP 1).  The following case (NKSP 4) exemplified the significance of the problem:  There were nine violations of 18-, 17-, 16-, 19-, 17-, 23-, 37-, 32-, and 36-minute gaps between the required 15-minute intervals.  Violations in the four cases were by multiple nursing staff.

A previous problem with patients being clothed inconsistent with their level of suicide risk, as well as routinely denied telephone and visiting privileges, had been corrected.  An RT was assigned to the MHCB unit for 40 hours per week and utilized the yard on a daily basis.  Review of pertinent records indicated that telephone and visiting privileges were authorized, and yard was found to be offered to patients several times per week.

Five IDTT team meetings were observed in the CTC.  Overall, there was very uneven discussion regarding patients' current suicide risk and safety planning.  In one case (NKSP 5), the patient

was on Suicide Watch status and had been clothed in a safety smock for eight consecutive days without any explanation or discussion of his suicide risk.  There was also no discussion regarding a possible psychiatric inpatient program (PIP) referral until outside reviewers raised the issue.  In another case (NKSP 2), the patient had been in the CTC since June 29, 2017, a period of 16 days.  He denied any suicidal ideation, had been given full-issue clothing for several days, but still complained of depression and requested to stay in the MHCB for another week.  The request was granted, and he was subsequently discharged back to the yard (and not higher LOC) five days later on July 19, 2017, for a total length of stay of 20 days.  His discharge safety plan is discussed below.  In a third case (NKSP 1), the inmate was discharged during the observed IDTT team meeting on July 14 with no discussion regarding safety planning.

A review of Guard One data for a recent 24-hour period found 99-percent compliance with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a list of emergency mental health referrals from the MHTS for the period of January 1 through June 30, 2017.  This reviewer's sample EHRS review of 42 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SREs in only 83 percent (35 of 42) of the cases.  Completion of SREs for inmates housed in alternative housing was also audited.  The sample review found that required SREs were completed in all (20 of 20) cases.

This reviewer examined a sample of 15 SREs from patients released from a MHCB between April and July 2017.  Most of the safety plans contained in the discharging SREs were not adequate, with several written by the same clinician.  The following safety plan was duplicated by this clinician in at least three cases (NKSP 1, NKSP 2, and NKSP 6) examined by this reviewer:

> Processing material pertaining to coping with long sentence and finding meaning to living effectively while incarcerated; increase functioning at a lower level of care through stability of mood.  I/P will be able to control and self-sooth when in distress and will be able to name coping skills, e.g., walking away, taking deep breaths, talking to clinicians, and know when to apply these strategies prior to being placed in EOPS LOC.  I/P is to be medication compliant 90% of the time.  CBT interventions to address coping skills and include psychoeducational on importance of medication compliance and how to implement strategies that aid with tolerance of distressful affect in a healthy manner.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 205 cases of patients discharged from a MHCB or alternative housing placement that remained at NKSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1, 2017 through June 30, 2017.  The review found that only 75 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 81 percent of the custody checks recommended for 48 hours or more by clinicians.  In addition, only 85 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation during both First and Third Watch.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings.  However, it was noteworthy that both the Warden and CEO were (not required members) active participants in each of the meetings.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, approximately 99 percent of custody staff, 97 percent of medical staff, and 90 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of June 2017, only 84 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and no clinicians were credited with completing safety plan training because adequate records were not kept.

**Recent Suicides**:  NKSP did not experience any inmate suicides during the review period.

### 7)   Richard J. Donovan Correctional Facility (RJD)

**Inspection**:  July 25-26, 2017 (previous suicide prevention audit was on October 25-26, 2016).  RJD housed approximately 3,798 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the R&R unit on July 25, 2017.  The nurse's office that was primarily utilized for intake screening had been renovated and enlarged the previous year, and had a large window to enhance visibility, as well as two options for egress.  The nurse was observed to be asking all of the required questions and entering the information on a hard copy of the Initial Health Screening form. (Of note, RJD had not yet implemented EHRS at the time of the on-site assessment.)  During the screening process in the primary nurse's office, the door remained closed, with an officer stationed in an outer room which served as another nurse's station.  When there were multiple inmates to be processed, as there was on July 25, this reviewer observed that the outer room was also utilized to conduct intake screening.  When both rooms were utilized, this reviewer observed an officer escort a second inmate through the outer room into the primary nurse's office during the screening process, thus interrupting the screening and compromising privacy and confidentiality.  This practice could be corrected simply by requiring the escorting

officer to bypass the outer room and walk through a short corridor that connects to the primary nurse's office.

Daily PT rounds in the B-6 and B-7 administrative segregation units were observed on July 25. The rounds were unremarkable, and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms at cell-front on all caseload inmates.

**Housing**: RJD had 12 MHCBs, as well as two swing beds. All 14 rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.

Both administrative segregation units (B-6 and B-7) each contained 12 retrofitted new intake cells. During inspection of each unit, this reviewer observed that all new intake inmates were housed in new intake cells.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was extensively used at RJD. Most inmates were placed in the B-7 administrative segregation unit (which was used for both 3CMS and general population) but could also be housed in other designated locations. On July 25, there were approximately 12 inmates on alternative housing status in B-7. This reviewer was provided data that indicated 283 inmates were placed in alternative housing from April 6 through July 21, 2017. The vast majority (74 percent) were housed over 24 hours, including approximately 29 percent held between 25 and 47 hours, 25 percent over 48 hours, and 20 percent over 72 hours. All inmates were observed to be provided bunks and observed on a continuous 1:1 basis. The overwhelming majority (90 percent) of inmates housed in alternative housing were later placed in a MHCB. The overall length of stay in alternative housing for these 283 inmates was 50 hours.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff. This reviewer was not able to verify the accuracy of observation rounds because RJD had not yet implemented EHRS at the time of the on-site assessment.

This reviewer observed four IDTT meetings in the MHCB unit on July 26. The treatment team was well represented by mental health, medical, and custody staff. Overall, there was very good discussion in most cases regarding current suicide risk and safety planning for those patients where SI was the primary concern.

A previous problem of non-suicidal patients not being given "full-issue" clothing had been resolved following the previous assessment, and all patients were observed to be appropriately clothed consistent with their level of suicide risk. This reviewer did not observe any problems related to MHCB privileges, and observed a patient using the telephone during the inspection. RJD continued to demonstrate a very proactive yard program within the MHCB unit that included an enthusiastic full-time RT that tried to encourage patients to attend yard twice a week. Music, books, magazines, and photocopies of daily newspapers continued to be available to patients that attended yard.

71

A review of Guard One data for a recent 24-hour period found a combined 98-percent compliance in both B-6 and B-7 administrative segregation units with the required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period January 1 through June 30, 2017.  This reviewer's subsequent sample eUHR review of 40 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in 93 percent (37 of 40) of the cases.

This reviewer examined a sample of ten SREs from patients released from a MHCB between May through July 2017.  Most contained an adequate safety plan for reducing SI.  For example, in one case (RJD 1), the safety plan stated the following:

> D/C to EOP LOC.  Start MH 5-day follow-up procedures.  Add up to 10+ hours of groups including life skills, conflict resolution and stress management.  Add to high risk list for at least 14 days to monitor for transition to ASU and to EOP. Teach IP warning signs of stress (emotional, physical and psychological), as well as coping skills for stress including breathing techniques/meditation, mindful drawing, encourage singing, puzzles for distraction, SMART goal setting, and techniques to manage worrying (such as create a 'worry' period).  Teach coping skills to reduce impulsivity to reduce future 115s such as counting, breathing or distraction.  Teach DBT distress tolerance skills to reduce possible distress from receiving 115, such as positive self-talk, engaging in activities, or prayer. Monitor and encourage regular contact with family/support system.  Inmate has already been referred and accepted to DSH-ICF for further support.

The challenge at RJD was that, although clinicians have continued to demonstrate adequate safety planning, there were often problems with concordance between safety plans contained within discharging SREs and safety plan summary sections contained within accompanying Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms.  For example, the safety plan contained on the first day of the 5-Day Follow-Up Progress Note for the above case (RJD 1) stated the following:

> MH staff will continue 4 more days of follow-up, or more, as needed.  His dx now is adjustment DO with depressed mood.  He has no rx'd psychotropic meds now, that several rx'd medical meds.  He will continue taking them as rx'd and ask for meds' eval as needed.  He will be monitored by CO staff hourly while in Ad Seg. He will get and use a pencil and puzzles as distractions from his reported boredom.  He will ask for additional help as needed.  He knows how to do so.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be

continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 208 cases of inmates discharged from a MHCB or alternative housing placement that remained at RJD and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1 through June 30, 2017.  The review found that 78 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 75 percent of the custody checks recommended for the full 72 hours of observation.  In addition, 89 percent of the "custody checks" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes from April through June 2017 found that quorums were achieved during April and May.  In fact, the meetings averaged between 19 and 27 participants each month.  Meeting minutes included corrective action plans from this reviewer's previous assessment.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff, 79 percent of medical staff, and 93 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of June 2017, 97 percent of mental health clinicians had completed the SRE mentoring program, 96 percent received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**:  RJD experienced one inmate suicide during the review period.  In that case (RJD 2), the inmate was found hanging from the top bunk by a sheet in his SNY cell during the morning of May 3, 2017.  The inmate entered the CDCR system in November 2001 to serve a 16- year-to-life sentence for second-degree murder (which occurred at age 16).  He was transferred to RJD in April 2015.  The inmate incurred eight RVRs during his 16-year incarceration, the most recent of which occurred in 2013 for possession of dangerous contraband. He was not known to be gang-affiliated but was placed in SNY in July 2010 after incurring drug debts.  The inmate had good support from family, including from his girlfriend and mother, who wrote letters to him several times per week and had regular telephone contact.

According to available records, the inmate had a dysfunctional childhood that included domestic violence between his parents.  His mother suffered from depression and had previously attempted suicide.  The inmate also experienced mental illness as a teenager, including hospitalization on two occasions for anxiety and depression.  Upon entry into CDCR in 2001, he was periodically seen by mental health staff, but not placed in the MHSDS until August 2010 (at 3CMS).  The inmate had been a victim of a stabbing a month earlier and began to have problems with sleeping, poor appetite, and social withdrawal.  He was initially diagnosed with Dysthymic Disorder.  During the next few years, the inmate continued to report depressed mood, anxiety,

and chronic pain secondary to the stabbing.  He also spent time preparing for his upcoming parole hearing.  In November 2015, the inmate appeared before the BPH and was denied parole consideration for three years.  Two months later on January 17, 2016, he was transferred to an outside hospital following a drug overdose.  Upon his return, documentation described his thought process as "scattered, paranoid, and he reported suicidal ideation with a wish to die, claiming he was severely depressed."  The inmate initially admitted, but subsequently denied, that the overdose was a suicide attempt.  (Previous records had also indicated that he attempted suicide by overdose at age 16.)  He was placed in a MHCB at CSP/Sac and continued to display bizarre behavior.  The inmate told a psychiatrist that he did not want to begin psychotropic medication because he was preparing for another parole hearing and believed he "might not parole if made EOP."

The inmate was later discharged from the MHCB in February 2016 and returned to RJD with a diagnosis of Psychotic Disorder Not Otherwise Specified (NOS) and Mood Disorder NOS, Rule-out Schizoaffective Disorder and Major Depressive Disorder, Recurrent with Psychotic Features, Amphetamine and Opiate Abuse.  Although prescribed psychotropic medication, the inmate refused to take it.  He continued to exhibit bizarre and delusional behavior, culminating in a detailed letter to the FBI in which he alleged that a mind control machine had been stolen from a local FBI office and placed on the grounds of RJD.  A recommendation to increase the inmate's level of care to EOP was considered, but ultimately rejected by the IDTT, citing that he remained able to maintain normal programming on the 3CMS yard.

The inmate last met with his PC on February 16, 2017, with the clinician noting that he had been stable and working on self-help packets.  The progress note stated that the plan was to continue treatment at 3CMS level of care and consider removal from MHSDS at the next IDTT if the inmate remained stable without medication, but, according to the CDCR reviewer in this case, "In terms of meeting treatment goals, the inmate's progress was mixed at best.  Although he did complete several take-home packets on self-help topics, including substance abuse, and did not attend/complete substance abuse groups, there was minimal evidence in the PC's documentation regarding any interventions to address his delusional thought process.  Instead, the PC opined 'it is probably counterproductive to confront his delusional thinking.'"

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although he continued to suffer chronic abdominal pain sustained from the 2010 stabbing, this medical issue was not viewed as a proximate cause of his death.  Posthumously reviewed telephone conversations between the inmate and his mother and girlfriend offered contrasting indications of his behavior.  For example, in January and February 2017, the inmate often expressed suicidal ideation and hopelessness during the telephone calls, whereas during April 2017, "his affect was calm and he did not seem to be stressed or agitated, and there was minimal evidence of delusional thought content" or suicidal ideation.  Of note, however, the inmate postponed his parole hearing on April 3 and updated his Death Notification list to include both his mother and sister on May 1, two days before his death.  The CDCR reviewer concluded that:

> It is not known why he chose to end his life, as he was actively making plans for
> the future; this included completing self-help treatment, making arrangements for

transitional housing, and arranging active employment opportunities.  However, he also had absolutely no insight into his mental illness and did not actively use mental health services or psychotropic medication in a way that would actually benefit him.  He believed mental illness was a stigma that would follow him and hinder his ability to be released from prison, which is a large part of why he refused psychiatric medication.  Based on telephone calls recovered postmortem, it is likely the inmate's mother consulted with his attorney and shared her concerns about his delusional system and current mental state, which may have prompted his waiving his right to appear at the BPH scheduled for May 2017.  What remains unclear is why the information about his suicidal thinking and psychiatric decompensation was not shared with the prison's mental health staff.

The Suicide Report contained seven recommendations for corrective action through a QIP:

1) Activation of the Emergency Medical System (calling 911) did not take place until approximately 10 minutes into the emergency which cause a significant delay in appropriate medical response. IMS P&P Chapter 12: Emergency Medical Response Instructions indicate that 'All Staff Have the Authority to Initiate a 911 Call for Emergency Medical Services (EMS).'

2) The documentation surrounding treatment planning on September 8, 2016 at RJD and treatment outcomes was insufficient and problematic.

3) The SRE completed on January 17, 2016 at RJD contained several errors and did not accurately incorporate chronic and acute risk factors.  As a result, the formulation of risk appeared to have been underestimated.

4) HQ:  A final post MHCB discharge SRE was due in February 2017.  This SRE did not occur due to a due dates error so that clinician was unaware that an SRE was due at that time.

5) The SRE completed for the inmate at SAC on February 16, 2016 upon discharge from MHCB also did not accurately reflect true chronic and acute risk factors.  Additionally, there were multiple concerns with the documented safety/risk reduction plan.

6) There was no mental health progress note from SAC on February 13, 2016 found in the eUHR chart, or data entry in MHTS reflecting a contact for that date.  Per MHSDS *Program Guide*, Chapter 5 (15-5-13):  In MHCB, "an inmate-patient's condition shall be assessed and monitored daily by the treating clinician, either a psychiatrist or a psychologist."

7) The inmate did not seek appropriate mental health treatment due to a misconception that his mental health issues might negatively impact his possible release from prison.

75

### 8)     California Health Care Facility (CHCF)

**Inspection**: August 8-9, 2017 (previous suicide prevention audit was on September 1-2, 2016). CHCF housed approximately 2,385 inmates at the time of the on-site assessment.

**Screening/Assessment**: The intake screening process within the R&R unit was not observed because there were not any new inmates admitted into the facility during the two-day assessment. Due to a scheduling conflict, daily PT rounds in the administrative segregation unit could not be observed during the on-site assessment.

**Housing**: CHCF had 98 MHCBs in housing units A1A, A1B, and A2B. All were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt. The administrative segregation unit had eight retrofitted suicide-resistant cells designated for new intake inmates. During the inspection, this reviewer observed that all new intake inmates were housed in new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were used on almost a daily basis at CHCF. Various units were utilized for alternative housing, including, but not limited to, D1A, D1B, 3CA, and E1A. Each inmate was provided a stack-a-bunk (when not assigned to a cell with a pre-existing bunk) and observed on a continuous 1:1 basis. From May 1 through July 30, 2017, there were approximately 101 inmates placed in alternative housing, and the vast majority (81 percent) was released within 24 hours. Few inmates were held in alternative housing over 48 hours. Most were subsequently placed in a MHCB. This reviewer also sampled 13 cases and verified that each had required a SRE/SRASHE completed, an improvement from the previous assessment when only 70 percent of SREs were completed. The overall length of stay in alternative housing for these 101 inmates was 19 hours.

**Observation**: Both Suicide Precaution and Suicide Watch statuses were being used in the MHCB units. In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of six patients (CHCF 1, CHCF 2, CHCF 3, CHCF 4, CHCF 5, and CHCF 6) on Suicide Precaution status in the three MHCB units during an eight-hour period from 12:00 a.m. through 7:59 a.m. on August 8, 2017. The chart review found numerous observation checks (i.e., between eight and 13 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 42 minutes in one case (CHCF 2). The following case (CHCF 4) exemplified the significance of the problem: There were 11 violations of 23-, 16-, 27-, 21-, 31-, 22-, 19-, 23-, 33-, 16-, and 16-minute gaps between the required 15-minute intervals. Violations in the four cases were by multiple nursing staff in all three MHCB units. Of note, similar deficiencies in observation rounds by nursing staff were found during the previous assessment when handwritten Suicide Watch/Suicide Precaution Record observation forms were used.

During this reviewer's previous assessment in 2016, numerous deficiencies were observed during the IDTT team meetings in all three MHCB units, including the quality of discussion regarding each patient's current observation level and safety planning, confusion regarding

clothing and privilege allowance, and standing orders for Suicide Precaution status at ten-day intervals. This on-site assessment found significant improvement. This reviewer observed eight IDTT meetings in all three MHCB units on August 8-9. All of the observed IDTTs were well represented by custody, medical, and mental health staff. (RTs were not represented only because they were conducting groups at the time of the meetings.) Three of the eight IDTT meetings involved patients who were being discharged from the MHCB, and two of the three cases included an adequate discussion of safety planning for reducing SI. With one exception involving a team decision not to allow a patient whose mother died two weeks earlier a telephone call because "maximum custody precludes telephone use," there was good use of both clothing and privilege allowance privileges. In addition, standing orders for Suicide Precaution status at ten-day intervals were not found in any of the reviewed charts.

A review of Guard One data for a recent 24-hour period in the administrative segregation unit found 98-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from January 1 through July 31, 2017. This reviewer's sample EHRS review of 40 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in 93 percent (37 of 40) of the cases. This was an improvement from the previous assessment when only 84 percent of SREs were completed.

This reviewer examined a sample of ten SREs from patients released from a MHCB between June and July 2017. Most of the safety plans to reduce SI in each SRE were very problematic. For example, the safety plan for a patient (CHCF 7) who had been placed in a MHCB for ten days was the following:

> Discharge to EOP; needs assistance to live in a dorm setting as a level II inmate, may have a diagnosable anxiety disorder; Initiate 5-day follow-up upon return to EOP.

The safety plan for another patient (CHCF 8) simply summarized *Program Guide* requirements (as well as misinterpreted other policies):

> 1) Patient will be placed on a 30-day Alert (for hoarding prescription meds) and monitor for any signs of OD
> 2) Patient will be returned to MHCB should he engage in or give any indications of SI, intent, plan
> 3) Patient will be discharged with a 30-day supply of mental health medications
> 4) Patient will be placed on a 5-day Suicide Precaution/Watch at sending institution to ensure patient stability
> 5) Patient will be seen by his PC x 1 per week at EOP LOC
> 6) Patient will participate and structured therapeutic groups x 10 per/week
> 7) Patient will be seen by psychiatry for medication monitoring and follow-up treatment

77

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 77 cases of patients discharged from a MHCB or alternative housing placement that remained at CHCF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January through June 2017. The review found that only 42 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most of the custody checks recommended for only 24 hours by clinicians. In addition, only 62 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Most of the problems were related to clinicians either not initiating the 7497 process or failing to sign the forms which authorized discontinuation of the checks, and correctional officers either conducting checks at 60-minute intervals or failing to conduct checks for significant amounts of time.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (May through July 2017) found that quorums were reached in only one month (July). This reviewer was presented with recent memorandums from both the SPRFIT coordinator and CMH regarding corrective action plans from this reviewer's previous assessment. Meeting minutes were otherwise unremarkable.

**Training**: According to training records, 98 percent of custody staff and 100 percent of medical staff were currently certified in CPR. In addition, 93 percent of custody staff, 98 percent of medical staff, and only 86 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of July 2017, 87 percent of mental health clinicians had completed the SRE mentoring program, 90 percent had received the seven-hour SRE training, and only 80 percent had completed safety plan training.

**Recent Suicides**: CHCF did not experience any inmate suicides during the review period.

### 9)   Mule Creek State Prison (MCSP)

**Inspection**: August 10-11, 2017 (previous suicide prevention audit was on September 27-28, 2016). MCSP housed approximately 3,619 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on August 10. The nurse was observed to be asking all of the required questions and entering the information on a hard copy of the Initial Health Screening

form. (Of note, MCSP had not yet implemented EHRS at the time of the on-site assessment.) The door to the new nurse's office was closed, with the officer stationed outside providing security.

In addition, this reviewer observed daily PT rounds in the administrative segregation units (Buildings 12 and 13) on August 11.  The rounds were unremarkable, and the PTs correctly completed a hard copy of the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  MCSP had a ten-bed CTC, with eight designated MHCBs that were suicide-resistant and not containing any obvious protrusions which could be utilized in a hanging suicide attempt.  Further, Building 12 (housing mostly administrative segregation EOP and some 3CMS inmates) had approximately 30 retrofitted suicide-resistant cells designated for new intake inmates, an increase of 14 new intake cells from the previous assessment.  During inspection of this unit, all new intake inmates were appropriately housed in new intake cells, a significant improvement from several previous assessments.  Building 13 (housing both administrative segregation 3CMS and general population inmates) no longer was utilized for new intake.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in Building 13, as well as other designated locations.  Alternative housing was used on a daily basis at MCSP, and inmates were all furnished beds and observed on a 1:1 basis.  From May 1 through July 31, 2017, there were approximately 154 inmates placed in alternative housing, and the overwhelming majority (94 percent) were released within 24 hours.  The overall length of stay in alternative housing for these 154 inmates was 14 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals by nursing staff.  At the time of the on-site assessment, MCSP had not yet implemented EHRS, and nursing staff were still utilizing Suicide Watch/Suicide Precaution Record forms to document the observation of patients on suicide observation status.  Observation of MHCB patients was problematic.  At approximately 8:08 a.m. on August 11, 2017, a colleague of this reviewer arrived at the MHCB and reviewed the Suicide Watch/Suicide Precaution Record forms of five patients (MCSP 1, MCSP 2, MCSP 3, MCSP 4, and MCSP 5) who were required to be observed at either 30-minute (MCSP 1 through MCSP 4) or 15-minute intervals (MCSP 5).  Each observation form was located on the door of each MHCB room.  The initial review at 8:08 a.m. found the last documented check for MCSP 1 had been at 6:50 a.m., a period of 78 minutes.  The last documented check for MCSP 2, MCSP 3, and MCSP 4 had been at 7:20 a.m., a period of 48 minutes.  The last documented check for MCSP 5, who was on Suicide Precaution status, was at 7:22 a.m., a period of 46 minutes.  As this reviewer's colleague was exiting the MHCB unit at approximately 8:35 a.m., the same five Suicide Watch/Suicide Precaution Record forms were again reviewed and found to have been falsified with notations suggesting that checks were performed at 8:00 a.m.  Similar problems with the correct documentation of observation rounds were also found during this reviewer's two previous assessments.

A previous problem of MHCB patients having to choose between an out-of-room activity of either yard or the program office had been corrected. An RT was assigned to the MHCB unit for 40 hours a week and utilized both the program office and yard for out-of-room activities. In addition, documentation indicated that patients were being offered both telephone and visiting privileges following their first IDTT meeting.

Three IDTT meetings were observed in the MHCB unit on August 10. The meetings were well attended by custody, medical, and mental health personnel. Two of the IDTTs involved complex cases in which safety planning was either not relevant or appropriate for discussion. The third case (MCSP 6), however, involved a patient who was admitted eight days earlier for suicidal ideation and grave disability, and the treatment team decided to discharge the patient without any discussion of a safety plan to reduce SI. The patient's subsequent discharging SRE dated August 10 contained the following safety plan that was not discussed during the IDTT:

> 1) IP should be closely monitored. IP is currently medication compliant and appears to have good insight to his medication needs.
>
> 2) IP was given a "coping card" to help remind him of coping skills he can use when he becomes upset. EOP PC should work with IP on expanding items on this card.
>
> 3) IP enjoys recreation activities both in and out of cell to help distract IP from negative thoughts/activity. EOP team should work with IP on expanding activities/protective factors.
>
> 4) IP has a long hx of trauma and substance abuse that he would benefit from processing in therapy sessions.
>
> Protective factors that mitigate risk include: family support-mother, hobbies (reading, writing, coloring, music), some insight, and is motivated for treatment.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation units found almost 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of February 1 through July 31, 2017. A subsequent sample eUHR review of 40 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in 95 percent (38 of 40) of cases.

This reviewer examined a sample of ten SREs for patients released from the MHCB between May and July 2017. In sum, although there were improvements from prior assessments in efforts to develop adequate safety plans, as well as examples of more consistent safety plan summaries contained within accompanying Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms, such efforts were collectively uneven in the sample documentation. For

example, the first day Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form for the above referenced case (MCSP 6), dated August 11, stated the following:

> IP stated he knows he can contact custody staff if he feels he may harm himself. He was informed that his IDTT was probably going to be next week Thursday.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 254 cases of inmates discharged from a MHCB or alternative housing placement that remained at MCSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1 through July 31, 2017. The review found that only 45 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most custody checks recommended for only 24 hours by clinicians. In addition, 85 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Problems found related to clinicians discontinuing the checks in less than the required 24 hours or failing to sign the forms which authorized discontinuation of the checks at 24 hours, and correctional officers failing to conduct checks for significant amounts of time.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings. Meeting minutes reflected reference to corrective action plans in response to this reviewer's previous assessment and were otherwise unremarkable.

**Training**: According to training records, 99 percent of custody staff and 94 percent of nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 96 percent of medical staff, and 97 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of July 2017, 100 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 96 percent had completed the safety plan training.

**Recent Suicides**: MCSP experienced two inmate suicides during the review period. In the *first* case (MCSP 7), the inmate was found exsanguinated in his SNY cell during the late morning of June 28, 2017. He had entered the CDCR system (for a fifth term) on June 6, 2013 to serve a 98-year-to-life sentence for two counts of attempted robbery and dissuading a witness. The inmate was transferred to MCSP on June 26, 2015. He was subsequently placed in SNY for safety concerns relating to both drug debt and being a gang dropout. The inmate had two RVRs during

his confinement, the most recent of which occurred on March 29, 2017 and involved possession of alcohol. He had been married for 34 years and had four children and five grandchildren. The inmate had some family support, including irregular telephone calls with his wife and one daughter, but such calls ended approximately one week before his suicide.

According to available records, the inmate had a very traumatic childhood that included both physical and sexual abuse, as well as neglect. He was raised by a grandparent but became involved with both substance abuse and the criminal justice system at age 12. The inmate received mental health treatment during most of his earlier CDCR terms, and generally treated for depressive symptoms, mood swings, anger, and impulsivity. His diagnoses included Depressive Disorder NOS, Major Depressive Disorder, Recurrent and Bipolar Disorder. Prior CDCR terms also included multiple MHCB and Department of State Hospitals (DSH) placements. During his most recent confinement, the inmate was placed in a DSH-Acute Psychiatric Program (APP) from February through May 2014, followed by Intermediate Care Facility (ICF) treatment from May 2014 through June 2015 when he returned to MCSP at the EOP LOC. He remained in EOP until his death, with final diagnoses of Major Depressive Disorder, Recurrent, Moderate/ Mild, Polysubstance Dependence, in remission in a controlled environment, Borderline Personality Disorder, and Antisocial Personality Disorder.

The inmate had a significant history of suicidal behavior, which included a suicide attempt at age 15 when he attempted to shoot himself with a gun. At least five other suicide attempts occurred in the community and included cutting himself on the wrist, hanging himself in his home, and multiple medication overdoses. There were also unconfirmed reports of a suicide attempt by hanging in the county jail in 1996, as well as a serious suicide attempt at CSATF in February 2014 by severely lacerating himself on the neck, resulting in MHCB placement. The inmate's most recent SRE (dated January 19, 2017) assessed both his chronic and acute risk for suicide as being "moderate." Although placed on the MCSP's "High Risk List," such placement did not result in an increase in the frequency of mental health services.

Although the inmate had several medical problems, including a seizure disorder, Hepatitis C, and chronic neck and shoulder pain, these issues were not viewed by the CDCR reviewer in this case to be contributory to the suicide. However, the reviewer found several probable precipitants to the suicide, including notification to the inmate in December 2016 that some of his pain medication was being discontinued, notification from his wife in April 2017 that she was filing for divorce, and a brief telephone call with his daughter in mid-June 2017 when she informed him not to call anymore. According to the CDCR reviewer, "As he was closest to his estranged wife and daughter, their abandonment was likely paramount to his decision to end his life. He freely admitted that feelings of rejection had spurred prior suicidal attempts; it is a plausible conclusion this perceived abandonment on the part of his family coupled with illicit substance use, hopelessness over his life-term, and ongoing physical pain likely triggered his suicide."

The Suicide Report contained seven recommendations for corrective action through a QIP:

    1) The primary clinician's weekly documentation in the form of SOAPE notes is problematic. Although the subjective and objective sections were properly updated weekly, the assessment, plan, and education sections were not

consistently updated after each submission. Rather, the assessment section contained only a diagnosis without an appropriate clinical assessment/evaluation of the presentation. Additionally, an overall review of the prior six months of weekly documentation showed almost no change in the plan and education sections, thus making it difficult to track what was being addressed in treatment, what interventions were being used, and the inmate's progress.

2) The SRE completed on January 19, 2017 is problematic as the PC checked 14 of 16 boxes under chronic risk, noted five previous serious suicide attempts, yet only found the inmate to have moderate chronic risk. The justification for choosing moderate risk (as opposed to high chronic) was not well developed on the second page, except to say that moderate risk was chosen due to his sentence and prior lethal suicide attempt in the past. Further, the safety/risk reduction plan section was underdeveloped and did not accurately incorporate his specific risk factors (which had led to prior attempts); these risk factors included perceived (or actual) abandonment by family members, substance use, and life-term without likelihood for parole.

3) The overall estimation of the inmate's suicide risk appears to have been underestimated given the early onset and severity of his prior suicide attempts. Despite this underestimation of risk, the inmate was placed on the High Risk List for suicide……a high risk log is to be maintained and presented for discussion by the SPRFIT; however, the LOP does not speak to the procedures and function of the HRL. It is unclear if his placement on this list provided additional resources or monitoring beyond his EOP LOC.

4) It is unclear why the inmate was not elevated for a higher LOC over the last three to six months of his life secondary to increase reports of SI, decreased programming, divorce papers resulting in feelings of abandonment, and possible reemergence of substance abuse.

5) On June 22, 2017, the inmate met with his PC and reported having "suicidal thoughts and morbid thinking," however a SRE was not provided. Per the Mental Health Services Delivery System *Program Guide*, Chapter (12-10-8), "When an inmate expresses current suicidal ideation, or make threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data. Documentation is achieved by conducting a standardized suicide risk evaluation SRE. Further, when an inmate expresses chronic suicidal ideation without intent or plan, the clinician may document that no change in suicide risk has occurred since completion of the prior SRE, instead of completing a new SRE. In this instant, the inmate reported suicidal thoughts, and although he denied current intent or plan, there was no documentation in this note to indicate a SRE was considered or a more thorough suicide risk assessment was completed on this date. Additionally, the clinician did not document whether a specific change and suicide risk had occurred since the prior SRE had been completed in January 2017.

6) The SRE completed at SATF in February 2014, following a serious suicide attempt, was poorly completed. Multiple boxes in the various sections were left unchecked, and there were no details about the attempt, no mental status examination listed, no real estimation or justification of risk (outside of 'cut self using a razor - feels hopeless and helpless'), and minimal safety plan ('MHCB placement, minimize escalation'). Although this SRE was conducted in 2014, it is being identified as a concern due to the absence of critical information after a serious suicide attempt, and to alert SATF to review current SRE quality and procedures to ensure this issue has been remedied.

7) Activation of EMS (911) – (Custody and Nursing): On June 28, 2015, officer immediately observes the inmate unresponsive and covered in blood on the lower bunk. The officer immediately called a Code 1 medical response via institutional radio to Building 6, Cell 202, and requests the medical cart. At 1121 hours, TTA staff calls for an ambulance - a 6-minute delay in activation of 911…. Local Operations Plan consistent with the memorandum identified above should be established and readily available to ensure all staff is aware it is their responsibility to initiate a 911 call during a medical emergency.

In the **_second_** case (MCSP 8), the inmate was found hanging from the upper bunk in his EOP cell by a sheet during the morning of September 20, 2017. The inmate entered the CDCR system for a second term in October 2009 to serve a 92-year-to-life sentence for attempted murder, inflicting great bodily harm involving domestic violence, assault with a deadly weapon, terrorist threat, and rape with force (of his girlfriend). He was transferred to MCSP in June 2017. The inmate had only one RVR during his eight-year confinement, occurring in April 2011 for possession of inmate manufactured alcohol. He was not known to be gang-affiliated. The inmate did not have any family support during his most recent CDCR confinement, and there was no record of either telephone calls or visits.

According to available information, the inmate, along with his brother and half-sister, was raised by both parents. His father was an alcoholic and died as a result of his excessive drinking. The inmate self-reported that he was a high school graduate, and also earned multiple undergraduate and graduate college degrees. He also reported being gainfully employed from 1970 through 1999 and worked in the environmental engineering field. The inmate was married three times and had a daughter with his third wife. That marriage was dissolved in 2006. He served in the Army from 1974 through 1976 and was deployed to Vietnam where he was the sole survivor of a helicopter crash which resulted in a coma for several days and numerous severe injuries. In 1991, he was diagnosed with depression, but was non-compliant with medication. The inmate would also later be diagnosed with Personality Disorder NOS with narcissistic and antisocial features, therefore, his education and employment histories would become suspect. The inmate began drinking alcohol at age 18 and described himself as a "functional alcoholic" as an adult. He did not have a juvenile arrest record, and his first involvement in the criminal justice system occurred in 2000 when he was arrested and subsequently sentenced for attempted murder. He served approximately eight years in CDCR, paroling in April 2008. He committed the instant offense the following month.

The inmate had a significant history of mental illness. In addition to previously being diagnosed with depression and treated for alcoholism on three occasions in the community, the inmate was placed in the MHSDS at the 3CMS level of care shortly after entering CDCR in November 2009. From April through July 2010, he was placed in DSH following a suicide attempt at RJD in March 2010.  He was later elevated to EOP with a diagnosis of Mood Disorder NOS, Alcohol Dependence, and Personality Disorder NOS, with narcissistic and antisocial features.  In April 2015, a diagnosis of Post-Traumatic Stress Disorder (PTSD) was added.  During his IDTT meeting on May 5, 2016, the inmate reported that EOP is "what is keeping me alive at this point."  The trauma treatment targeted his night terrors/nightmares, along with other PTSD symptoms.  His most recent diagnoses were PTSD, chronic (provisional), Major Depressive Disorder, Recurrent, Moderate (provisional), and R/O Bipolar II, Depressed.  Other than the suicide attempt at RJD in 2010, the inmate reported only one other suicide attempt by drug overdose while confined in the county jail.  Although reporting ongoing, typically passive suicidal ideation throughout his confinement, the inmate denied any plan or intention of committing suicide.  His last SRE, date unknown, listed his chronic risk for suicide as "high" and acute risk as "low."

The inmate last met with his psychiatrist on August 29, 2017 and while previously generally non-compliant with medication, due to an increase in nightmares, he agreed to restart some of the medication.

The inmate had significant medical problems including, but not limited to, emphysema, coronary artery disease, benign prostate hypertrophy, lower back pain, and suspected colon cancer.  He was in the Disability Placement Program because of his mobility impairment and was issued Double Medical Equipment that included a back-brace support, cane, eyeglasses, oxygen concentrator, and walker.  Due to his medical and mental health issues, the inmate was continuously arguing against both dorm and double-cell status and insisted on single-cell placement.  (Of note, the inmate was removed from single-cell status sometime in July 2017 and temporarily had a cellmate but was housed alone at the time of his death.)

The CDCR reviewer in this case did not note any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, simply stating that "From the beginning of his incarceration, he maintained that death was preferable to life in prison. Although he did not make another suicide attempt, he continued to express suicidal ideation, generally passive in nature, throughout his incarceration until his death on September 20, 2017 by suicide."

The Suicide Report contained seven recommendations for corrective action through a QIP:

> 1) SVSP IDTTs were not held in January and July 2016 according to timelines. The Mental Health *Program Guide*, 2009 revision, states IDTTs for EOP participants are to be held every 90 days unless the patient is on a modified program, which requires an IDTT every 30 days.

2) Treatment plans completed at SVSP outlined the inmate's ongoing suicidal ideation, combined with depressive and PTSD symptoms with corresponding goals and treatment interventions.  The recommendation for single cell status was documented.  However, when the inmate transferred to MCSP, his treatment plan on August 1, 2017 omitted goals or interventions to address suicidal ideation.  No rationale for this omission was documented.

3) At MCSP, the mental health screening did not acknowledge the long history of suicidal ideation and therefore did not prompt completion of an SRE upon his arrival.  Mental health screening upon intake requires a thorough review of the mental health records.

4) At SVSP, psychiatric appointments were not scheduled according to timelines in July 2015, December 2015, May 2016, July and August 2016, and November and December 2016. Policy requires psychiatric appointments every 30 days or more frequently as needed.

5) The inmate's last three primary clinician visits were conducted cell front without a confidential setting being offered and declined.  Meetings with patients are required to at least be offered a confidential setting.

6) Primary clinician appointments did not occur in accordance with policy.  There was a missed primary clinician appointment in the weeks preceding his death.  He was seen on September 1, 2017 and not seen again until September 12, 2017.

7) Multiple reports indicate when the inmate was cut down he fell backward striking his head on the stool in the cell, then striking his head on the cell floor.  It should be noted that staff should do everything possible to try and relieve the pressure/inmate's weight when cutting down an inmate and support them to the ground.

**10)**     **California State Prison-Solano (CSP/Solano)**

**Inspection**:  August 23-24, 2017 (previous suicide prevention audit was on May 26-27, 2016).  CSP/Solano housed approximately 3,742 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on August 24.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was closed during the process, thus ensuring both privacy and confidentiality.

Daily PT rounds in administrative segregation (Building 10) were observed on August 23.  The rounds were unremarkable, and the PT was observed to be correctly entering Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  CSP/Solano had nine MHCBs; each room was suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The administrative segregation unit (Building 10) contained a total of eight retrofitted new intake cells, with two additional cells renovated since the previous assessment.  This reviewer observed that all new intake inmates were housed in new intake cells as required.  However, it should be noted that many of the exterior cell windows still contained frosted screening that obscured natural light into the cell.  CDCR headquarters had ordered that such screening be removed in 2015.  The project had commenced on August 1, 2018 and was still ongoing during this on-site assessment.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement was primarily found in Building 10 and continued to be used infrequently at the facility.  Because inmates were housed in the administrative segregation unit, all were furnished with bunks and required to be observed on a 1:1 basis.  From January 1 through July 31, 2017, only 29 inmates were placed in alternative housing, and the vast majority (83 percent) were released within 24 hours.  No inmates were held in alternative housing over 48 hours.  The total length of stay in alternative housing for these 29 inmates was 12 hours.  (A sample review of EHRS charts for inmates held in alternative housing found that required SRASHEs were completed in all cases.)

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on a suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on several sample days (i.e., August 19 for SOL 1, August 23 for SOL 2 and SOL 3, and August 15 for SOL 4).  The chart review found numerous observation checks (between eight and 15 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 115 minutes in one case (SOL 4).  The following case (SOL 1) exemplified the significance of the problem: There were 13 violations of 20-, 19-, 41-, 19-, 22-, 34-, 33-, 26-, 17-, 22-, 86-, 27-, and 62-minute gaps between the required 15-minute intervals.  Violations in the four cases were by multiple nursing staff during multiple days.  Due to the significant number of large gaps for all patients, this reviewer subsequently conversed with a nursing supervisor, as well as several CTC nurses, regarding the findings.  The nursing supervisor attempted to downplay the findings by suggesting that there might have been equipment failures in laptop equipment used by nursing staff and/or staff might have been performing the checks but the data was somehow not being recorded in real time; whereas the three RNs acknowledged that because CNA and PT staff were not assigned to the CTC, and because there were several medically-infirm patients in the unit, the RNs were not always able to observe patients on Suicide Precaution status at 15-minute intervals as required.

In addition, a previous problem with patients being clothed in safety smocks while being observed at 30-minute intervals, as well as patients not always being offered out-of-room activities and privileges, had not been corrected and was perhaps worsening.  There were multiple deficiencies.

*First*, in one case observed during an IDTT meeting on August 23, a patient (<u>SOL 1</u>) on full-issue status and required to be observed at 30-minute intervals (i.e., not on a suicide observation status) entered the room wearing a T-shirt, boxers, and a smock.

*Second*, the RT was only available to the CTC between ten and 16 hours per week.  A review of RT progress notes for the nine patients in the MHCB unit as of August 23, 2017 found that these patients were in the CTC for a combined 110 days, and only interacted with the RT for ten of those days.  The CTC did not have a program office, and a TTM was recently installed in the dayroom for "out-of-room" activities.  There was no television or DVD player to play movies, or a radio to play music.  RT programming was limited to board games either cell-side or in the TTM.  This reviewer was informed that the RT rarely attended IDTT meetings.

*Third*, a review of records indicated that none of nine patients had been offered yard consistent with CTC policy, and there was documentation for only three of the patients being offered yard during their entire MHCB placement.  The records also indicated that no patients had been out into the yard for at least four days.

*Fourth*, custody staff reported that telephone and visiting privileges rarely occurred in the MHCB unit.

*Fifth*, a review of records indicated that only four of nine patients had been offered showers consistent with policy.

Four IDTT meetings were observed on August 23-24.  Overall, with the exception of the RT, treatment teams were well represented by mental health, medical, and custody staff.  The IDTT meetings were uneven, and the PCs in each case made decisions (e.g., clothing and RT programming) with limited or no input from treatment team members.  The two cases observed on August 23 were particularly problematic.  In the first case (<u>SOL 3</u>), the patient had been admitted into the MHCB on August 15 for danger to self.  He had an extensive history of self-injurious behavior, and multiple MHCB and DSH admissions.  The patient still expressed suicidal ideation and was on Suicide Precaution status clothed in a smock.  The treatment team discussed a PIP referral but did not distinguish between APP and ICF.  Despite the patient's SI, there was no discussion regarding safety planning for coping skills to reduce the ideation.  The patient was offered a shower for the first time since his admission eight days earlier.

In the second case (<u>SOL 1</u>), the patient had been admitted into the MHCB on August 15 for suicidal ideation and auditory hallucinations.  He was currently not on any suicide observation status and was on full-issue status, but as indicated above, still clothed in a smock.  The patient had been generally uncooperative with treatment and had multiple prior MHCB and DSH admissions.  Unbeknownst to the PC, a psychiatrist had assessed the patient two days earlier on August 21 and recommended that he be discharged back to the EOP program at the next IDTT meeting (August 23).  Despite being admitted into the MHCB eight days earlier, the PC told the patient on August 23 that "we need to keep you a little bit longer and get to know you….Would you be okay being released on Monday?" (i.e., an additional five days).  There was no discussion regarding safety planning to reduce SI and, following the meeting, this reviewer intervened in an

attempt for the patient to receive his full-issue clothing, yard, shower, and books, none of which he had received since entering the MHCB unit eight days earlier.

Finally, a review of Guard One data for a recent 24-hour period in administrative segregation found 99-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of January 1 through July 31, 2017.  The TTA log for the same time period was also reviewed.  This reviewer's sample EHRS review of 40 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed required SRASHEs in 98 percent (39 of 40) of the cases, a significant improvement from the previous assessment when there was only 84-percent compliance.

This reviewer examined a sample of ten SRE/SRASHEs from patients released from a MHCB from May through August 2017.  The review found that although some safety plans contained within the SRE/SRASHEs were adequate, many were problematic, including the case (<u>SOL 5</u>) of a patient with a chronic risk for suicide rated as "moderate" based upon three suicide attempts in CDCR custody during the past few years.  Following a ten-day placement in the MHCB, the safety plan contained within the discharging SRE/SRASHE dated May 23, 2017 stated the following:

> Pt. is currently stable and reports he is not suicidal. He is being discharged at CCCMS LOC.  The expectation is that he will be moved quickly as he is a Solano inmate.  In the event that he is retained overnight he will continue to receive 24-hour nursing care, continued contact with clinicians and access to medical and dental depts.  Upon discharge he will be placed on 5-day follow-up with checks by custody officers.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of only 22 cases of inmates discharged from a MHCB or alternative housing placement that remained at CSP/Solano and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1 through August 23, 2017.  The review found that only 45 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most custody checks recommended for 72 hours by clinicians.  In addition, only 32 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.  Problems found related to clinicians discontinuing the checks in less than the required 24 hours or failing to sign the forms which authorized

discontinuation of the checks at 24 hours, and correctional officers conducting checks at 60-minute, rather than the required 30-minute, intervals.

**Intervention**:  All reviewed housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings.  Meeting minutes reflected reference to corrective action plans in response to this reviewer's previous assessment and were otherwise unremarkable and continued to be sparse.

**Training**:  According to training records, 100 percent of both custody and nursing staff were certified in CPR.  In addition, 100 percent of custody staff, 91 percent of medical staff, and 92 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of August 2017, 97 percent of mental health clinicians had completed the SRE mentoring program, 87 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**:  CSP/Solano experienced one inmate suicide during the review period.  In that case (SOL 6), the inmate was found hanging from the top bunk by his pants in his GP cell during the afternoon of March 19, 2017.  The inmate entered the CDCR system on November 16, 2015 to serve a seven-year and eight-month sentence for robbery.  He was transferred to CSP/Solano in May 2016.  The inmate incurred four RVRs during his confinement, the most recent of which occurred on October 18, 2016 and involved disrespect of a GED teacher.  The inmate was not known to be gang-affiliated.  He had strong family support that included weekly visits and daily telephone calls with his wife, as well as letter correspondence with his mother and other friends.  The inmate also had a 2-year-old daughter.

According to limited available records, the inmate had a very dysfunctional childhood that began by being born at CCWF to an incarcerated mother.  His father was also incarcerated and remained so for much of the inmate's life.  Although noted to be a poor historian, the inmate and his twin sister were initially raised by a relative; he was sexually abused at age 11.  The inmate became a ward of the state at age 13 and was subsequently diagnosed with Anxiety Disorder during placement in a group home.  He also had a lengthy juvenile arrest record and was incarcerated for much of his teenage years.  He began abusing drugs at age 11, and also attempted suicide by hanging that same year due to the sexual abuse he endured.  The inmate also reported that an uncle committed suicide.

Upon entry into CDCR, the inmate did not screen positive during the mental health screening portion of the RC process and was not initially referred to the MHSDS.  However, several months later in July 2016, he was seen by a mental health clinician after complaining of depression, irritability, and poor sleep.  The inmate was initially diagnosed with Adjustment Disorder.  Due to several deficiencies attributable to poor documentation, the inmate was not formally placed into the MHSDS until October 26, 2016 at 3CMS level of care.  Although prescribed medication, the inmate preferred to be treated with both individual and group therapy, and psychotropic medication was subsequently discontinued.  Apart from self-reporting a prior

90

suicide attempt at age 11, the inmate never expressed any suicidal ideation during his CDCR confinement.  He was never provided with an SRE.  The inmate was very active in mental health treatment, education classes, and work assignments.

Apart from one significant event that occurred during visitation with his wife several hours before his death, the CDCR reviewer in this case did not find any other specific precipitating factors that were known to staff indicating that this inmate was contemplating suicide, and there were no medical issues that were viewed as contributory to his death.  Staff and other inmates interviewed did not offer any possible precipitating factors that led to the inmate's suicide, with most interviewed inmates stating that he worked hard on his programming and was deeply devoted to his wife and young daughter.  Some of these inmates noted that he appeared very anxious to use the telephone after a visit with his wife on the morning of March 19, 2017, the day of his suicide.

According to the Investigative Services Unit (ISU) review of the suicide, there was an incident that occurred during the March 19 visit which resulted in the inmate handing his wife his wedding band.  Staff in the visiting room reported to ISU that following the visit, the inmate asked staff to call his wife back, so he could retrieve his wedding ring.  However, his wife had already exited the building.  Later that same afternoon, the inmate telephoned his wife and, according to ISU staff who posthumously listened to the conversation, "repeatedly asked why she did not give the ring back to him prior to the end of the visit and asked that she return the ring the following weekend.  She repeatedly responded that she would not visit him the following weekend but would return the ring at her next visit.  As a conversation continued, he angrily threatened, numerous times, to commit suicide if she did not return the ring the following weekend."  He committed suicide a few hours later.  As offered by the CDCR reviewer, "The act of suicide appeared to be an impulsive response to the threat of his perceived dissolution of his family life, as there were no warning signs or indications of suicidal thoughts or contemplation prior to the day of his death."

The Suicide Report contained five recommendations for corrective action through a QIP:

> 1) There was no formal evaluation of suicide risk (e.g., a CDCR 7447 *Suicide Risk Evaluation*) conducted at the time of the initial intake evaluation on August 3, 2016, even though the clinician states an intention to complete an evaluation, and the intake evaluation completed in the EHRS on November 2, 2016 does not document an assessment of risk.  A mention of a past suicide attempt and denial of current ideation or intent does not equate to an evaluation of potential for suicide.  According to the 2009 MHSDS *Program Guide*, "The clinical assessment shall include… Evaluation of suicide and violence potential (p. 12-3-8).  Further the suicide and self-harm section of the EHRS initial intake was incomplete.

> 2) Upon entering the CDCR, 7386 *Mental Health Evaluation* on August 3, 2016, which noted the inmate was being placed in the MHSDS as CCCMS LOC, no CDCR-128 MH3, *Mental Health Placement Chrono*, was completed, causing a delay in his placement into the MHSDS until October 26, 2016.  Per the 2009

MHSDS *Program Guide*, "A 128 MH3 *Mental Health Placement Chrono* shall be produced with every change in level of care" (p. 12-3-1).

3) There was no CDCR 7448 *Informed Consent for Mental Health Care* in the record.  According to the 2009 MHSDS *Program Guide*, "Clinicians are responsible for informing inmate-patients of the limits of confidentiality, or ensuring that prior documentation in the UHR indicates that this disclosure has occurred prior to commencement of a clinical encounter.  CDCR 7448, *Informed Consent for Mental Health Care* shall be used for this purpose."

4) All clinical documentation by the PC lacked clinical detail pertaining to the inmate's current mental health status, presenting concerns and relevant historical information that would be necessary to conceptualize a clinical case, formulate a diagnosis, and develop an individualized treatment plan.  The PC failed to document mental status in several clinical encounters, which is standard practice for clinical care.  Further, there was no clinical rationale for the diagnosis assigned or a discussion regarding differential diagnoses, as required in the CDCR 7386 *Mental Health Evaluation*.  Finally, the initial treatment plan developed by the PC was not individualized and did not reflect treatment targeting the symptoms reported by the inmate.

5) Although staff requested an ambulance be called at 1632 hours, activation of the Emergency Medical System (Calling 911) did not take place until approximate 50 minutes into the emergency, which caused a significant delay in appropriate medical response….

## 11)   California State Prison - Corcoran (CSP/Corcoran)

**Inspection**: October 10-11, 2017 (previous suicide prevention audit was June 21-22, 2016).  CSP/Corcoran housed approximately 3,157 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on October 11.  The nurse was observed to be asking all of the required questions and entering the information on a hard copy of the Initial Health Screening form.  (Of note, CSP/Corcoran had not yet implemented EHRS at the time of the on-site assessment.)  Privacy and confidentiality, however, remained compromised because the screening occurred with the door open and an officer posted inside the nurse's office.  The only difference between the current assessment and the assessment conducted by this reviewer in June 2016 was that at a TTM had been placed in the hallway.  However, for reasons that remained unclear, the TTM was not being utilized for intake screening and its placement remained unacceptable because it was still located in a non-confidential area of a hallway used by both staff and inmates.  A CAP for this issue had first been created in March 2016 and remained unresolved.  This issue could be resolved if the TTM was relocated inside the nurse's office or another room in the R&R unit and the door remained closed, with the officer posted outside.

Daily PT rounds were observed in two (of four) administrative segregation units (EOP administrative segregation and long-term restricted housing (LTRH)) on October 11.  The rounds were unremarkable, and the PTs correctly completed a hard copy of the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  CSP/Corcoran had 24 MHCBs.  A previously identified deficiency of MHCB rooms with wall ventilation grates containing holes that were in excess of 3/16-inch diameter had not been corrected.[21]

Further, another previously identified deficiency of selected new intake cells in two administrative segregation units not being completely retrofitted as suicide-resistant was verified as corrected during this assessment.  There were six new intake cells (100-105) located in the STRH and ten new intake cells (124 through 128; 224 through 228) located in the EOP administrative segregation unit (3A04).  During inspection of both of these units, all new intake inmates were observed to be in new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in four designated OHU cells and a 20-cell section of the LTRH unit.  All cells used for alternative housing had beds, with inmates in OHU cells provided stack-a-bunks and required to be observed on a continuous 1:1 basis.  Alternative housing was used extensively at CSP/Corcoran.  From July 1 through September 30, 2017, there were approximately 431 inmates placed in alternative housing, with only 51 percent released within 24 hours, 29 percent released within 48 hours, 18 percent released within 72 hours, and the remaining two percent housed over 72 hours.  The average length of stay in alternative housing for these 431 inmates was 35 hours.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer was not able to verify the accuracy of observation rounds because CSP/Corcoran had not yet "gone-live" with EHRS at the time of the on-site assessment.

Further, a previous problem with patients remaining clothed in safety smocks after being clinically approved for "full-issue" clothing, as well as patients not being timely approved for yard privileges and/or being forced to choose between an out-of-room activity and yard, had not been corrected. There were multiple deficiencies.

---

[21]On January 25, 2018, the court ruled that "[w]ithin 14 days from the date of this order defendants shall show cause in writing why the inadequate wall ventilation grates at CSP/Corcoran cannot be replaced within six months."  ECF No. 5762 at 4.  On February 7, 2018, defendants submitted a plan to the court which indicated that the project would be completed within six months.  ECF No. 5775.  On February 22, 2018, defendants informed the Special Master that the 24-bed MHCB unit at CSP/Corcoran would be temporarily closed and that the renovation would commence by March 19, 2018, with estimated completion within three to four weeks.  On April 24, 2018, defendants notified the Special Master that the renovation project at CSP/Corcoran had been completed and that all MHCB unit beds were reactivated on April 24, 2018.

*First*, <u>no</u> patients on full-issue clothing status were issued either a uniform or shirts and pants because such clothing was <u>not</u> available in the MHCB unit.  As such, this reviewer was informed by IDTT members that safety smocks were issued to each patient for "privacy."

*Second*, review of Physician's Orders (CDCR 7221) forms found multiple contradictory orders. For example, it was not uncommon to see Orders that allowed for both issuance of a safety smock and "partial-issue" (i.e., shorts and T-shirt); there were orders to disallow both yard and telephone privileges without clinical justification for patients not on suicide observation status; as well as incorrectly automatically denying yard privileges for patients on administrative segregation status.

*Third*, there was only one RT assigned to the CTC for 24 MHCB patients, and that staff member informed this reviewer that one of those days was reserved for OHU medical patients.  As such, the RT estimated that they were available to each MHCB patient for only one hour every three days.  Due to the limited schedule, patients approved for out-of-room activities must choose either the program office or yard.  This writer was also informed that the RT rarely attended IDTT meetings.

*Fourth*, a review of 22 records of patients who had been in the MHCB unit for at least 72 hours as of October 10, 2017 indicated that only seven had been approved for yard privileges.  The records included an additional seven patients on administrative segregation status, all of whom had not been approved for yard.  (This reviewer was informed that because of security concerns regarding a low roof line in the MHCB yard, a procedure had been developed requiring patients on maximum-security and administrative segregation status to be escorted to an administrative segregation unit yard.  In practice, however, this was found not to be occurring on a regular basis.)  In addition, non-administrative segregation patients were also not approved for telephone privileges.

In sum, most of the above deficiencies were identified by this reviewer in the initial 2014 assessment and remained very problematic.

Three IDTT meetings were observed on August 10 between two treatment teams.  Both four-member IDTTs were comprised of a psychologist, psychiatrist, CC1, and PT.  Of the three cases presented, only one demonstrated an adequate discussion of safety planning to reduce SI.

Finally, a review of Guard One data for a recent 24-hour period found a combined 99-percent compliance in the four administrative segregation units (GP, STRH, LTRH, and EOP) with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period July 1 through October 10, 2017.  A review of the TTA log for a similar period was also conducted.  A sample eUHR review of 30 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in all of the cases.

This reviewer also examined a sample of ten SREs from patients released from a MHCB between July and October 2017.  There was uneven consistency with discharging SREs containing adequate safety plans in the reviewed sample.  Most documents simply deferred the development of safety plans to the yard clinicians.  The following was an example (COR 1) of an inadequate safety plan:

> I/P is already on a 5-day f/u and to continue daily PC contact to address s/s and monitor SI/HI.
> 1) Psychiatrist will prescribe and adjust medication as needed.
> 2) PC provide patient with Bible to read while in his cell.
> 3) PC will teach IP stress management and relaxation techniques to help decrease stress and anxiety that seem to be increasing SI.

In addition, the first day of the patient's Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form stated the following under safety plan: "If sxs increase, IP to contact staff/mental health staff immediately.  Continue with current tx. plan."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 160 cases of inmates discharged from either the MHCB unit or alternative housing that remained at CSP/Corcoran and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from mid-August through September 30, 2017.  The review found that only 69 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with approximately 78 percent of the custody checks recommended for between 48 and 72 hours.  In addition, only 60 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.  Problems found were related to clinicians failing to complete and/or sign the forms, and time gaps for correctional officers consistently conducting checks at 30-minute intervals.

**Intervention**:  All reviewed housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (June through August 2017) found that quorums were not achieved in any of the meetings.  However, it was noteworthy that there were between 13 and 16 participants at each monthly meeting.  Meeting minutes included a robust case presentation during July but were otherwise unremarkable.  This reviewer was also presented with a CAP based upon the previous suicide prevention assessment.  Dated October 5, 2016, the CAP indicated several items were noted to be "completed," including confidentiality during intake screening; allowable possessions, property, and privileges for

95

MHCB patients; and safety planning for patients discharged from the MHCB.  As indicated above, this CAP was incorrect because such issues remained problematic.

**Training**:  According to training records, 79 percent of custody and 98 percent of nursing staff were currently certified in CPR.  In addition, 96 percent of custody staff, 90 percent of medical staff, and 88 percent of mental health staff completed annual suicide prevention block training during 2016.  Finally, as of September 2017, only 72 percent of mental health clinicians had completed the SRE mentoring program, only 78 percent had received the seven-hour SRE training, and only 74 percent had completed safety plan training.  Similar low percentages for SRE training were found during the previous assessment.

**Recent Suicides**:  CSP/Corcoran experienced two inmate suicides during the review period.  In the _first_ case (COR 2), the inmate was found hanging from the bunk by a sheet in his EOP administrative segregation unit cell during the early morning of July 21, 2017.  The inmate entered the CDCR system on September 14, 2007 to serve a life sentence (with the possibility of parole) for second-degree murder (of his best friend).  He was transferred to CSP/Corcoran on April 24, 2017.  The inmate had 15 RVRs during his confinement, including ten for assault.  The last RVR occurred on June 4, 2017 for battery of an officer.  The inmate was not known to be gang-affiliated.  His family support was said to be exaggerated since he had not had any family contact since March 2016.

According to available documents, the inmate had a dysfunctional childhood and was raised by a mother who experienced significant substance abuse.  His father was incarcerated for most of his young life.  Records also indicated that the inmate was a victim of physical and emotional abuse by his mother, who died in 2009.  He had severe anger control deficits as a young child, as well as significant involvement with the juvenile justice system for assaultive behavior.  At age 13, he was hospitalized for fighting with his brother and attempting to hold his entire family hostage.  He spent a significant amount of time in either foster care or group home environments.  The inmate also had a significant history of substance abuse, and the instant offense, which involved the stabbing of his best friend, occurred while under the influence of drugs.

Other than being placed in two residential programs to treat his severe behavioral problems as a juvenile, the inmate did not have any other mental health treatment in the community.  Upon entry into CDCR, he began to demonstrate delusional thinking shortly thereafter by refusing to eat and claiming that his food had been poisoned by custody staff.  He was initially placed at the 3CMS level of care with diagnoses of Psychotic Disorder NOS, Antisocial Personality Disorder, and Traumatic Brain Injury (at age 7).  His care was later elevated to EOP in August 2008, and he was later placed in DSH on two occasions (2008 and 2010) for inpatient treatment.  Such delusional thinking triggered his refusal to eat, which correlated with a number of staff assaults.  As a result, a conservatorship was initiated in December 2009.  He lost a significant amount of weight between 2009 and early 2013 and had to be fed frequently for lengthy periods of time with a feeding tube.  In July 2013, a PC 2602 (involuntary medication order) for danger to others was initiated, and the order was annually renewed by the court until his death.  The inmate had two other APP placements in November 2012 and May 2016, as well as MHCB placements in April 2010, May 2012, August 2012, and April 2016, all for delusional behavior.

The inmate had a significant history of suicidal behavior, including two suicide attempts by overdosing while confined in a county juvenile detention facility. In 2005, he attempted suicide by cutting himself in a county jail. In 2007, he slit his wrist after self-reporting "depression." In 2012, he attempted to hang himself while housed in the SHU at CSP/Corcoran. He was later placed in a MHCB. The inmate had multiple SREs completed during his confinement, the last completed on May 3, 2017 and assessing his chronic risk for suicide as "high" and acute risk as "low."

In June 2017, following a staff assault, the inmate's PC opined that his psychotic symptoms and level of agitation appeared to be worsening. The inmate told the PC that he "heard voices every waking moment….You guys are poisoning me with food and water…. I have green stuff coming out of my ears, my urine and feces. I know you guys are trying to kill me. If I kill myself one day, I get back at you guys for poisoning me." The inmate's IDTT decided to retain him at the EOP level of care because "he was maintaining his activities of daily living and was medication compliant." However, the CDCR reviewer in this case found inconsistent clinical opinions about his level of care, ranging from the PC advocating another DSH referral based upon "his current level of functioning and delusional thoughts/beliefs," to a psychiatric note dated July 18, 2017 and stating that the inmate "would be better served at the CCCMS level of care, because he was not utilizing the therapeutic opportunities in EOP." The psychiatrist was also concerned that the inmate would be potentially assaultive to DSH staff. The inmate was seen by his PC on July 20, 2017, the day before his death. The progress note stated that he "denied having any mental illness, 'just an anger problem,' and stated that he wanted to get away from EOP and the psychiatrist, because he did not like being on medication. He went on to threaten both the PC and the psychiatrist with violence."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although he continued to suffer from several medical issues related to his refusal to eat for long periods of time due to his delusions, these issues were not viewed as proximate causes of his death.

The Suicide Report contained six recommendations for corrective action through a QIP:

1) Two days after the inmate transferred from COR to SVSP, a SRE dated January 7, 2016 was performed. It appears the inmate's suicide history was not reviewed prior to this evaluation because his historical information was replaced by information belonging to a different inmate, whose name is mentioned in the "Estimate of Risk" section. The erroneous reporting in this SRE also contained documentation of a suicide attempt by overdose in 2015 that was made by another inmate. The two subsequent SREs (dated April 7, 2016 and April 14, 2016, at 9:45am) carried forth the same inaccurate historical information as contained in the SRE dated January 7, 2016, and with other inmate information.

2) On July 5, 2017, the treatment team decided to retain the inmate in EOP, and not refer him to DSH, despite his lack of attendance in any structured out-of-cell activities, increased delusional symptoms, and increased anxiety/anger. Further, it noted, "he had no current MHCB admissions" and "he appears to be relatively

stable." However, clinical progress notes indicated the inmate's delusional system appeared to continue to worsen. The level of care justification is discrepant from the clinical progress documents within the file. On July 20, 2017, the inmate was seen by his PC. Documentation indicated the inmate would be retained at EOP level of care and work on reducing his paranoid ideation/delusions and improve his sense of reality. She added that the inmate would continue to "attend his 1:1 until being accepted to DSH." However, it does not appear that the IDTT had referred the inmate to DSH at that time. It is unclear if there was any intent to refer the inmate to DSH. The clinical documentation is inconsistent and the plan for the inmate's clinical care and interventions are unclear.

3) On July 18, 2017, a psychiatric note opined that the inmate would be better served at the CCCMS level of care because he was not utilizing the therapeutic opportunities in EOP. However, clinical documentation also indicated a worsening of delusional symptoms that may have contributed to his willingness to participate in mental health treatment. Lack of participation in treatment is not an adequate justification for lowering inmates' mental health level of care. It is unclear whether the clinical team considered his current mental health presentation and how it may have correlated with the inmate's unwillingness to attend EOP programming.

4) Activation of the Emergency Medical System (Calling 911) did not take place until approximately six minutes into the emergency which caused a significant delay in appropriate medical response. Although a request was made to activate 911 within one minute of discovery by the responding supervisor, the Watch Office did not initiate the 911 call as identified in Operational Procedure No. 1083.

5) On July 21, 2017, RN documented administrating 25 liters of oxygen via BVM (documentation error).

6) On July 21, 2017, Provider 2 (RN) gave a third dose of Narcan 0.8 mg IM in the TTA without a provider order.

In the ***second*** case (COR 3), the inmate was found hanging from a ventilation grate by a sheet in his STRH unit cell during the early afternoon of December 7, 2017. He had entered the CDCR system on August 27, 2015 to serve an unidentified sentence length for second-degree robbery. The inmate was 17-years-old at the time of the offense. He was transferred to CSP/Corcoran on August 31, 2016. The inmate had seven RVRs during his CDCR confinement, the most recent of which occurred on September 26, 2017 for possession of a dangerous weapon. He was known to be gang-affiliated. The inmate was a victim of a gang-related assault on November 17, 2015. (He would later be placed in SNY due to safety concerns shortly before his death.) Although his mother had previously thrown him out of the family home, he enjoyed good family support with her through telephone calls and letter correspondence, as well as occasional visits. The inmate was unmarried and had one young daughter.

The inmate was raised with three brothers and a sister by both parents but was self-described as "the black sheep of the family" as he was the only one involved in gangs and the criminal justice system (albeit limited). He had a long history of substance abuse, as well as a five-day hospitalization at age 15 for "for depression, agitation, and anxiety."

Upon entry into CDCR, the inmate self-reported having a history of depression, but denied any current suicidal ideation or prior suicidal behavior. On September 14, 2015, he was placed in the MHSDS at the 3CMS level of care for treatment of depression and substance abuse. His initial diagnosis was Depressive Disorder NOS. Several weeks later in October 2015, he was assessed by a psychiatrist and started on psychotropic medication "to treat symptoms of depression, chronic anger, ruminating thoughts, and sad mood." The inmate continued to be treated in the 3CMS program and remained stable enough that by March 2017 he requested to be removed from the MHSDS. The inmate's medication was eventually discontinued, and he remained stable for the next several months.

During an IDTT meeting on October 4, 2017, clinicians noted that the inmate had no history of suicidal thoughts or behavior, and although stable without medication, because he estimated his depressive symptoms at "four out of 10…..and agitation related to incarceration issues at seven out of 10," he "could benefit from continued treatment for depression using CBT techniques to help him learn to identify and modify cognitive distortions and use coping skills including emotion regulation, distress tolerance skills." The IDTT decided to retain the inmate in 3CMS pending a review of his mental health needs by the treatment team in six months. However, a few weeks later on October 23, 2017, a PT submitted an emergency mental health referral after the inmate stated that "I'm going to hurt myself." Although seen by a mental health clinician, the required SRE was not completed. During a follow-up appointment with a clinician two days later on October 25, the inmate denied any mental health distress or suicidal ideation, and the clinician noted that he "was motivated for treatment, as reflected by the fact he had recently completed at least four CBT workbooks."

During an IDTT meeting on November 21, 2017, the inmate was found to be stable and exhibiting no mental health symptoms and the team decided to discharge him from the MHSDS. However, approximately 20 minutes following his IDTT meeting, the inmate reported to custody staff that he needed SNY due to safety concerns. He was escorted to the STRH unit for further assessment. The following day (November 22), the inmate reported suicidal ideation and was seen by a clinician who concluded that "IP presented void of acute distress/crisis but is endorsing DTS with high likelihood of staff manipulation….Intermittently uncooperative evidence by being evasive with questions and potential for feigning symptoms for secondary gain to avoid process from mainline to SNY requiring STRH temporary placement." The inmate had admitted to the clinician that he wanted to bypass the STRH and obtain SNY status as soon as possible, as well as asking to return to the 3CMS program. The required SRE was completed and the inmate was referred to an MHCB due to his "adamant" report of suicidal ideation. He remained in the MHCB until December 3 when he was returned to the STRH unit. His diagnosis in the MHCB was revised to be Adjustment Disorder with Depressed Mood. His final SRE assessed both his chronic and acute risk for suicide as "low." The CDCR reviewer in this case subsequently found that the safety plan contained within the discharging SRE, as well as four days of

Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms, did not adequately reflect safety planning to reduce SI.

On December 4, 2017, three days before his suicide, the inmate was interviewed by a captain and stated, "he had heard rumors in the facility indicating he was considered to be in 'bad standings' with the Crips."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and there were no medical issues in his case that were viewed as proximate causes of his death.  Although a suicide note was not found in his cell, the reviewer opined that the inmate "had frequently reported a connection between safety concerns, symptoms of depression, and suicidal ideation.  The inmate's mood appeared to be substantially impacted by realistic fear reactions to external events, which he perceived to have a strong potential for impacting his safety.  Additionally, the inmate indicated he feared not being able to be with his mother before she died of breast cancer.  Finally, fear of potential future gang-related problems appears to be another plausible contributory factor."

The Suicide Report contained nine recommendations for corrective action through a QIP:

   1) On October 23, 2017, a primary clinician interviewed the inmate, but did not perform a Suicide Risk Evaluation, although the psychiatric technician who made the emergency referral noted the inmate having reported, "I'm going to hurt myself."  In the corresponding progress note, the clinician failed to adequately document the reason for this referral, sufficiently explore his statement of intended self-harm, or develop a safety plan to address intended self-harm.

   2) The IDTT documented on the Mental Health Master Treatment Plan completed on November 21, 2017 recommended removal from MHSDS. However, the transfer/discharge planning section was empty, and the case formulation section and clinical summary were inadequate.  During the performance of a "Danger to Self" Patient Level Outcome interview at the IDTT meeting, the inmate answered "somewhat often" to the question of how frequently he thought about suicide lately.  In spite of this assessment, the clinician reported the inmate to be free of symptoms.  The clinical rationale for discharge from MHSDS appeared to be based on symptom remission while medication-free for six months.  However, an Individual Plan of Care (IPOC) for depressed mood was activated at this IDTT, which is inconsistent with his reports of remission and discharge from the MHSDS.

   3) On November 22, 2017, a clinician interviewed the inmate in response to an emergency referral by ASU staff, because the inmate reported suicidal ideation. The clinician did not document the reason for conducting the interview in a non-confidential setting, where she posed a number of specific questions related to the inmate's reported safety concerns.

4) A progress note and SRASHE dated November 22, 2017 primarily focused on a diagnostic impression of manipulation and malingering.  The clinician did not document the nexus between the inmate's safety concerns, depression, and his suicidal ideation, and minimized the present risk factors by focusing primarily on manipulation and malingering.  Additionally, the assessing clinician omitted the Columbia Suicide Severity Rating Scale (C-SSRS), which led to the omission of important historical information related to the inmate's suicidal ideation.

5) Records show that the assessing mental health clinician for the November 22, 2017 evaluation did not complete the mandatory trainings: "Safety Planning Webinar" and "Differential Diagnosis of Complex Cases in Corrections."  The clinician stated she was not aware of and had not been offered these trainings.

6) Records show that the mental health clinician who conducted the November 22, 2017 evaluation had not attended the C-SSRS training.  However, the Statewide Mental Health Program (SMHP) had not yet placed the C-SSRS training on the list of mandatory trainings.

7) The documentation from the inmate's MHCB admission from November 22, 2017 through December 3, 2017 had a number of deficiencies.

8) The inmate was discharged from the MHCB on December 3, 2017.  Four 5-Day follow-up evaluations were completed prior to his death (the inmate died on day five).  On the 5-Day follow-up evaluations completed by a mental health clinician, the safety plans did not contain individualized treatment interventions targeting his triggers (i.e., safety concerns).

9) Activation of EMS (911): approximate 10-minute delay for EMS activation.

### 12)    California Substance Abuse Treatment Facility (CSATF)

**Inspection**:  October 12-13, 2017 (previous suicide prevention audit on June 23-24, 2016).  CSATF housed approximately 5,814 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on October 12, 2017.  The nurse was observed to be asking all of the questions and correctly entering information into the EHRS.  The door to the nurse's office remained closed, with officers stationed outside, thus ensuring both privacy and confidentiality. Of note, based upon this reviewer's previous recommendation, the intake screening process had been relocated to a former examination room (Room 103) that contained a TTM.

Daily PT rounds in the STRH unit were observed on October 13.  The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS.

**Housing**:  CSATF had 20 MHCBs.  A previously identified hazard (i.e., square-shaped stainless-steel sinks protruding from the wall) had been corrected with installation of stainless-steel triangle extensions.  The rooms were now suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.

The facility had one administrative segregation unit (STRH), with GP inmates requiring administrative segregation transferred to CSP/Corcoran.  The STRH unit contained nine new intake cells (100-108) that had been previously retrofitted to be suicide-resistant.  Upon inspection, all of the new intake cells were full on October 13.  However, the facility received eight new inmates the previous evening (October 12), resulting in several being placed in unsafe, non-intake cells.  A custody supervisor informed this reviewer that the STRH unit exceeded its new intake cell capacity approximately every one to two weeks, and the supervisor had recommended that an additional three cells be retrofitted for new intake inmates.  To date, the recommendation had not resulted in a work order.

Finally, **<u>alternative housing</u>** to temporarily house inmates identified as suicidal and awaiting MHCB placement was extensively used on a daily basis.  Two holding cells in the CTC and designated cells in E-1 unit, formally administrative segregation, were primarily utilized for alternative housing.  All inmates had beds, with those housed in the CTC holding cells provided stack-a-bunks and required to be observed on a 1:1 basis.  From July 1 through October 9, 2017, there were 357 inmates housed in alternative housing, with the majority (53 percent) released within 24 hours.  In addition, 34 percent of inmates were housed in alternative housing between 24 and 48 hours.  The overall average length of stay in alternative housing for all 357 inmates was 24 hours.  (Of note, a previous very problematic practice of handcuffing inmates to gurneys in two TTA examination rooms had been discontinued following this reviewer's preceding assessment.)

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were now required to be observed at 15-minute intervals by nursing staff, modifying a previous practice that allowed 60-minute rounds.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (<u>CSATF 1</u>, <u>CSATF 2</u>, <u>CSATF 3</u>, and <u>CSATF 4</u>) on Suicide Precaution status in the CTC for an eight-hour period from 12:00 a.m. through 7:59 a.m. on October 12, 2017.  The chart review found a few observation checks that were in excess of the required 15-minute intervals for the four patients.  In fact, there were no violations for cases <u>CSATF 1</u> and <u>CSATF 4</u>, but six violations for <u>CSATF 3</u> and nine violations for <u>CSATF 2</u>.  Of note, the CNE informed this reviewer that nursing leadership had previously determined that there were not enough certified nursing assistant (CNA) staff assigned to the CTC in order to consistently complete observation of MHCB patients at 15-minute intervals.  As a result, a determination was made that a staff-to-patient ratio of to 1:7 was required, and additional CNA staff were subsequently assigned to the MHCB unit.

A previous problem with patients being clothed in safety smocks or "partial-issue" clothing despite the fact they were not on suicide observation status had been corrected, as all patients were observed to be clothed consistent with their level of risk or lack thereof.  In fact, this reviewer observed many MHCB patients in "full-issue" uniforms.  The MHCB unit still did not have a RT, a problem found during the preceding assessment.  As such, there was limited use of

both the program office and telephone access, but most patients were offered yard access that was provided by custody personnel upon their availability.

This reviewer observed five IDTT meetings on October 12, 2017. The treatment team was well represented by mental health, medical, and custody staff, and there were robust discussions observed during the meetings, with each averaging approximately 30 minutes in duration. However, although there was significant discussion (primarily between the PCs, CC I and patients) about an assortment of issues, ranging from the MHCB process, parole planning, GED classes and treatment groups, and milestone credits, there was little, if any, discussion regarding safety planning to reduce SI, particularly for the two patients who were being discharged from the MHCB that day. For example, in one of those cases (CSATF 1), the patient had been admitted into the MHCB unit nine days earlier for depressed mood, paranoia, bizarre delusions, and suicidal ideation. The patient was at EOP level of care and, although viewed as an unreliable historian regarding his history of suicidal behavior, he remained suicidal for most of his MHCB placement. During the IDTT meeting on October 12, the team decided to discharge the patient without any discussion of safety planning nor even any inquiry regarding current suicidal ideation. A subsequent review of the patient's discharging SRASHE included the following safety plan that was not discussed during the IDTT:

> 1) Psychiatrist will continue with medication evaluation and monitoring (100% medication compliance); 2) IP to learn three emotional regulation techniques such as deep breathing, thought stopping negative thoughts and replace with positive self-talk, and/or distractions like reading, journaling, writing letters, exercise, dayroom leisure activities over the next 30 days to improve mood to a 4/10 or better, decrease impulsivity as a way to prevent SI and MHCB admits; 3) PC to remind and encourage IP to engage in more solution-focused behavior such as identifying appropriate resources to problems (custody, medical, MH) and participating in EOP psychoeducational groups.

Finally, a review of Guard One data for a recent 24-hour period found 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently reviewed a listing of emergency mental health referrals from the MHTS for the period of April 1 through September 30, 2017. The TTA log for the same time period was also reviewed. This reviewer's sample EHRS review of 40 emergency mental health referrals for suicidal ideation/behavior found that mental health clinicians subsequently completed the required SRASHEs in 95 percent (38 of 40) of the cases. This was an improvement from the previous assessment when only an 89-percent compliance rate was found.

This reviewer examined a sample of ten SRASHEs from patients released from the MHCB unit from August through early October 2017. Although a few safety plans contained within the discharging SRASHEs were adequate, most did not include specific strategies to reduce future SI. For example, in one case (CSATF 5), the patient had been admitted into the MHCB unit 11 days earlier on September 29, 2017. He had at least three previous suicide attempts, as well as

103

multiple prior reports of suicidal ideation resulting in five MHCB admissions.  The entirety of the safety plan section of the discharging SRASHE dated October 9, 2017 was the following:

> IP will contact clinician on yard to assist with problem-solving and verbalize feelings of distress in order to manage stressors effectively and avoid future SI.

In addition, the first day of the patient's Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form dated October 10, 2017 stated the following under safety plan: "1) increase drinking fluids during the day time, but not after 7pm, 2) Ask to talk to PC if SI symptoms increase, 3) Reading and watching some TV."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 454 cases of patients discharged from either the MHCB unit or alternative housing that remained at CSATF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during April through September 2017.  The review found that 87 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority of the custody checks recommended for 48 hours by clinicians.  In addition, 98 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.  The few problems found included clinicians discontinuing custody checks in less than the required 24 hours, as well as some gaps in observation by custody personnel.  Of note, all of the Discharge Custody Check Sheet (CDCR MH-7497) packets were found to be extremely well-organized.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (July through September 2017) found that quorums were only achieved during one month (September). Meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 97 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 97 percent of custody staff, 84 percent of medical staff, and 94 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of September 2017, 81 percent of mental health clinicians had completed the SRE mentoring program, 92 percent had received the seven-hour SRE training, and 76 percent had completed safety plan training.

**Recent Suicides**:  CSATF did not experience any inmate suicides during the review period.

### 13)   **High Desert State Prison (HDSP)**

**Inspection**:  November 2-3, 2017 (previous suicide prevention audit was on November 8-9, 2016).  HDSP housed approximately 3,502 inmates at the time of the on-site assessment.

**Screening/Assessment**:  The intake screening process within the R&R unit was not observed because there were not any new inmates admitted into the facility during the two-day assessment.  Daily PT rounds in the STRH unit were observed on November 3.  The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS.

**Housing**:  HDSP had ten MHCBs and all rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.  The STRH unit contained six retrofitted new intake cells (100-105) and had been relocated to Z-Unit.  During inspection of the unit, this reviewer observed several empty new intake cells, however, a new intake inmate who had arrived on November 1 was housed in an unsafe, non-new intake cell.  During the previous assessment, this reviewer had been informed that the facility received approval for renovation of approximately 17 additional new intake cells.  Because the STRH unit had since been relocated to Z-Unit, it was unclear if, or when, any additional new intake cells would be available.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was infrequently used at the facility.  From July 1 through October 30, 2017, only 58 inmates were housed in alternative housing, and all released within 24 hours.  An observation room (Room 11) in the CTC was primarily utilized for alternative housing and contained an MHCB bed; other designated CTC medical rooms or holding cells could also be utilized.  All inmates were provided stack-a-bunks in the CTC medical rooms/holding cells and observed on a continuous 1:1 basis.  The exact length of stay in alternative housing for these 58 inmates was unavailable but estimated to be 24 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on several sample days (i.e., November 2 for HDSP 1 and HDSP 2, August 8 for HDSP 3, and October 9 for HDSP 4).  The chart review found numerous observation checks (between two and ten per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 35 minutes in one case (HDSP 3).  The following case (HDSP 3) exemplified the extent of the problem:  There were five violations of 35-, 20-, 16-, 18-, and 23-minute gaps between the required 15-minute intervals.  Violations in the four cases were by multiple nursing staff during multiple days.

A previous problem with patients being clothed in both "partial-issue" and safety smocks had been corrected, and there were no problems observed regarding the issue of privileges within the MHCB unit.  There was a full-time RT assigned to the unit and patients were receiving out-of-room activities, including yard.  In fact, this reviewer observed two IDTT meetings in the MHCB

unit on November 2 and the PC had a uniquely good practice of going through both patients' CDCR 114-A Form and carefully explaining the privileges that they would be eligible for during their MHCB placement based upon clinical judgment.  The treatment team was well represented by mental health, medical, and custody staff.  The psychiatrist attended via tele-psychiatry.  There was not much discussion in either case regarding safety planning, despite the fact that one patient (HDSP 1) was discharged from the MHCB unit during the IDTT meeting.

Finally, a review of Guard One data for a recent 24-hour period in the STRH unit found 100-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from April through October 2017.  A sample EHRS review of 60 emergency mental health referrals for suicidal ideation/behavior revealed that clinicians completed the required SRASHEs in 90 percent (54 of 60) of the cases.

In addition, this reviewer examined a sample of ten SRASHEs from patients released from a MHCB from August through early November 2017.  Although all of the SRASHEs mentioned safety planning to reduce SI, few offered specific strategies to reduce risk.  For example, one case (HDSP 5) was representative of the problem.  The clinician wrote the following in the safety plan section of the discharging SRASHE:

> His prior safety plan/treatment plan focused on stabilizing his mood, developing goals for the future, and developing alternative strategies for relief besides cutting (self-harm).  The Pt currently states a safety plan is adequate for keeping him safe.

The above narrative failed to identify the specific "goals" and "strategies" contained within either the current or previous safety plan that was effective for the patient.

In contrast, although not discussed during the observed IDTT meeting, the safety plan for the patient (HDSP 1) discharged from the MHCB on November 2, 2017 was specific (albeit lengthy):

> Continue treatment for recent depression related to family issues.  Work with patient in individual and group tx utilizing CBT to reduce depressive symptoms and increase coping skills regarding environmental stressors.  He will continue to engage in positive coping, including regular exercise, phone calls with his family, religious practices, and reading.  DSH discharge summary from 2013, pt reported that he copes by listening to music and it was recommended that the pt should not have KOP medication in significant quantities.

> A common stressor that has been documented as the source of the patient's suicidal ideation is being far away from his family and grief and loss.  When the patient's father passes away the pt will likely struggle to maintain his positive coping skills and will require significant support from the mental health team.  It may be helpful to start processing grief and loss to prepare the patient for future situations involving grief and loss.

Due to the patient's recent relocation to HDSP and recent MHCB discharge pt should be met with frequently over the next couple of weeks to ensure a smooth transition to EOP LOC.  Pt should check in about continued phone calls with his family, and issues related to him receiving his property (specifically his radio, as this is a reported coping skill), and provide examples of his participation in positive coping skills, such as exercise, religious practices, and reading.  Additionally, if pt begins to sell his property items this could indicate an increase in his suicidal ideation.  Additionally, the pt should be considered for being clear for double cell due to MH symptoms.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 46 cases of patients discharged from a MHCB or alternative housing placement that remained at HDSP and were not transferred to the STRH unit (where observation at 30-minute intervals was required) from March through October 2017.  The review found that only 80 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most of the custody checks recommended for only 24 hours by clinicians.  In addition, only 67 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.  Most of the deficiencies found included clinicians discontinuing custody checks in less than the required 24 hours, as well as some gaps in observation by custody personnel.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (July through September 2017) found that quorums were not achieved in any of the meetings.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff, 71 percent of medical staff, and 85 percent of mental health staff received annual suicide prevention block training during 2016.  A similar low compliance rate for annual suicide prevention training by medical and mental health staff was found during all previous assessments.  Finally, as of October 2017, 62 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**:  HDSP did not experience any inmate suicides during the review period.

### 14)   California State Prison - Los Angeles County (CSP/LAC)

**Inspection**:  November 13-15, 2017 (previous suicide prevention audit was on April 28-29, 2016).  CSP/LAC housed approximately 3,410 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on November 14, 2017.  The nurse was observed to be asking all of the questions and correctly entering information into the EHRS.  The door to the nurse's office remained closed, with officers stationed outside, thus ensuring both privacy and confidentiality.

Daily PT rounds in the STRH unit and EOP administrative segregation unit (D-5) were observed on November 14.  The rounds were unremarkable, and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS.

**Housing**:  CSP/LAC had a 16-bed CTC, with 12 rooms designated as MHCBs.  All MHCB rooms were found to be suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The STRH unit had 12 retrofitted cells for inmates on new intake status, with five of the cells added since the previous assessment.  The EOP administrative segregation unit (D-5) had eight retrofitted new intake cells, with two of the cells added since the preceding assessment.  During inspection of both units, this reviewer observed that all new intake inmates were in new intake cells.  Of note, however, a new intake inmate (LAC 1) committed suicide in an unsafe non-intake cell in the EOP administrative segregation unit on August 4, 2017.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were found in a variety of designated locations, including TTA wet holding cells within the CTC, the EOP administrative segregation unit (D-5), and the overflow administrative segregation unit (D-4).  This reviewer was informed that TTA dry cells were no longer utilized for alternative housing.  All inmates were furnished beds, with stack-a-bunks utilized in the TTA wet holding cells and required to be observed on a 1:1 basis.  From August 1 through November 8, 2017, there were 310 inmates placed in alternative housing, with the majority (63 percent) released within 24 hours.  In addition, approximately 14 percent of inmates were in alternative housing over 48 hours.  The overall length of stay in alternative housing for these 310 inmates was 26 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were *not* being observed at any interval by nursing staff.  As discussed below, such a practice was identified in the previous assessment and continued to be contrary to CDCR policy.

This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods

from 12:00 a.m. through 8:59 a.m. on several sample days (i.e., November 9 for LAC 2 and LAC 3, November 12 for LAC 4, and November 13 for LAC 5).  The chart review found numerous observation checks (i.e., between eight and nine per patient) that were in excess of required 15-minute intervals for LAC 2 and LAC 3, with the longest gap between checks being 28 minutes. The violations in the other two cases were alarming.  For example, in one case (LAC 4), there were multiple time gaps including two and three hours (from 12:12 a.m. to 2:05 a.m. and then from 2:07 a.m. until 5:38 a.m. on November 12.  In the other case (LAC 5), there were multiple time gaps that included a five-hour period (12:19 a.m. until 5:28 a.m.) on November 13.  Later that morning, the patient was observed with a piece of cloth tied around his neck at approximately 12:00 p.m.  He had last been observed 24 minutes earlier at 11:36 a.m.

A previous problem with patients being clothed in both "partial-issue" clothing and safety smocks, as well as clinicians under the incorrect assumption that patients needed to be discontinued from a suicide observation level in order to be "eligible" for activities such as yard, telephone calls, and visits, had been corrected.  Patients were observed to be appropriately clothed consistent with their level of suicide risk or lack thereof.  In addition, an RT had been assigned to the MHCB unit the week prior to this reviewer's assessment for up to 12 hours per week and out-of-room activities, including yard, were beginning to be made available.

This reviewer observed nine IDTT meetings for MHCB patients on November 13 and 14. Although there was good representation from custody, medical, and mental health personnel, several problems were observed.  *First*, of the 12 patients housed in the MHCB unit on November 14, only three were on either Suicide Watch or Suicide Precaution status.  Although the LOP required that patients not on suicide observation status be observed at 30-minute intervals, the remaining nine patients were not being observed at all by nursing staff.  IDTT members appeared unaware of this policy when it was reiterated by this reviewer, even though the issue had been identified in the previous assessment.  *Second*, in at least one case (LAC 6), the patient was admitted to the MHCB on November 9, 2017 for suicidal ideation.  Despite continuing to voice SI throughout his placement, he was discontinued from Suicide Precaution status two days later on November 11.  During his IDTT meeting on November 13, the patient continued to express suicidal ideation, as well as experiencing auditory hallucinations "all the time telling him to kill himself," but still was not placed on Suicide Precaution status.  *Third*, of the nine IDTT meetings observed, there was some discussion of safety planning in four cases, but not in the two cases in which both patients were released from the MHCB on November 14.

Finally, a review of Guard One data for a recent 24-hour period found 96-percent compliance with required checks not exceeding 35 minutes in the STRH unit and 97-percent compliance in administrative segregation EOP.  Of note, however, CSP/LAC experienced a suicide in May 2017 in which the suicidal inmate (LAC 7) was placed in a STRH unit holding cell pending a mental health evaluation and left unobserved for over 60 minutes.  On August 4, 2017, another inmate (LAC 1) committed suicide and his body was found in a state of rigor mortis in the EOP administrative segregation unit, an indication that Guard One checks were not completed as required.  As detailed in the previous assessment, there were questionable Guard One practices involving an inmate who committed suicide in the STRH unit in April 2016.

*In sum, the multiple violations of required observation of MHCB patients on suicide precaution status, including cases involving gaps of two, three, and five-hour periods of time was extremely problematic at CSP/LAC and continued following this reviewer's November 2017 assessment.  In addition, there were 27 observation checks that were in excess of required 15-minute intervals during the 14 hours leading up to the suicide of a MHCB patient (LAC 8) on December 5, 2017.  Finally, high compliance rates for Guard One in the administrative segregation units were offset by continuing questionable Guard One practices related to two suicides that occurred in May and August 2017.*

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from May through November 10, 2017.  In addition, the TTA log for the same time period was also reviewed.  This reviewer's sample eUHR and EHRS review of 54 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRE/SRASHEs in only 85 percent (46 of 54) of the cases.

This reviewer examined a sample of ten SRE/SRASHEs from patients released from a MHCB between September and November 2017.  Although there was some progress noted in the quality of safety plans from previous assessments, most of the reviewed plans simply recommended that the patient identify coping skills and strategies to reduce SI with the receiving clinician.  For example, in one case (LAC 9) in which the patient was in the MHCB for ten days, and had a history of at least three suicide attempts and multiple MHCB placements, the safety plan contained within the discharging SRASHE stated the following:

> 1) IP to return EOP LOC w/5-day step down.
> 2) IP will have no self-reported and/or collateral self-reported incidents of SIB (cutting or hanging) over the next 90 days.
> 3) IP will identify 3 things that prevent him from harming himself and learn to focus on these things when he has thoughts of self-harm over the next 90 days. IP agreed to verbal safety plan and will notify custody if he is unable to control thoughts of self-harm or has intent or desire to harm himself.
> 4) IP will learn 2 strategies (e.g., journaling, letter writing) to start to process the death of his uncle and utilize the strategies at least once a day over the next 90 days.

In another case (LAC 10), a patient who had been in the MHCB for five days, had a "high" chronic risk for suicide, and had previously been on the facility's High-Risk List, had the following safety plan developed by another clinician:

> CBT/DBT model recommended to identify 1-2 effective coping skills to manage distress tolerance and reduce MHCB admits/crisis evaluations during PC contacts in the next 90 days.  IP to learn 3 new calming strategies to assist in managing anger response during 1:1 PC contacts in the next 90 days.  Identify at least 3 thoughts that trigger irritability within the next 90 days.  Reframe at least 3 negative thoughts that enhance agitation into a more neutral thought during each individual session over the next 90 days.  He has several protective factors

motivating his self-preservation such as getting his non-mental health needs met, family support including children in past suicide attempts that were situational specific, and more distant in time.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 319 cases of patients discharged from a MHCB or alternative housing placement that remained at CSP/LAC and were not transferred to the administrative segregation units (where observation at 30-minute intervals was required) from May through October 2017.  The review found that 91 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the vast majority (86 percent) of the custody checks recommended for the full 72 hours by clinicians.  In addition, only 57 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.  Most of the deficiencies found were gaps in observation by custody personnel.

**Intervention**:  Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (August through October 2017) found that quorums were not achieved in any of the meetings.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 82 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 93 percent of custody, 59 percent of medical, and 55 percent of mental health staff received annual suicide prevention block training during 2016.  Similar low percentages of medical and mental health staff completing annual suicide prevention block training was found in the previous assessment.  Finally, as of October 2017, only 50 percent of mental health clinicians had completed the SRE mentoring program, 99 percent had received the seven-hour SRE training, and 66 percent had completed safety plan training.

**Recent Suicides**:  CSP/LAC experienced four inmate suicides during the reporting period.  In the _**first**_ case (LAC 11), the inmate was found hanging from a ventilation grate by a bed sheet in his GP cell during the afternoon of March 26, 2017.  He had entered the CDCR system on March 3, 2016 to serve a sentence of unidentified length for resisting/deterring an officer with threat of violence.  He was transferred to CSP/LAC on March 16, 2017.  The inmate had two RVRs during his confinement, one for fighting on February 28, 2017, and the second for sexual disorderly conduct on March 15, 2017.  He was not known to be gang-affiliated.  The inmate had

111

family support from both parents through letter correspondence, as well as regular visits from his mother. He was unmarried with an 18-month-old son.

According to available records, the inmate had a very dysfunctional childhood. His parents divorced when he was 6 years old, and as a result of child abuse, was removed from the home at age 13. He subsequently lived in foster care and group homes. The inmate had a history of substance abuse beginning in early childhood. He was also involved in both the juvenile and criminal justice systems. He served his first CDCR term from 2006 through 2013.

As a teenager, the inmate was diagnosed and treated for ADHD, Bipolar Disorder, and depression. He was reportedly hospitalized once for a suicide attempt by overdose in 2000. During his first CDCR term, the inmate was admitted to DSH in 2011 for depression, anxiety, hopelessness, and suicidal ideation, with a plan to stab himself in the neck. Prior to his second term, the inmate self-reported a suicide attempt in the county jail in 2015. Upon entry into CDCR for the second term, he was placed in the MHSDS at the 3CMS level of care with a diagnosis of Mood Disorder NOS and Antisocial Personality Disorder. The inmate also reported visual hallucinations. He admitted to having used illegal drugs in the past as well as in CDCR, and although not found to be psychotic, the connection between his drug use and past psychotic symptoms was implied in his mental health records. He was admitted into the MHCB on two occasions in December 2016 and February 2017. Both admissions were for suicidal ideation based upon the loss of his young son to adoption, recent death of his grandmother, anxiety related to his upcoming release, and for receiving an RVR for fighting. His diagnoses of Mood Disorder and Antisocial Personality Disorder remained unchanged.

Upon arrival to CSP/LAC in March 2017, the inmate was evaluated for admission into the MHCB on three occasions (March 17, March 21, and March 22), but never admitted. All three emergency mental health referrals were based on suicidal ideation, "fear that he would never make it out of prison alive," and stress about his son's adoption and recent death of his grandmother. The inmate had two SREs completed on March 22, 2017. According to the CDCR reviewer in this case:

> Documentation in the first assessment quoted the inmate as stating, 'I did something that put me at risk,' 'they are going to kill me,' 'I am a piece of shit, I am not safe,' 'If I go back to my cell I am going to jump off the tier or hang myself,' and 'I am going to kill myself because I'm going to die anyway.' A second SRE was performed and 1310 hrs. to determine the inmate's need for a higher level of care. Although the inmate was observed to have cut himself while waiting for assessment, an LPT had informed the crisis clinician that the inmate's wounds had been medically-cleared, and that they were 'superficial.' No documentation regarding a medical clearance by a physician can be found. The crisis clinician documented that the inmate had calmed down. The crisis clinician noted that the inmate's reason for cutting himself previously was aimed at getting a cell move, and that his move was in process….The crisis clinician noted the inmate denied all suicidality (intent, plan, and means).

112

According to the CDCR reviewer in this case, although the inmate did not have any medical issues that were viewed as contributory to his death, and he did not leave a suicide note, "Over the past month or so, the inmate had persistently expressed concerns for safety…. Engaged in self-harm behavior, made statements regarding his intent to end his life, and was observed to be acting erratically…. He did not leave an explanation of the reasoning to end his life. However, the fear of retaliation for his actions during an altercation, loss of his child through adoption, and his fear of failure upon his July 2017 release appeared to be plausible contributory factors."

The Suicide Report contained 11 recommendations for corrective action through a QIP:

> 1) Custody staff responding to this incident failed to respond with the appropriate cut-down kit, but rather the cut-down tool alone, while another officer responded with the Ambu bag.

> 2) The inmate was secured in the shower versus a holding cell in boxer shorts for a total of 5 hours and 25 minutes while awaiting a mental health assessment on March 22, 2017. LAC #511 identifies use of showers as holding cells is not recommended separate except for incidents where no other option is available or practical. In addition, if clothing is confiscated from the inmate, new clothing shall be issued, such as the jumpsuit.

> 3) An initial SRE performed at DVI-RC on March 8, 2016 marked 'no' for all chronic risk factors, except 'yes' for 'male.' All acute factors marked 'no,' except for 'recent cell change' and 'single cell status.' There was no reference to a review of the inmate's first clinical documentation and suicide assessments, which would have provided consistent reference to his chronic risk factors, including the suicide attempt. A second mental health evaluation on March 22, 2016 referenced his first term clinical documentation and placed the inmate in CCCMS due to his clinical treatment history. It is unclear if there were barriers with the chart, making the prior clinical documentation unavailable to the assessing clinician on March 8, 2016; however, the documents were available for reference on March 22, 2016 and the inclusion of the information prompted a CCCMS level of care recommendation.

> 4) Two SREs were completed on March 22, 2017. The PC completed the SRE at 1018 hours and noted 9 acute and 7 chronic factors; the suicide risk was estimated as moderate chronic and high acute. The second SRE was conducted three hours later, and reports indicated the inmate had cut his arm in the shower while awaiting the assessment. This SRE identified 6 chronic risk factors and no acute risk factors; the risk was estimated as moderate chronic and low acute risk for suicide. The top of this SRE had a written statement – 'treat as original as of 3/27/17.' The inmate was not referred for an MHCB admission and the safety plan indicated: 'I/P was educated to always contact any staff when in crisis and also safety planning reviewed during contact. Provided psychoeducation on working with PC on appropriate ways to advocate for needs w/out resorting to maladaptive bxs.' Per consultation with facility supervisors, the first SRE was

reportedly not available in the system at the time of the assessment. The progress note and SRE for the MHCB evaluation does not provide a clinical rationale for not recommending additional precautions or resources, or for not admitting the inmate to the MHCB. It is unclear whether the PC was consulted for this MHCB evaluation; however, the collaboration would have been useful given the discrepant presentations by the inmate.

5-11) Seven nursing care concerns were identified. The concerns are listed above and considered contributory to the death. (Three of these nursing concerns occurred at DVI, one occurred at CHCF, two occurred at CSP/Sac, and one occurred at CSP/LAC. All related to documentation and medication errors.)

In the _**second**_ case (LAC 7), the inmate was found hanging from an unidentified fixture in a STRH holding cell during the early evening of May 18, 2017. He had entered the CDCR system on May 11, 2004 to serve a sentence of 40-years-to-life for second-degree murder. The inmate was transferred to CSP/LAC on March 15, 2012. He had 14 RVRs, most of which involved alcohol possession and threatening staff and other inmates. The most recent RVR occurred on May 6, 2017 and involved throwing feces and trash out of his cell, resulting in his STRH unit placement. The inmate was not known to be gang-affiliated. He had some family support, including irregular visits from his mother.

According to limited available records, the inmate had a dysfunctional childhood and was the oldest of seven children. His childhood included a history of physical abuse by family members and sexual abuse by a stranger. Both his father and a sister had involvement in the criminal justice system. There was also a significant family history of mental health problems. The inmate had a limited juvenile and adult criminal history. He had no known mental health history in the community. There were inconsistent reports about his marital status.

During the first ten years of his CDCR confinement, the inmate was in the MHSDS for brief periods of time including 2005 and 2009-2010. During both of these periods, episodes involving affective and psychotic symptoms were reported. He was initially diagnosed with Major Depressive Disorder, Severe with Psychotic Features in 2005, and was discharged from 3CMS in May 2010 with a diagnosis of Antisocial Personality Disorder. In April 2014, the inmate was referred to mental health after smearing feces on his body and around his cell. He re-entered the MHSDS at 3CMS level of care with a diagnosis of Psychotic Disorder NOS and subsequently had three MHCB placements that year for grave disability and suicidal ideation. He was often suspected of "malingering," and according to the CDCR reviewer in this case, "Secondary gain was suspected, with a motivation of attaining EOP placement rather than CCCMS level of care. He was seen as a low acute and low chronic risk for suicide."

On November 7, 2014, however, the inmate attempted suicide and was initially placed in an MHCB before being referred to DSH. From December 2014 through February 2015, he was placed in the DSH APP and ICF programs; from February through July 2015 he was in another DSH-ICF program. The inmate reported ongoing suicidal ideation throughout these DSH placements. His diagnoses were Mood Disorder, NOS, and Antisocial Personality Disorder. He returned to CDCR at the EOP level of care. In June 2016, he was again placed in an MHCB

after being sent to an outside hospital following an alleged suicide attempt by drug overdose. From late June 2016 until his death, the inmate was treated at the EOP level of care and had diagnoses of Anxiety Disorder, NOS, and Borderline Personality Disorder (that was revised in April 2017 to "Axis II Deferred").

On May 9, 2017, the inmate was again sent to an outside hospital after reporting that he ingested an unknown amount of Tylenol.  Upon return to CSP/LAC the following day (May 10), he was seen by a crisis clinician and stated: "I go 0 to 100, I want to be able to control some of (my) problems."  According to the CDCR reviewer, "He requested to see his prior clinician and to be referred to DSH.  He refused to discuss why he was sent out to the hospital, saying he would only talk to his prior clinician about what occurred.  The evaluating clinician opined that the inmate was appropriate to return to the STRH."  The inmate was screened by another clinician upon entry into the STRH unit later that day (May 10), with the clinician noting: "The I/P has been having a hard time coping since his cousin has been transferred (sic, had not occurred yet) and has been engaging in maladaptive behaviors: smearing feces and 'going suicidal.'"  He was not referred to an MHCB, although documentation erroneously indicated that he had been.

The following week on May 18, 2017, the inmate had an IDTT meeting in which the team offered a number of incentives, including receiving a television, a package, and retaining him in the MHSDS if he agreed to clean his cell, stop smearing feces and program appropriately.  As summarized by the CDCR reviewer, almost immediately after the IDTT meeting:

> Clinical staff noted that "around 1650 hours," the inmate was overheard talking with custody staff, saying that he did not want to go back and clean the cell.  He argued that his cousin had made him promise before he transferred not to clean the cell and as 'other inmates told him to leave it, to stand up to custody.'  A short time later the inmate told staff present that he felt suicidal, concerned that he 'cannot keep his word' with both his IDTT team and with the other inmates.  He told staff he had gone to his cell to start to clean it but was harassed by inmates for 'caving in.'  He was seen as reporting feeling suicidal to remove himself from the situation.  Clinical staff overheard the STRH sergeant state that the inmate was to be 'stripped out' and placed in a holding cell, with someone assigned to 'sit on him' until the crisis clinician evaluated him.

The inmate was left unobserved and subsequently committed suicide.

The CDCR reviewer found that the inmate's medical history was unremarkable and not contributory to his suicide.  Interviews with several STRH inmates indicated that the suicide was not surprising.  One inmate told the CDCR reviewer, "he was just tired… That he had 'had it with this.'  He gave someone a number to call if he died….and he asked me to pray for him."  Another inmate reported the inmate asked for his prayers, said "he wasn't feeling it, and was tired of living."  As the CDCR reviewer concluded:

> The inmate's clinical presentation was very complex, and his behavior was rather provocative…. The inmate was seen at times as having no mental illness, or having only personality pathology, or only adjustment problems.  His risk for

suicide was typically viewed to be low, despite considerable evidence of acute and chronic risk…. The suicide may represent that he had simply grown tired of living, or was distressed about his cousin transfer, or is facing harassment from other inmates, or was upset about not being able to return to his yard and program.  Perhaps being in conflict between his agreement with this team and custody, and his agreement with his cousin and other inmates triggered the hanging.  Whatever the combination of reasons, it is clear that his actual risk for suicide was often underestimated, and that leaving him unattended on May 18, 2017 was both unfortunate and not per policy.

The Suicide Report contained 25 recommendations for corrective action through a QIP:

1-7) The CDCR 837s submitted by responding staff identify numerous concerns as noted throughout the review which present as policy and procedure violations.

8-12) Five nursing care concerns were identified. The concerns are listed above and were considered contributory to the death.

13) Five mental health referrals were submitted regarding the inmate between April 21, 2014 and April 28, 2014 for behaviors including fecal smearing, mutism, visual hallucinations, and command auditory hallucinations. The referral on April 24, 2014 was elevated to an emergent status, and a second emergent referral was submitted on April 26, 2014.  He was not seen until April 28, 2014 and then was found in no need for mental health follow-up (despite having been placed in CCCMS on April 22, 2014).  Per the Mental Health Services Delivery System *Program Guide*, 2009 revision, "An inmate deemed to require an emergent (immediate) referral shall be maintained under continuous staff observation until evaluated by a licensed mental health clinician."  Further, the clinical documentation on April 28, 2014 did not have a rationale for not recommending a mental health follow-up, despite his recent erratic behavior and change in LOC.

14) On April 21, 24, 26, and May 9, 21, 24, 2014, the inmate was observed smearing feces on his body and around his cell.  He reported acting in this way in an effort to drive away 'foreign entities' and 'evil shadows.' Despite the severity of his behavior he was not referred for inpatient services until May 26, 2014.  The clinical documentation during these encounters did not provide a clinical rationale for not referring the inmate to a higher level of care.

15) While in a MHCB at CHCF from May 27, 2014 to June 2014, the inmate smeared feces, was initially evasive about suicidal plans, and refused medications offered to him.  Despite this presentation, no discussion of involuntary medications was found and there were no orders for psychiatric medications made.  He returned to his facility with no psychiatric medications.

116

16) No SREs completed in 2014 documented an assessment of imminent risk factors.  Chronic and acute risk appeared to be underestimated, and safety planning lacked in quality and continuity in these assessments.

17) Although it was mentioned in the DSH Psychiatric Discharge Summary (dated July 13, 2015) that the inmate reported a desire to jump to his death upon return to CDCR, a desire he reported over a number of months while at DSH, the treatment team at LAC did not document this information in the next treatment plan dated August 4, 2015, and the information was not included in the SREs completed in subsequent months.

18) SREs completed on July 13, 2015, July 20, 2015, and July 22, 2015 were administered by the same clinician, a clinician who used largely identical information in each evaluation (e.g., states, 'He doesn't hearing voices [sic]' in each SRE).  The clinician ignored or was unaware of statements made in ASU pre-screening evaluations, screenings that indicated active suicidal planning and intent.  Acute risk is underestimated on each occasion (as low chronic and low acute risk).

19) On December 23, 2015, the inmate requested to see a psychiatrist.  Per documentation, he was not seen for this request as he declined a prior psychiatric appointment on December 16, 2015.

20) On June 4, 2016, the inmate reported taking 45-50 pills, type unknown.  He was sent to an outside hospital, medically cleared, and returned.  He was evaluated to be at low risk and low chronic risk, despite presenting with numerous imminent risk factors, and despite endorsing suicidal intent, planning, and desire to die.  The action was deemed not to be a suicide attempt, though MHCB placement was made.

21) On April 13, 2017, the inmate was seen by a psychiatrist, five days after he threw feces on an officer's furniture and belongings.  The psychiatrist described the inmate is experiencing 'an episode of nonspecific anxiety that appears to have resolved' and discontinued his medication (Paxil).  This evaluation appears lacking in review of the inmate's history of mental illness and did not give rationale for not considering alternative medications.

22) Clinicians in the IDTT meetings on April 19, 2017 and May 18, 2017 did not document awareness of the inmate's prior suicidal crisis in October 2014, which was precipitated by a reduction in level of care (from EOP to CCCMS), or document knowledge of a prior suicide attempt (on November 7, 2014), in which he attempted to hang himself in a holding cell after hearing his level of care would not be increased back from CCCMS to EOP.  Knowledge of these prior events may have led to his risk being managed differently in the days leading up to his death.

117

23) The inmate's actions on May 9, 2017 (overdose) appeared to have been significantly minimized.  The evaluating clinician (on May 10, 2017) justified a rating of low acute risk despite the overdose and despite the inmate refusing to speak about the event to the clinician.  Following the evaluation, the inmate answered pre-ASU screening questions with reports of distress and suicidal ideation, indicating that his risk had not dissipated.

24) An IDTT meeting was held on the day of the inmate's death to address fecal smearing.  This documentation suggests that his participation in the MHSDS was somehow made contingent or related to him as contingent on his discontinuing fecal smearing, 'Patient will remain in the CCCMS program contingent on him programming and not retaliating against staff.'  This is not a valid reason for discontinuing services per program policy.

25) Custody documentation stated that a mental health supervisor told the inmate, 'You're not suicidal' approximately one hour and 20 minutes prior to his death, 'and would relay this information to the on-call psychologist' (the crisis clinician).  The statement may have been provocative to the inmate or increased his sense that he would be treated unfairly or dismissively.

In the ***third*** case (LAC 1), the inmate was found hanging from the ventilation grate by a sheet in his EOP administrative segregation unit cell during the morning of August 4, 2017.  His body was found in the state of rigor mortis.  He had entered the CDCR system on November 2, 2012 to serve a life sentence (with the possibility of parole) for first-degree murder with a firearm. The inmate was transferred to CSP/LAC on May 22, 2017. He had 6 RVRs, the most recent of which occurred on March 16, 2015 involving failure to return a library book.  The inmate was known to be gang-affiliated.  In May 2013, he was endorsed to the SNY due to expressed safety concerns.  He had good family support, including letter correspondence, regular telephone calls, and occasional visits from his parents.  The inmate was never married and did not have any children.

According to available records, the inmate was born and raised by his biological parents.  He had four other siblings.  The inmate would later confide to a mental health clinician that he molested one of his sisters as a teenager.  He had a history of substance abuse and joined gangs at an early age "because he yearned to belong and 'to man up'."  He did not have any prior history of arrests or convictions, and the instant offense involved the murder of a rival gang member when he was 17-years-old.  He received some mental health treatment in the community during early adolescence for depression.

Upon entry into CDCR, the inmate did not endorse any mental health symptoms and was not initially placed in the MHSDS.  However, on August 22, 2015, he was placed in administrative segregation for safety concerns and subsequently observed "ramming his head against the wall" and crying.  He was placed in a MHCB and given the diagnoses of Adjustment Disorder with Mixed Anxiety and Depressed Mood, and Antisocial Personality Disorder.  The admission note stated that: "He endorsed suicidal ideation passive. Anxiety/paranoia-large, depression-moderate, recent meth use (3 days prior), concerned about recent events of his safety and inmate's

discovering of his sex activity.  Despondent over sentence and shame about SNY and sexual incident that's been recently known by others/cellmate."  He was discharged from the MHCB on September 4, 2015.  Approximately a month later on October 2, the inmate was observed to be making a ligature out of a sheet.  He subsequently told a nurse that he was "ashamed of his situation as homosexual" and that "suicide may be a better alternative than being in prison."  He was again placed in an MHCB and discharged on October 23, 2015 at the EOP level of care.  His diagnoses were Adjustment Disorder, Methamphetamine-Induced Psychosis, Polysubstance Dependence, and Antisocial Personality Disorder.

The inmate was admitted into a MHCB for the third time on November 10, 2015.  He reported that he had allegedly made a suicide attempt by jumping off his bunk but the ligature broke.  According to MHCB documentation, the inmate "endorses purposelessness in face of life term, expects to go in front of the board in 19 years, but honestly believes he will likely commit suicide rather than serve out sentence."  He was not referred to DSH because his mood and paranoia had stabilized, he was medication-compliant, and engaged in out-of-cell activities.  The inmate was discharged from the MHCB on November 18, 2015 with diagnoses of Substance-Induced Mood Disorder, Adjustment Disorder, and Antisocial Personality Disorder.  During most of 2016, medication compliance and EOP programming was viewed as inconsistent.  His auditory hallucinations were thought to be drug-related.  Themes of loneliness and isolation from his family reoccurred during clinical contacts, as did the questioning of his sexual identity.  His substance abuse increased throughout the year.

On January 30, 2017, the inmate reported that he cut himself the previous week while using drugs, and a laceration was noted on his arm.  He denied any current suicidal ideation and an SRE was not completed.  During the next few months, the inmate's medications were adjusted due to his frequent non-compliance.  In a progress note dated April 10, 2017, his PC wrote that "IP reports a low level of depression.  IP shared that he recently had a visit from his father. IP shared that his father made a comment that insinuated he was to blame for his parents' divorce and other family problems."  In a subsequent progress note dated April 24, his PC wrote that "IP reports anxiety due to finding out that he will be transferred to another institution.  IP continues to struggle with substance abuse and recovery.  He reports labile mood over the past week."  On May 3, 2017, the inmate reported suicidal ideation during the previous weeks and months.  An SRE was completed and both his chronic and acute risk for suicide was rated as moderate.  The SRE did not contain a specific safety plan nor was the inmate referred to a MHCB.

Following his transfer to CSP/LAC on May 22, 2017, the inmate told a clinician that "I'm just checking it out.…to be honest, if I don't like it here then I'll leave…taking it day by day."  A subsequent Mental Health Evaluation dated June 2, 2017 noted that "IP appeared to have a history of reporting SI and making para-suicidal gestures in an attempt to manipulate his environment and fulfill certain needs/desires."  During the next few months, the inmate appeared to adjust adequately to the facility, stating that he was now closer to his family.  However, his drug abuse continued, and his attendance in both individual and group therapy was sporadic.  The inmate attended his IDTT meeting on August 3, 2017, the day before his death, and the summary stated:

I/P stated the following: 'It doesn't really matter (CCCMS or EOP)….I don't think any of you care ……even if I told you (everything), you wouldn't care…..I think with the things I've done I don't deserve to live.' I/P appeared tearful at one point during the meeting.  Affect-dysphoric, irritable, restricted.

Shortly after the IDTT meeting, the inmate was placed in the EOP administrative segregation unit due to safety concerns.  He was not placed in a suicide-resistant new intake cell as required. He committed suicide the following morning.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any serious medical issues that were deemed to be contributory to his death.  However, the CDCR reviewer opined that the inmate had been contemplating suicide for several years before his death:

> The weight of his lengthy term, the knowledge he molested his sister, his participation in a murder, his struggle with addiction, and the shame or confusion about his sexuality became too much to tolerate.  He grew tired of prison and increasingly felt like a burden to his family.  Because his suicidal thinking and suicide risk appeared chronically high, revealing itself back in a 2015 progress note ('I think of everything from hanging myself to slicing my wrists to starvation.  I go down the list and weigh my options'), it appeared to take very little to make his final decision.

The Suicide Report contained four recommendations for corrective action through a QIP:

> 1) There was no SRE completed or any specifics about the safety plan mentioned during a January 30, 2017 contact with mental health staff (at COR).  This contact was the result of a referral from nursing about lacerations on his arms from a suicide attempt.  In the May 3, 2017 SRE, the inmate reported suicidal ideation in the past week and past few months, yet there was no individualized safety plan included in the SRE to address his risk factors, warning signs or suicidal ideation. A suicide risk safety plan should include individualized items to reduce and manage suicidal ideation and risk factors.

> 2) Upon arrival at LAC, there was no SRE completed even though he reported suicidal ideation in the month before his transfer and had a suicide attempt in January 2017.  Per the 2009 Mental Health *Program Guide*, 'Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts,' a suicide risk assessment 'shall be completed.'  Given his history of suicide attempts, recently reported suicidal ideation in May 2017, and warning signs and risk factors, and comments during August 3, 2017 IDTT about not deserving to live, an SRE should have been completed.

3) The inmate was discovered alone in a non-retrofitted intake cell within 12 hours of his initial ASU placement.  Records identified a retrofitted intake cell (D5-125) was vacant at the time of his ASU admission.

4) Based on reports submitted by responding staff, the inmate was discovered cold to the touch, had a rigid jaw and fingers, and purple/blue fingertips.  This calls into question the thoroughness of the Security/Welfare checks completed initially on Second Watch and completed during First Watch on the unit.  The officer who conducted the first two Guard 1 checks on Second Watch (0610 hours and 0640 hours) reports cell 231 did not have a door tag that would assist in identifying an inmate was assigned to the cell.  The officer also reports he observed the sheet covering the window but was able to see two empty beds through a small space above the food port. Review of the Guard 1 'Rounds Tracker Summary' identifies all checks were completed.  However, it appears the making of a visual/physical observation of a living, breathing inmate, free from obvious injury as required did not occur appropriately during either watch.

In the ***fourth*** case (LAC 8), the inmate was found hanging from the protective cover of the smoke detector by torn strips of a mattress in his MHCB room during the late evening of December 5, 2017.  He had entered the CDCR system on February 29, 2000 to serve a life sentence (with the possibility of parole) for second-degree murder with enhancement for intentional discharge of a firearm causing great bodily injury/death.  He was transferred to CSP/LAC on December 28, 2017.  The inmate incurred 19 RVRs during his 17-year confinement, most recently for fighting on November 26, 2017.  He had been gang-affiliated and sought SNY status in July 2012 after being a gang-dropout.  He also spent considerable time in administrative segregation during 2016 and 2017 due to safety concerns over an accumulating drug debt.  The inmate was unmarried and had a young son.  He did not have any recent family support and had stopped communicating with his family a few years earlier because he did not want to be a burden to them any longer.

According to limited available records, the inmate was raised by his mother following the divorce of his parents when he was a young child.  His father subsequently committed suicide.  He had four siblings and was reportedly physically abused by his aunt and uncle.  He began experiencing substance abuse as a teenager and reportedly overdosed on cocaine in 1996.  He had numerous juvenile and adult arrests and convictions, and due to his illegal entry into the United States from South Vietnam, had an active Immigration and Customs Enforcement detainer.

The inmate did not have a history of mental health treatment in the community.  However, when he entered the MHSDS system in December 2016 at the MHCB level of care for suicidal ideation, he reported to a clinician that he first started experiencing symptoms of depression and anxiety when immigrated to the United States at age 14.  He also reported a suicide attempt as a teenager.  The inmate's initial diagnoses in the MHCB were Depressive Disorder, NOS, and Psychotic Disorder, NOS (rule in/out).  He was subsequently released from the MHCB on January 6, 2017 with a diagnosis of Major Depressive Disorder with Psychotic Features.  He was also assessed to have both a "moderate" chronic and acute risk for suicide.  However, three days

121

later on January 9, the inmate was again admitted into an MHCB for suicidal ideation and command auditory hallucinations telling him to hang himself. He also reported feeling distanced and disconnected from his family, as well as experiencing safety concerns due to drug debts. The inmate was also using methamphetamine on a regular basis during the previous two weeks. His diagnoses were revised to Substance-Induced Psychosis and Depressive Disorder, NOS. He was discharged at the EOP level of care on January 17, 2017.

From January 17 through May 18, 2017, the inmate received treatment in the EOP administrative segregation unit at CMC. He continued to report on-going passive suicidal ideation without a plan but remained relatively stable on his medication. On May 11, he was put up for transfer to a Level 4 facility and reported a few days later that he was actively suicidal with a plan he would not disclose. He was placed in a MHCB on May 18. While in the MHCB, the inmate was referred to a DSH-ICF program on May 30 and subsequently transferred to that program on June 22. He remained in the ICF program until November 16, 2017 when he was discharged to SVSP at EOP level of care. Although remaining medication-compliant in the ICF program, the inmate frequently refused any in-patient treatment groups, minimized his substance abuse issues, and had poor insight into his mental illness.

While awaiting transfer to CSP/LAC on November 28, 2017, the inmate superficially cut his right forearm because he was depressed and anxious over safety concerns related to the transfer. The required SRASHE was not completed and he was subsequently transferred and cleared for GP housing. Several days later on December 3, the inmate made suicidal statements to staff and superficially cut his right foot. A SRASHE was completed and he was placed in the MHCB. He told a clinician that "Wherever I go, they want to get me, it happened already here, I'm tire (sic) of running away." The inmate told a clinician the following day (December 4) that although he did not want to die, he was experiencing both depression and anxiety over fears that he would be attacked in the yard. His diagnoses were changed to Adjustment Disorder with Mixed Anxiety and Depressed Mood; Psychotic Disorder with Hallucinations. He was subsequently downgraded from Suicide Precaution status to 30-minute observation with "full-issue" clothing without any documented clinical rationale for the decision. Later that day, the inmate was found to be "braiding a towel" into a ligature and placed on Suicide Watch status, but the clinician inadvertently allowed the "full-issue" order to remain in effect, resulting in confusion amongst nursing staff. The following day (December 5), another clinician downgraded the level of observation to Suicide Precaution status, with the "full-issue" order remaining in effect. There was no progress note documenting the clinical rationale for the decision. The inmate was found hanging later that evening. During subsequent inspection of the cell, a razor blade was found which the inmate had apparently utilized to tear the mattress cover utilized in the hanging.

The CDCR reviewer in this case did not cite any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, other than the obvious fact that he was in the MHCB for suicidal ideation related to increased depression and anxiety surrounding his safety concerns. The reviewer suggested that:

> His cultural differences as a Vietnamese male further complicated his ability to
> gain insight into his mental illness and understanding how illicit substances
> further exacerbated his symptoms; it was not culturally sanctioned in his ethnic

122

group to reach out for mental health services or even to acknowledge a problem. His aloneness and isolation further escalated as time passed and he began to feel targeted for death by other inmates due to his mounting drug debts, and safety concerns as result of chronic substance abuse.  Unfortunately, his inability to adequately express himself and his fears due to cultural background, often resulted in staff underestimating his expressed psychiatric symptoms or believing he was less than truthful about his cultural and perceived enemy concerns.  In the end, these factors likely played a heavy role in his decision to end his life.

The Suicide Report contained 12 recommendations for corrective action through a QIP:

1) The MHCB discharge SRE conducted at COR on January 6, 2017 was very basic and non-descriptive.  The inmate had been hospitalized in the MHCB for approximately three weeks and there was minimal information in the SRE to note hospital course.  His chronic risk (8 of 16 factors positive) was noted to be low, which was notable as he averaged approximate 50% for both categories.  Yet, there was minimal discussion in the justification/safety plan sections for various ratings outside of the basic listing of factors.  Acute risk was noted as low because the inmate had denied current suicidal ideation and homicidal ideation and a current desire or wish to die.  Minimal protective factors were noted (4 of 12). Additionally, there was no individualization or integration regarding specific triggers which might necessitate a return to MHCB.

2) A SRASHE completed on January 23, 2017 at CMC post-discharge from MHCB to ASU EOP was problematic as a contained no real justification of risk and no viable safety plan.  The safety plan section contained a listing of chronic risk factors which were listed in the wrong section of the SRASHE, and were neither individualized nor integrated.

A second SRASHE completed by the same PC at CMC on April 19, 2017 also was not well conceptualized.  On this SRASHE, the PC reduced risk level for both chronic and acute risk to low, without an adequate explanation for the change. Additionally, the safety plan section noted: 'see SRE' without further explanation.

A SRASHE completed on May 30, 2017 as part of the MHCB discharge at CMC was problematic.  Some acute risk factors were missed (perception of loss of social support; safety concerns) and some protective factors were not documented correctly (family support; positive coping/conflict resolution; insight into problems).  The risk factors/justification section largely focused on the inmate's prior self-harm in the community without adequately incorporating the multitude of acute and chronic risk factors in prison.  Additionally, most of the information in the safety/treatment plan section would have been more accurately placed in the risk level/justification section.  Outside of the referral to the ICF program, there was minimal information contained in the safety plan about how the

institution's mental health staff was managing the inmate's depression, anxiety, fear over drug debts, and feelings of isolation.

3) The SRASHE written November 21, 2017 at SVSP was missing multiple elements, including which acute and chronic risk factors the inmate had, plus protective factors were missing.  Additionally, both the justification of the risk and safety/treatment planning sections contained minimal documentation.  There was no integration of risk factors. The C-SSRS section was also not fully completed.

There was another SRASHE written by the same clinician on November 27, 2017 after the inmate had been involved in a fight with another patient.  This SRASHE was also problematic as the clinician missed numerous acute risk factors for the inmate, including recent depressive and psychotic symptoms, recent substance abuse, loss of social support, interpersonal isolation, receiving bad news (PIP discharge with pending transfer to Level 4 prison), and safety concerns.  Therefore, her conclusion of a low acute risk was largely underestimated.

4) The SRASHE completed on November 29, 2017 upon transferred to LAC was inadequate.  The listing of acute risk factors was missing in the document and the protective factors were overstated (e.g., family support, insight, and positive coping skills).  Additionally, there was minimal justification of risk outside a basic listing of factors without integration, and the safety/treatment plan section was underdeveloped.  There was no indication the clinician had received any of the records from the PIP hospitalization.  There was no mention of the fact the inmate had cut himself the day before, which could escalate his risk for suicide.

The pre-MHCB admission SRASHE completed on December 3, 2017 was problematic: the clinician listed multiple protective factors in the safety plan which were likely confused with another inmate; for example, including contact with a daughter and grandchildren (this inmate had a son he was not in contact with), and completing his GED (which he had already possessed).  The inmate's individualized risk factors, including his recent episodes of self-cutting and self-reported safety concerns, and the pre-discharge fight at SVSP were not well integrated in the justification of risk nor the safety/treatment plan.

5) No SRASHE was found in EHRS documentation for November 28, 2017 after the inmate superficially lacerated his right forearm before leaving SVSP.  *Program Guide* 12-10-8 states: 'At minimum, a written suicide risk evaluation using a SRE shall be completed: every time an inmate has an individual face-to-face evaluation for suicidal ideation, gestures, threats, or attempts by a clinician trained to complete the SRE.'  Given the inmate had not previously evidenced cutting behavior during his time in CDCR, this noted a change from previous level of functioning so, at a minimum, a SRASHE should have been completed prior to the discharge by the senior psychiatrist involved.

124

6) Clinical documentation by the inmate's ASU EOP PC at CMC (January-May 2017) was frequently inadequate in that most of the clinician's progress notes did not contain complete mental status, nor a specific plan which noted weekly progress.  Frequently, the plan/disposition in the note was to 'continue EOP.'

7) When the inmate arrived at LAC, his psychiatric medications (Remeron and Zyprexa) were not reconciled, resulting in no psychotropic medication prescribed from November 28-December 4 (day before hanging).  The inmate did receive Remeron on December 5, but the Zyprexa had yet to be reordered for him and as a result it was not given.  During this time period, mental health staff were inaccurately documenting that he was medication compliant, when in actuality he was not prescribed psychiatric medication for seven days.

8) LAC mental health documentation in MHCB was sparse and inadequate. The clinician who reduced the level of observation on December 4 from Suicide Precaution after less than 24 hours in MHCB did not specify the rationale for such a quick removal of precautions.  The same afternoon, there was inadequate documentation for the reason the inmate was placed on Suicide Watch by the on-call psychiatrist (there is no mention of the inmate braiding a towel documented until the following day).  Similarly, the level of observation was decreased to Suicide Precaution on December 5, and no rationale was provided for that reduction in level of observation either.  For subsequent changes of orders, a new face sheet was not produced for the patient's door which could have incorrectly contributed to other staff giving the inmate access to privileges he did not have, including clothing and reading material which may have been used to partially block his door so that he could construct his noose.  Given LAC went live in EHRS at the end of October 2017, the confusion around EHRS orders for Watch and Precaution could be part of a training issue.

9) During the course of the on-site review at LAC, it was determined the inmate was found in possession of a state-issued razor that appears to have been utilized to cut strips of material from the safety mattress used to construct the ligature.

10) LAC Suicide Watch/Suicide Precaution documentation inconsistent with orders or policy.

11) LAC/SVSP Inter-Facility and Intra-Facility Transfer Process: Failure to follow procedures:  EHRS workflow 0100-031 for ambulatory R&R: a) Encounter at the sending institution was closed prior to transfer, b) Reconciliation of medications could not be done by Mental Health, c) Psychiatric medication not ordered at receiving institution for seven days (11/28/17 – 12/04/17: Patient without psychiatric medications for seven days).

12) LAC – Issues in EHRS with no Suicide Watch/Suicide Precaution orders. The reviewer was shown a copy of the orders page from the inmate's door, where the previous order had been crossed out and initialed by a MHCB psychologist

after the inmate was placed on Suicide Watch at 1555 hours by the on-call psychiatrist.  However, the MHCB staff did not delete or alter the part of the order in EHRS which states: 'Patient to be given full issue unless otherwise specified in this order by the provider' when he was placed on Suicide Watch.  This may have added to the confusion by all staff (custody, mental health and nursing alike) who may have been following doctors' orders that appeared contradictory.

### 15)   California Correctional Institution (CCI)

**Inspection**:  November 16-17, 2017 (previous suicide prevention audit was on April 26-27, 2016).  CCI housed approximately 3,849 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the D-Yard Clinic on November 17, 2017.  (Of note, R&R was conducted in several different yards/facilities at CCI.)  The nurse was observed to be asking all of the questions and correctly entering information into the EHRS.  However, there was no door to the nurse's office and the desk where the newly-admitted inmates were positioned was adjacent to a high-traffic area, with other staff and inmates passing through, creating both excessive noise and absence of privacy and confidentiality.  This reviewer was informed that the nurse's offices in both the C-Yard Clinic and E-Yard Clinic also did not have doors.  (During the preceding assessment, this reviewer observed new intake screening in the B-Yard Clinic and found that a TTM had been installed to ensure privacy and confidentiality, and the door to the nurse's office remained closed during the intake screening process.)

In addition, this reviewer observed daily rounds by a PT in the administrative segregation unit (B-8) on November 16.  The unit housed GP, 3CMS and EOP inmates.  The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS for MHSDS inmates.

**Housing**:  CCI had eight of its 16 OHU cells designated to temporarily house inmates with mental illness and/or requiring suicide observation.  These OHU cells were designated as **alternative housing** and required 1:1 observation prior to transfer to a MHCB unit.  The cells had either fixed beds or stack-a-bunks.  In addition, as observed during the previous assessment, inmates awaiting transfer to an MHCB and housed in the OHU on 1:1 observation were not automatically placed in a safety smock.  Rather, because they were required to be observed on a continuous 1:1 basis, pursuant to a LOP (Volume 12: Mental Health Services, Chapter 5.1: "Mental Health Crisis Bed Program, Alternative Housing-Mental Health"), each inmate was "provided with a safety mattress, sheets, safety blanket, state issued clothing, including pants, shirt, socks, underclothes, reading materials, hygiene items and a prescribed healthcare appliance as clinically indicated as per Policy 12.05.301."  Such a policy and practice continued to be very commendable.

From August 1 through November 4, 2017, there were approximately 127 inmates placed in alternative housing, and the vast majority (87 percent) was released within 24 hours.  Only a handful of inmates were housed over 48 hours, and the overall length of stay for the 127 inmates was 19 hours.  Almost all inmates were subsequently transferred to a MHCB.

126

Finally, the B-8 administrative segregation unit still contained three retrofitted new intake cells (A103-A105). Although there were not any new intake inmates observed in unsafe non-intake cells, a custody supervisor informed this reviewer that the unit exceeded its new intake cell capacity approximately every one to two weeks, and that a recommendation had been made in November 2016 to create more retrofitted new intake cells. It was unclear if a work order had been generated regarding this recommendation.

This reviewer also found another problematic practice in the administrative segregation unit. Five cells (101 through 105) in B-Section did not contain any bunks. This reviewer was informed that the bunks were removed several years ago when the unit was used for the special management of SHU inmates. Currently, any inmate placed in these cells was not provided a bunk. These cells should be taken off-line until permanent bunks are installed.

**Observation**: Because CCI did not operate a MHCB unit, all suicidal inmates were required to be supervised on 1:1 observation until they were transferred to a MHCB. No other levels of observation were permitted within the OHU. During the assessment, this reviewer only observed medical patients in the OHU.

Finally, a review of Guard One data for a recent 24-hour period found 98-percent compliance with the required checks not exceeding 35-minute intervals in the administrative segregation unit.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of September 1 through October 31, 2017. This reviewer's sample EHRS review of 60 emergency referrals for suicidal ideation/behavior found that clinical staff completed the required SRASHEs in 95 percent (57 of 60) of the cases.

This reviewer did not review discharging SRASHEs at CCI because the assessments were conducted by mental health clinicians at other MHCB facilities.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 51 cases of patients discharged from a MHCB or alternative housing placement that were returned or transferred to CCI and not transferred to the administrative segregation unit (where observation at 30-minute intervals was required) from May through October 2017. The review found that 94 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the vast majority (73 percent) of the custody checks recommended for 48

hours by clinicians.  In addition, 92 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**:  Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (August through October 2017) found that quorums were not achieved in any of the meetings.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 91 percent of custody and 100 percent of nursing staff was currently certified in CPR.  In addition, approximately 98 percent of custody, 90 percent of medical, and 86 percent of mental health staff completed the annual suicide prevention block training during 2016.  Finally, as of October 2017, 100 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had completed the seven-hour SRE training program, and 88 percent had completed safety plan training.

**Recent Suicides**:  CCI experienced one inmate suicide during the review period.  In that case (CCI 1), the inmate was found exsanguinated in his SNY cell during at approximately noon on December 26, 2017.  The inmate had entered the CDCR system on January 21, 2004 to serve a 21-year and four-month sentence for carjacking and attempted robbery.  He was transferred to CCI on May 3, 2017.  Of note, the inmate was housed in a contracted California Out-of-State Correctional Facility from April 2009 through May 2017.  He had eight RVRs during his confinement, the most recent of which occurred on October 28, 2016 for battery on another inmate.  The inmate was known to be gang-affiliated and was placed in SNY in March 2013 after becoming a gang dropout.  He had a detainer from Immigration and Customs Enforcement and was expected to be deported upon his release from CDCR.  The inmate had good family support through letter correspondence with his parents and siblings.  He also had periodic visits, including one as recently as December 2, 2017 from his niece.  The inmate was unmarried and had a 14-year-old daughter.

According to limited available records, the inmate was the youngest of eight siblings and initially raised by both parents in Mexico.  He came to the United States in 1993 at the age of 12.  The inmate initially lived with one of his brothers but was living with an aunt at the time of arrest for the instant offense.  The inmate did not complete high school and was sporadically employed.  He had a history of substance abuse as a teenager but did not report or have a documented history of mental illness in the community.  Throughout his CDCR confinement, the inmate did not report any mental health issues and was not placed in the MHSDS.  He never threatened suicide nor reported any history of suicidal behavior.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have a significant medical history that was found to be contributory to his death.  Posthumous interviews with staff and inmates found that the inmate was quiet, well-liked, and did not give any indication that he was depressed or suicidal.  However, a few inmates opined that he had sporadically used illegal drugs and it was possible that these substances contributed to the suicide.

The Suicide Report did not contain any recommendations for corrective action through a QIP.

### 16)   Deuel Vocational Institution (DVI)

**Inspection**:  December 5-6, 2017 (previous suicide prevention audit was on August 30-31, 2016).  DVI housed approximately 2,202 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed two new admissions during the medical intake screening process in the RC on December 6.  The nurse's office had been recently renovated, and the door was closed during the intake screening process with an officer stationed outside, thus ensuring both privacy and confidentiality.  However, both intake screenings were problematic because the nurse did not ask all of the mental health and suicide risk questions on the "Initial Health Screening-Male" forms.  Following the process, this reviewer conversed with the nurse and inquired why all of the questions were not asked to either inmate.  The nurse responded by stating that an "abbreviated" screening was completed if the county transfer form did not include any documentation of prior mental health or suicide history.  Such a response was problematic for several reasons, including the fact that CDCR policy required that all questions be asked; an individual could certainly become suicidal following their county jail confinement and transfer to CDCR; and despite not asking all of the required questions, the nurse entered "no" to all mental health and suicide risk responses in the EHRS for both inmates (DVI 1 and DVI 2).

The following day (December 6), this reviewer observed the mental health diagnostic testing in the RC on one case (DVI 3).  The clinician completed an extremely thorough examination of the inmate who had entered DVI a week earlier on November 30.  He self-reported being currently depressed, as well as being previously diagnosed with Bipolar and Schizoaffective Disorders, as well as ADHD.  During a previous CDCR term, he had been treated at the EOP level of care.  The inmate also had a history of five prior suicide attempts.  He had also been suicidal in the county jail and placed on suicide precautions for ten days in August 2017.  The inmate admitted to being suicidal when he first arrived at DVI on November 30, claiming that he had thoughts of jumping off the second tier of his housing unit.  Although not currently suicidal on December 6, he admitted having fleeting thoughts of suicide during the past few days.  The inmate also complained of auditory hallucinations.  The clinician spent well over 90 minutes evaluating the inmate, completing the MH Screening Interview, SRASHE (finding both "high" chronic and acute risk for suicide), MH Consult Inpatient, and mental health primary clinician (MHPC) Initial Assessment forms. The inmate was subsequently referred to a MHCB.

The only major concern with the case was that the inmate had self-reported much of the above information during the intake screening process on November 30.  Despite the abundance of such concerning information, he was not seen by a mental health clinician until December 6.

Finally, daily PT rounds in one of the administrative segregation units (L-1) were observed on December 5.  The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS for MHSDS inmates.  Of note, PT rounds were being performed twice a day following the most recent inmate suicide in the L-1 Unit in November 2017.

**Housing**:  DVI had 24 OHU rooms, ten of which were designated as **alternative housing** to temporarily house inmates with mental illness and/or requiring suicide observation.  Each of the rooms had a bunk and inmates were required to be under 1:1 observation prior to transfer to a MHCB.  On occasion, TTA cells were also designated for alternative housing.  From September 1 through November 30, 2017, there were approximately 128 inmates placed in alternative housing, with the vast majority (84 percent) released within 24 hours.  No inmates were housed over 48 hours, and the overall length of stay in alternative housing for these 128 inmates was 16 hours.

Finally, the administrative segregation unit (L-1) housed GP, 3CMS, and EOP inmates.  The unit originally had five retrofitted new intake cells, but that number had been increased to 11 in the past year.  However, the 11 new intake cells (138 through 148) were not completely suicide-resistant.  One cell (148) had a gap between the bunk and wall, and all 11 cells had ventilation grates with holes in excess of 3/16-inch in diameter.  In addition to these 11 new intake cells not being completely suicide-resistant, there were three new intake inmates observed in unsafe non-intake cells.  This finding was particularly problematic because two inmates (DVI 4 and DVI 5) who committed suicide in the administrative segregation unit in October and November 2017 were not placed in suicide-resistant new intake cells upon admission.

Of note, the other segregation unit (K-1) had been closed for renovation since spring 2016 and was scheduled to be reopened in early 2019.  The K-1 Unit had contained 27 retrofitted suicide-resistant cells for new intake inmates.

**Observation**:  Because DVI did not operate a MHCB unit, all suicidal inmates were required to be supervised on 1:1 observation until they were transferred to a MHCB.  As noted above, most inmates were housed in the OHU.  No other levels of observation were permitted within the OHU for suicidal inmates.

A review of Guard One data for a recent 24-hour period found almost 100-percent compliance in the L-1 administrative segregation unit with the required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from September 1 through November 30, 2017.  This reviewer's sample EHRS review of 40 cases of emergency mental health referrals for suicidal ideation/behavior revealed that mental health clinicians completed the required SRASHEs in only 85 percent (34 of 40) of the cases.

In addition, this reviewer examined ten SRASHEs of inmates initially placed in alternative housing for suicidal ideation at DVI, but their MHCB referrals were subsequently rescinded.  The review found that many of the SRASHEs did not contain safety plans to reduce future SI.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 92 cases of patients discharged from a MHCB and alternative housing that returned or transferred to DVI and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from June 1 through November 30, 2017. The review found that 85 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the vast majority (75 percent) of the custody checks recommended for 48 hours by clinicians. In addition, 88 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Most of the deficiencies cited were related to clinicians not signing documentation and/or gaps in the observation by correctional staff.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (September through November 2017) found that quorums were only achieved in one of the meetings (November). Of note, the monthly meetings averaged between 20 and 26 participants. Meeting minutes were otherwise unremarkable.

**Training**: According to training records, 96 percent of custody staff and 97 percent of medical staff were currently certified in CPR. In addition, 98 percent of custody staff, 86 percent of medical staff, and 79 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of November 2017, 93 percent of all mental health clinicians had completed the SRE mentoring program, 74 percent had received the seven-hour SRE training, and 19 percent had completed safety plan training.

**Recent Suicides**: DVI experienced four inmate suicides during the review period. In the ___first___ case (DVI 6), the inmate was found hanging from the window bar by a sheet in his RC-SNY cell during the late evening of March 12, 2017. The inmate entered the CDCR system through the RC at DVI on January 19, 2017 to serve a 24-year and eight-month sentence for rape, false imprisonment, and assault (of his girlfriend). During his 53-day confinement, he did not have any RVRs. The inmate was not known to be gang-affiliated. He was unmarried and had a 13-year-old daughter. There was evidence of family support through letter correspondence found in the inmate's cell. There were also two brief notes found in his cell allegedly from other inmates indicating possible extortion due to their knowledge of his commitment offense.

According to limited available records, the inmate was born in Mexico and raised by his parents until he illegally entered the United States in 2007 in search of employment. His mother died in 2014 and he did not have any contact with his father. There was no record of siblings. He denied any dependence on alcohol or illegal drugs. He did not have any prior criminal history. There were no records indicating that the inmate ever received mental health treatment in the

community.  Upon entry into the CDCR, the inmate screened negative for any mental health issues and was not placed into the MHSDS.  However, a mental health referral dated January 19, 2017 from the intake nurse indicating that the inmate "got sentenced to 24 years.  New commitment, feels depressed," was apparently misplaced and not available to the clinician completing the diagnostic testing the following day (January 20).

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any medical issues which were felt contributory to his death.  However, the reviewer noted that the inmate was possibly a victim of extortion from other inmates due to knowledge of his crime, and although it was not known if he succumbed to their demands, "the pressures of these threats likely aggravated the existing presence of his underlying despair.  The inmate did not leave a suicide note or any other insight into his final decision to end his life; although the overwhelming fear of his extensive sentence and the desperation for his safety are plausible contributory factors."

The Suicide Report contained one recommendation for corrective action through a QIP:

> 1) The mental health referral submitted on January 19, 2017 was not received by the mental health clinician. Mental health clinician had seen the inmate on January 20, 2017, but the session was not in response to the referral, rather the inmate was seen per the routine intake process.  The referral was determined 'completed' and closed in the system by an office technician who mistakenly associated the mental health session with the referral.  The office technician printed the mental health clinicians name on the 'received by' and the 'assigned to' line on the referral; therefore, it could be misinterpreted as a signature indicating the referral was complete and clinician have seen the inmate.

> While with the implementation of the EHRS on March 7, 2017, all health care referrals will follow an electronic process in which the referral is sent directly to a clinician, all referrals made by non-health care staff will continue to use a paper referral process.  All referrals will continue to be scanned into the EHRS and an office technician will assign the referral to the appropriate clinician.  It is important that all staff who are responsible for assigning referrals ensure they accurately identify themselves as a person who receive the referral and the mental health clinician assigned to the referral.

In the **_second_** case (DVI 7), the inmate was found hanging from the ladder by a sheet in his RC-SNY cell a few minutes after midnight on April 19, 2017.  The inmate entered the CDCR system through the RC at DVI on March 10, 2017 to serve a three-year sentence for corporal injury to his girlfriend.  During his 40-day confinement, he did not have any RVRs.  The inmate was not known to be gang-affiliated.  He had family support through letter correspondence with his mother and girlfriend.  The inmate was unmarried and had four children from prior relationships.

According to limited available records, the inmate was born and raised by his parents until he was approximately 15-years-old when he left home in order to obtain a job and provide financial

support to his newborn baby.  He became employed as a seasonal laborer.  The inmate also began using illegal drugs on a daily basis as a teenager.  He had limited juvenile and adult criminal histories.  There were no records indicating that the inmate ever received mental health treatment in the community.  Upon entry into the CDCR, he screened negative for any mental health issues and was not placed into the MHSDS.  The inmate denied any current or prior history of suicidal ideation or behavior.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any medical issues which were felt contributory to his death.  Of note, a cellmate interviewed following the suicide alleged that the inmate had attempted suicide on three occasions during his brief DVI confinement.  Two of these alleged incidents were not known to CDCR staff; there was an allegation that the third alleged suicide attempt by cutting was known to custody staff but did not result in a mental health referral.  This allegation was pending further investigation.  Several items of property and suicide notes were found in the inmate's cell.  According to the CDCR reviewer, "His property had various items with themes of death, regret, a sense of being a burden to his family, and anguish over his girlfriend.  He wrote several goodbye letters found within his belongings.  These letters suggested that he had been ruminating about finding the means to end his personal agony and guilt over the pain he felt he inflicted on others."

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) Custody staff responding to the incident failed to respond with the appropriate cut-down kit but rather the cut-down tool and Ambu bag. California Code of Regulations (CCR), Title 15, Section 3365 (c) states in part, "A cut-down kit shall be immediately assessable on each unit and shall be used by staff in case of an attempted suicide by hanging."

> 2) Custody staff responding to this incident failed to articulate whether or not the body weight of the inmate was supported prior to being cut down.  The Suicide Prevention lesson plan explains emergency response procedures and expectations during medical emergencies.  The primary objective is to preserve life and specifically states custody is to relieve tension and cut the noose above the knot.

In the **_third_** case (DVI 4), the inmate was found hanging from the ladder by a sheet in his RC-administrative segregation cell during the late evening of October 29, 2017.  The inmate entered the CDCR system through the RC at DVI for a third term on September 19, 2017 to serve a one-year and four-month sentence for possession of a weapon by a felon.  During his 41-day confinement, he did not have any RVRs.  The inmate was not known to be gang-affiliated while in CDCR but was associated with gangs in the community.  On October 27, 2017, he requested to be housed in protective housing due to safety concerns.  The inmate was subsequently housed in the RC section of the administrative segregation unit.  He was not placed in a suicide-resistant new intake cell.  The level of family support, if any, was unknown.  The inmate was unmarried and did not have any children.

133

According to limited available records, the inmate was born and raised by his parents in Laos until he was approximately 16-years-old when he immigrated to the United States.  His closest family members included a mother, two older brothers, a younger brother, and at least two sisters.  Available records suggested that he lived alone, did not complete high school, and was sporadically employed.  The inmate reported that he began using illegal drugs as an adult.  His criminal history began at age 19 and included two previous CDCR terms.  There were no records indicating that the inmate ever received mental health treatment in the community.  Upon entry into the CDCR, he screened negative for any mental health issues and was not placed into the MHSDS.  The inmate denied any current or prior history of suicidal ideation or behavior.  On October 25, 2017, however, the inmate answered, "a little" when asked by a PT completing the ASU Screening Questionnaire whether he was nervous, hopeless, restless or fidgety, depressed, everything was an effort, and worthless.  He was seen by a mental health clinician several hours later, denied any current suicidal ideation, presented with an adequate mental status, and assessed as not being in need of any further mental health services.  It was later determined that the clinician had not reviewed the ASU Screening Questionnaire.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any medical issues which were felt contributory to his death.  Two suicide notes, as well as a Health Care Services Request form, dated October 26 and reporting that he was depressed and needed to see a mental health clinician, were found in his cell.  The request form had not yet been submitted and, therefore, unknown to staff.  According to the CDCR reviewer, "information gathered during the course of this review suggests fear of his safety, his impending release to the community on December 13, 2017, and his fear of rejection by his family appeared to be plausible contributory factors to the inmate suicide."

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) In an ASU Screening Questionnaire performed by a psychiatric technician on October 25, 2017 at 0955 hours, the inmate, a non-participant in the MHSDS, stated that he felt nervous, hopeless, restless or fidgety, depressed, or worthless within the past 30 days.  At 1329 hours the same day, the inmate was interviewed by a mental health clinician who did not provide any documentation referencing the information contained in the ASU Screening Questionnaire, despite this information being readily available to the clinician in the Electronic Health Record System (EHRS).

> 2) Although not found to be a contributing factor to the suicide, a review of the SOMS identified that the inmate had not been housed in a retrofitted intake cell upon his initial placement in ASU.

In the ***fourth*** case (DVI 5), the inmate was found hanging from the ladder by a sheet in his administrative segregation unit cell during the evening of November 17, 2017. The inmate entered the CDCR system through the RC at DVI on September 20, 2017 to serve a 16-month sentence for evading or attempting to evade a peace officer.  During his 59-day confinement, he did not have any RVRs.  The inmate was known to be gang-affiliated.  He had family support

through letter correspondence with his mother and grandmother.  The inmate was unmarried and had a 4-year-old daughter.

According to limited available records, the inmate and five siblings were raised by both his mother and grandmother.  Information regarding his father was unknown.  The inmate reported a history of substance abuse beginning at age 12.  He had a minimal employment history.  He had an extensive juvenile history and was in and out of juvenile facilities from ages 12 through 17.  The inmate reported a childhood diagnosis of ADHD and inconsistently took medication until age 17.  He did not report any other mental health treatment in the community.

Upon entry into CDCR, the inmate reported a prior suicide attempt by a heroin overdose in 2016.  He denied any current thoughts of suicide but indicated to the intake nurse that he was "feeling down or depressed more than half the time in the last two weeks."  The inmate received diagnostic testing two days later on September 22 and again reported some depression and the prior suicide attempt (subsequently telling another clinician the incident was accidental).  As a result, he was referred for further mental health assessment.  Several days later on September 27, another mental health clinician completed both a SRASHE and MHPC Initial Assessment.  The SRASHE noted that the inmate had "fleeting thoughts of suicidal ideation within the past week," but he was not currently suicidal.  The mental status exam portion of the initial assessment found that the inmate had poor memory, distraction, fair judgment, a tendency to minimize his problems, had the need for mental health treatment, and a below normal intelligence.  He denied any current mental health issues, a desire to be on psychotropic medication, or willingness to participate in the MHSDS.  The clinician's initial diagnosis was Intermittent Explosive Disorder, Polysubstance Dependence, and Antisocial Personality Disorder.  The assessment noted that the inmate "denies any mental health issues and none were noted by this writer."  He was not placed in the MHSDS.

On November 15, 2017, the inmate was placed in administrative segregation due to safety concerns based upon expectations that he would be harmed after dropping his gang-affiliation.  In addition, he was also interviewed by his CC I that same day and expressed concerns that a previous juvenile arrest and conviction for child sexual assault would eventually be known to the inmate population.  As a result, he requested SNY placement.  Although initially double-celled in administrative segregation on November 15, the inmate was subsequently relocated to a single cell on November 17 following an investigation that determined his cellmate might be still gang-affiliated and a threat to him.  The inmate was not placed in a suicide-resistant new intake cell and committed suicide several hours later.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any medical issues which were felt contributory to his death.  According to the CDCR reviewer, "One of the possible cumulative psychological triggers for the inmate suicide may have been his concern over the "R" suffix and the potential consequences that could result from his gang or the prison population as a whole.  If discovered, this information may have put his safety in jeopardy.  Specifically, the inmate may have been fearful that the cellmate he was briefly housed with in ASU, who was later identified to potentially not be serious about leaving his gang-affiliation,

communicated the reasoning why the inmate was requested protective custody (potential "R" suffix)."

The Suicide Report contained six recommendations for corrective action through a QIP:

1) In the MHPC MH Initial Assessment dated September 27, 2017, the inconsistencies in the inmate's prior reports of self-harm (accidental versus suicide attempt) were not documented. Because of a lack of clarity, the rationale for excluding the inmate from the MHSDS was not well formulated.

2) In performing the Suicide Risk Assessment/Self-Harm Evaluation (SRASHE) on September 27, 2017, there are a number of documentation deficits. The rationale for the estimation of acute and chronic suicide risk are not well documented.

3) There was an 8-minute delay of activating 911. The delay most likely did not change the patient outcome.

4) Per SOMS, the patient was transferred to ASU unit at 1156 on November 15, 2017. The ASU pre-placement screening was not performed until November 16, 2017 at 1002 per EHRS documentation. It was not clear if custody brought the patient to a health care staff for pre-placement screening prior to ASU placement.

5) It was not clear how the two PTs notified the custody officers when they visualized that the patient was hanging. The PT notes showed 'We immediately notified custody staffs and the COs responded right away, cut down the rope and CPR initiated.'

6) A policy memorandum issued October 30, 2015 entitled, Revised Administrative Segregation Unit Intake Cell Procedure states, 'Under this revised policy, when inmates are in their initial 72 hours of ASU placement and the cell partner subsequently moves out of the cell, ASU staff shall immediately make every effort to identify another compatible cell mate. If the inmate cannot be double-celled with a compatible cell mate, ASU staff shall place the inmate in an available ASU intake cell as soon as possible, but no later than eight hours after the cell partner has been moved from the cell.'

The inmate was discovered hanging in his assigned cell approximately three hours after the cell move had taken place. Although the inmate's movement was consistent with existing policy and procedures, this event prompts the review of existing policy to check to determine if modifications are necessary.

**17)     Central California Women's Facility (CCWF)**

**Inspection**: December 7-8, 2017 (previous suicide prevention audit was on May 10-11, 2016). CCWF housed approximately 2,952 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the RC on December 8.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The door to the nurse's office was closed during the process, thus ensuring privacy and confidentiality.

The mental health diagnostic testing in the RC was observed on both December 7 and December 8.  There were concerns raised during the mental health screening on December 7.  In the observed case (CCWF 1), the inmate had arrived at CCWF from the county jail on December 5, 2017.  The nurse had timely completed the "Intake Health Screening-Female" form on December 5 in which the inmate had reported a prior history of mental illness, including Anxiety Disorder and ADHD.  She denied any current depression, auditory hallucinations, suicidal ideation, or any prior history of suicidal behavior.  A mental health referral was not generated.  Two days later on December 7, the inmate was seen by a mental health clinician for completion of the 31-item mental health screening.  The inmate answered affirmatively to the following questions: "Have you ever made a suicide attempt?" (with the date of the attempt not solicited by the clinician), "Have there ever been a few weeks when you've felt like you were useless, or sinful, or guilty?," "Have you ever been involuntarily committed for psychiatric problems?," "Are you now or have you ever taken any kind of medication or drugs for psychiatric or emotional problems?," and "Are you now or have you ever taken any antidepressants?"  Based upon the affirmative responses to the mental health screening, the inmate was referred for further mental health evaluation.

This reviewer asked the clinician if they routinely reviewed both the intake health screening form and any available discharge information from the county jail.  The clinician responded by stating that they and their colleagues responsible for the initial mental health screening waited until the Mental Health Evaluation was completed before reviewing any previous records, including county jail records.  This reviewer's concern with the clinician's response was twofold: *first*, the MHSDS *Program Guide* only required a Mental Health Evaluation to be completed if the inmate answered affirmatively to any mental health questions on the 31-item mental health screening form, and *second*, the *Program Guide* required the initial Mental Health Evaluation to be completed within "18 calendar days," although the process was historically completed earlier.  Under such a scenario, an inmate (not the one referenced above) who provided all "no" responses to the mental health screening would not be referred for completion of a mental health evaluation and would not have either the initial intake screening form or available county jail records reviewed by a mental health clinician.

In the above case (CCWF 1), this reviewer's subsequent examination of the available county jail records indicated that the inmate had attempted suicide by drug overdose approximately ten days earlier on November 24, 2017, with a note indicating that "she is depressed about being here but does not want to die.  Upset and emotional."  The county records also indicated she had been prescribed an antidepressant.  This reviewer's examination of the EHRS indicated that the inmate

137

had previously been incarcerated at CIW and placed on suicide precautions in the MHCB in September 2017 for suicidal ideation. In addition to the November 2017 suicide attempt, the inmate also had two suicide attempts in March 2016 by drug overdose. This information was available to, but not reviewed by, the mental health clinician at CCWF during the RC diagnostic testing on December 7, 2017. Based upon this reviewer's findings, the inmate was subsequently referred for completion of a SRASHE on December 8 which found a "high" chronic risk and "moderate" acute risk for suicide. Following review of all available records, the clinician completing that assessment found "more concerning from information gleaned was IP actually was minimizing history more than originally" determined during the RC process.

This reviewer also observed the mental health diagnostic testing in the RC by another clinician on December 8. During this observed screening, the clinician did review the available county jail records.

In sum, it would appear that CCWF mental health leadership needs to provide direction to clinicians assigned to the RC diagnostic testing area to ensure that they consistently review both the most recent initial intake screening forms and any available county jail records prior to and/or during completion of the 31-item mental health screening form. In addition, review of Chapter 2 of the MHSDS *Program Guide* ("Reception Center Mental Health Assessment) found that there was unclear language regarding requirements for review of health care information from both county jails and prior CDCR confinements.

Finally, daily PT rounds in the administrative segregation unit (Building 504) were observed on December 8. Building 504 contained GP inmates, STRH, administrative segregation EOP, condemned unit, and alternative housing. The rounds were unremarkable, and the PT was observed to be correctly entering Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**: CCWF had a Skilled Nursing Facility (or CTC) with 12 designated MHCBs in eight rooms. At the time of the assessment, one room was off-line for repair. Previously identified hazards (i.e., square-shaped stainless-steel sinks and faucets with a horizontal slit known as "anti-squirt slits") had been replaced in the rooms that were now reasonably suicide-resistant. The administrative segregation unit (Building 504) contained four retrofitted suicide-resistant cells (128 thru 131) for inmates on new intake status. During this reviewer's tour of the unit, there were no new intake inmates housed in unsafe, non-new intake cells. Of note, three previous special management cells were converted into regular administrative segregation cells with standard bunks.

Finally, **<u>alternative housing</u>** cells to temporarily house inmates awaiting MHCB placement were primarily found in Building 503 (RC housing), Building 504 (in the administrative segregation section), and A-73 (a holding cell in the CTC). As noted above, the three special management cells in Building 504 were no longer being utilized for either special management or alternative housing, correcting a previous problem. All inmates in alternative housing were observed on a 1:1 basis and furnished bunks. Alternative housing continued to be used extensively at CCWF, with more than three inmates on the status each day. From August 25 through December 5, 2017, there were 266 inmates placed in alternative housing, with only 43 percent discharged

within 24 hours.  Of the 57 percent of inmates who remained in alternative housing for more than 24 hours, a sizable number (i.e., 91 or approximately 34 percent of all inmates) were housed for 4.4 days or over 105 hours.  The overall length of stay in alternative housing for all 266 inmates was 51 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were being observed at 15-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on several sample days (November 16 for CCWF 2, December 1 for CCWF 3, December 6 for CCWF 4, and November 6 for CCWF 5).  The chart review found a few observation checks (between one and four per patient) that were in excess of required 15-minute intervals for all four patients, with the longest gap between checks being 38 minutes for CCWF 5.  Violations in the four cases were by multiple nursing staff.

A previous problem with clinicians not making daily determinations as to possessions and privileges afforded to MHCB patients had been corrected, and visits and telephone privileges were being approved based upon clinical determination.  With one exception, out-of-room privileges, including yard, were being afforded to MHCB patients.  The exception was patients on maximum-security or administrative segregation statuses did not have access to the program room in the unit.  This reviewer was informed that there was a pending work order to install a "Restart Chair" in the program room.  No timetable for the installation was provided.

This reviewer observed several IDTT meetings for MHCB patients on both December 7 and 8.  In the first case (CCWF 4) on December 7, the patient had been in the MHCB for eight days after being confined in alternative housing for an additional eight days.  She was at 3CMS level of care and had an extensive history of SI and SIB.  The patient had a diagnosis of Bipolar Disorder and had previously been treated at Patton State Hospital.  She had denied any suicidal ideation and had been medication compliant since her MHCB admission.  The IDTT was recommending the patient's discharge to EOP and she was concerned about how the new level of care would affect her upcoming parole board consideration.  There was adequate discussion regarding safety planning, including utilizing the patient's coping skills of reading, journaling and deep breathing exercises.  Finally, for purposes of transition, both the patient's current 3CMS clinician and newly assigned EOP clinician were at the IDTT meeting.  This was an excellent practice.

This reviewer subsequently examined the safety plan section of patient's discharging SRASHE.  Unfortunately, narrative in the safety plan was not consistent with the discussion of safety planning during the IDTT.  However, review of the first day of the patient's five-day follow-up progress note was consistent with the IDTT discussion and stated the following: "IP seen for Day 1 of 5-day follow-up and 30-minute custody checks were continued as patient continues to endorse symptoms of anxiety. IP denied current SI or HI.  Safety plan discussed the following: 1) IP will remain on 30-minute checks at this time; 2) IP will use coping skills including taking a shower, reading, and practice relaxation skills including deep breathing and shoulder shrugs to help cope with anxiety; 3) MHPC will provide IP with a journal to use in order to write her stories; and 4) IP will inform staff if she experiences SI."

The IDTT meeting observed on December 8 included different team participants from the previous day.  The patient (CCWF 6) had been in the MHCB for 11 days after being confined in alternative housing for an additional seven days.  She was at the 3CMS level of care and had a minor history of suicide ideation.  Diagnosed with Bipolar Disorder, she denied any suicidal ideation and had been medication compliant since her MHCB admission.  The patient had a history of volatile behavior and was observed wearing a spit mask during the meeting due to a previous incident of spitting on an officer during escort to administrative segregation.  There was no discussion during the IDTT meeting regarding safety planning other than the lead clinician reemphasizing medication compliance to the patient.  The patient was discharged to EOP level of care.  This reviewer subsequently examined the safety plan section of patient's discharging SRASHE.  The safety plan stated: "PC will work with IP to increase insight into medication compliance and how it directly affects functioning in the hopes of decreasing impulsivity.  IP will be provided with education on thought records (increased awareness), different forms of relaxation, and other self-soothing techniques to employ and urges to self-harm or suicidal ideation emerge.  IP will verbalize an understanding of how to contact MH staff in an emergency."  Of concern was the fact that none of the above described safety plan was discussed during this patient's IDTT meeting on December 8.

Finally, a review of Guard One data for a recent 24-hour period within Building 504 found 100-percent compliance with the required checks not exceeding 35 minutes.  It should be noted, however, that this level of compliance was not an accurate reflection of the overall level of observation of inmates housed in Building 504.  As detailed in the previous assessments, Building 504 at CCWF was unique in that it housed the condemned unit containing 22 single cells.  Seventeen of the cells were located within an enclosed program area on the first floor of the unit, with five cells located outside the enclosed program area.  According to CCWF custody officials and staff, because condemned unit inmates had regular access to the enclosed program area outside their cells, but within the chain-link fenced area, Guard One rounds were not conducted except during the First Watch.  A May 9, 2014 directive from the Director of the Division of Adult Institutions entitled, "Security/Welfare Check Procedure Utilizing the Guard One System to Supersede Administrative Segregation Unit Welfare Check and Security/Custody Rounds in Specialized Housing Procedures" supported such a practice by citing the "unique design and programs" of the enclosed condemned unit.  In addition, five of the condemned unit cells remained outside of the enclosed program area and adjacent to other administrative segregation unit cells that were subject to Guard One surveillance.  There continued to be no practical reasons why these five condemned unit cells should not be subject to Guard One surveillance.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of August through November 2017.  This reviewer's sample EHRS review of 40 emergency mental health referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in 93 percent (37 of 40) of the cases, a significant improvement from the previous assessment in which the compliance rate was only 82 percent.

140

In addition, this reviewer examined a sample of ten SRASHEs from patients released from a MHCB between August and November 2017. Most of the safety plan sections of the SRASHEs did not adequately address specific strategies to reduce suicidal ideation. One case (CCWF 7) symbolic of the problem contained the following safety plan: "Discharge to 3CMS LOC with 5-day follow-up. Discuss coping skills for substance abuse, pending court case, family separation, and missing her children."

Ironically, in a case discussed above (CCWF 6), although the safety plan contained in the discharging SRASHE on December 8 was viewed to be inadequate (as well as never discussed with the patient during the IDTT), when the same patient was previously discharged from the MHCB on November 6, 2017, the safety plan was very reasonable:

> IP to work with RC 3CMS PC to continue practicing self-soothing skills, physical exercise - walking; deep belly breathing and thinking future positive-oriented thoughts, taking meds, not getting any more RVRs, thinking about paroling on 2/08/18, and starting SSI application process. To develop new skills to continue to stabilize mood, reduce hypomanic behavior.

> IP to work with RC MHPP by continuing her psych meds and being open about side effects and other issues as opposed to stop taking them which she did prior to MHCB admit.

> IP to work with CC1 on endorsement process in A yard and to consider resources - programs that can continue to stabilize her.

> MHCB PC reviewed safety plan with IP and discussed triggers to recent decompensation, including anger over conflicts with other IMs that have contributed to her acting-out by not taking meds, faulty thinking of 'trying to get back at others,' and not thinking of consequences. IP to implement above stated self-soothing skills when this happens.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 315 cases of patients discharged from a MHCB or alternative housing placement that remained at CCWF and not transferred to the administrative segregation unit (where observation at 30-minute intervals was required) from June through November 2017. The review found that 93 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority (60 percent) of the custody checks recommended for only 24

hours by clinicians.  In addition, 97 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (August through October 2017) found that quorums were not achieved in any of the meetings, ironically only because the senior PT or designee were not invited to participate.  The meetings were consistently 90 minutes in length, but otherwise unremarkable.

**Training**:  According to training records, approximately 91 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 93 percent of custody, 95 percent of medical, and 96 percent of mental health staff had received annual suicide prevention block training during 2016.  Finally, as of November 2017, only 77 percent of mental health clinicians had completed the SRE mentoring program, 96 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**:  CCWF experienced one inmate suicide during the reporting period.  In that case (CCWF 8), the inmate was found hanging from the locker by a sheet in her administrative segregation cell during the late evening of October 28, 2017.  The inmate was a transgender identified individual (biologically female and identifying as male) who entered CDCR for a second term on June 24, 2013 to serve a 13-year sentence for assault with a deadly weapon.  (For purposes of this review, the inmate will be identified by their preferred pronoun.)  He was transferred between CCWF and CIW various times during the second term, and most recently transferred back to CCWF on March 15, 2017.  The inmate had a significant number of RVRs, approximately 60 during his confinement, including four that occurred in the last five months of his life and remained pending at the time of the suicide.  These incidents included assaulting a nurse, destruction of state property, covering the cell window with cardboard, and refusing a housing transfer.  He had approximately 21 administrative segregation placements as result of these RVRs.  The inmate was not known to be gang-affiliated and was unmarried with a 14-year-old son.  Family support was demonstrated by letter correspondence and occasional visits.

According to available records, the inmate and four sisters were raised by their parents, as well as by a grandmother for a period of time, in an unstable environment that included domestic violence and physical abuse by a stepfather.  Both parents had substance abuse problems, and several family members had been involved in the criminal justice system.  The inmate was sexually molested by his mother's friend at age 5, as well as by an uncle at age 8.  The molestation continued until he was 15-years-old.  As a result, he did poorly in school and began abusing illegal drugs.  As a teenager, the inmate was rejected by his parents for his sexual orientation.  His involvement in the criminal justice system began at age 18 when a series of robberies were committed under the influence of crack cocaine and methamphetamine.

The inmate had a significant history of mental illness, as well as self-harming behaviors that included cutting himself and head-banging beginning at age 8 and continuing into adulthood.  He also had a long history of suicide attempts which started at age 8 with a drug overdose and

continued with other incidents including deep arm lacerations and two attempted suicides by hanging at age 18. The inmate reported three hospitalizations in the community for suicide attempts and psychosis. Upon entry into CDCR for the second term, the inmate was placed at 3CMS level of care and provided diagnoses of Adjustment Disorder with Anxiety and Depression, Bipolar Disorder, Antisocial Personality Disorder, Post-Traumatic Stress Disorder, Gender Dysphoria, and Borderline Personality Disorder.

In addition to the inmate's history of suicidal behavior in the community, he also attempted suicide on two occasions at CCWF during the first CDCR term. The inmate had approximately 11 MHCB placements beginning in February 2016 and ending in September 2017, with an initial placement in alternative housing for suicidal ideation and a subsequent MHCB rescission. As of September 22, 2017, he was assessed as having a 'moderate' chronic risk and 'low' acute risk for suicide. The inmate was elevated to EOP level of care following the ninth MHCB placement due to increases in head-banging, depressive symptoms, hopelessness, tendency to isolate, and a decrease in baseline functioning. He was also placed in the PIP from July through September 2016. During the last year, the inmate rarely participated in group treatment, attending only ten of 78 treatment modules offered.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although experiencing several medical issues, they were not thought to be contributory to the death. However, the reviewer opined that the inmate's suicide was probably precipitated by both accumulating RVRs and the "toxic" long-term romantic relationship he had with another inmate in the administrative segregation unit which culminated in an argument shortly before the suicide on October 28, 2017.

The Suicide Report contained three recommendations for corrective action through a QIP:

> 1) The September 22, 2017 SRE was found to be deficient during the course of this review and by an audit performed at CCWF.

> 2) The primary officer's CDCR 837 states they visually observed cell 117 being covered up, blocking the view of staff. The primary officer ordered the inmate to take down the window covering with negative results as the inmate verbally stated 'no.' The officer reported leaving the immediate area of cell 117 to complete Guard One checks and returned 20 minutes later in an attempt to reestablish communication with the inmate.

> 3) During autopsy, 23 pills were found in the inmate's vaginal cavity.

## 18)   San Quentin State Prison (SQ)

**Inspection**: January 2-3, 2018 (previous suicide prevention audit was on September 29-30, 2016). SQ housed approximately 3,920 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process in the RC on January 3.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The door to the nurse's office was closed during the process, thus ensuring privacy and confidentiality.  This reviewer also observed the mental health diagnostic testing in the RC for two newly-admitted inmates on January 3.  Both screenings were thorough.

Daily PT rounds in administrative segregation (Carson Unit) were observed on January 2.  The rounds were unremarkable, and the PT was observed to be correctly entering information from the Psych Tech Daily Rounds Form into the EHRS for all caseload inmates.

**Housing**:  SQ had 40 PIP rooms for condemned inmates.  All non-condemned SQ patients requiring a crisis level of care were referred to outside MHCBs.  All PIP rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The administrative segregation (Carson) unit contained approximately 30 new intake cells on the first (1C8-1C22) and second (2C1-2C15) tiers.  All the new intake cells were retrofitted to be suicide-resistant.  Due to a low census, many of the new intake cells were empty and all new intake inmates were observed to be in new intake cells.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was found in either the ten licensed medical beds in the CTC, TTA cells, or various large holding cells scattered throughout the CTC building.  Alternative housing was used on a daily basis, and inmates were all furnished beds and observed on a 1:1 basis.  From April 1 through December 31, 2017, there were approximately 159 inmates placed in alternative housing and 96 percent were released within 24 hours.  The overall length of stay in alternative housing for all 159 inmates was 16 hours.

**Observation**:  All patients in the PIP at MHCB level of care were on either Suicide Precaution or Suicide Watch status.  All other PIP patients were under ICF level of care and observed at 60-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of three patients (<u>SQ 1</u>, <u>SQ 2</u>, and <u>SQ 3</u>) on Suicide Precaution status in the PIP during a nine-hour period from 12:00 a.m. through 8:59 a.m. on January 2, 2018.  The chart review found numerous observation checks (nine per patient) that were in excess of the required 15-minute intervals, with the longest gap between checks being 67 minutes in one case (<u>SQ 1</u>).  The following case (<u>SQ 2</u>) exemplifies the significance of the problem:  There were nine violations of 25-, 21-, 20-, 19-, 18-, 18-, 20-, 17-, and 32-minute gaps between the required 15-minute intervals.  Violations in the three cases were committed by multiple nursing staff.

This reviewer observed four IDTT meetings on January 2: two patients at MHCB level of care and two patients at ICF level of care.  All IDTT meetings were well represented by mental health, medical and custody staff.  Of note, the IDTT meetings for MHCB patients included representation of two outpatient psychologists from the Condemned Unit who were designated to the CTC for the sole purpose of participating in the IDTT for non-PIP patients.  During the IDTT meeting for MHCB patients, this reviewer observed that the two out-patient psychologists

144

dominated the sessions, with very little input solicited from other team members; whereas during the IDTT meetings for PIP patients, there was much more interaction amongst all team members. Despite this concern, this reviewer observed good safety plan discussion during the IDTT meetings for MHCB patients.

Finally, a review of Guard One data for a recent 24-hour period found a combined 93-percent compliance with required checks that did not exceed 35-minute intervals in the administrative segregation (Carson) and two condemned unit sections.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of July through October 2017.  In addition, various TTA logs were also reviewed for the period of July through December 2017.  This reviewer's sample EHRS review of 45 emergency mental health referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in 96 percent (43 of 45) of the cases.  This finding was a significant improvement from the previous assessment in which only 88 percent of the SRASHEs were completed.

In addition, this reviewer examined a sample of eight SRASHEs from patients released from the MHCB level of care at the PIP or alternative housing between July and December 2017.  In two cases (25 percent), the discharging assessments could not be found in the EHRS.  Of the remaining six cases, the quality of the safety plans contained within the discharging SRASHEs ranged from adequate to problematic.  Most of the safety plans were problematic, and simply contained recommendations to outpatient clinicians to assist the patients with development of safety planning.  For example, in one case (SQ 1) that this reviewer observed during the IDTT on January 2 and found adequate discussion of safety planning, the narrative for the patient's safety plan contained within the discharging SRE dated January 3, 2017 stated: "Over the next 30 days (in outpatient), the IP will work with his PC 1:1 on a weekly basis to identify three triggers of his (substance) use and two replacement behaviors.  He will also be enrolled in substance recovery group.  Given the IP is currently being recommended for discharge from the MHCB, psycho-education centering on methods of contacting mental health should the need arise; he was receptive and indicated that he understood."  In another case (SQ 4), the clinician utilized the same safety plan narrative for multiple patients: "The IP's Tx team will work with the IP to identify at least one coping skill to help him mitigate the experience of psychiatric distress over the next seven days.  Furthermore, the IP will work with his treatment team to identify two areas of this treatment plan that he can more fully engage in MH program; this will be done in an effort to reduce barriers to progress."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 48 cases of patients discharged from a MHCB, alternative housing placement, or PIP and returned to mainline SQ and not transferred to administrative segregation or the condemned unit (where observation at 30-minute intervals was required) between June and December 2017.  The review found that 89 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 74 percent of the custody checks recommended for the maximum period of 72 hours.  In addition, only 74 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.  Of note, although these compliance levels were in need of improvement, they were substantially higher than this reviewer's previous assessment which found various problematic practices, including the fact that many "Discharge Custody Check Sheet" (CDCR MH-7497) forms could not be located and observations for all remaining cases were not occurring at the required 30-minute intervals.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (August through November 2017) found that quorums were not achieved in any of the meetings.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 99 percent of custody staff, 94 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of December 2017, 96 percent of mental health clinicians had completed both the SRE mentoring program and seven-hour SRE training, and 97 percent had completed safety plan training.

**Recent Suicides**:  SQ experienced two inmate suicides during the review period.  In the _**first**_ case (SQ 5), the inmate was found hanging from the bookshelf by a sheet in his administrative segregation unit cell during the evening of January 27, 2017.  He entered the CDCR system through SQ for the third time on November 16, 2016 to serve a six-year sentence for assault with force likely to produce great bodily harm.  The inmate did not incur any RVRs during his confinement and was not known to be gang-affiliated.  He was twice divorced and had three young children.  The inmate had limited family support through letter correspondence with his grandmother, but no visits or telephone calls during his approximate 73-day confinement.

According to available records, the inmate was primarily raised by his grandparents because his biological parents suffered from substance abuse.  He self-reported being emotionally and physically abused by his mother, as well as robbed at gun point and sexually assaulted by a stranger at age 16.  The inmate began using illegal drugs at age 17 and was placed in various drug treatment programs pursuant to court orders.  His previous CDCR terms covered 2001 through 2004, as well as 2014 through 2015.

During the inmate's prior CDCR terms, he did not self-report any mental health problems and was not placed in the MHSDS.  However, when provided initial mental health screening through the RC on November 16, 2016, he reported over 20 previous suicide attempts, as well as a

146

significant mental health history that included five psychiatric hospitalizations. He also reported a diagnosis of ADHD as a child. During a mental health evaluation on November 30, the inmate's previously reported 20 suicide attempts was revised to three prior suicide attempts, including exsanguination and hanging while confined in a county jail during 2013, as well as an attempted hanging in a county jail in 2014. (Although completed, an SRE that noted both chronic and acute risk for suicide as "moderate," was not entered into the inmate's medical chart.) The inmate also endorsed a number of symptoms, including poor sleep and appetite, paranoia, hallucinations, and racing thoughts. Based upon the fact that he did not disclose such information during prior CDCR confinements, the inmate was initially viewed as an unreliable historian. Nonetheless, on November 30, 2016, he was placed in the MHSDS at the 3CMS level of care with a diagnosis of Psychotic Disorder NOS, as well as prescribed psychotropic medication.

On January 21, 2017, the inmate was placed in the administrative segregation unit after being assaulted by three other inmates. When interviewed, he admitted to owing a drug-related debt but did not seek SNY placement. Several days later on January 25, the inmate was seen by his psychiatrist for a follow-up assessment, as well as by a newly assigned PC. He reported both current auditory and visual hallucinations and rated his level of depression as eight out of ten.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although the inmate had several medical issues, including chronic back pain, these issues were not thought to be contributory to his suicide. However, the reviewer opined that increasing complaints of auditory hallucinations, anxiety regarding loss of custody of one of his children, safety concerns related to the recent assault from three other inmates and being taunted by other administrative segregation inmates to commit suicide a few days prior to his death, were likely precipitants to his suicide.

The Suicide Report contained 11 recommendations for corrective action through a QIP.

> 1) On November 30, 2016, a Suicide Risk Evaluation was completed and sent to a reviewing clinician. The SRE was reviewed and returned to the clinician with comments and requests for edits. However, the completing clinician did not resubmit a revised SRE. Therefore, no SRE was available in the electronic health record until two days prior to the inmate's death.

> 2) On January 25, 2017, an IDTT was held without the inmate being present. He was seen after the IDTT was held, with a treatment plan completed after the IDTT had already occurred. This suggests that the IDTT meeting was held with little information known about him and without his input either in person or via evaluations from members of the IDTT. The reason for his refusal to participate in the IDTT was not reported on a CDCR 7230-MH as required by the MHSDS *Program Guide*, 2009 revision. Finally, it is unclear if the IDTT psychiatrist was aware of the concerns about the inmate's depression and psychotic agitation. These concerns were documented after the IDTT team meeting occurred. The psychiatrist met with him on January 25, 2017 (after the IDTT) but did not initiate treatment for depression or psychosis prior to the inmate's death.

147

3) On January 25, 2017 the inmate reported to his clinician (after the IDTT meeting) that he had been distressed due to child custody hearings and loss of his custodial/parental rights at the end of court hearings.  These hearings occurred between February 2016 and April 2016.  However, the protective factor 'children at home' was endorsed and 'has three young children in the community' was included in the risk formulation of the SRE.  The same SRE appears to underestimate both chronic and acute risk, particularly as several imminent risk factors were present (substance abuse, anxiety, anger, recklessness, and mood changes), perhaps as a strength of protective factors was overestimated in the case.

4) On January 25, 2017, a mental health treatment plan was completed by IDTT in ASU.  The treatment plan lists imminent risk factors and reports on the inmate's history of suicide attempts yet identifies only one problem for the treatment plan: psychotic symptoms.  Psychotic symptoms are noted to cause him to engage in self-harm behaviors 'due to distress from AH.'  However, the short-term goals listed for the inmate focus on decreasing depression.

5) On January 25, 2017, the inmate reported to a mental health clinician that he was being taunted and encouraged to harm himself by other inmates.  There was no mental health documentation found regarding the inmate report and no documentation that report was shared with custody officers or psychiatric technicians in ASU, such as during morning huddles.

6) On January 26, 2017, a clinician observed the inmate in ICC and/or interviewed him after ICC.  The note written by the clinician was inadequate regarding this clinical contact.  The entire note states, 'ICC hearing on 01/26/2017. Patient reports mood as 'good.' He was smiling. Denied HI/SI.'

7) Per Departmental memorandum entitled, 'Multi-Powered Radio Loaner Program in Administrative Segregation,' dated January 22, 2014, upon completion of the administrative review, ASU inmates shall be given the opportunity to be issued a radio and ear-buds.  Based on the documentation provided by the institution, SQ failed to adhere to this policy.

8-11) Four nursing concerns were identified.  The nursing concerns were Narcan was administered twice without a physician's order, the SQ LOP for Loss of Consciousness was out of compliance, a PT incorrectly noted on the PT Daily Rounds form that the inmate was medication compliant on January 22, 2017, and the LVN did not complete the medication management referral after the inmate had refused his ADHD medication for three days.

In the *second* case (SQ 6), the inmate jumped from the upper tier of his RC housing unit during the early evening of October 7, 2017.  (Of note, the death was originally listed as suspicious and a possible homicide, but subsequently changed to a suicide.)  He entered the CDCR system

through SQ on July 19, 2017 to serve a 25-year-to-life sentence for first-degree murder.  The inmate did not have any RVRs and had no gang affiliation.  He was married and had two children.  Although still on RC status and not yet eligible for visits and telephone calls at the time of his death, the inmate had family support from his wife, children, and mother.

According to available records, the inmate was raised by both parents in Mexico and was physically abused by his alcoholic father.  Because his family was poor, the inmate had dropped out of school and obtained various part-time jobs.  As a teenager, he subsequently immigrated to the United States with a cousin and found various jobs.  However, beginning at age 19, the inmate began abusing alcohol and cocaine which led to his involvement in the criminal justice system.

The inmate did not have any mental health treatment in the community but was treated for both depression and anxiety in the county jail following a suicide attempt by cutting in December 2016.  Upon arrival to the SQ-RC, the inmate screened positive for mental health symptoms including auditory hallucinations, depression, and the prior suicide attempt.  He denied any current suicidal ideation.  The inmate was subsequently placed at the 3CMS level of care with diagnoses of Adjustment Disorder and Unspecified Anxiety and Depressive Disorders.  Although the inmate was seen by two different psychiatrists on both July 19 and August 7, 2017, there were no psychiatric notes or assessments entered into the EHRS.  Two months later on October 6, 2017 and two days before the suicide, he met with a psychiatrist who wrote a note that stated, in part, that the inmate "appeared alert and oriented with some signs of anxiety, no abnormal associations or pressured speech.  He reported having constant auditory hallucinations…. Telling him his family had been killed and that he would be killed, though he showed no signs of responses to internal stimuli.  His thought process appeared linear and goal directed."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although the inmate had several medical issues, they were not thought to be contributory to his death.  According to the reviewer, "This review did not reach a clear explanation for the inmate suicide.  Concerns about his safety, as he voiced in the weeks before his death, combined with the silence of inmates interviewed during this process and aspects of his fall from the tier raise questions about the circumstances surrounding his death and suggest the possibility he did not commit suicide."

The Suicide Report contained four recommendations for corrective action through a QIP:

> 1) On the day of his arrival at SQ, the inmate received an Initial Psychiatric Intake Assessment.  No documentation of the assessment was found in his records and the psychiatrist had left the facility by the time the on-site review of the inmate suicide.

> A second psychiatric assessment was provided to the inmate on August 7, 2017.  No documentation was found in his records describing the content of that contact.  During the on-site death review, the psychiatrist produced copious handwritten notes detailing an extensive assessment.

2) The result of a Mental Health Screening interview found the inmate positive for suicide risk, but the urgent mental health consult was conducted two days after the screening, not within *Program Guide* timelines, which specify a 24-hour limit. No orders for the urgent consult were found in the EHRS.

3) The patient sustained a skull fracture with brain matter exposed and loss of blood from that site. No documentation from the emergency response indicated that bleeding control was initiated even after the patient regained a pulse or that the site was dressed with a sterile dressing.

4) Emergency Medical Services (EMS) was activated at 1925 hours according to nursing documentation. The ambulance did not arrive to the TTA until 1955 hours, 30 minutes from activation. Standard response time is less than 10 minutes.

### 19)   California Medical Facility (CMF)

**Inspection**: January 4-5, 2018 (previous suicide prevention audit was on May 24-25, 2016). CMF housed approximately 2,545 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on January 4, 2018. The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS. The door to the nurse's office was closed during the process, thus ensuring privacy and confidentiality.

In addition, this reviewer had the opportunity to observe required daily rounds by a PT assigned to one (I-3) of the three administrative segregation units on January 5. The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**: CMF had 49 MHCBs located on two wings of the CTC. All rooms continued to be suicide-resistant and furnished with suicide-resistant beds. This reviewer inspected the three administrative segregation units (I-3, M-3, and Willis) and found that seven new intake cells had been retrofitted to be suicide-resistant. The new intake cells in both the I-3 Unit and Willis Units were either at or below capacity on January 5, however, inspection of M-3 Unit found that both new intake cells were full and one new intake inmate was housed in a non-new intake cell. A correctional supervisor informed this reviewer that the unit averaged three new intake inmates on a regular basis, and additional retrofitted new intake cells were needed. There was no indication that a work order had been requested for any additional new intake cells. The issue of new intake inmates placed in unsafe, non-new intake cells was previously raised during the 2014 and 2016 reviews and continued to be problematic.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in MHCB observation cells. Alternative housing was utilized on a daily basis, and inmates were all furnished beds and observed on a 1:1 basis. From September 26 through December 22, 2017, there were 90 inmates placed in alternative housing, and all were discharged in approximately 24 hours. The vast majority (88

150

percent) were transferred to a MHCB.  The overall length of stay in alternative housing for these 90 inmates was 18 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of three patients (CMF 1, CMF 2, and CMF 3) on Suicide Precaution status in the CTC during the nine-hour period from 12:00 a.m. through 8:59 p.m. on January 3, 2018 (for CMF 1 and CMF 2) and January 5, 2018 (for CMF 3).  The chart review found numerous observation checks (i.e., between 12 and 15 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 49 minutes in one case (CMF 2).  The following case (CMF 3) exemplifies the significance of the problem:  There were 13 violations of 19-, 20-, 31-, 22-, 20-, 21-, 21-, 43-, 29-, 16-, 18-, 18-, and 19-minute gaps between the required 15-minute intervals.  Violations in these three cases were committed by multiple nursing staff.  This reviewer was subsequently informed that a primary reason for this problem could be that one nursing aide was responsible for the observation of 20 to 25 patients.

With one exception, this reviewer observed that MHCB patients were clothed and received possessions and privileges consistent with their observation level.  The exception was a patient (CMF 4) observed during the IDTT meeting on January 4 to be on "full-issue" clothing but had not received any privileges apparently due to a suicidal gesture two weeks earlier in which he briefly climbed on top of his sink.  With the exception of the RT, all other IDTT members were unaware that the patient did not have any out-of-cell privileges.  In addition, a random review of documentation pertaining to privileges found that, although most MHCB patients assigned to the B-Wing were routinely receiving yard and other out-of-cell privileges, there was little documentation that patients assigned to the A-Wing were routinely receiving yard privileges during the previous two weeks.

This reviewer observed seven IDTT meetings in the MHCB unit on January 4-5.  Although the treatment teams were well represented by mental health, medical, and custody staff, discussion about safety planning for patients was very problematic.  In one case (CMF 3), the patient had been admitted into the MHCB a few days earlier on January 2 for self-injurious behavior.  Although denying any current suicidal ideation during the IDTT on Friday, January 5, there was no discussion regarding safety planning and the PC simply informed the patient that the team "will try to discharge you on Monday."  In another case (CMF 5), the patient also had been admitted into the MHCB for suicidal ideation on January 2 and there was no discussion regarding safety planning either before or after the patient told the treatment team that he would not alert staff if he had "intent or a plan" to commit suicide.

Finally, a review of Guard One data for a recent 24-hour period in the three administrative segregation units found a combined 98-percent compliance rate with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the three-month period of September through December 2017.  In addition, the TTA log for the same period was reviewed.

This reviewer's sample EHRS review of 48 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in only 79 percent (38 of 48) of the cases. A similar low compliance rate for SRE completion was found during the preceding assessment.

This reviewer also examined a sample of ten SRASHEs from patients released from a MHCB during October and December 2017. Most of the assessments were problematic with regard to adequate safety planning. For example, the safety plan section of the discharging SRASHE in one case (CMF 6) of a patient admitted to the MHCB for suicidal ideation and self-injurious behavior stated "Pt will return to EOP LOC and program. He will attend his 1:1 clinical sessions, 10 groups assigned to him, and engage in tx w/his designated psychiatrist. Pt will let his EOP team know when he is distressed and/or hearing AH or VH immediately so that he may be provided w/reminders about coping skills and ways to decrease his perpetual disturbances." In another case (CMF 7), the patient had a significant history of suicidal and self-injurious behavior, including eight previous suicide attempts and numerous self-injurious behaviors by cutting. The safety plan section of the discharging SRASHE simply stated: "I suggest that his long-term primary clinician develop a treatment objective and plan to replace his behavior of superficial cutting to relieve anxiety with an adaptive behavior to relieve anxiety."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 98 cases of patients discharged from a MHCB or alternative housing placement that remained at CMF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from June 30 through December 30, 2017. The review found that only 26 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 69 percent of the custody checks recommended for only 24 hours. In addition, only 67 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation. Similar low compliance rates were found during the previous assessment.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (October through December 2017) found that a quorum was only achieved in one month (November). The meeting minutes were otherwise unremarkable.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, approximately 96 percent of custody staff, 52

percent of medical staff, and 80 percent of mental health staff received annual suicide prevention block training during 2017.  Finally, as of December 2017, only 74 percent of mental health clinicians had completed the SRE mentoring program, only 51 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.  Similar low compliance rates for suicide prevention training by medical and mental health staff were found during the preceding assessment.

**Recent Suicides**:  CMF experienced two suicides during the review period.  In the **_first_** case (CMF 8), the inmate was found to have exsanguinated himself during the morning of March 21, 2017 in his GP cell.  He had also attempted to hang himself from a ventilation grate by a sheet.  The inmate entered the CDCR system on January 21, 2015 to serve a 22-year sentence for carjacking, burglary, and assault.  He was transferred to CMF a few months later on March 19, 2015.  The inmate incurred four RVRs during his confinement, the most recent of which occurred on December 28, 2016 for possession of morphine.  He was not known to be gang-affiliated.  The inmate had regular family support from his mother and sister, with several visits and over 50 telephone calls with family members over a three-month period leading to his death.

The inmate was born in Mexico and raised by his mother until age 12 when he immigrated to the United States to live with his father.  He began to experience substance abuse problem shortly thereafter.  The inmate dropped out of school and briefly worked in construction with his father.  He was arrested several times for offenses relating to his substance abuse.  The inmate did not report any history of mental illness in the community, although he did report at least two prior suicide attempts by hanging at age 17 or 18 that occurred under the influence of methamphetamine and were triggered by the breakup with his girlfriend.  At the time of his death, the inmate was single and did not have any children.

Upon arrival into CDCR, the inmate screened positive for mental health issues based upon a self-report of taking psychotropic medication for depression while confined in the county jail, as well as a history of suicide attempts.  He also complained of experiencing hallucinations when taking methamphetamine.  He was placed at the 3CMS level of care with diagnoses of Major Depressive Disorder, Psychotic Disorder NOS, and Polysubstance Dependence.  The inmate was a participant in the MHSDS and mostly compliant with medication.  He did not report any suicidal ideation or intent during his CDCR confinement and was rated at "moderate" chronic risk (due to his prior suicide attempts) and "low" acute risk for suicide on his only SRE completed in January 2015.

The inmate experienced several medical problems, the most important of which was chronic pain and headaches related to a gunshot wound to his skull that occurred during the instant offense in February 2014.  He often complained that the prescribed pain medication (Tylenol) was ineffective.  Eventually, the inmate underwent surgery on February 1, 2017 to remove the remaining bullet fragments in his skull.  The surgery was successful, but because the inmate committed suicide approximately six weeks later, it was unknown if he experienced a decrease in pain.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  However, the review found several

factors that might have been contributory to his death.  For example, the inmate began to incur RVRs beginning in September 2016 related to drug possession.  As a result, he lost his job and his points were increased, necessitating a pending transfer to a Level IV institution.  Clinical notes in both December 2016 and March 2017 indicated an increase in depression and anxiety. The inmate also was thought to have incurred drug debts from a gang.  Finally, the medical hold from his surgery was removed several days prior to his suicide, resulting in clearance for transfer to a Level IV facility.

The Suicide Report contained eight recommendations for corrective action through a QIP:

    1)  The CDCR 837s submitted by responding staff identifies approximately 30 minutes elapsed between the time the inmate was observed bleeding profusely in his cell and his arrival in the TTA.

    2)  Activation of the Emergency Medical System (calling 911) did not take place until approximately 35 minutes into the emergency, which caused a significant delay in appropriate medical response.  Additionally, Local Operational Procedure (LOP) #8, as submitted by CMF, is outside of the Department's expectation that all staff have the responsibility and authority to call 911.  LOP #8 identifies four classifications of employees who will make the determination a Code 3 ambulance is required.  These positions in turn must contact the Watch Commander who is the designated contact to call 911.  The steps create a potential for delay in providing adequate care.

    3) During the autopsy a suicide note alleging staff misconduct was discovered among the contents of the inmate's stomach.

    4-6) Three nursing concerns were identified. The concerns (relating to EMS activation and documentation during the emergency) were considered contributory to the death.

    7) The primary mental health clinician did not document consideration of placement in a higher level of care despite the patient's report of higher levels of depression and anxiety during consultations in December 2016 and March 2017.

    8) The treatment plan for the patient did not adequately address depression and anxiety in the frequency of intervention offered, or in adjusting the frequency of intervention, or in adjusting the targets of intervention, despite evidence that symptoms were increasing or at high levels.

In the **_second_** case (CMF 9), the inmate was found hanging from the ventilation grate by a piece of cloth in his MHCB room during the late afternoon of August 29, 2017.  He was on Suicide Watch status (i.e., 1:1 observation) at the time of his death.  The inmate entered the CDCR system on April 1, 2015 for his second term to serve a life sentence with eligibility for parole for murder.  He was transferred to CMF on June 9, 2017 to enter the PIP.  The inmate incurred 21 RVRs, many of which were for assaultive behavior.  The most recent RVR occurred on August

8, 2017 and involved the assault of several medical technician assistants. In addition, two district attorney referrals for indecent exposure were pending at the time of the inmate's death. The inmate was known to be gang-affiliated. He had limited family support and received a visit from a family friend in April 2017. The inmate was unmarried and had three children from three different prior relationships.

According to available records, the inmate was raised in a very dysfunctional family. In fact, he was born to parents who were approximately 15-years-old. Both parents were involved in the criminal justice system and had histories of substance abuse. Records also indicated that the inmate had been neglected and physically abused by his mother, resulting in his placement, along with several siblings, in foster care. He subsequently became gang-affiliated, involved in the juvenile justice system, as well as experienced substance abuse.

The inmate had an extensive history of mental health treatment in the community for ADHD, Bipolar Disorder and Depressive Disorder. He was not consistently medication compliant in the community. Although he frequently expressed suicidal ideation and threatened suicide during an earlier confinement within the Department of Juvenile Justice, the inmate did not have a documented history of suicide attempts prior to CDCR confinement (although he self-reported two suicide attempts by hanging at ages 16 and 18). In addition, there was documentation to indicate that his brother and grandmother both committed suicide.

Upon entry into CDCR in April 2015, the inmate was placed at the 3CMS level of care with an initial diagnosis of Mood Disorder. Three months later on July 28, 2015, he was placed in an MHCB. Subsequent MHCB placements occurred in November 2015, May and June 2016, November and December 2016, and May and August 2017. The inmate was also treated at the PIP level of care on two occasions: from December 11, 2015 through May 16, 2016 and June 9, 2017 through August 10, 2017. He was elevated to EOP level of care in August 2015 and remained at that level when not in MHCB or PIP placements. The inmate's diagnoses were adjusted throughout his CDCR term, with the most recent diagnoses in August 2017 being Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Mood Disorder NOS, and Antisocial Personality Disorder. He continued to be only sporadically compliant with his psychotropic medication.

According to the CDCR reviewer in this case, the inmate had a complex clinical presentation throughout his treatment in the MHSDS. According to the reviewer, "The clinical presentation from 2015 leading up to his death has common threads and themes throughout the duration of the treatment indicating his presentation did not appear to shift throughout his time in CDCR. DSH documentation from early 2016 indicated the inmate had a pattern of initially engaging in treatment, then becoming dissatisfied, disengaging from clinical staff, and making conditional threats of self-harm and harm to others."

The inmate did, however, have a significant history of self-injurious behavior throughout his CDCR confinement, including both May and June 2017 when he utilized pieces of safety mattresses, blankets, safety smocks, and shoelaces as ligatures in suicide gestures. He also ingested foreign objects (such as parts of an inhaler and sprinkler) and overdosed on drugs, often in front of staff, on at least four other occasions in November and December 2016 and May and

June 2017.  The inmate also cut his wrists on two occasions, one in front of staff, as well as placed a plastic bag over his head and ligature around his neck.  Several of these incidents of self-injurious behavior occurred within days of receiving an RVR and/or his anticipated transfer and/or discharge from an MHCB or PIP placement.

As one clinician noted in an SRE dated June 20, 2017 that would unfortunately become a premonition to the inmate's eventual death three months later:

> It appears Pt's behaviors are driven by personality pathology (impulsivity, mood lability, poor distress tolerance).  Feeling as though he is being ignored by staff or his perception that his needs are not being met are likely to elicit acts of self-harm.  Further, feelings of anger or distress are likely to increase risk of Pt engaging in impulsive acts of self-injurious behaviors…suggesting pt's risk will fluctuate rapidly with subtle changes in mood.  Self-harm may be planned, impulsive, fabricated and/or conducted in front of staff.  As Pt has a lengthy history of self-harm behaviors with varying motivations, it remains possible that he may one day lethally injure himself without intent to do so.

The inmate's last SRE was conducted on August 15, 2017 for purposes of an ICF referral.  The SRE was both inaccurate and incomplete, with acute risk of suicide estimated as "moderate" and the check box for chronic risk left blank.  Several risk factors were not listed, and there was no formulation of risk.  According to the CDCR reviewer, "The safety plan for this SRE included the referral to PIP and a lengthy list of broad treatment expectations."

Following the inmate's discharge from the PIP on August 10, 2017, he returned to CMF and was placed in the administrative segregation unit.  The following day (August 11), he threatened suicide and was placed in the MHCB.  Several days later on August 15, the treatment team recommended an ICF referral.  He remained in the MHCB pending the referral.  On August 29, the inmate was informed during his IDTT meeting that the ICF referral had been denied and that the treatment team was planning on discharging him back to administrative segregation.  Shortly thereafter, the inmate became very upset and threatened suicide, stating "I am going to hang myself."  Suicide Watch was ordered, but the inmate had already been returned to his room and refused to relinquish his clothing and other possessions.  Due to the inmate's history of assaultive behavior, correctional staff chose not to initiate use of force to retrieve the inmate's clothing and issue a safety smock.  Therefore, the 1:1 observation was initiated at approximately 10:30 a.m. with the inmate retaining his clothing and possessions.  Within minutes, he began to attempt to thread a piece of cloth through the ventilation grate in his MHCB room.  According to nursing notes, the inmate continued to periodically engage in this behavior over the next several hours in the presence of both nursing and correctional personnel.  At approximately 4:30 p.m., a nursing note reflected that the inmate was tying a piece of string from his blanket around his neck.  Correctional personnel were notified and attempted to speak with the inmate.  Approximately 20 minutes later at 4:50 p.m., an emergency response was initiated, and correctional and medical personnel entered the room.

As the inmate was on Suicide Watch at the time of his death, his obvious risk of suicide was known to various MHCB personnel.  As stated by the CDCR reviewer in this case, "regardless of his varying motivations, whether intentional or impulsive, he remained a high risk for suicide….This incident does not appear to be a response to an intent to die, rather a means to stop his discharge to ASU.  Although this dangerous behavior had previously served to be effective for him, it would prove to become a lethal means that ultimately led to his death by suicide."  In addition, although the inmate had several medical issues, including difficulty walking caused by being shot in the leg during his commitment offense in March 2013, these issues were not felt to be contributory to his death.

The Suicide Report contained 23 recommendations for corrective action through a QIP:

> 1) The SREs conducted on December 21, 2017 and May 3, 2017 at SAC did not accurately contain risk formulation and adequate safety planning.

> 2) The SRE conducted on August 15, 2017 at CMF contained inadequate risk formulation and safety planning.

> 3) The inmate was admitted to the MHCB on May 3, 2017, referred to ICF on May 25, 2017, and admitted to the PIP on June 9, 2017.  There was no documentation from SAC of an SRE completed for the MHCB discharge.  Per policy, an SRE must be completed upon discharge from an MHCB.

> 4-9) There were numerous custody concerns based upon the Department's Use of Force policy, including the lack of immediate activation of an alarm and immediate use of reasonable force to enter the inmate's cell to prevent self-injury, allowance of clothing and other possessions for an inmate on Suicide Watch status, several discrepancies and conflicting information regarding timeline, lack of documentation and communication amongst staff throughout the day of the incident, and the fact the inmate tested positive for methamphetamine and amphetamines and uncertainty as to how the patient was able to obtain these illegal drugs.

> 10) Due to the layout of the MHCB cells, it is all but impossible to observe the area near the sink and vent from outside the cell.  The only area with a clear view is right in front of the windows.  The mirror placed on the ceiling of the cell distorts the objects in the cell, eliminates a clear view of blind spots.  Lack of visual observation in the cells makes it a risk for inmates who are in crisis or on a 1:1 direct observation.

> Additionally, the majority of documentation provided by CMF gives descriptive information regarding what is observed while outside the cell during the 1:1 observation.  Based on the layout it is very difficult to have observed what is written in reports without having the cell door open.  This brings into question the accuracy and integrity of the documentation provided.

11) Failure to activate EMS immediately was determined to be outside of CMF's Local Operational Procedure for Emergency Medical Response Review Policy and Procedure, Plan #8, revised January 2017.

12) A piece of no-tear safety blanket was utilized by the inmate to fashion the noose. The safety blanket found in the inmate's property was fully intact. Linen exchange was conducted on second watch the previous day and there was no documentation indicating the inmate exchanged and altered safety blanket.

13-23) There were numerous nursing concerns, including deficiencies in medication administration, nursing assessment, implementation of provider orders, appropriate nursing care, and related activation of emergency response.

### 20)   **California Men's Colony (CMC)**

**Inspection**: January 16-17, 2018 (previous suicide prevention audit on August 18-19, 2016). CMC housed approximately 4,023 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on January 17, 2018.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  However, the door to the nurse's office was open during the process, with an officer straddling the doorway, thus compromising privacy and confidentiality.  The nurse informed this reviewer that they were reluctant to have the door closed during intake screening of maximum-security and administrative segregation unit inmates.  Although this concern was certainly reasonable, a common solution implemented in other facilities would be to install a TTM in the nurse's office.

In addition, this reviewer observed daily PT rounds in the administrative segregation unit (Building 4) on January 16.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for all caseload inmates.  Of note, however, there were numerous complaints by inmates about the lack of radios on the unit (which did not have any electrical outlets).

**Housing**:  CMC had a 50-bed MHCB unit.  All the rooms continued to be suicide-resistant.  The administrative segregation unit contained 16 new intake cells that were retrofitted to be suicide-resistant.  During inspection of this unit, this reviewer observed that there were at least five new intake inmates housed in unsafe, non-new intake cells despite the fact that several new intake cells were empty.  Although this reviewer was informed that there had been a recent riot in C-Yard resulting in an influx of administrative segregation inmates, there was no reason for there to be any empty new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were found in Building 7, a location formally utilized as an interim unlicensed MHCB unit.  Alternative housing was used on a daily basis, and inmates were all furnished beds and observed at staggered 15-minute intervals (because all of the cells were previously found to be suicide-resistant when it was utilized as an unlicensed MHCB unit).

158

From October 1 through December 31, 2017, there were approximately 176 inmates placed in alternative housing, and the vast majority (98 percent) was released within 24 hours.  Most (88 percent) were transferred to a MHCB.  The overall length of stay in alternative housing for these 176 inmates was 12 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (CMC 1, CMC 2, CMC 3, and CMC 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on January 13 (for CMC 1), January 15 (for CMC 2), January 16 (for CMC 3), and January 17 (for CMC 4).  The chart review found only a few observation checks (i.e. between two and five per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 30 minutes in one case (CMC 1).

This reviewer observed nine IDTT meetings in both the A and B units of the MHCB unit on January 16 and 17.  All patients were observed to be clothed and received possessions and privileges consistent with their respective observation levels.  There were several RTs assigned to the MHCB unit, and yard and other out-of-cell activities were utilized seven days a week.

The IDTTs were well represented by mental health, medical, and custody staff.  In fact, during IDTT meetings in B-Unit on January 17, the entire MHCB unit treatment team was in attendance, including multiple psychologists and psychiatrists.  There were robust discussions in most cases regarding MHCB treatment and possible referrals to higher levels of care.  The assigned CC I was active in attempting to problem-solve several cases of patients with custody issues.  There was, however, uneven discussion of adequate safety planning for the three patients being considered for discharge from the MHCB.  In one case (CMC 5), for example, the patient was admitted into the MHCB on January 5, 2018 for suicidal ideation and grave disability after setting a fire in his cell.  Although consistently reporting suicidal ideation, he vacillated between stating the fire-setting was a suicide attempt and accident.  He remained in the MHCB for 12 days and, during his IDTT meeting attended by this reviewer on January 17 (which resulted in his discharge to administrative segregation), there was limited discussion about safety planning other than to prepare the patient for the administrative segregation unit placement and encourage him to stay on his psychotropic medication.  There was no discussion during the IDTT meeting about any strategies for reducing suicidal ideation nor did the resulting SRASHE contain a safety plan:

> No suicide ideation or history.  Was started on injectable medication today and IDTT reinforced the need for continued compliance, as evidenced by recent decompensation when he did stop the medications.  The thought of getting IP back into his work program to increase pride and self-esteem and to decrease distractions or disruptions of his symptoms (sic).  It was also recommended today that should it become known that IP has not complied with his medication regime, that he be screened for the need of a higher level of care, based on recent events.  IP was very cooperative with all suggestions by MH psychiatry.  The MHA was completed by author of this treatment plan and it was clear to me that mental

health played a part in the action, that he would likely decompensate in segregated housing and that had IP been properly medicated, the behavior may not have occurred.  I will ask my supervisor to review this case and suggest documenting the behavior in an alternative fashion.

Of note, review of the first day of the required Five-Day Follow-Up progress note dated January 18 did include some evidence of safety planning for this patient: "IP reports that he was not in contact with his children for an extended period of time, this may trigger SI.  IP plans to cope by exercising, remaining med compliant, and talking to family.  IP plans to contact PC or CO if he has plans to self-harm/if in mental health crisis."

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found 98-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of July 1 through December 31, 2017.  The TTA log for October and November 2017 was also reviewed.  This reviewer's sample EHRS review of 49 emergency mental health referrals for suicidal ideation/behavior revealed that clinicians completed the required SRASHEs in 94 percent (46 of 49) of the cases.

This reviewer examined a sample of ten SRASHEs from patients released from a MHCB between October and December 2017.  Overall, although there was uneven discussion of adequate safety planning to reduce suicidal ideation, many of the safety plans showed promise as exemplified by the following case (CMC 6):

> IP is being discharged to EOP LOC at this time by the treatment team.  IP will be returning to CMC's ASU EOP HUB…..IP acknowledged he has a pattern of using Alt. Housing as a 'break' from ASU but has been working to increase his positive coping skills he can use when distressed which would help to avoid this pattern.  IP reported the following triggers would cause him to consider suicide: feeling depressed, being in ASU, problems with family, when not given a canteen, when feeling paranoid…..IP is reporting that he will inform staff if he needs help and will tell staff if he becomes suicidal at any time.  IP reported his current coping skills include: "counting to 10," talking to psychs, listening to music, watch TV, read, positive imagery, meditation, "having good thoughts," and writing.  IP described his version of positive imagery (being at the beach, eating his favorite foods, etc.) which he plans to consider when distressed.  IP reports future goals of paroling and re-entering the community.  IP would like to increase his mindfulness skills when at his next treatment team/clinician.  Treatment outcome should include identifying future positive coping skills IP can use in the ASU setting when distressed rather than to report suicidal ideation.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.

160

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 157 cases of patients discharged from a MHCB or alternative housing placement who remained at CMC and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from July 1 through December 31, 2017. The review found that 93 percent had Page One "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with approximately 74 percent of the custody checks recommended for 24 hours by clinicians. In addition, 99 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (September through November 2017) found that quorums were achieved in all three meetings. Attendance averaged between 18 and 22 members. Meeting minutes were informative and included a robust case presentation each month.

**Training**:  According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 99 percent of custody staff, 96 percent of medical staff, and 61 percent of mental health staff received annual suicide prevention block training during 2017. Finally, as of December 2017, 93 percent of mental health clinicians had completed the SRE mentoring program, 92 percent had received the seven-hour SRE training, and 95 percent had completed safety plan training.

**Recent Suicides**:  CMC did not experience any inmate suicides during the review period.

### 21)   Pleasant Valley State Prison (PVSP)

**Inspection**:  February 6-7, 2018 (previous suicide prevention audit on May 12-13, 2016). PVSP housed approximately 3,182 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on February 7, 2018. The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS. The nurse's office door was closed during the process, an officer was stationed in the hallway, and privacy and confidentiality were maintained.

In addition, this reviewer observed daily PT rounds in STRH unit on February 7. The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  PVSP had six MHCBs.  All the rooms continued to be suicide-resistant.  The STRH unit contained six new intake cells (100-105) that were retrofitted to be suicide-resistant.  During inspection of this unit, this reviewer observed that there were three new intake inmates housed in unsafe, non-new intake cells despite the fact that three new intake cells were empty.  The placement of new intake inmates in unsafe non-new intake cells was also found during the 2016 assessment.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement was infrequently utilized at PVSP.  When utilized, inmates on alternative housing status were housed in either CTC medical beds or TTA cells.  Inmates were provided stack-a-bunks and observed on a 1:1 basis.  From June 1, 2017 through January 31, 2018, there were only 35 inmates placed in alternative housing, with the vast majority (88 percent) released within 24 hours.  Most were transferred to an MHCB.  The overall length of stay in alternative housing for these 35 inmates was 12 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (PVSP 1, PVSP 2, PVSP 3, and PVSP 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on January 23 (for PVSP 1), January 29 (for PVSP 2), and February 6 (for PVSP 3 and PVSP 4).  The chart review found numerous observation checks (i.e. between 11 and 14 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 55 minutes in one case (PVSP 1).  The following case (PVSP 2) exemplified the significance of the problem:  There were 12 violations of 47-, 29-, 40-, 47-, 25-, 23-, 34-, 18-, 30-, 19-, 18-, and 30-minute gaps between the required 15-minute intervals.  Violations in these four cases were committed by multiple nursing staff.

This reviewer observed two IDTT meetings in the MHCB unit on February 6.  Although the treatment team was well represented by mental health, medical, and custody staff, one of the discussed cases was very problematic.  In that case (PVSP 3), the patient had been admitted into the MHCB on January 26 for suicidal ideation with a plan ("to use razors to cut his wrist").  His diagnosis was Bipolar Disorder with depressed mood.  The patient had stopped taking his psychotropic medication a few months earlier which resulted in increased depression and suicidal ideation.  He was at the 3CMS level of care and had a previous MHCB admission during 2017.  According to a recently completed SRASHE, the patient was assessed as having both a "moderate" chronic and acute risk for suicide based on risk factors that included a prior suicide attempt, family history of suicide, increased depression, and ongoing auditory hallucinations.  During the IDTT meeting on February 6, the patient was observed to be in "full-issue" clothing but had not been granted any privileges other than periodic showers.  Although he denied any current suicidal ideation or auditory hallucinations, there was no discussion regarding safety planning.

Following the IDTT meeting, this reviewer asked the treatment team why the patient had not received consideration for any privileges during his 12-day MHCB stay.  The PC replied that

162

privileges had not been granted until today (February 6) because "he was still experiencing hallucinations." When this reviewer then asked if the patient was going to remain in the MHCB unit or referred to a higher level of care, the response was that the patient had just been discharged to EOP level of care. Such a response was surprising since it was not discussed during the IDTT meeting. Subsequent review of the patient's discharging SRASHE dated February 6, 2018 found the following safety plan:

> IP was educated and encouraged to participate in groups, and 1:1 individual therapy with his PC. Based on hx, when non-medication compliant, IP may experience an exacerbation of sxs of psychosis, depression, SI, anxiety and PI that become unmanageable for him, as he has previously exhibited poor coping skills in managing these sxs in the past. IP can benefit from participating in groups or classes to develop skills to help with medication compliance, distress tolerance, reality testing, and substance abuse issues. IP was encouraged to inform his PC if he experiences any, or an increase in any of the following: depression, anxiety, psychosis, and/or suicidality.

This safety plan was not only problematic, but never discussed during the February 6 IDTT meeting.

Subsequent review of ten records (including the "CDCR-114: Inmate Segregation Record" and daily "Order Requisition" forms") of patients discharged from the MHCB unit found that out-of-cell privileges (e.g., a dayroom or therapeutic module) were granted by the IDTT in only 50 percent of the cases. A related discussion with a MHCB custody supervisor revealed that although patients had been approved for dayroom or therapeutic module out-of-cell activity, the IDTT rarely approved yard privileges (even for non-administrative segregation patients). This reviewer's preceding assessment contained a lengthy discussion regarding the absence of possessions and privileges afforded to MHCB patients. To date, the problem had not been resolved, and PVSP still did not have an RT assigned to the MHCB unit, another deficiency found during the 2016 assessment.

Finally, a review of Guard One data for a recent 24-hour period in the STRH unit found 98-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of August 1, 2017 through January 31, 2018. This reviewer's sample EHRS review of 36 emergency mental health referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in only 81 percent (29 of 36) of the cases.

This reviewer also examined a sample of ten SRASHEs of patients released from the MHCB unit from November 2017 through January 2018. Similar to the 2016 assessment, development of safety plans for patients discharged from the MHCB unit continued to be problematic. For example, the discharging SRASHEs for three different patients (PVSP 5 and PVSP 6 on January 4, 2018, and PVSP 7 on January 25, 2018) by the same MHCB clinician contained the same safety plan:

Treatment plan will include IP's practice of effective coping and motivational strategies. Therapeutic interventions will include:

1. PC will continue empathetic support for IP. PC will meet with IP as scheduled/requested.
2. PC-led instruction and practice in the use of CBT-based hypothesis testing and reframing interventions addressing any recurrent negative automatic thoughts experienced by IP.
4. Referral to psychiatry if appropriate (IP is not currently prescribed psychiatric medications).
5. Ongoing evaluation by PC to determine appropriateness for reduction in LOC to least restrictive environment (non-MHSDS).

Of note, the above safety plans were miss-numbered in each case.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of ten cases of patients discharged from a MHCB unit or alternative housing placement who remained at PVSP and were not transferred to the STRH unit (where observation at 30-minute intervals was required) from August 1, 2017 through January 31, 2018. The review found that 70 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) completed correctly by mental health clinicians, with most of the custody checks recommended for only 24 hours by clinicians. In addition, 90 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (October through December 2017) found that a quorum was achieved in only one meeting (December). The meeting minutes were otherwise unremarkable.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 89 percent of medical staff, and 88 percent of mental health staff received annual suicide prevention block training during 2017. Finally, as of January 2018, 100 percent of mental health clinicians had completed the SRE mentoring program, 96 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**:  PVSP did not experience any inmate suicides during the review period.

### 22)   Salinas Valley State Prison (SVSP)

**Inspection**:  February 8-9, 2018 (previous suicide prevention audit was on June 7-9, 2016).  SVSP housed approximately 3,523 inmates during the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R Unit on February 9, 2018.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was closed during the process, an officer was stationed in the hallway, and privacy and confidentiality were maintained.

In addition, this reviewer observed daily rounds in portions of the administrative segregation units (STRH, D-1, and D-8 [overflow]) on February 8.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  SVSP had a 22-bed CTC, with ten designated MHCBs.  All of the MHCB rooms were found to be suicide-resistant.  Following the previous assessment, triangle-shaped stainless-steel shelving was retrofitted to each side of the existing sinks so that any ligature would slide off during a suicide attempt.

The three administrative segregation units (STRH, D-1, and D-8 [over-flow]) had a total of 17 retrofitted new intake cells; nine in the STRH Unit (100-108); four in D-1 Unit (117-118, 217-218); and four in D-8 Unit (115-116, 215-216).  During inspection of the STRH Unit, this reviewer observed that all nine new intake cells were full and there were an additional four new intake inmates housed in unsafe, non-new intake cells.  In D-1, this reviewer did not observe any new intake inmates in unsafe, non-new intake cells.  In D-8, this reviewer observed two new intake inmates in unsafe, non-new intake cells despite the fact that one of the new intake cells was empty.  The placement of new intake inmates in unsafe non-new intake cells was also found during the preceding assessment.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in Facility D, Building 5 and TTA cells, as well as occasionally in other designated cells throughout the facility.  Alternative housing was used on a daily basis, and inmates were all provided beds and observed on a 1:1 basis.  From November 1, 2017 through January 31, 2018, there were approximately 266 inmates placed in alternative housing, and the vast majority (85 percent) was released within 24 hours.  The vast majority (88 percent) were also transferred to a MHCB.  The overall length of stay in alternative housing for these 266 inmates was 15 hours.  Of note, alternative housing practices at SVSP had dramatically improved since this reviewer's preceding assessment.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs.  All other patients not on a level of suicide observation were required to be observed at

staggered 30-minute intervals.  This reviewer subsequently reviewed the accuracy of observation rounds by reviewing the EHRS charts of four patients (<u>SVSP 1</u>, <u>SVSP 2</u>, <u>SVSP 3</u>, and <u>SVSP 4</u>) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on December 29, 2017 (for <u>SVSP 1</u>), February 5, 2018 (for <u>SVSP 2</u>), February 7, 2018 (for <u>SVSP 3</u>), and February 8, 2018 (for <u>SVSP 4</u>).  The chart review found numerous observation checks (i.e. between 13 and 17 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 68 minutes in one case (<u>SVSP 1</u>).  The following case (<u>SVSP 2</u>) exemplified the significance of the problem:  There were 14 violations of 21-, 18-, 27-, 19-, 23-, 28-, 21-, 19-, 28-, 26-, 53-, 22-, 18-, and 16-minute gaps between the required 15-minute intervals. Violations in these four cases were by multiple nursing staff.  One possible reason for these multiple violations was that nursing staff was documenting checks at only four intervals per hour.

Due to a low MHCB census, this reviewer was only able to observe two IDTT meetings during the on-site assessment.  One meeting had to be postponed because the patient became agitated and uncooperative.  The other meeting included a robust and interactive discussion by most treatment team members, but the case did not involve a patient eligible for discharge, therefore, there was not any meaningful discussion regarding safety planning.  Review of records indicated that most patients were approved for shower, yard, and telephone privileges, but out-of-cell activities were very limited.  There were multiple RTs providing coverage in the CTC that was divided among MHCB and medical patients.  Although an FTE RT was not available exclusively for MHCB patients, a larger problem was the RTs had very little program space other than trying to schedule out-of-cell time in medical and mental health staff offices.  In addition, the CTC yard did not have a "small management" module, therefore, patients on maximum-security and/or administrative segregation status were *never* provided access to the yard.

Finally, a review of Guard One data for a recent 24-hour period found 92-percent compliance with required checks not exceeding 35 minutes in the STRH unit, whereas the D-1 unit was at 98-percent compliance.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of November 1, 2017 through January 31, 2018.  This reviewer's sample EHRS review of 60 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in 95 percent (57 of 60) of the cases.  This was an improvement from the preceding assessment.

This reviewer also examined a sample of ten SRASHEs from patients released from the MHCB unit during the period of November 2017 through January 2018.  Many of the safety plan sections of these discharging SRASHEs contained some discussion regarding specific coping skills and strategies for reducing recurrence of suicidal ideation.  One particular case (<u>SVSP 5</u>) contained the following noteworthy and comprehensive safety plan:

> 1) Patient is discharged to the ICF LOC, while being housed in EOP-ASU pending placement. Upon arrival to EOP, patient will be seen on custody wellness checks and a 5-day clinical follow-up.

2) A Safety Planning card was established with and given to Pt which delineates the following:

- Pt's reason for living: hopes of getting a job one day and learning to read.
- People or things Pt can turn to:  I want to work in the kitchen and can talk to the workers.'
- The first person Pt contacts when feeling the stress is his clinician, though articulates ability to communicate to 'anyone' in an emergency.
- Ways Pt can cope include: breathing, art, increasing his activity, making sure he takes his medications.
- Warning signs Pt has identified include: 'feeling suicidal with a plan to hurt myself or if I can control the voices even after I have tried to distract for an hour.'

3) Patient is currently prescribed Remeron 30mg and Zyprexa 20mg with a PRN of Zyprexa 5mg. He continues to hear voices but noted improvement with medication and denies current side effects.  It is recommended that his future treatment team closely monitor auditory hallucinations and respond with medication as appropriate.

4) Treatment team recommends his PC follow-up with any possible classes to help him learn how to read.  He has expressed a desire to learn, saying the skill would help him when he paroles.  If program is available, Pt would benefit from daily support.

5)  Pt has identified that yoga and stretching has helped them in the past and motivates him to do more activity and would benefit from daily practice in his cell.

6) Patient has been educated on abdominal breathing while in MHCB and indicates that it helps him to distract from AH; it is recommended that his future PT continues to teach and reinforce daily use of breathing exercises.

7) It is recommended that his tx team continue to model, educate Pt on, and reinforce adaptive means of getting his needs met, include effective communication skills and changing cognitive distortions to include realistic expectations of others. He also has worked on art therapy, which has been effective in reducing distress from AH.

8) IP will let any staff member know immediately should he experience unmanageable SI.

Although review of the subsequent first day of the five-day follow-up assessments in these ten cases did not always find concordance with the safety plan narrative contained in the discharging

SRASHEs, there was demonstrated progress with safety planning compared to the preceding assessment.  It was noteworthy that, effective July 31, 2017, a memorandum was issued by mental health leadership at SVSP that required "all safety plans as documented in the Suicide Risk Evaluation conducted on the date of the patient's clinical discharge from MHCB must be reviewed and *positively cleared/approved* by the MHCB Senior Psychologist, Supervisor or designee."  As previously detailed in this report, such a directive became a system-wide requirement within CDCR in January 2018.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 201 cases of inmates discharged from either the MHCB unit or alternative housing who remained at SVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during the months of July, August, November, and December 2017.  The review found that only 50 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most custody checks recommended for 48 hours by clinicians. In addition, only 63 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.  Noted deficiencies were that either Page One of the forms was blank or custody checks were ordered for less than 24 hours, and correctional staff was not consistently completing checks during the First Watch.

Of note, although SVSP internal audits of the "Discharge Custody Check Sheet" (MH-7497) forms invariably reported higher compliance rates during monthly SPRFIT meeting minutes from November 2017 through January 2018, these audits were limited to the quantity of forms collected, and not the quality of documentation (with accompanying deficiencies).  Similar low compliance rates were found during the 2016 assessment.  Finally, as detailed below, problematic completion of the "Discharge Custody Check Sheet" (MH-7497) forms by both mental health and correctional personnel was a notable deficiency cited in a recent SVSP inmate suicide (SVSP 6) in December 2017.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (November 2017 through January 2018) found that quorums were not achieved in any of the meetings.  The meeting minutes included a corrective action plan regarding this reviewer's previous assessment and were otherwise unremarkable.

**Training**:  According to training records, approximately 99 percent of custody and 100 percent of nursing staff were currently certified in CPR.  In addition, 99 percent of custody staff, 100

percent of medical staff, and 99 percent of mental health staff received annual suicide prevention block training during 2017.  Finally, as of January 2018, 100 percent of mental health clinicians had completed the SRE mentoring program, 83 percent had received the seven-hour SRE training, and only 75 percent had completed safety plan training.  Of note, compliance rates for annual suicide prevention block training of both medical and mental health personnel were significantly improved since the 2016 assessment.

**Recent Suicides**:  SVSP experienced one inmate suicide during the review period.  In that case (SVSP 6), the inmate was found hanging from the upper bunk by a sheet in his SNY cell during the late afternoon of December 9, 2017.  The inmate entered the CDCR system on February 27, 2009 to serve a 26-year sentence for multiple counts of rape with force, oral copulation with force, and use of a firearm.  He was transferred to and from SVSP on several occasions, most recently on December 7, 2017, two days before his death.  There were conflicting reports regarding any gang affiliation by the inmate.  He had seven RVRs, including battery on an inmate in January 2012 that resulted in conviction.  The inmate's most recent RVR occurred in August 2017 and involved alteration of state clothing.  He was never married and did not have any children, although the inmate had the family support of his father and stepmother through visits and telephone calls.

According to available records, the inmate was born and raised in Mexico.  His parents divorced when he was 5-years-old.  His mother left the family and he, along with three sisters, remained in the care of his father who eventually remarried. The inmate was viewed as an unreliable historian and entered the United States either in 1998 or 2003 according to varying self-reports.  He did not complete high school and worked as a manual laborer.  The inmate began to abuse both alcohol and drugs at age 13, and his family had a history of substance abuse.  Prior to the instant offense, he had several arrests for non-violent offenses.  There was no record of the inmate receiving any mental health treatment in the community.

Upon his entry into CDCR, the inmate requested SNY status due to the instant offense.  In March 2011, the inmate was placed at the 3CMS level of care following reports of "mood instability, fighting with cellmates, dramatic outbursts, and tangential thinking/confusion."  His initial diagnoses were Depressive Disorder NOS (provisional) and Antisocial Personality Disorder.

The inmate was prescribed psychotropic medication, but he struggled with both medication compliance and group treatment.  In February 2012, the inmate complained of hearing voices telling him to hurt himself.  According to the completed SRE, he appeared confused, agitated, and disoriented.  Both his acute and chronic risk for suicide was noted to be "moderate," but he was not placed in an MHCB.  As time progressed, the inmate continued to endorse chronic depressive symptoms and "stress."  He noted the voices decreased when he consistently took his psychotropic medication.  The inmate remained relatively stable until 2016 when he stopped taking his medication and began having active mood and psychotic symptoms.  In July 2016, his level of care was elevated to EOP because his somatic delusions, auditory and visual hallucinations, paranoia, and anxiety intensified.  The inmate's diagnoses were revised to Schizoaffective Disorder, Depressive Type, R/O Bipolar Disorder, and Antisocial Personality Disorder.  Two months later in September 2016, he was transferred to SVSP and his level of care

was reduced back to 3CMS, although the reason for the level of care change was not clear from the records.  His diagnoses remained the same.

In March 2017, the inmate stopped taking his psychotropic medication.  He subsequently engaged in self-injurious behavior and was placed in an MHCB at CMF on April 2, 2017.  Both his chronic and acute risk for suicide was rated as "moderate."  The inmate did not report any prior history of suicidal behavior.  He was restarted on medication and remained mostly compliant.  The inmate was discharged back to SVSP at EOP level of care on April 12, 2017.  He remained stable during the next several months.  However, in October 2017, the inmate began refusing his psychotropic medication and by November reported he was eating and sleeping poorly due to increased auditory hallucinations and sexual urges.  On November 26, 2017, the inmate was admitted into an MHCB at CHCF after reporting auditory and visual hallucinations, depression, and suicidal ideation.  He was generally uncooperative during the placement and refused much of the treatment and afforded privileges.  The inmate remained psychotic during the ten-day MHCB stay and his diagnosis was revised to Schizoaffective Disorder, Manic Type.  His level of care was again elevated back to EOP.  As noted by the CDCR reviewer in this case, the discharging SRASHE completed on December 5, 2017 had several deficiencies, including an inadequate safety plan.

The inmate was discharged back to SVSP on December 7, 2017.  He was seen for the first day of his five-day follow-up assessment on December 8.  Although he denied any suicidal ideation, the Mental Health Crisis Bed Discharge Custody Check Sheet was not completed by the clinician.  The following day (December 9), when a clinician arrived on the housing unit to conduct another follow-up assessment, the inmate was found hanging in his cell.  The subsequent investigation also found that the required 30-minute custody checks were not consistently conducted as required.

Apart from the inmate being released from an MHCB a few days earlier, the CDCR reviewer in this case did not find any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  In addition, although the inmate had several medical problems, these issues were not thought to be contributory to his death.  A subsequent interview with a former cellmate revealed that the inmate had been acting in a bizarre manner (e.g., "talking to his mattress") since his return from the MHCB.  According to the CDCR reviewer, "By his own words, the inmate had reported to mental health staff he felt suicidal when the voices told him his family had died.  In the days leading up to his death, he admitted to staff he heard voices again telling him his family was dead.  It is plausible his auditory hallucinations had once again progressed to this point and he acted in an impulsive moment to try to end his distress."

The Suicide Report contained eight recommendations for corrective action through a QIP:

> 1) SVSP Mental Health:  Several months (June through November) of 2017 clinical progress notes by the inmate's primary clinician at SVSP were reviewed and found lacking in sufficient detail.

170

2) SVSP Mental Health PC:  The Mental Health Crisis Bed Discharge Custody Check Sheet (Form MH-7497) was not filled out by the mental health clinician. Training has already occurred with the local SPRFIT coordinator and the clinical staff to address the issue.

3) SVSP Mental Health:  Problematic SRE/SRASHE documentation was identified for the dates of April 17, 2017, July 12, 2017, and November 9, 2017.

4) CHCF Mental Health:  Problematic SRASHE dated December 5, 2017.

5) Custody:  The inmate was a Mental Health Crisis Bed Discharge from CHCF Stockton facility.  He was on a 5-day follow-up and required custodial checks at staggered intervals which should not be routine or pattern forming, and not to exceed 30 minutes.  Reviewing the custodial checks on the day of the incident, the last entry was at 1630 hours.  The next time an officer would see the inmate was at 1729 hours, which was the time of the incident.  A whole hour had passed since the welfare check was performed.

6) Nursing Assessment Provider 1: RN 1 did not assess patient for c/o dizziness as a side effect to his medication.  Documentation on top of 7362 reflects referral to medical and mental health.  There was no evidence to suggest patient was seen for this complaint.

7) Nursing Assessment Provider 2:  RN 2 did not assess patient for c/o feeling bad and wanting to see psychiatrist.  Patient wrote "Urgente" on top of the 7362.  There was no evidence to suggest patient was seen for this complaint.

8) There were multiple concerns with the MHCB in-patient stay at CHCF occurring on November 26, 2017-December 7, 2017 (involving multiple psychiatry and primary clinician deficiencies).

### 23)    **Pelican Bay State Prison (PBSP)**

**Inspection**: February 14-15, 2018 (previous suicide prevention audit was on September 14-16, 2016).  PBSP housed approximately 2,668 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer did not have an opportunity to observe the intake screening process because there were no new admissions during the on-site assessment.  The preceding assessment did not find any problems during the intake screening process.

This reviewer observed daily PT rounds in the STRH and GP sections of the administrative segregation unit on February 14.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.  This reviewer also observed rounds by a psychologist assigned to SHU.  Of note, the PSU at the facility was closed, and the SHU program was reduced to nine housing units.

**Housing**:  PBSP had ten MHCBs.  Due to a low census (one patient), this reviewer was able to conduct a thorough inspection of each room.  The inspection revealed a previously unidentified deficiency of wall and ceiling ventilation grates in each room having holes that were greater than the industry standard of 3/16 inches wide or 16-mesh per square inch.  The current diameter of the ventilation grate holes was unsafe and should be replaced.  The MHCB rooms were otherwise suicide-resistant.

The administrative segregation units had 24 retrofitted suicide-resistant cells designated for new intake inmates, with 12 new intake cells designated in both the STRH and GP administrative segregation sections of the unit.  During inspection, this reviewer did not observe any new intake inmates housed in non-new intake cells.  In addition, three housing units in the SHU building of Facility C were designated for administrative segregation overflow.  There were no 3CMS inmates assigned to these units, nor were new intake inmates initially assigned to these overflow units.  Of note, however, there were numerous complaints by inmates assigned to the three overflow administrative segregation units in the SHU building about the lack of radios and extended period of time to receive property.  There were also complaints that, although there was book distribution in both the STRH and GP sections of the administrative segregation unit, there was little, if any, availability of books in the three overflow units.  PBSP leadership was made aware of these concerns.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in either CTC medical rooms or observation rooms within the MHCB unit.  Alternative housing was utilized on a regular, but not daily, basis.  Inmates were provided stack-a-bunks (correcting a problem identified during the previous assessment) and observed on a 1:1 basis.  From November 12, 2017 through February 12, 2018, there were only 26 inmates placed in alternative housing, and all were released within 24 hours.  The vast majority (88 percent) were transferred to a MHCB.  The overall length of stay in alternative housing for these 26 inmates was 12 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer subsequently reviewed the accuracy of observation rounds by reviewing the EHRS charts of four patients (PBSP 1, PBSP 2, PBSP 3, and PBSP 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on December 17, 2017 (for PBSP 1), January 9, 2018 (for PBSP 2), February 2, 2018 (for PBSP 3), and February 11, 2018 (for PBSP 4).  The chart review found numerous observation checks (i.e. between two and ten per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 51 minutes in one case (PBSP 3).  The following case (PBSP 2) exemplified the significance of the problem:  There were eight violations of 16-, 24-, 32-, 34-, 50-, 31-, 22-, and 22-minute gaps between the required 15-minute intervals.  Violations in these four cases were by multiple nursing staff.

Due to a low MHCB census, this reviewer was not able to observe any IDTT meetings during the on-site assessment.  However, this reviewer was able to converse with several MHCB clinicians and was informed that a full-time RT was assigned to the unit and able to provide out-of-cell time of at least one to two hours to each patient, including availability of both yard and program

172

office.  In addition, this reviewer was informed that there was no longer confusion amongst IDTT members regarding possessions and privileges that could be approved for MHCB patients. However, given the significant deficiencies found during the preceding assessment, including inadequate discussions regarding safety planning, patients never being eligible for "full-issue" clothing, and confusion about, and restrictions placed upon, the issue of yard, telephone, and visiting privileges, any conclusions regarding the correction of these problems will be deferred until the next on-site assessment when various IDTT team meetings can be observed.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit (housing both the STRH and GP administrative segregation sections) found 95 percent compliance with the required checks that did not exceed 35-minute intervals.  In addition, the combined compliance rate in the three administrative segregation overflow units located in the SHU building of Facility C was 94 percent.  A review of Guard One data for a recent 24-hour period in a few SHUs found compliance with the required checks that did not exceed 35-minute intervals during Second and Third Watches, and 60-minute intervals during the First Watch (pursuant to a stipulation approved by the court on September 1, 2016) (ECF No. 5487) was a combined 92 percent.  However, these high compliance rates are tempered by the fact that an inmate (PBSP 7) committed suicide in the GP section of the administrative segregation unit in March 2017 and found to be in the state of rigor mortis, a clear indication that Guard One rounds were not properly conducted.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of August 12, 2017 through February 12, 2018.  This reviewer's subsequent sample EHRS review of 42 cases of emergency mental health referrals for suicidal ideation/behavior revealed by clinical staff completed the required SRASHEs in 93 percent (39 of 42) of the cases.  This was a significant improvement from the preceding assessment.

This reviewer examined a sample of ten SRASHEs from patients released from the MHCB unit between September 2017 and January 2018.  Although the safety plan narrative in all the assessments was lengthy, the safety plans did not consistently include specific strategies for reducing suicidal ideation.  For example, in one case (PBSP 5), the patient had a history of suicidal ideation and prior MHCB admissions.  The safety plan stated:  "Recommended out-patient intervention(s) include CBT to increase insight into cognitive distortions/thinking errors and how this triggers distorted decisions and poor self-care, by learning the 10 cognitive distortions and identifying 3 to begin interrupting when those thoughts occur, to practice daily; MI to explore IP commitment to change or choice to continue with repetitive destructive actions/choices/beliefs; use CBT to develop 3 new coping skills within the next 30 days that help to improve functioning and increase confidence."  In another case (PBSP 6), the same clinician developed the following safety plan for a patient with a "high" chronic risk for suicide: "Recommended out-patient intervention(s) is communication skills/problem-solving skills to express his concerns appropriately instead of reporting SI; psychoeducation on 2 relaxation techniques over 90 days to reduce anxiety; CBT to identify distorted thoughts associated with anxiety/SI; 2 mindfulness techniques to accept negative emotions/thoughts and 2 defusing techniques over 90 days to reduce impact of negative thoughts."

Instead of deferring the development of these techniques and strategies to outpatient clinicians, development of specific strategies to reduce suicidal ideation was the responsibility of the MHCB clinicians. Overall, although development of adequate safety plans was uneven, there was an improvement since the prior assessment.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with 22 cases of patients discharged from the MHCB unit or alternative housing placement who remained at PBSP and were not transferred to the administrative segregation unit or SHU (where observation at 30-minute intervals was required) from January 1, 2017 through February 10, 2018. The review found that only the 68 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with almost all of the custody checks recommended for only 24 hours by clinicians. In addition, 95 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Most of the deficiencies in completion of the forms by mental health clinicians were attributable to recommending discontinuation of custody checks in less than the required 24 hours.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (November 2017 through January 2018) found that quorums were achieved in all of the meetings (although a Correctional Health Services Administrator was not in attendance at any of the meetings because the position was frozen). Meeting minutes were otherwise unremarkable. This reviewer observed the SPRFIT meeting on February 14, 2018.

**Training**: According to training records, 99 percent of both custody and nursing staff were currently certified in CPR. In addition, 96 percent of custody staff, 99 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2017. Finally, as of January 2018, 90 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**: PBSP experienced one inmate suicide during the review period. In that case (PBSP 7), the inmate was found hanging from a light fixture by a sheet in his administrative segregation cell during the morning of March 23, 2017. He was found in the state of rigor mortis. The inmate entered the CDCR system for a second term on January 29, 2015 to serve a six-year sentence for carjacking, with enhancements for use of a firearm. He was transferred to PBSP on May 7, 2015 and scheduled for parole in December 2017. The inmate incurred only

174

one RVR during his confinement, a battery on another inmate occurring on February 15, 2017. As a result of that incident, the inmate was placed in administrative segregation and remained there for safety concerns pending transfer to another prison.  He was gang-affiliated, and the incident involved battery of a rival gang member.  The inmate was never married and did not have any children.  He enjoyed good family support that was reflected in letter correspondence, telephone calls, and visits.

According to limited available records, the inmate was raised by both parents and had three siblings.  He was reportedly a good student in grade school but was subsequently expelled for drug use.  He became gang affiliated at age 14 and soon accumulated a juvenile arrest record.  He subsequently worked with his father in a variety of jobs but received a five-year prison term in 2009 for resisting arrest and evading a peace officer.  He was paroled in August 2013.  According to his sister, the inmate became employed again and doing well until he started using alcohol and methamphetamine.  When using these substances, he would become paranoid, behavior that led to the instant offense in September 2014.

The inmate did not have any reported history of mental health treatment in the community and screened negative for any mental health symptoms upon entry into CDCR.  He also did not have any history of suicidal behavior nor did he ever express any suicidal ideation during confinement.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  He did not have any medical issues that were thought to be contributory to his death.  However, it was noted that "When the inmate attacked a rival gang member without permission (from the gang leader), he placed himself in a dangerous position with both the Northerners and the Southerners…. What actual information he might have received from the leadership of either gang is not known; however, it is possible that his life was being threatened by one or both gangs.  In addition, his family may have been threatened with harm as well.  Without a suicide note, the reason will never be known with any certainty."

The Suicide Report contained six recommendations for corrective action through a QIP:

> 1) The first area of concern involves the condition in which the inmate was discovered. Based on reports submitted by responding staff, the inmate was discovered rigid, with obvious signs of rigor mortis and he displayed blue lips, eyelids, fingers and toes.  Vitals taken by medical staff at 0634 hours indicated the inmate was cool to the touch and had a body temperature of 82 degrees.  This calls into question the thoroughness of the security/welfare checks completed initially on Second Watch and those completed during First Watch.  Review of the Guard One 'Rounds Tracker Summary' identifies all checks were completed. However, it appears the making of a visual/physical observation of a living, breathing inmate, free of obvious injury as required did not occur appropriately during either Watch.

2) When the inmate was cut down, he fell to the floor.  Staff should do anything possible to try and relieve the pressure/weight when cutting down a victim and support them to the ground.  The Suicide Prevention Training provided by PBSP (Chapter V, Emergency Response to a Suicide Attempt, Section B, Emergency Responses, Responding to a Suicide), states in part, 'Relieve tension and cut the noose above the knot.'

3) Although a whistle was blown to summon assistance, officers did not have their Personal Alarm Device (PAD) on their persons during the incident. The officer yelled out for the control booth officer to activate his PAD, with no response.  The officer had to blow his whistle and run out to the rotunda to get the control booth officer's attention, causing a delay for both a custody and medical response to this emergency.  Per PBSP's post orders, a PAD is part of the Equipment/Proper Uniform to have while on duty.

4-6) Per the Nursing Review Summary, three nursing concerns were identified that requires follow-up (responding nurses initiated CPR after noting the patient had positive signs of rigor mortis, inadequate AED documentation, and delayed 911 activation).

## ACRONYMS and ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Manager System |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| AED: | Automated External Defibrillator |
| AH: | Auditory Hallucinations |
| Ambu bag: | Ambulatory Bag Used for CPR |
| APP: | Acute Psychiatric Program |
| ASH: | Atascadero State Hospital |
| ASU: | Administrative Segregation Unit |
| BPH: | Board of Parole Hearings |
| BVM: | Big Valve Mask |
| CAH: | Command Auditory Hallucinations |
| CAP: | Corrective Action Plan |
| CBT: | Cognitive Behavioral Therapy |
| CCCMS: | Correctional Clinical Case Manager System |
| CC I: | Correctional Counselor I |
| CCI: | California Correctional Institution |
| CCR: | California Code of Regulations |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| CHCF: | California Health Care Facility |
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |

| | |
|---|---|
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMH: | Chief of Mental Health |
| CNE: | Chief Nursing Executive |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |
| CQIT: | Continuous Quality Improvement Tool |
| CSATF : | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| DAI: | Division of Adult Institutions |
| DBT: | Dialectical Behavioral Therapy |
| D/C: | Discharge |
| DCHCS: | Division of Correctional Health Care Services |
| DSH: | Department of State Hospitals |
| DVI: | Deuel Vocational Institution |
| EHRS: | Electronic Health Record System |
| EOP: | Enhanced Outpatient Program |
| eUHR: | Electronic Unit Health Record |
| GP: | General Population |

| | |
|---|---|
| HDSP: | High Desert State Prison |
| HRL: | High-Risk List |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| IDTT: | Interdisciplinary Treatment Team |
| IM: | Intra-Muscular |
| IP or I/P: | Inmate Patient or Inmate/Patient |
| IPE: | Initial Psychiatric Evaluation |
| IPOC: | Individual Plan of Care |
| IST: | In-Service Training |
| ISU: | Investigative Services Unit |
| KVSP: | Kern Valley State Prison |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |
| LPT: | Licensed Psychiatric Technician |
| LTRH: | Long-Term Restricted Housing |
| LVN: | Licensed Vocational Nurse |
| MCSP: | Mule Creek State Prison |
| MH: | Mental Health |
| MHCB: | Mental Health Crisis Bed |
| MHCBU: | Mental Health Crisis Bed Unit |
| MHCT: | Mental Health Compliance Team |
| MHOHU: | Mental Health Outpatient Housing Unit |

MHPC:          Mental Health Primary Clinician

MHPP:          Mental Health Psychiatric Provider

MHSDS:         Mental Health Services Delivery System

MHTS:          Mental Health Tracking System

NKSP:          North Kern State Prison

NOS:           Not Otherwise Specified

OHU:           Outpatient Housing Unit

OP:            Operating Procedure

PBSP:          Pelican Bay State Prison

PC:            Primary Clinician

PIP:           Psychiatric Inpatient Program

POR:           Probation Officer Report

PRN:           As Needed

PSU:           Psychiatric Services Unit

PT:            Psychiatric Technician or Psych Tech

PTSD:          Post-Traumatic Stress Disorder

PVSP:          Pleasant Valley State Prison

QIP:           Quality Improvement Plan

R&R:           Receiving and Release

RC:            Reception Center

RJD:           Richard J. Donovan Correctional Facility

RN:            Registered Nurse

R/O:           Rule Out

RT:                    Recreation Therapist

RVR:                   Rules Violation Report

Rx:                    Prescription

SHU:                   Security Housing Unit

SI:                    Suicidal Ideation

SIB:                   Self-Injurious Behavior

SMHP:                  Statewide Mental Health Program

SNY:                   Sensitive Needs Yard

SOAPE:                 Subjective Objective Assessment Plan Evaluation

SOMS:                  Strategic Offender Management System

SPMW:                  Suicide Prevention Management Workgroup

SPOC:                  Suicide Prevention Outreach Committee

SPRFIT:                Suicide Prevention and Response Focused Improvement Team

SQ:                    San Quentin State Prison

SRAC:                  Suicide Risk Assessment Checklist

SRASHE:                Suicide Risk Assessment and Self-Harm Evaluation

SRE:                   Suicide Risk Evaluation

STRH:                  Short-Term Restricted Housing

SVSP:                  Salinas Valley State Prison

Sx:                    Symptoms

TTA:                   Triage and Treatment Area

TTM:                   Therapeutic Treatment Module

Tx:                    Treatment

UHR:                    Unit Health Record

VH:                     Visual Hallucinations

WSP:                    Wasco State Prison

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.**
     **Plaintiffs,**

     **vs.**                          **No. CIV S-90-0520 KJM DB P**

**EDMUND G. BROWN JR., et al.**
     **Defendants.**

**SPECIAL MASTER'S REPORT ON
HIS EXPERT'S THIRD RE-AUDIT AND UPDATE OF SUICIDE PREVENTION
PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION**

This report by the *Coleman* Special Master accompanies his expert Lindsay M. Hayes' Report, "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" (CDCR).  Mr. Hayes' report is a follow-up to his third report to the Special Master and the Court on suicide prevention practices in CDCR prisons, "The Second Re-Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," filed on September 7, 2017.  ECF No. 5396.  These reports are submitted as part of the Special Master's continuing review of defendants' compliance with court-ordered remediation in this matter.

## BACKGROUND

On July 12, 2013, the *Coleman* Court issued an order directing the Special Master to establish a Suicide Prevention Management Workgroup (SPMW) to address and resolve the problem of elevated suicide rates among CDCR inmates.  ECF No. 4693.  After a series of meetings, the SPMW determined that in order to accomplish their task, an expert assessment of

suicide prevention practices in CDCR prisons was required.  Consequently, the Special Master requested, and the Court approved, the appointment of Mr. Hayes as an expert.  ECF No. 4857.

Mr. Hayes is a Project Director of the National Center on Institutions and Alternatives and the foremost leading authority in the field of suicide prevention within jails, prisons, and juvenile facilities, having provided suicide prevention services to hundreds of local and state jurisdictions in all 50 states.  In addition to his work on the *Coleman* case, he has been appointed as a federal court monitor and as an expert to Special Masters/Court Monitors in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction.  Mr. Hayes has conducted the only five national studies of jail, prison, and juvenile suicide, and has authored more than 60 publications in the area of suicide prevention within jail, prison, and juvenile facilities.  (*See* Exhibit A, *curriculum vitae* Hayes.)

As part of the work with the SPMW, the Special Master directed Mr. Hayes to conduct a review of suicide prevention practices in CDCR prisons.  Mr. Hayes' initial audit began on November 12, 2013 and concluded on July 24, 2014, covering all 34 prisons.  His initial audit report, filed on January 14, 2015, contained 32 specific recommendations.  *See*, "An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation."  ECF No. 5259.  On February 3, 2015, the Court issued an order directing defendants to adopt the recommendations and directing the Special Master to provide an update to the Court on defendants' progress in their implementation.  ECF No. 5271.

Mr. Hayes' first re-audit began on February 4, 2015 and concluded on July 24, 2015, covering 18 prisons.  His second audit report was filed on January 13, 2016.  *See*, "A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation."  ECF No. 5396.  At the time of the writing of the report,

discussion on three of the initial 32 recommendations had been postponed for six months and therefore remained unresolved as a result.[1]  The report recommended that defendants fully adopt all 32 specified recommendations contained in Mr. Hayes' initial audit report.  The report also recommended a re-audit of those prisons which chronically struggled with their suicide prevention programs, in addition to almost all prisons with MHCBs.  On April 4, 2016, the Court issued an order adopting the report in full.  ECF No. 5429.

Mr. Hayes' second re-audit began on February 23, 2016 and concluded on November 9, 2016, covering 23 prisons.  His third audit report, "The Second Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," was filed on September 7, 2017.  ECF No. 5672.  By the time of the writing of the report, Mr. Hayes had determined that the three recommendations that remained unresolved were no longer warranted.  As a result, he recommended the recommendations be withdrawn and that the February 3, 2015 order adopting them be modified accordingly.  The report also recommended a further re-audit of those prisons which chronically struggled with their suicide prevention programs.

On January 25, 2018, the Court issued an order adopting the report in full.  ECF No. 5762.  The order adopted the recommendation to withdraw the three unresolved recommendations and deemed the February 3, 2015 order modified accordingly.  *Id*. at 3.  The Special Master was directed to provide the Court with an updated report on the status of

---

[1] Recommendation 14:  Any inmate discharged from suicide observation status and arriving in administrative segregation from either an MHCB or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan; Recommendation 15: Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled.  They should be placed in suicide-resistant, retrofitted cells; Recommendation 16:  Based on current data indicating that risk of suicide in administrative segregation extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates.

defendants' continued implementation of the initial recommendations and the development of related corrective action plans.  *Id.* at 4.  The report filed herewith is submitted as an update to Mr. Hayes' September 7, 2017 report.

In addition to adopting the aforementioned recommendations, the Court also ordered that:

1. Within fourteen days from the date of this order defendants shall show cause in writing why the inadequate vent grates at CSP-Corcoran cannot be replaced within six months;

2. Within thirty days from the date of this order defendants shall provide to the Special Master and file with the court a detailed plan for completion of the necessary work at the California Institution for Men, including a schedule with a date certain for completion of the work, a description of every step necessary to complete the work, specific timetables by which each step shall be completed, the names and addresses of all persons responsible for approval and/or execution of each step of the work, and a timetable for certification to the Special Master of the action or actions taken and whether the renovations remain on schedule; and

3. Not less than thirty days from the date of this order defendants shall provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, so that the policy can be fully implemented by the time Mr. Hayes begins his next round of auditing in May 2018.

ECF No. 5762 at 4.

Defendants have complied with all three provisions of the Court's order as outlined above.  On April 24, 2018, defendants notified the Special Master that the inadequate vent grates at CSP/Corcoran had been replaced.  On September 27, 2018, defendants notified the Special Master that the MHCB unit renovations at CIM were complete.  A revised SPRFIT policy memorandum was issued on February 2, 2018.  Mr. Hayes provides a more detailed update on defendants' compliance on p. 7, 24, 60 n.21, and 93 n.22 of the attached report.

## THIRD RE-AUDIT REPORT OF CDCR SUICIDE PREVENTION PRACTICES

For his third re-audit, Mr. Hayes selected 23 prisons based upon their operation of MHCB units, his findings during previous audits of chronic struggles with their suicide prevention programs, their housing a significant population of *Coleman* class members, and/or the prison experiencing multiple suicides. As with Mr. Hayes' previous audits, his third re-audit consisted of both on-site institutional inspections and reviews of inmate suicide case files from the selected institutions. The third re-audit began on May 23, 2017 and concluded on February 15, 2018.

On August 27, 2018, Mr. Hayes' third re-audit report was distributed in draft form to the *Coleman* parties for comments and/or objections to be submitted to the Special Master no later than 30 days thereafter. On September 26, 2018, during an All-Parties Workgroup teleconference on an unrelated matter, defendants requested a seven-day extension of time within which to respond to the draft report. The Special Master granted defendants' request. On October 3, 2018, defendants submitted their comments and objections to the draft report.[2] On October 9, 2018, plaintiffs' counsel submitted their response to defendants' comments and objections to the draft report.[3] Plaintiffs' counsel did not submit objections to the draft report.

Parties' Responses to the Draft Report

Defendants' response to the draft report was related to the following three areas, (1) transition of suicide prevention monitoring to CDCR, (2) specific comments and objections to

---

[2] *See* Exhibit B, Letter dated October 3, 2018 from Nick Weber, Attorney, CDCR Office of Legal Affairs to Special Master Lopes. Certain of the exhibits included with defendants' letter contained privileged and/or confidential information; as such, Exhibit B is attached hereto without the attachments referenced within.

[3] *See* Exhibit C, Letter dated October 9, 2018 from Krista Stone-Manista, Plaintiffs' Counsel to Special Master Lopes and Nicholas Weber, Jerome Hessick, Melissa Bentz and Dillon Hockerson, CDCR Office of Legal Affairs. Certain of the exhibits included with plaintiffs' letter contained privileged and/or confidential information; as such, Exhibit C is attached hereto without the attachments referenced within.

the draft report, and (3) defendants' proposal to activate a temporary unlicensed 20-bed MHCB

unit at R.J. Donovan Correctional Facility (RJD).  In return, plaintiffs' reply to defendants'

response to the draft report also addressed each of these three areas.  The parties' responses,

organized by topic, are discussed in further detail below.

<u>Transitioning Suicide Prevention Monitoring to CDCR</u>

Defendants open their response to the draft report with an assertion that the time is ripe to

begin discussions on the transition of suicide prevention monitoring to CDCR.  In support of this

proposition, defendants state that the Continuous Quality Improvement Tool (CQIT) has been

"successfully piloted and recently updated to include suicide prevention audit criteria."[4]

Defendants maintain that through the Continuous Quality Improvement (CQI) process they can

quickly assess and respond to deficiencies.  Plaintiffs' assert that defendants have not yet

demonstrated that they are ready to assume self-monitoring.  Plaintiffs list several reasons in

support of their position, including, but not limited to defendants' failure to produce timely

institutional CQI reports, substantive omissions from said reports, and the lack of a connection

between the CQI process and the suicide review process.

The Special Master rejects defendants' suggestion that they are ready to assume self-

monitoring of suicide prevention practices as incredibly premature given the continued findings

of problematic suicide prevention practices over the course of Mr. Hayes' audits, elevated

suicide rates within CDCR prisons, and, perhaps most notably, the fact that the CQIT is still in

the process of being tested and is nowhere near finalization, despite defendants' characterization

to the contrary.  In fact, subsequent to the observation of four recent CQI tours[5], Mr. Hayes

---

[4] *See* Exhibit B, p. 2.

[5] California State Prison/Los Angeles County (July 16-20, 2018), North Kern State Prison (August 27-29, 2018), R.J. Donovan Correctional Facility (September 24-28, 2018), and Salinas Valley State Prison (August 6-10, 2018).

provided defendants with additional recommendations to ensure that the 19-item suicide prevention audit checklist would be incorporated into the process. He was informed that any changes would occur after completion of the current CQI audits scheduled for November 2018.

<u>Defendants' Specific Comments and Objections to the Draft Report</u>

Defendants' response contained an objection to additional corrective action plans (CAPs) and other recommendations for corrective action, reasoning that they were unnecessary to cure identified deficiencies.[6] Plaintiffs disagree with this position, stating that "[y]ears of court involvement, including the Court's January 25, 2018 Order requiring Defendants to implement finally long-identified critical safety problems in the crisis beds at CIM, show the necessity of enforceable court orders in these areas,"[7] and reiterating that defendants have not demonstrated that they are ready to assume self-monitoring.

The Special Master strongly disagrees with defendants' assertion that additional CAPs are unnecessary to cure identified deficiencies. As described in Mr. Hayes' report, existing CDCR CAPs have either not been fully implemented, or have been ineffective in resolving ongoing suicide prevention deficiencies. The report makes clear that most of the recommended CAPs were not necessarily based upon new recommendations, but rather by CDCR's continuing challenge of implementing and sustaining adequate suicide prevention practices. Accordingly, the recommendations for additional CAPs as set forth in the attached report remain unchanged.

---

[6] Specifically, defendants objected to CAPs and recommendations related to new intake cells in administrative segregation, alternative housing, safety planning, five-day clinical follow-up and custody welfare checks, suicide prevention training, CQIT, and reception center suicide prevention posters.

[7] *See* Exhibit C, p. 5.

Defendants' response also contained various requests for language revisions.  To the extent that those requests were deemed appropriate, changes were incorporated into the report.  (*See infra* p. 9, 11, 12, 23, 24, 26 n.10, and 37.)

Mr. Hayes made seven changes and/or additions to this report since it was submitted to the parties in draft form.  (*See infra* p. 4, 15, 27, 28, 30, 36, and 38.)

RJD Crisis Bed Proposal

Defendants also object to Mr. Hayes' rejection of their proposal to build a temporary unlicensed 20-bed MHCB unit at RJD, asserting that their proposal is sound, and that Mr. Hayes failed to provide a reasonable basis to conclude the project was inadequate.  In their reply, plaintiffs indicate their strong disagreement with this position, asserting that they share all the concerns Mr. Hayes expressed in the draft report regarding the proposed unlicensed unit.

The Special Master also shares the concerns expressed by Mr. Hayes in the attached report.  The concept of a temporary MHCB unit at RJD has been discussed with defendants ad nauseam over the course of several months, both within and outside of the Workgroup process.  Defendants' proposal has indeed received careful consideration.

As detailed in Mr. Hayes' report, an inspection of the proposed MHCB unit highlighted several significant concerns, all of which contributed to his professional opinion that activation of the unit would result in deplorable conditions unacceptable for class members needing an MHCB level of care.  Defendants' latest objection sheds no new light on the issue.  As a result, Mr. Hayes' position as memorialized in the attached report remains unchanged.

**RECOMMENDATIONS AND CONCLUSION**

On page 36 of his third re-audit report, Mr. Hayes recommends that defendants continue their efforts to fully implement his previous recommendations, as well as develop CAPs based

8

upon deficiencies found in his most recent assessment.[8]  The Special Master is in full agreement with Mr. Hayes' recommendations in this regard.

On page 38 of his third re-audit report, Mr. Hayes proposes a further re-audit of those prisons which chronically struggle with their suicide prevention programs.  This would (a) promote the continued provision of technical assistance related to efforts surrounding suicide prevention practices; (b) provide a means for measurement of the sustainability of defendants' corrective actions, and observation of CDCR's CQI process at individual facilities; and (c) facilitate movement towards decreased future monitoring, and possibly result in the continued reduction of the number of and rate of inmate suicides throughout CDCR prisons.  The Special Master agrees that a re-inspection of those prisons which continue to struggle with their suicide prevention practices is appropriate.  Accordingly, such further re-inspections will proceed forthwith to serve the interests listed above.

Although the amount and significance of the work that has been done by the SPMW and Mr. Hayes to reduce suicides in CDCR prisons has been considerable, it has not progressed rapidly enough, and is thus not far enough along, to consider the idea of self-monitoring by CDCR.  If defendants would put as much effort into complying with the Court's orders as they seem to do attempting to find a shortcut to the end of federal court oversight, undoubtedly progress in a variety of ongoing remedial efforts would be much further along.  It is approaching four years since defendants were first ordered to implement Mr. Hayes' initial recommendations, yet implementation remains incomplete and successive audits continue to find deficiencies as a result.  That there remains work to be done is inarguable; defendants should work on full implementation of the court-ordered recommendations without further delay.

---

[8] A complete list of the recommended CAPs is located on p. 37-38 of the third re-audit report.

In view of all of the foregoing, the Special Master requests:

(1) That the Court reject defendants' proposal to activate a temporary unlicensed 20-bed MHCB unit at RJD;

(2) That the Court order defendants to continue to implement the remaining 29 initial recommendations and develop corrective action plans based upon deficiencies found in Mr. Hayes' most recent assessment; and

(3) That the Court order the Special Master to provide an update report to the Court on the status of defendants' continued implementation of the initial recommendations and the development of related corrective action plans.

Respectfully submitted,

/s/

_____
Matthew A. Lopes, Jr., Esq.
Special Master

November 5, 2018

# EXHIBIT A

# VITAE

# LINDSAY M. HAYES

## PERSONAL INFORMATION

**Office Address:**     40 Lantern Lane
                        Mansfield, Massachusetts 02048

**Contact Information:**     (508) 337-8806
                            Lhayesta@msn.com
                            www.ncianet.org/suicide-prevention

**Date of Birth:**     June 5, 1955

**Marital Status:**     Married, four children

## ACADEMIC BACKGROUND

Master of Science -- Administration of Justice (1978); The American University, Washington, D.C.

Bachelor of Arts -- Sociology (1977); Ithaca College, New York

## SUMMARY

Lindsay M. Hayes is a Project Director of the National Center on Institutions and Alternatives, with an office in Mansfield, Massachusetts. He is nationally recognized as an expert in the field of suicide prevention within jails, prisons and juvenile facilities. Mr. Hayes has been appointed as a Federal Court Monitor (and expert to special masters/monitors) in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction. He has served as a suicide prevention consultant to the U.S. Justice Department's Civil Rights Division (Special Litigation Section) and for the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security (Immigration and Customs Enforcement) in their investigations of conditions of confinement in both adult and juvenile correctional and detention facilities throughout the country. He also serves as an expert witness/consultant in inmate suicide litigation cases. Mr. Hayes also serves as a technical assistance consultant/expert by conducting training seminars, writing and revising suicide prevention policies, and assessing inmate and juvenile suicide prevention practices in various state and local jurisdictions throughout the country. He is regularly asked to critique and revise, when appropriate, the suicide prevention sections of national correctional health care standards.

Mr. Hayes has conducted the only five national studies of jail, prison, and juvenile suicide (*And Darkness Closes In... National Study of Jail Suicides* in 1981, *National Study of Jail Suicides: Seven Years Later* in 1988, *Prison Suicide: An Overview and Guide to Prevention* in 1995, *Juvenile Suicide in Confinement: A National Survey* in 2004, and *National Study of Jail Suicide: 20 Years Later* in 2010). The jail and prison suicide studies were conducted through contracts with the National Institute of Corrections (NIC), U.S. Justice Department; whereas the first national study of juvenile suicide in confinement was conducted through a contract with the Office of Juvenile Justice and Delinquency Prevention, U.S. Justice Department.

Mr. Hayes served as editor/project director of the *Jail Suicide/Mental Health Update*, a quarterly newsletter devoted to research, training, prevention, and litigation that was funded by NIC from 1986 thru 2008; and was a consulting editor and editorial board member of *Suicide and Life-Threatening Behavior*, the official scientific journal of the American Association of Suicidology, as well as current editorial board member of *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, the official scientific journal of the International Association of Suicide Prevention. Mr. Hayes has authored over 100 publications in the area of suicide prevention within jail, prison and

juvenile facilities, including model training curricula on both juvenile and adult inmate suicide prevention. His *Training Curriculum and Program Guide on Suicide Detection and Prevention in Juvenile Detention/Correctional Facilities and Residential Programs: Instructor's Manual* was released in April 2013. His *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities: Instructor's Manual* was released in March 2016.

As a result of research, technical assistance, and expert witness consultant work in the area of suicide prevention in correctional facilities, Mr. Hayes has reviewed and/or examined over 3,500 cases of suicide in jail, prison, and juvenile facilities throughout the country during the past 38 years. Mr. Hayes was a past recipient of the National Commission on Correctional Health Care's Award of Excellence for outstanding contribution in the field of suicide prevention in correctional facilities. His work has been cited in the suicide prevention sections of various state and national correctional health care standards, as well as numerous suicide prevention training curricula.

**POSITIONS HELD**

**National Center on Institutions and Alternatives (NCIA), Baltimore, Maryland** (January 1978 to Present).

- **Federal Court Monitor for Suicide Prevention** (September 2004 to Present): *Coleman v. Brown (CA) et al* (2:90-cv-00520-LKK-DAD), serves as expert to Special Master in monitoring suicide prevention practices in the California Department of Corrections and Rehabilitation from October 2013 to Present; *United States v. Robertson County (TN) et al* (3:13-CV-00392), monitoring suicide prevention and mental health practices in the Robertson County Detention Center from February 2013 to November 2017; *United States v. State of Hawaii* (CV-08-00585-JMS-KSC), monitoring suicide prevention practices in the Oahu Community Correctional Center from July 2009 to June 2015; *United States v. King County (WA) et al* (CV-9-0059), monitoring use of force, suicide prevention, and medical care practices in the King County Correctional Facility from January 2009 to February 2012; *United States v. State of Mississippi* (3:03-CV-1354-HTW-JCS), monitoring suicide prevention practices in the state Division of Youth Services' facilities from February 2008 to May 2010; *United States v. State of Hawaii*, served as expert to Court Monitor in monitoring suicide prevention practices in the Hawaii Youth Correctional Facility from September 2006 to September 2010; *United States v. State of Arizona* (CV-04-1926-PHX-EHC), monitoring suicide prevention practices in the state Department of Juvenile Corrections' facilities from September 2004 to September 2007; *Campbell v. McGruder, et al* (District of Columbia), served as jail suicide prevention expert to Special Master, 1994 to 1997; *Jerry M. v. District of Columbia, et al*, served as juvenile suicide prevention expert to Special Master, 1989 to 1997, then periodically since 2005.

- **Consultant/Expert Witness** (June 1993 to Present) to the Special Litigation Section, as well as the Disability Rights Section, of the U.S. Justice Department's Civil Rights Division in its investigation of suicides and general conditions of confinement within jails, prisons, and juvenile facilities throughout the country.

- **Consultant/Expert Witness** (January 2014 to Present) to the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security in its investigation of suicides and general conditions of confinement within U.S. Immigration and Customs Enforcement facilities and contracted detention facilities throughout the country.

- **Technical Assistance Consultant/Expert Witness** (January 1983 to Present) providing specialized staff training and facility needs-assessment to jails, prisons, and juvenile facilities in suicide prevention. **Expert Witness** consultation and testimony provided in litigation concerning jail, prison, and juvenile suicide. Qualified as an expert in both state and federal court.

- **Technical Assistance Consultant** (June 1984 to 2012) to the National Institute of Corrections (NIC), U.S. Department of Justice for jail and prison suicide prevention. Also member of NIC's National Jail Suicide Prevention Task Force (1984-1985), an advisory board created to design strategies for reducing jail suicides nationwide.

- **Project Director/Principal Investigator** (September 2006 to February 2009) of the U.S. Justice Department (National Institute of Corrections) contract to conduct an updated national study of inmate suicides occurring in county and city jails, as well as police department lockup facilities during 2005-2006. Responsible for collection and analysis of suicide data, as well as development of recommendations to impact current practices and policies regarding programmatic intervention for identification of potential suicide victims. This contract encompassed a follow-up national study to that performed in both 1980 and 1986.

- **Project Director/Editor** (May 1989 to September 2008) of the *Jail Suicide/Mental Health Update*. This U.S. Justice Department (National Institute of Corrections) contract published a quarterly newsletter focused on two areas: 1) current research, litigation, training, and model programs in the field of jail suicide prevention; and 2) promoting information and technology transfer between local jurisdictions that desired to

implement or enhance jail-based mental health services.  This project was a continuation of prior U.S. Justice Department grants (1986-1988).

- **Project Director/Principal Investigator** (August 1999 to December 2003) of a U.S. Justice Department, Office of Juvenile Justice and Delinquency Prevention contract to conduct the first national survey of juvenile suicide in confinement.  During the contract period, the project determined the extent and distribution of juvenile suicides throughout the country, as well as developed a report (*Juvenile Suicide in Confinement: A National Survey*) for use by juvenile justice practitioners in expanding their knowledge base and in creating/revising policies and training curricula on suicide prevention.

- **Technical Assistance Manager** (September 1987 to September 1997) of NCIA's services to state and local government officials in identifying policies and programs to alleviate overcrowded prisons and jails.  Systemic assessments provided counties in the following states: Alabama, Delaware, Georgia, Idaho, Maine, Maryland, Pennsylvania and Rhode Island.  In addition, served as a consultant to U.S. Justice Department (National Institute of Corrections) in providing needs-assessment to jurisdictions which experience jail overcrowding.  Qualified as an expert in federal court.

- **Project Director/Principal Investigator** (April 1993 to August 1994) of a U.S. Justice Department (National Institute of Corrections) contract to develop a monograph on prison suicide.  The monograph (*Prison Suicide: An Overview and Guide to Prevention*) included an extensive literature review, examination of state and national standards for prison suicide prevention, analysis of prison suicide rates, case studies of effective prevention programs, and review of liability issues.

- **Project Director** (September 1990 to February 1991) of an NCIA research project to evaluate the effectiveness of the Intensive Parole Supervision Project, a joint venture of the U.S. Parole Commission and the U.S. Probation Office for the District of Maryland.  The purpose of this five-month evaluation project was to assess the performance and goal achievement of the program during a two-year period, while providing Parole Commission officials with information useful to decision-making regarding program continuation, expansion and/or refinement, and allocation of resources.

- **Project Director/Principal Investigator** (September 1986 to February 1988) for the National Coordination of the Jail Suicide Prevention Information Task Force. This U.S. Justice Department (National Institute of Corrections) contract: 1) Conducted regional seminars on jail suicide prevention throughout the country; 2) Gathered information from each state on the incidence of jail suicide and related issues, including replication of NCIA's 1981 National Study of Jail Suicides; 3) Provided technical assistance to individual jails and others regarding jail suicide prevention while disseminating a quarterly newsletter (*Jail Suicide Update*) concerning timely developments in jail suicide prevention, litigation, training and special issues; and 4) Developed a model training manual on jail suicide prevention.

- **Project Director/Principal Investigator** (July 1980 to November 1981) for the National Study of Jail Suicides, the first effort to determine nationally the extent and distribution of suicides within jails and lockups.  Responsible for collection and analysis of suicide data, as well as development of recommendations to impact current practices and policies regarding programmatic intervention for identification of potential suicide victims.

## Research Assistant/Juvenile Decarceration Project  --  Joint Effort of NCIA and The American University, Washington, D.C. (January 1978 to December 1978).

- A one-year project for the study of policy implementation regarding deinstitutionalization services for   delinquent youth (a four state study).  Responsible for compiling research for the monograph *-- The      Politics of Decarceration*.

## Administrative Assistant/Bergen County Courthouse, Hackensack, New Jersey (June 1977 to August 1977).

- Worked as an administrative assistant to the county court administrator and was responsible for conducting municipal court inspections. The purpose of these inspections was to correct any inadequacies   in each of the (72) municipal courts, and to coordinate each court into a consistently run municipal court   system.

**Youth Counselor/South Lansing Center, Lansing, New York**   (January 1977 to May   1977).

- The South Lansing Center was a New York State Division for Youth Title II Residential Treatment Facility.  Worked as a full-time intern in conjunction with Ithaca College.  Involved gaining knowledge of the treatment program as a whole and working with youth on a one-on-one basis.

**Administrative Assistant/Bergen County Jail Annex, Hackensack, New Jersey** (June 1976 to August 1976).

- Worked as an administrative assistant to the jail psychologist and assisted in interviewing, counseling     and screening individuals for the county's work-release program.

**SELECTED (STATE and NATIONAL) CONFERENCE PRESENTATIONS (excludes training and technical assistance consultation to individual jurisdictions)**

- U.S. Department of Homeland Security, Office of Civil Rights and Civil Liberties, Basic Principles and Components of a Suicide Prevention Program, Washington DC, May 2018;

- Washington Association of Sheriffs and Police Chiefs, Washington Counties Risk Pool, and the Washington Cities Insurance Authority, Jail Suicide Prevention and Liability Reduction Training Workshop, Seattle, WA, December 12, 2017;

- American Academy of Psychiatry and the Law, 48th Annual Meeting, Denver, CO, October 28, 2017;

- U.S. Department of Justice, National Institute of Corrections, State DOC Mental Health Directors Network Meeting, Grand Prairie, TX, June 2017;

- Correctional Service Canada, Round Table on Suicide Prevention, Assessment, and Management, Keynote Address, Moncton, New Brunswick, Canada, March 7-8, 2017;

- New Jersey County Wardens Association, 19th Annual Training Conference, Atlantic City, NJ, October 4, 2016;

- Performance-Based Standards (PbS) Learning Institute, 10th Annual State/Agency Coordinator Training, Boston, MA, August 5, 2016.

- National Commission on Correctional Health Care, National Conference on Correctional Health Care:

Pre-Conference Seminar, Las Vegas, NV, October 2018
Pre-Conference Seminar and Workshop, Chicago, Il, November 2017
Suicide Prevention Summit, Chicago, IL, August 2017
Pre-Conference Seminar, Atlanta, GA, April 2017
Mental Health Conference, Boston, MA, July 2016
Pre-Conference Seminar, Dallas, TX, October 2015
            Pre-Conference Seminar, New Orleans, LA, April 2015
                Pre-Conference Seminar, Nashville, TN, October 2013
        Mental Health Conference, Las Vegas, NV, July 2013
        Mental Health Conference, Chicago, IL, July 2012
        Mental Health Conference, Las Vegas, NV, July 2011
Pre-Conference Seminar, Orlando, FL, November 2009
Mental Health Conference, Las Vegas, NV, July 2008
Mental Health Conference, Chicago, IL, July 2005
Pre-Conference Seminar, New Orleans, LA, November 2004
Mental Health Conference, Las Vegas, NV, July 2004
Workshop, Albuquerque, NM, November 2001
Workshop, St. Louis, MO, September 2000
Workshop, Fort Lauderdale, FL, November 1999
Workshop, Nashville, TN, October 1996
Workshop, Washington, DC, November 1995
Workshop, Chicago, IL, June 1995

- University of Houston Law Center, Police, Jails and Vulnerable People Symposium, Houston, TX, January 2016.

- North Dakota Center for Persons with Disabilities, Minot State University, Jail Suicide Prevention Seminars, Grand Forks and Bismarck, ND, March 2015.

- New York State Correctional Medical and Behavioral Healthcare System Conference, Albany, NY, December 9, 2014.

- Suicide Prevention in Juvenile Correctional Facilities, Webinar Presenter, Council of Juvenile Correctional Administrators (Braintree, MA), November 2014.

- National Partnership for Juvenile Services, 19th National Symposium on Juvenile Services, Louisville, KY, October 2013.

- North Dakota Children and Family Services Conference, Bismarck, ND, July 2013.

- U.S. Department of Justice, National Institute of Corrections, Chief Jail Inspectors' Network Meeting, Jail Suicide Prevention Workshop, Aurora, CO, July 2012.

- Tennessee Corrections Institute, Jail Issues Annual Conference, Keynote Address and Workshop Presentations, Nashville, TN, May 2012.

- Suicide Prevention in Juvenile Detention and Correctional Facilities, Webinar Presenter, Suicide Prevention Resource Center (Washington, DC) and Council of Juvenile Correctional Administrators (Braintree, MA), February and March 2012.

- Wisconsin Department of Justice and Wisconsin Department of Corrections, 17th Annual Jail Administrator's Conference, Plenary Session, Stevens Point, WI, November 2011.

- Association of Correctional Mental Health Administrators Annual Meeting, U.S. Department of Justice, National Institute of Corrections, Prison Jail Suicide Prevention Workshop, Aurora, CO, May 2011.

- U.S. Department of Justice, National Institute of Corrections, Large Jail Network Meeting, Jail Suicide Prevention Workshop, Aurora, CO, March 2011.

- New Mexico Association of Counties, Jail Suicide Prevention Workshops, Albuquerque and Las Cruces, NM, March 2011.

- Missouri Juvenile Justice Association Educational Conference, Lake of the Ozarks, MO, October 2009.

- Council of Juvenile Correctional Administrators, 2nd Annual Leadership Conference, Chicago, IL, October 2009.

- Academy of Correctional Professionals, Managing the Mentally Ill Through the Correctional System, Luncheon Speaker, Fairfax, VA - May 2009, Farmington, CT - June 2009, and Austin, TX - July 2009.

- Council of Juvenile Correctional Administrators, Seminar for New Directors, Tampa, FL, January 2009.

- American Correctional Association, 138th Congress of Correction, Health Care Professional Luncheon Speaker, New Orleans, LA, August 2008.

- Missouri Institute of Mental Health, Suicide in Jails and Prisons Conference, Keynote Address, Chesterfield, MO, August 2008.

- Florida Sheriffs Association, Annual Jail Conference, Sandestin, FL, December 2007.

- International Association of Suicide Prevention, Preventing Suicide Across the Life Span: Dreams and Realities Conference, Correctional Settings-Symposium, Killarney, Ireland, August 2007.

- Colorado Division of Youth Corrections, 4th Annual DYC Provider Training Conference, Breckenridge, CO, May 2007.

- New Mexico Association of Counties, Jail Suicide Prevention Workshops, Santa Fe and Las Cruces, NM, November 2006.

- OJJDP/ACA's National Juvenile Corrections and Detention Administrator's Forum, Pittsburgh, PA, May 2006.

- National Disability Rights Network, Annual Skills Building Conference, San Diego, CA, January 2006.

- Texas Juvenile Probation Commission, Behind Closed Doors: Liabilities, Issues and Trends in Juvenile Justice Facilities, Austin, TX, September 2005.

- National Center for Mental Health and Juvenile Justice, National Policy Academy on Improving Services for Youth with Mental Health and Co-Occurring Substance Abuse Disorders within the Juvenile Justice System, Bethesda, MD, September 2005.

- Connecticut Youth Suicide Advisory Board and Connecticut Clearinghouse, Suicide Prevention Promises and Practices: Focus on Youth, Rocky Hill, CT, May 2005.

- Wisconsin Department of Justice and Wisconsin Department of Corrections, Suicide Prevention in Jails, Wisconsin Dells, WI, April 2005.

- Massachusetts Department of Public Health, Suicide Prevention Across the Lifespan, 3rd Annual Suicide Prevention Conference, Worcester, MA, May 2004.

- Suicide Prevention Resource Center, Preventing Suicide in Regions VII and VIII: Communities Working Together to Implement the National Strategy for Suicide Prevention in the Prairies and Mountain West, Westminster, CO, October 2003.

- North Dakota Office of Management and Budget, Risk Management Division, Suicide Prevention in Correctional Facilities Workshop, Bismarck, ND, May 2003.

- Maine Department of Behavioral and Developmental Services, 2003 Crisis Clinician Conference, Keynote Address. Augusta, ME, March 2003.

- Texas Juvenile Probation Commission, Symposium on Juvenile Suicide Prevention and Intervention: Putting Children First, Austin, TX, March 2003.

- American Correctional Association, Winter Conference, Charlotte, NC, January 2003.

- Council of Juvenile Correctional Administrators, Mid-Winter Meeting, Charlotte, NC, January 2003.

- New York State Commission of Correction and Office of Mental Health, Correctional Medical and Mental Health Care Symposium, Sarasota Springs, NY, October 2002.

- University of Connecticut Health Center/Correctional Mental Health Conference, Suicide Prevention: Assessment and Management in a Correctional Environment, Farmington, CT, September 2002.

- American Correctional Health Services Association, Multidisciplinary Training Conference, Portland, OR, March 2002.

- MCP Hahnemann University, Behavioral Healthcare Education, 9th Annual Forensic Rights and Treatment Conference, Grantville, PA, November 2001.

- Maryland Governor's Interagency Workgroup on Youth Suicide Prevention, 13th Annual Suicide Prevention Conference, Baltimore, MD, October 2001.

- Florida Department of Corrections, 4th Annual Female Offender Focused Symposium, Orlando, FL, September 2001.

- U.S. Department of Justice, National Institute of Corrections, Prison Health Care: Suicide Prevention Workshop, Longmont, CO, June 2001.

- New York State Office of Mental Health, Best Practices Conference, Brooklyn, NY, June 2001.

- Office of Juvenile Justice and Delinquency Prevention (OJJDP) National Conference, Justice for Children: A Vision for the 21st Century, Washington, DC, December 2000.

- Indiana Sheriffs' Association and Indiana Department of Corrections, Jail Suicide Prevention Workshop, Indianapolis, IN, July 2000.

- OJJDP/ACA's 15th Annual National Juvenile Corrections and Detention Forum, Albuquerque, NM, May 2000.

- Governor's Summit - Correctional Health to Community Health: A Continuum of Prevention and Care for the Criminal Offender, Las Vegas, NV, April 2000.

- Ohio Community Forensic Association, Suicide and the Criminal Justice Population, Columbus, OH, March 2000.

- Hawaii Criminal Justice Association, 3rd Annual Conference, Keynote Address, Honolulu, HI, March 2000.

- Council of Juvenile Correctional Administrators, Western Regional Meeting, Tucson, AZ, November 1999.

- Florida Senate and House of Representatives, Committees on Corrections, Presentation on Suicide in Florida Prisons, Tallahassee, FL, January 1999.

- Open Society Institute, 1st National Conference on Death and Dying in Prisons and Jails, New York, NY, November 1998.

- Ohio Department of Mental Health, Office of Forensic Services, Unlocking the Barriers: Mental Health Services in Jails and Working with Law Enforcement Agencies, Cuyahoga Falls, OH, August 1998.

- Oregon Senate and House of Representatives, Senate Judiciary Crime and Civil Subcommittee and House Interim Committee on Judiciary, Presentation on Suicides in Hillcrest Youth Correctional Facility, Salem, OR, March 1998.

- Combined California Correctional Associations, Keys to Inmate Management Conference, Concord, CA, March 1998.

- Wood County Juvenile Detention Center, 1998 Ohio Regional Juvenile Suicide Awareness Seminar, Bowling Green, OH, March 1998.

- Netherlands Institute for the Study of Criminology and Law Enforcement, Leiden University, Leiden, The Netherlands, July 1997.

- Institute for the Study and Treatment of Delinquency, 3rd International Conference on Deaths in Custody, Uxbridge, England, July 1997.

- National Juvenile Detention Association, 9th Annual National Juvenile Services Training Institute, Indianapolis, IN, June 1997.

- Sam Houston State University, Criminal Justice Center, 27th Annual Jail Management Conference, Huntsville, TX, October 1996.

- Oregon Jail Managers' Association, Bend, OR, August 1996.

- Ohio Department of Rehabilitation and Correction, Correctional Health Care Conference, Columbus, OH, May 1996.

- U.S. Department of the Army, U.S. Army Military Police Support Agency, Army Corrections Conference, Fort Belvoir, VA, December 1995.

- Centers for Disease Control and Prevention, National Violence Prevention Conference, Des Moines, IA, October 1995.

- Louisiana State University, School of Social Work, Office of Correctional Studies, Prison Suicide Prevention Workshop, Baton Rouge, LA, September 1994.

- Wisconsin Department of Corrections, Suicide Prevention in Detention Facilities Seminar, Wisconsin Dells, WI, September 1994.

- University of Virginia, Institute of Law,  Psychiatry and Public Policy, 26th Semi-Annual Forensic Symposium: Jails and Mental Health Services, Charlottesville, VA, May 1994.

- American Association of Suicidology, 27th Annual Conference, New York, NY, April 1994.

- Institute for the Study and Treatment of Delinquency, 2nd International Conference on Deaths in Custody, Cambridge, England, April 1994.

- National Association of State Mental Health Program Directors' Conference, St. Louis, MO, September 1993.

- Pennsylvania Prison Warden's Association, Jail Suicide Prevention Seminar, Bethlehem, PA, November 1992.

- Montana Sheriff's and Peace Officers' Association, 64th Annual Training Seminar, Billings, MT, June 1992.

- Iowa State Sheriffs' and Deputies' Association, First Annual 20-Hour Jail School, Ames, IA, February 1992.

- Institute for the Study and Treatment of Delinquency, Diamond Jubilee Conference -- Deaths in Custody, Canterbury, England, March 1991.

- Law Enforcement Television Network, Carrollton, TX, March 1990.

- American Jail Association, 8th Annual Training Conference, Hollywood, FL, April 1989.

- American Jail Association, 7th Annual Training Conference, Los Angeles, CA, April 1988.

- National Conference on Alcohol Countermeasures and Occupant Protection, Boston, MA, March 1988.

- American Correctional Association, Winter Conference, Phoenix, AZ, January 1988.

- American Association of Correctional Training Personnel and the Juvenile Justice Trainers Association, 3rd Annual National Correctional Trainers Conference, Pittsburgh, PA, October 1987.

- Police Foundation, Police Litigation Prevention Seminar, Chicago, IL, May 1987.

- University of Maine, Conference on Preventing Youth Suicides, Kennebunkport, ME, May 1987.

- Centers for Disease Control, 1987 Conference on Injury in America, Atlanta, GA, February 1987.

- Southeastern Psychological Association, 29th Annual Meeting, Atlanta, GA, March 1983.

- American Association of Suicidology, 16th Annual Conference, Dallas, TX, April 1983.

## PUBLICATIONS

- "Suicide Prevention in Jails and Prisons," (with Jeffrey L. Metzner) in L. Gold and R. Frierson (Eds.), *Textbook of Suicide Assessment and Management*, 3rd Edition, Washington, DC: American Psychiatric Publishing, Inc., forthcoming 2019.

- "Controversial Issues in Suicide Prevention," *CorrectCare*, Spring 2017, 31 (2): 12-14.

- *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities: Instructor's Manual*, Mansfield, Massachusetts: National Center on Institutions and Alternatives, March 2016.

- "The Inherent Dangerousness of Telephone Cords in Jail Cells," *Correctional Law Reporter*, February/March 2014: 67, 78-79.

- "Suicide Prevention in Correctional Facilities: Reflections and Next Steps," *International Journal of Law and Psychiatry* 36 (2013): 188-194.

- *Training Curriculum and Program Guide on Suicide Detection and Prevention in Juvenile Detention/Correctional Facilities and Residential Programs: Instructor's Manual*, Mansfield, Massachusetts: National Center on Institutions and Alternatives, April 2013.

- "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3), 2012.

- "Suicide Prevention in Jails and Prisons," (with Jeffrey L. Metzner) in R. Simon and R. Hales (Eds.), *Textbook of Suicide Assessment and Management*, 2nd Edition, Washington, DC: American Psychiatric Publishing, Inc., 2012.

- *National Study of Jail Suicides: 20 Years Later*, Washington, DC: National Institute of Corrections, U.S. Department of Justice, April 2010.

- "Toward a Better Understanding of Suicide Prevention in Correctional Facilities," in C. Scott (Ed.), *Handbook of Correctional Mental Health*, 2nd Edition, Washington, DC, American Psychiatric Publishing, Inc., 2010.

- "Characteristics of Juvenile Suicide in Confinement," *Juvenile Justice Bulletin*, Washington, DC: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, February 2009.

- "Juvenile Suicide in Confinement – Findings from the First National Survey," *Suicide and Life-Threatening Behavior*, 39 (4): 353-363, 2009.

- "Reducing Inmate Suicides Through the Mortality Review Process," in R. Greifinger (Ed.), *Public Health Behind Bars: From Prisons to Communities*, New York: Springer Science and Business Media, 2007.

- "Preventing Suicide in Jails and Prisons, Parts 1 and Parts 2: Recommendations from the International Association for Suicide Prevention Task Force on Suicide in Prisons," (with Marc Daigle, Anasseril Daniel, Greg Dear, Patrick Frottier, Ad Kerkhof, Norbert Konrad, Alison Liebling, and Marco Sarchiapone), *Crisis*, 28 (3): 113-130, 2007.

- *Preventing Suicide in Jails and Prisons* (with Marc Daigle, Anasseril Daniel, Greg Dear, Patrick Frottier, Ad Kerkhof, Norbert Konrad, Alison Liebling, and Marco Sarchiapone), Geneva, Switzerland, World Health Organization, 2007.

- "Suicide Prevention and Designing Saver Prison Cells," in G. Dear (Ed.), *Preventing Suicide and Other Self-Harm in Prison*, New York, NY: Palgrave MacMilllan, 2007.

- "Responding to Suicides in Custody: Review Processes," in G. Dear (Ed.), *Preventing Suicide and Other Self-Harm in Prison*, New York, NY: Palgrave MacMilllan, 2007.

- "Suicide Prevention in Jails and Prisons," (with Jeffrey L. Metzner) in R. Simon and R. Hales (Eds.), *Textbook of Suicide Assessment and Management*, Washington, DC: American Psychiatric Publishing, Inc., 2006.

- "Suicide Prevention in Correctional Facilities: An Overview," in M. Puisis (Ed.), *Clinical Practice in Correctional Medicine*, 2nd Edition, Philadelphia, PA: Mosby, Inc., 2006.

- "Suicide Prevention in Correctional Facilities," in C. Scott and J. Gerbasi (Eds.), *Handbook of Correctional Mental Health*, Washington, DC, American Psychiatric Publishing, Inc., 2005.

- "Juvenile Suicide in Confinement in the United States: Results from a National Survey," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 26 (3), 2005.

- "Demographic, Criminal, and Psychiatric Factors Related to Inmate Suicide," (with Eric Blaauw and Ad J.F.M. Kerkhof), *Suicide and Life-Threatening Behavior*, 35 (1), 2005.

- *Juvenile Suicide in Confinement:  A National Survey*, Washington, DC: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, February 2004.

- "A Framework for Preventing Suicides in Adult Correctional Facilities," (with Judith F. Cox) in B. Schwartz (Ed.), *Correctional Psychology: Practice, Programming and Administration*, Kingston, NJ: Civic Research Institute, 2003.

- "Prevention, Management, and Treatment of Offenders at Risk for Suicide," (with Andre Ivanoff) in J. Ashford et al (Eds.), *Treating Adult and Juvenile Offenders With Special Needs*, Washington, DC: American Psychological Association, 2001.

- "Jail Suicide Risk Despite Denial (Or When Actions Speak Louder Than Words)," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 22 (1), 2001.

- "Suicide Prevention in Juvenile Facilities," *Juvenile Justice*, 7 (1), 2000.

- "Suicide in Adult Correctional Facilities: Key Ingredients to Prevention and Overcoming the Obstacles," *Journal of Law, Medicine & Ethics*, 27 (3), 1999.

- "Guide to Developing and Revising Suicide Prevention Protocols," in *Correctional Mental Health Care: Standards and Guidelines for Delivering Services*, Chicago, IL: National Commission on Correctional Health Care, 1999.

- "Was it Preventable?: The Comprehensive Review of Inmate Suicide," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 20 (4), 1999.

- *Suicide Prevention in Juvenile Correction and Detention Facilities: A Resource Guide*, South Easton, MA: Council of Juvenile Correctional Administrators, March 1999.

- "Inmate Suicide: A Look at Yesterday, Today and Tomorrow," *Correctional Mental Health Report*, 1 (1), 1999.

- "Another Preventable Jail Suicide: Part Two," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 20 (1), 1999.

- "Juvenile Suicide Prompts Closing of Facility," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 19 (2), 1998.

- "Suicide Prevention in Correctional Facilities: An Overview," in M. Puisis (Ed.), *Clinical Practice in Correctional Medicine*, St. Louis, MO: Mosby, Inc., 1998.

- "Jail Suicide: Preventing Future Casualties," in A. Liebling (Ed.), *Deaths of Offenders: The Hidden Side of Justice,* Winchester, England: Waterside Press, 1998.

- "From Chaos to Calm: One Jail System's Struggle with Suicide Prevention," *Behavioral Sciences and the Law*, 15, 399-413, 1997.

- "Jail Suicide and the Need for Debriefing," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (4), 1997.

- "Book Review: *Deaths in Custody*," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (4), 1997.

- "Another Preventable Jail Suicide," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (2), 1997.

- "State Standards and Suicide Prevention: A Lone Star," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (1), 1996.

- "Custodial Suicide: Overcoming the Obstacles to Prevention," in A. Liebling (Ed.), *Deaths in Custody: Caring for People at Risk*, London, England: Whiting and Birch, 1996.

- "National and State Standards for Prison Suicide Prevention: A Report Card," *Journal of Correctional Health Care*, 3 (1), 1996.

- "An Unusual Case of State-Assisted Prison Suicide," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 17 (2), 1996.

- "Prison Suicide: A Look at Rates and Prevention Policies," *Corrections Today*, 58 (2), February 1996.

- "Controversial Issues in Jail Suicide Prevention, Part 2: Use of Inmates to Conduct Suicide Watch," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 16 (4), 1995.

- "Prison Suicide: An Overview and a Guide to Prevention," *The Prison Journal*, 75 (4), 1995.

- *Prison Suicide: An Overview and Guide to Prevention*, Washington, D.C.: U.S. Department of Justice, National Institute of Corrections, 1995.

- "Controversial Issues in Jail Suicide Prevention," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 16 (3), 1995.

- *Training Curriculum on Suicide Detection and Prevention in Jails and Lockups* (Second Edition), with Joseph R. Rowan, Mansfield, Massachusetts: National Center on Institutions and Alternatives, March 1995.

- "Prison Suicide: An Overview and Guide to Prevention (Parts 1, 2 and 3)," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 16 (2), 1995, 16 (1), 1995, and 15 (4), 1994.

- "Jail Suicide in Mississippi," *Crisis: The Journal of  Crisis Intervention and Suicide Prevention*, 15 (3), 1994.

- "Book Review: *Deaths in Custody*," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (3), 1994.

- "Jail Suicide Prevention in the United States: An Overview of Yesterday, Today and Tomorrow," in A. Liebling and T. Ward (Eds.), *Deaths in Custody: International Perspectives*, London, England: Whiting and Birch, 1994.

- "Juvenile Suicide in Confinement: An Overview and Summary of One System's Approach," J*uvenile and Family Court Journal*, 45 (2), 1994.

- "Developing a Written Program for Jail Suicide Prevention," *Corrections Today*, 56 (2), April 1994.

- "Jail Suicide: Overcoming Obstacles to Prevention," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (2), 1994.

- "Youth Suicide in Custody: An Overview," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (1), 1994.

- "Suicidal or Manipulative? -- Does it Really Matter," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 14 (4), 1993.

- "Jail Suicide -- Prevention Through Written Protocol (Parts 1 and 2)," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 14 (2), 1993, and 14 (1), 1993.

- "Can Jail Suicide Be Prevented?" *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 13 (2), 1992.

- "Jail Suicide -- An Overview of Yesterday," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 13 (1), 1992; *Befrienders Worldwide*, Issue 40, July 1993.

- "Jail Suicide," *Montana Sheriff Magazine*, Summer 1992.

- "Ask the Experts," *American Academy of Psychiatry and the Law Newsletter*, 16 (1), April 1991.

- "National Study of Jail Suicides: Seven Years Later," *Psychiatric Quarterly*, 60 (1), Spring 1989.

- "National Study of Jail Suicides: Seven Years Later," *National Sheriff*, December-January 1989.

- "Jail Suicide Prevention: Research, Litigation and Training," *Issues in Correctional Training and Casework*, 4, October 1988; *Ohio Law Enforcement Training Bulletin*, March through June 1989.

- "Research and Training in Jail Suicide Prevention," *American Jails*, Fall 1988.

- *National Study of Jail Suicides: Seven Years Later*, with Joseph R. Rowan. Alexandria, Virginia: National Center on Institutions and Alternatives, February 1988.

- *Training Curriculum on Suicide Detection and Prevention in Jails and Lockups*, with Joseph R. Rowan, Alexandria, Virginia: National Center on Institutions and Alternatives, February 1988.

- *Jail Suicide/Mental Health Update* (1986 to 2008)

  ➢ "The Tragic and Preventable Death of David Thomas," 17 (2), Fall 2008.
  ➢ "Looking Ahead Toward a Better Understanding of Suicide Prevention in Correctional Facilities," 17 (1), Summer 2008.
  ➢ "Liability for Custodial Suicide: A Look Back," 16 (4), Spring 2008.

> ➢ Special Issue on Preventing Suicides Through Prompt Emergency Response and Intervention," 16 (3), Winter 2008.
> ➢ "Treatment and Reentry Approaches for Offenders with Co-Occurring Disorders," (Editor), 16 (2), Fall 2007.
> ➢ "Suicide Risk Despite Denial (Or When Actions Speak Louder Than Words)," 16 (1), Summer 2007.
> ➢ "The Tragic Life of Brenda Mombourquette," 15 (4), Spring 2007.
> ➢ "Model Suicide Prevention Programs: Part III," 15 (3), Winter 2006.
> ➢ "Was It Preventable?: The Comprehensive Review of an Inmate Suicide," 15 (2), Fall 2006.
> ➢ "Custodial Suicide: Yet Another Look," (Editor), 15 (1), Summer 2006.
> ➢ "The Tragic and Preventable Death of Maurice Shaw," 14 (4), Spring 2006.
> ➢ "Security and Mental Health Professionals Revisited: Still a (Too) Silent Relationship," (Editor), 14 (3), Winter 2005.
> ➢ "Model Suicide Prevention Programs: Part II," 14 (2), Fall 2005.
> ➢ "Model Suicide Prevention Programs: Part I," 14 (1), Summer 2005.
> ➢ "A Practitioner's Guide to Developing and Maintaining a Sound Suicide Prevention Policy," 13 (4), Spring 2005.
> ➢ "Jail Standards and Suicide Prevention: Another Look," 13 (3), Winter, 2004.
> ➢ "Special Issue: Juvenile Suicide in Confinement – Findings From the First National Study," 13 (2), Fall, 2004.
> ➢ "Special Issue: Inmate Suicide Litigation Redux," (Editor), 13 (1), Summer, 2004.
> ➢ "Innovations to Reduce Jail Suicide – A Kentucky Initiative," (Editor), 12 (4), Spring, 2004.
> ➢ "Suicide Prevention and 'Protrusion-Free' Design of Correctional Facilities," 12 (3), Fall, 2003.
> ➢ "Use of 'No-Harm Contracts and Other Controversial issues in Suicide Prevention," 12 (2), Summer 2003.
> ➢ "Criminalization of People with Mental Illnesses: The Role of Mental Health Courts in System Reform," (Editor), 12 (1), Spring 2003.
> ➢ "A Jail Cell, Two Deaths, and a Telephone Cord," 11 (4), Winter 2003.
> ➢ "Characteristics of Suicide Attempts in a Large Urban Jail System With an Established Suicide Prevention Program," (Editor), 11 (3), Fall, 2002.
> ➢ "Preventing, Managing, and Treating Suicidal Actions in High-Risk Offenders," 11 (2), Summer, 2002
> ➢ "Special Issue: The Evolving World of Jail Suicide Litigation," (Editor), 11 (1), Spring 2002
> ➢ "Factors in Prison Suicide: One Year Study in Texas," (Editor), 10 (4), Fall, 2001.
> ➢ "Special Issue: Preventing Suicides Through Prompt Intervention," 10 (3), Summer, 2001.
> ➢ "Suicide Prevention and Manipulative Behavior," 10 (2), Spring, 2001.
> ➢ "Jail Suicide Risk Despite Denial (Or When Actions Speak Louder Than Words)," 10 (1), Fall 2000.
> ➢ "Suicide Prevention Initiatives in a Large Statewide Department of Corrections: A Full-Court Press to Save Lives," (Editor), 9 (4), Summer 2000.
> ➢ "Correctional Suicide Prevention in the Year 2000 and Beyond," (Editor), 9 (3), Spring 2000.
> ➢ "Playing Catch-Up With the Jail Logs: Another Look," 9 (2), Fall 1999.
> ➢ "Special Issue: Suicide Prevention in Juvenile Facilities," 9 (1), Summer 1999.
> ➢ "Special Issue: The Uncertain World of Jail Suicide Litigation," (Editor), 8 (4), Spring 1999.
> ➢ "Were They Preventable?: The Comprehensive Review of Inmate Suicides, 8 (3), Winter 1999.
> ➢ "Model Suicide Prevention Programs: Part IV," 8 (2), Fall 1998.
> ➢ "Model Suicide Prevention Programs: Part III," 8 (1), Summer 1998.
> ➢ "Model Suicide Prevention Programs: Part II - Juvenile Facilities," 7 (4), Spring 1998.
> ➢ "Model Suicide Prevention Programs: Part I," 7 (3), Winter 1998.

➢ "Suicide Prevention Though Repeated Tragedy: One Jail System and the Lessons that were Learned," 7 (2), Fall 1997.
➢ "Special Issue: Critical Incident Stress Debriefing," (Editor), 7 (1), Summer 1997.
➢ "Jail Standards and Suicide Prevention: Another Look," 6 (4), Summer 1996.
➢ "Special Issue: Jail Suicide Litigation Redux," (Editor), 6 (3), Spring 1996.
➢ "Suicide Prevention in Juvenile Facilities: New Jersey's Experience," (Editor), 6 (2), Winter 1995.
➢ "Use of Inmates to Conduct Suicide Watch and Other Controversial Issues In Jail Suicide Prevention," 6 (1), Fall 1995.
➢ "U.S. Justice Department's Investigation of Jail Suicides in Mississippi: A Status Report," 5 (4), Spring 1994.
➢ "Special Focus on Mental Health Issues and Suicide Prevention," (Editor), 5 (3), Winter 1993.
➢ "Special Issue: Juvenile Suicide in Confinement: An Overview and Summary of One System's Approach," 5 (2), Fall 1993; *Correct Care*, 8 (1), February 1994.
➢ "Preventing Suicides Through Critical Administrative Review," 5 (1), Summer 1993.
➢ "Managing the Manipulative Inmate," 4 (4), Winter 1992.
➢ "Preventing Suicide Through Prompt Intervention," 4 (3), Fall 1992.
➢ "Liability for Custodial Suicide," (Editor), 4 (2), Summer 1992.
➢ "Trouble in Paradise: Jail Suicide on the Hawaiian Islands and a Police Department's Pro-Active Response," 4 (1), Spring 1992.
➢ "Model Suicide Prevention Programs - Part 4," 3 (4), Spring 1991.
➢ "Model Suicide Prevention Programs - Part 3," 3 (3), Winter 1990.
➢ "Model Suicide Prevention Programs - Part 2," 3 (2), Fall 1990.
➢ "Model Suicide Prevention Programs - Part 1," 3 (1), Summer 1990.
➢ "Notes from the Eleventh Circuit," 2 (4), Winter 1989.
➢ "Litigation Revisited," 2 (3), Fall 1989.
➢ "National Standards of Jail Suicide Prevention," 2 (2), Summer 1989.
➢ "Suicide Prevention in New York State," 2 (1), Spring 1989.
➢ "National Study of Jail Suicides: Seven Years Later," 1 (4), April 1988.
➢ "Training," 1 (3), Summer 1987.
➢ "Litigation," 1 (2), Spring 1987.
➢ "Jail Suicide Prevention Information Task Force," 1 (1), Winter 1986.

- "And Darkness Closes In... A National Study of Jail Suicides," *Criminal Justice and Behavior*, 10 (4), 1983.

- "Confining Wayward Youths: Notes on the Correctional Management of Juvenile Delinquents, with Robert Johnson, *Juvenile and Family Court Journal*, 32 (4), 1981.

- *And Darkness Closes In... A National Study of Jail Suicides*. Final Report to the National Institute of Corrections. Washington, D.C.: National Center on Institutions and Alternatives, October 1981.

## OTHER SIGNIFICANT DATA

- Advisory Panel Member, National Institute of Justice, *Reducing Morality in Correctional Facilities*, Rand Corporation, Arlington, VA, May 16-17, 2016.

- Task Force Member, U.S. Justice Department's Office of Justice Programs and Office of Juvenile Justice and Delinquency Prevention, Suicide Prevention Task Force for Youth in Contact with the Juvenile Justice System, Washington, DC, May 2011 to July 2013.

- Testimony before the Joint Committee on Mental Health and Substance Abuse and the Joint Committee on Public Safety and Homeland Security regarding *Suicide Prevention Practices Within the Massachusetts Department of Corrections*, State House, Boston, MA, May 1, 2007.

- Consulting Editor and Editorial Board Member of *Suicide and Life-Threatening Behavior*, the official scientific journal of the American Association of Suicidology, 2004 to 2010.

- Editorial Board Member of *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, the official scientific journal of the International Association of Suicide Prevention, 2004 to Present.

- Recipient of the National Commission on Correctional Health Care's B. Jaye Anno Award of Excellence in Communication for an outstanding contribution to the field of suicide prevention in correctional facilities, November 2001.

- Recipient of a Governor's Citation by the Governor of the State of Maryland for assistance in the implementation of revised suicide prevention policies in the state's juvenile institutions, October 2001.

- Principal Investigator, Evaluation of Suicide Prevention Policies and Practices at Bridgewater State Hospital, Massachusetts, 2000.

- Testimony before the House of Representatives Committee on Corrections regarding *Suicides in Florida Prisons*, State Capitol, Tallahassee, FL., January 9, 1999.

- Testimony before the House Interim Committee on Judiciary and the Senate Judiciary Crime and Civil Sub-Committee regarding *Suicide Prevention Practices at the Hillcrest Youth Correctional Facility*, State Capitol, Salem, OR, March 10, 1998.

- Suicide Prevention Consultant to the Council of Juvenile Correctional Administrators, 1998 to Present.

- Special Editor for series devoted to international perspective of jail suicides in *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (4), 1997.

- Columnist to *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 1992 to 2005.

- Invited Lecturer, School of Justice, The American University, Washington, D.C., January 1985 to April 1990.

- Outstanding Alumnus, School of Justice, The American University, Washington, D.C., Spring 1985.

**SUICIDE PREVENTION SERVICES (staff training, program assessment/development and litigation consultation) PROVIDED TO HUNDREDS OF LOCAL AND STATE JURISDICTIONS IN THE FOLLOWING STATES:** Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington (State), West Virginia, Wisconsin, and Wyoming.

**Listings of training, technical assistance, and litigation consultation in suicide prevention furnished upon request.**

October 2018

# EXHIBIT B

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 3, 2018

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Dear Special Master Lopes:

I write in response to Lindsay Hayes's draft report "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" (Audit) provided to Defendants on August 27, 2018.  CDCR thanks Mr. Hayes for his suicide prevention audits and his recommendations, which have been adopted in their entirety by the California Department of Corrections and Rehabilitation (CDCR).

Over the past several years, CDCR has successfully developed and piloted its Continuous Quality Improvement Tool to conduct self-monitoring of CDCR's mental health programs.  More recently, CDCR has added suicide prevention indicators to the tool.  As discussed below, CDCR believes that the parties should soon begin discussions on transitioning suicide prevention monitoring to CDCR.

Also discussed below are CDCR's general and specific responses and objections to the Audit.  Additionally, CDCR objects to the finding that CDCR's proposed unlicensed crisis bed unit at R.J. Donovan Correctional Facility (RJD) is unsuitable to provide patient care.  Mr. Hayes's opinion is based on hypothetical concerns – not monitoring of the activated unit.  CDCR should be permitted to activate the unit, subject to monitoring, to ensure that CDCR can provide ready access to crisis care for patients in southern California.

    I.   The Parties Should Discuss Transitioning Suicide Prevention Monitoring to CDCR

Since 2012, with input from the Special Master and Plaintiffs, CDCR has developed its own self-monitoring tool, the Continuous Quality Improvement Tool (CQIT).  CQIT has been successfully piloted and recently updated to include suicide prevention audit criteria.  Following the current round of CQIT audits, expected to be completed by November 2018, CDCR will release reports outlining the suicide prevention practices for the ten audited institutions.  Coupled with chart review audits, CDCR's suicide case reviews and headquarters' Suicide Prevention and Response Focused Improvement Teams (SPRFIT), CDCR is thoroughly analyzing its own

Special Master Lopes
October 3, 2018
Page 2

suicide prevention practices and is in the best position to assess its prevention practices and respond to identified deficiencies with corrective action.

During the development of CQIT, the Special Master has monitored CDCR's suicide prevention practices. The most recent cycle of monitoring, now entering its sixth year, began in July 2013 when the Court ordered Defendants to "establish a suicide prevention/management work group . . . to work under the guidance of the Special Master to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause." (ECF No. 4693 at 5-6.) There is currently no established end date for the workgroup or a plan to transition monitoring to CDCR.

By utilizing CQIT, which incorporates the compliance indicators developed by the Suicide Prevention and Management Workgroup and applied by Mr. Hayes during his audits, CDCR can quickly assess and respond to deficiencies by adjusting practices or modifying policies, as necessary. The CQIT process also memorializes its audit findings and recommendations in reports addressed to each institution. By combining CQIT, headquarters SPRFIT, and the suicide case review process, CDCR is positioned to provide strong suicide prevention oversight. CDCR invites a discussion about how best to transition monitoring these issues.

II. Specific Objections and Comments

CDCR objects to additional Corrective Action Plans because they are unnecessary to cure deficiencies identified in the Audit. CDCR is responsive to deficiencies when they are identified and works to immediately remedy them. Outlined below are specific objections and requests for modification to the report. CDCR provides these objections and comments in addition to its general objection to additional corrective action plans.

A. Use of Suicide-Resistant Cells for Newly-Admitted Inmates in Administrative Segregation Units (Pages 8-9)

The report states that CDCR should develop Corrective Action Plans (CAPs) to address deficiencies at ten institutions related to intake cell placement during the first seventy-two hours of segregation. (Audit at 9.) Specifically, the report recommends that "[s]ome of the CAPs will involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available."

Notwithstanding the Audit's findings, there has been no determination that new intake cells remedy the deficiencies found during the monitoring period. As the report notes, the segregation population has decreased statewide. And CDCR was found to be more compliant with intake cell requirements in prior rounds than in the current round. CDCR has also undertaken

Special Master Lopes
October 3, 2018
Page 3

improvements to remedy intake cell issues since the start of the last monitoring period.  For instance, on September 17, 2017, CDCR directed the affected institutions to apply a standardized stencil to each intake cell that identifies them as such.  All institutions complied with this requirement by October 27, 2017.

CDCR will independently assess whether new intake cells are required to remedy the issues at these institutions.  However, until there has been such a determination, CDCR requests that the language at page nine be modified to read that "[s]ome of the CAPs ~~will~~ may involve creating additional retrofitted new intake cells . . . ."  This language should also be reflected at the third bullet of page thirty-seven.

> B.  Use of "Alternative Housing" for Suicidal Inmates (Pages 9-10)

At page ten, the report recommends that CDCR "develop CAPs in each of the four facilities (CIW, CCWF, CSP/Corcoran, and RJD) that continue to have alternative housing lengths of stay well in excess of 24 hours."[1]  Such a CAP is unnecessary, especially as applied to individual institutions.  Crisis bed transfers are managed by headquarters, and their timeliness depends on statewide bed availability.  There is nothing in the report to suggest that slower transfer times are the result of deficiencies at the local level.[2]  Moreover, CDCR has already undertaken or proposed remedies to reduce the time patients wait to transfer to a crisis bed.

With respect to California Institution for Women (CIW) and Central California Women's Facility (CCWF), CDCR and Plaintiffs entered into a stipulated agreement to activate nineteen unlicensed beds at CIW to ensure quicker access to crisis beds for patients referred from CIW and CCWF.  These beds are expected to be activated by year's end.

In addition, as discussed in CDCR's July 30, 2018 letter regarding its proposal to activate an unlicensed crisis bed unit at R.J. Donovan Correctional Facility (RJD), there are an insufficient number of crisis beds in southern California.  (Exhibit A.)  As a result, patients will often wait longer in the southern region because they must spend more time on transport vehicles heading to available beds, generally, in the central region.  Accordingly, RJD's crisis bed wait times exceed those at other institutions.  That is why CDCR is proposing to activate a twenty crisis-bed unit at RJD.[3]

Corcoran's noncompliance is tied to the inadequate number of crisis beds in southern California.  Although Corcoran is in the central region, it has a relatively large crisis bed unit, and is often

---

[1] This recommendation is repeated at page thirty-seven, bullet four.
[2] While CDCR has undertaken measures at the local level aimed at improving transfers, further local fixes are unlikely to positively impact transfer timeframes at these four institutions given the need for female crisis beds and beds in the southern region, the lack of which impacts bed availability in the central region.
[3] That Mr. Hayes has rejected this proposal outright makes this particular CAP even more objectionable.  This issue is discussed in more detail in section III, below.

Special Master Lopes
October 3, 2018
Page 4

used as overflow for patients from southern California.  Accommodating these patients can delay the time it takes for Corcoran patients to arrive in a crisis bed.  This issue further supports the need for additional crisis beds in southern California.

Accordingly, directing a CAP at these four institutions is unnecessary because crisis bed wait times are directly related to the availability of statewide beds, and not based on correctable local practices.  Further, since the availability of statewide beds is being addressed with additional beds at CIW, and potentially at RJD, the underlying issue is likely to be resolved in the  near future.

> C.   Practices for Observing MHCB Patients (Pages 11-13)

Page eleven of the report states, "the problem of falsification of observation forms of suicidal patients had not been resolved and, in fact, had been exacerbated.  This reviewer's preceding assessment found falsification of observation forms in 26 percent (six of 23) of the audited facilities."  It is unclear from the report which six institutions falsified forms.  Only California Institution for Men and Mule Creek State Prison are noted to have falsified form in the appendix.

As drafted, the report gives the impression that there is a systemwide issue with falsification of records.  However, the sentences and paragraph following the statement regarding falsification appear to discuss noncompliance with CDCR's frequency of rounding policy.  It is unclear whether falsification is at issue, or if the real issue is noncompliance with frequency of rounding policy[4].  If the issue is noncompliance with frequency of rounding, CDCR requests that the word "falsification" be struck at pages eleven and twelve and replaced with appropriate verbiage identifying the issue as one of "noncompliance with rounding policies."

If form falsification occurred, as alleged at page eleven, CDCR requests that Mr. Hayes specifically identify the six institutions alleged to have falsified forms, or that the compliance rate be adjusted to reflect the true number of institutions determined to have falsified records.  This information will provide an accurate picture of whether there is a systemwide issue, as opposed to a handful of staff who are not compliant with CDCR policy.

> D.   Safety Planning for Suicidal Inmates (Pages 17-21)

Mr. Hayes recommends that CDCR develop CAPs for safety plan training with a "proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies."  (Audit at 21.)  CDCR is in the process of updating its safety planning process.  CDCR presented proposed changes to the Special Master team on July 19, 2018, and to Plaintiffs on September 5, 2018.

---

[4] The report notes that rounding noncompliance was found in over 86% of the institutions.  CDCR is addressing that issue via the use of regional monitoring, fixes to the Electronic Health Record System, training, and the use of CDCR's Continuous Quality Improvement Tool.

Special Master Lopes
October 3, 2018
Page 5

CDCR anticipates training the field on these changes in October 2018.  In light of the imminent change in practice, monitoring should be suspended until such time that CDCR can properly train and fully implement the new safety planning protocol statewide.  Otherwise, any reassessment would be based on outdated protocols.

>    E.   MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical
>          Follow-Up and Custody Welfare Checks (Pages 22-23)

Mr. Hayes recommends that CDCR should "[d]evelop CAPs for the 'Discharge Custody Check Sheet' (CDCR MH-7497) form process in the 20 facilities identified above that were below 90-percent compliance."  (Audit at 23.)  The new CAP is redundant because CDCR already developed and implemented a CAP to address this issue in May 2018.  Instead of initiating a new CAP, CDCR should be allowed to complete implementation of its May 2018 CAP, followed by further assessment by the Special Master.

>    F.   Local SPRFITs (Pages 23-25)

The report states at page twenty-four that "[d]ue to a perceived lack of urgency in finalizing the revised SPRFIT policy, the court ruled on January 25, 2018 that '[g]ood cause appearing, defendants will be directed to provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, not later than thirty days from the date of this order.' (ECF No. 5762 at 3.)"

CDCR objects to the contention that CDCR has not acted timely to develop and implement revisions to its SPRFIT policy and requests that the Special Master strike the phrase "[d]ue to a perceived lack of urgency in finalizing the revised SPRFIT policy."  Over the past two-years, CDCR has developed and implemented countless initiatives resulting from the *Coleman* class action.  The Special Master's most recent report on inpatient care identifies forty-nine such initiatives. (See ECF no. 5894 at 89-90, fns. 20 and 21.)  This mischaracterization of CDCR's commitment to suicide prevention discounts the tremendous amount of work Defendants have accomplished in the last two years.

>    G.   Suicide Prevention Training (Pages 25-28)

>          i.   Basic Correctional Officers Academy Training

Mr. Hayes reports that he is concerned about the "currently allotted 2.5 hour time frame" for pre-service training.  (Audit at 26.)  CDCR has expanded the Basic Correctional Officers Academy Training to four hours.  CDCR requests this sentence be struck or edited appropriately.

Special Master Lopes
October 3, 2018
Page 6

    ii. Training Compliance Rates

For unexplained reasons, CDCR's forty-three percent compliance with in-service training is highlighted in both bold and italics on page twenty-six.  Conversely, CDCR's 100-percent compliance with cardiopulmonary resuscitation  (CPR) and automated external defibrillator (AED) training is relegated to a footnote on the same page.  CDCR requests that the CPR and AED training compliance rates be moved to the body of the report.

    iii. Recommendation

Mr. Hayes recommends that CDCR provide him with the revised pre-service *Mental Health Services Delivery System Instructor Guide* curriculum and a schedule of possible dates in which presentation of the revised curriculum can be observed at the Basic Correctional Officers Academy Training.  (Audit at 27-28.)  This recommendation is unnecessary.[5]  CDCR provided this information to Mr. Hayes on August 23, 2018.

   H. Continuous Quality Improvement Tool (Pages 28-29)

Mr. Hayes recommends that "[t]he reporting out of all of this reviewer's 19 suicide prevention audit measures should be encompassed in one final CQIT-formatted report for each facility, and not in various 'regional reports' as described in defendants' May 2018 CAP."  (Audit at 29.)  This recommendation is unnecessary[6] because these are reports of individual institutions, not "regional reports."  The reference to "regional reports" in CDCR's CAP refers to the author of the CQIT reports, the leadership in CDCR's regional mental health offices.  The regional chiefs and their staff conduct the CQIT audit and draft reports for each audited institution.  CDCR is processing an overarching CQIT report that will aggregate the findings of the institution reports.

   I. Reception Center Suicide Prevention Posters (Pages 30-32)

Mr. Hayes recommends a CAP "to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, [sic] nurse's offices where intake screening is administered, and pill call windows."[7]  (Audit at 32.)  While CDCR agrees that suicide posters should be placed in visible locations within Reception Centers, they cannot block visibility through windows or be placed outdoors.  CDCR requests that the sentence include provisional language such as "when conditions allow."

---

[5] The recommendation is separately repeated as the last bullet on page thirty-seven.
[6] The recommendation is repeated at the first bullet of page thirty-eight.
[7] This recommendation is repeated at the second bullet of page thirty-eight.

Special Master Lopes
October 3, 2018
Page 7

III. CDCR Objects to Mr. Hayes's Rejection of the RJD Crisis Bed Proposal

To increase crisis bed capacity in the region where beds are most needed, CDCR proposed a temporary twenty crisis-bed unit at RJD pending construction of a permanent facility on site. This unit is especially important to ensure prompt access to crisis beds for the large number of patients housed in southern California. The need for additional crisis beds has also been recognized by the Court. On April 19, 2017, the court found that CDCR does "not presently have sufficient capacity to meet the need for MHCB level of care" and that the Eighth Amendment required perfect compliance with the twenty-four hour MHCB transfer timeframe. (*See* ECF 5610 at pages 11-12.)

As noted in CDCR's July 30, 2018 letter on this proposal, patients wait longer to access crisis beds in southern California than in any other region and, "each crisis bed in the southern region must provide services to twenty-five Enhanced Outpatient Program (EOP) patients while MHCBs in the central and northern regions provide services to fifteen and seventeen EOP patients, respectively." (Exhibit A at 2.) Mr. Hayes notes that transfer timeframes are not currently being met at RJD. (Audit at 10.) RJD, which houses over 2,300 mentally-ill inmates, but has only fourteen crisis beds, is the ideal location for additional beds.

Despite the need to timely transfer patients in crisis, Mr. Hayes rejected this common sense approach outright. Instead of rejecting CDCR's proposal, CDCR should fully activate the unit and only then should Mr. Hayes should monitor and opine on its adequacy.

A. CDCR's RJD Crisis Bed Proposal is Sound and Will Ensure Crisis Bed Access for Patients in Southern California

CDCR toured the proposed site with Plaintiffs and Special Master in March 2018 and visited it separately with a member of the Special Master team and Mr. Hayes in April 2018. Following comments from Plaintiffs and the Special Master team, CDCR provided additional details on the project in a series of meetings. CDCR also detailed the RJD proposal in two letters provided to Plaintiffs and the Special Master in April and July 2018, which are attached to this letter as Exhibits A and B. The RJD proposal, which transfers funding and staff allocation from SAC's unlicensed crisis beds to RJD, was approved in the 2018 budget.

CDCR has carefully considered the placement of the RJD crisis-bed unit. CDCR proposes to convert one side of a housing unit to a crisis-bed unit which will contain patient cells, office and treatment space, observation and restraint rooms, nursing and medication rooms, and storage. While the proposed building currently shares space with an administrative segregation unit, that section will be reserved for overflow to minimize the administrative-segregation population. The units will be divided by a fence, and because it shares space with an administrative segregation unit, there will be no disruptions from the adjacent day-room.

The RJD cells will be similar in size to those approved at the California Medical Facility L1 unit, which successfully double cells patients in inpatient beds. RJD patients will be single celled and will each receive additional out of cell time, in part due to adjacent yard space. CDCR will ensure that the cells are suicide resistant.

CDCR will provide RJD with sufficient staffing to run a crisis bed unit. As noted above, CDCR plans to remove its unlicensed crisis bed unit at SAC and move all allocated staff and funding to RJD. The new RJD unit will be monitored regularly by headquarters and regional staff.

> B.   Rejecting the Proposal Outright is Improper

Mr. Hayes reports on at least a dozen items in his suicide-prevention audit to measure CDCR's compliance with its suicide-prevention policies. Yet the RJD proposal was rejected without analyzing the unit using under the same audit criteria. The Audit does not adequately explain why the proposal is rejected nor does it explain why concerns about the proposal's physical plant outweigh the transfer timeline concerns expressed by the Court. Mr. Hayes fails to provide a reasonable basis to conclude that the RJD project is inadequate.

Many of the current audit criteria and past audit reports focus on the operations of MHCBs. According to the draft report, Mr. Hayes audited the following crisis bed related items:

- Suicide-Resistant MHCBs (Audit at 6)
- Practices for observing MHCB Patients (*id.* at 11)
- MHCB Practices for Possessions and Privileges (*id.* at 13)
- Safety Planning for Suicidal Inmates (*id.* at 17)
- MHCB Discharge (*id.* at 22)
- Emergency medical response equipment in housing units (*id.* at 2)

Mr. Hayes takes issue with the proposed temporary MHCB unit at RJD, but those purported concerns have no foundation in the audit criteria. Under the proposal, RJD would follow the same observation, property, and privileges practices as any other approved CDCR crisis bed. Additionally, the same safety planning and discharge policies would apply. In sum, there is no evidence that the RJD unit, as proposed, would present a greater suicide risk as compared to other crisis bed units.

> C.   Mr. Hayes's Bases for Rejecting the Proposal Are Inconsistent with Past Suicide Prevention Findings and Recommendations and Ignore CDCR's Proposed Amendments.

Mr. Hayes agrees that the unit would be suicide resistant, which should satisfy the inquiry into suicide prevention. Yet, he objects to the proposed unit based on the physical plant and

Special Master Lopes
October 3, 2018
Page 9

hypothetical operational challenges.  Mr. Hayes rejects the proposed physical plant of the crisis bed because, in his opinion, the cells would resemble suicide resistant *intake* cells.  Mr. Hayes also attacks the cells as cold, dark, and with limited floor space well below any licensed MHCB unit.  But CDCR presented remedies to address those concerns, all of which would provide cells with better natural light than many licensed crisis bed units, and with sufficient out-of-cell time to adjust for smaller foot-print in each cell.

In fact, and as mentioned previously, the proposed cells are similar in size to the unlicensed beds in California Medical Facility's L1 unit.  However, unlike L1, RJD would not double cell patients, now or in the future.  Like L1, CDCR proposes to remedy any square footage shortcomings with increased out-of-cell time.  The RJD unit is located next to small management yards, typically used for segregation inmates.  These yards can be used for crisis bed patients and will allow for increased out of cell time.

CDCR has also proposed to replace the cell doors with models that have larger windows and also proposed to replace light bulbs on the unit to provide more light.  However, Mr. Hayes rejected these proposals as insufficient before ever seeing the doors or lights in place, or the impact of the larger windows on his stated concerns.

Also questionable is Mr. Hayes's rejection of the office and treatment space on the basis that sound easily travels between cells which are dozens of feet apart.  The Audit states, "[g]iven the *fact* that inmates freely converse through the ventilation grates and cell doors, even with clinical offices and interview rooms located at the end of each tier, privacy and confidentiality could still be compromised by the proposed location of these offices on each tier."  (Emphasis added.)  This characterization of the unit and potential impact on confidentiality is exaggerated and hypothetical.  It is true that inmates will loudly shout at their adjacent neighbor in an attempt to converse with one another.  Yet, CDCR is unaware of any finding that sound travels so clearly that a patient in one cell can clearly overhear an individual clinical session several cells away.  As noted in CDCR's July 30, 2018, letter, CDCR will examine whether individual sessions can be clearly heard several cells away and, if so, take corrective action to ensure confidentiality.

Mr. Hayes also rejects the proposed use of small management yards ignoring that this proposal has ample yard space and superior beds to the unit at SAC it will replace.  There is no real risk that CDCR will be unable to ensure inmates have adequate out-of-cell time.  CDCR should be permitted to activate the unit and illustrate that it can offer the out of cell time it committed to, much like it did with L1 wherein CDCR committed to offering twelve hours out of cell time each day.

Finally, Mr. Hayes opines that because the SAC unlicensed crisis bed is "problematic," CDCR should not close and move that program to RJD.  This objection ignores the fact that the RJD

Special Master Lopes
October 3, 2018
Page 10

project is located in the part of the state where additional beds are needed and that, unlike SAC, the RJD project is time limited.  The unit is planned to remain open only until the approved and budgeted permanent crisis bed unit opens at RJD in 2022.

In sum, CDCR's proposal to open an unlicensed crisis-bed unit at RJD is sound and Mr. Hayes's contrary suggestion lacks foundation.  Accordingly, CDCR should be permitted to immediately open the unit and provide faster crisis bed access to patients in southern California.

Thank you for your consideration of these objections and comments.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs

# EXHIBIT C



ROSEN BIEN
GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Krista Stone-Manista
Email: kstone-manista@rbgg.com

October 9, 2018

<u>VIA ELECTRONIC MAIL ONLY</u>

Nicholas Weber                          Matthew A. Lopes Jr.
Jerome Hessick                          *Coleman* Special Master
Melissa Bentz                           MLopes@pldolaw.com
Dillon Hockerson
CDCR Office of Legal Affairs
Nicholas.Weber@cdcr.ca.gov
Jerome.Hessick@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov

Re:     *Coleman v. Brown*: Plaintiffs' Response to Defendants' "Comments and
        Objections" to Lindsay Hayes' August 27, 2018 Suicide Prevention Audit
        <u>Our File No. 489-3</u>

Dear All:

Plaintiffs write in response to Nick Weber's October 3, 2018 Letter ("Defendants' Comments"), which set forth Defendants' "Comments and Objections" regarding Lindsay Hayes's draft report "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" ("Draft Hayes Report"), itself dated August 27, 2018. Plaintiffs disagree with Defendants' request to transition suicide prevention monitoring to CDCR, their proposal to open a temporary, unlicensed crisis bed unit at Richard J. Donovan Correctional Facility ("RJD"), despite Mr. Hayes's grave concerns, and their other "objections" to the Draft Hayes Report.

## I.      CDCR Has Not Demonstrated that It Is Ready to Assume Self-Monitoring of Suicide Prevention

Plaintiffs appreciate the substantial time and energy that Defendants have dedicated to the development of the Continuous Quality Improvement ("CQI") tool and

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 2

process, but disagree that CQI is yet ready to allow CDCR to "quickly assess and respond to deficiencies by adjusting practices or modifying policies, as necessary." Defendants' Comments at 2. As a general matter, "quickly" hardly describes the development of the CQI process to date, which has yet to produce a single timely, final institutional report. Before Plaintiffs or the Court can seriously entertain Defendants' requests for self-monitoring, Defendants must demonstrate that they can produce timely reports that identify key and emergent problems in an appropriate way. No final overall CQIT report was ever produced in connection with the 11 CQIT tours completed by Defendants in 2016. Defendants produced, belatedly, individual draft reports for single institutions, many months after each tour. The Special Master worked with Defendants on improving their reporting following these untimely reports, but no final revised reports were ever produced or reviewed by Plaintiffs, and no overarching report looking for patterns and trends system-wide was ever provided to Plaintiffs. *Cf.* Defendants' Comments at 6 (promising "an overarching CQIT report that will aggregate the findings of the institution reports," with no timeline for production of such). Even as to the individual reports, Defendants stated a goal for this year's tours that the reports would be issued within thirty days following each tour. Twelve weeks have now passed since Plaintiffs observed the first tour this year, at LAC, and nine weeks have passed since the SVSP CQI tour; Plaintiffs have not yet received any report for either.

Further, as will be discussed more fully in a forthcoming letter commenting on Plaintiffs' recent CQI tour observations, the tool and process remain critically deficient in other respects in addition to their lack of timeliness, many of which relate directly to suicide prevention efforts. The individual institution CQIT reports we have seen, while containing valuable and detailed information about mental health programs, often fail to highlight the most critical concerns and sometimes gloss over serious problems. The reports produced in 2016-2017 also had several serious omissions that were not remedied by amendments to the written materials. These include, but are not limited to, the fact that the process remains inadequate to ensure that class members housed where they should not be, such as EOP patients in a non-hub ASU, are appropriately monitored. This is of particular relevance to suicide prevention efforts because of historically high suicide rates in segregation units, and CDCR's failure to address this issue despite Plaintiffs' repeated comments about it casts into doubt the adequacy of the CQI process as a whole. Further, and again despite Plaintiffs' numerous comments on this issue, there is still no connection between the CQI process and the suicide review process, and no requirement that CQI reports include even a bare mention of suicides during a review period, much less any analysis thereof.

[3308291.2]

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 3

The CQI process is also, at present, inadequate to assume qualitative auditing of system inadequacies.  As just one example, the materials provided in connection with the recent CQI tours still do not require any substantive review of whether Guard One checks are actually being completed, despite ongoing problems with suicide victims who have been found in rigor mortis despite purportedly completed Guard One checks.  *See* Hayes Draft Report at 4.

With respect specifically to the quantitative suicide prevention measures audited by Mr. Hayes, Mr. Hayes' Draft Report noted that CDCR previously intended to capture data related to suicide-prevention training compliance in "regional reports," and recommended that all suicide-prevention measures instead by captured in one CQI report for each facility.  *See* Draft Hayes Report at 28-29.  It appears from the CQI Report Guide provided to Plaintiffs in connection with the recent tours that the institutional CQI reports will now capture this training data, but that at least some training-related measures are "not yet on report/coded."  Report Guide at 6-7.  It is difficult to credit CDCR's assertion that it is prepared to assume full responsibility for suicide-prevention monitoring when it has not even finished coding of data reporting.

Even had it done so, the recent revelations about alleged system-wide compliance data and reporting flaws and misinformation detailed in Dr. Michael Golding's October 3, 2018 report, and the need for a thorough investigation of the same, cast into serious doubt CDCR's ability to self-monitor in any area reliant on the collection of accurate data, including this one.  Simply put, now is not the time for Defendants to be asking the Special Master, Court or Plaintiffs to trust their transparency and reporting of complete and accurate compliance data, particularly with a suicide rate that continues to rival all-time highs for the system.

The record, particularly considered in light of the allegations in Dr. Golding's report, does not support the conclusion that CDCR is ready to assume monitoring either from a qualitative or a quantitative perspective.  Plaintiffs therefore stridently disagree with Defendants' assertion that "CDCR is positioned to provide strong suicide prevention oversight" and oppose their request to assume self-monitoring of this important issue. Defendants' Comments at 3.

## II.   Mr. Hayes' Rejection of the RJD Crisis Bed Proposal Is Merited and Well-Founded in His Extensive Expertise

Plaintiffs strongly disagree with Defendants' argument that, despite Mr. Hayes's grave concerns regarding the proposed temporary crisis bed project at RJD, it would be

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 4

appropriate to activate the unit now, and then allow for monitoring.  Although we appreciate Defendants' desire to locate and activate additional crisis beds in the Southern Region, the current proposal to open an unlicensed crisis bed unit in a shared segregation unit at RJD is deeply misguided for the reasons we articulated in greater detail in our March 16, 2018 and August 8, 2018 letters. *See* Plaintiffs' August 8, 2018 letter, attaching March 16, 2018 letter, attached here as **Exhibit A**.

As Mr. Hayes concluded, after touring the proposed space, "subsequent teleconference calls with Statewide Mental Health Program leadership staff," and a review of the parties' correspondence on the issue, including Defendants' proposed modifications to their original plan, "activation of defendants' proposal at RJD would result in deplorable conditions—unacceptable for class members needing an MHCB level of care."  Draft Hayes Report at 35.  It is therefore completely inappropriate to suggest that the unit should be activated in direct contravention of Mr. Hayes's professional judgment as a foremost expert in suicide prevention, and Plaintiffs would strongly oppose any request to waive relevant licensing laws to permit this dangerous unit to open.  Defendants' proposal amounts to a request that Plaintiffs and the Special Master countenance the use of real patients experiencing psychiatric crises as guinea pigs to test out whether the unit "present[s] a greater suicide risk as compared to other crisis bed units."  Defendants' Comments at 8.  Notably, Defendants have never responded to our inquiries regarding what alternatives, if any, they considered for temporary MHCBs in the Southern Region, seriously undermining their claim that the proposed unit at RJD was their only, or best, option.

We share all of the "significant concerns" Mr. Hayes expressed in his draft report regarding the proposed unlicensed unit, including the size of the cells, the minimal light, the lack of MHCB suicide-resistant beds, potential issues with client confidentiality due to noise transfer, the limited yard time and the use of "walk-alone" yards, the lack of a plan to install fencing on the second tier to eliminate suicide attempts by jumping, and his fundamental conclusion that the cells "simply resemble retrofitted new intake cells found in administrative segregation units."  *See* Draft Hayes Report at 34-35.  Defendants' letter does not address these serious concerns, except to argue that the cells are similar in size to those in California Medical Facility's L1 unit and that CDCR "proposes to remedy any square footage shortcomings" with an unspecified amount of "increased out-of-cell time."  Defendants' Comments at 9.  Regarding Mr. Hayes's patient confidentiality concerns, Defendants claim that they will take a wait and see approach and "take corrective action" if necessary; even assuming Defendants could and would properly ameliorate confidentiality problems, such an approach is highly inappropriate, as during the test period, severe breaches of clinician-patient confidentiality could occur, and class

[3308291.2]

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 5

members could be dissuaded from honestly reporting crisis symptoms, both of which are extremely dangerous. *Id.* Again, given CDCR's extremely high rate of suicide yet again this year, Plaintiffs are surprised Defendants have continued to support this misguided proposal rather than identifying an appropriate alternative, especially considering that Defendants' bed plans have projected crisis bed shortages for years and Defendants chose not to pursue alternatives to more quickly complete the planned crisis beds currently slated to activate in 2022.

Moreover, we do not believe that the issues raised by Mr. Hayes should be minimized because, as Defendants argue, "[t]he unit is planned to remain open only until the approved and budgeted permanent crisis bed unit opens at RJD in 2022." Defendants' Comments at 10. As we have previously stated, Defendants' track record in failing to close other "temporary" unlicensed units years after they were set to be phased out is poor, as is their track record in finishing planned construction projects on time. *See* Plaintiffs' August 8, 2018 letter at 4.

Mr. Hayes is a nationally recognized expert in suicide prevention practices, and he has clearly stated his professional opinion that Defendants' proposed unit at RJD is "unacceptable for class members needing an MHCB level of care." Draft Hayes Report at 35. Defendants' suicide rate is, for the second year in a row, on track to exceed twenty-four suicides per 100,000 inmates, and it is well-documented that the harsh conditions of administrative segregation units exacerbate suicidality—in 2017, the suicide rate for segregation units in CDCR was a horrifying 250 suicides per 100,000. *See* Plaintiffs' Letter re 2016 CDCR Suicides, Feb. 9. 2018, attached hereto as **Exhibit B** at 3. Defendants' proposal to "immediately open the unit" and then see if any problems arise, particularly with no plan in place to ensure confidentiality as required by the Program Guide, is reckless and likely to result in significant suffering and death.

## III.    Responses to Defendants' Specific Comments and Objections

As discussed above, Plaintiffs disagree that Defendants have demonstrated that they are prepared and ready to assume self-monitoring responsibilities, particularly for an area as sensitive and critical as suicide prevention. Plaintiffs also disagree with Defendants' comments and objections to the extent that they suggest that formal, monitored Corrective Action Plans ("CAPs") are unnecessary because Defendants promise they will fix problems on their own. Years of court involvement, including the Court's January 25, 2018 Order requiring Defendants to implement finally long-identified critical safety problems in the crisis beds at CIM, show the necessity of enforceable court orders in these areas. *See* Order, ECF No. 5762 at 2.

[3308291.2]

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 6

### A.    New Intake Cells

Defendants' assertion that there has been no "determination that new intake cells remedy the deficiencies found during the monitoring period" is confusing, given that Mr. Hayes specifically found that "[i]n most cases, inmates were placed in an unsafe cell because all new intake cells were occupied."  Defendants' Comments at 2-3; *see* Hayes Report at 10.  Clearly, where non-compliance with intake cell policies has been a problem over many rounds of auditing due to lack of adequate intake cell capacity, there is a need for additional intake cells.  While Defendants state that they will "independently assess whether new intake cells are required to remedy the issues," they have never done so, to Plaintiffs' knowledge, despite multiple rounds of non-compliance in this area and prior promises to conduct such a review, including most recently a report promised last month that has not materialized. *See* Second Hayes Re-Audit, Sept. 7, 2017, ECF No. 5672, at 6 (finding that eight of 23 audited facilities housed people in non-intake cells during the first 72 hours of administrative segregation confinement); First Hayes Re-Audit, Jan. 13, 2016, ECF No. 5396, at 13 (finding that 11 of 17 audited facilities had unsafe intake cell facilities and/or practices, and noting that CDCR was developing a "management plan" regarding the placement of new intake cells, which apparently was never completed); Hayes Audit, Jan. 14, 2015, ECF No. 5259, at 15-17 (finding that not all people were housed appropriately in intake cells and recommending that CDCR ensure it had enough intake cells). To the extent Defendants' requested linguistic change is for the purpose of conducting an assessment to determine the necessity of new intake cells at any given institution before construction, Plaintiffs do not object, but do request that Defendants complete that overdue analysis promptly and share it with Mr. Hayes and Plaintiffs given the recurrent nature of this problem and that the highest level of suicide prevention measures in segregation units is a critical and urgent matter.

### B.    Alternative Housing Use at CIW, CCWF, COR, and RJD

Plaintiffs disagree that the forthcoming crisis beds at CIW will solve CDCR's failure to transfer female class members to crisis beds in a timely manner, and as discussed at length above, object to CDCR's continued reliance on its rejected proposal to create dangerous unlicensed beds in a segregation unit at RJD as an answer to its intractable crisis bed problem.  *See* Defendants' Comments at 3-4.  Plaintiffs concur with Mr. Hayes' recommendation that the four institutions that subject class members in crisis to the longest wait times in "alternative housing" be directed to review and, if necessary, remedy any institution-specific factors that contribute to those wait times.  This issue merits more attention than Defendants' conclusory footnote that "further local fixes are

[3308291.2]

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 7

unlikely to positively impact transfer timeframes," particularly given how dramatically far outside the 24-hour time limit the four institutions in question fall, with ranges from 36 to 67 hours. *See id.* at 3 n.2; Draft Hayes Report at 10. Moreover, Defendants' claim that Southern Region bed shortages are the cause of RJD and COR's persistent failure to timely transfer patients in crisis fails to adequately explain why all of the other institutions in the area are compliant. Finally, if Defendants are correct that the problem is due to headquarters' mismanagement of crisis bed transfers, the solution would seem to be a headquarters-level CAP about improving timeliness of transfers in addition to review of institutional obstacles – not, as Defendants would have it, no review at all. *See id.* at 3-4.

### C.      Practices for Observing MHCB Patients

Plaintiffs strenuously object to Defendants' characterization of rampant, system-wide, and persistent findings, over several auditing rounds, of nursing staff falsification of observation of suicidal patients as "a handful of staff who are not compliant with CDCR policy." Defendants' Comments at 4; *see, e.g.,* Hayes Re-Audit, September 7, 2017, ECF No. 5672 at 11; Hayes Re-Audit, January 13, 2016, ECF No. 5396 at 28. This is hardly the kind of responsibility-taking leadership that would suggest that CDCR is prepared to assume self-monitoring.

Plaintiffs do not object to Defendants' request that the report provide additional specificity concerning whether there was widespread falsification of rounding documentation during this assessment round, or whether there are system-wide failures to comply with long-standing, and often reiterated, requirements in this area. In either event, this problem requires a more serious attitude, and response, than CDCR's attempt to dismiss it as a failure on the part of a "handful of staff."

### D.      Safety Planning for Suicidal Inmates

Given CDCR's assertion that the field will receive changes on safety planning updates in October 2018 – i.e., this month – there is no support for Defendants' request to suspend monitoring on this issue until some unspecified future date. Defendants' Comments at 4-5. This critical issue – a system-wide problem, as Mr. Hayes thoroughly and carefully documents – should continue to be monitored on the schedule he deems appropriate. *See* Draft Hayes Report at 17-21. Plaintiffs note that, despite multiple requests, Defendants have still not provided Plaintiffs with the proposed training materials for the new protocol in question, even though it is apparently in the midst of being rolled out.

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 8


### E. MHCB and Alternative Housing Follow-Up and Welfare Checks

As Plaintiffs understand Mr. Hayes' report, the May 2018 CAP on this issue focused on the need for statewide improvements to the process for ensuring adequate custody welfare checks following crisis bed discharges. *See* Draft Hayes Report at 23. There is therefore no redundancy in his recommendation for specific institutional CAPs at the 20 institutions with particularly low compliance in this area. *See id.* Given the vulnerability of these class members, it is difficult to understand why Defendants would object to improving institution-specific compliance with these requirements, as well as improving statewide compliance.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 9

### F.    Defendants' Various Wordsmithing Requests Are Inappropriate

Defendants make various requests, in the guise of "objections," that the draft report be revised so as to be more flattering to Defendants.  These requests are inappropriate and do not merit a response from the Office of the Special Master.  As to the request that the draft report remove Mr. Hayes' description of Defendants' dilatory response regarding the revised SPRFIT policy in particular, *see* Defendants' Comments at 5, the Court found, in January 2018, that Defendants had not provided a revised policy in response to comments received from Mr. Hayes almost a year earlier, and sua sponte set a date certain by which Defendants would finally be  required to do so, *see* ECF No. 5762 at 2.  Defendants have no grounds on which to object to Mr. Hayes' accurate description of the Court's Order.  And Defendants' request that certain information be moved from a footnote into the text of the report is simply inappropriate nitpicking.  *See* Defendants' Comments at 6.   Plaintiffs do not object to Mr. Hayes making any factual revisions he sees fit to clarify any ambiguity or acknowledge developments after the date of the report if appropriate, however.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Krista Stone-Manista*

By:   Krista Stone-Manista

JSY:cg
cc:  *Coleman* Co-Counsel            Tyler Heath
     *Coleman* Special Master team   Tobias Snyder
     Jay Russell                     Ian Ellis
     Andrew Gibson                   Christine Ciccotti
     Elise Thorn                     Sean Rashkis
     Adriano Hrvatin                 Joanna Mupanduki

# CDCR Mental Health System Report

## Some key issues detailed in the report

### The Resetting-The-Clock Strategy

Every time a mental health patient is transferred from one institution to another, CDCR resets the clock to the maximum Program Guide interval between psychiatry appointments. They use this Resetting The Clock strategy to deem as compliant appointments occurring later than the maximum interval the Program Guide permits (such as 170 days rather than 90 days at the CCC level of care). They reset the clock every time a patient is transferred, irrespective of when the patient last saw a psychiatrist. A CCC patient transferred more than once might not have another psychiatry appointment for eight months.

Effect On CDCR's Reports To The Court

The 2017 and 2018 staffing reports to the court significantly overstate percent timeliness of psychiatric appointments.

Effect On The Office Of The Special Master's Analysis

The Resetting The Clock strategy may have led the Office of the Special Master to conclude that psychiatry appointments are occurring in a more timely manner than is in fact the case. This is likely to have led to mistaken conclusions about psychiatry staffing needs.

See pages 4 13 of this CDCR Mental Health System Report for details.

i

1    **The Stretching-The-EOP-Maximum-Interval Strategy**

2    In their calculation of "timeliness" (percent patient weeks compliance), CDCR increased

3    the EOP interval between psychiatry appointments from 30 days to 45 days. With

4    rounding, the result was that in some cases CDCR deemed EOP psychiatry appointments

5    occurring nearly two months later to be compliant.

6    Effect On CDCR's Reports To The Court

7    The 2017 staffing report to the court significantly overstates percent patient weeks

8    timeliness.

9    Effect On The Office Of The Special Master's Analysis

10   The Stretching The EOP Maximum Interval strategy may have led the Office of the

11   Special Master to conclude that psychiatry appointments are occurring in a more timely

12   manner than is in fact the case. This is likely to have led mistaken conclusions about

13   psychiatry staffing needs.

14   See pages 13 16 of this CDCR Mental Health System Report for details.

15   **The Counting-On-Time-Appointments-As-Early Strategy**

16   In the 2018 staffing report to the court, to arrive at their figure of CCC appointments

17   being on average 2.6 days overdue, CDCR took an average of what they deemed late

18   appointments with what they deemed early appointments. If a psychiatrist ordered that a

19   CCC patient be seen a week later, and that patient was indeed seen a week later, instead

20   of counting that appointment as having been on time, CDCR counted that appointment

21   as having been 83 days early. If a psychiatrist ordered that a patient be seen a month later,

ii

1    but the patient did not see a psychiatrist for two months, CDCR counted that

2    appointment as one month early rather than a month late as was actually the case. The on

3    average 2.6 days overdue figure significantly understates how late on average

4    appointments were occurring.

5    Effect On CDCR's Reports To The Court

6    The on average 2.6 days overdue figure CDCR gave in the 2018 staffing report significantly

7    understates how late on average appointments were occurring.

8    Effect On The Office Of The Special Master's Analysis

9    The Counting On Time Appointments As Early strategy may have given the Office of the

10   Special Master a mistaken impression of the degree to which patients are being seen on

11   time, and of psychiatric staffing needs.

12   See pages 38 40 of this CDCR Mental Health System Report for details.

13   **The Biasing-The-Sample Strategy (MAPIP)**

14   In a caveat in small print in the 2017 staffing report to the court, CDCR stated that they

15   had eliminated three of the four mandatory MAPIP blood draws (baseline, three months,

16   and dose change related measurements) thus leaving only the annual measurement.

17   An "annual blood test" could mean (i) a blood test done a year after starting a medication

18   and then at yearly intervals thereafter, or it could mean (ii) one done within the first year

19   after starting a given medication and then at yearly intervals thereafter. But what it can't

20   reasonably be taken to mean is (iii) a blood test done within the first year after starting a

iii

1    medication (as in (ii)) but only if the patient continued to be on the medication for a full

2    year.

3    In its calculation of compliance with mandatory annual blood draws, CDCR included the

4    data from some but not all patients who had blood tests done within a year of starting the

5    medication. It included the data from patients who remained on the medication for a full

6    year. It perversely excluded from the calculation data from those patients least likely to

7    have had the mandatory blood draw    those who had been taken off the medication

8    within a year after starting it. Such patients are less likely to have had the mandatory

9    blood draw because there was less time in which to get the blood draw done. By using a

10   biased sample, CDCR biased its measurement of whether needed measurements were

11   done or not. Thus, in its 2017 staffing report, CDCR significantly overstated the mental

12   health MAPIP compliance figure.

13   ## Effect On CDCR's Reports To The Court

14   In its 2017 staffing report, CDCR significantly overstated mental health MAPIP

15   compliance.

16   ## Effect On The Office Of The Special Master's Analysis

17   The Mental Health Dashboard (CDCR's self monitoring tool) and CDCR's report to the

18   court may have given the false impression that medication usage was being appropriately

19   monitored.

20   See pages 20 26 of this CDCR Mental Health System Report for details.

1    **The Pretend-It's-All-Done-By-The-Line-Staff Strategy**

2    The staffing ratios CDCR reported to the court in the 2018 staffing report are incorrect.

3    Sixty percent of psychiatric supervisors were seeing patients like line staff at least part

4    time, and in some cases full time. The work was being done by a larger ratio of

5    psychiatrists to patients than was reported, suggesting that fewer psychiatrists are needed

6    per patient than is in fact the case. We need our psychiatric supervisors to be organizing

7    care like they are supposed to be, not serving as line staff psychiatrists.


8    Effect On CDCR's Reports To The Court

9    CDCR's reported staffing ratios in the 2018 staffing report are misleading. The ratio of

10   psychiatrists doing the work to patients receiving the psychiatric care is higher than was

11   reported to the court.


12   Effect On The Office Of The Special Master's Analysis

13   More than the number of line staff reported would be needed to accomplish the results

14   achieved. The Pretend It's All Done By The Line Staff strategy may have led the Office of

15   the Special Master to conclude that there are fewer staff shortages than is actually the

16   case.


17   See pages 47 48 of this CDCR Mental Health System Report for details.


18   **The Count-Every-Encounter-As-An-Appointment Strategy**


19   The average number of EOP appointments per 30 days was lower than CDCR reported to

20   the court in the 2018 staffing report. CDCR counted as compliant appointments "wellness

21   checks" including brief encounters with patients in the prison yard surrounded by other

1  inmates, three minute non confidential cell side visits, and telepsychiatry "wellness
2  checks" in which an MA holds a laptop for a telepsychiatrist to try to talk to the patient
3  who is behind the solid metal cell door. In misleadingly counting all these wellness
4  checks as compliant appointments, CDCR thereby overstated its timeliness figures,
5  because without all these wellness check "appointments", intervals between
6  appointments would be greater. No reports about EOP timeliness were given to the court
7  in the 2018 staffing report. The average number of EOP appointments per 30 days gives no
8  measure of timeliness, including whether appointments occurred on time when
9  scheduled. And in any case the number of EOP appointments per 30 days was overstated
10  in the 2018 staffing report, meaning that actual appointment timeliness is even lower than
11  timeliness figures appearing on the Dashboard.

12  ## Effect On CDCR's Reports To The Court

13  The average number of EOP appointments per 30 days was lower than CDCR reported to
14  the court in the 2018 staffing report. That wellness checks were counted as proper
15  appointments means that the actual timeliness figures are even lower (less timely) than
16  reported.

17  ## Effect On The Office Of The Special Master's Analysis

18  The Count Every Encounter as an Appointment strategy may have led the Office of the
19  Special Master to draw false conclusions about whether EOP patients are being seen by
20  psychiatrists when they need to be seen.

21  See pages 45 46 of this CDCR Mental Health System Report for details.

**The Pretending-"All"-Means-"Fewer-Than-All" Strategy**

One of the best measurements of when a doctor thinks a patient should be seen is when the doctor has scheduled the patient to be seen. According to the CDCR Mental Health Dashboard, at the CCC level of care, statewide, an average of 95% of "all scheduled appointments" were "seen as scheduled". But the word "all" did not mean all. Instead, CDCR deemed fewer than all to be "all". CDCR excluded appointments not seen as scheduled due to patient refusal, patient no showed, scheduling error, etc. The actual percentage of appointments that occurred as scheduled was far lower than 95%. Were those groups of patients not excluded from "all", the average percentage of mental health appointments occurring as scheduled would have been about 46%. But the true figure is actually even lower than that because scheduled appointments that don't happen are in many cases simply moved to a later date as though they were never scheduled to occur before that later date.

In a system that is failing to get more than 50% of patients to their appointments, many more psychiatrists are needed than would be otherwise, because of the wasted time, the enormous work needed to try to find patients who did not come to their appointment, the excessive rescheduling and juggling needed, the need to try to see patients at odd hours, etc.

Effect On CDCR's Reports To The Court

In failing to mention that fewer than 50% of patients are being seen when psychiatrists schedule them to be seen, the CDCR staffing reports significantly understate how many psychiatrists are needed given how grossly inefficient the system is.

vii

1   Effect On The Office Of The Special Master's Analysis

2   The Pretending "All" Means "Fewer Than All" strategy may have led the Office of the

3   Special Master to the erroneous conclusion that patients were being seen when the

4   psychiatrist thought they needed to be seen. In addition, the Office of the Special Master

5   may not have taken into account the greater number of psychiatrists needed in a system

6   as grossly inefficient as the CDCR one (which is failing to get more than 50% of patients

7   to their appointments).

8   See pages 26 37 of this CDCR Mental Health System Report for details.

9   **The Crazy-Algorithm Strategy**

10   The CDCR mental health computer algorithm generating compliance figures for

11   medication non compliant patients *seen* perversely creates the semblance of *greater*

12   compliance when *fewer* patients needing to be seen for medication non compliance are

13   *scheduled* to be seen. It counts appointments not scheduled as not being needed, it

14   counts refused appointments as completed appointments, and it double counts

15   appointments that occurred. In the CHCF report for August 2018, for example, the

16   Dashboard reported 100% compliance when in reality the compliance was only 3.6%.

17   Appointments for medication non compliance are one of a number of different types of

18   consultation appointments. Were the compliance figures for that kind of consultation

19   appointment accurately recorded, the compliance figures for "timely mental health

20   referrals" would be significantly lower. The Dashboard has significantly overstated

21   compliance with respect to timely mental health referrals.

1   Effect On CDCR's Reports To The Court

2   The number of psychiatrists CDCR suggests are needed fails to take into account that
3   CDCR's actual compliance with respect to needed psychiatric consultations occurring is
4   much lower than the Dashboard figures suggest.

5   Effect On The Office Of The Special Master's Analysis

6   Given that the algorithm creates such grossly false compliance figures, the Office of the
7   Special Master might decide that independent analysis is needed to check all Dashboard
8   data. The Crazy Algorithm strategy may have led the Office of the Special Master to
9   conclude that fewer psychiatrists are needed than is in fact the case.

10   See pages 48 52 of this CDCR Mental Health System Report for details.

11   **The Psychologists-Are-Physicians-Too Strategy**

12   Regardless of platitudes about the importance of including psychiatric physicians in
13   decision making, CDCR's actions are not consistent with such platitudes. CDCR
14   perversely deems the non medically trained *psychologist* rather than the psychiatrist (i.e.,
15   the medical doctor) to be the "primary clinician". There is not a single psychiatry
16   executive in CDCR. Psychologists wear name badges saying "Dr." and not specifying that
17   their doctorate is as a psychologist rather than a medical doctor. Indeed, a psychologist
18   has been listed as the "physician to call" in at least one CDCR mental health nursing
19   station. Psychologists in CDCR very often override psychiatrists' judgement and/or
20   medical orders, and the CDCR system effectively supports them in doing that rather than
21   discouraging it.

1     █████████ signed a memo that gave psychologists the authority to overrule

2     psychiatric physicians' medical decisions about the medical safety of discharging

3     medically complicated patients from licensed hospitals. The memo said that the decision

4     to discharge is made by "the primary clinician or treatment team". The psychiatrist and

5     the psychologist are both members of the treatment team. The psychologist is the

6     "primary clinician". It logically follows that the memo is saying that in cases where the

7     psychiatrist and the psychologist disagree (and thus the treatment team can't reach a

8     decision), the psychologist rather than the psychiatrist makes the decision.

9     Giving psychologists the authority to overrule medical doctors' decisions with respect to

10    potentially medically complicated patients must be one of the most radical policy

11    decisions ever. Having no medical training, psychologists have no ability to evaluate

12    medical issues such as whether a patient's diabetes or high blood pressure is stable, or

13    whether there is toxicity from a psychiatric medication, or indeed whether psychiatric

14    medications are increasing or decreasing suicidal risk. Psychologists overruling medical

15    doctors even in emergency situations and about discharging medically complex patients

16    from hospitals has had a steep cost in terms of bad outcomes.

## 17    Effect On The Office Of The Special Master's Analysis

18    The Office of the Special Master may be unaware of the degree to which poor outcomes

19    and have occurred because psychologists in CDCR overrule psychiatric medical doctors

20    even during emergency situations and discharges.

21    See pages 88 107 of this CDCR Mental Health System Report for details.

x

# CDCR Mental Health System Report

Suppose that in the California Department of Corrections, only 45% of Mental Health patients were seen by psychiatrists as scheduled. Suppose that 80% of those 45% were seen in a confidential office space. That would imply that just over a third of the total were seen appropriately confidentially and as scheduled. That is, they *would* have been being seen appropriately *if*, between appointments, consultation occurred in the event that they had stopped taking their medicines (which would have been unlikely in reality in the CDCR system) and *if* those patients who were seen as scheduled and confidentially were also seen *on time*. In the existing CDCR system that happens for some patients but not others.

A system in which a large majority of patients are not getting psychiatric care when scheduled or otherwise when they need it, and which is not set up in such a way that patients are brought to psychiatry appointments in confidential offices, but in which instead, the psychiatrist is expected to search the prison yard looking for patients or trying to communicate through a crack in the cell door and unable to look at the patient while speaking loudly to be heard through the crack in the door, is by no means conducive to good patient care. It might not be surprising to find high rates of hospitalization and suicide in such a poorly designed and run system.

In systems in which there is a focus on actively identifying and correcting problems, even serious problems can be fixed. Such systems can find ways of getting patients to confidential psychiatric medical appointments and other needed mental health appointments.

Making mistakes   even very serious mistakes   is part of the human condition. The question is whether the system is designed and managed in such a way that mistakes can

1  be learned from and issues corrected, or not. What is required for a system to be error

2  correcting is that information be accessible to those who could make a difference, rather

3  than restricting or denying access to the information needed to identify and correct

4  problems. Systems that deny access to vital information to those who need it thereby

5  actively prevent problems being solved. Those who may make mistakes should not be the

6  only ones to judge whether there has been an error.

7  The tragic picture painted above is not just a hypothetical. In fact, it is the reality in the

8  California Department of Corrections Mental Health system. Vital information has been

9  monopolized and its access restricted to a select group of mainly psychologists at

10  headquarters. This group has created a biased and inaccurately positive picture of what is

11  actually a troubled system of care. The ███████████ of Mental Health of the

12  California Department of Corrections have enforced this restriction of access to the

13  needed information. Those who most need to have access to this medical information are

14  the medical leaders in mental health   the psychiatric physicians   and those who review

15  our system of care. Yet the headquarters psychiatry leadership team and the Coleman

16  monitors and court have been denied access to this medical information. This has actively

17  prevented the normal medical error correction that would have prevented the very

18  serious problems we see in the field in CDCR.[i]

19  I, Michael Golding, M.D., CDCR Statewide Chief Psychiatrist, will document how the

20  attitude that information must be hidden away, controlled and interpreted by just a few

21  has cost the CDCR system dearly by preventing adequate care for a large majority of

22  CDCR mental health patients. The needed error correction has not happened, because

23  those few running the system are the only ones allowed to judge how things are going in

24  the system.

25  Patients need psychiatric medical care, yet in CDCR the provision of psychiatric medical

26  care is severely hindered by executive level decisions at headquarters and in the field. In

1   CDCR, psychologists and social workers are deemed to be the "primary clinicians", and

2   despite their lack of medical training they very often ignore psychiatrists' medical

3   judgement and sometimes override psychiatric physicians' medical orders.

4   Moreover, as a matter of policy at CDCR, non medically trained psychologists are

5   deemed to have independent medical privileges including admitting, discharging and

6   ordering restraints. *Pro forma*, there was (until very recently   see page 105) supposed to

7   be consultation and agreement from the treatment team including the psychiatric

8   physician, but frequently not only is there no consultation, non medically trained

9   personnel make medical decisions that override psychiatric medical doctors' orders. This

10  is so ingrained and pervasive in the culture and policy of CDCR that few but the

11  psychiatrists and other medical doctors appear to find it problematic.

12  In most CDCR institutions, psychiatrists are supervised by non medically trained

13  psychologists. Ostensibly, this supervision is administrative. However, in fact it is clinical

14  too. Psychologists and their administrative supervisors control medical information and

15  prevent it from getting to psychiatric physicians who need it to make medical decisions.

16  They also make determinations about what is or is not a medical issue, and sometimes

17  just boldly overrule physicians' orders, typically behaving as the clinical supervisors of

18  psychiatrists in most CDCR institutions. Our attempts to have psychiatrists report

19  clinically through a psychiatry chain have been stymied. In these circumstances, non

20  medically trained personnel decide what is a medical issue and consult physicians only if

21  in their own judgement a medical decision needs to be made.

22  There are perhaps about 30 executive level psychologists in CDCR, a half dozen dental

23  executives, dozens of general medical executives, regional medical executives, and dozens

24  of nursing executives, and corresponding numbers of administrative executives. Although

25  there are nearly 250 civil servant and contract psychiatric physicians statewide in the

26  system (more than the number of dentists and only 60 fewer than the approximately 310

1  general physicians and contractors), there is not a single psychiatry executive in all of the

2  California Department of Corrections (CDCR).

3  Those making the executive level decisions about mental health issues in the California

4  Department of Corrections Mental Health Program    psychologists and non medical

5  administrators    have no knowledge of psychiatric medicine, and they appear often

6  unwilling to take into account the medical knowledge of those of us who work in the

7  department. Their decisions have adversely affected patient care.

8  Whether in terms of seeming to lengthen court mandated compliance timeframes for

9  patients, not accurately reporting about measurements of court ordered psychiatric drug

10  monitoring, or not accurately reporting about whether scheduling, confidentiality of

11  appointments and medication consultation is occurring, there appears to be significant

12  bias in how the results are reported. The psychiatric leadership team is being denied

13  access to this information we need to create good patient care. On the other hand, the

14  leadership of the psychologists, mental health administrators, general medical physicians,

15  dentists, nurses, and medical administrators all have access to this information. Denying

16  our psychiatric physicians access to this medical information about our patients is itself a

17  medical decision, and it is being made by those with no qualification to make such

18  decisions and by those with an apparent propensity to report biased interpretations of the

19  data to the court, the Coleman Special Master, and our psychologists and psychiatrists.

20  **Lengthening EOP and CCC Timelines Beyond Court-Mandated Timelines**

21  If a psychiatric medical doctor writes a medical order that a given patient should have a

22  follow up appointment with a psychiatrist in a certain number of days, the CDCR medical

23  system *should* follow the doctor's order that the patient be seen again in that number of

24  days. Should, but doesn't. When a patient is transferred from one institution to another

25  within the CDCR system, any order for a follow up appointment with a psychiatric

14

1   medical doctor in a given number of days is automatically overridden without any

2   consultation with any medical doctor. That is how the system is designed.


3   Imagine a patient at what is called the CCC level of care, our lowest level of intensity of

4   mental health care. Assume the doctor has scheduled a follow up appointment with the

5   patient for, say, seven days later, because the patient needs to get blood drawn and the

6   doctor needs to review the lab test results. Suppose that the patient is then transferred to

7   a different location five days later. Were the doctor's order being followed, the patient

8   would be being seen by a psychiatrist two days after arrival at the new institution.

9   Nonetheless it is typical in the CDCR system for the admitting non medically trained

10  psychologist to override such a doctor's order and instead schedule the patient to see a

11  psychiatrist 90 days later, the court ordered *maximum* interval between appointments for

12  patients at this level of care.


13  When a psychologist overrides a physician's order, he or she is, in effect, determining

14  from his or her own assessment, whether a patient needs medical consultation or not, for

15  a given set of lab values and a given physical and psychological presentation. But that is

16  precisely beyond the scope of psychologists, since knowing what is a relevant medical

17  issue is something determined by physicians.[ii]


18  A given lab value in the normal range (yet rising) might be nothing to worry about, or in

19  some cases it can indicate very significant danger. For example, liver function studies

20  could go up after starting valproic acid, and while still being in the normal range when

21  rechecked, they might nevertheless be headed rapidly higher, indicating pending hepatic

22  failure from valproic acid toxicity. Just looking at whether a lab value is in the normal

23  range or not is insufficient. When the lab test numbers go up a bit at first, it could be a

24  lab error, or not clinically significant, or it could be dangerous. Because the medication is

25  needed the psychiatrist will not stop the medication without more information and so

26  orders a new blood level test and schedules a follow up appointment for seven days later.

1    But when the transferred from one institution to another the patient will typically be

2    scheduled to be seen around 90 days later by the psychologist at the CCC level of care,

3    effectively causing the patient to be evaluated 95 days later with such a rising lab value,

4    rather than the seven days later that the physician had ordered.

5    Note that the lab itself would not necessarily notify anyone either, because a *dangerously*

6    *increasing* lab value can be still *within the normal range* when checked.

7    In fact, this practice (psychologists rescheduling patients to be seen by a psychiatrist later

8    than the previous doctor who saw the patient had ordered) has been the norm for years,

9    and appears not to have been reported to the court. When patients switch institutions

10   within CDCR, a psychologist makes the determination of when a patient should be next

11   seen by a psychiatric physician, not the psychiatric physician who last assessed the

12   patient and made an independent medical determination of when the next

13   medical/psychiatric assessment should occur.

14   Suppose a psychiatrist in the CDCR system writes a medical order that a patient be seen

15   next 90 days later, the maximum interval allowed by the court for a patient at the CCC

16   level of care. Suppose that on day 80 the patient is transferred to a different CDCR

17   institution. The CDCR system again typically overrides the doctor's medical order that

18   the patient be seen on day 90.

19   The doctor ordered the patient to be seen back in 90 days, which would be ten days after

20   the patient has been transferred to the different CDCR institution. Instead of the patient

21   being seen ten days after transfer in accordance with the doctor's medical order, what

22   typically happens in CDCR is that a psychologist at the new institution creates a new

23   order, overriding the medical order of the doctor at the previous institution. Just like as

24   discussed with the rising lab value, the patient will typically be seen by a psychiatric

1   physician approximately 90 days *after arrival at the new institution, irrespective of what*

2   *the psychiatric medical doctor who last saw the patient has ordered.*

3   This is about 80 days later than the psychiatrist's medical order had said the patient

4   should be seen (about six months after the patient was seen last), and it is also about 80

5   days later than the court ordered maximum time between visits, a total of 170 days later.[iii]

6   This lengthening of intervals between psychiatric appointments allows patients to be seen

7   by a psychiatrist up to 100% later than the maximum court ordered Program Guide

8   intervals, though the quality managers consider such appointments to be compliant with

9   the intervals allowed by the court (e.g., 90 days at the CCC level of care).

10  This same assumption allows patients at the more intensely monitored EOP level of care

11  to be seen up to nearly 60 days after an appointment if the patient is transferred from one

12  institution to another, rather than just 30 days after an appointment, the court ordered

13  maximum for this level of care.

14  Actually, it can be *more* than 100% later. If a CCC patient is transferred multiple times,

15  there might well be an interval of nine months between one psychiatrist appointment and

16  another, yet despite that being six months more than the court mandated maximum

17  interval, CDCR counts that appointment as being compliant. They reset the clock each

18  and every time a patient is transferred from one institution to another.

19  During a recent quality management meeting that reaffirmed this stance, the

20  psychologists present plus the ███████████████ (a psychologist administrator) [iv]

21  and the ███████████████ (an additional administrator) plus several other

22  administrators and all the psychologists present and on the phone in that committee

23  meeting voted that it is fine to violate such medical orders, and indeed that it is fine to

24  violate the court order in that way, too. There are approximately 26 members of the

25  Quality Management Committee and approximately 17 of whom are psychologists who

1    report in a hierarchical relationship to each other. There are only two psychiatrists on the

2    committee and both voted that physicians' medical orders should not be overridden. I

3    asked the committee whether they thought the court monitor, Dr. Jeff Metzner, would

4    agree with countermanding physicians' medical orders and the court order in that way.

5    They laughed and said, "No".


6    I will show that this is part of a regular pattern in which executive administrators and

7    executive psychologists and quality management psychologists in CDCR appear to

8    discount expert medical opinion and make decisions allowing, and even mandating, non

9    medically trained individuals to override doctors' medical orders.


10   Please see the two email exchanges for patient ███ (see 2018 07 27 1634hrs). In this

11   case, a patient was transferred to another institution and if the psychiatrist's order had

12   been followed rather than the psychologist's order overriding the psychiatrist's order, a

13   psychiatrist would have seen the patient before the incident in which the inmate patient

14   attacked another inmate and seriously injured his eye.


15   Although this patient apparently had a psychotic illness, he was refusing the medication

16   he needed all along at the initial intake institution. It is possible that after transfer to the

17   new institution, a psychiatrist might well have been able to convince the patient to take

18   the medicine, or perhaps would have noticed enough paranoia or other psychosis to get

19   the patient to a crisis bed.


20   Patients who have been taking medication outside prison, as this patient apparently was,

21   sometimes have been doing so because of family or community support, or because they

22   have been getting injections of long acting medications at a mental health center in their

23   community.

1   In this case, apparently a doctor at the jail had managed to get him to take the medicine.

2   When taking medication, a patient may well become coherent, and then, due to their

3   coherence, paradoxically gain the ability to refuse medication when they switch settings,

4   such as when they come to prison to serve a sentence. Medico legally, such patients have

5   demonstrated improved capacity to make decisions about medication taking.

6   Thus, paradoxically, as patients enter our prison system at an intake institution and lose

7   the community support that has been encouraging the medication taking, the very fact of

8   their coherence due to previous medication compliance enables them to successfully

9   argue to the admitting physician that they do not need the medication (or they have a

10   right to refuse it because of their apparent capacity, though the physician might very

11   much want the patient to take it).

12   A patient's apparent coherence, coupled with loss of information as patients transfer care

13   from outside prison to care in prison, makes these times particularly dangerous for

14   patients. Finally, the good effects of the medication often last for several months after the

15   medication has been discontinued, *so the patient in fact does well off (without) medication*

16   for months, seeming to add to the argument that the medication was actually not needed.

17   It is at these times when patients are transferred from our intake institutions to other

18   institutions that our patients are most at risk. Yet our psychologists and administrators

19   voted that even in these situations, the admitting psychologist may override the medical

20   opinion of the physician at the intake institution with respect to when the patient should

21   be seen next after he or she transfers institutions.

22   In this case of patient ▇▇▇, a psychologist overruled the doctor's order and ordered that

23   the patient be seen later than the doctor had ordered, so the patient was not seen when

24   the psychiatric medical doctor had ordered.

1   In the case mentioned here (see 2018 07 27 1634hrs) the ███████████ at SATF,

2   unaware of many of our executive leadership's views and our two ████████████' views

3   that psychologists should typically override physicians' medical orders with respect to

4   when patients should be seen after patients transfer institutions, wrote:

5    "Hello Everyone,

6   This patient has not been seen since his arrival in May (2018) by one of our psychiatrists?

7   He has had a major incident that could be related to psychosis   he is currently not on an

8   antipsychotic. Why was the patient not seen?"

9   I had to explain to him that, "As I suspected, this patient according to the interpretation

10   of a quality management (QM) committee vote, did not need to be seen sooner." (see

11   2018 07 27 1634hrs)

12   The psychologist ordered a psychiatric appointment for the patient nearly three months

13   after his arrival in May, which would be some time in August, which had not yet passed. I

14   had to explain to this ████████████ that our psychiatrists want every patient who is

15   transferred from one institution to another to be assessed by a psychiatrist within 14 days

16   of transfer (and ideally it should be within a week), but that during the quality

17   management meeting our █████████████████ had said in front of the quality

18   management committee that that would negatively impact the workload of the

19   psychiatrists and so would be an issue to be reported to labor (i.e., the union). She

20   subsequently voted that CDCR should not follow physicians' orders for when patients

21   should be seen next.

1  Had the last physician's order been followed, patient ▮▮▮▮ would have been seen long

2  before the dangerous event (see 2018 07 30 0925hrs). But instead, a psychologist's order

3  was followed, overriding the doctor's order.

4  As Dr. ▮▮▮▮▮▮▮▮ says, "*if the psychiatrist's order had been followed* to see the

5  psychotic patient, who was relatively recently off medications, the patient *would have*

6  *required an appointment by 6/24/18*, about a month after transferring to SATF" [emphasis

7  mine, MG] (and well before the incident on July 26, 2018) which itself was before the

8  August meeting in which our non medical psychologists and executive voted that this

9  type of patient be seen later than the psychiatrist (i.e., medical doctor) may have ordered.

10  Patient ▮▮▮▮ arrived at SATF on 5/29/18. Had this patient been seen within 14 days, that

11  would have been before the middle of June. Had this patient been seen when the

12  psychiatrist had ordered, that would have been in late June. Instead, the psychologist

13  ordered that the patient be seen in August. This August appointment violated both the

14  psychiatrist's medical order, and also the maximum interval between appointments

15  allowed by the court ordered mandate.

16  Dr. ▮▮▮▮▮ says, "His history…. suggest[s] a patient who requires more frequent

17  psychiatric intervention. Also concerning is the discontinuation of Zyprexa without

18  regular follow ups to evaluate for decompensation. He was seen by psychiatry on 3/29/18,

19  4/25/18, and 7/27/18." Only after the incident in which the patient injured another

20  patient's eye was a psychiatrist called to see the patient on 7/27/18. (see 2018 07 30

21  1002hrs)

22  The records made available to the Coleman court appear to me and my team to

23  consistently overestimate our compliance with court ordered timelines for just about

24  every mental health patient who transfers institutions. One hundred and seventy days is

25  not 90 days. Therefore, the so called "timeliness" measure of psychiatric appointments

1    overall has overstated our compliance. Furthermore, our leadership knows about this, as

2    the HQ psychiatry team has informed them.


3    This overstating of our compliance has not only occurred on the Dashboard (CDCR's self

4    monitoring tool). Compliance figures given to the Special Master, and apparently directly

5    to the court, appear to have overstated CDCR compliance in the 2018 staffing plan figures

6    (see 2018 08 23) and in the 2017 figures (see 2017 03 30).


7    The 2018 data (see 2018 08 23) says that routine CCCMS mainline patients are seen in a

8    94% "timely" way. "Timely" is not defined in this court report. If we use the percent

9    patient weeks compliant meaning of the word that our Quality Managers routinely use,

10    then "94%" refers to "94% patient weeks compliant" with routine CCCMS appointments.

11    For the 2017 (not 2018) report (case 2:90 cv 00520 KJM DB Document 5591, beginning on

12    line 4 of page 14 of 18) it says (see 2017 03 30 5591 14): "Over the past year, inmates were

13    seen timely by their primary clinician ninety percent of the time, by their psychiatrist

14    ninety percent of the time..."


15    Two of the ███████████ voted for continuing this practice of resetting the

16    appointment due date clock every time a patient is transferred from one CDCR institution

17    to another, and the other ███████████ knows about the vote and allowed it to stand (I

18    myself told her about it).


19    Our quality managers reset the clock for both of these levels of care when patients

20    transfer institutions. The 2017 staffing report combines CCC appointments and EOP

21    appointments. Thus, a patient who has been transferred from one institution to another

22    and only once, might well not have an appointment with a psychiatric medical doctor for

23    six months at the CCC level of care, and yet CDCR would report that as being a compliant

24    appointment having occurred within ninety days. Similarly, again for a patient who is

25    transferred just once at the EOP level of care, CDCR resets the clock and thus reports an

1    appointment happening up to two months after the patient saw a psychiatrist at the first

2    institution as being compliant with the one month court ordered maximum interval.

3    This resetting of the clock every time a patient is transferred thus misleadingly inflates

4    the compliance figures, such that it is not true that 94% of CCC appointments were

5    timely in 2018 as stated in the 2018 report (see 2018 08 23) and neither is it true that 90%

6    of CCC and EOP appointments were timely in 2017 as stated in the 2017 report (see 2017

7    03 30) to the court.

8    But CDCR does not only reset the clock every time a patient is transferred to a different

9    institution and report as compliant appointment intervals beyond the court ordered

10    maximum intervals, they also have in the recent past lengthened the maximum interval

11    they allow between appointments for patients remaining in one institution.

12    **Lengthening EOP Timelines by 50% More than Court-Ordered Maximums (even**

13    **with no transfer of institutions).**

14    The EOP level of care for mentally ill patients in our prisons is a more intense outpatient

15    level of care for those with more severe mental illness. For example, many patients with

16    schizophrenia are at the EOP level of care, not the CCC level, as are those who are more

17    frequently suicidal. As stated, the court mandates that EOP patients be seen at least every

18    month by a psychiatrist.

19    Around March and April of 2017, our headquarters psychiatry team noticed that all the

20    psychiatrists across the institutions seemed to be doing better in terms of seeing EOP

21    patients in a more timely way. (The difference between seeing patients "on time" and

22    "timely" is itself a fascinating story which I describe below.)

1   We discovered that in December 2016, our psychology QM colleagues had decided to

2   change what they would deem to be a compliant interval between appointments from the

3   court ordered one month maximum interval, to up to 45 days, without telling the

4   psychiatry leadership team or, it seems, the court. That made the psychiatrists' EOP

5   timeliness with appointments appear much more compliant than before. But it was just a

6   difference in the way the calculation was made.

7   It took the psychiatric leadership team from about December 2016 to March 2017 to figure

8   out what our executive psychologist/QM team had done or had allowed to be done. We

9   had to painstakingly look at chart after chart to discover how the reported information

10  had been changed, attempting to establish, first, if something had in fact changed, and if

11  so, how it had changed, and the implications of the change. We needed to understand

12  how the new methodology changed the medical interpretation of the compliance rates we

13  saw. Being "compliant", after the change, no longer meant the same thing it had meant

14  before the change. Please see the note from Dr. ██████ describing the full implications

15  of her and our discovery. (see 2017 04 12 1316hrs)

16  It is interesting that our QM executive and psychologists seem to have overshot the mark

17  that even they were trying to achieve. Instead of deeming appointments to be compliant

18  at one and a half months (rather than the court mandated one month), they actually

19  managed to make certain types of the EOP appointment show as being compliant even at

20  nearly two months   nearly twice the maximum interval permitted by the court   if the

21  appointments were scheduled at particular times of the month. Dr. ██████ shows how

22  an EOP patient could be seen twice in nearly four months and how our QM colleagues

23  reported that as compliant with EOP monthly time frames in which a minimum of four

24  (not two) appointments should have occurred (see 2017 04 12 1316hrs).

25  When we asked, the executive psychologist head of QM admitted that she had not told

26  the court. Her reasoning can be seen in her email from the end of March 2017 in which

1   she says, "No we don't tell them about every change. Since they use our numbers I do let

2   them know when we make a major change that has significant impact." (see 2017 03 22 x)


3   Apparently, our head of QM genuinely thought that changing an EOP time frame from

4   one month to 45 days would not have a significant impact; that is, she must have thought

5   that increasing allowable appointment intervals to 50% more than the maximum interval

6   permitted by the court, across a system with thousands of patients, would have no

7   significant impact on data reported to our physician psychiatrists and the courts.


8   This practice of unilaterally deciding that 45 days is the same as the court's mandated one

9   month went on from December 2016 until at least April 2017, when we discovered it and

10  demanded that they change it back. I told our senior executive about it. Finally, I wrote a

11  private message to her, letting her know that this was truly problematic. In fact it was

12  changed back because of this insistence.


13  Note again from CDCR's 2017 staffing report (see 2017 03 30) the column called "Timely

14  Psychiatry Contacts: (Access to Care Banner) 8/1/2016 1/31/2017". As discussed previously,

15  these figures are very likely mistaken because they allow appointments to occur at greater

16  intervals than Program Guide timeframes when patients transfer institutions. (Note also

17  that the figures lump together CCC and EOP. EOP timelines were included in these

18  figures. I will explain why this is relevant later.)


19  Given that the EOP calculation strategy was changed in December 2016 to allow

20  appointment frequencies beyond the court ordered maximum one month interval (to 45

21  60 days), it is very likely that the EOP appointments for December and January were

22  measured as compliant at from 45 days to 60 days, rather than the court mandated one

23  month, and that they were reported as compliant to the court. The compliance timeframe

24  was increased even if the patient was not transferred from one institution to another.

1    It is quite possible that the change made in December was retroactive for many months,

2    as many of these changes are, so it is entirely possible that all the EOP timeframes

3    (8/1/2016 1/31/2017) had been increased (not just 12/1/2016 01/31/2017) from the court

4    ordered maximum of one month, up to 1½ to two months. Thus, the numbers reported to

5    the court in 2017 are apparently mistaken for this reason as well. Someone should

6    carefully ask whether EOP timeframes were increased even for patients not being

7    transferred between institutions.

8    **Summary So Far**

9    I have now mentioned that in CDCR's reports to the court the percent patient weeks

10    compliance numbers appear better than the reality

11    1.  Because our quality management colleagues reset the clock when patients transfer

12        institutions, so the allowable time increased up to 100% over the court ordered

13        maximum intervals between psychiatry appointments.

14    2.  And for the EOP calculation strategy, even for patients remaining in a single

15        institution, CDCR Mental Health QM allowed a 50% (in certain cases up to 100%)

16        increase in timeframes they reported as being compliant for EOP patients, until the

17        psychiatry team managed to get this change reversed later in the year.

18    **Combining CCC And EOP Compliance Figures To Mask Poor EOP Compliance**

19    Note something else about the compliance timeframes (see 2017 03 30). Those reporting

20    to the court combined CCC and EOP patients. That is relevant because usually EOP

21    patients are much more difficult to see in a timely way, and CCC patients are far more

22    numerous, so the relative success with the CCC patients masks the relative lack of success

23    with the EOP patients when they are numerically combined. (See for example 2018 09 04

24    1830hrs.) Overall, for CDCR in June 2018, EOP "percent patient weeks compliance" with

26

1   timely appointments was reported to be only 83% (vs. 95% for CCC), while at CHCF, EOP

2   compliance was reported to be only 78% (vs. 85% for CCC). Combining the two thus

3   serves to obscure the poor EOP compliance.


4   Please also note both pages of document 2018 07 26 1053hrs. Notice that CDCR Quality

5   Managers eliminated a simple filter option which allowed one to distinguish for

6   institutions between "Timely Psychiatry Contacts" between CCC and EOP. It used to be

7   there, but sometime around May or June of 2018 (we are not sure when), this option was

8   eliminated. So when evaluating institutional timeliness at the CCC and EOP levels of care,

9   the report returns one timely indicator for CCC and EOP combined, the usually lower

10  EOP numbers masked by the higher CCC numbers.


11  Someone without computer skills looking for information about timeliness of EOP and

12  CCC psychiatry appointments and consults in individual institutions in 2018 would have

13  difficulty finding such information, because CDCR did not report individual timeliness

14  figures. Someone should ask why that filter disambiguating the timeliness of EOP and

15  CCC at institutions was removed. The question is especially relevant given that 2018 EOP

16  timeliness figures are for unknown reasons just not reported in the CDCR staffing report,

17  at all. Coleman monitors might have wished to directly check the Dashboard numbers to

18  see which institutions were reporting timely EOP contacts, but would have been thwarted

19  because the filter was removed. Someone should ask why that useful filter was hidden.


20  If one takes into account the biases already discussed, the EOP figures (2017 03 30),

21  would likely be significantly lower.


27

**More Medically-Urgent Appointments Not Counted As Being Late**

Finally, there is a third biasing error: CDCR won't count any appointments as being late, if they are

  1. more medically urgent,

so

  2. scheduled more frequently than existing Program Guide timeframes to provide adequate care.

When such an appointment is missed, as long the next appointment occurs within the *maximum* Program Guide interval, the missed appointment isn't counted as missed or late (see discussion of this later in this document).

**Misleadingly Good Numbers**

Utilizing

  the reset the clock bias when transferring patients between institutions, plus

  the increase the EOP time frame to 45 days bias (in 2017), plus

  the more frequent than program guide appointment can't be late bias, plus

  the counting appointments that were not appointments bias (discussed later), and plus

  the combining more compliant and more numerous CCC patients with EOP appointments bias (in 2018), while

  eliminating altogether the EOP's measurement of lateness in the 2018 staffing report,

made the data appear reasonably good in 2017 (see 2017 03 30), and in the 2018 staffing report (see 2018 08 23). But the figures as reported are simply incorrect.

28

1    The psychiatric leadership team could calculate precisely what the accurate figures would

2    be if we had access to the database, but our requests for access have been denied.[v]

3    As mentioned, there is no report of EOP timeliness in the 2018 staffing report to the

4    court, while we know that EOP "timeliness", as reported on the Dashboard but not to the

5    court, is both lower than the CCC value and itself biased for the reasons given above.

6    **The Implications For Psychiatry Staffing**

7    Whether patients are seen on time at the EOP level of care is relevant to determine

8    whether there is adequacy of psychiatric staffing. Alternatively, getting patients

9    successfully moved from their cell to the offices of psychiatrists to be seen, would also

10    enable timely contacts, even with no increase in staffing numbers.

11    If one examines the current Dashboard to try to understand the EOP timeliness, and if

12    the biases mentioned above were eliminated[vi], the 83% EOP *Dashboard* report (not

13    staffing report) for 2018 psychiatric appointment timeliness would be far lower than the

14    83% reported. For example, in June 2018 (see 2018 09 04 1830hrs), EOP timeliness was

15    reported as being 83%. The real figure would be far lower were the biases listed above

16    eliminated.

17    Low compliance figures would demonstrate either inadequate staffing or inadequate

18    organization such that patients are not being brought to their psychiatry appointments as

19    scheduled, on time and in confidential offices.

1    **Medication Monitoring Biases (also reported to court)**

2    Appropriate psychiatric care includes monitoring psychiatric medications, including

3    checking patients' medication blood levels as appropriate, and measuring the potentially

4    adverse effects of medications on organ function. The court has mandated a MAPIP

5    protocol that includes keeping track of these measurements in a particular way.

6    My HQ psychiatry team and I have concerns about how CDCR was reporting our

7    compliance with the MAPIP lab reporting metrics. We have raised these concerns with

8    our HQ administrators (see 2018 01 16 1409hrs). These metrics report whether

9    appropriate labs have been drawn and whether various physiological parameters (e.g.,

10   weight and blood pressure) are being obtained, so as to safely utilize medication. Before

11   July 2018, the patients appeared to be doing better than we might have expected. If CDCR

12   were reporting accurately the measuring of lab values for patients on psychotropic

13   medications, we would expect the reported compliance to be lower than it was.

14   Ultimately, we found that only those patients who had been on the same class of

15   medication for the last year were considered for inclusion in the compliance measure.

16   And then, even if only one measurement was made in the year, as opposed to the

17   multiple measurements actually required, CDCR Mental Health deemed that to be

18   compliant with MAPIP requirements.

19   Patients who had switched medication classes (and thus required multiple

20   measurements) were excluded from the analysis before June 2018. Those switching

21   medication classes are precisely those most at risk of having problems with medications

22   they are taking and so are precisely those patients who need the monitoring more.

1   Those patients who switch medications are more at risk because the explanation for the

2   switch is often that the medication was causing a side effect (so might not be at the right

3   level) or possibly the patient was not taking it or not taking it appropriately. In addition,

4   more medication switching may create more risk of toxicity because each drug class has

5   its own set of risks.

6   I have no doubt that programming at least one of the MAPIP recordings was difficult. For

7   example, measuring whether physicians checked a blood level when medication doses

8   were changed. Indeed, we are not measuring that at present because of that genuine

9   difficulty.

10   I also have no doubt that it can be very reasonable to start with something easy, so that

11   compliance can be easily achieved before moving on to something more difficult. For

12   example, as I show below, in effect, the original MAPIP measurements were considered to

13   be compliant if the physician had drawn only a single measurement in the year after the

14   medication was started.

15   For the patient to be included in the analysis, CDCR deemed that the physician *needed to*

16   *have a full 12 months* to obtain a single blood draw for analysis. (see 2018 07 03 m) If there

17   was not a full year in which to get the one blood draw done, because the medication was

18   changed to another one during in the year, then that patient's data was excluded in the

19   calculation of whether there was lab test compliance was with respect to either drug. So

20   those who needed the measurement most, and who were least likely to have the

21   measurement done, were not included in the MAPIP calculations.

22   By excluding all of these somewhat more difficult to make measurements because there

23   had been less than a full year in which to do the blood test, very high compliance rates

24   could be recorded, as reported to the court [case 2:90 cv 00520 KJM DB Document 5591

25   page 14 of 18, beginning line 7]. (see 2017 03 30 5591 14)

1   We appear to have been failing to report straightforwardly to the court for years that we

2   were not measuring compliance with any of the laboratory drug monitoring MAPIP

3   criteria in the case of patients statistically most likely to need it.

4   Note that from the Defendants' Response to the Special Master's Report on the Status of

5   Mental Health Staffing and the implementation of Defendants' staffing plan, from March

6   30, 2017, [case 2:90 cv 00520 KJM DB Document 5591 pg 14 of 18, beginning line 7], the

7   following:

8           To ensure medication monitoring for its patients, CDCR uses a detailed

9           monitoring tool titled "Medication Administration Process Improvement Process."

10          This tool facilitates necessary and appropriate systemic monitoring of medication

11          management, including blood levels, for the following types of medications: (1)

12          Antipsychotics; (2) Clozapine, (3) Mood Stabilizers, including Carbamazepine,

13          Depakote, and Lithium; and (4) Antidepressants. CDCR clinicians generally

14          maintain high levels of compliance, with most institutions achieving compliance

15          above the ninety fifth percentile. (Tebrock Decl. 11, Exh. 1.) CDCR's systemic,

16          statewide compliance with its medication administration measures totals ninety

17          six percent over the past twelve months.

18  In terms of using a "detailed monitoring tool" that facilitates "necessary and appropriate

19  monitoring" of medications and that "compliance with its medication administration

20  measures totals ninety six percent", it seems that this "detailed" analysis included only

21  one of the four court required blood draws, as specified earlier.

22  For many of the medications, CDCR already utilizes a lenient standard, requiring just four

23  blood draws due to difficulties in the prison population in getting compliant blood draws.

24  For example, the National Health Service of Britain suggests weekly monitoring of lithium

25  blood levels (see 2018 08 28) when a patient is being started on the medication. For

1   lithium and many other drugs, CDCR and MAPIP just require a baseline blood

2   measurement, a measurement at three months, a measurement when the dose is

3   changed, and an annual measurement ("annual" in CDCR means between three months

4   and 12 months).

5   There is a caveat about MAPIP in small print on the exhibit provided by CDCR (see 2017

6   03 30) which says: "Percentages in this column represent the average compliance for

7   MAPIP Measures 1A 1G. These measures do not capture MAPIP Measure 1A 1G that are

8   baseline, 3 months or triggered by medication dose change."

9   For "1A 1G", each letter refers to different drugs. This statement in smaller print at the

10  bottom of the page seems to be saying that for the drugs for which the measurements

11  were recorded, of the four required MAPIP blood draw measurements when a medication

12  is started, three of the four are not included in the compliance reports. They did not

13  include the "baseline requirement", the "3 month" requirement, or the requirement for

14  checking blood draws when "triggered by medication dose change".

15  But even with these caveats it's still not right.

16  The annual measurement is the fourth measurement. It is *defined* in the MAPIP protocols

17  as a measurement that occurs 91 days to 365 days after the start date (for example see

18  2018 09 04 1700hrs). Actually, before 2018, it was defined as anytime in the year after

19  starting the medication. (see 2018 07 03 m) After reading the above caveat, it is the only

20  measurement left to enable any of the compliance calculations to be made in the table

21  presented, because the caveat eliminates the other three mandatory blood draws in this

22  "detailed monitoring tool". But actually, that measurement wasn't being followed either,

23  as explained below.

33

1   Does the fact that CDCR is not doing and reporting most of the required measurements

2   explain how CDCR overall reports such high compliance numbers in the table? Does that

3   explain the reported, "high levels of compliance, with most institutions achieving

4   compliance above the ninety fifth percentile"?

5   Not fully.

6   What is not even hinted at in the report to the court is that in addition to skipping

7   measurements of three of the four required blood draws in all of the patients, some of the

8   patient data was eliminated entirely from the reported analysis, namely, that of patients

9   who were not on a given medication for an entire year. Those who were not on a

10  medication for an entire year are precisely those who are less likely to have had even one

11  measurement done, because there was less time in which to get the blood drawn.

12  By screening out eligible patients who did not have the very highest likelihood of having

13  just a single correct measurement done (out of multiple needed), and thus only in fact

14  including in the analysis a small proportion of the population that should have been

15  included, CDCR reported "detailed monitoring" and "high levels of compliance, with most

16  institutions achieving compliance above the ninety fifth percentile".

17  The MAPIP calculations have subsequently been updated and released this July 2018 to

18  somewhat more accurately reflect the actual court ordered MAPIP rules, although the

19  rules CDCR is following are still more lenient than the court rules.

20  This change in reporting has made a dramatic difference. Since the change, virtually all

21  the court ordered blood measures (including drug monitoring for antipsychotics, valproic

22  acid, lithium, and carbamazepine) have turned "non compliant" (all red, most below 75%)

34

1   statewide. Though we were utterly non compliant, the reports to the court in previous

2   years were that we were virtually completely green (above 90%).

3   Moreover, the court needs to still be aware that we are not actually measuring

4   compliance in accordance with important parts of the MAPIP criteria. For example, when

5   we change the dose of a given drug, new drug levels and new blood measurements to

6   check for organ toxicity need to be made.

7   The MAPIP blood measurements are still not being made in one important way. We

8   encourage our psychiatrists to do what is right and good. But we are not yet measuring

9   whether psychiatrists are getting blood drawn when doses of medications are being

10   changed that require a blood draw, even now, though that is a critical part of MAPIP. So

11   whatever low level of compliance we are reporting now, our actual compliance with court

12   mandated MAPIP measurements is even lower.

13   Unfortunately, errors in reporting whether appointments are timely and whether drug

14   monitoring has occurred are not the only errors CDCR has made which seem to create

15   bias in terms of over reporting compliance. There are significant problems with the

16   Dashboard as well.

17   **Missed Scheduled Appointments**

18   Our quality management psychology team has provided an easy way of discerning

19   whether appointments at given levels of care, across levels of care, at a given institution,

20   or across institutions, are on average being seen as scheduled.

21   Please see the Appointments Seen as Scheduled report about CHCF (see CHCF 2018 07

22   ASAS). This report describes mainline CCC patients scheduled to be seen in the mental

35

1  health program by psychologists, psychiatrists, and other mental health providers. The

2  claim, as written in the report, can be seen below (CHCF 2018 07 ASAS)

3  Denominator = *All scheduled appointments* [emphasis mine, MG]

4  Numerator = All appointments from the denominator that were completed as seen.


5  The quality management psychology team (or those who direct them) would seem to be

6  claiming, based on what they are reporting and saying, that their report is calculating the

7  percentage of "all scheduled appointments" that are seen at the entered level of care and

8  location. In the case illustrated (CHCF 2018 07 ASAS) it would appear that 98% of all

9  scheduled mainline ("ML") CCC appointments were seen as scheduled at CHCF in

10  February. That sounds pretty good.


11  Indeed, this is what our colleagues think when I have asked them to look at the report.

12  What should they think? That is what the report and all similar ones about different

13  institutions and contexts say is being measured.


14  The report from SAC about February 2018 says that 91% of patients came to their

15  appointments as scheduled. (see 2018 07 30 2057hrs).


16  There is a different way of getting the information, from which one can try to calculate

17  the same statistic. However, it requires exporting into an Excel spreadsheet the

18  information about each and every individual patient appointment that occurred that

19  matches the search criteria, then checking whether the appointment is marked as having

20  occurred as scheduled or not, grouping all those appointments (conceptually) together in

21  terms of which are alike and different, and then calculating what percentage of the total

22  number of appointments the grouped appointments comprise.

1   Dr. ▮▮▮▮▮ writes: "There is a report called "Appointments" that allows for searching a

2   specific institution (or all of CDCR), program, date range, and appointment type, and

3   getting a list of all appointments that meet the search criteria. For example, I searched

4   CDCR, ML CCCMS, psychiatrist contacts on 7/10/18 with all outcome types, and received

5   a table with 955 rows (954 patient appointments). I then changed the outcome type to

6   "cancelled", "refused", or "pending" (all of the outcome types except "completed"), and

7   received a table with 461 patient appointments. So on 7/10/18 in all of CDCR, the

8   percentage of scheduled psychiatry appointments that were missed was 48%, or to put it

9   in performance report terms, the percentage of Appointments seen as scheduled was 52%.

10  This doesn't include the appointments that were just rescheduled by schedulers without

11  marking them as cancelled, but there's no way to track that. However, this is definitely

12  not a quick or easy way to obtain appointment data." (see 2018 08 13 1450hrs)


13  Dr. ▮▮▮▮▮ is describing how she got a report about the percentage of psychiatry

14  appointments that had occurred (not including other mental health providers) for all

15  CCC appointments in CDCR on 7/10/18, by importing each individual appointment that

16  had occurred into an Excel spreadsheet and then making a calculation.


17  Unlike using the Appointments Seen as Scheduled Report (that is easy to use), it is

18  unlikely that Coleman monitors, Chief Psychiatrists, CEOs, etc. will be checking too

19  frequently (or at all) for whether appointments were seen as scheduled in their institution

20  using the methodology that involves exporting appointments into several thousand page

21  Excel spreadsheets, as Dr. ▮▮▮▮▮ describes.


22  But our team did. Using this complex non "quick or easy way to obtain appointment

23  data" for SAC for mainline CCC for all providers (for example psychiatrists, psychologists,

24  etc.) in February 2018, we found that only *22% of appointments were seen as scheduled.*

25  For the first page of hundreds of pages of Excel Spread Sheet printed out, see page 3 of

26  2018 08 22 0900hrs. But the Dashboard report (see page 2 of 2018 08 22 0900hrs) claim

1   was that 87% of "All Scheduled Appointments" were seen as scheduled in February of

2   2018 at SAC mainline CCC.


3   Clearly, 87% is not 22% at SAC (for all mental health providers at the CCC mainline level

4   of care in February). The psychiatry team suspects that the 22% figure is the more

5   accurate one, though the 87% figure is presented on the Dashboard, because the 22%

6   figure was calculated from a table with hundreds of rows, actually listing *all* of the

7   scheduled appointments, which we could count one by one, to see which scheduled

8   appointment were marked as completed or not.


9   One can do the same type of calculation for all of CDCR Mental Health CCC mainline

10  appointments statewide, not just for SAC. The CDCR Dashboard report claims that 95%

11  of all scheduled mental health appointments at the CCC mainline level of care, for all

12  provider types, were seen as scheduled in February (see page 1 of 2018 08 22 0900hrs).

13  But we looked at each appointment that occurred individually as well. The full analysis

14  for this would be too large to physically attach to this document, as it would require an

15  attachment of many hundreds of pages to list all 84,120 appointments. But this list could

16  be provided if there were an interest. Our team could downloade this list into an Excel

17  Spreadsheet to make the calculations. (For the first page of our Excel download, see page

18  4 of 2018 08 22 0900hrs.)


19  Whereas at SAC, 22% of patients were coming to appointments for social workers,

20  psychologists, psychiatrists, etc., statewide it appears CDCR (for all institutions) was

21  doing better, with 42% of appointments being seen as scheduled for all mental health

22  providers at the CCC level of care (35,642 appointments seen out of 84,120 total

23  appointments). But the Dashboard calculation is that 95% of patients are being seen as

24  scheduled statewide at the CCC level of care.

1   Ninety five percent is very different from 42% for all providers statewide at the CCC level

2   of care. Furthermore, the 42% seems to be more accurate, though the 95% figure is the

3   one published on the Dashboard.

4   These reports of scheduled appointments that are completed seem to report greater

5   compliance than is in fact the case. These inaccurate reports are easily accessible to the

6   Coleman monitors, our psychologists, our Chiefs of Mental Health and our psychiatrists,

7   to enable them to judge our scheduling system, and they appear to be grossly inaccurate.

8   Concerning the whole process, Dr. ███████ says:

9   "It is odd, and I don't understand why Appointments seen as scheduled is so high [using

10   the *Appointments Seen as Scheduled* report, MG]. When I drill down on Appointments

11   seen as scheduled, the only options it shows are Seen, ProviderUnavailable,

12   ModifiedProgram, and TechnicalDifficulties [I have attached a screenshot (see 2018 07

13   30 2057hrs)]. There are several other options to choose from when cancelling an

14   appointment [when one uses the EHRS system, MG], including IP (inmate patient) No

15   Showed, IP Refused, Scheduling Error, etc., so it appears they do not include any

16   appointments with those outcomes in the denominator. But that is so illogical I am

17   doubting myself." (see 2018 07 31 1346hrs)

18   So the overwhelming bulk of patients who do not come to appointments as scheduled

19   somehow don't count in a measure of patients who do not come to appointments seen as

20   scheduled. Those patients who would make the appointments seen as scheduled

21   percentage lower are not included in the measure, though the reports say "All Scheduled

22   Appointments". Those inmates who, for example, "refuse" or "no show" and in which

23   there are "scheduling errors", are somehow just eliminated in measurements of whether

24   scheduled appointments occur.

1   And even whether patients actually "refuse" or not to come to appointments is a very

2   complicated question, since we know that different prisons are considerably better or

3   worse at getting patients to appointments. Some patients undoubtedly do refuse, but

4   many don't, which is a separate but also a very interesting question worthy of exploration.

5   The report of the psychiatrist Dr. ███, whom I followed at SAC, is instructive (see

6   2018 07 18 R). He documents what we heard as we spoke to patients and it certainly

7   appears that at least several did not refuse, though they were documented as having

8   refused or moved to a different day (discussed below). So the data very likely over

9   estimates patient refusals as well, even if included in this measure.

10   But there are even more oddities in how the individual appointments are tabulated, even

11   when we evaluated each and every appointment in a tabulated form.

12   Dr. ███ says (see 2018 08 14 1340hrs): "Per Dr. ███ write up that you attached,

13   he had 11 patients scheduled to be seen on 7/9/18    4 came and were seen, 6 did not come

14   and were not seen, and 1 was out to court and was not seen. I have attached a screen shot

15   of the Appointments report for Dr. ███ on 7/9/18, which shows he only had 5

16   scheduled appointments, 4 of which were seen.

17   It appears that the scheduler[vii] moved the appointments that were not seen on 7/9/18 to

18   the schedule for 7/10/18, instead of marking them as refused on 7/9/18 and rescheduling

19   them. This is a huge problem for two reasons: 1) Those 6 appointments were NOT seen as

20   scheduled, so the Appointments seen as scheduled percentage should be 36% (4/11), but

21   by erasing any record of them from the 7/9/18 schedule, the Appointments seen as

22   scheduled reported percentage is, erroneously, 80% (4/5); and 2) Those 6 appointments

23   should have been marked as No Shows/Refusals, making the appointment refusal rate

24   55%, but since there were just moved to a different day, the reported refusal rate is 0%."

1  Schedulers should be labelling such appointments as "cancelled", "refused" or "no show",

2  but are instead simply moving the appointments to a later date in such a way that there is

3  no indication that there ever was an appointment on the original date. Thus, the

4  appointments occurring as scheduled figures even in our own calculation are

5  inaccurately high, because we have no way to identify cases in which appointments have

6  been moved to later dates without leaving a record of the original appointment dates.

7  Indeed, when I recently visited SAC in July 2018, Dr. ███ and I listened (and I was in

8  disbelief) when the psychiatrists told us about this process and indeed explained those

9  who make appointments for them had recently been retrained to move appointments

10  exactly as described above. Obviously, this type of thing also creates questionable reports

11  to the Coleman monitors and our leadership.

12  Dr. ███ continues (see 2018 08 15 1004hrs): "The only reasonable argument for

13  excluding some of the appointments from the denominator is that the system auto

14  cancels appointments when a patient has been moved to a different institution after their

15  appointment was scheduled but before their appointment occurred. If auto cancellations

16  are removed from the denominator, then the percentage of appointments seen as

17  scheduled becomes 46% [a 4% difference from 42%, for all mainline CCC in CDCR, MG].

18  However, as we previously discussed this figure does not account for all of the

19  appointments that should have been marked cancelled/refused/ no show but are simply

20  rescheduled to a different date [discussed above, MG]. If we were able to include those

21  cases, the appointments seen as scheduled would be even lower [than 46%, MG]."

22  So it would appear that removing auto cancellations when a patient has been moved to a

23  different institution can in no way explain differences like 95% vs. 46% of CCC patients

24  seen as scheduled and 87% vs. 22% of CCC patients seen as scheduled at SAC. Likely the

25  figure is less than 46% because some of these appointments (vs. many of them?) are not

26  being recorded when they don't occur and are just being moved, as documented above.

41

1    So perhaps at the CCC level of care, conservatively, 40 45% of patients are being seen as

2    scheduled.


3    Dr. ███████ analysis of scheduled appointments that are seen vs. not seen, suggests

4    significant problems with the data portrayed on the Quality Management Dashboard as

5    well as highly significant and relevant clinical issues in getting care to patients. For

6    example, 22% of scheduled appointments were completed as scheduled at SAC in

7    February 2018. There are significant problems, even if one doesn't take into account the

8    appointments that did not occur as scheduled but of which we have no record, because

9    they were simply moved.


10   Moving patients to be seen at later time of the day, let alone another day (without

11   recording that this occurred) is itself problematic. For example, at SAC, when the patient

12   wasn't seen for a scheduled appointment in the morning, during my recent visit there, it

13   meant that the patient was not going to be seen in an office that morning.


14   Instead, in the afternoon, the psychiatrist would be roaming the yard looking for the

15   patient. The earlier appointment in the office did not occur as scheduled, or should be

16   recorded in some way as having not occurred, even if not recorded as "not seen as

17   scheduled". Yet it isn't recorded. This is a problem because failing to see the patient in the

18   morning is adding to the inefficiency of the system, because psychiatrists have to

19   reschedule patients to later in the day and then search to physically find them.


20   This is so even if the psychiatrist is ultimately able to find the patient somewhere on the

21   yard or in his cell and sees the patient on the day that he or she was originally scheduled.

22   In the case of seeing patients after a second attempt on the same day, it is true that the

23   appointment that occurs is still timely relative to when it was scheduled to occur; but the

24   appointment is nonetheless time wasting for the psychiatrist, at the least.

42

1   Taking into account that appointments are being moved and not counted as being

2   rescheduled, optimistically, then, less than 46%    perhaps 40  45% of patients    were seen

3   as scheduled, although this itself could be a major overstatement. The degree of error

4   depends on how widespread the practice is of training schedulers to move appointments

5   to a different day without recording a problem, let alone moving patients to be seen on

6   the same day without recording that any problem occurred. The latter is very common.


7   Imagine a CEO, Court officer, Special Master, Chief of Mental Health, Chief Psychiatrist

8   or anyone else who is working within our system trying to evaluate the health of our

9   system in terms of its ability to get patients seen as scheduled. Overall for CDCR,

10  according to the Dashboard, 95% of mainline scheduled CCC patient appointments are

11  said to occur as scheduled. Let's imagine an average institution that itself has the same

12  Dashboard average as the statewide average, i.e., 95% of mainline CCC patient

13  appointments are said to be occurring as scheduled.


14  Most leaders and line staff in our Department of Corrections, would guess that all is well

15  at that institution for those patients. There certainly could be improvements. But 95% is

16  pretty good.


17  In general, with a Dashboard that looks like that, people would think (and no doubt in

18  reality do think because that is the figure the Dashboard gives) that mental health

19  patients are getting seen, assuming they are being scheduled correctly. If mentally ill

20  patients are being seen as long as they are scheduled to be seen, there appears to be

21  nothing much to fix, so that leads to a lack of action to solve the problem that actually

22  does exist, of patients not actually being seen when they need to be seen. If this goes on

23  for years, with appointments appearing to be happening appropriately in the vast

24  majority of cases despite the fact that in reality, patients are not being seen when they

25  need to be seen, nothing gets fixed for years in terms of trying to get patients to

26  scheduled appointments.

1   Suppose, however, that we now tell the CEO, Court, Special Master, Chiefs of Mental

2   Health, Deputy Directors, Coleman psychiatrists and psychologists, CDCR Chief

3   Psychiatrists, and others interested in improving our system, that the actual percentage of

4   appointments occurring when scheduled is 40 45% not 95%, at the CCC level of care at

5   this institution and statewide.

6   The 40% 45% figure does appear to be a lot closer to the truth than the 95% figure

7   reported by QM, given the reports we ourselves have run. Indeed, our QM psychologists

8   are claiming a figure that is about 100% higher than what appears to be the case. [viii]

9   Surely about 40% 45% of all of our patients being brought to their psychologists' and

10   psychiatrists' CCC appointments is very different from 95% of appointments occurring as

11   scheduled. With a figure of 40% 45%, large numbers of patients are not being evaluated

12   when the psychiatrists and psychologists think they should be, enormous work has to be

13   done trying to find the patient cell side, fewer patients can be seen in the future because

14   the patients who have not been seen need to be rescheduled, extra work is needed,

15   patients are not getting treated when they are supposed to be and thus get worse, etc.

16   For a psychiatric physician or psychologist to be seeing patients at a given frequency

17   means that the patient has to be scheduled to be seen at least at that frequency. If only

18   40% 45% of scheduled appointments are occurring as scheduled, that means that the

19   clinician has to waste enormous amounts of time blocking off time in his or her schedule

20   for appointments not occurring as scheduled, and this destroys his or her efficiency.

21   Alternatively, if he or she schedules far more than the number that will be brought to try

22   to fill his or her schedule, in addition to the waste in resources planning for eventualities

23   that don't occur as others try to get these patients ready, when patients happen to be

24   brought as scheduled, then custody learns that mental health patient appointments will

25   not be occurring as scheduled, because of the unpredictability in psychologists' and

26   physicians' schedules. Officers then become less willing to bring patients in the future,

1    because they end up having to wait because patients are not being seen when their

2    appointments were scheduled to occur.

3    As they adapt to the fact that only 40% 45% of appointments occur as scheduled, less

4    than 50% of the resources are provided to bring patients. Furthermore, since custody

5    never knows which patient will not be available, for example because they have

6    conflicting appointments, then custody may well bring the patients in batches, since they

7    can't count on any given individual patient being seen as scheduled. Indeed, bringing

8    patients in batches happens, for example at SAC, though there is a Receiver's memo

9    saying that it shouldn't, because it discourages patients from coming.

10    And when patients are brought in batches, a far higher percentage of them don't want to

11    come, because they have to wait around to go to their appointments and to return from

12    their appointments. So the refusal rates from patients then goes up. Thus, a vicious circle

13    of inefficient patient care is created.

14    Indeed, we will see that in many environments, for example in the SAC EOP program

15    described later, the whole system has adapted to appointments not occurring as

16    scheduled, ensuring that it won't change without major effort. CDCR reports that 95% of

17    appointments are occurring as scheduled, when in fact half of that is occurring; and in

18    some environments (like SAC), less than a quarter (22%) of appointments appear to be

19    occurring as scheduled.

20    A straightforward presentation of the actual data with no over reporting of compliance

21    would enable important attention to be brought to one of the most critical psychiatric

22    issues: How do we get patients in a timely way in front of psychiatrists (and other mental

23    health professionals) in offices, so they can get treatment? How do we create psychiatric

24    and mental health clinics?

45

1   So instead of presenting biased reports of patients seen, timely or as scheduled, CDCR

2   could have been focused on knowing where the scheduled appointments were not

3   occurring, and devoting executive and other resources to solving the problem. There

4   could, for example, be a regional team of psychiatrists (reporting to psychiatrists so they

5   would be allowed to focus on precisely that problem) who could tour each institution to

6   try to identify and remove obstacles to creating appropriate clinics for psychiatric patients

7   to get care.

8   If the State does not want to hire more psychiatrists because they are expensive, or if the

9   State would have to raise psychiatric salaries to attract more psychiatrists, then surely

10  there should be a focus on using psychiatry resources efficiently, not least by utilizing a

11  clinic model allowing each psychiatrist to see many more patients per day, and by getting

12  patients to their psychiatry appointments.

13  The Statewide Dashboard combines results for Medical, Dental, and Mental Health. On

14  the Statewide Dashboard, but not on the Mental Health Dashboard, it explicitly says (see

15  2018 09 05 1700hrs) that the "Seen As Scheduled" measure "Excludes appointments not

16  seen as scheduled due to patient refusal or similar patient controlled factors, scheduling

17  error; patient transfer; lay in; out to court/medical; pending or "to be scheduled"

18  appointments; walk ins; and appointments scheduled to be seen during the reporting

19  period but not yet closed."

20  This seems similar to the caveat in MAPIP where virtually all of the needed

21  measurements were excluded. (see 2017 03 30)

22  But in addition, the Mental Health Dashboard *does not even say the above*. The mental

23  health Dashboard says that the denominator is "All Scheduled Appointments" which of

24  course *includes scheduled appointments in which patients refused services.* So people

1 looking at the mental health Dashboard would have no idea at all that they are in effect

2 being misled.

3 The purpose of measurement is to clarify and not obscure. Legitimate measurements of

4 whether patients are seen as scheduled are incredibly useful, because they would reveal

5 that in some of our institutions only 22% of patients are getting to mental health

6 appointments and that in most only about 40% 45% are at the CCC level of care. That

7 matters clinically and is significantly problematic (as examples later will show), but those

8 low figures have not been reported. Instead we see these rosy reports of compliance that

9 doctors and our leaders think mean that 95% of patients came to appointments and were

10 seen. But the measurements mean nothing like that at all.

11 This problem of over reporting compliance cannot help but raise concerns. Failing to

12 address the scheduling, and therefore the timing of appointments, prevents adequate

13 psychiatric care.

14 **Appointment Timeliness Revisited**

15 According to the Program Guide, at the EOP level of care, "A psychiatrist shall evaluate

16 each inmate patient at least monthly".

17 It does not say "shall evaluate each patient *monthly*", as it would have if monthly

18 appointments were all that were required. It says "shall evaluate" (are required to be

19 evaluated) "*at least* monthly", which implies that some patients are required to be

20 evaluated more frequently than monthly   those patients who need that care.

21 Yet in its percent patient weeks compliant timeliness figures, CDCR doesn't count a

22 psychiatry appointment as having been late (non compliant) unless it has occurred after

47

1  the maximum interval, i.e., one month at the EOP level of care. This is the case even

2  when a doctor has ordered that a patient be seen for a follow up seven days later but in

3  fact the patient has not been seen until 30 days later if an EOP patient, or 90 days later if

4  a CCC patient.

5  Therefore, all the percent patient weeks compliant numbers reported on the Dashboard

6  to our Coleman experts and CDCR leaders and clinicians and the court about timely

7  appointments appear to be inaccurate in the 2017 staffing report (see 2017 03 30 "Timely

8  Psychiatry Contacts" column) and in the 2018 staffing report (see 2018 08 23

9  "Compliance").

10  Suppose a patient is seen at the CCC level of care by a psychiatrist, and that the

11  psychiatrist orders a return visit in 30 days. Suppose that the patient is in fact seen 90

12  days after the initial appointment rather than in the 30 days ordered. That follow up

13  appointment is actually 60 days late. In its calculation of the average days overdue

14  figures, does CDCR count such an appointment as having occurred 60 days late, or does it

15  deem it not to be overdue at all? And overdue relative to what?

16  In its 2018 staffing report, CDCR claimed that appointments are an average of 2.6 days

17  overdue at the CCC level of care (see 2018 08 23). This figure is so much lower than I

18  would expect given my experience of CDCR, that it seems highly likely that CDCR is not

19  counting as overdue, appointments of the above sort, in which a CCC patient is seen even

20  60 days later than needed per the doctor's order. CDCR has never allowed psychiatric

21  physicians to analyze the data to be sure, but I am confident that this is the case. [ix]

22  When CDCR calculates its timely measure, "percent patient weeks compliant", it does

23  not take into account *when the physician ordered the patient to be seen* in determining

24  whether the appointment was late, as long as the patient was seen within the maximum

25  Program Guide interval. Given that CDCR ignored what the doctors ordered in

48

1   calculating their percent patient weeks compliant figure, it seems very likely that in their

2   calculation of how many days overdue appointments were, they were ignoring doctors'

3   orders with respect to when patients needed to be seen. The 2.6 days figure reported by

4   CDCR to the court is thus very likely falsely low. (see 2018 08 23)

5   Suppose a psychiatrist orders that a CCC patient be seen for a follow up appointment 30

6   days later, and that that patient is indeed seen 30 days later as ordered by the doctor. Is

7   such a follow up appointment occurring as scheduled on time, as any medical doctor

8   would argue, or can it be considered to have occurred early?

9   To arrive at such a low figure as 2.6 days overdue, CDCR must be counting as *early,*

10  appointments occurring earlier than at the court ordered *maximum* interval, including

11  those that occur sooner than the maximum interval *because the doctor has ordered that*

12  *the follow up appointment occur earlier,* i.e., because the patient *needs* to be seen sooner.

13  CDCR is probably also counting as *early,* appointments that actually occur *late* relative to

14  the doctor's medical order, if the follow up appointment occurs sooner than the court

15  ordered *maximum* interval.

16  This 2.6 days figure was presumably obtained by counting as late only appointments

17  occurring after the maximum court ordered interval, and counting as *early all*

18  appointments occurring before the maximum interval irrespective of when the doctor

19  ordered a follow up appointment to occur, and averaging out the figures. In reality, many

20  appointments are late, and many are very late indeed, and this 2.6 days figure seems to be

21  hiding that fact.

22  CDCR has argued that since psychiatrists are seeing their patients in a "timely" way, this

23  demonstrates that the number of psychiatrists is sufficient given CDCR's organizational

24  capacity to use a given number of psychiatrists. But in its calculations of late

25  appointments CDCR has not been counting as late many appointments occurring later

49

1   than the doctor had ordered, and nor has it been counting as late appointments occurring

2   after what is in some cases a very long time indeed, in cases in which the patient has been

3   transferred from one institution to another multiple times. So in fact there may be too

4   few psychiatrists given CDCR's current often inefficient use of the psychiatrists they have.

5   One can see in a simple calculation how CDCR could be counting late appointments as

6   late, even if using the exact CDCR "percent patient weeks compliant" model that our

7   psychology quality managers claim we should use. So even though the psychiatry team

8   thinks that we should (at least also) know the percentage of appointments that are seen

9   on time (though we will never be permitted to have that information unless outside

10  forces demand it), it is possible to use the CDCR method (which makes things appear

11  better) to get some information.

12  Suppose that a patient is seen at the CCC level of care and the psychiatrist orders the

13  patient to be seen four weeks later, but the patient is instead seen 11 weeks later. If CDCR

14  used the percent patient weeks compliant measure straightforwardly, they would report

15  such a patient appointment as being 4/11 weeks compliant or 36% weeks compliant,

16  because there were 11 weeks, and the first four weeks are compliant because the doctor

17  hasn't ordered the patient to be seen until 4 weeks later. So it is completely

18  mathematically possible, even using CDCR's percent patient weeks compliant

19  methodology, to take some of these lateness issues into account. It can be

20  straightforwardly done, as shown in this paragraph. But CDCR does not report such cases

21  as being late at all. The only appointments CDCR deems non compliant are those

22  occurring after the court ordered *maximum* intervals.

23  The failure to report this is therefore not due to CDCR's different way of calculating

24  lateness: they are just not applying the formula when patients are in fact seen late, in a

25  calculation of whether patients are seen late.

50

1   Even though the measure can be used to measure lateness, as demonstrated above, one

2   has to be careful with its use. This CDCR methodology is biased, and it is very easy for the

3   reader to misinterpret what is being reported.

4   To see why the CDCR measure of "percent patient weeks compliant" can give the

5   uninformed reader the wrong idea, consider Dr. ██████ analysis of the differences

6   between percent on time appointments (which most people understand and the

7   psychiatry team wants) and "percent patient weeks compliant" appointments (the CDCR

8   measure). Note also that percent on time appointments will always give an equal or

9   lesser value than "percent patient weeks compliant". Dr. ██████ writes:

10   "An Enhanced Outpatient Program (EOP) patient had a psychiatry appointment on

11   Monday 8/13/18, and their next appointment wasn't until Friday 9/21/18. They were due to

12   be seen by 9/12/18 (per Program Guide rules) so are 9 days late, but due to compliance

13   being measured by weeks, there are four weeks of compliance and one week of non

14   compliance, which is then reported as 80% compliant. If you have 100 patients, 50 of

15   whom are seen on time, and 50 of whom are seen late by one week, the reported Timely

16   Psychiatry Contacts compliance rate will be 90%. It would be very easy to think that the

17   90% compliance rate meant that 90% of the patients were seen on time, when in actuality

18   only 50% were." (see Appendix 1)

19   Given the example above, one can see why the mental health leadership (without external

20   pressure) will never allow calculations so we can see whether or when are patients are

21   being seen on time. The number could just be too low. Although our psychiatry team has

22   written a program elsewhere that would allow this analysis of our data, the ██████

23   ██████ has not allowed us to use it. If it were known that in many places 25% of our

24   patients were being seen on time, that would get executive level attention to fix the

25   problem (like SAC in which 22% of patients were seen as scheduled).

51

1    So whether one is seeing a patient on time or not has little to nothing to do with CDCR's

2    lateness measure called "percent patient weeks compliant".

3    Taking Dr. ███████ example even further, CDCR could report that psychiatrists are

4    being 90% "timely" with respect to psychiatric appointments (actually 90 percent patient

5    weeks compliant) and virtually never see a single patient on time. In fact, it is

6    mathematically possible for the report to say that appointments were "90% timely"

7    despite not a single appointment having occurred on time. And given that we are

8    reporting considerably lower than 90% "timely", in EOP patients being seen "timely", and

9    particularly given the biases in those very reports that I have previously mentioned, the

10   percentage of patients seen on time (rather than CDCR's "timely") could be very low

11   indeed.

12   Doctors will slowly increase medications in a particular time dependent way, while

13   monitoring results during pre determined time intervals. One can see, for example, that if

14   a psychiatrist sees patients to monitor medication titration on a prison ward in a "90%

15   weeks compliant" way, but only sees patients on time 15% of the time, that could, on

16   average, expose those patients to far more risk than if the patients are seen in a "90%

17   weeks compliant" way, and are seen on time 85% of the time.

18   Both of these are completely possible in our system. And our psychology quality

19   management team and the ████████████ won't let the psychiatry leadership team

20   (and apparently won't calculate themselves) which (if either) scenario applies in our

21   system. Our ██████████ disparaged our desire to check whether patients are being

22   seen late as "trying to parse the data". (see page 3 of 2018 05 23 2115hrs) The problem is

23   that this refusal to determine actual lateness and this refusal to allow us to look at this

24   issue adversely affects our ability to solve problems and improve patient care.

1    In the 2018 staffing report, it appears that CDCR didn't even attempt to report on whether

2    EOP appointments were seen using CDCR's "timely" measure. Instead, there is just a

3    report of frequency of appointments, which might appear to give a sense that CDCR is

4    reporting about EOP timeliness, but (see below) they are not (see 2018 09 01 0900hrs).

5    The report implicitly appears to be claiming that only 6915 EOP appointments per month

6    were needed in order for CDCR to be compliant with the Program Guide. And the claim

7    seems to be that 6501 contacts were occurring per 30 days (of the 6915 EOP appointments

8    that are alleged to have been needed? It is not defined). Using these figures CDCR reports

9    a ratio of (6510/6915) and a .94 "rate". I assume this means a "rate of compliance" with

10   (needed?) appointments, rather than a rate of time, but this is not defined.


11   Imagine for a moment that these figures are true. Indeed, imagine that CDCR is doing

12   even better than that. So perhaps 6915 EOP psychiatry appointments per month actually

13   occurred (an average of one every 30 days) out of 6915 appointments that were supposed

14   to have occurred.


15   According to the figure CDCR reported, 6915 appointments were needed. Hypothetically

16   assume that 6915 appointments occurred, rather than the reported 6501 appointments.

17   CDCR would then have reported a "rate" of 100%. But note that such a seemingly perfect

18   figure would also be perfectly consistent, mathematically, with 50% of the patients having

19   been seen within the 30 day maximum EOP interval *and 50% of patients being seen after*

20   *the 30 day maximum EOP interval*, since there is no obvious reason why the distribution

21   around a 30 day average period between actual appointments would not be about even.

22   And CDCR does not report whether patients are seen on time or late, and nor do they

23   even report patient percent weeks compliant in EOP, so one can't check. So a seemingly

24   perfect figure would also be perfectly consistent with 50% of patients being seen late.


25   If the distribution is not even, more than 50% of patients could have been seen late for

26   appointments or fewer than 50% could be. So how does that demonstrate adequacy of the

1   frequency of psychiatric appointments? It doesn't. The point is that the report says

2   nothing about that.


3   Now consider the number of EOP appointments that actually happened. According to the

4   report, that was 6501 appointments. The number of appointments CDCR claimed were

5   needed per month was 6915. But according to their report only 6501 appointments

6   actually occurred. If there are fewer appointments happening, then other things being

7   equal it follows that more appointments are occurring later than needed. So if CDCR were

8   reporting that 6915/6915 appointments had occurred, and 50% were late, then given the

9   smaller ratio CDCR reported, of 6501/6915, an even larger percentage than 50% of

10  appointments could have been late.


11  The numerator in the EOP report is that 6501 patients were seen on average per month by

12  psychiatrists. The denominator (6915) is defined as the EOP mainline population, but

13  then CDCR makes the inference (without specifying that they do) that each of those EOP

14  patients need to be seen just once a month. That would give a required number of

15  appointments per month as 6915. But in reality, many patients need to be seen earlier

16  than one month later, as the Program Guide clearly suggests, given the "at least" wording.

17  So that 6915 figure is too low. And in fact psychiatrists have often scheduled EOP patients

18  to be seen sooner than one month later.


19  Moreover, the 6501 figure is too high. CDCR was counting as fully compliant

20  appointments that we now are calling mere wellness checks. A wellness check could be,

21  for example, a three minute encounter in the prison yard surrounded by other inmates.

22  Or it could be a telepsychiatrist's MA using a laptop camera and microphone, and

23  attempting to communicate with a patient who is in the cell behind the solid metal cell

24  door, to ask a patient to come to the next appointment. And there are worse cell side

25  "appointments" in which it is just about impossible to communicate with the patient.

26  Those are not proper psychiatric medical appointments either. (see 2018 07 12 1442hrs)

1   If 6501 is too high, and 6915 is too low, the ratio (6501/6915 = 0.94), which is supposed to

2   be the rate of required compliance with appointments, is too high.

3   Suppose 20% of appointments were non confidential or otherwise inappropriate and

4   should be counted as "wellness checks", not psychiatric medical appointments. Then only

5   5201 compliant appointments occurred (0.8x6501). (see 2018 07 12 1442hrs)

6   The Program Guide says that EOP patients should be seen at least once per month.

7   Suppose that on average, EOP patients actually need to be seen by a psychiatrist five

8   times in four months, rather than just once a month (5/4=1.25). Then there should have

9   been 1.25 x6915 appointments, which is 8644 appointments.[x] The maximum possible ratio

10  given these generous assumptions, is 5201/8644, which is 60%. That is to say, even using

11  these generous assumptions, only 60% of required EOP appointments in fact occurred (as

12  opposed to the reported 94%). And that says nothing about whether or not any of those

13  appointments were on time.

14  Whether, as I generously assumed above, only 20% of the appointments were in fact cell

15  side "wellness checks", or 30%, or some other figure, that figure is not accurately recorded

16  or reported, as I will show later.

17  In the 2018 report to the court, no EOP timeliness figures were recorded. We know that

18  there are significant problems in terms of appointments occurring (or not) as scheduled.

19  We know that there are significant problems in terms of appointments occurring as

20  frequently as needed, and we know that many appointments are not happening in

21  confidential offices. We also know that the "timely" percent patient weeks compliant

22  figures are biased and inaccurate. Thus, CDCR has failed to provide to the court the

23  requisite information and the accurate figures needed for the court to be making an

24  assessment of the adequacy of psychiatric staffing.

55

1   Rates of suicide and 30 day readmission rates are reportedly high in CDCR. If patients are

2   not being seen when they need to be seen, that might well be a good explanation for

3   these elevated rates.

4   Note that the official Dashboard definition of "Timely Psychiatry Contacts" is "Number of

5   patient weeks included in denominator during which the patient was up to date on their

6   required Psychiatry contact. Contact requirements delineated in the Compliance Rules

7   grid." (see 2018 07 27 0926hrs)

8   But what is the meaning of *required*? As our quality management psychologists define it, a

9   required appointment has nothing to do with when the physician orders an appointment

10  to occur. Our psychologists are measuring *business* requirements, not *clinical* or Program

11  Guide requirements. So in its reports to psychiatrists and the court, CDCR's quality

12  management psychologists are not even measuring "percent patient weeks compliant"

13  with *required* psychiatry appointments, let alone whether these appointments are on

14  time. Instead our psychologists are actually measuring percent weeks compliance with

15  *maximum* court defined intervals, regardless of when physicians order patients to be

16  seen. (see 2018 07 27 0926hrs)

17  Finally, whatever "timeliness" is said to have been created by the line staff psychiatrists in

18  seeing patients, it was actually created by the line staff psychiatrists *plus the psychiatrist*

19  *supervisors*. Due to staffing shortages and/or inefficient organization and utilization of

20  psychiatry resources, 60% of supervisors in our system often see patients alongside line

21  staff. So to maintain the current timeliness of psychiatric appointments, everything else

22  being equal, a higher number of line staff psychiatrists would be required than has been

23  reported to the court as being needed.

24  Were CDCR to use psychiatrists efficiently by using a clinic model in which each

25  psychiatrist stays seated in an office and patients are brought to their appointments one

1   by one and on time, fewer psychiatrists would be needed than is the case in the current

2   very inefficient system in which many psychiatrists have to waste a lot of time trying to

3   find their patients.

4   A relative lack of patient access to care due to structural barriers to getting patients to

5   appointments (patients not seen as scheduled) creates a need for more physicians to try

6   to see the same patients, because they must try at odd hours, on multiple occasions, and

7   see patients in unusual and inefficient clinical situations. Given the scheduling numbers

8   seen so far, there is no reason to think that any of this is well organized in CDCR.

9   In addition to the biases previously mentioned, including:

10   1.  resetting the clock when patients transfer institutions to allow up to doubling of

11       Program Guide timeframes,

12   2.  arbitrarily increasing EOP timeframes from one month to 1.5 months in 2017 (even

13       with no patient transfers),

14   3.  not counting appointments scheduled more frequently than minimum Program

15       Guide Timelines (as appointments that could and frequently were missed and

16       late),

17   4.  counting what were actually mere wellness checks (e.g., cell side appointments

18       and cell side telepsychiatry appointments) as full appointments,

19   here are two additional sources of bias:

20   1.  Calling some mere wellness checks compliant appointments causes appointments

21       following those wellness checks to be mistakenly deemed to have been on time.

22   2.  Were the psychiatric work not being done by supervisors as well as line staff, more

23       of the appointments would be late.

57

1  **Medications Not Taken and Follow-up Appointments**

2  If a patient misses three days in a row of medication or if in a week the patient is 50%

3  non compliant with medications, or misses one dose of a critical medication, the

4  psychiatrist is supposed to schedule the patient to be seen for an appointment to review

5  medication or there needs to be some type of triage system in place to make sure those

6  who need an appointment have one, and at least some documentation of why those who

7  don't need an appointment don't need one. Patients who are medication non compliant

8  (not taking medications as prescribed) are flagged in "Huddle Reports".

9  Suppose there are 100 patients in a month who have missed their medications as defined

10  above. Now suppose that the psychiatrists schedule just ten of those 100 patients to be

11  seen, and further, that they only see nine of the ten appointments scheduled in that

12  month. One of the scheduled appointments does not occur for some reason.

13  What percentage of the patients who needed to be seen in consultation for medication

14  compliance were seen?

15  The straightforward answer is that 9/100 patients were seen and the organization is 9%

16  compliant with getting patients seen who missed their medications, unless there was

17  some reasonable explanation for why the other 91 patients did not need to be seen despite

18  being medication non compliant. But would the CDCR Dashboard have reported that 9%

19  of medication non compliant patients were seen? No. In this situation, it would have

20  reported that psychiatrists were a remarkable 90% (not 9%) compliant with seeing

21  patients who needed to be seen for medication non compliance.

22  In CDCR reports, only those mental health patients who are *scheduled* to be seen are

23  counted as *needing* to be seen. In this hypothetical example, ten patients were scheduled

58

1   to be seen and nine were seen. When we queried this issue, the QM leaders said that the

2   problem is with psychiatrists failing to schedule appointments for all the patients who

3   need to be seen for medication non compliance, and that were they doing so, all would

4   be well.

5   CDCR's logic is something like: if a medication non compliant patient isn't scheduled,

6   that patient isn't medication non compliant, or something like that. Actually, it's a bit

7   worse than that. Please see 2018 08 31 0242hrs for a precise recounting of how CDCR

8   reported 100% compliance with seeing patients at CHCF who needed to be seen given

9   medication refusals, when in reality the compliance was 3.6%. (see page 6 of 2018 08 31

10  0242hrs).

11  Basically, the computer algorithm that does this calculation

12      1.  counts appointments not scheduled as not being needed

13      2.  counts refused appointments as completed appointments

14      3.  double counts appointments that occurred

15  Apparently, there were 17 scheduled appointments, yet hundreds of patients needed some

16  type of appointment or there needed to be documentation of why the patient did not

17  need an appointment. So even assuming, totally unrealistically, that patients who were

18  not scheduled to see a psychiatrist were not medication non compliant, there still should

19  have been 17 appointments occurring as scheduled. Only 8 of those 17 occurred, so CDCR

20  should have reported that 8/17 (less than 50%) had compliant appointments, even if you

21  eliminate the hundreds of other appointments actually needed for medication non

22  compliance. But that didn't happen either.

23  They reduced the 17 scheduled appointments (using a computer algorithm) down to 12,

24  and increased the eight appointments that were actually seen, up to 12. One patient was

59

1   listed as needing to be seen but wasn't seen. His appointment was cancelled and there

2   was no note. So that leaves 16. Six more were cancelled, which somehow also made it so

3   they were no longer considered medication non compliant, so that reduced the reported

4   number of medication non compliant patients to ten.


5   One of the cancelled appointments was added back as a patient who needed to be seen,

6   so that made it 11. One appointment was counted twice, so now there were 12

7   appointments, while eight occurred.


8   Of those 12 appointments, two patients refused. They were counted as having been seen.

9   So instead of 8/12 patients having been seen, 10/12 patients were counted as having been

10  seen. Then one of the eight completed appointments was counted twice, so 11/12 patients

11  were counted as having been seen. Then one was counted as completed but was cancelled

12  and never seen. That added up to 12/12 patients having been seen.


13  So finally, though there were hundreds and hundreds of medication non compliant

14  patients, eight were seen, 12 were counted as having been seen, 12 were counted as having

15  needed to be seen, and the psychiatrists were then said to have been 100% compliant,

16  though actually they were less than 4% compliant. (see 2018 08 31 0242hrs)


17  An accurate report about this would give one real information. One might then conclude

18  that a complex triage system is needed to get the patients who need to be seen most,

19  seen. I don't think it is reasonable for our psychiatrists to be seeing hundreds of extra

20  appointments per month given their staffing. The problem is that psychiatrists don't have

21  enough hours in the day to get all the non compliant patients evaluated. How many of

22  these patients ended up in crisis beds, or suicidal, or violent, we will never know. No

23  doubt many of the patients could not have been seen given the psychiatric staffing that

24  we have. But that does not justify reporting less than 4% compliance as 100% compliance.

60

1   That argues for better triage systems, perhaps utilizing nursing staff and other

2   professional assistance.

3   *Apropos* of this type of situation, our Statewide ████████████, Dr. ████████,

4   quipped, "Why are we treating the scheduling rather than the patients?"

5   What's particularly odd about the way these calculations are done is that the more errors

6   that are made, the higher the compliance appears. The lower the proportion of patients

7   needing to be seen who are scheduled to be seen, the more compliant CDCR appears to

8   be per the reports, because it's easier to see fewer patients, and only those who are

9   scheduled count as needing to be seen. So the more the errors made by not scheduling

10  appointments, the easier it is to be "compliant", with less work needed. In addition,

11  Quality Management appear to deem refusals not to be a problem either: indeed, a refusal

12  not only eliminates the patient as needing to be seen, but credits the institution with

13  getting the patient seen. Compliance falsely appears higher if the institution manages to

14  have the patients refuse.

15  Dr. ████████ wrote:

16  "These appointments are only measured if the physician puts in a scheduling order for a

17  medication non compliance appointment. The appointments that are ordered are *far*

18  *more* likely to be completed. To accurately capture the percentage of medication non

19  compliant appointments that are occurring when they should, the denominator needs to

20  be the number of patients who are flagged as medication non compliant, and the

21  numerator needs to be the number of medication non compliant patients who are seen

22  within the specified Program Guide timeframe." (see 2018 09 19 report)

1    Critically, note from the CHCF report, that whether patients are seen when medication

2    non compliant, is part of the overall measure of whether all needed psychiatry

3    consultations are occurring. CDCR reported that 96% of all consultations occurred as

4    needed at CHCF. But because medication non compliance is part of that report and was

5    reported as being 100% compliant rather than 3.6% compliant, the overall figure of 96% is

6    too high. Indeed, Dr. ██████ calculated that a more accurate (if still too optimistic)

7    statement would be that 55% of psychiatric referral appointments occurred as needed.

8    (see page 6 of 2018 08 31 0242hrs)


9    **Refused and Cancelled Appointments**


10   **Treatment Cancelled**


11   Dr. ██████ says, "Instead of giving a straightforward percentage of the treatment that is

12   cancelled (e.g. if there are 100 appointments and 30 were cancelled, this indicator would

13   show 30%). The numerator is defined as "Number of patient weeks included in

14   denominator during which the following number of hours of treatment were cancelled:

15   More than 3 for ASU EOP Hub, PSU EOP, and ML EOP; More than 1.5 for RC EOP and

16   ASU EOP non Hub; More than 1.0 for SRH/LRH CCCMS." (see page 3 of 2018 08 15

17   1352hrs)


18   The reader could give us any number he or she wanted between say 1% and 50% and we

19   could subtly change numbers like "3", "1.5", and "1" to get that precise number as the

20   percentage of cancellations recorded. Therefore, as an absolute value, the reported

21   number 19% in this context is meaningless. Arbitrary numbers like "3", "1.5", and "1", with

22   arbitrary assignments to levels of care, could be changed to cause the "number of patient

23   weeks included in [the] denominator" to cause any overall percentage desired.

1    Measurements that are arbitrary are not useful because the definition can be changed to

2    create any value at all. We know from the scheduled appointments calculations that an

3    extremely high percentage of appointments are cancelled and refused. What CDCR

4    should report is what proportion of 100 appointments were cancelled or refused or both.

5    **Treatment Refused**

6    If there are 100 appointments and 40 are refused, then 40% are refused. Instead, CDCR

7    created a whole new definition (see below) that seems entirely unrelated to the (also

8    arbitrary) definition of percent treatment cancelled report above, to get the value

9    recorded to be 24%. (see page 3 of 2018  08  15  1352hrs)

10    The numerator is defined as:

11    "Number of patient  weeks included in denominator during which over 50% of all offered

12    treatment was refused AND less than the following hours of treatment were attended:

13    less than 5 for ASU EOP Hub, PSU  EOP, and ML  EOP; less than 2.5 for RC  EOP and ASU

14    EOP non hub; less than 1.0 for STRH CCCMS and LTRH CCCMS."

15    Why 50%? Why less than 5? Why less than 2.5? Why less than 1.0? Those are arbitrary

16    numbers chosen to get a particular result in terms of figures. Mathematically, if we varied

17    those numbers, the *reported* percentage of appointments refused would be totally

18    different. We know that huge percentages of the patients are said to refuse. It would be

19    useful to know that, and it would be useful to know where it happens, etc. But this

20    information is obscured using these arbitrary definitions and formulas.

1    **Expert Psychiatrists**

2    When CDCR hired outside expert psychiatrists to take a view about CDCR staffing levels,

3    the CDCR mental health leadership did not schedule the outside expert psychiatrists to

4    speak with the psychiatric leadership of CDCR about staffing. Had the outside expert

5    psychiatrists spoken to us, we could have told them some of the information in this

6    report, and their conclusions and recommendations would have presumably been very

7    different.

8    **Confidential Spaces**

9    Patient care is highly unlikely to be good in a given system without certain absolutely

10   basic necessities. One of those is, as we've seen, whether appointments are occurring

11   when the patients need to be seen, which can be measured by looking at whether

12   appointments are occurring on time relative to doctors' orders with respect to when

13   patients should be seen next.

14   Another basic necessity for good patient care is whether psychiatry appointments are

15   occurring in appropriate, confidential spaces, i.e., in a private room. That too would be

16   easy to measure. Did a given appointment occur in an office, confidentially, or *not*?

17   There are other critical issues for patient care that are less easy to measure, but those two

18   absolutely basic things could easily be measured accurately, and yet CDCR hasn't

19   provided even its psychiatry leadership with this vital information.

20   If we were accurately measuring whether psychiatry appointments are occurring in

21   confidential settings, like a clinic office, and particularly if we could see what was

64

1   happening ward by ward in the whole system, this would immediately highlight one of

2   the major barriers to good patient care there is in CDCR.

3   Not only should we be measuring and reporting each of those two things independently,

4   we should also be measuring and reporting, ward by ward, the proportion of

5   appointments occurring both on time as above AND in a confidential office. That

6   information is critical for improving patient care in the CDCR system.

7   This information would also enable CDCR to see where expensive psychiatry resources

8   are not being used efficiently in the system. In a system like CDCR, psychiatric

9   productivity is lower than it would be were the psychiatrists staying seated in clinic

10   offices seeing patients one after another rather than having to waste time trying to *find*

11   their patients. So in CDCR, more psychiatrists are needed per population than would be

12   needed were the system less inefficiently organized.

13   In many CDCR institutions, patients having an appointment with their psychiatrist are

14   often not brought to see their psychiatrist. The psychiatrist then has to go looking for the

15   patient, and usually ends up seeing the patient cell side or having a two minute

16   conversation on the yard. (See 2018 07 12 1442hrs, middle of the page starting, "My visit at

17   SAC was interesting." Also see previous report about SAC: 2017 12 06 1748hrs.)

18   Cell side visits often mean talking to patients through a slit in a pretty much solid metal

19   cell door that usually has a tiny window (which really can't be used when speaking to the

20   patient because of the location of the doctor's head when speaking through the slit). And

21   sometimes the doctor has to speak very loudly to be heard, due to extremely noisy

22   conditions. Several other patients and custodial officers can then hear what is supposed

23   to be a confidential conversation. And the cellmate who is usually also in the cell can

24   completely hear the conversation. In the SAC EOP "segregation" unit the air conditioner

25   and TV blare, so the psychiatrist sometimes needs to yell to be heard. This prevents

65

1   honest and open communication about patients' psychological states, prevents

2   neurological exams, and prevents building effective relationships with patients.


3   The CDCR electronic health record system has a number of significant design flaws that

4   could be corrected were there the will to do so. One of those flaws is that the system

5   defaults to categorizing the appointment type as being "confidential". It takes extra time

6   and several extra keystrokes to record that a given appointment did not in fact occur in a

7   confidential space, and many psychiatrists don't even know *how* to record that an

8   appointment did not occur in a confidential space.


9   For example, at the CCWF crisis bed facility, 100% of psychiatric appointments in May

10  2018 were recorded in the EHRS as having occurred in confidential spaces, yet according

11  to the psychiatrists on the ground, actually not a single one (except when Coleman

12  monitors were present) occurred in a confidential space. (see page 5 of 2018 08 01)


13  When I visited CCWF, the physicians and the nurse practitioner were unaware that it is

14  even possible to report the appointment type as "non confidential". Indeed, in my recent

15  tour to SAC, CHCF, Mule Creek, Valley State Prison, and CCWF, there was at least one

16  psychiatrist (and sometimes many) at each institution who didn't know how to record the

17  appointment as having been non confidential. (When I visited SATF and Corcoran, all the

18  psychiatrists I asked did seem to know how to record visits as having occurred in non

19  confidential spaces.)


20  Designing a system in such a way that lack of knowledge and random errors (such as

21  failing to take the extra time and keystrokes needed to record a visit as non confidential)

22  create a biased, inaccurate picture of what is actually happening, is clearly a mistake. It

23  would be very easy to remove this bias by having the system not default to one or the

24  other type but instead have the doctor simply specify which type it was as an

25  electronically required step in the recording of an appointment.

1    This is similar to the situation described in the scheduling section, in which the error of

2    *failing* to schedule consults creates the *semblance* of *greater* compliance with respect to

3    patients needing to be seen. The bigger the error in not scheduling patients for

4    medication non compliance or the bigger the error in forgetting to record visits as non

5    confidential, the greater the *reported* but not actual compliance. And it is not even

6    really psychiatrists simply forgetting: when people are in a rush, the need for extra

7    keystrokes makes accurate recording less likely. If you make it harder to record a bad

8    thing that actually happens, but easy to report a good thing, more good things will be

9    reported. It may be tempting to call this biased measuring and reporting of compliance a

10    mere training issue. But it is actually an EHRS QM system design issue.

11    It is difficult to get access to the information about whether the EHRS is recording visits

12    as occurring non confidentially. Our HQ psychiatry team recently figured out how to

13    obtain this information, but virtually no psychiatrists in the field or Chief Psychiatrists

14    knew how to when we asked them. To figure out whether the visits were confidential in a

15    given prison's segregation unit, for example, we had to painstakingly find and download

16    data for the institution to an Excel Spreadsheet and then perform a calculation on the

17    correct columns.

18    A simple Dashboard measurement in the quality management portal could

19    straightforwardly be programmed to report this EHRS measure.

20    In the CCWF crisis bed facility, women are double celled in four of the beds, but single

21    celled in four other beds. The psychiatrists and clinicians told us that when the Coleman

22    monitors come, the women who are double celled are individually escorted out into a

23    private space to make sure that their reviewers know that the patient would be seen in a

24    confidential space were the resources available. They also said that if they knew how to

25    record that they were not seeing the patient confidentially most of the time, they would

26    do so truthfully and honestly.

1   Nowhere in the institution, even in less critical patient care areas, were they recording

2   any patient visits as having been non confidential, including in the segregation unit in

3   which they told us that only 20% of the visits were confidential.

4   They said that they cannot normally pull the women from even the double cells, as they

5   lack the custodial resources and offices to do this. They said these women who are

6   double celled are never seen confidentially unless Coleman reviewers are there.

7   In the CHCF crisis bed unit (see report 2018 07 17 1722hrs), it is even worse than in the

8   CCWF crisis bed unit. Essentially *not a single follow up appointment is in a confidential*

9   *space*. At CCWF during morning rounds, the cell door is opened so the patient can be

10  seen and examined with custody present to ensure safety.

11  The issue is not just whether an appointment is confidential or not. Another issue is

12  whether or not the doctor can physically *see* the patient or not. At the CCWF crisis bed

13  facility, the psychiatrist walks into the cell so can see the patient and do a neurological

14  exam, but the appointments are not confidential. But at the CHCF crisis bed facility, the

15  appointments are neither confidential nor can the doctor even *see* the patient, so can't do

16  a neurological exam, can't see the patient's facial expressions, can't see the patient's

17  reactions to what the psychiatrist is saying, etc.

18  That the cell door is open at CCWF with appropriate custodial observation is hugely

19  clinically beneficial at CCWF and really seems to help them provide good care, because

20  patients can be briefly examined, their facial expressions can be immediately seen, and

21  patients are interviewed with the team able to clearly hear the patient. But at CHCF, the

22  door is not opened for the psychiatrists to see the patients. So 100% of the follow up visits

23  occur by communicating non confidentially through a slit in a closed cell door, the

24  doctor being unable to see the patient while talking (because to be heard the doctor has

68

1   to communicate through the crack in the door, whereas to see the patient the doctor

2   needs to look through the window, and it is not possible to do both simultaneously).

3   This dearth of custodial resources and offices for any follow up appointments has been

4   that way for years and when I myself briefly worked at CHCF nearly five years ago, I

5   encountered the same situation. Furthermore, the recreation therapists and psychologists

6   compete with the psychiatrists for common office space. Custody said that it allocates the

7   rooms on a first come first serve basis and that they give priority only to the initial

8   psychiatric visit, and essentially never for follow up appointments. Yet the CDCR QM

9   team designed the electronic system to categorize appointments as confidential by

10  default, and not to record the environment in which the care occurred[xi]. That information

11  is vital for creating an efficient, well organized system with good patient care.

12  The psychiatrists in the CHCF crisis bed unit do know how to record that a visit was non

13  confidential, and they told us that 100% of their visits are *non* confidential. Yet instead of

14  showing 0% of follow up routine appointments there as having been non confidential,

15  the QM electronic system nevertheless reported that 31% of them were confidential. This

16  inaccurately high compliance figure of 31% appears to have been caused by error

17  psychiatrists in a hurry failing to take the time to record visits as having been non

18  confidential. (see page 10 of 2018 08 01)

19  That is an example of how, in the CDCR system in several respects, more error creates the

20  false impression of more compliance. The more errors the psychiatrist makes, in not

21  doing the extra work needed to record patients as being seen in non confidential spaces,

22  or in failing to schedule patients to be seen for medication non compliance, the higher

23  the compliance *appears* to be, contrary to the reality. [xii]

24  Thus, the numbers reported by Quality Management about whether appointments were

25  timely, whether they occurred as scheduled, whether psychiatric consultations were being

1   made appropriately, or whether appointments were confidential, are inaccurate and can't

2   be replied upon.

3   To find out what was really going on, we HQ psychiatrists had to physically go to the

4   institutions, each of us following a different psychiatrist around for a whole work day to

5   see what was actually happening on the ground, in addition to talking to others there. We

6   have also tracked individual patients, and done other painstaking work to try to get the

7   information we need in order to improve the CDCR mental health system.

8   On a practical level, the psychiatrists at CHCF say that even if the office space were

9   plentiful at the crisis bed unit   which it is not at all   there would be nowhere near

10  enough custodial staff to physically bring patients to confidential office spaces given all

11  the disciplines competing to see patients at the same time. So CHCF psychiatrists,

12  essentially 100% of the time, have their crisis bed (non initial) appointments with patients

13  in a non confidential space, talking through a slit in the door and not really being able to

14  see the patient. These are not adequate medical appointments. (see 2018 07 17 1722hrs)

15  **The Importance of Recording the Environment of Care For Each Appointment**

16  If a given patient is using illicit drugs, what is the chance that, when asked by the

17  psychiatrist whether he or she is using illicit drugs, the patient is going to answer

18  truthfully, if custody is present? Currently, unless the physician states in the note the

19  environmental context in which the appointment occurred, those reviewing the chart

20  can't tell. That means that transmission of such important medical information doesn't

21  happen.

22  The recording of the environment of care is of critical importance, as we, the HQ

23  psychiatry team, have long argued. Our request that the system be made to require a

1    physician to select whether the appointment was behind a cell door, outside in a yard,

2    confidential, and other key variables, was denied: the psychiatry medical work flow is in

3    CDCR designed by non medically trained psychologists. So the environment in which

4    care is occurring is very difficult to discern unless one physically goes to the institution

5    and follows individual psychiatrists, as we did.

6    **Psychiatry Medical Opinion Ignored in the Design of EHRS QM**

7    When the EHRS system was being designed, we made many requests that were simply

8    ignored or overridden by those in charge. And now our psychology executive and ████

9    ████████ have added a new committee, called the Change Management Committee

10   (2018 07 12 1000hrs). This committee is yet another obstacle blocking our ability to get

11   needed changes made. (see also 2018 06 18 1359hrs.)

12   Our psychologists and our ████████████ who vigorously supported the psychologists

13   in ignoring our many requests and objections with respect to the psychiatric workflow

14   they were designing, created a system that does not disambiguate names of the various

15   types of medical appointments, and have thereby denied our physicians and the court the

16   vital information needed for us to fix our CDCR mental health system.

17   It used to be that our psychiatric physicians could sometimes appeal to our general

18   medical and nursing colleagues on a committee called CLAC if overruled by the

19   psychology designers of the mental health and therefore psychiatric workflow using the

20   EHRS. (see 2018 07 02 1508hrs and 2017 05 11 1447hrs)[xiii] But now, with the advent of the

21   Change Management Committee, the psychologist run EHRS team (or those who direct

22   them) has clamped down further on our headquarters psychiatrists' ability to appeal to

23   our general medical and nursing colleagues in CLAC to try to design appropriate medical

24   workflows for our psychiatrists. Only if this Change Management Committee were to

1   approve one of our proposals would we HQ psychiatrists be allowed to speak with our

2   colleagues at CLAC to even propose it. (see 2018 06 18 1359hrs.)

3   This new Change Management Committee is ruled by almost the same executive

4   psychology team who run the QM committee, and some of those who are on this

5   committee report to the executive and Chief QM psychologists (2018 07 12 1000hrs). On

6   this committee there are 22 non  medical personnel (including 12 psychologists) but just

7   two psychiatrists. We are simply out voted. We have no hope that our requests    for

8   example, that the EHRS require the recording of information about the environment of

9   care of each appointment    will be met in the foreseeable future.

10  To improve care in our system the psychiatric medical team needs to know whether

11  patients are being seen on time, as scheduled, in confidential spaces, and whether they

12  are seen when there are consults, when they miss their medications, and if there is

13  appropriate blood monitoring.

14  CDCR's reports (as mentioned above) tend to be very inaccurate except (now) the blood

15  monitoring. Our comments and requests about these overall processes have been

16  repeatedly ignored and rejected, and now the ███████████ have given those who

17  designed this bad EHRS QM system even more control, in the form of the Change

18  Management Committee.

19  The psychiatry leadership team needs access to the database in order to determine more

20  efficiently what is actually happening, so that we can know how to target our work in

21  trying to fix the CDCR mental health system. Although the QM psychologists have done a

22  few database searches for us, the ███████████ have denied us even read  only access

23  to the database, asserting that psychiatrists "don't do QM". A psychiatrist who used to

24  work for the psychiatry leadership team was not allowed access to the databases until he

25  had left our team and was then later hired by the QM psychologists. Now he is sometimes

1   permitted to do a search for us, but only with the permission of the psychologists who

2   have created the data biases I am mentioning in this report. And that permission is

3   generally not forthcoming in practice despite their *saying* that they will do the searches

4   we want.

5   Our ███████████ say that our leadership psychiatric team doesn't need to be able to

6   query the database directly to answer medical questions about care. They say we can ask

7   the psychiatrists working on the psychologist run team. However, the psychiatrists

8   working for the psychologists are either unable to run the queries we have asked for, or

9   they have been told not to run the database queries we have requested, for example to

10  find real information about whether patients are being seen on time, as scheduled, in

11  confidential spaces, whether they are taking their medications as they are supposed to, or

12  anything else of medical significance.

13  Note that none of the discoveries of grossly biased reporting about data, violations of

14  court mandates for timely care, etc., were discovered by the psychiatrists who report to

15  the psychologists. There is a reason for that, and it has to do with who is supervising the

16  medical queries that they are allowed to make.

17  As I've said, our medical opinion with respect to what medical data we need to collect and

18  access is simply ignored. (see 2018 08 23 1207hrs[xiv], 2017 05 11 1447hrs, 2018 07 02

19  1508hrs) The question is, why *don't* they welcome logical and sensible input from

20  experienced expert medical doctors with deep knowledge of how mental health systems

21  should be organized for good patient care, and about what needs to be measured to

22  maximize error correction and efficiency in the system?

23  Although our non medical executives will certainly publicly *claim* that they are

24  endeavoring to create good psychiatry workflows, their actions tell a different story. I

25  have seen no evidence that our ███████████ have any intention of actually changing

73

1  the status quo in which psychiatric input is rejected, and non medically trained

2  psychologists have almost full control over the psychiatric workflows and the design of

3  the EHRS for psychiatrists (unless they run afoul of nursing or medical or dental

4  workflows), and have the authority to decide what medical information we need.

5  I have shown that the reports with respect to whether appointments have been seen on

6  time, whether consults are taking place, whether appointments are occurring as

7  scheduled, etc., can't be trusted.

8  The same should also be assumed to apply to whether CDCR will allow our psychiatric

9  physicians to create efficiencies for themselves in using the EHRS, or enable the EHRS to

10  capture information that is medically needed. Even if, for example, we want to search the

11  old patient information in the data warehouse to figure out what medications kept a

12  given patient out of the hospital and what did not, we are not permitted to do that, and

13  we can't get that information at all unless the psychologists decide that we do need the

14  information and prioritize that query.

15  Unfortunately, despite my requests, the psychiatry leadership team has not been

16  permitted to search databases for the five years that I have been with CDCR; nor have we

17  had any significant influence with respect to the input of the information into the EHRS

18  that we need to medically evaluate the environment in which psychiatric care is

19  occurring.

20  The same individuals are creating the data analysis and running the EHRS design and

21  determining their own errors, and the ███████████ have vigorously supported their

22  monopolizing of information, preventing medical analysis and scrutiny of critical

23  information. This has effectively prevented appropriate error correction in the CDCR

24  mental health system.

1   As my colleague, Dr. ████, the psychiatrist in CDCR who knows most about how the

2   electronic health record is designed for psychiatrists, and most about the tactics of those

3   psychologists who created our workflows, wrote:


4   "We have surveyed the psychiatrists and know how they want to work in the EHRS. It is

5   not how they work currently. Given the continuing push for control [by psychologists and

6   administrators, MG], it would seem clear the intent is to engage psychiatrists when the

7   court is looking, but otherwise disregard as has been the case for the last 2 decades. It has

8   been very unsatisfying for psychiatry at all levels." (see pages 2 3 of 2018 07 02 1508hrs)


9   See also (2018 08 02 1232hrs) Dr. ████ description of a Change Management

10  Committee meeting in which those who vote about what our medical workflows will be

11  (many administrators) seem not even to know what they are voting about. They have no

12  medical background at all.


13  **Visits to Troubled Institutions**


14  Please see the reports on SAC and CHCF that our psychiatry team recently visited, and

15  the report from last year from the psychiatrists themselves at SAC, who were interviewed

16  by HQ psychiatrist Dr. ████. (See 2018 07 12 1442hrs, middle of the page starting "My

17  visit at SAC was interesting". Also see previous report about SAC: 2017 12 06 1748hrs; also

18  2017 11 21 1749hrs.)


19  Of interest, also see the report from SVSP where psychiatrists are essentially never able to

20  have confidential one to one (1:1) appointments. (see 2017 11 21 1749hrs). At SVSP,

21  psychiatrists have been allocated confidential office space for only three hours *per week* in

22  which to see all of their patients combined, for months at a time. Three hours in total, out

23  of a 40 hour work week.

75

1   In the schedule presented, the physician, Dr. ███████, asked for an additional hour and

2   was given three hours, up one from the previous two. (see page 4 of 2017 11 21 1749hrs)

3   To repeat, psychiatrists were allowed to see patients in a confidential setting for a total of

4   two to three hours in an entire week, rather than seeing patients for perhaps six to seven

5   hours *per day* in a confidential setting, as some other psychiatrists can in CDCR (for

6   example at VSP), and which would be considered more normal.

7   The ███████████████ of the SVSP PIP has more recently told me that psychiatrists may

8   now be able to see their patients in a confidential setting there for perhaps four hours per

9   week. The rest of the appointments have to be seen cell side at the SVSP psychiatric

10  inpatient program or patients need to be seen in treatment teams.

11  We have this information from SVSP despite not being allowed to electronically search

12  the database, create reports, or create EHRS non confidential note types to try to

13  understand these situations at SVSP and statewide. We have this information because we

14  were able to obtain a hard copy of the local patient schedule documenting how much

15  confidential office time the psychiatrist is given per week to see patients.

16  As can be seen on page 4 of 2017 11 21 1749hrs, custody and the schedulers granted

17  recreation therapists ten hours per week out of cell with patients per week, but the

18  psychiatrists were granted just three hours per *week*.

19  Although our senior executives and quality management psychologists have not allowed

20  us to directly access SAC EHRS information using queries to the database, or allowed us

21  to accurately get this information by designing the note types or workflow that would

22  capture the information, we can make some guesses by visiting the prison, watching what

23  happens, and talking to psychiatrists. Thus, we try to approximate what the data is.

76

1    For example, when we were last at SAC, three of 11 patients scheduled for one psychiatrist

2    came in the morning (in the Ad Seg unit) and four of 16 came for (EOP) appointments for

3    another psychiatrist and were thus seen in a confidential and almost appropriate space.

4    The space lacked computers so the psychiatrist could not get information about the

5    patient while talking to him, which would be deemed serious anywhere else, but given

6    how serious the other issues are at SAC, like access to care issues, it is, relatively

7    speaking, one of the more minor of the difficulties at SAC.


8    The psychiatrist's account of his day with me is helpful too, as it factually details the

9    various barriers he, Dr. ██████, encountered (see 2018 07 18 R). If, as we estimate, overall,

10   CCC patients were seen as scheduled by mental health care providers only 22% of the

11   time (see pages 2 and 3 of 2018 08 22 0900hrs), rather than the 87% of the time reported,

12   that does not reflect well on the ability of the SAC MH program to organize care.


13   The psychiatrists at SAC know that custody will not, or will not be able to, bring patients

14   to scheduled appointments, so the psychiatrists request ahead of time that many patients

15   be brought (like 16 for a morning) in the hope that a few arrive. The psychiatrists

16   themselves guess that 75 80% of patients in Administrative Segregation are not initially

17   brought to clinics when the psychiatrists request that they come.


18   The reports from SAC (not SVSP), including what we ourselves saw when we visited,

19   allow us to estimate that custody does not bring more than 25% of patients to see

20   psychiatrists at the SAC EOP program. (Note: some patients do refuse, and custody can't

21   force them to come, although see my suggestion.) (see page 4 of 2018 07 12 1442hrs)


22   After an unproductive morning in which three quarters of patients are not brought to

23   their appointments, SAC psychiatrists spend the afternoon trying to find their morning

24   patients who did not make it in the morning, with no custodial help for the psychiatrist

25   to find the patient.

1    The psychiatrist says he is getting better at guessing where on the prison yard he might

2    find a given patient. It was about 100 degrees while we were out looking. The psychiatrists

3    run into other patients who surround them on the yard or in the buildings connecting to

4    the yard and try to consult the psychiatrist there, but again, on the yard the doctor has no

5    access to patients' information or medical history, and some of the patients are not on the

6    doctor's schedule for the day (so the doctor can't be prepared for these events by reading

7    a given patient's electronic chart beforehand).

8    It would be easy enough for psychiatrists to pull patients from groups to get a few

9    moments with them in a confidential space[xv], but headquarters administrators and local

10   psychology leaders in general forbid this   though we have seen some psychologists

11   willing to disobey HQ by allowing such psychiatric visits. (see 2017 11 21 1749hrs)

12   These doctor patient encounters in the yard were being counted as compliant psychiatric

13   appointments by our psychologists in charge of the QM program, or by those who

14   directed them to do so. Thus, misinformation has been given to psychiatrists at HQ and

15   all others who read these reports, including those who rely on these CDCR reports giving

16   the impression that patients are being appropriately cared for.

17   This type of situation is precisely why brief input of information (for example checkbox

18   input into a pop up window to allow the note to be finished) is critically needed to

19   understand the environmental context of appointments, rather than what happens in the

20   current system, which by default categorizes appointments as confidential and compliant.

21   Had the EHRS QM team met our request that the system record who was seen behind

22   closed and locked cell doors and in what other physical contexts, including appropriately

23   measuring the timing of care, the quality of care could be more objectively evaluated. But,

1   1.  by not allowing a distinction in the data reported using appropriate note types and
2       not designing or allowing the psychiatry team to design specific recording of
3       information about the environment of care,

4   and

5   2.  by biasing input of data by having non confidential appointments defaulting to
6       being categorized as being confidential,

7   and

8   3.  by eliminating patients who don't come to scheduled appointments in a
9       calculation of the percentage of patients who come to scheduled appointments

10  and

11  4.  by varying the compliance rules for on time appointments when patients transfer
12      institutions to prolong them and by not counting any physician's scheduled
13      appointments (sooner than Program Guide max timelines) as late when they are
14      late

15  and

16  5.  by not allowing easy access to data (biased or not) to distinguish between a
17      confidential and non confidential appointment,

18  and

19  6.  by eliminating most of the patients who did not receive medication consultation
20      for medication non compliance from calculations of who received medication
21      consultation for non compliance

22  and

23  7.  by not allowing the leadership of our psychiatrist physicians in CDCR to utilize
24      queries of the database to search for this critical medical information ourselves,

79

1   the quality management and electronic health record psychologists and the senior mental

2   health executives who have supported their decisions are painting a misleadingly positive

3   picture of patient care, and deeming what is actually inadequate care and poor

4   organization of care to be good care, and so preventing appropriate remedial action to be

5   taken to correct significant issues affecting patient care.

6   When I visited SAC recently with the headquarters psychiatrist, Dr. ███, many of the

7   patients in the cell block were standing virtually naked in their towels as the psychiatrist

8   tried to briefly interview patients in and around the administrative segregation unit. I

9   followed a psychiatrist wearing a stab vest out into the yard in 100 degree temperatures to

10  try to locate patients for about an hour, because he had told me he had begun to learn

11  where patients hang out in the yard so he could be able to see them. There were no

12  custodial officers assigned to help the psychiatrists find the patients.

13  Psychiatrists should not be wandering in 100 degree heat in a stab vest to find dangerous

14  patients on the yard, trying to guess where patients might be, to try to prevent psychiatric

15  morbidity, manic episodes, psychosis or often to prevent death in these patients.

16  Dr. ███, who quit working there four years ago because patients (some level 4, our most

17  dangerous inmates) could not be seen in clinics, and because potentially dangerous

18  patients surrounded her on the yard, often with no custody in sight, commented,

19  "Nothing has changed in four years."

20  The female psychiatrist at SAC has been allocated 15 minutes in total in which to see

21  perhaps seven patients cell side (12:45PM to 1:00PM), after which it is shower time and

22  she can't see her patients anymore, because it is too dangerous for her to be among

23  dangerous inmates outside their cells while they stand around wearing only a towel.

24  Custody does not bring her patients in the morning, and she can't really see them in the

25  afternoon either: fifteen minutes is not enough time in which to see seven patients. This

1    is incredibly dangerous for the patients since they are getting just seconds to minutes of

2    psychiatric care.


3    Needless to say, this is not how other psychiatric clinics operate virtually anywhere in the

4    United States, and certainly the general medical clinics in the prison at SAC do not

5    operate this way. Only is it deemed appropriate to manage the *psychiatric* clinics this way

6    appropriate in the sense that CDCR is not measuring conditions that are medically

7    dangerous. Thus, CDCR is failing to create or report actionable information that would

8    allow us to fix the problem.


9    There was a Quality Management meeting a week after Dr. █████ and my visit to SAC

10   that illustrates how utterly uninformed the CDCR Mental Health Quality Management

11   group typically is. The 20 or so committee members literally applauded the alleged

12   psychiatry quality improvements at SAC, on the basis that the numbers looked good.

13   Perhaps few of those applauding had any idea that the so called "appointments" that they

14   were implicitly applauding included encounters in which the psychiatrist was having to

15   figure out the name of the patient while standing in a hallway surrounded by inmates.

16   Perhaps they were not aware that the good numbers they were applauding included

17   encounters in which a psychiatrist may have had one to two non confidential minutes to

18   see the patient while roaming the prison and yard trying to find his next patient in 100

19   degree heat. The majority (or all) in that room were probably also unaware that actually

20   only perhaps 22% of mental health patients were being seen as scheduled on the CCC

21   yards, since the Dashboard and those who calculate for them mislead them into thinking

22   that 90% were seen as scheduled.


23   After the round of applause, I tried to explain to those in the meeting that this was not

24   quality care worthy of applause and that the numbers they were applauding did not (to

25   put it kindly) accurately measure what they thought they measured. My strong

26   recommendation   my medical opinion   was that no new EOP patients be transferred

81

1   there (and many should be transferred away) until basic minimal standards of care are

2   met. They said they would record my ideas in the QM minutes. (Thursday July 26th, 2018)

3   As I wrote to the ███████████: You can't provide medical care with no little or no

4   information, standing cell side and virtually screaming through a cell door, no matter

5   how many EOP reviews we are said to pass. If we pass when this is occurring, passing

6   means nothing in terms of medical care.

7   Unfortunately, given their actions, it seems that our QM psychologists and senior

8   executives regard recording and analyzing where and when these inappropriate forms of

9   treatment occur to be unimportant, though they deny that when asked. Yet there is no

10   careful analysis of these problems at a statewide level. Moreover, their failure to do the

11   analysis themselves, and their denying us access and input into the EHRS that would

12   allow us to do this analysis, is telling. They *say* that the psychiatric leadership should feel

13   free to state their opinions and that information is provided to them and that their input

14   is welcome, but their *actions* tell a very different story.

15   This attitude of our psychology and administrative executives, both at HQ and in the

16   field, that psychologists and administrators can determine what is and is not actionable

17   medical information, as described above, and therefore what information psychiatric

18   physicians should be allowed to know and act upon, has direct and sometimes

19   devastating medical consequences. The psychologists' determination that SAC EOP (Seg

20   yards) were safe and good and improving for psychiatric medical practice, is particularly

21   problematic. It is concerning because conditions there are actually so dangerous.

22   Therefore, reporting that they are good and improving suggests either an inability to

23   evaluate what good care is, or deliberate indifference to woefully inadequate care.

**Patient X, Title 22, and the Proper Role of Psychologists**

Patient X is a woman who presented psychiatrically relatively well when she entered prison. But upon entry into the prison system she refused to take medication that she previously had been taking. The psychiatrist did not deem that he could force medications upon her given how well she presented. The patient was subsequently seen by another psychiatrist who also documented her apparently reasonable mental state off medications.

Arguably, in situations like this, longer transitions for patients at higher levels of care should be insisted upon when medication from the community is discontinued, even if the patient appears to have the legal right to discontinue medication because of presenting in a logical way.

The patient was transferred to a CCC level of care where she was to be followed, presumably because she was doing well as she left the reception center (anti psychotic medications take a while to work, but many times when they are, their good effects can sometimes last for a while after stopping taking them).

The patient was followed off medication in the prison mental health system at a CCC level of care and did well, per reports, for many weeks. But she did not stay well.

Four hours before a sentinel medical event in which the patient removed her eye and ate it, the patient had been evaluated by a psychologist who had found her to be gravely disabled and had written admission orders to the psychiatric crisis bed unit. These admission orders were being followed, except for the order for the patient to go to a crisis bed. At the time of the event, Patient X was in alternative housing in a non licensed TTA (like an urgent medical care center) despite the order for more intensive care.

83

1   The ████████████ version of events, many of which I have personally corroborated

2   by reading the record, are as follows. (see 2017 12 11 1622hrs) I summarized the events

3   both in an email to the head of medical quality management (see 2017 12 18 1934hrs) and

4   to other senior executives in mental health (see 2017 09 05 1449hrs). The ████

5   ████████████ version of events, from a medical perspective, was unfortunately not made

6   part of the report about the incident in the root cause analysis:

7   In the below text, the blue writing is ██████████████ Dr. ████████████, and the black

8   text in square brackets is mine:

9   "On 4/20/2017 I/P [Inmate Patient] X......, who was admitted to MHCB [mental health

10   licensed hospital crisis bed], although was housed in the TTA [a non licensed medical

11   acute unit], was involved in a sentinel event. Approximately 4 hours earlier, she had been

12   evaluated and determined to be gravely disabled by the on site psychologist who placed

13   admission, watch, and issue orders [admitted her, ordered how frequently she should be

14   observed, and ordered the clothing she should wear].

15   She was on one to one suicide watch by an LVN [a licensed vocational nurse. This LVN

16   was tasked with constantly observing her. MG] and was to be in a strong gown, however

17   refused to comply with issue orders. It was documented that she was "psychotic" at the

18   time of admission. Documentation from the one to one observer noted "screaming" every

19   fifteen minutes for most of the four hour period. She did not receive medications during

20   the four hour period prior to the event. The psychiatrist on call was not contacted by

21   [either] nursing, the admitting psychologist, or custody. After touching her eye for several

22   seconds, while in the supine position on the floor, the I/P used her left hand to enucleate

23   her left eye [take out her left eye]. The alarm was sounded and two correctional officers

24   entered the cell. The I/P was asked to relinquish the eye, however, she put the eye in her

25   mouth and ingested it......."

1  Dr. ███ was very concerned about several issues and wrote extensively about them. (see
2  2017 12 11 1622hrs) Her medical opinion was that the patient had given every indication
3  that the patient needed medications (forced if necessary); but that it was determined by
4  psychologists and nurses   including the patient safety committee which had no
5  psychiatrists on it   that there was no reason to mention the acute need for the
6  psychiatric medications (forced or otherwise) as having been a root cause of the
7  enucleation. It was determined that failure to provide medications was not a root cause of
8  the patient having removed her eye.

9  Multiple subsequent psychiatrists, including headquarters psychiatrists, who heard about
10 this event, agreed that medications and forced medications had been needed, but the
11 psychologist evaluating the patient did not call the psychiatrist. Furthermore, the
12 psychologists at CIW and the HQ psychologist evaluating the psychologist's action, and
13 the patient safety committee (with no psychiatric input), determined that failure to call
14 the psychiatrist had not been a root cause of the problem. For documentation of the
15 screaming, see 2018 08 10 1116hrs including the close up photo showing that what is
16 highlighted is the word "screaming" (page 3).

17 So failure to give emergency forced psychotropic medications in a newly hospitalized
18 patient was not a root cause of the problem, as determined by psychologists with no
19 medical training, while also ignoring the opinion of the ███████████. The opinion of
20 the psychiatrist who was on call for this admission in which tragedy occurred was not
21 sought, though he had the most experience and training about the emergency need for
22 medicine in situations like this. The psychologist apparently determined that there was
23 not a medically relevant situation necessitating that the physician be called. And the
24 psychologists and administrators (and I believe nurses) at the institution determined that
25 it was reasonable not to make sure that such a patient got medications in that emergency
26 situation. And the patient safety committee at headquarters, with no psychiatrist
27 representative, agreed. (see 2017 09 05 1449hrs)

1  Psychiatrists on call in CDCR are called after hours to "reconcile medications" for patients
2  being admitted. This is *not* someone (such as a psychologist) who has *interviewed* the
3  patient, calling the doctor and giving the doctor information about the patient. What
4  medication "reconciliation" amounts to is merely mechanically copying over medication
5  orders from the previous unit that a patient was on. Indeed, this is now being done by
6  pharmacists instead of physicians at some locations, and it will soon be done
7  automatically by the computer system.

8  The point is that reconciling medications is routinely done as a mechanical process, with
9  no knowledge about the patient, so cannot be considered a substitute for hearing about
10  the patient in a conversation with someone who has *interviewed* the patient.

11  In this case of Patient X, formal medication reconciliation was initiated for the patient,
12  but no relevant information was given to the on call covering psychiatrist *after the patient*
13  *was interviewed by the psychologist* (or anyone else), and that was the major problem.

14  Virtually anywhere across the country, for a patient newly admitted to a hospital, if no
15  general medical or psychiatric physician is available to interact on site with the patient,
16  the social worker or nurse initially interviewing the patient will call the doctor and tell
17  him or her about the patient.

18  Medical consultation is necessary even in the absence of a significant crisis, but it is even
19  more necessary when a patient is known to be psychotic and decompensated.[xvi] This
20  medical discussion with a physician (or sometimes a non physician provider like a nurse
21  practitioner) is needed to determine whether the patient would benefit from medication
22  (or forced medication) and also in order to determine in emergencies the potential
23  medical causes of the agitation, which could involve the need to check further laboratory
24  tests or perform medical evaluations (such as head CT scans, etc.).

1  But in this case, the psychologist interviewing the patient made the decision not to

2  consult the psychiatrist. According to Dr. ▮▮▮▮, the ▮▮▮▮▮▮▮▮▮▮▮, the psychologist

3  gave as a reason for not having called the doctor, that he thought that the patient would

4  refuse to take medication. So with no medical training, the psychologist took it upon

5  himself to determine that there was no need for a medical work up, and he apparently

6  didn't even consider that the psychiatrist might think it necessary to force medications in

7  this case.


8  According to Dr. ▮▮▮▮ (see page 6 of 2017 12 11 1622hrs), the psychologist did not even

9  have legal admitting privileges for the crisis bed unit. Moreover, despite this horrendous

10  event, licensing was not called, because the patient's physical location was in an

11  unlicensed TTA, though the orders (that were already being followed), specified that the

12  patient was to be admitted to a licensed facility (Mental Health Crisis Bed).


13  I am not an expert on the law. This patient had not made it to the licensed location in the

14  prison so perhaps licensing did not need to be called? Dr. ▮▮▮▮, the ▮▮▮▮▮▮▮▮▮▮,

15  thought that part of the reason the patient did not make it to the licensed bed is that the

16  patient would not change her clothes into the appropriate gown for a crisis bed. The

17  order admitted the patient to a licensed bed, but the patient was not at the time in one.


18  Regardless, for a psychologist to make the medical decision not to call the psychiatrist

19  during an admission is apparently the norm at this crisis bed hospital unit. Indeed,

20  according to the former ▮▮▮▮▮▮▮▮▮▮, when she took call, she was repeatedly not

21  called by psychologists admitting patients to licensed crisis beds, and was only called

22  when psychologists were going to deny admission to a patient (to share potential liability

23  with the psychiatrist if something bad happened from failing to admit). (see page 6 of

24  2017 12 11 1622hrs)

1   So at this crisis bed unit that the judgement of the psychologist (about when a patient

2   would need medical attention during a crisis hospital admission) was deemed to be

3   adequate, and consultation with a psychiatric physician after a history is taken was

4   deemed not to be needed. And the assumption was that in general, the psychiatrist did

5   not need to be called when patients were interviewed at the crisis hospital (or in

6   alternative housing) en route to the hospital.


7   This again follows from the underlying assumption and contention of many of our

8   psychologists that their license gives them the ability to determine when

9   medical/psychiatric consultation or information is needed, even if a patient is being

10  admitted to a crisis hospital, is screaming (even for hours), and is gravely disabled, as

11  determined by the psychologist himself. This is the same attitude which denies the HQ

12  psychiatric leadership team access to medical information about the entire CDCR mental

13  health system.


14  The tragedy is that any competent psychiatric physician or general medical physician

15  would have medicated the patient, and likely the patient's eye would still be in her head

16  had that happened. It is the standard of care that medical evaluation occur in the case of

17  psychotic patients [xvii], which implies that physicians must be contacted in situations in

18  which patients are admitted to hospitals and are psychotic and agitated. Indeed, it is the

19  standard of care that physicians (or physician extenders like nurse practitioners) be

20  involved any time patients are admitted to licensed crisis or hospital facilities (see below,

21  title 22), even if patients do not appear to be psychotic and agitated. But it is clearly not

22  the standard of care at this unit and many others across CDCR.


23  Indeed title 22 and 15 clearly state that in licensed CTCs (which includes mental health

24  crisis bed hospitals)

1. "Psychiatrist means a person who is a licensed physician and surgeon in the state of California...." (79567)
2. "Psychiatric/psychological services means consultative services to inmate patients (79609) of a correctional treatment center" (79609)
3. Physician Services are services provided by the licensed physician responsible for the care of the inmate patient in the correctional treatment center (79599). And under 79599 Physician service includes, "determination of the appropriate level of care for each inmate patient."

Psychiatrists are the physicians (licensed physician and surgeon per title 22) taking care of these patients in these mental health CTCs (hospital crisis bed units). Our general medical physicians do not care for these patients, except occasionally as consultants. Psychiatric physicians decide when to consult their general medical colleagues if they deem that a general medical condition (like diabetes or hypertension) needs attention. So it is clear from title 22 that the psychiatric physician is considered the "licensed physician" (79567) and thus has overall medical responsibility to consult the right people and make the right decisions to keep the patient safe, when the system works correctly. The psychiatrist has the same set of responsibilities as any other type of physician would have in caring for a patient in a licensed correctional treatment center, whether its focus is on general medical care or on psychiatric medical care (according to title 22 and 15).

Thus, it seems clear from these rules that the psychologist services (79609), per title 22 and 15, are consultative to the patient and therefore cannot substitute for the physician's care. The physician (according to title 22) is not consultative to the patient. Instead, the physician is "responsible for the care of the inmate/patient" (79599).

So not only should the psychologist, as a patient consultant, be checking with the physician who is ultimately "responsible for the patient" (and even more so in a crisis admission to a hospital) the psychologist *must* do so, whether psychologists think they

89

1  can determine what is a medical issue or not. And this is relevant for a broader discussion

2  about this patient and many other issues throughout CDCR.


3  Perhaps even worse than this tragedy, the decisions of our local psychologists are made in

4  the context of a headquarters culture that precisely encourages these types of

5  irresponsible decisions to continue. An HQ representative of the statewide patient safety

6  committee (a psychologist) was assigned to help with the root cause analysis that was

7  being done at the institution, and was said to "make suggestions".


8  The ███████████ at the institution, and I, the Statewide Chief, insisted that one of

9  the key root causes of the disaster was the decision of the psychologist not to call the

10  psychiatrist, resulting in medications not being promptly administered. HQ psychiatrists

11  who reviewed the case also do not understand why the psychologists would not be calling

12  the psychiatrists for admission routinely, but especially in a case like this. And of course,

13  the ███████████ at CIW also could not understand why the psychologist would not

14  call the psychiatric physician.


15  Further, though it was the psychologist who interviewed the patient and therefore should

16  have called the psychiatrist, HQ psychiatry was surprised, too, that nursing staff did not

17  call the psychiatrist. The ███████████ discovered that custody thought the

18  psychologist was the physician, and the psychologist is even listed as the physician to call

19  by nursing staff in certain documentation. (see page 3 of 2017 12 04 1043hrs)


20  Two HQ psychologists (one of whom visited the institution for patient X) sit on the HQ

21  patient safety committee. We have asked that a psychiatrist sit on the committee, given

22  events like this, but our request was denied. Had psychiatric physicians been represented

23  on the safety committee, that might have allowed relevant psychiatric medical

24  information, and then our vote, to make a difference. But it was clearly determined, not

25  just in the institution, but at headquarters as well, that the psychologist's opinion about

1    what was a medical issue in this case was valid (for example, that the failure to call the

2    physician was not a root cause of the disaster when a patient was admitted to a

3    psychiatric hospital and also happened to be decompensated, psychotic, and screaming).


4    Such problems are likely to continue happening at this institution and more widely in

5    CDCR wherever this thinking occurs. It occurs because psychologists, supported by HQ

6    administrators and non medical senior executives, continue to allow psychologists to

7    determine what is or is not a medical issue. That is particularly dangerous in emergencies,

8    for example during admissions to psychiatric hospitals.


9    The ███████████, who advocated that it be recognized that the patient should have

10   been given medications, wrote about her experience working there in an email message

11   to me (for original see <sup>xviii</sup>). (see 2018 04 30 1244hrs) [The text in black in square brackets

12   is my own]:


13   "It had come to a point where the Supervising Psychologists in each program were by

14   proxy supervising the staff psychiatrist in that program. This was not a 'team based'

15   approach in providing care. The therapist was [deemed] the 'primary clinician' (formally

16   so, as the "PC" in the electronic medical record) and made all the important decisions,

17   without needing agreement from the psychiatrist. This was even the case during IDTTs

18   [treatment teams in which major clinical decisions are made]    the 'primary clinician' was

19   the person who presented the case, spoke to the patient, and the psychiatrist was asked

20   only to speak when it was about medications. I can attest to at least a hundred IDTT's I've

21   been a part of as the psychiatrist. And this was the only role I was expected to play    the

22   prescription writer."

1  The ▮▮▮▮▮▮▮▮ continues:

2  "At CIW, in the one year period that preceded my becoming the ▮▮▮▮▮▮▮▮▮, no

3  psychiatrist had attended the pharmacy and therapeutics committee meeting. [A

4  psychologist ▮▮▮▮▮▮▮▮ attended in the place of the ▮▮▮▮▮▮▮▮▮▮]. No

5  psychiatrist had attended Licensed Inpatient Committee meetings, Utilization

6  Management Committee, Quality Management Committee, and perhaps most

7  importantly, the Mental Health Subcommittee. This can all be confirmed via meeting

8  minutes, [although these committees all explicitly review the medical aspects of mental

9  health care]. Psychiatrists had not been involved, at all, in policy review for any of the

10  programs outside of the PIP [Psychiatric Inpatient Program], even in the MHCB [Mental

11  Health Crisis (hospital) Bed]. In fact, nobody knew who the Clinical Director of the

12  MHCB was when I became ▮▮▮. I asked the ▮▮▮ the ▮▮▮ [▮▮▮▮▮▮▮▮▮▮▮▮▮, a

13  non psychiatric physician], ▮▮▮ [▮▮▮▮▮▮▮▮▮▮▮] and the ▮▮▮ [Psychologist

14  Executive, ▮▮▮▮▮▮▮▮▮▮]. The ▮▮▮ thought it was the previous ▮▮▮▮▮

15  ▮▮▮▮ of the PIP, ▮▮▮▮▮, PsyD [psychologist] (it was not). Or perhaps it was the

16  new acting ▮▮▮▮▮▮▮▮ I had appointed for the PIP, ▮▮▮▮▮▮, MD (it was not).

17  The ▮▮▮▮ thought it was the ▮▮▮▮▮▮▮▮▮▮▮▮▮ it was not, he was the ▮▮▮▮

18  ▮▮▮▮. Multiple policies in the MHCB refer to a "Clinical Director", yet lo and behold,

19  nobody knew who that person was.

20  Finally, the designated "▮▮▮▮▮▮▮▮▮▮", ▮▮▮▮▮▮ piped in and said that it

21  was the previous Supervising Psychologist, ▮▮▮▮▮▮, but unofficially. And currently, I

22  asked? Radio silence. Why is this problematic? Here was a licensed inpatient psychiatric

23  hospital, being solely run by psychologists, and had been for at least three years."

1  Dr. ███ continues, commenting on the local MHCB policy:

2  "One example is the enucleation [eye removal] case. A psychologist admitted the patient
3  to the MHCB, did not contact the psychiatrist on call, and for four hours, this severely
4  psychotic patient paced and was noted to be 'screaming', she refused to change into a
5  strong gown, and refused movement from the [unlicensed] TCU to the [licensed] MHCB.
6  She was not offered a single dose of an antipsychotic before enucleating her eye and
7  ingesting it. She only received a dose after the enucleation   which was when the
8  psychiatrist on call was notified.

9  To my shock and dismay, the ███████████ did not [note] that the policy
10  indicated that the psychologist must contact the psychiatrist when admitting. And that
11  notion [that nothing needed to be said to the psychiatrists] had been passed down to all
12  the staff, including the admitting psychologists who were told that the policy was to only
13  contact the psychiatrist when sending a patient back to their housing (that is not actually
14  in the policy). See local CIW Policy [see page 10 of 2017 12 11 1622hrs].

15  The ███ also wasn't aware that the admitting psychologist did not in fact have
16  admitting privileges at the MHCB, as none of the psychologists did. They only had
17  credentials to treat patients with therapy, not admit. That application process was
18  initiated by me after two years of psychologists admitting patients in a licensed
19  psychiatric hospital.

20  As a physician, I am well aware of what credentials and privileges are required for
21  admitting and treating and would not place a physician in a role without those being in
22  place. I know this because I have spent years training in hospitals. I am positive that the
23  psychologist who is the ███████████ has never worked in a free standing
24  hospital, psychiatric or otherwise. Nor has the other ███████████. This matters. As

1    physicians, we are trained largely in hospitals   we admit and discharge thousands of

2    times and we learn UM [utilization management] and QM via that process.

3    Yet this valuable skill set is completely disregarded at CDCR. Instead, there is a fiefdom of

4    power held together by a group who has been given more responsibility than their scope

5    would designate. The psychiatrists who encompass the broadest scope   all the

6    therapeutic modalities and the medical aspects of care   are relegated to being

7    prescription writers.

8    This is of course, related to CDCR's difficulty in maintaining psychiatrists   none of us

9    went to medical school and completed four to five years of residency to be a prescription

10   writer. Yet, perhaps more importantly, it affects the care provided to patients, as

11   evidenced by the one case illustrated in this letter (there are many more examples). All

12   patients, in particular inmates who are mentally ill, deserve the community standard of

13   care, which is a physician psychiatrist overseeing a department that provides psychiatric

14   care (which includes behavioral health). That standard is based on years of training and

15   licensure scope, not on hoarding of power." (see 2018 04 30 1244hrs)

16   In this CDCR culture that relegates psychiatric medical doctors to mere prescription

17   writing, perhaps it is not surprising that it was deemed unnecessary to get a medical

18   opinion in a case in which a psychotic patient was screaming for four hours. And it is not

19   surprising that a headquarters culture that allows psychologists to vote to allow

20   themselves to override physicians' orders (for when a patient should be seen next) and

21   has QM committee meetings applauding excellent quality care at SAC (without

22   recognizing that it was disastrous care) would also send a psychologist down to review

23   the process, and he and the committee (with no psychiatrists), would find it perfectly

24   acceptable for a psychologist to decide that failure to call the psychiatrist was not a root

25   cause of the problem, despite the opinion of the local ██████████, the Statewide

26   Chief Psychiatrist and the entire HQ psychiatry team.

1  The case of Patient X is tragic because the enucleation was likely preventable. This case

2  should be reopened and reviewed by the Coleman Special Master team or their designees,

3  as CDCR has not as yet developed the cultural knowledge (in many of its institutions or at

4  headquarters) needed to understand that medical decisions about acutely hospitalized

5  patients should be made by psychiatrists rather than non medically trained personnel,

6  and that clinicians should call the psychiatrist on call in such cases rather than failing to

7  consult the psychiatrist. It is important to learn from these tragedies and we will not do

8  so given the dangerous, medically inappropriate constraints CDCR imposes on

9  psychiatrists' access to information and analysis of psychiatric medical contexts in CDCR.

10  **Psychiatry Undermined and Sidelined**

11  For comparison with the case above, it is helpful to read the comments of a line staff

12  psychiatrist at a different institution (CHCF). Dr. ███████ comments are relevant to the

13  previous case (see 2018 07 17 1703hrs):

14  "It seems that certain types of decisions, including level of care changes, are made by the

15  supervising psychologist in consult with the clinician (psychologist or social worker). In a

16  setting like this, you must choose your battles, so I don't say anything. On a few occasions

17  I did get frustrated because I felt strongly about certain cases and spoke up, expecting

18  people to respect my view, but certain staff just argued against me. If I really felt I wasn't

19  being heard, I could have just contacted the other facility involved to say that I disagreed

20  with the team, but I would never do that. Even weirder is when they ask questions for

21  custody regarding whether mental illness played a role in some infraction when going in

22  front of a disciplinary board. This question almost always seems to involve a deep

23  understanding of the role of medications in relation to their illness, and I am trained in

24  forensics and have been involved in answering questions like these for courts in several

25  locations and internationally."

95

1   He continues:

2   "I've just gotten very good at biting my tongue for 90% of our meetings that are

3   dominated by psychologists. It helps keep me humble, because in reality I'm trained in

4   Johns Hopkins and Yale and have often had high level experiences or been directly

5   involved in research related to the matter at hand. So if a social worker with no real

6   mental health training is asked their opinion over mine, it just tells me that the system is

7   more interested in other things than truth. Hope that's not too cynical or going to get me

8   into trouble. I'm always interested in big picture and systems level thinking, so please let

9   me know if I can be of service or if there are any unique opportunities in the future."

10   Dr. ███████, ████████████ at SATF, similarly describes how the psychologist who

11   supervised him (a former Chief of Mental Health) made an apparently incorrect clinical

12   determination and used her disagreement with his good judgement as part of her

13   argument to get him removed as a Probationary ███████████. (see 2018 04 26

14   1257hrs)

15   Dr. █████, the excellent ███████████ at CIW when the enucleation case above

16   happened, stepped down from her position as probationary ████████████ before her

17   reputation could be tarnished as her preliminary probationary report did not reflect her

18   excellent skills, hard work and commitment to excellent patient care. Neither the

19   Statewide Chief Psychiatrist nor any other psychiatrist has any input into decisions about

20   whether chief psychiatrists are deemed to be doing a good job. Dr. █████ did not want to

21   have to report to subsequent employers that she had failed probation so she quit before

22   that happened. Please see my letter to our ████████████ (see 2017 10 25 1156hrs) and

23   Dr. ██████ note to me (see page 2+ of 2017 10 25 1156hrs).

24   But ████████████ at SATF, Dr. ████, stayed and was failed on probation and forced out

25   of his position. He was demoted. But he fought the charges against him in court, and

1   won, and was then reinstated as the █████████████, with no need to report any failures

2   to future employers, because he had been exonerated in court.

3   He says in a message to me about evaluations of his clinical care:

4   "....I had another patient in crisis bed that I saw at the request of the staff who making a

5   gesture of putting something around his neck and trying to pull the ends with his hands

6   without completely encircling the neck. He wanted custody to go in. He had a law suit

7   going on charging excessive force and had a detached retina because of that. He was

8   hoping for custody to go in and get physical so that he could get the injury aggravated

9   and have a further case against CDCR. I told the custody and staff that there was no acute

10  danger to the patient and for custody not to go in but for staff to just keep a visual 1:1 on

11  him. The patient calmed down after custody did not go in and was ok and an aggravation

12  of his detached retina was avoided. An additional lawsuit on CDCR was also avoided. This

13  was the case you [Dr. Golding] were consulted on and you sided with me but these guys

14  nevertheless used it against me.

15  I was written up by the █████ [...] and told that I had not followed the rules. She also did

16  not like some of the views I had expressed earlier that a psychiatrist should weigh in

17  before a patient is discharged. She failed me on probation because of this and other

18  trumped up lies and fabrications. I sought a Skully hearing and won the case and retained

19  my █████████████ position." (see 2018 04 26 1257hrs)

20  **Psychologists Shouldn't Be Making Medical Decisions**

21  Note also Dr. █████ mention of discharges from (presumably) crisis beds. Crisis beds are

22  licensed mental health facilities which are designed to be short term crisis psychiatric

23  hospitals (stays are often less than ten days). In virtually every hospital across the country

1   and throughout California, patients do not leave hospitals without a medical doctor (such

2   as a psychiatric physician) determining that from a medical perspective, the patient is

3   safe to leave.

4   For example, a patient might have diabetes or hypertension as well as mental illness and

5   it is the psychiatric physician's job to either determine that these medical conditions are

6   stable prior to the patient leaving, or to get them stable, for example by consulting a

7   general medical physician. Moreover, psychiatric medications are frequently being

8   adjusted, medication levels need to be checked, and physical and certain predictable

9   mental side effects may need to be evaluated before a patient leaves hospital. Patients

10   should not leave a hospital unless some kind of medical clearance is given.

11   In California, unlike in most states, psychologists are apparently allowed by law to

12   discharge patients from hospitals. Our ██████████ has affirmed that, and is working

13   to extend the CDCR system of psychologists admitting and discharging to the

14   Department of State Hospital Programs inpatient programs for inmate patients that

15   CDCR recently took over. Psychiatrists currently admit and discharge patients from these

16   formerly DSH hospitals. It is particularly crucial that physicians (including psychiatric

17   physicians) at least medically determine that it is safe for a patient to leave the acute and

18   long term psychiatric hospital, as psychologists have no medical training at all and will

19   soon be making discharge decisions in formerly state psychiatric facilities about our

20   sickest psychiatrically ill patients who are also often medically sick. Getting

21   medical/psychiatric clearance before patients leave hospitals or some type of medical risk

22   benefit analysis is the standard of care in every hospital across the country. That is why it

23   is particularly poignant when Dr. ███ was attacked for saying, "a psychiatrist should

24   weigh in before a patient is discharged".

25   Given these issues, the HQ psychiatry team has argued that custody and transportation

26   should not be contacted (and the patient prepared to leave the hospital) unless the

1   psychiatric physician (at a minimum) has affirmatively medically/psychiatrically cleared

2   the patient.


3   Our ██████████████████ denied that request. The ██████████████ did not allow it

4   in practice, arguing at one point that it was a local institutional issue.


5   In reviewing 32 records (see 2017 08 32R), the HQ psychiatry team found that in about

6   50% of cases, there was neither an order in the chart for discharge by a psychiatrist nor an

7   explanation for why the patient should leave. This would be unheard of anywhere in the

8   country, where physicians (including psychiatric physicians) are involved with decisions

9   to discharge patients from psychiatric hospitals. They discharge and write notes. But in

10  these 50% of cases, neither was occurring.


11  In reviewing some of these discharges, we found that a psychologist had discharged the

12  patient without any documented agreement by a psychiatrist or any other medical doctor.

13  The lack of any medical explanation for why a patient should leave a crisis hospital occurs

14  in no other hospital outside CDCR that any of our HQ psychiatrists have ever heard of.

15  (see 2018 07 06 1016hrs)


16  Although not documented in the above list, at CCWF, a psychiatrist clearly states in a

17  note on the day of a patient's discharge (see page 15 and the last page of 2018 08 14

18  1100hrs) that the patient should not be discharged. But the unlicensed psychology intern

19  discharged the patient anyway (after documenting that she spoke with her supervisor,

20  another psychologist).


21  The psychiatrist involved explained in an interview with me that it is considered

22  imperative to get patients out of crisis beds in ten days given directives (I tried to change

23  his mind and asked that he fight that perception, though he feels the pressure can be

99

1   intense from headquarters[xix]). The psychiatrist told me that to properly plan to send a

2   patient for long term hospital care at a psychiatric inpatient unit hospital (rather than the

3   current crisis hospital), a plan has to be started perhaps on day three of the crisis hospital

4   stay, at the first treatment team. So a decision has to made to get the patient to long term

5   care then, before virtually any treatment has occurred. If the team guesses wrongly about

6   the need for long term care early on in the crisis hospital admission, as the psychiatrist

7   says happened in this case, day ten approaches and something must be done. His

8   preference was to wait and send the patient nonetheless to long term care, but the

9   psychology intern overruled his decision. The issue of not being late for transfer seemed

10  absolutely imperative.

11  The psychiatrist said that the team might be accused of mismanaging the patient if the

12  patient stays beyond the strongly suggested maximum amount of time the patient should

13  be there (ten days) to wait for a long term bed. The argument is that, had the referral

14  been made earlier, for example, at day three, it would have been easier to get the patient

15  to the long term bed by day ten, not after day ten. If one can't get the patient to the long

16  term bed by day ten, the reasoning goes in this crisis bed unit, the only alternative is to

17  discharge the patient to no hospital at all, which is what the psychiatrist says occurred in

18  this situation.

19  He reports that many psychologists seem to be intensely focused and pressured to get

20  patients out of the crisis bed by day ten, even if good discharge plans have not been

21  made. Finally, there is additional pressure to discharge the patient to the lowest level of

22  care possible, the CCC level of care, not the EOP level of care.

23  So the psychiatrist wrote in his note that the patient should not leave a protected hospital

24  setting (see pages 8 and 15 of 2018 08 14 1100hrs), but the unlicensed psychology intern

25  discharged the patient to the lowest level of care mental health care (CCC) possible, not

26  even the EOP level of care in which the patient would have got enhanced services.[xx]

1    Of interest, about a week before the hospital admission described above, the patient had
2    also been discharged from a crisis bed and was similarly sent to a CCC level of care.
3    Consistent with the policy that when patients transfer levels of care (and institutions) the
4    psychologist (or social worker) writes orders for the psychiatrist to see the patient back at
5    the latest court allowable date, the non medical clinician scheduled the patient to see the
6    psychiatrist 90 days later   this was a patient just discharged from the hospital   with the
7    lowest level of supportive care possible.

8    Put simply, a patient was just discharged from a psychiatric hospital and put at the lowest
9    level of follow up care, and orders were written on 7/13/18 by a psychiatric *social worker*,
10   for the patient to be seen *90 days* after just being released from a psychiatric hospital (the
11   community standard is one *week*).

12   The social worker determined when the next medical intervention was needed and
13   determined that the psychiatric visit should occur 90 days later. There was no physician
14   involved because the social worker or psychologist determines when the patient should
15   be seen next, hospitalization or not, medication adjustment or not, and the maximum
16   time is chosen.

17   And then the patient bounced back almost immediately into the hospital from CCC and
18   then was discharged by the psychology intern who met the patient once. This was against
19   the will of the psychiatrist who had seen the patient essentially every day for a week. The
20   psychology intern who saw the patient once and overruled the physician sent the patient
21   to the CCC level of care again with the rationale for lower level of care
22   ("MHLowerRationale") being, "Patient is assign(e [sic] to CCCMS."

23   After the second hospitalization and discharge to a CCC level of care a second time, the
24   patient was finally sent to EOP on 8/9. (see 2018 08 15 1333hrs)

1   One wonders how a psychology intern could really understand that when one rapidly

2   lowers a very powerful medication like olanzapine (which occurred), then starts an

3   antidepressant, that could be profoundly destabilizing in terms of increasing short term

4   risk of suicide, which is no doubt why the psychiatrist Dr. ████ wanted to make sure the

5   patient did not become agitated then suicidal in making those changes. So it is hard to

6   fathom how the psychology intern could make the medical decision that Dr. ████

7   knowledge and information just wasn't relevant or at least not relevant enough, and that

8   it was fine to overrule the physician and his judgement.

9   The psychiatrist saw the patient 7/23/18, 7/24, 7/25, 7/26, 7/27, 7/29, 7/30, 7/31, 8/1 and the

10  psychology post doc intern saw the patient once on 8/1/18 and discharged the patient,

11  against the explicit and documented advice of the psychiatric physician.

12  The psychiatrist wrote:

13  "As per team IP [inmate patient, MG] will be discharged back today to his yard. This

14  psychiatrist is recommending additional observation in view of his long Hx, long

15  sentence, residual depressive Sxs [symptoms] and the recent initiation of AD

16  [antidepressant] medication however this opinion *was felt to be unnecessary* [emphasis

17  mine, MG] by the other team members...." (see page 2 of 2018 08 14 1100hrs)

18  In contrast, the post doc psychology intern wrote:

19  "Met with patient for IDTT [the patient's treatment team, MG]. Introduced myself as

20  covering for his primary PC [PC= "Primary Clinician" which is almost always defined to be

21  the psychologist or social worker in CDCR]. Informed patient that after reviewing his

22  chart notes, emailing yard PC and speaking today with primary PC, there does not appear

1   to be a reason to continue to keep him after 1 days [sic]." (see page 2 of 2018 08 14

2   1100hrs)<sup>xxi</sup>

3   To summarize, (see 2018 08 14 1100hrs), the patient was admitted to the mental health

4   crisis bed (a licensed correctional treatment center) for suicidal thinking with plan. He

5   was clinically discharged on 8/1/18, despite the psychiatrist's strong objections.

6   Dr. ████████ says:

7   "Two significant issues to note: 1) The psychiatrist saw the patient every day of his

8   admission, with the exception of 7/28/18, whereas the patient was seen by 7 different

9   psychologists or social workers during his stay. The psychiatrist was the staff member

10   with the most knowledge and familiarity with the patient, but he was overruled regarding

11   the discharge; 2) The patient was discharged by a post doc psychology intern, on the day

12   she met the patient. The psychiatrist strongly disagreed with discharging the patient, but

13   the patient was still discharged. This clearly demonstrates that the unlicensed psychology

14   intern, and not the psychiatric physician, was the primary clinical decision maker." (see

15   page 1 of 2018 08 14 1100hrs)

16   Please now see 2018 07 26 0948hrs, which relates to a different case. In this situation, the

17   psychiatric physician finds out that her non hospitalized patient was not taking

18   medications and writes that the patient should be admitted to a crisis bed for evaluation

19   for 2602 (forced) medications, as she thought forced medications may well be

20   appropriate.

21   "I informed her (the psychologist) that this pt needed to be sent immediately to the Crisis

22   Bed for safety, stabilization and consideration for an emergent PC 2602, which cannot be

1    accomplished in ASU [administrative segregation unit]." (see page 4 of 2018 07 26

2    0948hrs)

3    The above quote means that the psychiatrist told the psychologist that the patient needed

4    to be sent from an outpatient prison housing unit to an inpatient unit for consideration of

5    emergency forced medications ("emergent PC2602"). The psychiatrist also says that this

6    emergency forced medications cannot be safely done in the patient's current outpatient

7    housing arrangement (an administrative segregation unit) and indeed forced medications

8    are essentially never done in CDCR in outpatient units.

9    But the psychology supervisor of the ASU deemed that this evaluation for forced

10    medications in a crisis bed was unnecessary. Thus, this psychologist supervisor made the

11    medical determination that forced medications were not needed and should not occur,

12    though a psychology supervisor has no medical training whatsoever to be making these

13    medical decisions about whether consideration of forced medication is relevant or the

14    consequences of not forcing medication. This decision by the psychologist is eerily similar

15    to the case of patient X, described earlier, in which the psychologist determined that

16    calling the psychiatrist for a possible forced medication order was not needed   but that

17    time, failure to call the psychiatrist had disastrous consequences. So the above is a case

18    where a psychiatrist clearly documents the need for immediate hospitalization for

19    medication related reasons, and the non medical psychologist overrules her, making the

20    medical decision that medication evaluation in a crisis bed is not needed.

21    In theory, level of care changes are always made by the IDTT, the patient's treatment

22    team, which should include the psychiatrist. Yet Dr. ▆▆▆ and Dr. ▆▆▆ and Dr.

23    ▆▆▆ (at CHCF) directly told Dr. ▆▆▆ and me during our recent visit in July 2018

24    and we hear the same from many psychiatrists across the state   that they are frequently

25    only told that the patient is being discharged (or that the level of care is being changed)

26    when the psychologist tells the patient in treatment teams. So the physician psychiatrist

104

1   is finding out that a discharge is going to occur when the patient is being told. Clearly no

2   consultation is seen as necessary with the psychiatric physician, except if the psychologist

3   determines that a psychiatric medical opinion is needed (and often that happens). But it

4   is the psychologist who determines whether there is a relevant medical situation present

5   which necessitates calling a psychiatric physician. As our psychiatric physicians

6   repeatedly say, CDCR seems to want to use them only for prescription writing.


7   At headquarters, while our psychologists and administrators have asked our psychiatrists

8   to interpret certain sorts of data, we are typically denied any kind of comprehensive

9   system level information about the quality of care that we are providing.


10   So strong is the culture of psychologists ignoring and even overruling psychiatric/medical

11   decision making in the California system that, as illustrated above in the case of the

12   patient who removed her eye and swallowed it, and in the discharge and admission

13   decisions illustrated, psychologists are willing to put in writing their decisions to overrule

14   the medical decisions of the psychiatric physician. As our head of Quality Management

15   puts it, "We have a referral based system to psychiatry."


16   This can now be clearly seen to be interpreted to mean that psychologists determine

17   when there are medical scenarios in which psychiatric physicians are needed.


18   This means that psychologists ask for the opinion of psychiatrists only if they deem it

19   necessary. Dr. ███, overruled by the psychology intern, phrases it this way in his

20   discharge note:


21   "This psychiatrist is recommending additional observation in view of his long Hx, long

22   sentence, residual depressive Sxs [symptoms] and the recent initiation of AD

1   [antidepressant] medication; however, this opinion *was felt to be unnecessary* [emphasis

2   mine, MG] by the other team members...." (see page 2 of 2018 08 14 1100hrs)

3   But the physician's medical opinion can only be unnecessary if the psychologist (or

4   psychology intern) determines which medical opinions *are* necessary. Which is to say, the

5   CDCR culture allows psychologists to determine what is a medical issue or not and to

6   consult a psychiatrist only when they deem a psychiatrist's medical opinion necessary. A

7   referral based system means that psychiatrists in CDCR are considered mere consultants

8   to psychologists. This occurs at HQ in which psychologists and our ███████████

9   determine that it is

10     1.   fine to overrule the medical opinion of the psychiatrist about when a patient

11         should be seen next when patients transfer institutions, as a matter of policy

12   and

13     2.   fine to determine that it is unnecessary to allow physicians to have access to

14         needed medical information for patient care from databases or fine to fail to

15         provide the information if they determine the physician does not need it to care

16         for the patients

17   and

18     3.   fine to determine the psychiatric medical workflow in the EHRS and what will be

19         needed information by psychiatrists to make good decisions (for example,

20         reasonably detailed information about the environment of care is not deemed

21         relevant based on what they have allowed to be designed)

22   And in the field it is

23     1.   fine for the psychologist in the crisis bed unit to determine that medical

24         consultation is not needed with newly admitted and screaming and psychotic

25         patients

1   and

2   2.  fine for the psychologist (even just a psychology intern) to determine that
3       changing medications are not relevant in assessing risk for suicidality while
4       discharging the patient, while the psychiatrist disagrees

5   and

6   3.  fine for the psychologist to determine that there is no need for consideration of
7       forced medication in the crisis bed in a medication non compliant outpatient
8       though the psychiatrist insists on it

9   and

10  4.  fine to make a decision that in a licensed hospital it is fine for a psychologist to
11      order an aspirating patient into restraints, rather than calling a psychiatrist who
12      might give forced medication instead, and that it's fine for the psychologist to
13      write a restraints order without getting agreement from anyone with medical
14      knowledge beforehand (discussed later).

15  When I (a psychiatric medical doctor) worked very briefly at CHCF in the crisis bed unit
16  nearly five years ago, a psychologist (the patient's "primary clinician") said to me: "I am
17  discharging patient X. I need you to write his medicines."

18  But when I asked about the condition of the patient, whom I had actually never seen
19  before as I had just arrived at the institution, the psychologist could not or *would not* tell
20  me why the patient was there, or how long he had been there, or what his diagnosis was,
21  or what medical conditions he had, or what medications he was on, etc.

22  The psychologist told me merely that the patient seemed better and was not suicidal.

1   Needless to say, I could not agree to write the patient's discharge medications, because

2   neither the psychologist insisting that I do so, nor I, knew enough about the patient to

3   make such a decision at that time.

4   Having just moved to CDCR from a more standard correctional system elsewhere, in

5   which medical decision making mattered in situations like discharging medically and

6   psychiatrically ill patients from hospitals and in which it was not deemed to be the

7   psychologist's decision when a medical opinion is or is not necessary before discharging a

8   medically and psychiatrically sick patient from a hospital, I was surprised.

9   I was fully prepared to disobey the psychology supervisors who were telling me what to

10  do and to accept whatever consequences there would be. But they had so few

11  psychiatrists that they had to let me stay.

12  CDCR *says* that psychiatrists report to psychologists only *administratively*, not clinically.

13  However, in situations like I experienced above, in which your supervisor may be telling

14  you that a patient is going to discharged, it is very clear that the supervision is definitely

15  not just administrative. It is clinical.

16  The psychologists in many of our institutions are the *de facto* clinical supervisors of the

17  psychiatrists despite having no medical training to be supervising what a physician does

18  medically. But as illustrated in the above examples, they do it anyway. The conversation

19  detailed above, about me writing medications for a patient the psychologist was

20  discharging, was witnessed by fellow HQ psychiatrist Dr. ███████ .

21  When patients leave an inpatient/crisis hospital setting in environments in which

22  psychologists are ordering the discharges, I have argued that psychiatrists should

23  complete an order medically/psychiatrically clearing the patient, which then becomes the

108

1   precipitant to transportation being called to move the patient. Thus, the psychologist
2   could make the decision to discharge the patient    hopefully in consultation with the
3   treatment team    but no order for transport should occur unless and until the
4   psychiatric/medical clearance precipitates it. Then a discharge (usually written by the
5   psychologist) and the psychiatrist's medical clearance would enable the patient to leave. I
6   also believe that in definitively establishing this very important medical/psychiatric
7   clearance policy, it would help our non medical colleagues understand that they need to
8   include the psychiatric physician not just in these discharge decisions but also in other
9   decisions on a day to day basis.

10   Our psychologist █████████████████ has blocked this mandatory consideration of
11   medical issues by physicians when patients leave hospitals and her boss opined that it was
12   a local decision if institutions want to do this. She has in practice prevented this from
13   occurring, thus implicitly leaving many of our psychologists to be medically in charge of
14   many aspects of patients' care, though they have no training to do that.

15   To repeat:

16   Title 22 and 15 clearly state that in licensed CTC's (which includes mental health crisis
17   bed hospitals)

18   1.  "Psychiatrist means a person who is a *licensed physician and surgeon* in the state of
19       California…." (79567)
20   2.  "Psychiatric/psychological services means *consultative services* to inmate patients
21       (79609) of a correctional treatment center" (79609)[xxii]
22   3.  Physician Services are services provided by the licensed physician responsible for
23       the care of the inmate patient in the correctional treatment center (79599).
24       And under 79599 *Physician service includes, "determination of the appropriate level*
25       *of care* for each inmate patient."

1   As stated previously, it is clear from title 22 that the psychiatric physician is considered

2   the "licensed physician" (79567) and as the licensed physician is said to have overall

3   medical responsibility to consult the right people and make the right decisions to keep

4   the patient safe, when the system works correctly.

5   Thus, it should be clear from these rules that since psychologist services (79609), per title

6   22, are consultative to the patient but the physician is "responsible" for the care of the

7   patient, psychologists cannot substitute their judgement for the physician's, because the

8   decision making capacity of the physician (according to title 22) enables him or her to be

9   "responsible for the care of the inmate/patient" (79599).

10   The appropriate "level of care", the determination of which is assigned to the physician,

11   includes whether patients should leave licensed crisis hospital beds, and go to the EOP

12   level of care or the CCC level of care. Title 22 is thus explicit that the physician must be

13   responsible for the patient to make sure he or she is at the right level of care.

14   Not only should the psychologist, as a patient consultant, be consulting the physician, the

15   psychologist must do so, whether psychologists think they can determine what is a

16   medical issue or not. Indeed, when a physician affirmatively denies that clearance and

17   argues that the patient must say, it would seem to be legally problematic for the

18   psychologist to overrule the physician's decisions in licensed hospitals, given title 22, yet

19   this happens frequently in CDCR.

20   Mandatory physician involvement with each discharge decision from a hospital would

21   seem not only to be straightforward and commonsense (and occurs in just about every

22   hospital any physician has ever been a part of), it also seems to be mandated by law. So it

23   is hard to figure out why our psychology executive directors and senior mental health

24   executives (all non medical) at HQ will simply not allow a medical/psychiatric clearance

1  order prior to transportation being called to enable the patient to leave the hospital and

2  be consistent with the law.

3  It strikes our psychiatry team as indifferent to patient medical care to not have a system

4  in place in which a physician (for example a psychiatric physician) makes sure the patient

5  is physically/medically/psychiatrically safe when a patient first enters and before the

6  patient leaves a licensed crisis hospital, when patients are frequently both medically and

7  psychologically sick in hospitals. And during discharge, mandatory orders for

8  medical/psychiatric clearance should be tied to transport orders, to prevent the patient

9  from physically leaving when the psychologist writes the discharge order as happened in

10  the example given above. The psychiatrist said no. The psychology intern said yes. And

11  the patient left.

12  When one of our senior administrative mental health executives asked me what I hoped

13  to accomplish by insisting that physicians provide medical/psychiatric clearance before

14  patients leave hospitals, I responded as follows:

15    "When a patient is leaving the hospital to go to somewhere other than another

16    hospital, someone medically qualified (a psychiatrist or other Medical Doctor) is

17    taking a view about and legally and ethically signing off on a number of issues: that

18    the medical situation including medical meds, psych meds, psychological condition,

19    physical condition, housing and social situation, are such that the patient can safely

20    leave hospital.

21    In CDCR mental health hospitals, discharge orders are currently typically being

22    written only by psychologists, not psychiatrists or other medical doctors.

1    Psychologists are not medically qualified to address all the relevant issues that must

2    be considered.

3    Therefore, if psychologists can discharge patients from hospitals, then the physician

4    giving "medical clearance" in our system must therefore be taking on the

5    responsibility for signing off on all the relevant issues mentioned above.

6    Either the phrase "medical clearance" must take into account all the relevant issues,

7    or the word "discharge" must. If in our CDCR system neither does, we are neither

8    following the law, nor behaving ethically.

9    By requiring psychiatric or other MD involvement in discharge decisions, I am hoping

10   to achieve legal and ethical discharges rather than illegal and unethical ones with all

11   their associated consequences."

12   Our non medical ███████████ wrote:

13   "I am going to change the duties of the psychologists in the PIPS [psychiatric inpatient

14   programs] to allow them, with the IDTT, to make admissions and discharge

15   decisions....There is considerable concern from the psychiatry team at the new PIPs that

16   they will be exposed to liability when a psychologist makes a poor decision". (see 2017 11

17   15 1143hrs)

18   She ignored the need for medical clearance in this message when medically sick patients

19   leave the hospital (seemingly required by title 22 since level of care changes are supposed

20   to be made by the physician, not the psychologist), and ignored that physicians might

21   need input into these "decisions" to make them safe, both in terms of writing policy about

22   them and in terms of trying to protect our patients. Indeed, what if a patient's diabetes

1   were not under control when psychologists make these "decisions" (79599)    that it is

2   important for her that psychologists make.

3   Until recently, it was a mantra that discharges are "treatment team decisions" by the

4   "IDTT"; that is, that decisions about discharge were in theory made by the psychologist

5   and psychiatrist and other members of the treatment team, together.

6   In addition, if it is really always a joint decision, then no one should have any objection to

7   a physician psychiatrist merely psychiatrically/medically clearing the patient (as an order

8   in the treatment team meeting just prior to discharge) before transportation is called to

9   enable the patient to leave the hospital. No one should have any objection to a mandatory

10   physician's clearance order, because surely the treatment team leading and primary

11   clinician psychologist already obtained agreement from the psychiatric physician during

12   treatment team prior to discharge of the patient, if it really were a joint "treatment team

13   decision", as our executive psychology leadership asserts with the ███████████.

14   If the psychiatric physician agreed (in a treatment team meeting) to a discharge, as

15   claimed, why can it be wrong for transport to only be enabled to come if a psychiatrist

16   takes one minute to write a medical/psychiatric clearance allowing transportation to

17   come, in that same treatment team meeting in which that psychiatrist's agreement

18   allegedly occurred?

19   This is logically true and thus our executive psychologists and non medical ██████

20   ████████ should have no trouble at all with psychiatric physicians

21   medically/psychiatrically clearing patients to leave hospitals, unless having a physician do

22   that is actually not what is wanted by the psychologists doing the discharges and unless

23   that is not what is wanted by our █████████████ and those executive psychologists who

24   support the current process and thus will not allow mandatory medical clearances.

1    Please see my e mail to our ███████████ 2018 07 06 1016hrs.


2    Recently, our Senior ██████████, ███████████, released a memo saying the

3    following (see page 2, section c of 2018 09 18 memo):


4    "c. When patients are clinically discharged from crisis beds or inpatient beds, they shall

5    be moved from the bed to their assigned institution in an expeditious manner to ensure

6    bed availability for patients awaiting MHCB placement......."


7    Under "c", discharge is defined: "Clinical discharge means the primary clinician or

8    treatment team has determined that a patient requires a different level of care and

9    discharge orders are placed and the inmate/patient can be moved."


10   The primary clinician is deemed to be the psychologist in a short term (crisis bed)

11   hospital or an acute or intermediate hospital in CDCR.[xxiii] Moreover, the psychologist and

12   the psychiatrist are members of the treatment team as are others. Therefore, the language

13   that in hospitals and crisis beds discharges are authorized if the "primary clinician or the

14   treatment team has determined that a patient requires a different level of care and

15   discharge orders are placed and the inmate/patient can be moved" means:


16   1. The Psychologist (the primary clinician)

17   *or*

18   2. The psychologist and psychiatrist and others on the "treatment team"

19   *determine*

20   3. That a patient requires a different level of care and discharge orders are placed and the

21   inmate patient can be moved.

1    If the psychologist and psychiatrist disagree about discharge, it follows that the treatment

2    team haven't reached agreement so can't make the decision. Given that decision is to be

3    made by the treatment team *or* the psychologist, it follows that in the event that the

4    psychologist and the psychiatrist disagree, the person authorized to make the decision is

5    the psychologist rather than the psychiatrist. The psychiatrist is not authorized to make

6    the decision alone, whereas the psychologist is authorized to make the decision

7    independently of the treatment team.

8    Thus, logically, our ███████████ has determined that in the event that the

9    psychologist and psychiatrist disagree about, for example, whether it is safe to discharge a

10   patient, it is the psychologist, not the psychiatrist, who is authorized to determine

11   whether or not a discharge should occur.

12   Thus, as a matter of logic and policy (by memo), our ███████████ codified that non

13   medically trained clinicians in hospitals are permitted to overrule the medical decisions

14   of physicians.

15   This memo came out after more than a year of discussions with this ███████████

16   about the importance of physicians being able to medically clear patients when they leave

17   hospitals (and also after a year of discussion about the importance of accepting physicians

18   making sure the unit is safe medically for a patient). Psychologists don't have the training

19   to understand when a mental status change may be due to lithium toxicity or even

20   recognize it, let alone when the patient has begun to aspirate so a further work up is

21   needed. Nor do they understand the medical and mental status effects of infections and

22   the myriad complex medical issues that plague our patients and change their mentation.

23   Yet in one bold stroke, she has determined that the non medical psychologist, not the

24   physician with years of medical training, is to determine whether a medical opinion is

25   needed before discharging a patient.

1  No doubt if asked about this, she will be say   and indeed has said (see 2018 09 18
2  1619hrs)   that it does not mean what has been said above. And that "the language in the
3  ... memo is not a change of the policy."

4  If it is indeed not a change of policy, that explains why psychologists in our system so
5  often override medical orders and appear to see no problem with discharging patients
6  from hospital beds against medical doctors' judgement.

7  **Creating Policy Obstacles to Clinical Decision-Making Has Consequences**

8  Increasingly, patients are committing suicide or attempting suicide as soon as they leave
9  CDCR mental health crisis beds.

10  This increase has occurred because there is increasing pressure to get patients out of
11  crisis beds to lower levels of care or to the inpatient hospital within ten days. If clinicians
12  have not filled out the requisite documentation for a prolonged higher level hospital stay
13  by day three of ten of the crisis bed stay, they fail to make the ten day limit for acceptance
14  and transfer into the higher level of hospital care, and thus have to discharge the patient
15  to a lower level of care prematurely, even if the patient is not ready. Dr. ██████ case
16  earlier in this report is an example of this. (see pages 92 95 of this report)

17  In point of fact, a stay is allowed to go beyond ten days, but time consuming conferences
18  and paperwork must be completed to get approval, and time is short, so this policy is an
19  obstacle to good patient care, clinicians taking increased risks with patients and on day
20  nine or ten discharging them to a lower level of care because they did not correctly
21  anticipate a patient's needs on day three and get the necessary approval.

1   Furthermore, if the patient came from the lowest level of outpatient mental health care

2   (CCC), these patients are being returned to CCC, even after the hospitalization, rather

3   than the EOP level of care, to decrease the number of more expensive to care for EOP

4   patients. For example, the number of psychiatrists required per patient is higher at the

5   EOP level of care, so the mandatory number of psychiatrists is lower if the system can get

6   more patients discharged to the lowest levels of care.

7   The increasing suicidality could be corrected in the current system by:

8   1. encouraging more frequent referrals to higher levels of care at day three of crisis bed

9   admittance

10  2. insisting on psychiatric clearance of patients for discharge to lower levels care before

11  transport is contacted

12  3. making the paperwork far easier to fill out with less consultation needed to be allowed

13  to keep patients beyond day 10 in the crisis bed.

14  4. Detailed analysis needs to be done about suicidality coming out of crisis beds and

15  inpatient hospitals (attempts and completions) and data compiled. I have discussed crisis

16  beds. But since CDCR took over DSH, the DSH units are no longer full. They have

17  become more like segregation units because patients cannot get out of their cell.

18  Continuing analysis of 30 day readmission rates from these hospitals and from the crisis

19  beds, as well as rates of attempted suicide need to be done by unbiased reviewers, as the

20  current purveyors of this information have been demonstrated to give false reports.

21  # Conclusion

22  CDCR has a broken system of care because information is not accurately reported upon,

23  and reliable commonsensical action has not been taken. I have documented that patients

24  are not getting to appointments on schedule and in confidential spaces, that appropriate

1  consultation is not occurring, and worse, appropriate medical decision making by

2  psychiatric physicians has been overridden. I have documented that CDCR has prevented

3  errors from being fixed, and worse, CDCR has not allowed anyone to know that there has

4  been inaccurate reporting to the courts and to our leadership. Such knowledge would

5  allow problems to be identified so they can be fixed.


6  A prison mental health system needs to ensure that patients see their psychiatrists and

7  other mental health providers on schedule, on time and confidentially, in an office. CDCR

8  is not doing that, as has been demonstrated in this report.


9  If a mentally competent patient refuses to go to his or her appointment with the

10  psychiatrist, then, as happens with medical and dental appointment refusals in CDCR, the

11  patient should be ordered to walk to the psychiatrist and tell the doctor that he or she

12  doesn't want the appointment.


13  Failing that, a custodial representative should be required to carefully and to the best of

14  his or her ability document the patient's reason for refusing to go to the appointment,

15  and any other possible reasons that might be behind the refusal. The custodial

16  representative should also document the condition of the cell. The custodial

17  representative should then immediately go to talk to the physician him or herself, and

18  have a personal conversation with the psychiatrist, in which together they create an

19  individual plan of action to make sure the patient does get to subsequent appointments.

20  It should be required that all of this be documented.


21  Cell side encounters should not be counted as appointments. They are at best wellness

22  checks. For proper medical care, patients need proper confidential medical appointments

23  in offices, when they need them, on time relative to doctors' medical scheduling orders.

24  Outcomes will continue to be poor (high numbers of suicides, suicide attempts,

25  rehospitalizations, patients' symptoms failing to improve, etc.) unless we have a mental

1  health system in which patients are actually seen, and unless we have a mental health

2  system in which there is accountability for actually getting patients seen properly.

3  If patients were being seen as scheduled, on time, in offices, and for an appropriate

4  amount of time, that would be evidence of adequacy of staffing, but only if the data is not

5  being distorted.

6  If a seriously mentally ill patient cannot or will not come out of his cell for an

7  appointment, the team responsible for that patient (see below), with a custodial officer,

8  should visit these very difficult patients together, like Assertive Community Treatment

9  (ACT) Teams do. The custodial officer is critical so that the door to the cell can be opened

10  safely if needed.

11  QM should focus on basic, straightforward measurements that are accurately and

12  straightforwardly calculated. The approach should be that we measure those things that

13  actually determine good care, and the QM system should be transparent and open to

14  ideas for improvement, both in terms of what is measured, and in terms of how to

15  improve the system of mental health care itself. A good QM system is one that facilitates

16  error correction rather than hiding errors. Our approach should be more like that of

17  airline and air traffic control systems, which focus on actively identifying and learning

18  from mistakes without blaming or shaming anyone.

19  The EHRS needs to be programmed so that the psychiatrist and other clinicians can enter

20  into the chart the environment of care in which the appointment took place. A combined

21  measure of both whether appointments occurred on time, in an office, and for an

22  appropriate amount of time, should qualify an appointment as occurring in a compliant

23  way.

1  Low 30 day readmission rates and suicide rates in a population are in fact legitimate hard

2  outcome measurements demonstrating good quality care. Those institutions that do this

3  better (for a given mental health level and custodial level) should be studied and

4  emulated.

5  Rates of cancellation and refusal should be recorded as a simple percentage (for example,

6  number of cancelled appointments per patient per time). When a patient is scheduled to

7  be seen within a certain number of days and that appointment does not happen, that

8  appointment is late, and should be recorded as such. Labs and blood levels either

9  occurred when they were supposed to or they didn't, and need to be recorded that way.

10  The number of consultations requested, and the number of consults that occur as

11  scheduled, should be recorded straightforwardly. A simple triage system needs to be

12  established to deal with situations in which there are more consultations scheduled than

13  can occur at that time. For example, a nurse and a Supervising Psychiatrist could spend

14  one hour twice a week going through the list of medication non compliant patients

15  together, determining which patients should be seen first and which can wait (or in

16  which cases it would be appropriate for a nurse or psychologist to provide education,

17  rather than the psychiatrist).

18  None of the above QM measurements should be obscured from those who wish to

19  understand them. Thus, many people within and outside the mental health system within

20  CDCR should be able to run simple read only queries to assess the accuracy of what is

21  being reported. All queries being made should document both the query and the purpose

22  of that query: what question does the person running the query think the query might

23  help the person answer? The results of the query including an explanation of what was or

24  was not found should also be recorded. To facilitate error correction in the system, it

25  should be mandated that all this information about every query be easily available for

26  anyone in CDCR to read.

1    Continuity of care is key. Mentally ill patients more reliably get better when they are

2    under the care of the same reliable, caring doctor and treatment team over time, for the

3    following reasons. Doctors improve their care by learning how to treat patients. The first

4    choice of medicine is often suboptimal. Psychiatrists iteratively figure out which medicine

5    or combination of medications to give, by judging responses to preceding medications. A

6    single treatment team should take care of a given patient wherever the patient is in a

7    given institution, and transfers between institutions should be minimized.

8    Making a single team responsible for a given inmate would eliminate the patient

9    dumping that tends to happen in any system in which patient dumping can happen.

10   Systems in which it is possible to reduce one's workload or legal risk by transferring a

11   difficult patient from one's own care to someone else's thereby encourage a lot of

12   transferring (patient dumping). Such systems also tend to result in those looking after

13   patients at higher levels of care holding on to easy patients who don't really need to be

14   there, to avoid having to care for the new and potentially tougher patient that will replace

15   that easy patient. Systems having this flaw (like CDCR) tend to be very expensive both

16   financially and in terms of the care provided.

17   Both patient dumping and inappropriately keeping easy patients in higher levels of care

18   would be solved by a given inmate being assigned to a given treatment team, that

19   treatment team being responsible for the inmate's care irrespective of level of care

20   needed, or even if the inmate doesn't need treatment for mental health problems. That

21   would very quickly result in a reduction of the number of prisoners inappropriately

22   diagnosed as needing treatment, and it would very quickly result in those who do really

23   need treatment actually getting effective treatment. That is, it would do so if clinical staff

24   numbers in the institution were not cut as patients improve.

25   When you are responsible, and dumping is not an option, you get your patients better.

26   The way CDCR is currently set up, more and more inmates will be deemed to have mental

1   health issues, because staff naturally err on the side of referring inmates for mental health

2   diagnosis, not wanting to be blamed for failing to refer when it was needed. This is why,

3   no matter how hard we try to do better in the current system, the number of patients

4   needing higher levels of care never seems to diminish. Take away the incentives to refer

5   unnecessarily, to dump difficult patients, to hold on to easy patients, and make a given

6   team responsible for and accountable for a given set of inmates, and that will solve many

7   of the problems of the current system. Mental health teams will learn to treat patients

8   effectively, as happens outside CDCR, and the whole system will be vastly cheaper to run.

9   The other thing this would do would be to create real teams, with real teamwork. It

10  would create camaraderie. People work much more effectively and efficiently when they

11  feel valued and appreciated as they would in such teams.

12  In CDCR, I'm told we need armies of expensive therapists (do take a look at the ratio of

13  the number of psychologists to the number of patients in the CDCR system    it is

14  remarkably high). But in the real world outside CDCR, excellent patient care can be

15  achieved with fewer resources. Less expensive but still professional individuals like

16  vocational nurses, social workers and "qualified professionals", for example, can make

17  regular checks on patients (and report to psychiatrists regularly who are covering a panel

18  of patients throughout a prison). With regular reports about the health of patients by

19  professionals who are checking on them, the frequency and need for psychiatric visits can

20  be diminished as well.

21  Treatment and therapy should be practical (facilitating work, education, exercise, etc.) in

22  most settings, and only when patients have acquired the basic ability to function, should

23  therapy move on to exploring psychological issues like past relationships with parents,

24  etc. Excellent patient care is not necessarily expensive.

1  Large numbers of responsible adults from outside prison should (after having been

2  carefully oriented to prison rules and to boundaries and the strict limits of relationships

3  with prisoners) be able to visit and check on mentally ill patients. Senior citizens or

4  students of social work and psychology are excellent for this. Such a program could be

5  either on a voluntary basis or very inexpensive. The individuals checking on prisoners

6  should be given clear instructions with respect to what they should do (informing the

7  right person on staff) in the event that they think a given prisoner needs help. Such a

8  program would ease stretched resources.

9  Suicidal patients should not be isolated and should usually be able to stay in the same

10  institution and transported to the institution's own crisis bed unit, the same team taking

11  care of them at the outpatient level of care and when hospitalized.

12  Until we have a culture of excellence in which all or most psychiatrists in our system are

13  comfortable prescribing clozapine when it is indicated, for example, for patients with

14  dangerous life threatening suicidality/self mutilation/self injury associated with

15  personality compensation into psychosis, consultative pharmacologists (for example from

16  the Department of State Hospitals, called "PRN" psychiatrists) should be utilized for

17  consideration of the anti suicidal drug clozapine, with mandatory blood draws, to save

18  such patients' lives. There must be a statewide focus on getting our sickest patients on

19  clozapine with its demonstrated, proven ability to stop hospitalization rates (with proof

20  from Dr. ███████████ team even in CDCR). Clozapine is well known to decrease

21  suicidality in even the sickest mentally ill patients. Aggressive support for clozapine

22  clinics should be mandatory throughout CDCR to support those psychiatrists who

23  prescribe this often life saving medication for our sickest patients.

24  It is reported that in CDCR more than 100,000 inmates move more than 1,000,000 times

25  in a year. Mental health patients can't get better if they keep moving. Moving mentally ill

26  patients from one institution to another, or from one provider or treatment team to

1    another, is unsettling for them. All such moves mean the loss of their familiar

2    environment of care. It's a bit like moving a child to a different set of foster parents every

3    month. No matter how great each home and set of foster parents is, there is likely to be

4    trouble. Moving is stressful enough when it is voluntary and the person is mentally

5    healthy and not in the prison system, let alone when there are mental health problems

6    and it's involuntary and the person is in prison.


7    All this moving of mentally ill patients has been disastrous in CDCR, because, unlike in

8    the world outside CDCR, in CDCR information about the patient is in effect lost when a

9    patient is transferred from one institution to another. Outside CDCR, the patient's

10    existing doctor and the doctor at the hospital to which the patient is being transferred

11    talk to each other about the patient, so that the receiving psychiatrist knows about the

12    patient and can take into account what the previous psychiatrist has tried in terms of

13    treating the patient. Such conversations should be mandatory whenever there is a

14    transfer, whether from one institution to another, or from one psychiatrist and treatment

15    team to another.


16    Admissions should be done by psychiatric physicians and mental hospital units should be

17    cleared medically by psychiatrists as happens outside the CDCR system, and the

18    psychiatrist or treatment team sending the patient should call the psychiatrist who will be

19    admitting the patient to tell the receiving psychiatrist about the patient *before sending* the

20    patient. The psychiatrist poten tially admitting the patient needs to be sure that it would

21    be an appropriate admission before the patient is sent. When a nurse, psychologist or

22    social worker has interviewed an incoming patient, he or she should tell the psychiatrist

23    about the patient as happens outside CDCR.


24    Discharges from psychiatric hospitals should be done by psychiatrists, or at least should

25    never occur without a psychiatrist or other medical doctor having first medically cleared

26    the patient for discharge. The CDCR system would be medically much safer for patients if

1    transportation were not called unless and until the patient has been medically cleared for

2    discharge or transfer. And the psychiatrist must order the follow up care, for example

3    with a psychiatrist in a certain number of days, for a blood draw to occur in a certain

4    number of days, and with a therapist and nurse in a certain number of days.

5    Before a mentally ill patient leaves prison, there should be a video call connecting the

6    inmate patient and the clinicians from the prison with the clinicians the patient will be

7    being cared for in the community after leaving prison, so that the patient will feel

8    comfortable with his or her new providers.

9    Psychiatrists should be reporting to psychiatrists. Just as is the case for Medical, Dental

10   and Nursing reporting structures in CDCR, psychiatrists in the field should be reporting

11   to regional psychiatrists, who themselves should be reporting to the headquarters

12   psychiatry team.

13   Psychiatrists should play a significant role in the leadership of the mental health

14   department, given their greater knowledge and broader expertise. The current situation

15   with psychologists being in charge has clearly been a disaster. CDCR mental health must

16   have psychiatry executives. Currently there are zero, and none are considered eligible.

17   This is perverse and harmful.

18   Psychiatrists in the system should be hired by psychiatrists rather than by psychologists

19   who, in CDCR, appear to literally choose the candidates who will defer to them rather

20   than those who are the best. In CDCR (though not in other systems I have worked),

21   psychiatrists and other medical doctors are more likely to pick the best candidate than

22   psychologists are.

1   Psychiatrists should be clinically in charge of patient care individually and globally in

2   accordance with their legal obligations and greater clinical knowledge.

3   Psychiatry is a medical field and should be treated as such.

4   Hospitals should be run by doctors and those who listen to doctors' clinical opinions

5   about how things should be run. Reinventing the wheel with spokes missing and strange

6   additions, as CDCR has done, hasn't proved successful.

7   Basics before frills. Without the basics, frills are the icing on a mud pie. First get the

8   basics of safe patient care in place. Nothing works without that. Patients need to see their

9   doctor when the doctor says he or she needs to see them. Medical orders must be

10   followed. Medications, etc., must be administered as ordered. There must be handoffs.

11   There must be communication. Medical orders must not be given by psychologists.

12   Medical orders must not be overridden by custody or anyone else other than another

13   medical doctor. More vocational nurses, social workers and custody officers, fewer

14   psychologists.

15   The EHRS needs to be a lot easier and less time consuming to use. This won't happen

16   unless psychiatric physicians are involved in designing the workflow they use. There need

17   to be clinics where general medical physicians, psychiatric physicians, doctors, nurses,

18   and therapists comingle when they see patients. If that cannot exist given the current

19   physical structure of our institutions, at the very least psychiatric physicians should have

20   assigned offices in which they can see their patients, like other physicians do in CDCR.

21   The CDCR Department of Mental Health should offer regular psychiatric continuing

22   medical education and be staffed to do that, so that psychiatric continuing medical

1   education is offered at least monthly. These conferences should be for psychiatrists, but

2   they could be open for all too.

3   Telepsychiatry is a useful method of care. The telepsychiatrist must have the authority to

4   insist that care be provided by an onsite psychiatrist if in the telepsychiatrist's medical

5   judgement a given patient needs onsite care. For example, some patients need regular

6   physical exams to judge a neurological condition, and unless someone onsite is reliably

7   available to do those exams for the telepsychiatrist, the case may not be a good candidate

8   for telepsychiatry. Telepsychiatrists' medical judgement about whether or not particular

9   cases are appropriate for telepsychiatry must not be overruled. Telepsychiatrists should

10  operate from regional hubs in California so that appropriate supervision and training can

11  occur. Psychiatrists from, for example, Pensacola, Florida or somewhere in the United

12  States, have no idea the conditions in our prisons and it would have been disastrous for

13  that to have been allowed to proceed, as was attempted with even advertisements placed.

14  Enough telepsychiatry staff psychiatrists should work at night to fully cover all of our

15  institutions every night throughout the year. This cannot be done with the ten proposed

16  to the court. At least 25 are required.

17  When, following a doctor's medical judgement, a judge orders that a patient needs forced

18  medications, that should happen without delay. The current situation in CDCR in which

19  custodial officers sometimes refuse to facilitate the judge ordered forcing of the

20  medications on the grounds that to them the patient seems calm, is absolutely

21  unacceptable, medically dangerous, and should never happen. Medication forcing isn't

22  necessarily anything to do with a patient's visible level of agitation. Custody should be

23  mandated to facilitate such orders without delay.

24  We need to work to create a collaborative culture in which the different disciplines work

25  together rather than in opposition. When there is good collaboration between clinicians

127

1   and custody for example, patients get to their appointments, and thus get treated, and

2   thus get better, which makes life better not just for the patients themselves but for

3   clinicians and custody. Inmate patients left suffering, untreated, are much more likely to

4   act out than when they are being treated and stable. Having custodial officers individually

5   speak with the psychiatric physician when a patient won't come to an appointment is a

6   good way of beginning to create collaboration between those ultimately working together

7   to keep the public safe.

8   To combat illicit drug use in our system, instead of spending a fortune on medications

9   aimed at combatting such drug use, CDCR should take much more care to prevent illicit

10   drugs entering the prison system, and to prevent medication diversion. Careful drug

11   interdiction programs are needed and more of them. When patients are leaving prison,

12   there is an increased risk of narcotic overdose. Only at those times (and when patients in

13   prison frequently overdose), injectable (and very expensive) medications should be used

14   to decrease the risk of overdose. Moreover, self help drug recovery programs such as NA

15   and AA, and non religiously based programs such as SMART recovery, are virtually free,

16   are *effective,* and should be far more aggressively encouraged than they are in CDCR

17   currently. The absence of several varieties of self help groups for drug and alcohol abuse

18   in a prison is nearly an emergency.

19   None of CDCR's challenges are insurmountable.

20   I close with Dr. ████████ comments about his experiences working for CDCR. He is the

21   ████████████████ of the Salinas Valley Psychiatric Inpatient Program  formerly the

22   Department of State Hospital program that has now been taken over by the Department

23   of Corrections in the "Lift and Shift":

1    "Dear Dr. Golding,

2    I am writing to you in order to consolidate my thoughts about the
3    psychiatry/psychology problem in CDCR and to communicate them to you so that
4    you can best be informed in your position of great responsibility. In my experience
5    you have always been strongly supportive of a civilized, dignified and respectful
6    relationship with psychology. In writing this problem and even speaking of it, I find
7    myself not feeling completely comfortable doing so. Having worked with
8    psychologists for the 30 years since graduating from medical school in multiple
9    settings has given me quite an appreciation for the specialty as well as most of the
10   people in it.

11   However the culture I have discovered and experienced since the "Lift and Shift" has
12   rattled me and given me pause when I consider my future career if such an
13   environment is allowed to continue. I have always valued my collegial relationships
14   with psychologists over the years and continue to in the PIP. What causes me
15   significant dysphoria is the apparent attempt to have psychology be in a position of,
16   frankly, medical equality with psychiatrists as well as clinical authority over
17   psychiatry. This is anathema to me.

18   While psychologists receive a wide variety of training they fail to meet the standard of
19   medical training by a long shot of what physicians and psychiatrists receive. In fact,
20   psychiatrists have received far more widespread and in depth training overall than
21   psychologists particularly when you consider that very few if any of them would even
22   have the necessary prerequisites to take the MCAT, much less to go to medical
23   school. Despite this I have experienced and continue to experience them as valuable
24   members of the treatment teams as well as leadership. In the "real world" outside of
25   CDCR you will barely find one psychologist on staff of inpatient psychiatric programs
26   which is a reflection of their ability to perform in the setting.

1    Since the "Lift and Shift" was announced I have been apprehensive as a result of

2    knowing from both a personal as well as professional level that "things are different in

3    CDCR. Psychologists are in charge and using psychiatrists as mere consultants.

4    Psychologists run the teams, make the diagnoses and determine the direction of care

5    for the patients." These are things I have heard repeatedly from psychiatrists

6    numbered in the double digits over the years many of whom had previously worked

7    in CDCR and left for that very reason. Since the "Lift and Shift" we in SVSP PIP have

8    lost a total of 9 psychiatrists and each and every one of them has listed this

9    eventuality as one of the reasons for their departure from CDCR. I personally

10   experienced this 4 years ago when I applied, interviewed and was offered the position

11   of ████████████ for SVSP CDCR. I accepted but prior to a walk though tour I was

12   baited and switched.


13   Initially I was told during the interview that I would report to the CEO. Later an

14   administrative psychologist told me that I would report to the Chief Psychologist,

15   that psychiatrists were consultants, psychologists ran the teams, made the diagnosis

16   of the patients and we were expected to follow that. I was also told that psychiatrists

17   would have to get over the "sibling rivalry" with psychology in order to work in that

18   model. I was shocked but maintained my composure and began to query how that

19   might work as well as wondering out loud how they had managed to subvert the

20   community standard medical model as well as the rationale for it. Instead of being

21   given a professional answer to a reasonable question, the psychologist with whom I

22   was speaking became angry and told me I would just have to decide if I could do it or

23   not. I said okay and planned to take the tour the next day. The next morning I went

24   to my front door after the bell had rung and was handed a certified letter stating that

25   the offer had been rescinded because I had said that I could never work under a

26   psychologist. I had never said that or even implied it. I then tried to contact the

27   administrative psychologist and the ████ but was unprofessionally treated with no

1   response whatsoever. I then proceeded to apply here in SVSP DSH and remain here 4

2   years and 2 months until now.


3   I chose to stay here once the Lift and Shift occurred despite my apprehension

4   ignoring the advice of all of my psychiatrist colleagues because I love the work, the

5   challenge, the patients and the employees. However recent events have proven me

6   wrong as the further and constant creep of micromanagement particularly from

7   psychologists via policy meetings, CCATs for no good reason as well as important

8   meetings that occur that make and create important changes in the system not only

9   without my presence but also without the presence of any psychiatrist. I even had the

10  displeasure to have to participate in 3 CCATs over a 2 week period on one of our

11  patients who was in dire straits medically before I could get the proper physicians on

12  the phone in order to give direction about the proper LOC as well as care. Once that

13  happened we followed their direction and the patient suffered a perforated bowel

14  that very day. He could have easily died had that happened in the PIP while he was

15  sleeping.


16  My biggest fear is that this will/has become the new normal. A system of mental

17  health dominated by unqualified persons who do not know what they don't know,

18  cannot be told that as they perceive it as insulting and continue to make critical

19  decisions in that state of ignorance. I fear a disaster coming if this is allowed to come

20  to fruition. One wonders if psychologists in administration question whether this

21  structure and culture might be one huge part of why CDCR has not been able to get

22  out from under the Special Master. Frankly, since the Lift and Shift I believe that is

23  the exactly the reason why it has not occurred. Irrational, misinformed and ignorant

24  decisions are made one after another in rapid succession in a bullying manner.


25  Most recently there has arisen the issue of psychologists "scope of practice" including

26  admission, discharge, seclusion and even restraints, which it turns out is completely

131

1    de novo.[xxiv] It does not exist in their training or licensure requirements. There is no
2    basis for it in law, precedent or the wishes of stakeholders other than psychology.
3    This is all made up out of nothing by psychology to assist them in their economic
4    survival and hoped for ongoing dominance in CDCR. This has nothing to do with
5    what is best for patient care. Society and the law have over millennia decided that 3
6    classes of persons are allowed to take control over another human being's body under
7    certain circumstances. Those are law enforcement, nurses and physicians. That does
8    not included psychologists.

9    I had an occasion to talk with an administrative psychologist recently and informed
10    her of my thoughts and feelings about all of this. I told her that I would never take
11    clinical direction from a psychologist ever because they are not qualified to do so. She
12    became visibly angry and told me that basically I was wrong, psychologists and
13    psychiatrists are the same. In addition she said that psychiatrists should be beneath
14    psychologists because we are lazy, don't work as hard as psychologists, are not willing
15    to do the dirty work that psychologists are willing to do, behave poorly and are not
16    willing to discipline ourselves.

17    Stunned, I thought "this is prejudice...bigotry." I couldn't believe it and decided in the
18    moment that I would leave CDCR. Since then I have cooled and received sage advice
19    from multiple corners and have struggled to stay. This is important. It is a huge
20    problem. This culture is wrong and to run away is to flee doing the right thing. I
21    realize that staying and fighting involves risk for me. I was told by this same
22    psychologist that I should not think this way or express it otherwise I would not rise
23    in the system and people would not like me.

24    What she didn't know is that this is not important to me. What is important is the
25    right thing. I do not believe that psychologists have taken the Hippocratic Oath or
26    anything like it. This is very important to me and I take it very seriously. Above all, do

1    no harm. Allowing psychologists to succeed in this purely selfish and unnecessary

2    endeavor is to do real harm to the system and patients. It is highly likely that the

3    catastrophic patient outcomes will make the Coleman Commission stay longer not

4    leave sooner. There will be more conflict between the disciplines, not less. CDCR will

5    continue to have a psychiatrist retention problem, even worse than we do now.

6    I sincerely appreciate and support your efforts to improve the system for the benefit

7    of the patients we serve.

8    ██████████████, M.D.

9    ███████████████,

10   Psychiatric Inpatient Program

11   Salinas Valley State Prison

12   California Department of Corrections & Rehabilitation"

# 1  **Appendix 1**

2   See 2018 08 15 1352hrs (screenshots of the Dashboard, with explanation of the errors).

# Appendix 2

(For this report including screenshots and other evidence, see 2018 09 04 1600hrs)

**Psychiatry Indicators and Biases**

**Timely Psychiatry Contacts**

1. Biases due to measurement:
   a. Measured in weeks, rather than on time versus late. This causes significant bias towards inflating compliance.
      i. E.g. an Enhanced Outpatient Program (EOP) patient had a psychiatry appointment on Monday, 8/13/18, and their next appointment wasn't until Friday, 9/21/18. They were due to be seen by 9/12/18 (per Program Guide rules), so are 9 days late, but due to compliance being measured by weeks, there are four weeks of compliance and one week of non compliance, which is then reported as 80% compliant. If you have 100 patients, 50 of whom are seen on time, and 50 of whom are seen late by one week, the reported Timely Psychiatry Contacts compliance rate will be 90%. It would be very easy to think that the 90% compliance rate meant that 90% of the patients were seen on time, when in actuality only 50% were.
   b. The clock resets when patients transfer.
      i. E.g. a Correctional Clinical Case Management System (CCCMS) patient had a psychiatry appointment on 3/5/18, and was due to been seen again by 6/3/18 (90 days later). However, the patient transferred to a different CCCMS institution on 5/25/18. Instead of requiring that the patient still be seen by 6/3/18 (to comply with the Program Guide

1    rules), and reporting it as late if it occurs after 6/3/18, this indicator
2    resets the clock to the date of transfer, and only reports the
3    appointment as late if it occurs more than 90 days after transfer. In
4    this example, the patient could go 172 days (from 3/5/18 to 8/23/18)
5    without seeing a psychiatrist, and still be counted as compliant.

6    c. Physician orders for follow ups prior to maximum time per Program Guide
7    are ignored by this indicator.

8        i. E.g. a CCCMS patient has a psychiatry appointment on 3/5/18, and
9    the psychiatrist is concerned about him, so orders a follow up
10   appointment for three weeks later. This appointment was scheduled
11   but cancelled due to custody, or was refused, or did not occur for any
12   number of reasons, and the patient was not seen again until 6/2/18.
13   This indicator counts that appointment as compliant, because it
14   occurred within 90 days, despite the appointment being 68 days late
15   based on the psychiatrist's clinical judgment, and order, that the
16   patient needed follow up within three weeks.

17   d. Sixty percent of psychiatry supervisors see patients (per our polling data),
18   due to staffing shortages. The compliance numbers in this indicator are
19   presented as having been obtained by line staff alone, and are used to
20   determine psychiatry staffing needs. This both results in an underestimate
21   of staffing needs, and in supervisors being unable to do necessary
22   supervisory work due to having to compensate for the line staff shortage.

23   e. In December 2016 the indicator was inexplicably changed to count EOP
24   appointments as timely if they occurred within 45 days of the prior
25   appointment, despite the Program Guide rule that EOP psychiatry
26   appointments must occur at least monthly. This significantly inflated the
27   compliance percentages statewide, and allowed for an inaccurately
28   favorable report to the court in March 2017. The indicator was not fixed
29   until this change was discovered by the psychiatry team in March 2017.

**Appointments seen as scheduled**

1. Biases due to measurement:
   a. The definition of this indicator states that it measures "All scheduled appointments", but in actuality it only includes appointments that are coded as Seen, Cancelled due to ProviderUnavailable, Cancelled due to ModifiedProgram, or Cancelled due to TechnicalDifficulties (see snip titled Appointments seen as scheduled). It excludes Refusals, No Shows, and all other cancelled appointments, which account for approximately half of all scheduled appointments.
      i. E.g. the Appointments seen as scheduled indicator reports that 95% of mainline CCCMS appointments in CDCR in February 2018 were seen as scheduled. (see attachment CDCR CCCMS appointments seen as scheduled) However, per the Appointments report, in February 2018 in mainline CCCMS, there were 84,120 mental health appointments, 35,642 of which were seen (see Excel spreadsheets titled CDCR CCCMS all appointments in February 2018 and CDCR CCCMS completed appointments in February 2018). Thus the percentage of appointments that were seen as scheduled was 42%, not 95%.

**Timely MH Referrals**

1. Biases due to measurement:
   a. Only measures the referrals that were ordered, not all of the referrals that occurred, *or should have occurred*. Ordered referrals are much more likely to be completed and done on time than are referrals that should have been ordered but weren't.

137

i.  E.g. on 8/3/18 at CHCF, 225 patients were flagged as non compliant with their psychiatric medication (meaning they refused 50% or more of their psychiatric medication in a week, or refused three consecutive days of psychiatric medication, or refused one dose of a critical psychiatric medication). Each of these patients is supposed to be seen by a psychiatrist to discuss their medication non compliance within seven days, or within one day for refusal of a critical medication. However, during the entire month of August, there were only 17 medication non compliance appointments scheduled at CHCF   10 were seen, 7 were cancelled. The cancelled appointments were excluded from the Timely MH Referrals measurement, with the exception of one cancelled appointment that was counted as completed, despite never having occurred. Additionally, two refused appointments were counted as completed, and one seen appointment was counted twice, so the compliance was recorded as 12/12, or 100% for the month of August (see CHCF August Timely MH referrals screenshot). In actuality, 225 patients required follow up for medication non compliance on a single day in August, and only 8 patients (12 minus the appointment that was counted twice, minus the cancelled appointment that was counted as completed, and minus the two refused appointments) in the whole month of August had a completed medication non compliance consult. If we use these numbers (8 out of 225), the compliance percentage is 3.6%. However, if the entire month of August is included   not just a single day   this compliance percentage would be much lower.

ii.  E.g. for the month of July at CSP Sacramento, there was one urgent MHMD consult, two emergent MHMD consults, and three routine MHMD consults (see snip titled SAC Timely MH referrals). It is unlikely that there were truly only three routine MHMD consults in

138

1    a month at an institution with such a large mental health

2    population. The far more likely scenario is that most routine MHMD

3    consults were "ordered" by psychologists or social workers via

4    stopping by the psychiatrist's desk, calling them on the phone, or

5    emailing them, rather than placing an official order (see email from

6    Dr. Golding titled "FW: MHMD emergent consults"). This prevents

7    an institution from having a low compliance rate despite insufficient

8    psychiatry staffing to complete these consults, because these

9    consults will not be measured by the indicator. Compare this to an

10    institution with sufficient psychiatry staffing    at San Quentin during

11    the same month there were 32 routine, 11 urgent, and one emergent

12    MHMD consults (see snip titled SQ Timely MH Referrals).

13    b. Excludes most cancelled appointments, and counts refusals as "completed".

14    As described in "Appointments seen as scheduled 1 a" above, all cancelled

15    appointments, except those coded as ProviderUnavailable,

16    TechnicalDifficulties, and ModifiedProgram are also excluded from this

17    indicator's calculations.

18    2. Biases due to lack of knowledge:

19    a. Many psychiatrists appear to not know about the medication non

20    compliance appointment order in EHRS, or are not aware of the

21    requirement to see patients who have been flagged for medication non

22    compliance. If all psychiatrists had this knowledge, and placed a medication

23    non compliance appointment order for every patient flagged as non

24    compliant, there would be thousands of medication non compliance

25    appointments statewide per month. Psychiatry staffing is not sufficient to

26    complete all, or even most, of these appointments, so the percentage of MH

27    referrals completed on time would significantly decrease.

1    3.  Biases due to random error:

2        a.  Medication non compliance appointments may be ordered erroneously as a

3            psychiatry follow up appointment, and thus not captured by this indicator.

4            Also, as mentioned above, mental health referrals may be communicated to

5            the requested provider verbally and an order never placed in EHRS, despite

6            knowledge of the process and intention to place an order. In both of these

7            examples the appointment is less likely to occur when there is no official

8            order, due to a number of factors, including the increased likelihood of the

9            provider forgetting, the provider having limited time and triaging some of

10           these appointments as less important, and there being less pressure from

11           supervisors on the provider to complete the appointment in a timely

12           manner to improve the indicator results.

13   **Appointment confidentiality**

14   There is an indicator for "Group treatment in a confidential setting", but not for

15   psychiatry appointment in a confidential setting. However, this is an important indicator

16   of quality care, and should be one of the measured indicators. Currently, there is no easy

17   way to determine the percentage of psychiatry appointments at a given institution or

18   level of care that were confidential, but it is possible to use the Appointments report to

19   check on whether individual appointments were recorded as confidential or non

20   confidential, count all of the confidential appointments in the population of interest, then

21   divide by the total number of appointments in order to get a percentage. This is time

22   consuming, but more importantly it is inaccurate, due to the following biases.

23   1.  Biases due to measurement: In the Electronic Health Record System (EHRS),

24       confidentiality is recorded in a drop down menu on the appointment check out

25       screen. The default value is "Confidential", thus if the provider does not change

26       this selection, all appointments are recorded as confidential. If an accurate

measure of confidentiality was desired, this drop down menu would default to NULL (no selection), and it would require the provider to change the selection to either confidential or non confidential.

2. Biases due to lack of knowledge: If a provider does not know how to record an appointment as non confidential, it is recorded as confidential (due to #1 above).

   a. E.g. in the MHCB at CCWF, the psychiatrists reported that all routine psychiatry appointments are conducted in the patient's cell, not in a confidential treatment room, thus 100% of the routine appointments are non confidential. All of the psychiatrists stated they did not know how to record an appointment as non confidential. Per the Appointments report, there were 96 completed psychiatry appointments in CCWF MHCB in May 2018, 100% of which were recorded as confidential.

3. Biases due to random error: Even if a provider knows how to record an appointment as non confidential, if they forget, or are in too much of a hurry, to change the drop down menu to non confidential, it is recorded as confidential.

   a. E.g. in the MHCB at CHCF, the psychiatrists reported that all routine psychiatry appointments are conducted cell front, not in a confidential treatment room, so 100% of the routine appointments are non confidential. All of the psychiatrists stated they knew how to record an appointment as non confidential. Per the Appointments report, there were 289 completed routine psychiatry appointments in CHCF MHCB in May 2018, 31% of which were recorded as confidential.

**Diagnostic Monitoring (Medication Administration Process Improvement Program)**

1. Biases due to measurement:

   a. Until June 2018, this indicator ONLY measured whether annual labs and tests were done. MAPIP guidelines mandate obtaining baseline, 3 month,

and annual labs for antipsychotics (except Clozapine) and mood stabilizers, obtaining labs within 14 days of increasing the dose of mood stabilizers, and obtaining baseline, 3 month, and annual weight/height and blood pressure for antipsychotics and Clozapine. However, until June 2018, the indicator monitoring compliance with these guidelines did not even measure whether baseline, 3 month, or dose increase labs and tests were done. It only checked to see if annual labs and tests were done, and reported 100% compliance if the annual lab draw and tests occurred (see Memorandum dated 7/3/2018).

    i. E.g. A patient is prescribed an antipsychotic, and has labs, a blood pressure measurement, and his weight obtained 8 months after starting the medication, but had no tests or labs done at baseline or 3 months. This indicator reports that this patient is 100% compliant with MAPIP, despite being only 33% compliant. This is very misleading, but more importantly it is *dangerous* and poor care. If his blood pressure is elevated, he is morbidly obese, and his fasting lipid levels are critically high at 8 months, we have no idea whether those problems were all present prior to starting the antipsychotic in which case we likely would not have started the medication   or occurred within the first few months after starting the medication in which case we would likely have stopped it after obtaining the 3 month test results. Failing to obtain these labs and tests can lead to permanent organ damage or death.

b. Until June 2018, it counted annual labs and tests as completed if the patient had the relevant labs and tests done at any point within a year of starting the medication. Since June 2018, it still counts annual labs and tests as completed if the patient had the relevant labs and tests done between 91 and 365 days after starting the medication. The baseline, 3 month, annual, and after dose increase criteria for obtaining labs and tests is not arbitrary.

1            It was created by physicians, per their clinical judgment of the minimum

2            monitoring necessary to maximize patient safety. Therefore, measuring

3            whether the required tests were done at any point within a year or at any

4            point from 91 to 365 days after starting the medication — not within limited

5            periods around the baseline, 3 month, annual, and dose increase time

6            points — is inappropriate, and leads to falsely elevated compliance.

7      c.  Until June 2018, it excluded patients who were not on the same medication

8            class for the whole year. This inflated MAPIP compliance, because these

9            patients were less likely to have had the required labs and tests, due to the

10           provider not having had an entire year during which to have ordered labs

11           and tests.

# Appendix 3

**Summary of Performance Report Errors**

Please see the CDCR Mental Health Performance Report from 5/1/18 to 5/31/18. (2018 08 15 1352hrs)

Timely MH Referrals "92%" (see page 1 of 2018 08 15 1352hrs)

This report is biased and reports over compliance. It only measures those referrals that are ordered and skips all referrals that are not ordered, but occurred, or *should have occurred* within a timeframe. "Timely Mental Health referrals" is a composite measure that includes multiple referral types, including referrals for consultations with psychiatrists when patients were non compliant with a certain percentage of their medications. At large institutions like CHCF there are hundreds of medication referrals that don't get seen in a month (see page 2 of 2018 09 04 1500hrs), though meet the policy criteria for needing to be seen (see Appendix 2 and also 2018 09 04 1600hrs).

If the referrals that were supposed to be seen as mandated by policy, and not just those referrals that were turned into orders were counted, the compliance percentages recorded would be dramatically lower for the composite measure of timely mental health referrals. Extremely conservatively estimating at CHCF, the timely MH referrals would be 55% (see page 2 of 2018 09 04 1500hrs), not 100% as reported. At other institutions, the overall performance percentage would also be significantly reduced and so would be nowhere near the markedly exaggerated 92% figure reported above. It's just an incorrect figure (with all of these, the psychiatry leadership team is not allowed to search the databases to report precisely, so we do what we can to determine whether our patients are getting the care they need). Psychiatrists are not seeing the consults they are supposed to see in the

144

1    timeframe they are supposed to see them, though it is falsely reported that they are ("92%

2    compliance"). It is very likely less than 50%. This report is grossly biased.

3    Appointment Cancelled Due to Custody "2%" (see page 1 of 2018 08 15 1352hrs)

4    In general, providers don't know why patients don't come to appointments and figuring

5    out whether custody was busy doing other important activities, rather than bringing

6    patients, is not something that is known by the provider when the patient does not come.

7    Arguably, many of the patients that did not make it to Dr. ███████ (see 2018 07 18 R) at

8    SAC were cancelled due to custody, but recorded as patient refusals or no shows. The

9    patients were brought in batches and when patients missed what is called the "train"

10    (custody bringing a group over), the patient missed his appointment. Most appointments

11    are listed as "CancelledUnspecified", because the provider does not know or does not

12    select an outcome, which likely means this report very much underestimates the

13    appointments that did not come due to custodial reasons.

14    In fairness, it would be tough to design a measure which captures this, which is why it

15    does not make sense to have it on the Performance Report. It is not easily or accurately

16    measured, except that the default (not selecting it because of no knowledge of it) leads to

17    low reports of appointments being cancelled by custody, but the measurement actually

18    doesn't mean much unless there is a way to figure out the far higher percentage of

19    patients who were not brought because of custodial competing obligations. Our

20    scheduling system in the CDCR mental health system is so broken (only 40% 45% of

21    appointments occurring as scheduled   see the section beginning on page 35 about this),

22    that it is very inefficient for custody to devote large numbers of resources to get patients

23    to appointments, because often they can't determine which patients will be coming or not

24    or at which time (because patients are not seen as scheduled).

145

1    Diagnostic Monitoring "95%" (see page 1 of 2018 08 15 1352hrs)

2    That is not accurate, as explained in the section on drug monitoring. The MAPIP

3    methodology changed in July 2018, after this 95% was recorded in May 2018. The new

4    measure more accurately captures current MAPIP results for compliance in the 70% to

5    85% range, but doesn't measure whether psychiatrists are checking blood levels when

6    they change the dose of medications, which is the most difficult of the measurements to

7    get. Consequently, the figures being reported now are still likely reporting overly high

8    values. These values were wrong for years and falsely reported to the court in 2017.

9    Timely PC contacts "97%" (see page 1 of 2018 08 15 1352hrs)

10   This is too high because the clock resets when patients transfer institutions. It also is

11   potentially misleading for those who don't understand this calculation, if it is thought to

12   be a measure of whether patients are seen on time (zero percent of patients could be seen

13   on time for a 97% patient weeks compliant report). 97% is a "percent patient weeks

14   compliant" measure, which overestimates whether patients are seen on time. See 2018 09

15   04 1600hrs for a description of why that is so.

16   Timely Psychiatry Contacts "93%" (see page 1 of 2018 08 15 1352hrs)

17   This is incorrect for many reasons:

18   A. The clock resets when patients transfer institutions, so up to six months between

19   patient visits could be a compliant time frame in CCC (rather than three months) and up

20   to two months becomes a compliant time frame in EOP, rather than one month. If a

21   patient transferred institutions more than once, appointments up to nine months later

22   could be considered compliant. This bias led to false reports to the court in 2017 and 2018

23   in the staffing plan.

1    B. It measures percent patient weeks compliant (see above) which is an overestimate of

2    whether patients are seen on time.

3    C. It conflates business rules with patient need for timely care. If the patient needs to be

4    seen (say at the CCC level of care) and the physician orders the patient to return back

5    urgently in one week   because the Program Guide and professional ethics require that

6    patients be seen when they need to be seen   yet that patient is then seen eleven weeks

7    late, the QM report will not count this appointment as even one day late. If the patient is

8    seen more frequently than a mathematical minimum frequency, any patients who need to

9    be seen more frequently than that to get at least adequate care will not be thought to

10   have any late appointments, even if the needed appointment is critical. So this measure

11   reports on whether patients are being seen on time, except if they urgently/more

12   frequently need to be seen. Since all of these late appointments aren't counted for our

13   thousands of patients, this measure is biased and falsely elevated. (This bias also inflated

14   the numbers sent to the court in 2017 and 2018 in the staffing report.)


15   Note that both the measure of whether psychiatrists are seeing patients in consultation

16   ("Timely Referrals" from others) and when they are supposed to medically (Timely

17   Psychiatry Contacts)   within a minimal Program Guide determined frequency   are

18   reported in a potentially significantly biased way. To the extent that there is inadequate

19   psychiatry staffing (or inadequate ability to get patients to psychiatric clinics) these

20   measures will be low and we don't know how low they are. The psychiatry team is not

21   authorized to calculate these measures, so we can't precisely know where and when

22   patients are getting inadequate care because they are not being seen when they need to

23   be. To the extent that patients being seen when they need is a determinant of adequate

24   psychiatric staffing and program organization, at the very best whether this is occurring is

25   not known.

1   Appointments Seen as Scheduled "92%" (see page 2 of 2018 08 15 1352hrs)

2   Quoting Dr. ███████ :

3   "The denominator is defined as 'All scheduled appointments", however QM excludes all

4   cancelled appointments, except those cancelled due to ProviderUnavailable,

5   TechnicalDifficulties, or ModifiedProgram. Approximately half of all scheduled

6   appointments are cancelled due to a reason that is not included by this indicator (see

7   section on Appointments Seen as Scheduled in the body of this), which makes the true

8   Appointments Seen as scheduled percentage closer to 50%, not 90+%"

9   So to make this indicator right, approximately cut it in half or a bit more. So the indicator

10  is also grossly wrong. These values falsely report to our Coleman monitors about 2x the

11  actual value. We could actually fix institutions if knew that at SAC for example 22% of

12  patients were being seen as scheduled. We could focus on the problem, rather than doing

13  nothing because of the high reports.

14  Group Treatment (see page 3 of 2018 08 15 1352hrs)

15  This is an indicator for group treatment being conducted in a confidential setting, but not

16  for psychiatry appointments. Had they reported on that, the report would be biased. The

17  system defaults to counting appointments as confidential and thus when psychiatrists

18  don't know how to record the appointment as confidential (and even when they do and

19  are hurried) we have documented repeated biases and elevations. For example, in the

20  CCWF crisis bed, 100% of appointments are reported as being seen confidentially, but

21  actually none (0%) are.

148

1    Treatment Cancelled (page 3 of 2018 08 15 1352hrs)

2    Dr. ▮▮▮▮▮ says: "Instead of giving a straightforward percentage of the treatment that is
3    cancelled (e.g. if there are 100 appointments and 30 were cancelled, this indicator would
4    show 30%.) The numerator is defined as "Number of patient weeks included in the
5    denominator during which the following number of hours of treatment were cancelled.
6    More than 3 for ASU EOP Hub. PSU EOP, and ML EOP. More than 1.5 for RC EOP and
7    ASU EOP non Hub. More than 1.0 for SRH/LRH CCCMS."

8    With a sufficient number of convolutions in one's calculations one can make any number
9    become any other. As an absolute value, the number 19% in this context is absolutely
10    meaningless. The reason is that arbitrary numbers like "3", "1.5", and "1", with arbitrary
11    assignments to levels of care, could be changed to cause the "Number of Patient weeks
12    included during the denominator" to cause any overall percentage that is desired.
13    Measurements that are arbitrary are meaningless because the definition can be changed
14    to create any value at all. We know from the scheduled appointments that an extremely
15    high percentage of appointments are cancelled and refused. That answer (what number of
16    100 appointments were cancelled or refused or both) needs to be in the Treatment
17    Cancelled part of the Mental Health Performance Report.

18    Treatment Refused (page 3 of 2018 08 15 1352hrs)

19    If there are 100 appointments and 40 are refused, then 40% are refused. Instead, we get a
20    whole new set of arbitrary numbers (relative to the cancellation report above) to get the
21    value recorded to be "24%". There is more "Number of patient weeks" verbiage included,
22    but unlike the cancelled appointments, we get the new words, "50% of all offered
23    treatment was refused AND less than the following hours of treatment were attended. "5"
24    for ASU EOP Hub, PSU EOP, and ML EOP, less than "2.5" for RC EOP and ASU EOP non
25    hub, and "less than 1" for STRH CCCMS and LTRH CCCMS." With access to the

1  databases, our psychiatry team could make these percentages be anything by slightly

2  varying numbers like "50%", "2.5", "less than 1". We know that huge percentages of the

3  patients refuse. It would be good to know where that happens more and where less, etc.

4  But all of this is utterly obscured by a creative measurement system that allows any

5  number to be created as the so called measured result.


6  Our QM psychologists are creating the semblance of scientific measurement, but doing

7  nothing of the kind, with false, misleading, and arbitrary reports of numbers that

8  allegedly mean something in these reports.

---

[i] Note that the court has never been given a report as to whether our patients are seen on time. The court may be told about "patient percent weeks timeliness", but never the percent of patients who are seen on time. There is a reason for that which will be explained later in the report.

Suffice for now to say that our psychiatrists have developed an algorithm on a different platform for determining whether our patients are being seen on time. Were we permitted access to the database we could easily determine whether our patients are being seen for their appointments on time, etc., but unless an external reviewer with considerable power mandates that we be given that access, this information will continue to be denied us. We think the results would be quite helpful. But our psychologists and ██████████ determine what we are allowed to know. Underlying that problem is the fact that in CDCR psychologists with no medical training determine what is or is not medically relevant. This is a theme mentioned throughout this report.

ii Physicians determine what is a medial issue or not (and so do judges, after hearing relevant testimony from medical experts). Psychologists can't determine whether a set of labs or physical findings creates a relevant medical issue that requires attention, as they have no medical training.

iii There is a brief 15 minute "treatment team meeting" 14 days after a patient arrives at a new institution (which would nonetheless be late in the hypothetical situation in the body of this report, even if the treatment team visit counted as a psychiatric visit, which it doesn't). A group meets and a psychiatrist should be present, a psychologist or social worker is present, representatives who understand the custodial issues are present, and others come. This occurs so that the team (including the psychologist and other participants) can help to make plans for the patient. At this time the psychologist will have done a psychological assessment of the patient, but the patient will not have been seen by a psychiatrist.

The reason a psychiatrist should do an assessment before the day 14 treatment team or at least when the last physician who saw the patient ordered the patient to be seen, is precisely to figure out what the patient needs medically. During the physician ordered subsequent assessment (say because a lab is rising), the psychiatric physician should be reviewing the labs and medications, interviewing the patient, physically/neurologically examining the patient when necessary, and figuring out medically what the patient needs. None of that occurs in a 15 minute treatment team.

When a patient is transferred from one institution to another, the physician at the receiving institution doesn't know the patient. The point of a psychiatric intake assessment is not to get the kind of non specific, non medical assessment that a psychologist does when presenting the patient to a treatment team for a few minutes, otherwise psychological assessment and psychiatric medical assessment would be identical.

151

No general medical physician would consider a psychologist's assessment in a treatment team meeting to be relevant in determining whether there are medical issues. Nor does a psychiatrist, because psychologists cannot evaluate medical parameters like increasing liver function tests. But it is even harder for a psychiatric physician than it is for other medical doctors. The psychiatrist has to understand how changing medical parameters can affect psychological states. For example, initiation of lithium can damage the kidney, which can cause the lithium level to rise higher and higher because the lithium isn't being excreted by the kidney, which can damage the kidney even more. The ever higher lithium level can then cause mental status changes which may prevent a patient from hydrating properly and seeking medical attention to deal with the lithium toxicity. But to understand any of this, the psychiatrist needs to check the lab value and interview the patient. That's what a psychiatric assessment is.

The reason physicians should do assessments before treatment teams is so that they can know enough about the patient's medical condition *to participate* in the team to guide future treatment. A physician is not going to glean from a psychologist's psychosocial assessment (with the patient not even necessarily present at the treatment team) when a patient might need to be seen, which is why it is dangerous for psychologists to overrule medical doctors' orders with respect to when patients should net be assessed by a psychiatric physician.

Finally, as just mentioned, quite frequently *patients don't even come to treatment teams*. So the psychiatrist won't see the patient at all and thus *no assessment could possibly be made.*

If treatment teams substituted for psychiatric assessments, then we wouldn't need the psychiatric assessments, which the physician specifically ordered to occur at the time he or she ordered it to occur.

152

[iv] This same ████████████ told me that psychiatric physicians are not qualified ("in CDCR") to say that a psychiatric patient is medically OK for discharge from a crisis bed or acute psychiatric hospital. (Then who *is*?) Often a general medical physician will not see a patient for months in a long term hospital. If not the psychiatric physician, which physician *is* saying the patient is medically and psychiatrically safe to leave when he or she does? No one? In a sense the ████████████ appeared to be saying that neither psychiatric physicians nor psychologists can determine when a patient is medically appropriate for discharge, except that psychiatrists are physicians and make that decision every day in hospitals across the country.

[v] And we need this data to determine where institutions are having trouble getting patients seen on time so we can move, or advocate moving, additional organizational or staff resources to solve the medical problems of getting patients seen when they need to be.

[vi] The EOP extra bias   in which they increased the compliance timeframe from one month to 45 days   is no longer present in any calculations because the psychiatry team was able to get that change reversed.

[vii] In some institutions the psychiatrist always "closes" his or her appointments. But in institutions in which patient care is particularly difficult (see later report about my team's visit there), an OT or MA administratively helps to close out an appointment. Dr. ██████ is referring to that.

[viii] No doubt those defending this would claim that there is no problem. All that is being reported is shown in how the calculation is done. For example, they could say that they implicitly stated (in how the number was calculated) that refused appointments would [153] not be counted in the measurement of those who miss appointments, because it was not

included in the items said to be included in the calculation (in the screenshot, see 2018 07 30 2057hrs). But how many observers who have seen this Dashboard would think that a calculation that is said to report about whether "ALL" scheduled appointments occur, does not include multiple types of appointment that are in fact scheduled but don't occur. Using this reasoning, somehow, the refused but scheduled appointments are not the right type of "ALL scheduled appointments" to be counted.

The very best interpretation is that the report is very misleading. Whatever the explanation, one can be sure that virtually no one seeing a Dashboard report claiming that 95% of patients scheduled for appointments come to their appointments, would know that actually about 40 45% do. Since the purpose of measurement is to help people gain understanding of reality, the measurement reported fails in that domain, because it causes people to draw mistaken conclusions about what is occurring.

[ix] CDCR has never allowed psychiatric physicians to analyze the data to be sure, but I am confident that this is the case, because CDCR has never counted an appointment as late if it is ordered by a psychiatric physician to occur at a certain time and occurs late, but within the maximum CDCR court defined interval. Thus, in the situation of reporting "overdue" days to the court, CDCR would also very likely not allow such a physician ordered appointment to be considered to have occurred a certain number of days late, even when it was.

[x] Saying that on average an EOP patient needs to be seen five times in four months may seem arbitrary. But we could, given access to the database, make a better estimate by noting the interval that psychiatric physicians order for certain patients to be seen, when they are writing for patients to be seen more frequently than minimum Program Guide intervals. For example, patients who may have suicidal thinking, but with no intent or plan, are often scheduled by psychiatrists to be seen once or twice a week for several

154

weeks at the EOP level of care. Psychiatrists may be checking in on their patients while adjusting a medication or waiting for a medication to work, for example.

There is arbitrariness in my guess that an EOP patient may on average need to been 5 times over 4 months. But the CDCR assumption that patients require appointments only once a month at the EOP level of care is clearly mistaken given that some patients do need to be seen more frequently.

xi We, the psychiatry leadership team, wanted psychiatrists in the field to have to enter information about the context of a given appointment in a pop up note, but we were overruled by the psychology designers of the psychiatry workflows. Psychologists control both QM for psychiatrists and the design of the EHRS psychiatric workflow, and have not in general allowed psychiatric participation.

xii There are a few exceptions to this. When nurses schedule emergency consults *at night*, the psychiatrist may actually complete the work in the evening, but do not have access to the EHRS to document it. Also, routine appointments with psychiatrists need to be "opened" and "closed" which can be tedious. So more recurrent appointments occur than are said to have occurred. QM's assessment of psychiatric productivity has suggested, inaccurately, that psychiatrists were seeing only about 3.2 patients per day. (see 2018 09 24 productivity) The productivity measurement was thus biased and under reported psychiatric productivity. When counting treatment teams, our manual calculations show a very different number (around nine per day for our telepsychiatrists).

Overall the effect of the QM biases is such that it appears that psychiatrists are getting more work done than they are (better MAPIP compliance with monitoring meds, more confidential appointments, higher percentage of routine contacts seen timely, etc.) but are seeing very few patients per day, like 3.2 according to the Dashboard (see 2018 09 24 [155] productivity). This creates the false impression that the system has more psychiatrists

than are needed, as psychiatrists *appear* to see very few patients per day, and also *appear* to be fully compliant, especially with "timely" appointments. But as I have pointed out in a previous section, many actually late appointments are just not counted as late. For a discussion of late appointments due to prioritizing recreation therapy groups over psychiatry appointments, see 2017 11 21 1749hrs.

[xiii] Our psychology colleagues have insisted for years that psychiatrists use powerplans. Powerplans schedule recurring psychiatry appointments at a preset interval (approximately the maximum time allowed by the court). They thus discourage physicians from making appointments with patients any time sooner than the maximum court mandated intervals: see our ███████████████████████ comment disparaging medical scheduling orders sooner than the maximum intervals as "workarounds". Our ██████████████████████ responded that the Prisoner Law Office might not approve of "OTs [the schedulers] deciding when to schedule the patients." Our psychiatrists think these powerplans make them less likely to see patients on time because instead of scheduling an appointment after each visit, the psychiatrist has to remember when the powerplan is expiring on each individual patient (or find that information, which takes time). Also, appointments often need to occur sooner than the maximum Program Guide intervals. Powerplans are also very time consuming to use, requiring many more clicks. Our psychiatrists in fact use them less than 1% of the time for follow up appointments. We have sent surveys to our psychiatrists, and they very much dislike them because of their inefficiency.

Very recently, it was decided that CDCR will utilize a unified scheduling system for all disciplines, which caused our ██████████████ to finally call a halt to our psychologists' insistence that we use a scheduling tool that essentially is supposed to cause inflexible scheduling of our patients, usually at maximum Program Guide intervals for months in advance. Insisting on this seems most consistent with trying to force psychiatrists to follow business rules rather than the clinical needs of the patient, as our psychiatrists

156

think it makes them less likely to see patients on time, because one can't tell when the powerplan scheduling has expired, unless by checking through orders.

[xiv] Our team notes that only very recently, as court hearings about staffing are about to happen, have there been some moves to change procedures in line with some of the many requests we have made that have been denied or ignored in some cases for years. All of our leadership team worries, however, that after the staffing decision (when there is less need to worry about vocal psychiatrists), things will return to normal (for example, lack of access of psychiatrists to quality management tools or electronic health record tools).

[xv] Patients get credits off their prison sentence by attending groups, but just a fraction off for attending psychiatry appointments, so they attend groups. Our team tried to prevent that asymmetry, but failed.

[xvi] See for example *How to stabilize an acutely psychotic patient*, Current Psychiatry, 2012 December; 11(12):10 16 Hannah E. Brown, MD

[xvii] Current Psychiatry, 2012 December; 11(12):10 16 Hannah E. Brown, MD

[xviii] [xviii] "It had come to a point where the Supervising Psychologists in each program were by proxy supervising the staff psychiatrist in that program. There was not a 'team based' approach in providing care. The therapist was donned the 'primary clinician' (formally so, as the "PC" in the EMR)    and made all the important decisions, without needing agreement from the psychiatrist. This was even the case during IDTTs    the 'primary clinician' was the person who presented the case, spoke to the patient, and the psychiatrist was asked only to speak when it was about medications. I can attest to at least a hundred IDTTS I've been a part of as the psychiatrist and this was the only role I was expected to play    the prescription writer.

157



At CIW, in the one year period that preceded by becoming becoming ▮▮▮▮▮▮▮▮▮, no psychiatrist had attended the pharmacy and therapeutics committee (a psychologist ▮▮▮▮▮▮▮ attended in the place of the ▮▮▮▮▮▮▮▮), no psychiatrist had attended Licensed Inpatient committee, UM, QM, and perhaps most importantly, the Mental Health Subcommittee. This can all be confirmed via meeting minutes. Psychiatrists had not been involved, at all, in policy review for any of the programs outside of the PIP (psychiatric inpatient program), even in the MHCB. In fact, nobody knew who the Clinical Director of the MHCB was when I became ▮▮▮. I asked the ▮▮▮, the ▮▮▮ (▮▮▮▮▮▮▮▮▮, a non [psychiatric physician], ▮▮▮ (▮▮▮▮▮▮▮▮▮▮) and the ▮▮▮ (Psychologist Executive [▮▮▮▮▮▮▮▮]). The ▮▮▮ thought it was the previous ▮▮▮▮▮▮▮, of the PIP, ▮▮▮▮▮, PsyD [psychologist] (it was not) or perhaps the new acting ▮▮▮▮▮▮▮ I had appointed for the PIP, ▮▮▮▮▮▮▮, MD (it was not). The ▮▮▮ thought it was the ▮▮▮▮▮ it was not, he was the ▮▮▮▮▮ ▮▮▮▮. Multiple policies in the MHCB refer to a "Clinical Director", yet lo and behold, nobody knew who that person was.

Finally, the designated "▮▮▮▮▮▮▮▮▮▮", ▮▮▮▮▮▮ piped in and said that it was the previous Supervising Psychologist, ▮▮▮▮▮▮, but unofficially. And currently, I asked? Radio silence. Why is this problematic? Here was a licensed inpatient psychiatric hospital, being solely run by psychologists, and has been for at least three years."

[xix] HQ psychologists adamantly deny that they have insisted that patients leave after ten days or that the patients must go to particular levels of care.

[xx] Although the local psychiatrists and clinicians seem convinced that HQ psychologist reviewers are pressuring them, those HQ reviewers who would be responsible for such pressure deny it. Nonetheless as we tour the institutions, for whatever reason, the psychiatrists, psychologists and social workers feel intense pressure to discharge patients to the lowest levels of care at or before ten days.

xxi Psychiatric physicians can make mistakes, just as psychologists and others can, and they can make rational decisions that nonetheless lead to bad outcomes. If psychologists disagree with the psychiatric physician, they need to approach a psychiatrist's medical supervisor. This psychiatrist can then make the decision, write the medical/psychiatric clearance and document in the chart why the decision was made, if the supervisor disagrees. Though psychologists (no medical training) should be able to discharge patients apparently, given California law, a physician must clear the patient medically/psychiatrically for there to be appropriate discharges that take into account all of the relevant medical issues that patients have (Appropriate drug levels? Is the diabetes under control?, etc.)

xxii Title 22: 79609: "Psychiatrist/psychologist services means consultative services to inmate patients of a correctional treatment center including diagnostic psychological assessment and treatment. Primary services may also be provided to inmates not requiring admission to a licensed bed."

xxiii Some psychologists will claim that the psychiatric physician can be the "primary clinician" in CDCR. But the primary clinician has case management responsibilities and there are far more psychologists (and social workers) who take on this role in CDCR. The ratios of psychiatrist to patient would have to be radically adjusted to be equivalent to the high ratios of psychologists plus social workers to patients for psychiatrists to be able to take on the case management responsibilities of the "primary clinician". In the vast majority of cases in CDCR (and maybe all cases), it is the psychologist or social worker who is deemed the "primary clinician" and essentially never the psychiatrist.

xxiv Dr. ████ is referring to the push by our psychologists to be able to place patients in restraints without needing medical clearance prior to doing so, though the patient is in a licensed facility with 24 hour nursing coverage. Psychologists currently are allowed to do this in CDCR crisis beds, but not the former state psychiatric hospitals. Normally if no

physician is available, the nurse (who certainly has some medical training) can initiate the restraints and then call the physician, usually the psychiatric physician. Patients die frequently because of restraints. A person who has a tendency to aspirate (bring stomach contents into his lungs, for example) can die in restraints from this, and so there needs to be some type of medical assessment, even briefly by a nurse, that restraints would be better and safer than (for example) medication or forced medication.

But these are medical decisions. Currently in CDCR, as our policy works, psychologists with no medical training are allowed to overrule nurses who object to patients being placed in restraints. Dr. ███ is pointing out that psychologists have no training in this at all, or even any medical understanding of the implications of doing so in hospital settings with medically sick and vulnerable patients. Yet many are fighting to be able to do so without a physician determining that it is medically safe for them to order it. Dr. ███ appropriately finds this dangerous and absurd.

A final issue is that if psychologists can initiate restraints, the policy calls for the written order of the psychiatric physician (or psychiatric nurse practitioner) to cosign the emergency order of the psychologist. But if the physician disagrees with the emergency order of the psychologist, then he or she can't sign it, which thus violates the policy. Nurses, on the other hand can make a quick decision whether forced medications might be more appropriate in a patient who is aspirating (high risk of death in restraints because of bringing stomach contents into the lung), whereas psychologists have no training at all even to notice when patients are aspirating to take that into account. Making a quick decision whether shots or restraints is a better option is a medical decision. Restraints are a physical procedure that frequently kills patients and so requires utmost care in assessing medical risks and benefits. Psychologists have no training for that, yet in CDCR they have the authority to order restraints right now and the leadership is fighting to continue to allow psychologists to order patients to be put in restraints in[160]

the licensed crisis beds prior to medical clearance, and to extend that into the licensed inpatient facilities that CDCR recently took over.

A particular problem is that physicians don't want to be forced to sign a restraint order initiated by a psychologist, whether in an "emergency" or not. If CDCR deems that psychologists in hospital settings are medically qualified to decide that sometimes desperately medically ill patients should be in restraints, then physicians should not be forced to legitimize these decisions. Their orders should be unsigned by physicians. (see 2018 06 01 1459hrs)